1              UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                   EL PASO DIVISION

4

5    UNITED STATES OF AMERICA     )   No. EP-13-CR-370-DB
                                  )
6    vs.                         )   El Paso, Texas
                                  )
7    MARCO ANTONIO DELGADO       )   July 31, 2014

8

9

10             MOTION FOR INTERLOCUTORY ORDER OF SALE

11

12

13   A P P E A R A N C E S:

14   FOR THE GOVERNMENT:   MS. ANNA ARREOLA &
                           MS. DEBRA P. KANOF
15                         Assistant United States Attorneys
                           700 E. San Antonio, Suite 200
16                         El Paso, Texas  79901

17

18   FOR THE DEFENDANT:    MR. ERIK HANSHEW &
                           MS. MAUREEN FRANCO
19                         Assistant Federal Public Defenders
                           700 E. San Antonio, Room D-401
20                         El Paso, Texas  79901

21

22

23

24       Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.

1          THE COURT:  The clerk will call the case.

2          THE CLERK:  EP-13-CR-370, Marco Antonio Delgado.

3          MS. ARREOLA:  Good morning, Your Honor.  Anna Arreola

4   and AUSA Debra Kanof for the United States.

5          MR. HANSHEW:  Good morning, Your Honor.  Erik Hanshew

6   as well as Maureen Franco on behalf of Mr. Delgado, Your Honor.

7          THE COURT:  You may be seated.

8          Counsel, I usually don't hold hearings, but I think

9   I'm required to on this one.  I've gone over the pleadings, so

10  I don't want you to get into that, but I had a couple of

11  questions, Ms. Arreola, maybe you can answer them.

12         MS. ARREOLA:  Yes, Your Honor.

13         THE COURT:  What gives Mr. Delgado the standing to

14  object?

15         MS. ARREOLA:  Your Honor, it's an excellent question

16  which the Government has looked into and the conclusion that we

17  came to is simply because --

18         THE COURT:  I'm sorry.  Talk into the microphone.

19         MS. ARREOLA:  Oh.  Your Honor, because the property

20  is listed in the Indictment and we're seeking forfeiture of it

21  in his criminal case, that, the Government would submit, gives

22  him standing to contest the forfeiture.  We're not -- we're

23  going to assume arguendo for purposes of the motion that he has

24  standing to contest.  It is unclear, though, what interest he

25  has in the property and --

1          THE COURT:  He's not the owner.  He's not the legal

2    owner; Mr. Velarde is.

3          MS. ARREOLA:  Right.

4          THE COURT:  Which is my other question.  What is

5    Mr. Velarde's position on this?

6          MS. KANOF:  I have that position, Your Honor.

7          MR. HANSHEW:  Your Honor, obviously we're going to

8    object to a hearsay explanation of --

9          THE COURT:  Well, I'm -- still, I'm requesting it.

10         MS. KANOF:  Your Honor, I don't know how --

11         THE COURT:  The objection is --

12         MS. KANOF:  -- they can object since in his response

13   Mr. Delgado dropped a footnote vigorously chastising the

14   Government for not being able to provide Mr. Velarde's position

15   or control Mr. Velarde's actions with regard to the

16   condominium, so I don't understand the objection.

17         MR. HANSHEW:  And they should have brought Mr. Velarde

18   here, that's very simple.

19         MS. KANOF:  We don't have an obligation to bring

20   Mr. Velarde here, Your Honor.

21         But I spoke with Mr. Velarde yesterday and he advised

22   me to advise the Court if the Court asked that Mr. Delgado

23   provided him with the deed, transferred the property to him of

24   the Kändahär condominium to cover his legal fees to represent

25   him in connection with the money laundering case, the -- and

1    the civil forfeiture case, and the case that would be the mail

2    fraud or wire fraud case involving CFE, the Mexican electrical

3    company, that both he and Mr. Esper, who were co-counsel in the

4    case, did communicate to the Court back I think it was earlier

5    this year when the Court allowed them to withdraw, that they

6    did not intend to exercise control or proprietary interest over

7    the property because they were no longer representing him in

8    this criminal case.  And also -- and as such did not intend to

9    sell the condominium to secure their legal fees because it was

10   still part of the criminal forfeiture case.

11          But with that in mind or they -- and that's how they

12   became qualified as appointed counsel because not wanting to

13   sell it or touch it as their fees was I guess part of the basis

14   that made Mr. Delgado indigent.

15          But regardless, Mr. Velarde's position is that he

16   would like very much for the property to not be in his name and

17   that if the Court grants the Government's motion to sell the

18   condominium, he completely agrees and consents to that sale and

19   will put his signature on whatever documents the Court directs

20   as necessary for that sale.

21          THE COURT:  Well, stands to reason.  Just common sense

22   probably.

23          Ms. Arreola, let me hear from you first on your --

24          MR. HANSHEW:  Your Honor, at the outset, I would like

25   to move to have Government's motion denied.  I pointed out in

1    our opposition brief, Your Honor.

2              THE COURT:  Wait a minute.  Let me hear from the

3    Government first.  They filed a motion.

4              MR. HANSHEW:  Your Honor, before they move into

5    putting witness and testimony, frankly, we have been put in the

6    position in this case, because their motion doesn't include law

7    or argument as to what it is that they were relying on in their

8    motion, we have to oppose that and then wait now and reply and

9    as late as last night and this morning to get more basis for

10   their motion that wasn't put in the motion.  So I'm asking the

11   Court to deny it on the papers and allow -- and if the Court

12   wants to, let the Government file a real motion that actually

13   includes law and argument.

14             THE COURT:  Well, overruled.  If you want an

15   opportunity to respond or if you have witnesses that you want

16   to bring in, I'll give you that opportunity.

17             MR. HANSHEW:  Your Honor, their motion is tantamount

18   to essentially a place filler.  They filed a motion --

19             THE COURT:  Overruled, Mr. Hanshew.

20             MR. HANSHEW:  This is a record I have to make,

21   Your Honor.  It's unfair.  It's completely unfair.  I've never

22   seen a court do this.

23             THE COURT:  I have all that in your pleadings.

24             MR. HANSHEW:  In their reply, they put all of the

25   arguments --

1          THE COURT:  Sit down.

2          What do you have?

3          MS. ARREOLA:  Your Honor, as a housekeeping matter,

4    the general manager of the Kändahär Association is present in

5    the courtroom today, Mr. Brent Knox, and the Government

6    anticipates that if the Court would like to hear from Knox, he

7    could testify as to a few things.  One is an explanation of the

8    homeowners' association fees that are currently due on the

9    property.  He could also testify --

10         THE COURT:  All that's in your pleadings.  I know how

11   much is owed, 28,000, whatever it is, and it's accumulating at

12   the rate of 20 percent per annum, something like that.

13         MS. ARREOLA:  Okay.  He --

14         THE COURT:  And I know the taxes are going to be due

15   also soon.

