```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                       EL PASO DIVISION

 4                       VOLUME 1 OF 1

 5


 6   UNITED STATES OF AMERICA           EP:13-CR-0370-DG

 7   v.                                 EL PASO, TEXAS

 8   MARCO ANTONIO DELGADO               May 17, 2016

 9
                          STATUS HEARING
10             THE HONORABLE DAVID C. GUADERRAMA
                    UNITED STATES DISTRICT JUDGE
11


12

13   APPEARANCES:

14   For the Government:   Debra Kanof
                           Anna Arreola
15                         Luis Gonzalez
                           Assistant United States Attorney
16                         700 East San Antonio, Suite 200
                           El Paso, Texas 79901
17
     For the Defendant:    Maureen Franco
18                         Erik Hanshew
                           Assistant Federal Public Defender
19                         700 E. San Antonio, Suite 410
                           El Paso, Texas  79901
20
     Court Reporter:       Kathleen A. Supnet
21                         El Paso, Texas
                           (915)834-0573
22                         kathi.supnet5303@gmail.com

23

24            Proceedings reported by mechanical stenography,

25   transcript produced by computer-aided software and computer.
```

1                        CHRONOLOGICAL INDEX

2     MAY 17, 2016                              PAGE    VOL.

3     Announcements. . . . . . . . . . . . . . . . . 3     1

4     Court's Ruling . . . . . . . . . . . . . . . 50     1

5     Court Reporter's Certification . . . . . . . . 52     1

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        *  *  *  *  *

2              (Proceedings begin at 9:57 a.m.)

3                        *  *  *  *  *

4              (Open court.)

5              THE COURTROOM DEPUTY:  EP:13-CR-370, Marco Antonio

6              Delgado.

7              THE COURT:  I'd ask for announcements, please.

8              MS. KANOF:  Good morning, Your Honor.  Debra Kanof,

9    Anna Arreola and Jose Gonzalez for the United States.

10             THE COURT:  Good morning to all of you.

11             MS. FRANCO:  Good morning, Your Honor.  Maureen Franco

12   and Erik Hanshew on behalf of Mr. Delgado.  We're ready.

13             THE COURT:  All right.  Good morning to both of you.

14             All right.  I wanted to have this status hearing, so I

15   can get a better grasp on what actually happened in regards to

16   that subpoena and then where I'm going to go from here.

17             The first thing I want to know is because I guess I

18   can assume that the subpoena was actually served on Mr. Gireud

19   in Federal Court, apparently those returns aren't filed and

20   courts are left to guess, I guess, if subpoenas have been

21   served.

22             MS. FRANCO:  Yes, Your Honor.  It was served on one of

23   Mr. Gireud's attorneys, Rene -- well, had represented him the

24   past -- Rene Ordoñez had accepted service that said he did not

25   represent him with regard to that compliance with the subpoena,
```

1    but he did accept service and gave it to Mr. Gireud.

2         THE COURT:  All right.  So if I hold a show cause

3    hearing to hold Mr. Gireud in contempt for failing to comply

4    with a subpoena, is that sufficient that you serve someone that

5    used to represent him in the past and then we go on that?

6         MS. FRANCO:  Well, Your Honor, he accepted service on

7    his behalf.  And of course, Mr. Gireud has not filed anything

8    seeking that he didn't receive proper service of it, but federal

9    rules are different on the service of subpoena.  I mean pretty

10   much anyone can serve a subpoena on someone.

11        THE COURT:  Okay.  So then because he, I'm thinking

12   from your pleadings, he showed up at the Government's office,

13   and from the Government's response that that in fact is true,

14   that he showed up at the Government's office with these

15   documents, so I guess I can safely assume that he was served.

16        MS. FRANCO:  Yes, sir.

17        THE COURT:  All right.  So then I can set him for a

18   show cause.

19        If you give me an affidavit telling me all of these

20   things you just told me that I can use for my show cause, I'll

21   serve him with a show cause as to why he should not be held in

22   contempt for failing to comply with the directive.

23        Now, I looked at the subpoena.  Was the Court's order

24   attached to the subpoena?  Because that subpoena doesn't say

25   anything.

1          MS. FRANCO:  Let me check, Your Honor.

2          Yes, Your Honor, it was.

3          THE COURT:  So all of those documents are then

4     attached to that cover sheet and then that's what's served on

5     the defendant.

6          MS. FRANCO:  Yes -- on the witness, Your Honor.

7          THE COURT:  I'm sorry, on the witness.  And he reads

8     through that order and figures out what he's supposed to do?

9          MS. FRANCO:  Yes, sir.

10          THE COURT:  Okay.  All right.  So I know that's where

11     we're at.

12          Now, from reading your pleadings, and I saw all of the

13     things you raised, the thing that concerned me was that you're

14     alleging that Mr. Gireud shows up with, let's say, 20 different

15     documents to the Government's office.  The Government looks

16     through them and says, well, here's 15 we'll give to the Court.

17     These five don't -- aren't responsive, so take those back, you

18     don't need to produce those.  That's kind of what -- something

19     like that was what you were alleging?

20          MS. FRANCO:  It's possible, Your Honor.  I mean that's

21     the problem with the Government interjecting itself into this

22     subpoena process is that we're not sure exactly what happened.

23          THE COURT:  Right.  Well --

24          MS. FRANCO:  I mean it wasn't 20 documents, Your

25     Honor.  I mean, I don't know --

1          THE COURT:  Oh, I know.  I'm just using that as --

2          MS. FRANCO:  It was 300 pages and that they tried to

3   say that they perused it, but they were able to find a tax

4   return in the middle of it, and so -- I mean, obviously, they

5   made copies of it.

6          THE COURT:  All right.  You're way past me right now.

7          MS. FRANCO:  Okay.

8          THE COURT:  I'm just trying to get the basics done.

9          MS. FRANCO:  Yes, sir.

10          THE COURT:  All right.  There's nothing that prevents

11   a witness from getting subpoenaed and going to the Government,

12   right?  I mean, he could've gone to the Government, showed them

13   the documents and then come here to the court complying with the

14   subpoena --

15          MS. FRANCO:  Yes.

16          THE COURT:  -- and violated no rule.

17          MS. FRANCO:  Correct, Your Honor.  He didn't.

18          THE COURT:  Right, because that's why I'm going slowly

19   because I'm trying to see what actually happened.

20          MS. FRANCO:  Yes, Your Honor.

21          THE COURT:  So you're saying that he showed up with

22   "X" amount of documents, but then only "X" minus "Y" was

23   delivered to the Court.  "Y" was then returned with Mr. Gireud

24   back to his house.

25          MS. FRANCO:  I don't know, Your Honor.

1          THE COURT:  I'm reading -- I'm talking about your

2     pleadings.

3          MS. FRANCO:  Well, Your Honor, I don't think that's

4     the position that we took.

5          THE COURT:  Tell me what it is.

6          MS. FRANCO:  Thank you, Your Honor, I will.

7          Our position is that through a series of telephone

8     conversations that Mr. Gireud had with the case agent and with

9     the Government, he was given legal advice as to how to comply

10    with the subpoena.  He was told not to substitute items that

11    were not specifically requested.

12         THE COURT:  The only thing I want to know right now is

13    if he showed up with documents, left some and went home with

14    some.

15         MS. FRANCO:  That's why we would need to have an

16    evidentiary hearing to find out.  We don't know.  That's the

17    problem.

18         THE COURT:  But that's what you are alleging or at

19    least wanting me to believe that's what happened.

20         MS. FRANCO:  Your Honor, what we wanted the Court to

21    be concerned about is to determine whether or not that indeed

22    happened.  We don't know, because all we know is that Mr. Gireud

23    showed up with some documents and Ms. Kanof received those

24    documents and some documents were returned to the Court pursuant

25    to a subpoena.

