1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                      EL PASO DIVISION

3

UNITED STATES OF AMERICA       )
4                              )
v                              )   No. 3:13-CR-370-DCG
5                              )
MARCO ANTONIO DELGADO          )
6

7                    EXCERPT OF JURY TRIAL
         BEFORE THE HONORABLE DAVID C. GUADERRAMA
8              UNITED STATES DISTRICT JUDGE
                   SEPTEMBER 15, 2016
9

10   APPEARANCES:

11   For the Government:   Ms. Debra Kanof
                           Ms. Anna Arreola
12                         Mr. Jose Luis Gonzalez
                           Assistant United States Attorney
13                         700 East San Antonio, Suite 200
                           El Paso, Texas 79901
14

15   For the Defendant:   Mr. Erik Hanshew
                          Ms. Maureen Franco
16                        Assistant Federal Public Defender
                          700 East San Antonio, Suite D-401
17                        El Paso, Texas 79901

18

19

20

21

22   Proceedings recorded by electronic recording.  Transcript

23   produced by Rhonda McCay, CSR, RPR.

24

25

1              **I N D E X**

2    GOVERNMENT'S CASE IN CHIEF

3    Witness Name          Direct Cross Re-Direct Re-Cross Voir Dire

4    FERNANDO GIREUD        --      4     35        69

5    HECTOR PONCE           75

6

7    Certificate of Court Reporter                             150

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**E X H I B I T S**

| NO. | DESCRIPTION | MARKED | ADMITTED |
|-----|-------------|--------|----------|
| D-193 | 2010 & 2011 FGG Tax Returns | 9 | 10 |
| D-193A | 2010 & 2011 FGG Tax Returns | 6 | 6 |
| D-195 | Wells Fargo Statement 06/01/2011 | 4 | 5 |
| G-16 | Email 12/31/2009 Gireud to Ponce, re: "Agua Prieta Project," with attachments | 119 | 119 |
| G-22 | Three-paragraph letter, 1/10/2010, re: Pledge | 128 | -- |
| G-47 | Email 3/12/2010 Delgado To Ponce, re: "Running of Payments" | 144 | 145 |

```
 1              (Proceedings called to order)
 2          THE COURT:  The record will reflect that all members
 3   of the jury are present.  The United States, through its
 4   Assistant United States Attorney, is present.  Defendant and
 5   his counsel are present.
 6          The witness, Mr. Gireud, is on the witness stand.
 7          Mr. Hanshew.
 8          MR. HANSHEW:  Thank you, Your Honor.
 9                        FERNANDO GIREUD,
10   having been previously duly sworn, testified as follows:
11                        CROSS-EXAMINATION
12   BY MR. HANSHEW:
13      Q.  All right.  So I'm going to refer you back to -- this
14   is Defendant's Exhibit 194.
15      A.  Yes, sir.
16          MR. HANSHEW:  It's admitted, I believe, Your Honor.
17      Q.  (BY MR. HANSHEW)  Second page here.  On 4/29, you
18   received into the FGG account a $125,000 payment from
19   Mitsubishi?
20      A.  Yes, sir.
21      Q.  I'm going to have you look at this document for me.
22   It's marked Defendant's Exhibit 195.  Does that look familiar
23   to you?
24      A.  Yes, sir.
25          (Defendant's Exhibit 195 marked for identification)
```

14:01:30 (line 12)
14:01:59 (line 21)

1              MR. HANSHEW:  Your Honor, I move to admit that

2    document.

3              MS. KANOF:  No objection.

4              THE COURT:  This is 195?

5              MR. HANSHEW:  Yes, Your Honor.

6              THE COURT:  Defendant 195 is admitted.

7              (Defendant's Exhibit 195 admitted into evidence)

8         Q.   (BY MR. HANSHEW)  And the top there, there is a

14:02:26  9   payment from Solcer to FGG account of $1.4 million on 6/24; is

10   that correct?

11        A.   Yes, sir.

12        Q.   So at this point, there's been payments totaling

13   $3,450,000 from the account in the Carribean, correct?

14        A.   Yes, sir.

14:02:58  15      Q.   Then, an additional 125,000 from Mitsubishi?

16        A.   Yes, sir.

17        Q.   And then, they pay another 175,000 later, correct?

18   Mitsubishi?

19        A.   Yes, sir.

20        Q.   As well as 1.4 million from Solcer?

21        A.   Yes, sir.

22        Q.   Now, as the sole member and owner, you were

23   responsible for the accounting for FGG as well?

24        A.   Yes, sir.

14:03:27  25      Q.   And a part of that, you were responsible for

Gireud - Cross                                    6

1    reviewing, putting together tax forms, correct?

2        A.   Yes, sir.

3        Q.   I'm going to show you a document here.  It's marked

4    Defendant's Exhibit 193A.  Do you see that?

5        A.   Yes, sir.

6             (Defendant's Exhibit 193A marked for

7             identification)

8        Q.   Is that familiar to you, sir?

9        A.   Yes, sir.

10            MR. HANSHEW:  Move for admission of Defendant's

11   Exhibit 193, Your Honor.

12            MS. KANOF:  No objection.

14:03:59  13  THE COURT:  193A is admitted, Defendant's 193A.

14            (Defendant's Exhibit 193A admitted into evidence)

15       Q.   (BY MR. HANSHEW)  That's a 1040 IRS form, correct?

16       A.   Yes, sir.

17       Q.   That's yours and your spouse?

18       A.   Yes, sir.

19       Q.   We'll move to Schedule C.  Schedule C here is listed

20   as Profits or Loss from a Business, correct?

21       A.   Yes, sir.

22       Q.   It has identified there that -- FGG Enterprises?

14:04:30  23  A.   Yes, sir.

24       Q.   And there on Income --

25       A.   Yes, sir.

1      Q.    -- lists $2,050,000?

2      A.    Yes, sir.

3      Q.    So that's short at least $2 million from the money

4  that was taken in by FGG in 2010, correct?

5      A.    Correct.

6      Q.    So you failed to report that?

7      A.    No, sir.  I need to go back and check all the -- how

14:04:55  8  did we do the accounting.  But I paid -- that was not all

9  income.  This is -- we paid Michael Delgado and Mace Miller and

10  everybody else amounts from this money, yes.

11      Q.    Well, you're talking about the next section where it

12  talks about expenses, right?

13      A.    Yes, sir.

14      Q.    Number 10?

15      A.    Yes, sir.

16      Q.    Fees, for example?

17      A.    Yes, sir.

18      Q.    But that's what you deduct out of the income,

19  correct?

20      A.    Yes, sir.

21      Q.    So my question was:  Where is the other $2 million

14:05:27  22  that FGG took in that's not shown on this income?

23      A.    I don't know.  They are probably in the account of

24  FGG Enterprises.  I need to go back and check all these

25  documents, but...

1      Q.    You failed to report it, correct?

2      A.    No, sir.

3      Q.    It's not there, right?

4      A.    Yes, sir.

14:05:52  5      Q.    Now, we talked about earlier that your wife was a

6  signatory to this bank account here, right?

7      A.    Yes, sir.

8      Q.    And is she an attorney for FGG?

9      A.    No, sir.

10      Q.    Is she an accountant for FGG?

11      A.    No, sir.

12      Q.    Does she have any corporate relationship to FGG?

13      A.    No, sir.

14      Q.    Yet, she's a signator?

15      A.    Yes.  I was told by Marco that I needed to have a

14:06:27  16  second signature, so I decide to put my wife.

17      Q.    When you worked at El Paso Electric, do you know if

18  the CEO put his wife or spouse as the signator for their

19  account?

20      A.    I don't know, sir.

21      Q.    Now, I'd like to go back there and look through some

22  of these charges here.  So you got a BMW with the FGG account?

23      A.    Yes, sir.

24      Q.    A Mercedes?

25      A.    Yes, sir.

1      Q.    And a Lexus?

14:07:00  2      A.    Yes, sir.

3      Q.    And you wrote two of those off on your taxes as well,

4    correct?

5      A.    I don't remember if we put them on the taxes, but

6    they were leased and they were used for the company.  So yes.

7      Q.    The company was only you, right?  There was only one

8    member?

9      A.    Yes, sir.

10      Q.    You had a BMW and a Mercedes, though?

11      A.    Yes, sir.

14:07:24 12      Q.    Now, you were asked earlier about 1099s.  You

13    submitted those, correct?

14      A.    Yes, sir.

15      Q.    Let me show you a document here.  It's marked Defense

16    Exhibit 195.  Do you see that, sir?

17      A.    Yes, sir.

18            (Defendant's Exhibit 193 marked for identification)

19      Q.    And is this document familiar to you?

20      A.    Yes, sir.

21            MR. HANSHEW:  I'd move for admission of Defendant's

22    Exhibit 195, Your Honor.

23            MS. KANOF:  No objection.

24            THE COURT:  195?

14:07:59 25            MR. HANSHEW:  195, Your Honor.

Gireud - Cross                                    10

1      THE COURT:  That is already in evidence.

2      MR. HANSHEW:  I'm sorry.  1-9-3.  I apologize.

3      THE COURT:  Any objection to 193?

4      MS. KANOF:  No, Your Honor.

5      THE COURT:  That's admitted.

6      (Defendant's Exhibit 193 admitted into evidence)

7      MR. HANSHEW:  Thank you.

8      Q.   (BY MR. HANSHEW)  So the first one there, we talked

9  about that earlier.  That is for Marco Delgado, correct?

10     A.   Yes, sir.

11     Q.   The next one is for Mace Miller?

12     A.   Yes, sir.

13     Q.   The next one here is for Arturo Vargas?

14     A.   Yes, sir.

15     Q.   Ralph Kendrick.

14:08:29  16     A.   Yes, sir.

17     Q.   And then Fernando Daniel Gireud?

18     A.   Yes, sir.

19     Q.   That's your son?

20     A.   Yes, my son.

21     Q.   You paid him $30,000?

22     A.   Yes.  He was helping me.  He just got his law degree

23  and he didn't have a job.  So I was helping him and he was

24  helping me.  So, yes, I put him in there.

25     Q.   What was he doing for FGG?

Gireud - Cross                                    11

1     A.   Well, he was helping me, looking for things or -- he

14:08:59  2  prepared the web site that we had at one time.  And he was

3  helping me when I have questions or something --

4     Q.   Law questions?

5     A.   -- I used to call him.

6          Questions, in general.  He didn't have a job and I

7  had a company.  So I was helping my son.  Since I didn't

8  have -- I never had a -- how do you say that? -- when I was

9  getting paid every month or something.  So, yes, that was my

14:09:26  10  company, my money, and I helped my son.

11     Q.   So, in 2012, you meet with agents and the government

12  for the first time on this case?

13     A.   I think so.  I don't remember exactly when was the

14  time.  But, yeah, probably 2012.

15     Q.   You signed that proffer in September 2012?

16     A.   Yes.

17     Q.   And you tell them that Marco Delgado took the

14:09:59  18  majority of the $30 million.  That's what you told them, right?

19     A.   Yes, sir.

20     Q.   That's not true, is it?

21     A.   It is true.  I believe he has most of the money.  He

22  just sent the profits or what we were going to share to my

23  account, yes.

24     Q.   Okay.  Can you look at Government's Exhibit 2 in

25  front of you.

Gireud - Cross                                                    12

1    A.   Yes, sir.

2    Q.   So there's $20 million payment first, correct?

3    A.   Yes, sir.

14:10:26    4    Q.   And of that, 11 million right off the bat goes to

5    CFE, correct?

6    A.   Yes, sir.

7    Q.   And there's these payments to Anexo, correct?

8    A.   I'm sorry?

9    THE REPORTER:  I'm sorry?  Payments to?

10    Q.   (BY MR. HANSHEW)  Payments to the Anexo?

11    A.   Yes.  Yes, sir.

12    Q.   And those payments are in two separate payments of $2

13    million, correct?

14    A.   Yes, sir.

15    Q.   So you've got already $15 million of the 20 million

16    that don't go to Marco Delgado, correct?

14:11:00    17    A.   Yes, sir.  I don't know about the inner [phonetic]

18    account.  I don't know who they are.  I don't know anything.

19    Q.   But you don't know, right?

20    A.   I don't know.

21    Q.   But that's not a majority of the $20 million,

22    correct?

23    A.   I understand, yes, sir.

24    Q.   And that's what you told the government?

25    A.   Excuse me?

1    Q.    That's what you told him the first day you met him.

2 You told him that Mr. Delgado took the majority of the money?

3    A.    Well, that he changed the accounts into his personal

4 account and --

5    Q.    You already said, right, sir --

6    A.    Yes.

7    Q.    -- you told him they took them?

8    A.    Yes, sir.  That's fine.

14:11:30  9    Q.    We can do the same for the $12 million as well,

10 right?  There's $12 million, 7 million goes to Mitsubishi?

11    A.    Yes, sir.

12    Q.    Right there alone, the majority of that money, of the

13 12 million, is going to Mitsubishi, correct --

14    A.    Yes, sir.

15    Q.    -- not Mr. Delgado?

16    A.    Yes, sir.

17    Q.    Not what you said to the agents?

18    A.    Yes, sir.

19    Q.    Have they, the government, said something to you

20 about that?

14:12:00 21    A.    No, sir.

22    Q.    As part of your proffer agreement was you have to be

23 honest with them, right?

24    A.    I didn't have this account, sir.  I didn't have any

25 of these records.  All I know is that he opened an account in

1    the Carribean in his name and he transferred all the money from

2    the contract to that account.  So I don't know if he -- who he

3    paid or how he paid.  All I know is that the contract says the

4    money is going to be wired to an FGG account in El Paso and the

14:12:29   5    money wasn't wired.

6        Q.    So, in 2012, you are telling the jury you didn't know

7    that Mitsubishi got paid $11 million?

8        A.    No.   I knew that Mitsubishi got paid, but he sent all

9    the money to the account.  I'm not saying he didn't pay.  I'm

10   just saying that the contract -- the contract with the

11   government entity says to transfer the money to this account,

12   and he didn't.  He transferred the money to his personal

13   account.

14       Q.    That's what you are saying today?  That's not what

14:12:57   15   you told the agents when you first met them, correct?

16       A.    No, sir.  If I remember correct -- if I remember,

17   what I told them was that he changed the accounts into his name

18   and he transferred all the money to his account.

19       Q.    You told them that he kept -- you told them that he

20   kept the majority of the $30 million?  That's what you told

21   them?

22       A.    Yes, and he did.

23       Q.    That's absolutely false, isn't it?

24       A.    No, sir.  It is right here.  The money was

25   transferred to his account, the whole amount of money.

Gireud - Cross                                    15

1        Q.    When you met with the government the first time, did

14:13:28  2  you tell the government that, per the memorandum of

3   understanding, you owed 62.5 percent of the profits to Mr.

4   Delgado?

5        A.    Yes, I did.

6        Q.    You told them that?

7        A.    I don't remember when they -- I have a chance to

8   provide a contract.  But I did provide it to Mary Stillinger so

9   she had that, and I don't know what kind of interchange of

10  documents they have.

11       Q.    Did you -- you spoke to them, correct?

12       A.    Yes, sir.

14:13:57  13     Q.    Did the words come out of your mouth to them, "I owed

14  62.5 percent of this money to Marco Delgado"?

15       A.    I don't remember.  But they -- I have the contract

16  with me, so I'm sure they showed it and it says right there,

17  yes.

18       Q.    You don't remember if you told them that?

19       A.    To be honest with you, I don't remember the whole

20  conversations that we have.

21       Q.    Well, the conversation was about the missing money,

22  correct?

23       A.    Yes, sir.

24       Q.    That was the main topic of this conversation?

14:14:29  25     A.    The main topic of the conversation was that we had a

Gireud - Cross                                                 16

1    contract with the Mexican utility and it has an FGG account

2    that, according to the government, they were going to transfer

3    the money to that account.  That money has never been

4    transferred.  He transferred just the profits to my account

5    later on.  But he took all the money.  He put all the money in

6    his personal account.

7        Q.    Okay.  And so you told him all about the rest of the

8    documents and the agreements?

9        A.    No.  At this time, I -- well, I told him about that

14:15:00  10  the contract that him and I have, but I didn't have all this

11   information with me.  Actually, today is the first time that I

12   see these documents.

13       Q.    This is the first time that you've seen that

14   Mitsubishi got paid $11 million?

15       A.    No.  I called them and I asked them if they were

16   paid.  They said he didn't pay the whole amount, but he did pay

17   some money, yes.  So I knew that he made some payments to

18   Mitsubishi.

19       Q.    The majority of all the money that is the payments he

14:15:29  20  made to Mitsubishi?

21       A.    You might say so, yes, sir.

22       Q.    I'm asking you.  Do you agree with that?

23       A.    No, because they didn't get the full amounts,

24   according to all the documents that we have been reviewing all

25   day along.  But, yes, the majority of the payments to

Gireud - Cross                                          17

```
 1  Mitsubishi was done.
 2       Q.   I'm sorry?
 3       A.   The majority of the payments to Mitsubishi were done,
 4  yes.
 5       Q.   And the majority of the $32 million in total, the
 6  majority of it went to Mitsubishi?
14:15:58 7   A.   Well, what I see is 7 million and 11- or something,
 8  so...
 9       Q.   Well, I'm not an engineer like you, sir.  But 7
10  million out of 12 million, that's a majority, right?
11       A.   Yes.  Correct.
12       Q.   And how about 11.32 million out of 20 million?
13       A.   Yes, sir.  You're correct.
14:16:22 14  Q.   Now, when FGG is created, what exactly is your role
15  with FGG?
16       A.   To be the managing member, to make sure that I find
17  equipment for this contract and that I take care of all the
18  technical issues to find the right equipment for this project;
19  and then, later on, to make the payments to the suppliers from
20  the accounts that they were going to decide.  I mean, he was
21  just managing the contracts -- not the contract, I'm sorry --
14:16:58 22  managing the project with the technical issues in the United
23  States.
24       Q.   Okay.  But earlier you indicated you had never worked
25  on any type of specs like the ones involved here?
```

Gireud - Cross                                    18

1      A.    That's why we hired Mitsubishi.   They were the

2  specialists and they were going to provide all the technical

3  documents and they were going to take care of all the technical

4  issues.

5      Q.    So they are doing all that.   But you just said you

6  were doing that.

7      A.    Well, you said, "When you founded FGG Enterprise,

8  what was your role?"   And I'm telling you, that was going to be

9  my role.   When we hired Mitsubishi, we hired them because they

14:17:29  10  were the experts because they have all the knowledge and they

11  were going to take care of all the technical documents, yes.

12  They were going to keep me informed and I was going to ask

13  questions and back and forth.   That was it, yes.

14      Q.    Okay.   So they get hired and they are more

15  knowledgeable than you are about this.   So your job duty of

16  dealing with the technical specs is no longer there, correct?

17      A.    Yes, sir.

18      Q.    Okay.   With that being out, what is the remaining

14:17:59  19  duty you have once Mitsubishi is coming with the technical

20  component?

21      A.    Managing the project, managing the questioning,

22  managing the meetings that we needed to have.   And the next

23  part was to find a company to do the long-term service

24  agreement because Mitsubishi didn't take it.   So part of my job

25  was going to be to get somebody to do the long-term service

1    agreement.

2         Q.   That was Solcer?

3         A.   Yes, sir.   That's Solcer.

4         Q.   Now, they are in a lawsuit against you, correct?

14:18:28  5   A.   They are in a lawsuit against me.

6         Q.   And what happens here, Mr. Delgado is guilty, is that

7    it will help you in that lawsuit?

8         A.   I hope so.

9         Q.   So then you execute the power of attorney in July --

10   on July 13th, 2009; is that right?

11        A.   I think it's the right date, yes, sir.

12        Q.   I want to pull it up here.

14:19:00  13            MR. HANSHEW:   I believe this has been admitted,

14   Judge.

15             THE COURT:   It has, yes, sir.

16        Q.   (BY MR. HANSHEW)   This here, that's the power of

17   attorney, correct?

18        A.   Yes, sir.

19        Q.   And go down here.   And in this contract, you delegate

20   to Mr. Delgado, give him power for litigation?

21        A.   No.   I just give him -- according to the way he

22   explained it to me and the way it says in the first paragraph,

14:19:25  23   he was going to represent FGG Enterprises in the bid process

24   for the equipment.

25        Q.   Well, my question was not what he explained to you.

1    My question was:  In this contract that you signed, you

2    delegated various authority to him, correct?

3         A.   Yes, sir.

4         Q.   And let's look at that, right there in front of you.

5    You've delegated the authority of litigation?

6         A.   Yes, sir.

7         Q.   The authority of collection?

14:19:59  8    A.   Yes, sir, that's what it says.

9         Q.   Acts of ownership?

10        A.   Yes, sir.

11        Q.   I think, in your own words, this was a big power of

12   attorney.  That's what you said, right?

13        A.   Well, at the very beginning and what I understand and

14   what he explained to me, being the attorney, he said this is so

15   I can take care of all the contract issues during and only

14:20:26 16   during the proposal side of the business -- of the contract.

17        Q.   Let me have you read right here.  It says that, "I

18   read this instrument to the grantor and what he stated is in

19   agreement with the contest --

20             THE REPORTER:  I'm sorry.  Would you slow down?

21        Q.   (BY MR. HANSHEW) -- "document.  He ratified it and

22   signed it before me on this date."

23             THE REPORTER:  I'm sorry?

24        A.   Yes, sir.

25        Q.   (BY MR. HANSHEW) So you read it?

1    A.   Well, I read as much as I can.  But, again, he gave

2  me this document.  This is what I need to do, just sign it, and

14:20:56  3  we move on.  And I trusted him that he was giving me a good

4  document.

5    Q.   I'm lost because you keep saying you read these

6  documents and you sign saying you're reading them, but then you

7  say --

8    A.   Yes, sir.  If you provide me with the legal document

9  and I can read it a hundred times.  I'm just an engineer.  You

10  guys use wording and special words that sometimes, even if I

11  read it -- okay.  He tell me, "Yeah, it's fine.  Just go ahead

12  and trust me," and I sign it.

13       So I can read it ten times, and sometimes I have my

14:21:27  14  questions and my doubts.  At this time, we did it quick and

15  he -- I trusted him, as simple as that.

