1          IN THE UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF TEXAS

3                   EL PASO DIVISION

4                   VOLUME 6 OF 20

5

6   UNITED STATES OF AMERICA          EP:13-CR-0370-DG

7   v.                                EL PASO, TEXAS

8   MARCO ANTONIO DELGADO             May 17, 2016

9
                         **STATUS HEARING**
10            THE HONORABLE DAVID C. GUADERRAMA
                UNITED STATES DISTRICT JUDGE
11

12

13   APPEARANCES:

14   For the Government:   Debra Kanof
                           Anna Arreola
15                         Luis Gonzalez
                           Assistant United States Attorney
16                         700 East San Antonio, Suite 200
                           El Paso, Texas 79901
17
     For the Defendant:    Maureen Franco
18                         Erik Hanshew
                           Assistant Federal Public Defender
19                         700 E. San Antonio, Suite 410
                           El Paso, Texas  79901
20
     Court Reporter:       Kathleen A. Supnet
21                         El Paso, Texas
                           (915)834-0573
22                         kathi.supnet5303@gmail.com

23

24         Proceedings reported by mechanical stenography,

25   transcript produced by computer-aided software and computer.

1                          CHRONOLOGICAL INDEX

2                            VOLUME 6 OF 20

3     MAY 17, 2016                                    PAGE     VOL.

4     Announcements. . . . . . . . . . . . . . . . . . 3        6

5     Court's Ruling . . . . . . . . . . . . . . . . 50       6

6     Court Reporter's Certification . . . . . . . . . 53      6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              * * * * *
 2              (Proceedings begin at 9:57 a.m.)
 3                              * * * * *
 4              (Open court.)
 5              THE COURTROOM DEPUTY:  EP:13-CR-370, Marco Antonio
 6         Delgado.
 7              THE COURT:  I'd ask for announcements, please.
 8              MS. KANOF:  Good morning, Your Honor.  Debra Kanof,
 9    Anna Arreola and Jose Gonzalez for the United States.
10              THE COURT:  Good morning to all of you.
11              MS. FRANCO:  Good morning, Your Honor.  Maureen Franco
12    and Erik Hanshew on behalf of Mr. Delgado.  We're ready.
13              THE COURT:  All right.  Good morning to both of you.
14              All right.  I wanted to have this status hearing, so I
15    can get a better grasp on what actually happened in regards to
16    that subpoena and then where I'm going to go from here.
17              The first thing I want to know is because I guess I
18    can assume that the subpoena was actually served on Mr. Gireud
19    in Federal Court, apparently those returns aren't filed and
20    courts are left to guess, I guess, if subpoenas have been
21    served.
22              MS. FRANCO:  Yes, Your Honor.  It was served on one of
23    Mr. Gireud's attorneys, Rene -- well, had represented him the
24    past -- Rene Ordoñez had accepted service that said he did not
25    represent him with regard to that compliance with the subpoena,
```

1   but he did accept service and gave it to Mr. Gireud.

2          THE COURT:  All right.  So if I hold a show cause

3   hearing to hold Mr. Gireud in contempt for failing to comply

4   with a subpoena, is that sufficient that you serve someone that

5   used to represent him in the past and then we go on that?

6          MS. FRANCO:  Well, Your Honor, he accepted service on

7   his behalf.  And of course, Mr. Gireud has not filed anything

8   seeking that he didn't receive proper service of it, but

9   federal rules are different on the service of subpoena.  I mean

10  pretty much anyone can serve a subpoena on someone.

11         THE COURT:  Okay.  So then because he, I'm thinking

12  from your pleadings, he showed up at the Government's office,

13  and from the Government's response that that in fact is true,

14  that he showed up at the Government's office with these

15  documents, so I guess I can safely assume that he was served.

16         MS. FRANCO:  Yes, sir.

17         THE COURT:  All right.  So then I can set him for a

18  show cause.

19         If you give me an affidavit telling me all of these

20  things you just told me that I can use for my show cause, I'll

21  serve him with a show cause as to why he should not be held in

22  contempt for failing to comply with the directive.

23         Now, I looked at the subpoena.  Was the Court's order

24  attached to the subpoena?  Because that subpoena doesn't say

25  anything.

1          MS. FRANCO:  Let me check, Your Honor.

2          Yes, Your Honor, it was.

3          THE COURT:  So all of those documents are then

4    attached to that cover sheet and then that's what's served on

5    the defendant.

6          MS. FRANCO:  Yes -- on the witness, Your Honor.

7          THE COURT:  I'm sorry, on the witness.  And he reads

8    through that order and figures out what he's supposed to do?

9          MS. FRANCO:  Yes, sir.

10          THE COURT:  Okay.  All right.  So I know that's where

11    we're at.

12          Now, from reading your pleadings, and I saw all of the

13    things you raised, the thing that concerned me was that you're

14    alleging that Mr. Gireud shows up with, let's say, 20 different

15    documents to the Government's office.  The Government looks

16    through them and says, well, here's 15 we'll give to the Court.

17    These five don't -- aren't responsive, so take those back, you

18    don't need to produce those.  That's kind of what -- something

19    like that was what you were alleging?

20          MS. FRANCO:  It's possible, Your Honor.  I mean that's

21    the problem with the Government interjecting itself into this

22    subpoena process is that we're not sure exactly what happened.

23          THE COURT:  Right.  Well --

24          MS. FRANCO:  I mean it wasn't 20 documents, Your

25    Honor.  I mean, I don't know --

1        THE COURT:  Oh, I know.  I'm just using that as --

2        MS. FRANCO:  It was 300 pages and that they tried to

3   say that they perused it, but they were able to find a tax

4   return in the middle of it, and so -- I mean, obviously, they

5   made copies of it.

6        THE COURT:  All right.  You're way past me right now.

7        MS. FRANCO:  Okay.

8        THE COURT:  I'm just trying to get the basics done.

9        MS. FRANCO:  Yes, sir.

10        THE COURT:  All right.  There's nothing that prevents

11   a witness from getting subpoenaed and going to the Government,

12   right?  I mean, he could've gone to the Government, showed them

13   the documents and then come here to the court complying with

14   the subpoena --

15        MS. FRANCO:  Yes.

16        THE COURT:  -- and violated no rule.

17        MS. FRANCO:  Correct, Your Honor.  He didn't.

18        THE COURT:  Right, because that's why I'm going slowly

19   because I'm trying to see what actually happened.

20        MS. FRANCO:  Yes, Your Honor.

21        THE COURT:  So you're saying that he showed up with

22   "X" amount of documents, but then only "X" minus "Y" was

23   delivered to the Court.  "Y" was then returned with Mr. Gireud

24   back to his house.

25        MS. FRANCO:  I don't know, Your Honor.

1          THE COURT:  I'm reading -- I'm talking about your

2     pleadings.

3          MS. FRANCO:  Well, Your Honor, I don't think that's

4     the position that we took.

5          THE COURT:  Tell me what it is.

6          MS. FRANCO:  Thank you, Your Honor, I will.

7          Our position is that through a series of telephone

8     conversations that Mr. Gireud had with the case agent and with

9     the Government, he was given legal advice as to how to comply

10     with the subpoena.  He was told not to substitute items that

11     were not specifically requested.

12          THE COURT:  The only thing I want to know right now is

13     if he showed up with documents, left some and went home with

14     some.

15          MS. FRANCO:  That's why we would need to have an

16     evidentiary hearing to find out.  We don't know.  That's the

17     problem.

18          THE COURT:  But that's what you are alleging or at

19     least wanting me to believe that's what happened.

20          MS. FRANCO:  Your Honor, what we wanted the Court to

21     be concerned about is to determine whether or not that indeed

22     happened.  We don't know, because all we know is that

23     Mr. Gireud showed up with some documents and Ms. Kanof received

24     those documents and some documents were returned to the Court

25     pursuant to a subpoena.

1          We had requested several documents that were not

2     returned by Mr. Gireud either, because he was instructed by the

3     Government, well, they don't exist, you can't present them or

4     that he tried to substitute documents in and they told him not

5     to.

6               THE COURT:  Okay.  So that's what I'm talking about.

7               MS. FRANCO:  Yes, sir.

8               THE COURT:  That's the "Y."

9               MS. FRANCO:  Yes, sir.

10              THE COURT:  The documents that he had that weren't

11    turned over.

12              MS. FRANCO:  Correct.  That's our impression, Your

13    Honor.

14              THE COURT:  All right.

15              So let me hear from Ms. Kanof.

16              Is -- are you saying she is the one that dealt with

17    Mr. Gireud?  He's the one that has this knowledge?

18              MS. FRANCO:  Yes, Your Honor.

19              THE COURT:  Ms. Kanof, tell us what you think

20    happened.

21              MS. KANOF:  On Wednesday afternoon or I guess it was

22    early afternoon on Wednesday, April 6th, I was sitting in my

23    office and AUSA Arreola came to me and said that Agent Fry had

24    called her and said that Mr. Gireud wanted to talk to us.  We

