```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                       EL PASO DIVISION

 4                      VOLUME 7 OF 20

 5

 6   UNITED STATES OF AMERICA          EP:13-CR-0370-DG

 7   v.                                EL PASO, TEXAS

 8   MARCO ANTONIO DELGADO             September 6, 2016

 9                         STATUS HEARING
10              THE HONORABLE DAVID C. GUADERRAMA
                   UNITED STATES DISTRICT JUDGE
11

12

13   APPEARANCES:

14   For the Government:   Debra Kanof
                           Anna Arreola
15                         Luis Gonzalez
                           Assistant United States Attorney
16                         700 East San Antonio, Suite 200
                           El Paso, Texas 79901
17
     For the Defendant:    Maureen Franco
18                         Erik Hanshew
                           Assistant Federal Public Defender
19                         700 E. San Antonio, Suite 410
                           El Paso, Texas  79901
20
     Court Reporter:       Kathleen A. Supnet
21                         El Paso, Texas
                           (915)834-0573
22                         kathi.supnet5303@gmail.com

23

24            Proceedings reported by mechanical stenography,

25   transcript produced by computer-aided software and computer.
```

CHRONOLOGICAL INDEX

VOLUME 7 OF 20

SEPTEMBER 6, 2016                                    PAGE    VOL.

Announcements. . . . . . . . . . . . . . . . . 3       7

Status Hearing . . . . . . . . . . . . . . . . 3       7

Court Reporter's Certification . . . . . . . . . 37      7

1           (Open court.)

2           THE COURTROOM DEPUTY:  EP:13-CR-370, Marco Antonio

3      Delgado.

4           MS. KANOF:  Good afternoon, Your Honor.  Debra Kanof,

5      Anna Arreola and Jose Luis Gonzalez for the United States.

6           THE COURT:  Good afternoon, Ms. Kanof.

7           MR. HANSHEW:  Good afternoon, Your Honor.  Erik

8      Hanshew and Maureen Franco on behalf of Mr. Delgado.

9           THE COURT:  And good afternoon, Mr. Hanshew.

10          I think we set this matter on your request.

11          MR. HANSHEW:  If I may, Judge.

12          THE COURT:  Yes, sir.

13          MR. HANSHEW:  We -- last week -- I'll go through a set

14     of chronology -- last Wednesday afternoon, we received the

15     first set of documents from the government in this case which

16     were -- I have a copy here and they're double-sided.  The first

17     batch was about 270 pages of untranslated Spanish documents.

18     They're an opinion by the Secretario in Mexico, as to -- in the

19     first batch, as to the lead legal counsel for C.F.E. and the

20     reprimand and opinion on -- as it relates to his involvement

21     and failings and the such on the contract that's part of this

22     case, Judge.

23          The following morning, Thursday, September the 1st,

24     about eight-something in the morning, the government provided

25     also via disk, due to it's volume as well, another opinion

1    which I have here, double-sided, that's also untranslated in

2    Spanish, as it relates to one of the chief engineers on this

3    contract, the C.F.E., M.P.S.A. and F.G.G. contract, Judge.

4         And I want to make clear for the record that the

5    government -- these were not promulgated or decided until

6    August 3rd or 4th based on the dates of the documents, and we

7    believe that, you know, the government, Ms. Arreola, handed

8    these over to us contemporaneous to her receiving them as well.

9    So this is not, you know, there's no complaints, and we

10   appreciate and told her as much already that we appreciate the

11   timely disclosure of these documents.  But what that has led to

12   obviously is that we're here having to ask for a continuance in

13   this case, Judge.  These documents, as I've mentioned, are --

14   there's no translations for it, let alone any type of certified

15   translations.

16        In our review of these and reviewings with our client,

17   you know, they go to the heart of what this case is about.  And

18   in fact, they impune to C.F.E. employees, lead employees that

19   were involved in this, so much so that we've learned that it's

20   the government's intention not to bring these two any longer,

21   one, which is the engineer, Mr. Buendia, the result of the

22   order in here that he was actually terminated from C.F.E.  So

23   we spoke with on Friday, Ms. Franco and I, and we contacted the

24   C.F.E. lawyer, Mr. Buendia is now no longer in the control of

25   C.F.E. and/or as part of the MLAT or any type of agreement and

1    is not being brought by the government.  The government

2    provided the name and the contact number for Mr. Buendia's

3    lawyer.  We called that number and left a voicemail on Friday

4    as well.  To date, we've received no return call.

5        And then we learned late Friday that the government

6    has no intention of bringing Mr. Moreno, Francisco Moreno.  He

7    is the counsel who was involved in this case.  We believe

8    that's significant in telling of these reports, these opinions

9    about their misconduct and misfeasance, and that previously,

10   those two -- the C.F.E. attorney told us those two individuals

11   had actually been flown out from Mexico City to El Paso to meet

12   and be prepared by the government counsel in this case.  And

13   now they are no longer coming.  They're off in Mexico City,

14   Judge.

15       We also, on Thursday last week, I contacted our

16   translator who had worked on the previous translations to check

17   on her availability over the next couple of months as well as

18   get an estimate of the amount of time it would take for this

19   type of document and the volume of it.  Those are the two

20   qualifiers that they -- to get an estimate on; however, her

21   estimate was about a three-month period.  What it was that she

22   said they could do about ten pages a day, and we have about

23   600 pages of document, which would be 60 days if you were to be

24   working every single day, which obviously, you know, she's not

25   going to be able.  She works for this court as well as Las

1    Cruces and has other projects.  You know, a conservative

2    estimate from her was three months.  From our prior hiring of

3    her I can tell you, you know, we hired her and it took the

4    entirety of the summer to do about 400 pages that we had

5    translated and provided to the government last week, Judge.

