1                    IN THE UNITED STATES DISTRICT COURT

2                        WESTERN DISTRICT OF TEXAS

3                            EL PASO DIVISION

4                            VOLUME 8 OF 20

5

6    UNITED STATES OF AMERICA                EP:13-CR-0370-DG

7    v.                                      EL PASO, TEXAS

8    MARCO ANTONIO DELGADO                   September 8, 2016

9
                            **PRETRIAL CONFERENCE**
10                 THE HONORABLE DAVID C. GUADERRAMA
                        UNITED STATES DISTRICT JUDGE
11

12

13   <u>APPEARANCES</u>:

14   For the Government:   Debra Kanof
                           Anna Arreola
15                         Luis Gonzalez
                           Assistant United States Attorney
16                         700 East San Antonio, Suite 200
                           El Paso, Texas 79901
17
     For the Defendant:    Maureen Franco
18                         Erik Hanshew
                           Assistant Federal Public Defender
19                         700 E. San Antonio, Suite 410
                           El Paso, Texas  79901
20
     Court Reporter:       Kathleen A. Supnet
21                         El Paso, Texas
                           (915)834-0573
22                         kathi.supnet5303@gmail.com

23

24          Proceedings reported by mechanical stenography,

25   transcript produced by computer-aided software and computer.

1                    CHRONOLOGICAL INDEX

2                     VOLUME 8 OF 20

3     SEPTEMBER 8, 2016                          PAGE    VOL.

4     Announcements. . . . . . . . . . . . . . . . 3       8

5     Pretrial Hearing . . . . . . . . . . . . . . 3       8

6     Court Reporter's Certification . . . . . . . . 79      8

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Open court.)

 2                    (Defendant and counsel present.)

 3          THE COURTROOM DEPUTY:  EP:13-CR-370.

 4          MS. KANOF:  Good afternoon, Your Honor.  Debra Kanof,

 5  Anna Arreola and Jose Luis Gonzalez for the United States.

 6          THE COURT:  Good afternoon to you all.

 7          MR. HANSHEW:  Good afternoon, Your Honor.  Erik

 8  Hanshew on behalf of Mr. Delgado, as well as Ms. Maureen

 9  Franco.

10          THE COURT:  Good afternoon to all of you.

11          All right.  We are here for our final pretrial.  We've

12  covered all of the -- all of the plea offers that have been

13  made.  There's been no new plea offer that we need to cover; is

14  that correct, Ms. Kanof?

15          MS. KANOF:  No, Your Honor.  Defense counsel or

16  defendant has rejected all of the government's plea offers,

17  including time served, as well as he gave us the money.

18          THE COURT:  Okay.  But there hasn't been any plea

19  offers that we've not covered that I should be asking him about

20  to make sure that it was communicated to him by his counsel?

21          MS. KANOF:  That's correct, Your Honor.

22          THE COURT:  Now, trial -- will the three of you be

23  here for the government?

24          MS. KANOF:  Yes, we will, Your Honor.

25          MR. GONZALEZ:  But Your Honor, I have other
```

```
 1    appointments.  I'll be in and out if that's okay with the
 2    Court.
 3              THE COURT:  Okay.  No, that's fine.  I'm just thinking
 4    about my voir dire and who I'm going to be inducing to them.
 5              MR. GONZALEZ:  I will be here Monday.
 6              THE COURT:  Okay.
 7              Mr. Hanshew, you and Ms. Franco, will there be anyone
 8    else with you?
 9              MR. HANSHEW:  We'll have our paralegal and
10    investigator, Judge.
11              THE COURT:  All right.  Now, under my new order, the
12    investigator will have to sit in the back.  Your paralegal, if
13    she's helping you with documents or technology she can sit
14    there, otherwise she'll sit in the back of the room.
15              MR. HANSHEW:  She is helping with those.
16              THE COURT:  And are you going to have an agent there?
17              MS. KANOF:  We have two agents, Your Honor.  Joshua
18    Fry and Brian Cunningham.  The reason we have two agents is
19    because Agent Fry was transferred from El Paso two years ago,
20    so he was the initial agent on both of the Delgado cases and
21    has institutional knowledge, and Brian Cunningham is the local
22    agent that had to pick up where he left off.  And then we have
23    our forfeiture paralegal, Amy Serrano (phonetic), who will help
24    us with the technical aspects at counsel table.
25              THE COURT:  All right.  Well, I guess if they're going
```

1      to have two agents sitting there, we'll just let your

2      investigator sit there with you.  He'll probably have similar

3      knowledge.

4              MR. HANSHEW:  Thank you, Judge.

5              THE COURT:  All right.

6              Ms. Kanof, you are stating two weeks or one week for

7      your case?

8              MS. KANOF:  It might be a little short of two weeks,

9      but, yes, out of abundance of caution, anticipating lengthy

10     cross-examination, two weeks.

11             THE COURT:  All right.

12             And Mr. Hanshew, for your case?

13             MR. HANSHEW:  No longer than a week additionally,

14     Judge.

15             THE COURT:  About a week.

16             MR. HANSHEW:  (Nodding head affirmatively.)

17             THE COURT:  So, we're looking at at least three, maybe

18     three and a half for the whole trial.

19             MR. HANSHEW:  Correct, Judge.

20             THE COURT:  I think we have prepared a unified charge

21     where we took your two proposed charges and basically put

22     everything into one charge, that way as we get closer to the

23     charge, all we have to do is remove the matters if they're not

24     applicable rather than to insert matters.

25             And so Waheed, I don't know if you have those now.

1          LAW CLERK KHAN:  It's almost ready, Judge.

2          THE COURT:  Oh, okay.  We almost have that.  We'll

3    e-mail it to you and that way we'll be working off of that as

4    we're going through the trial so we can boil it down to what

5    we're going to use at the end of trial.  All right.

6          Now in terms of the exhibits, were you all able to

7    agree to any of those exhibits or no?

8          MS. KANOF:  Yes, sir.  We've agreed to some of the

9    exhibits, but not all of the exhibits.  AUSA Arreola is more on

10   top of that, I think.  But we have jointly agreed to -- let's

11   see -- okay.

12         What we did, Your Honor, is we filed with the court,

13   it's E.C.F. 190, a joint admissibility of exhibits.  And in

14   that, we have a column, the very last column that has under

15   the -- defense counsel had no objections, as I understand, to

16   the government's exhibit list that I can see.  But under the

17   defendant's proposed exhibit list, we added a column that says

18   government's objections starting on page 12, and if there's

19   either the word yes or an asterisk, it means that the

20   government objected to the admission of that exhibit.  So

21   unless they've changed their minds, the defense had --

22   Ms. Arreola is telling me they didn't have objections, but I

23   don't --

24         MS. ARREOLA:  We filed a joint exhibit list after our

25   conference with defense counsel and they did preserve their

1    objection to the documents received in response to the MLAT

2    request, and we noted that on page one.  And I will allow them

3    to speak if there are any other objections.  But in their

4    exhibit list, the government noted, yes, if there was an

5    objection and an asterisk if it was contingent upon -- our

6    decision was contingent on the actual document.

7         The defense counsel filed an amended exhibit of this.

8    And what I've asked of Mr. Hanshew, which he's agreed to

9    provide, is an amended proposed exhibit list that includes

10   another chart that lists the old exhibit number, because

11   they've added some exhibit numbers so that the columns -- the

12   tows have changed, and I think that will facilitate knowing

13   which ones we've already discussed and agreed to.

14        THE COURT:  So as to the ones that you've agreed to,

15   when we begin trial will you move to enter all of those

16   exhibits all at once, so there's a motion and I'm assuming no

17   objection.  Then I'll admit all of the exhibits that are agreed

18   to and so we don't have to waste any time in trial to deal with

19   any of that.

20        MR. HANSHEW:  The only concern I have with that,

21   Judge, is that -- what we said was we didn't have a problem

22   with the bulk of their exhibits subject to, of course, you

23   know, laying foundation and the such, I'm a little hesitant to

24   just in bulk say everything is fine and then, you know, they

25   throw it down and this person can't lay the foundation as such,

1    those types of issues.  But substantively in terms of the

2    exhibit itself, that's correct, we don't have an objection to

3    those.

4            THE COURT:  So they are going to bring a witness to

5    for each of those exhibit to lay the foundation?

6            MR. HANSHEW:  If the person who is going to be shown

7    it and testifying to it, that's there's that linkage, Judge.

8    That's all.

9            THE COURT:  All right.

10            MS. ARREOLA:  Nothing further, Your Honor.  They

11    did -- I'm looking at page one of the joint admissibility

12    exhibits.  Defense counsel did reserve their right to oppose

13    the disability subject to it being properly authenticated to

14    each document.

15            THE COURT:  Okay.  So basically we'll have to go

16    through each exhibit and make the motion and hear any

17    objection?

18            MR. HANSHEW:  I think once the -- once the particular

19    witness is up there, Judge, I think at that point, you know, we

20    want to just say, look, these are coming through this witness,

21    we can resolve that real quick at that point.

22            THE COURT:  Okay.

23            MR. HANSHEW:  We'll know who it is and we're going to

24    be talking about.

25            THE COURT:  All right.

```
1              MR. HANSHEW:  That way we --

2              MS. ARREOLA:  Your Honor, I do believe the parties

3     were able to -- I do believe the parties were able to reach a

4     consensus on self-proving affidavits.

5              MR. HANSHEW:  Correct, Judge, other than as it related

6     to the MLAT.

7              THE COURT:  Okay.  So those are self-proving

8     affidavits.  We're going to have no problems.  We'll just

9     identify them and introduce them into evidence.

10             MR. HANSHEW:  Correct, Judge.

11             MS. ARREOLA:  Your Honor, the government is also

12    prepared today to address the admissibility of the MLAT

13    documents in response to the defense counsel motion in limine.

14             THE COURT:  We'll get to that in just a second.

15             MS. ARREOLA:  Thank you.

16             THE COURT:  Yes, ma'am.

17             Now, the motions in limine, I think you agreed to some

18    but not others.  Where are we on the motions in limine?  And

19    what document number is the government motion in limine?

20             LAW CLERK KHAN:  196.

21             THE COURT:  196?

22             LAW CLERK KHAN:  Yes.

23             MS. KANOF:  196, Your Honor.

24             THE COURT:  Waheed, could you come over here and help

25    me find it in here?
```

```
 1                  (Brief pause in proceedings.)
 2           THE COURT:  Okay.  So there's no opposition to the
 3  limine request regarding Mr. Gireud's lawsuit and the facts
 4  regarding that lawsuit?
 5           MS. KANOF:  I'm sorry, Your Honor?  We can't hear you.
 6           THE COURT:  There's no opposition to your in limine
 7  request regarding Mr. Gireud's issues with the electric
 8  company?
 9           MS. KANOF:  Correct, Your Honor.
10           THE COURT:  Okay.
11           MS. KANOF:  And I believe he pronounces it "Jeroo"
12  (phonetic).
13           THE COURT:  Who?
14           MS. KANOF:  I believe he pronounces it "Jay"
15  (Phonetic.)  It's french.
16           THE COURT:  Okay.  So how do you pronounce it?
17           MS. KANOF:  I think Ms. Arreola can say it better than
18  I can.
19           MS. ARREOLA:  Gireud.
20           THE COURT:  Gireud?
21           MS. ARREOLA:  Gireud.  Yes, Your Honor.
22           MR. HANSHEW:  He's fancy.
23           THE COURT:  Well, We'll do the best we can.  Gireud.
24           All right.  So then the next one is...
25           MS. KANOF:  I think it begins on page seven, Your
```

1    Honor.

2              THE COURT:  Regarding Linda Medlock?

3              MS. KANOF:  Her misdemeanor DWI in 2001 in New Mexico.

4              THE COURT:  Okay.  Is there some reason how that might

5    become admissible?

6              MR. HANSHEW:  We we're just waiting for the documents

7    related to that.  They've provided that so we'll withdraw that.

8              THE COURT:  So that one was withdrawn.

9              Then Liliana Narvaez.

10             MS. KANOF:  No, Your Honor.  And the next one is her

11   general use of alcohol.

12             THE COURT:  Her what?  Her general use of alcohol?

13             MS. KANOF:  I just was anticipating that -- that

14   Mr. Delgado would make some allegations that she's not sober.

15             THE COURT:  Did she use something at the time that

16   maybe she was drinking at the time she --

17             MS. KANOF:  No.

18             THE COURT:  So it's not like it affects her ability to

19   observe, recall, anything?

20             MS. KANOF:  It is not, Your Honor.  There are no --

21   she's not going to testify about any transactions or documents

22   that occurred when she was drinking.

23             THE COURT:  Okay.

24             MR. HANSHEW:  They don't know that, Judge.  She just

25   testified to that, but that's obviously --

```
 1            THE COURT:  Well, we'll ask -- I'll ask you to

 2    approach the bench on Ms. Medlock.  If you want to get into any

 3    of her drinking history or any specific acts of drinking so

 4    that you can show me how it's relevant to those issues of

 5    observation recall and the other.  All right.  So...

