<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF TEXAS

 3                        EL PASO DIVISION

 4                        VOLUME 18 OF 20

 5

 6   UNITED STATES OF AMERICA          EP:13-CR-0370-DCG

 7   v.                                EL PASO, TEXAS

 8   MARCO ANTONIO DELGADO             September 29, 2017

 9
                             SENTENCING
10                       RESTITUTION HEARING
             THE HONORABLE DAVID C. GUADERRAMA
11              UNITED STATES DISTRICT JUDGE

12
   APPEARANCES:
13
   For the Government:   Debra Kanof
14                       Anna Arreola
                         Assistant United States Attorney
15                       700 East San Antonio, Suite 200
                         El Paso, Texas 79901
16
   For the Defendant:    Maureen Franco
17                       Erik Hanshew
                         Assistant Federal Public Defender
18                       700 E. San Antonio, Suite 410
                         El Paso, Texas  79901
19
   Court Reporter:       Kathleen A. Supnet
20                       El Paso, Texas
                         (915)834-0573
21                       kathi.supnet5303@gmail.com

22

23

24        Proceedings reported by mechanical stenography,

25   transcript produced by computer-aided software and computer.
</pre>

```
 1                    CHRONOLOGICAL INDEX

 2                    VOLUME 18 OF 20

 3   SEPTEMBER 29, 2017                    PAGE    VOL.

 4   Announcements. . . . . . . . . . . . . . . . . 3      18

 5   Hearing. . . . . . . . . . . . . . . . . . . . 3      18

 6   Court Reporter's Certification . . . . . . . . 124    18

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Open court.)

 2                    (Defendant present.)

 3            THE COURT:  Good morning, everyone.  All right.  We

 4   are here for some evidentiary hearings, sentencing and some

 5   restitution hearings.

 6            I would ask for announcement of counsel please.

 7            MS. KANOF:  Debra Kanof and Anna Arreola for the

 8   United States.

 9            We also have in the courtroom, Your Honor, two other

10   counsel; Matthew Herrington from Steptoe Johnson in Washington

11   D.C. representing the victims Mitsubishi, and Mark Maney from

12   Maney and Gonzalez-Felix of Houston, Texas, representing the

13   victim Comisión Federal de Electricidad de Mexico.  Both may

14   want to make statements for restitution under the victim

15   statute that permits them to do so on behalf of their clients.

16   And we are ready for sentencing and for the restitution hearing

17   or the forfeiture hearing.

18            THE COURT:  All right.

19            MR. HANSHEW:  Good morning, Judge.  Erik Hanshew and

20   Maureen Franco on behalf of Mr. Delgado.

21            THE COURT:  And good morning to all of you.

22            PROBATION OFFICER LUEVANO:  Good morning, Your Honor.

23   Luis Luevano on behalf of the United States probation office.

24            THE COURT:  Good morning, Mr. Luevano.

25            All right.  We are here to accomplish a number of
```

1    things.  In the evidentiary hearings, we're going to talk about

2    the forfeitability of the items in that the government's notice

3    of the forfeiture.  And we'll also settle the objections that

4    were made by the defendant to the PSR and his request for an

5    evidentiary hearing there as well.

6            So my plan is to do this:  First, we will take up the

7    evidentiary hearings as to forfeitability and the objections to

8    the PSR.  Once we complete that phase, we will have a

9    sentencing phase.  Once we finish the sentencing phase, then we

10   will proceed with a restitution phase.  So...

11           MR. HANSHEW:  Your Honor, if I may briefly?  We have

12   another issue that we need to raise with the Court.

13           Approach the podium?

14           THE COURT:  Okay.  Sure.

15           MR. HANSHEW:  Thank you, Judge.

16           Last week, Judge, our office, the Federal Public

17   Defender, received correspondence from an individual in Mexico

18   who is apparently a Mexican attorney.  The correspondence we

19   received included an attachment, which was a letter indicating

20   various documents and/or evidence that this attorney was

21   working to obtain in Mexico.

22           The letter indicated that, in essence, through some

23   procedure akin to what we call Freedom of Information Act here

24   in the United States, this attorney was working to obtain these

25   documents.  The documents that were described in this

1    correspondence included video of the signing of the contracts

2    that were an issue in this case, and purportedly in this video

3    showed that various of the witnesses that you heard at the

4    trial in this case were there and participated in this process,

5    correspondence to and/or from, C.F.E., and/or Mitsubishi

6    officials indicating their acquiescence to, for example, the

7    letters of credit and such.

8              And so this correspondence we spoke with our client

9    about this correspondence and you know what he wanted us to do

10   as a result of it.

11             It was framed in the letter to us that there needed to

12   be a continuance of the hearings that the Court just mentioned,

13   so that they could obtain these documents so that we'd be able

14   to provide them here for the Court at a hearing evidentiary or

15   otherwise, Judge.  So we're in a situation where we have to ask

16   the Court, based on that information and our client's wishes,

17   for a continuance so that we can allow this Mexican attorney to

18   complete the process there.  The information received was that

19   the process takes either 90 or 120 days; 90, if the request

20   remained uncontested; 120 days, if there is some type of

21   objections or someone or entity contesting that process.

22   Information received is that this process didn't start going

23   until mid September and that there was a bit of a time

24   disruption because of the earthquake in Mexico.

25             So based on all of that, Judge, we are asking the

1    Court to continue these hearings so that we can obtain

2    information.

3         We've asked and we haven't received -- my office has

4    asked, in response to correspondence, for some type of at least

5    preliminary document, so that we can show the Court, for

6    example, the Freedom of Information request and we haven't

7    received that to date.  So that's -- that is our request,

8    Judge.

9         THE COURT:  All right.  Thank you, Mr. Hanshew.

10        Ms. Kanof?

11        MS. KANOF:  Your Honor, I received a phone call from

12   Jose Luis Gonzalez.

13        Do you want me to go to the podium?

14        THE COURT:  Only if you want to.

15        MR. KANOF:  Only if the court reporter wants me to.

16        I received a phone call at 4:27 p.m. yesterday

17   afternoon from the El Paso chief and deputy criminal chief of

18   the district, Jose Luis Gonzalez, that I needed to call

19   Ms. Franco about this, so we first learned about this yesterday

20   afternoon before closing.

21        And I know very little other than they received an

22   e-mail last Monday.  I don't know whether this is really a

23   lawyer.  I don't know whether this is really a peruse.  I don't

24   know whether this e-mail really came from Mexico.  Another is,

25   I don't know of anything about this.  And for the Court to once

1     again continue the sentencing of the defendant on such nebulous

2     information I think is inappropriate.  We have victims' counsel

3     here, who have many times made reservations, spent money, lost

4     money.

5          Mr. Maney took six hours going from his home in

6     Houston to the airport in San Antonio, his home -- his backyard

7     being full of snakes, armadillos and alligators during the

8     hurricane only to be stopped from flying to El Paso in the last

9     continuance.  It's a lot of inconvenience and a lot of expense

10    on the part of the victims.

11         There are other remedies that are available after

12    sentencing; motions for reconsideration, motion for new trial

13    based on new evidence that can occur once we find out that this

14    is actually valid and not perhaps a fictitious e-mail that

15    could've been generated by the defendant himself or friends of

16    the defendant.  So the government would object to once again

17    allowing additional time for a process that's already taken a

18    year.

19              THE COURT:  Okay.

20              MR. HANSHEW:  Your Honor, if I may briefly.

21              THE COURT:  Sure.

22              MR. HANSHEW:  I'll show the government these documents

23    before I...

24              MS. KANOF:  Okay.  The record shows that Mr. Hanshew

25    has provided me with documents that seem to certify that this

1    individual named Juan Manuel Valdez Rodriguez is a lawyer.

2    Although yesterday, when I asked them the name of the

3    individual, they told me it was Villanueva, and I don't see any

4    documents -- oh, Jose Ruiz Villanueva doesn't seem to match the

5    e-mail or I don't know what this is.  What is this?

6              THE COURT:  Well, why don't you mark those and make

7    them an exhibit for the record.  I'm going to deny the motion

8    for continuance so we can get going.  We've got a long day.

9              All right.  So, the government filed an indictment on

10   January 22nd of 2014, it seems like, where they gave notice of

11   the forfeiture.  We got the trial.  At that point, somewhere on

12   the record, I had asked my court reporter to look this up.  She

13   found where Mrs. Arreola had agreed with Mr. Hanshew that the

14   issue of forfeitability would not be submitted to the jury that

15   was going to determine guilty or innocence on the charges, so

16   the issue of the jury was waived.  There was no request for a

17   hearing and no indication that forfeiture would be contested at

18   that point.  And now this is September 21, 2016, a year and a

19   half after the notice of the forfeiture.

20             On July 14th of 2017, the defendant submitted

21   objections to the PSR.  And in objection four, the defendant

22   indicated that as to PSR paragraph 2, which included all of the

23   properties the government is wanting to forfeit, included a

24   Jeep, and the defendant indicated that the Jeep was not

25   purchased with proceeds from the offense and was opposed to the

1    Jeep forfeiture.  There was no request for an evidentiary

2    hearing attached to that objection.

3          However, in the rest of the objections, defendant

4    submitted objection number one to the PSR regarding the loss

5    valuation and requested an evidentiary hearing.  Defendant

6    submitted objection number two to the PSR regarding restitution

7    and requested an evidentiary hearing.  So, it would have seemed

8    from the defendant's objections that they were not contesting

9    anything but the Jeep.

10          And obviously the Court is allowed to consider, in

11    terms of forfeiture, everything heard at trial, and pursuant to

12    Federal Rule of Criminal Procedure 32.2(b)(1)(B), the Court can

13    determine the issue on any additional evidence or information

14    surround submitted bit parties.  This objection is one of those

15    things.  But there was no request for a hearing.

16          The government then files its motion for preliminary

17    order of forfeiture.  I did sign that.  Over a month later, the

18    defendant indicates that they are contesting the forfeiture and

19    would like a hearing.

20          And so I guess my first question is, are you

21    contesting the forfeiture on all of the assets or just the

22    Jeep, because I don't think the Jeep was included in the order.

23    For some reason none of the vehicles were in the order.  Where

24    are the vehicles or what's going on with the vehicles?

25          MS. ARREOLA:  Your Honor, the government, I believe we

1    dropped a footnote in the motion for preliminary order

2    forfeiture that the vehicles were administratively forfeited.

3              THE COURT:  Okay.  So now the Jeep is not part of

4    that.  Are you standing on your objection that you don't have

5    any objections to the others or are you --

6              MR. HANSHEW:  And Judge, to be clear, I think you

7    skipped part of the time line here, which was we filed our PSR

8    objections, and timely, on July 14th.  But at that point the

9    government hadn't filed its motion for forfeiture.

10             THE COURT:  Right.

11             MR. HANSHEW:  In fact, they didn't file that until I

12   think six days later, July 20th.

13             THE COURT:  Right, I agree.

14             MR. HANSHEW:  And then the Court, in less than

15   one day --

16             THE COURT:  No.  Actually four days.  It was four days

17   later.  They filed their motion on the 20th.  The order was

18   issued on -- or at least it was filed --

19             MR. HANSHEW:  It had a date stamp on it of July 21st.

20             THE COURT:  The record I looked at said it was filed

21   on the 4th.

22             MR. HANSHEW:  I mean, as I put it in our motion,

23   whether it's one day or four days, it's obviously shorter than

24   the time to respond.

25             THE COURT:  And we're like three years later.

1    Certainly, somebody might say the defendant was a little

2    dilatory in indicating that they were contesting the forfeiture

3    and they wanted a hearing.  That's beside the point.  Because

4    the preliminary order of forfeiture is a draft until sentencing

5    when its finalized.

6              MR. HANSHEW:  Okay.  I just wanted to show the Court

7    when --

8              THE COURT:  No.  I don't have any problem giving you a

9    hearing, but your motion was a little harsh and I wanted to

10   respond.  You clearly could've asked for hearing in your

11   objection and you did not, and the only thing you objected to

12   was a Jeep, which would lead me to believe that you were not

13   contesting the forfeiture as to the rest of those items.

14             MR. HANSHEW:  But the government hadn't filed the

15   motion for forfeiture.

16             THE COURT:  They filed their indication they -- the

17   notice of forfeiture with their indictment three years ahead of

18   time.

19             MR. HANSHEW:  Right.  But the notice is not --

20             THE COURT:  Fine.  Well, we can debate I guess from

21   now until forever, but you're going to get your hearing.  So...

22             MR. HANSHEW:  Yes, Judge, but I have to make a record

23   here.

24             So it would be clear for the record, I want to make

25   sure the Court is not in somehow interpreting this that we

1    waived our right to object because of any of the time line in

2    this case.  We believe it's timely in accordance with the law

3    that when they filed their motion, we then filed our opposition

4    to that.

5         And frankly, if you read the statutes on this, Judge,

6    the Court and the government should have been taking care of

7    the motion for forfeiture soon after the trial.  So, you know,

8    I mean in terms of dilatoriness, that falls on the I think the

9    Court and government as well, and so, you know, I don't think

10   Mr. Delgado and/or his defense in this case that anything that

11   was out of order in terms of the time to respond to this

12   information.

13        THE COURT:  And I understand that's your opinion and

14   you're entitled to it.  So here we go.  Here we are on the

15   motion now.

16        Ms. Arreola, what is your evidence in terms of motion

17   for forfeiture of all of the items except the vehicles?

18        MS. ARREOLA:  Your Honor, as the Court recommended

19   under Federal Rule of Criminal Procedure 32 point (b)(1)(B)

20   [sic], the Court's determination may be based on evidence that

21   is already in the record.  And the government rests based upon

22   the evidence that was introduced.

23        The government would respectfully cite for the Court

24   the case of *United States v. Capoccia*, 503 F.3d 103, which is a

25   Second Circuit case in 2007, where the Court wrote that the

1    appellant in that case, his interpretation of the rule would

2    have led to the absurd result that whenever a defendant

3    contests the amount of forfeiture, the government will be

4    required to reintroduce at a post trial hearing potentially

5    large portions of its case from the guilt phase of defendant's

6    trial to a judge or jury that has already seen and considered

7    the relevant evidence.  The Rule's drafters could not have

8    intended such an unnecessary and burdensome outcome.

9         The government does not believe it needs to

10   reintroduce any of the evidence.  And the government has

11   already cited in its motion for preliminary order of

12   forfeiture, the specific exhibits and testimony that support

13   forfeiture.  All of the assets that were included in the

14   government's proposed order were directly traceable out of the

15   Turks and Caicos' account and therefore are directly proceeds

16   of the offense.

17        If Your Honor wants me to address the other arguments

18   that were raised in the government's -- excuse me -- in

19   defendant's opposition of the forfeiture at the time?

20        THE COURT:  Which arguments from those?

21        MS. ARREOLA:  There was an argument regarding the

22   conditions of probation.  They were -- the government relied on

23   the summary --

24        THE COURT:  The money forfeiture?  Uh-huh.

25        MS. ARREOLA:  -- in 2011.  I contacted the probation

1    office and I was advised that the probation office had

2    issued -- that there are now new conditions of probation of

3    supervised release that were filed on November 28th, 2016.

4    They're not available as far as I could tell on the probation's

5    website, but the government did, as defense counsel pointed

6    out, cite in its proposed order the incorrect numbering for

7    three of those conditions.  As far as I can tell, the language

8    of the conditions is the same.  They've just been -- the

9    numbers have been changed.  So 20, 21 and 22 are now 14, 15 and

10   16.  It's a de minimus error, Your Honor.  If the Court wants

11   the government to resubmit an amended proposed order of money

12   judgment, the government is happy to do so, but otherwise the

13   government's position it's de minimis.  If it could be the case

14   that the Court issues the order and the conditions change again

15   in another couple of years that won't invalidate the order.

16           THE COURT:  All right.

17           Mr. Hanshew?

18           MR. HANSHEW:  Thank you, Judge.

19           We would respond in kind that the evidence that was

20   put in at trial would also show the lack of nexus in terms of

21   the property and the forfeiture in this case.

22           Introduced, among other things in the trial, was the

23   memorandum of understanding as well as special power of

24   attorney as well as settlement agreement.  And when you look at

25   those documents collectively and/or even individually, it

1   demonstrates that Mr. Delgado was operating within powers that

2   were enumerated and provided in this case.

3           And additionally we would reiterate our objection to

4   the Court's denial of the motion for a continuance, because

5   those materials that would be forthcoming would also relate to

6   this and we don't have those at this time, Judge.

7           THE COURT:  All right.

8           MR. HANSHEW:  And lastly, Judge, and just for purposes

9   of record-keeping, we incorporate by reference all of the

10  objections we put in our written pleading on this forfeiture

11  issue.

12          And additionally, I just wanted to highlight to the

13  extent that the Court failed to make the required determination

14  in terms of whether the jury would consider this issue, we

15  again reiterate that objection, Judge.

16          THE COURT:  All right.

17          And so Ms. Supnet, do you have the record?

18          I think that was placed in the record that you waived

19  presenting the issue to the jury.

20          MR. HANSHEW:  And I didn't have the record, Judge, so

21  that's why I put that there in abundance of caution.

22          THE COURT:  Can you show him that, Ms. Arreola?

23          MS. ARREOLA:  Yes, Your Honor.  I'll provide him a

24  copy of the transcript.

25          And the government does not dispute that he did not

1    waive the right to forfeiture hearing in front of the Judge,

2    but simply waived his right to have it tried before a jury.

3    And I'll provide a copy to defense counsel.

4            THE COURT:  So did you have any other evidence or

5    purposes of the hearing?

6            MR. HANSHEW:  Those documents that I mentioned, Judge,

7    as part of the record already.

8            THE COURT:  They are part of the record and they are

9    before the Court.  I will find by preponderance of the evidence

10   that the government has established a nexus between the

11   offenses and the assets that they seek forfeiture of and that

12   those assets are in fact forfeitable.  Your request that I

13   vacate the preliminary order is denied.

14           And I don't know, Ms. Arreola, maybe we can amend the

15   money judgment to reflect what it needs to reflect at this time

16   and that way we won't have that issue pending with us.

17           MS. ARREOLA:  Yes, Your Honor, the government will

18   submit one today and copy defense counsel.

19           THE COURT:  Okay.

20           So, there were some additional issues.  And I guess

21   I'm thinking that those evidentiary hearings that you're

22   requesting go to the restitution and so to Mitsubishi what

23   their loss really was.

24           MR. HANSHEW:  Yes, we request --

25           THE COURT:  And also in relation to the loss amount

1      that we're going to use for additional levels to the

2      sentencing.

