1          IN THE UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF TEXAS

3                  EL PASO DIVISION

4                  VOLUME 20 OF 20

5

6  UNITED STATES OF AMERICA           EP:13-CR-0370-DCG

7  v.                                 EL PASO, TEXAS

8  MARCO ANTONIO DELGADO              December 19, 2017

9
                        **RESTITUTION HEARING**
10            THE HONORABLE DAVID C. GUADERRAMA
                  UNITED STATES DISTRICT JUDGE
11

12

APPEARANCES:
13
   For the Government:   Debra Kanof
14                       Anna Arreola
                         Kristy Callahan
15                       Assistant United States Attorney
                         700 East San Antonio, Suite 200
16                       El Paso, Texas 79901

17 For Mitsubishi:       Matthew J. Herrington
                         Steptoe and Johnson LLP
18
   For C.F.E.:           Mark Maney
19                       Maney & Gonzalez-Felix PC
                         712 Main St., Ste. 2100
20                       Houston, TX 77002

21 For the Defendant:    Maureen Franco
                         Erik Hanshew
22                       Assistant Federal Public Defender
                         700 E. San Antonio, Suite 410
23                       El Paso, Texas  79901

24

25

KATHLEEN A. SUPNET, CSR

```
 1    Court Reporter:        Kathleen A. Supnet
                            El Paso, Texas
 2                          (915)834-0573
                            kathi.supnet5303@gmail.com
 3

 4            Proceedings reported by mechanical stenography,

 5    transcript produced by computer-aided software and computer.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CHRONOLOGICAL INDEX

2                     VOLUME 20 OF 20

3    DECEMBER 19, 2017                          PAGE    VOL.

4    Announcements. . . . . . . . . . . . . . . . 4      20

5    Restitution Hearing. . . . . . . . . . . . 4      20

6    Findings of Facts. . . . . . . . . . . . . 52     20

7    Court Reporter's Certification . . . . . . . . 57   20

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Open court.)

 2              (Defendant and counsel present.)

 3              THE COURTROOM DEPUTY:  EP:13-CR-370, Marco Antonio

 4        Delgado.

 5              MS. KANOF:  Good afternoon, Your Honor.  Debra Kanof,

 6   Anna Arreola and Kristy Callahan for the United States.

 7              Your Honor, I'd like to introduce Kristy Callahan, if

 8   you already haven't met her.  She heads our Financial

 9   Litigation Unit for the Western District of Texas, which is

10   housed in our San Antonio division, but she assists all of us.

11   And she very graciously agreed to take a look at the

12   restitution issues and the law pertaining to the restitution

13   issues in these cases in order to assist us and will be

14   handling the primary issues in this case, although AUSA Arreola

15   and I will assist where there are factual issues that maybe

16   from the trial that she, of course, was not present during.

17              THE COURT:  Good afternoon, Ms. Kanof, Ms. Arreola and

18   Ms. Callahan.  I've had the pleasure of meeting Ms. Callahan on

19   three separate occasions.  This will be the fourth.  So I am

20   actually familiar with her.  Welcome to El Paso.

21              MR. HANSHEW:  Good afternoon, Judge.  It's just the

22   two of us, Maureen Franco and Erik Hanshew on behalf of Mr.

23   Delgado.  We are ready.

24              PROBATION OFFICER CARRILLO:  Good afternoon, Your

25   Honor.  Isabel Carrillo for U.S. Probation on behalf of Sandra
```

1 Torres.

2    THE COURT:  Okay.

3    And who's representing Mitsubishi here?

4    MR. HERRINGTON:  Good afternoon, Your Honor.  Matt

5 Herrington representing Mitsubishi.

6    THE COURT:  All right.

7    And C.F.E.?

8    MR. MANEY:  Your Honor, Mark Maney for C.F.E.

9    THE COURT:  All right.

10    Okay.  So I suppose that our process will be the

11 government has the burden of showing where the restitution is

12 owed.  And so we'll start with that.

13    I think there was a lot of confusion.  The last

14 hearing we had there was huge confusion as to who paid what and

15 how much.  I mean there was like a $60-million discrepancy

16 between C.F.E. and Mitsubishi.  C.F.E. is saying they paid

17 130-million.  Mitsubishi is saying they only received 60.  And

18 there is some missing money.  I think the parties have worked

19 that out.  From what I understand, they've agreed -- Mitsubishi

20 has agreed to subordinate their claim to the electric company.

21    And somewhere in the paperwork I saw where the

22 electric company signed their rights to Mitsubishi.  This was

23 at page four Mitsubishi's impact letter.  So, confusion all

24 around.

25    MS. CALLAHAN:  So, Your Honor, Kristy Callahan for the

1    United States.  I'm going to attempt to eliminate the confusion

2    today.

3         I understand from the victims that C.F.E. and

4    Mitsubishi do not agree regarding the government's brief.  It

5    appears that there is a settlement agreement from 2013 that the

6    United States has with it, and I believe that the defense has

7    already seen, I think it may have been dealt with a motion in

8    limine before this Court before the trial.  But nevertheless,

9    what we have before us or really the losses attributable to the

10   counts of conviction, there are three counts in which

11   restitution stems from.  They're Counts One, Two and Three.

12        Counts One and Two deal with a $32-million that was

13   wired to Delgado's Turks and Caicos accounts.  So from those

14   what we can look at is what amount did Mr. Delgado divert

15   improperly and that's really simple.  The amount is

16   $13,678,907.00.  That amount would belong to C.F.E.

17             THE COURT:  Tell me again.  13-million.

18             MS. CALLAHAN:  $13,678,907.00.

19             THE COURT:  Okay.

20             MS. CALLAHAN:  The issue really is Count Three and

21   that is where there's a little bit of a gray area.  And the

22   reason for that --

23             THE COURT:  Before we go there, out of the 13-million

24   that he diverted, how much of that was paid to Mitsubishi?

25             MS. CALLAHAN:  How much of that has been paid to

1   Mitsubishi?  None that I'm aware of.

2          So the settlement agreement --

3          THE COURT:  I understand Delgado paid $11,321,093.00

4   to someone and then an additional $7-million to someone.  This

5   is at page 76 of the report.  So who was that money paid to?

6          MS. CALLAHAN:  The 95-million?

7          MR. HERRINGTON:  That money was paid to Mitsubishi?

8          THE COURT REPORTER:  Could you use the microphone,

9   please?

10          MR. HERRINGTON:  Sorry.

11          THE COURT:  So Mitsubishi received $18-million out of

12   the 32?

13          MS. KANOF:  Yes, Your Honor.

14          MR. HERRINGTON:  Which was less than IT WAS supposed

15   to get, Your Honor, so...

16          THE COURT:  We're not getting there yet.  We're going

17   to go one step at a time.

18          I'm trying to get to this 13-million, because Delgado

19   didn't keep 13-million.  I think he kept 6-million 691, but

20   I'll follow your numbers and then show you mine, and then we'll

21   see if we can agree?

22          MS. CALLAHAN:  So we get to those numbers using the

23   table that's in the presentence report and so we look at

24   several numbers.  There's the amount that Mr. Delgado wired to

25   Mitsubishi, which is the $18-million number.  After we are

1    finished with that, there's the amount that he wired to F.G.G.,

2    which is about 3.4-million.

3           THE COURT:  Uh-huh.

4           MS. CALLAHAN:  And then whatever is left --

5           THE COURT:  2500 or 2-million-5 in Turks and Caicos

6    account.

7           MS. CALLAHAN:  Yes.

8           THE COURT:  Which the government picked up.

9           MS. CALLAHAN:  So then whatever is left is the amount

10   that he diverted today his own pockets or spent.

11          THE COURT:  So show me how this adds up and this comes

12   out to 13.

13          We got 32-million.

14          MS. CALLAHAN:  We have the 32-million.

15          THE COURT:  We take out 18 to Mitsubishi.

16          MS. CALLAHAN:  Right.

17          THE COURT:  So that's 14.  Now 14-million and you pay

18   how much F.G.G.?

19          MS. CALLAHAN:  So F.G.G. was the $3,450,110.00.

20          THE COURT:  Ms. Arreola is coming apart over there.

21          Just walk over there or tell her whatever you want.

22          MS. CALLAHAN:  She's breaking it up more.

23          THE COURT:  3-million-450, then we are at

24   10-million-650.

