<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF TEXAS

 3                        EL PASO DIVISION

 4                  VOLUME 9(A) of 9(C) OF 20

 5

 6  UNITED STATES OF AMERICA          EP:13-CR-0370-DG

 7  v.                                EL PASO, TEXAS

 8  MARCO ANTONIO DELGADO             September 12, 2016

 9
                           MOTIONS HEARING
10              THE HONORABLE DAVID C. GUADERRAMA
                   UNITED STATES DISTRICT JUDGE
11

12

13  APPEARANCES:

14  For the Government:  Debra Kanof
                         Anna Arreola
15                       Luis Gonzalez
                         Assistant United States Attorney
16                       700 East San Antonio, Suite 200
                         El Paso, Texas 79901
17
    For the Defendant:   Maureen Franco
18                       Erik Hanshew
                         Assistant Federal Public Defender
19                       700 E. San Antonio, Suite 410
                         El Paso, Texas  79901
20
    Court Reporter:      Kathleen A. Supnet
21                       El Paso, Texas
                         (915)834-0573
22                       kathi.supnet5303@gmail.com

23

24        Proceedings reported by mechanical stenography,

25  transcript produced by computer-aided software and computer.
</pre>

1                          CHRONOLOGICAL INDEX

2                        VOLUME 9(A) of 9(C) OF 20

3    September 12, 2016                               PAGE    VOL.

4    Announcements. . . . . . . . . . . . . . . . . 3       9A

5    WITNESS TESTIMONY     DIRECT    CROSS     VOIR DIRE PAGE    VOL.

6    GIREUD, FERNANDO      4         38        --              9A

7    Argument by Mr. Hanshew. . . . . . . . . . . . 48      9A

8    Argument by Mr. Gonzalez . . . . . . . . . . . 53      9A

9    Argument by Mr. Hanshew. . . . . . . . . . . . 55      9A

10   Court's Ruling . . . . . . . . . . . . . . . . 56      9A

11   Court Reporter's Certification . . . . . . . . 63      9A

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Open court.  Defendant and counsel present.)

 2                THE COURTROOM DEPUTY:  EP:13-CR-370 Marco Antonio

 3      Delgado.

 4                THE COURT:  I'd ask for announcements.

 5                MR. GONZALEZ:  Good morning, Your Honor.  Jose Luis

 6      Gonzalez, Anna Arreola and Debra Kanof for the government and we

 7      are ready.

 8                THE COURT:  Good morning.

 9                MR. HANSHEW:  Good morning, Your Honor.  Erik Hanshew

10      and Maureen Franco on behalf of Mr. Delgado.

11                THE COURT:  Good morning to both of you.

12                Mr. Hanshew, we're here on your motion to dismiss or

13      in the alternative to disqualify the AUSA in the Western

14      District.

15                All right.  Who's your first witness?

16                MR. HANSHEW:  Your Honor, defense calls Mr. Fernandez

17      Gireud to the stand.

18                THE COURT:  Mr. Gireud.

19                MS. KANOF:  Your Honor, Mr. Gireud's attorney is here

20      in the courtroom.  May he sit at counsel table?

21                THE COURT:  Oh, absolutely.

22                Mr. Gireud, where are you?

23                THE WITNESS:  Good morning, Your Honor.

24                MS. KANOF:  And for the record, his name is Colin

25      Hobbs.
```

```
 1                    (Witness sworn by the court.)
 2               MR. HANSHEW:  May I proceed, Your Honor?
 3               THE COURT:  Yes, sir.
 4                         FERNANDO GIREUD,
 5                DIRECT EXAMINATION BY THE DEFENSE
 6    BY MR. HANSHEW:
 7    Q.   Sir, could you please state your name for the record?
 8    A.   Fernandez Gireud.
 9    Q.   And Mr. Gireud, do you understand that the purpose of this
10    hearing today is about your interaction with the government in
11    regards to a subpoena?
12    A.   Yes, sir.
13    Q.   And in preparation for today's hearing, did you review any
14    documents, sir?
15    A.   No, sir.
16    Q.   Did you have any conversations with law enforcement
17    officials regarding this hearing?
18    A.   Yes on -- last week, Friday, I think I was called by
19    Mr. Jose Luis.  He wanted to ask me questions and tell me that
20    we were going to have a hearing this morning regarding that
21    situation.
22    Q.   Okay.  And what were the questions that he asked you?
23    A.   Well, he asked me questions, number one, he wanted me to
24    know if I knew what a legal representation was.  He went
25    through -- he asked me, for example, have you ever had attorneys
```

1    in your life.  And I said, yes.

2              THE COURT:  Attorneys where?

3              THE WITNESS:  Have you ever have attorney -- have you

4    ever had representation in your life.

5              THE COURT:  In your life.

6              THE WITNESS:  Have you ever hire attorneys, and I said

7    yes, I have.  And I gave him one or two examples of attorneys

8    that I have and what was the relationship and all of that, and

9    he wanted me to know if I was aware of what it's -- what does he

10   mean by legal representation and that it -- what is that, so I

11   went and head and tell him that two or three situations in my

12   life that I had to hire legal counsel and I explained that to

13   him.

14   BY MR. HANSHEW:

15   Q.   Can you explain those, please?

16   A.   Well, for example, he asked me what is -- the first time

17   that I have an attorney was when I was working for El Paso

18   Electric.  I was discharged and I hired an attorney in El Paso

19   to representing [sic] me on the case against El Paso Electric.

20   And for example, he asked me what kind of -- how do you know he

21   was your attorney.  Well, we signed our contract.  We have a

22   contract.  In this case, he was going to work on contingency

23   basis or on commission.  And he was representing me.  We signed

24   a contract.  I -- (indiscernible) -- attorney for this case.

25   Q.   Okay.  What were the other examples that you explained?

A.   When I have -- when I started this situation, I contracted
Mary Stillinger.  This is a completely different case than her
case.  I discussed the situation and she was retained as my
attorney.  In this case, she work -- she had a fee.  I have to
pay a fee and we signed a contract.  The contract says that she
was going to representing me in the case and we have a fee and
we have a contract.

In the first case, we have a contract, but we didn't
have a fee.  It was on a contingency basis.

Q.   Okay.  And did you give other examples to Mr. Gonzalez?

A.   Yes, I think we talked about the Rene Ordoñez, which is
another attorney that I have for a civil case.  And again in his
case we have a contract.  We discussed the issues and we -- he
presented me with a contract and the contract has a fee, also,
in this case, so I gave him a fee and he's working on my case
and he's representing me.

Q.   Okay.  Did you give any other examples to Mr. Gonzalez?

A.   No, sir.  I think that's all I give.  I don't remember.

Q.   Okay.  And did Mr. Gonzalez explain to you his opinion of
what attorney-client relationship was?

A.   Did he explain to me what was attorney-privilege
relationship was [sic]?  Is that what are you asking, I'm sorry?

Q.   Correct, sir.

A.   Yes.  Yes.

Q.   What did he tell you?

1    A.    Attorney-privilege information is that when you hire an

2    attorney and somebody is representing you, you have the right to

3    tell them anything that you need to talk to or they -- the cases

4    you have to present it with documents, I guess, whatever you

5    have.  And they are representing you, so you have an

6    attorney-privilege relationship with him.

7    Q.    And that's what Mr. Gonzalez explained to you recently?

8    A.    To begin with, I don't remember if he explained -- if we

9    discussed the attorney privilege, but I think that's what I

10   understand it is.

11   Q.    This conversation was on Friday; is that right?

12   A.    Yes.  Yes, I think so.

13   Q.    And that would have been three days ago?

14   A.    Yes, yes.

15   Q.    Okay.  So what else did Mr. Gonzalez explain to you about

16   his opinion of attorney-client relationships?

17   A.    He just said in general this is -- we just want you -- what

18   I want you to understand is -- I want -- actually, what I want

19   to know is if you understand what's an attorney-client

20   relationship, and if you understand when you are being

21   represented by somebody and when you are not.

22         So in other words, if you have an attorney, I want you

23   to understand what is it that you have and if you don't have one

24   what is it that you have.

25   Q.    Okay.  And so my question is, again, sir, what did he

```
 1   explain to you as his definition of the attorney-client
 2   relationship?
 3   A.   His definition is that if you have a contract, if you hire
 4   an attorney to represent you and you have a contract, then he's
 5   representing you and you have a client relationship with an
 6   attorney, I guess.
 7   Q.   Okay.  So, he explained to you that the way that the
 8   attorney-client relationship exists is only if there's a
 9   contract and you've been hired; is that right?
10   A.   Yes, that's what it is.
11   Q.   Okay.  Did he explain anything else about his understanding
12   of attorney-client relationship?
13   A.   No, sir.
14   Q.   Okay.  And about how long was this conversation you had?
15   A.   I don't know.  Probably, 30 minutes we spend there.  I
16   don't -- I didn't use a watch.  I don't keep time.
17   Q.   Was it telephonic or were you in person?
18   A.   I'm sorry?
19   Q.   Did you meet in person?
20   A.   Yes, we met in person.
21   Q.   Where at?
22   A.   We were at the second floor of the federal building, which
23   is a block from here.
24   Q.   The U.S. Attorney Office?
25   A.   The U.S. Attorney office.
```

```
1    Q.    And did you record that conversation?

