IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

VOLUME 9(C) of 9(C) OF 20


UNITED STATES OF AMERICA                    EP:13-CR-0370-DG

v.                                          EL PASO, TEXAS

MARCO ANTONIO DELGADO                       September 12, 2016


**STATEMENT OF FACTS**
THE HONORABLE DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Government:   Debra Kanof
                      Anna Arreola
                      Luis Gonzalez
                      Assistant United States Attorney
                      700 East San Antonio, Suite 200
                      El Paso, Texas 79901

For the Defendant:    Maureen Franco
                      Erik Hanshew
                      Assistant Federal Public Defender
                      700 E. San Antonio, Suite 410
                      El Paso, Texas  79901

Court Reporter:       Kathleen A. Supnet
                      El Paso, Texas
                      (915)834-0573
                      kathi.supnet5303@gmail.com



         Proceedings reported by mechanical stenography,

transcript produced by computer-aided software and computer.

2

```
 1                      CHRONOLOGICAL INDEX

 2                     VOLUME 9(C) OF 20

 3   September 12, 2016                        PAGE    VOL.

 4   Announcements. . . . . . . . . . . . . . . 3      9C

 5   Court's Instructions to the Jury . . . . . . . 3    9C

 6   Opening Statement by Ms. Arreola . . . . . . . 8    9C

 7   Opening Statement by Ms. Franco. . . . . . . . 18   9C

 8   Rule Invoked . . . . . . . . . . . . . . . 21      9C

 9   GOVERNMENT'S
     WITNESS TESTIMONY    DIRECT   CROSS    VOIR DIRE PAGE  VOL.
10
     BRIAN CUNNINGHAM    24,39    35       --       --    9C
11
     JOSEPH KEVIN BEDDARD 42                              9C
12
     Court Reporter's Certification . . . . . . . . . 92  9C
13
```

1              (Open court.  Jury present.)

2              (Trial resumes at 2:18 p.m.)

3         THE COURT:  Let the record reflect that all members of

4    the jury are present, the United States is present through its

5    assistant United State's attorneys, defendant and counsel are

6    present.

7              Ladies and gentlemen of the jury, I'll give you some

8    preliminary instructions before we begin our trial.  Now that

9    you've been sworn, I'll give you these instructions that will

10   guide your participation in the trial.  It will be your duty to

11   find from the evidence what the facts are.  You and you alone

12   will be the judges of the facts.  You will then have to apply

13   those facts to the law as I will give you.  You must follow the

14   law whether you agree with it or not.

15             Nothing I may say or do during the course of the trial

16   is intended to indicate or should be taken by you as indicating

17   what your verdict should be.  The evidence from which you find

18   the facts will consist of the testimony of witnesses, documents

19   and other items received into the record as exhibits and any

20   facts that the lawyers may agree to or stipulate to or that I

21   may instruct you to find.

22             Certain things are not evidence and must not be

23   considered by you.  I will list them for you now.  Statements

24   arguments and questions by lawyers are not evidence.  Objections

25   to questions are not evidence.  Lawyers have an obligation to

1   their clients to make objections when they believe evidence

2   being offered is improper under the Rules of Evidence.  You

3   should not be influenced by the objection or by my ruling on it.

4   If the objection is sustained, ignore the question.  And if

5   there was an answer before I ruled, ignore the answer.  If it is

6   overruled, treat the answer like any other.  If you were

7   instructed that some item of evidence is received for a limited

8   purpose only, you must follow that instruction.  Testimony that

9   I have excluded or told you to disregard is not evidence and

10  must not be considered as evidence.  Anything you may have seen,

11  heard or read outside the courtroom is not evidence and must be

12  disregarded.  You are to decide the case solely upon the

13  evidence presented here in the courtroom.

14          In this case, the defendant is charged with three

15  counts of wire fraud in violation of Title 18, United States

16  Code Section 1343, seven counts of international money

17  laundering in violation of Title 18 United States Code Section

18  1956(a)(2)(B)(i), and nine counts of engaging in monetary

19  transactions with criminally derived property in violation of

20  Title 18 United States Code 1957.

21          I'll give you a detailed instruction on the law at the

22  end of the case and those instructions will control your

23  deliberations and decision, but in order to help you follow the

24  evidence, I'll now give a brief summary of the elements of the

25  offense that the government must prove beyond a reasonable doubt

1    to make its case.

2         As to the offense of wire fraud, the government must

3    prove beyond a reasonable doubt that the defendant engaged in a

4    scheme to defraud, that the defendant used or caused the use of

5    wire communications in furtherance of that scheme to defraud and

6    that the defendant acted with a specific intent to defraud.

7         As to the offense of international money laundering,

8    the government must prove beyond a reasonable doubt that the

9    defendant transmitted or transferred funds to a place in the

10   United States from a place outside the United States, that the

11   defendant knew that the funds involved the proceeds of unlawful

12   activity, and that the defendant knew the transmission or

13   transfer was designed to conceal or disguise the nature,

14   location, source, ownership or control of the proceeds of a

15   specified unlawful activity.

16        As to the offense of engaging in monetary transactions

17   with criminally derived property, the government must prove

18   beyond a reasonable doubt that property valued at more than

19   $10,000, that was derived from a specified unlawful activity,

20   that the defendant knew that the property was derived from an

21   unlawful activity and that the defendant knowingly engaged in a

22   monetary transaction with that property.

23        Now, during the course of the trial, you should not

24   speak with any witnesses or with the defendant or with any of

25   the lawyers in the case.  Do not speak to them about any subject

1   whatsoever.  You may be unaware of the identity of every

2   witness, every person connected with this case, therefore in

3   order to avoid even the appearance of impropriety, do not engage

4   in any conversation with anyone in or about the courtroom or

5   courthouse.  It is best that you remain in the jury room during

6   breaks in the trial and do not linger in the hall.

7          In addition, during the course of the trial, do not

8   talk about the trial with anyone else, not your family or your

9   friends or the people that you work with.  Also, do not discuss

10  this case amongst yourselves with your fellow jurors, until you

11  have been instructed to return to the jury room to begin your

12  deliberations on the case.  Otherwise, without realizing it, you

13  may start forming opinions before the trial is over.  It is

14  important that you wait until all of the evidence is received

15  and you have heard my instructions on the rules of law before

16  you deliberate amongst yourselves.

17         You as jurors must decide this case based solely on

18  the evidence presented here within the four walls of this

19  courtroom.  This means that during the trial, you must not

20  conduct any independent research about this case, the matters in

21  the case, the individuals or corporations involved in this case.

22  In other words, you should not consult dictionaries or reference

23  materials, search the Internet, websites, blogs or use any other

24  electronic tool to obtain information about this case or help

25  you decide this case.  Please do not try to find out any

1    information from any source outside of what you hear, here in
2    the courtroom.
3            I'm sure that many of you use cell phones, the
4    Internet and other tools of technology.  You also must not talk
5    to anyone at any time about this case or use these tools to
6    communicate electronically with anyone about the case.  This
7    includes your family and friends.
8            You may not communicate with anyone about the case
9    through any means, including your cell phone, through e-mail,
10   Blackberry, iPhone, text messaging, Snapchat, Twitter, blog or
11   websites, Facebook, Google, Myspace, LinkedIn, YouTube or any
12   other social media, even if I have not specifically mentioned
13   that particular media.  The point is, we don't want you talking
14   to anyone about the case.  You'll have plenty of time to do that
15   once you are discharged as this jury.
16           And I expect you will inform me as soon as you become
17   aware of another juror's violation of these instructions.  A
18   jury who violates these restrictions jeopardizes the fairness of
19   the proceedings and a mistrial could result from that activity,
20   which would require us to begin the entire trial process over
21   again.  And I'll give you a road map to help you follow what
22   will happen over the entire course of this trial.
23           First, the government will make an opening statement,
24   which is simply an outline of what they understand the evidence
25   will be.  Following that, the defendant's attorney has the

1    opportunity to make an opening statement, but doesn't have to.

2    They can reserve their opening statement until they put on their

3    evidence, if they do put on any evidence.  Attorney evidence is

4    not evidence.  They're not arguments.  They're just a detail of

5    what they expect the testimony will be.

6           After the opening statements, the government will then

7    present its witnesses and counsel for defendant may

8    cross-examine those witnesses at the conclusion of the

9    government's direct examination.

10          Following the presentation of the government's case,

11   the defendant may, if he wishes to present witnesses on his

12   behalf, and once he does that, then he will -- when he concludes

13   their direct examination, will pass that witness to the

14   government, who will have an opportunity to cross-examination

15   that witness.

16          After all of the evidence is in, the attorneys will

17   present their closing arguments, where they summarize the

18   evidence to you and give you their interpretation of what that

19   evidence proved.  And following that, I'll instruct you to

20   retire to the jury room where you will begin your deliberations.

21          With that, we will begin with opening statements.

22          Ms. Arreola?

23                 OPENING STATEMENT BY THE GOVERNMENT

24          MS. ARREOLA:  This case is about a corporate lawyer

25   who stole millions of dollars.  That lawyer was the defendant

1    Marco Delgado.

2            In 2010, Delgado's client, a company called F.G.G.

3    Enterprises entered into a contract to supply power generators

4    to the Mexican government utility company, a company called

5    C.F.E.  The contract was for $121 million.

6            The payments under the contract were supposed to go to

7    F.G.G.'s Wells Fargo account right here in help.  Instead, the

8    evidence will show that Delgado submitted a document to the

9    Mexican government directing that the monies instead be sent to

10   an offshore account in the Turks and Caicos Islands where

11   Delgado controlled the money.

12           C.F.E. paid $32 million into the Turks & Caicos

13   account and Mr. Delgado went on a spending spree.  He bought a

14   $375,000 home in the Coronado Country Club.  He bought a condo

15   at a ski resort.  He spent over half-a-million-dollars

16   renovating a house in Mexico, and there were other expenses as

17   well which you will here about in this trial.  And that is one

18   of the reasons -- excuse me -- as a result of Delgado's schemes,

19   the contract between C.F.E. and F.G.G. fell apart and F.G.G.

20   never delivered the turbines to the Mexican government.  And

21   this is one of the reasons we are here today.

22           But first, let me reintroduce the members of the

23   prosecution.  At the government's trial table are Assistant

24   United States Attorneys Debra Kanof and Jose Luis Gonzalez,

25   Paralegal Amy Serrano and Department of Homeland Security

1   Special Agent Joshua Fry and Brian Cunningham.  My name is Anna

2   Arreola.  I'm an assistant United State's attorney.  And my

3   colleagues and I will be presenting the government's case to

4   you.  So, what will the evidence show?

5          In 2009, Mr. Delgado had a client, a company called

6   F.G.G.  F.G.G. was owned by an electrical engineer named

7   Fernando Gireud.  That year, 2009, Delgado helped Mr. Gireud win

8   a contract with the Mexican government's utility company to

9   supply power generators.  That company in Mexico is called

10  C.F.E.  And you'll here that C.F.E. is owned by the Mexican

11  government and it supplies electricity throughout Mexico.

12  C.F.E., by the way, is short for La Comisión Federal de

13  Electricidad or the Federal Electric Commission.

14         Now, back in 2009, C.F.E. had plans to build a power

15  plant at a town in Mexico called Agua Prieta.  In order to build

16  that power plant, C.F.E. needed power generators.  You will hear

17  that power generators or power turbines are equipment that

18  generate electricity, the same electricity that you use at your

19  home to turn on a light or to charge a cell phone.  So, in

20  October, 2009, Delgado helped F.G.G. win a contract with the

21  Mexico government to supply these power generators to C.F.E. and

22  the contract was for $121 million.

23         Now F.G.G. was a new company and it didn't manufacture

24  power turbines.  So where was F.G.G. going to get these power

25  turbines?  The evidence will show that F.G.G. entered into a

1    subcontract with a large company called Mitsubishi Power Systems
2    America.  F.G.G. agreed to purchase the power turbines from
3    Mitsubishi for about $102 million.
4         Now, how was the $121 million that F.G.G. was going to
5    get paid from C.F.E. going to get deposited to F.G.G.?  Well,
6    the contract between the Mexican utility company C.F.E. and
7    F.G.G. contained a schedule of payments, five payments totalling
8    $121 million.
9         The contract between the Mexican utility C.F.E. and
10   F.G.G. also contained a per -- division in the contract that
11   identified the specific bank account into which the payments
12   were supposed to be deposited.  That bank account was at a Wells
13   Fargo here in El Paso and it was held in the name of F.G.G.
14        The evidence will show that Mr. Delgado repeatedly
15   asked F.G.G.'s owner, Mr. Gireud, for signatory authority on the
16   account.  In other words, the authorization to draw money from
17   the account, but Mr. Gireud refused.
18        Now, the first payment that was due to F.G.G. from the
19   Mexico utility company was $20 million and it was supposed to
20   arrive at F.G.G. account on or about March 8, 2010.  But that
21   day came and went and $20 million never arrived in the F.G.G.
22   account.  Instead the evidence will show that the $21 million
23   was paid into that Turks & Caicos' account without Mr. Gireud's
24   knowledge or permission.
25        The evidence will show that Mr. Delgado submitted a

1    one-paged letter to the C.F.E. directing that the monies be

2    deposited into this offshore account where Delgado controlled

3    the money.  This bank account was held in the name of a law firm

4    Skippings and Rutley.

5        The evidence will show that Mr. Delgado was a client

6    of Skippings and Rutley, but that F.G.G. and F.G.G.'s owners

7    didn't know about Skippings and Rutley and had no relationship

8    with Skippings and Rutley.