16         MS. ARREOLA:  Yes, Your Honor.  He can testify what --

17   the interior condition of the apartment.  We also have, though,

18   Your Honor, in the exhibits that the Government marked for

19   today's hearing photos that were obtained yesterday in which we

20   received late yesterday of the interior condition of the

21   apartment, and he would also be able to explain, if the Court

22   wants to hear, how the rental process works, but the rental --

23   the unit itself cannot be rented right now because there's

24   carpet missing from the basement floor, the first floor of the

25   condominium which is apparent from the photos, and not to

```
 1    mention the fact that the apartment has no insurance and
 2    there's nobody who would be responsible as a landlord in case
 3    something goes wrong with the apartment such as a broken heater
 4    or broken refrigerator.  Nobody would be accountable for that
 5    if something went wrong.
 6              Did Your Honor want to hear from Mr. Knox?
 7              THE COURT:  Yes, I do.
 8              MS. ARREOLA:  Okay.  Your Honor, if I could, just
 9    before calling him, I believe there are two issues today,
10    Your Honor.  One is the connection between the crime and the
11    property, and the Government submits that that's clear from the
12    documents we submitted from First Caribbean International Bank.
13    Those documents the Government received in response to request
14    to the -- to authorities in the Turks and Caicos Islands under
15    a Mutual Legal Assistance Treaty between the United States and
16    the UK, and those documents establish, they show the
17    152,000-dollar transfer from the Turks and Caicos account --
18              THE COURT:  It's all in your pleadings.
19              MS. ARREOLA:  Okay.
20              THE COURT:  I'm well aware of it.
21              MS. ARREOLA:  Okay.  And then the second issue, Your
22    Honor, is just simply whether the sale is justified, so the
23    Government calls Richard Brent Knox.
24              THE COURT:  Come on up, sir.
25              MR. HANSHEW:  Your Honor, to the extent there's any
```

1   other witnesses or agents and the such here, we also invoke the

2   Rule.

3           THE COURT:  Okay.  The Rule will be invoked.  Any

4   other witnesses here will have to wait outside.

5           MS. KANOF:  There are no other witnesses.

6           MR. HANSHEW:  Well, this gentleman just raised his

7   hand, back there, Your Honor.

8           MS. ARREOLA:  Your Honor, there's a special agent

9   who's present in the courtroom, but the Government does not

10  intend to call him.

11          THE COURT:  Okay.

12          (Witness duly sworn.)

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Speak into the microphone, if you would,

15  sir.

16          THE WITNESS:  Okay.

17          RICHARD BRENT KNOX, GOVERNMENT'S WITNESS, SWORN

18                   DIRECT EXAMINATION

19  BY MS. ARREOLA:

20  Q.  Good morning, Mr. Knox.  How are you employed?

21  A.  I'm general manager of Kändahär Condominiums.

22  Q.  How long have you been a general manager?

23  A.  Just a little over a year.

24  Q.  Before becoming general manager, did you work at Kändahär?

25  A.  Yes.

Knox – Direct by Ms. Arreola

```
1    Q.  In what capacity?
2    A.  I was -- worked at the desk and basically checked people in
3    and unlocked condos and --
4    Q.  How long were you working at the front desk?
5    A.  About six years.
6    Q.  What is The Kändahär?
7    A.  It's a condominium complex in -- at Taos Ski Valley.
8    Q.  And how many condominiums are located there?
9    A.  There are 27.
10   Q.  Who owns the condominiums?
11   A.  They're all individually owned.
12   Q.  What is your -- what are your duties and responsibilities
13   as a general manager?
14   A.  Payroll, still reservations for guests that are checking
15   in, making statements up, or sending statements out to the
16   homeowners in regard to their condos.
17   Q.  What are those statements -- what are those statements
18   regarding?
19   A.  It's the utility bills, the property management, the HOA
20   fees, and any kind of interior maintenance expenses that may
21   occur.
22   Q.  Do you prepare those statements or does somebody else?
23   A.  The CPA prepares it, but I send her all the individual
24   bills as far as electric, and propane, and stuff.
25   Q.  Are you the only employee of Kändahär or are there others?
```

1    A.  There's others.

2    Q.  Approximately how many are there currently?

3    A.  It's seasonal.  In the summer, we have maybe six to eight

4    employees and in the winter, it can go up to 14 or 15.

5    Q.  Can you briefly describe for the Court what their general

6    duties are, what their role is at Kändahär?

7    A.  We have a housekeeping crew which in the summer there are

8    two as needed, and then we -- during the summer, we do most of

9    our maintenance work and right now we have four maintenance

10   people, and then every now and then I have someone come help me

11   in the office.

12   Q.  Do any of the owners ever put their condominiums up for

13   rent?

14   A.  Some do.

15   Q.  Who do they go through in order to rent their unit?

16   A.  Me.

17   Q.  And how does that process work?

18   A.  The homeowner -- it's up to the homeowner if they want to

19   put their condominium into the rental pool and if they decide

20   to put it into the rental pool, they just tell us that they

21   want to put it in the rental pool.

22   Q.  How much do the homeowners get to keep of the rental income

23   and how much does the condominium -- does the association keep,

24   if any?

25   A.  It's a 60/40 split and the homeowner gets to keep

Knox - Direct by Ms. Arreola

1    60 percent and the condominium -- the association keeps

2    40 percent.

3    Q.  How much approximately are their rents?

4    A.  It varies with the season.  During the summer it's between

5    100 to 150 a night, and in the winter, it can -- it's between

6    400 and 520 a night.

7    Q.  How many of the 27 condos are currently in the rental pool?

8    A.  Approximately 16.

9    Q.  And how many of those are as of today being rented?

10   A.  Right now there's one, I think.

11   Q.  Okay.  And on average during the summer, how many units are

12   rented at any given time on average?

13   A.  On average one to two a week.

14   Q.  Okay.  Does that number fluctuate during the rest of the

15   year?

16   A.  Yes.  In the winter time it goes up.

17   Q.  Okay.  So on average, during the winter season, how many of

18   the condominiums in the rental pool are rented?

19   A.  Oh, unless it's Christmas or Spring Break probably

20   40 percent of them are.

21   Q.  That's during the winter?

22   A.  That's during the winter.

23   Q.  Okay.  And are there times when it's -- you mentioned

24   Christmas and Spring Break, are -- what other times during the

25   year when you might be fully booked?

Knox – Direct by Ms. Arreola

1   A.  President's Day weekend and Martin Luther King, we're both

2   completely booked all of those weekends.

3   Q.  Okay.  Are Christmas and Spring Break also completely

4   booked?

5   A.  Yes.

6   Q.  Okay.  How is it decided which units are going to be rented

7   among the 16 in the pool?

8   A.  When it's kind of a slow period, we will -- the way the

9   complex is set up, there's four different buildings and they're

10  on the side of the mountain and we try to make it easily --

11  easier for that housekeeping so we try to keep everybody in one

12  building, but it is also decided, and that's basically with the

13  reservation people, some condos are better than others, a

14  little more updated and if you have a nicer condo, it rents out

15  more.

16  Q.  Okay.  Have you -- are you familiar with apartment number

17  19?

18  A.  Yes, ma'am.

19  Q.  Have you been inside that apartment?

20  A.  Yes.

21  Q.  How often do you go in that apartment?

22  A.  About twice a week.

23  Q.  Why is that?

24  A.  We go in to make sure there's not a water leak or a gas

25  leak or just try to make sure there's nothing -- since it's

1  unoccupied making sure that there's nothing -- going on.