```
 1              We had requested several documents that were not
 2      returned by Mr. Gireud either, because he was instructed by the
 3      Government, well, they don't exist, you can't present them or
 4      that he tried to substitute documents in and they told him not
 5      to.
 6              THE COURT:  Okay.  So that's what I'm talking about.
 7              MS. FRANCO:  Yes, sir.
 8              THE COURT:  That's the "Y."
 9              MS. FRANCO:  Yes, sir.
10              THE COURT:  The documents that he had that weren't
11      turned over.
12              MS. FRANCO:  Correct.  That's our impression, Your
13      Honor.
14              THE COURT:  All right.
15              So let me hear from Ms. Kanof.
16              Is -- are you saying she is the one that dealt with
17      Mr. Gireud?  He's the one that has this knowledge?
18              MS. FRANCO:  Yes, Your Honor.
19              THE COURT:  Ms. Kanof, tell us what you think
20      happened.
21              MS. KANOF:  On Wednesday afternoon or I guess it was
22      early afternoon on Wednesday, April 6th, I was sitting in my
23      office and AUSA Arreola came to me and said that Agent Fry had
24      called her and said that Mr. Gireud wanted to talk to us.  We
25      don't know what it was about.
```

1          We placed a conference call from my telephone and

2     Mr. Gireud said that he had received a subpoena.  We're aware he

3     had received this subpoena because Mr. Fry had told us that

4     already.

5          The first thing he said was didn't you give the

6     defense all of the documents --

7          THE COURT:  This is Mr. Gireud?

8          MS. KANOF:  It was a conference call with Mr. Fry --

9     didn't you give all of the documents that I gave to you to them?

10    And I said, yes, of course we did.  And he said, well, most of

11    what he's asked for I already gave you.  So, do I have to give

12    it to them again?

13         Prior to that, I had said, did you call Mary?  Mary

14    Stillinger was his attorney until the middle of last week.  I

15    had been in constant communication with her and I had e-mails.

16    Ever -- the case has been reset eight times.  Every time it was

17    reset, I would tell her.  She's given us permission to talk to

18    him in her absence, both for the agents and the AUSA.

19         THE COURT:  Ms. Stillinger gave someone in your office

20    permission to talk to Mr. Gireud.

21         MS. KANOF:  Correct.  In her absence, she gave the

22    AUSAs and the case agent permission that -- from the very

23    beginning, she gave to Ms. Fielden and then reiterated to us

24    that we're free to discuss with him.  He is my witness for

25    preparation and since the case has been set so many times, I had

1    engaged in preparation of him more than one time, never alone,

2    always with other people present.

3            During this conversation, he -- I first asked him, did

4    you talk to Ms. Stillinger?  He had, according to Agent Fry, he

5    had spoken with him before and Agent Fry had said you need to

6    call your lawyer.  He said -- my understanding is that he told

7    Agent Fry that Rene Ordoñez wouldn't discuss it with him,

8    because he was only his lawyer for the civil case, the lawsuits

9    that are ancillary to this, and that he had tried to get ahold

10   of Mary Stillinger and could not.  On more than one -- one

11   occasion, Agent Fry and AUSA Arreola had said, tell him to call

12   his lawyer.

13           Now, in this conversation, we were caught off guard.

14   We don't know what it was going to be about and he started

15   talking about this.  The first thing I said is, did you call

16   your lawyer?  I tried many times.  I have not gotten a response.

17           Then he asked whether or not we had provided the

18   documents, and I said, yes.  Well, then why do I have to give it

19   to them again?  Because the subpoena says you do.  And then he

20   said, well, some of the things don't even exist.  Well, if it

21   doesn't exist, you can't very well give it to them.

22           In the middle of the conversation, he related that his

23   daughter was getting married that Saturday.  He was very, very

24   distressed and concerned that he do the right thing.  He said he

25   had actually missed out on some of the festivities and

1    participation, because he was spending so much time to respond

2    to items he didn't understand or may not exist.

3          At one point, he -- well, during the process,

4    Ms. Arreola or either Agent Fry or Ms. Arreola says, you have

5    the subpoena.  I e-mailed it to you.  I didn't realize that.  He

6    e-mailed it to both of the AUSAs, but neither of us bothered to

7    open it.  I popped it open to continue discussing it with him.

8          When I popped it open, I took a look at it and

9    realized it was in violation of Rule 17(c).  Not only --

10         THE COURT:  Is that the discovery issue you were

11   talking about where you're circumventing discovery?

12         MS. KANOF:  I'm sorry?

13         THE COURT:  Was that the issue raised about

14   circumventing the discovery?

15         MS. KANOF:  Yes, Your Honor.  Oddly enough, about two

16   weeks before that when I was out of town, I had received a

17   request from one of our (indiscernible) on a motion to suppress.

18   It was a little fresh in my mind and I took a look at it and he

19   -- the third thing he said to me was I don't have this item.  He

20   identified one item.  I don't recall.  And we, of course, had

21   discussed it and none of us recall what item he pointed to,

22   because we're trying to get through this, and he said I don't

23   have this item, but I've been searching.  Maybe I have something

24   that's related to it.  And that's when I said you just are

25   supposed to comply with the subpoena.  Don't substitute things

1       that are not asked for.

2               He said can I bring them to you so that you can make

3       sure that I did the right thing, that I complied with the

4       subpoena?  And I told him that I would review it with him on

5       Monday, the day that it was due, April the 11th.  Before that

6       was a possibility, he called me early Monday morning and he was

7       crying.  He was very upset about having lost his mother.  Excuse

8       me.  He is a very kind man and he spent a long time telling me

9       about his mother and that she was so kind that she had waited

10      until his daughter got married to die, because she had died on

11      Sunday after the wedding.  I told him that -- I told him if he

12      brought the documents to my office, I would walk across the

13      street with him and go to the court.  And he did present them

14      and -- and he said he needed to leave to fly to Torreón to take

15      care of the things for his mother.  I said bring the documents

16      to me.  I'll make sure the Court gets them.

17              About ten o'clock in the morning -- I even told him

18      just drive by, call me and I'll run out and pick them up.  I

19      don't want you to have any more stress.

20              THE COURT:  This was on Sunday?

21              MS. KANOF:  Monday, the day they were due.

22              And he called me on Monday -- no, I'll come in.  We'll

23      meet you in the lobby.  We met in the lobby, gave condolences,

24      spoke about his mother, handed the package, went upstairs.  I

25      handed the package to my legal assistant to make copies.  It