16    Q.   You are the sole member --

17    A.   Yes, sir.

18    Q.   -- and owner of FGG?

19    A.   Yes, sir.

20    Q.   You have fiduciary obligations; is that correct?

21    A.   Yes, sir.

22    Q.   You are the only one to make this choice?

23    A.   Yes, sir.

24    Q.   And you made it?

25    A.   Yes, sir.

Gireud - Cross                                                    22

1    Q.   You've had a team of lawyers that you've dealt with

2    in the past, correct?

3    A.   No, sir.  At this time, I only have one lawyer that I

14:21:55  4   met the first time.  So it was George Andritsos.  I don't have

5    a ton of lawyers.

6    Q.   You have Mace Miller?

7    A.   Yes, sir.

8    Q.   He's a lawyer, right?

9    A.   Yes.  I think, when we signed this one, he wasn't

10   there.  Or probably he read it, and he said, "If Michael give

11   you this, this is fine."  But you are correct.  You're correct,

12   sir.

13   Q.   I mean, you weren't -- you weren't handcuffed

14   somewhere, right?

15   A.   Yes, sir.

16   Q.   You weren't put in a box?

17   A.   I understand.  No, sir.

14:22:29  18   Q.   You had every ability to go out and ask somebody if

19   you had questions, correct?

20   A.   Yes, sir.

21   Q.   You did not do that?

22   A.   Yes, sir.

23   Q.   Instead you signed it?

24   A.   Yes, sir.

25   Q.   Now, in August, FGG enters into the teaming agreement

Gireud - Cross                                23

14:22:59   1   with MPSA; is that right?

2          A.   Yes, sir.

3          Q.   And you testified earlier that you had a good

4   relationship with Hector Ponce?

5          A.   Yes, sir, I did.

6          Q.   Well, that's not what you said in the statement you

7   wrote, correct?

8          A.   What statement, sir?

9          Q.   Did you write a statement --

10         A.   Oh, yes.  Yes.  I know what you're talking about.  I

11   don't remember what I wrote on that document.  I don't have it

12   with me.

13         Q.   Did you write, for example, that it was the worst

14   week in this whole venture?

14:23:27   15  A.   Yes.  If I recall, that was when we signed the

16   contract with Mitsubishi.  We spent a week in Mexico.  Is that

17   what you are referring to, sir?

18         Q.   Correct.

19         A.   Yes.

20         Q.   And you testified yesterday that when you came into

21   the deal with Mitsubishi, you were carefully guarding who the

22   purchaser is, correct?

23         A.   Yes, sir.

24         Q.   Because you were afraid that Mitsubishi would steal

25   it if they knew?

14:23:58   1        A.   I think that's standard practice.  You don't tell

           2   everybody what kind of project because --

           3        Q.   I didn't ask for a standard practice, sir.  I asked

           4   you if you were afraid MPSA would steal the information?

           5        A.   Yes, sir.

           6        Q.   And you had a meeting with them where you felt that

           7   they were being racist even, correct?

           8        A.   Well, they didn't took us seriously.  They didn't

           9   think we have something like that.  Just people with no prior

          10   experience of this.  Yeah, they thought we --

14:24:29  11        Q.   My question was --

          12        A.   -- couldn't handle it.

          13        Q.   -- yesterday, didn't you testify --

          14        A.   Yes, sir.

          15        Q.   -- that you thought that they were characterizing you

          16   as a stupid Mexican?

          17        A.   Yes, sir.  That's what my thought, not that they did.

          18   Nobody did that, neither.

          19        Q.   I'm asking what you said.

          20        A.   That's how I felt.

          21        Q.   That's how you felt?

          22        A.   Yes, sir.

          23        Q.   And in this week where -- this horrible week you had,

          24   you also wrote that MPSA was refusing to work on the

14:24:59  25   subcontract, correct?

1     A.   Yes, sir.

2     Q.   And they were out partying?

3     A.   Yes, sir.

4     Q.   They were getting drunk in Mexico City?

5     A.   Yes, sir.

6     Q.   And they were telling you, "We are going to steal the

7  contract from you now"?

8     A.   I don't remember -- no.  No, I don't think that

9  conversation was completely like that.  What they were saying

10  is -- they were playing games with us.  Like, we read one part

14:25:26  11  and then they'd go out and they'd come back.  And we were

12  struggling to get them to sign the contract.  We needed the

13  contract, so they --

14       That was a very difficult, very tiring week.  I mean,

15  we spend one week almost in Mexico and they -- it was difficult

16  negotiations, yes.

17     Q.   Difficult because you are afraid at that point that

18  Mitsubishi is going to steal the deal?

19     A.   No.  They cannot steal the deal because we have -- we

20  bought the solicitation papers on the FGG name.  Nobody can go

14:25:59  21  into the game at that time.  So they just --

22     Q.   You weren't worried about it?

23     A.   I was worried that we didn't sign or that they'd back

24  off or something.  But they cannot steal the contract at that

25  time.

Gireud - Cross                                    26

1    Q.   I didn't ask if they could steal it.  I'm asking you

2    if you were concerned about that.

3    A.   I was concerned about the time that it was taking,

4    but not that they will steal the contract.

5    Q.   And this is the good relationship you had with Hector

6    Ponce?

14:26:24  7    A.   Yes, sir.  Yes.

8    Q.   Now, during that meeting, who from Mitsubishi was

9    there to vet the technical specs?

10   MS. KANOF:  Excuse me, Your Honor.  What meeting?

14:26:58  11   Q.   (BY MR. HANSHEW)  During the meeting that you had in

12   Mexico City with Mitsubishi, who did Mitsubishi bring to view

13   the technical specs?

14   A.   They had Hector Ponce.  I'm assuming that he was the

15   technical guy.  Yes, he was reviewing that.

16   Q.   Was he the only one?

17   A.   No.  They had one of the executives, Mr. Waki.  I

18   don't remember his last name.  They have the VP of MPSA, which

19   is the one who signed the contract.  I don't remember his name

14:27:29  20   off my head.  And they have Pat Altamura, which is the attorney

21   representing Mitsubishi.  I think that was -- there were four

22   of them.

23   Q.   And FGG, you'd set up a whole war room in Mexico

24   City, correct?

25   A.   I'm sorry?

Gireud - Cross                                          27

1       Q.    FGG, you set up a war room, hotel rooms and suites,

2    in Mexico City for this?

3       A.    No, sir, they did.  We met at their hotel.

14:27:55  4       Q.    Okay.  And at the hotel, did they have suites that

5    they set up documents and reviewed?

6       A.    No.  They just had one of the small conference rooms

7    somewhere on, I don't remember, the second floor or something.

8    And they just have -- at this time, they just have the contract

9    from the CFE and they have their computers, and they were just

10   typing and copying and pasting from the original document.  We

11   didn't have any technical data right there with us.

12      Q.    Okay.  They had the contract, though, you said?

14:28:27  13       A.    The contract -- not the technical information, just

14   the contract itself.  The contract that is 11 or 12 pages or a

15   20-page document.  Just the contract, not the technical

16   documents.

17      Q.    The bid proposal?

18      A.    Not even the bid proposal.  It's the contract, when

19   you are awarded a contract to say you are going to follow this,

20   this, this and that.  So it was the -- not the technical

21   contract, but the contract for the goods.

22      Q.    And part of your job was to deal with these

23   documents, right?

14:28:59  24       A.    Part of the job was just to sign the contract.  As I

25   said, they were -- nothing was technical.  It was just the main

```
 1   contract to hire -- or to team up with FGG Enterprise to

 2   produce the turbines to FGG Enterprises.  It was not a

 3   technical --

 4        Q.   Before that, you entered into a teaming agreement as

 5   well, correct?

 6        A.   I don't know if the teaming agreement was before or
```

14:29:28  7   after that, sir.  I don't remember exactly.  But, yes, we had a

```
 8   teaming agreement.

 9        Q.   I'm going to pull up here Government's Exhibit 7.

10             MR. HANSHEW:  I believe it is admitted, Judge.

11             THE COURT:  Yes, sir.

12        Q.   (BY MR. HANSHEW)  Is that the teaming agreement?

13        A.   Yes, sir.

14        Q.   It's dated August 2009?

15        A.   Yes, sir.

16        Q.   That's before, correct?

17        A.   Yes, sir.
```

14:29:51  18        Q.   And in there, there's -- one moment, sir.

```
19        A.   Yes, sir.
```

14:30:28  20        Q.   There's -- page 4 here, there's specific delegation

```
21   by both FGG and MPSA of authorities to Marco Delgado, correct?

22        A.   Yes, sir.

23        Q.   Including being the liaison between FGG and CFE?

24        A.   Yes, sir.

25        Q.   Providing analysis for the parties?
```

Gireud - Cross                                                    29

14:31:02   1      A.   Yes, sir.

           2      Q.   And that's what he was doing, right?   He would bring

           3   back information from CFE to MPSA?

           4      A.   Yes, sir.

           5      Q.   Now, at some point, you decide to try to cut Mr.

14:31:27   6   Delgado out of this deal, right?

           7      A.   Yes, sir.   After -- between the first and second

           8   payment, yes.

           9      Q.   And had you told MPSA about the memorandum of

          10   understanding?

          11      A.   Yes, I have.

          12      Q.   Who did you tell?

          13      A.   I don't remember at this time, but probably --

          14   probably Hector Ponce.

          15      Q.   When did you tell Hector Ponce that?

          16      A.   I think when we had it or sometime -- somewhere in

          17   the conversation that Marco was part of this.   Yes, they knew.

14:31:59  18      Q.   What did Hector Ponce say about the fact that Marco

          19   was going to get $14 million from the first disbursement?

          20      A.   I don't think we ever discuss -- we didn't know at

          21   this time how much money it's going to be or nothing.   We are

          22   in the -- in the process of replying to the RFP.

          23      Q.   So Hector Ponce, who represents MPSA, had no response

14:32:25  24   to the fact that you had already obligated 62.5 percent of the

          25   profits at the first disbursement to Marco Delgado?

1    A.   Yes, sir.

2    Q.   He had no response?

3    A.   No, sir.

4    Q.   Did you tell anyone else besides Hector Ponce?

5    A.   I don't remember, sir.

6    Q.   That would mean Mitsubishi wouldn't be able to get

7 anywhere the amount they were owed for the first disbursement,

8 correct?

9    A.   Could you please repeat the question.

14:32:58 10    Q.   If the first disbursement was 20 million and the

11 differential was 14 million, that would mean there was only 6

12 million left, correct?

13    A.   Yes, sir.

14    Q.   That's a lot less than what Mitsubishi was -- got

15 even, correct?

16    A.   Yes, sir.  But that money was for letters of credit

17 and to take care of other expenses.  But, yes.  Go ahead.

18    Q.   The memorandum of understanding doesn't separate out

19 debts, credits or anything to that effect, does it?

14:33:30 20    A.   I don't know, sir.

21    Q.   Would you like me to show it to you?

22    A.   No.  That's okay.  That's okay.

23    Q.   Well, does it have that?

24    A.   Well, it's very general to say this, this, you are

25 going to have to pay for transportation, and this and that.

Gireud - Cross                                          31

 1   But you're -- I understand.

 2        Q.   Well, I don't understand, so I'm going to ask you.

 3   There is the memorandum of understanding, Exhibit 8 in front of

 4   you.

 5        A.   Yes, sir.

 6        Q.   Could you read me any portion of that that says that

 7   debts and such are exempted from this?

 8        A.   That what?

14:33:59  9        Q.   That -- that supports what you just said.

10        A.   Yes.

11        Q.   It doesn't say that, does it?

12        A.   I'm sorry.  I'm confused with your question again.

13   I'm sorry.

14        Q.   You made a statement that it didn't account for debt

15   expense, something to that effect.

16        A.   No.  It does account for everything.  This is the

17   money we're going to get, which is what we need to pay.  And

18   whatever is left as profit, that's what we were going to share,

19   yes.

14:34:29  20        Q.   It doesn't say anything about that in this memorandum

21   of understanding, sir, does it?

22        A.   Well, it says, "Delgado and Associates will receive

23   an amount equal to 62 and one half, .5, percent of the

24   difference between the purchase price to FGG and all the

25   equipment, transportation, and the field services required for

Gireud - Cross                                           32

1    the satisfaction of all the bid requirements."

14:34:58  2           "All the bid requirements" and the requirement was to

3    pay transportation, to pay letters of credit and to pay all

4    that, yes.  That includes everything.

5           Field services.  Of all the bid requirements, if you

6    read the bid package, the bid package requires to have

7    transportation, letters of credit, and the delivery of the

8    equipment, yes, sir.

9       Q.   It doesn't say debts.  That's what you said, right?

14:35:28  10      A.   No.  That's what it says right here.  It says, "And

11   all" -- I'm sorry.  "Required for the satisfaction of all the

12   bid requirements," and the requirement is to provide all the

13   bid requirements, to included financial requirements there.  So

14   that's what I understand.

15      Q.   That's what you understand?

16      A.   Yes, sir.

14:35:58  17      Q.   That's what you understood when you signed it?

18      A.   Yes, sir.

19      Q.   I thought you just read it really quickly and you

20   didn't understand this agreement.

21      A.   I read it.  It was very fast.  And I already told you

22   that story, so...

23      Q.   Well, but now you are saying that's how you

24   understood it when you read it.  So you had a nuance

25   understanding of this agreement?

Gireud - Cross                                                33

1      A.   Yeah.   The way I understand it is, after you

2  satisfied all the requirements of the bid package and of the

3  contract, then whatever money is left, it was going to be

14:36:26  4  divided on those amounts, yes.   That was my understanding.

5      Q.   All right, sir.   So you're saying that you were

6  trying to cut Mr. Delgado out of this agreement after the first

7  payment, correct?

8      A.   Yes, sir.

9      Q.   And to effectuate that, you went to Mexico City a

10  number of occasions?

11      A.   Yes, sir.

12      Q.   And you met with -- who was that again?

13      A.   Alberto Ramos.

14:36:59  14      Q.   Now, was Alberto Ramos designated in the contract

15  documents as the point person?

16      A.   I don't remember exactly, but he was the contact for

17  the project when the contract started.   But I think it was

18  Eugenio Laris, the point of contact, and he -- I was never able

19  to talk to him.   So in Mexico --

20      Q.   So you didn't speak to the person's designated point

21  of contact?

14:37:25  22      A.   I did talk to his subdirector, which is as important

23  as him, and he was going to talk to him.   That's what he says.

24      Q.   And then you talked about a letter earlier that you

25  had his wife draw up?

1       A.   No.   This was Eugenio Vargas' [phonetic] wife.

2       Q.   So you went to the union leader's wife to write up a

3  letter for you?

4       A.   No.   He called me and he wanted to discuss these

14:37:56   5  issues.   And I'm not an attorney in Mexico either.

6            So he says -- I said, "I need to get some document."

7            He said, "I can provide you documents, you review.

8  You make sure they are okay and we send it.

9            So she [sic] was an attorney in Mexico and she [sic]

10  offered to provide that document for me.

11       Q.   And you signed off on that document as well?

12       A.   Well, I reviewed and, yes, I signed off.   And it says

13  very clear that it doesn't have a lot of legal terminology or

14  much things.   It just says it straight, what is it that you

15  want?   Which is to, number one, the first document was to

14:38:27  16  remove Marco Delgado's power of attorney, and the second was to

17  bring back and make references to the letter when they changed

18  the accounts into Marco's name and say to bring them back to

19  the original accounts.

20       Q.   So you read that letter carefully?

21       A.   Yes, sir.

22       Q.   You made sure you understood every part of it?

23       A.   I tried, yes.

24       Q.   And that's the one -- that's the one that's important

25  because that's the one where you cut out the 62.5 percent,

```
  1   right?

  2       A.   Yes, sir.

14:38:57  3       Q.   Unlike the one where you actually delegated out

  4   authority and monies of FGG?

  5       A.   You could say that, sir, yes.

  6            MR. HANSHEW:  One moment, Judge, if I may.

14:39:20  7            THE COURT:  Yes, sir.

  8       Q.   (BY MR. HANSHEW)  Sir, you never returned any of the

  9   money to CFE or Mitsubishi, have you?

 10       A.   No, sir.

 11            MR. HANSHEW:  No further questions, Your Honor.

 12            THE COURT:  Thank you, Mr. Hanshew.

 13            Ms. Kanof.

 14            MS. KANOF:  Yes, sir.

 15                      REDIRECT EXAMINATION

 16   BY MS. KANOF:

 17       Q.   Mr. Gireud --

14:39:59 18       A.   Yes, ma'am.

 19       Q.   -- let's talk about all your lawyers first.  Why did

 20   you go to Mary Stillinger?

 21       A.   Because I thought there was a criminal action done

 22   against my company and that she specializes in criminal

 23   defense.  So I just -- I just went with her, referred by

 24   Armando Gutierrez, the other Mexican attorney.

 25            And I explained the case, and I said, "Is this
```

14:40:29   1   something that you can help me with?"  And since it was a

         2   criminal case against somebody who forged my company -- or

         3   stole money from my company, I -- she said she could handle it.

         4   But she also mention that she has to bring this into the -- she

         5   has to let know the police or the FBI or I don't know what

         6   is --

         7        Q.   I don't understand.  You went to Mary Stillinger why?

14:40:57   8        A.   Because there was a criminal action against my

         9   company and my company was -- stole money and changed a lot of

        10   documents and forged documents without my authorization.  So

        11   I --

        12        Q.   When you went to Mary Stillinger, was it because you

        13   thought you needed a lawyer?

        14        A.   No, ma'am.  I have never thought that I did something

        15   wrong, so I never -- I didn't go with her -- to her because of

        16   that.  I just went to her to help me solve a criminal case

        17   against my company.

14:41:27  18        Q.   Okay.  And what did Mary Stillinger tell -- do or

        19   instruct you to do?

        20        A.   Well, she says --

        21             MR. HANSHEW:  Objection, hearsay, Your Honor.

        22             THE COURT:  Sustained.

        23        Q.   (BY MS. KANOF)  Where did you go as result of

        24   consulting with your attorney?

        25        A.   I'm sorry?  Can you -- I don't understand your

1    question.

2         Q.   Did you and Ms. Stillinger go visit with someone?

14:41:57   3         A.   I didn't go with her.  What we did, we went to

4    Armando Gutierrez' office and we reviewed things.  And by this

5    time, they were --

6         Q.   Who is Armando Guerra?

7         A.   Gutierrez.  Armando Gutierrez.  He's a Mexican

8    attorney, a friend of mine.

9         Q.   And who took you there?

10        A.   He's the one who referred me to Mary Stillinger for

11   this case.

12        Q.   So you went to him first.  Because why?

14:42:25   13        A.   Because I -- the project died and I was getting a lot

14   of papers and things in Mexico saying that we didn't deliver

15   equipment, that they paid us $32 million and we didn't deliver

16   the equipment.  So originally, they thought FGG did something

17   wrong.

18        Q.   Okay.  And then he referred you to Mary Stillinger?

19        A.   To Mary Stillinger.

20        Q.   And where did Mary Stillinger take you?

21        A.   Mary Stillinger took me to -- to, I guess, the feds

14:42:56   22   or -- you can say that.  She said that this is a case that they

23   have to be involved and she got them involved.

24        Q.   I'm looking for defense exhibit, proffer letter.  I

25   don't think I wrote down the exhibit number.  Could I get --

1          MS. KANOF:   What exhibit number is the proffer

2    letter?

3          MS. ARREOLA:   163.

4          MS. KANOF:   I'm sorry?

5          MS. ARREOLA:   163.

14:43:26   6    Q.   (BY MS. KANOF)   Okay.   Now, Mary Stillinger took you

7    to talk to some federal people?

8          A.   Yes, sir -- yes, ma'am.

9          Q.   Was there a woman there?

10         A.   I thought Anna Arreola was on there and I thought

11   that they mentioned Juanita Fielden that was going to be at

12   that meeting.   And then I don't think Juanita Fielden ever was

13   able to be there.

14         Q.   I'm showing you Defense Exhibit 163.   And you see the

14:43:59  15   signature there.   Who is that that signed it?

16         A.   The lady that I'm saying that she was going to be

17   there.   Juanita Fielden was going to be the U.S. attorney for

18   this case.

19         Q.   She was the initial U.S. attorney.   Did you ever meet

20   with her?

21         A.   Ma'am, it was one of the hardest days of my life.   I

22   don't know if I heard that she came into the room.   I don't

23   know if she says hi or not.   And she said that she had

24   something else to do, so she wasn't -- I don't recall her being

25   at that meeting, ma'am.

Gireud - Redirect                                    39

1    Q.   She is about as petite as I am.  So another woman --

14:44:30  2          MR. HANSHEW:  Objection, Your Honor.

3          MS. KANOF:  Sorry.  Just trying to --

4    A.   I don't remember if she was there or not.

5    Q.   (BY MS. KANOF)  Let's talk about this proffer letter.

6    Did you ask for it?

7    A.   No, ma'am.

8    Q.   Who asked Juanita for this proffer letter?

9    A.   I don't know, ma'am.

10   Q.   Suddenly -- who gave it to you?

11   A.   Mary Stillinger went -- I think we went to lunch, and

12   when we came back, the letter was sitting on my table.  I don't

13   remember exactly, but it was already put in my -- next to me.

14:45:00  14  I was sitting next to Mary and Mary had it in front of her.

15   Q.   Okay.  And did Ms. Stillinger have an opportunity to

16   go over each and every clause and its meaning before you

17   continued to talk to the federal agents?

18   A.   I don't think so, ma'am.  I don't recall that we took

19   the time to go -- probably I read it and -- pretty quick, and I

20   said, "There is a lot of things."

21          She said, "Just sign it.  It's okay."

14:45:27  22          I read it and I agreed with that.

23   Q.   Number 3, did you agree to submit to a polygraph if

24   the government asked?

25   A.   I read that thing and -- yes.

1     Q.   Did you read that you must be truthful and make no

2 material misstatements or omissions of fact?

3     A.   Yes, ma'am.

4     Q.   Did you read the part that said, "In the event" --

14:45:55  5 this letter is actually to Ms. Stillinger, is it not?

6     A.   Yes, ma'am.

7     Q.   The letter is not to you, correct?

8     A.   Yes, ma'am.

9     Q.   Okay.  And it's to Ms. Stillinger on -- what's the

10 date?

11     A.   September the 12th, 2012.

12     Q.   Exactly four years ago when the day of the trial

13 started, correct?