25    don't know what it was about.

1          We placed a conference call from my telephone and

2     Mr. Gireud said that he had received a subpoena.  We're aware

3     he had received this subpoena because Mr. Fry had told us that

4     already.

5          The first thing he said was didn't you give the

6     defense all of the documents --

7          THE COURT:  This is Mr. Gireud?

8          MS. KANOF:  It was a conference call with Mr. Fry --

9     didn't you give all of the documents that I gave to you to

10    them?  And I said, yes, of course we did.  And he said, well,

11    most of what he's asked for I already gave you.  So, do I have

12    to give it to them again?

13         Prior to that, I had said, did you call Mary?  Mary

14    Stillinger was his attorney until the middle of last week.  I

15    had been in constant communication with her and I had e-mails.

16    Ever -- the case has been reset eight times.  Every time it was

17    reset, I would tell her.  She's given us permission to talk to

18    him in her absence, both for the agents and the AUSA.

19         THE COURT:  Ms. Stillinger gave someone in your office

20    permission to talk to Mr. Gireud.

21         MS. KANOF:  Correct.  In her absence, she gave the

22    AUSAs and the case agent permission that -- from the very

23    beginning, she gave to Ms. Fielden and then reiterated to us

24    that we're free to discuss with him.  He is my witness for

25    preparation and since the case has been set so many times, I

1    had engaged in preparation of him more than one time, never

2    alone, always with other people present.

3           During this conversation, he -- I first asked him, did

4    you talk to Ms. Stillinger?  He had, according to Agent Fry, he

5    had spoken with him before and Agent Fry had said you need to

6    call your lawyer.  He said -- my understanding is that he told

7    Agent Fry that Rene Ordoñez wouldn't discuss it with him,

8    because he was only his lawyer for the civil case, the lawsuits

9    that are ancillary to this, and that he had tried to get ahold

10   of Mary Stillinger and could not.  On more than one -- one

11   occasion, Agent Fry and AUSA Arreola had said, tell him to call

12   his lawyer.

13          Now, in this conversation, we were caught off guard.

14   We don't know what it was going to be about and he started

15   talking about this.  The first thing I said is, did you call

16   your lawyer?  I tried many times.  I have not gotten a

17   response.

18          Then he asked whether or not we had provided the

19   documents, and I said, yes.  Well, then why do I have to give

20   it to them again?  Because the subpoena says you do.  And then

21   he said, well, some of the things don't even exist.  Well, if

22   it doesn't exist, you can't very well give it to them.

23          In the middle of the conversation, he related that his

24   daughter was getting married that Saturday.  He was very, very

25   distressed and concerned that he do the right thing.  He said

1    he had actually missed out on some of the festivities and

2    participation, because he was spending so much time to respond

3    to items he didn't understand or may not exist.

4          At one point, he -- well, during the process,

5    Ms. Arreola or either Agent Fry or Ms. Arreola says, you have

6    the subpoena.  I e-mailed it to you.  I didn't realize that.

7    He e-mailed it to both of the AUSAs, but neither of us bothered

8    to open it.  I popped it open to continue discussing it with

9    him.

10         When I popped it open, I took a look at it and

11   realized it was in violation of Rule 17(c).  Not only --

12         THE COURT:  Is that the discovery issue you were

13   talking about where you're circumventing discovery?

14         MS. KANOF:  I'm sorry?

15         THE COURT:  Was that the issue raised about

16   circumventing the discovery?

17         MS. KANOF:  Yes, Your Honor.  Oddly enough, about two

18   weeks before that when I was out of town, I had received a

19   request from one of our (indiscernible) on a motion to

20   suppress.  It was a little fresh in my mind and I took a look

21   at it and he -- the third thing he said to me was I don't have

22   this item.  He identified one item.  I don't recall.  And we,

23   of course, had discussed it and none of us recall what item he

24   pointed to, because we're trying to get through this, and he

25   said I don't have this item, but I've been searching.  Maybe I

1    have something that's related to it.  And that's when I said

2    you just are supposed to comply with the subpoena.  Don't

3    substitute things that are not asked for.

4           He said can I bring them to you so that you can make

5    sure that I did the right thing, that I complied with the

6    subpoena?  And I told him that I would review it with him on

7    Monday, the day that it was due, April the 11th.  Before that

8    was a possibility, he called me early Monday morning and he was

9    crying.  He was very upset about having lost his mother.

10   Excuse me.  He is a very kind man and he spent a long time

11   telling me about his mother and that she was so kind that she

12   had waited until his daughter got married to die, because she

13   had died on Sunday after the wedding.  I told him that -- I

14   told him if he brought the documents to my office, I would walk

15   across the street with him and go to the court.  And he did

16   present them and -- and he said he needed to leave to fly to

17   Torreón to take care of the things for his mother.  I said

18   bring the documents to me.  I'll make sure the Court gets them.

19          About ten o'clock in the morning -- I even told him

20   just drive by, call me and I'll run out and pick them up.  I

21   don't want you to have any more stress.

22          THE COURT:  This was on Sunday?

23          MS. KANOF:  Monday, the day they were due.

24          And he called me on Monday -- no, I'll come in.  We'll

25   meet you in the lobby.  We met in the lobby, gave condolences,

1   spoke about his mother, handed the package, went upstairs.  I

2   handed the package to my legal assistant to make copies.  It

3   took her a little while -- meticulous folders for the Court --

4   but immediately prior to that, I put it on -- pulled out the

5   pullout on the side of my desk.  Ms. Arreola stood to my left.

6   And we literally took the corner and went like that to see if

7   they were voluminous.

8        It jumped out at me because I was considering filing

9   17(c) quash that there was a tax return and it also jumped out

10  at me that it was a personal -- so I looked at it.  It was a

11  1040.  The subpoena had not requested personal 1040s.  It had

12  requested from FGG.  And this was a personal 1040.  We are

13  trained in our office that if anything that has personal

14  identification in it like Social Security numbers, dates of

15  birth have to be redacted.  I knew I couldn't tamper with the

16  document, so I instructed my assistant take that, return, put

17  it in an envelope marked PPI, personal identification, personal

18  tax record.  Even though I knew it was not compliant to the

19  subpoena, I didn't remove it and put it back in where it came

20  from so that nothing has been altered.

21        After a little while, after she had -- she made two

22  copies, one for myself and AUSA Arreola, we had read the order

23  before we did anything.  We assure that the order was not

24  sealed, the subpoena was not sealed.

25        I will tell the Court that before this occurred,

1    Matthew Herrington, H-E-R-R-I-N-G-T-O-N, counsel for

2    Mitsubishi, had called me and had the identical conversation

3    with me.

4          Mr. Herrington had called when he received the

5    subpoena, which he also sent to the Government, and said you --

6    didn't you give the disk we provided to the defense?  And I

7    said, yes, we did.  And he said, well, pretty much everything

8    we're asking for we may have, it's on that disk.  And I said,

9    well, you know, what can I tell you, you to give it to them.

10   And he said, I'm thinking of making a motion to quash.

11         In lieu of that, that's what we gave to the Court,

12   sealed.  He instead identified from the disk that was provided

13   to us by Mitsubishi and then directly to the defense without

14   any deletions the numbers of most of the items that had been

15   requested.

16         Rule 17 subpoenas are not a discovery tool and it's an

17   extreme measure and a showing has to be made to the Court.  I

18   felt very strongly when I saw Mr. Herrington's subpoena that

19   that -- and Mr. Herrington and I did discuss it -- that there

20   had been no compliance of any of the four prongs of the United

21   States Phoenix or Nixon, as adopting (indiscernible.)

22         And so regardless when Gireud said that to me, I had

23   already heard it.  And so on the Monday when -- after the

24   copies had been made, kind of for about an hour or so -- I was

25   actually working on a different case -- and that morning

1    Mr. Gireud was very upset that he hadn't had an opportunity to

2    go through the documents to make sure he was in full

3    compliance.  He -- and because of his daughter's wedding felt

4    like, you know, I want to make sure I do the right thing, you

5    know, I need more time.  And I said don't worry.  Don't worry.

6    I'll tell the Court that, you know, what happened with your

7    mother and that you want more time.

8         And I had considered just calling the Court and

9    communicating this, but decided for full disclosure so defense

10   counsel would be aware of what happened, that I would do it in

11   a motion.  I wasn't doing it as his counsel as an officer of

12   the Court to communicate something because he had no other