6           So the first phase of this in terms of our request for

7    continuance is to get these translations done so that we can

8    have them, have them be available so that we can, you know,

9    submit them to the Court as proper evidence and have a

10   certified translation.  It will also then, at that point, we

11   are going to, because of what's happened with these two what

12   were government witnesses and now non-Government witnesses,

13   is initiate proceedings for extraterritorial discovery as it

14   relates to these two.

15          It was made clear to us that Mr. Buendia, since he's

16   terminated, is no longer in any C.F.E. control, so we're going

17   to have to try to track him down in Mexico City ourself and try

18   to initiate some type of proceeding.  You know, we've been

19   looking at Rule 15 proceedings as well as some of the other

20   rules of, you know, extraterritorial discovery, but those we

21   can't even initiate, so we actually have the translations,

22   because those are what would be the subject to, for example,

23   depositions and such, Judge.

24          THE COURT:  Why is all of this relevant about those

25   two?

1          MR. HANSHEW:  About those two individuals?

2          They are the two C.F.E. employees that were the

3     integral in the negotiation and execution of the contract

4     that's the subject of the indictment, Judge.

5          MS. KANOF:  I have to object.  That's not in the

6     statement of facts of the case.  They didn't have anything to

7     do with negotiations at all.

8          THE COURT:  But they did with the execution?

9          MS. KANOF:  Nor the execution, Your Honor.  I have a

10    lengthy response to many misstatements that have been made,

11    Your Honor, perhaps misunderstandings, including that this

12    wasn't a surprise, and we had already provided some documents

13    with regard to both of these individuals and also with regard

14    to whether we were going to call them or not.  I also have law

15    with regard to their admissibility, because the government does

16    adamantly oppose the continuance.

17         THE COURT:  Here's what I thought this case was about.

18    The Mexican power company needed generators, so they were going

19    to bid it out.  Your client and the guy that ignored my

20    subpoena formed a corporation whose only purpose was to bid on

21    the contract and then they were going split the profit 67/23.

22    That was its only function.

23         So the Mexican government puts out the bids.  Your

24    client wins the bids.  They get Mitsubishi to provide the

25    generators.  The power company pays you or your client;

1   Mitsubishi's paid.  Mexico's got their generators.  All that's

2   left is 67/23 split of the profits.

3          Why does something about those two guys have anything

4   to do with that?

5          MR. HANSHEW:  Judge, referring to the superseding

6   indictment here, it discusses this equipment, the agreements,

7   the collateral, the pledge, all of these components that were

8   negotiated between all of these parties; C.F.E., Mitsubishi as

9   well, as well as F.G.G., the corporations created.  And what

10  the government claim, as it relates to fraud or frauds in this

11  case in part, is that somehow Mr. Delgado acted outside of what

12  the terms of the specifications and the contracting documents

13  that he acted outside of those.

14         THE COURT:  That's in relation to pledging the

15  generators as collateral for the support of those generators on

16  down the line.

17         MR. HANSHEW:  Right.

18         And what these documents show, these individuals as

19  found by the Mexican government, how they failed to create

20  and/or have the proper clauses or compliance with

21  specifications both in terms of the economics as well as the

22  technical compliance as it relates there.  In other words, what

23  you have is you have the Mexican government saying these two

24  folks who were leads in their contract didn't ensure that the

25  contract included the right provisions to protect from a bad

1    contract in the end.

2           And so you've got -- in short, you've got a contract

3    that we, you know, one of the defenses we have obviously, is

4    that the contract didn't prohibit Mr. Delgado from doing any of

5    the things that he did or failed to do in this case.

6           THE COURT:  Now what does that have to do with this

7    case?

8           If the contract didn't meet up to Mexican law, it

9    didn't meet up to Mexican law, but does that have something to

10   do with this indictment?

11          MR. HANSHEW:  Right, because it has to do with what

12   the contract itself requires or not, what it allows individuals

13   on each side of this to come to the table with and what their

14   respective obligations, responsibilities and authorities are

15   that directs into it.

16          THE COURT:  Is the government's case somehow built

17   upon a breach of that contract?

18          MR. HANSHEW:  It's certain individuals had authority

19   or not to do what they did, in other words, the terms of this

20   clause.

21          THE COURT:  If that's governed by the terms of the

22   contract, why is it important what the Mexican government

23   thinks about the two guys that didn't do what they were

24   supposed to do under Mexican law in ensuring the contract had

25   those provisions, why is that relevant?

1          MR. HANSHEW:  Well, because they didn't ensure, for

2     example, that certain economic portions of the contract

3     complied with what was needed to protect the Mexican interests

4     on the contract.

5          THE COURT:  What difference does it make?  If it

6     didn't happen it didn't happen.  This is what we're basing the

7     criminal proceeding on, not what the contract should have been,

8     what the contract was.  So how is it relevant?

9          MR. HANSHEW:  Well, because these opinions have line

10    by line of here is what the specs were, here's what the

11    requirements were, here is the failing of it and here's the

12    result of it.

13         And remember, Judge, again, these were two individuals

14    who are the government's main witnesses for C.F.E.  They were

15    bringing 'em here.  They brought them.  A C.F.E. lawyer

16    themself told us they were bringing them here to get up and

17    talk about, in this court, about this trial and the indictment

18    what the terms of this were and what their relationships were

19    as related to the obligations.  And now it's turned out that

20    they failed at it.  I mean, it obviously is material to us to

21    point out, here are these individuals who, because of what they

22    did in their contracting and how it relates to the contract and

23    what we failed to include and stuff, makes Mr. Delgado, he is

24    not the culpable player in terms of any type of fraud as it

25    relates to these contracts.  It goes hand-in-hand.  Its why

1    they were bringing them.