 6            Then Liliana Nevarez?

 7            MS. KANOF:  It's "Narvaez," Your Honor.

 8            THE COURT:  Oh, Narvaez.

 9            MS. KANOF:  The first regards a shoplifting in 2007.

10    It was a Class A. Misdemeanor.  Case was dismissed.  She was

11    not prosecuted.  The second was in 2009.  It was another

12    shoplifting and it was deferred adjudication.  We provided the

13    Court with the documents.  Frankly, it's been so many years

14    since I was a state prosecutor, I couldn't interpret what they

15    meant, so we thought this Court that spent 17 years on the

16    bench would be better.

17            THE COURT:  I looked at that, but it was a little bit

18    confusing because -- let me make sure I have the right one.

19    This is in 384th, 20090D05828?

20            MS. KANOF:  It was -- I only have -- I'm sorry.

21            THE COURT:  I'm looking at the docket sheet.

22            MS. KANOF:  At the docket sheet?  Um --

23            THE COURT:  It says.

24            MS. KANOF:  Z07085491; is that it?

25            THE COURT:  I have 5828.
```

1          MS. KANOF:  Maybe I am not looking at the right place

2     for the docket number.

3          THE COURT:  It says registers of actions, case number

4     20090D05828?

5          MS. KANOF:  5828, yes, sir, Your Honor.

6          THE COURT:  In the disposition section they have -- at

7     the bottom they have two dates; one is 6-21, theft of property

8     greater than 1,500 less than 20,000 is dismissed, but on 6-21,

9     2011, there's a plea.  I'm not sure why, because she already

10    had a plea hearing in 2010 where she pled.  So there was a

11    plea.  And then they show "guilty."  And if it's deferred

12    adjudication, deferred adjudication means you never adjudicate

13    them guilty.  So I'm not exactly sure what the docket sheet --

14    it sounds like it's speaking out of both sides of its mouth.

15         MS. KANOF:  And then Exhibit A to that is the order

16    adjudging that, her probationary terms had been satisfied and

17    early release is warranted, and she's being discharged from

18    community service.

19         THE COURT:  Yeah.

20         MS. KANOF:  So that's -- we have a lot of former

21    assistant D.A.s and nobody can figure it out.

22         THE COURT:  Yeah, it's -- are you confused by the use

23    of the word "probationary?"  I mean because it should -- I

24    mean, deferred adjudication resulted in supervised release,

25    basically.  I'm not sure why they called it probationary.  She

1   wasn't on probation, but defendant being is hereby discharged

2   from further community service -- being discharged from a

3   community service --

4           MS. KANOF:  Because it was so confusing, Your Honor,

5   that's why I did the research and found U.S.C. Entrekin and

6   U.S.C. Pruitt that specifically say the crime of shoplifting is

7   not considered a crime involving dishonesty or false

8   statements.  They were both shoplifting.  And since one was

9   from Dillard's and one was from Khol's.

10          THE COURT:  I'm not arguing with the court that said

11  that, but I have a strong disagreement with their opinion.  I

12  mean where I grew up, that absolutely would be a crime of moral

13  turpitude.

14          MS. KANOF:  Oh, believe me, Your Honor, my parents

15  would agree with you.

16          THE COURT:  I don't know what court that opinion came

17  from, but that's --

18          MS. KANOF:  I'm just citing the law, Judge.

19          THE COURT:  So I think that from reading this docket

20  sheet, this person got deferred adjudication and probably

21  because there was a motion for early release filed on

22  6-17-2011, you normally wouldn't do that if you're messing up

23  on deferred adjudication, because a judge most likely won't let

24  you out early if you are messing up.  And then there's in the

25  docket sheets 6-21-2011, ordered discharge from probation, and

1    then on 6-30-2011, motion for early discharge from probation.

2    I mean, you know, maybe we should take this as an exhibit as to

3    how well we're doing here, Greg, in our docketing, because who

4    knows.

5            COURTROOM DEPUTY DUENAS:  We should, Judge.

6            THE COURT:  I'm not sure what this all is.  But it

7    would seem that if we went and got the file, I bet there was a

8    motion for early release from deferred adjudication and the

9    judge granted it although he said he was releasing her from

10   community service.  I think he meant community supervision.

11   But in any event if that's the case, there's never an entry of

12   a finding of guilt even though the docket sheet does indicate

13   guilty.

14           MR. HANSHEW:  Well, Judge, I mean that's -- the docket

15   sheet speaks for itself and the words of the judge --

16           THE COURT:  No, no.  The docket sheet speaks for

17   itself, but it speaks the truth.

18           MR. HANSHEW:  And there's no entry of the deferred

19   adjudication.

20           THE COURT:  Yeah.  I think in this case you would have

21   to have the file to see what happened.  I have think the docket

22   entries are very confusing.

23           MR. HANSHEW:  And that's --

24           THE COURT:  If you have the file, you can see exactly

25   what it was that happened.

```
 1              MR. HANSHEW:  But I think if you look at the only

 2    order that they provide here shows that what was terminated was

 3    probation and/or community service.  There's not a word about

 4    the deferred adjudication, Judge.

 5              THE COURT:  No, I don't deny that.  So, unless we have

 6    something more, I'm thinking that that may be something they

 7    can use against her.  It was reduced to a Class A misdemeanor

 8    based on deferred adjudication.

 9              MS. KANOF:  I will tell you --

10              THE COURT:  Where did you get the reduction to Class A

11    misdemeanor?

12              MS. KANOF:  On the first one.

13              THE COURT:  On the docket sheet?

14              MR. HANSHEW:  That was her first shoplifting crime.

15    This is her second time.

16              MS. KANOF:  The 2007.

17              THE COURT:  Oh.

18              MS. KANOF:  Because it was County Court at Law Number

19    Two and it's misdemeanor theft of property.  I didn't get a

20    reduction to a misdemeanor on this one.

21              THE COURT:  Because it says -- I'm reading.

22              MS. KANOF:  Oh, that's right.  I got it from paperwork

23    somewhere.

24              THE COURT:  You did?

25              MS. KANOF:  Somewhere in here it said that.
```

1          THE COURT:  It would still -- now am I bound by that

2     court that says shoplifting is not considered --

3          MS. KANOF:  I think it's entirely in your discretion,

4     Your Honor.

5          THE COURT:  To me, if you are convicted of that then

6     it's moral turpitude.  It should come in if you are convicted.

7     But if it's deferred adjudication, technically she would not

8     have been convicted and I would have to see something that says

9     that she was convicted, more than a docket sheet.

10          MS. KANOF:  I just quoted, Your Honor, United States

11     v. Ashley, 569 F.2d 975, (5th Cir.) 978, pretty old, quote:

12     Conviction for shoplifting is not a conviction involving

13     dishonesty or false statement within the meaning of Federal

14     Rules of Evidence 609(a)(2).  That's a quote from the case.

15     And I would abide by whatever the ruling the Court wants to

16     make.

17          I will tell you that Mr. Delgado bailed her out of

18     jail.  That was his girlfriend.

19          THE COURT:  Oh, well -- and I suppose that if

20     Mr. Hanshew wants to impeach her with this and he shows me

21     something out of the state court, more than this docket sheet,

22     indicating that she was adjudicated guilty, then I think he's

23     entitled to impeach her with it.

24          It's going to be up to you, Mr. Hanshew, to get

25     something to show that she was adjudicated guilty, because it

1    could be that they just never adjudicated her guilty and they

2    just let her go and the paperwork is all messed up.  This is

3    what we're seeing.

4          MS. KANOF:  He's got a few days.  We don't intend to

5    call her until Thursday.

6          THE COURT:  Then --

7          MS. KANOF:  Next is on Adams, Your Honor.  This was

8    self-disposing.

9          THE COURT:  Right.  I would grant that.  I might be

10    more convinced that that may become admissible as a bad act if

11    one of them were married to -- I mean, I'm assuming they're not

12    married to each other and someone was married -- if one of

13    these people was married then I think it's causing me more

14    concern than if they were just two single people that didn't

15    report their relationship to the corporation who wants to know

16    if there's any relationship amongst their employees.

17          MS. KANOF:  I think the rule as is -- he had been at

18    the company a long time.  And I think the rule was if you are

19    having a relationship regardless of whether are you married or

20    not with another employee.

21          THE COURT:  Because the corporation is interested in

22    knowing where these relationships are.  You don't want somebody

23    supervising someone you're living with, so...

24          MS. KANOF:  Actually, the inquiry was made of him

25    after the relationship was over.  And he's not -- they weren't

1    seeing each other anymore.  And then the inquiry was made of

2    him and so they found out after the fact that they did and they

3    still said he broke the rules, so...

4            THE COURT:  Okay.  I'm going to grant that.

5            MR. HANSHEW:  Your Honor, if I can for the record at

6    least?

7            THE COURT:  Sure.

8            MR. HANSHEW:  We filed a response on that as well, and

9    what we've noted was that they're going to put on John Adams to

10   testify about that -- whether a document's forged and his

11   compliance with his employer's policies and rules.  So that is

12   why we are saying here.  It doesn't go to in terms of what

13   we're offering it for whether he was, you know, being

14   unfaithful to his wife or spouse or vice versa with the other

15   person.  It goes to an individual, who was released from his

16   employment for failure to comply with those policies.  I mean

17   they're going to put him up there to be, you know, Mr. Honest

18   Abe and Mr. Company Rule Guy, and yet here he is being

19   terminated, essentially, other than they let him resign for

20   violating company rule.  That is why we're offering it, Judge.

21           MS. KANOF:  I don't know that Mr. Adams violated a

22   company rule with Mitsubishi.

23           MR. HANSHEW:  It says right --

24           MS. KANOF:  I don't think there's any rule that says,

25   you, executive vice president of Mitsubishi, can't pledge

1    equipment that you violated, because he didn't.

2          THE COURT:  It's kind of like introducing a person's

3    criminal history to show that his character is bad generally.

4          MS. KANOF:  Yeah.  And the other thing, Your Honor, is

5    timing.  I mean, he didn't have permission to pledge this

6    equipment, but there was no rule that he violated.

7          He -- this happened where the forged letter is dated

8    January 10th of 2010.  And just if it matters to the Court,

9    there's the allegation because there's another letter that

10   says, oh, John Adams was in Mexico City and handed that letter

11   to us.  January 10th is a Sunday.  And we have his crossing

12   records.  We have his phone rooming records.  We have

13   everything to show he was at home in the United States.

14         So, if that helps in the determination at all as far

15   as his credibility is concerned that he didn't write that

16   letter and certainly didn't hand it to anybody at C.F.E. on

17   January 10th.  But with regard to the timing, that alleged

18   letter is dated January 10th of 2010, and the relationship

19   incident in the firing -- he wasn't actually fired.  He was

20   asked to resign.  I mean he volunteered -- was in 2015 or 2016.

21   It was recent.  And he had a job waiting for him.  His next

22   employer was not concerned about that kind of conduct, if

23   that's makes any difference to the Court.

24         THE COURT:  Well, I'll grant the in limine.  It only

25   means that Mr. Hanshew has to approach the bench and convince

KATHLEEN A. SUPNET, CSR

 1    me at the time that he wants to use it that it's appropriate.

 2              MS. KANOF:  Your Honor, the next issue, the three

 3    lawsuits -- if I could use the podium.

 4              THE COURT:  Oh, of course.

 5              MS. KANOF:  And I have exhibits.

 6              One of the exhibits I took the liberty of marking.  I

 7    didn't write on it, but I put some stickies for the Court.

 8              Here's copies for defense counsel.

 9              First I want to talk about the lawsuit regarding

10    Mitsubishi Power Systems America versus F.G.G. Enterprises and

11    Marco Delgado.  Mr. Delgado believes this is admissible and he

12    should be able to use it.  So what I have marked -- and I

13    started with the next number after the hearing on Tuesday, just

14    so there's not a lot of ones and twos, so it's number four.

15              What I've given the Court is a letter that was sent to

16    Mr. Delgado's lawyer on June 9th of this year in which

17    Mr. Delgado was sanctioned for lying within the confines of

18    that lawsuit.  It's called the order on the plaintiff's amend

19    motion.  Attached to it is the order by a judge who made a

20    ruling.  It's Judge or Orlinda, O-R-L-I-N-D-A, Narranjo, of the

21    419th District Court of Travis County.

22              Now what had happened is in anticipation of the last

23    trial setting, two years after anything had happened in this

24    case, Mr. Delgado filed a bunch of stuff.  He filed a cross

25    claim.  He filed a motion for sanctions against Mitsubishi and

1    he filed -- two motions for sanctions -- and he filed a

2    severance.  This is the Court's findings.  And then Mitsubishi

3    filed a motion for sanctions against Mr. Delgado.  Mitsubishi

4    won everything.  The Judge granted Mitsubishi's amended motion

5    for sanctions and entered an order.  The court made the

6    following factual findings:

7            First of all, the court found that Mitsubishi filed a

8    motion for partial summary judgment seeking declaratory relief

9    on July 19th, 2013, which had been granted.  On August 13th of

10   2013, the Court granted the plaintiff, that's Mitsubishi's

11   partial summary judgment, determining that the defendant --

12   that's F.G.G. -- and by the time -- you need to understand this

13   is not the same F.G.G.  This is not Mr. Gireud.  This is

14   because Mr. Gireud turned F.G.G. over to Mr. Delgado two years

15   before this.  So it's Mr. Delgado and Mr. Delgado.

16           The Court granted plaintiff's partial summary judgment

17   determining the defendant did not have the authority to pledge

18   over $100-million worth of the plaintiff's industrial equipment

19   to the La Comisión Federal de Electricidad as collateral on

20   behalf of defendant F.G.G.

21           On August 13th, the Court declared that the Jan 11,

22   2010 power of attorney purportedly authorizing defendant

23   Delgado to make such a pledge, which was void ab initio as

24   matter of law and found that plaintiff never authorized

25   anyone -- that's Mitsubishi never authorized anyone -- to

1    pledge the plaintiff's equipment.  These were findings that

2    were made in June of this year.

3              So then on August 16 of 2013, the plaintiff filed a

4    motion to sever the declaratory judgment claim from the balance

5    of its action.  The defendant Mr. Delgado did not oppose it.

6    At that time Richard Esper represented Mr. Delgado.  And he

7    advised Mitsubishi the defendant did not oppose Mitsubishi's

8    severance.  On August 29th of 2013, the Court granted the

9    severance.

10             Number seven.  Approximately 29 months later on

11   February 8th of 2016, Mr. Delgado filed a motion for sanctions

12   in which he claimed among other things -- it says "they"; it's

13   F.G.G. and Delgado -- that the plaintiff lied, that he --

14   Mr. Delgado claimed the plaintiffs lied to a Travis County

15   district court judge by falsely representing to the Court that

16   defendants F.G.G. and Delgado were unopposed to the plaintiff's

17   motion to sever.  Okay.

18             So let's skip, Your Honor, to what was ruled on, on

19   page five.  Therefore, the Court makes the following legal

20   conclusions:

21             The defendant failed to make -- that's Mr. Delgado and

22   F.G.G. -- a reasonable inquiry into the accuracy of the

23   allegations set forth in their February 2016 motion for

24   sanctions.  Defendant's motion for sanctions was legally and

25   actually --