3             MR. HANSHEW:  Correct, Judge.  We did ask for

4      evidentiary hearing on both of those matters, because it's the

5      government's burden.

6             THE COURT:  All right.

7             So let's start off with the issue of the lost amount.

8      And if you can -- my calculation is that it's not above 25,000.

9      I believe its below 25.  And so the appropriate guideline would

10     be two levels lower, but if the government wants to put on

11     evidence to show otherwise, I'm happy to hear that.

12            Did you have a calculation, Mr. Hanshew, or you're

13     just -- do you think zero is appropriate?

14            MR. HANSHEW:  I believe zero is appropriate.  And I

15     think the Seventh Circuit in the case I cited hit the nail on

16     the head, which is that just simply because the government goes

17     to a jury and proves up a fraud, doesn't mean that they've

18     proved up a loss.  And in fact, they even used the language

19     that, you know, that's the bonus points that they get if they

20     come here and show in court this loss.

21            And so I think that's very important to remember here,

22     because you heard, and the government has read in their brief,

23     that, you know, somehow we're saying to undue the jury verdict.

24     Well, the courts have made clear that is not at what's at issue

25     here when you are disputing loss.  It is they have that extra

1    burden to show that and we don't believe they've showed any

2    loss by what is there, Jude.

3             THE COURT:  All right.

4             Ms. Arreola or Ms. Kanof?

5             MS. KANOF:  Your Honor, I think the Court said 25,000.

6    I think the Court meant 25-million.

7             THE COURT:  25-million.  Sorry.  I never deal in

8    millions of dollars, and so that's an unusual number.

9             MS. KANOF:  I'm there with you, Judge.  I've always

10   been a government employee.

11            And if you're referring -- first of all, we rely on

12   calculations of the probation department, because we think they

13   got it right, but first of all, it's loss or intended loss, and

14   there's definitely intended loss that was proven up by the

15   evidence before the jury.  And with regard to if you look at

16   there's definitely an indication, both by the victims'

17   impact presentation on the part of Mitsubishi as well as the

18   conclusions that were made from the figures that were provided

19   by the agent of 24-million-plus.  So I won't disagree with the

20   Court that it was under 25-million, but it was certainly just

21   slightly under 25-million.

22            THE COURT:  Right.  The guidelines being the

23   guidelines, that's a two-level reduction.  That would be a base

24   offense level 29, because we would be adding 20 levels for

25   below 25-million.

1          And I think there's -- the guidelines tell us that if

2     the loss is difficult to figure out, we take the amount -- I

3     think there's one where it says you take the amount that the --

4     by which the defendant benefited, which was about 10-million,

5     because he takes the 32-million.  That's the number probation

6     used, the 32-million that C.F.E. paid for their first payment

7     on the equipment that was then diverted to Turks and Caicos.

8     But I don't think -- it doesn't make sense to me that Mr.

9     Delgado intended to take all of the 32-million, because then

10    the jig would be up immediately.

11         It seems like this scheme was, give C.F.E. everything

12    they bargained for, get the money from C.F.E., and then have

13    F.G.G. and Mitsubishi think that because of the things that go

14    on in Mexico, it wasn't really going to be 120-million after

15    all.  It's only going to be 110 and then he gets to keep 10.

16    And everybody else just has to be satisfied with a slight

17    reduction in what they were going to get.  I think that was the

18    scheme.  I don't think the scheme was to take 32-million and

19    run.

20         And so I know the report indicates that at this point

21    Mr. Delgado realized that people were getting wise to what may

22    have been going on and started disbursing money to appease

23    them.  I understand that.  But still in all, it seems to me

24    like it doesn't make sense that the scheme would be to take the

25    32-million.  And the scheme would be to fool everybody as to

1    how much was actually being paid and that's how he made his

2    profit or would have made his profit.  That would be below

3    25-million.  And if we take the loss to Mitsubishi, that would

4    also be below the 25-million.  So...

5            MS. KANOF:  Your Honor, the Court isn't saying that

6    we're just limiting it to the $10-million that he obtained

7    because there's more loss.  I mean, the value of the power

8    generator deteriorated over time, because they didn't get

9    shipped.  And then, you know, there's --

10           MR. HANSHEW:  You Honor, I object.  I mean, if she

11   wants to put evidence on, this is --

12           THE COURT:  No, no.  This is her argument.  I

13   understand.  I understand I haven't heard it and this is new to

14   me, too.

15           MR. HANSHEW:  Thank you.

16           MS. KANOF:  But I understand that -- I agree with the

17   Court that it's under 25-million, but I would limit it to the

18   10-million, although it doesn't make any sense because of the

19   range.

20           THE COURT:  No, no.  I'm not doing that.  And I'll

21   give Mitsubishi an opportunity to put on whatever evidence it

22   wants.

23           Were there other objections that you had that we need

24   to have evidence on?

25           MR. HANSHEW:  If I could just, briefly, on this topic,

Judge, you know, on record keeping here, Judge, is to ask the Court what its conclusion is to the actual loss.  Because I know if we get to the Court of appeals, and we haven't objected and asked for a ruling from the Court, they're going to say we waived some component of argument.  So we ask the Court to make a finding as to what that loss is, so that in turn, I can make the appropriate objection to that finding.

THE COURT:  Yeah.  If you want like an exact number, I'll have to wait and see after we have the restitution hearing, because it's not entirely clear to me exactly what that would be exactly.

MR. HANSHEW:  Okay.

THE COURT:  So for purposes of calculating the guidelines, I'm going to find that there was a loss, clearly that they can support that there was at least 10-million, so that would be -- we would add 20 levels for that.  And I don't think it would be 25-million, so we wouldn't add the 22 levels.

So we would have a base of 7, 20 for the loss, the additional loss, 2 for the sophisticated scheme, that puts us at 29.  And -- I'm sorry -- 29, and 2 for the sophisticated scheme puts us as 31 and 2 -- Category II is 121 to 151 months suggested guideline range.

MR. HANSHEW:  Okay.  Judge, so that I -- oh, I'm sorry.

THE COURT:  But I can, after we have the restitution

1    hearing, then I have a better idea of what exactly, because now

2    Ms. Kanof is talking about deterioration of the turbines

3    because of the time.  I don't know exactly how much time that

4    was or why they would deteriorate if we're assuming they were

5    still in Mitsubishi's possession.  They were the experts of the

6    machines and so --

7         MR. HANSHEW:  If I can just -- I'll preserve and/or

8    make an objection now.

9         THE COURT:  Yeah.

10        MR. HANSHEW:  We ask for a finding and when that

11   finding is made, I'll make appropriate objections at that time.

12        And then just for -- to be sure, because I didn't go

13   through reiterating all of my written objections, but I want to

14   make sure the Court reviewed those and I incorporated those

15   into my argument.

16        THE COURT:  I did.  And when we get to sentencing,

17   we'll go through each objection one by one.  We'll address each

18   of the objections one by one.

19        MR. HANSHEW:  Okay.  Thank you, Judge.

20        THE COURT:  All right.

21        So, then, Mr. Delgado, we come now to the sentencing

22   part of the sentencing phase.  And it is my duty to consider in

23   sentencing your individual history and characteristics and the

24   nature and circumstances of this case as well as other factors

25   set out forth the Court in the sentencing statute.

1          I will also consider probation's presentence

2    investigation report, all of the information that's included in

3    that report, and all of the information that will be directed

4    to the Court by yourself or by your counsel.

5          And once I have considered all of these matters then

6    it's my intention to assess a sentence which is sufficient, but

7    not greater than required, in order to accomplish the goals of

8    the sentencing statute.  Once I have imposed your sentence, you

9    will then have the right to appeal that sentence to -- and your

10   conviction as well, because this was a trial -- to the Fifth

11   Circuit Court of Appeals.

12         If you wish to appeal your sentence, you must file a

13   notice of appeal with the clerk of this court, indicating your

14   desire to appeal your sentence to the Fifth Circuit Court of

15   Appeals.

16         You must file that notice of appeal within 14 days of

17   the date of the entry of judgment in your case.  The date of

18   the entry of judgment could be as early as today.  I doubt that

19   it would be, but it could be as early as today, so you need to

20   be diligent about pursuing your notice of appeal.

21         If you don't have the money with which to appeal, you

22   can petition the Court within this same 14-day period to appeal

23   at no charge to you.  And if you'd like, you can could request

24   that Mr. Dueñas, my courtroom deputy who's seated right here,

25   file the notice of appeal for you.  He'll be happy to do that

KATHLEEN A. SUPNET, CSR

1    for you today.  Otherwise, I refer you to your counsel.  They

2    will be able to counsel you further on those appellate rights

3    and help you perfect your appeal if you do wish to appeal.

4           Everything that I've just explained to you orally, I

5    believe we provided you with a written document containing

6    that.  That document was in both English and Spanish.

7           All right.  Mr. Delgado, why don't you and Mr. Hanshew

8    come on up to the lectern.  We'll cover these things quickly

9    and then we will get back to your seats once we start going

10   through the objections.

11           (Defendant an counsel present at the lectern.)

12           THE COURT:  All right.  You are Marco Antonio Delgado,

13   the defendant in this case?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  All right.  Mr. Delgado, you were found

16   guilty by a jury on September 21st of 2016 of Counts One

17   through Three of your indictment that charged wire fraud, Four

18   through Ten of your indictment that charged laundering of

19   monetary instruments, then Counts 11 through 19, which charged

20   engaging in monetary transactions in property that was derived

21   from a specified unlawful activity.  So, the jury having found

22   you guilty of that, I judge you guilty of that.

23           Now, prior to this morning's proceeding, did you have

24   an opportunity to review and discuss with Mr. Hanshew and

25   Ms. Franco the contents of Ms. Torres' presentence report?

1          THE DEFENDANT:  I did, sir.

2          THE COURT:  All right.  In that report, she groups all

3    of these counts together, applies the scoring of the highest

4    count to the group, and that would have been the 4 through 19

5    counts -- Count 4 through Count 19.  She's scores your base

6    offense level at 31, because they used the $32-million payment

7    that was paid by C.F.E. to your Turks and Caicos account.

8          I'm going to find that that should be base offense

9    level 29.  And we reach the base offense level 29, because this

10   offense carries base level of 7.  I add $10-million for the --

11   I'm sorry.  I add 20 levels for the amount of the loss, which

12   is in my view below 25-million, but more than 9,500,000 which

13   is the lower end of it.

14         I agree that we would add two levels, because of the

15   sophisticated nature of the offense.  Perhaps, if that didn't

16   apply, there would be two levels added, because a large part of

17   it was from outside the United States or was done outside the

18   United States.

19         That puts us at a total offense level of 29 -- I'm

20   sorry -- 31.  Those calculations are 29.  Then we add the other

21   2 for the sophisticated nature outside the United States.

22   We're at 31, now.  Cause you had a trial, there is no

23   adjustment for acceptance.  You do have a Criminal History

24   Category of II.  And so these two numbers, 31 and II, suggest,

25   but do not demand the guideline imprisonment range of

```
1    121 months to 151 months.

2            That could be followed by very large fines.

3            And did the fine level change because of the drop in

4    the two levels from 33 to 31?

5            PROBATION OFFICER LUEVANO:  Your Honor, for Counts One

6    through Three, the fine should be 15,000 to 150,000.  Counts

7    Four through Ten is 15,000 to 64,000, and Counts Eleven through

8    Nineteen is 15,000 to 150,000.

9            THE COURT:  All right.

10           So you're subject to those fines.

11           And in addition, there is -- you're subject to a $100

12   special assessment on each count.  So there's 19 counts, that

13   would be $1,900 in special assessments.

14           All right.  Mr. Hanshew, do you concur in that

15   scoring?

16           MR. HANSHEW:  Well, subject to my objections on the

17   loss valuation as well as my objection to the sophisticated

18   means, Judge.

19           THE COURT:  All right.  Okay.  Any objections or

20   corrections to the report?

21           MR. HANSHEW:  We --

22           THE COURT:  Let's start with corrections.

23           MR. HANSHEW:  Okay.

24           Well, we had objected in paragraph of my objection --

25           THE COURT:  Yeah, we'll cover all of your objections.
```

```
1      Do you have any corrections to it?
2                 MR. HANSHEW:  Like?  I mean --
3                 THE COURT:  Like on paragraph 38.  Let me see, I
4      think -- it was page 38.  Let me see.
5                 On page 38, the second full paragraph says third
6      line -- second lines begins:  In this instance, F.G.G. and
7      C.F.E. entered into a $21-million contract.  Is that a separate
8      contract or is it the $120-million contract?
9                 MR. HANSHEW:  One moment, Judge.
10                THE COURT:  Sure.
11                It's page 38, the second paragraph, third line.
12                MR. HANSHEW:  121, Judge.
13                THE COURT:  Is it 120?
14                MR. HANSHEW:  That's what I got.
15                THE COURT:  Yeah.  So, Mr. Luevano, should that be
16     $120-million?
17                PROBATION OFFICER LUEVANO:  It should be $120-million.
18                MS. KANOF:  120-million.
19                THE COURT:  All right.  So we'll make that change.
20                Also, page 92 -- is there a page 92?  Maybe it's
21     paragraph 92.
22                This is paragraph 92 on page 36.  It's less than the
23     original contract.  (Reading.)
24                MS. KANOF:  That's also a mistake, Your Honor.
25                THE COURT:  Is it?
```

```
 1              MS. KANOF:  Uh-huh.

 2              THE COURT:  So, in the third line from the bottom in

 3     paragraph of 92 where it says 102, Mr. Luevano?

 4              Because we're talking about the contract with C.F.E.

 5              MS. KANOF:  The original contract price is incorrect.

 6              THE COURT:  Right.  So it should be 120.

 7              PROBATION OFFICER LUEVANO:  That is correct, Your

 8     Honor.

 9              THE COURT:  Mr. Hanshew?

10              MR. HANSHEW:  Correct, Judge.

11              THE COURT:  Okay.  So those are the two I have.  I

12     don't know if you have any others.

13              MR. HANSHEW:  Yes Judge, if I could.  I'll just try

14     to, and I want to hopefully get these right, because my

15     objections obviously were to the first version.

16              THE COURT:  No, I'm talking about corrections.

17              MR. HANSHEW:  Well, so -- so there was, for example, a

18     correction that -- on page six and I had paragraph seven.  It

19     stated that Gireud was the sole owner and managing member.

20     That's not true.  He was the organizer, not owner, according to

21     the documents --

22              THE COURT:  To the incorporation.

23              MR. HANSHEW:  -- the secretary of state documents.

24              And then --

25              THE COURT:  All right.  Hold on.
```

1          Ms. Kanof?

2          MS. KANOF:  I think that's correct, Your Honor, and

3    then Delgado LLC, there's no such thing as an owner.

4          THE COURT:  Okay.  So organizer, Mr. Luevano?

5          PROBATION OFFICER LUEVANO:  Yes, Your Honor, I'll have

6    that corrected.

7          MR. HANSHEW:  Then, Judge, on page --

8          THE COURT:  And if you miss something, we can just go

9    through your objections and...

10         MR. HANSHEW:  That's what I was just trying to -- I

11   was trying to figure out which ones were the --

12         THE COURT:  Yeah, let's just go through the objections

13   and we'll pick them up that way.

14         MR. HANSHEW:  Okay.  Okay.

15         THE COURT:  All right.  So let's start with -- okay.

16   Objection One, loss valuation and sophisticated means.  Okay.

17   So, it seems like you're objecting to the use of the

18   32-million.  And so my calculations -- let me find those --

19   it's the 32-million minus -- I think there was like 18,300 --

20   $18,321,093.00 that were paid to Mitsubishi and some, I don't

21   know, 3-million or something like that.

22         MR. HANSHEW:  3.54.

23         THE COURT:  So I would take the 32 minus those amounts

24   and that would be the loss amount from that.

25         MR. HANSHEW:  Okay.

```
 1          THE COURT:  So the amount that Mr. Delgado was working
 2    with as his own money.
 3          So if we do that math -- I know I did it somewhere.
 4    It's $10,328,797.00.  We have 32-million that was paid by
 5    C.F.E.  Then Mr. Delgado paid out 21,771 and -- well,
 6    $21,771,203.  So he kept in the account, 10,328,797 that we
 7    have this from the trial.  I would assume that's the money he
 8    was going to try to keep or as much of it as he could.  That,
 9    to me, is the loss from the 32.
10          MR. HANSHEW:  There was also, additionally, another
11    4.2-million that went to the engineering firm, Judge, as well.
12          MS. KANOF:  Your Honor, I don't --
13          THE COURT:  I thought that was -- I thought from the
14    trial we weren't exactly sure if that was an issue.
15          MS. KANOF:  I would object to that as being any
16    evidence that there was ever any evidence of that.  There was
17    cross-examination to that, but it was a series $4.2-million
18    going to who knows what.
19          MR. HANSHEW:  Well, but the wire transfers showed
20    where it went.  The government has the burden to show that is a
21    part of the loss or not.
22          THE COURT:  I'm the fact finder at the restitution
23    hearing from -- or from the evidentiary hearing from a
24    preponderance and from the trial, I didn't get that that was a
25    real engineering firm, so I'm not giving him credit for that.
```

1              MR. HANSHEW:  We'd object to that, Judge, as for the

2      record.

3              And then additionally in terms of the Court's, you

4      know, calcu- -- I understand it's calculations.  We object

5      again that there's no loss in this case.  The guidelines say

6      and they're very, very specific about this, is that you're

7      looking at the amount that the defendant intentionally intended

8      to take this loss.

9              And as the Court mentioned earlier, it didn't make

10     sense that, for example, the starting point that probation came

11     in here, which is that he was trying to take all of this

12     32-million.  The Court acknowledged that.  But that same kind

13     of common sense analysis applies equally to the total of these

14     transactions, because it would make no -- you saw and heard in

15     the trial all sides involved were still trying to make this

16     deal work.  I mean, they went on through that.  It was

17     prolonged.  And in fact in the end, we know the two sides, once

18     they knocked out the middleman on this, in fact consummated

19     this agreement all to their benefits.  They all got better

20     deals, because they didn't have to pay to the middle person in

21     this, which was F.G.G. and Mr. Delgado as their representative

22     in their case.

23             Additionally, I know that you saw in the agreements

24     with F.G.G. that Mr. Delgado was entitled to upwards of

25     65 percent of the amount that was to go to them.  And so you

1    have a contract for $121-million, right, and 102 of that is to

2    go to Mitsubishi.  That leaves the remaining $19-million and --

3    that was to go there, and so, you know, that's even less than

4    what in this -- in the course conclusion Mr. Delgado is keeping

5    here.  There is no evidence here in our opinion, Judge, that he

6    intended in this initial payment to defraud, to take any of

7    this money that he wasn't authorized to take, Judge.