25          MS. CALLAHAN:  Right.

```
 1              THE COURT:  Okay.  So we're already below the 13,670.

 2              MS. CALLAHAN:  So the 13 is the 3.4-million plus the

 3      10-million.

 4              THE COURT:  What 3.4?

 5              MS. CALLAHAN:  The amount that went to F.G.G.

 6         And so the confusion why would we give -- why would we

 7      attribute that to restitution.  The answer is because Count

 8      Three.

 9              THE COURT:  Oh, okay.

10              MS. CALLAHAN:  So Count Three is where he constructed

11      the fraudulent e-mail and wired that and basically induced

12      C.F.E. to send the money to begin with.  So but for that act,

13      the 3.4 million would never have gone to F.G.G. at all.

14         So, Mitsubishi gets credit for the 18-million pursuant

15      to an offset that it received under the settlement agreement,

16      but Mr. Delgado is responsible for the remaining amounts,

17      because Counts One and Two, he improperly acquired money and

18      Count Three, he improperly induced C.F.E. to send the money and

19      to representatives of F.G.G. in the first place.

20              THE COURT:  Okay.  I get that part, but what -- how

21      does F.G.G. come out of here with 3-million-and-some without

22      having to repay that?

23              MS. CALLAHAN:  I don't know that --

24              THE COURT:  Well, because we're charging Delgado with

25      the 3-million-some he paid to F.G.G., if he shouldn't have done
```

1    that, shouldn't we get the money back from F.G.G.?

2         MS. CALLAHAN:  Well, that would be to the extent they

3    had it, but even more than that, I don't believe that F.G.G.

4    knew that he was doing that on their behalf.

5         As a matter-of-fact, it's my understanding F.G.G. did

6    not know even know he had diverted the money to the offshore

7    bank account.

8         THE COURT:  Right, I agree.  But they sure knew it

9    when the money came to their account.  They knew it was there.

10   They didn't give it back.

11        MS. KANOF:  They did, Your Honor.  F.G.G. used that

12   money to pay Delgado for his services.

13        THE COURT:  All of it?

14        MS. KANOF:  Not all of it.  Some of the money -- some

15   of that $3.4-million went back to Delgado.

16        THE COURT:  Because under the contract, F.G.G. was

17   entitled to money, right?

18        MS. KANOF:  They were entitled to some money, but

19   remember gets 68 percent of everything.

20        THE COURT:  Right, uh-huh.

21        MS. KANOF:  So he took or so they didn't know that he

22   had diverted the $10-million.  So they went ahead and paid him

23   what they thought that they owed him for what they thought was

24   being paid on the first and second installments.  So --

25        MR. HANSHEW:  Your Honor, I'm going to object at this

KATHLEEN A. SUPNET, CSR

1    point that this isn't evidence.  This is pure argument.  They

2    haven't submitted a document to support any of this.

3            MS. KANOF:  Mr. Gireud testified to it.  Mr. Gireud

4    testified and --

5            MR. HANSHEW:  I mean what he testified to was that he,

6    and we have documents here, that he spent nearly a quarter of a

7    million dollars on legal fees to defend himself because he was

8    probably a criminal in this.

9            Secondly, you heard about he bought Mercedes, I think

10   a BMW.  The list, if you may remember in cross-examination, all

11   of the extravagance that Mr. Gireud, who they've touted over

12   and over again as being the sole owner or the sole director of

13   the company, he ended up with a huge share of this money.

14           THE COURT:  Here's the question.  At what point is

15   F.G.G. entitled to get paid?  At what point in this contract

16   are they entitled to get paid?

17           MS. KANOF:  Your Honor, they were entitled to be paid

18   their percentage.  They were entitled to distribution.  When

19   they got the distribution, they didn't get the amount they were

20   entitled to just like Mitsubishi.

21           THE COURT:  That would be another story.  I don't

22   think we can fault Delgado for that part of the contract.  He

23   may have been a criminal in other parts.

24           MS. KANOF:  You can't fault F.G.G.  They didn't know

25   that.

1          THE COURT:  That's what I'm saying.  I'm not going to

2     fault either one.  I'm going to give Delgado credit for his

3     payment to F.G.G.  I'm going to give him credit for that,

4     because they're entitled to that under the contract.

5          MS. KANOF:  Except for the money they take back from

6     him.

7          THE COURT:  He's not entitled to get paid?

8          MS. KANOF:  He induced it through fraud.  He induced

9     that payment back to himself through fraud.  He already got

10     paid.  He took it off the top.  So he already got paid.  Now

11     he's getting paid again, because they're unaware that he

12     diverted the $10-million.

13          THE COURT:  Okay.  So I might go with that.  So how

14     much did they give back to him?

15          MS. KANOF:  Anna as a figure.

16          MS. ARREOLA:  Your Honor, this is Government

17     Exhibit 144.  And I'm citing a page from the government's

18     motion for preliminary order forfeiture and money judgment.

19     But at least approximately $785,200.00 was transferred back to

20     Mr. Delgado from the funds that went to F.G.G.

21          THE COURT:  Okay.  So how much went to F.G.G.,

22     3-million-450.

23          MS. ARREOLA:  Pardon, Your Honor?

24          THE COURT:  3-million-450 is what went to F.G.G.?

25          MS. CALLAHAN:  Yes.  $3,450,110.00.

1          THE COURT:  Let me do that math real quick.

2          MR. HANSHEW:  Again, for the record, Judge, we're

3     objecting that this isn't evidence.  This is just argument that

4     the government --

5          THE COURT:  You know what?  I don't remember what is

6     or isn't in evidence.  It was so long ago and it was such a

7     long trial.  I'll let the Court of Appeals sort that out.  I

8     can always have Kathi dig it out before I enter an order.

9          So then I'm going to credit Delgado with $2,665,410.00

10    that he paid F.G.G.  So, now --

11         MS. CALLAHAN:  Your Honor, just as you're considering

12    that, one thing I would ask you to note is whereas it would

13    look like the government could recover -- since someone could

14    recover that money from F.G.G., there's really no mechanism.

15         THE COURT:  No, no.  I'm not saying recover.  I'm --

16    are you saying F.G.G. is not entitled to that money under the

17    contract?

18         MS. CALLAHAN:  I'm saying that but for Mr. Delgado's

19    acts, the money would never have been paid.

20         THE COURT:  It would've been paid, but it would've

21    been paid directly to F.G.G.  All he did was divert it to

22    himself.

23         MS. CALLAHAN:  But Count Three, the fraudulent letter

24    of credit, the contract couldn't have been fulfilled without a

25    proper letter of credit.

1          THE COURT:  Right.

2          Let's say there was fraudulent letter of credit and

3     everybody got paid according to the contract; C.F.E. got their

4     turbines, Mitsubishi got their money, F.G.G. got their money;

5     and there was a fraudulent letter of credit.  Would it matter

6     if everybody got their money?

7          So what did the letter of credit do?

8          MS. CALLAHAN:  It induced C.F.E. to sent the money.

9          THE COURT:  And we know that and we're going tax him

10     with the 32-million that he got, absolutely.  He is going to

11     account for the 32-million he got, but Mitsubishi got

12     18-million of that, and so we did that math and we came up with

13     14-million, and then we're going to give him credit for

14     2-million-6 to F.G.G.  Okay.  So it looks like $11,334,590.00

15     out of the 32-million that he took from C.F.E.  That's what's

16     left.  That's what he had his hands on that he didn't -- that

17     wasn't paid to Mitsubishi, that wasn't paid to F.G.G., so

18     that's 11-million.

19          MS. CALLAHAN:  So then the remaining issue was, which

20     really I don't belive is an issue that the Court can resolve

21     today, is the settlement agreement between Mitsubishi and

22     C.F.E.  And under that settlement agreement, C.F.E. gave

23     Mitsubishi subrogation rights to damages caused by Mr. Delgado.

24          THE COURT:  Yeah.  And then in this last letter they

25     gave me, they're subrogating their rights to C.F.E., so now

1    we're going in a circle.

2         MS. CALLAHAN:  We are going in a circle.  And so, Your

3    Honor, for the purposes of the restitution order which is part

4    of Mr. Delgado's sentence, I would submit that it would be most

5    proper for the Court just to award that amount to C.F.E. and

6    then allow the parties to deal with their settlement agreement

7    in the avenues that they have before them, whether it be in

8    Mexico or the United States.

9         THE COURT:  I first have to be convinced that C.F.E.

10   lost any money, because I had two lawyers here dealing with the

11   Court, under the requirements that an attorney deal with the

12   Court, with candor, and I had one attorney assuring me

13   Mitsubishi only got $66-million and another attorney assuring

14   me that C.F.E. paid Mitsubishi $130-million.  We're going to

15   get to the bottom of that, before I start giving anybody any

16   money, because as of now I'm not convinced that any of those

17   two parties deserve any restitution.

18         MS. CALLAHAN:  So we'll allow the Court to do what it

19   needs to do.

20         I would submit, Your Honor, though, that Mr. Delgado

21   did do something with at least $10-million.

22         THE COURT:  Absolutely.

23         MS. CALLAHAN:  And whether that amount was dealt with

24   in some sort of contractual arrangement after Mr. Delgado still

25   spent $10-million, and to that end, I would ask the Court.