2    A.    No, sir, I don't record.

3    Q.    Did you see Mr. Gonzalez record the conversation?

4    A.    I don't think I saw him recording it.

5    Q.    And other than Mr. Gonzalez, who else was present?

6    A.    The first ten minutes, I guess, or five minutes -- again, I

7    don't keep track of time -- it was only him and me.  And later

8    on, Agent Joe Fry came into the room and he sat down there for

9    another 10, 15 minutes.

10   Q.    And nobody else came or entered into that conversation or

11   the room during the rest of the time?

12   A.    No, sir.

13   Q.    Okay.  Did Mr. Gonzalez take notes?

14   A.    Yes, he did took [sic] one or two pages of notes or three

15   pages.  Yes, he did take notes.

16   Q.    How about Mr. Fry?

17   A.    I don't think he did take notes.

18   Q.    Did you take notes?

19   A.    I have -- I took two notes, yes.

20   Q.    You took --

21   A.    I made two notes, yes.

22   Q.    And what were those notes?

23   A.    Note number one was how Mr. Gonzalez -- Mr. Gonzalez asked

24   me how I got the subpoena for the request of the documents to

25   collect the documents that I think you sent.  And I didn't
```

1    remember how I got them, so he said make a note and make sure

2    that you know.  If they ask you at least you know how you got

3    it.

4           And the second question was make sure that you bring

5    all of the documents that you provide, uh, uh, as in find them,

6    look at the documents and see if you can get them just so you

7    can have them with you.  And I think that's -- those were the

8    only two questions I have.

9    Q.   Okay.  And so he explained to you how to answer the

10   question about when you -- who provided the subpoena to you?

11   A.   No.  He asked me -- he asked me, do you know how did you

12   got these subpoena documents?  And at the time, I didn't recall

13   exactly how did I got them, because I have subpoenas delivered

14   to me by people at my house and I have some other ones that Mary

15   Stillinger sent me through e-mail through Rene Ordoñez, and then

16   I get it myself, which is the case of this one.

17   Q.   Okay.  Your attorney provided it to you, correct?

18   A.   Yes, sir.

19   Q.   All right.  And were you able to, when you reviewed these

20   notes, determine when he gave that to you?

21   A.   No, I didn't check the date, but it was somewhere in March,

22   March something.

23   Q.   Early March or late March, if you recall?

24   A.   Late March, I think.

25   Q.   Okay.  Now, other than that meeting with Mr. Gonzalez and

1   Agent Fry, did you speak with anyone else before today's hearing

2   about this hearing?

3   A.   Yes, sir.

4   Q.   And who is that?

5   A.   Brett Hobbs, which is my attorney.

6   Q.   But he is in the courtroom here today, correct?

7   A.   Yes, he's right here.

8   Q.   All right.  And he is your attorney for this matter?

9   A.   Yes.

10  Q.   Now he wasn't your attorney when you received the subpoena

11  though, correct?

12  A.   No, sir.

13  Q.   Who was that?

14  A.   I thought it was Mary Stillinger.

15  Q.   You said you thought.  Does that mean you were wrong about

16  that?

17  A.   Well, uh, I was always been in the impression that she was

18  my attorney, that we never cancel our contract, because she was

19  also helping me another civil lawsuit that we have with Sulzer,

20  a company in Houston, and she withdrew from that one, and that's

21  when Rene Ordoñez came into the game.  So, I didn't know until

22  almost Friday before, the day of the subpoena, that I wasn't

23  represented by her, that now it is Rene Ordoñez.  And I talked

24  to Rene Ordoñez and he says I'm not representing you in this

25  case.  I'm representing you in the civil case.

```
 1   Q.    Okay.  So you're saying the subpoena -- well, let me
 2   approach first.
 3              MR. HANSHEW:  If I may?
 4              THE COURT:  Yes, sir.
 5   BY MR. HANSHEW:
 6   Q.    Sir, if you could take a look at that document in front of
 7   you?
 8   A.    Yes, sir.
 9   Q.    Is that document familiar to you?
10   A.    Yes.  This is the document, the subpoena to produce the
11   documents.
12   Q.    If you could do me a favor, speak into the microphone, so
13   we can all hear.
14   A.    I'm sorry.
15   Q.    Thank you.  No problem.
16   A.    I'm sorry.
17              Yes, this is the document that we've been -- we're
18   discussing right now.
19   Q.    Okay.  And this is the document that your attorney Rene
20   Ordoñez provided to you?
21   A.    Yes, sir.
22   Q.    And he provided it to you in March, correct?
23   A.    Yes, sir.
24   Q.    Now, you were just explaining that -- well, let me have you
25   turn to page three of that document, if you can, number two at
```

the bottom, sir.

A.   Okay, sir.

Q.   And at the top there it indicates that you're to produce the following documents in court on or before April 11th; is that right?

A.   Yes, sir.

Q.   Okay.  And you indicated that you didn't know until the Friday before that your now former attorney, Mary Stillinger, wasn't assisting you with this; is that correct?

A.   Yes -- well, I left her a bunch of messages a week or two weeks before and she never returned my e-mails or, I mean, my calls or anything.  So, until that day -- I mean, I was putting all of these documents together during that time, but then I realized that I don't have all of the documents, that we never -- that we don't have all of the set of documents.  So I was kind of afraid or something, so I say if I don't fulfill this document, am I doing something wrong or something, so I just wanted to find that -- somebody, that everything was fine, that I was okay.  I mean I can only produce what I have.  I cannot produce something I don't have or collect, I'm sorry.

Q.   Okay.  So, it would be fair to say then that when you received this document from attorney Rene Ordoñez in March --

A.   Yes.

Q.   -- you immediately read it and reviewed it, correct?

A.   Yes.  I start looking at this [sic] documents.  I knew I

1   had some times to look for the documents and yes.

2   Q.   And you knew then, when you first read it, that it had a

3   due date of April 11th, correct?

4   A.   Yes, I do.

5   Q.   And you knew it had to be provided to the court, correct?

6   A.   Yes, I do.

7   Q.   Okay.  And you were just saying, that caused you concern,

8   right?

9   A.   It caused my concern that I don't -- when I read through

10  them pretty quick, I realize that I don't have all of the

11  documents.  They don't exist, some of the documents I never had.

12  Q.   Because you wanted to be in compliance with the Court's

13  order?

14  A.   Yes, of course.

15  Q.   So, you said already you reached out to your attorney.  Is

16  that attorney Mary Stillinger?

17  A.   Yes, I did.

18  Q.   Okay.  And you did that via telephone?

19  A.   I left some messages in her office, yes.  And yes.  And I

20  never got a call back.

21  Q.   And you never received any callbacks?

22  A.   Later on, somewhere, I receive a call from Juan Godinez,

23  which is his -- her husband, and I think he's the manager of

24  his [sic] office or something, and he called me and told me that

25  they withdrew from the case on this date and all of that, and I

1  should be talking to Rene Ordoñez on these cases and things like

2  that.  But they emphasized you have to collect documents as much

3  as you have and you have to collect that because you have to

4  provide those documents.

5  Q.   Okay.  And when was that call?

6  A.   I don't know, sir.  I don't have the exact dates and all of

7  that.  But it was between -- now I see that the document for

8  this was given to me I guess or sealed on March the 4, so it

9  must be somewhere between that and April 8 or something like

10  that.

11  Q.   Okay.  They're due on April 11th, right?

12  A.   Yes, which was Monday.

13  Q.   A Monday.  Okay.  So you don't know -- I mean in relation

14  to the due date, when did Ms. Stillinger's office contact you?

15  A.   No, sir.  I don't have the exact dates or anything, but it

16  was, of course, prior to this.

17  Q.   Okay.  Earlier you had indicated that you didn't know that

18  until the Friday before?

19  A.   Yeah.  Again, I may receive it or probably was a little bit

20  before that I -- that I found out that -- no, it was before.

21  I'm sorry.  I misstate something.  It was before, because I -- I

22  talked to Rene Ordoñez before on that, when he told me,

23  Fernando, you -- I'm not your -- I'm your civil attorney.  I'm

24  not your attorney for this case and you need to get the

25  documents as soon as you can.  You have a due date of this date

1    so you have to collect the documents, yes.

2    Q.   When was that conversation?

3    A.   I don't know, sir.  It could be on -- in different dates I

4    talked to him several times.

5    Q.   Okay.

6    A.   It was probably between March the 4 and April, something

7    like that, April 9 or the week of.

8    Q.   That's a whole month time frame?

9    A.   Yes, sir.  I talk to them all the time and I -- yes.  And I

10   was looking for documents.  These are documents that happened

11   three, four years ago and I've been looking for most of the

12   documents, yes.

13   Q.   Okay.  So then what you said earlier about the first time

14   that you learned this was being the Friday before, that's not

15   correct?

16   A.   No, the Friday before is when I was -- well, let me tell

17   you another thing that happened.

18   Q.   Well, my question, sir, is, what you said earlier, the

19   first time you learned of this was the Friday before, that is

20   not correct?

21   A.   That is not correct.  You are right.  It was probably a

22   week or two before.  I don't have -- I don't remember the dates.

23   Q.   Okay.  And at this point, you're still concerned, right,

24   because you wanted to comply with this court order?

25   A.   Yes, sir.

1  Q.   Okay.  And so after you'd been told by your various

2  attorneys that they are not representing you on this, you reach

3  out to the government?

4  A.   No, sir.  I -- I never reached out to them until -- there's

5  a few things that happened in between.

6          My mother has been very ill for a few years.  She's

7  been on bed [sic] for a few years.

8  Q.   My question was, sir -- I'm sorry to interrupt you -- but

9  my question was, though, you learned from your lawyers that

10  they're not representing you on this --

11  A.   Yes.

12  Q.   -- and after that, you then contact the government?

13  A.   No.  I contact the government on Friday.  I don't know what

14  day it is.  The 8, Friday, prior to Monday the 11.

15  Q.   Okay.  So the first time you contact any government

16  official about the subpoena --

17  A.   It was Friday.

18  Q.   -- is Friday?

19  A.   Yes, sir.

20  Q.   Okay.

21  A.   Yes.

22  Q.   So you didn't speak with Agent Fry in the beginning of

23  April, sir?

24  A.   No, no.  I'm sorry.  Yes, somewhere in April, at the

25  beginning of April, I -- Agent Fry is the person that always

1    keep us informed if they -- if the dates are going to be changed

2    or things are going to be delayed under that.  And I remember I

3    talked to him.  Again, I don't know the time, but it was

4    somewhere in April, yes, I talked to him.  And I ask him, I'm

5    working in documents for the subpoena and all of that.

6          Actually, I said I received a subpoena on that, and I

7    believe a lot of the documents, they already in the possession,

8    so what am I doing?  He said, Fernando, talk to your attorneys.

9    And that was the answers that I always got from him.

10   Q.   That's the answer you got from him?

11   A.   Yes.

12   Q.   Okay.  And Ms. Arreola, you know who she is, correct?

13   A.   Yes, I know.

14   Q.   And she's in the courtroom today?

15   A.   Yes, she's there.

16   Q.   And she also relayed a message to you to talk to your

17   lawyer about the subpoena, correct?

18   A.   I think -- well, as I said, you asked me if I talked to

19   Agent Fry.  I talked to Agent Fry previous to this Friday.  And

20   I think on that Friday, which is I think the 8 -- yes, Friday

21   the 8 of April, I -- I have finally put as much as documents as

22   I could together and I was on my way to copy the documents, but

23   again, I called again Mary Stillinger and so -- and people,

24   trying to ask a question that, okay, if I don't have all of the

25   documents because I don't have them, what do I do?  And i didn't

1    get ahold of anyone.

2            So I -- I called my son.  My son is in El Paso, in

3    town, because my daughter is getting married, and he told me

4    again like everybody says, you have to put together what you

5    have and that's all you can do.  There's no way that you can --

6    if you don't have them, you don't have them.  It's simple as

7    that.

8    Q.   Okay.  So the people that you reached out to were your

9    attorneys, correct?

10   A.   Yes, sir.

11   Q.   And --

12   A.   Well, I talked to my son on the day again and then when I

13   was --

14   Q.   And your son is an attorney, correct?

15   A.   Yes, he is.

16   Q.   And you contacted him in his capacity as an attorney as

17   well, correct?

18   A.   Well, he's my son.

19   Q.   Well, but do you recall then, because he's a lawyer, to

20   give you legal advice about this, right?

21   A.   I just had a question, yes, I did.

22   Q.   You didn't call any other family members to ask how to

23   respond to this subpoena?

24   A.   Other family members, no, sir.

25   Q.   You didn't, correct?