9        After the first payment arrived in this Turks & Caicos

10   account, the $20 million, Mr. Delgado didn't notify Mr. Gireud

11   that the payment had arrived.  Instead, the evidence will show

12   that a few weeks after this payment arrived, he sent a copy of a

13   fake letter on C.F.E. letterhead to Mr. Gireud and Mitsubishi.

14       The letter indicated that C.F.E. was going to reduce

15   the amount of the first payment from $20 million to $15 million.

16   What Mr. Gireud and Mitsubishi didn't know was that F.G.G. --

17   excuse me -- C.F.E. had already made that first payment of

18   $20 million into the account.  C.F.E. wasn't reducing the amount

19   of the first payment from 15 -- from 20 to 15, because it had

20   already made the first payment.

21       During the course of this trial, you will see the bank

22   records for that Turks & Caicos account.  And you will also see

23   the e-mail that Mr. Delgado sent to Mr. Gireud and Mitsubishi

24   indicating that C.F.E. was going to reduce the amount of the

25   first payment.

1          So, what did Mr. Delgado do with the money in the

2     Turks & Caicos account?  The evidence will show that Mr. Delgado

3     diverted millions of dollars worth of the money and went on a

4     spending spree.  He bought a house for three $375,000 in the

5     Coronado Country Club here in El Paso.  He bought a condo at a

6     ski resort.  He spent over $300,000 at Charlotte's Furniture in

7     El Paso.  He spent $250,000 to university to create a foundation

8     in his name.  He also spent about half-a-million-dollars to

9     renovate his house in Mexico.

10          The evidence will also show that Delgado caused about

11    $700,000 from the Turks and Caicos account to be sent to his

12    accountant here in El Paso.  Her name is Linda Medlock.  And

13    evidence will show that Delgado approached Ms. Medlock and said

14    he was busy traveling and tired of paying late fees, so he asked

15    her for help paying his bills.  He asked her to create an

16    account to help him do that.

17          Well, on the day that he and his accountant were

18    supposed to meet at a Wells Fargo here in El Paso to set up the

19    account, the accountant showed up, but Mr. Delgado didn't.  And

20    so the accountant went ahead and opened the account in her name

21    and the monies began to arrive from the Turks and Caicos

22    Islands.

23          The evidence will show that Mr. Delgado told his

24    accountant that this money coming from the Turks and Caicos

25    Islands was from a line of credit.  In other words, it was money

that he was borrowing from the bank.  The evidence will also show that he repeatedly promised to put his name on the account, but he never did.  The evidence will show that Delgado used money from this new account at Wells Fargo here in El Paso for personal expenses like meals at the Coronado Country Club, donating a pool at his new home and $34,000 in a European vacation.  The evidence will show that like that Turks & Caicos account, this new account at Wells Fargo was not in Delgado's name even though he controlled the money.

What else did Mr. Delgado do with the money?  Well, the evidence will show that the first payment into the Turks & Caicos account, about $20 million, arrived in about March 9th, 2010.  Now, Mr. Gireud and F.G.G. didn't know about the account or have access to it and Mitsubishi didn't know about the account either.  And the evidence will show that Mr. Delgado didn't tell Mitsubishi or F.G.G. about this deposit.  Instead, the evidence will show that a few weeks after that $20 million was deposited, Delgado sent an e-mail to Mr. Gireud and to a Mitsubishi official, in which he claims he was trying to secure the first payment.  In the e-mail, Delgado told Mitsubishi that C.F.E. would pay Mitsubishi directly even though the money was already in the Turks & Caicos account.  And he also told Mr. Gireud that he would receive his fees directly from F.G.G. after F.G.G. got paid.  What Mitsubishi and F.G.G. didn't know was that the money was already in the Turks & Caicos account.

1    On April 1st, Mr. Delgado sent about $11 million to
2    Mitsubishi for the first payment on the equipment contract.  The
3    evidence will show that Mitsubishi was actually owed several
4    million dollars more than that, about $14.5 million for the
5    first payment on the equipment.  And the evidence will show that
6    same day that he sent that payment to Mitsubishi, he also sent a
7    payment to F.G.G. of about $2.1 million.
8    Now, Mr. Gireud didn't know that Delgado was sitting
9    on this money in the Turks & Caicos, so when he got the
10   disbursement, he paid some of the bills at F.G.G., including
11   some of the investors and including his attorney, Marco Delgado,
12   for his legal fees in the amount of $620,000.
13   The evidence will show that after the money was
14   deposited into the Turks & Caicos account, the contract between
15   F.G.G. and C.F.E. fell apart.  F.G.G. didn't have the money to
16   perform its obligations on the contract and it never delivered
17   the power turbines to the Mexican government, which had paid
18   $32 million into the Turks & Caicos account.
19   Ladies and gentlemen, I mentioned earlier that there
20   was another reason that we are here today.  Let me describe that
21   reason.  Under F.G.G.'s contract with C.F.E., the contract in
22   which F.G.G. agreed to provide power generators to the Mexican
23   government, F.G.G. was required to obtain something called a
24   letter of credit.  What is a letter of credit?  Well, a letter
25   of credit is a letter from a bank that would basically guarantee

1    F.G.G.'s performance under the contract.  So if, for example,

2    F.G.G. didn't deliver the equipment or the equipment wasn't

3    working, C.F.E. could demand reimbursement from the bank in

4    order to compensate it for its loss.  In other words, the letter

5    of credit provided a guarantee or a fallback position to C.F.E.,

6    the Mexican utility, in the event that F.G.G. didn't do its job

7    correctly.

8            Now, under the contract F.G.G. was required to obtain

9    a $20-million letter of credit, which meant a letter of credit

10   that provided insurance or a guarantee to C.F.E. for

11   $20 million.  And Mr. Delgado told Mr. Gireud, the owner of

12   F.G.G., that these letters of credit were going to be expensive

13   and cost millions of dollars.  He also told Mr. Gireud not to

14   worry about it, that he would taken care of it.

15           The evidence will show, however, that Mr. Delgado

16   hadn't taken care of it.  He never used the money from the Turks

17   & Caicos to buy the letters of credit.  Instead, he signed an

18   agreement with the Mexican government in which he pledged

19   Mitsubishi's equipment as a substitute for the letters of

20   credit.  In other words, if F.G.G. didn't do its job right under

21   the contract, Mitsubishi's equipment would be at risk.  The

22   problem, ladies and gentlemen, and what the evidence will show,

23   is that Mr. Delgado didn't have Mitsubishi's permission to do

24   that.

25           The evidence will show that Delgado submitted a

1    one-page letter to C.F.E. that was -- had a signature for a

2    senior vice president at Mitsubishi, someone named John Adams.

3    The letter stated that Mitsubishi was authorization a pledge of

4    this equipment.  But the evidence will show that John Adams

5    never signed the letter, never saw the letter, never approved

6    the letter.  And the notary whose signature is on the letter,

7    the evidence will show that she never signed it either.

8           Now that I've stated what the evidence will show, let

9    me tell you a bit about where the evidence will come from.

10   You're going to hear from about 17 or so witness in this case.

11   You will here from, example, from Mr. Gireud, from John Adams

12   and from Mr. Delgado's former accountant, Linda Medlock.  You

13   will see the letter that Delgado signed causing the monies to be

14   sent to that Turks & Caicos account.  You will see the John

15   Adams letter and the pledge agreement that Mr. Delgado signed

16   pledging Mitsubishi's equipment, and you're also going to see

17   the financial records to show how the money was spent.

18          The evidence in this case is going to come in, in bits

19   and pieces, and I have tried in this opening to give you a

20   preview so that you can see how the evidence fits together.  But

21   I can't possibly tell you about all of the evidence that you

22   will hear and see in this case, which is why the government asks

23   you to pay close attention to the evidence as it comes in

24   because you may not be able to evaluate all of its importance

25   until the end of this case.  But at the end of this process,

1    once all of the proof is in, you will see how the proof fits

2    together.

3            The government asks you to do three things in this

4    trial:  To pay close attention to the evidence, to apply the law

5    as instructed by Judge Guaderrama and finally to apply your

6    common sense as you assess the evidence, the same common sense

7    that you use in your everyday lives.  And the government submits

8    that if you do all of that, you will reach the only conclusion

9    supported by the evidence, that the defendant, Marco Delgado, is

10   guilty of the offense as charged in the indictment.

11           THE COURT:  Thank you, Ms. Arreola.

12           Ms. Franco?

13           MS. FRANCO:  Thank you, Your Honor.

14              OPENING STATEMENT BY THE DEFENSE

15           MS. FRANCO:  May it please the Court, counsel.

16           Good afternoon.  I'm proudly here representing Marco

17   Delgado in this case.  And what I would want for you to listen

18   to and pay very close attention to is the reason why the company

19   was formed; F.G.G. was Mr. Delgado was Mr. Gireud had an idea to

20   be able to provide to answer this bid that was up in Mexico for

21   C.F.E. for the turbines, and they had a contact with Mitsubishi

22   to be able to supply the equipment.

23           So, F.G.G. and Mitsubishi came up with a teaming

24   agreement that they would work together to try to secure this

25   bid in Mexico.  The sole purpose for why F.G.G. was formed was

1    to enable Mr. Delgado to get the contract with C.F.E. so that

2    they could get this business.

3          The evidence is going to show that these turbines were

4    already in existence.  Mitsubishi did not have to build them.

5    They were already in business.  They were already in storage.

6    They were supposed to be supplied to a power plant somewhere

7    else and that company had defaulted on them, so they had them in

8    their warehouses.  And Mr. Delgado and Mr. Gireud came up with a

9    memorandum of understanding that you're going to see in

10   evidence.  And when you see this, you'll see that Mr. Gireud was

11   a managing partner of this limited liability corporation, but

12   Mr. Delgado was to get 62.5 percent of the profit of anything

13   that they -- the difference between what the Mexican government

14   was willing to pay for their turbines and what they could buy it

15   from Mitsubishi from.  And also in that memorandum of

16   understanding, it's very clear that Mr. Delgado was supposed to

17   get paid first in the first disbursement.

18         And when you do the math, and I ask you to hang in

19   there while we work through all of this, because these are big

20   numbers, but it's going to show that the amount of money that

21   Mr. Delgado received was in relation to the amount of money that

22   the memorandum of understanding paid for.

23         Please remember what Ms. Arreola said.  Mitsubishi did

24   get paid from the disbursements when Mr. Delgado did direct

25   payment and so did F.G.G.; they got paid as well.  The

1    memorandum of understanding not only called for Mr. Delgado to

2    get 62.5 percent of the profits.  It also reimbursed him for

3    over $400,000 of his investment, his expenses that he put in to

4    make this deal happen.

5         On Mitsubishi, you are going to hear evidence that

6    there's a reason why Mr. Adams is saying that he didn't sign

7    that letter and so we'll get into that during his testimony, but

8    in any case, he did sign the letter.  It was accepted by the

9    Mexican government and it was excepted in lieu of letters of

10   credit, because the machinery didn't have to already be made --

11   built.  It was already built, so this wasn't starting from

12   scratch.  The equipment was already there.  And Mr. Delgado

13   properly registered that pledge.  And the officials from Mexico

14   went to Japan and France, which is where the two turbines were,

15   to inspect them to make sure that they existed, and they

16   accepted the pledge in lieu of the letters of credit.

17        After you hear all of the evidence and you see the

18   memorandum of understanding, you see the special power of

19   attorney that Mr. Gireud signed with Mr. Delgado, which clearly

20   says that he is able to do and act in Mr. Gireud's place, that

21   he could move the bank account, he could change the bank

22   account, he could do whatever he want, because the power of

23   attorney that Mr. Gireud had signed allowed Mr. Delgado to do

24   that.

25        You are going to see the memorandum of understanding,

1    which talks about the fact that Mr. Gireud was supposed to pay

2    and establish an escrow account to ensure that Mr. Delgado was

3    paid timely in that first disbursement.  And when he got

4    rebuffed several times is when Mr. Delgado ensured that his

5    interest in the profits were going to be protected and set up

6    the bank account.

7          Now, the government is going to bring, and they

8    already have evidence about all of the things that Mr. Delgado

9    purchased with the money, but remember, it was his money.  So

10   the fact that he bought a house or he did this or he did that,

11   don't let that inflame and affect what is the right thing to do

12   in this case, which is to find Mr. Delgado not guilty as he had

13   every authority in the world to do what he do did in this case.

14         And the final thing I would like for you-all to know

15   is that those turbines, F.G.G. wasn't able to provide it, but

16   Mitsubishi did so, and those turbines are in Agua Prieta as we

17   speak.

18         Thank you, Your Honor.

19         THE COURT:  Thank you, Ms. Franco.

20         Ms. Arreola, who is your first witness?

21         MS. FRANCO:  Your Honor, we invoke the rule.

22         THE COURT:  If you would bring all of the witnesses

23   that you have up here to the bar.

24         Ms. Franco, do you have any witnesses here?

25         MS. FRANCO:  No, Your Honor.

1          THE COURT:  Okay.  I'll make it your obligation to

2  inform your witnesses of the rule.

3          MS. FRANCO:  Yes, sir.

4          THE COURT:  All right.

5          MS. KANOF:  He's the only one coming.

6          THE COURT:  Well, the rule isn't going to apply to

7  Agent Cunningham.

8          MS. KANOF:  Right.

9          THE COURT:  If you'd raise your right hand.

10          (Witnesses sworn by the Court.)