2  Q.  Do you do that just for apartment 19 or for all of the

3  condominiums?

4  A.  All condominiums.

5  Q.  So you go into all the condominiums -- you or somebody else

6  goes into all the condominiums twice a week?

7  A.  Yes.

8  Q.  All right.  How would you describe the current condition of

9  apartment number 19?

10  A.  It's -- it's unrentable because there's no furniture or no

11  carpet in the bottom floor.

12  Q.  Okay.  And once that's fixed, how would you describe the

13  condition of the apartment?

14  A.  It would be probably a mid-level condominium.

15  Q.  Okay.  And do you know why the carpeting on the first floor

16  was removed?

17  A.  Yes.  Not last summer, but the summer before there was a

18  water leak in the water -- the hot water heater and it flooded

19  the public or the bottom floor, and so The Kändahär took all

20  the carpet out so it wouldn't get moldy or, you know, just to

21  try to dry it out.

22  Q.  Who's responsible for replacing the carpeting?

23  A.  The homeowner.

24  Q.  I'm going to ask you to take a look at what's been marked

25  for identification as Government's Exhibit 9 in front of you.

1    Can you take a moment to look at that.

2              MS. ARREOLA:  Your Honor, may I approach?

3              THE COURT:  You may.  Did you give one to Mr. Hanshew

4    yet?

5              MS. ARREOLA:  Yes, Your Honor.

6              MR. HANSHEW:  Your Honor, we object.  We did get it

7    last night, slash, this morning.  These were provided to us,

8    Your Honor.

9              THE COURT:  Okay.

10             MS. ARREOLA:  Your Honor, the Government obtained the

11   photos yesterday and we provided it to Mr. Hanshew as soon as

12   we got them.

13   BY MS. ARREOLA:

14   Q.  Do you recognize this document?

15   A.  Yes.

16   Q.  What is it?

17   A.  The first page?

18   Q.  Or what are the -- what does the document consist of?

19   A.  It's the pictures of the condo number 19 --

20             MR. HANSHEW:  Your Honor, objection.  There's no

21   foundation.  She hasn't -- there's been no indication as to who

22   took these photos, if this individual took them.  There's no

23   foundation for them.

24             MS. ARREOLA:  Your Honor, it doesn't matter who took

25   them.  He recognizes them having been in the apartment twice a

1    week.

2              THE COURT:  The objection is overruled.

3              MS. ARREOLA:  Your Honor, the Government offers

4    Government's Exhibit –– what's been marked for identification

5    as Government's Exhibit 9.

6              THE COURT:  To which?

7              MR. HANSHEW:  The same objections, Your Honor.

8    Untimely submission as well as lack of foundation in entering

9    these.

10             THE COURT:  The objection is overruled.  Government's

11   Exhibit 9 will be admitted.

12   BY MS. ARREOLA:

13   Q.  I'm going to ask you to take a look at the first page,

14   Mr. Knox.

15   A.  Okay.

16   Q.  What is that page?

17   A.  That is the entrance into the main living floor, main

18   living area and that's kind of the second –– it's up on the

19   second floor.

20   Q.  Okay.  And we're speaking of apartment number 19, correct?

21   A.  Yes, ma'am.

22   Q.  I'm going to ask you to look at page 2 of Government's

23   Exhibit 9.  What is that?

24   A.  That's looking into the front door into the living area and

25   just a partial picture –– partial bit of the bar area.

Knox – Direct by Ms. Arreola

```
1    Q.  And the flooring in there, that is present, there is
2    flooring in that first level, right?
3    A.  Yes, there's carpet and laminate flooring.
4    Q.  Okay.  Is that called the main floor?
5    A.  That's the main floor.
6    Q.  And I'm going to ask you to look at page 3.  What is that?
7    A.  That's the kitchen area.
8    Q.  Is that also on the main floor?
9    A.  Yes.
10   Q.  Okay.  Can you take a look at page 4.
11   A.  Yes.
12   Q.  What is that?
13   A.  That's the kitchen area and looking in from kind of the
14   dining and living area.
15   Q.  How about page 5.  What is that?
16   A.  That's -- the red part is the fireplace and then that's the
17   start of the stairway leading down to the bedroom area, lower
18   floor.
19   Q.  Okay.  Take a look at page 6 and tell us what we're looking
20   at?
21   A.  That's the fireplace and then the railing there, that's the
22   spiral staircase that goes down to the bedrooms downstairs.
23   Q.  How about page 7?
24   A.  That's kind of what most homeowners use as the dining area.
25   It's the living room and the dining room and the kitchen are
```

Knox - Direct by Ms. Arreola

1    all one area.

2    Q.  And page 8?

3    A.  That's more just a little bit of the corner of the dining

4    area and that's the windows looking down onto the balcony.

5    Q.  What are we looking at on page 9?

6    A.  There's an upstairs bedroom or upstairs bathroom in the

7    living area and that's the hallway leading down to it and

8    that's the shower in there.

9    Q.  Okay.  And page 10?

10   A.  That's a little -- just a closer picture of it.

11   Q.  Of the main floor bathroom?

12   A.  Yes.  It just has a shower and toilet and a sink upstairs.

13   Q.  What is on page 11?

14   A.  Right now we're doing our summer maintenance projects and

15   that is looking out on number 19's balcony where the crow bar

16   is and we're replacing all the woodwork -- or down there at the

17   end, you can see the new stuff and that's what we'll be doing

18   this summer.

19   Q.  Okay.  And who is paying for that?

20   A.  The homeowners.  It's a summer maintenance assessment that

21   all the homeowners are responsible to pay.

22   Q.  When was that assessment due?

23   A.  I believe August 1st was the last date.

24   Q.  Okay.  And are you going to be doing the work for apartment

25   number 19 even though no payment has been received?

Knox - Direct by Ms. Arreola

1    A.  Yes.

2    Q.  What are we looking at on page 12?

3    A.  The flat area is where most homeowners put their TVs, and

4    then the wrought iron or the iron, that's the spiral staircase

5    that goes down to the bedroom area.

6    Q.  Okay.  And what is on page 13?

7    A.  That's the bottom of the stairs, and there's a little

8    hallway and a stairwell and then where the door's partially

9    opened, that's a bedroom.  It's just a little hallway down

10   there.

11   Q.  What is on the flooring there?

12   A.  That's just the base flooring.

13   Q.  Is that where the carpeting was removed?

14   A.  That's where the carpeting was.

15   Q.  And on page 14 what are we looking at?

16   A.  That is one of the bedrooms and that's a rug that was in

17   there that was salvageable and it's fine, but it was just a rug

18   that was laying on top of the carpet, but we had it cleaned.

19   Q.  Okay.  And the flooring there, again there's no flooring in

20   that room?

21   A.  Correct.

22   Q.  On page 15, what is that?

23   A.  That is -- one door is a closet door in that bedroom and

24   then the other door is a door that leads out to the lower level

25   exit.