```
1    took her a little while -- meticulous folders for the Court --
2    but immediately prior to that, I put it on -- pulled out the
3    pullout on the side of my desk.  Ms. Arreola stood to my left.
4    And we literally took the corner and went like that to see if
5    they were voluminous.
6            It jumped out at me because I was considering filing
7    17(c) quash that there was a tax return and it also jumped out
8    at me that it was a personal -- so I looked at it.  It was a
9    1040.  The subpoena had not requested personal 1040s.  It had
10   requested from FGG.  And this was a personal 1040.  We are
11   trained in our office that if anything that has personal
12   identification in it like Social Security numbers, dates of
13   birth have to be redacted.  I knew I couldn't tamper with the
14   document, so I instructed my assistant take that, return, put it
15   in an envelope marked PPI, personal identification, personal tax
16   record.  Even though I knew it was not compliant to the
17   subpoena, I didn't remove it and put it back in where it came
18   from so that nothing has been altered.
19           After a little while, after she had -- she made two
20   copies, one for myself and AUSA Arreola, we had read the order
21   before we did anything.  We assure that the order was not
22   sealed, the subpoena was not sealed.
23           I will tell the Court that before this occurred,
24   Matthew Herrington, H-E-R-R-I-N-G-T-O-N, counsel for Mitsubishi,
25   had called me and had the identical conversation with me.
```

1          Mr. Herrington had called when he received the

2     subpoena, which he also sent to the Government, and said you --

3     didn't you give the disk we provided to the defense?  And I

4     said, yes, we did.  And he said, well, pretty much everything

5     we're asking for we may have, it's on that disk.  And I said,

6     well, you know, what can I tell you, you to give it to them.

7     And he said, I'm thinking of making a motion to quash.

8          In lieu of that, that's what we gave to the Court,

9     sealed.  He instead identified from the disk that was provided

10    to us by Mitsubishi and then directly to the defense without any

11    deletions the numbers of most of the items that had been

12    requested.

13         Rule 17 subpoenas are not a discovery tool and it's an

14    extreme measure and a showing has to be made to the Court.  I

15    felt very strongly when I saw Mr. Herrington's subpoena that

16    that -- and Mr. Herrington and I did discuss it -- that there

17    had been no compliance of any of the four prongs of the United

18    States Phoenix or Nixon, as adopting (indiscernible.)

19         And so regardless when Gireud said that to me, I had

20    already heard it.  And so on the Monday when -- after the copies

21    had been made, kind of for about an hour or so -- I was actually

22    working on a different case -- and that morning Mr. Gireud was

23    very upset that he hadn't had an opportunity to go through the

24    documents to make sure he was in full compliance.  He -- and

25    because of his daughter's wedding felt like, you know, I want to

1    make sure I do the right thing, you know, I need more time.  And

2    I said don't worry.  Don't worry.  I'll tell the Court that, you

3    know, what happened with your mother and that you want more

4    time.

5          And I had considered just calling the Court and

6    communicating this, but decided for full disclosure so defense

7    counsel would be aware of what happened, that I would do it in a

8    motion.  I wasn't doing it as his counsel as an officer of the

9    Court to communicate something because he had no other

10   alternative.

11         So I quickly drafted a motion for extension of time to

12   comply with the subpoena explaining to the Court what had

13   occurred.  And about an hour later, the U.S. Attorney Richard

14   Durbin called me and told me that he had received a call from

15   the Federal Public Defender, who was very angry, who was

16   accusing the Government of having engaged in a legal

17   relationship with Mr. Gireud and having represented him as

18   counsel.

19         He indicated to me that he had asked Ms. Franco, what

20   do you want?  What's the remedy?  What will make you happy?  He

21   said that she wanted us to withdraw the motion.  She wanted us

22   to explain what happened and explain what we did.  But most

23   importantly, she wanted us to give them a copy of the documents.

24         So when I hung up the phone, I immediately told my

25   legal assistant to run up to FPD before 5 o'clock -- this is

KATHLEEN A. SUPNET, CSR

1   like 4:30 -- and give them my copy, which she did before close

2   of business.  Then Mr. Durbin told me to file a motion to

3   withdraw the motion for extension of time and explain why.

4          That night after having a discussion with Ms. Arreola,

5   I called -- I am supervised directly by the Chief of Criminal,

6   Ms. Leachman.  She's also professional responsibility officer.

7   I won't disclose, because I think it's privileged what I

8   discussed with her, but she directed me to be a little more

9   specific and file an amended motion to withdraw.  And what she

10  actually said was draw a footnote.  Look, let's -- a full

11  disclosure.  I'll do it in the body and I won't tell you what

12  advice she gave me as far as legal advice, so I did that.

13         The next morning, I wrote a little more in depth to

14  withdraw the conversation that I had had with Mr. Gireud to be a

15  little more complete.  And that's basically what happened.

16  Every document that was turned over to the Government to go to

17  the Court was provided.  Nothing was deleted, nothing was added

18  and nothing was read.

19         In fact, I will tell the Court I still have not looked

20  through those documents, because having read the subpoena and

21  talking to Mr. Gireud, I know they are just repetitious.  It was

22  very clear that some of the things that were requested just

23  don't exist; copy of the website, are totally irrelevant and

24  improper.

25         Because of the dust-up, I did not file a motion to

1    quash.  I just didn't want to create any more issues.  But I did

2    have the opportunity and did submit to the authors of the

3    response what I had planned to submit to the Court in order to

4    quash that subpoena, and that's --

5              Have I left anything out?

6              (Sotto voce conversation.)

7              MS. KANOF:  I just want to point out to the Court two

8    things; one, Ms. Arreola and Agent Fry were present during every

9    word that came out of my mouth to Mr. Gireud and, two, before

10   writing the amended motion, Chief Gonzalez came into my office.

11   Ms. Arreola and I wanted to make sure we were very accurate

12   about what I told Mr. Gireud.  And we were calling Agent Fry.

13   Agent Fry lives in Arizona.  We were counseling him to ask his

14   recollection of what I said.  So -- for fairness and

15   completeness -- Jose Gonzalez walked into the office and we

16   said, could you please stay and be a witness to the conversation

17   we have with Agent Fry about the conversation I had with Gireud?

18   So AUSA Gonzalez stayed and listened to Agent Fry's rendition of

19   that conversation that occurred on April 6th between myself on

20   conference call with Agent Fry and Mr. Gireud, with Ms. Arreola

21   present in my office, and that's basically what happened.

22             THE COURT:  All right.  Thank you, Ms. Kanof.

23             All right.  Did you have a response?

24             MS. FRANCO:  Your Honor, I apologize for my voice.

25   I'm losing it for some reason, so, hopefully you'll be able to

1      understand what I'm saying.

2              Your Honor, with regard to what Ms. Kanof has related

3      to the Court, it's very clear that she did provide legal advice

4      to Mr. Gireud.  He calls up first case agent.  I got the

5      subpoena.  I don't know what it all means.  What do I do with

6      it?  He then reaches out to Ms. Arreola, who says, call your

7      lawyer, the only response that should have been given to

8      Mr. Gireud.

9              Your Honor, just to correct something, Ms. Stillinger

10     told us she did not represent Mr. Gireud, because we sent the

11     subpoena to her and she's the one that told us about

12     Mr. Ordoñez.  So at that point in time in March, she said she

13     did not represent him or we wouldn't have been going through

14     her.

15             For whatever reasons, his wife, daughter getting

16     married, the unfortunate death of his mother, he obviously sees

17     the AUSA office as his attorney, because he's asking for advice

18     on how to comply with the subpoena at issue.  The simpler and

19     ethical thing, he could talk to a lawyer.  If he didn't or

20     couldn't reach his lawyer, then it was up to him to comply with

21     a subpoena and come to the court to explain what it was.

22             By him indicating to Ms. Kanof that there was

23     something that was somewhat on point to what we were asking for

24     in the subpoena and her telling what's directly on point, don't

25     present it, it shows that she interfered with the issuance of a

 1     subpoena that was up to the Court to decide whether or not that

 2     response that he would have given would have been compliant with

 3     your subpoena order that you issued.

 4          I think that she did ultimate representing of him when

 5     we agreed to accept those documents and then she filed a

 6     document with the Court asking for more time for him to comply

 7     with it and for her to potentially do a motion for quash, which

 8     I think promised standing with regard to that, because the

 9     subpoena went to a third party, at least we thought not to his

10     attorney, which is apparently she became during this process.

11          So I think with everything that's happened, Your

12     Honor, by what she's told the Court here today, she definitely

13     created an attorney-client relationship with this witness.

14          MS. KANOF:  May I respond to a few factual

15     misrepresentations?

16          AUSAs never spoke to -- (indiscernible) told Mr. Fry

17     to tell Mr. Gireud to call his lawyer.  That's number one.

18          Number two, after this incident, I called Mary

19     Stillinger to ask her, do you still represent him?  And she did.

20     In fact, I have an e-mail from her husband.  What Mary told me

21     was I don't know whether he tried to call me or not.  I don't

22     give my client my -- certainly, I give them John's, her legal

23     assistant.  She said I'll have to ask John.  She did say

24     something about Mr. Gireud not having paid her and then she said

25     I'll have John talk to him.  I got an e-mail from John Godinez

1    saying that he had talked to Mr. -- he did talk to Mr. Gireud.

2         I received a phone call, and I think it's in the

3    footnote of our response time, last week from a familiar Colin

4    Hobbs, who's an attorney in San Antonio.  So, Colin Hobbs told

5    me that he was beginning his representation on that day, and on

6    that day Mary Stillinger's representation terminated.  So I

7    spoke with Mary Stillinger and she agreed.  She said, you

8    understand I am no longer -- she also sent me an e-mail -- you

9    understand I'm no longer the attorney.  And I said, as of when?

10   And she said, as of today.  And that was last week.

11        THE COURT:  All right.  Well, this is just a status

12   hearing.  Okay.  I'll let you put on whatever evidence you want

13   to put on Thursday after our final judge's conference, if you

14   have witnesses, whatever you want to do, make whatever record

15   you want to make, that's the time to make it.

16        Right now I wanted to find out about if Gireud was

17   actually served or not, what exactly he was served with.  And if

18   you give me the affidavit, I'll schedule him for a show cause

19   hearing and he can show me why I shouldn't hold him in contempt

20   for not complying with the subpoena .  I think he had plenty of

21   opportunity to comply.  He chose to go see the Government.  I

22   don't think there's anything wrong with that.  He can certainly

23   do that, what he wants.  This is America.  And so I don't see

24   anything problematic with that.  And I'll give you an

25   opportunity to put on whatever evidence you want to have.

1          I think that removing a member of the other branch of

2    government, that's a big deal, and so I would read the case that

3    you provided.  I just barely read Ms. Kanof's response this

4    morning.  But show me whatever cases you have where a court has

5    removed a prosecutor from a case and the reasons for that.

6    Maybe this wasn't perfect what happened, but it's -- I'm not at

7    this point as offended as you are.

8          MS. FRANCO:  Right.

9          THE COURT:  So I'm going to give you the opportunity

10   to show me how I should take that kind of offense where I'm

11   going to remove Ms. Kanof from the case, who's apparently been

12   with this case for the longest time, remove all of the United

13   States attorneys from the Western District of Texas.  Show me

14   some authority and reasons why I would do something like that.

15         Here's the thing that concerned me is that the

16   Government received "X" amount of documents, sifted through

17   them, provided "X" minus "Y" to the Court and provided "Y" back

18   to Mr. Gireud.  Ms. Kanof said that didn't happen.

19         MS. FRANCO:  Right.  I guess we'd have to get them

20   from Mr. Gireud if that's the case.

21         THE COURT:  I'll give you the opportunity right after

22   our judge's conference of everything you want to put on, any

23   witnesses, whatever, at that time.

24         MS. FRANCO:  Okay.

25         Your Honor, since we're here at a status conference,

1    and I know that you need to start working or bringing in a jury,

2    there are some recent developments in the case you need to be

3    aware of that's happening that could potentially affect this

4    trial date next week.

5          The contract FGG, which is the company that

6    Mr. Delgado was involved in with Mr. Gireud, had entered into a

7    bid agreement or contract with the electric company in Mexico.

8    That's the CFE contract.  And it's a long contract with a lot of

9    attachments to that contract.

10         THE COURT:  Is it in English or Spanish?

11         MS. FRANCO:  It's in Spanish, Your Honor.  The

12   Government only translated two of the attachments to the

13   contract and so we have a problem now because the entirety of

14   the contract should have been translated from Spanish to

15   English.

16         I think the Government's position is that those other

17   attachments aren't necessary for their case.  Our argument is

18   Rule 106, which is a rule of completeness, if they're relying on

19   that contract, the contract is read as a whole, not just cherry

20   picking provisions out of the -- that account with the Mexican

21   government and our client Mr. Delgado.  It's voluminous.

22         THE COURT:  Rule 106 is an evidentiary rule that deals

23   with admitting evidence, whether or not they should be putting

24   together that under the rule of contracts, but if they produced

25   the exhibits and you want the entire document produced, it's

1    your obligation to provide the translated parts that you want to

2    admit.

3            MS. FRANCO:  My point is back to the Court, if you

4    will with all due respect, is that improperly shifts the burden

5    to us since the Government is the one who's prosecuting

6    Mr. Delgado.  And so if they're going to offer in this contract

7    as proof of his fraud, because of his compliance or fraudulent

8    activity with regard to that contract, then the entirety of the

9    contract should be submitted to the jury and to the Court for

10   consideration and that has not been done.  And it's voluminous.

11   It's probably another 500 to 1,000s of pages of documents that

12   would need to be translated.  If the Court is to rule it's on us

13   to do it, I haven't done it.  I would need a court certified

14   interpreter and that can't be done by Monday.

15           THE COURT:  I can't argue with that.  I can tell you

16   that the rule of optional completeness is the rule of optional

17   evidentiary rule contract law who admits what and when.  And so

18   I'm not changing any burdens on anybody.  That's an interesting

19   argument, which certainly you can make, but the rule is the

20   rule.  They produce it.  And if you have something that should

21   come in contemporaneously, then you submit it .  If you need

22   time to translate the documents, if you need a certified

23   interpreter -- when did you get those documents?

24           MS. FRANCO:  Well, Your Honor, we've had them.  We

25   haven't got all of the attachments until relatively recently,

1    because all of this stuff has been trickling in.  So I think now

2    we have a complete set as a result of the subpoenas that were

3    served, and AUSAs and Mr. Gireud, that we now have the complete

4    set.  It hasn't been that long that we've had the complete set.

5    The last time we were in court, the Government had indicated

6    they were going to be dropping translations on us.  I don't --

7            THE COURT:  Approximately 5,000 documents.  That's how

8    much that --

9            MS. FRANCO:  5,000.

10           THE COURT:  -- that contract is page-wise?

11           MS. FRANCO:  I couldn't know.  I think that 5,000 is

12    kind of a lot; 3,000 pages is a lot.  It's a lot.

13           THE COURT:  There was a contract that was 3,000 pages.

14           MS. KANOF:  It's about 150 pages.  We produced it on

15    March 20th, 2014.  It was signed for by handwriting Sandra, last

16    name Duffy, maybe from the Federal Public Defender's office.

17           MS. FRANCO:  They're misunderstanding what I'm saying.

18    I'm talking about all of the Mexican -- the attachments, the

19    exculpatory, those.  That's what I'm talking about, which were

20    attachments to the contract that are referenced in the contract.

21    They're in the last page of the C -- yes, we've had all of that

22    stuff, but we haven't had the translations of all of the -- I'm

23    sorry -- the attachments to that contract.  And they're

24    attachments A through W.  They have translated S and T, but not

25    any of the other letters of the alphabet.