14     A.   I didn't know.

14:46:25  15     Q.   You said something about meeting every time the case

16 was reset.  Do you know how many times this trial has been

17 reset?

18     A.   No, ma'am.  To be honest with you, I think it was

19 three or four times.  I don't know.

20     Q.   Maybe more?

21     A.   It's been a long time.  Maybe more.  It's been a long

22 time.

23     Q.   So Ms. Stillinger is being addressed in this letter,

24 right?

25     A.   Yes, ma'am.

1     Q.   With regard to that same number 2, "In the event your

14:46:58  2  client becomes a witness, your client must testify truthfully

3  and completely before any federal grand jury."

4     Did you testify before the grand jury?

5     A.   No, ma'am.

6     Q.   Okay.  "And if called upon to testify at a hearing or

7  trial" --

8     A.   No, ma'am.

9     Q.   But you have been called upon to testify at a trial,

10  right?

11     A.   Yes, I have been --

12     Q.   -- "your client will do so willingly."

13     Are you here willingly?

14     A.   I'm here willingly.

14:47:29  15     Q.   Testifying truthfully and completely?

16     A.   I am testifying truthfully and completely, yes.

17     Q.   Number 4, what is your understanding with regard to

18  any promises that Ms. Fielden, AUSA Fielden, provided

19  Ms. Stillinger on your behalf in this letter?

20     A.   I believe that if I help the U.S. government on this

14:47:58  21  case with as much information that I can and true -- be truly

22  about this, I think it was explained later on, in very -- in

23  plain English -- and actually, in Spanish by my son.  I don't

24  know if I asked him, too, about this -- he said that if I

25  cooperate with the government, if I tell the truth as much as I

 1    have information and all that, that I cannot be prosecuted on

 2    this things, but that I could be prosecuted if I lied or if I

14:48:29   3    say something wrong, yes.  He said, "This is not a complete

 4    immunity."

 5         Q.   Okay.  Look at number 6.  "Except in prosecutions for

 6    false statement, obstruction of justice or perjury, with

 7    respect to acts committed or statements in connection with this

 8    proffer, the government agrees that statements or information

 9    contained in your client's proffer may not be used against

10    him."

14:48:59  11         Is there any other promise made by the government

12    other than not to use statements made against you if you are

13    truthful in this entire letter?

14         A.   Yes, ma'am.

15         Q.   Where is that?  Where is the promise, other promises?

16         A.   Well, I don't know if -- I think it was explained to

17    me by Mary or by my attorney, but I don't -- I don't know

18    exactly where it says that.

19         Q.   Okay.  Has -- since I've come on to the case, have I

14:49:29  20    or AUSA Arreola ever promised you anything other than what's in

21    this letter?

22              MR. HANSHEW:  Objection, hearsay.

23              THE COURT:  No.  Overruled.

24         A.   Can you ask me the question --

25         Q.   (BY MS. KANOF)  Has the government --

Gireud - Redirect                                    43

1    A.   Oh, I'm sorry.  I don't know if I --

2    Q.   I forgot about Jose Luis.

3    A.   No, ma'am.  Nobody has ever offered me anything

4  from -- from the government.

5    Q.   In addition to this letter, has any promise been made

6  to you?

7    A.   No, ma'am.  Nobody has ever promised anything to me.

8    Q.   Okay.  Back to all the lawyers.  So first you go to a

14:50:00  9  local El Paso lawyer who sends you to Mary Stillinger who

10  brings you to the federal government, correct?

11    A.   Yes, ma'am.

12    Q.   Okay.  Before Mary Stillinger brought you to the

13  federal government, did the federal government come looking for

14  you?

15    A.   No, ma'am.

16    Q.   And when you started debriefing with the federal

17  government, did you do so willingly?

18    A.   I did so willingly because I know I never did

14:50:27  19  anything wrong on this project.  So, yes, I was there willingly

20  and ready to cooperate and to provide anything I have.

21    Q.   Okay.  Did you ever talk to me alone?

22    A.   No, ma'am.  I have never talked to you alone.

23    Q.   Who was always present when you spoke with me?

24  Because you're my witness, who was present?  I know there were

25  differing numbers of people, but were there always other

1    people --

2        A.   There was always people coming in and out, but there

14:50:59  3  was always at least one of the agents.  It was either Mr. Fry

4    or Mr. Brian.

5            THE WITNESS:  I don't know your last name.  I'm

6    sorry.  I forgot it.

7        A.   And I believe that most of the time has been Ms.

8    Arreola.  I don't think I ever met with you alone ever in my

9    life.

10       Q.   (BY MS. KANOF)  With regard to your other lawyers --

11       A.   Yes, ma'am.

12       Q.   -- you have been sued --

13       A.   Yes, ma'am.

14       Q.   -- by Mitsubishi, correct?

14:51:30  15  A.   Yes.

16       Q.   And so has Mr. Delgado, correct?

17       A.   Yes, ma'am.

18       Q.   In the same lawsuit?

19       A.   That's what I understand, that it has names of all of

20   us, yes.

21       Q.   Did you hire a lawyer for that?

22       A.   No.  I thought, for some reason -- that's part of my

23   ignorance as an engineer.  I thought Mary Stillinger was going

24   to take care of all these lawsuits.

25       Q.   And then, after that -- after you found out she was

```
 1    just a criminal lawyer, who is Rene Ordonez?
 2        A.    Rene Ordonez, I met him when he was in the firm that
 3    El Paso Electric used to do business with, Delgado, Acosta,
 4    Braden & Jones, and I met him.  Mace Miller was also being sued
 5    at the same time that we did and he used Rene Ordonez.  So he
 6    suggested I go and talk to Rene Ordonez.
 7        Q.    So you, Mr. Delgado, and Mace Miller were sued.
 8    Also, was FGG sued?
 9        A.    Yes, ma'am.
10        Q.    And did this other company Solcer also sue the three
11    of you?
12        A.    Yes, sir.
13        Q.    Is Rene Ordonez still your civil attorney?
14        A.    Yes, he is my civil attorney.
15        Q.    And at some time, did Mary Stillinger stop being your
16    criminal attorney?
17        A.    Yes, ma'am.
18        Q.    And your criminal attorney is -- I think Mr. Hanshew
19    pointed out Mr. Hobbs in the courtroom, correct?
20        A.    Yes, ma'am.
21        Q.    Are you paying him?
22        A.    I'm not paying him any money.
23        Q.    Why?
24        A.    Because he is part of my family.
25        Q.    So your son's best friend?
```

14:52:01  2
14:52:25  10
14:52:59  25

```
 1        A.    Yes.  He -- I'm sorry.

 2        Q.    That's okay.

 3        A.    He -- I met him about seven or eight years ago when

 4   my son was going to law school.  He was his best friend.  And

 5   about a year and a half ago -- I don't know how long is it --

 6   they -- they came up together to form their own firm.

 7        Q.    Not here in El Paso, right?

 8        A.    Not here in El Paso.  In San Antonio.

 9        So when I heard -- when I had a situation during this

10   subpoena process, I mean I called him and -- I had been talking

11   to my son.  And he says, "He's going to help you.  He is going

12   to be there to support you, to help you."

13        And I miss -- called him a criminal attorney a minute

14   ago.  He's not my criminal attorney.  He's just an attorney

15   that knows about law and he offered to be here with me all this

16   time.

17        Q.    Okay.  So --

18        A.    So he's --

19        Q.    -- you're not paying him?

20        A.    I'm not paying him.  He is like a son to me.

21        Q.    So let's talk a little bit about your taxes.  Did you

22   prepare your taxes?

23        A.    At the beginning, I did.  The first year, I did

24   because there was not much going on.  And later on, I have -- I

25   have an accountant reviewing the documents and all that, yes.
```

14:53:28 — line 9
14:54:00 — line 18
14:54:26 — line 24

```
 1        Q.    Defense Exhibit Number 193 -- it's a single document.
14:54:45 2  Let me find it, all of the tax returns.  Here we go.
 3              Do you recognize this page, part of Defense Exhibit
 4  193, to be your individual tax return for 2010?
 5        A.    Yes, ma'am.
 6        Q.    And then, it's a joint return with you and your wife,
 7  correct?
 8        A.    Yes, ma'am.
 9        Q.    And some names have been blacked out for protection,
10  right?
11        A.    Yes, ma'am.
14:55:27 12        Q.    Okay.  And at the bottom of the second page, who is
13  Carla Legaspi?
14        A.    She is the CPA that did all this return.
15        Q.    Okay.  Did you provide all of the paperwork that she
16  requested to prepare your tax return?
17        A.    Everything she asked, I provided her.
18        Q.    Did you provide her everything that you had
14:55:58 19  financially acquired or all of your finances?
20        A.    Yes, I did, ma'am.
21        Q.    Did she ask you questions?
22        A.    She asked me questions, yes.
23        Q.    For example, the use of the vehicles, did she ask you
24  how you used the vehicles?
25              MR. HANSHEW:  Objection, hearsay, Your Honor.
```

```
 1              THE COURT:  It's not offered for the truth of the

 2    matter asserted.  I'm going to overrule.

 3         Q.   (BY MS. KANOF)  Did she ask you how you used the

 4    vehicles?

 5         A.   Yes, ma'am.

 6         Q.   Did you answer her?

 7         A.   Yes, ma'am.

 8         Q.   And as far as your -- was your son already graduated

 9    from law school at this time?

10         A.   I don't know exactly when he graduated, but he was, I

11    think -- this year, I think he finished law school and he

12    didn't have a job.  And he was looking and looking, so I was

13    helping him.

14         Q.   Okay.  Did he legitimately assist with issues -- not

15    necessarily legal, but just help you out?

16         A.   Yes, ma'am --

17         Q.   Okay.

18         A.   -- he did.

19         Q.   This whole idea of the Agua Prieta project, whose was

20    it?  Who came -- did you go to Marco or did Marco come to you?

21         A.   Marco came to me.

22         Q.   Okay.  And he -- when he came to you, what

23    information did he already have?

24         A.   He already had some set of the specs because he knew

25    exactly how many megawatts and capacities and what kind of
```

- Line 8: 14:56:26
- Line 19: 14:56:57

Gireud - Redirect                    49

```
          1  equipment it would need.  So he had a lot of information
14:57:29  2  already regarding the project.
          3      Q.   You had initially -- Mr. Hanshew asked you a lot
          4  about how meticulous you are as an engineer.  When you came to
          5  the United States at 18, did you already speak English?
          6      A.   No, ma'am.
          7      Q.   Did you speak any English at 18?
          8      A.   Whatever they teach you in preparatoria school, which
          9  is similar to high school, which, to be honest, is nothing.
         10  But I knew how to say hi.  I'm sorry.
14:57:57 11          You know, it's not very strong and I didn't speak
         12  much English, but I did speak a little bit.
         13      Q.   Okay.  And with regard to, but if you looked at a
         14  wiring system, would it matter what language that you spoke?
         15      A.   If I look at a what?
         16      Q.   A wiring system.  Specifications that have, you
         17  know --
         18      A.   Numbers and all that?
14:58:28 19      Q.   -- numbers and wires and that kind of stuff.
         20      A.   Yeah, I would be able to understand.  Yes, I would
         21  have an idea what is it because I'm an engineer.
         22      Q.   Does it make any difference what language an engineer
         23  speaks when you're looking at that kind of a document?
         24      A.   If you look at a drawing and something that has
         25  symbols and all that, it doesn't make a difference what
```

```
 1   language it is.

 2        Q.   Okay.  But if you look at a legal document, does it

 3   make a difference what language it's in?

 4        A.   I'm 59 years old and I still don't understand many

 5   terminology on legals.

 6        Q.   Now, with regard to Kendrick Electric, did you know

 7   Mace Miller before you went to Kendrick Electric?

 8        A.   I have met with him, yeah.  One or two times that I

 9   met him, yes.

10        Q.   And I think there was some question, when Marco

11   brought the project -- Mr. Delgado brought the project to you,

12   were you still working with Kendrick Electric?

13        A.   I think I was still there, yes, ma'am.

14        Q.   So there wasn't some kind of a gap?  You weren't

15   unemployed at the time -- or were you unemployed at the time,

16   Mr. Gireud?

17        A.   No, ma'am.  As soon as I left to El Paso Electric, I

18   was doing some consulting work using my -- I didn't have a

19   full-time job that commits me eight hours a day, but, yes, I

20   was doing some consulting work.  I was working, yes.

21        Q.   Okay.  The memorandum of understanding, I went

22   through some of this with you or most of it with you, but I

23   think, number 4, the amount of money, this paragraph, will

24   become due and payable upon the awarding of the contract,

25   correct?
```

Timestamps (left margin):
14:58:57 — line 4
14:59:24 — line 12
14:59:55 — line 21
15:00:25 — line 23

Gireud - Redirect                                      51

1   A.   That's what it says, yes, ma'am.

2   Q.   Was the awarding of the contract the same as the

3  signing of the contract?

4   A.   No, ma'am.

5   Q.   Okay.  When did the awarding of the contract occur,

6  before or after the signing of the contract?

7   A.   Before.

15:00:53  8   Q.   Was the awarding of the contract November of --

9   A.   Yes.  Yes, ma'am.

10   Q.   So the amount was due and payable upon the awarding

11  of the contract?

12   A.   That's what it says right there.

13   Q.   "And will be paid at the first disbursement of funds

14  by the investor lending institution"; is that correct?

15   A.   Yes.

16   Q.   And that would be the fideicomiso, correct?

17   A.   Yes, ma'am.

15:01:27  18   Q.   "As will be FGG in accordance with the contract

19  terms" --

20   A.   Yes, ma'am.

21   Q.   -- correct?

22   A.   Yes, ma'am.

23   Q.   Okay.  So as soon as it's disbursed, FGG is supposed

24  to get paid, right --

25   A.   Yes, ma'am.

Gireud - Redirect                                        52

1          Q.    -- according to that?

2          A.    Yes, ma'am.

3          Q.    The money, according to Government's Exhibit Number

4   2, the chart, arrives in the Turks and Caicos account on what

5   day?

15:01:58   6          A.    On March the 9th.

7          Q.    Is it immediately, as soon as it's disbursed,

8   provided to FGG?

9          A.    No, ma'am.  According to the document, the payment to

10  FGG was on -- almost a month later -- three weeks later.

11         Q.    And according to the memorandum of understanding, due

12  and payable upon -- "and will be paid at the first disbursement

13  of funds by the investor lending institution, the

15:02:29  14  fideicomiso" --

15         A.    Yes.

16         Q.    -- "to FGG."

17         A.    Of course.

18         Q.    Did the fideicomiso provide it directly to FGG?

19         A.    No, ma'am.  I don't see FGG named anywhere in this

20  document.

21         Q.    No.  Did FGG get the money from the fideicomiso?

22         A.    No, ma'am.

23         Q.    So were there more things that were not complied with

24  in this memorandum of understanding?

25         A.    Yes, ma'am.

15:02:56    1       Q.    Okay.  D&A commits to remaining fully engaged in

            2   managing the contractual relationship with CFE during FGG's

            3   involvement, correct?

            4       A.    Yes, ma'am.

            5       Q.    They were -- D&A is Mr. Delgado, correct?

15:03:30    6       A.    Yes, ma'am.

            7       Q.    Was Mr. Delgado your legal representative?

            8       A.    Yes, ma'am.

            9       Q.    And you talked a little bit about your

           10   understanding -- well, let me just ask you.  Do you know

           11   whether a lawyer is supposed to always do what is in the best

           12   interest of their client?

           13             MR. HANSHEW:  Objection, Your Honor.  That's a

           14   legal --

           15             THE COURT:  So what is your objection?

15:03:56   16             MR. HANSHEW:  Calls for a legal conclusion, Your

           17   Honor.  She's asking a layperson what lawyers' obligations

           18   are.

           19             THE COURT:  That would assume that only lawyers know

           20   what lawyers know and other people would never know that.  I'll

           21   overrule that objection.

           22             MS. KANOF:  I'm sorry, Your Honor.

           23             THE COURT:  It's overruled.  He can answer, if he

           24   knows.

           25       Q.    (BY MS. KANOF)  Do you know that a lawyer is always

1    supposed to do what's in the best interest of their client?

2         A.    Of course.  Yes, ma'am.

3         Q.    Okay.  You've evidently hired a few of them lately?

15:04:30  4  A.    Yes, ma'am.

5         Q.    Was cutting you out of the technical meetings in your

6    best interest, as FGG?

7         A.    Of course not.

8         Q.    Was diverting the money from the FGG account without

9    telling you to the Turks and Caicos account in the best

10   interest of FGG?

11        A.    Of course not.

12        Q.    Was prohibiting Mitsubishi from talking directly to

13   CFE in the best interest of FGG?

14        A.    No, ma'am.

15             MR. HANSHEW:  Your Honor, I'm going to object to this

15:04:58  16  line of questioning.  There's no -- this is not a legal

17   negligence claim, Your Honor.  This is bringing up that

18   she's --

19             THE COURT:  What's your objection?

20             MR. HANSHEW:  They struck the amendment to the

21   indictment, Judge.

22             THE COURT:  That's overruled.

23        Q.    (BY MS. KANOF)  With regard to the letters of credit,

24   was lying to you and saying that Mr. Delgado expended $4.6

25   million for letters of credit that did not exist in the best

15:05:28  1   interest of his client, FGG?

2       A.   Of course not, ma'am.

3       Q.   Was pledging the Mitsubishi equipment without telling

4   you in the best interest of you, his client?

5       A.   Of course not, ma'am.

6       Q.   Was telling you -- was calling you after you go to

7   Mr. Ramos and talk to Mr. Ramos and telling you you cannot talk

15:05:56  8   to Mr. Ramos in the best interest of FGG, your client?

9       A.   No, ma'am.

10      Q.   Did you understand, when you signed this MOU, that

11  you were letting Mr. Delgado have more money than you in the

12  project?

15:06:30 13      A.   I didn't have any choice, ma'am.  There were --

14      Q.   My question is:  Did you understand it?

15      A.   Yes.

16      Q.   Did you have a problem with letting your friend have

17  more money than you?

18      A.   No, ma'am, I didn't.

19      Q.   Government's Exhibit Number 52.  Government's Exhibit

15:06:55 20  Number 52, which is actually to Mr. John Adams but copied to

21  Mr. Miller -- you note you are not copied on it -- were you

22  aware that Mr. Delgado said that his payment would be issued to

23  FGG first and then FGG would wire it to his account 24 hours

15:07:28 24  after receipt?

25      A.   That's the way we agreed that he was going to get

1    paid.  As soon as I get paid, he was going to get paid.

2        Q.   Oh.  You agreed that you would get paid and then you

3    would pay him?

4        A.   Yes, ma'am.

5        Q.   Not that he would have the money go to a Turks and

6    Caicos account, you would pay himself?

7        A.   No, ma'am.

8        Q.   Okay.  And then next, were you aware that he told

15:07:58  9    John Adams, "Please note that I did not request assignment of

10   my fees so as to not undermine my ability to payment of my fees

11   as soon as practicable"?  Did you know that he said that to Mr.

12   Adams?

13       A.   No, ma'am, I didn't know.

14       Q.   Well, if the money goes directly from CFE to Mr.

15   Delgado's account, is that the same as assignment of collection

15:08:29  16   fees directly to him?

17       A.   Yes.

18       Q.   And is that deferring his payment of fees and only

19   taking them as soon as practicable?

20       A.   Yes, ma'am.

15:08:58  21       Q.   When I was showing you bank records, I was showing

22   your personal account, 1614, correct?

23       A.   Yes, ma'am.

24       Q.   This was the 1614 account I was discussing with you,

25   correct?

1        A.   Yes, ma'am.

2        Q.   Mr. Hanshew was showing you the other account that

15:09:24  3  you opened that you believed was consistent with the memorandum

4   of understanding, correct?

5        A.   Yes, ma'am.

6        Q.   I'm going to try to find it.  And that account number

7   ended in -- is this -- I think this is it -- in 5345?

8        A.   Yeah.  That's --

9        Q.   No, that's not an account number.

15:09:59  10   A.   That's --

11       Q.   Yeah.  See if I can find it.  No, that's still the

12  other account.

13            Oh, but interestingly enough, the $620,000 that

14  you -- well, let's just look at your 1614 account a little bit,

15  okay?  Did you, out of the 1614 account, your personal account,

16  did you pay Mr. Delgado $100,000 in July -- on July 31st of

17  2009?

15:10:27  18   A.   This is -- this is -- yes, I paid him 100,000.

19       Q.   Okay.  For consulting fees?

20       A.   Yes.

21       Q.   That's your personal money?

22       A.   That's my personal money that I put in the account,

23  so I can --

24       Q.   And do you recognize on the back of the check his

25  endorsement?

Gireud - Redirect                                           58

1    A.    Yes.  That's his signature.

2    Q.    And on August -- is that a 24 or a 29?

3    A.    August 24, I think.

4    Q.    Did you pay -- how much did you pay Mr. Delgado?

5    A.    $9,000 more.

6    Q.    And I can't read your handwriting.  What was it for?

15:10:59  7    A.    It says "Fee."

8    Q.    Okay.  What kind of fee was that?

9    A.    I don't remember, ma'am.

10    Q.    Well, the teaming agreement was August 8th.  So FGG

11  is already in existence.  Was this related to FGG?

12    A.    Yes, ma'am.

13    Q.    Okay.  On October 2nd, you paid Delgado and

14  Associates $2600.  Do you recall that?

15    A.    Yes, ma'am.

16    Q.    And this is not out of your escrow account, this is

17  just your personal account, correct?

18    A.    Yes, ma'am.

15:11:29  19    Q.    And do you recognize Mr. Delgado's endorsement?

20    A.    Yes, ma'am.

21    Q.    On December 8th of 2009, you gave Mr. Delgado $600;

22  is that correct?

23    A.    Yes, ma'am.

24    Q.    Do you remember -- these don't have a legend.  They

25  don't have a reason.  Do you -- if you have an independent

1   recollection of what purpose of these payments were, if you

2   would let me know.

3           Do you remember the $600?

4       A.   I don't remember the $600.  I remember the 2600 that

5   you have --

15:11:56   6       Q.   Okay.  The 2600, check 100- -- 1006, what was that

7   for?

8       A.   He ask -- he asked me -- he told me that he didn't

9   have any money, he needed money, and he was going to charge me.