13   alternative.

14        So I quickly drafted a motion for extension of time to

15   comply with the subpoena explaining to the Court what had

16   occurred.  And about an hour later, the U.S. Attorney Richard

17   Durbin called me and told me that he had received a call from

18   the Federal Public Defender, who was very angry, who was

19   accusing the Government of having engaged in a legal

20   relationship with Mr. Gireud and having represented him as

21   counsel.

22        He indicated to me that he had asked Ms. Franco, what

23   do you want?  What's the remedy?  What will make you happy?  He

24   said that she wanted us to withdraw the motion.  She wanted us

25   to explain what happened and explain what we did.  But most

1    importantly, she wanted us to give them a copy of the

2    documents.

3          So when I hung up the phone, I immediately told my

4    legal assistant to run up to FPD before 5 o'clock -- this is

5    like 4:30 -- and give them my copy, which she did before close

6    of business.  Then Mr. Durbin told me to file a motion to

7    withdraw the motion for extension of time and explain why.

8          That night after having a discussion with Ms. Arreola,

9    I called -- I am supervised directly by the Chief of Criminal,

10   Ms. Leachman.  She's also professional responsibility officer.

11   I won't disclose, because I think it's privileged what I

12   discussed with her, but she directed me to be a little more

13   specific and file an amended motion to withdraw.  And what she

14   actually said was draw a footnote.  Look, let's -- a full

15   disclosure.  I'll do it in the body and I won't tell you what

16   advice she gave me as far as legal advice, so I did that.

17         The next morning, I wrote a little more in depth to

18   withdraw the conversation that I had had with Mr. Gireud to be

19   a little more complete.  And that's basically what happened.

20   Every document that was turned over to the Government to go to

21   the Court was provided.  Nothing was deleted, nothing was added

22   and nothing was read.

23         In fact, I will tell the Court I still have not looked

24   through those documents, because having read the subpoena and

25   talking to Mr. Gireud, I know they are just repetitious.  It

1    was very clear that some of the things that were requested just

2    don't exist; copy of the website, are totally irrelevant and

3    improper.

4         Because of the dust-up, I did not file a motion to

5    quash.  I just didn't want to create any more issues.  But I

6    did have the opportunity and did submit to the authors of the

7    response what I had planned to submit to the Court in order to

8    quash that subpoena, and that's --

9         Have I left anything out?

10        (Sotto voce conversation.)

11        MS. KANOF:  I just want to point out to the Court two

12   things; one, Ms. Arreola and Agent Fry were present during

13   every word that came out of my mouth to Mr. Gireud and, two,

14   before writing the amended motion, Chief Gonzalez came into my

15   office.  Ms. Arreola and I wanted to make sure we were very

16   accurate about what I told Mr. Gireud.  And we were calling

17   Agent Fry.  Agent Fry lives in Arizona.  We were counseling him

18   to ask his recollection of what I said.  So -- for fairness and

19   completeness -- Jose Gonzalez walked into the office and we

20   said, could you please stay and be a witness to the

21   conversation we have with Agent Fry about the conversation I

22   had with Gireud?  So AUSA Gonzalez stayed and listened to Agent

23   Fry's rendition of that conversation that occurred on April 6th

24   between myself on conference call with Agent Fry and

25   Mr. Gireud, with Ms. Arreola present in my office, and that's

1   basically what happened.

2           THE COURT:  All right.  Thank you, Ms. Kanof.

3           All right.  Did you have a response?

4           MS. FRANCO:  Your Honor, I apologize for my voice.

5   I'm losing it for some reason, so, hopefully you'll be able to

6   understand what I'm saying.

7           Your Honor, with regard to what Ms. Kanof has related

8   to the Court, it's very clear that she did provide legal advice

9   to Mr. Gireud.  He calls up first case agent.  I got the

10  subpoena.  I don't know what it all means.  What do I do with

11  it?  He then reaches out to Ms. Arreola, who says, call your

12  lawyer, the only response that should have been given to

13  Mr. Gireud.

14          Your Honor, just to correct something, Ms. Stillinger

15  told us she did not represent Mr. Gireud, because we sent the

16  subpoena to her and she's the one that told us about

17  Mr. Ordoñez.  So at that point in time in March, she said she

18  did not represent him or we wouldn't have been going through

19  her.

20          For whatever reasons, his wife, daughter getting

21  married, the unfortunate death of his mother, he obviously sees

22  the AUSA office as his attorney, because he's asking for advice

23  on how to comply with the subpoena at issue.  The simpler and

24  ethical thing, he could talk to a lawyer.  If he didn't or

25  couldn't reach his lawyer, then it was up to him to comply with

1    a subpoena and come to the court to explain what it was.

2         By him indicating to Ms. Kanof that there was

3    something that was somewhat on point to what we were asking for

4    in the subpoena and her telling what's directly on point, don't

5    present it, it shows that she interfered with the issuance of a

6    subpoena that was up to the Court to decide whether or not that

7    response that he would have given would have been compliant

8    with your subpoena order that you issued.

9         I think that she did ultimate representing of him when

10   we agreed to accept those documents and then she filed a

11   document with the Court asking for more time for him to comply

12   with it and for her to potentially do a motion for quash, which

13   I think promised standing with regard to that, because the

14   subpoena went to a third party, at least we thought not to his

15   attorney, which is apparently she became during this process.

16        So I think with everything that's happened, Your

17   Honor, by what she's told the Court here today, she definitely

18   created an attorney-client relationship with this witness.

19        MS. KANOF:  May I respond to a few factual

20   misrepresentations?

21        AUSAs never spoke to -- (indiscernible) told Mr. Fry

22   to tell Mr. Gireud to call his lawyer.  That's number one.

23        Number two, after this incident, I called Mary

24   Stillinger to ask her, do you still represent him?  And she

25   did.  In fact, I have an e-mail from her husband.  What Mary

1     told me was I don't know whether he tried to call me or not.  I

2     don't give my client my -- certainly, I give them John's, her

3     legal assistant.  She said I'll have to ask John.  She did say

4     something about Mr. Gireud not having paid her and then she

5     said I'll have John talk to him.  I got an e-mail from John

6     Godinez saying that he had talked to Mr. -- he did talk to

7     Mr. Gireud.

8              I received a phone call, and I think it's in the

9     footnote of our response time, last week from a familiar Colin

10    Hobbs, who's an attorney in San Antonio.  So, Colin Hobbs told

11    me that he was beginning his representation on that day, and on

12    that day Mary Stillinger's representation terminated.  So I

13    spoke with Mary Stillinger and she agreed.  She said, you

14    understand I am no longer -- she also sent me an e-mail -- you

15    understand I'm no longer the attorney.  And I said, as of when?

16    And she said, as of today.  And that was last week.

17             THE COURT:  All right.  Well, this is just a status

18    hearing.  Okay.  I'll let you put on whatever evidence you want

19    to put on Thursday after our final judge's conference, if you

20    have witnesses, whatever you want to do, make whatever record

21    you want to make, that's the time to make it.

22             Right now I wanted to find out about if Gireud was

23    actually served or not, what exactly he was served with.  And

24    if you give me the affidavit, I'll schedule him for a show

25    cause hearing and he can show me why I shouldn't hold him in

1    contempt for not complying with the subpoena.  I think he had

2    plenty of opportunity to comply.  He chose to go see the

3    Government.  I don't think there's anything wrong with that.

4    He can certainly do that, what he wants.  This is America.  And

5    so I don't see anything problematic with that.  And I'll give

6    you an opportunity to put on whatever evidence you want to

7    have.

8            I think that removing a member of the other branch of

9    government, that's a big deal, and so I would read the case

10   that you provided.  I just barely read Ms. Kanof's response

11   this morning.  But show me whatever cases you have where a

12   court has removed a prosecutor from a case and the reasons for

13   that.  Maybe this wasn't perfect what happened, but it's -- I'm

14   not at this point as offended as you are.

15           MS. FRANCO:  Right.

16           THE COURT:  So I'm going to give you the opportunity

17   to show me how I should take that kind of offense where I'm

18   going to remove Ms. Kanof from the case, who's apparently been

19   with this case for the longest time, remove all of the United

20   States attorneys from the Western District of Texas.  Show me

21   some authority and reasons why I would do something like that.

22           Here's the thing that concerned me is that the

23   Government received "X" amount of documents, sifted through

24   them, provided "X" minus "Y" to the Court and provided "Y" back

25   to Mr. Gireud.  Ms. Kanof said that didn't happen.