2          THE COURT:  Is the government charging Mr. Delgado

3    with fraud because the contract didn't conform from Mexican law

4    or are they charging him with the pilfering the proceeds of the

5    profits?

6          MR. HANSHEW:  They're charging him with fraud as that

7    relates to the contract, Judge.  That's what they are charging.

8          THE COURT:  The one thing relating to the contract was

9    pledging the generators for the service contract for the

10   generators.

11         MR. HANSHEW:  Right.

12         THE COURT:  And that's it though.

13         What does it have to do with these two guys?

14         MR. HANSHEW:  In their job, which there job was to

15   excuse and comply with the contract requirements for this type

16   of a bid so that it met up with the specs, technical specs and

17   the financial specs, had comported with what they're arguments

18   were, it arguably, for example, could've pro- -- then there

19   could have been a prohibition against, you know, the conduct

20   that's alleged against in Delgado.  But if it's not and what

21   they did shows otherwise, you know, you've got -- they have a

22   problem.  I mean, we know they have a problem, Judge.  They're

23   not -- they're jetting them to Mexico City?  These two were

24   flown out here before, are now gone, it's exculpatory.  It is

25   exculpatory as it relates to this.

1          THE COURT:  Well, I'll give you an opportunity to have

2    a hearing to show me how that's exculpatory, but let me -- I

3    want you to finish before Ms. Kanof.

4          MR. HANSHEW:  And if I just can, Judge, part of the

5    difficulty in this is that we don't have a full certified

6    translation of this.  So you know what I'm explaining and

7    arguing to the Court is based off of, you know, a few days of

8    madly trying to get through there, but it's enough in our

9    opinions and our office having gone through it and, you know,

10   asking other people in assistance in looking at this that, you

11   know, moving forward in trial at this stage, when you receive

12   this number of voluminous documents that relate directly to the

13   two individuals there, it it is in our -- we can't in good

14   conscience, you know, move forward in the trial in this case

15   without having any of these ready to be briefed to be able to

16   engage in a full discourse that we're having right now, for

17   example, Judge, it would be one thing.

18          You know, I mean I could've probably handled a set of

19   English documents like this and come in here, they were from a

20   U.S. court, and you know be able to try to apply contract

21   principles and criminal law and those things like that.  I

22   could've made a good shot at that with the Court.  But to come

23   in here and to try to, you know, layout the entirety of the

24   case or to prove that it's exculpatory or not, that's a mere

25   impossibility on what we were given.

1          Again, no fault of their own, but it is what it is,

2    which is 600 pages of untranslated documents that relate to

3    these two individuals that were the government witness that

4    related to the contract that's referenced and discussed in this

5    case throughout.  I mean, these are -- these are what -- the

6    discovery in this case.  I mean we were provided with the

7    contract.  We were provided, you know, all of the different

8    documents related to the contract by the government previously

9    in this case.  They've turned them in as potential exhibits in

10   this case, so it's hard to see how, you know, everything that

11   they've turned in relating to this contracts and talking about

12   this deal and all of that, you know, when there's now something

13   that's adverse to the contract all of a sudden to step back and

14   say well the contract didn't have anything to do with it.

15          And I would also just say respectfully to the Court,

16   you know, we don't -- I know we have a burden to ask for a

17   continuance in this case, but I don't think that that burden

18   requires us proving up here at a hearing today that this is

19   exculpatory to the nth degree in terms of the law, Judge.  I

20   just want to make sure.  I mean we're -- I'm trying to put it

21   out there the best I can for this, but for us to have to have

22   to, you know, mouth and put on our whole defense as it relates

23   to that would be improper of shifting the burden a little bit,

24   Judge.

25          THE COURT:  All right.  Thank you.

1            MS. KANOF:  May I, Your Honor?

2            THE COURT:  Yes, ma'am.

3            MS. KANOF:  First, Your Honor, I have three exhibits

4    I'd like to put into evidence for purpose of this hearing.

5            Mr. Hanshew has -- and I'll deal with some of the

6    things he said now.  Let me correct a couple of things.  And

7    this may have just been a misunderstanding.  We never said we

8    weren't going to call these witnesses.  And in fact, in an

9    e-mail that we sent last week, we specifically said that the

10   government has been provided with a contact information for

11   Buendia's attorney.

12           At this time the government is not reaching out to his

13   attorney to see if Mr. Buendia is available as a witness.  If

14   he would just contact him, please let us know and we'll give

15   you the contact information, which we did.  We didn't say we

16   weren't calling him.  He may have gotten that impression

17   because we asked Mr. Gonzalez to be the front man.  He was --

18   Mr. Gonzalez is in South Carolina.  This was done

19   telephonically.  I know he spoke with Ms. Franco.  But we never

20   said we were not going to call these witnesses.

21           **MR. GONZALES:  Your Honor, excuse me, just so that

22   it's clear.  I did speak to Ms. Franco and Ms. Franco asked

23   about a continuance.  We cannot agree to a continuance.  We can

24   forego having to call all of these witnesses.  I just wanted to

25   make sure that's what --

1          MS. KANOF:  What we said was --

2          THE COURT:  You just wouldn't use that evidence and so

3    we don't need the continuance.

4          Mr. Hanshew is saying that there might be some like

5    smoking gun kind of stuff --

6          MS. KANOF:  Right.

7          THE COURT:  -- in all of this Spanish stuff that's in

8    here and we need time to find the smoking gun.