```
 1              THE COURT:  Mine says February 8th, motion for

 2    sanctions.

 3              MS. KANOF:  That's the motion for sanctions

 4    Mr. Delgado made on February 8th.

 5              THE COURT:  So what page are you on?

 6              MS. KANOF:  Five.

 7              THE COURT:  That's the page I'm on.  Do I have the

 8    wrong document?

 9              MS. KANOF:  Did I give you a bad copy?

10              THE COURT:  It says page five at the bottom, but it

11    says page six up here at the facts.  Are we going with the

12    document's number or the fax page number?

13              MS. KANOF:  It doesn't -- your page five doesn't start

14    off, therefore the court makes the following legal conclusion?

15              THE COURT:  It does.  And then it says, number one,

16    February 8th, the accuracy -- allegations set forth in their

17    February 8th, 2016 motion for sanctions prior to filing that

18    motion.  Defendant failed to make an reasonable inquiry --

19              MS. KANOF:  Right.

20              THE COURT:  -- into the accuracy and the allegations

21    set forth in their February 8th, 2016, motion for sanctions.

22              MS. KANOF:  Correct.  That's what I was reading, Your

23    Honor.

24              THE COURT:  Oh, I thought I heard a different date.

25              MS. KANOF:  No, that's the date I read.
```

1          THE COURT:  Okay.

2          MS. KANOF:  Defendant's motion for sanctions was

3    legally and factually groundless when filed.  The defendant

4    filed the motion for sanctions, and I think this is important,

5    in bad faith and/or for improper purpose as evidenced by the

6    fact the defendant refused to withdraw the motion after

7    obtaining clear and uncontradicted evidence that their

8    allegation that plaintiff made on material misrepresentation to

9    the court lacks merit.  Accordingly -- and then it goes on and

10   on, basically stating the legal conclusions that the judge

11   found.

12          So the judge went through and on each of the three

13   findings, the motion or sanctions was found to be both made in

14   bad faith or for improper purpose and in violation of Texas

15   Number Four Rule of Civil Procedure 13 and Texas Civil Practice

16   and -- what does "rem." mean, Judge?  I don't know.  Code,

17   sanction; anyway, it has the numbers there -- and good cause

18   that exists to impose sanctions against the party and counsel.

19   So that basically they go through -- the judge goes through

20   making legal conclusions on all three of the defendant's

21   motions and each one finds that they were made -- they were

22   groundless.

23          Number six.  The motion to vacate severance was

24   grounded when filed.  Those are the factual allegations.  And

25   in bad faith or in -- as an improper purpose on and on.

1        So finally, the Judge finding that all of his actions

2    were either in bad faith or for an improper purpose and

3    violated Texas law.  The Judge finds that the conduct of the

4    defendants and their counsel warrant striking the motion to

5    vacate as a sanction for filing this groundless pleading.  For

6    the reasons, this court grants the defendants amended motion

7    for sanctions and for good cause shown strikes the following

8    pleadings, and struck the two motions to vacate severance

9    orders and the motion for sanctions.

10       So the next document, Your Honor, that should be

11   attached to yours is an e-mail.  Is there an e-mail attached?

12       THE COURT:  Yes, there i.

13       MS. KANOF:  Okay.  I called Matthew Herrington, who is

14   with Steptoe and Johnson in Washington D.C. this morning and

15   asked him what the current status of this litigation is, and he

16   said that on August 16th, the court denied defendant Delgado's

17   motion for reconsideration of sanctions from the ruling and

18   ruled from the bench.  He was going to try to find out if a

19   paper order had ever been signed, but I didn't hear from him

20   again.

21       And on the counterclaims they were not dismissed, but

22   the defendant has been allowed or Mr. Delgado has been allowed

23   limited discovery focussed on date of accrual.

24       So, why Mr. Delgado would want this litigation to use

25   it, because then the government gets to use how he was

1    sanctioned, how his attempts were groundless, how they were for

2    an improper purpose.  I don't know.  I think that would be

3    reversible error if the government used it, but certainly if it

4    was admissible for him, it would be admissible for the

5    government under Rule 106.

6            And moreover, Your Honor, counsel for the defendant

7    cited some cases saying that lawsuits are admissible, except

8    that's not what the cases said.  They cited a Fifth Circuit

9    case where it said a patient -- the fact that a patient filed a

10   lawsuit against a doctor is admissible.  That's what the case

11   said.  The case said that the fact that they filed the lawsuit

12   was admissible because it showed that they might have a

13   financial motive.

14           Mr. Delgado was the defendant in these lawsuits, in

15   this suit and in the Sulzer lawsuit.  He -- a lot of the

16   allegations are against him.  And I think what he wants

17   admissible is especially in February of this year he filed a

18   cross-claim where he wrote voluminous accusations against

19   everybody in the case, and what he wants is to admit that, his

20   self-serving accusations to get his side of the story in so he

21   doesn't have to testify, and I don't -- no case law permits

22   that .  It's not only hearsay and self-serving, but it's -- it

23   would be pretty dangerous because the rest of it would come in.

24           The same goes for the Sulzer lawsuit.  Nothing much

25   has happened on the Sulzer lawsuit, but that's government's

1    Exhibit 5.  The Sulzer lawsuit he's named also.  And if we

2    start getting -- the Sulzer lawsuit happened way later, after

3    what's alleged in the indictment.  The Sulzer lawsuit talks

4    about a transaction in which Mr. Delgado was involved.  And

5    their agreements with Mitsubishi fell through.  They are

6    looking for somebody to contract with to do the long term

7    service agreement.  Sulzer said -- they told Sulzer we can't,

8    you know, work on this without some money.  They ask Sulzer for

9    money.  Sulzer gave him money.  Mr. Delgado got 900,000 of the

10   1.65 million and frittered it away.  So again, he's the

11   defendant.  And there's no case law that says you can admit a

12   lawsuit's pleadings to prove anything, and it would be

13   Mr. Delgado's self-serving pleadings that he would want to

14   admit as a defendant which again would undoubtedly be

15   reversible error.

16        With regard to the settlement agreement.  Defense --

17   the defense has drawn this Court's attention to a piece of the

18   settlement agreement and stating that that it's admissible

19   because this shows that C.F.E. believed that the pledge was

20   righteous.  They failed to point out the rest of that same

21   paragraph .  And again, what they pointed out to the Court was

22   basically a preamble.

23        It's on page five and it says in its complaint the

24   trust demanded if F.G.G. did not pay the amounts indicated.

25   Mitsubishi should be ordered to deliver possession of the

1    turbines in execution of the pledge, which the trust, as C.F.E.

2    maintained, was validly executed.  This is the part they quoted

3    in their motion:  And created a perfected security interest in

4    the turbines for the benefit of the trust.

5         The very next paragraph says:  Mitsubishi has

6    repeatedly and consistently rejected the validity and

7    enforceability of the pledge agreement before several entities

8    and authorities over the seventh -- other than the Seventh

9    District Judge of Civil Matters in Mexico, and of the purported

10   security interest that it allegedly created on the turbines.

11   From among other reasons, Mitsubishi maintains and has always

12   maintained that Mitsubishi remains the sole and exclusive owner

13   to the titles, free from liens or encumbrances, at which

14   turbines are and at all times, since they're acquisitioned by

15   Mitsubishi, have remained in Mitsubishi's possession in

16   different locations outside the borders of Mexico.  For its

17   part, Mitsubishi did not consent in any form or manner to the

18   pledging of the turbine by F.G.G. whether through the pledge

19   agreement or in any other manner whatsoever.

20        Accordingly, there's a legal dispute among the trust

21   and C.F.E. on one side and Mitsubishi on the other regarding

22   the validity and enforceability and the security interest which

23   the parties now seek to settle.

24        So how does that help him?  He just wants to say, oh,

25   C.F.E. thinks it's valid, therefore, the government is wrong,

1    when the same document says, well, wait a minute.  Mitsubishi

2    is always asserted that it's invalid.  And then there's two

3    other pages, page seven and page eight that explains that

4    they're basically forgiving that they have this difference;

5    they agree to disagree and now we're going to settle.

6           And you know, I initially thought they wanted this

7    document to be admitted to prove there was no loss, but they

8    expressly said in their response, no, that's not what they

9    wanted.  They don't want to prove no response.  They want this

10   settlement agreement to prove the facts of the case.  Not only

11   does it not do that, again, we would be spending the whole time

12   trying this document and trying this instead of trying whether

13   or not he changed the wiring instructions from the Wells Fargo

14   bank account of F.G.G. in El Paso to his control Turks and

15   Cacaos account and stole the $18-million, which is what the

16   indictment alleges.

17          So, the government persists in the fact that none of

18   the lawsuits are relevant, none of the lawsuits are admissible

19   and not appropriate and we re-urge our motion in limine.

20          THE COURT:  All right.

21          Mr. Hanshew?

22          MR. HANSHEW:  Thank you, Judge.

23          Well, Ms. Kanof very powerfully I guess reframed what

24   was actually in our written motion in limine on the topic.  And

25   to be clear, what they put in their motion in limine was to

1   exclude evidence regarding the existence, content of and

2   disposition of several civil cases.  So I'll take what she said

3   today that the fact of one exists is actually admissible.

4   That's what she said and that's something that courts allow.

5   If we want to exclude all of the pleadings and documents at

6   this point, I don't have a problem with that, subject to, you

7   know, what they say on direct, but we'll --

8           THE COURT:  So all you want from this is to show that

9   there's an interest --

10          MR. HANSHEW:  Right.

11          THE COURT:  -- that Mitsubishi has to convict

12  Mr. Delgado because they have a lawsuit.

13          MR. HANSHEW:  And the same with C.F.E. and the same

14  with Gireud.  I mean all -- you are going to see a bevy of all

15  of the government's witnesses that are going to come in here,

16  and they have a huge financial and arguably criminal interest

17  in the results of this case as to how it's going to affect the

18  various proceedings they have going on.

19          I mean, it's why frankly this case is a mockery of the

20  American justice system which is the criminal justice system.

21  You have all of these parties are fighting this and I mean in

22  at least three different jurisdictions.  They went and fought

23  it in Mexico.  You see this resulting settlement.  They've gone

24  to Austin.  This is a suit.

25          Ms. Kanof focussed here on the counterclaim.  There's

1    a counterclaim to the original complaint, which is Mitsubishi

2    sued F.G.G., their other witness, Mr. Gireud, "Juray"

3    (phonetic), whatever you want to call him, Mr. Delgado, for all

4    of the exact same issues and claims that are in this case.  I

5    mean that's what that lawsuit is about.  And, yes, there's a

6    counterclaim and, you know, we could sit here and talk all day

7    about that.

8          I would also note that the document that they're

9    talking about here was a motion for sanctions.  It had nothing