8            And again, I harken back to what I started with this

9    which is, you know, there doesn't have to be any loss in a

10   fraud.  And frankly, that is what's very clear in this case.

11   Nobody lost anything.  And for sure, there's no evidence by the

12   government that Mr. Delgado intended to create that loss on any

13   entity.

14            THE COURT:  Okay.  You're objection is noted.

15            MS. KANOF:  Your Honor, can I respond?

16            THE COURT:  Sure.

17            MS. KANOF:  I don't how -- I know they have this

18   benefit argument, which is absolutely absurd.  They're taking

19   it from the settlement agreement that now the middlemen were

20   out of it.  That's ridiculous.

21            The residence of Agua Prieta paid billions of dollars

22   more for the generation of energy that they would not have paid

23   for had Mr. Delgado not committed this fraud.  Mitsubishi

24   sustained a loss.  C.F.E. sustained a loss, albeit a loss

25   that's recognizable under the restitution statute, but the

actions of Mr. Delgado, the jury certainly believed it.

Subsumed under his loss argument is the sophisticated means argument.  And I don't know if the Court is going to address that separately or if the Court or if Mr. Hanshew is including that in his idea that since there's no loss there's no sophisticated means, because I would like to address the specifics.

THE COURT:  Oh, I didn't hear him say that.

MS. KANOF:  It's kind of conflated.

MR. HANSHEW:  It's because probation put it all in one paragraph, so I responded, in kind, not to confuse the Court.

MR. COURT:  Right.  Right now, I just want to talk about is the loss.

MR. HANSHEW:  Right.

THE COURT:  And so I hear your objection and it's overruled, and certainly you can take that up with the Fifth Circuit.

MR. HANSHEW:  And for the record, Judge, Ms. Kanof's statements or argument are not evidence.  She did not put on evidence and she's talking about billions of dollars now to the residence of Mexico.  It shows further what ridiculousness the loss is in this case.

MS. KANOF:  Your Honor, a representative from the C.F.E. did testify to that loss.  It was a lawyer to C.F.E., who talked -- who testified of how much money they had to spend

```
 1    because of the fact that they didn't have the generators.

 2              THE COURT:  I'm drawing a blank on that.  I don't

 3    remember that witness.

 4              Do you remember that witness?

 5              I know I read a document like that, but I don't --

 6              MR. HANSHEW:  I know C.F.E. submitted a request in

 7    this proceedings for $1.3-billion or something like that.

 8              MS. KANOF:  Ms. Arreola says it was an affidavit.

 9              THE COURT:  I did read that, but I don't remember the

10    witness.

11              So, anyway, that's overruled.

12              Did you have anything else on that amount, on the loss

13    amount?

14              MR. HANSHEW:  No Judge, just that and my written

15    objection.

16              THE COURT:  Okay.  So now the sophisticated -- you're

17    objection to sophisticated means.  What is the guideline on

18    that, Mr. Luevano?

19              PROBATION OFFICER LUEVANO:  2B1.1, Your Honor.

20              THE COURT:  2 B 1.1 --

21              PROBATION OFFICER LUEVANO:  2B1.1(b)(1)(k).

22              THE COURT:  2B1 -- wait.  2B1.1 --

23              PROBATION OFFICER LUEVANO:  I'm sorry.  2B (10)(c)

24    [sic], which is on page 90.

25              THE COURT:  Page 90?
```

```
 1          PROBATION OFFICER LUEVANO:  And it's letter (c).

 2          THE COURT:  "(c)."  Okay.

 3          And the whole thing reads:  If a defendant relocated,

 4   participated or relocated in a fraudulent scheme to another

 5   jurisdiction to evade law enforcement or (b), a substantial

 6   part of the fraudulent scheme was committed from outside the

 7   United States or (c), the offense otherwise involves

 8   sophisticated means and the defendant intentionally engaged in

 9   or caused the conduct constituting a sophisticated means,

10   increased by two levels.

11          So let's see if we have a definition of

12   sophisticated -- I think there's a definition of sophisticated

13   means somewhere; is there not, Mr. Luevano?

14          PROBATION OFFICER LUEVANO:  There is, Your Honor, if

15   you can give me a moment, I can find that for you.

16          THE COURT:  Mr. Hanshew, do you have it right there by

17   any chance?

18          MR. HANSHEW:  I'm sorry, Judge.  I just lost my -- I

19   don't.  I apologize, Judge.

20          THE COURT:  Okay.  We'll find it in here.

21          MR. HANSHEW:  I know that it has and where we're going

22   to get to, it has the reference of offshore accounts.

23          THE COURT:  In the definition.

24          MR. HANSHEW:  Sure.  But it doesn't say "shall," as we

25   know by any of these definitions.  And so, as I noted, I
```

1    understand why the guidelines would put that in there as an

2    exemplar of something that could constitute sophisticated

3    means, but that doesn't take away the obligation of courts when

4    they look at the individual case and the facts that are

5    present.

6              And if you look at this case, the wires in this case

7    were open and notorious.  I mean, the other entities involved

8    in this business transaction received the monies from that

9    account.

10             You know, I could see a scenario where, let's say, you

11   know, you have one and you skip, you skip right, you skip a

12   couple around, and then you pass it through some rails and send

13   it to the folks, so they can't track where it is.  I mean, it

14   was the opposite.  It went from Mexico, to this account, to

15   paid out.

16             And in fact, you even had Gireud writing letters

17   saying, okay, send us our next disbursement, you know, from the

18   account.

19             THE COURT:  Right.

20             MR. HANSHEW:  You have documents that were filed in

21   Mexico.  That's the only way Mexico could reroute this.  So

22   C.F.E. had knowledge of it.  That's how they were authorized

23   and allowed to send that.  And so this is not the scenario of

24   --

25             THE COURT:  But if you look at the whole deal, it's

not just the offshore -- use of the offshore thing.  It's the
way that kind of a Chinese wall was built between C.F.E. and
F.G.G. and Mitsubishi.  And the only the person that could
cross over that wall was Mr. Delgado, because that was
necessary to the scheme.

He had to totally fulfill the contract of C.F.E., so
he could get C.F.E.'s money and then make Mitsubishi and F.G.G.
believe that that's not what happened, that there was less
money available.  Then that provided a little pot from which
Mr. Delgado could take his property.

And so the sophistication of the scheme is not just
the offshore account.  It's the whole entire scheme and that's
what's sophisticated about it.  I mean, it's certainly much
more sophisticated than any scheme you know a regular Joe-guy
off the street in El Paso would come up with.

MR. HANSHEW:  Right.  And I guess -- if I could
address that Judge.  Thank you.

There's also a very valid argument in response to that
that played out in this case, which is that, yes, when you are
a broker, which is you know I think the best way you can kind
of analogize this.  You're the broker between these two
behemoths.  I mean you are talking about the second largest
government owned monopoly power agency, C.F.E., and Mitsubishi,
a Forbes, you know probably ten, okay, in the list of Forbes;
for sure in the top 50; and broker, who put them together the

1    only way they got to -- for C.F.E. to get rid -- I'm sorry --

2    Mitsubishi to get rid of these mothballed turbines that they

3    already got paid for from Brazil, okay, was because of Mr.

4    Delgado's connections to C.F.E., and C.F.E. in a turn hadn't

5    dealt with Mitsubishi America, this particular entity.  So of

6    course anyone that's creating that and has F.G.G. in that would

7    be concerned that at some point these guys, these behemoths,

8    are going to cut you out of the deal, which they did in the

9    end.  Okay?  That's exactly what happened in the end.

10            So the idea that you know he created this island where

11   he was, you know, blocked every one out so that he was running

12   it, well, there's a perfectly legitimate reason for that,

13   because we saw what happened in in case.  And it's also not --

14   I would say it's not particularly sophisticated in the sense

15   that it was just a business transaction here.

16            You know, what the fraud, which is what we're looking

17   at to see the scheme here, the fraud in their own document is

18   sending an e-mail, okay, sending the e-mail with a letter, with

19   a letter that was purportedly forged, you know, sending that.

20   That's what, when you read the indictment, what -- they have to

21   do that, because that's the only way they can try to hook in

22   U.S. jurisdiction to this case, which was otherwise everything

23   happened in Mexico.  And that's just not sophisticated, Judge,

24   we would argue.

25            THE COURT:  Well, what about if the two points were

```
 1    added instead for --
 2             MS. KANOF:  Sophisticated money laundering, Your
 3    Honor, 2S1.15.
 4             THE COURT:  I wasn't even going to go that far.  I was
 5    going to stay in the same one about all of this foreign country
 6    stuff.
 7             Send me back to that again, Mr. Luevano.  Where am I
 8    looking?
 9             PROBATION OFFICER LUEVANO:  Which one are we looking
10    at?
11             THE COURT:  (10)(b).
12             PROBATION OFFICER LUEVANO:  Page 90.
13             THE COURT:  90.  Thank you.
14             Okay.  So, a substantial part of a fraudulent scheme
15    was committed from outside the United States.  You just said
16    everything was committed in Mexico and the jurisdictional
17    attachment was the e-mail and the letter.
18             MR. HANSHEW:  Well, I don't think any of the
19    fraudulent part of the -- the substance part of what occurred
20    here occurred in Mexico -- I mean, what occurred in Mexico was
21    a business deal.  I mean, that's our position, is that the
22    business deal was a business deal that was legitimate and
23    consummated in Mexico.
24             The fraud that's alleged is the fraud -- is these
25    e-mails and the money wire transfers and those in and of
```

1    themselves wouldn't constitute that and/or sophisticated.

2         THE COURT:  Well, because the money was being wired

3    from Mexico to Turks and Caicos.

4         MR. HANSHEW:  Well, the government had to put on their

5    case.  We argued they didn't and we asked for a motion for

6    acquittal, but their argument at trial was that the wire

7    transfer went to New York first and then back through, because

8    without that -- which we still maintain, you know, that's

9    incorrect, that they didn't have jurisdiction and they didn't

10   prove that point, but if you were to take their arguments,

11   Judge...

12        THE COURT:  For those two reasons we would add two.

13   If you have any other objections that you want to make on the

14   record, you can go ahead an perfect your record on that.

15        MR. HANSHEW:  Okay.  As to that issue, I don't have

16   any --

17        THE COURT:  As to that issue.

18        MR. HANSHEW:  Correct, Judge.

19        THE COURT:  Let's get back to your objections then.

20   That was the first one, right?

21        MR. HANSHEW:  Yes, Judge.

22        THE COURT:  So then number two.

23        MS. KANOF:  Excuse me, Your Honor, may I respond to

24   the sophisticated means argument?

25        THE COURT:  Oh, sure.

1          MS. KANOF:  Because I talked to Sandra Torres

2    extensively.

3          THE COURT:  You spoke to who?

4          MS. KANOF:  Sandra Torres about it.

5          THE COURT:  Oh.

6          MS. KANOF:  When I saw that she gained two points for

7    sophisticated means, I called Officer Torres to discuss it with

8    her, because I also thought 2S1.1 5(A) sophisticated money

9    laundering --

10         THE COURT:  Hold on.  2S1.1?

11         MS. KANOF:  2S1.1, which is the money laundering

12   guideline.

13         THE COURT:  Uh-huh.

14         MS. KANOF:  5(A), sophisticated laundering I thought

15   it applied as well.

16         THE COURT:  2S1.1 5(A).  Okay.  I got A, one and two,

17   B, one and two.  Am I in the right place?  Oh, your looking at

18   the application notes.

19         MS. KANOF:  Yes.  I'm sorry.  I'm looking at the

20   application notes.  I'm sorry Your Honor, yes.

21         THE COURT:  Okay.

22         MS. KANOF:  Application note number 5, because I

23   thought an adjustment for sophisticated laundering also

24   applied.

25         So Ms. Torres, first of all, told me she did a lot of

1      talking with the commission about all of the adjustments in

2      this case, and that she did in fact think that this applied,

3      but didn't that she couldn't apply both, and so the advice that

4      she received was to do it under the wire fraud statute instead

5      of under the money laundering statute.

6              But if the Court will look at this application note,

7      it applies as well, that the sophisticated money laundering

8      incurred because just the use of an offshore account would

9      apply for making it a complex or intricate offense.

10             Remember that the original agreement in the original

11     contract on the bid was that they were supposed to use a Wells

12     Fargo account in El Paso.  And testimony from Mr. Gireud was he

13     did not give permission for the money to be used in the

14     offshore account.  And the Court will also remember that that

15     offshore account was not in Mr. Delgado's name.  It was a law

16     firm, Skippings and Rutley, that was used precisely to hide

17     money.

18             And so it applies to both of those adjustments.  And

19     what Ms. Torres told me was, I can't do both.  I could only do

20     one of them.  So they suggested that she used the wire fraud

21     one.

22             And with -- what's missing here, Your Honor, with

23     regard to the appearance of legitimate actions are the

24     fraudulent actions such as a fraudulent apostille on the

25     testimony of a young notary here in El Paso who said that's not

my signature and that's not the stamp that I used, and all of

the fraudulent documents that Mr. Delgado provided to C.F.E.

and to Mitsubishi that didn't have Mr. Adam's signature on it,

that you could hold up to the light and see had been co-opted

from other documents.  The typical fraud that occurs, that was

made sophisticated by the use of offshore accounts that didn't

have Mr. Delgado's name it, the testimony from the C.F.E.

officials was, we got this check or this wire transmission from

an account that we never even heard of.  And we thought it

should have been from Wells Fargo.  And it took extra time and

time is money for these corporations with regard to interest on

large amounts of money.

          So what's missing here is the fact that an actual

fraud was committed, that to the extent that the premise was

ostensibly some legitimate contracts.  The fraud is what the

jury saw, and it would be an extra 2 points whether the money

laundering guideline for sophisticated money laundering was

applied or a sophisticated means was applied from wire fraud.

So either way, the government agrees with probation that it was

appropriately added.

          THE COURT:  That the sophisticated means was

appropriately added?

          MS. KANOF:  Yes.

          THE COURT:  Okay.  Why is it that we can't have

alternate grounds for the two levels?

1              MS. KANOF:  She has told me that the commission told

2    her she couldn't do both.

3              THE COURT:  Right.  I mean, we can two for this, two

4    for that, two for that and add six, but we could say, we're

5    going to add two for sophisticated means, because so much of it

6    was outside the United States and because it was a complex

7    money laundering deal under this one.

8              MS. KANOF:  I think --

9              THE COURT:  We're going to add two for one of those

10   three.  And if the Court doesn't think there's enough for one

11   then what about the other, what the other one?  Otherwise, it

12   goes up on appeal.  They send it back to us.  So then we do

13   another sentencing and we use the other one.  Then it goes up

14   on appeal and they don't like that one.  Then they send it back

15   to us and we use the other one and then it goes back on appeal.

16   Then if they don't like any of them, well, then we come back

17   and adjust the score.

18             MS. KANOF:  I see no prohibition whatsoever for the

19   Court to order in the alternative that if it's 2 1.1 also.

20             THE COURT:  To me, that would be the most efficient

21   way to operate, that we're adding two levels.  And it would be

22   under either of those three provisions.  And if the appellate

23   court thinks that neither of those three apply, well, then

24   they'll send it back and we'll rescore it and resentence.

25             MS. KANOF:  I would propose that would be optimum,

1    Your Honor.

2           THE COURT:  All right.  So for those three reasons,

3    the Court would asked the two levels.

4           So, Mr. Hanshew, now whatever objections --

5           MR. HANSHEW:  A common theme, Judge.

6           We object.  And you know, I think it's telling that

7    probation spoke to the commission on the very point and

8    expressly decided not to do what's being proposed right now.

9           Obviously, it wasn't in the PSR and scored on that

10   particular one, so I can't pretend that, you know, speak to the

11   law on this particular one, Judge.  I can only read what it

12   says in terms of the express language.

13          But we would, for purposes of keeping the record, we'd

14   object that, you know, we don't know what grounds probation

15   would have done to score that and/or what -- why it should not

16   have been done, which is what they decided.

17          THE COURT:  All right.  Anything else on objection

18   two?

19          MR. HANSHEW:  Let me see.

20          THE COURT:  And to read it to you, counsel objects to

21   paragraph 90, 91, 138, 143, requesting -- M.P.S.A. is

22   requesting 24 --

23          Are we on to that one or what -- how --

24          MR. HANSHEW:  So number one was because in the PSR

25   they did loss and sophisticated in the same paragraph, so I

```
 1    respond in kind.  So that was number one the second part.
 2    We're done with that.
 3              THE COURT:  So now we're at two.
 4              MR. HANSHEW:  Two, Judge, is restitution.
 5              THE COURT:  So that's -- and Mitsubishi is here, and
 6    we'll hear from them and we'll figure out what the answer to
 7    that one is.
 8              MR. HANSHEW:  Yes, Your Honor.
 9              THE COURT:  Okay.  So now, on three -- okay.  So I
10    think that one has been solved as well, right?  That condition
11    is no longer a condition.
12              I don't know that I ordered someone --
13              MR. HANSHEW:  I thought they did.  Okay.  But they
14    still --
15              THE COURT:  -- to pay whatever it is in the millions
16    of dollars immediately, especially after someone has been in
17    the penitentiary.
18              MR. HANSHEW:  Okay.  If that's what the Court -- yeah,
19    okay, Judge.
20              So, the only remaining concern I had with that one is
21    the probation's response was that certain of the originally
22    enumerated special proposed special conditions, it turned out
23    were part of either mandatory or standard conditions.  To the
24    extent they're part of mandatory -- and I went back and
25    reviewed the statute.  I don't see that any of these were
```

1   mandatory, which would mean they're standard which would mean

2   the Court has discretion and not to impose those.  So, we would

3   again object.

4           THE COURT:  If we're going to impose reasonable

5   conditions, unless Mr. Delgado has a bunch of money stocked

6   away somewhere, I don't know how I order him to pay in the

7   millions of dollars immediately.

8           MR. HANSHEW:  Okay.  And that's our objection, Judge.

9           And then the other objection, and just to be certain

10  that it's excised and not inserted in the standard conditions,

11  was there was a -- in addition to the conditions that related

12  to payments schedule and timing and lump sums, there was also a

13  proposed condition that required Mr. -- or authorized him --

14  sorry -- probation to share information it obtained from

15  Mr. Delgado with the U.S. Attorney's Office.  So we objected to

16  that.  There's plenty of legal procedures that the government

17  should go through before they obtain, you know, sensitive

18  financial information.  And the government shouldn't be using

19  probation as essentially their -- you know, their attack dog on

20  that.