1          THE COURT:  I think by my numbers it's 11,334,059.

2          MS. CALLAHAN:  Yes, Your Honor.

3          THE COURT:  All right.

4          Mr. Hanshew?

5          MR. HANSHEW:  Are the victims going to --

6          THE COURT:  Well, they can speak to it later.  They're

7    not really a party to this restitution hearing.  I'm going to

8    try to find out from them what the truth is.

9          MR. HANSHEW:  That should be interesting.  That's a

10   good start off to where I'm going to go with this, Judge, which

11   is between the government, C.F.E. and Mitsubishi in this case,

12   they have, in their filings and arguments, given this Court

13   completely disparate numbers as well as legal arguments.  I'm

14   just going to kind of apologies, but read off of my notes,

15   because it's a little bit complicated here.  So you got -- I'm

16   going to start with the government, Judge.

17          You have the P.S.R. comes out in this case earlier

18   this year.  In that P.S.R. probation recommends the restitution

19   of the $24-million -- I'm giving you an approximate -- but

20   24-million and change to M.P.S.A.  It recommends zero to C.F.E.

21          THE COURT:  That was based on the numbers I think,

22   that at least I thought we had sentenced on, which apparently

23   are not.

24          MR. HANSHEW:  Right.  And so that's the P.S.R.

25          We timely object, Your Honor.  You know you see my

1    objection.  We detail why we thought that it was inappropriate

2    in various ways in terms that have $24-million.  The government

3    never files a response, Judge, nor do they object to those

4    calculations.

5            THE COURT:  That objection wasn't to the restitution.

6    That objection was to determining the guideline.

7            MR. HANSHEW:  No, no, it was to the restitution.  I

8    objected to the restitution.  I objected to the guidelines, but

9    I had a separate whole section.  I think it was about

10   two-and-a-half pages, Judge.  In my objection, that was

11   specifically about the restitution and explaining that, you

12   know, it's the government's burden that has to be preponderance

13   and explaining some of the standards as it relates to

14   restitution, as well as saying that the numbers don't add up

15   here in terms of the restitution figure that's been concluded,

16   and then also asking for an evidentiary hearing.  And so that

17   would be said out there.

18           The government doesn't file its own objection to the

19   P.S.R. nor does it file a response as it relates saying, oh,

20   no, you know, we disagree with the P.S.R., and then they show

21   up in court and they've essentially went with, you know, defer

22   the probation as it relates to this, and that was 24-million to

23   M.P.S.A., nothing to C.F.E.  Okay.

24           Then we show up in court in September before this

25   Court, and the Court frankly, I mean, rightfully was concerned

1  about the fact that it had, as it just mentioned, two lawyers

2  get up and, you know, give differing numbers for the same exact

3  items and as such.

4       The government doesn't object or anything like that.

5  They don't say anything responsive.  They leave it as it is.

6  And then on December 8th, you get their most recent version

7  where now it is, you know, the 13-million goes to C.F.E.,

8  essentially nothing to Mitsubishi and nothing to Gireud.  So

9  that's the tracks of the government's version of this, which

10 is, I mean, completely changed to say the least.

11      Then you look at the track of M.P.S.A.  So M.P.S.A.

12 submits their victim statements February 16th.  Some highlights

13 of that, some of which you read already, Judge, but I'll point

14 to some other ones, is that they make sure to highlight that

15 C.F.E. has signed its rights against F.G.G. and Delgado to

16 Mitsubishi.  All right.  They put in there that they also got a

17 $44-million judgment against F.G.G. in Mexico.  And then they

18 have a separate section where they talk about how double

19 recovery is not allowed.  And they cite to the C.F.R.s.  And

20 they explain that C.F.E. already was compensated through a

21 $12,012,135.00 reduction in the price of turbines.  It has no

22 standing to seek award.  So their position is that C.F.E. has

23 already gotten paid.  If they were to get more, they would be

24 double-dipping, and they have no standing to get any

25 restitution.  Okay.  And they also indicate in there their that

1    their losses are defined and concrete.

2           And they point out that C.F.E. never accepted the

3    pledge was a forgery, which we'll remember in that settlement

4    agreement was C.F.E. and M.P.S.A. keeping their positions, and

5    the C.F.E. being that the pledge documents, this -- you know,

6    the alleged fraud in this case, were actually valid.  That's

7    the position and they -- M.P.S.A. puts in there a reminder that

8    that was C.F.E. position all along.  All right.  And they

9    indicate that M.P.S.A. was the exclusive victim and that C.F.E.

10   recognized satisfaction of its losses in the terms of the 2013

11   settlement agreement.  All right.  That's back in February of

12   '16.  It's February of 2016.

13          Then, November 20th, after we had the hearing here,

14   Judge, recently with you, where you asked the parties -- and

15   the parties, I mean the victims and the government -- to go

16   outside and basically get their stories straight, because

17   they've been giving very disparate responses to the same

18   questions and the same figures.  They submit a joint statement.

19   Okay.

20          So now M.P.S.A. is taking the position that the

21   24-million is right, but that C.F.E. gets priority.  I mean

22   it's 100 percent the opposite of what they put in their filed

23   pleadings with the Court in their statements in their attached

24   affidavit.  Okay.  So there you got the track of M.P.S.A.

25          And then you have C.F.E.  They submit in August their

1    statement, their first amended statement, where they ask for

2    the you know $1.3-billion.  They have a figure that they put in

3    their brief that is $13,978,907.00, which interestingly is

4    about $200,000.00 more than what the government has put in in

5    its brief.

6         Then you have in November 20th they've joined this

7    joint statement.  We've talked about that.  And curiously the

8    same exact day, they then file a supplemental statement where

9    despite having said in the joint statement that it's 24-million

10   and it should go to C.F.E. first, they then regurgitate back

11   essentially their claims about this $1.3-billion.  Okay.  So, I

12   mean that's the track that you've seen with these, you know,

13   purported victims in their claims.  I mean it's -- I'm just

14   going to call it.  It's dishonest.  It's not just inconsistent.

15   It is absolutely the opposite in what they say.

16        And so, you know, here they are again.  And they've

17   got, you know, some new -- we'll hear what they have to say

18   about whatever the new amounts are and whether they can get

19   their stories straight, but this Court is tasked with the very

20   difficult job, which is this isn't an estimation.  This isn't

21   like loss valuation and the such for guidelines.  This

22   restitution is actual loss.

23        And you know, Judge, these submissions, you know, I

24   kind of analogies it to this.  It's like showing up, you know,

25   go to dinner at Pelicans, and they give you your bill and it

1    says dinner $1,000.00.  Oh, no one is going to pay that.

2    You're going to say, hey, where's the itemization of this?

3    Where are the specifics?  You know, where does it show, you

4    know, my salad, my chowder, my -- you know, whatever it is on

5    there, the drinks?  And then, you know, you tell the waiter,

6    server or manager this and they come back with a bill and now

7    it says, you know, 1,500 dinner.  Okay.  Well, that didn't

8    answer the first question I have, which is where is the

9    itemization, which is what this Court asked last time was give

10   me the breakdown of itemization.  And what do you get?  A joint

11   statement that basically asks you to sanction some settlement

12   they've reached.  This isn't a settlement.  I mean, you have to

13   determine actual loss, not what these third parties, alleged

14   victims have claimed to be, you know, some amount they can work

15   out amongst themselves, which by the way they didn't.  And, you

16   know, then you raise the issue again, hey, where's the

17   itemization and how did it change from a 1,000 to 1,500, and

18   then they come back and they give you a bill for 500 with no

19   itemization.  I mean that's where you are.

20          I have searched up and down in case law.  You know,

21   I've been involved with restitution hearings with some

22   significant numbers previously, Judge, but never of

23   $1.3 billion at the high end and at the low end $24-million.  I

24   mean, these are astronomical numbers.  And they are asking you

25   to give an award to those based on two affidavits, not a

1    singular witness.  I've never seen a restitution hearing for

2    values less than this where they don't have a singular witness

3    they bring in.  They give you two declarations; one, from

4    Matamora [sic].  It's in English.  You'll remember, he had to

5    have a translator here to testify in Court.  And I'm sure they

6    remembered that, because they put in the beginning of it that

7    his English skills are sufficient enough to fill out a, you

8    know, under oath, declaration that asked for $1.3-billion.  I

9    mean, how reliable is that start.  The reliability of that is

10   about zero, if you ask me, when you saw this gentleman in here,

11   you know, refusing to be able to speak any English, yet, he can

12   submit a $1.3-billion request in affidavit and it's conclusory.

13   It doesn't give you -- it doesn't break down your dinner.  When

14   am I paying for 1.3-billion?

15            THE COURT:  I wasn't particularly moved by that when I

16   saw it.