```
 1    A.   No, I didn't.

 2    Q.   He's the lawyer?

 3    A.   He's the one who knows the law, yes.

 4    Q.   And you wanted his advice to make sure you were following

 5    the legal requirements?

 6    A.   And again he --

 7    Q.   My question was --

 8    A.   Yes.

 9    Q.   -- did you call him to make sure you were following the

10    legal requirements?

11    A.   Again, when you are under stress and pressure and the

12    situations you haven't even let me explain, but, yes, I ask him

13    just to be -- to be okay, to be sure that I was not doing

14    something wrong or something.

15    Q.   And by that you mean something illegal?

16    A.   No, by if I -- if you ask me on the subpoena to produce ten

17    documents and I only have eight, I just wanted to make sure I

18    only have eight, what do I -- I mean, there's nothing I can do

19    to produce the document.  They -- I cannot produce documents.  I

20    just have to -- it says collect what you have, so I don't have

21    documents, so what do I -- he said just collect what you have

22    and that's all you can do.

23    Q.   And my question is for you, you asked lawyers to explain

24    that to you?

25    A.   I just asked what happened if I don't have documents.  They
```

1    said nothing, just put together what you have and that's it,

2    yes.

3    Q.   So, yes?

4    A.   Yes.

5    Q.   Okay.  And after you didn't get a response from your

6    previously retained lawyers and then your son who's a -- who's a

7    lawyer, you turn to the Government, correct?

8    A.   I called Mr. Fry, yes, on Friday.

9    Q.   And he told you that you needed to speak to your lawyer

10   about it?

11   A.   He told me, Fernando, you need to talk to your attorney on

12   this.  That's all I can tell you.

13   Q.   Okay.

14   A.   He's not an attorney to begin with.

15   Q.   So at this point, you still haven't got any legal response

16   how to respond?

17   A.   No, and --

18   Q.   "Yes" or "no," sir.

19        At that point, you hadn't received counsel from your

20   lawyers?

21   A.   Oh, they told me just collect what you have and turn them

22   in.

23   Q.   That was their legal advice?

24   A.   Yes.

25   Q.   Okay.  And so then you had a discussion with Ms. Kanof,

correct?

A.    Yes.   When I called Agent Fry and I said I am under a lot

of pressure, I have a wedding coming, my mother is very sick

right now, I have a wedding that we've been trying to delay, my

daughter is getting married on Saturday, and I want to make sure

that -- I need to review this.   And he says, Fernando, talk to

your attorneys.   And I said I cannot reach anybody right now,

not even my son.   My son, I didn't know where he was that day.

He didn't answer my phone that day, that afternoon, and I said

I'm on my way to copy this.   And Agent Fry says, if you want,

let me -- let me ask the ladies.   That's the way -- he said, let

me talk to Ms. Kanof or to Anna and see what they -- if they

have anything to say.   That's all he says.

Q.    And when was that?

A.    On Friday afternoon.

Q.    But previous to that, that you had made arrangements ton

actually meet with Ms. Kanof at her office?

A.    No, sir.   No, sir.

Q.    You never made any arrangements to meet?

A.    This is -- this is on the call that I have with Mr. Fry.

After I talk to Mr. Fry, he says let me call the ladies, let me

ask the ladies.   Then about 30 minutes later or 15 minutes

later, I don't recall the time, I was driving to FedEx-Kinkos on

Mesa to get copies of the documents, and I receive a call from

Agent Fry and he said I have Ms. Kanof and Ms. Anna Arreola on

1    the phone.

2    Q.    Okay.  And then what did --

3    A.    And then I said, I'm sorry to bother you.  I don't have

4    people call me back.  Even though I already talked to my son and

5    told me just do this, but I said, for me, a subpoena is a very

6    important document and I just want to make sure that I am doing

7    the right thing.  So -- so Ms. -- I think Ms. Kanof says,

8    Fernando you just produce what you have and you turn that in and

9    that's all you can do.  There's nothing else.

10   Q.    So she had a copy of the subpoena at this point, correct?

11   A.    No.  No, she doesn't have a copy.

12   Q.    She didn't?

13   A.    Oh, of this document itself of the subpoena?

14   Q.    Yes, sir.

15   A.    I don't know, sir.

16   Q.    But you were having a discussion about it, right?

17   A.    I said I have a subpoena from an attorney and I have to

18   produce these documents and I just want to make sure I'm not

19   doing something wrong by not providing documents.

20   Q.    But you had already provided a copy to Agent Fry?

21   A.    No, sir.

22   Q.    You hadn't provided a copy to any government official?

23   A.    I don't remember I ever did that.

24          No, actually, I never did.  I don't recall doing that.

25   Q.    Okay.  Then --

1    A.   The copy came from me from Rene Ordoñez.

2    Q.   Okay.  So you never gave a copy at any point to the

3    government?

4    A.   Not at this point.  This is Friday afternoon with talking

5    to them.  And Ms. Kanof, when I'm talking to her, I don't even

6    remember the time.  I think it was like 5 o'clock or something

7    that Friday.  And she said, Fernando, just collect what you have

8    and turn it in on Monday.  That's all you can do.  And I even --

9    Q.   What else did you discuss with her?

10   A.   I said my problem is, Ms. Kanof, is not being an attorney

11   and I don't have all of the documents.  And she again replied,

12   you have to collect what you have and that's all you can do.

13          And I even said, well, for example, they asking me and

14   I'm going ballistic in the middle of a lot of things, and I'm

15   going by like say, for example, they want me to put documents of

16   minutes of the company time -- and I don't have it.  We never

17   did something.  Again she said, just collect what you have and

18   that's all you can do.

19   Q.   Okay.  So you're explaining to her what the request is,

20   right?

21   A.   I just used one example or two examples of documents I

22   didn't have and I (indiscernible), and she said, Fernando, just

23   collect --

24   Q.   So my question was, you're explaining to her what some of

25   the requests were, correct?

1    A.   I talk about two of the things that I didn't have and I

2    mentioned that to her.  I said, I don't have these documents,

3    for example.  What do I do?

4    Q.   So the answer is, yes.  You explained to her what the

5    requests were; yes or no, sir?

6    A.   Yes.  One, yes.

7    Q.   Okay.  And you asked for her to give you an explanation of

8    what that meant so were you compliant, right?

9    A.   Actually, I'm not even -- I don't know if I'm asking

10   questions.  I'm just going ballistic because of all of things

11   that I have.  And I said I don't have of this document, so I

12   don't know what to do and all of that, and she said just collect

13   what you have.

14   Q.   Right.  But you just gave the example that you said you

15   were going ballistic to her --

16   A.   Yes.

17   Q.   -- explaining that they're asking for minutes and you don't

18   have it, correct?

19   A.   Yes, I -- I --

20   Q.   And she in turn gives you a response about that example?

21   A.   She said just collect --

22   Q.   My question is "yes" or "no"; did she give you a response,

23   sir?

24   A.   Yes.  Yes, sir.

25   Q.   And did you feel less ballistic at that point?

1   A.   No, sir.   I still felt the pressure and all of that, but

2   I -- I mean I said, okay.   I mean there's nothing I can do.   I

3   mean she's not telling me what to do or nothing.   She just

4   says --

5   Q.   I didn't ask you if she's telling you what to do.   I asked

6   did she give you a response to your question in the example?

7   A.   Yes, she said collect the documents and produce what you

8   have.

9   Q.   And you know that she's a lawyer, right?

10   A.   Yes, I know he's a -- she's a lawyer.

11   Q.   And all of the other people that you called before that,

12   that you didn't get a response from were lawyers as well,

13   correct?

14   A.   Yes, sir.

15   Q.   All right.   And then she explained how to respond?

16   A.   No, she didn't explain how to respond.   She just said

17   collect the documents and --

18   Q.   Well, isn't that responding, sir?

19   A.   Well, yes, you might say, yes.

20   Q.   Okay.   And she told you, you could or you could or could

21   not provide documents based on whether you had them?

22   A.   No.   She just says collect the documents that you have and

23   give that.   That's all she says.

24   Q.   And did she explain to you about substituting other

25   documents in or out?