11          THE COURT:  Thank you.  State your name for the

12  record, beginning with you, Agent.

13          MR. CUNNINGHAM:  Brian Cunningham.

14          THE COURT:  And you, sir?

15          MR. BEDDARD:  Joseph Beddard.

16          THE COURT:  I'm sorry.  Joseph?

17          MR. BEDDARD:  Kevin Beddard, B-E-D-D-A-R-D.

18          THE COURT:  All right.  The rule has been invoked in

19  this case.  That means once you exit the courtroom, you cannot

20  re-enter the courtroom unless you've been instructed to do so by

21  the Court or someone else at the Court's direction.  You cannot

22  discuss your testimony with anyone other than the attorneys in

23  the case nor can you allow anyone else to discuss their

24  testimony or anyone else's testimony with you.

25          Do you understand the rule?

```
 1                 MR. BEDDARD:  I do.

 2                 THE COURT:  All right.  The rule is punishable by

 3      contempt, the violation of it.

 4                 Who's going to be your first witness?

 5                 MS. KANOF:  Many of our witnesses are represented by

 6      counsel.  Is he permitted to discuss anything with his own

 7      counsel?

 8                 THE COURT:  Of course.  Yeah.

 9                 MS. KANOF:  Agent Cunningham is our first witness.

10                 THE COURT:  Sir, if you would remain outside.  We'll

11      call you in.

12                 MS. ARREOLA:  Your Honor, the government requests

13      sidebar.

14                 THE COURT:  Yes, ma'am.

15                 (Bench conference.)

16                 MS. ARREOLA:  Your Honor, at the hearing on Thursday,

17      we talked about the documents that we received pursuant to the

18      MLAT, and the government will be offering Government's

19      Exhibit 1, which are the documents from Turks and Caicos

20      Islands.

21                 THE COURT:  The foreign documents?

22                 MS. ARREOLA:  The foreign documents.  Is there a

23      ruling?

24                 THE COURT:  What was your objection to those?

25                 MR. HANSHEW:  The Crawford objection with our motion
```

```
 1    in limine.
 2              THE COURT:  That'll be overruled.
 3              MS. ARREOLA:  Okay.  Thank you, Judge.
 4              (Bench concluded.)
 5              MS. ARREOLA:  Your Honor, the government offers
 6    Government's Exhibit 1, which are bank records received from the
 7    Central Authority of the Turks and Caicos Islands, pursuant to
 8    Mutual Legal Assistance Treaty between the United States and the
 9    United Kingdom.
10              THE COURT:  And is your objection to that previously
11    stated?
12              MR. HANSHEW:  Yes, Your Honor.
13              THE COURT:  That's your only objection?
14              MR. HANSHEW:  Correct, Judge.
15              THE COURT:  All right.  That's overruled.  GX-1 is
16    admitted.
17              MS. ARREOLA:  Your Honor, the government calls Special
18    Agent Brian Cunningham.
19              THE COURT:  All right.  You may proceed.
20                           BRIAN CUNNINGHAM,
21              DIRECT EXAMINATION BY THE GOVERNMENT
22    BY MS. ARREOLA:
23    Q.   Would you state your name for the record?
24    A.   My name is Brian Cunningham.
25    Q.   How are you employed?
```

A.    I'm a Special Agent with Homeland Security Investigations

here in El Paso, Texas.

Q.    Are you assigned to any particular unit?

A.    Yes, currently I'm in the National Security Investigations

group.

Q.    Okay.  Before being assigned to that National Security

Investigations group, what unit were you assigned to?

A.    I was in financial one.

Q.    And what types of cases do agents who are assigned to

financial one investigate?

A.    Money laundering, structuring, fraud cases, and then you,

also, as the predicate offense, you wind up getting into drug

investigations, alien smuggling, things of that nature.

Q.    I'm going to ask you to take a look at what is already in

evidence as Government's Exhibit 1 in the binder?

A.    Yes, ma'am.

Q.    Do you recognize these documents?

A.    Yes, ma'am.

Q.    What are they?

A.    They are bank records from a Turks & Caicos bank account.

Q.    Okay.  And the Turks & Caicos are in the Caribbean?

A.    Yes, ma'am.

Q.    What is the name on the account?

A.    It is Skippings and Rutley.

Q.    Now, do the bank records that are in Government Exhibit 1,

1    do they show any credits into the account, in other words,

2    monies going into the account?

3    A.   Yes, ma'am, they do.

4    Q.   How many credits are reflected in the bank records?

5    A.   Two.

6    Q.   What are the amounts of those?

7    A.   $20 million and $12 million.

8    Q.   I'm going to ask you to turn to page 79 of Government

9    Exhibit 1.

10             MS. ARREOLA:  And Your Honor, the government requests

11   it be published to the jury?

12             THE COURT:  That's GX-1?  Yes, ma'am.

13             THE WITNESS:  Okay.

14             THE COURT:  Maybe we can zoom in a little.

15   BY MS. ARREOLA:

16   Q.   Can you read from the top of the page the type of

17   transaction that's reflected on this document?

18   A.   Yes, ma'am.  It says it's a wire transfer credit.

19   Q.   Okay.  And what is listed as the date of the transaction?

20   A.   It's March 9th, 2010.

21   Q.   And what is listed as the amount of the transaction?

22   A.   It's $20 million.

23   Q.   Who is listed as the ordering customer?

24   A.   It is Federic Commisso Costos Previous, C.F.E.  Please

25   excuse my pronunciation.

```
 1    Q.    And what is listed as the remittance information?

 2    A.    It is to F.G.G. Enterprises, LLC.

 3    Q.    I'm going to ask you to turn to page 940.

 4              Can you read from the top of the page, the type of

 5    transaction reflected on this page?

 6    A.    Yes, ma'am.  It is a wire transfer credit.

 7    Q.    And what is shown as the date.

 8    A.    It is July 6th, 2010.

 9    Q.    And what is listed as the branch?

10    A.    It is International Corporate Banking, Turks & Caicos.

11    Q.    What is listed as the amount of the transfer?

12    A.    $12 million.

13    Q.    And who is listed as the ordering customer?

14    A.    It is once again Federic Commisso Costos Previous, C.F.E.

15    Q.    And what is listed as the remittance information?

16    A.    It is F.G.G. Enterprises, LLC.

17    Q.    Does the document, that is now in evidence as Government's

18    Exhibit 1, also include debits from the account, in other words,

19    monies being drawn from the account?

20    A.    Yes, ma'am.

21    Q.    I'm going to now ask you to take a look what has been

22    marked for identification purposes as Government's Exhibit 2.

23    Do you recognize it?

24    A.    Yes, ma'am, I do.

25    Q.    What is it?
```

1    A.   It's a summary chart of the Turks & Caicos account.

2    Q.   What information is summarized on what's been marked for

3    identification as Government Exhibit 2?

4         MR. HANSHEW:  Your Honor, there's no authentication,

5    yet, as to where this chart came from --

6         (Court Reporter asks to repeat.)

7         MR. HANSHEW:  There's no authentication as to his

8    knowledge of this document, Judge.

9         MS. KANOF:  Your Honor, we're getting there.  I'm just

10   laying the foundation.

11        THE COURT:  Right.  She's not offering it.  She's just

12   laying the foundation.

13   A.   I'm sorry.  Could you repeat the question?

14   BY MS. ARREOLA:

15   Q.   Yes.  What information is summarized on this chart?

16   A.   It summarizes the date of the transaction, whether it was a

17   credit to the account; if it was a credit to the account, who it

18   came from; and then four debits to the account meaning money

19   going out, the date of that transaction, who it was sent to and

20   any information that was referenced in that wire transfer and

21   then the amount of the wire transfers out of the account.

22   Q.   Did you prepare what's been marked for identification

23   purposes as Government Exhibit 2?

24   A.   No, ma'am, I did not.

25   Q.   Did you verify the information that's regarded in this

1    exhibited?

2    A.   Yes, ma'am, I did.

3    Q.   How did you do that?

4    A.   I reviewed the documents in Government's Exhibit 1, in

5    order to verify the transaction in this chart.

6    Q.   Okay.  Does the information -- does what's been marked as

7    Government Exhibit 2 fairly and accurately summarize the

8    information that's in Government Exhibit 1?

9    A.   Yes, it does.

10   Q.   Does this chart, what's been marked as Government Exhibit

11   2, does it contain any analysis?

12   A.   No, ma'am.

13            MS. ARREOLA:  Your Honor, the government offers what's

14   been marked for identification as Government Exhibit 2.

15            THE COURT:  Mr. Hanshew?

16            MR. HANSHEW:  No, objection Your Honor.

17            THE COURT:  GX-2 is admitted.

18            MS. ARREOLA:  May we publish, Your Honor?

19            THE COURT:  Yes, ma'am.

20            MS. ARREOLA:  Your Honor, may we also put these on an

21   easel?

22            THE COURT:  Sure.  Do you have an easel?

23            MS. ARREOLA:  We're going to be setting that up, but I

24   am going to continue to ask questions.

25            THE COURT:  Mr. Hanshew, if you need to leave your

1    seat so you can view the easel, you are welcome to do that.

2              MR. HANSHEW:  I'm assuming it's going to be the same

3    thing, hopefully.  Thank you, Judge.

4    BY MS. ARREOLA:

5    Q.   Agent Cunningham, can you walk us through the different

6    columns on this chart?

7    A.   Yes, ma'am.  The first column is the date of the

8    transaction, whether it was a debit or credit regardless.  The

9    second column is if it was a credit to the account, meaning

10   money coming in and who sent it.  The third column here is if it

11   is a credit to the account -- excuse me -- again, money coming

12   into that account, what the total dollar amount into the account

13   was.  The fourth column is if it's a debit transaction, meaning

14   money going out of the account, who it was sent to and then also

15   if there was a memo line with some of the information that might

16   be included there.  And then the final column is for the debits,

17   meaning again the money going out of the accounts, what the

18   dollar total was.

19   Q.   And how is the information sorted on this chart?

20   A.   By date, chronologically.

21   Q.   Okay.  You testified previously there were two credits

22   reflected in the account.  Are those shown on this exhibits?

23   A.   Yes, ma'am, they are.

24   Q.   Okay.  Can you identify where they are?

25   A.   You bet.  Right there and right there, 12 million and

1    12 million in the third account or third column.  Excuse me.

2    Q.   Okay.  You said 12 million and 12 million?

3    A.   They're 12 million and 20 million.  Excuse me.

4    Q.   Okay.  Where does the rest of the chart -- where does the

5    rest of the information on this chart come from?

6    A.   Oh, the documents in Government's Exhibit 1.

7    Q.   Okay.  And are those from wire debit advices?

8    A.   Yes, they are.

9    Q.   I'm going to ask you about a few line items on this chart.

10   Can you please take a look at page 26 of Government Exhibit 1?

11           Okay.  Can you explain, and I'm going to try to do

12   these side by side, but their difficult to explain.

13           MS. ARREOLA:  Your Honor, may the witness approach the

14   boards?

15           THE COURT:  Yes, ma'am?  Is he going to be pointing to

16   the chart.

17           MS. ARREOLA:  Yes, sir.

18           MR. HANSHEW:  Judge, I'm going to take you up on that

19   offer, if I can.

20           THE COURT:  Okay.  Sure, absolutely.

21   BY MS. ARREOLA:

22   Q.   Okay.  And if you look at this screen page 826 from

23   Government Exhibit 1 that's showing on the screen, can you

24   explain how the information from this page, from Government

25   Exhibit 2, is reflected on Government Exhibit 1?

1    A.   Yes, ma'am.  So, this is a debit wire debit to the account,

2    so a transfer of money out of the account.  It shows the date,

3    which is going to be April 1st, 2010, that's reflected on the

4    chart right here.  The total dollar amount is going to be

5    $11,321,093, and it is going to be from Mitsubishi Powers -- or

6    excuse me -- it's from the Turks & Caicos account and it's being

7    sent to Mitsubishi Power Systems Americas, Inc.

8              MS. ARREOLA:  Okay.  And when the witness said, right

9    here, may the record reflect that he was pointing to the board

10   that is Government Exhibit 1?

11             THE COURT:  Any objection to that, Mr. Hanshew?

12             MR. HANSHEW:  No, Your Honor.

13             THE COURT:  The record will so reflect.

14   BY MS. ARREOLA:

15   Q.   So I'm going to ask you to take a look at page 1070, which

16   is showing on the screen from Government Exhibit 1.  Can you

17   explain how this information is reflected on Government Exhibit

18   2?

19   A.   Yes, ma'am.  The date of the transaction -- excuse me -- is

20   December 10th, 2010.  It is a debit, so again money coming out

21   of the account in the form of a wire transfer.  The total amount

22   is going to be $200,000, and it's going from the Turks & Caicos

23   into -- to Charlotte's, Inc., and that is 5411 North Mesa,

24   El Paso, Texas, and that is reflected right here on the chart.

25             MS. ARREOLA:  Your Honor, may the record reflect that

1    the Agent has pointed to the line item to Charlotte's dated

2    December 10th, 2010, on the summary chart that's been marked

3    as -- excuse me -- that's been marked as Government Exhibit 2.

4              THE COURT:  Mr. Hanshew?

5              MR. HANSHEW:  There's multiple Charlotte's lines.

6              THE COURT:  He's objecting, because there's multiple

7    Charlotte's lines.

8              MS. ARREOLA:  Yes, Your Honor, but not multiple ones

9    that have the same date.  The agent was just pointing to the one

10   that is dated December 10th, 2010.