1    Q.  Page 16?

2    A.  That's looking into the closet in that one bedroom.

3    Q.  And again there's no flooring in this room?

4    A.  Correct.

5    Q.  And page 17?

6    A.  That's looking from that bedroom into the little hallway

7    and that door that is open that you see, that's open, that is a

8    little hallway going into the downstairs bathroom.

9    Q.  Okay.  And does the downstairs bathroom have flooring?

10   A.  Yes, it does.

11   Q.  That flooring was not damaged?

12   A.  That flooring was not damaged.

13   Q.  On page 18, what are we looking at?

14   A.  That's the other bedroom.

15   Q.  And does this bedroom have flooring?

16   A.  No, it does not.

17   Q.  On page 19, what is that?

18   A.  That's looking into the master or the downstairs bathroom.

19   Q.  And lastly page 20?

20   A.  That's a toilet downstairs.

21   Q.  Mr. Knox, I'd now like to show you what's been marked for

22   identification as Government's Exhibit Number 3 in front of

23   you.  Can you take a look at Government's Exhibit 3 and tell me

24   when you're ready.

25   A.  Okay.

Knox – Direct by Ms. Arreola

1    Q.   Do you recognize those three pages?

2    A.   Yes.

3    Q.   What are they?

4    A.   Those are homeowner's statements, monthly statements.

5    Q.   Who prepared these?

6    A.   I and the –– our CPA service.

7    Q.   And are these for any specific unit?

8    A.   This is for condo number 19.

9    Q.   I'm going to ask you to take a look at the third page.

10   What period does this statement cover?

11   A.   It would be from June 1st to June 30th of 2014.

12   Q.   And I'm going to ask you about a few of the line items

13   here.  If you look at the line that says maintenance expense,

14   there's a $25 fee.  What is that for?

15   A.   The $25 fee, we file a lien on this condo every month and

16   that's to the Taos County Clerk.  It cost $25 to file.

17   Q.   There's also a dollar number or there's a figure by the

18   electricity.  The unit is unoccupied presently?

19   A.   Yes.

20   Q.   Why is there an $89 charge for electricity?

21   A.   There is exterior lighting on all the condos and there is a

22   refrigerator still in this condo that we keep functioning.  And

23   if the heating comes on, the fans are electric or –– the

24   blowers are electric.

25   Q.   And there's also a water and sewer expense.  What is that

Knox – Direct by Ms. Arreola

1    for?

2    A.   The whole complex it's about -- our base bill is $2800 a

3    month for water and sewage and that is distributed between all

4    the homeowners and they base it on occupancy use.

5    Q.   Okay.  And there's also a monthly assessment for $650.

6    What is that?

7    A.   That's a monthly assessment.  It's homeowner assessment

8    that everyone pays that.  All the homeowners pay 650 a month.

9    Q.   What does that money go to?

10   A.   That covers the snow removal in the winter, firewood, the

11   salaries to help offset the salaries of the staff, laundry

12   services, just the operations of the whole condominium.

13   Q.   Okay.  And if you could take a look at page 2 of that

14   exhibit.  Do you see that the ending balance due was 26,487?

15   A.   Yes.

16   Q.   And then for the next month, the ending balance was 27,942?

17   A.   Yes.

18   Q.   So the amount that's due is increasing by over a thousand

19   dollars every month?

20   A.   Pretty well, yes.  Yes.

21          MS. ARREOLA:  Your Honor, the Government offers what's

22   been marked for identification as Government's Exhibit 3.

23          THE COURT:  Mr. Hanshew?

24          MR. HANSHEW:  No objection.

25          THE COURT:  Government's Exhibit 3 will be admitted.

1   BY MS. ARREOLA:

2   Q.  Mr. Knox, I'd also like you to take a look at what's been

3   marked for identification as Government's Exhibit 4.  Can you

4   take a look at it and tell me when you're done.

5   A.  The —

6   Q.  Government's Exhibit 4.

7   A.  Oh, okay.

8   Q.  Do you recognize this?

9   A.  Yes.

10  Q.  What is it?

11  A.  That's the — the board met and approved a maintenance

12  assessment for the summer to replace all those balconies on the

13  building that consist of condos 14 through 20.  We're also

14  going to repair the steam room, and staining some more

15  sidewalks up on the top building.

16  Q.  And was this assessment ever paid for condo unit 14 [sic]?

17  A.  No.

18          MS. ARREOLA:  Your Honor, the Government offers

19  Government's Exhibit — what's been marked to identification as

20  Government's Exhibit 4.

21          MR. HANSHEW:  No objection, Your Honor.

22          THE COURT:  Government's Exhibit 4 will be admitted.

23  BY MS. ARREOLA:

24  Q.  Since you've been working at The Kändahär, have some of the

25  condominiums ever been sold?

Knox – Direct by Ms. Arreola

1    A.  Yes.

2    Q.  Do you play any role in listing the apartments for sale?

3    A.  No.

4    Q.  When they go up for sale, do you ever learn how much they

5    are on sale for?

6    A.  No.  But I do sometimes hear what they sold for, but not

7    officially.

8    Q.  Okay.  Let me just clarify my question.  I was asking if

9    you ever learn how much they are going on sale for not how much

10   they sold for?

11   A.  Oh, yes.  Yes, I can.

12   Q.  And how do you find that out?

13   A.  I look in the real estate books.

14   Q.  Okay.  And based on your experience, how much do the

15   properties generally list for?

16          MR. HANSHEW:  Objection, Your Honor.  The best

17   evidence of this would be the actual listings that he looks at.

18   To have him testify here as a lay person, as to the price and

19   listings of this, he himself by their own questioning, made it

20   obviously clear the evidence that would be for this would be

21   the actual listings, not a general manager talking about what

22   he goes and looks at on his own time.

23          THE COURT:  Overruled.

24   BY MS. ARREOLA:

25   Q.  Mr. Knox, how much have you seen the properties list for on

Knox – Direct by Ms. Arreola

1    average?

2    A.   Between 200 and at the very top was 250.

3    Q.   Okay.  Are there any exceptions to that?

4    A.   There's one exception.

5    Q.   Okay.  Can you tell us what that exception is?

6    A.   There's one currently on the market for 450,000.

7    Q.   Okay.  And how does that unit compare to apartment 19?

8    A.   The one that's listed for 450 is a very, very nice

9    condominium unit.

10   Q.   Is there any comparison to apartment 19?

11   A.   No.

12   Q.   Okay.  And how is it different from apartment 19?

13   A.   They have custom carpet, custom marble fixtures.  The

14   plastering in the condo was –– it's what we call diamond

15   finish, and marble floors, and it's just –– very nice

16   cabinetwork and everything.

17   Q.   How long has that property been sitting on the market?

18   A.   A little over a year.

19   Q.   Okay.  Do you know why?

20   A.   It's a little more expensive than anything else that's

21   going for up there.

22            MS. ARREOLA:  May I have a moment, Your Honor?

23            THE COURT:  You may.

24            MS. ARREOLA:  Your Honor, no further questions for

25   this witness.