```
 1              THE COURT:  When did you get the anexos (Spanish)

 2    or --

 3              MS. FRANCO:  Let me check on those, Your Honor.

 4              MS. KANOF:  Your Honor, I can respond.

 5              This FedEx package is the entire request from the

 6    MLAT.

 7              THE COURT:  I'm sorry, the request for what?

 8              MS. KANOF:  M-L-A-T -- it's all caps -- stands for

 9    Mutual Legal Assistance Treaty.  It has all of the anexos except

10    Anexo W, which has -- I think is three pages long -- no, I'm

11    sorry, Anexo W is 32 pages long.  And Anexo W is also in both

12    English and Spanish.  And this is the package that was provided.

13    We received it March 12th of 2014.  And it's the one I referred

14    to you that was picked up by FPD in April.

15              MS. ARREOLA:  March 20th.

16              MS. KANOF:  Oh, March 20th.

17              We've pretty much turned over everything we do -- we

18    got it, but the anexos are part of the MLAT production.  And

19    what has trickled in are translations and --

20              THE COURT:  Did the FPD represent him in 2014?

21              MS. KANOF:  Yes.

22              We'll get you the exact date, Your Honor.

23              But they did sign for -- yes, this was actually

24    produced -- the MLAT production which is the contract with all

25    of the anexos.  It was Anexo A through V, because Anexo W didn't
```

```
 1    come through the MLAT.  We got it from Anexo W from Mitsubishi.

 2    And so that -- the Mexican government didn't provide it to us.

 3              THE COURT:  Did not provide it?

 4              MS. KANOF:  They did not.  It did not come in the

 5    MLAT.  And so we gave them the Anexo W when we did get it.  And

 6    I don't remember when that was, but it was quite sometime ago.

 7    It was --

 8              THE COURT:  And you say that's three pages?

 9              MS. KANOF:  It's 32 pages.

10              THE COURT:  Oh, 32 pages.

11              MS. KANOF:  32 pages.

12              And it's -- there're several versions of it.  We've

13    provided all of the versions that we received.  And it's

14    called -- Anexo W is called -- basically, it's a document --

15    it's a technical document in which Mitsubishi insisted that it

16    be included in the subcontract, because they insisted that every

17    one know that their generators did not meet the specifications

18    of the bid.  The generators were preexisting.