10  When he found -- when he found -- or funded FGG Enterprise, he

11  did FGG Enterprises for me and he did another company for --

12  Mr. Lozada, the other guy who was originally working --

13      Q.   Mr. Lozado, L-o-z-a-d-o.

14      A.   -A-d-a, Lozada.

15      Q.   I'm sorry.

15:12:29  16      A.   And he wanted -- I'm sorry.  And he wanted to collect

17  money for him doing the work to form the companies in Nevada.

18  And Delgado, of course, said he will do it for us.  Now he

19  wants $2600.  To begin with, it's a lot of money.

20          But he said, "Fernando, I need your help.  Come and

21  help me."  And I paid the $2600 to fund the company.

22      Q.   So this was for him doing work for someone else?

15:12:57  23      A.   This is -- this is -- no.  I pay my part.  Since he

24  was charging $2600 to the other guy, I had to show him -- I

25  mean, I said, "Well, the other guy didn't pay," so I paid him.

Gireud - Redirect                                      60

```
 1    This is the money he charged me to do --

 2         Q.   To establish FGG --

 3         A.   -- to establish FGG Enterprises, yes, ma'am.

 4         Q.   You don't remember the 600, I think you testified?

 5         A.   I don't remember, ma'am.

 6         Q.   On October 27th of 2009, check 1011, did you pay him

 7    another $2,000?

 8         A.   Yes, ma'am.

 9         Q.   Do you recall what that was for?

10         A.   I don't remember, ma'am.

11         Q.   And do you recognize his endorsement?

12         A.   Yes, ma'am.

13         Q.   On November 12th of 10 -- check number 1017, November

14    12th of 2009, did you pay him $1,000?

15         A.   Yes, ma'am.

16         Q.   Do you recall what that was for?

17         A.   No, ma'am.  Most of the time, he needed the money.

18    He'd say, "I'm going to Mexico," or something.  I don't

19    remember exactly.

20         Q.   Do you recognize his endorsement?

21         A.   Yes, ma'am.

22         Q.   On February 2nd of 2010, check number 1025, did you

23    pay him $16,000?

24         A.   That's what it says right there, yes, ma'am.

25         Q.   Is that your signature on that check?
```

- 15:13:29 at line 11
- 15:13:57 at line 22

Gireud - Redirect                                    61

1      A.    Yes, ma'am.

2      Q.    And is that bank account number 1614?

3      A.    Yes, ma'am.

4      Q.    Do you remember what the $16,0000 was for?

5      A.    No, ma'am.  Unfortunately, I don't remember.

6      Q.    Do you recognize his endorsement?

7      A.    Yes, ma'am.

15:14:27   8      Q.    On November 23rd of 2010, check number 1029, did you

9   pay Mr. Delgado $3,000?

10      A.    Yes, ma'am.

11      Q.    Do you recall what that was for?

12      A.    No, ma'am, I don't remember.

13      Q.    Do you recognize his endorsement?

14      A.    Yes, I do, ma'am.

15      Q.    These are all, by the way, from Government's Exhibit

16   144.

17            On March 30th of 2010, check number 1031, you paid

18   him $2,0000.  Do you recall what that was for?

19      A.    No, ma'am.

15:14:59   20      Q.    Do you recall that the first payment, the $20 million

21   payment from CFE, was supposed to be on March 6th of 2010?

22      A.    Yes, ma'am.

23      Q.    Had you received any money from that payment by March

24   30th?

25      A.    No, ma'am.  I believe it was until April 1st or

Gireud - Redirect                                          62

1    something.

2         Q.    And do you recall -- did you know that Mr. Delgado

3    had the $20 million sitting in his account by this time for

4    more than three weeks?

15:15:30  5         A.    No, ma'am.  If I knew, I wouldn't have given any

6    money.  I'm sorry.

7         Q.    Do you recognize his endorsement?

8         A.    Yes, ma'am.

9         Q.    On April the 2nd -- and now you said you recall -- by

10   April the 2nd, you had received money from the Turks and Caicos

11   account?

12        A.    Yes, ma'am.

13        Q.    And we discussed this check already, correct?

14        A.    Yes, ma'am.

15        Q.    And you do, in fact, put "Consulting fees"?

16        A.    Yes, ma'am.

17        Q.    And there's no endorsement on that check.

15:15:59  18             Five days later -- who is Alberto Alvidrez?

19        A.    I don't know.  I mean, it says right here, "Loan for

20   Marcos."  So he asked me for a loan or something and I -- I

21   don't know.  I don't know who is Albert Alvidrez.

22        Q.    Okay.  You don't know an Albert -- an Albert

23   Alvidrez?

24        A.    Not that I recall, ma'am.

25        Q.    But on the notation, the memo portion of the check,

15:16:28  1  it says, "Loan for Marco"?

        2      A.   Yes, ma'am.

        3      Q.   Okay.  And this is check number 1039.  You don't have

        4  any independent recollection of Mr. Delgado -- do you know

        5  another Marco that you would be writing a check for a loan for

        6  them, to pay back the loan for them?

        7      A.   Not that I remember right now, ma'am.

15:16:55  8      Q.   On April 14th now, 12 days after the $620,000 check,

        9  check number 1042, did you write Mr. Delgado -- Delgado and

       10  Associates a check for $29,000?

       11      A.   Yes.  That's what it says.

       12      Q.   I'm asking you, is that your signature?

       13      A.   Yes, ma'am.

       14      Q.   And what is in the memo portion?

       15      A.   "Technologies," I think.

       16      Q.   Do you have any memory of why you gave him a check

15:17:26 17  for $29,000 for technologies?

       18      A.   I don't remember, ma'am.

       19      Q.   Now, who did he tell you Enerproyectos was?

       20  E-n-e-r-p-r-o-y-e-c-t-o-s.

       21          Do you have any idea who -- what did he tell you

       22  Enerproyectos was?

       23      A.   The engineers doing the field services.

       24      Q.   Okay.  Was this for Enerproyectos Technologies?

       25      A.   I don't think so, ma'am.  If it was an invoice, I

15:17:56    1    would have -- write the check to Enerproyectos, instead of

2    Delgado and Associates.

3         Q.   Did you have an invoice from Mr. Delgado for

4    technologies?

5         A.   No, ma'am.

6         Q.   But you did write him a check for $29,000?

7         A.   Yes, ma'am.

8         Q.   And do you recognize his endorsement?

9         A.   Yes, ma'am.

10         Q.   On March 30th, I believe that was the same -- no.  on

11   March 30th, it's -- the reason the date is not in order is

12   because it's by check number.  On check number 1048, did you

15:18:30   13   write Mr. Delgado another check?

14         A.   No.  1048 is to Fernando Daniel, to my son.

15         Q.   I'm sorry.  These aren't your checks.

16              Did you write yourself a consulting fee check?

17         A.   This is for my son.

18         Q.   This is for your son.  So you gave your son $3600 for

19   three months' worth of consulting; is that correct?

20         A.   Yes, ma'am.

21         Q.   So in addition to -- you previously testified Marco

15:19:00   22   asked for money all the time; is that correct?

23         A.   Yes, ma'am.

24         Q.   Did you ever withdraw money from an ATM for him?

25         A.   I don't remember.  I think one time I did that he

Gireud - Redirect                                    65

 1   needed -- he wanted me to give him cash and I think I pay

 2   him -- I gave him $1,000 or something because he was on his way

 3   to the airport, or something like that.  I don't remember

 4   exactly.

 5        Q.   Did you ever give him cash?

 6        A.   Yes.  That probably -- that's the only time that I

15:19:28  7   went to an ATM and got money for him.  I don't know if I did it

 8   more than one time.  I don't remember.

 9        Q.   With regard to the memorandum of understanding, the

10   handwritten part, the $470,000 to pay back the people who

11   fronted you money, did you pay them back?

12        A.   Yes, I did, ma'am.

13        Q.   If we were to look in Exhibit 144, would we find

14   checks to Kendrick Electric and to Dr. Vargas?

15        A.   And 1099s, also.

15:19:59 16        Q.   And on the 1099s, okay.

17        A.   Yes, ma'am.

18        Q.   You -- Mr. Hanshew was asking you a lot of questions

19   with regard to personal expenditures out of what you perceived

20   to be your escrow account.  And did you ask your accountant --

21   the same accountant that did your tax returns, did you ask your

22   accountant about that?

23        A.   Yes, ma'am.

24        Q.   And what did she say?

25             MR. HANSHEW:  Objection, hearsay.

```
 1              THE COURT:  Sustained.

 2              MS. KANOF:  He already testified to it.  I was

 3      just --

 4              THE COURT:  Well, but it was -- I'm not sure that

 5      that's what Mr. Hanshew had asked him.  He asked him why there

 6      was a payment like that.  Mr. Gireud volunteered that it was

 7      his account.

 8              MS. KANOF:  Okay.

 9         Q.   (BY MS. KANOF)  Did you think you were doing anything

10      wrong?

11         A.   No, ma'am, not at all.

12         Q.   Did you knowingly lie to the IRS on your tax return?

13         A.   No, ma'am.

14         Q.   The two -- in the account that you considered your

15      escrow account, the two payments to Mitsubishi, the 125,000 and

16      the hundred and I forget how much thousand, what were those

17      for?

18         A.   Somewhere at the end, they offered to pay us a

19      million dollars back -- or give us that million dollars back

20      because they didn't have the letters of credit.  I don't

21      remember exactly what it was.  So they said every payment that

22      you make us, we are going to give you back a percentage.

23      That's why we got the two monies from MPSA.

24         Q.   Okay.  I thought that you were paying -- I guess they

25      were paying you.  I'm sorry.
```

15:20:28  (line 4)
15:21:00  (line 15)
15:21:25  (line 23)

1          Did you have access to the Turks and Caicos account?

2     A.   No, ma'am, not at all.

3     Q.   So in the MOU where it says that FGG or you are

4    supposed to pay Mr. Delgado, you could not have paid him from

15:22:00  5    the Turks and Caicos account, correct?

6     A.   Correct.

7     Q.   With regard to your relationship with different

8    people, do your feelings sometimes change when you get sued by

9    somebody?

10    A.   Oh, yes.

15:22:26 11    Q.   The meeting in Mexico, where you said Ponce, Waki,

12   the other person whose name you couldn't remember and the

13   lawyer, when did that meeting occur?

14    A.   It was in December when we were signing the contract.

15   This was after the contract was awarded in November.  We met in

16   December to sign the contract between FGG and MPSA.

17    Q.   Okay.  And was John Adams there?

15:23:00 18    A.   No, ma'am.

19    Q.   Mr. Hanshew showed you the part of the teaming

20   agreement that said that Mr. Delgado was supposed to be a

21   liaison between FGG and Mitsubishi.  Do you consider not

22   permitting people to talk to each other being a good liaison?

23    A.   No, ma'am.

24    Q.   Okay.  In the memorandum of understanding, at the

15:23:27 25   time that you signed the memorandum of understanding, which I

1    believe is September 13th -- I guess I'll double-check really

2    quick.   September -- I'm sorry -- September 16th of 2009, did

3    you know how much all the things were going to cost?

4          A.   No, ma'am.

5          Q.   Did you know anything about the schedule of payments?

6          A.   No, ma'am.

7          Q.   Did you know the exact amount of money, for example,

8    that the letters of credit were going to cost?

15:24:00  9    A.   No, ma'am.

10          Q.   Did you know how much consulting was going to cost?

11          A.   No, ma'am.

12          Q.   Did you know how much the people that Mr. Delgado was

13   going to hire to help him with field services was going to

14   cost?

15          A.   No, ma'am.

16          Q.   So basically, you had no idea what the expenses were

17   going to be at that time; is that correct?

15:24:30  18   A.   Yes, ma'am.

19          Q.   And ultimately, the power of attorney that Mr.

20   Hanshew went over with you, you tried to revoke it, right?

21          A.   Yes, ma'am.

22          Q.   Did it work?

23          A.   No, ma'am.

24          MS. KANOF:  Pass the witness.

25          THE COURT:  Mr. Hanshew, before we begin, let's go

```
 1    ahead and take a recess.

 2              We will stand in recess until 3:40.  Recess for 15

 3    minutes.
```

15:24:55  4              (Recess from 03:24 PM to 03:42 PM)

```
 5              THE COURT:  Let the record reflect all the members of

 6    the jury are present.  The United States, represented by the

 7    Assistant United States Attorney, is present.  Defendant and

 8    counsel are present.  The witness, Mr. Gireud, is on the

 9    witness stand.
```

15:41:59 10              Mr. Hanshew.

```
11              MR. HANSHEW:  Thank you, Your Honor.

12              The ELMO, please.  This is Government's Exhibit 144,

13    a selected page out of it.

14              THE COURT:  Government's Exhibit 144?

15              MR. HANSHEW:  Yes, Your Honor.

16              THE COURT:  Okay.

17                          RECROSS EXAMINATION

18    BY MR. HANSHEW:

19         Q.   Can you see that in front of you?

20         A.   Yes, sir, I do.

21         Q.   Earlier, Ms. Kanof asked you the question if this
```

15:42:27 22    account was your personal account, and you said, yes, it was,

```
23    correct?

24         A.   I don't recall what account she showed me.  But, yes,

25    I said it was mine.  This is an FGG account.
```

Gireud - Recross                                                70

```
 1        Q.   It's not your personal account?

 2        A.   No, sir, it's not.

 3        Q.   And then she went through various checks out of that

 4   account, correct?

 5        A.   Yes, sir.

 6        Q.   This is also a check from that account, right?

 7        A.   Yes, sir.

 8        Q.   That's to a jewelry store?

15:43:01  9        A.   Yes, sir.

10        Q.   This is a check from that account?

11        A.   I don't see nothing, sir.

12             Yes, sir.

13        Q.   That's to yourself?

14        A.   That's for my son.

15:43:27 15        Q.   This is from that account?

16        A.   Yes, sir.

17        Q.   It is to your daughter?

18        A.   That's for my daughter, yes.

19        Q.   This is paying $20,000 to yourself from that account?

20        A.   Yes, sir.

21        Q.   This is paying Hector Ponce?

15:43:58 22        A.   Yes, sir.  And the reason why this check was --

23        Q.   I didn't ask.  I didn't ask.  I asked you if this was

24   a check to Hector Ponce, sir.

25        A.   Yes, sir.
```

Gireud - Recross                                        71

1      Q.    A check for your Mercedes?

2      A.    Yes, sir.

3      Q.    A check for your Lexus?

15:44:31   4      A.    Yes, sir.

5      Q.    Explain that check to me.

6      A.    Yes.  That was part of the money when we got paid the

7  first time.  I was paying back some of the money to myself.  I

8  asked my accountant.  And she said, "Yes, you are the owner and

9  you invest the money in it.  You can take the money out of the

10  account."  Yes.

11      Q.    Earlier, you explained yesterday that you had put in

15:45:00   12  $200,000, correct?

13      A.    I don't know -- I don't know exactly how much money I

14  put, but I put some, yes.  Some money, yes.

15      Q.    Yesterday you said $200,000?

16      A.    Okay.  $200,000.

17      Q.    That was a check to yourself for three quarters of a

18  million dollars, right?

19      A.    Yes, sir.

15:45:26   20      Q.    That's a withdrawal form; is that right?

21      A.    Yes, sir.

22      Q.    And you withdrew $400,000, correct?

23      A.    Transfer money from the account to the other account

24  in the bank.  And I used to do things like this for whatever

25  reason.  I was told by the bank that it wasn't good to have --

Gireud - Recross                                    72

```
 1        Q.   It says "Withdrawal" at the top, right?

 2        A.   Withdrawal and deposit to another -- in the same

 3   bank, same accounts.

 4        Q.   This -- I'll try to zoom in.  Can you see that, sir?

 5        A.   Yes, sir.

 6        Q.   That's a lengthy list of expenses in Barcelona?

 7        A.   Yes, sir.

 8        Q.   Madrid?

 9        A.   Yes, sir.  I went on vacation.

10        Q.   Toledo?

11        A.   Yes.  I went on vacation and paid my vacation, yes.

12        Q.   You went on vacation on the FGG account is what you

13   did, right?

14        A.   Well, I didn't have a salary on that account, so I

15   was told -- my accountant said, "You can spend this and that's

16   your salary," yes.

17             MR. HANSHEW:  No further questions.

18             THE COURT:  Ms. Kanof.

19                      REDIRECT EXAMINATION

20   BY MS. KANOF:

21        Q.   Mr. Gireud, the $2200 to Mr. Ponce, at the bottom, it

22   said "LAPEM."  Could you tell the jury what the $2200 was.

23        A.   Yes.  I don't know if at this time Hector Ponce was

24   in a meeting in Mexico.  And they requested -- I told you

25   earlier, in some of the conversations that we have
```

15:46:01    4
15:46:28   12
15:47:00   23

1   certifications to -- to do business with the CFE.  And one day,

2   they called us, and say, "You have to pay the fees for LAPEM.

3   This is so you can be certified."

4          Q.   What is "LAPEM"?

5          A.   I don't remember exactly what is it, but it's like --

15:47:29   6          Q.   I'm not asking what the acronym stands for.  But what

7   kind of organization is it?

8          A.   LAPEM is part of the CFE.  It's -- CFE certification

9   department.  And every time you get certain permits certified,

10  you have to pay a fee.

11         Q.   CFE is part of the Mexican government, right?

12         A.   Yes, ma'am.

13         Q.   So go ahead.

14         A.   Hector Ponce was in Mexico.  And he said, "I can do

15  the payment for you and then you pay me back the money."

16              I said, "Yeah.  I cannot send any wire transfer or

17  anything."

18              So he paid that money for the LAPEM and I returned

15:48:00   19  the money to him.  It was a fee that you have to pay to the

20  utility to be certified or to get your certifications.  In

21  Mexico, nothing is free.  They charge you for everything.

22         Q.   You paid Mr. Delgado $620,000 out of that account as

23  his payment from the CFE first payment, correct?

24         A.   Yes, ma'am.

15:48:27   25         Q.   And then you paid yourself money as well, correct?

Gireud - Recross                                    74

1      A.   Yes, ma'am.

2      Q.   You also -- did you pay Mace Miller some money?

3      A.   Yes, ma'am.  He got paid like $350,000 too.

4      Q.   Did you pay Dr. Vargas back out of that money?

5      A.   I paid Dr. Vargas back from my money and I paid Mr.

6  Kendrick the $350,000 that he provided to Marco at the

7  beginning.  So I took care of all the monies, yes, ma'am.

8      Q.   Before you used that account to make these personal

15:48:57  9  payments, did you check with your accountant?

10      A.   Yes, ma'am.  Every time I did anything, I checked

11  with her, my accountant.

12           MS. KANOF:  Pass the witness.

13           THE COURT:  Mr. Hanshew.

14           MR. HANSHEW:  No further questions, Your Honor.

15           THE COURT:  May Mr. Gireud be permanently excused?

16           MR. HANSHEW:  Yes, Your Honor.

17           THE COURT:  Ms. Kanof?

18           MS. KANOF:  Hector Ponce.

19           THE COURT:  May Mr. Gireud be --

20           MR. KANOF:  I'm sorry, Your Honor.  He may be

21  excused.

22           THE COURT:  Mr. Gireud, thank you so much for coming

23  down.  You are free to go, sir.

24           THE WITNESS:  Thank you, sir.

15:49:28  25           (Witness excused)

1              THE COURT:  Hector Ponce.

15:49:59  2              MS. ARREOLA:  Your Honor, the government calls Hector

3    Ponce.

4              THE COURT:  Would you raise your right hand,

5    please.

6              (Witness sworn)

7              THE COURT:  Have a seat, please.

8                         HECTOR PONCE,

9    having been first duly sworn, testified as follows:

10                     DIRECT EXAMINATION

11   BY MS. ARREOLA:

12        Q.   Good afternoon, sir.  Could you introduce yourself to

13   the jury.

15:50:29 14        A.   Good afternoon, ladies and gentlemen.  Good

15   afternoon, Your Honor.  My name is Hector Ponce.

16        Q.   Where do you currently live, sir?

17        A.   I live in Lake Mary, Florida, near Orlando.

18        Q.   Where are you originally from?

19        A.   I was born and raised in Honduras, Central America.

20        Q.   When did you come to the United States?  How old were

21   you?

22        A.   I was 14 years old in 1973 when I came to the United

23   States as a permanent resident.

24        Q.   Can you tell us briefly about your educational

25   background.

Ponce - Direct                                                    76

15:50:55    1        A.    I did my middle school and my high school in New

            2   Jersey, and I also finished my university studies in New

            3   Jersey, where I graduated as a mechanical engineer from Stevens

            4   Institute of Technology in 1991.

            5        Q.    At some point after graduating from Stevens, did you

            6   work for Mitsubishi?

            7        A.    At some point much later than that, yes.

            8        Q.    Okay.  Can you walk through the work history.

            9   Briefly walk us through your work history from the time you

           10   graduated from Stevens up until the time you worked at

           11   Mitsubishi.

15:51:27   12        A.    Okay.  In 1991, I graduated from Stevens and I joined

           13   Westinghouse Electric Corporation in Pittsburg, Pennsylvania.

           14   Westinghouse moved the --

           15        Q.    Let me stop you right there.  I want to ask you a

           16   question.  What kind of a company was Westinghouse?

           17        A.    Westinghouse was one of the two old companies in the

           18   United States that started the electrical industrial

15:51:56   19   revolution.  Westinghouse was the company that developed the

           20   alternating current systems that deliver electricity to homes

           21   and industries.  And for more than a hundred years,

           22   Westinghouse was in the business of manufacturing equipment,

           23   supplying equipment, and starting up equipment for the purpose

           24   of generating electric power.

           25             And I was a young engineer out of the university who

Ponce - Direct                                77

1    joined them in the electrical generation group.

15:52:28  2        Q.   Okay.  And after you joined Westinghouse, you said

3    that you were an engineer.  At some point, did your position

4    change?

5        A.   Yes.  I grew up in Westinghouse through the ranks.

6    Westinghouse moved its operations from Pittsburgh to Florida

7    and to the southeastern United States in the early '80s and I

8    went to be an engineer at the headquarters there.