```
1              MS. FRANCO:  Right.  I guess we'd have to get them

2      from Mr. Gireud if that's the case.

3              THE COURT:  I'll give you the opportunity right after

4      our judge's conference of everything you want to put on, any

5      witnesses, whatever, at that time.

6              MS. FRANCO:  Okay.

7              Your Honor, since we're here at a status conference,

8      and I know that you need to start working or bringing in a

9      jury, there are some recent developments in the case you need

10     to be aware of that's happening that could potentially affect

11     this trial date next week.

12             The contract FGG, which is the company that

13     Mr. Delgado was involved in with Mr. Gireud, had entered into a

14     bid agreement or contract with the electric company in Mexico.

15     That's the CFE contract.  And it's a long contract with a lot

16     of attachments to that contract.

17             THE COURT:  Is it in English or Spanish?

18             MS. FRANCO:  It's in Spanish, Your Honor.  The

19     Government only translated two of the attachments to the

20     contract and so we have a problem now because the entirety of

21     the contract should have been translated from Spanish to

22     English.

23             I think the Government's position is that those other

24     attachments aren't necessary for their case.  Our argument is

25     Rule 106, which is a rule of completeness, if they're relying
```

1   on that contract, the contract is read as a whole, not just

2   cherry picking provisions out of the -- that account with the

3   Mexican government and our client Mr. Delgado.  It's

4   voluminous.

5          THE COURT:  Rule 106 is an evidentiary rule that deals

6   with admitting evidence, whether or not they should be putting

7   together that under the rule of contracts, but if they produced

8   the exhibits and you want the entire document produced, it's

9   your obligation to provide the translated parts that you want

10  to admit.

11         MS. FRANCO:  My point is back to the Court, if you

12  will with all due respect, is that improperly shifts the burden

13  to us since the Government is the one who's prosecuting

14  Mr. Delgado.  And so if they're going to offer in this contract

15  as proof of his fraud, because of his compliance or fraudulent

16  activity with regard to that contract, then the entirety of the

17  contract should be submitted to the jury and to the Court for

18  consideration and that has not been done.  And it's voluminous.

19  It's probably another 500 to 1,000s of pages of documents that

20  would need to be translated.  If the Court is to rule it's on

21  us to do it, I haven't done it.  I would need a court certified

22  interpreter and that can't be done by Monday.

23         THE COURT:  I can't argue with that.  I can tell you

24  that the rule of optional completeness is the rule of optional

25  evidentiary rule contract law who admits what and when.  And so

1    I'm not changing any burdens on anybody.  That's an interesting

2    argument, which certainly you can make, but the rule is the

3    rule.  They produce it.  And if you have something that should

4    come in contemporaneously, then you submit it.  If you need

5    time to translate the documents, if you need a certified

6    interpreter -- when did you get those documents?

7            MS. FRANCO:  Well, Your Honor, we've had them.  We

8    haven't got all of the attachments until relatively recently,

9    because all of this stuff has been trickling in.  So I think

10   now we have a complete set as a result of the subpoenas that

11   were served, and AUSAs and Mr. Gireud, that we now have the

12   complete set.  It hasn't been that long that we've had the

13   complete set.  The last time we were in court, the Government

14   had indicated they were going to be dropping translations on

15   us.  I don't --

16           THE COURT:  Approximately 5,000 documents.  That's how

17   much that --

18           MS. FRANCO:  5,000.

19           THE COURT:  -- that contract is page-wise?

20           MS. FRANCO:  I couldn't know.  I think that 5,000 is

21   kind of a lot; 3,000 pages is a lot.  It's a lot.

22           THE COURT:  There was a contract that was 3,000 pages.

23           MS. KANOF:  It's about 150 pages.  We produced it on

24   March 20th, 2014.  It was signed for by handwriting Sandra,

25   last name Duffy, maybe from the Federal Public Defender's

1    office.

2           MS. FRANCO:  They're misunderstanding what I'm saying.

3    I'm talking about all of the Mexican -- the attachments, the

4    exculpatory, those.  That's what I'm talking about, which were

5    attachments to the contract that are referenced in the

6    contract.  They're in the last page of the C -- yes, we've had

7    all of that stuff, but we haven't had the translations of all

8    of the -- I'm sorry -- the attachments to that contract.  And

9    they're attachments A through W.  They have translated S and T,

10   but not any of the other letters of the alphabet.

11          THE COURT:  When did you get the anexos (Spanish)

12   or --

13          MS. FRANCO:  Let me check on those, Your Honor.

14          MS. KANOF:  Your Honor, I can respond.

15          This FedEx package is the entire request from the

16   MLAT.

17          THE COURT:  I'm sorry, the request for what?

18          MS. KANOF:  M-L-A-T -- it's all caps -- stands for

19   Mutual Legal Assistance Treaty.  It has all of the anexos

20   except Anexo W, which has -- I think is three pages long -- no,

21   I'm sorry, Anexo W is 32 pages long.  And Anexo W is also in

22   both English and Spanish.  And this is the package that was

23   provided.  We received it March 12th of 2014.  And it's the one

24   I referred to you that was picked up by FPD in April.

25          MS. ARREOLA:  March 20th.

```
 1              MS. KANOF:  Oh, March 20th.

 2         We've pretty much turned over everything we do -- we

 3    got it, but the anexos are part of the MLAT production.  And

 4    what has trickled in are translations and --

 5              THE COURT:  Did the FPD represent him in 2014?

 6              MS. KANOF:  Yes.

 7         We'll get you the exact date, Your Honor.

 8         But they did sign for -- yes, this was actually

 9    produced -- the MLAT production which is the contract with all

10    of the anexos.  It was Anexo A through V, because Anexo W

11    didn't come through the MLAT.  We got it from Anexo W from

12    Mitsubishi.  And so that -- the Mexican government didn't

13    provide it to us.