9          MS. KANOF:  Well, I think that's a little disingenuous

10   and I'm going to give you some exhibits to show why.

11         But what we said was if the Court wants to grant a

12   continuance and it'll stop a continuance, then we won't call

13   them if it's for the purpose of cross-examination.

14         However, Government's Exhibit Number 1, we've given

15   them notice of the problems that both of these employees have.

16   And one of the things Mr. Hanshew said is, you know, they want

17   months, because now they want to get evidence out of Mexico.

18   Well, they've had an opportunity to do that, because we gave

19   them notice in May of most of the problems.

20         On May 11th, I'm going to start first with

21   Mr. Buendia.  And by the way, Mr. Buendia was an engineer.  He

22   wasn't in a decision making capacity.  The two people that were

23   in the decision making capacity was an individual named Laris,

24   L-A-R-I-S, who was fired.  Well, actually, he was told to

25   resign or he'll be fired a long time ago, and a man by the name

1    of Ramos.  Ramos was also fired from C.F.E.  They were found

2    culpable with -- and I don't know exactly why they were fired,

3    because they're not our witnesses and we didn't go into it.  So

4    there were some people from C.F.E. that were fired.  These were

5    administrative.  And the way it's been explained to me, the

6    attorney for C.F.E. -- there's two -- a man by the name of

7    Gonzalez Felix, who represents both C.F.E. and **Pemix, and

8    lives in Mexico City, and his partner Mark Maney, M-A-N-E-Y,

9    who I know defense counsel has spoken with recently as well as

10   in the past, who works and lives in Houston.  And Mr. -- my

11   information comes mostly from Mr. Maney, who is fluent in

12   Spanish, and in fact, he's done a preliminary translation of

13   the Moreno document, so that we can get an understanding of

14   what this document is really all about, but we did say in an

15   e-mail from Mr. Gonzalez to defense counsel.

16           Also, today, we interviewed Eduardo Buendia, a manager

17   at C.F.E.  He reported that a procedimiento (Spanish) was

18   initiated against him based on an accusation that he should not

19   have enabled the modification of the contract from the letter

20   of credit to the pledge.  He received a 30-day suspension, and

21   because a judge agreed with him, granted an amparo (Spanish)

22   and this matter is pending.  That was May 11th.

23           So we gave them notice and they could've at that time

24   investigated, because we did tell them that we were calling

25   three Mexican witnesses and we told them that we were talking

1    to them on that during that week.  And Buendia was one of them.

2    Buendia did not come to El Paso.  We talked to him via video.

3    The other two did, Moreno and a man by the name of Cortes,

4    which is spelled with an "s."  The other two, Moreno and Cortes

5    are attorneys.  And -- not high level, but they in the legal

6    department of C.F.E.  So they had notice as early as May 11th.

7            On Government's Exhibit 2 is a letter that was sent to

8    them by myself and AUSA Arreola on the May 9th, two days before

9    this.  We were meeting our *Giglio* deadline.  In Government's

10   Exhibit 2, and on page three, the -- after talking about some

11   of the other witnesses and potential *Giglio* issues, it says

12   Francisco Moreno Nuñez, who we're talking about -- this Paco

13   Moreno -- Mr. Moreno related to the government that on or about

14   October of 2014, he was notified of an investigation against

15   him by Organo, O-R-G-A-N-O, Interno, I-N-T-E-R-N-O, de Control

16   of the C.F.E., the comptroller's office, as follows.  And then

17   this exhibit will show the Court we inserted into our letter

18   the three charges in Spanish.  This was on May 9th.

19           Then following up after that, a couple of days later,

20   we provided to them a 13-page document that contained all of

21   the charges against Mr. Moreno.  What's been explained to the

22   government by Mr. Maney is that this is an Administrative

23   process that's similar to the American national labor relations

24   board where they look at how individuals acted within the

25   confines of their employment.

1        So, this is not news and it had at least 13 pages

2   summary with regard to Moreno since the middle of May or

3   earlier.  And they've been noticed of the problem with Buendia

4   since May 11th.  So if they were so concerned that this was

5   exculpatory for their client, they could've reached out and got

6   all of this other information.  Certainly, there may -- I don't

7   know how ever long Mexico is, but there could have been

8   interrogatories.  There could have been depositions.  There

9   could've been all kinds of things that now they say they want

10   to seek for a continuance.

11        So I want to talk a little but more -- that's

12   government's Exhibits 1, 2 and 3, we move they be admitted so

13   that the Court can peruse --

14            THE COURT:  Have you shared those with Mr. Hanshew?

15            MS. KANOF:  Well, we sent them to him.

16            THE COURT:  Okay.  Well, just make sure he agrees

17   that's what you sent him.

18            MS. KANOF:  Yes, sir.  I think we do have copies that

19   we can provide to them now.

20            THE COURT:  All right.

21            MS. KANOF:  May I approach them?

22            THE COURT:  Yes, ma'am.

23            MS. KANOF:  With regard -- one of the things that

24   surprised me that Mr. Hanshew said was that he wanted to admit

25   these -- you know, the thing that I'm most concerned about is

1    the time that we needed for a certified translation.  I don't

2    understand that.  Because the only reason you would need a

3    certified translation, especially from an office that has

4    Spanish speakers, and I can understand it's complex and it

5    might take a translator, but you don't ever need a certified

6    translation in this case, because there's nothing admissible

7    about these documents.

8           These documents are a judge's or an administrator's

9    opinion.  And I have case law regarding those admissibilities

10   and two Rules of Evidence regarding the admissibility of such a

11   document.