10   to do with whether the case had continued on gone on.  And in

11   fact, that last page which is from M.P.S.A.'s outside counsel,

12   indicates that that litigation is ongoing, which also goes back

13   to the fact that there's a strong interest, financial and/or

14   civil liability and or even criminal liability, that these

15   witnesses they're bringing in have and it's shown in these

16   cases.  So I think the fact that exists, we put the case law.

17   They didn't dispute it.  We don't have a problem.  We'll agree

18   to not bring in a bunch of the pleadings on this, Judge, but

19   the fact that these litigations --

20         THE COURT:  So, how would this evidence come up?  You

21   would ask the government's witness, isn't it true that you

22   filed or your company filed a lawsuit against Mr. Delgado for

23   money and you have an interest in that lawsuit which could be

24   helped by a conviction in this case?

25         MR. HANSHEW:  Along those lines, Judge.

1          MS. KANOF:  The problem with that, Your Honor, is that

2     first of all, some of the witnesses didn't work for Mitsubishi.

3     They were consultants.  Hector Ponce was a consultant.

4          THE COURT:  Let's say that -- let's say the proper

5     witness is there.

6          MS. KANOF:  I'm sorry, Your Honor?

7          THE COURT:  Let's say that they have the proper

8     witness; they have someone that can speak as to that.

9          MS. KANOF:  I think they only have one witness,

10    Patrick Altumura, that actually still works for Mitsubishi.

11         THE COURT:  But because it seems to me that if you

12    have a financial interest, as small as it might be, that

13    they're entitled to pursue that for prejudice.

14         MS. KANOF:  I don't know what interest an employee

15    would have when the company is owned by M.H.I. out of Japan and

16    the decision would be made by the board of directors to make

17    the lawsuit in Japan, a company that employs thousands and

18    thousands of people.

19         THE COURT:  Because if they convict Mr. Delgado that

20    would be helping their employer and I don't --

21         MS. KANOF:  Okay.  All right.

22         THE COURT:  I mean because that helps the employer's

23    financial interest.  If they are able to help their employer's

24    financial interest, perhaps some of that benefit may flow down

25    to them.  I mean, I suppose -- I think what Mr. Hanshew is

1    saying is he's entitled to pursue that avenue.  And I think all

2    he's going to do is say there's been a lawsuit filed.

3    Obviously you're not going to introduce the document, certainly

4    not the document you indicated, because then the whole thing

5    would come in and that wouldn't be helpful.

6                   MS. KANOF:  Your Honor, so should I provide a list of

7    witnesses of the people that still work for Mitsubishi?  I mean

8    it only --

9                   THE COURT:  I don't think you are obligate to do that.

10   I think Mr. Hanshew has to do his own legwork, but I think he's

11   entitled to pursue any interest that these people -- any

12   financial interest they may have in testifying the way they do.

13                  MS. KANOF:  Okay.

14                  THE COURT:  So...

15                  MR. HANSHEW:  It will be on direct.

16                  MS. KANOF:  Right.

17                  MR. HANSHEW:  They're going to ask who the person is

18   and who they work for and in what capacity.  I mean they're

19   going to establish that in about two seconds.

20                  THE COURT:  I don't think -- and her other issue

21   was -- I mean I don't want to go spend another week trying

22   those other cases.  I don't think it's going to be actually

23   much.  It seems to me like you are going to ask maybe five

24   minutes about some other pending lawsuit and the interest and

25   the outcome and how this might impact that and we're done.  Do

1    you anticipate it being more than that?

2           MR. HANSHEW:  Other than, you know, they go far on

3    their direct, Judge, so -- but I would agree.

4           THE COURT:  We're not going to be going into the

5    pleadings and when they -- you know, all of this other stuff

6    that's here, I don't think we're getting into that.

7           MR. HANSHEW:  I wouldn't anticipate that.  If they

8    somehow go there, we'll ask to approach.

9           THE COURT:  All right.  So I think you are entitled to

10   pursue that.

11          MR. HANSHEW:  Thank you.

12          And then the second issue is settlement.  I think, you

13   know, it's made clear in there and, in fact, Ms. Kanof actually

14   proved our point, which is why she read off what M.P.S.A.'s

15   position is.  Of course, we know from their indictment and

16   common sense that M.P.S.A. is going to come in and say they

17   didn't authorize it, but C.F.E. claims otherwise, and that

18   document shows that and that is absolutely clear.  They can say

19   all they want about M.P.S.A. in here, but if they put a C.F.E.

20   person in up here who says, oh, you know what?  We never

21   thought this was valid and the such.

22          MS. KANOF:  Your Honor, it's hearsay.

23          THE COURT:  But it's impeachment.  He set up the

24   scenario for impeachment.

25          I agree the document is hearsay if a C.F.E. person

1   comes up here and says, we never thought that was a valid

2   consent to attach the collateral using the generator's

3   collateral --

4         MS. KANOF:  (Indiscernible.)

5         THE COURT:  -- and then he says, well, that's not what

6   this says and didn't you or somebody in your organization

7   agreed to this, but if that happens then here we go.

8         MR. HANSHEW:  All right.  And really this is what

9   flows from when the government decides to bring a case to

10  court.

11        THE COURT:  Yeah.  And you know what?

12        MR. HANSHEW:  Their prerogative.

13        THE COURT:  Aren't we glad we live in America and we

14  get to do that?

15        MR. HANSHEW:  I'm excited.

16        THE COURT:  Believe me.  If it takes two weeks, three,

17  four, five, hey, I'm okay with it.

18        MR. HANSHEW:  So I think that covers their stuff.

19        THE COURT:  Okay.  All right.  So then -- is that the

20  last one, Ms. Kanof?

21        MS. KANOF:  I'm looking.  Oh, I don't think we

22  discussed Sulzer, Your Honor.  The Sulzer, there's nobody -- I

23  mean, Mr. Gireud is no longer part --

24        THE COURT:  Gireud.

25        MS. KANOF:  Gireud.  Thank you, Judge.

1          There's nothing that happened on this lawsuit.  And I

2     guess if you want to say, isn't it true that you and

3     Mr. Delgado were sued, I, you know, could ask that and that's

4     it, but you know Sulzer sued him, but we're not -- even talking

5     about Sulzer is so outside the scope of the indictment, I don't

6     know how we get there.

7          THE COURT:  Any time a witness is up there, they're

8     always subject to impeachment for bias or prejudice or specific

9     interest.  And if they have a lawsuit against Mr. Delgado, then

10    obviously a conviction in this case could impact the result of

11    that lawsuit and they're entitled to ask.  I don't expect it to

12    be even a minute of time.  And some jurors may wonder why

13    they're asking the question.  I think he's entitled to ask it.

14          Is that everything?

15          MS. KANOF:  That was it for the government, Your

16    Honor.

17          THE COURT:  And now Mr. Hanshew, you had some as well?

18          MR. HANSHEW:  Yes, Judge.  But one moment.

19          THE COURT:  I'm sorry?

20          MR. HANSHEW:  One moment, Judge.

21          So I'm going to be referring to our filing, our motion

22    in limine, Judge, which is CM/ECF document number 195.

23          The first one -- and I'm going to keep these short,

24    Judge.

25          THE COURT:  Okay.  I've read this.  Is there some

1    purpose for going beyond that he took the money and spent it on

2    personal things where we would have to show pictures of -- I

3    mean I don't know what pictures you have.  Maybe they are

4    really lavish stuff, but...

5         MS. ARREOLA:  There is a reason to introduce that

6    evidence.  The photos corroborate the fact that Delgado spent

7    this money on himself.  I mean these are photos of the

8    furniture that were bought right out of the Turks and Cacaos

9    account at Charlotte's Furniture and there were items found

10   from Charlotte's Furniture in his house.  And so those photos

11   corroborate it.

12        THE COURT:  Is this the one where you shoed me a big

13   long computer printout with all of the holes on it of all the

14   stuff he bought?

15        MS. ARREOLA:  Your Honor, the government's not

16   introducing that box, just a small selection of documents from

17   Charlotte's, but I believe what defense counsel is objecting to

18   are photos taken inside his home.

19        THE COURT:  Right.  Because he's saying that the

20   probative value of the photograph, which is already

21   substantiated by the printouts and the trail of the money to

22   the personal account, from the personal account to Charlotte's

23   and the printout from Charlotte's what was bought, that the

24   photographs are so prejudicial that they substantially outweigh

25   any probative value, because you already got the probative

1   value from trailing the money to his personal account and from

2   showing from the personal account he's spending at Charlotte's

3   on personal furniture items.  So once you prove that, you've

4   proven your case.  To show the pictures is to basically inflame

5   the passion, that's his argument.

6         MS. ARREOLA:  Right, Your Honor.  And the government

7   respectfully disagrees.  These are not crime scene photos with

8   gruesome bloody images.  These are simply photos of furniture

9   in the house, the ski condo.  And the government respectfully

10   invokes Rule 402; all relevant evidence is admissible unless

11   otherwise prohibited by the rule.

12         THE COURT:  Well, 404, and substantially outweighed by

13   it's prejudicial effect.

14         MS. ARREOLA:  Your Honor, the government would submit

15   that this is not unfairly prejudicial, because as government

16   explains, these are not gruesome photos.  These are just images

17   of what he actually bought.

18         THE COURT:  Right.

19         MS. ARREOLA:  And it would be helpful for the jury and

20   it corroborates the government's evidence.  These are the

21   photos of what was found in his house.  It helps show that this

22   wasn't an accident, that the Charlotte's money ended up here at

23   trial.

24         THE COURT:  No, no.  After page after page, they're

25   not going to think it's an accident.

1          MS. ARREOLA:  Your Honor, the government is not going

2     to be seeking to introduce that printout, that lengthy printout

3     that was presented to the Court previously.  What I believe

4     defense counsel is objecting to are the photos themselves.

5          THE COURT:  Right.  No, but see, here's the analysis I

6     have to do in balancing probative and prejudice.  Do you have

7     enough evidence to prove every element of your case through

8     matters that are not unfairly prejudice?  And if you do, then

9     the likelihood that these photographs might be prejudicial

10    becomes very likely.  Because you've already proven your case,

11    you don't need these to prove your case, so why are they being

12    introduced?  To show look how lavish they are, look at all of

13    them.  It was personally spent on him, all of those things.

14    Well, that is what -- that's the analysis I have to make to

15    determine if its prejudicial effect outweighs its probative

16    value, because you don't need it.  So if you don't need it,

17    then the chances that its prejudicial effect outweighs it is a

18    greater than if you really need it.  If you absolutely need it

19    to prove your case, there's no chance its prejudicial effect

20    would outweigh it's probative value.  But in this case you

21    don't need it and there is a chance that its prejudicial effect

22    will outweigh its probative value.  That's why I'm referring to

23    the printout and all of that.  Because you can prove a

24    documentary with documents, you don't have to show the

25    documents, because photographs do have a tendency to inflame.