21          There is subpoenas.  There is depositions.  There is a

22  procedure for that.  And to have probation be hand-in-hand with

23  the government working on those issues post-judgment in this,

24  would sure give an appearance of impropriety.  And I put some

25  case law objecting to that, Judge.

```
 1              THE COURT:  And Mr. Luevano, what are the situations

 2    where it would be wise or reasonable to give that information

 3    to the U.S. Attorney's Office.

 4              MR. HANSHEW:  I can tell you.

 5              THE COURT:  Most of the time they wouldn't even care.

 6              MR. HANSHEW:  I can tell you the origin of this,

 7    Judge, actually.

 8              THE COURT:  Okay.

 9              MR. HANSHEW:  Because it's another one of my cases.

10              There was a case with Mr. Adrian Peña and the

11    government was seeking and continues to seek monetary payments.

12    Probation tried to amend the supervised conditions to include a

13    provision like this so that they could then hand the stuff over

14    to the government, because --

15              THE COURT:  But why?

16              MR. HANSHEW:  Because they wanted to help the

17    government, Judge.

18              THE COURT:  Help the government do what?

19              MR. HANSHEW:  Give the financials that they had to the

20    government, because the government had its own forfeiture and

21    civil proceedings and they were trying to get at where this

22    money is.  And so what it is, is they are trying to backdoor

23    what their requirements are from the government by allowing and

24    having the Court order that -- and I can tell the Court, Judge

25    Cardone denied that request.  It was Ms. Kimmelman in our
```

1    office worked on that.  I had worked on the original case.  And

2    it came up in that process.  And Judge Cardone denied that

3    request for them for basically the same reasons we are saying

4    here, which is, government, you go, if you have your

5    proceedings and you're trying to obtain these financial -- this

6    financial information, use the statutory tools at hand, but

7    don't have probation become, you know, your teammate, your

8    lackey, whatever it may be in this, because probation is

9    supposed to be working with a person that's under their

10   supervision to assist them and help them on probation not to

11   be, you know, essentially a second to the prosecution.

12          THE COURT:  Right.  And I suppose that's one way of

13   looking at it, but you could also look at it that probation is

14   part of the judiciary and the judiciary's function is to make

15   people whole with their restitution orders and those kind of

16   orders, and so I'm not sure that I wholeheartedly agree with

17   that position.  I mean, the government is the government.

18   They're the executive branch.  They do what they do.  But the

19   judiciary also has a role and we're also charged with making

20   people whole through restitution.

21          MR. HANSHEW:  I don't disagree with that, Judge.

22   That's a very obvious point.  I think what we're saying is

23   judiciary shouldn't be working with the information that it --

24   it receives sensitive information it receives from a person

25   that's a supervisee of the Court, vis-á-vis probation, and then

1    handing that over to the government, when there are established

2    procedures for the government to go about in front of a court,

3    no less a federal court, to see whether they get information.

4           THE COURT:  Right.  Yeah.  And I don't have any

5    problem with probation not doing that on their own and

6    approaching the court and having a hearing and turning over the

7    information.

8           MR. HANSHEW:  Right.

9           THE COURT:  I mean, I don't see that somehow the

10    judiciary is insulated from that process.  I don't think it is.

11           MR. HANSHEW:  Right.  And that's why we objected,

12    because this condition authorized probation to just hand it

13    over.

14           THE COURT:  And I think a lot of those conditions with

15    probation was making determinations on its own have been

16    eliminated for all of those reasons.

17           MR. HANSHEW:  Oh.  Okay.  Thank you, Judge.

18           THE COURT:  So, we're on -- are we on two or three?

19           MR. HANSHEW:  Three.  This is three still, so I think

20    we've dealt with the special conditions.

21           There was also, Judge, a $5,000 fine that they

22    recommended imposing in this case and asserted that he has the

23    ability to pay this fine due to his ability to gain suitable

24    employment, which, you know, sorry for laughing, but I mean he

25    has a 16-year sentence.

```
 1            THE COURT:  I don't know what's going to happen with
 2   that or with this, but there is a good chance that Mr. Delgado
 3   will be close to 70 when he gets out of the penitentiary and
 4   will not have his bar license.
 5            MR. HANSHEW:  Correct.
 6            THE COURT:  And unless he's got money stocked away or
 7   wins the lottery or something, I just don't -- I just don't see
 8   it, so I'm not focussed on that.
 9            MR. HANSHEW:  All right.  Thank you, Judge.  That
10   would be move us to four.
11            THE COURT:  Which one was that?
12            MR. HANSHEW:  That was part of three, Judge.
13            THE COURT:  Okay.  What else on that?
14            MR. HANSHEW:  I believe we've covered it all, Judge.
15            THE COURT:  Okay.  Then four is the asset forfeiture
16   thing.
17            MR. HANSHEW:  Right.  We've dealt with that.
18            THE COURT:  Apparently the Wrangler already was taken
19   by the authorities and had it administratively.
20            MR. HANSHEW:  Right.
21            THE COURT:  And five?
22            MR. HANSHEW:  We resolved that one, Judge.
23            THE COURT:  So that one is done.
24            Six?
25            MR. HANSHEW:  Six?  We still maintain that objection,
```

1    Judge.

2            THE COURT:  So let me see.  (Reading.)

3            Okay.  That should be to sign, page 7, Mr. Luevano,

4    under 6, signed for F.G.G. account.  (Reading.)  It was

5    believed was authorized...

6            Okay.  So, I'm going to overrule your objection.  And

7    as to the belief, do you have any evidence as to that?

8            MR. HANSHEW:  Other than we saw all of the bank

9    records during Mr. Gireud's testimony and during when he

10   testified that his family had access to the account, I believe.

11           THE COURT:  All right.  So that's overruled as well.

12           Okay.  So, seven?

13           MR. HANSHEW:  And I think if I can have one moment.

14   Let me just look through these, Judge, because I think I can

15   probably summarize them all.

16           THE COURT:  Okay.

17           MR. HANSHEW:  You know what?  Okay.  I don't think I

18   can.

19           THE COURT:  All right.  So, let's see.  Seven?

20   Objects, clarifies does not include information by long term

21   service agreement intrinsic to the contract.  (Reading).

22           Okay.  I'm going to overrule that objection.  Do you

23   have any evidence as to that claim?

24           MR. HANSHEW:  I think the government will concede that

25   Mr. Mitsubishi executed a long term service agreement.

```
 1                THE COURT:  On the second go-around?

 2                MR. HANSHEW:  Correct, Judge.

 3                THE COURT:  Right.  I think that's true.  Is that what

 4   you were saying?

 5                MR. HANSHEW:  Yes, Judge.

 6                THE COURT:  I think that's in evidence.  Is it not,

 7   Ms. Kanof?  Or at least I saw it in the affidavit that was

 8   presented by Mitsubishi.

 9                MS. KANOF:  I don't remember, Your Honor, because --

10                THE COURT:  I don't think it came in at trial, but I

11   did read it somewhere.

12                MS. KANOF:  Maybe in the settlement agreement?

13                THE COURT:  No.  They have a new -- they sold the

14   generators for cheap and then they have this other service

15   agreement.

16                MS. KANOF:  Yeah, that would be in the settlement

17   agreement then, because they don't sell the generators until

18   2013.

19                THE COURT:  (Reading.)  Wait a minute.  What does that

20   say?  What is it saying exactly?  They didn't execute it with

21   themselves, did they?

22                In any event, I'm going to overrule that objection.

23                Objection number 8, paragraph 13 of the presentence --

24   (reading).  Contract bid and specification documents made clear

25   the equipment would be encumbered.  I'm overruling that
```

1    objection.

2            And what evidence do you have that -- because all of

3    the testimony was that it was not going to be encumbered, at

4    least that's what Mitsubishi thought.  You're saying that these

5    documents actually say that?

6            MR. HANSHEW:  I think in the totality, if you read

7    through all of the contract and the bid specifications, there

8    was discussion that there could be encumbrances.

9            THE COURT:  Okay.  I'm overruling that objection.

10           Number 9?  (Reading.)  Clarifies that the contract

11   materials are referenced in the pledge and/or contract -- wait.

12   Okay.  (Reading.)

13           All right.  So, basically objecting to what paragraph

14   15 said and Delgado believes something different, from those

15   documents and the appellate court I am sure will be able to

16   figure out, you know, what's right, so I'm going to overrule

17   that objection.

18           Objection number 10?  Objects to conclusion.  F.G.G.

19   and are -- we are unaware.  Okay.  "Were."  I guess that's a

20   "were," w-e-r-e -- were unaware that the equipment would be

21   pledged.  Delgado objects to the conclusion.  Okay.  So I'm

22   going to overrule that objection.

23           MR. HANSHEW:  What was the spelling issue, Judge?

24           THE COURT:  The what?

25           MR. HANSHEW:  The spelling.

```
 1                THE COURT:  On 7?

 2                MR. HANSHEW:  You said it should have been something

 3      else?

 4                THE COURT:  Oh, I think it says F.G.G. and/or

 5      M.P.S.A., we unaware -- and I think it --

 6                MR. HANSHEW:  It is "were."

 7                (Counsel speaking over the Court.)

 8                THE COURT:  -- it should be were un- -- were --

 9                MR. HANSHEW:  -- came up recently in our office.

10                THE COURT:  Huh?

11                MR. HANSHEW:  And I've noticed a couple of corrections

12      you've made.  You have something different than what my

13      objections --

14                THE COURT:  I do?

15                MR. HANSHEW:  And we found out recently that I guess

16      probation uses some type of scanning software.

17                THE COURT:  What's the date of your report?  Maybe I

18      got the wrong report.

19                MR. HANSHEW:  No, this is my objection, July 14th.

20                THE COURT:  Oh, that's your objection?

21                MS. MAUREEN:  Your Honor, if I may?  I can let you

22      know what happened to --

23                THE COURT:  Oh, I know.  Oh, this is -- okay.  It's

24      because I'm reading off of probation's deal.

25                MS. FRANCO:  Right.
```

```
 1              THE COURT:  Sorry.  Yeah.

 2              MS. FRANCO:  When they are scanning in it's changing

 3      the formatting.  I've spoken to David Natividad about it, Your

 4      Honor, so that will stop hopefully in future submissions to the

 5      Court.  But basically what's happening is when we turn over a

 6      document to probation, they'll scan it in so that they can

 7      electronically submit it to the Court.  And in the process of

 8      that scanning, that PDF to a Word document is where the problem

 9      is coming up.  But we were made aware of it a couple of weeks

10      ago and I spoke to Mr. Natividad about it, so just so that you

11      know, Judge, that it is an issue that's come up before.

12              THE COURT:  It's the scanner that's doing the --

13              MS. FRANCO:  Exactly, Your Honor.

14              MR. HANSHEW:  Yeah.

15              MS. FRANCO:  It's not that we're illiterate.

16              MR. HANSHEW:  Yeah.  No, I was getting worried, Judge,

17      because I'm pretty anal and I try to be about -- and there was

18      a couple other.  When you mentioned earlier, I just ignored and

19      I realized something was wrong here.

20              THE COURT:  All right.  So let's see.  On number 11,

21      Delgado objects and denies the voracity of the information

22      contained there.

23              MS. KANOF:  Your Honor, there's two E.C.F.s.

24              THE COURT:  There's two what?

25              MS. KANOF:  There's two E.C.F.s.  263 has the
```

```
 1     mistakes, but 263-2 has it corrected.
 2              THE COURT:  Ms. Kanof, you are like in another
 3     universe from me talking about -- I mean, I can barely read and
 4     you expect me to figure out there's two E.C.F.s --
 5              MS. KANOF:  Yeah.
 6              THE COURT:  -- on the same document?
 7              MS. KANOF:  There are or they have the same objections
 8     in them.
 9              So, evidently, what Ms. Franco is talking about is
10     when it was originally scanned, it was filed as 263, and it has
11     the mixed up stuff.  And then it subsumed in E.C.F. 263-2 and
12     it's been corrected.
13              THE COURT:  Okay.  Mine doesn't even have that on
14     here.
15              MS. KANOF:  Okay.  Sorry.
16              THE COURT:  So I probably have the first one.  But
17     this one has no markings.
18              MS. KANOF:  Okay.  Just trying to help.
19              THE COURT:  I'm not sure how I got this.  I think I
20     printed them without the headers, because they get in the way.
21              All right.  So then -- where in the heck were we,
22     Supnet?
23              MR. HANSHEW:  Number 11.
24              THE COURT:  Okay.  On number 11.  So, Delgado objects
25     and denies the voracity.  So, I'll overrule the objection and
```

1    ask if you have any evidence to support that denial.

2          MR. HANSHEW:  Just the same we raised and argued at

3    trial, Judge.

4          THE COURT:  So then, number 12.  Delgado objects and

5    clarifies the alleged forged letter was never made part of the

6    pledged instrument.

7          Well, I don't remember -- what happened there,

8    Ms. Kanof?  Do you remember the pledge of the -- are we talking

9    about the pledge of the generators and the letter -- that the

10   letter from the big guy over there at Mitsubishi --

11         MS. KANOF:  For Mr. Adams.

12         THE COURT:  Adams.

13         MS. KANOF:  Was the letter from Mr. Adams made part of

14   the pledge instrument?  I don't think it matters whether it

15   was.

16         THE COURT:  Well, it -- but there is an objection, so

17   that matters, and I have to address it.  I mean, if it's not

18   going to change the calculation --

19         MS. KANOF:  I'm trying to remember.  Let's see.

20   Ms. Arreola is checking something.  We actually have the

21   exhibits with us.

22         MS. ARREOLA:  Your Honor, would it be worthwhile to

23   proceed to the next one and I'll pull out the pledge agreement?

24         THE COURT:  Sure.  Absolutely.  Yes, ma'am.  Thank

25   you.

```
 1              MS. KANOF:  We have the exhibits with us in the

 2    courtroom, Your Honor.

 3              THE COURT:  Okay.

 4              So then 13 is Delgado objects and denies the

 5    information contained there.  Okay.  24.

 6              Now, I'm not even sure I got the right -- that this,

 7    when you're saying 24, that it's really 24 in mine.

 8              So, Mr. Luevano, maybe you can figure this out.

 9              But if it's really 24, they're saying that on January,

10    30th Delgado prepared a letter -- concerns -- (reading).  Would

11    not be responsible for any letter of credit.

12              I think their objections as to the first generation of

13    PSR, and so now I have the next generation and the numbers are

14    wrong.

15              MS. KANOF:  I've got the first one, Your Honor.

16    And --

17              THE COURT:  So when he says 21, what does 21 say?

18              MS. KANOF:  21 says, on January 10th, a fraudulent

19    letter was transmitted to C.F.E.  In this fictitious letter,

20    someone purported to be John Adams, Mitsubishi's Vice President

21    of New Projects, indicated to Gireud that Mitsubishi had

22    reviewed the desirability of pledging its equipment instead of

23    posting a letter of credit as discussed.

24              It's kind of long.  Do you want me to read the whole

25    thing?
```

```
 1                THE COURT:  Wait.  Okay.  It says on January 12th?
 2                MS. KANOF:  10th.  On January 10, 2012.
 3                THE COURT:  So it's 21.  It's 21 in the new
 4     generation.
 5                MR. HANSHEW:  No I think it's the same one.
 6                THE COURT:  It's the same one.  Sorry.
 7                MR. HANSHEW:  It's the same, Judge.  I think it stays
 8     the same.
 9                THE COURT:  Right.
10                MR. HANSHEW:   And 21 is the one that Ms. Arreola was
11     going to look at and get back to us.
12                And I believe paragraph 24, which is objection 13, is
13     the same in both iterations --
14                THE COURT:  It is?
15                MR. HANSHEW:  -- as the PSR.
16                THE COURT:  So tell me what the objection is to 24
17     then.  The whole thing?
18                MR. HANSHEW:  He denies that.
19                THE COURT:  Everything?
20                MR. HANSHEW:  Yes, Judge.
21                THE COURT:  Okay.  Oh, that he prepared the letter.
22     That's what he's objecting to.  Is That what you are saying or
23     what?
24                MR. HANSHEW:  He's denying the totality of that.
25                THE COURT:  Okay.  All right.  So that objection is
```

1    overruled.

2         Do you have any evidence that you would like to

3    present on 13?

4         MR. HANSHEW:  No, Judge.

5         THE COURT:  Okay.

6         Then on 14, as to 26, Delgado clarifies that he had

7    the authority -- oh, okay.  That's overruled.

8         On 15?  Okay.  I think they -- did you fix those

9    amounts, Mr. Luevano?  I think you did.  Do you know?  He's

10   saying that it's not 103 and not 102.

11        PROBATION OFFICER LUEVANO:  I think those are the

12   corrections we made.

13        THE COURT:  So that's right.

14        So then as to 16, Delgado objects there was no

15   evidence presented supporting this assertion, 35.  35, 35, 35.

16   (Reading.)

17        Okay.  Ms. Arreola, was this introduced in evidence,

18   this letter that he's talking about here?

19        MS. KANOF:  It was.

20        MS. ARREOLA:  I'm sorry, Your Honor, which paragraph?

21        THE COURT:  It's paragraph 35.  And it says the

22   attached -- it's a letter where it says they changed the

23   payments.  That's where the payments were changed; first,

24   second, third, fourth, fifth and fine; and totals 106-million

25   instead of 120.

1          MS. ARREOLA:  My recollection is that was introduced,

2     Your Honor, into evidence, but may I look, Your Honor?

3          THE COURT:  Yes, ma'am.

4          MS. ARREOLA:  Your Honor, I'm going to need a little

5     more time.  I don't know if you want to move on.

6          THE COURT:  Sure.  That's fine.

7          So then on 17, defendant objects...

8          Okay.  And that's also correct, right, Mr. Luevano, we

9     corrected that?

10         PROBATION OFFICER LUEVANO:  It has been corrected,

11    Your Honor.

12         THE COURT:  Okay.  On 18, I think that, pursuant to

13    the objection, the thing about the litigation in Travis County

14    I think they took it out.

15         MR. HANSHEW:  I think they took it out.

16         THE COURT:  I think they deleted it.

17         PROBATION OFFICER LUEVANO:  That's correct.  It was

18    deleted, Your Honor.

19         THE COURT:  So that one is out.

20         Then 19, objection, denies information contained

21    therein.  That's paragraph 65.

22         MR. HANSHEW:  Now, here, I don't know if the

23    paragraphs might change now.  This might be where --

24         THE COURT:  Farther down where it's changed.

25         MR. HANSHEW:  Did they delete --

1          PROBATION OFFICER LUEVANO:  That paragraph has now

2     changed to paragraph 64, Your Honor.