17            MR. HANSHEW:  Right.  And that's the whole basis

18   for --

19            THE COURT:  Here's the numbers.  You heard my numbers.

20   If you want to address those, that's the only real numbers I

21   have.  All of that other stuff...

22            MR. HANSHEW:  And they've been paid as M.P.S.A. put in

23   their first version in this.  They already got paid.  They'd be

24   double-dipping for this.  They all got paid, Judge.  They all

25   got what they bargained for.  They got better deals.  And they

1   even point to each other to point the same out.  I mean they

2   pointed it out that none of them are entitled to restitution.

3   If they really have the proof, they would've shown up with a

4   witness, a witness that could sit here and we could all spend

5   time, myself, the government and Your Honor, asking them to

6   give you what you asked for last time; give me the numbers,

7   give me the breakdown, show this to me.  They don't do that.

8   Why?  They can't.  They can't prove it.  And they sure as heck

9   don't want to subject one of their witnesses to either perjury

10  or our cross-examination to get to the actual facts, to the

11  numbers.  Where do these come from?  I mean, they're

12  outrageous.  You see storage fee of $9-million.  I mean, that's

13  the -- you know, there's your dinner bill.  I mean, here you

14  go.  What did that entail?  What did this -- and, you know, all

15  of these things that you see, that's what they asked for.

16          So you know, we're asking the Court, one, to find that

17  they haven't provided any sufficiently reliable evidence and to

18  support these claims, as well as the fact that in this case

19  there is no actual loss to any of the alleged victims in this

20  case.

21          I thank you for your time, Judge.

22          THE COURT:  All right.  Thank you, Mr. Hanshew.

23          MS. KANOF:  Your Honor, Ms. Callahan -- oh, I'm sorry.

24          May I respond, Your Honor?

25          THE COURT:  Yes, ma'am.

1        MS. KANOF:  Ms. Callahan os going to respond to most

2   of what Mr. Hanshew said, but I need to correct the record.

3        THE COURT:  Okay.

4        MS. KANOF:  Mr. Hanshew said the government did not

5   respond to his restitution objections and I'd like to direct to

6   the Court E.C.F. 271-1, which is the government's letter in

7   response -- to Sandra Torres in response, beginning:  By this

8   letter the government responds and disagrees with the below

9   referenced parts of defendant Delgado's objections to the

10  presentence investigation report.

11       And there are two full paragraphs under the heading

12  restitution in which the government details how it disagreed

13  with the defendant's analysis and how it agreed with the

14  probation department with figures included.

15       So I just wanted to correct the record, because that

16  is not true that the government did not respond and it's in a

17  public filing.

18       Secondly, I'd like to tell the Court that when I read

19  the restitution part of the presentence report, I called

20  Ms. Torres.  And I talked to her fairly extensively about how

21  she got the figures and how she came to this conclusion,

22  because I wanted to be assured that she understood that there

23  was some case law cited by Mitsubishi in their impact statement

24  that implied that C.F.E., as a sovereign of a foreign country,

25  could not take restitution, and I wanted to make sure she had

1    not relied on that.  And she reassured me that she did not rely

2    on it since she awarded all restitution to Mitsubishi.  She

3    assured me she disregarded that case law.

4         So at that time, this seemed like a reasonable way

5    to -- that the probation department's conclusion seemed

6    reasonable.  But I just for the record have to say that that

7    was a misstatement.  We absolutely did respond publicly in a

8    public file.

9         MR. HANSHEW:  And Judge, to be clear, what I said was

10   they didn't object to the figure that was in the restitution,

11   the 24-million to the M.P.S.A.  That's what I'm saying is they

12   didn't object either on their own or in response to me to that

13   figure, and in fact they went along with it, and yet now,

14   they've completely changed their position on it in terms of

15   both the amount by half as well as who it goes to.  That's what

16   I was saying they didn't respond.

17        THE COURT:  They brought their expert.

18        That's you, Ms. Callahan.

19        MS. CALLAHAN:  So the government did change.  To be

20   honest, it did.  And the reason it changed is because it is an

21   officer of this Court and is abound by federal law.

22        And so to be fair to Mr. Hanshew when I read his

23   objections, I went back and I did a legal analysis and I said,

24   okay, so these contract rights are a problem here.  The reason

25   they're a problem is there is a lot that goes into contractual

1    negotiations.  And we have international players here.  But

2    that's not what we look at in restitution.  What we look at is

3    what are the counts of conviction and what compensable harm

4    stem from those accounts of conviction.  And that's the

5    analysis that the government put before this Court.

6              There is a number that we can't account for.  That's

7    the money that Mr. Delgado spent.  And neither C.F.E. nor

8    Mitsubishi should be tagged for that amount.

9              Mr. Hanshew didn't say that the government's analysis

10   was wrong.  He said we've gone from here to there and back

11   around.  And I don't deny that.  It's on the record.  But

12   today, before this Court, is the proper analysis.  And Mr.

13   Delgado should pay for the losses that he caused.  And what he

14   caused, no one else should have to pay.  He spent over

15   $10-million.  Contrary to the defense, this is evidence before

16   this Court.  It's in government Exhibit Number 2 of the trial.

17   It's also shown in the P.S.R.  That is all before this Court.

18   These aren't magical numbers.  These are hard fast numbers and

19   they weren't objected to previously.

20             What's objected to now is the math that we did to get

21   there.  But I submit to this Court, the number is right.

22   Mr. Delgado should pay for the harm he caused by spending other

23   people's monies and the number should be the 11-million that

24   the Court Hales already arrived at.

25             THE COURT:  All right.  Thank you, Ms. Callahan.

KATHLEEN A. SUPNET, CSR

1          All right.  Mr. Maney, if you have a challenge to the

2    Court's determination that's the $11-million-334, reminding you

3    of your duty of candor to the Court, if you'd like to address

4    the Court, I'm happy to hear what you have to say.

5          MR. MANEY:  Your Honor, I think your number is correct

6    in terms of how much money Mr. Delgado pocketed.  And according

7    to the restitution statute, according to the U.S. Supreme

8    Court, that money was -- and by the jury -- that money was

9    taken from C.F.E., and the restitution statute is to be

10   returned to its owner, which is the C.F.E. and I agree with

11   that amount.

12         I'm not saying that our numbers on what C.F.E. lost,

13   their actual damages, which did go over a billion dollars, were

14   more than $9-million to get these same turbines, were more than

15   $90-million to finish this plan on what was budgeted, because

16   of the delays.  But in terms of the diversion, the C.F.E.

17   property that Mr. Delgado pocketed that should be returned to

18   C.F.E., yes, that's the simple number and we agree with that.

19   And given how much larger that sum is than the amount of

20   property that we can trace from Mr. Delgado, I see no point in

21   trying to figure out a higher number.

22         THE COURT:  All right.

23         Mr. Herrington?

24         MR. HERRINGTON:  Your Honor, I want to start by saying

25   it's privileged to be here in your courtroom this afternoon.

1    I'm from Washington and I get a lot of grief when I travel the

2    country about how things are messed up in Washington, but I'm

3    going to say that things are a little messed up here in El

4    Paso, because I've been practicing law 24 years.  I've never

5    had a man come up to this podium and accuse me of being

6    dishonest with this Court.

7              (Counsel speaks to Mr. Hanshew.)

8              MR. HERRINGTON:  And I recent it, sir, and it's

9    unfounded.

10             MR. HANSHEW:  It's in your pleadings, for the record,

11   and your pleadings are absolutely inconsistent, so you should

12   file claims that don't contain --

13             THE COURT:  Mr. Hanshew.

14             All right.  Woe, woe, woe.

15             You guys can talk about that outside.  In here we're

16   just going to deal with the Court.

17             MR. HERRINGTON:  And if Mr. Hanshew were able to read

18   to the second page, would have a point.  But what the filing

19   says is that M.P.S.A. and C.F.E., C.F.E. will be given priority

20   such as any awards to M.P.S.A., shall be subordinated except

21   with the prior clause being of no effect if there's no award in

22   favor of C.F.E.

23             And you know, I think it's a little strange here that

24   a victim here is somehow to blame for these numbers, because I

25   thought we had a process in here in El Paso, and I thought that

1    process was that I engaged with the probation office and that I

2    submitted a serious document that doesn't say $1.3-billion, but

3    that runs out exactly how you get to the 24-million that I have

4    claimed.

5          And I reject and resent any implication that I've been

6    anything but perfectly candid with this Court, Your Honor.  And

7    this --

8          THE COURT:  Well, in --

9          MR. HERRINGTON:  -- this shows where the number comes

10    from.

11          THE COURT:  Then I need an explanation from Mr. Maney

12    as to his statement that C.F.E. paid Mitsubishi $130-million

13    for the machines, because I asked him specifically, "Is this

14    for the machine and not for any kind of service contract or

15    anything else?"  "Absolutely.  130-million for the machine."