```
1    A.   Not at all.  No, sir.

2    Q.   She never told you, don't substitute documents that you

3    don't have -- for ones you don't have.  I'm sorry.

4    A.   I don't exactly recall what was the conversation to be

5    honest with you, but it was -- again, it was just collect what

6    you have and that's all you are going to be delivering.

7    Q.   Okay.

8    A.   She never told me to produce or nothing.  Show said collect

9    what you have and deliver it.  That's it.

10   Q.   Okay.  Did -- but she explained to you that don't put

11   something in if it's not responsive to the questions, right?

12   A.   I don't remember exactly those words, but she just says you

13   collect what you have and that's what you are going to present.

14   That's it.

15   Q.   That's all she ever told you?

16   A.   I don't recall any more things.  I mean this -- this is.

17   Q.   Well, "yes" or "no," sir.  Is that all that she told you?

18   A.   No, sir.  The -- the --

19   Q.   That's her only response to your questions?

20   A.   Yes.

21   Q.   Just turn in what you have?

22   A.   Turn in what you have.

23   Q.   Okay.  But then you get into a discussion about how --

24   well, let me go to Sunday and your mom passes; is that right,

25   sir?
```

| | |
|---|---|
| 1 | A.   Yes, sir. |
| 2 | Q.   And my condolences to you for that. |
| 3 | A.   Thank you, sir. |
| 4 | Q.   And you then contact Ms. Kanof again, correct? |
| 5 | A.   Yes -- no, after -- after that conversation on Friday, and |
| 6 | again, I was desperate, and she just said, if you want, you can |
| 7 | come up to the office on Monday and we -- I'll take you to |
| 8 | deliver the documents.  I walk you to deliver the documents. |
| 9 | Q.   Okay.  So there was actually a scheduled meeting with |
| 10 | Ms. Kanof in her office? |
| 11 | A.   She said whenever you are ready to bring in the documents |
| 12 | on Monday, if you want, I can walk with you the documents.  I |
| 13 | can go with you to deliver the documents. |
| 14 | Q.   Okay.  So the answer is "yes," you made arrangements to |
| 15 | meet with Ms. Kanof about complying with the order, correct? |
| 16 | A.   No, sir. |
| 17 | Q.   Well, I'm confused then. |
| 18 |      You're saying that -- |
| 19 | A.   Well, you're saying that I make -- |
| 20 | Q.   You -- let me ask the question. |
| 21 | A.   You're saying that I make arrangements to comply with the |
| 22 | documents.  No.  We make arraignments that she said, I will walk |
| 23 | with you to deliver the documents. |
| 24 | Q.   Okay.  And that's because the court order requires you to |
| 25 | deliver the documents to the court, right? |

A.   Yes.  Actually, I didn't even think about where to go.  I
thought --

Q.   My question, sir, was --

A.   Yes.

Q.   -- the order required that you deliver the documents to the
court.

A.   Yes, sir.

Q.   Okay.

A.   Yes, sir.

Q.   And you made an arrangement with her to go to her office on
Monday to then turn in those documents?

A.   Yes.

Q.   Okay.  So that you were in compliance with the court's
order?

A.   Yes, sir.

Q.   All right.  And you then go to the U.S. Attorney's Office
on Monday, correct?

A.   Yeah.  What happened is Saturday my mother -- I mean,
Sunday, my mother passed away.  This is the day after my
daughter's wedding and we have about 50 people.  All of her
friends from Houston came and they were going to be there all
day and we were going to start bringing people to the airport on
Sunday.  And they called me around 11 o'clock that my mom passed
away that morning.

          So -- and they also told me that my brother in Mexico

1    made arrangements to do the cremation on Monday right away.

2    Q.   My question was, sir, and then again, I -- you know, I'm

3    sympathetic to your family circumstances, but my question wasn't

4    about that.  My question was, you went on Monday to meet

5    Ms. Kanof with the documents, correct?

6    A.   Before I went on Monday to deliver the documents I called

7    her.  I called her early morning.  I said, we have a situation.

8    My mother passed and I need to go to Mexico right now.  And you

9    and I, we're going to go to deliver the documents today, so,

10   what do I do?  I am under a lot of pressure.  My mother passed

11   and I was crying.  And she says, just bring the documents and I

12   deliver them for you, as a humanitarian effort that I would do

13   for you.

14   Q.   And she told you that she was doing this as a humanitarian?

15   A.   She didn't say that.  I was crying and she said, Fernando,

16   just bring the documents -- oh, I explained to her that I needed

17   to go right away, because they were going to cremate my mother.

18   And my wife, at this time, found a flight from Juarez to Mexico,

19   so I needed to leave right away.  I -- and she says, just bring

20   the documents and I will deliver them for you.  And I run to the

21   courthouse.  I met her in the front.  I give the documents to

22   her and she says go and take care of your mother.  I will

23   deliver the documents for you right now.

24   Q.   And at this point, you were also still concerned about the

25   completeness of the documents, right?

A.   To be honest with you, at this time, all I wanted was to see my mom for the last time before they did the cremation.  I was hoping that I made it on time to Juarez.  I was hoping that --

         I hope with all my heart that you still have your mother, which is a blessing.  I lost mine and it was one of the most difficult times in life.  You don't think straight.  You don't make decisions.  You try to fix the problem and move on and be with your mother.  That was my priority, to be honest with you, that day.

Q.   But you took time out of that to make sure you were following the court's order, because you went to the U.S. Attorney's Office?

A.   Yes.

Q.   You had some moment to think about your compliance with the court order --

A.   I think --

Q.   "Yes" or "no," sir?

A.   Yes, like I said --

         (Witness speaking over counsel.)

Q.   Okay.  And before -- and the Friday before, you were still worried about the completeness of your submission, correct?

A.   No.  To be honest with you, that day, all I wanted was to make sure the documents were delivered on time and I made it to my flight to go to see my mother for the last time.