11             THE COURT:  Mr. Hanshew?

12             MR. HANSHEW:  That's fine, Judge.

13             THE COURT:  Okay.  The record will so reflect.

14             Just can we cover the thing about the date?  To me,

15   that's October 12th of 2010, but I know maybe in Europe they put

16   the month -- I mean could you explain that's what -- in case

17   there's any --

18             MS. ARREOLA:  Yes.

19   BY MS. ARREOLA

20   Q.   Agent, the Turks and Caicos Islands, are they a British

21   territory?

22   A.   Yes, they are.

23             THE COURT:  And so that's why the date --

24   BY MS. ARREOLA

25   Q.   Is that why the date is reversed?

1    A.    Yes.    Because the way that they write the date in Brittain

2    or England is the day, then the month, then the year, so the

3    10th is the tenth day of the month.    The next number is 12, so

4    December and then finally the year 2010.

5                 THE COURT:    Thank you.

6    BY MS. ARREOLA

7    Q.    I'm going to ask you to take a look at page 456 of

8    Government Exhibit 1.

9                 Can you explain how this information on page 456 is

10   reflected on the summary chart?

11   A.    Yes, ma'am.    First of all, it's another wire transfer

12   debit, again, the money going out of the account.    The day of

13   the transaction is going to be March 17th, 2001.    It's from the

14   Turks & Caicos account.    It is for $152,000 and it is being sent

15   to First New Mexico Title an Abstract Company, Taos, New Mexico,

16   and is reflected on the chart right here.

17                MS. ARREOLA:    And Your Honor, may the record reflect

18   that the agent has pointed to the March 17th, 2011 transaction

19   on Government Exhibit 2.

20                THE COURT:    Mr. Hanshew?

21                MR. HANSHEW:    No, objection, Judge.

22                THE COURT:    The record will so reflect.

23   BY MR. ARREOLA:

24   Q.    I'm going to now ask you to take a look at page 171 of

25   Government Exhibit 1.    Can you explain how the information on

1    this page is explained on Government Exhibit 2?

2    A.   Yes, ma'am.  Once again this is another wire transfer debit

3    to the account.  So it is dated March 30th, 2012.  It is for a

4    total of $46,655, and it is being sent to Rudolph Chevrolet and

5    referencing Marco Delgado, and it is reflected on the chart

6    right here.

7              MS. ARREOLA:  Your Honor, may the record reflect that

8    the agent has pointed to the March 30th, 2012 line item to

9    Rudolph Chevrolet on Government Exhibit 2.

10             MR. HANSHEW:  No, objection.

11             THE COURT:  Record will so reflect.

12             MS. ARREOLA:  No further questions, Your Honor.  The

13   government passes the witness.

14             THE COURT:  Thank you, Ms. Arreola.

15             Mr. Hanshew?

16             Can the agent have a seat or are you going to want him

17   at the chart?

18             MR. HANSHEW:  I don't need the chart, Your Honor.

19             THE COURT:  All right.  Okay.  Go ahead and have your

20   seat then.

21             MR. HANSHEW:  No.

22                         BRIAN CUNNINGHAM,

23              CROSS-EXAMINATION BY THE DEFENSE

24   BY MR. HANSHEW:

25   Q.   Agent, in order to get the information for this chart, you

1    went through a bunch of bank records, right?

2    A.   Yes, sir.

3    Q.   Okay.  But you indicated you weren't the one that created

4    the chart?

5    A.   No, sir, I was not.

6    Q.   Who created that?

7    A.   I am not sure.

8    Q.   Okay.  You have no idea who created it?

9    A.   I'm not sure.  It was sent to me by Special Agent Fry, but

10   I don't know if he created it.

11   Q.   You didn't ask to verify the voracity of this, the source?

12   A.   Sir, I did verify the transactions based off of the records

13   from the Turks & Caicos account.

14   Q.   Okay.  Why didn't you make your own chart then?

15   A.   It was the one that was provided to me.  I was just asked

16   to verify it.

17   Q.   Okay.  And I guess to the best of your knowledge, because

18   you don't know who created this, what documents did they use to

19   create it?

20   A.   The documents contained in Government's Exhibit Number 1,

21   the bank records from the Turks and Caicos Islands.

22   Q.   Okay.  But those aren't complete, right?

23   A.   I'm not -- I'm sorry, in Exhibit 1?

24   Q.   Correct.

25   A.   Oh, no, those are not all of the documents that were

1   received.

2   Q.   Right.  Because the government received thousands of pages

3   of documents?

4   A.   I'm not sure how many they are, but they are quite a few.

5   Q.   When did you first get on this case, sir?

6   A.   I assumed the case in December 2014.

7   Q.   Okay.  And so from December 2014 to today, your testimony,

8   have you had a chance and opportunity to review all of the

9   documents?

10  A.   Yes, sir, I did review all of the documents in that

11  request.

12  Q.   Okay.  And how many pages are there of the banking records?

13  A.   Several.  I can't speculate as to how many there would be

14  in.

15  Q.   Over a thousand?

16  A.   I can't say, sir.

17  Q.   Could you physically describe the amount of documents?

18  A.   It was a stack, probably that big, just off the top of my

19  head.

20  Q.   So a stack about that big, as Government Exhibit 1 is only

21  this big, right?

22  A.   Yes, sir.

23  Q.   So there's a bunch of documents that aren't included then?

24  A.   Yes, sir.

25  Q.   What's not included?

1   A.   Other transactions and statements that are relevant to that

2   account.

3   Q.   Okay.  And who decided to not show those to this jury?

4   A.   I'm not sure.

5   Q.   You don't know who excluded them?

6   A.   No, sir.

7   Q.   Okay.  You didn't have any part in that?

8   A.   No, sir.

9   Q.   All right.  Now you testified today about a bunch of, as

10  you said, bank documents and these transactions, do you have an

11  academic background in banking?

12  A.   I have a business management degree.

13  Q.   Okay.

14  A.   And I have -- also, I have my serious three stocks

15  and commodities or commodities and futures license.

16  Q.   Okay.  And you would agree commodities ands futures is a

17  completely different profession than banking, correct?

18  A.   Yes, sir.

19  Q.   They have nothing to do with one another?

20  A.   Well, they both involve money, but they are different.

21  Q.   So your studies from that didn't train you to review and

22  analyze these particular type of bank documents?

23  A.   Uh, no, sir.

24  Q.   I'm sorry?

25  A.   No, sir.

```
1    Q.   Do you know why the person who created these charts isn't
2    here?
3    A.   No, sir, I don't.
4    Q.   So, the best way to characterize these would be that this
5    is a cheat sheet to be able to explain a larger volume of
6    documents?
7    A.   Yes.  My understanding is it's the transactions that are
8    most relevant to the case.
9    Q.   Okay.  Most relevant meaning there could be other documents
10   that are relevant?
11   A.   Possibly.
12   Q.   Do you know?
13   A.   No, sir I don't.
14   Q.   Okay.
15            MR. HANSHEW:  One moment, Judge?
16            THE COURT:  Yes, sir.
17            MR. HANSHEW:  Nothing further, Judge.  Thank you.
18            THE COURT:  Ms. Arreola?
19                       BRIAN CUNNINGHAM,
20            REDIRECT EXAMINATION BY THE GOVERNMENT
21   BY MS. ARREOLA:
22   Q.   Agent Cunningham, who is is the account holder for the
23   Skippings -- for this account that you verified the information
24   for?
25   A.   Skippings and Rutley, their attorneys.
```

1    Q.    And were there other client's information reflected in

2    those bank records that were received?

3    A.    Yes, ma'am.

4    Q.    And those other client's records are not reflected, are not

5    contained in Government Exhibit 1; is that right?

6    A.    That is correct.

7              MS. ARREOLA:  Your Honor, the government offers the

8    entire packet of material received from the Central Authority of

9    the Turks and Caicos Islands as Government Exhibit 159.

10             MS. KANOF:  No.  Make it 1-A.  Yeah.  Just make it 1-A

11   because it's part -- it's a subset.

12             THE COURT:  All right.  So GX-1A is the entire record?

13             MS. ARREOLA:  Yes, Your Honor.

14             MS. KANOF:  And we're looking for a government's

15   exhibit sticker, Your Honor.

16             THE COURT:  Mr. Hanshew, any objection to GX-1A?

17   Those are the entire records.

18             MR. HANSHEW:  Obviously, they haven't showed it to us

19   or had an opportunity --

20             THE COURT:  Can you show those to Mr. Hanshew?

21             I'm assuming you used -- saw these in discovery.

22             MS. KANOF:  We did show it to him before and

23   (indiscernible) in discovery, Your Honor.

24             MS. ARREOLA:  Yes, Your Honor.  And Mr. Hanshew has

25   had an opportunity to inspect them at our office.

```
1              MR. HANSHEW:  Judge, we, I guess, object that these
2    were never marked as an exhibit before trial.
3              THE COURT:  Well, I'm going to --
4              Ms. Arreola, did you have a response?
5              MS. ARREOLA:  Yes, Your Honor.  He's asked the agent
6    about the rest of the documents and so he's made it relevant.
7              THE COURT:  All right.  I'm going to overrule the
8    objection and admit GX-1A.
9              MS. ARREOLA:  Your Honor, no further questions of this
10   witness.
11             THE COURT:  Mr. Hanshew?
12             MR. HANSHEW:  I'd just ask for an opportunity to
13   review the entirety before it goes to the jury, Judge.
14             THE COURT:  Sure.
15             MR. HANSHEW:  Thank you.
16             THE COURT:  I'm assuming that you've had that through
17   discovery, you said.
18             MR. HANSHEW:  Right, but --
19             THE COURT:  You just want to make sure those are them,
20   there's not something new?
21             MR. HANSHEW:  Exactly, Judge.  We didn't get this
22   design.
23             THE COURT:  All right.  Any other questions of Agent
24   Cunningham, Mr. Hanshew?
25             MR. HANSHEW:  No, sir.
```

```
 1              THE COURT:  You may take your seat.
 2              THE WITNESS:  Thank you, Your Honor.
 3              THE COURT:  Ms. Kanof, who is your next witness?
 4         MS. KANOF:  The government calls Kevin Beddard.
 5              (Witness previously sworn.)
 6         THE COURT:  Ms. Kanof?
 7         MS. KANOF:  May I proceed, Your Honor?
 8         THE COURT:  Yes, ma'am.
 9                    JOSEPH KEVIN BEDDARD,
10              DIRECT EXAMINATION BY THE GOVERNMENT
11   BY MS. KANOF:
12   Q.   State your name for the record please, sir?
13   A.   Joseph Kevin Beddard.
14   Q.   And how are you employed?
15   A.   I'm the director of my own company, a consulting company
16   now.
17              THE COURT:  If I could ask you to roll into the
18   microphone a little bit, kind of lean in to it when you answer.
19              THE WITNESS:  Oh, okay.
20              THE COURT:  We'll be able to hear you better.  Thank
21   you, sir.
22              THE WITNESS:  Thank you.
23   BY MS. KANOF:
24   Q.   You were sworn to tell the truth a few minutes ago,
25   correct?
```

1   A.   Correct.

2   Q.   Okay.  Now, you were starting to say how you're employed?

3   A.   At the moment I have my own consult agency business called

4   Pete Grove Limited based in the U.K.

5   Q.   Okay.  You don't sound like you're from this country.

6   Where are you from?

7   A.   I'm originally from the U.K.

8   Q.   The U.K.?

9   A.   Yes.

10  Q.   And where in the U.K. are you from?

11  A.   A place called Teeside.

12  Q.   Is that T-E-E-S-I-D-E?

13  A.   Correct.

14  Q.   And where is Teeside?

15  A.   It's in northeast of England.

16  Q.   And what is your, you said your company was called Pete

17  Grove?

18  A.   Correct.

19  Q.   Okay.  And what business -- kind of business is Pete Grove?

20  A.   I do a consult agency in the power, and at the moment I am

21  contracted with Mitsubishi Power Systems America on a

22  consultancy basis.

23  Q.   Okay.  How long have you been in this business?

24  A.   In the power business, since 1976.

25  Q.   What kind of education do you have related to the power

KATHLEEN A. SUPNET, CSR

```
1    business?
2    A.   My schooling was a secondary modern.
3    Q.   Secondary modern?  What is that --
4    A.   I think it would be high school, I think, here, would be
5    the same.
6    Q.   I'm sorry.  I talked over you.  I apologize.
7              What kind of school?
8    A.   It would be a stead school similar here for the public.  I
9    think that's what I mean.
10   Q.   Like high school or...
11   A.   Yes, you go up to 15, and then I went to college, Longlands
12   Technical College.
13   Q.   Okay.  And technical college it's still a four-year
14   university type school?
15   A.   It's a technical college, which is you specialize into like
16   myself, mechanical engineering, so I did mechanical engineering
17   for four years, but on a day release.  So I went to work and
18   then I got released to go to college for one day and three
19   nights a week.
20   Q.   Okay.  So this kind of college that your went to was a
21   combined apprenticeship and education, would that be fair?
22   A.   Yes.
23   Q.   And you finished that education and that apprenticeship; is
24   that correct?
25   A.   That's correct, yes.
```

1    Q.    And when did you finish it?

2    A.    Around 1973.

3    Q.    Okay.  And after that, were you considered an engineer?

4    A.    No.  I would be a technician.

5    Q.    A technician?

6    A.    Yeah.

7    Q.    So, what kind of apprenticeships were you doing while you

8    were on day release?