1            THE COURT:  I don't know how this works, okay, as far

2    as condominium, especially in New Mexico and you may not know,

3    because this is maybe a legal question --

4            THE WITNESS:  Okay.

5            THE COURT:  -- does the association, the condominiums,

6    do they have a right to foreclose on the property when let's

7    say the assessment grows?

8            THE WITNESS:  I really don't know.

9            THE COURT:  You don't know?

10           THE WITNESS:  No.

11           THE COURT:  Okay.

12           Mr. Hanshew?

13                        CROSS-EXAMINATION

14   BY MR. HANSHEW:

15   Q.  Good morning, Mr. Knox.

16   A.  Morning.

17   Q.  Before today's hearing you met with federal agents,

18   correct?

19   A.  Yes.

20   Q.  How many times have you met with them?

21   A.  Just once.

22   Q.  When was that?

23   A.  Yesterday.

24   Q.  And before today's hearing, did you review any documents or

25   notes or reports in preparation for your testimony today?

Knox – Cross by Mr. Hanshew

1   A.  Yes, I went over --

2   Q.  And what was that?

3   A.  We just went over the homeowner statements and questions

4   about the condominium, what, you know, the current status of it

5   is and things like that.

6   Q.  Okay.  And in terms of documents, which documents did you

7   look at with the Government for this hearing today?

8   A.  I looked at the homeowner statements, that number 3 and

9   number -- number 3.

10  Q.  Number 3 and number 3.  So just number 3?

11  A.  Just number 3.

12  Q.  Okay.

13  A.  Sorry.

14  Q.  It's okay.  It's nerve-racking in here, I understand.  No

15  other documents?

16  A.  Not that I recall.

17  Q.  The Government didn't show you anything?

18  A.  Not that I recall.

19  Q.  Okay.  You don't recall or --

20  A.  No.

21  Q.  This was yesterday, right?

22  A.  Yes, this was yesterday.  That's all we looked at.

23  Q.  Okay.  Now, you became the general manager of The Kändahär

24  Condominiums in May 2013; is that correct?

25  A.  Yes.

Knox – Cross by Mr. Hanshew

1   Q.  All right.  And as the general manager, one of the roles,

2   one of the jobs and duties you have is to find out from the

3   owners whether they want to put their condominium up for rent?

4   A.  They tell us if they want -- want it in there or not.

5   Q.  They tell you?  You're the general manager, correct?

6   A.  Yes.

7   Q.  Okay.  Now, I assume you keep records as part of your job?

8         MS. ARREOLA:  Objection, Your Honor, vague.

9         THE COURT:  Over- -- well, can you be a little more

10  specific?

11        MR. HANSHEW:  Sure.

12  BY MR. HANSHEW:

13  Q.  Did you keep records of how and when individuals rent their

14  condominiums?

15  A.  Yes.

16  Q.  What types of forms do you have for that?

17  A.  We -- most of the condominiums, I mean, when they're in the

18  rental pool and somebody makes a reservation, we have a

19  computer system called Registering and we put all the

20  information into there and it generates these reports.

21  Q.  Now, you told the Government that Mr. Delgado had removed

22  his condominium from the rental pool; is that correct?

23  A.  No.

24  Q.  You did not tell them that?

25  A.  No.  He never did put it into the rental pool.

Knox – Cross by Mr. Hanshew

1    Q.  Okay.

2              MR. HANSHEW:  May I approach the witness, Your Honor?

3              THE COURT:  You may.

4    A.  That may have been before I was the general manager.

5              MS. ARREOLA:  Objection, Your Honor.  Counsel is

6    showing the witness a document.  There's no evidence in the

7    record that the witness has seen this document or knows what

8    he's being shown.

9              MR. HANSHEW:  I didn't introduce it, Your Honor, as

10   evidence.  I asked him to look at a document, see if that

11   refreshed his memory.

12             MS. ARREOLA:  That was never asked, Your Honor.  It

13   was never asked if he had seen the document.

14             THE COURT:  Okay.  I'll sustain the objection.  Now go

15   on.

16   BY MR. HANSHEW:

17   Q.  Sir, you met with agents on the 29th, correct?

18   A.  Yes.

19   Q.  July 29th.  Okay.  And how long was that interview?

20   A.  Hour and a half maybe.

21   Q.  Okay.  And according to you today at no point did you tell

22   the agents that Delgado removed his condominium from the rental

23   pool?

24   A.  No.

25   Q.  Okay.

Knox – Cross by Mr. Hanshew

1    A.  It just never was in there.

2    Q.  Would you be surprised to know there's a report by the

3    agents of your interview that says you said that?

4    A.  I don't think I ever said that.

5    Q.  Okay.  Now, where's the form that has Mr. Delgado taking

6    his condominium out of the rental pool?

7          MS. ARREOLA:  Objection, Your Honor.  Assume facts not

8    no evidence.  The witness has said that it was never put in

9    pool; not that it was removed.

10          THE COURT:  Overruled.

11   BY MR. HANSHEW:

12   Q.  Do you have that form, sir?

13   A.  No.

14   Q.  You have no such form?

15   A.  No.

16   Q.  When, if you know, was Mr. Delgado's condominium taken out

17   of the rental pool?

18   A.  I've been there -- this is starting my seventh year, that

19   condo has never been in the rental pool in seven years.

20   Q.  And have you seen anything that indicates that was at

21   Mr. Delgado's directive?

22   A.  No.

23   Q.  And you as the general manager would be made known -- that

24   would be made known to you, correct?

25   A.  Yes.

Knox - Cross by Mr. Hanshew

1    Q.  Now, on those, the Exhibit 3, the forms from The Kändahär

2    Condominiums, it lists an individual by the name of Ray Velarde

3    on there, correct?

4    A.  Yes.

5    Q.  And what does it list him as?

6    A.  Owner.

7    Q.  And how many times have you spoken with Mr. Velarde?

8    A.  I don't think I have ever talked to him, but I have

9    e-mailed him.

10   Q.  You e-mailed him.  What did you e-mail him about?

11   A.  Statements.

12   Q.  Such as?

13   A.  These -- all the statements.

14   Q.  Okay.  Now, let's talk about those statements.  They

15   indicate, you know, amounts owing?

16   A.  Yes.

17   Q.  From what date did those amounts begin accruing?

18   A.  Pretty well since he owned it.  I mean, we send these

19   statements out to the owners.  As soon as they buy one.

20   Q.  When was the last time Mr. Velarde paid the fees?

21   A.  Mr. Velarde has never paid a fee.

22   Q.  He's never paid a fee.  In the entirety of this?

23   A.  Pardon?

24   Q.  In in the entirety of his ownership of this condo, he's

25   never paid a fee?

Knox – Cross by Mr. Hanshew

1    A.  Correct.

2    Q.  Okay.  And all of the fee bills you sent to Mr. Velarde,

3    correct?

4    A.  Yes.

5    Q.  Okay.  And do you get Mr. Velarde's approval to enter the

6    condominium?