19              They were provided to them on March -- oh, the FPD

20    became counsel --

21              THE COURT:  Ms. Arreola can tell us if she wants.  I

22    mean --

23              MS. KANOF:  Oh, I asked her did she want to and I

24    don't think she did.

25              As to the -- his counsel, March -- March 19th of 2014.
```

KATHLEEN A. SUPNET, CSR

1              Huh?

2              And we produced them the next day.

3              THE COURT:  All right.

4              Ms. Franco, do you agree with that?

5              MS. FRANCO:  Mr. Hanshew was talking to me, Your

6    Honor, so I don't --

7              THE COURT:  Oh, I'm sorry.

8              MS. FRANCO:  I'm sorry.

9              THE COURT:  She said -- she's saying that you-all

10   became counsel on -- in March of 2014, and the next day that

11   they provided that -- everything that's included in that FedEx

12   envelope, which included Anexos A through --

13             MS. KANOF:  V, Your Honor.

14             THE COURT:  -- V, and then W --

15             MS. FRANCO:  Well, Your Honor --

16             THE COURT:  -- and W came at a later date.

17             MS. FRANCO:  At a later -- right.

18             And during the course of our representation,

19   Mr. Delgado, we had asked for the specks that were part of the

20   contract and that was not included in the MLAT.  And so they --

21   you know, these are the things that have been coming in.

22             But you know it's interesting that they have the

23   original MLAT that has the entirety of the contract, but they

24   don't -- but they didn't translate the entirety of the contract.

25   And, yet, they want the Court, under their exhibits to introduce

1      a modified MLAT, which is I guess now is going to exclude the

2      entirety of those -- of the contract, leaving out the ones that

3      they didn't -- that they didn't translate.

4              But Your Honor, they have not been translated by a

5      certified translator, the other amendments to it.  I think that

6      we're going to be absolutely ineffective, because this is

7      important to our case to be able to use the other parts of the

8      contract.  When we were cross-examining Mr. Gireud, he

9      referenced CFE during the trial.  And it's our error, quite

10     frankly, that we assumed and you know said anything about that,

11     that those -- that the entirety of the contract and the

12     attachments would have been provided to us.

13             Part of the confusion is that Ms. Kanof was referring

14     to things that had trickled in like the translations is because

15     Mr. Hanshew and I can read Spanish, you know, we can read what

16     these are, but I'm not going to testify and tell the jury what

17     it is and I can't cross-examine that witness on it and that's

18     part of the problem.  So recently, the other -- so there's that

19     issue.

20             The other issues are that they provided some *Brady* and

21     *Giglio* to us, which is probably five or six pages that's

22     Spanish.  I asked if they were going to translate that for us

23     and they said, no.  So there's that.

24             And very recently, Mr. Pimentel from the first case

25     has now risen his head in this case and has now changed the

1    theory of the Government's case as to how this contract was

2    entered into within FGG.  Mr. Delgado needs to be -- CFE is now

3    claiming that bribery was involved in it.

4          On Friday afternoon, Mr. Jose Luis Gonzalez gave us

5    the contact information for Mr. Pimentel, so that we can talk to

6    him to find out about this impeachment material with regard to

7    Mr. Gireud and some of the other potential individuals that the

8    Government is going to have.  We need the opportunity to track

9    him down.  We do have his phone number.

10         THE COURT:  When did you get that notice?

11         MS. FRANCO:  On Friday.  And we're in the process of

12   trying to locate him, but the Government also told us he's in

13   the process of moving, so he's sort of a moving target.  And if

14   we do decide we want to use him, we'll have to have them served

15   again and ask for a subpoena for him, which is not going to be,

16   you know, like that.  It wouldn't be quick.  So...

17         THE COURT:  Do I have to get him counsel?  Do I have

18   to have counsel if you subpoena him?

19         MS. FRANCO:  I don't know on that, Your Honor, but...

20         THE COURT:  I'm trying to remember from the other

21   case.  Pimentel wasn't -- it was the young guy --

22         MS. KANOF:  He's the informant.

23         THE COURT:  -- from UTEP.

24         MS. KANOF:  I can respond to all of this.  Would you

25   like me --

1          What happened was when it got to be close to 14 days,

2    the Government started providing *Brady* and *Giglio* on 2014, as

3    soon as we learn about it, but at the time to be complete,

4    Ms. Arreola recalled that during debriefing, Pimentel knew

5    Delgado very well.  They were friends.  And that during debrief,

6    Pimentel made a comment about Gireud having something to do with

7    a bribe in this case.  So we decide to call him to clarify it,

8    so that -- we never discussed it because it didn't have anything

9    to do with that case.  And Frankly, I didn't know about this

10   case at the time.

11          And so we made that phone call in participation of our

12   deadline.  We made it with Mr. Gonzalez present, two agents

13   present.  And what Mr. Pimentel told us does not in any way

14   change, shape or form, change the Government's theory.  The

15   Government did not charge Mr. Delgado with a violation of the

16   Foreign Corrupt Practices Act.  Of course the Government did not

17   charge Mr. Delgado with obtaining the contract by bribe.  The

18   Government recognizes that's how you get contracts in Mexico and

19   did not -- that's not the gravamen of the indictment.  He's

20   charged with a bunch of lies to steal money from the contract.

21   And Mr. Gireud, I think the testimony will show, didn't know

22   that was happening.

23          But we do have a *Brady* obligation to the extent that

24   it could possibly be considered *Brady* or *Giglio*.  We called

25   Mr. Pimentel and he told us that he recalled that Mr. Delgado

1    sent Mr. Pimentel and Mr. Gireud to an individual named Nervo,

2    N-E-R-V-O, Vargas.  He's not the actual head of the electrical

3    union, but he's the functional head, very, very powerful man.

4    If he doesn't send his workers to the power plant, it doesn't

5    get built.  And Mr. Pimentel's family had been friends with

6    Vargas.  Delgado met Vargas and became very close to

7    Mr. Pimentel and said Mr. Vargas does work by bribes.

8           So he said Mr. Delgado sent him and Mr. Gireud to

9    Mr. Vargas to find out what he wanted to get the contract.  So

10   we -- he also -- so we brought Mr. Gireud in to ask him about it

11   on Sunday, again, with everybody present.  And in fact,

12   Mr. Gonzalez was the lead inquirer -- inquirer about it.  And so

13   Mr. Gireud did admit he assumed that that was the way they had

14   to get a contract.  He not only said that, he didn't recall what

15   specifically Mr. Pimentel said, specific instance, but he did

16   say that, you know, he knew that that's what Delgado was doing.

17   He turned a blind eye to it.  But there was a specific instance

18   where they were in Las Vegas where Mr. Vargas goes and asked

19   Mr. Gireud for $5,000 for a bribe, and Mr. Gireud said, no,

20   because he didn't have $5,000.

21          So it has nothing to do with the Government's theory

22   of the case.  It was merely an obligation for impeachment.  They

23   can ask him, Mr. Gireud, till the cows come home, bribe the

24   Mexican Government.  I don't care.  It doesn't have anything to

25   do with what is charged with the indictment, how the contract --

1    everybody looks at that contract and this must be a bribe

2    because the other two bitters were General Electric and Siemens

3    of Germany.

4            Now, FGG, which was recently formed in a corporation

5    out of El Paso with one member, Mr. Gireud and -- and to -- Your

6    Honor, Mr. Delgado could have gotten that contract, you know, a

7    kindergartner would have known it was a bribe.  It isn't a

8    surprise to anybody nor believed or understood or turned a blind

9    eye that that's how they were getting contracts.  That's what

10   Mitsubishi thought, I am sure.  But that's what really happened.

11   So there's no change in theory going on here.

12           With regard -- and I agree with the Court's

13   interpretation to the rule of completeness and translation.  I

14   would just, if the Court will indulge me, I'd like to give some

15   law.

16           THE COURT:  That's always a good --

17           MS. KANOF:  Well, I have this planned, so if the Court

18   will indulge me.

19           UNKNOWN SPEAKER:  Your Honor, may I say something

20   before to make a little correction here.

21           The Government is not saying that all contracts

22   entered in Mexico are by corruption.  I don't want to believe

23   that.  I don't want somebody to go out and report that the

24   United States is taking that position, because I want to make

25   that clear for the record.

1          MS. KANOF:  I'm glad he said that, Your Honor.  The

2     majority of businessmen in Mexico are probably honest, but

3     having prosecuted a whole lot of Americans for taking bribes for

4     contracts here in El Paso, I didn't mean to imply that Mexico

5     was the only location or that that was the only way they did

6     business, so I do apologize if I left that impression.

7          Your Honor, in talking about the rule of completeness,

8     Whitmore liked to (indiscernible) McCormick, would quote, could

9     hold up the Bible and say, there's no God, because in the Bible

10    there's a quote that says there's no God.  But rule of

11    completeness, the believer would have entitled -- be entitled to

12    give the entire quote, which is the fool hath said in his heart

13    there's no God.

14          But what the Fifth Circuit says about that it is

15    incumbent on the opposing party if they think the portion that

16    has been placed into evidence is not complete, well, could

17    have -- or confuse the jury, they have an obligation.  And that

18    obligation according to *U.S. v. Garret*, 716 F.2d 257 is that

19    they must show -- or at least a better case, *U.S. v. Crosby*, 713

20    F.2d 1066 -- they must show precise that the portion they wish

21    to admit at the time encourages completeness, that it is

22    relevant, that it will assist the jury and that -- and also that

23    it's admissible, that --

24          And in this particular case, I will tell the Court one

25    of the reasons the Government did not translate everything, and

1    one of the reasons that they only proposed to put in those parts

2    that are relevant is because unlike the United States, Mexico

3    still uses lots of legal jargon that is meaningless pages and

4    pages of irrelevant stuff, explain who people are, "whereas" and