9             Soon after that, Westinghouse sent me to back to

15:52:59 10  Pittsburgh where I studied Japanese language and culture at the

11   University of Pittsburgh.  And the reason I did that was

12   because Westinghouse had an alliance relationship with

13   Mitsubishi Heavy Industries of Japan at that time.  It was an

14   old friendship and alliance of cooperation.  And one of the

15   cooperative methods was to exchange engineers.  So one of us

15:53:24 16  engineers went to Japan and one of their engineers came to

17   Orlando to spend a year at Westinghouse.  It was a great

18   experience and I was sent there for one year.

19             After returning from that year, I continued in

20   engineering where I was lead engineer for a major development

21   of special electrical generation equipment.  And then I became

22   manager of manufacturing operations in Pensacola, Florida,

15:53:56 23  which was one of the factories of Westinghouse at the time.

24             Soon after that, I was sent back to the headquarters

25   to head one of the engineering groups and be in charge of them.

Ponce - Direct                                                           78

 1    And soon after that, they again sent me off to Japan where I

 2    spent -- from 1992 until 1998, I spent three years in Kobe,

 3    Japan, and three years in Tokyo where I was in charge of all

 4    the businesses of Westinghouse in Asia Japan.

15:54:28   5        Q.    What was your title when you held that last position?

 6        A.    My last title in Tokyo was Westinghouse -- I mean

 7    President of Westinghouse Asia Japan.

 8        Q.    And what happened?  Did you eventually leave

 9    Westinghouse?

10        A.    At the -- the last year that I was in Tokyo,

11    Westinghouse had a strategy to exit the industrial businesses

12    and to concentrate more on what is now CBS television, which

15:55:00  13    was part of Westinghouse at the time.  And Westinghouse

14    eventually sold the power-generation business to Siemens of

15    Germany, which is what the company is today.

16            And I had a decision to make, whether to come back

17    from Tokyo and join that new company called Siemens or to do

15:55:25  18    something else.  And at the time, I had an opportunity to work

19    for another major power-generation company called ABB in

20    Switzerland.  So I went to live in Switzerland for about a year

21    and a half so I could be trained in the philosophies of that

22    new company.

23        Q.    And did you eventually leave AAB [sic]?

24        A.    I left ABB in 1998 because they were absorbed by

25    another company.  And at the same time, my wife fell ill with

15:55:58  1    cancer and I couldn't be in Europe.  So I came home, being

2    offered a position at Mitsubishi Heavy Industries, who wanted

3    to begin a new way of doing business in the United States.

4         Because up until that time, with the partnership with

5    Westinghouse, Mitsubishi supplied equipment and services to

6    Westinghouse and Westinghouse did the projects.  But now that

15:56:25  7    Westinghouse had been sold or bought out by Siemens, Mitsubishi

8    had the -- the desire and obligation to be one more competitor

9    in the Americas so that they could offer products to the

10   customers who were -- who were seeking to buy those products.

11        Q.   Now, are there multiple companies that have the name

12   "Mitsubishi" in them?

13        A.   In Japan, there's a loosely called Mitsubishi group

14   of companies, which is actually a group of companies that are

15:56:56  15   related to each other only by history.  Mitsubishi Heavy

16   Industries is one of those.

17        Q.   When you joined Mitsubishi, which Mitsubishi company

18   did you join?  What was the name of the company that you

19   joined?

20        A.   I joined Mitsubishi Heavy Industries.

21        Q.   Was that an American company?

22        A.   Well, Mitsubishi Heavy Industries is the parent

23   company which is headquartered and registered in Japan.  But in

24   order to employ me in the United States, I literally became

15:57:28  25   employed by Mitsubishi Heavy Industries Americas, which was a

Ponce - Direct                                    80

1    company -- a subsidiary company established in the United

2    States for doing business in the United States.  So I joined

3    that company.

4        Q.   And what year did you join that company, Mitsubishi

5    Heavy Industries America?

6        A.   That was 1999.

7        Q.   And what was your position when you joined?

8        A.   I was vice president of power generation.

9        Q.   What type of company was Mitsubishi Heavy Industries

10   America?  What did they sell, if anything?

15:58:00  11        A.   Up until that time, Mitsubishi Heavy Industries

12   America was providing several products except power generation.

13   So, for example, Mitsubishi Heavy Industries Americas was

14   providing ships for the -- for both the shipping and the luxury

15   liner industries.  So Mitsubishi Heavy makes one of the luxury

15:58:26  16   liners that does cruising, as well as oil tankers, et cetera.

17   But also even smaller equipment, such as Caterpillar tractors

18   were part of Mitsubishi Heavy Industries at the time.

19        Q.   Okay.  And what was your -- what was your title again

20   at Mitsubishi Heavy Industries America?

21        A.   It was vice president of power generation.

22        Q.   What were your duties and responsibilities as the

23   vice president of power generation at Mitsubishi Heavy

24   Industries America?

25        A.   Since up until that time, Mitsubishi Heavy Industry

15:58:58  1   Americas did not provide power generation services, because as

2   I said, everything was -- was done in cooperation with

3   Westinghouse.  Westinghouse no longer being a company, I was

4   charged with establishing a strategy and figuring out how the

5   power-generation products of Mitsubishi Heavy Industries could

6   be marketed in the United States and the rest of the Americas.

7       Q.   Were you successful in that project?

15:59:27  8       A.   We did -- we did go ahead and establish a plan, a

9   strategy.  We hired people.  We established a headquarters, and

10   eventually it became wise and proper to break off from

11   Mitsubishi Heavy Industries Americas and to establish a company

12   owned by MHI of Japan, and we called that company Mitsubishi

15:59:54  13   Power Systems Americas and we established it as a U.S. Inc. in

14   2001.

15       Q.   You said you mentioned MHI Japan, I believe is what

16   you mentioned.  What does that stand for?

17       A.   "MHI" stands for Mitsubishi Heavy Industries.

18       Q.   Okay.  What was Mitsubishi Power Systems Americas

19   relationship with Mitsubishi Heavy Industries Japan?

20       A.   It was a wholly owned subsidiary, which means

16:00:28  21   Mitsubishi Heavy Industries Japan owned Mitsubishi Power

22   Systems a hundred percent.

23       Q.   Okay.  And is Mitsubishi Power Systems America also

24   referred to as MPSA for short?

25       A.   We refer to it as MPSA, yes.

Ponce - Direct                                    82

1    Q.   And just very briefly, what type of company was MPSA?

2  What did they -- what were they trying to sell, if anything?

3    A.   Our charter was to -- to do the business development,

4  to seek projects, to make proposals and to deliver equipment

16:00:59  5  and services to people who were building power stations in the

6  United States.  The equipment literally being turban generators

7  for the production of electric power.

8    Q.   And very briefly, what did turbine generators do?

9  Just very briefly.

10    A.   Turbine generators, if you imagine, for example, a

11  steam kettle turning a big wheel or wind turning a big wheel,

16:01:28  12  the power of the wheel is used to turn a dynamo, almost like a

13  little dynamo on a bicycle when you're turning, and it makes

14  electricity.  That electricity for those purposes is at very

15  high voltage and very high current, such that it can be

16  transmitted from a power station, which normally gets put

17  outside of residential areas, and it goes through the power

18  lines that you see across the fields, the transmission lines,

19  to eventually gets to your homes, to hospitals, to schools and

20  to everybody that needs the power.

21    Q.   Thank you.

16:01:59  22         What was your title at MPSA when you joined?

23    A.   When we formed the company, my title was executive

24  vice president of operations.

25    Q.   As executive vice president of operations, who did

1  you report to?

2        A.   I reported to the president and CEO of the company.

3        Q.   Did anyone else report to the president and CEO of

4  the company?

5        A.   No.

6        Q.   So does that mean that you were the second highest

16:02:26  7  ranking official at the MPSA when the company joined?

8        A.   That is correct.  But I'd like to correct what I just

9  said.  Some of the administrative functions, like the HR

10  department and the legal department, did report to the

11  president.  But the operating people, like sales and marketing

12  and service and manufacturing, those people reported to me and

13  then I reported to the president.

14        Q.   All right.  Were you the second highest level

15  official at the company?

16        A.   Yes.

17        Q.   And what were your duties and responsibilities as the

16:02:58  18  executive vice president of operations?

19        A.   I -- the first and most important duty was to

20  establish the business model, the philosophy, the procedures

21  for how the company would do business in the United States and

22  in the rest of the Americas.  I think the second biggest

23  responsibility for me was to hire the proper people and to make

24  sure that we had good people that could provide good services.

16:03:27  25        And the third most important responsibility was to

1   follow the day-to-day operations to make sure that I could

2   advise my staff, on the one hand, but that I could also advise

3   the Japanese.   I considered myself to be the cultural bridge

4   between the two -- the two nations and two cultures because,

5   basically, we think very differently from one another.   And I

6   was the translator in many ways to make sure that we understood

7   what was important.

8        Q.   Okay.   Did there come a time when you left MPSA?

9        A.   Yes.   I left MPSA in 2007.

10       Q.   Is that for personal reasons?

11       A.   It was for very personal reasons, yes.

12       Q.   By the time you left Mitsubishi, approximately how

13  many years of experience did you have in the power generation

14  industry?

15       A.   From 1991 to 2007.   So that would have been a quarter

16  century, basically.

17       Q.   After you left MPSA, did there come a time when you

18  worked for MPSA again?

19       A.   Yes.

20       Q.   How did that happen?

21       A.   Well, I left in -- as I said, I left for personal

22  reasons.   So I left, certainly, in very good terms with my

23  company.   And soon after that -- or I should say, specifically,

24  I think it was the end of 2008, they called me back to see if I

25  could help to manage a project that became an opportunity in

1    Mexico.

2         Q.   And what opportunity was that?

16:04:56  3         A.   It was -- it was an opportunity to provide equipment

4    for a project in Mexico, which went by the name of Agua Prieta.

5    And specifically, the *Comision Federal de Electricidad* of

6    Mexico, or I'll call it CFE from now on.  CFE was asking the

7    people who could supply such equipment to make proposals and to

16:05:26  8    make offers for CFE to evaluate and choose one of those offers.

9              And literally, a group called FGG had -- had bought

10   the bid specification and they had qualified to bid.  So they

11   had the rights and the -- and they were establishing the

12   process for making a proposal and they came to Mitsubishi to

13   ask if Mitsubishi could supply a set of equipment that was

14   already in existence.  It was inventory equipment.

16:05:59  15        Q.   Okay.  And who at Mitsubishi approached you about

16   this opportunity?

17        A.   Specifically, John Adams asked me if I could come in

18   and help.

19        Q.   And did you know John Adams before he approached you

20   about the Agua Prieta project?

21        A.   Yes, I did.

22        Q.   How did you know him?

23        A.   I hired John Adams into Mitsubishi and John Adams was

24   on my staff while I was in charge of Mitsubishi.

25        Q.   Okay.  Now, you said -- I seemed to have heard that

Ponce - Direct                                                    86

16:06:29  1   you said 2008 is when they approached you.  Are you sure about

        2   the year?

        3       A.   I think -- I think it might have been 2009, but it

        4   was somewhere in there.

        5       Q.   Okay.  And after Mr. Adams approached you, did you

        6   agree to help on the project?

        7       A.   Yes, I did.

        8       Q.   What type of employment relationship, if any, did you

        9   enter into?

       10       A.   It was an independent contract for services where I

       11   would provide to him my experience and the ability to put

       12   projects together and he would pay me money.

16:06:59 13       Q.   Okay.  And did you become an employee again at MPSA

       14   or were you an independent contractor?

       15       A.   No, ma'am.  No, I was not an employee.  I was an

       16   independent contractor.

       17       Q.   And what was the pay arrangement?

       18       A.   They paid me a daily rate for the days that I worked

       19   on the project.

       20       Q.   So what were you hired to do?

       21       A.   I was hired to evaluate the project.  Again,

16:07:27 22   translate it.  Now in a different way because the project was

       23   being done by a company in Mexico, so there was Spanish

       24   language involved.  And then I would take it back to Mitsubishi

       25   and make sure people like John Adams understood what the

 1   project was all about and also that the Japanese management

 2   understood what the project was all about.

 3        But most importantly, once we made a decision that we

 4   could proceed with it, my job was to put together the proposal,

16:07:58  5   follow the commercial aspect of the project and hopefully win

 6   the project, you know, to supply the equipment and build

 7   another Mitsubishi power station in Mexico.

 8        Q.   Had Mitsubishi, or MPSA, worked with CFE before you

 9   left the company?

10        A.   No.  No, they had not.

11        Q.   Okay.  How about Mitsubishi Heavy Industries Japan?

16:08:30  12        A.   Yes.  For many years, Mitsubishi supplied equipment

13   in Mexico.

14        Q.   Okay.  And so, after you were hired, did you

15   participate in any meetings with FGG?

16        A.   After I was hired?

17        Q.   After you were hired back by MPSA, did you

18   participate in any meetings with FGG?

19        A.   You mean before my independent contracting

20   arrangement?

21        Q.   No, sir.  After you were hired.  After John Adams

16:08:56  22   approached you and you signed this agreement to work at a daily

23   rate, did there come a time when you participated in any

24   meetings with FGG?

25        A.   Yes.  Many times, we partic- -- we had meetings

Ponce - Direct                                                   88

1    together so that we could discuss what -- what FGG required of

2    Mitsubishi and what Mitsubishi was willing to supply.

3         Q.   When was your first meeting with FGG?

4         A.   I believe it was -- it was soon after John Adams

16:09:29  5    called me and FGG came to visit the offices of Mitsubishi in

6    Orlando, Florida.  Literally, in Lake Mary, Florida.  So FGG

7    came at that time.

8         Q.   What was the purpose of that meeting?

9         A.   It was to have the initial discussions on what they

10   needed, what the project description was, and for us, of

11   course, to describe what equipment we had.  And we were

16:09:59 12   confirming what equipment we had because FGG already knew and

13   was asking for equipment that they knew we had.

14        Q.   Okay.  And did that equipment preexist?

15        A.   Yes.  It was premanufactured and on inventory.  It

16   was in storage.

17        Q.   All right.  Was it built for some other project?

18        A.   Yes.  It was built for another project in Latin

19   America.  But that project never got completed, so the

20   equipment was being preserved and maintained, you know, under

21   the direction of Mitsubishi.

16:10:28 22        Q.   Who attended this meeting?  First -- I'll break it up

23   for you.  Did anybody -- who from Mitsubishi or from MPSA

24   attended the meeting?

25        A.   John Adams attended the meeting.  A few -- a few

1    engineers attended the meeting.  Some of them were Japanese and
16:10:56  2    at least one American engineer, I believe.  But I believe
3    Patrick Altamura, as counsel, attended.  I, myself, as now
4    being under contract with Mitsubishi, I was on the Mitsubishi
5    side.  I don't remember anybody else who attended.
6        Q.  All right.  And did anybody from FGG attend?  And if
7    so, who?
16:11:28  8        A.  I'm quite sure that the president of FGG, Mr.
9    Fernando Gireud, attended.  I believe Mace Miller attended at
10   that time, also, because I believe that's the first time I met
11   him, and I believe he was kind of the financial guy of FGG.  I
12   think that's it, just the two of them.
13       Q.  Okay.  And was Marco Delgado there?
16:11:58  14       A.  Mr. Delgado was not there at the beginning of the
15   meeting.  He arrived I believe it was that night and he joined
16   the meeting the next day.
17       Q.  Okay.  Did anybody from Mitsubishi request his
18   presence?
19       A.  I believe that both Mitsubishi as well as another
20   gentleman from another company, Mr. Rick Williamson, I believe
16:12:30  21   that all of us requested from FGG that Mr. Delgado be called in
22   to join the meeting.
23       Q.  Why was that?
24       A.  It became apparent to us that the officers of FGG
25   didn't have all the answers to the questions that we were

1    asking with respect to, you know, how is the project being put

2    together?  When will the commercial operation be?  How will it

16:12:57  3    be financed?  Several questions that they said, "Well, we

4    have -- we have a person that is looking after that.  His name

5    is Marco Delgado."

6              And we said, "Could Mr. Delgado join this meeting?"

7              And they called him.  And as I said, I believe he

8    flew that afternoon or night and joined the meeting at the

9    offices the next day.

10         Q.   When he arrived, was he able to answer the questions

11    that had been presented the day before?

12         A.   I believe so.  I believe that he clarified a lot of

13    the items.

16:13:27  14         Q.   And were any decisions made as a result of this

15    meeting?

16         A.   I think that certainly we decided that we should

17    continue looking at the details.  And I believe that was the

18    day in which we said that a teaming agreement should be put

19    together to define what the responsibilities and the

20    limitations would be on one another.

21         Q.   I'm going to ask you to look around the courtroom and

22    tell me if you see Mr. Marco Delgado in the courtroom today?

16:14:00  23         A.   I need my -- my vision to make sure and I've lost it.

24              Anyway, I believe Marco is the gentleman at that

25    table, second from the right.

1    Q.   Can you identify an article of clothing he's wearing.

2    A.   Marco is wearing an orange-reddish necktie, white

3    shirt and a dark suit.

4         MS. ARREOLA:   Your Honor, may the record reflect that

5    the witness has identified the defendant?

6         MS. FRANCO:   No objection.

7         THE COURT:   The record will so reflect.

8    Q.   (BY MS. ARREOLA)   After the first meeting, this

16:14:30  9  Orlando meeting, did MPSA and FGG enter into any agreements?

10    A.   Yeah.   It takes several days or weeks to negotiate an

11    agreement.   But, yes, we began to develop and eventually

12    entered into what we called the teaming agreement for the

13    project.

14    Q.   What is the "teaming agreement"?

15    A.   The teaming agreement is a document that says that

16    the parties agree to work with one another on a specific

16:14:59  17  project.   Most of the time, it's done for one specific project.

18    And it says that the parties agree that Mitsubishi will do the

19    following things and FGG will do the following things, and that

20    if there are any disputes, the teaming agreement says how the

21    disputes will be -- will be handled and it also has limitations

22    and requirements of one party or the other.

23    Q.   Did you play any role in the process of getting to

24    the teaming agreement?

25    A.   Yes, I did.

Ponce - Direct                                          92

16:15:29   1        Q.   What was that role?

           2        A.   I -- basically, I was instrumental in drafting the

           3   agreement and in making sure that all the right clauses and all

           4   the -- you know, all the articles that would define the

           5   relationship, the way to work, and that would protect the

           6   rights of Mitsubishi.  It was my job to make sure that all

           7   those things got in there and it was with the help of our

           8   internal counsel, of course.

16:15:57   9        Q.   Is there a provision in the agreement, the teaming

          10   agreement, regarding letters of credit?

          11        A.   There was a provision, if I remember correctly,

          12   that -- that it was one of the responsibilities of FGG to

          13   provide any letters of credit related to the supply of the

          14   equipment or to otherwise make sure that those letters of

          15   credit were not required.

16:16:29  16        Q.   So I'm going to ask you to take a look at what is

          17   already in evidence as Government's Exhibit 7.  And there's a

          18   set of binders, but you can also look at your screen.

          19             Do you recognize this document?

          20        A.   This is at least the beginning page and the recitals

          21   of the teaming agreement.

          22        Q.   So I'm going to ask you to take a look at a paragraph

16:16:59  23   on page 4.

          24        A.   I assume you are in control because it's moving.  I

          25   hope you are in control.

1        Q.   I'm going to highlight a passage and I'm going to ask

2   you to read it and we will follow along.

16:17:28   3        A.   You are asking me to read it?

4        Q.   Yes, sir.  Please.

5        A.   Okay.  "FGG will also provide any letters of credit

6   required by the RFP for the supply of the equipment and

7   services and cost of financing required by the RFP to be

8   provided or cause CFE to waive such requirements as

9   appropriate.  FGG will not be responsible for letters of credit

10  or financing for the LTSA."

16:17:59  11        Q.   So how many letters of credit are being addressed in

12  these two sentences?

13        A.   There are two letters of credit being addressed.

14        Q.   Can you explain the difference.

15        A.   Essentially, one of the -- one of the contracts that

16  we were discussing between each other was for Mitsubishi to

17  supply the inventory equipment to FGG, together with certain

18  services that are required to put together the equipment, to

16:18:29  19  assemble it into the site, and to make sure it starts properly.

20  So that's what we call the equipment and services.

21        And in order to do that, a customer pays for that and

22  a letter of credit is posted to protect the interest of that

23  customer.  And that was the letter of credit for the equipment.

24        The other one that's referred to here is the letter

25  of credit for the LTSA.  The LTSA is normally a contract that

16:18:57  1    goes after the equipment and for years of operation of the

2    equipment.  An LTSA is a long-term services agreement, which is

3    once you start the power station, there are things required for

4    many years to be done.  And we typically put that in a separate

5    contract which is called the LTSA, long-term services.

6         Q.    Okay.

7         A.    And there's a letter of credit required for that

8    because the customer pays for those services.  And if you don't

9    deliver, most customers would require some protection.

16:19:28 10       Q.    And the second sentence that you read said that FGG

11   will not be responsible for letters of credit for the LTSA.

12   Why was FGG not going to be responsible for the letter of

13   credit for the LTSA?

14       A.    Because it was the intention of the parties that if

15   FGG was able to win the bid and supply to -- the equipment to

16   the *Comision Federal,* to CFE, it was the intention that they

16:19:57 17   would be the prime contractor with CFE for that and deliver the

18   equipment under those contractual obligations.

19            But for the LTSA, we were agreeing with FGG that

20   the -- once they obtained the long-term services agreement, it

21   would immediately be assigned to Mitsubishi to have a direct

22   contractual relationship with the CFE going forward for the

23   number of years or the LTSA.

16:20:27 24            As such, we would be contractually and primarily

25   obligated to CFE; therefore, we would be willing to supply

         1   their letters of credit.

         2        Q.   And was there --

         3        A.   On assignment, we would also get direct payment from

         4   the CFE; therefore, it makes sense.

         5        Q.   I'm sorry.  Was there a provision to the effect in

         6   the teaming agreement?

         7        A.   Yes.

         8        Q.   I'm going to ask you about that in a moment.  But

         9   this passage that you just read also references financing.  Can

        10   you explain what the financing was for the equipment contract?

16:21:00 11        A.   I don't know the -- very clearly what it was, but

        12   there was a -- there was a provision or a clause in the request

        13   for proposal documents of the suppliers which said that the

        14   suppliers, I believe, would organize or put together or, you

        15   know, arrange for financing that the CFE would use in order to

        16   purchase the equipment.