14              THE COURT:  Did not provide it?

15              MS. KANOF:  They did not.  It did not come in the

16    MLAT.  And so we gave them the Anexo W when we did get it.  And

17    I don't remember when that was, but it was quite sometime ago.

18    It was --

19              THE COURT:  And you say that's three pages?

20              MS. KANOF:  It's 32 pages.

21              THE COURT:  Oh, 32 pages.

22              MS. KANOF:  32 pages.

23         And it's -- there're several versions of it.  We've

24    provided all of the versions that we received.  And it's

25    called -- Anexo W is called -- basically, it's a document --
```

1    it's a technical document in which Mitsubishi insisted that it

2    be included in the subcontract, because they insisted that

3    every one know that their generators did not meet the

4    specifications of the bid.  The generators were preexisting.

5              They were provided to them on March -- oh, the FPD

6    became counsel --

7              THE COURT:  Ms. Arreola can tell us if she wants.  I

8    mean --

9              MS. KANOF:  Oh, I asked her did she want to and I

10   don't think she did.

11             As to the -- his counsel, March -- March 19th of 2014.

12             Huh?

13             And we produced them the next day.

14             THE COURT:  All right.

15             Ms. Franco, do you agree with that?

16             MS. FRANCO:  Mr. Hanshew was talking to me, Your

17   Honor, so I don't --

18             THE COURT:  Oh, I'm sorry.

19             MS. FRANCO:  I'm sorry.

20             THE COURT:  She said -- she's saying that you-all

21   became counsel on -- in March of 2014, and the next day that

22   they provided that -- everything that's included in that FedEx

23   envelope, which included Anexos A through --

24             MS. KANOF:  V, Your Honor.

25             THE COURT:  -- V, and then W --

 1                MS. FRANCO:  Well, Your Honor --

 2                THE COURT:  -- and W came at a later date.

 3                MS. FRANCO:  At a later -- right.

 4           And during the course of our representation,

 5      Mr. Delgado, we had asked for the specks that were part of the

 6      contract and that was not included in the MLAT.  And so they --

 7      you know, these are the things that have been coming in.

 8                But you know it's interesting that they have the

 9      original MLAT that has the entirety of the contract, but they

10      don't -- but they didn't translate the entirety of the

11      contract.  And, yet, they want the Court, under their exhibits

12      to introduce a modified MLAT, which is I guess now is going to

13      exclude the entirety of those -- of the contract, leaving out

14      the ones that they didn't -- that they didn't translate.

15                But Your Honor, they have not been translated by a

16      certified translator, the other amendments to it.  I think that

17      we're going to be absolutely ineffective, because this is

18      important to our case to be able to use the other parts of the

19      contract.  When we were cross-examining Mr. Gireud, he

20      referenced CFE during the trial.  And it's our error, quite

21      frankly, that we assumed and you know said anything about that,

22      that those -- that the entirety of the contract and the

23      attachments would have been provided to us.

24                Part of the confusion is that Ms. Kanof was referring

25      to things that had trickled in like the translations is because

1    Mr. Hanshew and I can read Spanish, you know, we can read what

2    these are, but I'm not going to testify and tell the jury what

3    it is and I can't cross-examine that witness on it and that's

4    part of the problem.  So recently, the other -- so there's that

5    issue.

6          The other issues are that they provided some *Brady* and

7    *Giglio* to us, which is probably five or six pages that's

8    Spanish.  I asked if they were going to translate that for us

9    and they said, no.  So there's that.

10         And very recently, Mr. Pimentel from the first case

11    has now risen his head in this case and has now changed the

12    theory of the Government's case as to how this contract was

13    entered into within FGG.  Mr. Delgado needs to be -- CFE is now

14    claiming that bribery was involved in it.

15         On Friday afternoon, Mr. Jose Luis Gonzalez gave us

16    the contact information for Mr. Pimentel, so that we can talk

17    to him to find out about this impeachment material with regard

18    to Mr. Gireud and some of the other potential individuals that

19    the Government is going to have.  We need the opportunity to

20    track him down.  We do have his phone number.

21         THE COURT:  When did you get that notice?

22         MS. FRANCO:  On Friday.  And we're in the process of

23    trying to locate him, but the Government also told us he's in

24    the process of moving, so he's sort of a moving target.  And if

25    we do decide we want to use him, we'll have to have them served

```
 1    again and ask for a subpoena for him, which is not going to be,

 2    you know, like that.  It wouldn't be quick.  So...

 3           THE COURT:  Do I have to get him counsel?  Do I have

 4    to have counsel if you subpoena him?

 5           MS. FRANCO:  I don't know on that, Your Honor, but...

 6           THE COURT:  I'm trying to remember from the other

 7    case.  Pimentel wasn't -- it was the young guy --

 8           MS. KANOF:  He's the informant.

 9           THE COURT:  -- from UTEP.

10           MS. KANOF:  I can respond to all of this.  Would you

11    like me --

12           What happened was when it got to be close to 14 days,

13    the Government started providing Brady and Giglio on 2014, as

14    soon as we learn about it, but at the time to be complete,

15    Ms. Arreola recalled that during debriefing, Pimentel knew

16    Delgado very well.  They were friends.  And that during

17    debrief, Pimentel made a comment about Gireud having something

18    to do with a bribe in this case.  So we decide to call him to

19    clarify it, so that -- we never discussed it because it didn't

20    have anything to do with that case.  And Frankly, I didn't know

21    about this case at the time.

22           And so we made that phone call in participation of our

23    deadline.  We made it with Mr. Gonzalez present, two agents

24    present.  And what Mr. Pimentel told us does not in any way

25    change, shape or form, change the Government's theory.  The
```

KATHLEEN A. SUPNET, CSR

1    Government did not charge Mr. Delgado with a violation of the

2    Foreign Corrupt Practices Act.  Of course the Government did

3    not charge Mr. Delgado with obtaining the contract by bribe.

4    The Government recognizes that's how you get contracts in

5    Mexico and did not -- that's not the gravamen of the

6    indictment.  He's charged with a bunch of lies to steal money

7    from the contract.  And Mr. Gireud, I think the testimony will

8    show, didn't know that was happening.

9         But we do have a *Brady* obligation to the extent that

10   it could possibly be considered *Brady* or *Giglio*.  We called

11   Mr. Pimentel and he told us that he recalled that Mr. Delgado

12   sent Mr. Pimentel and Mr. Gireud to an individual named Nervo,

13   N-E-R-V-O, Vargas.  He's not the actual head of the electrical

14   union, but he's the functional head, very, very powerful man.

15   If he doesn't send his workers to the power plant, it doesn't

16   get built.  And Mr. Pimentel's family had been friends with

17   Vargas.  Delgado met Vargas and became very close to

18   Mr. Pimentel and said Mr. Vargas does work by bribes.

19        So he said Mr. Delgado sent him and Mr. Gireud to

20   Mr. Vargas to find out what he wanted to get the contract.  So

21   we -- he also -- so we brought Mr. Gireud in to ask him about

22   it on Sunday, again, with everybody present.  And in fact,

23   Mr. Gonzalez was the lead inquirer -- inquirer about it.  And

24   so Mr. Gireud did admit he assumed that that was the way they

25   had to get a contract.  He not only said that, he didn't recall

1      what specifically Mr. Pimentel said, specific instance, but he

2      did say that, you know, he knew that that's what Delgado was

3      doing.  He turned a blind eye to it.  But there was a specific

4      instance where they were in Las Vegas where Mr. Vargas goes and

5      asked Mr. Gireud for $5,000 for a bribe, and Mr. Gireud said,

6      no, because he didn't have $5,000.

7              So it has nothing to do with the Government's theory

8      of the case.  It was merely an obligation for impeachment.

9      They can ask him, Mr. Gireud, till the cows come home, bribe

10     the Mexican Government.  I don't care.  It doesn't have

11     anything to do with what is charged with the indictment, how

12     the contract -- everybody looks at that contract and this must

13     be a bribe because the other two bitters were General Electric

14     and Siemens of Germany.

15             Now, FGG, which was recently formed in a corporation

16     out of El Paso with one member, Mr. Gireud and -- and to --

17     Your Honor, Mr. Delgado could have gotten that contract, you

18     know, a kindergartner would have known it was a bribe.  It

19     isn't a surprise to anybody nor believed or understood or

20     turned a blind eye that that's how they were getting contracts.

21     That's what Mitsubishi thought, I am sure.  But that's what

22     really happened.  So there's no change in theory going on here.

23             With regard -- and I agree with the Court's

24     interpretation to the rule of completeness and translation.  I

25     would just, if the Court will indulge me, I'd like to give some

1    law.

2         THE COURT:  That's always a good --

3         MS. KANOF:  Well, I have this planned, so if the Court

4    will indulge me.

5         UNKNOWN SPEAKER:  Your Honor, may I say something

6    before to make a little correction here.

7         The Government is not saying that all contracts

8    entered in Mexico are by corruption.  I don't want to believe

9    that.  I don't want somebody to go out and report that the

10   United States is taking that position, because I want to make

11   that clear for the record.

12        MS. KANOF:  I'm glad he said that, Your Honor.  The

13   majority of businessmen in Mexico are probably honest, but

14   having prosecuted a whole lot of Americans for taking bribes

15   for contracts here in El Paso, I didn't mean to imply that

16   Mexico was the only location or that that was the only way they

17   did business, so I do apologize if I left that impression.

18        Your Honor, in talking about the rule of completeness,

19   Whitmore liked to (indiscernible) McCormick, would quote, could

20   hold up the Bible and say, there's no God, because in the Bible

21   there's a quote that says there's no God.  But rule of

22   completeness, the believer would have entitled -- be entitled

23   to give the entire quote, which is the fool hath said in his

24   heart there's no God.

25        But what the Fifth Circuit says about that it is

1    incumbent on the opposing party if they think the portion that

2    has been placed into evidence is not complete, well, could

3    have -- or confuse the jury, they have an obligation.  And that

4    obligation according to *U.S. v. Garret*, 716 F.2d 257 is that

5    they must show -- or at least a better case, *U.S. v. Crosby*,

6    713 F.2d 1066 -- they must show precise that the portion they

7    wish to admit at the time encourages completeness, that it is

8    relevant, that it will assist the jury and that -- and also

9    that it's admissible, that --

10            And in this particular case, I will tell the Court one

11   of the reasons the Government did not translate everything, and

12   one of the reasons that they only proposed to put in those

13   parts that are relevant is because unlike the United States,

14   Mexico still uses lots of legal jargon that is meaningless

15   pages and pages of irrelevant stuff, explain who people are,

16   "whereas" and "therefore" and all of that kind of stuff, we

17   could not afford the money to translate.  But in addition to

18   that, in this particular case in these documents, the

19   Government believes that putting the whole document in would

20   actually confuse the jury more.  So the government in its

21   case-in-chief chose to provide those documents and translate

22   those documents and translation that would in our opinion prove

23   the Government's case and assist the jury.

24            The defense can stop us when we put that in and show

25   the Court it will confuse the jury in -- if that's all in

1    there, this portion needs to be in here, too, and we've

2    translated it and it needs to go in right now so as not to

3    confuse the issue and it's relevant to the issue and we, of

4    course, have no objection to that because it's consistent.

5           I do have case law on the translation issues as well,

6    but I think --

7           THE COURT:  Case law on the translation issues?

8           MS. KANOF:  -- on whether or not we have to translate,

9    we don't.

10          THE COURT:  Oh.

11          MS. KANOF:  But the Court has already -- I have many

12   cases from every other that agrees with the Fifth Circuit.  The

13   Fifth Circuit is pretty strong about not having a requirement

14   to put in the whole document and it basically is incumbent upon

15   the true believer.

16          THE COURT:  Did they talk about the burden of

17   shifting?

18          MS. KANOF:  There's no burden of shifting, Your Honor.

19   Never saw a burden of shifting in any of the cases.

20          Does the Court have any other issues that need to be

21   addressed?  I did want to give them a couple of cases and *U.S.*

22   *Branch*, another case -- it's another Fifth, 91 F.3d, 699, and

23   opposing party has to provide relevancy, but they have to do it

24   with, quote, particularity, relevance, necessity and explain

25   how it would be required in that place in context so that the