12           ********************

13           **THE COURT:  I'm not sure he wants to admit the

14   documents.

15           MS. KANOF:  He said it.

16           THE COURT:  Well, but I think he wants to find some

17   top secret stuff in there that his client is not guilty.

18           MS. KANOF:  I understand that, Judge, but he actually

19   said that he wanted to admit it.  And I wrote it down and he

20   was talking and it concerned me, so I just happened to have

21   the --

22           THE COURT:  I suppose, and I don't know all of the

23   possible ways it might be admissible.  I guess there is a way

24   it could be admissible.  We won't know that until we try it and

25   so...

1          MS. KANOF:  I have case laws and rules of evidence

2    that say it's not.

3          THE COURT:  That would be my gut feeling.  My gut

4    feeling has often been wrong and something comes up and all of

5    a sudden something from some weird happening at trial it

6    becomes admissible.

7          MS. KANOF:  I will tell the Court --

8          THE COURT:  I'm not saying that right now looking at

9    those you can come up with any reason why they would be.  I

10   think his purpose is he thinks there's either something hidden

11   amongst all of that to show his client.

12         MS. KANOF:  What I'm talking about is this great

13   lengthy period of time that it takes to get certified and

14   translated by a certified interpreter, because I don't see the

15   need for a certified translation, Rule of Evidence 608(a) and

16   Rules of Evidence 801(c).  And I will quote the closest and

17   most analogous case I could find is not a reported case, but it

18   is an -- out of California.

19         And there was a police officer who -- who had been

20   written -- a *Brady* letter had been written about him.  And the

21   ruling was even if the *Brady* letter arguably contains an

22   opinion about the officer's truthfulness, which is the only

23   time *Brady* and *Giglio* would be admissible, the letters

24   nevertheless would be inadmissible as opinion evidence under

25   rule 608, because the letter itself is inadmissible hearsay, a

1    statement, other than one made by the declarant while

2    testifying at the trial of a hearing offered into evidence to

3    prove the truth of the matter asserted.  So what I'm saying is,

4    that would be like printing something out of an opinion out of

5    Westlaw and saying, you know, I want the jury to see this

6    because it's true, and that's just -- it's just not the law.

7    And so really we're just talking about understanding it to

8    cross-examine.

9           So you can cross-examine pursuant to *Giglio* if there's

10   something in there that's an inconsistent statement, a

11   statement that's inconsistent with what the person testified

12   to.  And again, if the Judge rules -- if you want to rule, Your

13   Honor --

14          THE COURT:  Is this an opinion from an administrative

15   judge?  Do they have quotes from various witnesses?

16          MS. KANOF:  That, not that I know of.  Mr. Maney gave

17   me a summary of what --

18          THE COURT:  Because I suppose if they interviewed

19   witnesses --

20          MS. KANOF:  Yeah, that's why I --

21          THE COURT:  -- some witness under oath said this and

22   that witness testifies here, then --

23          MS. KANOF:  Well, what Mr. Maney has said was that

24   this was -- this was an administrative decision and that

25   particularly -- let me talk about Moreno first -- that with

regard to Moreno that the gravamen of it was that Mr. Moreno

was present when the bids were opened.  The bids were opened on

November 19th of 2009, which is the same day they were granted

to C.F.E.

So, first of all, it's the first time he saw it, the

economic proposal that was submitted.

And by the way, I just want to point out to the Court

that Mr. Delgado wrote the proposal, and he -- it's in

Spanish -- and he holds himself out to be, to everyone, an

international lawyer, so I guess he speaks legal Spanish.

And that on the day that they opened it, he failed to

point out its deficiencies.  He failed to point out that

pursuant to Mexican law that the company F.G.G. did not meet

the criteria to win the bid.  The other two bidders were

Siemens, S-I-E-M-E-N-S, and General Electric.  And basically

the issue here was F.G.G. had only been in existence for seven

days.  And how could this little Podunk, brand new LLC that

Mr. Delgado had created have the experience, because I think

they're required to have ten years experience, the company,

have the experience with generation of electricity.

And in order to get to bid, what has been explained to

us by witnesses is that what they did was they relied, since

they were -- they had a subcontractor that was selling the

generators, which was Mitsubishi, and since Mitsubishi had a

lengthy relationship with C.F.E., had already sold them

1    identical generators, that it was Mitsubishi's good will that

2    they were using in order to get the contract.  There are also

3    other benefits; the three generators were already in existence.

4    And had they picked Siemens or General Electric, they would

5    have to wait two years.  There were other reasons.

6            There's no accusations of criminal conduct or fraud

7    according to Mr. Maney of either Buendia or Moreno,  but

8    dereliction of duty is the way he explained it to me.  So

9    then...

10           THE COURT:  But that has nothing to do with

11   Mr. Delgado, right?

12           MS. KANOF:  No.  And that's my other point, Your

13   Honor, is Mr. Delgado is basically charged with having written

14   a letter to reroute the money from the F.G.G. Wells Fargo bank

15   in El Paso to his Turks and Caicos account and then having

16   spent all of it on himself, basically all of the money that or

17   $18-million.

18           THE COURT:  So 23 percent didn't go to the other guy?

19           MS. KANOF:  No, Your Honor.  And there's all kinds

20   much changes in contracts.  I would very much like to call

21   Mr. Buendia.  And I think Mr. Moreno and Mr. Buendia would make

22   excellent witnesses.  They are both on appeal -- had they both

23   had the right to appeal.

24           What initially happened is that the last time when we

25   sent these letters this decision had not come out.  They both

1    had their punishments suspended.  Buendia being fired --

2    initially, he was going to be suspended and then he was going

3    to be fired.  That was suspended so he could appeal.  Moreno

4    was always only going to be suspended for a certain number of

5    months and that was also suspended.