```
 1            And I know they're not -- and I will tell you in
 2    300-something jury trials that I've had, I've never excluded a
 3    photograph and this is the first time I ever thought that maybe
 4    it might be appropriate.
 5            MS. ARREOLA:  Your Honor, the government's case is
 6    like a wall and every brick ads up to proving the government's
 7    case.  This is just one brick in that wall.  It's highly
 8    probative.  It is based -- possibly are prejudicial, but that's
 9    not the test.  If the government wasn't allowed to introduce
10    prejudicial, even highly prejudicial evidence, the government
11    would never make a case.  All of the evidence that comes in is
12    prejudicial.
13            THE COURT:  Right.
14            MS. ARREOLA:  That's how we prove our case.
15            THE COURT:  Right.
16            MS. ARREOLA:  And the government respectfully relies
17    on Rule 402.  If the evidence is -- if it's relevant, then it's
18    admissible unless otherwise.
19            THE COURT:  Well, it's relevant, it's admissible if
20    its probative value is not substantially outweighed by tits
21    prejudicial effect which is 403 or 404, one of those rules.
22            MS. ARREOLA:  The photographs aren't in front of the
23    Court.  So if the Court is inclined to rule against --
24            THE COURT:  I'm assuming this is really lavish stuff.
25    He said -- you know, what is it?
```

1          MR. HANSHEW:  It's going to be all of these pictures

2    of what some people may consider to be expensive and lavish

3    furniture and house items and the such.

4          MS. ARREOLA:  (Indiscernible.)

5          THE COURT:  Well...

6          MR. HANSHEW:  But the short of it is, Judge, is

7    they -- let's be clear here.  As you've noted, they're going to

8    introduce the financial transactions.  Okay?  We're not asking

9    to exclude the financial transaction, which is what is the

10   elements that they're proving here.  The financial transaction

11   to show that the money went from point A to B and that money is

12   there.  That's done with the documents that they have.  We know

13   this.  I mean, they're going to introduce those as part of the

14   evidence.

15         This?  There's no reason for it, other than to have

16   our jury here, who are an El Paso jury that, you know, we are

17   in a -- unfortunately sometimes categorized as, you know what,

18   a lower income big city in the United States.  A lot of people

19   that will be unquestionably inflamed at looking at all of these

20   pictures.  I mean it's what you see when they go do these shots

21   of, oh, hey, we just took down Bernie Madoff's house.  I'm not

22   saying that's what's in this case, but, you know, gold and you

23   know statutes and the such, but there's no reason for it.

24         THE COURT:  Is it anywhere close to that?

25         MR. HANSHEW:  It's a lot of furniture as you saw by

1     that list.

2          THE COURT:  I need to see the pictures.  I mean I know

3     where you are coming from and I'm kind of leaning that maybe

4     you might be right, but let's see the photographs.

5          MS. ARREOLA:  Your Honor, the government just wants to

6     correct something that defense counsel said, which is that this

7     is just about the transactions.  This is about a scheme to

8     defraud.  And the scheme to defraud in the indictment

9     specifically alleges that Delgado used the money for his

10    personal enrichment.  These photos corroborate that.  It's not

11    enough -- the government would submit that having a witness say

12    they saw this stuff in the house is very different than

13    actually seeing photos that corroborate the witness's

14    testimony.  And the jury is entitled to see that and the

15    government is entitled to introduce that evidence because it's

16    relevant.

17         THE COURT:  I totally, absolutely 100 percent agree

18    with you that it's relevant.  The issue here is, is its

19    prejudicial effect, does it substantially outweigh it's

20    probative value.  When you're considering probative value, you

21    consider all of the rest of your available evidence and whether

22    or not you actuality need this piece of evidence or not,

23    because that's how you balance prejudicial and probative.  So I

24    mean that's the Rule.  That's 403 or 404, it follows that one

25    that says that all relevant evidence is admissible .  So I

1    understand that.

2         I'm just saying I think Mr. Hanshew has a point.  I

3    need to see the photographs.  I'm thinking you don't need it,

4    because you can show his personal enrichment by showing that he

5    spent the money at Charlotte's on personal items for his house

6    just by reading that.  He bought a furniture set.  He bought, I

7    don't know, whatever it was that people buy at Charlotte's,

8    because I don't ever go there, but whatever they buy there,

9    people are going to know it's for his own personal enrichment.

10   They don't need to see a photograph of it that's somehow going

11   to inflame them.  And maybe the photographs are not

12   inflammatory.  I mean I'm just assuming as true what

13   Mr. Hanshew has said.  And we'll cover that ground when we get

14   there.  Photographs may be inflammatory like you say or may

15   not.  I mean it depends on what they show us.

16         MS. KANOF:  Your Honor may I add something?

17         THE COURT:  Sure.

18         MS. KANOF:  Just because somebody purchases something

19   doesn't mean they've purchased it themselves.  For example, I

20   think he's going to paint himself as a philanthropist.  He

21   wanted to be big man on campus.

22         THE COURT:  Don't your records show where the

23   furniture was delivered?

24         MS. KANOF:  I don't know if they do or not.

25         THE COURT:  Delivered to his house?  I mean...

1          MS. KANOF:  I don't know that they show where they

2     were delivered, Your Honor.

3          THE COURT:  Well?

4          MS. KANOF:  We were going to put on Ms. Narvaez to

5     testify that the furniture was delivered to the house and

6     identify that these were the items that were purchased --

7          THE COURT:  See, all of that's --

8          MS. KANOF:  -- through photos.  I mean just because

9     money is wire transferred to Charlotte's, he could have been

10    buying it Cathedral High School, because he does make a

11    donation to Cathedral High School.  He could have been buying

12    it, you know -- I mean the whole -- it's $100 -- the whole

13    purpose is to show that the money was not used for the -- well,

14    first of all, it went to him -- it was used for him.  And I

15    think we are entitled to show that.

16         THE COURT:  Didn't it go from Cacaos to his

17    girlfriend's account at Wells Fargo?

18         MS. KANOF:  Some money did.  There was $250,000 wire

19    transfer from the Turks and Cacaos account to Charlotte's.  And

20    I think we're entitled to show what that $250,000 was for.  And

21    I don't think that the -- the reason we're not admitting that

22    is it because it's very confusing, that antiquated computer run

23    is confusing.  There is three $375,000 transfer directly from

24    the Turks and Cacaos account to purchase the house.  I think we

25    can show a picture of the house that was purchased.

1          We're going to -- we have money that his accountant --

2    he transferred a lot of the money from the Turks and Cacaos to

3    an account at Wells Fargo that he forced his accountant to be

4    the sole signature on; he promised to go put his signature and

5    he didn't -- it's called money laundering -- and then she had

6    to transfer the money to his other account at Wells Fargo to

7    pay his bills, and those bills were to build a $30,000 pool in

8    his backyard, for landscaping and decking of the pool.  And he

9    -- and he was always behind -- I mean they were gunning her --

10   to pay his wife's child support which he was always behind on

11   and she had to negotiate the accountant.  I mean these are part

12   of -- I mean these give a picture of the misuse of the money

13   instead of going to Mitsubishi and instead of going

14   appropriately to F.G.G., they were going for him to live a very

15   lavish lifestyle and I think that's relevant.  And the only way

16   we can show that that transfer ended up in his hands, you know

17   just because you buy furniture doesn't mean you're buying it

18   for yourself, just because you buy a house doesn't mean you're

19   buying it for yourself.  I disagree that the weighing of

20   probative value versus prejudicial value stops here.

21          You know it's not unlike a drug dealer case where we

22   would show the house that the drug dealer bought.  It's

23   ill-gotten gains.  This money was illegally stolen.

24   $18-million were diverted and they were diverted in a very

25   sophisticated way and why were they diverted.  And it's part of

1    a laundering process to do it this way.

2         And I just -- we'd like to show the Court the pictures

3    before the Court makes a addition as to whether they're very

4    prejudicial and, you know, it's definitely historically the way

5    that you prove money laundering.  So, if the Court could just

6    withhold that ruling until we can show the Court the exhibits

7    on Monday, we would be grateful.

8         THE COURT:  You've seen them.  You have seen them.

9         MR. HANSHEW:  Yes, Judge.  I have no problem with the

10   Court reviewing those in making a decision.

11        Just one thing, Judge, and I've tried to be patient

12   about this and not interrupt and interject, but you know I

13   think that Ms. Kanof is crossing the line a little bit here, in

14   terms of the discussions she's having about, for example, that

15   somehow Mr. Delgado was not up on his child support and these

16   things.  I mean, these comments are, one, borderline

17   slanderous, okay, and two, they have -- what does his child

18   support payment have anything to do right now with a discussion

19   about these photographs.

20        You know, she's been spending her time up here

21   basically arguing her whole case and trying to prejudice the

22   Court about the case or Mr. Delgado, so I feel compelled.  I'm

23   letting a whole bunch of other things go that I think were said

24   by her that weren't related to the issues in front of this

25   Court.  But this one?  I mean, it is blatantly irrelevant to

1    the discussion we're having.  It's, frankly, to say in an open

2    court and make those types of comments, when she knows full

3    well one of their exhibits shows him paying 8, $10,000 a month,

4    month after month after month in child support, you know, for

5    her to say that.

6          You know, it's my job to defend Mr. Delgado.  I don't

7    want us to get off on, you know, all of those issues, and I am

8    mindful of the Court, you know, admonitions on that topic

9    before, but I'm just compelled, Judge.

10         THE COURT:  All right.

11         So I'll look at the photographs.

12         MR. HANSHEW:  Thank you, Judge.

13         THE COURT:  I hear your motion and I understand it.

14         MR. HANSHEW:  Thank you.

15         THE COURT:  I'll look at it.

16         MR. HANSHEW:  The next one, Judge, was the notice of

17   the manner of forfeiture.  That was agreed to.

18         Then the next one, also, other crimes and acts,

19   agreed.

20         THE COURT:  Okay.  Well, let me -- when am I going to

21   read the indictment to the jury?  When does that happen?

22         MR. HANSHEW:  I'm sorry, Judge?

23         THE COURT:  "Refrain from reading the forfeiture

24   notice aloud during voir dire."  Am I going to read the

25   indictment to the jury during voir dire?

```
 1              MR. HANSHEW:  Well, the indictment includes the

 2    forfeiture, so we're just asking that the --

 3              THE COURT:  If we ever a copy of that attached to the

 4    indictment include the forfeiture.

 5              MR. HANSHEW:  Correct.

 6              THE COURT:  Okay.

 7              You don't -- do you have any problem with that, Ms.

 8    Kanof?

 9              MS. KANOF:  I'm not sure.  He's saying that --

10              THE COURT:  I guess the forfeiture paragraph at the

11    end.