3          THE COURT:  64.  Okay.  So then when agents later

4     interviewed Gireud, he said he never signed a letter.

5     (Reading.)

6          So that objection is -- so I'm going to overrule the

7     objection and ask if you have any evidence that you want to

8     present on that.

9          MR. HANSHEW:  One moment, Judge, if I can reread that.

10    Thank you.

11         I guess we refer back to the cross-examination of

12    Mr. Gireud.  I don't have any documents.

13         THE COURT:  All right.  So then objection 20,

14    (reading.)

15         As to the math, the numbers, I think, Mr. Luevano, you

16    made a correction pursuant to this objection; is that correct?

17         PROBATION OFFICER LUEVANO:  That is correct.

18         THE COURT:  So that's been corrected.

19         As to the other, I'm going to overrule Mr. Delgado's

20    objection and ask if you have any evidence as to the denial?

21         MR. HANSHEW:  The attempt to conceal, Judge,

22    obviously, you know, we go back to memorandum of understanding,

23    there was the agreement that delegation of powers by

24    F.F.G./Gireud to Mr. Delgado that related to this.

25         THE COURT:  All right.  Then as to 21, objection 21,

1    let me see.  Fraudulently deposited any funds.

2         Okay.  I'm going to overrule that objection.  Is there

3    any evidence that you want to add to objection 21?

4         MR. HANSHEW:  The same as in the prior objection,

5    Judge.

6         THE COURT:  Okay.

7         Then objection 22.

8         Well, Mr. Luevano, what about those?  I think some of

9    those paragraphs have changed.  What's your response to that

10   objection of denial?

11        PROBATION OFFICER LUEVANO:  Your Honor, because of the

12   prior changes, the paragraphs have changed, so now it's

13   paragraph 74, 75, 77, 78 and 79.

14        THE COURT:  From where did you glean that information?

15        PROBATION OFFICER LUEVANO:  Here we have they were

16   gleaned from documents provided by the government, which we

17   found that were deemed reliable.

18        THE COURT:  Let me look at those.  Those may have been

19   introduced.

20        MR. HANSHEW:  I don't think so, Judge.  These were all

21   probably taken, and the government could clarify, but from

22   reports of investigation that they handed to probation.

23        THE COURT:  Paragraph 24 is the one about the CPA and

24   she testified.

25        MR. HANSHEW:  Right.  But probation didn't look at any

```
 1    testimony.  They just took all of the R.O.I.s from the
 2    government and sat down with Ms. Kanof for hours to take her
 3    statements of this, which obviously we objected to that as
 4    well.
 5              MS. KANOF:  I think she sat down with the agent for
 6    hours, not with Ms. Kanof.
 7              MR. HANSHEW:  She said she met with you extensively.
 8              MS. KANOF:  Only for a little while.
 9              THE COURT:  Well, you-all can discuss that later, but
10    I'm going to overrule that objection.
11              Do you have any evidence you want to introduce on this
12    object?
13              MR. HANSHEW:  I would note that the Court doesn't have
14    any evidence in terms of these -- they were never provided
15    these R.O.I.s to check the sufficiency, the accuracy, the
16    voracity of them, and so we'd object additionally to that, as
17    well as to the cross-examination of the accountant that related
18    to the topic.
19              MS. KANOF:  We found the exhibit, Your Honor, if you
20    want it.
21              THE COURT:  Okay.  Which one?  Which exhibit are we --
22    which objection are we addressing.
23              MS. KANOF:  The objection number we were talking about
24    was objection number 16.  But I think it's helpful to go back.
25              THE COURT:  Okay.
```

1          MS. KANOF:  In the PSR, paragraph number 33 is a table

2     that was in Government's Exhibit Number 49.  It was actually

3     the legitimate letter and it was admitted as Government's

4     Exhibit Number 49.

5          Paragraph number 35, which is defendant's objection

6     number 16, was admitted into evidence as Government's Exhibit

7     Number 50.  And if the Court will recall, Government's Exhibit

8     Number 49, which is in paragraph 33 and shows the bottom line

9     120.4-million, had Mr. Delgado's little initials at the bottom,

10    and it was also March 23rd, and Government's Exhibit Number 50,

11    which was the one that is in paragraph 35 and to which the

12    defendant is objecting, and objection number 16, does not have

13    Mr. Delgado's little initials at the bottom, and it changes the

14    numbers and the total to 106-million -- 106.6 instead of 120.4.

15         If the Court wants to see the exhibits, I can show

16    you.

17         THE COURT:  No, I remember, because that's where I got

18    the idea that that's where the moving parts were, where the

19    money was going to come from.  So I'm going to overrule 16.

20         But we still -- I don't know if you were able to find

21    anything on objection 11.

22         MS. KANOF:  Which one was objection 11?

23         MR. HANSHEW:  Objection 12, Judge.  12.

24         THE COURT:  Oh, was it 12?

25         MR. HANSHEW:  Yes, sir.

1          THE COURT:  12.  I'm sorry.  12.

2          As to paragraph 21, the pledge --

3          MS. KANOF:  Oh, the pledge, we're still looking.

4          THE COURT:  That the forged letter was never made part

5     of the pledge that was made in Mexico.

6          MS. ARREOLA:  Your Honor, I'm still reviewing the

7     pledge agreement, which is Exhibit Number 32 and the

8     translation was at 32-A.  I think what they're trying to argue

9     is that in the event that the letter itself wasn't incorporated

10    by reference or specifically attached, that it somehow didn't

11    lead to the pledge agreement.  But I think the evidence at

12    trial made it pretty clear that that letter that was signed --

13    purportedly signed by John Adams, that forged letter, was the

14    basis by which Delgado then pledged Mitsubishi's equipment.

15         So regardless of whether or not the letter itself is

16    referenced or attached to the pledge agreement, that was the

17    purported authority on which he relied to pledge the equipment.

18         MR. HANSHEW:  But to be clear that I'm correct, which

19    is it is not made part of the pledge instrument.  I mean

20    it's --

21         THE COURT:  Where does it say that?

22         MR. HANSHEW:  My objection is that the forged letter

23    was never made part of the pledge instrument.

24         THE COURT:  Where does it say that in paragraph 21?

25         MR. HANSHEW:  So it was an objection and a

1     clarification on my part is what I had wrote in the objection,

2     so we would ask that that be included in there, that it was

3     never made part of the pledge instrument, to make it clear.

4          THE COURT:  I'm going to deny that.

5          Certainly, the Fifth Circuit has the record of the

6     trial and can determine that if it determines that's important.

7     It's not going to affect our calculation nor do I the think

8     Bureau of Prisons is going to need any of that.

9          MR. HANSHEW:  But it's a correct statement of the

10    scenario, that's why we're asking for it to be put there,

11    because you heard the argument from the government right now,

12    which is, you know, they're trying to argue that implicitly or

13    inferred or somehow or another that that was -- became part of

14    this pledge agreement and that's not true.  The pledge

15    agreement is a specific document, a contractual document.

16         THE COURT:  And I think the trial was clear that the

17    important part of that letter was that it cleared the way for

18    the pledge agreement.  And whether it's attached to it or not,

19    I don't think really makes any deference.  It's the impact that

20    it had on the minds of people that then executed a pledge

21    agreement.

22         So I think we're on 22.  I'm going to overrule those

23    objections.

24         23.  So he's just arguing that the power of attorney

25    gave him the power to do these things, so I'm overruling that.

1    Do you have any other evidence you want to admit on objection

2    23?

3              MR. HANSHEW:  As I mentioned earlier, the documents

4    themselves specify the authority granted, and we believe it's

5    consistent with our statement here, Judge.

6              THE COURT:  Okay.

7              24.  It's kind of the same thing.  I'm going to

8    overrule the objection.  Although it is true that he was to

9    receive, at least somewhere I saw, and I don't know if it was a

10   trial or before trial or where, but I did see a contract that

11   indicated that Mr. Delgado would get 63 percent of the profits

12   or 65 percent of the profits.

13             MR. HANSHEW:  That's correct.

14             THE COURT:  So that part, I'm not overruling that.  I

15   think that is true.

16             As to 25?  Objection and denies information --

17   (reading) -- defendant claims that Gireud and/or Miller

18   attempted to and sold the L.T.S.A. without any authority --

19   paragraph 83.

20             What's the new number for paragraph 83, Mr. Luevano?

21             PROBATION OFFICER LUEVANO:  One moment, Your Honor.

22             THE COURT:  I'm sorry?

23             PROBATION OFFICER LUEVANO:  One moment.

24             THE COURT:  It's the paragraph about I guess the --

25   where Mitsubishi backed out of the servicing agreement and

1    they -- and they got there competitor Sulzer to agree to do it.

2    Maybe it's 82.

3            MR. HANSHEW:  I believe it's 82, Judge.

4            THE COURT:  Is it 82?

5            MR. HANSHEW:  Correct, Judge.

6            THE COURT:  Okay.  So then, (Reading) it is -- denies

7    information contained therein.

8            PROBATION OFFICER LUEVANO:  What was your question

9    again, Your Honor?

10           THE COURT:  82, that information, did that come from

11   the trial?  I can't remember if that came out at the trial or

12   that's --

13           PROBATION OFFICER LUEVANO:  No, Your Honor, that's --

14   according to documents here we have from investigative reports

15   are from what I have here.

16           THE COURT:  And whose reports are those?

17           PROBATION OFFICER LUEVANO:  The case agent, Your

18   Honor?

19           THE COURT:  The lady case agent?  Am I getting my

20   trials confused?  Yes, I am.

21           MR. HANSHEW:  I think it was two males.

22           THE COURT:  Yeah.  I don't remember if we heard from a

23   case agent, but maybe we did.

24           MR. HANSHEW:  We just heard from one at the outset,

25   where he put up the chart of the payment distributions.

KATHLEEN A. SUPNET, CSR

1    Nothing about this, the background, because the lead case agent

2    they didn't put on.

3              MS. KANOF:  You said the lead case agent --

4              MR. HANSHEW:  It wasn't the lead, right?  That's

5    correct, right?

6              MS. ARREOLA:  The lead case agent was transferred to a

7    different district, Your Honor, and came back and sat through

8    the trial.  A new local agent was assigned to the case and

9    Brian Cunningham was put on.  The original case agent was

10   not --

11             THE COURT:  Oh, it was Cunningham?  That's who?

12             MS. ARREOLA:  Brian Cunningham was the new case agent,

13   the local case agent.

14             MR. HANSHEW:  He started the trial.  The first

15   witness, Judge, they put up the demonstrative board, the

16   transactions and then they had a box of documents they

17   introduced, but that was essentially the totality of his

18   testimony.

19             THE COURT:  So that box of documents, was that that,

20   that Mr. Luevano has?

21             MR. HANSHEW:  No.  They have a box of R.O.I.s.  that's

22   the problem why we keep objecting to all of this, is a lot of

23   this information comes from the agent sitting down with

24   probation and/or handing over R.O.I.s, no trial testimony.

25             THE COURT:  So how am I supposed to do this?

1          MR. HANSHEW:  Strike them all.

2          MS. KANOF:  Your Honor, I guess I'm getting kind of

3     lost.  Are we talking about objection 24 or 25?

4          THE COURT:  25.  And it's 82, now.  It's 82.

5          MS. KANOF:  Okay.  Because I have objection 25 as to

6     paragraph 83.

7          THE COURT:  Well, it used to be 83, because he made

8     these objections under the old --

9          MS. KANOF:  Oh, okay.  So we're talking about a

10    paragraph, 50, begins:  According to Gireud, Mitsubishi and

11    Sulzer Corporation --

12         THE COURT:  I think so.

13         MS. KANOF:  -- file lawsuits?

14         THE COURT:  That's what I'm talking about.  I think

15    that's what we're talking about, but I'm not positive.

16         But Mr. Hanshew --

17         MR. HANSHEW:  I agree.

18         THE COURT:  -- that's the one you had the objection

19    to, right?

20         MR. HANSHEW:  Correct, Judge.

21         MS. KANOF:  I don't think it needs to be -- Your

22    Honor, I don't think that paragraph even needs to be in the

23    presentence report.  I don't think it has anything to do with

24    the trial.

25         THE COURT:  All right.  So let's take that out.

 1        That's what Mr. Hanshew wants.

 2               So then 26.

 3               MS. ARREOLA:  Your Honor, I apologize for asking the

 4      Court to take a step back to objection number 24 to paragraph

 5      82.  Did the Court sustain the objection as to the entire

 6      objection or just the last sentence?

 7               THE COURT:  No.  The only part I'm not sustaining an

 8      objection to is that Mr. Delgado was to receive the majority of

 9      the profits, a large majority of the profits.

10               MS. ARREOLA:  Okay.  Thank you, Judge.

11               THE COURT:  And then the last one is 84.  And is this

12      another one of those -- is it now 83, Mr. Luevano?

13               PROBATION OFFICER LUEVANO:  That's correct, Your

14      Honor.

15               THE COURT:  There's a lot of information in there.

16      Where did that come from?  Is that from the trial?

17               MR. HANSHEW:  R.O.I.s, Judge.

18               THE COURT:  R.O.I.s also?

19               MS. KANOF:  We need to find --

20               MR. HANSHEW:  It even starts out saying, on separate

21      occasions in November 2012, agents reinterviewed Gireud --

22               THE COURT:  Oh.

23               MR. HANSHEW:  -- and provided the following.

24               THE COURT:  Do we need any of that for anything?  Is

25      the government wanting to prove up any of that?  Is that

```
 1    important to have it in here?

 2              MS. KANOF:  It looks like it's from the interview of

 3    Gireud.

 4              PROBATION OFFICER LUEVANO:  It is.

 5              MS. KANOF:  It is?

 6              From an R.O.I. interview of the witness Gireud.  I

 7    think he testified to a lot of it, but a lot of it is totally

 8    irrelevant, especially with regard to the Sulzer information

 9    starting on --

10              THE COURT:  Well --

11              MS. KANOF:  Yeah, that --

12              THE COURT:  So are we going to have to go paragraph by

13    paragraph?

14              MS. KANOF:  No.

15              THE COURT:  Do we just strike the whole thing or...

16              MS. KANOF:  I think we can just strike the whole

17    thing.

18              First of all, I would tell the Court that Gireud did

19    testify to a lot of this, but also a lot of it came into

20    evidence through the actual documents that Gireud is talking

21    about.  So I do think it's unnecessary.  It's a reiteration.

22              To the extent that it's pertinent, it's reiteration of

23    other parts of the presentence report and the rest of it is

24    irrelevant, so I have no objection to striking the entire

25    thing.
```

```
 1              THE COURT:  Okay.  So we'll strike what is now

 2    paragraph 83, pursuant to objection number 26 as to paragraph

 3    84.  Okay.

 4              In the future, because hearsay is admissible for

 5    purposes of these hearings, right, you could attach, I suppose,

 6    those R.O.I.s or whatever they are, at least I would be able to

 7    see them because otherwise I, you know, all I have is the trial

 8    testimony.

 9              PROBATION OFFICER LUEVANO:  Sure.  We'll do that, Your

10    Honor.

11              THE COURT:  So those are the objections.

12              So with those corrections, then, I will adopt the

13    report.

14              So now, allocution.

15              MR. HANSHEW:  Thank you, Judge, if I may.

16              And I'll preface this, Judge, as every judge in trial

17    knows that allocution after a jury trial where obviously you

18    are preserving your record for purposes of appeal, can be a

19    difficult task.

20              You know, Mr. Delgado, we've spoken at length about,

21    you know, he's not going to allocute today based simply on the

22    fact he can preserve his records.

23              THE COURT:  Well, you know, I see in civil cases all

24    the time, lawyers have -- because the discovery has gotten so

25    burdensome, they have this cover order that says if we
```

1    accidently disclose something that we shouldn't be, are we

2    going to pretend like it never happen and we're not giving up

3    any rights and you know those sort of things.  Why?  We should

4    have a rule like that so that people can say what they want to

5    say and yet not waive their error by making admissions that are

6    going to count against them.

7         MR. HANSHEW:  Unfortunately, we live in the Fifth

8    Circuit, and they take a harsher view to any types of

9    admission, statements, et cetera, so we have to follow the

10   safest side of things with that.

11        I agree with the Court.  It seems perfectly reasonable

12   and legitimate that somebody should be able to get up here and

13   talk about their life and their case and what happened and not

14   be, you know, held responsible for that.  But I mean this is

15   the same, the Fifth Circuit, that makes you do the *Pelletier*

16   objection, after we've already filed a 30-page brief, and we

17   have to -- you make your ruling and then we have to still say

18   it or else we waive it.  I mean, this is kind of ridiculousness

19   that they forced us into.  But I appreciate the Court's

20   comments and I personally agree.

21        So in terms of this case and Mr. Delgado I hope the

22   Court saw the letters from his family and friends.

23        THE COURT:  I did.  It had his son and...

24        MR. HANSHEW:  Right.  And you were able to see a more

25   human side of Mr. Delgado, the one that, you know, I've spent

1    now years in speaking with, dealing with, talking to his

2    family, obviously, hours upon hours with Mr. Delgado.

3            You know, what I glean from that, from my experience

4    and hopefully the letters reflect that is that you know there's

5    a person that had a wonderfully positive influence on the

6    people around him.  And obviously there'll be, you know,

7    detractors, and we heard some of those at trial about, you

8    know, where they had a very negative experience with their

9    dealings with Mr. Delgado and for various reasons.

10           You saw that he helped raise a family, very

11   successful.  You know he has the son going off to Harvard Law

12   School.  He's instilled in them the importance of where they

13   come from, their foundation, how they got to where they were,

14   hard work.  And it's reflected in the results in their lives

15   and their sentiments.

16           I thought their letters were also very truthful in the

17   duality of all humans, but of what they knew in this case,

18   which is Mr. Delgado, is that it -- you know it wasn't letters

19   saying, oh, you know, poor mijo.  He's like the most perfect

20   angel you've ever seen in your life and, you know, he never did

21   anything wrong and that type of thing.  They have a normal

22   human experience with him, the ups and downs, and they

23   acknowledge that.  But they still pointed out the same thing as

24   I've seen is that, you know, he does have a care for community.

25           You know, he was a benefactor here for in El Paso for

1    various charities throughout his time.  I know, and the

2    government will of course cast dispersion on some of it because

3    he, you know, was at Carnegie Melon and he gave a significant

4    endowment to them and, you know, they'll claim that that comes

5    from this or any other case.  But there's a lot of parts of it

6    that had noting to do with M.V.s and there's no disputing that,

7    Judge.

8         Moving more into this case.  And you know I've always

9    believed, and I still do believe after, you know, the years of

10   looking at this case and the trial that -- you know, this was a

11   business transaction.  This was a business transaction amongst

12   very sophisticated businessmen, and the least of which was

13   frankly Mr. Delgado.