16          You told me that Mitsubishi received only $66-million

17    for the machine.  So we have a huge inconsistency.  Maybe that

18    wouldn't be inconsistent in Washing, but it's inconsistent in

19    El Paso.

20          MR. HERRINGTON:  I know --

21          THE COURT:  So, I need -- I need for you two to figure

22    out how much was paid for the machine, because it might be that

23    Mitsubishi got the money that they bargained for and you're --

24          (Counsel interrupts the Court.)

25          MR. HERRINGTON:  Well, that is -- that is set out in

1    in Mr. Beddard's affidavit, Your Honor.

2           THE COURT:  No, we're not talking about Mr. Beddard.

3    I'm talking about Mr. Maney saying that C.F.E. paid you

4    $130-million you for the hard equipment --

5           MR. HERRINGTON:  Well, he's going to have to --

6           THE COURT:  -- is that true or is that not true?

7           MR. HERRINGTON:  That's not --

8           THE COURT:  It's either true or it's not true.

9           MR. HERRINGTON:  It's not true.

10          THE COURT:  I'm going to get him up here in a minute

11   and tell him why he told me that then.

12          MR. HERRINGTON:  Okay.  Well, he can --

13          THE COURT:  All right.  Come on up here, Mr. Maney.

14   Tell me why you told me that last time.  I can have my court

15   reporter read back the record.

16          MR. MANEY:  Your Honor, my memory of what I told you

17   is that we paid 130-million for what we contracted for with

18   F.G.G., everything we contracted for.

19          THE COURT:  Kate, look it up and figure out what I

20   asked Mr. Maney last time we were here.

21          (Court Reporter inquires with the Court.)

22          THE COURT:  I asked you about the machine.  I was

23   clear about it, because it shocked me when I heard you say it.

24   It shocked me, that I would get two inconsistencies like that

25   from two licensed lawyers in this very courtroom.  And I made

KATHLEEN A. SUPNET, CSR

 1    it clear we were talking about the machine and not any service

 2    contract.

 3              MR. MANEY:  I remember trying to tell you that that --

 4    the machine isn't isolatable [sic] in the F.G.G. contract.  It

 5    was not for the service contract.  The service contract is

 6    entirely separate.

 7              THE COURT:  So you paid 130-million for what?

 8              MR. MANEY:  The F.G.G. contract included --

 9              THE COURT:  No, no.  No.  You paid Mitsubishi

10    130-million for what?

11              MR. MANEY:  For everything that F.G.G. was supposed to

12    supply.

13              THE COURT:  And what is that?

14              MR. MANEY:  The machines, delivery of the machines,

15    which Mitsubishi originally was not to provide, the warranties

16    on the machines, installation of the machines and the deicing,

17    some of the equipment that they didn't tell Mitsubishi was

18    supposed to be on the equipment.

19              THE COURT:  And that's what they had contracted with

20    you for $120-million for?

21              MR. MANEY:  No.  We contracted with C. -- with F.G.G.

22    for all of that.

23              THE COURT:  For 120 --

24              MR. MANEY:  We eventually paid 129 -- we paid

25    $9-million more for the same stuff we were supposed to get from

1    F.G.G.

2          But Your Honor, in terms of the restitution, this

3    isn't a victimless crime.  Even if we worked out our deals,

4    this man pocketed over $10-million --

5          THE COURT:  And I'm willing --

6          MR. MANEY:  (Indiscernible.)

7          THE COURT:  -- to make him pay that, but I think if

8    you all are asking me to go beyond that to cover your losses,

9    then we've got to figure out what those are, because I'm not

10    just going to accept what you're giving me so far, because it

11    is absolutely confusing and counterindicative.  So, if you want

12    that, we're going to be here for a long time.  If you are

13    satisfied -- if Mitsubishi is satisfied with the amount I came

14    up with, we're done.

15          MR. MANEY:  Well, that's up to Mitsubishi.

16          MR. HERRINGTON:  Your Honor, I remember saying the

17    exact same thing that last time I was, which is the reason

18    there's confusion about this is because of Mr. Delgado, because

19    he promised C.F.E. one thing in the contract between F.G.G. and

20    C.F.E., and he bought something else in the contract between

21    F.G.G. and M.P.S.A., and that's where the different numbers

22    come from.

23          And if Mr. Hanshew can't figure that out without

24    calling people dishonest, then he should go back and work with

25    his calculator.

1    I believe that we should pay some attention to the

2   process in this courthouse that the conclusions reached by the

3   probation office were correct, and that clearly exploitation of

4   the document that Mr. Delgado forged caused damages as set

5   forth in the V.I.S. to Mitsubishi.

6         THE COURT:  And what were the probation numbers that

7   you're touting?

8         MR. HERRINGTON:  The probation office returned the

9   24,797,717.

10        THE COURT:  How did they get there?  How did they come

11   to that number?

12        MR. HERRINGTON:  Okay.  They came to that number.

13   This is all set out in the Beddard affidavit.

14        THE COURT:  Uh-huh.

15        MR. HERRINGTON:  That number is, that the original

16   value of the contract was 102-million, so that's what

17   Mitsubishi expected to get.  What Mitsubishi got instead was

18   18-million from the Turks and Caicos account and then

19   76-million under the 2013.  It's 76 987, so if we call that 77,

20   that adds up to $95-million.

21        So, for starters --

22        THE COURT:  Wait, wait, wait.

23        You have 102 and we're going to subtract from that

24   25-million that you got?

25        MR. HERRINGTON:  No.  We're going to tract from that

1       77 plus 18, which is 95-million.

2               THE COURT:  77 plus 18 equals 95?

3               MR. HERRINGTON:  Yes.

4               (Counsel speaks directly to Mr. Herrington.)

5               MR. HANSHEW:  You want my calculator?

6               THE COURT:  77 plus 18...

7               MR. HERRINGTON:  Is 95.

8               THE COURT:  Not here in El Paso.  That's 25.

9               MR. HERRINGTON:  77 plus 18.

10              THE COURT:  Oh, I'm sorry.  Okay.  95.

11              So you got -- where did you get the 77 6 from C.F.E.?

12              MR. HERRINGTON:  Yes.  Page -- paragraph ten of the

13      Beddard affidavit properly before you.

14              THE COURT:  And so why -- and they were saying that

15      they paid you $130-million.  Okay.  Hold on.  So they're paying

16      you -- they paid 77 6.  They paid 32 over there, so that's 99

17      6, so they got the turbines for 99 6, C.F.E.  They paid 32 to

18      Delgado.

19              MR. HERRINGTON:  Right.

20              THE COURT:  Paid you 77.  That's 99 6.

21              MR. HERRINGTON:  Correct.  And then because of

22      these -- because of Mr. Delgado's crimes, and the way he set up

23      this transaction, all of the other things that Mr. Maney spoke

24      to had to be gotten in there.  And so as set forth in the

25      Beddard affidavit, where you see there's additional work for 13

1    and the storage time for 4.5.

2            And maybe you don't accept those.  Maybe you do.

3    Maybe you think those are different from the seven that

4    Mitsubishi just didn't make out under the contract, but the

5    idea that these numbers aren't properly before you and don't

6    add up is just simply not accurate, Your Honor.

7            THE COURT:  Well --

8            MR. HERRINGTON:  And it seems to me there was some

9    point to all of the time I spent with the probation office

10   going through this, and the probation office coming to a

11   report, and then we sat here in this courtroom and United

12   States Attorney's Office said they agreed with that report, and

13   now today we get a different theory.  And as to the different

14   theory, what I would --

15           THE COURT:  Here's what we can do what I suggested

16   last time.  That you all actually produce a written document,

17   not the Beddard affidavit, a written document describing all of

18   these different things, how much you've spent, what they were

19   spent for, so I can actually look at some hard numbers, not

20   just generally this much for storage.  I --

21           MR. HERRINGTON:  Every single number is in the Beddard

22   affidavit.  And how you get to 13-million, it's all there.

23           THE COURT:  This doesn't add up to me.  So I'm not

24   sure how they get to 130-million.  How do they get to

25   130-million?

1      MR. HERRINGTON:  See, because they had to pay for

2  things that were never part of the Mitsubishi contract like the

3  delivery and like the warranty that Mr. Delgado had promised

4  them, but had never contracted to get from M.P.S.A.

5      So, there's lots of victims here for Mr. Delgado's

6  crimes.

7      THE COURT:  I totally agree with that, but I need

8  to -- you need to make it clearer for me, because I'm not

9  understanding that and I'm not getting it.  So if you need

10  to -- what I would like is for you to point out directly to the

11  Delgado contract with C.F.E., the F.G.G. contract with you, and

12  how all of these things were included in the contract with

13  C.F.E., but not included with the contract with you.  So I

14  don't understand.  I mean, you're saying that they contracted

15  with you to deliver the units where?