```
 1    Q.    Okay --
 2    A.    It was the priority for me, sir.
 3    Q.    -- and you --
 4    A.    I didn't even think if it was complete or not anymore.  I
 5    just went and delivered the documents.
 6    Q.    But that's on Monday.  But on Friday, you were still
 7    concerned and asking questions about what you needed to submit,
 8    correct?
 9    A.    Yes.
10    Q.    Okay.  Can you say that louder?
11    A.    Yes, sir.
12    Q.    Okay.  And you had this discussion with Ms. Kanof about
13    your mother passing and your need to get to Mexico, correct?
14    A.    That was on Monday morning, yes.
15    Q.    All right.
16    A.    And I said --
17    Q.    And part of that, you explained to her the details, you
18    know, that you had to leave to Mexico, correct?
19    A.    I just told here, Ms. Kanof, I'm sorry to call you early
20    this morning.  You were going to walk with me to deliver the
21    documents.  My mother passed.  I need to go to Mexico right now
22    and -- and I need to deliver the documents right now.  And she
23    said, Fernando, take care of your mother.  Bring the documents
24    to me and I will deliver them for you.
25    Q.    Okay.  And that -- that helped alleviate your concerns
```

1    about getting this to the court, correct?

2    A.   Well, we'll take care of that big pending thing that I have

3    and that would give me enough time to make it -- I only had

4    about 30 minutes to go, deliver and go to Juarez.

5    Q.   But you felt better about the documents at this point,

6    because you knew that a U.S. attorney was delivering it to the

7    court, right?

8    A.   I -- you are asking me a question, I didn't think they were

9    complete or not.  All I think is that I need to deliver this

10   document and I go to see my mother.

11   Q.   Okay.  But the only person you asked to do this was the

12   U.S. attorney, correct?

13   A.   That's the first person that came into my brain that

14   morning when you're not thinking, when you're not -- again, it's

15   a stress --

16   Q.   I understand, sir.

17   A.   -- that you can't believe it.

18        So the first thing that came to my mind it's --

19   Ms. Kanof is the one asking me all of these questions and all of

20   these meetings, so I thought she's at the courthouse, she's

21   there, so, yes, that's the first thing I did, to call her and

22   said [sic] my mother passed, and she said, deliver the

23   documents; I will deliver them for you.

24   Q.   But you felt better because she was delivering them and not

25   you?

A.   To be honest with you, if you were in the front door and
you offer me to do that thing, I will give them to you --

Q.   Okay.

A.   -- and I wanted --

Q.   My question is you felt better that she was delivering it
instead of you, correct?

A.   I felt better that somebody was delivering the documents,
yes.

Q.   But her, in particular, correct?

A.   If it was anybody from the room, I wouldn't have any
problem.

Q.   She's the only one you asked though?

A.   That's the only person that she came into my mind, yes.

Q.   And the U.S. Attorney's Office is across the street from
this building, right?

A.   Yes, sir.

Q.   About $100 yards away?

A.   Yes, sir.

Q.   Okay.  So why didn't you go right to the courthouse instead
of left to the U.S. Attorney's Office?

A.   Because I wasn't thinking.  My mother passed.  And, yes,
it's a good question how come I didn't do that.  Actually, Jose
Luis, when I met with him on Friday, he asked me the same
question, and said, I don't know.  To tell you the truth, you're
not thinking, you're not making sense of things when your mother

1    pass.  Believe me it's the worst thing that ever happened in my

2    life.  So, yes, I'm not thinking.  Perhaps was -- I don't know.

3    I'm not thinking, sir.

4    Q.   But you had thought previous to this that you'd ask

5    Ms. Kanof, the lawyer, about how to respond.  You had already

6    asked her that, correct?

7    A.   No, sir.  I have never asked her how to respond.  I never

8    asked her how to respond.  I said I have this problem.  I don't

9    have the documents and that's all I have.

10   Q.   Okay.

11   A.   She didn't tell me, well, do this, do that.  She said, you

12   can only collect and give what you have, that's all she said.

13   Q.   And then she took down the information about your mother's

14   passing and you were going to be gone in Mexico, right?

15   A.   Yes.  I told her I needed to deliver -- I mean, yes.

16   Q.   And then she told you that she would make sure the Court

17   knew that, correct?

18   A.   She just told me, I will deliver the documents for you.  Go

19   ahead and take care of your mother.

20   Q.   And let the Court know?

21   A.   I don't know if she was going to let -- probably she said

22   that, yeah.  Probably I would let them know that your mother

23   passed, that you needed to go.  I mean I don't know.

24   Q.   So, yes, the answer is yes, sir, correct?  You said, yes?

25   A.   Yes.

1    Q.    Okay.  And she also went and filed a motion for more time

2    on your behalf explaining all of the details of your mom,

3    correct?

4    A.    I'm not aware of that, sir.

5    Q.    You are not aware of that?

6    A.    That she asked for an extension or something; is that what

7    you're saying, for my documents?

8    Q.    Correct.

9    A.    I don't know what -- what she did.  All I ask her was to

10   deliver the documents.  She offered to deliver the documents.

11   Q.    And then explain to the Court about what had happened?

12   A.    I don't know if she was going to explain to the Court.  I

13   don't know if she knew what happened.  I told her what happened

14   and that was it.

15   Q.    And then the documents are submitted to the Court by the

16   government, correct?

17   A.    I think so.  I wasn't there.  I just gave the documents to

18   her to be delivered.

19   Q.    Well, did you ever follow up and ask?

20   A.    I think I send her a text when I came back from Mexico and

21   I said was the documents delivered, and she said, yes, no

22   problem, something like that.

23   Q.    So you did, correct?

24   A.    Yes, I did.

25   Q.    Did you reach out to your lawyers about the documents in

1   the subpoena?

2   A.   No.  Not anymore.

3   Q.   You didn't need to because Ms. Kanof already took care of

4   that?

5   A.   When they were delivered.

6   Q.   You weren't concerned anymore about complying with the

7   Court's order?

8            MR. GONZALEZ:  Objection, Your Honor.  Argumentative.

9            THE COURT:  Sustained.

10  BY MR. HANSHEW:

11  Q.   At that point in time and leading to today, have you talked

12  to your lawyers about the response to the subpoenas?

13  A.   No, sir.

14  Q.   And why not?

15  A.   It's a done deal.  There's nothing I can do.  We already

16  produced -- we already collect what we have and there's no more

17  documents.

18  Q.   And to be clear, Ms. Kanof did?

19  A.   I'm sorry.

20  Q.   Ms. Kanof did, correct?

21  A.   I was hoping that she did.  She offered to deliver the

22  documents and that's it.

23  Q.   Not hoping.  You know she did?

24  A.   Well, I know she did, yes.

25  Q.   On your behalf?

1    A.   Um, she offered to deliver the documents because of the

2    situation and, yes, she did.

3              MR. HANSHEW:  Judge, may I have a moment?

4              THE COURT:  Yes, sir.

5    BY MR. HANSHEW:

6    Q.   Mr. Gireud, when you provided the documents to Ms. Kanof,

7    had you separated any of those documents into envelopes?

8    A.   No, sir.  I just gave her the documents in a binder just

9    like the one that you have.

10   Q.   Okay.  Did you know that eventually the documents, when

11   they were submitted to the Court by Ms. Kanof, were separated,

12   some of them in envelopes?

13   A.   No.

14             MR. HANSHEW:  No further questions, Judge.

15             THE COURT:  Mr. Gonzalez?

16                     FERNANDO GIREUD,

17             CROSS-EXAMINATION BY THE GOVERNMENT

18   BY MR. GONZALEZ:

19   Q.   Mr. Gireud, you and I met on Friday; is that correct?

20   A.   Yes, sir.

21   Q.   And when we went met, we went over the through the

22   different relationships you've had with other attorneys; is that

23   correct?

24   A.   Yes, sir.

25   Q.   And would you explain to us what you understood when you