9    A.    Basically, I was doing an apprenticeship for a millwright

10   fitter, Tanner (phonetic), which is to utilize all machine tools

11   and to maintain and install rotating equipment.

12   Q.    Okay.  You are saying rotating equipment, correct?

13   A.    Correct.

14   Q.    Okay.  And that was many, many years ago.  If you don't

15   mind me asking, how old are you?

16   A.    I'm 63.

17   Q.    Okay.  You're not the only one in this courtroom.  There

18   are three of us that are 63?

19   A.    Oh, thank you.

20   Q.    And so have you been in this industry regarding rotating

21   equipment your entire professional career?

22   A.    Basically, yes.

23   Q.    Okay.  What is rotating equipment?

24   A.    Rotating equipment is any equipment that revolves; pumps is

25   classed as rotating equipment, compresses rotating equipment,

1    turbines, engines; and basically anything that twirls is

2    rotating equipment.

3    Q.   By turbines, what do you mean?

4    A.   Turbines at that time was steamed turbines and it involved

5    steam turbine as a driver of pumps, compresses, et cetera, and

6    then later on it was to drive generators into power.

7    Q.   Okay.  So did -- for many years, did you travel all over

8    the world learning different aspects of your specialty?

9    A.   I did.

10   Q.   Okay.  Let's just try to hit the highlights that give

11   you -- that bring you to the courtroom today, if that's

12   possible.

13        Did you ever have -- when you started -- well, first

14   of all, when you came out of school, what was the first aspect

15   of your engineering that you or your business that you tried to

16   learn?

17   A.   Basically, I wanted to expand the knowledge to find out in

18   which sector of engineering I was best suited and enjoyed most.

19   So they -- I went into light industry, initially, from the

20   petrochemical, because I was in the petrochemical environment.

21   Q.   And did you work for someone or did you have your own

22   consulting firm then?

23   A.   No, I worked for people.  So I went into Light Engineering,

24   which is packaging, right, which was Lyons Tetley, and I was

25   there --

```
1    Q.    That's the name of the company?

2    A.    Yes.  And --

3    Q.    Lyons Tetley?

4    A.    Yeah.

5    Q.    Is that Tetley of Tetley Tea?

6    A.    Exactly, because it was machines producing tea bags, and I

7    looked after them high speed packaging machine as well as the

8    behind the scenes where they blend the tea products, because you

9    get multiple tea.  It doesn't make one tea.  You have to have a

10   blend of tea.

11   Q.    And after your light year, your touch with Light

12   Engineering, did you learn anything about offshore drilling?

13   A.    Basically, I left there and I went off to the Ninian Field

14   for a company called Wilson and Molten from U.K.  And I was

15   assigned, was (indiscernible) to John Brown Turbines from Clyde

16   side.  That was my initial thing to gas turbines driving

17   generators.  And I was in the Ninian Field and I was installing

18   two Nancy-type gas turbines.

19   Q.    Okay.  And where were you installing these gas turbines?

20   A.    On the rigs in the north sea on the Ninian Field.

21   Q.    Okay.

22          MS. FRANCO:  Your Honor, I'm sorry to interrupt, but I

23   don't know what the relevance of all of this is, unless she's

24   proffering him as an expert.

25          THE COURT:  That's what I'm assuming.
```

1              MS. KANOF:  I'm not so much proffering him as an

2     expert to give special scientific knowledge.  I'm proffering him

3     as an expert to know what happened in this case.  He

4     participated in this case.  He was working for Mitsubishi at the

5     time and he developed an expertise about this particular

6     equipment.  And so I'll try to go a little bit faster, but I

7     think it's important that he has a superior expertise with this

8     particular equipment in this case.

9              THE COURT:  So he's an expert on the equipment.

10             MS. KANOF:  On this equipment.

11             THE COURT:  Okay.  So --

12             MS. FRANCO:  Your Honor, they never noticed us that he

13    was an expert.  We thought was a fact witness in the case.

14             MS. KANOF:  Well, he's very much a fact witness.  He's

15    on tens of hundreds of e-mails.  And he talked endlessly with

16    the defendant.  And I'm not tendering him as an expert, because

17    I'm not going to ask him about expertise.  But I think it's

18    important that he knows his stuff, I guess is the best way to

19    put it.

20             THE COURT:  Right.  But if he's a fact witness, he's a

21    witness to the facts and his background really isn't all that

22    helpful to us.

23    BY MS. KANOF:

24    Q.   Did you develop over the years extensive knowledge of

25    rotating equipment including turbines?

1            MS. FRANCO:  I'm sorry, Your Honor.  Did you sustain

2     my objection?

3            THE COURT:  I did.

4            THE WITNESS:  To answer your question --

5            MS. KANOF:  No, he -- the Court --

6            THE COURT:  He can answer that one last question.  I

7     think we got the idea that he knows about turbines.

8            THE WITNESS:  Yes, for the installation commission of

9     the turbines, yes.

10    BY MS. KANOF:

11    Q.   Did you ever go to work with Mitsubishi?

12    A.   Yes, I did.

13    Q.   When was that?

14    A.   Directly for Mitsubishi was in 2000 -- maybe, 2005.

15    Q.   Did you have contact with Mitsubishi and work at the

16    Mitsubishi plant in Japan prior to that?

17    A.   Yes.

18    Q.   And when was that?

19    A.   Basically my first association with Mitsubishi was in 1992,

20    when I put eight of their gas turbines, installed them.  And

21    then I was then --

22    Q.   Who were you installing Mitsubishi's gas turbines for?

23    A.   Enron.

24    Q.   Enron?

25    A.   Yes.

1    Q.    Where were you installing them?

2    A.    In Teesside.

3    Q.    That's your hometown?

4    A.    That's correct.

5    Q.    And how -- and did you have to go to Mitsubishi in order to

6    be permitted to do that?

7    A.    No, not for the Teesside project, but the subsequent

8    project where Mitsubishi, they actually split or divided from

9    Westinghouse, and they went on their own technology.  And they

10   got their first project in Europe, in Holland.  So there, asked

11   me would I go to Japan and be tested, for example, am I capable

12   of putting their machine, right, for them in Europe, which I

13   did.

14   Q.    Is there a difference between a turbo generator for -- to

15   be installed in Japan and one to be installed in Mexico?

16   A.    No.  It depends on which technology you are using.

17   Basically, the units in Mexico were F. Technology, which is old

18   technology.  The technology nowadays, we're up to J. now, which

19   is advanced efficiency.

20   Q.    At some point in time, were you offered a job by Mitsubishi

21   in the United States?

22   A.    Yes.

23   Q.    When was that?

24   A.    Basically, after the Dubai project from Mitsubishi,

25   which finished in 19- --

1   Q.   You were in Dubai?

2   A.   For Mitsubishi, yes.

3   Q.   What were you doing for Mitsubishi in Dubai?

4   A.   I was installing six gas turbines.

5   Q.   And after you did that, they asked you to do what?

6   A.   Basically, because the Dubai project was a very intense

7   project, I was given the portfolio of Mitsubishi of all of the

8   projects, and the they asked me to pick one, which I would like

9   to do.

10  Q.   And where did you end up?

11  A.   I didn't end up at the one I picked.  I ended up in Dallas,

12  Texas.  Well, outside of Dallas, Texas, in a place called

13  Grandbury.

14  Q.   Grandbury?

15  A.   Yes.

16  Q.   How long were you there?

17  A.   Two-and-a-half years.

18  Q.   And were you installing turbines?

19  A.   Yes.

20  Q.   For a power plant?

21  A.   Yes.  Two of them.

22  Q.   And then what happened with regard to your employment with

23  Mitsubishi?

24  A.   They asked me to go down to headquarters in Lake Mary and

25  would I start setting up construction.

1    Q.   Is that Lake Mary, Florida?

2    A.   Correct.

3    Q.   Okay.  And Mitsubishi had a business there at that time?

4    A.   Yes.  They started a U.S. entity there and then the

5    president was known to me and I was going to go out to --

6    Q.   Wait.  The president of?

7    A.   Mitsubishi Americas.

8    Q.   I'm sorry?

9    A.   Mitsubishi Power -- well, Mitsubishi Heavy Industries

10   America, at the time.

11   Q.   Okay.

12   A.   And the they asked me would I in between going to North

13   Cairo in Egypt.  I had a project already assigned to me, my next

14   one, over in Japan, and they asked us to stay there six weeks.

15   And I was in two --

16   Q.   He asked you to stay in Lake Saint Mary, Florida, for six

17   weeks?

18   A.   Yes, to set up some construction procedures.

19   Q.   And what happened?

20   A.   Well 15 years later, I'm here.

21   Q.   Okay.  So when did you move to Florida?

22   A.   Basically, 2003.

23   Q.   And when you got to Mitsubishi in Lake Mary, Florida, did

24   you get hired by Mitsubishi to work directly for them in the

25   United States?

```
1    A.   Not initially, because I wanted to keep as a contractor.

2    Fussaya (phonetic), it was the president, as I mentioned --

3    Q.   Can you spell his name for the court reporter, please?

4    A.   Oh, God, I couldn't.

5    Q.   You can't.  Okay.

6    A.   It begins F-U-something, right.  They kept pestering --

7    Q.   We'll put "phonetic" next to it.

8    A.   Okay.  (Indiscernible).

9    Q.   That's fine.  Go ahead.

10   A.   And he kept asking me, right, he says I'm putting a

11   transfer in for you; would you object?  Meaning, moving from

12   M.H.I. Takasago in Japan to the states.

13   Q.   So you are talking about the president in Japan that asked

14   you --

15   A.   No, no, the president in Lake Mary of the Americas.

16   Q.   Okay.

17   A.   Was -- kept asking me.

18   Q.   So when did you become a Mitsubishi employee?

19   A.   2005.

20   Q.   Okay.  2005.  And what was your title?

21   A.   Basically then construction manager.

22   Q.   Okay.  And what were your duties, when you got to

23   Mitsubishi were hired as a construction manager, who was the

24   senior vice president of Mitsubishi in Lake Mary?

25   A.   That was Hector Ponce.
```

1    Q.    And who was the vice president of sales?

2    A.    That would be John Adams.

3    Q.    And what were your duties and responsibilities at the plant

4    in Lake Saint Mary, Florida?

5    A.    Well, it's the headquarters.  And I think, my agreement was

6    to develop a construction erection team from local, meaning,

7    U.S., personnel and train them in the Mitsubishi procedures and

8    how we put the machines in.  So we would not need the Japanese

9    technicians coming from Japan, which is very costly, to the

10   states where we have quality here.

11   Q.    Okay, did they actually manufacturer turbines in Florida?

12   A.    No.  But we ended up manufacturing parts of the gas turbine

13   like combustors and blades there.

14   Q.    Okay.  So, once you had -- did you do that, did you put

15   together a team?

16   A.    It was -- and it's still a work in progress.

17   Q.    I'm sorry.  I didn't understand.

18   A.    It's still a work in progress.

19   Q.    A work in progress?

20         Now, is there anything else you did for Mitsubishi?

21   Were they -- where they antiquated in any way or did you have to

22   change anything?

23   A.    Yeah.  As we developed and we started building up the

24   construction team, and then it went on to the commissioning team

25   and then it went on to projects, one of the biggest issues we

1    had was that 95 percent of the manufacturing of all the

2    equipment was done in Japan, and it was put on ships and coming

3    to the states.  So at that time, John Adams was now my boss, if

4    you like, so he gave me the (indiscernible) to customize and to

5    modulize that equipment and then actually get it manufactured

6    here, but in a module basis, so we could reduce the erection

7    time, make it more cost efficient.  So I developed the balance

8    of planned equipment which is the axillaries to the turbine.

9    Q.   Okay.  So you have a turbine and then you have axillaries;

10   is that correct?

11   A.   Correct, correct.

12   Q.   All right.  So by 2009, did you have a new title?

13   A.   Yeah, I then -- well, several titles -- I went to director

14   of construction, then I went to general manager of projects and

15   finally V.P. of all projects.

16   Q.   Okay.  So what different -- John Adams was the vice

17   president of sales, correct?

18   A.   (Nodding head affirmatively.)

19   Q.   Is that yes, sir?  You have to speak.

20   A.   Oh, sorry.  Yes.

21   Q.   Okay.  And you were in projects; is that correct?

22   A.   Correct.

23   Q.   How does projects interact -- and by the time, when you

24   were the general manager of projects was John Adams still your

25   boss?

A.   Um, yes in the early parts.  But what had happened was
construction and commission and projects, we would come under
engineering, so our V.P. was an engineer from Japan.  And then
when John moved over, he took over that reign, so everybody
reported to John.  So that was the change in reporting
structure.

Q.   Okay.  What is the gray market?

A.   The gray market is stock units or -- I mean stock units,
which we've already manufactured, and the sale went bad, so they
never went and got delivered, or a project we got delivered, all
of the equipment to the project and project did not materialize.

Q.   So, for example, in your average contract, is the turbines
preexisting?

A.   No.

Q.   Okay.  So say El Paso electric company ordered turbines
from Mitsubishi, would they have to be built?

A.   Correct, manufactured.

Q.   Okay.  But in the gray market, if there's perhaps a turbine
that's been built for another project it might fit what El Paso
Electric needs; is that correct?