7    A.  No.  I mean, we just -- I mean, it's the -- no, we don't.

8    I mean, it's assumed I guess that we are supposed to take care

9    of their property and if they're vacant forever, we have to go

10   in and make sure that --

11   Q.  Based on your assumption?

12   A.  Yes, that's based on my assumption.

13   Q.  And has Kändahär Condominiums filed any action against

14   Mr. Velarde for the amounts due?

15   A.  We put a lien on this condo.

16   Q.  Against Mr. Velarde.  He's the title owner, as the owner,

17   correct?

18   A.  I guess -- yes.

19   Q.  Has Kändahär initiated any action against Mr. Velarde?

20   A.  No.

21   Q.  Why not?

22   A.  I don't know.

23   Q.  Is Kändahär -- have you asked Mr. Velarde about putting the

24   condominium up for rent?

25   A.  No, I have not.

Knox - Cross by Mr. Hanshew

1    Q.   In the entire time you've been the general manager, you've

2    never asked that?

3    A.   Right.

4    Q.   Okay.  Has anyone from Kändahär, to your knowledge, asked

5    Mr. Velarde?

6    A.   No.

7    Q.   Why is that?

8    A.   It's really not our obligation to.  That's the homeowner's

9    decision.  If they want to put it in rental pool or not.

10   Q.   Mr. Velarde's right?

11   A.   (No verbal response.)

12   Q.   Now, I notice -- you mentioned earlier that the rug was

13   cleaned in the condominium and who did that?

14   A.   The carpet cleaning company.

15   Q.   Okay.  At -- but who paid for that?

16   A.   The Kändahär paid for it.  We just cleaned it.

17   Q.   I thought Kändahär wasn't responsible for carpets?

18   A.   Well, that was a rug and that was -- we just were trying to

19   salvage some things in there.

20   Q.   Okay.  Who tore out the carpet?

21   A.   The Kändahär.

22   Q.   Under what authority?

23   A.   They were -- I don't know.  That was before I was general

24   manager and I wasn't even there when they took the carpet out.

25   Q.   When was the carpet taken out if you know?

1   A.  I believe two years ago and -- two or three years --
2   probably probable closer to three and at that time I was a
3   part-time employee and during the summer I went back and --
4   Q.  You say you believe that on what basis?
5   A.  I'm just -- I'm trying to remember when -- I can't really
6   remember exact dates, but I think it was about three years ago.
7   Q.  That the carpet was taken out?
8   A.  Yeah.
9   Q.  Was there furniture taken out by Kändahär as well?
10  A.  No.
11  Q.  Never?
12  A.  One of the -- Mrs. Delgado or, you know, somebody -- Ray
13  Velarde sent or had called and said that -- and then this --
14  some lady, I can't even remember her name -- but her -- they
15  came up and got most of the furniture out of there.
16  Q.  Okay.  So now you did actually talk to Ray Velarde?
17  A.  I -- I think he talked to -- I think it was his -- one of
18  his people that worked for him.  I don't --
19  Q.  Before you said you last communicated --
20  A.  Okay.  I don't remember who I talked to.
21  Q.  Well, let my finish.  Before, you indicated that you just
22  communicated via e-mail correspondence.  That's what you
23  testified, correct?
24  A.  Right.
25  Q.  Now, you've just indicated that you actually spoke with

Knox - Cross by Mr. Hanshew

1  him?

2  A.  I'm not sure if I even talked to him, but he probably sent

3  me an e-mail telling me that some -- and I don't remember her

4  name -- was coming up to get their personal belongings out of

5  there.

6  Q.  Okay.  So Mr. Velarde made it known to you that he was

7  coming or someone, his agent, to take out the property that was

8  in there?

9  A.  It was Mr. Delgado's wife, I believe, that was coming to

10  get the stuff.

11  Q.  You believe or you're certain?

12  A.  I'm not sure if it was his wife or not.

13  Q.  Okay.  What did this e-mail say?

14  A.  I don't remember.

15  Q.  When was this e-mail?

16  A.  I don't remember.  I mean, it's probably been two years

17  ago, but I don't remember exactly.

18  Q.  You were asked about the fact that work was going to be

19  done to the deck including the deck outside of number 19 --

20  A.  Uh-huh.

21  Q.  -- regardless of any fee being paid by the owner?

22  A.  Right.

23  Q.  That's correct?

24  A.  Correct.

25  Q.  All right.  And -- and your job as general manager, you're

Knox – Cross by Mr. Hanshew

1    obviously aware of the -- it appears then by that -- of some of

2    the accounting aspects of these condominiums?

3    A.  Yes.

4    Q.  What's the percentage of these outstanding fees to The

5    Kändahär's general account?

6    A.  I don't know.

7           MS. ARREOLA:  Objection, Your Honor, vague.

8           THE COURT:  He answered he doesn't know.

9    BY MR. HANSHEW:

10   Q.  Who would know that from Kändahär?

11   A.  I'm sure we could generate a report for it, but I've --

12   we've never been asked this before.

13   Q.  Who?  I asked who?

14          MS. ARREOLA:  Objection, Your Honor, relevance to this

15   questioning.

16          THE COURT:  Overruled.

17   A.  It would probably be our -- the accounting firm that we

18   use.

19   BY MR. HANSHEW:

20   Q.  Who is that?

21   A.  That's CPA Southwest and they just changed their name.

22   Q.  Do you know to what?

23   A.  I think it's CPA Swinthart [phoen.] or something like that,

24   but I don't know.

25   Q.  Now, part of your job as the general manager at Kändahär,

1  you have some duty of confidentiality to the homeowners?

2  A.  In regard to what?

3  Q.  Who owns places, what's inside of them, the price of them,

4  the fees that are outstanding on them.  Those types of things.

5       MS. ARREOLA:  Objection, Your Honor, compound

6  question.

7       THE COURT:  I'll sustain the objection.  Cut it down,

8  Mr. Hanshew.

9  BY MR. HANSHEW:

10  Q.  What -- under what obligations as general manager do you

11  have to keep homeowner information private?

12       MS. ARREOLA:  Objection, Your Honor, overbroad.

13       THE COURT:  Overruled.

14  A.  I really don't understand the question.

15  BY MR. HANSHEW:

16  Q.  Okay.  You're the general manager, correct?

17  A.  Yes.

18  Q.  There are privacy issues that come up as to individuals

19  that belong to this association?

20       MS. ARREOLA:  Objection, Your Honor, vague.

21       THE COURT:  Overruled.

22  A.  What kind of privacy issues?

23  BY MR. HANSHEW:

24  Q.  Are there -- I'm asking you.  You're the general manager.

25  What privacy considerations do you have as the general manager

Knox - Cross by Mr. Hanshew

1    at Kändahär as it relates to the homeowners?

2    A.  I don't -- I still don't understand what you're saying.

3    Q.  Okay.  Are you allowed to go tell other people about what's

4    inside that condominium?

5    A.  As far as -- I mean what --

6    Q.  The contents of the condominium, are you allowed to go tell

7    anyone you would like about what's inside someone else's home?

8    A.  I wouldn't think so.  I mean, I've never.

9    Q.  Are you allowed to tell the other homeowners about your

10   opinion as to whether the condominium belongs to the

11   Government?

12   A.  No, I mean --

13   Q.  Have you ever made such a statement to the other homeowners

14   at Kändahär?