5    "therefore" and all of that kind of stuff, we could not afford

6    the money to translate.  But in addition to that, in this

7    particular case in these documents, the Government believes that

8    putting the whole document in would actually confuse the jury

9    more.  So the government in its case-in-chief chose to provide

10   those documents and translate those documents and translation

11   that would in our opinion prove the Government's case and assist

12   the jury.

13          The defense can stop us when we put that in and show

14   the Court it will confuse the jury in -- if that's all in there,

15   this portion needs to be in here, too, and we've translated it

16   and it needs to go in right now so as not to confuse the issue

17   and it's relevant to the issue and we, of course, have no

18   objection to that because it's consistent.

19          I do have case law on the translation issues as well,

20   but I think --

21          THE COURT:  Case law on the translation issues?

22          MS. KANOF:  -- on whether or not we have to translate,

23   we don't.

24          THE COURT:  Oh.

25          MS. KANOF:  But the Court has already -- I have many

1     cases from every other that agrees with the Fifth Circuit.  The

2     Fifth Circuit is pretty strong about not having a requirement to

3     put in the whole document and it basically is incumbent upon the

4     true believer.

5             THE COURT:  Did they talk about the burden of

6     shifting?

7             MS. KANOF:  There's no burden of shifting, Your Honor.

8     Never saw a burden of shifting in any of the cases.

9             Does the Court have any other issues that need to be

10    addressed?  I did want to give them a couple of cases and *U.S.*

11    *Branch*, another case -- it's another Fifth, 91 F.3d, 699, and

12    opposing party has to provide relevancy, but they have to do it

13    with, quote, particularity, relevance, necessity and explain how

14    it would be required in that place in context so that the jury

15    can understand it.

16            THE COURT:  But those cases are limited to the rule of

17    optional completeness.

18            MS. KANOF:  They are.

19            THE COURT:  They can always, but it in their case in

20    chief.

21            MS. KANOF:  They're all Rule 106.

22            THE COURT:  Yeah.  Okay.

23            MS. FRANCO:  Your Honor?

24            THE COURT:  Are we in a big hurry to try this case?

25    If the Public Defender wants time to translate the "but fors"

1    and "heretos"...

2         MS. KANOF:  My only concern, Your Honor, is speedy

3    trial.  This will be the ninth --

4         THE COURT:  They did waive speedy trial, right?

5         MS. FRANCO:  Yes, Your Honor.  If we've -- if I could

6    let Mr. Hanshew take over, because I'm --

7         THE COURT:  Oh, yes.  I'm sorry.  And thank you,

8    Ms. Franco, for being here and offering your voice for what you

9    could.  Hope you feel better.

10        MR. HANSHEW:  Thank you, Judge.  I'll be the voice

11   from now on.

12        I think the last question is really relevant here

13   which is I did confer with Mr. Delgado myself about the issues

14   that have come up in the last week which -- and to get his

15   response in terms of if he would have any opposition to continue

16   with the trial in this case.  He indicated he would not.  He

17   would waive speedy trial consideration.  And I just wanted to

18   just quickly summarize.

19        In total, I think that the issues in the last two

20   weeks that have come up at the forefront is this issue about

21   whose obligation it is to provide the interpretation -- the

22   English interpretation, certified, no less, of this contract.

23   And I won't repeat everything Ms. Franco indicated, but in terms

24   of the rule of completeness, yes, I'm not disagreeing with the

25   Court's commentary about, you know, how that happens.

1    Obviously, the direct party puts their evidence, the opposing

2    party can then say you need to include, you know, "X" "Y" and

3    "Z" to make that complete, and that is the process.

4           The wrinkle in this is that frankly I think our

5    offices have been trying, and one of the only things we've been

6    able to work out in total of this is the passing of the

7    information in terms of translations.  And the Court will

8    remember Ms. Kanof, not the sentencing in the last case, the

9    last hearing in this case, even acknowledged presentencing

10    concerns about later disclosures of translations.  She indicated

11    we'll be providing those as we go.  For better or not, we took

12    that to understand that there would be translations of all of

13    the pertinent documents.

14           It's undisputed from the Government that this contract

15    and the anexos (Spanish), the annexes that are attached, which

16    are incorporated by reference and the specifications which even

17    Ms. Kanof raised earlier, complete and make up what is the

18    contract.

19           THE COURT:  When did the defendant get the

20    translations?

21           MR. HANSHEW:  We received -- oh, gosh, Judge.

22           THE COURT:  What I don't want is for both of you to be

23    spending money on translating the entire document.  It makes

24    sense to receive the portion she wants and then you translate

25    the portion you want.

1          MR. HANSHEW:  And that is exactly the point where we

2     got to last week, which is -- the short -- and I'll take

3     responsibility for this.  I should have probably long ago said,

4     please identify which specific ones you're going to provide and

5     by what date that was going to happen.  Instead what occurred

6     was last week, Ms. Franco spoke with Mr. Gonzalez to confirm

7     that there would be the rest of this, what we thought the rest

8     of the translation was coming, and we were told that was the end

9     of the translations, which obviously caused this, you know, this

10    rift and great concerns on our parts and the back and forth

11    about whose responsibility it is.

12          The documents as they are shown, that's part of it,

13    but the specifications are part of it.  And I can, just by

14    visual -- I couldn't give you a page count -- but we have in our

15    office two binders full.  And I know in the conversations

16    between Mr. Gonzalez and Ms. Franco, you know, there was visual

17    discussions of documents, you know, knee high, plus it's the

18    type of thing that had not been certified -- hadn't received

19    certified translations, grave concerns of economics, you know.

20          From the Government's perspective, they indicated that

21    DOJ was not going to do -- spend the resources to do that.  You

22    can imagine if DOJ is concerned about their resources, our

23    little public defender office in a district, you know, is

24    concerned about the finances.

25          That being said, we're obviously at a point now, and

1    that's why I raise it with this Court that -- to take the

2    Court's guidance, it appears that what the Court is indicating

3    today that, you know, it would be -- the burden would be on us

4    to do that, which, you know, we will -- we'll do if that's

5    what's required, but it's going to take time.  These

6    translations take time.  I know we've seen from the Government,

7    and Ms. Kanof explained last time, the translations will be

8    coming as time passed, because it took some time and effort.

9    It's going to take us time to do that as well.

10          So in terms of asking for a continuance and speedy

11   trial concerns, that's the first and foremost problem we have in

12   front of us.

13          The other issues have been the submission of *Brady* and

14   *Giglio*.  And to be clear about this so that there's -- I'm not

15   implicating bad faith on the Government, that component of it,

16   but the Government complied with the Court's scheduling order,

17   which was to provide *Brady, Giglio* two weeks before trial was

18   the scheduling order on May 9th.  We received letter information

19   attached to that from Mr. Gonzalez detailing that information.

20          What had been accompanying that over those few weeks

21   as well, as soon as Mr. Gonzalez noticed his appearance in this

22   case, had been their continuing discovery obligations is, I

23   think they word it, they were meeting with witnesses and

24   providing new information.  And this -- it wasn't just random

25   information.  It wasn't extrinsic.  It wasn't irrelevant

1    information.  It was, for example, the chief attorney for CFE

2    that's involved in this was investigated and found in the wrong

3    by Mexican government agencies as it relates to this contract.

4    It was, for example, last week, finding out that Mr. Pimentel

5    had recently been interviewed and provided this information that

6    their star witness, Mr. Gireud, that we heard and talked about

7    and was emotional about how closely he felt to this person, lied

8    and was actually at a meeting by himself with Mr. Pimentel,

9    summons Mr. Delgado to set up a bribe in this contract.  So this

10   isn't just, oh, by the way, information about some, you know,

11   random letter.  This is information that impeaches and in fact

12   implicates their witness in that crime that relates specifically

13   to the contract that's at the heart of this case.  The heart of

14   their case is about what Mr. Delgado was authorized or not to do

15   in terms of this contract and obligations of the various

16   parties.  So this is the type of information we get.  We get as

17   you heard that Mr. Pimentel is out of state moving and we have a

18   phone number.  We don't know if he's represented by counsel.

19          And I think the Court raised an excellent question.

20   Should the Court appoint counsel?  I frankly would ask that the

21   Court do that, because I don't want to get involved in another

22   Gireud, you know, escapade here.  We don't want to speak to

23   someone who isn't represented by counsel, that's why we reached

24   out to Mary Stillinger, who received court materials, talked

25   about accepting service.  And she said, well, I haven't talked

1    to him for so long.  You know, I don't think I'm his lawyer

2    anymore.  So here's Rene Ordoñez, otherwise, our office doesn't

3    want to and I am sure the Court wouldn't want me to unless it's

4    compelled.

5           So by grave contrast, I can tell the Court that

6    dealing with Matt Herrington, the attorney for FPSA on this

7    case, which I did on a regular basis throughout their

8    submissions to this Court, was a pleasure.  It was the normal

9    process.  It was two lawyers meeting, conferring, not once to be

10   clear to clarify something, not once did he in all of

11   discussions we have indicate that he was going to file a motion

12   to quash.  In fact, the only issue that even remotely got to

13   that was questions about attorney/client privilege, particular

14   areas addressed there we worked that out.  And you saw by the

15   cover letter attached, this is how that process works, a lawyer