16:21:28 17        Q.   Okay.  I'm going to ask you to take a look at page 3.

        18   I'm going to highlight a passage and ask you to read it.  You

        19   don't need to read what is in parentheses, but if you could

16:21:57 20   read this passage.

        21        A.   I believe this clause D is under the LTSA provisions

        22   of this -- of this agreement and -- yeah, teaming for LTSA.  So

        23   this was the second part of the -- of the teaming agreement

        24   talking about how we would handle the LTSA assigned to

        25   Mitsubishi.

1              And it says, "Prior to submission of the proposal,

16:22:25   2   FGG shall obtain CFE's unconditional consent for the assignment

3   of the LTSA prime contract between FGG and CFE to MPSA, as

4   provided in paragraph 1.3E below, if FGG is awarded the LTSA

5   prime contract.  CFE's refusal to give its prior unconditional

6   consent to the FGG for the assignment or FGG's inability or

7   refusal to assign the LTSA prime contract to MPSA for any

16:22:58   8   reason such that MPSA will not be the sole party in contract

9   directly with CPE on the basis described below for the LTSA

10  prime contract shall be a reasonable cause for termination of

11  this agreement."

12         Q.   What was the purpose of this section, Section D, that

13  you just read?

14         A.   Again, Mitsubishi's firm position and philosophy

16:23:24  15  would be that we provide long-term, ongoing services to our

16  customers directly and in contractual obligatory manner to the

17  customer.  And so what we were saying to FGG is we are willing

18  to supply you the equipment so that you can be the contractor

19  for the supply of the equipment, but in no uncertain terms will

20  we entertain having you in the middle of the LTSA.  So as soon

21  as you get that, if you get that, it shall be assigned to us.

16:23:57  22  If you cannot assign it to us or CFE doesn't agree that it can

23  be assigned to us, then we don't -- we don't have a teaming

24  agreement.  This agreement ceases to exist.

25         Q.   Did MPSA ever agree to provide the letter of credit

Ponce - Direct

1    for the equipment contract?

2         A.    No.

3         Q.    Why not?

4         A.    Because we are not in the position to provide letters

5    of credit for someone else's obligations on a contract that

6    they have with someone else.

7         Q.    Does that make good business sense?

8         A.    It is good business sense.

9         Q.    Can you explain that.

16:24:32  10   A.    If -- if you can imagine that -- that the CFE

11   provides payments to FGG and then we supply the equipment to

12   FGG as we are obligated to do so.  And FGG, for example, the

13   ship sinks in the ocean while transporting or FGG does not

16:24:59  14   otherwise deliver the equipment, the CFE will want the money

15   back.  If FGG doesn't give the money back, then they will draw

16   down on the letter of credit.  And if we were providing the

17   letter of credit, it would be our loss.

18        So we are not in a position to -- we do not provide

19   letters of credit when someone else has the contractual

20   obligation.

21        Q.    In other words, you don't guarantee somebody else's

22   performance, only your own.  Is that a fair statement?

16:25:30  23   A.    Correct.

24        Q.    Okay.  And approximately -- do you know how much

25   letters of credit cost?

1    A.   Typically, they would -- you know, on a hundred-plus-

2    million-dollar project, it would cost a million dollars to get

3    a letter of credit.

4    Q.   And how much --

5    A.   1 percent of the money being guaranteed is typical.

6    Q.   I'm going to direct your attention to Government

16:25:59    7    Exhibit 12.  Do you recognize this?

8    A.   FGG, Mitsubishi -- yes.

16:26:29    9    Q.   What do you recognize this to be?

10    A.   This seems to be the Spanish version of the

11    subcontract that was generated for the supply of the equipment

12    from MPSA to FGG.

13    Q.   Who were the parties to this agreement?

16:26:56    14    A.   The parties to this agreement were FGG as the buyer

15    and MPSA as the supplier of the equipment.

16    Q.   Okay.  Was this entered into after the teaming

17    agreement?

18    A.   Yes, certainly.

19    Q.   Is there a date on this agreement?

20    A.   I would have to look.  But, yeah, it's December 16th.

21    I think that date was on every page.

22    Q.   Now, did you play any role in the process of reaching

23    this subcontract?

24    A.   Yes.

25    Q.   And what was that?

16:27:31   1      A.    The role was to -- well, first of all, it was to

           2  understand what -- what the obligations were of FGG as they

           3  described them to us and to see if we could, in fact, meet

           4  those obligations in the portion which we called the supply of

16:27:57   5  the agreement.   It was -- in translating space, it was for me

           6  to translate this document into English for Mitsubishi to

           7  understand it, and then also to negotiate the clauses and to

           8  make sure they got put together into the proper Spanish

           9  language because FGG wanted the document between Mitsubishi and

          10  FGG to be signed in Spanish because it was a Spanish project.

16:28:30  11      Q.    Did the subcontract give Mitsubishi or MPSA any

          12  responsibility for the letter of credit for the equipment

          13  contract?

          14      A.    No.

          15      Q.    And was this subcontract only with respect to the

          16  equipment and not -- this has nothing to do with the LTSA?

          17      A.    If I remember correctly, the LTSA is not mentioned

          18  here; and if it is mentioned here, it's to say that it's not

          19  part of this subcontract.

16:28:57  20      Q.    I'm going to ask you to take a look at the last page.

          21  I don't want to make anyone dizzy, but I'm going to just scroll

          22  right down to the last page.

          23          Do you see a handwritten note on the last page?

          24      A.    Yes.

          25      Q.    Do you know whose handwriting this is?

1        A.    Yours truly, Hector Ponce.

16:29:29  2       Q.    Okay.  And can you go ahead and read it for us.

3        A.    "With respect to the subcontract, the parties agree

4    to check and amend the subcontract as needed and to adjust the

5    price according to the final arrangements for the letter of

6    credit, cost, shipping and delivery terms, and any errors in

7    the documents and adjustments based on final prime contract."

8        Q.    This passage that you just read mentions the

16:29:59  9   letters -- mentions a letter of credit.  Can you explain what

10   the purpose of this sentence was.

11       A.    In this particular case, it refers to the letter of

12   credit for the equipment.  And what it meant was that we had --

13   we had been negotiating price up to this point back and forth.

14   Mitsubishi, of course, trying to maintain the price of our

16:30:28 15   proposal and FGG trying to get us to reduce the price for

16   whatever reasons.  And one of the -- one of the concessions we

17   have made during the negotiations leading to this subcontract

18   was that we had agreed to reduce the price of our equipment by

19   $1 million if -- if -- I'm sorry.  This letter of credit refers

20   to the LTSA.  I correct myself.

16:30:59 21       We had reduced the price of the equipment by $1

22   million if FGG would make efforts during the negotiation of the

23   LTSA to get the CFE to accept a parent guarantee instead of a

24   letter of credit for the LTSA.  That's -- and there was also a

16:31:28 25   discussion of -- whereas the shipping and the delivery of the

1  equipment was in our initial proposal, there was a discussion

2  that that -- I believe -- I believe we were told by FGG that

3  the shipping ended up not being in the final prime contract

4  between them and CFE and that it would be separate.

5          So what I was saying here is that, you know, if the

16:31:54  6  letter of credit is not -- if CFE or FGG doesn't convince CFE

7  to accept a parent guarantee instead of a letter of credit on

8  the LTSA, then our price will go up by the million dollars that

9  we offered as a discount for that effort, on the one hand.  On

10  the other hand, if they expected us to provide shipping

11  services from where the equipment is to the site of the

12  project, then the price would be adjusted accordingly.  So it

13  was -- it was that which I meant to cover and to get Mr. Gireud

16:32:28  14  and the MPSA official to sign to.

15      Q.  Can you explain what a parental guarantee is and why

16  Mitsubishi wanted a parental guarantee instead of a letter of

17  credit for the LTSA?

18      A.  When you -- when your company is small, for example,

19  or it doesn't have a high amount of assets and money, a

20  customer who is paying for services may want -- they always

16:32:58  21  want to protect themselves in case you don't perform or even in

22  case you dissolve the company or go bankrupt or do something

23  else.  A letter of credit gives them that provision.

24          However, in many cases, with our customers, where

25  they trust us, they may say, "Well, MPSA, we trust you, so you

1    don't need to provide a letter of credit."  Either the project

2    is to small or something else.  Or else, they say, "This

16:33:27   3    project is too big.  MPSA is not big enough to guarantee it by

4    themselves.  But if Mitsubishi Heavy Industries of Japan, as

5    the parent company, gives us a written guarantee that they have

6    so many assets, and if the subsidiary company fails, they will

7    back up and continue the project," that is what we refer to as

8    a parent guarantee.

9         And in many cases, customers who trust us would

10   accept a parent guarantee instead of a letter credit.  A letter

16:33:59  11   of credit costs money.  You have to pay money to a bank to get

12   it.  A parent guarantee is just your promise to perform.

13        Q.   Okay.  And did you make a price offer or a price

14   adjustment offer to FGG in the event they were able to get CFE

15   to agree to a parental guarantee instead of a letter of credit

16   for the LTSA?

17        A.   We made -- or asked, if you can do that on the LTSA,

18   we will discount the price of our equipment by a million

19   dollars because, otherwise, we would have to spend a million

16:34:29  20   dollars anyway to get a letter of credit.  So it was a fair

21   concession.

22        Q.   I'm going to ask you to take a look at Government's

23   Exhibit 10, which is already in evidence.  Does this look like

16:34:58  24   an email chain to you?

25        A.   It is an email chain, yes.

Ponce - Direct

1    Q.   We are going to start at the bottom, which says, "On

2   November 19th, 2009, Hector Ponce wrote."  Can you read what

3   you wrote on November 19th, 2009.

4    A.   I wrote to -- and it's addressed to Mr. Delgado.  I

5   wrote, "Was the announcement made officially, question mark.

16:35:26  6   You said it would be November 18th.  Hector."

7    Q.   Okay.  And then, do you recognize this email address

8   as Mr. Delgado's email?

9    A.   I believe that's what it was at the time, yes.

10    Q.   Okay.  And I'm going to read his response and ask you

11   a question.

12        "Hector, I am getting ready to board, but wanted to

13   remind you that we are going to be needing MPSA's info on the

16:35:55 14   $20 million letter of credit asap, but no later than 14 days

15   from today.  Thanks."

16        Did I read that right?

17    A.   Yes.

18    Q.   Okay.  Can you read what your response was that same

19   day?

20    A.   I said, "This needs to be discussed with respect to

21   timing of your contract signing.  Timing of assignment of the

22   LTSA to MPSA, inclusion of our -- of the terms of our proposal

23   and the teaming agreement in the ultimate assignment to MPSA

16:36:27 24   and timing of the start of the LTSA, which is not until the

25   date of commercial operation.  14 days" -- which is what he

1   said we needed, 14 days from today.  "14 days is not consistent

2   with any of the above."

3        Q.    Let me stop you there.  What letter of credit are you

4   referring to?  Are you referring to the LTSA?

5        A.    I'm referring to the LTSA because it's the only

6   letter of credit that we would be responsible for.

7        Q.    Why was 14 days not consistent with that?

16:37:00  8        A.    Because we didn't know anything about the LTSA.  It

9   wasn't being awarded yet.  It wasn't in the picture.  And an

10  LTSA doesn't start until a few years when the commercial

11  project begins.  You build a power station first before you

12  need services.

13       Q.    Okay.  So did you -- I'm sorry if I missed it.  Did

14  you say how long after the equipment arrived the LTSA would --

15  would happen?

16       A.    You can sign an LTSA at any time, but, typically, you

16:37:28 17  don't post a letter of credit until payments begin on the LTSA.

18  And we were well far away from having any definition of what

19  the LTSA was going to be.  And I didn't think 14 days was

20  necessary for, you know, any definition of the letter of credit

21  while we didn't know any details of the timing of signing that

22  LTSA contract or whether the -- as I said there, whether the

16:37:57 23  terms of our proposal had been included in the -- in the LTSA.

24  So I didn't know anything about the LTSA.  So what I'm saying

25  is 14 days is not consistent.  I can't provide that without

1    knowing anything about it.

2          And, you know -- and then I said we would have to

3    understand the reasoning and negotiate the timing and the need

4    for the letter of credit.  Our proposal is based on a parent

16:38:26   5    company guarantee from MHI of Japan and we would like to

6    arrange for this during our discussions.

7          Q.   And, again, when you are referring to the parent

8    guarantee, you are referring to the parent guarantee for the

9    LTSA?

10         A.   Our proposal was clear that it was with a parent

11    guarantee.  Normally, what that means is our price is with the

12    parent guarantee.  If somebody says, "I need a letter of

13    credit, too," then we would have to adjust the price.

14         Q.   Okay.  And at the top of the document is an email

15    from, again, the email Marco Delgado to you --

16         A.   Right.

16:39:00   17         Q.   -- on November 20th.  Can you read -- or I'll read

18    what Mr. Delgado wrote.

19          "I will let you and Federico sort it out, but you and

20    I have read the specs and we both have known from day one of

21    the requirement.  Otherwise, would MPSA have offered FGG $1

22    million to change it?"

23          What did you understand he was referring to with

24    respect to the million dollars?

16:39:24   25         A.   I understand that he was saying here -- that he was

1    saying that we always knew about the letter of credit for

2    the -- for the -- for the LTSA.

3         Q.   Okay.

4         A.   And that may be true.  But we specifically said the

5    proposal is without a letter of credit.  It's with a parent

6    guarantee.

7         Q.   I'd ask you to take a look at Government Exhibit 11,

16:39:54  8    which is also already in evidence.  Tell me if you recognize

9    this.

10              First -- we'll get to the attachment -- but do you

11   see that this is a letter from John Adams to Mr. Gireud and you

12   were copied on it?

13        A.   I see that.

14        Q.   Is the date sent November 27th, 2009?

15        A.   Uh-huh.

16:40:28  16             MS. FRANCO:  Your Honor, objection, 403.  It's

17   cumulative evidence.  It's already been testified to by Mr.

18   Adams and Mr. Gireud.

19              THE COURT:  What is your exhibit number?

20              MS. ARREOLA:  Number 11, Your Honor.

21              THE COURT:  Well, let me see what she's going to ask.

22              What's your question?

23        Q.   (BY MS. ARREOLA)  Can you take a look at the

24   attachment and tell me if you recognize this.

16:40:58  25             A.   Can you scroll down a little, please?

1       Q.    Yes, sir.

16:41:14  2     A.    And stop there.  Yes, I recognize it.

3       Q.    Did you play a role in writing this letter?

4       A.    Yes.

5       Q.    Okay.  I'm going to direct your attention to the

6    paragraph that begins "One example."

7            MS. ARREOLA:  Your Honor, I was going to ask him

8    about that paragraph.

9            THE COURT:  I don't think that paragraph was covered

10   in the other two.

11           MS. ARREOLA:  Pardon, Your Honor?

12           THE COURT:  Was that paragraph covered by the other

13   two witnesses?

14           MS. ARREOLA:  I believe one of the witnesses, I seem

15   to recall this being mentioned, but I'm not --

16:42:00  16           THE COURT:  I'm going to overrule the objection.

17           MS. ARREOLA:  Okay.

18      Q.    (BY MS. ARREOLA)  Can you take a look at this --

19   first, can you just read this paragraph for us and then I'll

20   ask you a question.

21      A.    "One example that illustrates our concerns is the

22   recent request for MPSA to prepare a letter of credit for $20

23   million.  This was discussed with you and addressed in our LTSA

24   proposal in which we proposed to provide assurance through a

16:42:24  25   parent guarantee from MHI Japan to be provided to CFE.  Your

1    staff has indicated that the LOC was always in the specs and

2    MPSA knew about it.  Please make sure everyone understands that

3    this is precisely why we took exception to it and offered an

4    alternative instead of increasing our price to include the

5    letter of credit.  We also offered an incentive to FGG to work

6    on making sure that CFE understands and accepts the parent

7    guarantee.  If they do not, there will be a price adjustment to

8    our equipment price and to our LTSA proposal price."

16:42:59   9        Q.    Again, this refers to a price adjustment to the

10   equipment price and to the LTSA proposal price.  What letter of

11   credit is being discussed in this paragraph?

12        A.    This is the letter of credit for the LTSA.

13        Q.    Okay.  I'm going to ask you to take a look at

14   Government Exhibit 13.  Tell me if you recognize it.  I'm going

16:43:26   15   to scroll down slowly.

16:43:37   16        A.    Can you go back up, please.  Okay.

17        Q.    So do you see -- is this an email from Marco Delgado

18   to you?

19        A.    Assuming the email is Mr. Delgado's email address,

20   which I seem to remember.  But, yeah, I believe it is.

21        Q.    Okay.  We're going to -- I'll read it in a second.

22   What is the Date Sent shown?

16:44:27   23        A.    It's December 24th of 2009.

24        Q.    So that's Christmas Eve?

25        A.    Christmas Eve.

1       Q.   Okay.  I'm going to read it and then ask you a

2  question.

3            "*Saludos,* Hector.  I'm running to the airport to try

4  to make a flight back home.  I will call you when I get in.

5  Weight lifted.  Keep fingers crossed.  See if he wants to know

6  where we are on the independent third-party notarized

7  certifications verifying existence of the equipment.  They are

8  urgent.  Also, please provide exact location of equipment and

16:44:59  9  contact person at each facility.  They requested this info

10  since Monday.  Please advise."

11            Did you have any conversations with Mr. Delgado about

12  any equipment inspection?

13       A.   I believe that it was around that time when it was

14  being requested, in my case, by Mr. Delgado to me, that the CFE

16:45:29 15  wanted to go to personally look and inspect the equipment, both

16  the equipment that was stored in Japan as well as the equipment

17  that we had stored in France.

18       Q.   Did you actually have any conversations on the phone

19  with him?

20       A.   Yes.

21       Q.   Okay.  Do you remember approximately how many

22  conversations you had with Mr. Delgado about the inspection?

23       A.   It was at least one conversation.  But between

16:45:56 24  texting or conversations, it was maybe -- maybe four times that

25  we went back and forth discussing the need for this visit.

Ponce - Direct                                      110

1      Q.   What did he say the need for the visit was?

2      A.   It was for the *Comision Federal* staff or appointed

3  people to go and actually see the equipment and verify that it

4  was in existence.

5      Q.   Did he say why CFE people wanted to do that?

16:46:28  6      A.   Yeah.  I believe it was because they were about to

7  sign a major contract, so they wanted to make sure -- up until

8  that point they had heard it exists and they had not seen it.

9      Q.   Okay.  And what was your response to him?

10      A.   My response was that it was impossible for us to

11  entertain such a thing during the holidays, because I believe

12  it was -- people were ready to travel, and I said, we -- I

13  suggest we wait until next year to arrange it.

14      Q.   And what did he say, if you recall?

16:46:59  15      A.   That it's really, really, really critical because

16  they are trying to get this done.

17      Q.   Did you have any conversation about the equipment

18  inspection with Mr. Delgado with anybody else present?

19      A.   I don't recall that.

20      Q.   Do you recall having any conversations about the

21  equipment inspection with Mr. Adams and Mr. Delgado?

22      A.   Oh, on the phone, yes, but not personally.

23      Q.   Okay.

24      A.   On the phone, yes.

16:47:28  25      Q.   Okay.  Tell us about that.

1    A.   There was at least one instance where I was sitting

2    with John Adams in his office because I believe that Mr.

3    Delgado wanted to talk personally with John and make sure he

4    understood also that this visit was necessary and so we had a

16:47:56  5    discussion of that on the telephone.  And I can't tell you if

6    it was December or already into January.

7    Q.   Okay.  And do you recall what Mr. Delgado said during

8    that call?

9    A.   It was -- it was basically the same thing, iterating

10   the need for CFE to go to Japan and to take a look at this

11   equipment.

12   Q.   Okay.  And as a result of that call -- did that call

13   prompt any suspicions on the part of MPSA?

16:48:28  14   A.   Yeah.  That was -- that was the single call which --

15   which prompted us to communicate to FGG that for some reason,

16   we had a feeling that -- that maybe our equipment would be --

17   would be pledged or otherwise promised in a way that was not

16:48:59  18   consistent with what anything we were able to do or had written

19   on our teaming agreement.

20   Q.   Do you remember what Mr. Delgado said that made you

21   suspicious, if you recall?

22   A.   I honestly don't recall how it was said, but it might

23   have been something like we need to look at the serial number

24   or something like that, which is -- it was something that I

25   cannot recall, specifically.

Ponce - Direct                                    112

16:49:29    1          But it was -- we hung up the phone, and John and I

            2   looked at each other and said, "Are these, you know, people

            3   trying to somehow promise the equipment to CFE before payments

            4   are made?"  And so we analyzed that a little bit and formulated

            5   several letters -- or at least one letter that said, if

16:49:57    6   anything like this is happening, it is not allowed by MPSA nor

            7   will we support it.

            8      Q.   Okay.  Did Mr. Delgado communicate to you directly,

            9   either phone or by text or by email, that the purpose of the

           10   inspections was to pledge the equipment?  Did he communicate

           11   that to you?

           12      A.   No.

           13      Q.   This was a suspicion that you gathered from something

           14   that he said about the inspection?

           15      A.   Yes.

           16      Q.   Okay.  As a result of that action, you mentioned that

           17   some letters were sent; is that correct?

           18      A.   Yes.

           19      Q.   Or a letter was sent?

16:50:30   20      A.   At least one letter that we wrote immediately.

           21          THE COURT:  Before we get to the letter, let's take

           22   our last recess.

           23          Ladies and gentlemen of the jury, we'll recess for

           24   ten minutes and be back in the jury room at 5:00 and we'll

16:50:42   25   resume our proceedings.

Ponce - Direct                                           113

17:01:43   1            (Recess from 04:50 PM to 05:01 PM)

          2            THE COURT:  Let the record reflect all members of the

          3    jury are present.  The government, through its Assistant United

          4    States Attorney, is present.  Defendant and counsel are

          5    present.  The witness, Mr. Ponce, is on the witness stand.

          6            Ms. Arreola.

          7       Q.   (BY MS. ARREOLA)  Mr. Ponce, you recall that before

17:01:58   8    the break, you looked at a Christmas Eve email about the

          9    inspection?

         10       A.   Yes, I do.

         11       Q.   And I'm going to ask you to take a look at what is

         12    already in evidence as Government's Exhibit 14.  And please

17:02:11 13    read quietly to yourself and tell me if you recognize it.