```
 1    jury can understand it.
 2            THE COURT:  But those cases are limited to the rule of
 3    optional completeness.
 4            MS. KANOF:  They are.
 5            THE COURT:  They can always, but it in their case in
 6    chief.
 7            MS. KANOF:  They're all Rule 106.
 8            THE COURT:  Yeah.  Okay.
 9            MS. FRANCO:  Your Honor?
10            THE COURT:  Are we in a big hurry to try this case?
11    If the Public Defender wants time to translate the "but fors"
12    and "heretos"...
13            MS. KANOF:  My only concern, Your Honor, is speedy
14    trial.  This will be the ninth --
15            THE COURT:  They did waive speedy trial, right?
16            MS. FRANCO:  Yes, Your Honor.  If we've -- if I could
17    let Mr. Hanshew take over, because I'm --
18            THE COURT:  Oh, yes.  I'm sorry.  And thank you,
19    Ms. Franco, for being here and offering your voice for what you
20    could.  Hope you feel better.
21            MR. HANSHEW:  Thank you, Judge.  I'll be the voice
22    from now on.
23            I think the last question is really relevant here
24    which is I did confer with Mr. Delgado myself about the issues
25    that have come up in the last week which -- and to get his
```

1    response in terms of if he would have any opposition to

2    continue with the trial in this case.  He indicated he would

3    not.  He would waive speedy trial consideration.  And I just

4    wanted to just quickly summarize.

5            In total, I think that the issues in the last two

6    weeks that have come up at the forefront is this issue about

7    whose obligation it is to provide the interpretation -- the

8    English interpretation, certified, no less, of this contract.

9    And I won't repeat everything Ms. Franco indicated, but in

10   terms of the rule of completeness, yes, I'm not disagreeing

11   with the Court's commentary about, you know, how that happens.

12   Obviously, the direct party puts their evidence, the opposing

13   party can then say you need to include, you know, "X" "Y" and

14   "Z" to make that complete, and that is the process.

15           The wrinkle in this is that frankly I think our

16   offices have been trying, and one of the only things we've been

17   able to work out in total of this is the passing of the

18   information in terms of translations.  And the Court will

19   remember Ms. Kanof, not the sentencing in the last case, the

20   last hearing in this case, even acknowledged presentencing

21   concerns about later disclosures of translations.  She

22   indicated we'll be providing those as we go.  For better or

23   not, we took that to understand that there would be

24   translations of all of the pertinent documents.

25           It's undisputed from the Government that this contract

1    and the anexos (Spanish), the annexes that are attached, which

2    are incorporated by reference and the specifications which even

3    Ms. Kanof raised earlier, complete and make up what is the

4    contract.

5          THE COURT:  When did the defendant get the

6    translations?

7          MR. HANSHEW:  We received -- oh, gosh, Judge.

8          THE COURT:  What I don't want is for both of you to be

9    spending money on translating the entire document.  It makes

10   sense to receive the portion she wants and then you translate

11   the portion you want.

12         MR. HANSHEW:  And that is exactly the point where we

13   got to last week, which is -- the short -- and I'll take

14   responsibility for this.  I should have probably long ago said,

15   please identify which specific ones you're going to provide and

16   by what date that was going to happen.  Instead what occurred

17   was last week, Ms. Franco spoke with Mr. Gonzalez to confirm

18   that there would be the rest of this, what we thought the rest

19   of the translation was coming, and we were told that was the

20   end of the translations, which obviously caused this, you know,

21   this rift and great concerns on our parts and the back and

22   forth about whose responsibility it is.

23         The documents as they are shown, that's part of it,

24   but the specifications are part of it.  And I can, just by

25   visual -- I couldn't give you a page count -- but we have in

1     our office two binders full.  And I know in the conversations

2     between Mr. Gonzalez and Ms. Franco, you know, there was visual

3     discussions of documents, you know, knee high, plus it's the

4     type of thing that had not been certified -- hadn't received

5     certified translations, grave concerns of economics, you know.

6           From the Government's perspective, they indicated that

7     DOJ was not going to do -- spend the resources to do that.  You

8     can imagine if DOJ is concerned about their resources, our

9     little public defender office in a district, you know, is

10    concerned about the finances.

11          That being said, we're obviously at a point now, and

12    that's why I raise it with this Court that -- to take the

13    Court's guidance, it appears that what the Court is indicating

14    today that, you know, it would be -- the burden would be on us

15    to do that, which, you know, we will -- we'll do if that's

16    what's required, but it's going to take time.  These

17    translations take time.  I know we've seen from the Government,

18    and Ms. Kanof explained last time, the translations will be

19    coming as time passed, because it took some time and effort.

20    It's going to take us time to do that as well.

21          So in terms of asking for a continuance and speedy

22    trial concerns, that's the first and foremost problem we have

23    in front of us.

24          The other issues have been the submission of *Brady* and

25    *Giglio*.  And to be clear about this so that there's -- I'm not

implicating bad faith on the Government, that component of it,
but the Government complied with the Court's scheduling order,
which was to provide *Brady, Giglio* two weeks before trial was
the scheduling order on May 9th.  We received letter
information attached to that from Mr. Gonzalez detailing that
information.

       What had been accompanying that over those few weeks
as well, as soon as Mr. Gonzalez noticed his appearance in this
case, had been their continuing discovery obligations is, I
think they word it, they were meeting with witnesses and
providing new information.  And this -- it wasn't just random
information.  It wasn't extrinsic.  It wasn't irrelevant
information.  It was, for example, the chief attorney for CFE
that's involved in this was investigated and found in the wrong
by Mexican government agencies as it relates to this contract.
It was, for example, last week, finding out that Mr. Pimentel
had recently been interviewed and provided this information
that their star witness, Mr. Gireud, that we heard and talked
about and was emotional about how closely he felt to this
person, lied and was actually at a meeting by himself with Mr.
Pimentel, summons Mr. Delgado to set up a bribe in this
contract.  So this isn't just, oh, by the way, information
about some, you know, random letter.  This is information that
impeaches and in fact implicates their witness in that crime
that relates specifically to the contract that's at the heart

1   of this case.  The heart of their case is about what

2   Mr. Delgado was authorized or not to do in terms of this

3   contract and obligations of the various parties.  So this is

4   the type of information we get.  We get as you heard that

5   Mr. Pimentel is out of state moving and we have a phone number.

6   We don't know if he's represented by counsel.

7          And I think the Court raised an excellent question.

8   Should the Court appoint counsel?  I frankly would ask that the

9   Court do that, because I don't want to get involved in another

10  Gireud, you know, escapade here.  We don't want to speak to

11  someone who isn't represented by counsel, that's why we reached

12  out to Mary Stillinger, who received court materials, talked

13  about accepting service.  And she said, well, I haven't talked

14  to him for so long.  You know, I don't think I'm his lawyer

15  anymore.  So here's Rene Ordoñez, otherwise, our office doesn't

16  want to and I am sure the Court wouldn't want me to unless it's

17  compelled.

18         So by grave contrast, I can tell the Court that

19  dealing with Matt Herrington, the attorney for FPSA on this

20  case, which I did on a regular basis throughout their

21  submissions to this Court, was a pleasure.  It was the normal

22  process.  It was two lawyers meeting, conferring, not once to

23  be clear to clarify something, not once did he in all of

24  discussions we have indicate that he was going to file a motion

25  to quash.  In fact, the only issue that even remotely got to

1    that was questions about attorney/client privilege, particular

2    areas addressed there we worked that out.  And you saw by the

3    cover letter attached, this is how that process works, a lawyer

4    to lawyer, meeting, conferring, and they submit the documents

5    to the Court.

6           But again, I think as far as Mr. Pimentel is I think

7    he should have an attorney.  His statements implicate him in a

8    crime.  His statements implicate their star witness is a

9    client.  He also -- Ms. Kanof left out his statements -- not

10   only do they implicate Mr. Gireud, their star witness as being

11   involved in a crime with him with Mr. Delgado at that time, but

12   we received the *Brady*, *Giglio* from the Government, which are

13   the statements that Mr. Gireud had been giving to the

14   Government and none of that included admissions by Mr. Gireud

15   that he had been involved in the bribe scheme with

16   Mr. Pimentel.  So it appears he has also broken whatever

17   agreements he has with the Government.

18          So again -- and this is the type of information that

19   we now as of Friday have a phone number for that we have to

20   investigate, reach out to, perhaps subpoena this individual and

21   go through this process, which makes again a Monday trial date

22   an impossibility for us in this case.  And that is the issue

23   that has been partly -- I think, we have reached the end of the

24   road, because hopefully the Government at this point, and what

25   they've done in the last two weeks in the run of this trial has

1    given us everything now, now that they've spoken with this