6            So these decisions came out.  They got sent to us a

7    week ago Friday.  Mr. Maney had a hard time getting them to us,

8    because they were so big, so we had to get a drop box.  And

9    basically what happened is Buendia, this body that wrote the

10   opinion, did not again suspend his firing.  They didn't -- but

11   he can still appeal, which is why he has a lawyer.  He also has

12   the option of resigning instead of appealing and getting all

13   of -- keeping all of his benefits.  This is according to

14   Mr. Maney.  I obviously don't know him individually.

15           Mr. Moreno was suspended again.  He's still working

16   for C.F.E..  So --

17           THE COURT:  His -- what his --

18           MS. KANOF:  -- his suspension was suspended.

19           THE COURT:  Right.  Okay.

20           MS. KANOF:  Yeah.  He is still working for C.F.E.

21           At the time, because Mr. Buendia had an attorney and

22   we're busy preparing trial, we didn't reach out to the attorney

23   yet.  Mr. Gonzalez is out of town .  We just hadn't made the

24   final decision.

25           Mr. Maney calls us and says, we don't control

1    Mr. Buendia because he's in the status of being fired, but he

2    has communicated -- he still talks -- I think he talks to

3    Mr. Moreno as a friend.  He is still willing to come and

4    testify in the meantime since we talked to them.  And

5    Mr. Moreno is also willing to testify.  I will confide to the

6    Judge, they didn't want to come over the (Spanish) of September

7    weekend, because it is a weekend holiday, but they're still

8    willing to testify.

9         We are willing to forego their testimony if it means a

10   continuance.  This would be the tenth continuance and the

11   reality is we are not going to call these witnesses in the

12   first week of trial.  And we don't go to trial for another

13   week, so defense counsel would have two weeks to digest in

14   Spanish the meaning of those documents.  But with regard to

15   them wanting all of this time to investigate this, they were

16   already on notice in May that these two witnesses had these

17   issues, because we told them, we provided, you know, based on

18   our responsibility to do that.

19        What Mr. Maney told me with regard to Mr. Moreno is

20   that he is an compliance officer, that he did not have the

21   authority to award the bid.  So he is just being criticized for

22   not having been diligent in identifying the deficiencies in the

23   bid process and communicating them.  He have should have seen

24   and noted the disqualifying factors.  That's a translated quote

25   from Mr. Maney.

1         And with regard -- let's see -- that it says that

2    there's -- that C.F.E. shouldn't approved F.G.G.'s bid on

3    multiple levels because they violated the bidding rules, which

4    requires previous experience and C.F.E. had only been in

5    existence for seven days.

6         The administrative judge said Moreno had the

7    responsibility to ensure that all billing requirements were

8    fulfilled or to disqualify the bid, but never ever had the

9    authority to decide who would win the bid.  And that's pretty

10    obvious because the bid was opened -- Mr. Moreno told us that

11    the day that it was opened was, you know, he saw the package,

12    and they opened them and granted them on the same day.

13         So, the government feels pretty strongly that waiting

14    two and a half years for trial is causing problems.

15         The other thing is, Judge, this is -- I'm grateful to

16    Mr. Hanshew that he pointed out to the Judge this isn't our

17    fault that we just got these documents, that we didn't see this

18    coming, but we dutifully provided it.  We didn't even look at

19    it before we sent it to them.  We just put it in our drop box.

20    We had somebody copy it and send it to them.  We've still not

21    reviewed the documents.

22         But I will tell the Court, we have a witness coming

23    from England.  We have these witnesses coming from Mexico.  And

24    it is not the first time we've had to make arrangements, not

25    just airline flights, but lodging arrangements.

1    And I think the bottom line question is that they are

2    asking for time -- the time for certified transcription is not

3    necessary.  The time to understand it, they have, a couple of

4    weeks.  And whether or not we gave it to them in case there

5    might be some information they might want to use to

6    cross-examine out of abundance of caution, the reality is it's

7    an administrative hearing and there is a case.  There are cases

8    that say that administrative decisions, disciplinary decisions,

9    are not *Brady* and are not *Giglio*, because basically, unless

10   it's an inconsistent statement, *Giglio* is about the likelihood

11   of truthfulness or lies, and that document, there's no

12   indication -- I asked Mr. Maney, is there any indication that

13   he lied to anyone.  And that's really the only thing.  They

14   could only use extrinsic evidence.  They can only

15   cross-examine.  It's only *Giglio* if there is a finding that he

16   lied, that it effectuates the impeachment for -- the rules say

17   that impeachment for truthfulness -- character of truthfulness

18   and honesty is the only thing you can really cross-examine on

19   from extrinsic evidence.  And it just -- it doesn't meet the

20   test at this point in time, and if it does, they've got two

21   weeks to figure it out.

22        Anything else, Your Honor?

23        THE COURT:  All right.  And so anything about those

24   two documents that impacts the issue about pledging the

25   generators as collateral contract --

1          MS. KANOF:  Here's the issue with the pledge.

2          I will tell you that Mr. Moreno, as an attorney,

3    participated in drafting the original draft of the pledge, but

4    he had an honest belief that Mr. Adams had given permission for

5    the pledge because Mr. Delgado --

6          THE COURT:  Because he had that letter.

7          MS. KANOF:  Right -- told him that.  Right.

8          I mean, these are not co-conspirators.  These are not

9    individuals -- we've traced the money as best we can, all the

10   money that was -- all of the money that went into the Turks and

11   Caicos account.  And you know they're still working for C.F.E.

12   I don't know if they would if they got all of this money, this

13   $6-million that's missing.