12              MS. KANOF:  The notice of government's forfeiture?

13              THE COURT:  Right.

14              MS. ARREOLA:  The government has no objection

15    redacting that --

16              MS. KANOF:  No objection.

17              MS. ARREOLA:  -- when it is presented to the jury.

18              MS. KANOF:  Until after the conviction, Your Honor.

19              THE COURT:  Well, he's presumed innocent.

20              MS. FRANCO:  Right.

21              MS. KANOF:  I know.

22              MR. HANSHEW:  Three was agreed to as well, Judge.

23              THE COURT:  Was agreed.  Right.  I see that.

24              MR. HANSHEW:  Four was agreed to as well.

25              Five agreed to.
```

1          Six was opposed.  And that's just refrain from -- the

2     government to refrain from the voracity of their witnesses.

3     That's set out there with the law, Judge.

4          THE COURT:  Are you --

5          MS. KANOF:  Your Honor, he has the right to object to

6     a question at the time.  I don't understand this sort of

7     general motion in limine about how to ask a question.

8          THE COURT:  Well, it's because it's a question that's

9     asked in every trial I've ever had.

10         MS. KANOF:  I don't ask questions that way.

11         THE COURT:  Okay.

12         MS. KANOF:  I mean I'm going to try to stick to the

13    Rules of Evidence.  And if in the heat of battle I ask a

14    question the wrong way, I will expect that you will sustain an

15    objection.  But in general, I will refrain from presenting

16    questions of this nature.  I'm human.  And if I -- and if I

17    violate the motion in limine, I apologize in advance, Your

18    Honor, but that's why we have objections.

19         THE COURT:  All right.  Okay.  Sounds like she agrees.

20         MR. HANSHEW:  Yes, subject to she's going to violate

21    your motion in limine.

22         THE COURT:  Well, you know, in the heat of battle

23    sometimes things slip out.  We've all done it.

24         MR. HANSHEW:  Understood.

25         Number seven.  That was opposed that's the foreign

legal document translation.  I think at this point that
everything has been translated.

    THE COURT:  So are you withdrawing that?

    MR. HANSHEW:  Yeah.

    THE COURT:  Okay.

    MS. ARREOLA:  Your Honor, just so the record is clear,
the government respectfully asks if defense counsel is going to
stipulate to the translations so that we don't need to call our
interpreters.

    MR. HANSHEW:  I guess the same, if they stipulate to
ours.

    MS. ARREOLA:  That's agreed.

    MR. HANSHEW:  Yes.

    THE COURT:  And you both stipulate.  Okay.  Good.

    Okay.  Document number eight.

    MR. HANSHEW:  Eight was just incomplete documents and
records, Judge.

    THE COURT:  So, what -- did they not offer in complete
documents?

    MR. HANSHEW:  At some point, we were concerned.  And I
think this somewhat alleviated, not entirely, but they were
going to issue just -- present partial documents, in particular
ones that were not, you know, some portions were translated or
not.  I'm hopeful that as a result of us, you know, spending
the last couple of months and a lot of money getting those

1    translations done, that that shouldn't come into play.  I'll

2    withdraw that and I can make it at the time, Judge.

3            THE COURT:  All right.  Because you always have the

4    rule of optional completeness.

5            MR. HANSHEW:  Right.

6            THE COURT:  All right.  And nine?

7            MR. HANSHEW:  That's the admission of foreign

8    documents without live testimony.  That's our -- and I wrote it

9    out extensively, Judge -- that's our constitutional challenge

10   to the provisions in the statutes here.  It's our argument that

11   *Crawford* should apply to the scenario that's bringing in these

12   documents without an ability to cross-examine them violates the

13   confrontation clause.

14           We acknowledge that, you know, the statute does exist

15   and, you know, asking courts to strike statutes as

16   unconstitutional is typically an extreme remedy and decision by

17   the Court, but nevertheless in light of what *Crawford* and its

18   progeny said, we believe that it should apply here.

19           MS. ARREOLA:  Your Honor, for clarification, is the

20   objection only based on *Crawford* or is it to whether or not the

21   documents meet the statutory requirements for authentication?

22           THE COURT:  I think I heard him say that he thinks the

23   statute's unconstitutional because in it's advocation it would

24   violate *Crawford*.

25           MR. HANSHEW:  Correct, Judge.

1          MS. ARREOLA:  Your Honor, I can touch through the

2     different -- just for the record, how the documents are

3     properly authenticated and then address the *Crawford* concerns.

4          THE COURT:  Has any case ever addressed it before?  I

5     mean has this been brought up and ruled on?

6          MS. ARREOLA:  Well, Your Honor, the documents

7     themselves are -- include bank records and contract documents

8     and some correspondence by Delgado himself, which --

9          THE COURT:  Okay.  So that's -- that wouldn't be a

10     confrontational violation.

11          MS. ARREOLA:  Right, Your Honor.

12          THE COURT:  The bank records are not testimonial are

13     they or are they?

14          MS. ARREOLA:  No, Your Honor.  And there's case law

15     that they are not testimonial because they were not stated for

16     use at trial.  I'm going to cite an unpublished decision on

17     this point, but a Fifth Circuit decision nonetheless, which is

18     *U.S. v. Herrera*, 466 F.App'x 409 (5th Cir. 2012), the court

19     ruled that defendants, quote, bank records are kept in the

20     ordinary course of business.  They were not specifically

21     prepared for use at trial, thus, under *Crawford* and *Martinez*

22     *Rios*, the bank records were non-testimonial business records

23     that fell outside of the purview of the confrontation clause.

24          THE COURT:  That all sounds rational to me.  I'll read

25     this one again and I'll think about your invitation to hold the

1    statute unconstitutional.

2         MS. ARREOLA:  Your Honor, there's one more thing.

3    There's also another Fifth Circuit case I would like to bring

4    the Court's attention to.

5         THE COURT:  Sure.

6         MS. ARREOLA:  It's *United States v. Morgan.*  And to

7    the extent that they are arguing that the certifications

8    themselves from the foreign governments somehow create

9    confrontation clause issues, the Fifth Circuit has held that

10   under Rule 104, preliminary determinations by the court are not

11   subject to the purview of the confrontation clause.

12        And *Morgan* itself involves using grand jury testimony

13   to admit patient records at trial, and the witness who

14   testified and authenticated the documents at the grand jury was

15   unavailable to testify at trial.  I have a copy of *Morgan* for

16   defense counsel and for Your Honor.

17        THE COURT:  Okay.  Thank you.  If you'd just hand it

18   to Waheed.

19        So the argument is that we can't cross-examine the

20   person who is authenticating the document, therefore it

21   violates *Crawford*.

22        MR. HANSHEW:  In the way the statute's structured, so

23   it's allowing -- and part of it is that in particular this

24   statute because it deals with the introduction of foreign

25   documents and the lack of reliability, obviously, as it comes

1    through this process.

2         My thought would be and I cited it for the judge, for

3    you, Judge, that decision on the last page, page 16.  It's

4    *United States v. Anekwu*.  It's from the 9th Circuit.  And that

5    has a fairly significant discussion of the challenges that

6    we're talking about here.

7         Now admittedly, and I've cited for the Court so the

8    Court had all candor on this, you know, they rejected the

9    argument we're making here, but that was under plain error

10   analysis, which they made sure to note.  So, I think if the

11   Court takes a look at that case, you'll see a very thorough

12   breakdown of the analysis as it relates to here.  Of course,

13   you know, our argument is because they did the plain error

14   review in that case, you know, the standard was --

15        THE COURT:  High.

16        MR. HANSHEW:  -- not the same as the Court is right

17   now looking at it.  We believe that when courts are looking at

18   this where it's been properly raised, the initial point here

19   and/or the Fifth Circuit if that's where it goes, the decision

20   would turn otherwise.

21        THE COURT:  Well, the standard would be different.

22   The decision may be the same.

23        MR. HANSHEW:  Right.

24        MS. ARREOLA:  Your Honor, the government would ask the

25   Court again to look at the specific documents we're trying to

1    admit.  The bank records are not testimonial.  The Fifth

2    Circuit has already held that.  I cited *United States v.*

3    *Herrera*.

4         The other document is a contract document.  Those are

5    non-testimonial.  They weren't created for use at trial.

6    There's some bank transmission records from the Mexican

7    government as well.  And of course -- by the way Your Honor,

8    two of the contract documents were actually signed by

9    Mr. Delgado.  And that's it, Your Honor.

10        THE COURT:  Okay.  Thank you.

11        All right.  I'll think about that over the weekend.

12        MS. ARREOLA:  Your Honor?  One more thing, Your Honor.

13   The government is relying on the Statute 3505 for the Turks and

14   Cacaos documents, but the Mexican documents which were actually

15   received from the Mexican government, the government is

16   actually relying on Federal Rule of Criminal Procedure 44,

17   which incorporates by reference of Federal Rule of Civil

18   Procedure that allows for the authentication of documents

19   received through MLAT for apostille.  The government has

20   proffered apostille and (indiscernible) -- produced to defense

21   and we've marked it as an exhibit.

22        THE COURT:  So on this one we'll take it up at trial.

23   And my guess is, to accept your invitation to hold it

24   unconstitutional would mean that you don't ever get to bring in

25   foreign documents unless you got the people coming in.

1          MR. HANSHEW:  Possibly, yes, Judge.

2          THE COURT:  Okay.  Let's go back.  Let's see where

3     left off over here.

4          All right.  I think you filed some motions today,

5     Mr. Hanshew?  I know that when we left -- at the last hearing

6     we had, we were -- it was on a Tuesday, we were going to have a

7     hearing on Thursday before trial.  We were going to take up

8     some issues.  One of them was -- was it -- Mr. Gireud should be

9     held in contempt for failing to heed the Court's order and

10    another issue was something about some case that requires you

11    to get permission to subpoena the government.

12         MS. ARREOLA:  We can't hear.

13         MR. HANSHEW:  I'm sorry, Judge.  I couldn't hear you.

14         THE COURT:  Oh.  It was -- you told me about you were

15    going to have a hearing but you needed time to subpoena the

16    government and some case called *Touhy* that requires you to get

17    the government's permission to do that.  And so we ended up

18    granting a continuance of the trial, and we pushed back the

19    Thursday hearing because you needed to get permission from the

20    government to subpoena somebody to come in to testify to

21    something or another, and then the two of you were going to

22    work something out and I never heard about it anymore.

23         MR. HANSHEW:  Okay.  So we -- what was filed today was

24    a reply brief to the government's response to our motion to

25    dismiss.  And our motion to dismiss wasn't to sanction

1    Mr. Gireud for non-compliance.  It was a sanction against the

2    government, in particular Ms. Kanof, what we believe to be

3    illegal conduct in interfering with the subpoena process and

4    representing Mr. Gireud, so we filed that reply, Judge.  You

5    know, we filed it because in re-urging a request for an

6    evidentiary hearing on that, that's what that was.  That was

7    just a reply.

8              THE COURT:  So do you have your witnesses now?

9              MR. HANSHEW:  We can't have witnesses without a date

10   for a hearing, because we can't subpoena without the date.

11             THE COURT:  How soon can you get them here?

12             MR. HANSHEW:  We could --

13             THE COURT:  I'm thinking Monday, if not tomorrow,

14   Monday.  We got Monday.  We can do it tomorrow any time during

15   the day.  Well, anytime in the afternoon.  And then we can do

16   it -- or we can pick the jury Monday and then Tuesday we can

17   have the evidentiary hearing and start trial on Wednesday.

18             MR. HANSHEW:  Okay.

19             THE COURT:  We can have the evidentiary on Monday and

20   pick the jury on Tuesday.

21             MR. HANSHEW:  Yeah, if the government could help us

22   with -- I mean, Mr. Gireud is essentially under their control.

23   I know he's going to be one of their witnesses.  He's the

24   individual who will we'll be asking.  And if they'll make --

25             THE COURT:  Who is the Touhy guy?

```
1          MR. HANSHEW:  Ms. Kanof.

2          MR. GONZALEZ:  Your Honor, when we were here last back

3    on I think it was May 17th, you specifically -- I mean this

4    issue was raised back then.

5          THE COURT:  And I said I was leaning in favor of

6    denying it.

7          MR. GONZALEZ:  Exactly.  And so the issue became,

8    well, what witnesses do they need to go forward?  And they

9    rightly identified -- Mr. Hanshew, stating that we need to

10   subpoena some witnesses, some government witness, at which

11   point the issue became we have to comply with this federal

12   regulation.  And I think it's 5 U.S.C. 302, federal regulation

13   that incorporates what Touhy says.  And what Touhy says, is

14   that you have to go through this process before a government

15   witness -- say a government's employee, for example, Ms. Kanof,

16   myself, Ms. Arreola or a government agent could be called to

17   testify to make sure that the agency is okay with what they're

18   going to be asked, because they may invoke some privileges.  So

19   that's what came up at that point.