14        You know, I spoke earlier in a different context about

15   these behemoths.  I men, you have the C.F.E. and you have

16   Mitsubishi, albeit, you know, one of their sub-shell companies

17   in Mitsubishi America, but it's a global powerhouse.  They have

18   teams of lawyers.  Some are sitting here today.  They sat

19   through this trial.  They had teams of business folks, some of

20   which testified, others which you saw were involved.  They had

21   accountants.  They had individuals that went and looked at the

22   documents and the records and the accounting in the business

23   cases from start to end.  And they -- many people along that

24   path signed off on this.

25        You know, I mean there was a mention earlier about,

1    you know, C.F.E. was -- they didn't worry about the interest,

2    and so they, you know, oh, the shot off a $32-million check.

3    No.  They got documents.  And then they responded accordingly;

4    they accepted those, they certified them, they paid this.

5         So, you know, the notion to me that Mr. Delgado in

6    this case is some incredible fraudster, that he perpetrated

7    this you know fraud against these two players.  I mean these

8    guys, that's their business.  C.F.E. and Mitsubishi, that is

9    what they do.  They make that energy and provide it to their

10   country, and to do that they have to buy these turbines among

11   other mention.  Mitsubishi manufacturers per month and sells

12   them around the globe.

13        And you had a, you know, a perfect storm in this case,

14   which you had Mitsubishi, who had no contacts prior -- with

15   C.F.E., Mitsubishi America, prior to this.  They had a

16   mothballed turbine that was originally produced for some entity

17   in Brazil, we heard, that had been sitting around for, you

18   know, who knows how long, and they were more than excited to,

19   one, have a business entrée into Mexico because it's a

20   powerhouse.  It's not only that.  It's a monopoly in terms of

21   it -- at that time -- now I know that those -- undone some of

22   this -- but at that time, the C.F.E. was a monopoly that's run

23   by the government.  And so, you know, any

24   energy-equipment-producing company in their right mind would

25   want to get in on a country that, you know, has these types of

1        government-run energy companies.

2              And C.F.E. had the need for a turbine.  And they knew

3        they could get a good deal, because they were finding out it's

4        gray marketed in mothballs.  And the person that had the

5        connections to make that, and the only person that made this

6        happen, was Mr. Delgado, largely.  And so he, you know,

7        brokered this deal.

8              You know, obviously it's been our position and, you

9        know, I know the jury ruled otherwise in terms of the frauds

10       they were presented, okay, the frauds they were presented,

11       about it, but this deal was ultimately consummated with those

12       two behemoths.  They had their deal.  They got their equipment.

13       They got their money.  They even got their long term service

14       agreement that they weren't going to get before this.  It is a

15       classic business deal, contract deal that's gone wrong.

16             I mean, I know this Court has been, you know, a judge

17       for many years in state and federal court and you see this.  I

18       mean this is what happens and, you know, businesses get in

19       contract disputes, especially supply contracts and such.  This

20       is part of the normal course of business.  And that's what

21       happens here.  And it happens not just in Travis County, in

22       Mexico.  I believe Sulzer had a lawsuit against the various

23       parts.  And they're not all, to be clear about this, they're

24       not all suing Mr. Delgado.  They're all suing each other.

25             You even saw in the settlement agreement between

1    C.F.E. and Mitsubishi that they expressly each preserved their

2    claim about what happened in this deal.  And C.F.E., for

3    example, didn't give up its claim that all of this contract,

4    the transactions, the pledge in this were legitimate, to this

5    day.

6            In that document, that last document you have, they

7    don't give out and Mitsubishi, you know, they countered to

8    that.  That litigation goes on in these other jurisdictions.

9    Mexico had various -- I believe they had administrative

10   proceedings, possibly criminal ones, civil proceedings.  They

11   go on about this.  And frankly, you know, it's my position, our

12   position.  That's where, you know, they should have all been.

13   But you know they found a strong hand of the U.S. Federal

14   Government and it's a money grab.  You know, this case is a

15   money grab.

16           You've got the easiest way for them to collect is to

17   have, you know, a federal judge impose, you know, 25-million or

18   $1.3-billion in, you know, restitution and such, so they can

19   get that federal court judgment and runaround with that and

20   collect.

21           THE COURT:  Collect from where?

22           MR. HANSHEW:  I'm sorry?  From the restitution, for

23   example, in this case they're asking for.  It's all the same

24   claims they've made in all of these other civil proceedings.

25           And I say all of that to get to where -- an

1    appropriate, you know, sentence in this case, which is the

2    notion that what Mr. Delgado did in this fraud case.  I mean,

3    this is distinctly different, let's say, for example, you now,

4    a Ponzi scheme, where you see somebody comes in and they've

5    stolen, you know, every grandma and grandpa and every other

6    poor person's life savings and to put something against their

7    homes.  I mean, the list goes on.  You've seen and we've all

8    heard of these cases where individuals come in and they, you

9    know, through a Ponzi or some other scheme, they destroyed, you

10   know, these individual persons' lives.  This couldn't be

11   farther away from that.

12          And you know, of course, the argument will be, well,

13   you know, corporations are people too, you know, and that

14   debate goes on in our country, and they have a right to come

15   here, I'm not disputing, and make their claims about it.  But

16   to really look at what's in the factors of 3553 for this case

17   for Mr. Delgado, I mean, the danger he is to the public, the

18   injury he caused in this case, he already has a sentence of,

19   you know, 16 years, Judge, in the other case.  You know, we're

20   asking the Court to consider a significant variance in this

21   case.

22          You know, the idea that I think with the new guideline

23   that the Court came up with, 121 to 151, and in the others it's

24   capped at 10 years, I mean, a 10-year sentence for what was

25   nothing more than, you know, a business transaction gone wrong,

1    is incredibly excessive, Judge.  I think that the Court can

2    fashion a sentence much lower than that, that accounts for all

3    of the factors in 3553 and what actually did happen here and

4    what didn't happen here.

5            We'd also ask the Court to run this sentence

6    concurrent with the sentence in the other case.  You know, the

7    notion that stacking onto Mr. Delgado's 16-year sentence, a

8    ten-plus-year sentence, I mean, this is an individual in his

9    50s.  As it is, he's going to, you know, at best get out in his

10   mid 60s.  You know, we know by fact by the sentencing

11   commission, you know, recidivism rates drop as people get

12   older.  I mean, he's going to spend a decade already

13   incarcerated.  There is no penological interest.  There's no

14   3553 factor that supports a consecutive sentence here.

15           And really the only reason why, you know, the

16   government is going to be -- if they are -- if they've

17   threatened, asking for a consecutive sentence is because he

18   exercised his right to a trial in this case.  But for that,

19   they wouldn't be sitting here saying that and we all know that.

20           So I ask the Court to consider all of that.  And if it

21   has any other areas of concern you'd like me to address, Judge,

22   I can.

23           THE COURT:  All right.  Thank you, Mr. Hanshew.

24           Mr. Delgado, is there something you want to address to

25   the Court pip know your attorney for the reasons you may not

1    want to but I need to give you the opportunity if you do.

2           THE DEFENDANT:  Just thank Mr. Hanshew and Maureen

3    Franco.

4           THE COURT:  All right.  Thank you.

5           Ms. Kanof?

6           MS. KANOF:  Yes, Your Honor.

7           This is definitely not a classic business deal and

8    this is not a business deal gone bad.

9           MR. HANSHEW:  Do you want us to move over, Judge?

10          THE COURT:  Sure.  You can go ahead and have your

11   seat.

12          MS. KANOF:  F.G.G. should never have gotten this

13   contract, should never have gotten permission to bid for it.

14   They had no assets.

15          If the Court will remember the testimony, generally,

16   in order to bid for this what was ultimately more than

17   $200-million contract, including the L.T.S.A., you had to have

18   at least 10 years business expenses and you had to be vetted.

19          There were usually -- this was very unusual deal that

20   somebody actually came in between.

21          Mr. Delgado shut out Mitsubishi and didn't let them

22   see anything.  Mr. Delgado shut out Mr. Gireud.  He found a

23   dupe, Mr. Gireud, to create a company that he created in

24   Nevada, to use in order to steal money, go on lavish vacations,

25   buy a ski resort, buy a house in El Paso, spend over $70,000 at

1    Charlotte's and live the life of Riley.  And he has no money

2    now, because he spent is all having a real good time.

3         This was not a classic business deal gone wrong,

4    because F.G.G. should never have gotten this contract.  Look

5    who they were bidding against:  Westinghouse, Siemens; some of

6    the largest energy providing corporations in the world.  How

7    does it happen that F.G.G., a little nobody in El Paso, who had

8    to open an account at Wells Fargo, a little branch, would get

9    that contract.  There was nothing classic.  There was not a

10   business deal.

11        Mitsubishi had these old -- not that old -- but they

12   had these generators that were built for Brazil.  And Brazil,

13   it went under, and they were sitting there.  And this middleman

14   in Houston, who some of these people knew, put the two of them

15   together.  A businessman would say, yeah, let's get rid of this

16   equipment.

17        But this is really not a complex case.  It's really

18   pretty simple.  Somebody was in cahoots with Mr. Delgado or

19   somebodies were in cahoots with Mr. Delgado.

20        Remember that Mr. Gireud had to sit outside the office

21   of a labor union leader, who had an awful lot of power.  And I

22   know that this Court did not hear the testimony where

23   Mr. Delgado was convicted of conspiracy to launder $600-million

24   for the Milenio cartel, but that same individual came up in

25   that case as well.  This case is just about plain old fraud,

 1    fraudulent signatures, fraudulent documents, fraudulent names,

 2    fraudulent contracts; all of them pointing to Mr. Delgado.

 3    There was -- it just a plain, simple individual.

 4         Throughout the government's dealings with Mr. Delgado

 5    in both cases, and they were not originally mine or

 6    Ms. Arreola's, but the cases began with an AUSA that left our

 7    office, and were already charged, when they were turned over.

 8         There're attorneys -- four attorneys asked for

 9    Mr. Delgado to be evaluated.  And one of the problems with our

10    judicial system is that there are only two psychological

11    situations in which an individual can avoid trial; one, is that

12    they're insane.  Mr. Delgado is clearly not insane.  He knows

13    what he did was wrong at the time that he did it.  And

14    Mr. Delgado was certainly competent.  He knows the law very

15    well.  But there's something in between there that somebody can

16    falsify documents.

17         In the first case, he falsified legal documents to try

18    to justify over a million dollars in cash, that his partner in

19    crime, an informant who turned, had with him, he falsified some

20    false settlement papers to try to justify the cash.

21         He falsified an e-mail that purported to be from an

22    agent from Homeland Security that came from Atlanta, but some

23    computer expert, forensic experts, detected that the e-mail

24    actually came from a cyber cafe in El Paso.

25         Here he falsified letters from Mr. Adams that said

that he could pledge equipment that everybody in the whole
world knew he could not pledge, and that Mr. Adams himself just
days before had said, are you sure you're not pledging this
equipment?  This is just a pretty simple fraud case from a very
smart man, who is neither insane nor competent, but certainly
is diabolical.

Is he fit, under the 3553 characteristics, to get
leniency in this case?  Well, maybe, there's not sympathy for
corporations, although when corporations are defrauded, it
usually ends up hurting the purchasers of their products, the
end user, but there were a lot of victims in this case.
Whether or not you have sympathy for some of the individuals
that were tied up with him or not is not the question, but he
used people like his former fiancée.  She was very damaged by
his conduct.

He used people like his former accountant.  You know,
she waited an waited at that bank for him to come and put his
signature on it -- on that account and it never happen, and she
was terrified that she was going to be libel for that money.
Where was all of this money coming from, from this offshore
account.  She knew nothing about it, and finally became
concerned that she was going to be charged with money
laundering and went to an attorney, which is how we got the
case, someone that she was calling her son betrayed her.  His
own family are his victims.

1        One of the things that happens in white collar crime

2   that's so insidious is that they convince their family that

3   they did nothing wrong, and they have a whole bunch of people

4   that hate the government for the rest of their lives and teach

5   the families that the government is evil, because they were

6   innocently convicted.

7        If Mr. Delgado is concurrently serving his time, I

8   guess, he's already been in prison or in jail five years; he

9   gets time for that; he could be out as early as six or

10  seven years if it's concurrent or seven or eight.  And I

11  promise the Court he'll find somebody else to cheat.  And the

12  government does ask the Court to realize that no matter how

13  much money he funneled, he squandered it.  He bought expensive

14  things and toys and very expensive clothes.  You'll remember,

15  he buys clothes from Ft. Worth from a man, who kept telling his

16  accountant "where's my money, where's my money?"  And the pool

17  guy, "where's my money, where's my money?"  She ended up using

18  her credit card to pay for his hotel in Italy.

19        This isn't a classic or common business deal.  This

20  was a horrible fraud and had a lot of victims, and the

21  government is going to ask the Court to stack his sentence,

22  because if he gets out while he still has the ability, he's

23  going to cheat a lot more people.

24        THE COURT:  All right.

25        And you said you had some victims that wanted to make

1    a victim impact statement prior to sentencing.

2            MS. KANOF:  Yes, Your Honor.  Who wants to go first?

3            Your Honor, this is Mr. Mark Maney.  He represents

4    Comisión Federal de Electricidad.

5            THE COURT:  Good morning, Mr. Maney.

6                MARK MANEY VICTIM IMPACT STATEMENT

7            MR. MANEY:  Good morning, Your Honor.  I have the

8    honor of representing the Mexican governmental entity Comisión

9    Federal de Electricidad usually called the C.F.E.

10           During this relevant time, the C.F.E. was the only

11   provider of electricity in Mexico.  It was not a corporation.

12   It did not do it for profit.  It did it in part of the public

13   trust.  As a governmental entity, all of C.F.E.'s property,

14   including this money, is sovereign property of Mexico.

15   C.F.E.'s officials are government officials.

16           It is C.F.E.'s position and Mexico's position that

17   C.F.E. was the direct victim of Delgado's crimes.  Frankly, the

18   words of Willie Sutton the famous bank robber, "that's because

19   that's where the money was."  It was C.F.E.'s money that was

20   going to fund the scheme.  To get C.F.E.'s money, Delgado had

21   to defraud C.F.E., chiefly through a -- let me make sure I get

22   the date right -- March 3rd letter, where he told C.F.E. that

23   the account was shifted from El Paso to the Turks and Caicos

24   and any and all proper approvals had F.G.G.'s attorney to do

25   that.  That allowed him to divert $32-million of C.F.E.'s money

1    to an offshore bank account.

2           Now, keep the scheme going, as the Court noted

3    earlier, he sent $18-million of that money to Mitsubishi where

4    it was supposed to go, which was less then Mitsubishi was owed,

5    and he defrauded them and told them the payments were lower,

6    but they got $18-million, which means 13-million-987 --

7    78-thousand-97-dollars of C.F.E.'s money were diverted from

8    where they were supposed to go.  They were supposed to go for a

9    number of things, mainly to Mitsubishi; they went to Mr.

10   Delgado.  He used that money, C.F.E.'s money, Mexico's money,

11   to buy a house, ski condos, really nice furnishings, three

12   cars, vacations, et cetera.  All of that property traces

13   directly to the sovereign patrimony of Mexico and Mexico wants

14   it back.

15          Now, I recognize there are other victims here.

16   Mitsubishi would have made a lot more money if the deal went

17   through.  F.G.G.'s owners certainly loss money.  Lots of people

18   in Mexico pay for electricity, but the property is Mexico's.

19          I also want to note that Mexico's losses were far

20   greater than $14-million.  In addition to $14-million, C.F.E.

21   spend an extra $9-million just for the turbines, for extending

22   guarantees, the warranties because of the delays in getting

23   those, et cetera.  They spent and extra 90 --

24          THE COURT:  Hold on a second.

25          Their original contract was 120-million for the

1    turbines.

2              MR. MANEY:  And they ended up sending 129.

3              THE COURT:  No, no.  For the turbines?

4              MR. MANEY:  For the turbines and all of the

5    accoutrements of the turbines.

6              THE COURT:  So C.F.E. paid Mitsubishi 129-million for

7    the turbines?

8              MR. MANEY:  Yes.

9              THE COURT:  Oh, okay.  Because this is really news to

10   me.

11             MR. MANEY:  Yes, they paid them 9- -- now it wasn't --

12   it was turbines plus you had Mitsubishi -- you know, because

13   there was a three-year delay, the warranties and the originals

14   were out and they had to pay extra for that.

15             THE COURT:  Okay.  So you're saying that C.F.E. paid

16   cash money to Mitsubishi of 129-million.

17             MR. MANEY:  Yes, that was the last price of the

18   turbines themselves.

19             THE COURT:  Okay.  Because I have a letter from

20   Mitsubishi saying that they only paid, I don't know,

21   67-million; that's not true?

22             MR. MANEY:  Your Honor, I'm combining the cross of the

23   turbines and the warranties and extended warranties --

24             THE COURT:  We're just talking about the turbines.

25             MR. MANEY:  -- not the service agreement.

1          THE COURT:  I asked you about the turbines, not the

2     service agreement.  You're saying you paid --

3          (Counsel interrupts the Court.)

4          MR. MANEY:  No, no, no.  I'm not talking about the

5     service agreement.

6          THE COURT:  I'm not either.

7          MR. MANEY:  Okay.

8          THE COURT:  I'm just talking about turbines, the

9     machines, that physical structure that generates electricity;

10    your saying C.F.E. paid Mitsubishi $129-million.

11         MR. MANEY:  Yes.  But what I am trying to clarify and

12    the reason there might be a discrepancy between us and

13    Mitsubishi is, is that I included or at least C.F.E. includes

14    in the cost of the turbines apart from the service agreement --

15         THE COURT:  I'm just talking about the cost for the

16    machine, 129 --

17         (Counsel interrupts the Court.)

18         MR. MANEY:  It was one contract, Your Honor, and it

19    includes some warranties, includes some deicing, et cetera.  I

20    don't know how that breaks down --

21         THE COURT:  You can make it as complicated as you want

22    or as easy as you want.  Here is the question:  For the

23    physical machine that you push the on button and out comes the

24    electricity, the turbine, two diesels, one steam, how much did

25    C.F.E. pay Mitsubishi?

1          MR. MANEY:  I don't know the break down in the

2     contract.  What I will say is the original -- what we purchased

3     in the original $120-million contract, ultimately crossed

4     $129-million.

5          THE COURT:  All you purchased in the $120-million

6     contract was the physical machine that generated the

7     electricity.