16      MR. HERRINGTON:  The -- well, the contract originally

17  provide that -- see F.G.G. promised that they would deliver

18  them to Mexico to the Agua Prieta site.

19      THE COURT:  So you were going to deliver them where?

20      MR. HERRINGTON:  The contract with M.P.S.A., they were

21  F.O.B.  So the transporting them --

22      THE COURT:  Was F.G.G.'s deal?

23      MR. HERRINGTON:  Was going to be on F.G.G., but of

24  course they didn't do that and they couldn't do that.

25      THE COURT:  So you were going to -- it was 102-million

1    for the turbines right where they were at.

2           MR. HERRINGTON:  Right.  And what we got for them

3    instead was 95.  And that is probably the simplest way to look

4    at these numbers.

5           THE COURT:  So you were out 70-million on the

6    turbines.

7           MR. HERRINGTON:  Right, just on the machines.

8           THE COURT:  All right.  This is sounding clearer.

9           MR. HANSHEW:  Your Honor, for purposes of the record,

10   so that nobody says I've waived anything, obviously, we object

11   to counsel giving argument in place of actual evidence in this

12   matter, Judge.

13          MR. HERRINGTON:  And Your Honor, for the record, I've

14   cited every number I've given you to the Beddard affidavit.

15   That man testified in front of you and so this is properly

16   before you.

17          THE COURT:  And so F.G.G. was then going to install

18   those turbines, transport them from wherever they were in the

19   world, take tame to Agua Prieta and install them and set them

20   up.  And that was going to be done for 120-million.

21          MR. HERRINGTON:  We never saw that contract that

22   F.G.G. had with C.F.E.  So we didn't know how they were going

23   to do that or if they were going to come back and contract with

24   us separately for that.

25          THE COURT:  Well, but that wasn't your concern --

```
 1                MR. HERRINGTON:  Right.

 2                THE COURT:  -- because that was in the contract.

 3                MR. HERRINGTON:  So if you just want to talk about the

 4    machines, it's 102 minus 95.

 5                THE COURT:  Okay.  It's 7-million that you've lost

 6    already.

 7                If he paid 32-million and then they paid you for the

 8    machines --

 9                MR. HERRINGTON:  18 out of that.

10                THE COURT:  No, they paid 32-million that was taken by

11    Delgado.  Then they paid you directly for the machines, was 63

12    681.  What was the price of the machine?

13                MR. HERRINGTON:  What were they paid or what was the

14    price?

15                THE COURT:  What did C.F.E. pay you for the machines?

16                MR. HERRINGTON:  18-million, which was in the first

17    trash that went through F.G.G.

18                THE COURT:  No, no, no.  I'm talking about after all

19    of that, when everything --

20                MR. HERRINGTON:  After -- in the settlement?

21                THE COURT:  -- when it blew up, when it blew up, then

22    you contracted with C.F.E. directly.

23                MR. HERRINGTON:  Right.  When it blew up and then

24    C.F.E. used the fraudulent pledge to bring a lawsuit in Mexico,

25    and then we settled that case, they paid 76,987,745, which is
```

1    in paragraph 10 of the Beddard affidavit.

2              THE COURT:  So they paid as part of that settlement?

3              MR. HERRINGTON:  Yeah.  And in turn they got the

4    turbines.

5              THE COURT:  Okay.  So then they got the turbines for

6    98.

7              MR. HERRINGTON:  95, I think, Your Honor; 77 plus 18.

8              THE COURT:  Well, but they paid -- they actually paid

9    Delgado 32-million for the turbines.

10             MR. HERRINGTON:  Yeah.  I think one of the things

11   that's confusing about this is you can look at it from -- you

12   can ask the question:  What did Delgado steal?  You can ask the

13   question:  What did Mitsubishi get damaged by?  Or you can ask

14   the question:  What did C.F.E. get damaged by?  And one of the

15   reasons there is different numbers is because those are three

16   analytically distinct questions.

17             THE COURT:  And so we're trying to figure out what

18   each of the parties lost.  To me, Delgado pocketed

19   11-million-334.  So now I'm trying to figure out how much

20   C.F.E. is out, because they paid Delgado 32-million, and then

21   they paid you, you're saying, 76-million.  But didn't that

22   76-million include 13,306,000 for the additional services?

23             MR. HERRINGTON:  No, the additional work, that

24   13-million, we would say should have been on top of that.  So

25   the 76 987 was for the turbines.

1          THE COURT:  Well, did you have a contract with C.F.E.

2     to provide the turbines and the additional material?

3          MR. HERRINGTON:  That's part of the settlement

4     agreement in 2013.

5          THE COURT:  That's 108-million or not?

6          MR. HERRINGTON:  Well, the total revenue under that

7     totals up to 95-million.

8          THE COURT:  Okay.  Break it down for me.

9          MR. HERRINGTON:  Well, the amount of money that

10    changed hands --

11         THE COURT:  No.  I want to know how much the cost of

12    the additional work.

13         MR. HERRINGTON:  Well, the cost of the additional work

14    was 13-million.

15         THE COURT:  How much?  13?

16         MR. HERRINGTON:  Yes.  That's in paragraph eight of

17    the Beddard affidavit.

18         THE COURT:  Right.  That's 13,306,610, right?

19         MR. HERRINGTON:  Right.

20         THE COURT:  Okay.  So C.F.E. paid you $76,987,745.

21         MR. HERRINGTON:  Right.

22         THE COURT:  So that means that they paid for the

23    turbines 63,681,135 --

24         MR. HERRINGTON:  Oh, I see.

25         THE COURT:  Because they paid 13 306 for the addition.

```
 1            MR. HERRINGTON:  I see what your doing.  That's a
 2     sensible way to look at it, yes.
 3            THE COURT:  Okay.  All right.  So C.F.E. paid
 4     32-million to Delgado.  And then they paid 63-million to you
 5     are for the turbines.  That would make 95-million-681.  That's
 6     what C.F.E. paid for the turbines.
 7            Now, originally I thought they had gotten a windfall,
 8     because it was less that is 120-million, but now apparently
 9     F.G.G. had the contract to provide other matters.  I thought
10     that contract was 120-million, plus additional for the other
11     things.  Is that not -- where is that contract?  Does anybody
12     have that contract?  Where is it?
13            MR. HERRINGTON:  The original contract with F.G.G.?
14            THE COURT:  Yeah.
15            MS. KANOF:  It's in evidence.
16            THE COURT:  Not between you and F.G.G.; between F.G.G.
17     and C.F.E.
18            MR. HERRINGTON:  Right.  The C.F.E./F.G.G. contract
19     was $121-million.
20            THE COURT:  Okay.  That was for what?
21            MR. HERRINGTON:  That was for the turbines plus all of
22     these other things that M.P.S.A. ended up providing.
23            THE COURT:  Okay.  Well, can we read from the
24     contract?  I mean, can we see that?  That's what I was hoping
25     would be provided today in a written form.
```

1          MR. HERRINGTON:  Okay.  So the contract with F.G.G.

2     and C.F.E. -- and Mr. Maney, correct me if I'm wrong --

3     provided for both the turbines and the delivery and the

4     deicing, the things we call the additional work.

5          THE COURT:  Because I thought from reading the

6     presentence report that it was 120-million, plus some

7     additions.

8          MR. MANEY:  No.  There was a service contract that was

9     being -- was not issued, which was for more than 100-million.

10    Think of it this way.  If I want to get a furnace in my house,

11    this was to have the furnace put in my house and get it

12    running, then a long term warranty service contract for that

13    furnace, we didn't get to the second contract.  But the first

14    one was to deliver these.  And moving these turbines from Japan

15    and Dunkirk, France to Agua Prieta, Mexico was not cheap.

16    Plus, there had to be changes to the turbines, because the

17    turbines represented by F.G.G. to C.F.E. were not the same as

18    they were buying from Mitsubishi.  They didn't have deicing for

19    one thing, because they were designed to go I think to Brazil

20    or somewhere in South America.

21         MR. HANSHEW:  Your Honor, I guess I would ask for a

22    running objection, Judge, so I don't have to keep interrupting.