```
1    hire -- what it is that it takes to hire an attorney, your
2    understanding; not mine, yours?
3    A.   What is it that it takes to hire an attorney?
4    Q.   Yes, sir?
5    A.   You go ahead and sit down with them, you explain you have a
6    case.  It could be any kind of case.  And you ask to be
7    represented by the attorney and you sign a contract and then you
8    are being represented by an attorney.
9    Q.   Now, was that your understanding or my understanding?
10   A.   That's my understanding.
11   Q.   And did I tell you what it takes to form a contract with a
12   lawyer or did I ask you about that?
13   A.   You asked me about that.
14   Q.   And how many times -- how many different examples did you
15   give me?
16   A.   I think I gave you three examples.  I give you one where I
17   had an attorney to represent me on a case of -- with El Paso
18   Electric, and he work -- we sign a contract and we work on a
19   contingency basis.
20   Q.   What does that mean to you?
21   A.   That he's going to represent me, that he's going to give me
22   opinions, provide legal advise to me, if necessary, and he's
23   going to represent my interest in --
24   Q.   Was that a civil matter or a criminal matter?
25   A.   This was a civil matter, I guess.  This is a -- a labor
```

1    issue.

2    Q.   And what was the other example that you gave him when you

3    hired an attorney?

4    A.   The other example was in a criminal case.  I hired Mary

5    Stillinger and in that situation, again, she draft a contract

6    and it has a fee, so I have to pay her a fee and she was going

7    to represent me with the contract in-hand that she was going to

8    take care of the issue with me.

9    Q.   And I'm sorry.  But going to the first example you gave me,

10   in your mind did you have a contract with that lawyer?

11   A.   Yes, I have a contract.  We signed a contract.

12   Q.   And in the sentence you just gave me, did you have a

13   contract, in your mind, with that lawyer?

14   A.   Of course.

15   Q.   And you gave a third example when you retain an attorney.

16   Would you tell us about that one?

17   A.   Yeah, that was Rene Ordoñez, which is another attorney that

18   is working on the civil cases.  And yes, again, we draft a

19   contract.  We have a contract and there was a fee, and he is

20   representing me in the civil case with that, but we do have a

21   contract, yes, sir.

22   Q.   Have you ever discussed a contract with Ms. Kanof between

23   you and her?

24   A.   No, sir.  No, sir.

25   Q.   Have you ever thought that she represented you?

1   A.   She doesn't representing me [sic].  She doesn't and she

2   never have represented me.

3   Q.   Now, when we met, I asked you to produce two things --

4   A.   Yes, sir.

5   Q.   -- or to look at two things.  What are the first things?

6   A.   You asked me to find out how did I got the subpoena from

7   [sic] and when did I got it, and I told you I believe I got

8   it -- I believe it was to sent to Mary Stillinger and then Mary

9   Stillinger sent it to Rene Ordoñez, which we're talking about

10  attorneys that I have a contract with, and then Rene Ordoñez

11  sent it to me.

12  Q.   So your retained attorneys provided you with that subpoena.

13  It was not Ms. Kanof or Ms. Arreola or anyone else from the

14  government; is that correct?

15  A.   Nobody from the government.  It came from my retained

16  attorneys.

17  Q.   And you received the subpoena in early March; is that

18  correct?

19  A.   Yes.

20  Q.   And were you working on that subpoena to comply with it for

21  those two months, between March and April when it was due?

22  A.   I have -- I had a -- I work for a company.  I work eight

23  hours a day.  I travel a lot in the United States.  So, yes, I

24  was making the time in weekends and all this, I knew I had

25  plenty of time to look for documents.

1    Q.   And during those two months, did you ever talk with

2    Ms. Kanof about the compliance of that subpoena?

3    A.   Never, sir.

4    Q.   Until when?

5    A.   Until -- I think the first time I talked to them about the

6    subpoena was that -- I think that Friday.

7    Q.   Friday.  And they were due on the 11th, so it would have

8    been Friday, April the 8th?

9    A.   Yes, April the 8th.

10   Q.   And just to be clear, whose idea was it to talk to

11   Ms. Kanof?  Was it your request?

12   A.   No.  When I called Agent Fry, that was the first person I

13   call, and he said let me talk to the ladies and that's when they

14   came on.

15   Q.   So it was Agent Fry's suggestion, not yours?

16   A.   It was Agent Fry's.  He was the one that made the

17   conference call.  I did not.

18   Q.   And then the other thing that I asked you to produce was

19   what, sir, when we met?

20   A.   I thought it was to make sure I had the documents with me,

21   and just in case somebody asked, and if I had ever touched the

22   documents and if I have every -- add or delete something, so I

23   said, no.  I just bring those documents.  I think -- I don't

24   have the little note that I have, but I thought it was that.

25            MR. GONZALEZ:  I may I approach the witness, Your

1    Honor?

2              THE COURT:  Yes, sir.

3    BY MR. GONZALEZ:

4    Q.   Mr. Gireud, I'm handing you what's been marked Government's

5    Exhibit 7.  Would you look through that document?

6    A.   Yes, sir.

7    Q.   Do you recognize Government's Exhibit Number 7?

8    A.   Yes, sir.

9    Q.   What is Government's Exhibit Number 7?

10   A.   This is the subpoena requested to collect the documents.

11   Q.   Okay.  What's beneath the subpoena?  Is it the actual

12   documents that pertain to the subpoena?

13   A.   Yes, sir.

14   Q.   And are those -- is that -- when did you produce that

15   record for us?  Did you bring it in this morning?

16   A.   Yes, I brought it.  You asked me to bring the documents in

17   case somebody asked me.  And you told me just bring them exactly

18   the way you left them and that's what I did.

19   Q.   And is that a copy of the records that you provided to

20   Ms. Kanof on or about April 7th?

21   A.   I -- yes, this is -- I -- I give her a package exactly like

22   this.  I went to copy the documents and what they were produced

23   I put them on a binder -- I mean in a rubber band and that's

24   what I gave her.

25   Q.   And that, the document in Government's Exhibit 7, has been

1    in your possession the entire -- this entire time; is that

2    correct?

3    A.   Yes, sir.

4    Q.   It's never been in the government's possession, correct?

5    A.   No, never.  No.

6    Q.   And that's an exact copy of what you gave Ms. Kanof?

7    A.   Yes, sir.  That's my understanding, the copier [sic] was

8    fine, yes, that's should be an exact copy.

9    Q.   And when you produced this, the copy that you gave to

10   Ms. Kanof, did you have Government's Exhibit 7 with you at that

11   time, that Sunday -- I mean, that Monday morning?  Do you

12   understand what I'm asking?

13   A.   No, sir.

14   Q.   You brought her the documents, correct, or you came on

15   Monday with the documents, correct --

16   A.   Yes.

17   Q.   -- that you have government's exhibit with you, the copy?

18   A.   No, sir.  I left my copy in my house and I just brought the

19   copy that was going to be delivered to the court.

20   Q.   And when you handed the documents that were to be delivered

21   to the court, does -- how much time did you spend with

22   Ms. Kanof?

23   A.   Probably one minute or less than a minute.

24   Q.   And where did this meeting occur?

25   A.   In the front of the building of the federal building.  Just

1    as you pass security, the elevator opened and she came up.  I

2    gave her the documents because I was -- I needed to leave, and I

3    said thank you very much for doing this for me.

4    Q.   Did she stand there with you and go through the documents

5    to see?

6    A.   No, sir.  She just told me God bless you, take care of your

7    mom, and I will deliver this for.

8    Q.   Did she pull anything out of that stack of documents that

9    you gave her?

10   A.   No, sir.

11   Q.   Did she give you anything to return?

12   A.   Nothing.  She just -- she just said God bless you, take

13   care of your mom, I will deliver the documents for you.

14        MR. GONZALEZ:  Your Honor, at this time we move into

15   the record Government's Exhibit 7.

16        THE COURT:  Mr. Hanshew?

17        MR. HANSHEW:  No, objection.

18        THE COURT:  GX-7 is admitted.

19   BY MR. GONZALEZ:

20   Q.   Now after you received the subpoena, who did you reach out

21   to?

22   A.   When I got the subpoena?

23   Q.   Yes, sir.

24   A.   I reached out to Mary Stillinger and I reached out to Rene

25   Ordoñez.

1    Q.   And approximately how many different times did you talk to

2    those attorneys about that subpoena?

3    A.   I left a message -- about three messages or four messages

4    to Mary Stillinger and I talked to Rene Ordoñez about two or

5    three times.

6    Q.   But Rene Ordoñez was your civil attorney?

7    A.   Yes, sir.

8    Q.   Did he make it appear to you that he was your civil

9    attorney?

10   A.   Yes, he did.

11   Q.   Did he make it clear he was not your attorney on that

12   subpoena?

13   A.   Yes, sir.

14   Q.   What did he instruct to you do?

15   A.   He asked me to collect as much documents as you can and

16   that's all you can do.

17   Q.   Did he say anything that was essentially different what --

18   for what Ms. Kanof said?

19   A.   No, sir.  No, sir.

20   Q.   And again you testified earlier that you were under a lot

21   of stress.  What were the stressors that you were under?

22   A.   Well, number one, and I'm sorry if I don't put enough

23   priorities, but number one, the health of my mother.  She's been

24   sick and she's getting ill, so I have a lot of pressure on that.

25        Second, my daughter is getting married on April

1    the 9th, and you're combining two huge events in the life of a

2    person; number one, the marriage of a daughter and the

3    illness various [sic] of your mom, and on top of that you add

4    that I -- we've been involved in this case for three years or

5    whatever and we're going to have a -- it's going to happen and

6    then it change, and then it's going to happen and then it

7    change.  And then on top of that, you have a subpoena, a

8    document you have to produce and, uh, uh, I'm sorry, but it was

9    very, very stressful.

10            And at the same time, I have to work ten to

11   eight hours a day with my company, so believe me, I'm not young

12   anymore to do these things or to cope with so many things at a

13   time.  But I did my best.

14            MR. GONZALEZ:  May I have a moment, Your Honor?

15            THE COURT:  Yes, sir.

16            MR. GONZALEZ:  Pass the witness, Your Honor.

17            THE COURT:  Mr. Hanshew?

18            MR. HANSHEW:  Nothing further, Judge.

19            THE COURT:  You may step down, Mr. Gireud.

20            THE WITNESS:  Thank you, sir.  Thank you.

21            THE COURT:  Did you have any other witnesses?

22            MR. HANSHEW:  No Judge.

23            THE COURT:  Mr. Gonzalez?

24            MR. GONZALEZ:  No, Your Honor.

25            THE COURT:  All right.

1              Mr. Hanshew, argument?

2              MR. HANSHEW:  For argument, Judge?

3              THE COURT:  Yes, sir.

4                     ARGUMENT BY THE DEFENSE

5              MR. HANSHEW:  Judge, I'd ask that we incorporate our

6     pleadings that we filed with the Court.  We filed both obviously

7     the motion itself as well as the reply to the government's

8     response, so those are lengthy.  I'm going to try to -- I'll

9     incorporate those by reference and make that part of my argument

10    and try to summarize based on the evidence today, Judge,

11    relating to that.

12             THE COURT:  Okay.

13             MR. HANSHEW:  I think what you saw here questionably

14    is the creation of an attorney-client relationship.  Whether the

15    government's version or Mr. Gireud's purported version today

16    of -- that, you know, we have attorney-client relationship when

17    you sign a contract and pay a fee, we know full well that that

18    is not correct as a matter of law.

19             What occurs when there's attorney-client relationship

20    is when an individual seeks out counsel as it relates to legal

21    matters and responding to, for example, in this case, a legal

22    order, an order from this Court.  That's precisely what we heard

23    that Mr. Gireud did, first to his retained lawyers that he's had

24    in the past to ask questions about how he's supposed to respond,

25    you know, the manner in which he does, the time and place these

1    types of things, the completeness.

2          When he received no response from Ms. Stillinger until

3    a later date, which that date changed, I would note, and/or you

4    know being told by his attorney that he separated out the

5    matters in which he represents him, but then still advises him

6    he needs to comply with the Court's order and be complete and

7    turn in these submissions.

8          He turns to next, the next lawyer that he knows, which

9    was his son, gets a similar response, obviously not feeling

10   satisfied that he's going to be compliant and wants to get

11   assurances who does he turn to lastly?  A United States federal

12   prosecutor a United States attorney.  I mean who could make an

13   individual that's respond nothing a criminal case feel more

14   relieved in.

15         MS. KANOF:  Object.

16         MR. GONZALEZ:  I know this is /R-R misrepresentation

17   of what she just heard the person he reached out to was Agent

18   Fry not in the Kanof.

19         THE COURT:  It's first person he reached out to was

20   Mr.

21         MR. HANSHEW:  The proximate as I for Ms. Kanof, that

22   to get what he needed done in terms of his legal obligation

23   social security absolutely clear that's we are went to.  That

24   actually occurred before and I'm absolutely specific thick to

25   the experience speck thick before his mother passed he already

1    initiated this exact process.  The only thing that changed from

2    you to believe this testimony and credibility which I would call

3    into question as well, Judge; that instead of going and having a

4    protracted meeting on that Monday he supposedly came and had a

5    minute or two whatever it is an just handed off these documents.

6           But at the end of the day he didn't come here to the