A.   In layman term, but there's a lot more nuances of that.

Q.   Go ahead and explain it, please.

A.   The turbine will be still be the same, the engine, but
auxiliaries, right, will not, because what we have to look at is
the technical specification.  Every location has it's own

1    nuances, so we have to look at what we call a "site speck."  In

2    that site speck we'd have the seismic zone.

3    Q.   Okay.  What's a seismic zone?

4    A.   It's where there's earthquakes or not and where it's level.

5    So what we have to do is make sure our equipment and all

6    axillaries are strong enough, right, for that environment.  And

7    basically with that we have building codes, and there's two that

8    we uses, which is the I.B.C., International Building Code and

9    U.B.C. Code.  And then they're set out what needs to be done, so

10   by code we have to build it.  And then there's wind loading and

11   snow loading, right, basically it has got to be strong enough

12   for hurricane, right, with it --

13   Q.   In some places?

14   A.   In some places --

15   Q.   We don't usually get hurricanes in El Paso, but in some

16   places, right?

17   A.   Okay.

18   Q.   But I know you got them in Florida, right?

19   A.   And then the other one is like wind loading and snow

20   loading, because of the wind -- the snow actually is a hell of a

21   wisp, you know, so if you got a roof and you got six inches of

22   snow on it, you got a real dead weight coming down, so we have

23   to make sure the structure is domed for that.  So -- and also

24   the last one is temperature, because our gas has to go into the

25   gas turbine and stay in temperature, so the gas turbine can

1    actually operate, it doesn't stop with it.  So there's all of

2    these nuances that have to be looked at.

3    Q.   At sometime did you get approached by John Adams about a

4    possible contract with a company -- with the Mexican-owned

5    electric company, C.F.E., or did he just approach you and not

6    tell you who it was for?

7    A.   Yeah, yeah.  See, I don't get involved in those things.  I

8    just get things done.

9    Q.   You are not bothered about what?  I'm sorry?

10   A.   Basically, where they go and what they are.  I just need

11   the specification, whatever it is, we're going to go there and

12   do a good job, build it and make sure that it operates, right --

13   Q.   Okay.

14   A.   -- because that's our brand -- well, was our brand for

15   Mitsubishi, right.  But John come to us and asked me to do an

16   estimate, right, and could I put an estimate together for a two

17   and one, gray and market.

18   Q.   What's a two and one?

19   A.   Two gas and one steam turbine.

20   Q.   And is the two and one a pretty common combination of

21   turbines to generate electricity?

22   A.   In the U.S., yes.

23   Q.   Okay.  And it's two what kind and one what kind?

24   A.   Well, it's two gas turbines, depending on the technology,

25   as I've just said, was it this one with an F. Technology, which

1    was a gray market.  Well, I've just finished a year previous one

2    or assisted plan to that and -- in Minneapolis, St. Paul, two

3    and one plant there for excel energy.

4    Q.   Okay.  So two of them generate gas and other one is what

5    kind?

6    A.   No, the two gas turbines generate electricity --

7    Q.   Okay.

8    A.   But actually the exhaust gasses actually are then used into

9    an H.R.S.G., a kettle if you like, so it's a heat source and so

10   it boils up the kettle, steam comes out of the kettle, and then

11   we use that steam in the steam turbine, so it makes the process

12   very efficient if we have a two and one.

13   Q.   So two gas and one steam?

14   A.   Correct.

15   Q.   And sometimes the steam is called "vapor"?

16   A.   Uh, well, in Spanish, yes.

17   Q.   Okay.  So John Adams came to you and asked you to prepare

18   and estimate and what did he want an estimate for?

19   A.   Because there was a potential of a project in Mexico,

20   right, could I get the best figures to him.

21   Q.   Okay.  And what do you have to estimate?

22   A.   Basically, again, I'd estimate the equipment, what needs to

23   be there, what is there, what isn't there, find out what I need

24   to do, what I need to upgrade on basic units.

25   Q.   Were you looking at specific preexisting gray market

1    turbines?

2    A.   Yes.  They already purchased two gas turbines and one steam

3    turbine from a French company called A.D.F.

4    Q.   Okay.  So let's go back.

5            You knew that there were three turbines, two of them

6    were steam or two of them were gas and one was steam; is that

7    correct, that already were in existence?

8    A.   I knew about them, yes.

9    Q.   Okay.  And you knew what models they were, correct?

10   A.   I knew they were F. Technology.  I didn't know what the

11   manufacturing time was when that was manufactured.

12   Q.   Why is it impossible -- why is it important to know when

13   they were manufactured?

14   A.   Because as we develop, we improve, so we have modifications

15   and we call them prod-mods (phonetic).  And when there's a

16   prod-mod (phonetic) developed, right, it then says that it has

17   to go in the next machine.  So I have to look when the machine

18   was manufactured and when we're going to deliver, right, and

19   say, right, that leaves all of these prod-mods on it to go out,

20   so when it leaves the factory again, right, it has all of the

21   modifications in.

22   Q.   So, you knew that there were three existing turbines that

23   had been created for another purpose; is that correct?

24   A.   Yes.

25   Q.   Okay.  And were they supposed to go to Mexico originally?

1    A.    No, they were supposed to go to Brazil.

2    Q.    They were supposed to go to Brazil.

3          And you didn't know how old they were, correct?

4    A.    Not at that time.

5    Q.    Were they new or had they been used?

6    A.    Uh, they were -- well, they weren't new, but they'd never

7    been used.   There was no fired hours on there.

8    Q.    Okay.   There's no what hours?

9    A.    "Fired," meaning that we set the gas up.

10   Q.    Okay.   They've never -- they've never generated electricity

11   before?

12   A.    Correct.

13   Q.    Okay.   And -- but John Adams identified that these three

14   turbines that originally were built by Mitsubishi to go to

15   Brazil, he wanted you to give him an estimate to do what?

16   A.    To refurbishing what we need to get an estimate and what it

17   would cost.

18   Q.    Okay.   So you were going to give Mr. Adams an estimate of

19   what it would cost to refurbish these three preexisting

20   turbines, correct?

21   A.    Correct.

22   Q.    Do you know where they were stored?

23   A.    Yes.   The two gas turbines were stored in the factory in

24   Takasago.

25   Q.    They were -- I'm sorry?

A.    The two gas turbines were in Japan at our factory.   The
steam turbine was in storage at Dunkirk, France.

Q.    Is that because France was the intermediary for the Brazil
project?

A.    No, because France A.D. F., it was a French company, owned
the turbines, that's who we bought them of, right.

Q.    Okay, so what does it take to refer -- what went into the
estimate?

A.    Basically, what I would do then is because of the prod-mods
and that -- and I'd look, we'd have to open the casings, inspect
all of the blades and everything and all of --

Q.    Do they rust?

A.    Basically, I'm not supposed to say that, but, yes, they
can.

Q.    Well, you are under oath, Mr. Beddard.

A.    I know.

Q.    Do they rust?

A.    In certain parts they can -- you can get corrosion.

Q.    Okay.  And if they do, you have to clean that up, correct?

A.    We have to, yes.

Q.    But you have to check first?

A.    Yes.

Q.    And what else do you have to do to refurbish other than try
to get rid of that kind of problem?

A.    Well, we've got to look at the equipment, the auxiliary

1    equipment, again, right, when they were supplied and who

2    supplied them, who was the vendor who supplied the

3    (indiscernible) pump.

4             (Court reporter asks for clarification.)

5             THE WITNESS:  The lube, L-U-B, lube.  Lubrication

6    is --

7             THE COURT:  Lube and oil pump?

8             THE WITNESS:  Yeah.

9    A.   So we have to look at the vendor and does the vendor still

10   support, right, that piece of equipment, because what we have to

11   look at is that we have to give a warranty, right, and sometimes

12   it's one year two-year warranty, after we finish the erection

13   and commission of it.  So that could be a period of four years

14   or five years in some cases, so what we got to look at, we

15   supported by the vendor who supplied us that piece of auxiliary

16   equipment that it still supports that as we go.

17   Q.   Now, you --

18            THE COURT:  Mr. Kanof, if I can stop you there so we

19   can take a break.  We'll be in recess for ten minutes.  If you

20   would be back at five minutes 4:00, we'll resume our proceedings

21   then.

22            COURTROOM SECURITY OFFICER:  All rise.

23            (Break taken at 3:46 p.m. to # p.m.)

24            (Jury present.)

25            THE COURT:  Let the record reflect that all members of

KATHLEEN A. SUPNET, CSR

1   the jury are present, the United State's assistant attorneys are

2   present, the defendant and his counsel are present.

3            Ms. Kanof?

4            MS. KANOF:  May I proceed, Your Honor?

5            THE COURT:  Yes, ma'am.

6            MS. KANOF:  Thank you.

7                      JOSEPH KEVIN BEDDARD,

8                  DIRECT EXAMINATION CONTINUED

9   BY MS. KANOF:

10  Q.   Mr. Beddard, we were talking about this estimate that you

11  had to make.  And before you told the jury about difference in

12  the gray market, you had to look at the equipment because there

13  are differences for the auxiliaries relating to location that

14  the generators are going to be placed, correct?

15  A.   Yes, it is.

16  Q.   Okay.  So the two in Japan and the one in France that you

17  were going to give estimates to Mr. Adams about to refurbish,

18  what were they originally -- where were they supposed to go,

19  originally?

20  A.   They were supposed to go to a place called (indiscernible)

21  in Brazil.

22            (Court reporter asks for clarification.)

23            THE WITNESS:  Paracommy (phonetic) in Mexico -- in,

24  Brazil.

25  Q.   In Brazil.

1          Okay.  And if I asked to you spell it for the court

2     reporter, could you do that?

3     A.    P-A-R-C-E-M-I -- oh, God.

4     Q.    Okay.  Close enough.

5          So, did Mr. Adams tell you where these particular

6     units would possibly now be going?

7     A.    Mexico.

8     Q.    Okay.  And -- so what kind of what kind of research did you

9     have to do in order to create your estimate for refurbishing

10    these machines for Mexico instead of Brazil?

11    A.    Yeah, well, I did a budget reestimate, basically, because I

12    just completed a similar project in St. Paul on a two and one

13    and it turned out with the same vintage.  For budget repair

14    purposes, I used that and brought the actual historic bid from

15    that to build up an estimate, because we don't know if we're

16    going to win, right, so for the estimating purposes --

17    Q.    So what goes into that budget?

18    A.    Basically, I split up the gas turbines and the steam

19    turbines in the systems, right, and the gas turbine, we normally

20    have 100 systems, and each system has a designated number, so I

21    go through each one them, what its technical is and an estimate

22    end, and then go through each one section and then end up with a

23    total -- a grand total for both gas turbine and steam turbine.

24    Q.    Okay.  When you do an estimate, do you also have to know

25    when the equipment has to be ready?

1    A.    Basically, yes.  The shipment -- the shipping is crucial

2    for scheduling-wise, because the refurbishment was in Japan, the

3    gas turbines, I have to find a slot within the factory, because

4    there's manufacturing slots, so if there's orders going in, I --

5    we have to work out a slot where we can put that gas turbine in.

6    So I have to ask Japan, where is my slots, and they'll come back

7    to me, when do you need the machine, and that would be the

8    delivery.

9    Q.    Okay.  And also does it also make a difference whether or

10   not the equipment is going to be used right away or whether or

11   not the equipment is going to be used a year from then?

12   A.    Yes, because we have different storage times.  We have a

13   short term, which is basically for ocean and going in.  It's

14   basically for one year, I think.  And then we have the long term

15   storage procedure, which actually goes up to about five years.

16   Q.    So, if a piece of equipment is refurbished -- is it

17   refurbished before it's shipped or after it's shipped?

18   A.    In the gray market, I'll make that decision whether it's

19   cost effective.  And if I ship it from the other side of the

20   world, right, especially with the shipping and the docks and how

21   they handle things, is it going to get damaged?  So am I going

22   to get damage at the other end?  So then I would make a judgment

23   call to say, no, don't touch it, bring it across the pond.  I'll

24   do it here on this side and then it will go to the other side.

25   Q.    With regard to refurbishment, are their temperature

```
 1   differences between Brazil and Mexico?
 2   A.   Oh, the specification, the -- I think it was
 3   solicitation -- was spelled out.  You needed to do minus
 4   19.5 degrees C.  That was the temperature that we were told to
 5   look at.
 6   Q.   In Mexico or in Brazil?
 7   A.   In Mexico.
 8   Q.   And were the generators made for a different temperature in
 9   Brazil?
10   A.   Big time -- sorry -- yes.
11   Q.   So minus 19 degrees celsius --
12   A.   Right.
13   Q.   -- in other words, in Agua Prieta, Mexico, it gets colder
14   in Mexico than it does Brazil?
15   A.   Correct.
16   Q.   So you have to change, do something to the turbines to
17   account for that, correct?
18   A.   The auxiliaries.
19   Q.   Okay.  To the auxiliaries to the turbines, correct?
20   A.   Yes.
21   Q.   Okay.  And were there size differences between Brazil and
22   Mexico?
23   A.   Yes.
24   Q.   And were the other?  I forget, already.
25   A.   Wind loading.
```

1  Q.   Wind loading.  And were there wind loading differences

2  between Brazil and Mexico?

3  A.   They were slight, but not as -- not to affect the design.

4  Q.   So we talked a little bit about whether it's the -- a long

5  term shorts -- storage -- or short term storage, was this going

6  to be short term or long term?