15   A.  No.

16   Q.  What have you told the other homeowners at Kändahär about

17   the Government's relationship to this condominium?

18   A.  To this deal?

19   Q.  Yes, sir.

20   A.  It's that they're trying to decide who owns the

21   condominium.

22   Q.  And how did you form the basis of that statement?

23   A.  The Government called and said that they were looking into

24   trying to decide who's the owner of the condominium.

25   Q.  Okay.  Who was that that called you for that?

1    A.  I believe it was Anna.

2    Q.  Anna.  Okay.  So the prosecutor called you and told you

3    that they were trying to decide who the owner of the

4    condominium was?

5    A.  There was going to be some hearings that was going to be

6    discussing who's going to -- and this is just -- you know,

7    retained ownership of the condominium or get the, you know, who

8    owns it, paying the bills on it.

9    Q.  When did that call take place?

10   A.  Six months ago maybe.

11   Q.  And how many subsequent phone calls did you have with

12   Ms. Arreola or any other Government official?

13   A.  Maybe five.

14   Q.  Were they all with Ms. Arreola?

15   A.  No.

16   Q.  Who else did you speak with from the Government?

17   A.  I don't remember his name.

18   Q.  It was a male?

19   A.  Yeah.

20   Q.  Did he identify what his position was?

21        THE COURT:  What does this have to do with the motion

22   for interlocutory sale, Mr. Hanshew?

23        MR. HANSHEW:  Well, we just learned that the

24   Government has been speaking to an agent -- I mean, to a

25   witness --

Knox – Cross by Mr. Hanshew

```
 1            THE COURT:  Well, what does this have to do with the
 2   motion?
 3            MR. HANSHEW:  Well, Your Honor, let me finish, Judge.
 4   You asked a question and I'm allowed to answer which is this
 5   goes exactly to the motion and to the objections we have which
 6   is the Government investigated and spoke with this witness six
 7   months ago and yet doesn't put any of it in their motion and
 8   drops this on this Court and Defendant last night.  I think
 9   this Court should frankly be more upset than we are about the
10   way that this has been conducted.
11            THE COURT:  I'm not upset.  I'm not upset.
12            MR. HANSHEW:  It should be, because the precedent the
13   Count is setting is you get to file a motion with no argument,
14   no law, no evidence and then you wait until the other side
15   files an opposition.  It would be if I mail a motion to
16   suppress, cite the Constitution, let them try to oppose that
17   and then come back and reply and say, Oh, here's the law and
18   argument and evidence.
19            THE COURT:  Just go ahead, Mr. Hanshew.  Okay?  If
20   you're going too far I'm going to put a stop to it, okay.
21   Stick to the motions that we're here on.
22            MR. HANSHEW:  I'm asking him about who he's spoken
23   with at the Government as to statements that he gave to them to
24   find out whether they're truthful or not, about what it is he's
25   been telling people, what about what they've told him is the
```

1   subject of his testimony today.  I mean, that is absolutely

2   relevant what a Government official --

3          THE COURT:  Go on.  Just go on, okay.  What other

4   questions do you have?

5   BY MR. HANSHEW:

6   Q.  Now, you testified about this other condominium that was

7   listed at $450,000?

8   A.  Yes.

9   Q.  Okay.  Have you personally been in that condominium?

10  A.  Yes.

11  Q.  Okay.  And when did you go into that condominium?

12  A.  Probably last week.

13  Q.  Okay.  And did the Government mention that condominium to

14  you?

15  A.  No.

16  Q.  In none of their conversations?

17  A.  (No verbal response.)

18  Q.  Okay.  What made you go into that last week?

19  A.  We go into all the condominiums twice a week.

20  Q.  Okay.  And that condominium is part of The Kändahär?

21  A.  Yes.

22  Q.  And prior to a week ago, when was the last time you went

23  into that one?

24  A.  The week before.

25  Q.  And you've testified about your time living in Taos, your

1    time as general manager of The Kändahär, you're aware that the

2    entire Taos ski resort was recently purchased by a hedge fund,

3    correct?

4    A.  Yes.

5    Q.  And what do you know about that?

6    A.  Just that --

7            MS. ARREOLA:  Objection, Your Honor, relevance.

8            THE COURT:  Overruled.

9    A.  -- Louis Bacon bought the ski area.

10   Q.  I'm sorry.  I couldn't understand your --

11   A.  Louis Bacon, the hedge fund guy, bought this -- bought the

12   Ski Valley, the Taos Ski Valley, Inc.

13   Q.  And have you had any inquiries at Kändahär that mention the

14   purchase of Taos as a whole by Mr. Bacon?

15   A.  Not -- I mean, it's kind of, what's he doing, you know.

16   What improvements are they going to be making to the Ski

17   Valley.

18   Q.  Okay.  So you have inquiries as a result of that?

19   A.  Inquiries as to what?  There's more inquiries of what's

20   going on at the Ski Valley?

21   Q.  Okay.  But this condominium is on the area that has been

22   bought, correct?

23   A.  No, it's on Kändahär property.

24   Q.  It's separate from that.  It's on the mountain of Taos?

25   A.  Right.

Knox - Cross by Mr. Hanshew

1   Q.  It's on Taos Ski property?

2   A.  Yes, but it's private property.

3   Q.  Okay.  But it's on the ski resort, correct?

4   A.  Well, the ski area belongs to -- the -- most of the trail,

5   probably all of them, belong to the forest service.

6   Q.  Right.  Okay.  And when you leave this condominium do you

7   you ski out onto the ski resort, correct?

8   A.  Right.

9   Q.  It's a ski in and ski out?

10  A.  Correct.  Correct.

11  Q.  And in your experience -- you were previously a ski

12  instructor?

13  A.  Yes.

14  Q.  Okay.  So you're familiar with the ski lifestyle, correct?

15  A.  Yes.

16  Q.  All right.  And as part of that, ski in and ski out is the

17  most prized property on the ski resort, correct?

18          MS. ARREOLA:  Objection, Your Honor.

19          Can you clarify the question?

20          THE COURT:  I'll sustain the objection.  Rephrase it.

21  BY MR. HANSHEW:

22  Q.  Is there in many instances greater value given to a

23  condominium or property that has ski in and ski out access?

24  A.  Yes.

25          MR. HANSHEW:  May I have a moment, Your Honor?

```
1                 THE COURT:  You may.
2                 MR. HANSHEW:  No further questions, Your Honor.
3                 THE COURT:  Ms. Arreola?
4                 MS. ARREOLA:  No further questions from the
5  Government, Your Honor.
6                 THE COURT:  Very well.  You may be excused, sir.
7                 What else do you have?
8                 MS. ARREOLA:  Nothing further from the Government,
9  Your Honor.
10                THE COURT:  Mr. Hanshew?
11                MR. HANSHEW:  Your Honor, you know, we reiterate our
12 objection about the way in which the motions were filed in this
13 case, the way in which evidence was submitted in this case.
14 You know, this is a motion by ambush, Your Honor, so we ask
15 again the Court deny the motion for that.  If it doesn't grant
16 that and actually considers what went on here, then I ask that
17 in the future, you know, all sides be allowed the same type of
18 procedure in terms of motion practice in this Court for this
19 case.
20                I'd also ask that the Court -- if the Court's not
21 going to deny their motion on its face for being violative of
22 due process and actually presenting arguments in the motion
23 itself versus the reply that the Court actually allow us to
24 have additional time to file sur-reply to all the information
25 that's been presented and arguments presented for the first
```

1  time in a reply brief as well as extra time to be able to bring

2  a witness in, specifically Ray Velarde.