16   to lawyer, meeting, conferring, and they submit the documents to

17   the Court.

18          But again, I think as far as Mr. Pimentel is I think

19   he should have an attorney.  His statements implicate him in a

20   crime.  His statements implicate their star witness is a client.

21   He also -- Ms. Kanof left out his statements -- not only do they

22   implicate Mr. Gireud, their star witness as being involved in a

23   crime with him with Mr. Delgado at that time, but we received

24   the *Brady*, *Giglio* from the Government, which are the statements

25   that Mr. Gireud had been giving to the Government and none of

1   that included admissions by Mr. Gireud that he had been involved

2   in the bribe scheme with Mr. Pimentel.  So it appears he has

3   also broken whatever agreements he has with the Government.

4          So again -- and this is the type of information that

5   we now as of Friday have a phone number for that we have to

6   investigate, reach out to, perhaps subpoena this individual and

7   go through this process, which makes again a Monday trial date

8   an impossibility for us in this case.  And that is the issue

9   that has been partly -- I think, we have reached the end of the

10  road, because hopefully the Government at this point, and what

11  they've done in the last two weeks in the run of this trial has

12  given us everything now, now that they've spoken with this

13  witness, received new documents, new testimony and statements

14  from them.  And they have been, you know, as Mr. Gonzalez has

15  been diligently, you know, providing to Ms. Franco and myself,

16  that part has been done, but it's only fair and due process at

17  this point that we be allowed to actually investigate and

18  prepare that information for a trial which is an impossibility

19  for Monday, Judge.

20         THE COURT:  I'm not taking up a motion to continue

21  right now.  This was just a status hearing.  We'll take up all

22  of these motions on Thursday and give everybody a chance to

23  subpoena witnesses, put on whatever you want.  We'll be here all

24  afternoon and night to get that done.

25         I'll tell you what my impressions are, which are

subject to change.  These are not set in concrete.  My first

impression is I probably will grant the continuance based on

that.  My first impression is I don't think that what happened

here is so egregious that I would take that extraordinary step

of removing a member of the other branch of government from this

case.  If there are any ethical or other criminal concerns,

that's going to be somebody else's issues.  It's not mine,

because it doesn't impact the fairness of the trial to your

client.  That's what I was primarily concerned about, whether

there were any documents that were removed from the stack that

was produced.  That concerned me.  I don't think that's

happened.  I'll give you an opportunity to prove that it did

happen at this hearing.  My general impressions, what I heard,

I'll probably grant you a continuance.  I can be convinced this

is so egregious that I would have to remove all of the AUSAs

from the Western district, but that's not my first impression.

            MR. HANSHEW:  I understand, Judge.  One issue relates

to the issue for Thursday on the motion to dismiss and

disqualify.  The only way we would be able to have witnesses,

which would obviously be Mr. Gireud, the Government, its agent,

would be through subpoena.  Any subpoenas for the Government or

its agents are subject to Touhy, which is a process that would

take longer.

            THE COURT:  What's Touhy?

            MR. HANSHEW:  Touhy?  It's a case.  And it basically

1    requires that there's more extended administrative process to

2    get the approval from the Department of Justice on when you

3    subpoena federal agents and/or prosecutors and also the issue

4    with Mr. Fernando Gireud.  I can reach out immediately to his

5    new counsel, who I found out is his son's law partner, and ask

6    if he'd accept service for subpoena, but I don't know if he

7    would do that and/or if he would be available for Thursday.  I'm

8    putting it out there.  I don't want to -- to happen Thursday and

9    say, Judge, we're out this, but the Touhy process, the

10   Government can speak better to how long that is, but it's

11   definitely not a two-day turnaround.

12         THE COURT:  Ms. Kanof?  I mean because, basically,

13   that's going to force me to decide the continuance right now if

14   having the hearing is going to take us beyond the trial date.

15         MS. KANOF:  Your Honor, if I can also respond to a few

16   misstatements made by Mr. Hanshew.  We'll get a copy for the

17   Court to put in evidence.

18         On July 16 of 2014, that's almost two years ago, the

19   Government sent its first discovery letter.  And we have

20   receipts from FPD.  We have practiced in this case -- in the

21   past, the Government likes to notify (indiscernible) -- meeting,

22   potential agent, AUSA's case agent takes notes and commits these

23   notes to writing.  While these statements are not technically

24   Jencks material, we have in the past permitted your client,

25   former counsel, to read these.  And other agent again

memorialized interviews in the U.S. Attorney's office in advance of trial.  We are extending that offer to you as well.

The letter goes on, but it includes two single-lined summaries of the first interview we had with Miller and Fernando Gireud.  We extended that invitation two years ago and the defense never took us up on it.  We extended an invitation for the defense to come over and look at records that were hard to copy like bank documents, and the defense never availed themselves to that invitation.  We have many, many discovery letters, because it is Ms. Arreola's and my practice to do that. We did it with Mr. Esper and Mr. Velarde, who did avail themselves in many cases.

This -- Mr. Hanshew seems to have the impression that Mr. Gonzalez came into this case and was providing them with things.  No, that's not what happened.  Ms. Arreola and I were providing them to Mr. Gonzalez to forward.  He was just an intermediary on our behalf.

The attorney, Mr. Moreno Nunez, we didn't know he was going to be a witness.  He came to El Paso a couple of weeks ago and immediately, and during that interview, told us not that he had -- what he told us is he had investigated an administrative proceeding in which they blamed him in 2014 for having been present at the opening of the bids and having not taken action to point out to them some irregularities in the bids.  He said I'll send it to you.

1          He sent it to us.  We sent it by e-mail immediately

2     that day to defense counsel.  There is nothing that we have

3     provided them that we did not give to them within a day or maybe

4     two days of what we received.

5          As far as talking to Mr. Gireud and Mr. Pimentel,

6     defense counsel has turned due diligence into nefarious conduct.

7     We didn't have to do any of that and they wouldn't have known.

8     They didn't have to make a motion to extend and they wouldn't

9     have known, but we did.

10         It's just very difficult -- Francisco Moreno Nunez is

11    not the chief attorney general for CFE.  He is a subs --

12    sub-deputy at the time, just happened to do some rough drafts

13    and CFE offered him with knowledge.  He's one of the few people

14    that's still there.  There's another attorney that we spoke

15    with.  He had some knowledge and he's also going to be a

16    witness.  He didn't have Spanish.

17         And then there's a substantive witness and we also

18    told them his name is Buendia, that he's going to testify, none

19    of which we had to do.  We've been extremely open and we have

20    every discovery letter, every receipt.

21         If this Court will remember, in its first motion the

22    knee jerk reaction that we gave them so much material, and of

23    course the Government provided the Court with the Bate stamped

24    numbers provided two years before, but evidently the defense

25    attorneys were unaware of what they had.

1            With regard to Mr. Hanshew's dealing with

2     Mr. Herrington, the letter speaks for itself.  Again

3     Mr. Herrington provided Bate stamped numbers of things that

4     defense counsel has had more than two years and violation 17(c)

5     subpoena.

6            He -- the most interesting thing Mr. Hanshew said is

7     that Ms. Franco said Mary Stillinger said she was not his

8     attorney, and Ms. Franco -- Mr. Hanshew just said Ms. Stillinger

9     said I don't even think I'm still his attorney or his lawyer.

10    That's not even consistent with each other.  They want to call

11    Mary Stillinger.  I can only represent to the Court what she

12    told the Government and that was that she was.

13            But Your Honor, the Government has no objection in the

14    interests of truth and justice in the court system to a

15    continuance.  They do have an objection when both the actions of

16    the Government are misrepresented as is Mr. Gonzalez was brought

17    in because myself or Ms. Arreola had done something wrong, he

18    was not, and as if the Government has not complied with their

19    obligations, because they have.

20            THE COURT:  Well, you know, when the zealous advocates

21    meet in the well of the court, it often creates such friction

22    that it seems much more important to the applicants than to the

23    Court.  The bar here at the bench somehow insulates the Court

24    from those sort of engagements between the litigants, and I

25    certainly -- I listen to advocates.  I don't take a lot of that

1  to heart to mean anything.  Here's a zealous advocate

2  representing their client to the -- we should be very grateful

3  tries cases, because trials are starting to disappear, and I

4  just -- I don't know any lawyers who spend all of the time to go

5  to law school and getting barred that don't have a very basic

6  desire to be at trial.  And you-all are very lucky that you get

7  to be in trial, because there's a lot of people, really smart

8  lawyers, who don't get that opportunity.  And I've had a lot of

9  people come through my chambers, brilliant minds, that never get

10  the opportunity to go to court much less trial.  And it's a

11  great opportunity we have.  So we shouldn't let the zealous

12  advocacy destroy what is otherwise kind of a pleasure we all get

13  to enjoy, those of us that get to participate in the courtroom.

14          Anyway, Mr. Hanshew, I didn't mean to interrupt you.

15          MR. HANSHEW:  I'll close with the part that just to be

16  clear as I said in my -- no way what I said to say that they

17  have been acting nefariously.  I actually opened with that.  And

18  my comments about -- just to be clear about Mr. Gonzalez, that's

19  where it came from and I received it and I appreciated it.

20          And I appreciate the Court's comments.  I'm very proud

21  to be an officer of the Court.  I know they are as well, Judge,

22  and we all look forward to coming here and giving Mr. Delgado

23  his constitutional right.

24          THE COURT:  All right.

25          MR. HANSHEW:  Thank you Judge.