         14       A.   Can you scroll up, please.

         15       Q.   It's at the top of the page.  I can scroll down.

         16       A.   Oh, sorry.

         17            I recognize it.

         18       Q.   Is this an email from you?

         19       A.   It was from me, yes.

         20       Q.   Is it to Mr. Gireud?

         21       A.   Yes.

17:02:57 22       Q.   Is Mr. Delgado copied on the email?

         23       A.   Yes.

         24       Q.   What is listed as the date sent?

         25       A.   December 28th, 2009.

1    Q.    So this is just a few days after that Christmas Eve

2    email, correct?

3    A.    Correct.

4    Q.    Can you read the first paragraph that I've marked.

5    A.    "Fernando, please see attached letter from MPSA

6    requesting your immediate action and a formal response asap.

7    The failure to provide requested documents and the unusual

17:03:29  8    request for equipment inspections is of significant concern."

9    Q.    Why did you call the request for equipment

10   inspections as unusual?

11   A.    It was unusual with respect to the urgency that was

12   being represented and the time of the year.

17:03:54  13   Q.    I'm going to scroll to the attachment.  And is this

14   the December 28th, 2009, letter to Mr. Gireud, copy Marco

15   Delgado, from John Adams?

16   A.    It is, yes.

17   Q.    I'm going to ask you -- these two individuals --

18   there is, rather, a few individuals who are copied right below

19   Mr. Delgado --

20   A.    Uh-huh.

17:04:25  21   Q.    -- K. Hasegawa and an S. Waki, who are those

22   individuals and do you know why they were copied on this

23   letter?

24   A.    Those two individuals are senior officers from --

25   from Japan who were stationed here at MPSA.  Mr. Hasegawa was

|  |  |
|---|---|
|  | the president and CEO of Mitsubishi Power Systems America, |
| 17:04:59 | MPSA.  And he was copied on that email and so was Mr. Waki |
|  | because our suspicions were very high that -- that, you know, |
|  | something was being done on the project that was inconsistent |
|  | with what MPSA had said we would do on the teaming agreement |
|  | and it was visible at a very high level. |

                      At that time, we were copying Mr. Hasegawa and Mr.

17:05:29  Waki to make sure they understood that there was a concern and

that we were taking written action to FGG.

     Q.   So I'm going to read the first paragraph and then ask

you a question.  Mitsubishi --

          MS. FRANCO:  Objection, Your Honor.  This has been

testified to by two prior witnesses.

          THE COURT:  Let me hear the question.

          MS. FRANCO:  She's not asking a question, Your Honor.

She's reading the letter.

17:05:58          THE COURT:  It's in evidence.  She can read it as

many times as she wants, I guess.

          MS. ARREOLA:  Thank you, Judge.

     Q.   (BY MS. ARREOLA) "Mitsubishi is, once again, very

concerned about the informality of FGG's actions on this

project and the failure to respect MPSA's request for

information.  Specifically, we are suspicious about, A, the

short notice and apparent urgency for MPSA to support equipment

inspections during end-of-year holidays, and, B, FGG's failure

Ponce - Direct                                   116

1   to provide prime contract documentation which we have requested

2   repeatedly."

17:06:27   3        And I'm going to jump below and then read two more

4   paragraphs and then ask you a question.  The equipment

5   inspection -- excuse me.  Having some technical difficulties.

6   I'm going to jump below to a paragraph 1 and 2.

7        "The equipment inspection issue leads us to suspect

8   FGG may be offering existing MPSA equipment as collateral for

9   financial guarantees that are the responsibility of the FGG.

17:06:58   10  This is unacceptable to MPSA.  Therefore, please confirm that

11  MPSA's equipment is not being negotiated or offered to anyone

12  as collateral and that no liens or restrictions of any kind are

13  being discussed with any third parties.

14       "Two, related to the above, it is FGG's

15  responsibility, if required, to arrange for the letter of

16  credit to warrant completion of the equipment prime contract.

17  Please provide a copy of the equipment LOC as evidence that

18  this arrangement has been made without liens or restrictions on

17:07:29   19  MPSA's equipment.  In addition, since MPSA may provide certain

20  discounts related to the letter of credit issue provided for

21  the LTSA, provide a copy of such LTSA letter of credit so we

22  can verify such expenditures being made."

23       So in this, you are requesting a copy of the

24  equipment LOC as evidence that the arrangement has been made

25  without liens on MPSA's equipment.  Did you ever receive a copy

Ponce - Direct                                    117

```
  1   of the equipment LOC?

  2        A.   No, I did not.

  3        Q.   And did you ever ask for a copy -- did you ever ask

  4   again for a copy of the equipment LOC?  Do you recall?

  5        A.   I don't recall, specifically.

  6        Q.   Okay.  And do you remember what the response to this

  7   letter was?

  8        A.   I would have to look at it, but I think there -- I

  9   think there was a response that said that the equipment is not

 10   being promised to a third party, but that there would be a lien

 11   on the equipment or something like -- something to that effect.

 12   It's a paragraph that I recall.

 13        Q.   We'll take a look in a moment.  But did the equipment

 14   inspection actually happen?

 15        A.   The equipment inspection happened, yes.

 16        Q.   Can you tell us about that.

 17        A.   I believe it was -- I believe it was certainly after

 18   the holidays.  I believe it was in January of 2010.  Therefore,

 19   people of CFE, who were assigned by CFE, flew to Japan, and I

 20   was informed by Mr. Delgado that they were already on an

 21   airplane and that we should make arrangements to receive them

 22   to look at the equipment in Japan.  And then they were also

 23   scheduled to fly to France and to make those arrangements.

 24        Q.   Okay.  And when he called -- did you have notice

 25   before those people were on the plane that they were heading
```

17:07:59 — line 3
17:08:27 — line 10
17:08:55 — line 18
17:09:29 — line 24

```
 1   over to inspect the equipment or you found out when they were
 2   already en route?
 3        A.   I found out when I was told they are on the plane.
 4        Q.   I'm going to ask you to take a look at what is
 5   already in evidence as Government Exhibit 16.  Do you see that
 6   this is an email from Mr. Gireud to you on December 31st, 2009?
 7        A.   Yes.
 8        Q.   I'm going to scroll down and I'm going to pass a few
 9   pages until we get to the letter which -- a letter that is an
10   attachment as well.
11             Take a look at this letter and tell me if you
12   recognize it.
13        A.   Yes, I recognize it.
14        Q.   Okay.  And I'm going to highlight a sentence and read
15   it to you and then ask you a question.
16             Well, first, let me --
17             MS. ARRELANO:  Yes, ma'am?
18             MS. FRANCO:  Your Honor, this has not been admitted
19   or offered.
20             MS. ARREOLA:  I apologize, Your Honor.  I thought
21   this was already in evidence.
22             THE COURT:  It's your exhibit number what?
23             MS. ARREOLA:  It is in evidence, Your Honor.  It's
24   Exhibit 14.
25             THE COURT:  14 is admitted.
```

The time stamps in the left margin read: 17:09:49 (line 5), 17:10:23 (line 10), 17:10:59 (line 18).

1           MS. FRANCO:  I believe she said 16, Your Honor.

17:11:26  2           THE COURT:  16 is not admitted.

3           MS. ARREOLA:  I am mistaken.

4      Q.   (BY MS. ARREOLA)  Mr. Ponce, do you recognize this

5  document?

6      A.   Yes.

7           (Government's Exhibit 16 marked for identification)

8      Q.   Okay.  And at the top of the page, do you recognize

9  the first page and email from Mr. Gireud to you on December

10  31st, 2009?

11      A.   Yes.

12           MS. ARREOLA:  Your Honor, the government offers

17:11:58  13  what's been marked for identification as Government's Exhibit

14  16.

15           THE COURT:  Ms. Franco?

16           MS. FRANCO:  No objection.

17           THE COURT:  GX-16 is admitted.

18           (Government's Exhibit 16 admitted into evidence)

19           MS. ARREOLA:  Your Honor, may we publish?

20           THE COURT:  Yes.

21      Q.   (BY MS. ARREOLA)  Just so the jury can see the

22  document.  Is this an email from Mr. Gireud to you on December

17:12:25  23  31st, just a few days after the letter that we just looked at

24  from John Adams?

25      A.   Yes.

```
 1        Q.    Okay.  So I'm going to scroll down until we get to
 2   the letter.  And is this a letter on FGG Enterprise's
 3   letterhead dated December 30th, 2009?
 4        A.    Yes.
 5        Q.    And it's addressed to Mr. Adams?
 6        A.    Yes.
 7        Q.    And it says in here -- I'm going to read here and
 8   then ask you a question.
 9             "Hoping the holiday season finds you well.  I'm
17:12:59 10   writing to update you with regard to the referenced matter and
11   to respond to the relevant issue raised by your correspondence
12   dated December 28th, 2009."
13             So is this a response to that December 28th, 2009,
14   letter that we looked at a moment ago?
15        A.    Yes.
16        Q.    I'm going to read a sentence from this letter and
17   then ask you a question.
17:13:27 18             "The sense of urgency of the inspection was and is
19   FGG-driven in attempt to modify payment terms prior to
20   execution of financing facility, because otherwise the process
21   will prove more bureaucratic."
22             Do you have any idea what this means?
23        A.    I believe he was trying to say that -- that they want
17:13:54 24   to get there right away because we were asking for an earlier
25   schedule.
```

```
 1              Hold on one second.  Let me read it.
 2              I believe he was trying to say FGG is pushing for the
 3    inspection because we are trying to, you know, modify the
 4    payment terms.
 5         Q.   Okay.  And does this letter give any indication that
 6    the purpose of the equipment inspection was in order for FGG to
 7    pledge Mitsubishi's equipment?
 8         A.   It doesn't in that paragraph, but the next paragraph
 9    seems to imply something about it.
10         Q.   Okay.  So let's look at that next paragraph.  I'm
11    going to read it and then ask you a question.
12              "Regarding item 1 of your letter, please be advised
13    that although the inspection of equipment is not tied to any
14    pending encumbrance on the MPSA equipment sold to FGG, as
15    previously discussed, a lien will be placed in favor of the
16    CFE, but at no time will this lien serve as collateral for the
17    financing or the needed letters of credit."
18              Did Mitsubishi at any time agree for a lien to be
19    placed in favor of CFE?
20         A.   No.
21         Q.   And if there had been an agreement for a lien to be
22    placed in favor of CFE, would that have been documented --
23    excuse me -- would that have been memorialized in an agreement?
24         A.   If there was an allowance for a lien, we would have
25    memorialized it, yes.
```

17:14:30 (line 6)
17:14:59 (line 14)
17:15:30 (line 24)

1    Q.   Okay.  And under the terms of the subcontract, when

2  did title pass from Mitsubishi Power Systems America to FGG?

3    A.   I would have to go back and read the subcontract.

4  But normally, it's at the time of a certain amount of money

5  having been paid to Mitsubishi.  And normally, it is at the

6  time of delivery.

17:15:59  7    Q.   Okay.  And we're going to take a look at that in a

8  moment.  But at this point in time, on December 28th, 2009, had

9  MPSA been paid any money?

10    A.   No.

11    Q.   And the sentence goes on to say -- well, it says, "At

12  no time will this lien serve as collateral for the financing

13  for the needed letters of credit."

14         So whatever lien might be referenced here, is an

15  assurance being made that the equipment will not be used for

17:16:29  16  the letters of credit?

17    A.   Correct.

18    Q.   Okay.  I'm going to ask you to take a look back at

19  the subcontract, which is Government's Exhibit 12, already in

17:16:54  20  evidence.  We're going to scroll ahead to page 4.  I'm going to

21  read a sentence and ask you a question.  It's under the fourth

22  paragraph in the subcontract.

23         "Notwithstanding anything to the contrary, even

24  though the trust carries out the importation, ownership of the

17:17:28  25  goods -- ownership of the goods will go to the trust when the

 1   supplier receives payment in full."

 2           Does that refresh your memory about when title would

 3   pass?

 4       A.   Yes.

 5       Q.   Okay.  When was that?

 6       A.   It would be when we were paid -- when we were paid in

 7   full.

 8       Q.   Okay.  I'm going to now ask you to take a look at

17:17:44  9   Government's Exhibit 21, which is already in evidence.  Take a

17:18:00  10  look at this letter and tell me when you're done.

11       A.   Okay.

12       Q.   And is the date on this letter January 10th, 2010?

13       A.   Uh-huh.

14       Q.   And does the letter purport to be from John Adams?

15       A.   Yes.

16       Q.   Okay.  And if you could take a look at the cc line?

17       A.   Uh-huh.

18       Q.   Do you see that you are listed here?

19       A.   Yes.

20       Q.   Okay.  When was the first time you saw this document?

17:18:57  21      A.   It was maybe a couple of years ago.  Certainly after

22   I was no longer involved in anything with MPSA.

23       Q.   Okay.  And when did you stop working for MPSA as a

24   contractor?

25       A.   As a contractor -- oh, gosh, I believe it was around

Ponce - Direct                                    124

```
      1    April of 2010.
17:19:26  2         Q.   Do you remember who first showed you this letter?
      3         A.   This letter was shown to me either by my attorney or
      4    maybe by your office --
      5         Q.   Okay.
      6         A.   -- when you first wanted to talk to me.
      7         Q.   Okay.  Was it years after the January 10th, 2010,
      8    date shown above?
      9         A.   Oh, yes, certainly.
     10         Q.   Okay.  And did Mr. Adams ever show this letter to
     11    you?
     12         A.   No.
17:19:55 13         Q.   Okay.  And at the time, it says, "MPSA H. Ponce."  At
     14    the time of this letter, January 2010, you were a contractor;
     15    is that right?
     16         A.   Correct.
     17         Q.   Are there any employees of Mitsubishi listed in any
     18    of these lines that are indicating who the recipients are?
     19         A.   No.
     20         Q.   Okay.  And so I'm going to read some of the language
     21    in this and then ask you a question.
17:20:30 22              It says, "Ref:  MPSA authorization of equipment
     23    pledge in lieu of posting letter of credit.  MPSA has had a
     24    chance to review the desirability of pledging its equipment
     25    instead of posting an LC as discussed and agreed with CFE
```

1   officials during my past visit and subsequent phone

2   conversations."

3            Did you participate in any conversations with CFE

17:20:58  4   officials in which John Adams agreed to pledge or discussed

5   pledging Mitsubishi's equipment?

6       A.   No, I did not.

7       Q.   I'm going to continue reading.

8            "And decided to proceed with the pledge of the three

9   turbines provided that title will not be transferred by MPSA

10  until after final payment is received and no material changes

11  are made to the draft of the pledge agreement prepared by

12  fideicomiso and reviewed and approved by MPSA."

17:21:26  13           Were you ever shown a draft pledge agreement?

14      A.   No.

15      Q.   I'll continue reading.

16           "In order to allow the prepledged equipment

17  inspections in France and Japan."

18           Did anybody from FGG or CFE tell you that the purpose

19  of the equipment inspections was for the pledge?

20      A.   No, never.

17:22:01  21      Q.   Okay.  I'm going to continue reading in the next

22  paragraph.

23           "Related to the above, MPSA will not transfer

24  ownership or possession to FGG, but authorizes FGG to pledge

25  the MPSA equipment on its behalf as if it was its own."

1              Who at this time owned the equipment?

2       A.    Mitsubishi Heavy Industries.

3       Q.    And MPSA didn't own any equipment?

17:22:30  4     A.    I believe MPSA did not own the equipment.  It was

5    Mitsubishi Heavy Industries.

6       Q.    Did John Adams have authority to pledge MPSA's

7    equipment in lieu of the letters of credit?

8       A.    No, he did not.

9       Q.    And what is the consequence of authorizing a pledge

10   in lieu of the letter of credit?  What's the consequence to

11   Mitsubishi of doing that?

12      A.    The consequence to Mitsubishi is that Mitsubishi

17:22:59  13  could potentially lose its equipment without having been paid.

14      Q.    Okay.  And this equipment was worth how much,

15   approximately?

16      A.    You know, between 100- and 120,000,000 dollars.

17      Q.    As of January 10th of 2010, how much money, if any,

18   had FGG or CFE paid to Mitsubishi?

19      A.    I'm sure it was zero.  It was no money --

20      Q.    No money?

21      A.    -- had been paid yet.

17:23:27  22     Q.    Okay.  And would that be good business sense to

23   pledge close to $100 million worth of equipment when you hadn't

24   been paid anything?

25      A.    It makes no sense at all, actually.

Ponce - Direct

1    Q.   And why is that?  Can you explain to the jury.

2    A.   Well, in very simple terms, if I have a contract with

3    the jury, for example, as a company, and you are going to pay

17:24:00  4    me certain amount of money for me to perform services, then I

5    expect the money and you expect delivery.  If you pay me the

6    money and I don't deliver, you lose.  Therefore, you ask me for

7    some guarantee in case I don't perform.  I can give you a

8    letter of credit, I can give a guarantee from a big rich

9    parent, you can just trust me.  That's okay.  We can work it

10   out.

17:24:29  11        However, if -- in this case, let's say FGG is in the

12   middle.  Now, you give money to FGG and FGG doesn't -- and FGG

13   doesn't give me money, then I'm not going to give the equipment

14   to FGG.  So, then, you should go after FGG's letter of credit,

15   because that's -- your agreement is with FGG.

17:24:59  16        However, imagine that you pay the money.  FGG doesn't

17   give me the money.  And then, you say, "Well, I'm keeping the

18   equipment."  That's essentially what a pledge would do.  If the

19   money gets lost, you have a right to my equipment even though

20   you didn't give me the money.  You gave it to someone else.

21        That's why we are saying the man in the middle must

22   take the responsibility to post the letter of credit, because

23   the man in the middle is the one getting the money from the

24   CFE.

17:25:29  25        I don't have a problem in the arrangement with FGG

```
 1   to, in fact, deliver the equipment as they pay me the money.
 2   That is a separate arrangement.  But it wouldn't make sense for
 3   me to pledge the equipment to the jury, if the jury is giving
 4   the payments to someone else and they don't pay me.
 5             That's the thrust of the matter.
 6             MS. ARREOLA:  Your Honor, may I have a moment?
 7             THE COURT:  Yes, ma'am.
 8        Q.   (BY MS. ARREOLA)  I'd ask you to take a look at
 9   what's been marked for identification as Government's Exhibit
10   22.  It's not in evidence.
11             (Government's Exhibit 22 marked for identification)
12        Q.   Take a look at this and tell me when you're done.
13        A.   It seems to otherwise be, once again, a January 10th
14   letter from John Adams to the same addressees.
15        Q.   Mr. Ponce, this is in evidence.  I'm just going to
16   ask you some simple questions about it.  When is the first time
17   you saw this document?
18        A.   It was just a few days ago.
19        Q.   Was that at the U.S. Attorney's office?
20        A.   At your office, yes.
21        Q.   No further questions about this document.
22        A.   Okay.
23        Q.   Now, I'm going to ask you to take a look at the
24   pledge agreement, which is in evidence as Government's Exhibit
25   Number 32.  I'm going to ask you to look at the Spanish-
```

17:25:52 (line 6)
17:26:29 (line 12)
17:27:32 (line 21)

1  language version first.  There's also a hard copy in front of

2  you in the binders if you prefer to look at a hard copy.

17:27:59   3       And the question I'm going to ask you is:  Have you

4  seen this document before?

5       A.   I have seen it and it's the document that I saw in

6  your offices this past weekend.

7       Q.   And is that the first time that you saw this

8  document?

9       A.   That was the first time I saw that document, yes.

10      Q.   Okay.  If you could take a look at -- I'm going to

17:28:29  11  scroll through here.  If you could take a look and tell me if

12  your initials appear on any of the pages of this document.

17:28:38  13       We've just scrolled through the entire document.  Do

14  your initials appear on any of the pages of the document?

15      A.   They did not appear on the document.

16      Q.   I'm going to now ask you to take a look at the

17  English translation of this document, which is Government's

18  Exhibit 32A, already in evidence.  I'm going to read a

19  paragraph and ask you a question.

17:29:57  20       "The parties appearing before me state that on

21  January 15th of 2010, they signed a 13-page document with its

22  annexes which corresponds to the agreement to create a

23  non-possessory security interest related to the procurement

24  contract FAGP-00."

25       Did I read that right?

1      A.   You read what's there.

17:30:28  2      Q.   Do you see that there is a reference to a 13-page

3   document?

4      A.   I see that.

5      Q.   Okay.  And do you see there is also a reference to

6   parties appearing on January 15th, 2010?

7      A.   Uh-huh.

8      Q.   Okay.  So I'm going to go back to the Spanish

9   language and ask you to look at the signature page of this

17:31:08 10  document.  For the record, I'm looking at page -- the bottom of

11  page 9, and do you see a signature for somebody named Marco

12  Delgado?

13     A.   I see it, yes.

14     Q.   Okay.  Then, on page 10, do you see any signatures

17:31:27 15  for any Mitsubishi officials?

16          So we just looked at page 10 and 11.  Did you see a

17  signature for any Mitsubishi officials?

18     A.   There are no Mitsubishi officials --

19     Q.   Okay.

20     A.   -- signing.

21     Q.   All right.  I'm going to go back to the English

22  translations so you can see the titles of the officials who

17:31:59 23  appeared on pages 10 and 11.  And do you see where it says

24  Marco Delgado --

25     A.   Uh-huh.

Ponce - Direct

1    Q.    -- on page -- at the bottom of page 9.

2    A.    Uh-huh.

3    Q.    And at the top of page 10, it says Alberto Ramos.

4    A.    Uh-huh.  Yes.

5    Q.    And then it says, Carlos Santana, Commercial

6  Notary --

7    A.    Uh-huh.

17:32:24   8    Q.    -- and a Carlos Salinas and Ana Corina Silva and a

9  Carlos Arturo, again.

10         Okay.  So were there any Mitsubishi officials on this

11  document?

12    A.    No.

13    Q.    Okay.  Now, the document, also, as we just saw,

14  referenced a 13-page document.  And I'm going to scroll down to

17:32:55   15  the next part of this document to see that 13-page document.

16  Do you see a 1 at the bottom of the page?

17    A.    A 1 as in page 1, yes.

18    Q.    Yes.  Okay.  And at the top of page, for the record,

19  does it start off, Non-Possessory Pledge Agreement?