2    witness, received new documents, new testimony and statements

3    from them.  And they have been, you know, as Mr. Gonzalez has

4    been diligently, you know, providing to Ms. Franco and myself,

5    that part has been done, but it's only fair and due process at

6    this point that we be allowed to actually investigate and

7    prepare that information for a trial which is an impossibility

8    for Monday, Judge.

9              THE COURT:  I'm not taking up a motion to continue

10   right now.  This was just a status hearing.  We'll take up all

11   of these motions on Thursday and give everybody a chance to

12   subpoena witnesses, put on whatever you want.  We'll be here

13   all afternoon and night to get that done.

14             I'll tell you what my impressions are, which are

15   subject to change.  These are not set in concrete.  My first

16   impression is I probably will grant the continuance based on

17   that.  My first impression is I don't think that what happened

18   here is so egregious that I would take that extraordinary step

19   of removing a member of the other branch of government from

20   this case.  If there are any ethical or other criminal

21   concerns, that's going to be somebody else's issues.  It's not

22   mine, because it doesn't impact the fairness of the trial to

23   your client.  That's what I was primarily concerned about,

24   whether there were any documents that were removed from the

25   stack that was produced.  That concerned me.  I don't think

1    that's happened.  I'll give you an opportunity to prove that it

2    did happen at this hearing.  My general impressions, what I

3    heard, I'll probably grant you a continuance.  I can be

4    convinced this is so egregious that I would have to remove all

5    of the AUSAs from the Western district, but that's not my first

6    impression.

7            MR. HANSHEW:  I understand, Judge.  One issue relates

8    to the issue for Thursday on the motion to dismiss and

9    disqualify.  The only way we would be able to have witnesses,

10   which would obviously be Mr. Gireud, the Government, its agent,

11   would be through subpoena.  Any subpoenas for the Government or

12   its agents are subject to Touhy, which is a process that would

13   take longer.

14           THE COURT:  What's Touhy?

15           MR. HANSHEW:  Touhy?  It's a case.  And it basically

16   requires that there's more extended administrative process to

17   get the approval from the Department of Justice on when you

18   subpoena federal agents and/or prosecutors and also the issue

19   with Mr. Fernando Gireud.  I can reach out immediately to his

20   new counsel, who I found out is his son's law partner, and ask

21   if he'd accept service for subpoena, but I don't know if he

22   would do that and/or if he would be available for Thursday.

23   I'm putting it out there.  I don't want to -- to happen

24   Thursday and say, Judge, we're out this, but the Touhy process,

25   the Government can speak better to how long that is, but it's

1    definitely not a two-day turnaround.

2             THE COURT:  Ms. Kanof?  I mean because, basically,

3    that's going to force me to decide the continuance right now if

4    having the hearing is going to take us beyond the trial date.

5             MS. KANOF:  Your Honor, if I can also respond to a few

6    misstatements made by Mr. Hanshew.  We'll get a copy for the

7    Court to put in evidence.

8             On July 16 of 2014, that's almost two years ago, the

9    Government sent its first discovery letter.  And we have

10   receipts from FPD.  We have practiced in this case -- in the

11   past, the Government likes to notify (indiscernible) --

12   meeting, potential agent, AUSA's case agent takes notes and

13   commits these notes to writing.  While these statements are not

14   technically Jencks material, we have in the past permitted your

15   client, former counsel, to read these.  And other agent again

16   memorialized interviews in the U.S. Attorney's office in

17   advance of trial.  We are extending that offer to you as well.

18            The letter goes on, but it includes two single-lined

19   summaries of the first interview we had with Miller and

20   Fernando Gireud.  We extended that invitation two years ago and

21   the defense never took us up on it.  We extended an invitation

22   for the defense to come over and look at records that were hard

23   to copy like bank documents, and the defense never availed

24   themselves to that invitation.  We have many, many discovery

25   letters, because it is Ms. Arreola's and my practice to do

1    that.  We did it with Mr. Esper and Mr. Velarde, who did avail

2    themselves in many cases.

3          This -- Mr. Hanshew seems to have the impression that

4    Mr. Gonzalez came into this case and was providing them with

5    things.  No, that's not what happened.  Ms. Arreola and I were

6    providing them to Mr. Gonzalez to forward.  He was just an

7    intermediary on our behalf.

8          The attorney, Mr. Moreno Nunez, we didn't know he was

9    going to be a witness.  He came to El Paso a couple of weeks

10   ago and immediately, and during that interview, told us not

11   that he had -- what he told us is he had investigated an

12   administrative proceeding in which they blamed him in 2014 for

13   having been present at the opening of the bids and having not

14   taken action to point out to them some irregularities in the

15   bids.  He said I'll send it to you.

16         He sent it to us.  We sent it by e-mail immediately

17   that day to defense counsel.  There is nothing that we have

18   provided them that we did not give to them within a day or

19   maybe two days of what we received.

20         As far as talking to Mr. Gireud and Mr. Pimentel,

21   defense counsel has turned due diligence into nefarious

22   conduct.  We didn't have to do any of that and they wouldn't

23   have known.  They didn't have to make a motion to extend and

24   they wouldn't have known, but we did.

25         It's just very difficult -- Francisco Moreno Nunez is

1    not the chief attorney general for CFE.  He is a subs --

2    sub-deputy at the time, just happened to do some rough drafts

3    and CFE offered him with knowledge.  He's one of the few people

4    that's still there.  There's another attorney that we spoke

5    with.  He had some knowledge and he's also going to be a

6    witness.  He didn't have Spanish.

7            And then there's a substantive witness and we also

8    told them his name is Buendia, that he's going to testify, none

9    of which we had to do.  We've been extremely open and we have

10   every discovery letter, every receipt.

11           If this Court will remember, in its first motion the

12   knee jerk reaction that we gave them so much material, and of

13   course the Government provided the Court with the Bate stamped

14   numbers provided two years before, but evidently the defense

15   attorneys were unaware of what they had.

16           With regard to Mr. Hanshew's dealing with

17   Mr. Herrington, the letter speaks for itself.  Again

18   Mr. Herrington provided Bate stamped numbers of things that

19   defense counsel has had more than two years and violation 17(c)

20   subpoena.

21           He -- the most interesting thing Mr. Hanshew said is

22   that Ms. Franco said Mary Stillinger said she was not his

23   attorney, and Ms. Franco -- Mr. Hanshew just said

24   Ms. Stillinger said I don't even think I'm still his attorney

25   or his lawyer.  That's not even consistent with each other.

1    They want to call Mary Stillinger.  I can only represent to the

2    Court what she told the Government and that was that she was.

3          But Your Honor, the Government has no objection in the

4    interests of truth and justice in the court system to a

5    continuance.  They do have an objection when both the actions

6    of the Government are misrepresented as is Mr. Gonzalez was

7    brought in because myself or Ms. Arreola had done something

8    wrong, he was not, and as if the Government has not complied

9    with their obligations, because they have.

10          THE COURT:  Well, you know, when the zealous advocates

11    meet in the well of the court, it often creates such friction

12    that it seems much more important to the applicants than to the

13    Court.  The bar here at the bench somehow insulates the Court

14    from those sort of engagements between the litigants, and I

15    certainly -- I listen to advocates.  I don't take a lot of that

16    to heart to mean anything.  Here's a zealous advocate

17    representing their client to the -- we should be very grateful

18    tries cases, because trials are starting to disappear, and I

19    just -- I don't know any lawyers who spend all of the time to

20    go to law school and getting barred that don't have a very

21    basic desire to be at trial.  And you-all are very lucky that

22    you get to be in trial, because there's a lot of people, really

23    smart lawyers, who don't get that opportunity.  And I've had a

24    lot of people come through my chambers, brilliant minds, that

25    never get the opportunity to go to court much less trial.  And

1   it's a great opportunity we have.  So we shouldn't let the

2   zealous advocacy destroy what is otherwise kind of a pleasure

3   we all get to enjoy, those of us that get to participate in the

4   courtroom.

5          Anyway, Mr. Hanshew, I didn't mean to interrupt you.

6          MR. HANSHEW:  I'll close with the part that just to be

7   clear as I said in my -- no way what I said to say that they

8   have been acting nefariously.  I actually opened with that.

9   And my comments about -- just to be clear about Mr. Gonzalez,

10  that's where it came from and I received it and I appreciated

11  it.

12         And I appreciate the Court's comments.  I'm very proud

13  to be an officer of the Court.  I know they are as well, Judge,

14  and we all look forward to coming here and giving Mr. Delgado

15  his constitutional right.

16         THE COURT:  All right.

17         MR. HANSHEW:  Thank you Judge.

18         MS. KANOF:  I have a legal matter, Your Honor.

19         THE COURT:  Mr. Garcia?

20         MS. KANOF:  If you do plan on continuing the case,

21  he's our speedy trial expert.

22         THE COURT:  Is there a problem?

23         MS. KANOF:  I don't know if there's a problem,

24  although the defendant waives the -- may waive or is

25  waivering --