14         But after talking to him there -- I mean, it's hard

15   for me, because I think you need to speak the language to

16   understand internation, but from all of the people that we've

17   dealt with, including counsel for the companies, they -- you

18   know, they didn't think that they were co-conspirators and we

19   can't find any money that went to them.  So it's not like we

20   have a co-conspirator.

21         We have public servants that didn't pay attention and

22   probably -- and it appears because they were not that high.  He

23   did participate in drafting -- Mr. Moreno did participate in

24   drafting it, but then sent the draft to his boss the chief

25   attorney and he didn't finalize it.  And he did it based on

1      information that was provided to him by Mr. Delgado.

2            So, the issue of the pledge is only that -- and

3      it's -- and within the evidence -- I will tell the Judge, Your

4      Honor, we have about 150 or 160 exhibits.  About 100 of them

5      are e-mails.  Mr. Buendia and Mr. Moreno -- Mr. Moreno is on

6      two e-mails.  They are not substantive, just acknowledging

7      receipt.  And Mr. Buendia is also I think on two e-mails.  And

8      they have letters attached to them, to their transmission

9      e-mails with letters attached.  They are Buendia's letters that

10     Buendia will testify that he did not write that are forgeries

11     of his.

12           And I think we can corroborate that.  But all of that

13     evidence was given to defense counsel two-and-a-half years ago.

14           So, I don't want to misrepresent that he had anything

15     to do with the pledge, because did he draft it, but based on

16     information that was provided to him thinking that John Adams

17     had given him permission.  And -- but the gravamen of the

18     indictment is the stealing of the money.  And the rest is just

19     an explanation of how -- of the interworkings of how that money

20     could be stolen.  And then of course the money laundering.  And

21     neither of these defendants had anything to do -- the

22     authorization to transfer -- to change the wiring instructions

23     from Wells Fargo to the Turks and Caicos was done by Laris.

24     And there was an attempt to change it.

25           THE COURT:  And he's a defendant?

1          MS. KANOF:  Huh?  No, he's not.  We didn't charge

2     anybody in Mexico.

3          THE COURT:  When you said either of these defendants,

4     who were you talking about?

5          MS. KANOF:  Oh, did I say --

6          MR. GONZALES:  You misspoke.

7          MS. KANOF:  I misspoke, Your Honor.  I meant either of

8     these individuals.

9          Had we had access, we didn't charge anybody, because

10    the likelihood of getting an extradition on a white color, in

11    my experience (indiscernible), and frankly we didn't have the

12    evidence and beyond a reasonable doubt evidence, just strong

13    suspicions of Ramos and Laris and so did C.F.E., which is why

14    they were fired.

15         But with regard to the people who had the authority to

16    make decisions that assisted Mr. Delgado, they were Ramos and

17    Laris, and they were fired a long time ago.  So that -- I

18    don't -- I don't think any action and certainly, um, we are

19    not -- I will tell the Court that, um, Mr. Moreno does not come

20    into the, um -- the inner workings of the indictment, and

21    neither does, um, Mr. Buendia with the exception of the fact

22    that Mr. Buendia was at C.F.E. one day when Mr. Delgado walked

23    in and said here's Mr. Adam's letter and introduced him to

24    someone that turns out was not John Adams -- we actually have

25    the security stuff from C.F.E. to prove it was not John

1    Adams -- and introduced somebody as John Adams and handed him a

2    letter.  The letter had three paragraphs.  The ultimate letter

3    that Mitsubishi got was only two paragraphs and it wasn't even

4    the letter that was ultimately used.  And of course we have

5    ample evidence that the letter was a forgery.  So he took that

6    letter, Mr. Moreno took that letter and took it and gave it to

7    Mr. Buendia who gave it to his bosses.  But that would be the

8    only involvement they would have had.

9         So, I understand the Court has to make a decision.

10   And I will tell the Court that if the Court makes a decision --

11   I mean, if it hangs in the balance as to a continuance as to

12   whether or not those two witnesses testify, as much as we want

13   them two, we'll give them up, because we don't have to have to

14   have them, I guess.  I guess, we should ethically, and to do

15   our jobs correctly, but I think it's more important to try this

16   case on the ninth setting and not have a tenth setting,

17   especially in light of the fact that defense counsel had notice

18   of these issues and could have issued letters (indiscernible)

19   in May, if it was that important.

20        THE COURT:  Okay.  Thank you.

21        MR. HANSHEW:  Just a couple of reply commentaries.

22        I'll start out with I think one of the most glaring

23   errors and the argument from the government today about this is

24   that they haven't even reviewed the documents.  The quote was

25   that the government still hasn't reviewed the documents and

1    instead what was offered today as a response and objection to

2    everything that we pointed out, was what C.F.E.'s outside

3    counsel Mark Maney told them about everything here; what he

4    told him in the meaning of theses documents were, both by word

5    by word what that supposedly is, what the conclusion is, which

6    I found curious that someone could sum up, you know, a 300-page

7    ruling in a sentence or two, that that was the totality and

8    that's what it meant.

9           Mr. Maney's explanations to the government about the

10   final nature or not, about this is the equivalent of N.L.R.B.,

11   I mean all of these come from C.F.E.'s outside counsel to say

12   that C.F.E.'s outside counsel has a specific interest in mind

13   when its presenting its version of these documents, both in

14   content, substance, procedural meaning, Mexican law

15   interpretation.  I mean all of these are all easily

16   characterized as self-serving, I mean, absolutely to the nth

17   degree, and the Government has no idea to say otherwise about

18   it.  They haven't even reviewed it, Judge.