20         So Mr. Hanshew acknowledged that, yes, that's what we

21   have to go through and it will take more than two days.  So he

22   knew back in May that it would take more than two days, because

23   he, himself, said that.  We've been waiting all of this time to

24   hear from him.  We had not heard a word.  We thought he

25   abandoned that motion.  And now here we are two days from trial
```

1    and they're raising the same thing, Your Honor.  We think that

2    motion should be denied.  He's had over three months to come

3    forward to have the Court address that.  We think it's unfair.

4    We're two days from trial, essentially, and we're back where we

5    were three months.

6              THE COURT:  Right.  I agree with everything you said,

7    but I don't want to cut him off from having the ability to make

8    his record and so if we can do that.

9              MR. GONZALEZ:  I'm sorry?

10             THE COURT:  I don't want to keep him from making a

11   record by putting on whatever evidence he's going to put on.

12             MR. GONZALEZ:  And he's had three months to do that,

13   Your Honor.

14             THE COURT:  I understand that.

15             MR. GONZALEZ:  They have no problem calling the Court.

16   I mean we had the status conference two days ago.  They had no

17   issue reaching out to the Court and having a hearing.  Why

18   haven't they done that?

19             THE COURT:  I don't know.

20             MS. KANOF:  Your Honor, we have a serious witness

21   problem.  We have a witness that can only testify on Monday.

22             THE COURT:  Who is that?

23             MS. KANOF:  It's a witness from a foreign country.

24             THE COURT:  Oh, you mean in the trial?

25             MS. KANOF:  In the trial.  And we have a couple of

1    witnesses with time constraints.  We have already made

2    reservations to fly people from Detroit, to fly people from or

3    Oregon, to fly people from England, to fly -- I mean, they're

4    here at certain times.  They've already gotten leave from their

5    jobs.  And it really --

6              THE COURT:  Well, we'll have the hearing at 6:30 in

7    the morning and we'll start trial at 8:00.

8              MS. KANOF:  Okay.

9              THE COURT:  We'll accommodate everyone.  I want every

10   one to be happy when they walk out the courtroom doors.

11             All right.  So you'll be ready to go when then?

12             MR. HANSHEW:  The Court setting.

13             THE COURT:  Because we can do it Monday morning 6:30

14   or we can do it Tuesday morning, whenever you want to do it.  I

15   guess Monday morning, since you don't want Ms. Kanof to be

16   proceeding in the case, so if I were to grant your motion, she

17   wouldn't be trying the case.  We should probably do it before

18   trial.

19             MS. KANOF:  Your Honor, I will tell the Court there's

20   no way he's going to get *Touhy* permission by Monday.

21             THE COURT:  I thought that was already done.

22             MS. KANOF:  He never issued *Touhy* letters.  That's

23   what Mr. Gonzalez was trying to tell the Court is we've been

24   waiting for our *Touhy* letters and nobody ever got them, that's

25   why we thought there was an abandonment.

```
 1              MR. HANSHEW:  We're just going to call Mr. Gireud.

 2              MS. KANOF:  We'll have him here.

 3              THE COURT:  Do we have to be here at 6:30 for him?

 4    How long is he going to be?

 5              MR. HANSHEW:  It shouldn't be very long.

 6              THE COURT:  Just give me a guess.

 7              MR. HANSHEW:  Less than an hour.

 8              MS. KANOF:  Between jury selection and the putting on

 9    of the evidence at trial.

10              THE COURT:  Okay.  Let's do that.

11              Okay.

12              MR. HANSHEW:  Will the Court -- I mean, Judge, I just

13    ask that the government will put on the record that they'll

14    facilitate Mr. Gireud being here for that?

15              MS. KANOF:  Oh, I'm sorry, Your Honor.  We do need to

16    do it before we select the jury.

17              THE COURT:  So when is Mr. Gireud going to be here?

18              MS. KANOF:  I'm sorry?

19              (Audio technicalities.)

20              THE COURT:  Mr. Gireud.  When will he be here?

21              MS. KANOF:  Whenever the Court wants.  We'll call his

22    attorney.  His attorney is Collin Hobbs.  And we'll ask his

23    attorney to have him here whenever the Court wants him.

24              THE COURT:  What's the earliest we can go, Greg?

25              COURTROOM DEPUTY DUENAS:  7 o'clock.
```

KATHLEEN A. SUPNET, CSR

1          THE COURT:  Should we do it at 7:00 just to be sure

2   just because sometimes lawyers say an hour and it's really two

3   hours, three?

4          MS. KANOF:  So 7 o'clock on Monday?

5          THE COURT:  7:00?

6          MS. KANOF:  And he'll be here.

7          THE COURT:  Now, you also wanted to re-urge your

8   motion for a continuance.

9          MR. HANSHEW:  Yes, Your Honor.  We filed our motion

10  for reconsideration setting out all of the issues, concerns we

11  have with being unable to have a translation of those documents

12  and why we think that they would be exculpatory and irrelevant,

13  and in the end will end up being a due process violation in

14  this case, for this case to proceed without being able to have

15  any type of translation done on that, Judge.

16          You know, as we stated before, you know, we just asked

17  for the period of time to be able to have those translated so

18  that we can make sure that that issue has been cleared up.  We

19  know how significant it must be, because the government has

20  now, again, gotten rid of the two witnesses that were their

21  main witnesses before, from C.F.E., as a result of those

22  documents.  Until those documents came out, they were going to

23  use them.  They are not now.  That speaks in and of itself to

24  the damaging nature of those individuals and their testimony as

25  it relates to these orders that came out, Judge.  That's all we

1    ask for.

2           We think that the record shows clearly here there's

3    nothing in terms of any efforts that anyone could have done,

4    including the government and/or Mr. Delgado, to have obtained

5    that document any earlier.  It wasn't produced until August 4th

6    at the earliest 2016.  It was created at that point appears at

7    least from the face of the document, and it wasn't produced and

8    handed over to us until August the 29th -- I'm sorry -- 31st

9    and September the 1st, when the government itself just received

10   it.

11          Their offer to take out these witnesses, again, that

12   really is kind of a backwards concept when think of that, that

13   they're offering to some gesture of trying to leave alleviate

14   my client's, you know, right to have due process in a trial;

15   oh, we'll take out the two witnesses, who we now know and

16   realize have damaging evidence against them and damaging

17   rulings apparently against them as it relates directly to their

18   involvement in this entire project, Judge.  That's what we've

19   asked for.  It's clear that we have not had any time to be able

20   to do that.  And it's clear that there was no fault of our own.

21          And I'll just add anecdotally, Judge, you know, to let

22   you know, I've -- when we've tried to run these things through

23   translation software, I took it to, you know, one of -- this

24   Court knows, Sergio Garcia from my office.  He was born and

25   raised from Mexico City.  And he was agasped that when I had

1    him try to read and translate a couple of these paragraphs at

2    the technical nature of it.  I know that's anecdotal.  You

3    know, I don't have him her testifying to that, but that is how

4    difficult it is to get, you know, any substance of this and the

5    time frame we've had of less than a week is absolutely

6    insufficient.

7          That's the reason we're asking for this so we can get

8    that translated and done.  We have a translator we used for the

9    other documents, which was, you know, the reason we spent the

10   last couple of months getting them translated, who she works

11   for the court.  Her name is Barbara Espinoza.  She is not only

12   a certified translator.  She's also a Mexican lawyer.  And so

13   it's someone that the government has used themselves.  In fact,

14   we learned recently from her that the government contacted her

15   to try to get her to work for them in this trial.

16         You know, I immediately contacted her to try to get

17   the fast track on being able to do this.  You know, there's

18   been no delay on any part of Mr. Delgado to get this and try to

19   resolve it, Judge.  So that's why we're asking the Court,

20   re-urging the Court to consider that.  We're just at a loss on

21   this with Mr. Delgado and his rights, Judge.

22         THE COURT:  All right.  If I deny your continuance,

23   how do I prejudice you?

24         MR. HANSHEW:  Prejudice is clear in that the small

25   portions that we've been able to discern out of this show that

1    these individuals have information and/or have reports and

2    additional documents that show in this particular case that

3    their actions, as it relates to the allegations in this case,

4    their -- in the entire project as it relates to the C.F.E.,

5    F.G.G., M.P.S.A. project and bidding specifications, it relates

6    directly to this, Judge, that they were -- one was terminated

7    and the other was suspended for that, and that we have no way

8    to be able to bet at this point that -- what exactly the

9    details of those conclusions were and what other evidence.  So

10   it precludes us from being able to put forward exculpatory

11   evidence.

12           THE COURT:  What is the exculpatory evidence?

13           MR. HANSHEW:  The exculpatory evidence is that other

14   individuals who were involved in this bidding process and this

15   contract and the projects that are at issue in here are

16   culpable for the results that occurred, that the government is

17   trying to place on Mr. Delgado, Judge.

18           THE COURT:  Okay.  And if they are culpable, how does

19   that show your client is not culpable if they prove he is?

20           MR. HANSHEW:  Well, it shows, for example, if they,

21   for example in these documents and their testimony and

22   everything that comes from it, that they for example didn't put

23   the right type of contract, language or provisions into this

24   contract.  And the result, for example, the documents

25   encumbered the property that they didn't provide the proper

1    financial protections as it relates to the property interests

2    to C.F.E.  These are all of the issues that go to what

3    supposedly Mr. Delgado had done and manipulated, but if it's in

4    fact individuals on the inside that work at C.F.E. that did

5    this things and not Mr. Delgado, that's absolutely exculpatory,

6    Judge.

7         THE COURT:  Was Mr. Delgado a signatory on that

8    contract?

9         MR. HANSHEW:  I'm sorry?

10        THE COURT:  Was he a part of that contract?  Did he

11   negotiate that contract?

12        MR. HANSHEW:  Yeah, he was the lead individual

13   involved for F.G.G., Judge.

14        THE COURT:  So he knew what was in the contract.

15        MR. HANSHEW:  Right.  And so -- but the problem being,

16   of course, is what they did or failed to do as it relates to

17   the contract and what the terms were, and that the fault that

18   lies on them, Judge, in this contract and the result.  I mean

19   that's exculpatory.  And it doesn't -- you don't split

20   exculpatory evidence and say, well, that could be you could

21   both be equal.  I mean both be.

22        THE COURT:  Is it -- if you have members of a

23   conspiracy just because the members are all equally liable,

24   does that make you -- is that exculpatory to you?

25        MR. HANSHEW:  It is exculpatory in that it's not, you

1  know, making co-conspirators that Mr. Delgado is innocent on

2  this obviously, and that they are the ones that would be

3  culpable as opposed to him.

4       THE COURT:  All right.  So aside from that prejudice,

5  is there any other?

6       MR. HANSHEW:  Well, the other prejudice is that we

7  don't -- we don't have the ability with the timing that this

8  document came to be able to properly review it and have it

9  translated.  You know, this again is incredibly technical.  We

10  don't have the ability to get all of the details.  It becomes a

11  problem in this very discussion that we're having right now

12  which is, you know, if we were just given the time to translate

13  these and properly and have it done, we could sit here and say

14  to the Court, okay, this point, this point and this point are

15  how it is and shows it's exculpatory or not.  That's what we're

16  unable to do, because of this timing, which again had nothing

17  to do with anything anyone could've done otherwise, Judge.  So

18  that's another prejudice.

19       And if I can have one moment?

20       THE COURT:  Sure.

21       MR. HANSHEW:  One of the other prejudices would be

22  that the documents could show that -- that the due diligence by

23  Mitsubishi was, in fact, done and that's why C.F.E. maintains

24  it's position as we talked about earlier in the settlement

25  agreement that the pledge itself -- that the documents were

1    valid and enforceable, and it discuss that is in part as well,

2    which obviously goes to showing that it's exculpatory, Judge.

3            THE COURT:  All right.  And that's just a possibility.

4    You don't know that that's in there.

5            MR. HANSHEW:  That's from, again, from these rough

6    translations that we received in terms of the portions in here.

7    But that again goes back to the prejudice we have, which is the

8    inability to be able to provide all of this.

9            THE COURT:  Okay.

10           Ms. Kanof?

11           MS. KANOF:  Your Honor, we haven't looked at them,

12   yet, but what I expected is that they would O.C.R. them and do

13   a control find and look for Delgado's name.  I expected in,

14   since they wrote a motion, that it would say, oh, Delgado is

15   mentioned in here; it must be relevant.  We didn't see that.

16   They didn't say that.

17           Again, in his motion, Mr. Delgado claims these

18   documents are admissible.  Under no -- but doesn't support it

19   with any law, how it's not hearsay.  It's an opinion in

20   findings of a judge about someone that's not a party in the

21   case.  He's not charged with a conspiracy.

22           Count One alleges that he divides a scheme to steal

23   $20-million by changing the wiring directions of money that

24   came -- that was supposed to go in one account, instead went to

25   his account in Turks and Caicos; Count Two alleges that he

committed wire fraud by stealing $12-million.  Count One is

20-million.  Count Two is 12-million.  And Count Three says he

causes an e-mail that as wire transmitted that had a letter

with a line in it that was allegedly written by Fernando

Gireud, but the testimony --

THE COURT:  Gireud.

MS. KANOF:  Gireud.  Thank you -- doesn't speak

English well enough in the letter, and that it had a line in it

that facilitated the fraud to obtain money and property.  None

of that stuff has anything to do with that.  The rest are money

laundering counts.  None of those things have anything to do

with what Mr. Delgado is charged with.  That's number one.

Number two, it's not admissible, so certified translation, I

don't know how necessary that is.

And I just have to say this, Judge.  You denied a

motion for continuance yesterday, and then all of a sudden --

or on Tuesday -- and then all of a sudden there's this other

rising from the ashes where no *Touhy* letters were issued,

another attempt at a continuance.  I just --

THE COURT:  I don't even think that way, Ms. Kanof.

MS. KANOF:  Okay.  Well, you know, I'm a prosecutor

for 36 and a half years.  I do think that way.  I'm sorry.  I

apologize if that is demonistic, but I just see the dark side

unfortunately.

So, I just have to tell the Court that it's not over