8          MR. MANEY:  I -- I --

9          THE COURT:  So if you paid Mitsubishi 129-million,

10    we'll speak to Mitsubishi in a minute.  We'll find out what's

11    going on.

12         MR. MANEY:  But I do believe included -- Your Honor,

13    is incorrect that it was just the machines, because it was the

14    machines, the warranties for the machines and --

15         THE COURT:  It may have included all of that, but then

16    they had another $121-million service agreement.

17         MR. MANEY:  That did not change.

18         THE COURT:  Okay.

19         MR. MANEY:  That's not what --

20         THE COURT:  That's not what I'm talking --

21         (Counsel interrupts the Court.)

22         MR. MANEY:  (Indiscernible.)

23         THE COURT:  -- just the machine, you, C.F.E., paid

24    Mitsubishi $129-million.

25         MR. MANEY:  Yes, but it -- you know, that included

1    transportation, all -- everything to get the machines in, apart

2    from the service contract, went up $9-million.

3            THE COURT:  Okay.

4            MR. MANEY:  All right.

5            They spend an extra -- C.F.E. spends an extra

6    $90-million to complete the power plant.  If the power plant

7    was designed for these turbines, when the turbines didn't show,

8    they couldn't finish the project, all the delays, so an extra

9    $90-million just to finish the facility.

10           Finally --

11           THE COURT:  Did you have to get other turbines or were

12   you still --

13           MR. MANEY:  We -- well, they could've spent

14   $250-million to adjust the power plant to set different

15   turbines, so I mean it was a bad decision versus bad decision.

16           THE COURT:  Okay.  So that really was an additional

17   cost, because you were still planning to get those turbines,

18   the very same ones.

19           MR. MANEY:  If the turbines had come when planned, and

20   this -- in the design, the cost of the building finishing the

21   plant would have been $90-million less.  They were 90-million

22   over budget, because they didn't get the turbines anywhere near

23   in time.

24           THE COURT:  So was this a function of time that

25   increased the price?

```
 1            MR. MANEY:  Yes.  They had to maintain the facility

 2     that wasn't operating.  They had to keep workers out there.

 3     And then they had to bring -- and then they didn't have

 4     deicing, which they were supposed to have.  They were told

 5     deicing, but then Mitsubishi said, no, there isn't deicing, so

 6     we had to put the deicing in, and all of those things was an

 7     extra $90-million.  And this was all --

 8            THE COURT:  So C.F.E. put in the deicing?

 9            MR. MANEY:  Well, Mitsubishi did, but they paid for

10     it.

11            THE COURT:  Okay.  All right.

12            MR. MANEY:  And then the La Auditoría Superior de la

13     Federación in Mexico, the national auditing firm, did an audit

14     of the cost of this and determined that the delay, the

15     three-year delay in getting the turbines, cost the C.F.E.

16     $432-million a year.  That works out to about $300.00 a year

17     per family in Mexico.  And for some of those people that's a

18     lot of money.  And all of that was passed through, but it was a

19     big burden.  So the official estimate and the estimate that got

20     four officials of C.F.E. disbarred ten years from ever working

21     for the government, is a $1.3-billion number.  And all of those

22     numbers I gave you are part of the official audit of the

23     government of Mexico; not C.F.E.'s number, a separate entity.

24            This obviously -- and all of this was both testified

25     by Mr. Matamala, including the 1.3-billion, and is in his
```

1     declaration.  This was obviously, was and is a huge problem for

2     the Mexican government.

3          Mexico charged through what they called a comptroller,

4     which is their public function, secretary of public function.

5     A number of C.F.E. officials, eventually, four high level

6     officials were disbarred from any government office for

7     ten years.  Four other officials, including one who came to

8     testified, but didn't testify because the appeal came out right

9     before, lost their jobs for six months, including all pay and

10    seniority benefits, which is essentially a career killer, not

11    to mention a six month loss in time, all for not stopping him,

12    Mr. Delgado, from stealing this money.

13         Since this trial, in March of this year, a C.F.E.

14    official, who was above those eight, was sentenced to prison

15    for corruption; not for this case, but the suspicion was that

16    he was somehow involved in this fiasco as well.  And notably on

17    numerous occasions I talked to Mr. Hanshew, and tried to get on

18    behalf of the Mexican government, Mr. Delgado's cooperation to

19    uncover any corruption with the C.F.E., working on behalf of

20    the P.T.R. and comptroller's office.  I got nowhere in those

21    efforts despite promises that we would be coming here at this

22    time asking for leniency as opposed to what we are doing right

23    now.

24         I was retained to try to get that cooperation and to

25    try to get justice, but mostly to get the money back, because

1     for political reasons, this is the sovereign property of Mexico

2     and they want to back.

3            Now, there is a contract which you've seen with

4     Mitsubishi.  And if we get back any money, if the C.F.E. does,

5     as government properties, there are contractual provisions that

6     have been amended so many times about that high (motioning),

7     that would give them some credits and offsets.  We're not

8     obviously trying to hide that from Mitsubishi.  They're sitting

9     there right with us.  But our position is, is that all of this

10    money is constructive trust money, sovereign property of

11    Mexico.  And Mexico, like the United States, doesn't abandon

12    their property, can't lose their property, can't assign away

13    their rights.  So, for example, when I have a contingency

14    fee for C.F.E., not this case, but other cases, I can't get

15    assignment of their claim.  I get a right to get payment, a

16    percentage of what's won, but they're separate.  They just

17    can't give me that.  This is C.F.E.'s money.  They want it

18    back.

19           So therefore, the C.F.E. did not file suit against

20    Mr. Delgado, because this is political and sovereign property,

21    the Mexican government sent an official request to the United

22    States Government from the C.F.E. to the P.G.R.,

23    (indiscernible) -- state department, to the DOJ, asking for

24    assistance to get their property back.  That formal request was

25    granted and the U.S. Government assured C.F.E. that all would

1    be done within the law to get their property back.

2            And frankly, I can tell you that so far that's been

3    wonderful.  Ms. Kanof, Ms. Arreola, every one in the United

4    States Attorney's office has obviously done a fantastic job in

5    pursuing this case.

6            C.F.E.'s also cooperated.  We gathered documents.  I

7    travel to El Paso with witnesses, write video conferences with

8    other witnesses, brought two witnesses to trial; one who

9    testified, Juan Pablo Matamala; Francisco Moreno did not,

10   because the appeal -- lengthy, lengthy appellate decision

11   confirming his suspension for six months came out right before

12   trial.  I was here every day for trial.  And I'm here today for

13   the sort of the last part to see if Mexico gets justice in this

14   case.

15           I appreciate the Court's time, but this was not a

16   victimless crime.  The C.F.E. didn't just lose profit.  They

17   cost real people real money and some good people their jobs

18   because this happened.

19           Thank you.

20           THE COURT:  Thank you.

21           MS. KANOF:  Your Honor, for representing Mitsubishi,

22   Mr. Matthew Herrington from Steptoe and Johnson, Washington

23   D.C.

24           MR. HANSHEW:  Judge, I just want to clarify for

25   purposes of -- these are victim's statements.  This is not --

1          THE COURT:  Right.  I know.  I know.  But they're

2    interesting statements.  And I understand these are just victim

3    impact statements and we're going to have a restitution hearing

4    after.

5          MR. HANSHEW:  The Court is not going to consider any

6    of these statements for restitution purposes, correct?  Because

7    we don't have -- subject to cross-examination.  They're not

8    testifying.

9          THE COURT:  No, no.  It's just giving me a lot of

10   ideas for questions I might ask at the restitution hearing.

11         MR. HANSHEW:  I just want to make sure, because if it

12   is, I object that any of this information be used for purposes

13   of restitution.

14         THE COURT:  No.  I understand where we're at; victim

15   impact statement.

16         MR. HANSHEW:  Thank you.

17                    MATTHEW HERRINGTON,

18         MR. HERRINGTON:  Your Honor, Matt Herrington for the

19   firm that's now known as Mitsubishi Hitachi Power Systems

20   America, but I usually refer to it as M.P.S.A., which is the

21   corporate moniker.  It went under at the time when it had the

22   unfortunate experience of going into business with Mr. Delgado.

23         I want to start by answering a question that came up

24   in your colloquy and I will direct you to the declaration of

25   Kevin Beddard, who sat in that witness stand, his affidavit,

1    actually which is attached to my statement that went to the

2    probation office, discusses in paragraph eight the discrepancy

3    here.

4             You know when something is wrong in this case, you

5    know what it bottoms out to?  It bottoms out to a lie by Marco

6    Delgado.

7             THE COURT:  Hold on.  Where are we at?  Because all of

8    the information I got from you is that the C.F.E. got those

9    turbines for $12-million less than they had bargained

10   Mr. Delgado, which was 120-million.  So that would come out to

11   about 108-million.

12            MR. HERRINGTON:  That's exactly --

13            THE COURT:  C.F.E. is saying they actually paid

14   129-million.  So we're talking about $21-million of

15   discrepancy.  That's not in Mr. Gireud letter.  Show me where

16   that's at, please.

17            MR. HERRINGTON:  Actually, I can't tell you where the

18   21 comes from.  I can tell you where the 13 comes from.

19            THE COURT:  Well --

20            MR. HERRINGTON:  There was a lot of things because it

21   all comes down -- and we'll have a chance to look at this in

22   restitution.

23            THE COURT:  Sure.

24            MR. HERRINGTON:  But like most things in this case, it

25   comes down to a lie from Mr. Delgado.  Mr. Delgado told C.F.E.,

1   oh, yeah, don't worry, we've got the transportation taken care

2   of.  Don't worry we've got the deicing taken care of.  Those

3   were lies.  And so did C.F.E. have to pay additional monies for

4   that material and that work that was outside the original

5   contract with M.P.S.A.?  Absolutely, they did.  And that's

6   what's reflected in paragraph eight of Mr. Gireud affidavit.

7       You know, I've heard some extraordinary things this

8   morning, that this was all sort of two corporate sumos who were

9   out to knock out the middleman.  I think it's pretty

10  extraordinary.

11      I think it's pretty extraordinary to have counsel sit

12  here and talk about allegations after a jury has returned a

13  verdict.  These aren't allegations.  This was a fraud that this

14  man was convicted of.  And this wasn't a deal gone wrong.  This

15  was a deal -- and you put it very well, Your Honor -- that was

16  built from the beginning as give it to C.F.E. and short

17  M.P.S.A. in every step of their way.  That's exactly what Mr.

18  Delgado did.

19      And that's true whether you are talking at the

20  beginning about that $32-million that went to the Turks and

21  Caicos account, only 18 of which was sent to M.P.S.A.  It's

22  also true, and this is where, you know, what happened to

23  M.P.S.A. just tracks right in the indictment, because when you

24  read through it and you ask yourself, well, hey, you know,

25  Count One of the indictment, well that was about the forgery.

1    What was the forgery all about?  Well, the forgery was all

2    about a lie by Mr. Delgado, because Mr. Delgado had said, don't

3    worry guys, I'll cover the letter of credit.  But what did he

4    do?  He did a lie that's in Count One and a lie that's in Count

5    Three.

6         On the one hand, he, in Count One, forged a letter

7    from my client, employee.  He forged that letter to say, oh,

8    you know, we're pledging the equipment.  We don't need a letter

9    of credit.  And then what did he do in Count Three?  He lied to

10   my client and said, oh, don't worry.  We didn't do anything

11   like forging, like pledging the equipment.  We know we -- oh,

12   we know we couldn't do that.  It's lie, after lie, after lie.

13   It's an insult to the businessmen and women of this country for

14   someone to stand at this podium and say this is just a normal

15   course of business.  That's a quote.  It's not the normal

16   course of business that my clients conduct.  And I don't think

17   it's the normal course of business that anyone in this country

18   thinks it's an acceptable course of conduct.

19        You said it best.  He got everything from C.F.E. and

20   he shorted M.P.S.A.  Many people signed off on this.  You know

21   who the many people that signed off on this were?  Mr. Delgado,

22   when he signed Mr. Adams name to the forgery; Mr. Delgado when

23   he lied to M.P.S.A. about how, oh, no.  Oh, no, I would never

24   pledge your equipment.  I know you feel like I'm pulling a fast

25   one on you here, but oh, no.

 1          So, the idea that this is some kind of victimless

 2     crime, and boy, you know, the bad guy is federal government

 3     just sort of stepped into the world of business and don't

 4     really understand how things are done, I just find that an

 5     absolutely unacceptable thing be said from this podium, Your

 6     Honor.

 7          The submission that we made to the probation office

 8     puts forward exactly the number that we believe that the losses

 9     were here to Mitsubishi, which is $24,797,772.00.

10          I am not going -- I think my friend drifted into the

11     restitution issue.  I think we'll come back to that and I'll

12     have another chance to address that.  I think those are the

13     losses that are proximately tied to this indictment that

14     Mr. Delgado was found guilty of.  These aren't allegations.

15     These were what he was found guilty on.

16          So, you know, I was here.  I brought the witnesses

17     here.  We brought the witnesses to El Paso on other occasions

18     to cooperate in this investigation.  We had to file the lawsuit

19     in Texas to declare -- to get the pledge declared illegal.  We

20     had to go to Mexico and be sued by our customer; not what we

21     want to have, because we made the poor decision of doing

22     business with Mr. Delgado.  We paid a big price for this, well

23     beyond the number on that piece of paper.  And I'm hear today

24     just for the same reason that my friend is from C.F.E., to make

25     sure that justice is done here.  And I'm sure that the Court

1    will take that into consideration and I thank you.

2              THE COURT:  All right.  Thank you.

3              MS. KANOF:  That's it.

4              THE COURT:  Okay.  All right.

5              Well, noting your request for a variance, I think that

6    the facts of the case and the history of this defendant counts

7    against that, so I'm going to assess a guideline sentence of

8    120 months in Counts 11 through 19.  And I'm going to vary

9    slightly from the suggested guideline range for purposes of

10   Counts One through Ten and assess a sentence of 120 months for

11   those counts.  Those counts will run concurrent.

12             I don't see where there's any money from which

13   Mr. Delgado is going to pay a fine, and so I'm not sure that a

14   fine is going to help, so I'm not going to assess a fine in

15   this case.  It's going to be waived.

16             I'm going to follow the term of confinement with

17   three years of supervised release and be concurrent on all

18   counts under standard conditions adopted by the Court.  These

19   will include that you commit no crime against the United

20   States, any state of United States or any local government,

21   that you abide by the special condition that you submit to

22   one year of intermittent confinement as directed by the Court

23   pursuant to law.

24             And Mr. Hanshew, you're familiar with the one count

25   that's -- requested special condition of supervision that's in

1    paragraph 137 under the new -- the September -- the July 20th,

2    2017, P.S.I.  It's just the one that the defendant shall

3    provide the probation officer with access to any requested

4    financial information and authorize the release of any

5    financial information as directed by the Court.

6              The last line will be deleted.

7              MR. HANSHEW:  Okay.  Yeah.  As long as it's striking

8    the government.

9              THE COURT:  Okay.  Any objection to that?

10             MR. HANSHEW:  We don't have objections.

11             THE COURT:  Okay.  Then that will be included as a

12   condition as well.

13             All right.  So, I will also order that the

14   forfeiture -- the preliminary order of forfeiture in relation

15   to the defendant's interests in the property that we addressed

16   earlier is forfeited to the United States, all title, ownership

17   and interest that the defendant may have in that property.  A

18   special assessment of $1,900.  And I will order restitution and

19   we'll determine that in the proceeding that we will proceed on

20   next.

21             I'm going to order that -- this is ten years -- I'm

22   going to order that five years of this sentence run concurrent

23   with the sentence previously assessed against Mr. Delgado in

24   cause number EP:12-CR-2106.  So five will run consecutive, five

25   will run concurrent.

1          And I believe that a sentence then, if there's no

2     changes on appeal and Mr. Delgado is then serving 21 years,

3     that is sufficient to address the significant issues that he

4     was involved in, especially in relation to the other case, but

5     also in relation to this case.  And so that's the Court's order

6     on sentence.

7          A facility, Mr. Hanshew?

8          MR. HANSHEW:  One moment, Judge.  I need to -- going

9     back to the Fifth Circuit's ridiculous rule, I have to object

10    to all of this --

11         THE COURT:  Okay.

12         MR. HANSHEW:  So we'd object that the sentence

13    imposed, both in terms of the length as it relates to each

14    count as well as to not running it concurrent, is excessive and

15    not reasonable and is not reasonably related to the factors set

16    forth in 3553 as based on all of our objections and arguments

17    made in writing as well as orally today, Judge.

18         THE COURT:  Okay.  Did you have a suggestion?

19         MR. HANSHEW:  If I can one moment, Judge.  Thank you.

20         (Counsel and defendant converse sotto voce.)

21         MR. HANSHEW:  Judge, one other additional request.  We

22    ask that the supervised release run concurrent with the other

23    case.  And then as far as the designation, we request FCI La

24    Tuna, Judge.

25         THE COURT:  FCI La Tuna is the Court's recommendation.

```
 1              MR. HANSHEW:  And also, Judge, the DAPS program as

 2    well.

 3              THE COURT:  RDAP?

 4              MR. HANSHEW:  Yes.

 5              THE COURT:  I'll order that he be screened for

 6    addition and participate in RDAP if found to need it.

 7              So, I would order that if -- that the supervised

 8    release portions, those three years, run concurrently as well.

 9    We can address those issues if we need to extend.  I suppose we

10    could do that.  What do we have?  One, two -- I can't remember

11    how many years of supervised release I gave him on the other

12    one.

13              MR. HANSHEW:  I apologize, Your Honor.

14              MS. KANOF:  Three.

15              THE COURT:  Was it three also?

16              MS. KANOF:  (Nodding head affirmatively.)

17              THE COURT:  Okay.  All right.

18              So anything else on the sentencing portion today?

19              MS. ARREOLA:  Your Honor, does the sentence also

20    include the forfeiture of the money judgment in addition?

21              THE COURT:  Yes, ma'am.  The money judgment -- and

22    we're going to file an amended version of that to make the

23    changes we indicated.

24              MS. ARREOLA:  Yes, sir.

25              THE COURT:  We would also include that, yes, ma'am.
```

```
1    Thank you.
2              MR. HANSHEW:  And just to be safe, we object to the
3    money judgment component as well, Judge.
4              THE COURT:  Okay.  All right.  So let's go to
5    restitution.
6              Is there -- I mean do we have anything for Mr. Gireud?
7    I saw that he filed something, but it was mostly consequential
8    things for his medical expenses and...
9              MS. KANOF:  I didn't think there was anything that was
10   specifically covered by the restitution statute.
11             THE COURT:  Okay.  So that was my feeling, so I'm not
12   going to award anything there.
13             The one issue I have with C.F.E. is because I -- his
14   argument saying that the actual money that's there is the
15   Mexican government's money, that that's their asset, and
16   therefore they should get it back, and that they've applied
17   through different governmental agencies.
18             And so what is -- what's the government's position as
19   to that?
20             MS. KANOF:  Well -- you want to go ahead.
21             MS. ARREOLA:  Your Honor, I'm not aware of any
22   promises that have been made regarding what's going to happen
23   to the assets and certainly I don't believe AUSA Kanof has made
24   any such promises either.
25             THE COURT:  That seems like a different issue.  I'm
```

1      here to assess restitution, kind of like an equitable, and

2      those seem like hyper-legal issues that should be litigated

3      somewhere else.