23         THE COURT:  Sure.  That's fine.

24         I remember this testimony.

25         MR. HANSHEW:  Well, except for it's not testimony,

```
 1    because he's not under oath --
 2            THE COURT:  I remember the testimony from the witness.
 3            MR. HANSHEW:  -- that's subject to cross-examination.
 4            THE COURT:  I remember the testimony from the witness.
 5            MR. HANSHEW:  I understand, Judge.  I'm making a
 6    record, Judge --
 7            THE COURT:  Sure.
 8            MR. HANSHEW:  -- which is a running objection to all
 9    of their arguments here --
10            THE COURT:  You got it.
11            MR. HANSHEW:  -- that are being made in place of
12    actual evidence.
13            THE COURT:  You absolutely --
14            MR. HANSHEW:  Thank you, Your Honor.
15            MS. KANOF:  And Your Honor, since everybody is
16    talking, you know I can't resist.  E.C.F. 263-1, which is the
17    presentence report, has a lot of these numbers in it.  Page 11
18    has the original $121-million and says what it's -- generally
19    says what it's for, how much for each of the gas turbo
20    generators and for the steam generator.
21            Page 16 shows when they moved it down to 106.  Page 17
22    shows -- and they derive it directly from the exhibits in the
23    case; probation does -- shows the 103.  And then if you --
24    which they had ultimately negotiated for.
25            And then on page 33, paragraph number 85, Officer
```

1    Torres explains that based on the investigation -- and we had a

2    lot of testimony about this -- in order to get it done, they

3    dropped it one more million dollars, so that came to the 102,

4    and it's on page 33 of 263-1.

5          So a lot of these figures that they're talking about

6    are subsumed in the P.S.R.

7          THE COURT:  All right.  I'm just trying to figure out

8    what the additionals are.  I mean because we know it's --

9          MR. HERRINGTON:  Your Honor, if you look at page --

10    paragraph eight of the Beddard affidavit, it runs through each

11    of the elements that total up to the $13-million.

12          THE COURT:  No, I am talking about the contract

13    between F.G.G. and C.F.E.

14          MR. HERRINGTON:  Okay.  That one I can't speak to.

15    Mr. Maney --

16          THE COURT:  Right.  So I want no know what the

17    delivery cost, if that's broken out, what the changes were...

18          MR. MANEY:  Well, I think most of it through the

19    $13-extra-million we paid to Mitsubishi.

20          THE COURT:  See, that's not going to work.  I mean I

21    need to know -- if we're going to do this, then we're going to

22    do it by detail.  So I want to know what the delivery charges

23    are.  These changes, I don't know if that happened as a result

24    of this offense or if that was just bad contracting, which is a

25    contracting issue and is not part of the restitution issue.

1          MS. KANOF:  Your Honor, I believe Mace Miller

2    testified that there was this other company in Houston that's

3    called (indiscernible) for the delivery, and that delivery was

4    not part of the original contract that --

5          THE COURT:  So that was not part of the 121-million?

6          MR. MANEY:  No, no.  That wasn't part of the original

7    Mitsubishi contract.

8          MS. KANOF:  Right.

9          MR. HERRINGTON:  It was part of the F.G.G./C.F.E.

10    contract.

11          THE COURT:  All right.  So...

12          MR. MANEY:  I understand the F.G.G. contract with

13    C.F.E. it was turbines working in Agua Prieta --

14          MR. HERRINGTON:  Right.

15          MR. MANEY:  -- Mexico, not in Dunkirk not in Japan.

16          MR. HERRINGTON:  And with the are freeze protection

17    and everything else.

18          MR. MANEY:  Yes.  That was an existing warranty where

19    if they were buying them from Mitsubishi as is, so we had to

20    buy warranties that didn't exist.  So, everything that they

21    were supposed to get in the $121-million contract ended up

22    costing them $130-million.

23          THE COURT:  C.F.E. had to pay $130-million for what?

24          MR. MANEY:  Total everything they were supposed to get

25    out of the 121, not counting chain -- delays in the plans.  The

1    construction cost 90-million more for the whole plant, but just

2    what the F.G.G. contract was there for.

3           But the sentencings guidelines say that if you have a

4    procurement problem, the restitutional damages are the entirety

5    of the excess cost of fixing it that.  That was $99-million.

6    The larger number is the cost to replacing the electricity,

7    which they had to buy from the U.S. market.

8           THE COURT:  All right.

9           Ms. Callahan or Ms. Kanof or Ms. Arreola, what

10   about -- and I think I had asked you this once before -- the

11   claim that because this money, the $32-million Mr. Delgado took

12   to the Turks and Caicos island, you-all captured it there, that

13   is Mexican money that's sitting there.  It's a property that

14   belongs to the Mexican government that they now want.  That's

15   what -- I think that's what he is telling me; that that's their

16   money and they want to back.  That's not a fungible deal.

17   That's actually their dollars and there's something that says

18   that somewhere or something.

19           MS. CALLAHAN:  And in that respect, they should be

20   thankful to the United States for capturing it, because absent

21   our forfeiture laws, it wouldn't be frozen right now, and

22   without the ability to forfeit and then restore it under the

23   Attorney General's guidelines, they would get nothing.

24           THE COURT:  All right.  Well, I think this is a mess.

25   There's -- there is a standard preponderance and I am not sure

1    we've reached that.  So I'm just going to go with the

2    11,334,590 and that's what he owes in restitution.

3           Now, this restitution, Ms. Callahan, do I make this

4    payable to C.F.E., to the Mexican government or to the United

5    States?

6           MS. CALLAHAN:  Yes, Your Honor, it's payable to the

7    victim, which is C.F.E.  They'll need to supply the clerk with

8    a that information.  What can happen is to the extent that

9    C.F.E. and Mitsubishi reach some sort of agreement regarding

10   who the proper payee is, meaning, they have other contract

11   rights, the government can move this Court to substitute a

12   different payee, but we're not going to do that today.  They

13   have to work that issue out.

14          THE COURT:  How much money is -- what are we talking

15   about; is it just the $2-million?

16          MS. CALLAHAN:  No, Your Honor.  He has other

17   properties.  So when this Court sentences him to pay the

18   11-million, at that moment a lien arises in favor of the United

19   States, and the United States will then begin to execute and

20   foreclose on that lien.  He has a homestead, I believe, here in

21   El Paso.

22          THE COURT:  What is that worth?

23          MS. CALLAHAN:  I'm sorry?

24          THE COURT:  What is that worth?

25          MS. CALLAHAN:  I believe it's worth in the nature of

1    300,000.  I'm actually going to go look at it later today.

2         And then he has a condo, that I don't has a lot of

3    equity, in Taos, New Mexico.  And then from that, Your Honor, I

4    will be looking to see what else he might have.

5         THE COURT:  Well, I feel very comfortable ordering the

6    11.  I'm not so comfortable ordering beyond that unless I have

7    all of those contracts in front of me where I can look at all

8    of those things and compare it apples to apples to see what the

9    agreement was with C.F.E. and what was delivered by Mitsubishi

10   and then the different...

11        MS. CALLAHAN:  Your Honor, not to diminish the

12   victim's losses here or to undermine the loss that Mr. Delgado

13   did, but what we do recognize is federal saw, that there's just

14   some damages that are better suited for civil proceedings.  And

15   I believe that in this case, we're deep in the contract law and

16   negotiations and so forth.  In addition to Mexican federal law,

17   there're just some of those damages that in my mind are better

18   left to civil proceedings than a restitution hearing.

19        THE COURT:  Well, I think I certainly agree with that.

20   And I know Mr. Herrington suggested that the last time we were

21   here.  He didn't want to turn this into a trial on these

22   damages.  And neither do I, because it seems to me like I'm a

23   long way away from feeling comfortable about all of those other

24   contracts, because I have not seen them.  I don't know what

25   exactly he contracted for or what he didn't.

1          So they have a judgment against Mr. Delgado somewhere,

2     don't they?

3          MR. HANSHEW:  Judge, if I could offer, there's a

4     provision in the statute, section nine (indiscernible); you're

5     an expert -- you're probably aware of the brief --

6          THE COURT REPORTER:  Could you speak up, Mr. Hanshew?

7          MR. HANSHEW:  -- 3663(A) at the end.  And I can

8     show... Right.  It says that this section not apply in the case

9     in offense described in paragraph 1A2, if the Court finds from

10    the facts on the record that either the number of identifiable

11    victims is so large as to make restitution impractical or --

12    and I think this the relevant one here -- determining complex

13    issues of fact related to the cause or amount of victim's

14    losses would complicate or prolong the sentencing process to a

15    degree that the need to provide restitution to any victim is

16    outweighed by the burden on the sentencing process.

17         So I just offer that to the Court in terms of it's

18    a -- I mean, we would argue that frankly that would apply to

19    everything in this case, in addition to, obviously, to all of

20    our other objections that we've lodged in terms of the

21    calculations of reliability and lack of evidence.  But for the

22    Court's purview, that statute there provides another vehicle to

23    deal with this.

24         MS. CALLAHAN:  And Your Honor, I find myself in

25    difficult territory, maybe having to partially agree with the

1    defense, but nevertheless I would agree that as it pertains to

2    those contract amounts and those losses, that is certainly the

3    case here.