7    Court house to do it paws he was told by an attorney, Ms. Kanof

8    to take it to her.  And frankly the stressor of, you know,

9    turning right or left and going -- that doesn't, in my humble

10   opinion, make sense that -- my argument is that, that occurred

11   because who else would better represent you in this matter?  Who

12   else would provide the security of both alleviating his own

13   concerns about whether he's complied and the security of being

14   the intermediary between this Court and himself.  He knew full

15   well that when he sent that to her and had her go take it over

16   and gave all of the explanations about what had happened in his

17   personal life and, also, what had happened in terms of him

18   trying to be as responsive as possible to be compliant, then the

19   United States attorney, Ms. Kanof, of course that's where he

20   went.  It is the last attorney and the only one that actually

21   went through doing the process of what lawyers do, which is

22   finding out the information, representing it to a court, which

23   they did, and filed a motion on his behalf identifying the

24   information that was shared to him as it relates to his real

25   obligation to this Court's order.  There is no question that

1    there was an attorney-client relationship created there; no

2    contract, no fee arrangement, no -- nothing of that.  That is a

3    red herring, Judge.  That, we know.

4            We don't have to look further than the Federal Public

5    Defender Office.  I don't have any contracts or fee agreements

6    and I still represent thousands of people over my career.  That

7    happens all of the time.  One of the things we learn when we're

8    lawyers, even in law school, is the carefulness and

9    thoughtfulness by which a person who's an attorney goes about

10   providing advice and counsel and representation to others.  And

11   there's a reason for that.

12           One, as we put in our motion, one, it's illegal for

13   government attorneys to provide counsel, which they did in this

14   case.  Ms. Kanof provided legal counsel, Judge.  That's a

15   violation there.

16           It also results in an individual, and I understand

17   that he's, you know, he stated here that what he provided is

18   what exactly Ms. Kanof provided, but it's about how he got to

19   that.  It's about how he got to whether he was being compliant,

20   whether his submissions were complete or not.  That's what he

21   spoke with them about.  That's what he got legal advice about.

22           There's a clear relationship.  It's a violation of

23   law.  It's a violation of ethics.  And it's a prejudice to

24   Mr. Delgado in this case.  It's a prejudice, not just in terms

25   of the fact that they've possibly created a scenario where this

1    person didn't turn in everything they could have, because they

2    were advised about certain manners and means to deliver or find

3    information.

4            It also creates a relationship between the U.S.

5    attorneys and Mr. Gireud that the only people that know about it

6    are the people in this courtroom right now, not the jurors who

7    are going to be here in about an hour, who when they see this

8    government, counsel stand up here on direct presumedly and

9    asking Mr. Gireud questions, that doesn't look the same and

10   sound the same and give us the impression as for example if I

11   were to be directing Mr. Delgado.  Every person in that jury, if

12   I'm up here directing Mr. Delgado, is going to know late or not

13   that I'm his attorney and we have an attorney-client

14   relationship and all the things that flow from that.  They're

15   not going to know that when the government is up here asking

16   that.  It's going to just look like another government witness,

17   not a witness that they've developed a bond and, in fact,

18   attorney-client relationship.

19           So, Judge, we would ask the Court to dismiss this case

20   or alternatively exclude the U.S. -- the Western District U.S.

21   Attorney's Office in this case or as an alternative and the last

22   resort at the very least that Ms. Kanof be recused from this

23   case, Judge.

24           THE COURT:  All right.  Thank you, Mr. Hanshew.

25                    ARGUMENT BY THE GOVERNMENT

1          MR. GONZALEZ:  May it please the Court.

2          Your Honor, it really is a sad day when we can't even

3     speak to another civilly when the criminal defense attorneys

4     cannot reach the prosecutors, cannot find out what it is that

5     was turned in, what it is that's missing.  My understanding from

6     the last hearing was that that was their concern that somehow

7     Ms. Kanof took something out of that package of the documents

8     that were turned to the Court this morning.  They could've asked

9     us.  They could have asked if the witness had a copy.  They

10    never asked.  That wasn't their concern.  Their concern was to

11    impugn the integrity of this prosecution.  It's really sad state

12    of as to where we are, Your Honor.  But the Court has the

13    documents.  The Court can compare the documents that were

14    tendered today to what was submitted back on April 11th, Your

15    Honor.  They're all there, Your Honor.

16          There is no reason why Ms. Kanof would do that.  In

17    fact, as you heard today, Ms. Kanof had, as far as any

18    representation of Mr. Gireud, that never occurred.  There were

19    months that went by Mr. Gireud was trying to comply with the

20    subpoena.  He talked to Ms. Stillinger's office.  He tried to

21    speak to her office, but they were not returning that phone

22    call.  That was sad.  Who did he reach out to?  He reached out

23    to Rene Ordoñez.  What did Rene Ordoñez also in essence turned

24    him away, but says, do what you have to do; turnover the

25    documents.  I'm not your attorney on that matter.

1          Mr. Gireud is concerned that he's in compliance -- not

2    in compliance with the Court's subpoena.  What does he do next?

3    He reaches out to his own son, who doesn't represent him on this

4    matter, but "what do I do son."  Can't get ahold of his son

5    either.  What does he do next?  It's the 11th hour.  It's a

6    Friday before the Monday that these documents are due, the day

7    before his daughter getting married, and as it turns out, two

8    days before, his mother dies.  What does he do?  He reaches out

9    to Agent Fry.  He's not asking to speak to Ms. Kanof or to

10   Ms. Arreola.  He's asking to speak to Agent Fry.  For what

11   purpose?  He doesn't know what to do.  He's not asking for

12   counsel.  He doesn't know what to do.  He wants to comply with

13   the Court's subpoena.  What does Kanof do eventually when Agent

14   Fry talks to her?  She has compassion as an officer of the Court

15   to speak to the witness.  Okay.  Bring in what you have.  I'll

16   get it to the Court.  I'll walk you across.  That's all she's

17   doing, Your Honor.  She's working as an officer of the Court.

18   We've all upheld an oath to uphold the Constitution and to

19   follow the laws and that's all she was doing, Your Honor, and

20   yet that somehow was painted to something dirty, something ugly.

21   That's reprehensible, Your Honor.  But, yet, no one really cares

22   about the documents in question.  Do they ever try to find them?

23   No.  They instead want to soil our representations by lodging

24   all of these baseless accusations -- allegations and

25   accusations, Your Honor.

1          Your Honor, you have the documents and you've heard

2     the testimony of the witness.  He never thought he had an

3     employment contract or representation with Ms. Kanof or anyone

4     else with the Government.  Ms. Kanof at the last hearing said

5     the same thing.  There is no meeting of the minds.  There was

6     never a contract.  There was never any legal representation.

7     All she did was try to help produce the evidence and that's all,

8     Your Honor.

9          We would ask that you deny the motion to dismiss as

10    well as the motion to recuse our office.

11          THE COURT:  All right.

12          Mr. Hanshew, did you want to close the argument?

13          MR. HANSHEW:  If I May, Judge.

14                    CLOSING ARGUMENT THE DEFENSE

15          MR. HANSHEW:  Just a reply in turn.

16          With all due respect to Mr. Gonzalez, he clearly

17    didn't read our motion or our reply, because in our initial

18    motion papers, we identified even with headers that the problems

19    involved here weren't just about the ultimate documents.

20    There's headers in here about the unethical relationship, the

21    illegal contact, the violation of law.  So, to stand up here

22    today and start his argument with we thought this was about one

23    singular point, is either an act of purposeful omission or

24    negligence in not being prepared for what the totality of the

25    motion said.  I mean that's an outlandish statement to make when

1    the motion sets forth all of these.  I'm sure that's not missed

2    on the Court.

3            Secondly, what Mr. Gonzalez just explained confirms

4    our main point, which is reaching out to your lawyer, reaching

5    out to your lawyer, reaching out to your son lawyer, reaching

6    out for the same questions and ultimately reaching out.  Sure,

7    they can say Mr. Fry, but that's because Mr. Fry is the point

8    person, but that then turns to Ms. Kanof.

9            And to be clear on this record, Ms. Arreola gave the

10   only response that we all know is the proper response.  That

11   response is go talk to your lawyer.  Did Ms. Kanof do that?  We

12   didn't hear anything about that.  What we heard was, no.  She

13   answered and helped with the problems and concerns that he had

14   after not getting ahold of his lawyer and his other lawyer and

15   his other lawyer.  It's clear, Judge, that relationship was

16   created.  Contracts, fee arrangements do not define an

17   attorney-client relationship.  That's clear and they have

18   conceded it, Judge.

19           So again we ask the Court to grant this motion.

20           THE COURT:  All right.  Thank you, Mr. Hanshew.

21           I'm going to deny your motion to dismiss.

22           My primary concern was the fairness, the Sixth

23   Amendment right to a fair trial that your client holds.  The

24   thing that concerned me most was that there may have been

25   documents produced that were then removed from that which was

1    turned over to the Court.  I'm satisfied after listening to this

2    witness that that did not occur, so I don't have any concerns

3    with the fairness of the trial.

4         I -- I agree that we are all taught in law school that

5    the only proper response to a question by someone who is not

6    your client is hire an attorney.  That's the only advice we're

7    allowed to give.  Anything beyond that is in nebulous grounds.

8    And I'll leave it to the code of -- the Commission on

9    Professional Conduct to determine whether or not there was an

10   ethical violation and I'll leave it to the prosecutor to

11   determine whether or not there was a violation of the law.  I

12   think I can have this trial for Mr. Delgado and provide him an

13   absolutely appropriate Sixth Amendment litigation.

14        If you'd like and you want to open the question about

15   whether or not she represents Mr. Gireud after he testifies,

16   you're welcome to cross him on that issue and submit it to the

17   jury and the jury can decide whether or not there's a

18   relationship there that they should consider in evaluating

19   Mr. Gireud's testimony.

20        With that, I think your client's rights are protected.

21   That's my primary interest.  Anything beyond that belongs to the

22   people that are riding herd on the ethical violations and the

23   criminal violations.  So I'm going to deny your motion to

24   exclude Ms. Kanof from this trial as well as the U.S. Attorney's

25   Office in the Western district.

1          Anything else?

2          MR. HANSHEW:  Nothing further, Judge.

3          MR. GONZALEZ:  No, Your Honor.

4          THE COURT:  All right.  I think we have about

5  45 minutes.

6          Oh, yeah, there was your motion to seal your response

7  regarding the lady who had the DWI, Mr. Gireud in his civil

8  case.

9          MS. KANOF:  That's the motion in limine.

10         THE COURT:  And some man that had an issue because he

11  didn't report a personal relationship to the company.

12         MS. KANOF:  That was our motion in limine, Judge.

13         THE COURT:  All right.  I'm going to grant it as to

14  the person who didn't disclose his personal relationship to the

15  corporation.  The others are matters of record and so I don't

16  see there's any point in doing that on those two.  So in

17  relation to the man, I don't know who he is.  He's one of your

18  witnesses.

19         MS. KANOF:  I have a couple of other questions, Your

20  Honor.  Defense counsel was going to provide to the Court, I

21  guess, the file with regard to the shoplifting --

22         THE COURT:  If he wants to -- if he wants to impeach

23  that person because of -- I can't remember what the issue was,

24  whether --

25         MR. HANSHEW:  She was -- the dispute is whether she's

1    a convicted felon.  We know that she was --

2            THE COURT:  Right.  That's what it is.

3            MR. HANSHEW:  -- arrested for a felony theft for the

4    second time.

5            THE COURT:  Because it was deferred and then the

6    judgment was -- there was an indication there was a finding of

7    guilt, which would not be deferred.

8            MR. HANSHEW:  Correct.

9            THE COURT:  And so --

10            MR. HANSHEW:  Yeah.  So, Judge, this was the one where

11    the Court reviewed the state court docket sheet and it was --

12    and then looked at the order that the government has submitted

13    as an exhibit, which was an order that read that probation and

14    supervision had been terminated.

15            THE COURT:  Well, community super- -- community

16    service.  Community service was terminated.

17            MR. HANSHEW:  Right.

18            THE COURT:  I mean that's telling me that the

19    condition for community service was terminated, not that the

20    community supervision was terminated.

21            MR. HANSHEW:  Right.

22            THE COURT:  So it's kind of messed up.  Did you

23    produce --

24            MR. HANSHEW:  We're still investigating.  As the

25    government said themselves last week, they weren't going to call