7  A.   It was short term.

8  Q.   And so did you get your estimate from Mr. Adams?

9  A.   Yes.

10 Q.   And what happened next?

11 A.   I stepped out of the picture, because it's not my --

12 Q.   You just tell him, here's how much it would cost?

13 A.   Basically, yes, right.

14 Q.   Based on what you knew?

15 A.   Correct.

16 Q.   Okay.  And did you ever hear that -- so you didn't know

17 what was going on in the project at that time, did you?

18 A.   No, just water cooler talk, you know, they're still talking

19 in Mexico, okay.

20 Q.   Did you ever hear of -- at that time, did you hear who in

21 Mexico wanted these turbines?

22 A.   No.

23 Q.   Did you hear whether there was any other company involved?

24 A.   I did hear, but as I said before, I administered a contract

25 and I implement --

1    Q.    What do you mean you administer the contract?

2    A.    It means that a contract is given to us.  We check that

3    contract and is it a workable contract, and then we actually

4    administer that to that contract.

5    Q.    In November of 2009, what did you learn with regard to the

6    estimate and the work that you had done on these three gray

7    market turbines?

8    A.    I got told that the bid had been accepted.

9    Q.    Okay.  And what does that cause you to do to prepare for

10   your job?

11   A.    Basically, what I would look at then is to try to look at

12   tentative schedule and then what manpower I have available, so I

13   can schedule people from other projects into that project.

14   Q.    Okay.

15   A.    And also visas, because it's in Mexico.

16   Q.    I'm sorry?

17   A.    Also, I have to look at the visa, right, so we have to look

18   at that because it's international.

19   Q.    Okay.  And that -- is that visa for personnel --

20   A.    Yes.

21   Q.    -- that you might have to send?

22   A.    Correct.

23   Q.    Okay.  So you're responsible for all of that?

24   A.    Yes.

25   Q.    All right.  Did you ever hear that the project succeeded or

1    that you got the project?

2    A.   I got told that the bid was accepted.  But in normal

3    projects in respect to the gray market, then the engineers and

4    the contract's commercial people get together and then they talk

5    and then they finalize.

6    Q.   Okay.  So what do you mean in normal projects of gray

7    market equipment, they get together; who gets together?

8    A.   Basically, the commercial people.

9    Q.   Okay.  Who are the commerce people.

10   A.   Basic sales and commercial, the marketing people get

11   together.  And the legal, they formulate a contract, right.

12   Q.   And then you administer that contract?

13   A.   Correct.

14   Q.   Okay.  So before -- was a contract formulated, to your

15   knowledge?

16   A.   Uh, some paper was formulated in my knowledge.

17   Q.   Why were you hesitant to say, yes, a contract?

18   A.   Because a contract has four corners to it and what I was

19   seeing didn't have four corners to it.

20   Q.   Okay.  If -- you have in front of you some notebooks.  Do

21   you have in front of you Government's Exhibit Number 12?

22   A.   On the screen?

23   Q.   I don't know if is projecting to you.

24   A.   Yes.

25   Q.   12A?

```
 1    A.    12A.

 2    Q.    12A.  Because it's in English, correct?

 3    A.    (No response.)

 4    Q.    Government's Exhibit 12 is Spanish.  Government's Exhibit

 5    12A is in English.

 6              And do you recognize this subcontract?

 7    A.    Yes.

 8    Q.    Did you have to review this in order to do your job?

 9    A.    Yes.

10    Q.    What is it?

11    A.    Yes, I had to --

12    Q.    What is this?  What is this --

13    A.    Obviously this is the base contract or the index to your

14    contract, which gives the administration things, but it should

15    then give pointers to annexes in the contract.

16    Q.    Okay.  So let's go back just a second.

17              Is government's Exhibit 12 and 12A the contract

18    between F.G.G. and Mitsubishi to sell Mitsubishi's turbines to

19    F.G.G., so they could sell them to C.F.E.?

20    A.    Well, I don't know about the afterwards, but, yes, there's

21    a contract between -- a subcontract with equipment supply only.

22    Q.    Okay.  Now, when you say "equipment supply only," why do

23    you say that?

24    A.    Basically, we don't supply anything outside of what's in

25    our technical scope of supply with it.  And also, you
```

KATHLEEN A. SUPNET, CSR

1    normally -- there's a delivery point.  This contract didn't have

2    that.  So you go to what they call a termination called X-works

3    (phonetic); that somebody else has to pick it up, right, and

4    somebody else has to ship it.

5    Q.   So, normally, you would deliver the turbines to Mexico, but

6    this contract didn't provide for that?

7    A.   (No response.)

8    Q.   And is that one of the reasons it's -- you didn't want to

9    call it a contract?

10   A.   No.

11   Q.   Oh, okay.  Why didn't you want to call it a contract?

12   A.   Well, in contracts, when we review, we have to have -- I

13   don't know how to put it -- a big stake, right, basic

14   termination, right, you know, so if said actions are not done or

15   add [sic] on country to contract, we can bring it in a bridge

16   and a termination of the contract.

17          This so contract, the one that was presented, did not

18   have any termination with it.  It had, you know, go to

19   arbitration in Mexico City, I think it was, if I can remember.

20   But it didn't have a stake, so, you know, what can I do?

21   Q.   Well -- so you said you have to basically put the contracts

22   into motion?

23   A.   Yes.

24   Q.   The paperwork.  Let's call it the paperwork into motion.

25   And one of those agreements was Government's Exhibit 12A, which

1     is the English version of Government's Exhibit 12.  Let me show

2     you Government's Exhibit 12, just so you can verify that it's

3     the Spanish.

4            By the way, do you have any idea why two United States

5     companies entered into a subcontract in Spanish?

6     A.   Uh, (indiscernible), I don't know.

7     Q.   No?  Okay.  But it -- I have in front of you, I'm

8     displaying to you Government's Exhibit 12, which is the Spanish

9     version.  And do you --

10           You don't speak Spanish do you?

11    A.   No.

12    Q.   Okay?  But you do generally recognize -- I'll put, for

13    example, page one, the declarations; do you recognize they have

14    the same numbering and headings that are similar to the one in

15    English?

16    A.   Correct.  We move admission of Government's Exhibit 12 and

17    12A, Your Honor.

18           THE COURT:  Ms. Franco?

19           MS. FRANCO:  No, objection, Your Honor.

20           THE COURT:  GX-12 and 12A are admitted.

21    BY MS. KANOF:

22    Q.   Okay.  With regard to Government's Exhibit 12A -- we've put

23    the English version of that up -- it's called procurement of two

24    gas turbo generators and one turbo steam generator, site Agua

25    Prieta II, subcontract for the procurement of goods and annexes.

1    So this is -- is this the first document you've looked to --

2    well, before we talk about this document, once there was a

3    contract, do you have any input into the acceptance of that

4    contract?

5    A.    Yes.

6    Q.    Tell the jury about that?

7    A.    Within our S.O.P., Standard Operating Procedures, there's a

8    turnover from sales and marketing commercial to projects, so

9    there has to be a turnover meeting, and then the sales and

10   marketing people have to tell us the problem areas, right, and

11   we go through it, and then we accept that contract as projects,

12   so we --

13   Q.    Who is we, projects?

14   A.    Projects accepted.

15   Q.    So sales and marketing is John Adams and his people,

16   correct?

17   A.    Yeah, and commercial.  And commercial was not, you know, I

18   can't remember what Ueki-san, a Japanese, was the V.P. --

19   Q.    U-E-K-I, correct?

20   A.    That's correct, yeah.

21   Q.    Ueki?

22   A.    I could spell that one.

23   Q.    And -san is just a title that you give somebody out of

24   respect, correct?

25   A.    It's like we do "Mr.," it's "-san," right.

1    Q.   So Mr. Ueki -- go ahead.

2    A.   Was the V.P. of commercial.  So he would be doing and his

3    team would be doing the commercial part of it and then we'd have

4    the legal team doing the legal part of it.

5    Q.   Okay.  So you have commercial, you have sales, you have

6    legal and you have projects; that is correct?

7    A.   Yes.

8    Q.   And they, once they have the contract, you have the option

9    to accept or decline the project; is that correct?

10   A.   Yes.

11   Q.   Okay.  Why do you have all of that power?

12   A.   Because once I -- I don't know, but I wrote the S.O.P., I

13   suppose.

14   Q.   You gave yourself that power.

15   A.   Basically, yes.  We need a contract that's workable, right,

16   and we can administrate it, and what we received from this was

17   not anywhere near a contract.

18   Q.   But initially you thought you could administrate this

19   contract?

20   A.   No.

21   Q.   No.  But you accepted it?

22   A.   No.

23   Q.   What happened?

24   A.   I come with this into February of 2010, with it, and the

25   contract was still not --

```
1    Q.   Okay.  Let's not jump ahead, because we're still in
2    November.
3    A.   Oh, okay.
4    Q.   And you've given an estimate, you hear that you got the
5    contracts, they turn it over to projects --
6    A.   No, no, no.  No.
7    Q.   Okay.
8    A.   The contract was not formulated then.
9    Q.   We're talking about the contract between F.G.G. and C.F.E.?
10   A.   No, no.  Our contract.  Our subcontract --
11   Q.   I'm sorry.  Go ahead.  I'll let you talk.
12   A.   -- our subcontract.  This was not formulated to my
13   knowledge till December.
14   Q.   Correct.
15   A.   Right.  Not in November.  From November to December, the
16   commercial, the legal and the sales would have been talking with
17   the client to formulate the contract as such.
18   Q.   Did you do a risk analysis to determine whether or not you
19   could implement the project?
20   A.   I did, in February.
21   Q.   Okay.  And let me ask you who a few people are.  Who is
22   Hector Ponce?
23   A.   Hector Ponce used to be a senior V.P. for Mitsubishi and he
24   left, and he's brought back as a consultant.
25   Q.   On this -- on the Agua Prieta II --
```

```
1    A.    I'm not --

2    Q.    Project?

3    A.    He was involved in it, I don't know if he --

4    Q.    You don't recall whether he was an employee or consultant?

5    A.    No, he was a consultant.

6    Q.    Okay.  Who is Greg Wunder, W-U-N-D-E-R?

7    A.    He was the V.P. --

8    Q.    Sorry?

9    A.    Was the V.P. of sales.

10   Q.    The V.P. of?

11   A.    Sales.

12   Q.    Sales.  Okay.

13          And so when you look at implementation, you look at

14   risk analysis, correct?  What is risk analysis?

15   A.    Basically what I go through is, again, I relook at all

16   aspects and all documentation, and this pages here are just an

17   outline.  I've got to go into the technical specifications.

18   Q.    If you look at the bottom of page one, you do in fact see

19   December 16th, correct?

20   A.    Yes, I see that.

21   Q.    And it doesn't say the year, but this was 2009, correct?

22   A.    Yes.

23   Q.    All right.  And so you look at the financials; is that

24   right?

25   A.    Yeah, I look at -- for the budget, because I got to deal
```

1    with the budgetary.

2    Q.    Okay.  And do you set a project schedule?

3    A.    Normally, yes.

4    Q.    And then what else do you do?

5    A.    Then I start scheduling for checking on the drawings for

6    the project with it, and I double check on the technical

7    specification and to see what kind of clarifications are in that

8    technical specification.

9    Q.    Now, Mitsubishi Power Systems Americas is owned by a

10   company in Japan, correct?

11   A.    Yes.

12   Q.    There's a parent company, correct?

13   A.    Yes.

14   Q.    And they're very -- are they very formal in the way they

15   set up projects?

16   A.    Yes.

17   Q.    Okay.  And having worked both in Japan and in the United

18   States, you're familiar with the formalities that have to be put

19   in place; is that correct?

20   A.    Correct.

21   Q.    And did you begin to put some of these formalities in

22   place?

23   A.    Yes.

24   Q.    What are they?

25   A.    Basically, I've got to get a communications group protocol,

1   uh, to set up --

2   Q.   First there's a communications group protocol, what's that?

3   A.   Basically official mail system, right.  In Mitsubishi, we

4   have to -- every project gets a number, a unique number to that.

5   And then I would set a mail system, and at that time, it was

6   Lotus Notes for the project.  I've also to get -- with that,

7   I've got to put in who is the approver for the official mail and

8   who does it go to on the other end.  So basically, I've got to

9   get contact with the client to say, who do I send e-mails to,

10  the official ones, and in my own organization I've got to get,

11  first of all, from my side, I need a project engineer assigned

12  to it.  And then I've got to do an approval thing for the

13  official mails, right.

14          So basically, even if I write that letter, right,

15  assuming advantage I'm not allowed just to send it, so it's got

16  to go through a chain of approvals, right, with this.  So for

17  that project was Ueki-san, because he was a V.P. at the time,

18  would be on the approvals, and then the commercial person from

19  his would be on there.  And then if there's a technical, my

20  project engineer would be on there as well.

21  Q.   If it was a technical issue --

22  A.   Yeah.

23  Q.   -- there were certain people, if it was a financial issue

24  there were different people; is that correct?

25  A.   Correct.

1    Q.   Because you've reviewed the e-mails that you're going to

2    talk about, correct?

3    A.   Yes.

4    Q.   And some of them, they don't have -- they don't always sent

5    to the same people, and does this explain why they're sent to

6    who they're sent to?

7    A.   The official mail system, right, for the project, does not

8    change; it goes to the person, right.  The interoffice e-mails,

9    which is we talk like talking, if you like, it doesn't, that can

10   go to different people.