3          THE COURT:  How much time do you need?

4          MR. HANSHEW:  Your Honor, normally I'd say two weeks

5  or so, but I'm actually out all of next week, Your Honor, so

6  I'm asking for three weeks so that we can have the two-week

7  time to prepare that, file our sur-reply, assess the

8  information and investigate it and also subpoena Ray Velarde to

9  bring him here because I think --

10         THE COURT:  Okay, in three weeks?

11         MR. HANSHEW:  Yes, Your Honor.

12         THE COURT:  Ms. Arreola, what is so important about

13 the interlocutory sale at this time?  I mean, when you filed

14 this, we were set to go to trial next week -- I mean, the week

15 after Monday.  Okay?  Why proceed to this now?  Okay.  I'm

16 going to take up the question of the continuance in just a

17 little bit, but why proceed -- why did you proceed at that time

18 when the trial was shortly coming up?

19         MS. ARREOLA:  We had heard from Defense Counsel that

20 there were plans to ask for a continuance even before we filed

21 our motion, Your Honor, so we anticipated there would be a

22 forthcoming motion for continuance.  Our goal here --

23         THE COURT:  The fees are accumulating at the rate of,

24 what, about 1400 a month?

25         MS. ARREOLA:  Yes, Your Honor, approximately.  And

1    that does not account for the unpaid taxes and the lack of

2    insurance on the property.  The building itself is insured.

3    It's the interior of the apartment that is not insured.

4            THE COURT:  Then why did you agree to a continuance?

5    This could have been resolved right after the trial.

6            Do we have a date, Ruben, three weeks?

7            (The Court and courtroom deputy confer.)

8            THE COURT:  The 21st, 10:30.

9            THE CLERK:  Yes.

10           THE COURT:  The 21st at 10:30, Mr. Hanshew.

11           MR. HANSHEW:  Thank you, Your Honor.

12           THE COURT:  If you want to bring in witnesses, if you

13   want your sur-reply, if you have anything, you better file it

14   real quick.  Okay.

15           MS. ARREOLA:  Yes, Your Honor.

16           THE COURT:  In response to their sur-reply.

17           MS. ARREOLA:  Yes, Your Honor.

18           THE COURT:  Now, quite frankly, I don't know.  I don't

19   know why they have to do it at this time.  You waited this

20   long, we'll wait for the next six months until he comes up for

21   trial, six, seven months, whenever it is, which I'm about to

22   take up.

23           Okay.  You're requesting to go March the 23rd?

24           MR. HANSHEW:  Yes, Your Honor.

25           THE COURT:  Is that correct?

1            MS. KANOF:  That's correct, Your Honor.  The

2    Government has no objection.  I don't know whether or not the

3    Court is aware of the fact that the Defendant filed an appeal

4    in his case, but the appeal did not challenge the conviction.

5    It only challenged the sentence, and I didn't know whether the

6    Court, if the Court --

7            THE COURT:  On the other case?

8            MS. KANOF:  On the other case.  So basically since

9    there's been no challenge to the actual guilty conviction, but

10   just to the length of time, I think that perhaps affects the

11   rights of the Defendant with regard to speedy trial.  He's not

12   going anywhere, in other words, because the challenges to the

13   sentence dealt primarily with adjustments.  Adjustment for

14   leader/organizer and other specific adjustments, so based on --

15   even if -- and that's a discretionary issue on the part -- it's

16   an abuse of discretion standard, so regardless even if the

17   appeal would undoubtedly take a year or two, so the Government

18   doesn't have any objection to the continuance in light of the

19   fact that basically it doesn't change his living conditions and

20   I do -- don't question that Defense Counsel, being relatively

21   new to the case, probably need additional time to go through

22   the amount of documents that were provided by the Government

23   and to talk to the Government about the case in light of the

24   fact that the conviction was not appealed to talk about some

25   kind of settlement, which I've already talked to our

```
1    supervisors in case there is an approach on how we might be
2    able to mediate that.
3         So I think having more time is a good idea and the
4    Government doesn't have any objection to the March date.  We
5    would have an objection to a closer date; however, if the case
6    was continued because we have a major trial in this court in
7    November.
8         THE COURT:  What -- I was told previously it would
9    take about two weeks.
10        MS. KANOF:  I'm sorry, Your Honor?
11        THE COURT:  I was told previously it would take about
12   two weeks to try the case.
13        MS. KANOF:  This case?
14        THE COURT:  Yes.
15        MS. KANOF:  At the very most, Your Honor.
16        THE COURT:  At what?  At the very most?
17        MS. KANOF:  At the very most.
18        THE COURT:  Counsel, I'll tell you right now.  I'm
19   going to grant the continuance, okay, but I will not entertain
20   another motion for continuance.  Unless I'm incapacitated,
21   you-all are going to trial on the 23rd or unless you settle it.
22        Anything else?
23        MR. HANSHEW:  Your Honor, we'd also propose a motion
24   deadline in that same motion to continue in January,
25   dispositive motion deadline.
```

```
1              THE COURT:  Yeah.  I agree.
2              MR. HANSHEW:  Okay.  Thank you, Your Honor.
3              THE COURT:  Have you -- deadline, file pretrial
4    motions extended until January the 12th.  That's what you-all
5    agreed to?
6              MS. KANOF:  Yes, Your Honor.  The Government has no
7    objection.
8              MR. HANSHEW:  Correct, Your Honor.
9              THE COURT:  Okay.  It will be part of the order.
10             MR. HANSHEW:  Thank you, Your Honor.
11             Okay.  Very well.  You may be excused.  We'll be in
12   recess.
13                            *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        I N D E X

 2                  GOVERNMENT'S EVIDENCE

 3   WITNESS:                                        PAGE

 4   RICHARD BRENT KNOX:

 5        Direct Examination by Ms. Arreola ...................8
          Cross-Examination by Mr. Hanshew ...................25
 6

 7

 8

 9                  GOVERNMENT'S EXHIBITS

10   NO.  DESCRIPTION                               ADMITTED

11   3    Monthly Statements of amounts due for the
          Kändahär Condominium 4-30-14 through 6-30-14    21
12

13   4    Notice of Assessment for the Kändahär 5-10-14    22

14   9    Photos of the Kändahär Condominium             15

15

16

17

18

19

20

21

22

23

24

25
```

1                      CERTIFICATION

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.  I

5    further certify that the transcript fees and format comply with

6    those prescribed by the Court and the Judicial Conference of

7    the United States.

8

9    Date:  August 6, 2014

10                                   /s/ Maria del Socorro Briggs

11                                   Maria del Socorro Briggs

12

13

14

15

16

17

18

19

20

21

22

23

24

25