```
 1              MS. KANOF:  I have a legal matter, Your Honor.

 2              THE COURT:  Mr. Garcia?

 3              MS. KANOF:  If you do plan on continuing the case,

 4     he's our speedy trial expert.

 5              THE COURT:  Is there a problem?

 6              MS. KANOF:  I don't know if there's a problem,

 7     although the defendant waives the -- may waive or is

 8     waivering --

 9              THE COURT:  I have no problem if you draft the order

10     drafting an order for continuance.

11              MR. HANSHEW:  I have no problem.

12              THE COURT:  And Mr. Delgado, I'll ask you since you

13     are here.  Do you have any objection to the motion that I expect

14     to get from your counsel that they move to continue the trial

15     setting for next Monday, May 23rd?

16              DEFENDANT DELGADO:  None.

17              THE COURT:  And would you waive any speedy trial that

18     you have with the statute?

19              DEFENDANT DELGADO:  Yes.

20              MS. KANOF:  We have witnesses under subpoena for

21     Monday, Your Honor, and you know reservations and hotels and

22     airplanes...

23              THE COURT:  And I know that, too.  I know that

24     sometimes these continuances are a burden on the Government.

25              MS. KANOF:  I'm not saying that -- I just wanted to
```

1    know whether or not they should still be on standby.

2                        COURT'S RULING

3            THE COURT:  No.  I'm going to grant the motion.  I

4    will grant the motion now so it's on the record.  If you bring

5    the order, I'll sign that order.

6            And I appreciate all of the hard work that you do on

7    behalf of the Government.

8            Mr. Hanshew, I always appreciate the hard work that

9    the public defender does and excellent work in representing

10   their clients.  It's a blessing to participate in trials where

11   counsel is so competent on both sides.  It's a nightmare if

12   you've ever had to -- where that's not the case.

13           MS. KANOF:  Your Honor, are you going to postpone the

14   Thursday hearing to give --

15           THE COURT:  We can.  That way -- because I'm hearing

16   Mr. Hanshew say I'm going to look up Touhy.  I didn't realize

17   the defendant had to ask permission of the Government to

18   subpoena the Government.

19           MS. KANOF:  Not -- basically they have to make a

20   request to homeland security and they have to submit the

21   questions they would ask the agent.  We can probably hurry up

22   that process and then they have to do the same if they're going

23   to call myself or Mr. Gonzalez or Ms. Arreola to the Department

24   of Justice.  And then I think we can expedite -- Eddie Castillo,

25   our civil attorney handles the request in my office and other

1    requests in that that's what you want me to ask.

2            And with regards to the setting of the trial, Your

3    Honor, we did communicate all of our conflicts or dates of

4    rescinding a trial and our biggest concern is the case agent

5    Josh Fry being -- went to the Secret Service to do protection

6    detail for the -- and that is for the United States Presidency.

7    He will be called intermittently and hopefully have the dates in

8    advance of having to do that, but...

9            THE COURT:  Should I just allow the two of you to

10   agree on a date and just notify the Court?

11           MR. HANSHEW:  Two months?

12           One, I think we can meet, confer on the Touhy subject

13   and get that narrowed out and, two, meet on those dates.  We can

14   for sure have the date today with a proposed order.

15           Is that okay, Ms. Kanof?

16           MS. KANOF:  (Nodding head affirmatively.)

17           THE COURT:  A trial date and date for the hearing put

18   on whatever --

19           MR. HANSHEW:  Yes, Your Honor.

20           THE COURT:  -- Touhy.

21           Anything else?

22           MS. KANOF:  Nothing further.

23           MR. HANSHEW:  Nothing further.

24           THE COURT:  We are adjourned.

25           (Proceedings concluded at 11:21 a.m.)

1                            * * * * *

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.  I

4     further certify that the transcript fees and format comply with

5     those prescribed by the Court and the Judicial Conference of the

6     United States.

7     Signature:/S/KATHLEEN A. SUPNET         May 21, 2016
                Kathleen A. Supnet, CSR        Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25