20    A.    Yes, it does.

21    Q.    Okay.  And if I scroll all the way down, so we can

17:33:23   22  see how many pages there are, are there 13 pages to this

23  document?

24    A.    Can you continue to scroll a few more pages.

25    Q.    I'll tell you, this is a certification, a self-

1   proving affidavit that's included because of where we got the

2   documents from.

3        A.   I just saw page 13.  It seems to be the last one.

4        Q.   Okay.  So I'm now going to ask you questions about

5   this 13-page document.

17:34:12   6        I'm going to read the title first.  It says,

7   "Non-possessory pledge agreement in reference to the contract

8   for the procurement of goods entered by and between Banco

9   Nacional De Comercio Exterior, National Credit Corporation,

17:34:28  10   Fiduciary Division, not on its own but -- not on its own behalf

11   but as trustee for Trust Number 10248 for the management of

12   prior expenses, hereinafter Creditor Trust, represented in this

13   act by the deputy trustees" -- and there are some names -- "and

14   FGG Enterprises, hereinafter Debtor Supplier, represented in

15   this act by Mr. Marco Delgado Licon in his capacity as legal

16   representative, hereinafter collectively The Parties."

17:34:58  17        Is Mitsubishi Power Systems America identified as a

18   party to this non-possessory pledge agreement?

19        A.   No.  Mitsubishi is not identified as a party.

20        Q.   Okay.  Because we are going to see it later on, is

21   FGG identified as the Debtor Supplier?

22        A.   Seems to be, yes.

23        Q.   I'm going to scroll down.  Do you see there is a

24   section called Recitals?

25        A.   Yes.

         1          Q.   And do you see that there is a section called

         2   Declarations?

17:35:30 3          A.   Uh-huh.

         4          Q.   I'm going to ask you to say "yes" or "no" for the

         5   record.

         6               Do you see that there is a section called

         7   Declarations?

         8          A.   Yes.

         9          Q.   And do you see where it says, under Roman Numeral I,

        10   "The Creditor Trust declares that"?

        11          A.   Yes.

        12          Q.   And do you see under Roman Number II, where it says,

        13   "The Debtor Supplier declares that"?

        14          A.   Yes, I see it.

        15          Q.   And do we see above it, the Debtor Supplier was

        16   defined as FGG?

        17          A.   Yes.

17:35:57 18          Q.   I'm going to jump down under the Declarations for

        19   Debtor Supplier to Roman Numeral VI.  If we started off above,

        20   at the bottom of page 3, it states, "The Debtor Supplier

        21   declares that he's the owner and is in possession and full

        22   control of two gas turbo generators and a steam turbo

        23   generator."

        24               Was FGG the owner of the equipment on January 15th,

        25   2010?

Ponce - Direct

1      A.   Certainly not.

17:36:29  2      Q.   Was FGG in possession and full control of equipment

3   on January 15th, 2010?

4      A.   No.

5      Q.   I'm going to continue scrolling down.

6           By the way, do you see any serial numbers -- is this

17:36:49  7   a description -- this chart on pages 4 through 6, do you see

8   any indicators for the equipment?

9           I'll scroll down more slowly.  I apologize.

10      A.   You mean, throughout the document, it seems to be --

17:37:30  11   without me looking at the equipment, it seems to be information

12   from perhaps the name plate of the equipment itself.

13      Q.   Okay.  And I'm going to scroll down to the next

14   section.  We just went through Declarations and now I'm going

15   to down to Clauses.  Do you see where it says "Clauses"?  And

16   we are on page 9.

17      A.   Yes, I do.

17:37:57  18      Q.   Okay.  First, I'm going to read the first paragraph

19   under First and then ask you a question.

20           "To guarantee the fulfillment of the procurement

21   contract, the Debtor Supplier, by virtue of this contract,

22   pledges as first-ranking collateral their turbo generators

23   described in 11.6 of this non-possessory pledge contract.  The

24   collateral compromises all that by fact and by law corresponds

25   to the above-mentioned goods without any reserve or limitation

17:38:27   1   until the total resolution of the debt.  And in addition, it

           2   grantees the compliance with any and all of the obligations for

           3   which the aforesaid is responsible and which are contained in

           4   the procurement contract regarding the performance bond."

           5         Did FGG have any authorization or permission to

           6   pledge the equipment as stated here?

           7   A.    No.

           8   Q.    I'm going to continue reading and then ask you a

           9   question.  "The parties agree that the creditor" -- for the

          10   record, I'm going to continue to read on to the top of next

          11   page, which is page 10.

17:38:59  12         "The parties agree that the creditor trust, through

          13   the commission, could carry out the verification of the

          14   existence and condition of the equipment with the understanding

          15   that this contract shall be registered in the corresponding

          16   public property and commerce registry."

          17         Does this appear to indicate that the purpose of the

          18   equipment inspection was for the pledge?

          19   A.    This appears to indicate that, yes.

17:39:24  20   Q.    I'm going to jump down to page 11 under the fourth

          21   clause and I'm going to read here and ask you a question.

          22         "If the Debtor Supplier doesn't fulfill the

17:39:55  23   obligations assumed in the procurement contract, the Creditor

          24   Trust, on the instructions of the technical committee, may

          25   request a public auction sale of the pledged goods for payment

Ponce - Direct

136

1    of the conventional penalties foreseen in the procurement

2    contract.  Said damages caused to the Creditor Trust shall be

3    charged to the Debtor Supplier as well as costs and expenses

4    that may arise from the filing of the suit, which shall be

5    filed before a federal judge in the first circuit of the

6    federal district."

17:40:25   7         Did anybody at MPSA authorize FGG to give permission

8    to CFE to publicly auction the goods?

9         A.    No.

10        Q.    And what is the consequence of this paragraph on

11   Mitsubishi Power Systems America?

12        A.    It means that if the customer or, in the prior

13   example, the jury gave the money to FGG and FGG did not give us

14   the money and we did not deliver the equipment to you, you

15   could sell it at auction.

17:40:58   16        Q.    Okay.  I'm going to scroll down to page 12.

17             Do you see that there are some indications that there

18   are signatures on the original?  Do you see any signatures for

19   any Mitsubishi officials -- or do you see any indication that

20   there are Mitsubishi officials who signed this document on page

21   12?

22        A.    No.

17:41:30   23        Q.    Okay.  We're going to look at the Spanish language,

24   which is Government's Exhibit 32, and look at the signature as

25   well.  It's a 13-page document.  I'm going to scroll down to

```
 1    the bottom of page 32.

 2              And do you see any signatures or names of CFE

 3    officials?

 4              MS. KANOF:   CFE?

 5              MS. ARREOLA:   Pardon me.

 6         Q.   (BY MS. ARREOLA)  Of Mitsubishi officials.  Do you

 7    see any names or signatures from Mitsubishi officials on

 8    page -- at the bottom of page 12 in Exhibit 32?

 9         A.   I do not see Mitsubishi officials.

10         Q.   Okay.  I'm going to now ask you to take a look at

11    Government Exhibit 34, which is already in evidence.  I'm going

12    to scroll through this document and then ask you if you

13    recognize it.

14         A.   Yes.

15         Q.   Okay.  I'm going to ask you some questions about it.

16              Is this an email from you to Fernando Gireud?

17         A.   Yes.

18         Q.   And did you copy Marco Delgado and John Adams?

19         A.   Yes.

20         Q.   And is the date January 12th, 2010?

21         A.   It is.

22         Q.   Okay.  So this is three days before that pledge?

23    Does it appear to be?

24         A.   It's just January 12th.  I --

25         Q.   Okay.
```

17:41:59 (line 7)
17:42:18 (line 11)
17:42:57 (line 17)

Ponce - Direct                    138

 1        A.    -- do not know the pledge existed.  So it's January

 2   12th.

 3        Q.    All right.  And is it two days after that John Adams

 4   letter that we looked at that you hadn't seen before until a

 5   few years later?

 6        A.    Yes.

17:43:28  7    Q.    Okay.  So attached here is a January 12th letter from

 8   John Adams; is that correct?

 9        A.    Yes.

10        Q.    And I wanted to -- did you play a part in writing

11   this letter, by the way?

12        A.    Yes.

13        Q.    Okay.  And are you making a request to FGG in this

14   letter?

15        A.    Yes.  We're making requests.

16        Q.    Okay.  So I'm going to read two lines.  I'm going to

17:43:55 17   jump to the bottom of the letter, paragraph 5.

18             "Please confirm whether the letter of credits

19   required to guarantee this equipment contract.  Please confirm

20   that FGG is posting such letter of credit and the date by which

21   it will be posted to satisfy the contract."

22             And I'm going to jump down to the bottom of the page,

23   last two sentences.

24             "We had already agreed that MPC will not provide any

25   letter of credit for either contract.  Please confirm FGG will

Ponce - Direct                                    139

17:44:25  1   not ask MPSA to guarantee equipment or service obligations via

        2   any letter of credit."

        3            Did anybody respond to this letter that you sent to

        4   Mr. Gireud and copy Mr. Delgado on indicating that there was a

        5   January 10th John Adams letter in which he had purportedly

        6   given permission to pledge Mitsubishi's equipment?

        7       A.   No, there was no such response.

        8       Q.   I'm going to ask you to take a look at Government's

17:44:56  9   Exhibit 37.  And do you recognize this letter or this email?

       10       A.   Yes, I recognize it.

       11       Q.   Okay.  Is this an email from you to Fernando Gireud?

       12       A.   Yes.

17:45:30 13       Q.   Are you copying John Adams and Marco Delgado?

       14       A.   Yes.

       15       Q.   And the letter -- was this email sent on January

       16   18th, 2010?

       17       A.   Yes, it was.

       18       Q.   Okay.  I'm going to read the first line.

       19            "Fernando, please provide FGG response to John Adams'

       20   January 12th letter reattached."

       21            Did you, in fact, attach the January 12th John Adams

       22   letter?

       23       A.   Yes.

       24       Q.   Okay.  And just let me go back to the date on the top

17:45:57 25   of this email.  This is January 18th.  So is this three days

1  after that pledge agreement which had a January 15th date on

2  it?

3      A.   Yes.

4      Q.   Okay.  And just so we can remind ourselves what the

5  January 12th letter said --

6           MS. KANOF:  Look at the date.

7      Q.   (BY MS. ARREOLA)  The date on this letter was January

8  12th, right?

9      A.   The letter, yes.

10     Q.   Okay.  And I'm going to read from the bottom of the

11  page.

17:46:27  12      "Please confirm FGG will not ask MPSA to guarantee

13  equipment or service obligations via any letter of credit."

14      Did anybody respond to this letter or this email and

15  inform you that Mitsubishi's equipment had been pledged as a

16  substitute for the letters of credit?

17     A.   Certainly not.

17:47:01  18     Q.   I want to turn your attention now to collection

19  rights.  Did Mitsubishi Power Systems America and FGG have any

20  agreement about collection rights?

21     A.   We had an agreement -- yes, we did.

22     Q.   Okay.  What was the agreement?

17:47:23  23     A.   The agreement was that FGG would obtain permission

24  from CFE that -- that Mitsubishi could have rights to invoice

25  and collect payments directly -- to collect their portion of

1    the payments directly from CFE to Mitsubishi.

2          Q.    Was there a provision regarding collection rights in

3    the subcontract?

4          A.    The subcontract was an agreement between the two

17:47:58  5  parties that FGG would obtain the collection rights for

6    Mitsubishi to invoice and receive payments from CFE.

7          Q.    Okay.  What was the purpose of reaching an agreement

8    on collection rights?  Was it important to Mitsubishi Power

9    Systems America to get that assignment of collection rights?

10         A.    Yes, it was important.

11         Q.    Why was it important?

12         A.    Because if CFE gave the money to FGG and FGG did not

17:48:27 13  transfer the corresponding portion to Mitsubishi, then we would

14   have a problem.

15         Q.    Okay.  I'm going to ask you to take a look at

16   Government Exhibit 45.

17:48:59 17         MS. ARREOLA:  Your Honor, we are on a new topic.  Do

18   you want me to keep going?

19               THE COURT:  Yeah.  We've got 11 minutes.

20               MS. ARREOLA:  Okay.  Just want to make sure.

21         Q.    (BY MS. ARREOLA)  I'm going to ask you to take a look

22   at Government's Exhibit 45 and tell me if you recognize it.

17:49:29 23         A.    I remember this, yes.

24         Q.    Okay.  And is this an email from Marco Delgado to

25   Mace Miller, Mr. Gireud and to you?

Ponce - Direct                                                       142

```
 1        A.    Yes, it is.

 2        Q.    Okay.  Is the date sent on the email March 8th, 2010?

 3        A.    Correct.

 4        Q.    Okay.  I'm going to read Mr. Delgado's email.

 5              "Gentlemen, I'm forwarding for your review CFE

 6   acknowledgment of formal FGG request for collection rights

 7   assignment.  Given Hector's request for written status report,

 8   I will attempt to generate a rough draft for FGG review by

 9   midweek."

10              Did I read that correctly?

11        A.    Yes, you did.

12        Q.    I'm going to ask you to take a look at Government's

13   Exhibit 43.  The date on that letter, the email we just saw,

14   was March 8th, correct?

15        A.    Yes.

16        Q.    So I'm going to ask you to look at Government's

17   Exhibit 43, which is a March 3rd, 2010 letter.  I'm going to

18   ask you if you recognize this.  And I'm going to show you the

19   Spanish version because it has the original signature and then

20   we'll pull up the English version in a moment.

21              Have you seen this document before?

22        A.    I don't remember seeing this document.

23        Q.    Okay.  So now I'm going to pull up the English

24   version, which is Government's Exhibit 43A, also already in

25   evidence.  And I'm going to read from this letter.
```

Time stamps (left margin): 17:50:00 (line 7), 17:50:29 (line 17), 17:50:58 (line 23)

 1              First, do you see the date on this letter is March

 2    3rd, 2010?

 3         A.   I see it.

 4         Q.   Okay.  Is that the four -- five days before the March

 5    8th letter where Mr. Delgado told you he had forwarded

 6    assignment of collection rights to CFE?

 7         A.   Yes.

 8         Q.   Okay.  At the bottom of this page, is the letter on

17:51:27  9   Government's Exhibit 43 from Mr. Delgado?

10         A.   Yes, it is.

11         Q.   Okay.  So I'm going to go ahead and read.

12              "To the CFE Federal Electricity Commission.  By means

13    of the present document, I hereby request that an official

14    letter be issued requesting the modification of the contract

15    with the procurement of goods signed last January 6 of the

16    current year and entered into with the Banco Nacional De

17    Comercio Exterior as party of the second part.  In this

18    contract, there was agreement on its 14th clause which

17:51:58 19   establishes the location of the payment and the account number

20    to which the payment shall be made by electronic transfer.

21    Therefore, I request that a modification be made as to the

22    account number and that the corresponding electronic transfer

23    be made under the following banking instructions.  Send -- for

24    initial credit, send Wacovia Bank" -- I'm going to jump below

25    -- "for a initial credit to First Carribean International Bank,

Ponce - Direct

17:52:27  1    Providenciales, Turks and Caicos Islands, for further credit to

2    Skippings Rutley" -- and there's an account listed --

3    "reference FGG Enterprises."

4           I'm going to go back to Government Exhibit 45 and ask

5    you a question about what we just saw.

6           When you received this email from -- on March 8th

7    from Marco Delgado indicating that he had forwarded CFE

8    acknowledgement of FGG's request for collection rights

9    assignment, did you know that he had already, five days

17:52:58 10    earlier, directed that the payment under the prime contract be

11    sent to an offshore account in the Turks and Caicos Islands?

12       A.   I did not know that.

13       Q.   By the way, when you mentioned earlier that you

14    stopped working for Mitsubishi Power Systems America in about

15    spring of 2010, had the collection rights been assigned by that

17:53:24 16    time that you left?

17           MS. ARREOLA:  Did you hear -- did the court reporter

18    hear?

19       A.   I said no.  I'm sorry.

20       Q.   (BY MS. ARREOLA)  I'm going to ask you to take a look

21    at Government Exhibit -- what is -- what has been marked for

22    identification as Government Exhibit 47.  And this is not in

23    evidence.

24           (Government's Exhibit 47 marked for identification)

25       Q.   I'm going to ask you to take a look at it and tell me

1    if you recognize it.

17:54:00  2        A.    Yes, I do.

3        Q.    Okay.  Is this an email from Marco Delgado to you?

4        A.    Yes, it is.

5        Q.    Is it sent -- was it sent on March 12th, 2010?

6        A.    According to what this says, yes.

7        Q.    So is that approximately the last -- let me see, one

8    second.

9              MS. ARREOLA:  Your Honor, the government offers what

17:54:30  10  has been marked as Government Exhibit 47 and the corresponding

11   translation 47A.

12             THE COURT:  47A I show is already in evidence.

13             But 47, Ms. Franco, any objection?

14             MS. FRANCO:  To the Spanish version, no, Your

15   Honor.

16             THE COURT:  Spanish version 47 --

17             MS. ARREOLA:  I have in my notes, Your Honor, that we

18   had offered the second page, but not the first page.  So now we

19   are offering the entire document.

17:54:55  20       THE COURT:  47A was admitted by Mr. Gireud.  But 47

21   will be admitted through Mr. Ponce.

22             MS. ARREOLA:  Okay.

23             (Government's Exhibits 47 admitted into evidence)

24        Q.    (BY MS. ARREOLA) So is the date on this email.  This

25   is an email again so the jury can see.

1          MS. ARREOLA:  May we publish, Your Honor?

2          THE COURT:  Yes, ma'am.

3      Q.   (BY MS. ARREOLA)  Is this an email from Marco Delgado

4  to you?

5      A.   Yes, it is.

6      Q.   The date sent shown is March 12th; is that correct?

7      A.   March 12th, yes.

17:55:25  8      Q.   Is this approximately nine days after the letter that

9  we just saw from Marco Delgado directing the funds to be

10  transferred to an offshore account in the Turks and Caicos

11  Islands?

12      A.   Yes, it is.

13      Q.   Okay.  I'm going to ask you -- I'm going to show the

14  English version in a moment, but I wanted to ask you something

15  about the original before I get to the English version.

16          Does he appear to be forwarding an email to you?

17:55:58  17      A.   Yes.  It seems to be he is forwarding to me on the

18  12th an email from Ms. Alfaro written to him on the 11th.

19      Q.   Okay.  And is Ms. Alfaro, does she appear to be a CFE

20  official, based on her email address?

21      A.   Based on the CFE, yes.

22      Q.   Okay.  Also, is there -- is La Comision Federal

23  Electricidad indicated in the bottom under her title?

17:56:30  24      A.   Yes, it is.

25      Q.   Okay.  And is there an attachment to this email?

Ponce - Direct                                              147

 1        A.   There was an attachment on the email, yes.

 2        Q.   Okay.  So now let's go to the English version.

 3             Marco Delgado writes, "Hector, FYI, let me know what

 4   time to call you."

 5             What was the purpose of this document that he sent

17:57:00  6   you?  Did you call him?

 7        A.   He asked me at what time -- his email says, "Hector,

 8   let me know what time to call you."  I don't recall if I said,

 9   "I will call you" or I called him, but I do know that we spoke

10   of it soon thereafter because it was a big transmission.

11        Q.   Okay.  What do you mean it was a big transmission?

12   Do you mean it was a big deal?

17:57:28 13        A.   It was a big deal.  It was -- keep in mind that the

14   email didn't tell me anything.  It just said, "Please let me

15   know when to call you," and then this was attached.  This

16   attachment was essentially three columns, one showing the price

17   and the payment terms of the proposal we made in writing for

18   the Mitsubishi equipment, and the other two columns were option

19   A and option B, which not only had a reduction in the price but

17:57:58 20   also less percentage for each of the payments that we were to

21   receive.

22        Q.   Let me ask you for some clarification.  You said that

23   the first column was payments to you.  Do you mean payments to

24   you -- because it says $121 million at the top, was this

25   payments to you or payments that were due to FGG under the

Ponce - Direct

1    prime contract?

2         A.   I'm sorry.  I believe that's the prime contract and

3    the amounts and percentages to be sent by CFE to FGG.

17:58:29   4         Q.   By "prime contract," I mean the contract between CFE

5    and FGG, not the subcontract between FGG and Mitsubishi Power

6    Systems America.  Is that what you were referring to as well?

7         A.   Correct.  "Prime contract" means the contract between

8    CFE and FGG.

9         Q.   Okay.  So this column here -- this first column where

10   it says "Price offered, 121USD," below that, it says, "First

11   Payment," "Second Payment," and indicates 20 and 12, what does

17:58:58   12   that indicate?  What do those numbers represent?

13        A.   Those are -- those are $20 million payment at the

14   timing agreed to for the first payment.

15        Q.   Okay.  In other words, was the first payment due to

16   the FGG supposed to be $20 million?

17        A.   In the original payment terms, yes.

18        Q.   Okay.  And was the second payment due to FGG supposed

17:59:29   19   to be $12 million?

20        A.   Yes.

21        Q.   And are these --

22             MS. ARREOLA:  Your Honor, you see that we are close

23   to 6:00.  I still have some more to go on this.  Should we

24   pause?

25             THE COURT:  Would you like to pause now?

1          MS. ARREOLA:  Yes, Your Honor.

2          THE COURT:  All right.  Ladies and gentlemen of the

3     jury, we'll recess for the evening.  Please remember the

4     instructions I gave Monday about not discussing the case

5     amongst yourselves or among anyone else.

6          We'll see you back tomorrow morning at 9:00.

7          (Proceedings adjourned)

18:00:27

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

STATE OF TEXAS        )

COUNTY OF EL PASO   )


        I, Rhonda McCay, Certified Shorthand Reporter in and

for the State of Texas and Registered Professional Reporter,

hereby certify that this transcript is a true record of the

said proceedings, and that said transcription is done to the

best of my ability.

        Given under my hand and seal of office on this 19th

day of October, 2016.



                        /s/ Rhonda McCay
                        _____
                        Rhonda McCay, CSR, RPR
                        Texas Certification Number 4457
                        Date of Expiration:  12/31/2016
                        REPORTERS INK, LLC
                        Firm Registration Number 420
                        221 N. Kansas, Suite 1101
                        El Paso, Texas 79901
                        Ph.:  915.544.1515