```
 1              THE COURT:  I have no problem if you draft the order
 2      drafting an order for continuance.
 3              MR. HANSHEW:  I have no problem.
 4              THE COURT:  And Mr. Delgado, I'll ask you since you
 5      are here.  Do you have any objection to the motion that I
 6      expect to get from your counsel that they move to continue the
 7      trial setting for next Monday, May 23rd?
 8              DEFENDANT DELGADO:  None.
 9              THE COURT:  And would you waive any speedy trial that
10      you have with the statute?
11              DEFENDANT DELGADO:  Yes.
12              MS. KANOF:  We have witnesses under subpoena for
13      Monday, Your Honor, and you know reservations and hotels and
14      airplanes...
15              THE COURT:  And I know that, too.  I know that
16      sometimes these continuances are a burden on the Government.
17              MS. KANOF:  I'm not saying that -- I just wanted to
18      know whether or not they should still be on standby.
19                              COURT'S RULING
20              THE COURT:  No.  I'm going to grant the motion.  I
21      will grant the motion now so it's on the record.  If you bring
22      the order, I'll sign that order.
23              And I appreciate all of the hard work that you do on
24      behalf of the Government.
25              Mr. Hanshew, I always appreciate the hard work that
```

1   the public defender does and excellent work in representing

2   their clients.  It's a blessing to participate in trials where

3   counsel is so competent on both sides.  It's a nightmare if

4   you've ever had to -- where that's not the case.

5        MS. KANOF:  Your Honor, are you going to postpone the

6   Thursday hearing to give --

7        THE COURT:  We can.  That way -- because I'm hearing

8   Mr. Hanshew say I'm going to look up Touhy.  I didn't realize

9   the defendant had to ask permission of the Government to

10  subpoena the Government.

11       MS. KANOF:  Not -- basically they have to make a

12  request to homeland security and they have to submit the

13  questions they would ask the agent.  We can probably hurry up

14  that process and then they have to do the same if they're going

15  to call myself or Mr. Gonzalez or Ms. Arreola to the Department

16  of Justice.  And then I think we can expedite -- Eddie

17  Castillo, our civil attorney handles the request in my office

18  and other requests in that that's what you want me to ask.

19       And with regards to the setting of the trial, Your

20  Honor, we did communicate all of our conflicts or dates of

21  rescinding a trial and our biggest concern is the case agent

22  Josh Fry being -- went to the Secret Service to do protection

23  detail for the -- and that is for the United States Presidency.

24  He will be called intermittently and hopefully have the dates

25  in advance of having to do that, but...

1          THE COURT:  Should I just allow the two of you to

2     agree on a date and just notify the Court?

3          MR. HANSHEW:  Two months?

4          One, I think we can meet, confer on the Touhy subject

5     and get that narrowed out and, two, meet on those dates.  We

6     can for sure have the date today with a proposed order.

7          Is that okay, Ms. Kanof?

8          MS. KANOF:  (Nodding head affirmatively.)

9          THE COURT:  A trial date and date for the hearing put

10    on whatever --

11         MR. HANSHEW:  Yes, Your Honor.

12         THE COURT:  -- Touhy.

13         Anything else?

14         MS. KANOF:  Nothing further.

15         MR. HANSHEW:  Nothing further.

16         THE COURT:  We are adjourned.

17         (Proceedings concluded at 11:21 a.m.)

18                          *  *  *

19

20

21

22

23

24

25

1                         * * * * *

2              I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of

6    the United States.

7    Signature:/S/KATHLEEN A. SUPNET          September 7, 2018
             Kathleen A. Supnet, CSR          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25