19          In terms of the discussion about the exhibits that

20   were provided to us, I think that's also very telling as well,

21   which is, you know, in May, there's one that says that Buendia

22   received a 30-day suspension, and that the Judge -- this is

23   Exhibit 1, Judge, at the bottom -- and because a Judge agreed

24   and then granted and amparo's the matter as pending, well,

25   that's a big difference from what we received last week which

1   is a, you know, nearly 300-page decision terminating his

2   employment with C.F.E.  To say that this would have triggered

3   the thought that the files inclusion be what it is and what we

4   did receive, I think that's a pretty large leap to take.

5          And the same thing goes with if you look at Exhibit 2,

6   page three, about Francisco Moreno, that he -- in 2004, he's

7   notified of investigation by the comptroller's office.  Again,

8   I mean that -- that would in no way lead a person to believe

9   that it would be another 300-page document suspending him for

10  six months from his work, let alone all of the nuance details

11  of what led to those conclusions, which obviously weren't

12  provided here or even suggested really in this, Judge.

13         So, I think if you look at those -- I mean, again,

14  we're back to -- I'll just say in closing to the Court, is we

15  have 600 pages of document that no matter how the government

16  would like to characterize it and no matter how much C.F.E.'s

17  self-serving outside counsel would like to characterize this,

18  these witnesses, until last week, were being prepared to come

19  here to testify next week in this courtroom against

20  Mr. Delgado.  They've vanished.  They are gone.  One is gone to

21  Mexico.  I mean literally.  Okay.  The other one, you know,

22  we'll see what happens.  But again as Mr. Gonzalez clarified up

23  there and made it clear, they had said they would -- if it

24  meant not continuing, they would jet us in this witness.

25         I mean to tell my client, hey, you know a week and a

1   half before trial we receive all of these documents about these

2   individuals that were involved in this as admitted to by

3   Ms. Kanof here about the pledge document which is there, then

4   it's integral to the indictment.  Ms. Kanof explained and said,

5   well, all of that is just, quote, explanation.  Well, it's

6   called not explanation.  It's called the scheme and artifice to

7   the fraud.  Everyone knows in wire fraud cases that's not an

8   explanation.  That is part of the charge even incorporated into

9   the counts.  As you go through each one of those counts, it

10  incorporates the scheme and artifice.  That's the heart of wire

11  fraud.  So what she characterized as explanation, it says what

12  it is.  It's the scheme and artifice.  It's what this case

13  entails.  Is it every piece of it?  No, of course not.  But it

14  is an integral part of it.  That's not been disputed.  It's

15  been, I think tried to mitigate and try to diminish the

16  importance of it, but she frankly had to admit that the pledge

17  and his involvement and accepting of it and review of it is

18  part of this charge, Judge.

19         You know, this is not something, again, that we could

20  have anticipated, nor could they, that's why I said this is

21  nobody's fault.  But the due process component of this for, you

22  know, Mr. Delgado is that he has an opportunity vis-á-vis his

23  counsel to review, investigate these materials and be able to

24  use them or prepare them for the trial proceedings, and that's

25  not a possibility.

1          THE COURT:  Use them in the trial proceedings if they

2     are in fact useful.

3          MR. HANSHEW:  Correct.

4          THE COURT:  Because they may not be.

5          MR. HANSHEW:  That's always the possibility.  And

6     there may be, as this Court knows, I mean, criminal

7     investigations bolt from the prosecution side and from the

8     defense side can take many different paths that we may not

9     anticipate, but to not be able to study this, get it prepared

10    and be able to take those next steps, it's left him without the

11    due process and that's just unacceptable, Judge.  That's why

12    we're asking for this.

13          Again, it is clearly nobody's fault.  This is the

14    nature of the beast, frankly, when you have a prosecution that

15    involves a foreign government and foreign witnesses and the

16    such.  I mean it's easy for the government to say, oh, you

17    know, we just left these guys alone, because you know the reach

18    of our, you know, extraterritorial jurisdiction or being able

19    to extradite them or difficulties, that's the Department of

20    Justice.  Imagine for the office of Federal Public Defender

21    being able to do the same thing.  It is a struggle and this is

22    something that's going necessitate time for us to be able to do

23    this.  We wouldn't be asking for this for any other reason.

24          You know as much as the government explained they

25    wanted to move forward on this, you know, we can can understand

1    the same, but at this point, I've spoken and met with

2    Mr. Delgado about this, and he is in agreement with this

3    continuance, Judge.  And we've been reviewing the documents

4    with many him as fast as we can, but this is going to take that

5    time, so we're asking the Court to consider, Judge.

6            THE COURT:  All right.

7            Ms. Kanof, I'm going to take up your offer that you

8    not use those witnesses.

9            I'm going to deny your motion for continuance.  I

10   think we need to get this case tried.

11           Mr. Hanshew, we're going have a hearing on Thursday to

12   tie up some of these loose ends.  If you have some additional

13   evidence or matters you want to make of record, I'm happy to

14   let do you that on Thursday as well.  After you've had a chance

15   to review some of those exhibits, you may have something you

16   want to put on the record.  All right.

17           Then we'll see you all on Thursday.

18           COURT SECURITY OFFICER:  All rise.

19           (Proceedings conclude.)

20                            * * *

21

22

23

24

25

1                              * * * * *

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.  I

4     further certify that the transcript fees and format comply with

5     those prescribed by the Court and the Judicial Conference of

6     the United States.

7     Signature:/S/KATHLEEN A. SUPNET          September 7, 2018
              Kathleen A. Supnet, CSR          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25