```
 1    for these guys.  They get to appeal and --
 2              THE COURT:  Well, he could be found not guilty.
 3              MS. KANOF:  What?
 4              THE COURT:  He could be found not guilty and he
 5    walks -- well, I mean...
 6              MS. KANOF:  Yeah.  I mean, when are we going to try
 7    the case?  This Would be the tenth setting.
 8              THE COURT:  We're going to try it next Monday.
 9              MS. KANOF:  Thank you, Your Honor.
10              THE COURT:  I'm going to deny -- I have reconsidered
11    it and stand by my decision to deny your motion to continuance.
12              All right.  Now, Ms. Kanof, will you have photographs
13    of all of your witnesses?
14              MS. KANOF:  We do, Your Honor.
15              THE COURT:  And Mr. Hanshew, do you?
16              MR. HANSHEW:  We don't.
17              THE COURT:  Just to show the jury, not for me, but to
18    show the jury on the ELMO when we are picking the jury.
19              MR. HANSHEW:  I don't have any.
20              THE COURT:  Do you have the witnesses here?
21              MR. HANSHEW:  I don't, but we can make them available.
22              THE COURT:  You either need to get photographs of them
23    or bring them --
24              MR. HANSHEW:  Right.
25              THE COURT:  -- so you can show the -- most of the time
```

1    people do not recognize names, and then in the middle of trial

2    after all of that, oh, I remember that guy.  We went to school

3    together.  All right.  So you'll be sure to do that for me?

4              MR. HANSHEW:  Yes, Judge.

5              THE COURT:  Thank you.

6              In my standard discovery order, there's one question

7    that I ask that no one asked and that is -- well, not the

8    question, but the preface:  Witness so-and-so, my name is this.

9    I represent thus.  I'm going to ask you a few questions today.

10   If you do not understand my question, please ask me to repeat.

11   Just ask the question.  Forget that.

12             It has been my practice to show the jury panel a video

13   honoring our service members and veterans.  And in 300-some

14   cases I've never had a problem, but one person objected once.

15   And so do you have any objection to me showing the video to the

16   panel?

17             MS. KANOF:  Your Honor, as a proud daughter of a

18   retired colonel, buried at Arlington National Cemetery, I have

19   no objections.

20             MR. HANSHEW:  Your Honor, I don't have a problem with

21   it just so long, for example, we don't have, you know,

22   grandstanding by anybody about their connection to --

23             MS. KANOF:  I'm not going to say anything.

24             THE COURT:  Here's how I do it.

25             MR. HANSHEW:  Right.

1          THE COURT:  I just show the video and then I ask --

2     there will be about four or five people -- how many of the

3     jurors do we have coming in?

4          COURTROOM DEPUTY DUENAS:  50, Judge.

5          THE COURT:  Maybe three people that are going to stand

6     up and say I'm a veteran and then we're just going to thank

7     them for their service.  And the video is just, you know, kind

8     of a, you know...

9          MR. HANSHEW:  I don't oppose videos, just as long as

10    we don't have, for example, agents and witnesses.

11         THE COURT:  Are you -- are you -- because I do ask all

12    of our veterans stand.  Are you a veteran, Ms. Kanof?

13         MS. KANOF:  I am not, no.

14         THE COURT:  Ms. Arreola?

15         MS. ARREOLA:  No, Your Honor.

16         THE COURT:  Mr. Gonzalez?

17         MR. GONZALEZ:  No, Your Honor.

18         THE COURT:  No one over there is a veteran.

19         Mr. Delgado?

20         THE DEFENDANT:  No.

21         THE COURT:  Ms. Franco?

22         MS. FRANCO:  No, Your Honor.

23         THE COURT:  Mr. Hanshew?

24         MR. HANSHEW:  No, Your Honor.

25         But none of their witnesses.  I mean, for example, the

```
 1    agents, it's very likely agents are veterans, so that they

 2    don't stand up, otherwise they've created this bond with folks

 3    that stand up and we're all part of the same team.

 4          MS. KANOF:  I'll admonish them, Your Honor.

 5          THE COURT:  Okay.  They won't stand.

 6          MS. KANOF:  Right.

 7          THE COURT:  All right.  Thank them if they are.

 8          Okay.  So we'll do that.  Because I can always show

 9    the video after we pick the jury.

10          MR. HANSHEW:  I don't have a problem with the video at

11    all, Judge.  I just -- there's a bond, understandably.

12          THE COURT:  Charles Roberts was always very happy when

13    I did that.  He's a proud Vietnam veteran.

14          MS. KANOF:  He is, Your Honor.

15          THE COURT:  Okay.  Now, do you-all think you could

16    write me a short one or two-paragraph summary of the case that

17    I can read the jury, so we don't have to read them the

18    indictment, we just tell them what it's about, so then I can

19    ask them is there anyone who has heard or knows anything about

20    this?

21          Now, are you going to want me to ask them about the

22    prior trial for Mr. Delgado?  I mean do you want to know?

23          MR. HANSHEW:  I think --

24          THE COURT:  Can I just leave that to you and then you

25    on the time you have you'll ask?  That way you can handle that.
```

1          MR. HANSHEW:  That's fine, Judge.

2          THE COURT:  Okay.

3          Is Mr. Pimental going to testify?

4          MS. KANOF:  We're not calling him, but we've given his

5    contact information to defense counsel.

6          MR. HANSHEW:  I'm not going to call him.

7          THE COURT:  We don't have to worry about getting him a

8    lawyer or anything like that?

9          MR. HANSHEW:  No.

10         THE COURT:  That's all we have.  Is there something

11   you-all want to cover before we go?

12         MS. FRANCO:  Your Honor, just one thing.  We had an

13   unopposed motion for access to the jury.

14         THE COURT:  Oh, I granted that.  I did.  I don't know

15   if it's in the system yet, but I granted it?

16         COURTROOM DEPUTY DUENAS:  It is.

17         THE COURT:  Do you get very much from that, other what

18   you are asking for?  Is there much in there?

19         MR. HANSHEW:  It has employer information as it

20   relates to the particular juror as well their spouse.  I think

21   that's usually pretty -- you know, that's helpful.  I'm trying

22   to -- you know, we don't ever keep these.  I'm trying to

23   remember off the top of my head what else is on there.  It has

24   that and --

25         MS. FRANCO:  Jury service, maybe?

1          MR. HANSHEW:  Yeah, it relates to their prior service,

2    you know, what types of cases, whether it reached a conclusion,

3    I believe.

4          THE COURT:  Because I do ask them all of that.

5          MR. HANSHEW:  Right.  So there's definitely, as we put

6    in the motion, some information that's useful to us.  And

7    frankly we'll hopefully expedite, you know, the process for

8    maybe the Court as well as us in terms of voir dire, because

9    we'll know some that in advance without us having to get into

10   it.

11         THE COURT:  Why has the bar never moved for a more

12   extensive paper voir dire?

13         MR. HANSHEW:  That, I don't know the answer to.

14         THE COURT:  Because you-all get such limited time in

15   federal court.  I mean voir diring over here is heaven compared

16   to over there.

17         MR. HANSHEW:  Well, for some.

18         THE COURT:  And so paper voir dire would be reasonable

19   where you get a lot of other information that we don't have to

20   spend time asking.

21         MR. HANSHEW:  Yeah, my guess is pure speculation, is

22   that this is the practice that's existed for a long time.  And

23   you know, I've learned in federal courts since working inside

24   and working on this side a lot of things here are just kind

25   of --

1          THE COURT:  That's the way we've always done it;

2     counsel, now sit down.

3          MR. HANSHEW:  There yeah go.  Not a good answer, but

4     I'm guessing that's why it is.

5          THE COURT:  Ms. Kanof, Mr. Arreola, Mr. Gonzalez

6     anything else?

7          MS. KANOF:  Your know, Judge, Mr. Gonzalez is saying

8     that we used to get more information and they actually made it

9     less.  I'm too old to remember.

10         But I just want to tell the Court that when I moved

11    from the state side to the federal side, I had this feeling

12    that voir dire --

13         THE COURT:  Is non-existent.

14         MS. KANOF:  I was shocked.  Actually, what I thought

15    was I would never win a case again because I contracted with

16    jury on voir dire.  I found out it made no difference, so...

17         THE COURT:  I'm finding that to be true as well.

18         MS. KANOF:  I was told -- so now I don't want to ask

19    any questions.  I just want to get that part over with and go

20    on.  So maybe it's because the courts have found that it really

21    doesn't make much of a difference.  I just found in my practice

22    I've been here almost 30 years, that the court's voir dire is

23    more than sufficient and we -- Mr. Gonzalez and I get a

24    little -- get that kind of information from grand jurors,

25    because we pick the grand juries, and it's still not very

1    accurate.  You still have to ask them the questions.  You

2    rarely find out like husband's occupation, manager, you know,

3    and it really doesn't tell you a whole lot.

4         So we certainly don't have any objection to their

5    motion.  I don't think it helps very much.

6         THE COURT:  Mr. Dueñas has an answer to the question.

7         MS. KANOF:  Oh, yeah.

8         THE COURT:  The E-Government Act of 2002 protects

9    juror's information, so we don't ask them any good stuff.

10        MS. KANOF:  There you go.

11        THE COURT:  Thank you, Mr. Duenas.

12        COURTROOM DEPUTY DUENAS:  You're welcome.

13        Whatever is on the questionnaire gets redacted by the

14   jury clerks before they see it.

15        THE COURT:  Basically you get their name.  All right.

16        So we're good to go on Monday at 7 o'clock.

17        COURTROOM DEPUTY DUENAS:  Yes, Judge, 7 o'clock.

18        THE COURT:  See you-all here at 7:00.

19        COURT SECURITY OFFICER:  All rise.

20        (Proceedings conclude.)

21                              *  *  *

22

23

24

25

1                              * * * * *

2              I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of

6    the United States.

7    Signature:/S/KATHLEEN A. SUPNET          September 7, 2018
             Kathleen A. Supnet, CSR          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25