4             MS. ARREOLA:  Your Honor, the government agrees, and

5      there're two separate issues; one, what will happen with the

6      forfeited assets and restitution.  What will happen with the

7      forfeited assets is to be determined by the Department of

8      Justice.  The money laundering and asset forfeiture -- excuse

9      me.  I think it's -- it's changed it's name recently to MLARS,

10     Money Laundering and Asset Recovery Section.  The Attorney

11     General has designated his authority to distribute forfeited

12     assets for purposes of victim restitution to the chief of that

13     section, which is a component of the Department of Justice.

14             After the Court enters the restitution order in this

15     case, in the event that any properties are forfeited to the

16     United States, this office, the U.S. Attorney's Office will

17     make a request to MLARS to apply for forfeited assets to the

18     restitution orders, assuming the criteria under the restoration

19     policy are present, which I believe that they are.  But that's

20     not that's a decision that's made by the U.S. Attorney's

21     Office.  It's made solely by the chief of MLARS.

22             THE COURT:  And they'll also decide -- let's say I was

23     to order restitution to both C.F.E. and Mitsubishi, that office

24     will then decide how much goes to each if of what they have?

25             MS. ARREOLA:  I don't believe so, Your Honor.  I

KATHLEEN A. SUPNET, CSR

1     believe it's -- I believe that they just send the forfeited

2     assets to the clerk's office.  That's my understanding, and I

3     apologize if I later on learn something else, but my

4     understanding at the moment is that they don't -- once the

5     Court enters the restitution order, the forfeited assets, if

6     restoration is granted will simply be sent to the clerk's

7     office for distribution.

8               MS. KANOF:  If I may, Your Honor.

9               I think what Mr. Maney is talking about is that the

10    Office of International Affairs agreed to participate in

11    seeking justice for C.F.E.  We don't ever make any agreement or

12    agree that specific things or specific funds are funds of the

13    government or anything like that.

14              But with -- apologies in advance for saying that's not

15    my department.  We have a section in the San Antonio office

16    called the Financial Litigation Unit.  And forfeitures -- what

17    happens with forfeited properties and forfeited funds is --

18    Ms. Arreola has explained, goes through one direction, and a

19    determination is made as to whether or not that can satisfy

20    restitution.

21              The other thing that happens is when a restitution

22    order is issued, that restitution order goes to our financial

23    litigation unit, which is headed by an assistant United States

24    attorney named Kristy Callahan.  And she's an expert in this

25    field.

1          And there are the U.S. Attorney's manual and the

2     Department of Justice is replete with regulations that

3     determine how that money is distributed.  And they will --

4     Kristy Callahan will first of all look to see if Mr. Delgado

5     has other assets that are -- that Homeland Security -- that

6     Josh Fry missed.  They have an incredible shovel and are pretty

7     magnificent in finding things that have not been located and do

8     it in perpetuity until the defendant, in some instances, is

9     deceased.  And they satisfied those restitution orders forever

10    depending on the statute, and the regulations as to how they

11    should be satisfied.

12         So the Court's -- my understanding is the Court's only

13    responsibility is to determine whether or not restitution is

14    appropriate and how much that restitution would hypothetically

15    be and that's it.

16         How it's distributed is determined by other

17    regulations and by our financial litigation counsel.

18         THE COURT:  All right.  So then let's start with

19    C.F.E., because from reading everything, it seemed to me like

20    C.F.E. had these collateral damage issues that are not

21    necessarily contemplated by restitution.

22         MS. KANOF:  That's correct.

23         THE COURT:  And so if I'm looking just at the numbers

24    and I thought before I came here, that the number was

25    $120-million for the generators.  And then the service contract

1    which then fell through and so we don't need to worry about

2    that.

3            And then from what I saw from the filings that

4    Mitsubishi produced and the affidavit from Mr. Beddard?

5            MS. KANOF:  Beddard.

6            THE COURT:  -- Beddard, he indicates that

7    Mitsubishi -- that C.F.E. received those very same generators

8    and a service contract and insulation and the whole ball of

9    whacks, for less than what C.F.E. had originally contracted

10   for, so there was actually a savings of $12-million for C.F.E.,

11   and so if there was a savings, they lost nothing.  They

12   actually gained $12-million.  And so if that's the case, we

13   don't have to really spend a lot of time on that.

14           So, that's the first thing we need to clarify, because

15   counsel indicates that C.F.E. sent a check over to Mitsubishi

16   for 129-million, and nowhere in any of this written material do

17   I see that.

18           MS. KANOF:  Your Honor, would you like testimony

19   there?

20           THE COURT:  Sure, absolutely.

21           MS. KANOF:  From whom?

22           THE COURT:  Whoever has firsthand knowledge and

23   ability to testify to it.

24           MR. HANSHEW:  Oh, well, obviously we're going to

25   object to -- I mean, an attorney for these parties does not

1    have firsthand knowledge, Judge.

2           THE COURT:  Well, you know, I misspoke, because I

3    think hearsay is admissible here, actually.  I think hearsay is

4    admissible in these hearings.

5           MR. HANSHEW:  To put on an attorney to testify without

6    firsthand knowledge of what happened.

7           THE COURT:  When the rules say hearsay is admissible,

8    that's what it means, someone that doesn't have firsthand

9    knowledge who just heard about it is going to testify.  I think

10   that's the rule.

11          MS. KANOF:  Yeah, hearsay is admissible.

12          But Your Honor, could we just have a brief recess so I

13   can talk to the representatives for the victims.

14          THE COURT:  Yeah, you think the three of you could get

15   together and come up with a number and figure it out?

16          MS. KANOF:  Okay.

17          THE COURT:  Because those two numbers aren't jiving.

18   They're far apart.  One is 13 and other is like 20 --

19          MR. HANSHEW:  Well, the PSR in this case said zero to

20   C.F.E. and the government didn't object or file anything.

21          THE COURT:  Right.  And I think that's probably right,

22   but since we're here for an evidentiary hearing...

23          MS. KANOF:  And I did talk to Ms. Torres about it and

24   she did explain to me that -- I'll tell you what she said.  She

25   said that the victim impact statement from C.F.E. did not ask

1       for money that was consistent with the restitution statute.

2              THE COURT:  Right, but that's because there was all of

3       those collateral damage kind of issues, but I just heard

4       C.F.E.'s lawyer say they paid $129-million for the machines --

5              MS. KANOF:  Right.  That was --

6              THE COURT:  -- and they had originally contracted for

7       120, so they lost $9-million.  That's an actual loss.

8              MS. KANOF:  That's what we need to clean up.

9              THE COURT:  So let's take, what, 15 minutes?

10             MS. KANOF:  That would be great, Your Honor.

11             THE COURTROOM SECURITY OFFICER:  All rise.

12             (Break in proceedings.)

13             MS. KANOF:  Your Honor, could Mr. Herrington address

14      you.  I think that pursuant to statute they're going to ask for

15      a little time.

16             THE COURT:  All right.

17             Mr. Hanshew?

18             MR. HANSHEW:  Not me.  Mr. Herrington.

19             THE COURT:  No, I know, but before -- while he walks

20      up here, do you have any objection to giving him more time.

21             MR. HANSHEW:  I don't.

22             THE COURT:  Ms. Kanof, do you?

23             MS. KANOF:  No, we have no objection, Your Honor.

24             THE COURT:  All right.  So...

25             MR. HERRINGTON:  Your Honor, so you know it's because

```
 1    of this process where we're victims and didn't have the PSR
 2    before today and didn't have each other's statements, I think
 3    it would be more respectful to people's time if you give us
 4    30 days, and we'll come back, and you know we may be in the
 5    same place, but hopefully we can work something out.  And then
 6    we'll make a filing and Mr. Hanshew will object, and then we
 7    can decide or you can decide if we need a hearing, but that
 8    seems better today than the two of us arguing about icing
 9    systems.
10            THE COURT:  Okay.
11            MR. HERRINGTON:  Under 18 U.S.C., 3364(d)(5), as I
12    understand it, the Court has 90 days --
13            THE COURT:  Right.
14            MR. HERRINGTON:  -- to make a determination.  And so
15    by having 30 days until we come back, that should leave ample
16    time for --
17            THE COURT:  Plenty of time.  And if we have to reset
18    it again, we can do that.
19            Here's what I am interested in knowing.  Obviously, I
20    need to figure out what happened to Mitsubishi as a result of
21    this thing.  Initially from my reading, it looked like
22    Mitsubishi sold that equipment -- I am talking just about the
23    physical equipment --
24            MR. HERRINGTON:  Yeah.
25            THE COURT:  -- sold it for about half of what the
```

1  contracted price ways, and so I want to know, did Mitsubishi

2  know about the original contract for 120-million, and if they

3  did, why did they sell it at such a discount knowing that

4  C.F.E. was willing to pay 120-million, because it could been

5  120-million minus the 32 they already paid, because they paid

6  32, and that would still come up with $88-million.

7          MR. HERRINGTON:  And we'll be prepared.

8          THE COURT:  And so I think you also did like

9  $67-million or something like that, just the equipment, not

10  the --

11          MR. HANSHEW:  Yeah.

12          THE COURT:  -- service contract.

13          MR. HERRINGTON:  And we'll be prepared, Your Honor.

14          THE COURT:  And also, in fairness to Mr. Delgado, I

15  guess we need to factor in whatever profit Mitsubishi is making

16  off the service contract.

17          MR. HERRINGTON:  Well --

18          THE COURT:  Because there's a cost to you for that and

19  there's a profit to you for that.

20          MR. HERRINGTON:  So, I'm happy to address that in the

21  papers, but I think that that's a bit of a detour and let me

22  say why.

23          These turbines are among the most complicated things

24  that human beings make.  There's no world in which those

25  turbines were installed and there wasn't a service contract.

1    Now, that service contract might have been gone to Mitsubishi,

2    it might have gone to somebody else.

3              THE COURT:  Originally, it did.

4              MR. HERRINGTON:  Right.

5              THE COURT:  Originally, the service contract was with

6    Mitsubishi for 121-million, but then something happened and

7    they got that other company or competitor.

8              MR. MANEY:  That would be Mr. Delgado went to other

9    people and shopped it over there.

10             MR. HANSHEW:  Mr. Gireud did do that, Judge, just to

11   be clear or the record.

12             THE COURT:  Okay.  All right.

13             MR. HERRINGTON:  So -- I mean, I could argue it's in

14   the papers.  I think it's apples and oranges.  That L.T.S.A.

15   was going to be there either way, and so if there was profit on

16   the L.T.S.A., that's not, you know, an offset against the

17   losses on the sale of the turbines.

18             THE COURT:  Except in my sense of justice, what we're

19   looking is how you were put out by his conduct.  How you were

20   financially impacted by his conduct.  You definitely were

21   impacted on the price of the equipment.

22             MR. HERRINGTON:  Okay.

23             THE COURT:  But you had already backed out of the

24   contract.  So then you got another contract with C.F.E. for the

25   servicing.  I don't know how much of that is actual cost and

1     how much is profit, and I'm not sure how much of the profit

2     incentive on the service contract caused you to underprice the

3     equipment when you sold it to C.F.E., because I know C.F.E. was

4     willing to pay $120-million for that equipment and you sold it

5     for a lot less.

6              So, I want to know all of those things.

7              MR. HERRINGTON:  Okay.

8              THE COURT:  If we're going to look at it, we're going

9     to look at it, otherwise, we're not going to do it.  I mean,

10    that's how I want to do it.

11             MR. HERRINGTON:  And that's -- with me.

12             THE COURT:  So you need to show me cost and profit off

13    of the service contract and the reason for underselling the

14    equipment.

15             MR. HANSHEW:  Your Honor, if I could ask just in terms

16    of the scheduling on this, suggest possibly instead of a 30-day

17    a 60-day.  At the 30-day mark, the Court could set a deadline

18    so that they submit their written material that they're going

19    to and then that gives us a 30-day period to be able to

20    investigate what it is that they'll be turning in, because it

21    will be something we've never seen before.  That way we don't

22    have to be, you know, calling and asking for extension here and

23    there.  That gives -- you have 90 days by statute, so 60

24    doesn't even touch, that way we just all have our appropriate

25    time to be able to respond.

```
 1                THE COURT:  All right.  What do you think about that,
 2     Ms. Kanof?
 3                MR. HERRINGTON:  Sure.
 4                MS. KANOF:  (No response.)
 5                THE COURT:  Mr. Herrington?
 6                MR. HERRINGTON:  No, I think that's right.
 7                THE COURT:  Okay.  So then in 30 days, C.F.E. and
 8     Mitsubishi will submit their paper argument as to what the loss
 9     should be with all of the math details.
10                And then Mr. Hanshew you'll have 30 days to address
11     that or read that and be familiar with it and then we'll set
12     the hearing in 60.
13                Where will that put us, Greg?
14                COURTROOM DEPUTY DUENAS:  That would put us around the
15     week of November 27th, Judge.
16                THE COURT:  November what?
17                COURTROOM DEPUTY DUENAS:  27th.
18                THE COURT:  When is Thanksgiving in relation to that?
19                MS. KANOF:  24th.
20                MR. HERRINGTON:  24th?
21                COURTROOM DEPUTY DUENAS:  23rd.
22                THE COURT:  So we're at the following week.
23                Okay.  Mr. Herrington, how is your calendar for that
24     week?
25                MR. HERRINGTON:  I could make that work, Your Honor.
```

KATHLEEN A. SUPNET, CSR

```
 1                THE COURT:  All right.  Can we make that work?
 2                UNKNOWN SPEAKER:  Yes, sir.
 3                THE COURT:  Ms. Kanof?
 4                MS. KANOF:  Other than Monday, I'll be coming back in
 5       to town on that Monday.
 6                THE COURT:  Okay.  Maybe Wednesday then.
 7                Mr. Hanshew?
 8                MR. HANSHEW:  Either of those days are fine, Judge.
 9                THE COURT:  So let's do it Wednesday.  What day is
10       that?
11                COURTROOM DEPUTY DUENAS:  November 29th, Judge.
12                THE COURT:  Okay.  What is the most convenient day for
13       you-all to travel?
14                MR. HERRINGTON:  May I just check my phone, Your
15       Honor?
16                THE COURT:  Sure.
17                MR. HANSHEW:  Judge, I guess just a question the Court
18       may ask.  Are they actually going to bring the witnesses that
19       were the affiants and the such.
20                THE COURT:  I don't know.  But I think that hearsay is
21       admissible and I think they can just do affidavits.
22                MR. HANSHEW:  I've never seen in any case a
23       restitution I've researched that the evidence has been based on
24       secondhand testimony of attorneys and victims.  It always has
25       the victims.
```

1          THE COURT:  All right.  Can you show me a case that

2     says it cannot be hearsay?

3          MR. HANSHEW:  I'll look for that, Your Honor.

4          MS. KANOF:  The statute says the attorneys can speak

5     for the victims.

6          MR. HERRINGTON:  And Your Honor, we're going to put

7     this in by affidavit and I'm not sure there is a right to

8     cross-examine here.  I think you're right.  It would be kind of

9     odd to having attorneys taking the stand.  But you know C.F.E.

10    and M.P.S.A. have already put in affidavits from the technical

11    people.  I think one of the big jobs we have is just to get the

12    technical people to agree on what these different numbers mean

13    and what does and doesn't count.

14         THE COURT:  Okay.  Because the other thing is, I don't

15    have the original contract.  And I don't know how much of the

16    original contract the $120-million for the equipment included,

17    because we want to make sure we're comparing apples to apples.

18         MR. HERRINGTON:  Which is a challenge in this case.

19         THE COURT:  Right.

20         MR. HERRINGTON:  November...

21         THE COURT:  29th, is that good for you?

22         MR. HANSHEW:  Judge, like you, we'd ask if they can

23    bring the entire contract and all of the bids that make up that

24    contract so that everybody sees what the valuations are.

25         THE COURT:  Mr. Maney, the 29th, is that good for you?

1          MR. MANEY:  Yes, sir.

2          THE COURT:  Okay.  Mr. Herrington --

3          MR. HERRINGTON:  I do -- I'm sorry.  I have a speaking

4     engagement on the 29th.  I could come on the 30 -- no.  I could

5     be here on the 28th.

6          THE COURT:  Mr. Maney, 28th?

7          MR. MANEY:  Yes.

8          THE COURT:  Ms. Kanof, are you here on the 28th?

9     That's a Tuesday.

10          MS. KANOF:  I'll be here Tuesday, yes, Your Honor.

11          THE COURT:  Okay.

12          Mr. Hanshew, Tuesday?

13          MR. HANSHEW:  That's fine.

14          THE COURT:  Okay.  So we'll do it on the 28th then.

15          MR. HERRINGTON:  And I just have this feeling we're

16     going to end up having back-and-forth about this.  I don't

17     think we need to turn this into a minitrial on the contracts.

18          THE COURT:  It kind of feels like it's going to be

19     that, doesn't it?

20          MR. HERRINGTON:  Yeah.  And I'm not --

21          THE COURT:  It would be great if you all could just

22     agree.  That would be outstanding.

23          MR. HANSHEW:  There're asking for $25-million into a

24     billion dollars and they don't want to have a little minitrial.

25     I mean that's nice, but you have to actually have evidence and

1    the government has the burden of the statute to prove it

2    with --

3              THE COURT:  That's true.  And in the end, this is

4    really an academic exercise.  Because unless Mr. Delgado has

5    this pot of gold hidden away somewhere where we can get our

6    hands on it...

7              MR. HERRINGTON:  It's really not -- understood.

8              THE COURT:  Okay.

9              MR. HERRINGTON:  Thank you, Your Honor.

10             THE COURT:  All right.  Thank you all.  We'll see you

11   back in 60 days.

12             (Proceeding concludes.)

13                          *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

* * * * *

        I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Signature:/S/KATHLEEN A. SUPNET          September 7, 2018
           Kathleen A. Supnet, CSR          Date