4               THE COURT:  And Mitsubishi has a judgment against

5    Mr. Delgado for 44-million?

6               MS. CALLAHAN:  They have a judgment against F.G.G.,

7    which largely, Your Honor, is uncollectible.

8               THE COURT:  So is that like 66 percent of that is

9    Mr. Delgado's liability since he owns -- that whole F.G.G. was

10   invented just to do this deal, and apparently he owned

11   66 percent of any profit.  So I guess that's 66 percent his.

12              MS. CALLAHAN:  Correct.

13              THE COURT:  Yeah, I think a civil court will develop

14   some deep discovery rules and figure where all of that it is.

15              I don't think you're going to be able to recover more

16   than one $11-million.

17              MS. CALLAHAN:  No, Your Honor.

18              THE COURT:  We're just trying to spin our wheels to

19   try to figure this out, so I'm going to leave it at that.

20              I'm going to order restitution in the amount of

21   $11,334,590 to the Comisión Federal de Electricidad, the

22   Mexican power company.  And I'm not going to order any interest

23   on that.  I don't see that the defendant is going to have even

24   the ability to pay that amount, much less the interest, so

25   that'll be the judgment of the Court.

```
 1                  All right.  Anything else from either side?

 2                  MS. KANOF:  Nothing further from the United States.

 3       Wait.  Okay.

 4                  MS. CALLAHAN:  Your Honor, although the Court will

 5       enter an order, it will need to amend the judgment so we'll

 6       have a first amendment judgment that contains the restitution

 7       amount.

 8                  THE COURT:  Did we do the judgment already?

 9                  COURTROOM DEPUTY DUEÑAS:  No.

10                  THE COURT:  We'll do it.  Yes, ma'am.  All right.

11       Okay.

12                  MR. HANSHEW:  Judge, record-keeping-wise, here I am

13       again.  Sorry.

14                  THE COURT:  Sure.  Yeah.  Absolutely.

15                  MR. HANSHEW:  Judge, we object to the that conclusion.

16       Obviously, for all of the reasons that have been stated in

17       writing, as well as orally at this hearing and as well as the

18       September hearing on this matter.

19                  We'd also request that the Court issue a written

20       finding of facts and conclusions on this as to what fact and

21       evidence it relied on to reach these conclusions, as well as

22       the actual methodology used to reach that conclusion, so we

23       would ask for that.

24                  THE COURT:  And what is the provision in the code that

25       requires me to do findings of facts?
```

1          MR. HANSHEW:  I don't believe there's a provision in

2     the code that requires it, but obviously this is going to be

3     subject to Fifth Circuit review.  And it's our position that

4     not having any live testimony and evidence admitted other than

5     the affidavits, that it's left with some ambiguity in terms of

6     what this Court held to be credible and/or what was the

7     evidence that met the preponderance standard.  So I just want

8     to make sure we made that request and lodge the objection for

9     the failure to that do that, so that the Court of Appeals

10    doesn't say that we didn't ask you to do the same.

11          THE COURT:  Sure.

12          MR. HANSHEW:  Thank you, Judge.

13          THE COURT:  I think probably do that right now.

14                          FINDINGS OF FACTS

15          THE COURT:  I think the testimony and the pretrial

16    service's report clearly established that your client received

17    $32-million that was not entitled to him.

18          And then either from the testimony or the pretrial

19    service's report, I note that Mr. Delgado should be credited

20    with a payment of $11,321,093.  That's at page 76 of the

21    pretrial service's report, which I find credible, and then and

22    additional 7 -- it would have been a $7,000 -- I'm sorry -- a

23    $7-million additional payment, there on page 76.  So that's the

24    $18,321,000 that was paid to Mitsubishi in total.  That would

25    leave us with just under 14-million, so it's 13-million in

```
1    change.
2            And then I'm crediting him with a payment to F.G.G.,
3    $3,450,410 minus the 785,000 that was paid by F.G.G. back to
4    Mr. Delgado, leaving 2,665,410.
5            MS. ARREOLA:  Your Honor, my math on that was
6    2,664,910.
7            THE COURT:  I'm sorry?  Could you say that again for
8    me?
9            MS. ARREOLA:  Yes, Your Honor.  The amount to F.G.G.
10   was 3,450,110, and then subtracting the 785,200 that was paid
11   back to Mr. Delgado, the balance I got was 2,664,910.
12           THE COURT:  All right.  Thank you, Ms. Arreola.
13           And also, using a round number on the 14, because we
14   have the 32-million, then the 18,321,093 that was paid to
15   Mitsubishi, I get 13,678,907.
16           Is that your number, Ms. Arreola?
17           MS. ARREOLA:  That's the number I reached, Your Honor,
18   taking the 32-million minus the 18.3-million and change that
19   was paid to Mitsubishi before subtracting the amount.
20           THE COURT:  And we subtracted 2-million-664 and 10 is
21   7...  And then 11,013,997, is that your next one?
22           MS. ARREOLA:  11,013,997, Your Honor; is that what
23   Your Honor said?
24           THE COURT:  Okay.
25           So as finding of fact, that's how I come to the
```

1    number.  I'm going to know, having corrected my math,

2    $11,013,997.  I get that from the testimony in the trial and

3    from the pretrial's report in this case, paragraph 76

4    indicating the payments Mr. Delgado made.  But I think I also

5    need to credit him -- there's 2.5-million in the Turks and

6    Caicos account, no?  That's not his money?

7         MS. CALLAHAN:  No, Your Honor.  Money subject to

8    forfeiture is actually in control of the Attorney General.  The

9    way that we handle it is that the United States will then seek

10   to restore those funds to the victim in this case, but it

11   wouldn't be appropriate to credit the defendant with that.

12        MR. HANSHEW:  Is that not double-dipping then?  I

13   don't understand.

14        THE COURT:  Yeah, then -- let's say Mr. Delgado had a

15   very deep checking account and right now he wrote a check for

16   $11,013,997.  So then the money in the Turks and Caicos account

17   would be in addition to the 35-million that he got from or the

18   32-million he got from --

19        MS. CALLAHAN:  No, Your Honor, it's not.  I know that

20   this part gets confusing.  The reason is both the restitution

21   is mandatory and is considered compensation to the victim, but

22   asset forfeiture in its laws are considered to be punishment to

23   the defendant.

24        What the Unites States will represent to this Court is

25   what it will seek to do under its own guidelines is it's

1    seeking both restitution and that it's seeking to forfeit those

2    funds.  And we have to seek to forfeit those funds, because

3    that's the mechanism we have to bring them back.  But then what

4    will do is we will ask the Attorney General to then restore

5    those funds to the restitution or so that they go back to the

6    victims.  And that's the mechanism that the Court has.

7         But the case law is very clear that it's not

8    double-dipping.  That's typically the argument that's made.

9    But they're both mandatory, they can both be ordered, and then

10   the government will seek to restore that to the victims,

11   because its own guidelines are that the victims go first.

12        MR. HANSHEW:  And if the government decides the

13   Attorney General is with them, Mr. Sessions and all, that

14   they're not going to give that money, then that's the --

15        MS. CALLAHAN:  Then it's punishment for Mr. Delgado

16   under the forfeiture laws for the criminal activity he

17   undertook.

18        THE COURT:  So then it's clear that that money does

19   not belong to Mexico or you wouldn't be able to forfeit.

20        MS. CALLAHAN:  Correct.

21        THE COURT:  Okay.  All right.

22        So I'll leave that to you, Mr. Hanshew, to make that

23   argument.

24        Anyway, that's the Court's restitution order,

25   $11,013,997.  And my findings of facts are on the record.  It

1    comes from the trial and from the pretrial service's report.

2         And if the government wants to submit a proposed

3    additional findings of fact, I'm happy to consider those,

4    otherwise I think these are sufficient.

5         All right.  Anything further?

6         MS. KANOF:  Nothing further from the government.

7         THE COURT:  Mr. Hanshew?

8         MR. HANSHEW:  Judge, the last objection to the

9    conclusion and to findings for the record, we object for all of

10   the reasons we put forth already.

11        THE COURT:  You're objecting to my conclusions and

12   findings?

13        MR. HANSHEW:  Yes, Judge.  Shocker, right?

14        THE COURT:  We're adjourned.

15        COURTROOM SECURITY OFFICER:  All rise.

16        (Proceedings conclude.)

17                               *  *  *

18

19

20

21

22

23

24

25

1                          * * * * *

2           I certify that the foregoing is a correct transcript

3      from the record of proceedings in the above-entitled matter.  I

4      further certify that the transcript fees and format comply with

5      those prescribed by the Court and the Judicial Conference of

6      the United States.

7      Signature:/S/KATHLEEN A. SUPNET          September 7, 2018
               Kathleen A. Supnet, CSR          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25