```
 1     that witness till later, so the Court --

 2             THE COURT:  They're working on it.

 3             MR. HANSHEW:  -- we've had an opportunity to, you

 4     know, to investigate and try to --

 5             THE COURT:  Yeah, I know that Ms. Kanof had those

 6     cases saying that shoplifting is not a crime of moral turpitude

 7     in that jurisdiction.

 8             I guess it was a Fifth Circuit case you had.

 9             MS. KANOF:  It was, Your Honor.

10             THE COURT:  I don't know.  Maybe, that was from

11     some -- one of those other eastern states, but over here --

12             MR. HANSHEW:  Right.  Yeah, you had mentioned on a

13     similar vein last week, Judge, which is, you know, by anyone's

14     understanding, theft, let alone theft of the magnitude of that

15     value that was involved.  And that was her second theft arrest,

16     by the way, was a crime of moral turpitude.

17             THE COURT:  Right.

18             MR. HANSHEW:  The issue -- the only issue that

19     remained from my understanding, Judge, if we could produce some

20     documents showing that there was a final conviction.

21             THE COURT:  Right.  Right.  Yeah, so that's the issue.

22             MS. KANOF:  Your Honor, may I ask the Court if you

23     have a schedule, a daily schedule so that --

24             THE COURT:  Yeah, today we'll finish at 4:30, give the

25     jurors a chance to go home and get everything straightened out,
```

```
1    and then we'll start art 9:00 to avoid the west-side traffic

2    issue and we'll go to six.

3              MS. KANOF:  Each day?

4              THE COURT:  Each day.

5              MS. KANOF:  And we work a full day Friday?

6              THE COURT:  Yes.

7              MS. KANOF:  Some courts don't.

8              THE COURT:  Oh, okay.  I thought maybe there was

9    something going on.

10             MS. KANOF:  No, no, Your Honor.  In lengthy trials in

11   the past, some judges don't work on Fridays, so they can work

12   their regular docket.  I tried a ten-week trial that was managed

13   that way.

14             THE COURT:  Well, yeah --

15             MS. KANOF:  I just --

16             THE COURT:  -- we're just -- we're going to do our

17   regular docket like from 7:30 to 9:00 every day and then do the

18   trial to 6:00 -- to 6:00, but let's make sure we have enough

19   people to get all the way to 6:00 so it only takes two and a

20   half weeks instead of four.

21             MS. KANOF:  I think it's going to be a little shorter

22   than anticipated, Your Honor.

23             THE COURT:  Oh, okay.  All right.

24             Anything else, Ms. Hanshew?

25             MR. HANSHEW:  No, sir.
```

1              THE COURT:  No, sir.

2              And Ms. Franco, you've been very quiet over there.

3              MS. FRANCO:  Just getting riled up, Judge.

4              THE COURT:  Okay.  All right.  We'll see you-all in

5    about 45 minutes then.

6              COURTROOM SECURITY OFFICER:  All rise.

7              (Break at 8:20 a.m. to 9:00 a.m.)

8                           *  *  *

9              (Proceedings continued in Volume 9(B).)

10                          *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          * * * * *

2            I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.  I

4     further certify that the transcript fees and format comply with

5     those prescribed by the Court and the Judicial Conference of the

6     United States.

7     Signature:/S/KATHLEEN A. SUPNET        December 5, 2018
              Kathleen A. Supnet, CSR        Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25