11   Q.   Okay.  So is Japan copied on all of the e-mails?

12   A.   Basically, what we do, because this was a contract

13   initiated from the Americas and what -- any communication from

14   Japan, right, on the technical side or the commercial side,

15   because I issue P.O.s to them, they issue a number, a project

16   number to it, a correspondence number the same as I do, and that

17   goes into a vault, right.

18   Q.   Once a project is initiated, you've set up the

19   communication protocols, do you have a special initiating

20   meeting?

21   A.   Yes.

22   Q.   What's it called?

23   A.   It's called a kickoff meeting.

24   Q.   A kickoff meeting.  What's a kickoff meeting?

25   A.   Basically, what we do is we have a kickoff meeting, not

1    only with the client, because normally the client is the end

2    user.

3    Q.    Okay.  So explain that.

4    A.    The client we sell to say, I don't know, Excel Energy.

5    Excel Energy is going to operate that plant with it.  So we have

6    a contract with them.  There's not a third party in between,

7    right.

8    Q.    How often do you have a third party like F.G.G. in between

9    you, the owner of the turbines and the end user?

10   A.    This was the first time I've come across this.  In my

11   opinion, I don't agree.  It's unbelievable.

12   Q.    And you've been in the industry how many years?

13   A.    Years.

14   Q.    How many, I'm sorry?

15   A.    4-0 years.

16   Q.    40 years.

17         Was there a kickoff meeting?

18   A.    Eventually, yes.

19   Q.    Okay.  What do you mean by eventually?

20   A.    I had kickoff meetings in Japan, because I had to discuss

21   with the factories for what slots were available, what the

22   project was, what we were doing with it, so they could give me a

23   detail estimate with it.  And I kept asking for a kickoff

24   meeting.

25   Q.    Who were you asking?

1    A.   F.G.G. and our own people.

2    Q.   Okay.  So usually the kickoff meeting, who's present to the

3    kickoff meeting?

4    A.   Usually, the client and engineers and everybody so we can

5    sit around, introduce ourselves, tell them who is who, right, so

6    we --

7    Q.   Your engineers meet the engineers that are going to run it

8    once it's up and running?

9    A.   No, for installing it and for what we have to do.

10   Q.   Okay.  Your engineers, who know about the equipment, have a

11   kickoff meeting with the engineers that are going to install it?

12   A.   Correct.

13   Q.   Okay.  But now you have somebody in between in this case,

14   correct?

15   A.   That was so.

16   Q.   So did you have a kickoff meeting with C.F.E.?

17   A.   Eventually, I think that was -- I think it was in April.

18   I'm not sure.  It could've been March.  But I think it was

19   April, 2009.

20   Q.   Okay.  Did you try to have it in a timely manner?

21   A.   Yes, because I had a lot of information that I needed.

22   Q.   Well, what did you need?

23   A.   I needed deliveries.

24   Q.   You needed to know when the delivery time was?

25   A.   Schedules, et cetera, like that.

1    Q.    Well, why didn't you just call the engineers and ask them?

2    A.    Well, it's protocol, and I have to -- my contract to

3    initiate it was with F.G.G. not with C.F.E.

4    Q.    So that takes us back to 12A.  You say that you have to --

5    that you're responsible for the contracts; is that correct?

6    A.    Correct.

7    Q.    All right.  So you have experience with facilitating the

8    contract; is that correct?

9    A.    Correct.

10   Q.    Looking at the first page, who is the purchaser?

11   A.    F.G.G.

12   Q.    Okay.  And who is the sub-supplier?

13   A.    That would be us.

14   Q.    And it refers to something called the Teaming Agreement

15   that was entered into on August 8th of 2019.  Do you know what

16   that was about?

17   A.    It was an agreement, I think, by parties.

18   Q.    It wasn't something that you needed in order to do your

19   job?

20   A.    No.

21   Q.    Okay.  And what else in here is important to you?

22   A.    Basically, from my point, I need to -- the drawings on the

23   technical specifications.  The technical specification is my

24   Bible, if you like, because that tells us exactly what scope of

25   supply is needed.  It also tells us what the engineers, right,

1    put in as clarifications, right, or the difference, right,

2    between these units for that project.

3    Q.    Okay.  Do you need to look at what the specifications

4    C.F.E. needed in order to see whether or not you can meet those

5    standards with your equipment?

6    A.    I do not do that.

7    Q.    You do not.

8    A.    I don't.

9    Q.    Who does that?  Does anybody do that?

10   A.    Basically, that would be engineering that would look at the

11   thing.  In essence what I'm saying, when I get that, the

12   clarification document is there, so that's already being done

13   when I get that from administration.

14   Q.    What else about this is important to you, Government's

15   Exhibit 12A?

16   A.    Well, you said commercial.  Then I have to find out the

17   payment schedule with it, so then I can look at it.  I also have

18   to look at our performance guarantees, what we're supposed to

19   achieve, the power output and the heat grid coming from the

20   machine.  And then I've got to look at what we call liquidated

21   damages associated, if we do not meet them guarantees.  And the

22   guarantees can be both in deliverables, such as delivery of the

23   units, but also down to deliverable of drawings, right, with it.

24         So I have to look at all of that to do an overrule

25   schedule so Mitsubishi is not liable to any of these.

1    Q.   I'm going to draw your attention to -- and these pages

2    are -- I apologize, not your fault or mine -- the pages aren't

3    numbered in this particular subcontract, but it would be the

4    next page down that's got in the middle of it the word

5    "clauses."

6    A.   Correct.

7    Q.   Is there any information on this page that is pertinent and

8    necessary to you?

9    A.   Oh, yes.

10   Q.   Okay.

11   A.   Basically, the technical specifications for Mitsubishi

12   number 09070168MPS, is the gas turbine specification, gas

13   turbine.

14   Q.   You are looking at the first bullet point --

15   A.   Correct.

16   Q.   -- that says technical specifications for Mitsubishi

17   number, and then it has a number, of gas turbo generator set

18   technical proposal specification, correct?

19   A.   Correct.

20   Q.   What does that mean to you?

21   A.   That is the technical spec.

22   Q.   Okay.  And what is -- now, you started to explain what

23   technical spec was?

24   A.   A technical spec is everything.  It tells us each system,

25   what the gas turbine is, the technology, what temperatures the

1   gas has got to be, it puts the clarifications in there.  It

2   describes all of the systems we have and how --

3   Q.   So that number says all of that to you?

4   A.   No.  There's a document that goes with that number.  So I

5   have got -- that is a specification number.  I just call that up

6   and I get that specification.

7   Q.   Okay.  So that specification number goes with a document --

8   A.   Yes.

9   Q.   -- that has all of the technical information, information

10  you need to identify which gas turbine and what you need for the

11  project?

12  A.   Yes, because this would be one of the annexes you see on

13  the contract.  It says "the subcontract," and then it says

14  "annexes."  Well, this would be one of the annexes.  It's the

15  technical specs annex.  And the second bullet point is the steam

16  turbine spec, which again would be an annex.

17  Q.   So if you go above those two bullet points to the beginning

18  of the paragraph, you're the sub-supplier that -- by you, I

19  meant Mitsubishi, correct?

20  A.   Yes.

21  Q.   And it says, binds itself to provide the purchaser with the

22  goods that are described below; is that correct?

23  A.   Correct.

24  Q.   So Mitsubishi -- are you telling the jury that Mitsubishi

25  is binding themselves to the specifications that are found under

1    those numbers for the gas and steam generators?

2    A.    Basically, yes.

3    Q.    Okay.  And nothing else?

4    A.    It will be commercial things in there, nuances, but that is

5    the main crux of -- that is the project.

6    Q.    Look at bullet point three:  Attached clarifications titled

7    clarifications related to the subcontract.  What's that?

8    A.    That would be clarifications from the engineers, their

9    discussions as you said before, with a licitation of the bid

10   spec.

11   Q.    Explain.

12   A.    So, say the -- an intake system, you know, we need air into

13   the gas turbine, and with that one, the initial one was our

14   already manufactured equipment was a two-stage, just meaning

15   that it's two banks of filters, but apparently the licitation

16   said three-stage, right, with it.  So there was that

17   clarification on that; this will be a two-stage.

18   Q.    So in other words, they were asking for a three-stage and

19   you attached a clarification that said, okay, but ours is only a

20   two-stage?

21   A.    I didn't.

22   Q.    Well, not you personally, but Mitsubishi?

23   A.    There would have been, and that's why I was saying, inside

24   that technical specification, right, the clarifications were

25   already embedded --

1    Q.    Oh, okay.

2    A.    -- right, in there as part of the technical specification,

3    so as long as I had that, I'm happy, right.

4    Q.    Okay.  In other words, the whole truth is out there?

5    A.    Yes.

6    Q.    All right.  And scrolling down a little bit, these

7    specifications and clarifications represent the exclusive

8    statement of the scope of the sub-supplier for the purpose of

9    the subcontract.  What does that mean to you?

10   A.    It looks like the lawyers have got together.

11   Q.    Oh, okay.  Sorry.  Not this lawyer, but okay.

12   A.    Present company.

13   Q.    Okay.  Then it talks a little bit about the second and

14   third deliveries.  Is this something that's important to you?

15   A.    Yep.

16   Q.    Well, tell the jury about that?

17   A.    Well, the second one is a delivery location; where do I

18   have to deliver to, with it, because the equipment because it's

19   manufactured, and it's not just manufactured in our factories or

20   in a warehouse in France.  There's vendors all around the world,

21   right.  So I have to then check, right, with each of the

22   vendors, have we still got that there, with it, and find out

23   where it's going to be sent to, but again, as I said before,

24   with this contact, that was taken away, so it ended up as

25   x-works (phonetic).

1    Q.   What do you mean it was taken away?

2    A.   I was under the impression that the transportation in that

3    would come under a second phase.  It would be a supply contract

4    and then a transport contract and then a technical support

5    contract and a training contract.

6    Q.   Okay.  And why were you under that impression?

7    A.   Uh, John told me.

8    Q.   Okay.  And that didn't happen, correct?

9    A.   No.

10   Q.   The third is delivery time?

11   A.   That is a big one for me, because what I have to do then

12   delivery time, what I have to do with refurbishment because I

13   don't want to do a refurbishment twice.  So what I need to do is

14   try to time all of the refurbishment to coincide with the

15   delivery, right, with it, but also have it at least some time

16   period, grace period, where I can do inspections, and if I find

17   anything, I can fix it before it gets packaged and ready for

18   shipment.

19   Q.   Okay.  Is there anything else as I page down, the fourth,

20   the amount, is that important to you?

21   A.   The amount?  Not really.

22   Q.   No?

23   A.   Well, the only thing is I'm on commission.

24   Q.   Somebody else decides how much they're going to sell them

25   for, right?

1    A.   Yes.

2    Q.   Okay.  And the condition of the prices, you don't care

3    about that or the taxes, right?

4    A.    Well, that does come into play if it's taxes on us, then it

5    comes under me, because I have to put a budget for taxes,

6    especially when it's going over the border, right, because

7    there's import taxes, customs clearances and all of this, which

8    I have to evaluate into my budget, right, for the project.

9    Q.   Okay.  So you have to have a budget and you have to include

10   import taxes and certain kinds of customs taxes and things like

11   that, correct?

12   A.   If it's in our scope, but this got changed because it went

13   x-works and it never went there, right.

14   Q.   And then it talks about the payments, the first payment,

15   the -- you are also responsible for the invoices, aren't you?

16   A.   Correct, yes.

17   Q.   Explain that.

18   A.   Basically, I get from this which is the payment schedule,

19   With a payment schedule, it maps out when we can put an invoice

20   in, right, and then we send out the invoice to submit it, and

21   then there's a period of time when it comes in.  And then what I

22   have to do is -- now, in modern days, it's all wired, so I have

23   to put all of the wire details on there, so I put everything on

24   that invoice.

25   Q.   So somebody gives you the payment schedule.

```
 1   A.    It's supposed to be part of the contract.

 2   Q.    It's supposed to be part of the contract --

 3   A.    Yes.

 4   Q.    -- and again you are supposed to administer the contract,

 5   correct?

 6   A.    Correct.

 7   Q.    And so you follow that payment schedule and you send the

 8   invoices which include where the money is supposed to go to pay

 9   you, correct?

10   A.    Yes.

11   Q.    It has the wiring instructions on it, correct?

12   A.    Yes.

13   Q.    Okay.  And --

14             THE COURT:  Ms. Kanof, it's 4:35.

15             MS. KANOF:  Okay.  Your Honor.

16             THE COURT:  Is this a good time to break?

17             MS. KANOF:  It is a good time.

18             THE COURT:  All right.

19             Ladies and gentlemen of the jury, we're going to

20   recess for the evening.  I ask you to be back in the jury room

21   at 9 o'clock tomorrow.  Please remember the instructions I gave

22   you earlier about not discussing the case with any family

23   members or friends or even amongst yourselves, and with that,

24   we'll see you tomorrow at 9 o'clock.  We're in recess till then.

25             Tomorrow we'll work till 6:00 as we will the rest of
```

1    the time for this trial.

2              THE COURT SECURITY OFFICER:  All rise.

3              (Proceedings conclude for the day.)

4                        *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                            * * * * *

2              I certify that the foregoing is a correct transcript

3      from the record of proceedings in the above-entitled matter.  I

4      further certify that the transcript fees and format comply with

5      those prescribed by the Court and the Judicial Conference of the

6      United States.

7      Signature:/S/KATHLEEN A. SUPNET        December 5, 2018
                  Kathleen A. Supnet, CSR         Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN A. SUPNET, CSR