```
1                IN THE UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF TEXAS

3                        EL PASO DIVISION

4                        VOLUME 10 Of 20

5

6   UNITED STATES OF AMERICA          EP:13-CR-0370-DG

7   v.                                EL PASO, TEXAS

8   MARCO ANTONIO DELGADO             September 13, 2016

9
                        STATEMENT OF FACTS
10              THE HONORABLE DAVID C. GUADERRAMA
                  UNITED STATES DISTRICT JUDGE
11

12

13  APPEARANCES:

14  For the Government:   Debra Kanof
                          Anna Arreola
15                        Luis Gonzalez
                          Assistant United States Attorney
16                        700 East San Antonio, Suite 200
                          El Paso, Texas 79901
17
    For the Defendant:    Maureen Franco
18                        Erik Hanshew
                          Assistant Federal Public Defender
19                        700 E. San Antonio, Suite 410
                          El Paso, Texas  79901
20
    Court Reporter:       Kathleen A. Supnet
21                        El Paso, Texas
                          (915)834-0573
22                        kathi.supnet5303@gmail.com

23

24          Proceedings reported by mechanical stenography,

25  transcript produced by computer-aided software and computer.
```

CHRONOLOGICAL INDEX

VOLUME 10 OF 20

September 13, 2016                                    PAGE    VOL.

JUROR NUMBER 2 . . . . . . . . . . . . . . . . . . 8       10

GOVERNMENT'S
WITNESS TESTIMONY      DIRECT      CROSS      VOIR DIRE      VOL.

BEDDARD, KEVIN         13,208      173,217    --            10
ADAMS, JOHN MICHAEL    220         --         --            10

Court Reporter's Certification . . . . . . . . . . 293     10

```
 1              (Open court.  Jury not present.)
 2          THE COURT:  Ms. Kanof, you had some matters we need to
 3     take up?
 4          MS. KANOF:  Yes, Your Honor.
 5          Last night the Court filed in the E.C.F. system E.C.F.
 6     Document 226, which was Exhibit Number 7 from the evidentiary
 7     hearing from yesterday morning, and the government has -- was
 8     able to access it and it has every exhibit and contained in
 9     there is P.P.I., is protected personal information.
10          Mr. Gireud and his wife's personal 1040 with their
11     Social Security numbers --
12          THE COURT:  Are you talking about that packet of --
13          MS. KANOF:  Yes.  That one document, the one that I
14     put in the envelope for this very purpose and so anybody in the
15     whole world that wants to steal their identities and their
16     Social Security number can.  So we'd ask that it either be
17     redacted or removed from that exhibit on public display.
18          THE COURT:  Okay.  We'll do that.
19          THE COURTROOM DEPUTY:  I'll have the docket clerk log
20     it, Judge.
21          THE COURT:  Anything else?
22          MS. KANOF:  No, that was it, Your Honor.
23          THE COURT:  Okay.  So we have issues with two jurors.
24     The one juror Rosanna Lara that very badly wanted not to serve
25     because she wanted to be home because her daughter was pregnant
```

1    and so wanted to be home to I guess take care of the child or

2    something like that.  Apparently, that didn't work, so now she's

3    got a letter from the Mayor of Anthony that says that she is the

4    accountant for the City of Anthony, is the only person who can

5    prepare a budget.  There are budget hearings and it would

6    absolutely destroy the City of Anthony if she's not there

7    working on their budget.

8            I'm tempted to set a hearing this afternoon and tell

9    the Mayor he can come down here, tell me all of this under oath

10   subject to penalties of perjury and let me hear why he only has

11   one human being that knows how to run that budget.  What happens

12   when she's on vacation.  What happens if she were to die?  What

13   happens if she were to stay home with her daughter who's having

14   the child like she first told us, what would happen to the

15   budget then?  So that's one.

16           The other is Juror Number 2, who spoke to Mr. Heidtman

17   and apparently is unhappy about serving as well.

18           And what was it that she told you?

19           COURTROOM SECURITY OFFICER HEIDTMAN:  Your Honor, she

20   told me she was having problems with concentration.  And she

21   advised, I asked about the concentration, she said that she

22   neglected to tell the Court that she also works a primary job

23   for the Texas Workforce and they just hired three people that

24   she was responsible for training, thus, her concentration was

25   not here.  It was with those new employees she was supposed to

1    be training.

2          THE COURT:  Ms. Lara, doesn't concern me as much,

3    because she's an alternate.  Juror Number 2, my experience, I've

4    had three or four trials with jurors like that, and it seems

5    like in every single one of those, they did everything they

6    could to sabotage the proceedings, and so it's always dangerous

7    to proceed with jurors who are digging in their heels and

8    wanting to do that.

9          The law is pretty clear that if someone is being that

10   resistant to jury service, I can remove them and seat an

11   alternate.  If I do that, I'm simply going to move Juror Number

12   2 to the Alternate Number 2 position and have her sit through

13   the entire trial.  I am bothered by the fact that people don't

14   want to do their duty.  And so I can move her off the primary

15   jury, so she can't affect it, put her in Alternate Number 2

16   position and she can sit through the trial, that way she's not

17   going to get what she wants by throwing her tantrum.

18         MS. KANOF:  Would you replace her with Alternate

19   Number 1.

20         THE COURT:  That's what the law requires that it be in

21   that record.  So Alternate Number 1 would have to be seated and

22   Juror Number 2 would be moved to the back.  And we don't -- I

23   mean, this is just us talking.  We can bring in Juror 2 and see

24   if we can't encourage her do what she's supposed to do.  If that

25   doesn't happen and we seat her -- because yesterday she was

1    visibly not engaging with the witnesses.  And so if she

2    continues to do that, we can always replace her any time during

3    the proceeding.

4         So we can talk to her now or we can talk to her later.

5    We can bring her in, talk to her now, continue to watch her

6    demeanor during the proceeding, and we find that it's going to

7    be incongruent with what a reasonable juror should be doing, we

8    can then talk about replacing her with Alternate Number 1.

9         MS. KANOF:  Your Honor, I think the team agrees that

10   you should talk to her now.

11        THE COURT:  Okay.

12        Ms. Franco, did you want a moment to talk to

13   Mr. Hanshew?

14        MS. FRANCO:  Well, that's what we're talking about

15   right no, Your Honor.  It just seems -- I don't now how to say

16   this so that it's unrespectful, but it seems rather heavy-handed

17   to bring her in and talk to her right now.  And I don't mean any

18   disrespect by that, but --

19        THE COURT:  No, she's the one that's wanting to give

20   us this new information.

21        MS. FRANCO:  Okay.  I just -- I'm concerned about

22   moving her from the panel into the alternate slot, because I

23   think the problem is still going to be there, because the

24   alternates go to the jury room, and so the idea that she could

25   perhaps poison or pollute the rest of the pool is still there,

1    so I think --

2         THE COURT:  The damage is done at deliberations, not

3    during the time.  They're not talking about the case.  The other

4    jurors know they're under instructions not to talk about the

5    case.

6         MS. FRANCO:  Not supposed to.

7         THE COURT:  The damage is done at deliberations.  At

8    least that was my experience, those jurors just, you say this,

9    I'll say that; you say that, well, then I'll say this.

10        MS. FRANCO:  Well, I'll leave it to the Court's

11   discretion as to what you think is obviously the right thing to

12   do.  I'm just concerned that it might shut her down even more

13   so.

14        THE COURT:  Well, I think -- she wants to talk to us,

15   right?

16        COURT SECURITY OFFICER HEIDTMAN:  Yes, sir, she does.

17        THE COURT:  So we can speak to her and hear her out

18   about this other job that she never told us anything about, even

19   though that was the whole point of the three hours of voir dire

20   yesterday, and let her vent a little bit and then we'll just

21   watch her during the rest of the trial and if we have to replace

22   her we will.  So let's do that.

23        I don't need to bother you with this, sir.  If you'd

24   like to go out and get a drink, we'll call you in from the

25   hallway once we are finished with this.

```
 1              COURT SECURITY OFFICER HEIDTMAN:  Ms. Valenzuela.

 2              THE COURT:  Venezuela, yes, sir.  Valenzuela.

 3              (Juror present.)

 4              THE COURT:  Good morning, Ms. Valenzuela.  You are

 5    Juror Number 2?

 6              JUROR VALENZUELA:  Yes, I am.  Good morning.

 7              THE COURT:  Good morning.  You wanted to address

 8    something with us?

 9              JUROR VALENZUELA:  Yes.  Thank you for giving me the

10    opportunity to explain my situation.

11              Yesterday, when you questioned me, I only mentioned my

12    part-time job because that was one of my worries.  And I'm also

13    the director of Texas Workforce Commission.  That's my full-time

14    job.  I imagine that you have that information in my

15    questionnaire when I completed that information.  I'm still

16    working there.  My hope was when I found this job with community

17    college that I was going to resign from my full-time job, but I

18    haven't been able to do that because of extreme circumstances

19    that are occurring within my agency.

20              I retire -- and I'm sorry for making this story long.

21    I think you need to know the details.  I didn't want to disclose

22    them, because they have to do with the way that the agency,

23    specifically hear in El Paso, operated.

24              I retired.  I went to -- from the agency after

25    27 years, I went to get a Ph.D., and when I was graduating, they
```

1    called me back to the agency if I wanted to become the director.

2    And because they fired the director at that time and the

3    operations coordinator.  So I went back to work for them and

4    it's been very hectic there after firing those two managers.

5    Nothing is resolved immediately because there are people that

6    have old habits and their difficult to change.  So I've been

7    struggling in wanting to go to full-time teaching, but

8    unfortunately I feel responsible and maybe that's the way I am

9    for that position.  Not until I have everything in order there,

10   then I can quit that job and go to teaching, which is my degree

11   is in teaching education.

12          So to make the story short, there has been some of the

13   supervisors that were there are retired and now we're in the

14   process of hiring new supervisors.  So the state center where I

15   work, I have 150 employees under my direction, and all the

16   supervisors under my direction, so I don't think yesterday I

17   felt that maybe this was a good time for me to see if they can

18   manage the center without me being there and things happened.

19   As I haven't been able to take a vacation from there, because

20   every time that I leave something happens.  And they send me a

21   series of e-mails that have to do with selection of the new

22   supervisors with training them.  I found this during my lunch

23   yesterday, so I was thinking about it all afternoon during the

24   trial, and I was just thinking that I was needed there.  And

25   even though I wanted to participate in this process, it's not

```
 1    time for me to be away such a long time from that center.  And

 2    that's the way things are.

 3           THE COURT:  Okay.  All right.  Well, I will tell that

 4    you in our country there are a lot of people who are in

 5    important positions where they're supervising and running

 6    operations --

 7           JUROR VALENZUELA:  I know.

 8           THE COURT:  -- that are critical, and because we live

 9    in this country and we enjoy the benefits of this country, this

10    country asks very little of us in return; one is military

11    service, the other is jury service.

12           And so we all have to shoulder that responsibility,

13    including me.  I get called to jury service, also, and so when I

14    get called, I show up, because that's our duty as Americans.

15    And if that duty only fell to those people that didn't have a

16    job, didn't have another commitment, then the face of our juries

17    would be very, very different and the input into our court

18    system would very, very different, and that's not the way the

19    system was set up.

20           The beauty of America is that in this country

21    everybody is the same, rich and poor, powerful and weak, all the

22    same under the law.  And everybody gets a seat in the jury box

23    and everybody gets a voice in deliberations.

24           And so if we start eliminating those people that --

25    doctors?  Oh, Judge I got patience scheduled for surgery.  If
```

```
 1   I'm not there that patient isn't going to have surgery.  Well, I
 2   understand.  Truck drivers?  Jude, I have a contract to deliver
 3   perishable goods.  If I'm not there to drive it, the goods are
 4   all going to rot in my truck.  Well, I understand.  Everybody
 5   has a really good legitimate economic reason for not serving on
 6   jury duty.  Lots of people do.  Unfortunately, it's one of those
 7   things we got to get the job done and everybody has to lend a
 8   hand equally.
 9           JUROR VALENZUELA:  I understand, Your Honor, and
10   that's precisely why I didn't persist yesterday on, my -- on
11   this explanation.
12           I also like to mention that now that I'm close to one
13   of the attorneys, I don't know if -- I don't know him by name,
14   but I don't if he's your -- you seem familiar, because my
15   daughter is a close friend of a lady, an attorney, Soria; is she
16   your wife?
17           MR. HANSHEW:  Yes, ma'am.
18           JUROR VALENZUELA:  So I -- knowing that you're the
19   wife of Soria, I don't think I can be completely impartial,
20   because my daughter is a very close friend of Soria.  Not
21   until -- because she went to the wedding and she talks about
22   Soria.  I cannot never [sic] had the pleasure of meeting you,
23   but she has a picture of Soria and you.  And I connected the
24   dots yesterday afternoon and now that I'm closer to you, I see
25   that your name starts with H., something like that, right?  I
```

 1    didn't pay attention, because I didn't know your name.  Soria

 2    goes by her maiden name, so that's why.

 3              THE COURT:  Ms. Kanof?

 4              MS. KANOF:  Move for cause.

 5              THE COURT:  All right.  That's granted.

 6              All right.  Ms. Valenzuela, we'll schedule you for

 7    another trial where Mr. Hanshew is not counsel and I'm sure --

 8    so you don't have those issues.  Thank you very much.  If you

 9    would -- do you have any other personal items in the jury room.

10              JUROR VALENZUELA:  I don't think so.

11              THE COURT:  Okay.  Thank you so much.

12              JUROR VALENZUELA:  Thank you.

13              (Juror Number 2 excused.)

14              THE COURT:  Okay.  So now we move -- Rene Saucedo will

15    be Juror Number 2.  Okay.

16              So what about Ms. Lara?  Should I call in the Mayor

17    and have him come down and --

18              MS. KANOF:  We'd like to see the Mayor's explanation,

19    Your Honor.

20              THE COURT:  Sure.

21              MS. KANOF:  I mean, we'd like the Court to call the

22    Mayor in.

23              THE COURT:  Oh, okay.  Yes.

24              All right.  Then we're ready to go.  If you'd notify

25    Mr. Saucedo, he is now Juror Number 2 and seat him in the second

```
 1    chair.
 2              COURT SECURITY OFFICER HEIDTMAN:  Yes, sir, I will.
 3              THE COURT:  If we can get Mr. Beddard.  How do you
 4    spell his name?
 5              MS. KANOF:  Gireud.
 6              THE COURT:  No, that's Gireud.  No, no.  The --
 7              MS. KANOF:  Oh, Beddard.  I'm sorry.
 8              THE COURT:  How do you spell it?
 9              MS. KANOF:  B-E-D-D-A-R-D.
10              THE COURT:  Beddard.
11              (Jury present.)
12              THE COURT:  Let the record reflect that all members of
13    the jury are present, the United States through its assistant
14    United States attorney is present, the defendant and his counsel
15    is present.  The witness Mr. Beddard is on the witness stand.
16              Ms. Kanof?
17              MS. KANOF:  May I proceed, Your Honor.
18              THE COURT:  Yes, ma'am.
19                        JOSEPH KEVIN BEDDARD,
20                     DIRECT EXAMINATION CONTINUED
21    BY MS. KANOF:
22    Q.   Mr. Beddard, you understand you are still under oath?
23    A.   I do.
24    Q.   Mr. Beddard, do you know an individual by the name of Marco
25    Delgado?
```

1    A.   Yes.

2    Q.   How do you know him?

3    A.   Concerning the contract with F.G.G.

4    Q.   Is he here in the courtroom?

5    A.   He is.

6    Q.   Would you identify him by indicating where he is sitting?

7    A.   He's sat over there.

8    Q.   Over there.  The record doesn't know what "over there"

9    means?

10   A.   Okay.  With the defense lawyers, in the gray jacket.

11   Q.   Gray?

12   A.   Well, it looks gray for me.

13   Q.   In between the two defense lawyers?

14   A.   Correct.

15          MS. KANOF:  Let record reflect the witness has

16   identified the defendant?

17          THE COURT:  Mr. Hanshew?

18          MS. FRANCO:  No, objection, Your Honor.

19          THE COURT:  I'm sorry.  The record will so reflect.

20   BY MS. KANOF:

21   Q.   What was your understanding was his role in the Agua Prieta

22   II Project?

23   A.   Well, attorney.

24   Q.   Attorney for who?

25   A.   F.G.G.

1    Q.   Okay.  And we talked yesterday about you having to

2    implement contracts; is that correct?

3    A.   Correct.

4    Q.   And with regard to that, implementation meant what to you?

5    A.   Basically, to administer the contract as such and to make

6    sure the supply contract will be fulfilled with supply, the

7    scope of supply, which includes not just the equipment, but the

8    delivery of those such as drawings, et cetera, also, making the

9    budget for internal purposes and, also, then making a payment

10   schedule, make sure that the invoices so we get the payments

11   coming in, right, accounts receivable.

12   Q.   Were you concerned at all with something known as

13   assignment of collection rights?

14   A.   Yes.

15   Q.   What is assignment of collection rights?

16   A.   Basically, for this contract -- normally we get paid

17   directly on a contract into Mitsubishi.

18   Q.   Why is that?

19   A.   Because the contracts are normally that way and it gives us

20   assurance that payment we receive it into our bank.

21   Q.   Well, you said yesterday that normally there isn't an

22   intermediary company like F.G.G., correct?

23   A.   Correct.

24   Q.   Usually, it's Mitsubishi and the people that are going to

25   use the energy, right?

1   A.   Or an E.P.C., erection contractor there who is actually

2   building the plant.

3   Q.   So, in this case, however, since there was an intermediary,

4   you wanted an assignment -- you, meaning Mitsubishi, wanted an

5   assignment of collection rights; is that correct?

6   A.   Correct.

7   Q.   And why did you want that?

8   A.   Well, it gives us assurance of payment.  So what we invoice

9   with accounts receivable, we get that amount in and it comes

10  from a reliable entity and that it means that no one can mess

11  about with the payment.

12  Q.   So even through you were selling the equipment to F.G.G.,

13  you, Mitsubishi, wrote in to the contracts that they did

14  participate that they would have an assignment of collection

15  rights; is that correct?

16  A.   Somebody in Mitsubishi did.

17  Q.   Okay.

18  A.   I -- I reviewed that on the VISC analysis to find out, you

19  know, why aren't I getting the payments directly to our project?

20  It's because we have to wait for the assignment.

21  Q.   In other words, for you to do your job, you had to make

22  sure that you were going to get that money directly so that you

23  could keep preparing the generators; is that correct?

24  A.   Correct.

25  Q.   Yesterday we were talking about Government's Exhibit 12A.

```
 1              MS. KANOF:  If you could display it, please?
 2    BY MS. KANOF:
 3    Q.   That's basically the subcontract between Mitsubishi and
 4    F.G.G.  Do you recall this contract?
 5    A.   I do.
 6    Q.   Now, that contract at the bottom appears to have been
 7    entered into on December 16th of 2009, correct?
 8    A.   Correct.
 9    Q.   And I'm going to draw your attention in that contract
10    to page -- let me find it -- to clause 15.  This contract
11    doesn't have any pages so it's a little bit difficult to find.
12    Oops.
13              MS. KANOF:  I'm sorry.  How do I get out of it?  Zero.
14    It disappeared.  It's good.  It's gone.  Okay.  Okay.  Thank
15    you.  I'm showing my age.
16              Okay.  Clause number 15 -- no, it didn't go away.  It
17    didn't escape.  Okay.  Thank you.
18              You can tell Ms. Arreola is much younger than I am.
19    BY MS. KANOF:
20    Q.   Okay.  Clause number 15.  Clause number 15, in fact, is
21    called assignment of collection rights; is that correct?
22    A.   Correct.
23              MS. FRANCO:  Your Honor, I've been very tolerant of
24    the leading nature of Ms. Kanof's questions.
25              THE COURT:  Sustained.
```

1    BY MS. KANOF:

2    Q.   What is clause number 15?

3    A.   It's where F.G.G. -- to get the assignment from the end

4    user, so we receive our money directly into our bank account.

5    Q.   And is that written directly into the subcontract?

6    A.   Well, that's a copy of the letter from the federal

7    electricity commission confirming the approval of the aforesaid.

8    It's attached to this subcontract.

9    Q.   So what exactly was the agreement in the subcontract with

10   regard to assignment of collection rights?

11   A.   The agreement from here what I was told was that as soon as

12   the contract between F.G.G. and the Comisión or C.F.E., it would

13   be wrote in there that they would assign collection rights to

14   directly to Mitsubishi.

15   Q.   Okay.  So, it -- because there was no relationship directly

16   between C.F.E. and Mitsubishi, the subcontract had a clause in

17   it that F.G.G. had a responsibility to get those rights for

18   Mitsubishi; is that correct?

19            MS. FRANCO:  Your Honor?

20            THE COURT:  Sustained.

21            MS. KANOF:  I'm sorry.

22   BY MS. KANOF:

23   Q.   What was the purpose then of this clause?

24   A.   To establish that we get a direct line of payment from the

25   end user into our account.

1    Q.    So from the very beginning, then there was a prime

2    contract.  Was there a contract between F.G.G. and C.F.E.?

3    A.    Yes, there was a contract.

4    Q.    I'm going to draw your attention to Government's Exhibit

5    Number 18.  And there's and 18 in Spanish and 18A.

6           MS. KANOF:  Your Honor, we would move to admit -- this

7    is an item that was provided through the Mutual Lateral

8    Assistance Treaty.

9           THE COURT:  Ms. Franco?

10          MS. FRANCO:  No, objection.

11          THE COURT:  Admitted GX-18 and GX-18A are admitted.

12   BY MS. KANOF:

13   Q.    And if I draw your attention to the front page, on what --

14   when was that contract entered into?

15   A.    Well, on this page it says January 2010.

16   Q.    And specifically are we talking about -- it says the

17   National Bank of International Commerce as a fiduciary.  Exactly

18   who did F.G.G. enter into a contract with, if you know?

19   A.    I can only say that it was the Comisión.

20   Q.    You don't know how to pronounce it, but somebody that was

21   representing F.G.- -- the C.F.E.; is that correct?

22   A.    I think the Comisión represents the payment of Mexico.

23   Q.    If you'll look at Roman numeral number II under recitals.

24   Does that refresh your memory?

25   A.    No, because I never dealt with the maximum.

1    Q.    Okay.  And at the bottom of page two on the right-hand

2    side, does it give the date that this contract was entered into?

3    A.    Yes, January the 6th.

4    Q.    Okay.  I'm going to turn your attention to page 12 of the

5    prime contract.  And you didn't sign this contract, because

6    Mitsubishi was not a party to it; is that correct?

7              MS. FRANCO:  Your Honor, objection.

8              THE COURT:  Sustained.

9    BY MS. KANOF:

10   Q.    Did you review this contract in order to fulfill your

11   obligations?

12   A.    No.

13   Q.    Initially, on page 12 of the contract, does it have where

14   the payments were agreed to be wired?

15             MS. FRANCO:  Your Honor, this witness has already

16   testified that he didn't review this contract.

17             MS. KANOF:  But Your Honor, it's part of his job and

18   this is what he tries to --

19             THE COURT:  The document's in evidence.  He can tell

20   us what the document says.  He can read it.

21   BY MS. KANOF:

22   Q.    Under the 14th paragraph, payment location, what was the

23   original agreement for the payment location?

24   A.    According to this contract?

25   Q.    Yes.

1    A.    The wire contract is Wells Fargo Bank in El Paso.

2    Q.    And what are the last four digits of the account number?

3    A.    00.

4    Q.    Last four digits?

5    A.    That's 1614.

6    Q.    Okay.  And with regard to -- on page 13, there's a

7    paragraph 16.  With regard to paragraph 16 -- excuse me -- do

8    you know whether or not the Comisión through their trustee,

9    agreed to assignment of collection rights?  Look at paragraph

10   15.

11   A.    I just reading it.

12         It says that the supplier would apply in writing for

13   the collection rights to be changed.

14   Q.    Okay.  And paragraph V of the assignment of collection

15   rights, do you understand whether or not Mitsubishi required

16   paragraph V to be included in the prime contract?

17   A.    I do not know.

18   Q.    Okay.

19         That number, the Wells Fargo Bank number, do you know

20   what that account was?

21   A.    No, I don't.  I can only speculate.

22   Q.    I'm showing to you -- displaying to you Government's

23   Exhibit 144.

24         MS. KANOF:  Your Honor, this has a self-proving

25   affidavit, these bank records, and we'd ask that it be moved

 1    into evidence.

 2              THE COURT:  Ms. Franco?

 3              MS. FRANCO:  No, objection.

 4              THE COURT:  GX-144 is admitted.

 5    BY MS. KANOF:

 6    Q.   And this item from Wells Fargo bank, do you see an account

 7    number?

 8    A.   I do.

 9    Q.   And does it have the last four digits that you read to the

10    jury?

11    A.   I did, 1614.

12    Q.   And does it have a date when the account was opened?

13    A.   Date was 07-17-2009.

14    Q.   Okay.  And I know that's in the American way and there's no

15    17th month anyway, so that would be July 17th?

16    A.   Correct.

17    Q.   Okay.  And the date that preceded, did it precede the date

18    of those two contracts?

19    A.   Yes.

20    Q.   Okay.  So was it your responsibility then to ensure that

21    the assignment of collection rights was in place before you

22    invoiced for the first payment?

23    A.   I had to ensure it was going on for my subcontract, right,

24    that the assignment was in play.

25    Q.   Okay.  And did you eventually invoice for the first

1    subcontract?

2    A.    I did.

3    Q.    Okay.

4          MS. KANOF:   Government's Exhibit Number 41.

5    BY MS. KANOF:

6    Q.    Is that an e-mail that you sent?

7    A.    Yes, it is.

8          MS. KANOF:   We move for admission of Government's

9    Exhibit Number 41.

10         THE COURT:   Ms. Franco?

11         MS. FRANCO:   No, objection.

12         THE COURT:   GX-41 admitted.

13   BY MS. KANOF:

14   Q.    To whom did you send it?

15   A.    Fernando Gireud, it was.

16   Q.    And why did up send it to him?

17   A.    Because as I mentioned yesterday, we have protocols, right,

18   and who receives mail.  Like all mail comes to me directly as

19   the project managers or any one of my project managers, and then

20   we get an assignment, a name from the client of who all of the

21   mail goes to and they give us that all of official mail has to

22   go to Fernando.

23   Q.    Okay.  And so when -- what was the purpose of this e-mail?

24   A.    That one was -- because of the contract on the fast payment

25   schedule.

1    Q.    Okay.  And you were sending it -- an e-mail for what

2    purpose?

3    A.    To put in our first hour, first invoice into play.

4    Q.    Previously you said that there was approval process for all

5    of your e-mails.  Does that indicated here?

6    A.    Yes, it is.

7    Q.    And I've highlighted the approval process.  What does this

8    mean?

9    A.    Basically, the first name is the initiator who writes it,

10   right, and then it goes to -- the second part there is the one

11   over them, approves and checks it and approves it to go to the

12   next floor.

13   Q.    So who wrote it?

14   A.    I wrote this one.

15   Q.    Who was the first approver?

16   A.    It is me, actually.

17   Q.    And the next approver?

18   A.    It was the V.P. of commercial, Ueki-san.

19   Q.    Then did it go back to you?

20   A.    Then it went back to me, because it goes back in that work

21   floor, because if Ueki made any changes, right, from a

22   commercial, I must check that to ensure that it didn't affect

23   the technical part, so then I review it, then I send it back.

24   Q.    And then who's Mr. Nomba (phonetic)?

25   A.    Nomba was the commercial and salesperson who works for

1    commercial.

2    Q.    And does your e-mail start at "Dear, sir"?

3    A.    Yes.

4    Q.    And could you read that to the jury, please?

5    A.    As we approach the finalization of our agreement, according

6    to its revised payment schedule with the first invoice payment

7    you did as the 6th of March, please find attached a copy of the

8    reference invoice.  The original will be sent by courier on the

9    12th of February, 2010.  Can you please review the invoice

10   submittal and inform if you require any further backup

11   documentation.  And then it says, best regards, and I've

12   attached the said invoice.

13   Q.    So where did you get the date of the 6th March as the first

14   payment that you should receive?  You, meaning Mitsubishi.

15   A.    What I look at is the contract and then it normally has a

16   payment net 30 days, net 60 days.

17   Q.    And how far in advance from the date of payment do you send

18   an invoice?

19   A.    Normally, as early as possible.  But normally, I'm governed

20   in the contract when I can send it.  But normally, one month,

21   six weeks.

22   Q.    So this e-mail was dated February 12th of 2010, correct?

23   A.    Yes.

24   Q.    And attached to this e-mail, what did you attach?

25   A.    The invoice.

1    Q.   On the screen now, is that the invoice that you attached to

2    the e-mail?

3    A.   Could you scroll a little bit further?  Yes, because it's

4    my signature.

5    Q.   Who did you write the invoice to?

6    A.   Again, Fernando Gireud, who was the president of F.G.G.

7    Q.   Did you -- had you received from F.G.G. the assignment of

8    collection rights, yet?

9    A.   No.

10   Q.   So did you know where or who was going to be sending your

11   money on March 6th?

12   A.   Basically, no.

13   Q.   Okay.  Were you and other employees at Mitsubishi still

14   trying to attain an assignment of collection rights?

15   A.   Yes.

16   Q.   With regard to the invoice, how much money are you

17   invoicing?

18   A.   The total amount there was 16,995,000.

19   Q.   Do you know how much the first payment, what agreement

20   between F.G.G. and C.F.E. was for the first payment that would

21   be sent to them?

22   A.   I don't know.

23   Q.   Okay.  But this is how much -- what this amount, almost

24   $17-million, represented what?

25   A.   That represented the payment scheduled between Mitsubishi

 1    and F.G.G., which I think I said it was annex five, which meant

 2    that we get the invoice 16.5 percent of the contract value.

 3    Q.   Is that a standard percentage for a first payment?

 4    A.   Not really because every contract changes.  It has nuances.

 5    And that's one of the reasons we have to check the contract for

 6    the payment, right.

 7    Q.   Okay.  So what was the total price then at this point?

 8    A.   At this point to my knowledge, right, was our portion was 1

 9    or 3 million.

10    Q.   So this would be 16-and-a-half-percent of 103 million?

11    A.   Basically, this could have been the equipment contract,

12    right, supply was 106.6 million and included in that was a fee

13    basis to F.G.G.

14    Q.   Okay.  What was that fee for?

15    A.   That was for services and also certain of commercial and

16    financial.

17    Q.   And as part of the invoice you laid out on the second page

18    of the invoice, you broke it down; is that correct?

19    A.   Correct.

20    Q.   And could you explain how you broke it down?

21    A.   Basically, what we did, we had to the bill of sale for the

22    two gas turbines, so basically each gas turbine's value to the

23    contract was 45 million, right, and 835,000, so, for one gas

24    turbine.  So 16 and half percent of that and then timed by two,

25    because it's two units, gives me the total price of

1    15-point-125,550 dollars for the gas turbine portion.  And then

2    the second portion would be for the steam turbine, which had a

3    value of 11.3 million.  And then so again, I did 16.5 percent of

4    that, which accumulated to 1-point-869,450.

5    Q.   Where did you get the 16.5 percent?

6    A.   Basically, that was in the annex of payment schedule.

7    Q.   Of which contract?

8    A.   Of F.G.G. and Mitsubishi.

9    Q.   All right.  The subcontract --

10   A.   Yes.

11   Q.   -- government's 12?

12   A.   Correct.

13   Q.   All right.  Now below on the left-hand side in the box

14   marked description, there's a box that has some other

15   information in it.  What is this all about?

16   A.   Basically, as I said as part of our subcontract, we wanted

17   the assignment of collection rights.  We had the right to get

18   that.  So that was put into that, again, reminding who I want

19   paying or Mitsubishi wanted paying into our account directly

20   that amount that we've invoiced.  So basically what I've done

21   here is put part of the contract in there to say, you know,

22   collection rights, whether it's the Comisión or it's F.G.G.

23   whether it's Tom Blogs [sic], you know, that 16 million goes

24   into Mitsubishi's account directly.

25   Q.   Did -- where did you lift that language from.  You have

1    quotation marks?

2    A.    Basically, that would be from the subcontract.

3    Q.    And after that below you have the words "remit to."

4    A.    Correct.

5    Q.    What is that information?

6    A.    That is the bank of Mitsubishi where our account is.  And

7    that's our account date and there's a routing number.

8    Q.    So this invoice is consistent with what?

9    A.    Normal practice, Mitsubishi for invoicing.

10   Q.    And is it also consistent with the subcontract between

11   F.G.G. and Mitsubishi?

12   A.    Yes.

13   Q.    Is that where the money was wired?

14   A.    Eventually, some money was.

15   Q.    Was it wired directly --

16   A.    No.

17   Q.    -- from C.F.E. as per this little box?

18   A.    No.

19   Q.    Okay.  C.F.E. did not wire the money to you?

20   A.    Uh, no.

21   Q.    And earlier in your e-mail you said you were -- you gave a

22   date that the payment was supposed to be made?

23   A.    Correct.

24   Q.    Was that payment made on the 6th of March of 2010?

25   A.    No.

1    Q.   I'm sorry, I can't hear you.

2    A.   No.

3    Q.   Okay.  Do you remember when you finally got paid?

4    A.   I don't, but it could've been at the end of March.

5    Eventually.

6    Q.   Okay.  With regard to Government's Exhibit Number 47A.  I'm

7    going to just use the English.

8              Now, I'll ask you just to look at this and ask whether

9    or not you've ever seen the suggested revised payment schedule?

10   A.   Yes.

11   Q.   Okay.  And when did you see this and why did you see this?

12   A.   I cannot remember when I did first see this.

13   Q.   I'm sorry?

14   A.   I could not definitely say when I've seen this.  It would

15   be in early 2010.

16   Q.   Why did you -- what were -- was this provided to you?

17   A.   Well, if you look and if you scroll down again.

18   Q.   Yes, sir.

19   A.   It says here, the first -- the event and date and the price

20   offered and then it says assignment of contract the first

21   payment is two -- you're moving too fast.

22   Q.   I'm sorry?

23   A.   Okay.  The first payment is two months after signing the

24   contract.  So basically, this one was with F.G.G. and C.F.E., so

25   I took that as January the 6th, right, so two months after that

1    is March the 6th, so that's why I put March the 6th down as the

2    payment was due.  And then we come to the next column.  It's

3    price offered was -- it says 16.5 percent.

4           MS. KANOF:  Excuse me, Your Honor, since he used this

5    to figure his invoice, may we publish it to the jury and move it

6    in admittance as Government's Exhibit 47A.

7           THE COURT:  Any objection to 47A.

8           MS. FRANCO:  Yes, Your Honor.  It's not an e-mail that

9    he either authored or received.  At the beginning of 47A is an

10   e-mail.

11          MS. KANOF:  Um, we -- you know, we'll tie it up later,

12   Your Honor.  Mr. Ponce will testify that he received it.

13          THE COURT:  Well, when is Mr. Ponce going to testify?

14          MS. KANOF:  Probably tomorrow.

15          Anna?

16          Probably tomorrow.

17          THE COURT:  All right.  I'm going to allow you to

18   display that to the jury.  I'm going to admit it provisionally,

19   but Mr. Ponce absolutely needs to lay the foundation to that.

20          MS. KANOF:  Yes, Your Honor.

21          THE COURT:  All right.

22   BY MS. KANOF:

23   Q.   All right.  Now with regard to this chart --

24          MS. KANOF:  I won't show the e-mail until Mr. Ponce

25   has testified, Your Honor, just the chart that he used.

1    BY MS. KANOF:

2    Q.   What were you saying about the first payment?

3    A.   Basically, the first payment says here two months after

4    signing of the contract.

5    Q.   Okay.

6    A.   So basically, as we see in the C.F.E.-F.G.G. contract was

7    signed on January the 6th, right, so from January the 6th, the

8    first payment was due two months later which was March the 6th,

9    which I put in my letter that payment was due March the 6th.

10   Q.   Okay.  And with regard to the other two columns it says

11   Option A and Option B.  Did you have input regarding your

12   opinion of Option A and Option B?

13   A.   Basically, I was not in control of that one.

14   Q.   All right.  And at some point in time, did the price

15   adjustment occur?

16   A.   Yes.

17   Q.   Do you know when that was?

18   A.   It was -- I think it was March-, April-time of 2010.

19   Q.   Now, with regard to the payment schedule getting changed,

20   are you familiar with how the payment schedule was changed?

21   A.   The first time?

22   Q.   The first time.

23   A.   The first time, basically, I understood that there would be

24   a reduction of 1 million from our contract and it would be split

25   half a million from our portion and half a million from T.A.I.

1    portion, right.

2    Q.   Well, you didn't participate in changing -- reducing your

3    price, did you?

4    A.   No.

5    Q.   No.  But as a result of it, were you given a new price for

6    you to figure how much to invoice?

7    A.   I did.  I was given 102 million.

8    Q.   When you invoiced, did you invoice a different amount?

9    A.   I --

10   Q.   Did you re-do the first invoice?

11   A.   Uh --

12   Q.   Or did you take the new amount into account in the second

13   invoice?

14   A.   I cannot remember.

15   Q.   Okay.  With regard to -- we talked about this kick off

16   issue.  Have you still -- now you're asking for money and it

17   said February for March 6th, did -- had you had a kickoff

18   meeting, yet?

19   A.   No.

20   Q.   How do you know -- did you expect to get the money on

21   March 6th?

22   A.   Yes.

23   Q.   Okay.  And why did you need the money on the scheduled

24   date?

25   A.   Well, for the refurbishment I needed to get the equipment

1    and I was out laid because we were doing inspections, we were

2    doing engineering interfacing, so I was paying for storage fees.

3    So I had a lot of outlay going out, with it, so basically I

4    needed some inflow to balance my books or my budget.

5    Q.   Do you send an e-mail to Mr. Delgado?  It's a little bit

6    difficult seeing this.

7            MS. KANOF:  Could you -- can you give me number 55,

8    please?

9            I got it.  No, that's not it.  I'll do it.

10   BY MS. KANOF:

11   Q.   Did you send and e-mail on April 1st of 2010 to Mr. Gireud

12   with copies to Mr. Delgado?

13   A.   Yes.

14           MS. KANOF:  We move that Government's Exhibit Number

15   55 be admitted into evidence.

16           THE COURT:  Ms. Franco?

17           MS. FRANCO:  No, objection.

18           THE COURT:  GX-55 is admitted.

19           MS. KANOF:  I'm sorry.  I keep walking on you, Judge.

20           THE COURT:  It's all right.

21   BY MS. KANOF:

22   Q.   What's the date of the e-mail?

23   A.   The date is the 1st of April, 2010.

24   Q.   What was the purpose of the e-mail?

25   A.   I tried to track down where the payment was.

DIRECT BEDDARD                                                    35

1    Q.   And who did you write it to?

2    A.   Fernando Gireud.

3    Q.   All right.  So you were supposed to get the first payment

4    on March 6th; is that correct?

5    A.   Correct.

6    Q.   And now it's April 1st?

7    A.   Correct.

8    Q.   And you still have not received the payment?

9    A.   Correct.

10   Q.   Did you know that Mr. Delgado had $20 million in his bank

11   account from C.F.E. at this time already?

12   A.   No.

13   Q.   Did you know that the payment was made timely in the second

14   week of March?

15   A.   No.

16   Q.   And so you are -- you've copied Mr. Delgado on this e-mail,

17   correct?

18   A.   Yes.

19   Q.   And you've used two different e-mail accounts in order to

20   copy him.  Why did you do that with regard to your protocol?

21   A.   Basically, normally when -- if I get sent another e-mail

22   address from the same person, I put them into my address book.

23   Q.   All right.  And so at some point in time you had already

24   communicated with Mr. Delgado?

25   A.   I think so.

1    Q.    And what are you asking him --

2    A.    Um --

3    Q.    -- or asking Mr. Gireud in copying Mr. Delgado?

4    A.    It says, Fernando, we've been informed that our payment for

5    our invoice was wired to your bank yesterday as of 4:00 p.m.

6    Thursday the 1st of April.  No payment has been received --

7    meaning no payment received in our bank.  Can you please send us

8    the bank statement, transaction number for C.F.E.-F.G.G. wire

9    transfer to Mitsubishi Power Systems America.

10   Q.    Let's break this down.  You were informed that Mitsubishi's

11   payment for the invoice was wired to your bank the day before;

12   is that correct?

13   A.    That's correct.

14   Q.    Okay.  Who informed you of that, do you know or recall?

15   A.    I don't recall.

16   Q.    All right.  And so you're basically asking them -- I think

17   the e-mail speaks for itself.

18            MS. FRANCO:  Your Honor?

19            THE COURT:  Sustained.

20   BY MS. KANOF:

21   Q.    Do you continue to communicate with Mr. Gireud regarding

22   this issue?

23   A.    I think so.  Yeah.

24   Q.    Okay.  Government's Exhibit Number 57, do you recognize

25   that as an e-mail from you to Mr. Gireud?

```
 1   A.   Yes.
 2           MS. KANOF:  Move that Government's Exhibit Number 57
 3   be admitted into evidence.
 4           THE COURT:  Ms. Franco?
 5           MS. FRANCO:  No, objection.
 6           THE COURT:  GX-57 is admitted.
 7           MS. KANOF:  Okay.
 8   BY MS. KANOF:
 9   Q.   And do you recall this e-mail?
10   A.   Yes.
11   Q.   And beginning at, as most mail chains do at the bottom, did
12   you initiate this e-mail chain or did Mr. Gireud?
13   A.   I initiated.
14   Q.   And can you tell me what date?
15   A.   I initiated the first one on April the 1st I just
16   mentioned, 2010.
17   Q.   And then that -- and then was it responded to?
18   A.   I can't remember, but it will be a chain of e-mails.
19   Q.   Okay.  Did Mr. Gireud respond to you on the same day?
20   A.   Yes.
21   Q.   What did he tell you?
22   A.   He said, Hi, Kevin.  I do not have the information yet.  My
23   bank just told me that I was getting a wire transfer today for
24   one -- I take it as 1 million -- and that it will be posted
25   tomorrow morning.  I bank with Wells Fargo and they told me that
```

1    usually the national transactions take three to five business

2    days.  If I find out more info I will call you all and Hector.

3    Q.   And how did you respond?

4    A.   Basically, I responded, Fernando, for your information, the

5    payment had not arrived by noon Friday.  We will check Monday we

6    will require transaction numbers and track -- for tracking

7    purpose.

8    Q.   When he said that he was supposed to get $1 million into

9    his account, what did you do?

10   A.   Uh, well, for me, I'm not there to deal with F.G.G.

11   business.  That could be getting 1 million from anywhere.  I'm

12   waiting for my money, Mitsubishi money.

13   Q.   And how much money were you waiting for?

14   A.   Basically, initially the invoice was 16 million and I think

15   it got reduced to 15.

16   Q.   And how does he respond to you on Sunday, April 4th?

17   A.   Basically, on the 4th he says, Hi, Kevin, as I said last

18   week, I will be trying to find out tracking numbers or anything

19   to help you.  Unfortunately, I do not have any control of this.

20   As you know, the info from your bank was sent directly to Marco

21   and I think he transferred the info to C.F.E. and the Federal

22   Comisión, but I will try to find out.  Have you reviewed the

23   codes and all of the info to make sure it was okay?  I have a

24   doctor's appointment from 8:00 a.m. to about 11:00, E.L.P.,

25   El Paso time.  I will call while I wait with the doctor.

1    Q.   Why did you continue to communicate with him when he said

2    it was Mr. Delgado who provided your wiring information?

3    A.   Because bank protocol is actually Fernando, unless Fernando

4    tells me to contact.

5    Q.   And finally on this e-mail chain of that Monday, what did

6    you respond to Mr. Gireud?

7    A.   On the Monday, which I take it would be the 5th of April,

8    Fernando, just a reminder, please send a copy of C.F.E. letter

9    you received last week referring to the C.F.E. payment and a

10   request for a kickoff meeting.

11   Q.   Did you eventually get your approximately

12   16-plus-million-dollars?

13   A.   No.

14        MS. FRANCO:  Objection, Your Honor.  He testified that

15   he was expecting 15 million not 16.

16   BY MS. KANOF:

17   Q.   I'm sorry.  How much were you expecting?

18        THE COURT:  Well, I'll sustain your objection.

19        MS. FRANCO:  Thank you, Your Honor.

20   BY MS. KANOF:

21   Q.   How much were you expecting, sir?

22   A.   The initial invoice was for 16.8 million, whichever it was,

23   but then it was negotiations and things and I think it got

24   reduced down to 15.

25   Q.   Okay.  With regard to Government's Exhibit Number 67, are

1    you copied on this e-mail?

2    A.   Yes, ma'am.

3    Q.   And why are you copied on this e-mail?

4    A.   Well, I'll be the project manager.

5    Q.   And is it important for you to have the information in the

6    contents of this e-mail?

7    A.   With dealing with balances and amount going into the

8    project, yes.

9         MS. KANOF:  Move to admit Government's Exhibit Number

10   67 into evidence.

11            THE COURT:  Ms. Franco?

12            MS. FRANCO:  No, objection.

13            THE COURT:  GX-167 is admitted.

14   BY MS. KANOF:

15   Q.   Could you please tell the jury what this is e-mail is

16   about?

17   A.   It's from John Adams, who was my boss at the time, to

18   Fernando.  Unfortunately, your letter did not clear up the

19   situation.  In good faith, we had agreed to the first payment

20   from F.G.G. to M.P.S.A. in the amount of

21   40-million-point-493-thousand-434.  And we expected you to

22   confirm the same as you verbally did yesterday.  Please confirm

23   that M.P.S.A. and T.A.I. will receive the balance of the amount

24   due immediately.

25            Also, we must clearly be informed of all common

1   payments amounts and dates, so that we have certainty of the

2   payments of the total amount of 103 million will be paid.  Also,

3   we need your confirmation that all financing, L.C. and banking

4   fees are outside the scope and the price.

5   Q.   So does that refresh your memory how much money you were

6   supposed to receive in April?

7   A.   40-million-493.

8   Q.   How much did you receive?

9   A.   Eventually, we received 11 million and I can't remember.

10          MS. FRANCO:  Your Honor, I'm sorry to interrupt at

11  this time, but the Government's 67 that I have isn't the one

12  that's being displayed.  Maybe if Ms. Kanof can scroll down to

13  show us the exhibit number.

14          MS. KANOF:  Oh, I'm sorry.  I'm talking about

15  Government's 61.  I apologize and would move Government's 61.

16  67 is the next e-mail.

17          THE COURT:  Ms. Franco?

18          MS. FRANCO:  No, objection Your Honor.

19          THE COURT:  GX-61 is admitted.

20          MS. KANOF:  I apologize.

21  BY MS. KANOF:

22  Q.   So, you -- this is an e-mail verifying that you did expect

23  the 14-and-a-half and you received how much, I'm sorry?

24  A.   It was 11.3 million I think or about.

25  Q.   And with regard to that, Government's Exhibit Number 67,

1   now 67, you recognize this e-mail as having been initiated by

2   you?

3   A.   Yes.

4           MS. KANOF:  We move 67 into evidence at this time?

5           THE COURT:  That is in evidence, 67.

6   BY MS. KANOF:

7   Q.   And what is this document?

8   A.   The subject of the document is the F. --  the Agua F.G.G.

9   subcontract for purchase of gas turbine generators and steam

10  turbine generators.

11  Q.   What is the date?

12  A.   The date is the 20th of April, 2010.

13  Q.   And attached to this e-mail is what document?

14  A.   It says that it's invoice number two.

15  Q.   Okay.  Do you recognize the attachment?

16  A.   Yes, it's the second invoice.

17  Q.   And if you could please describe -- first of all, what is

18  the date in the second invoice?

19  A.   March 23rd.

20  Q.   You previously testified that you had not received the

21  first payment until sometime in April; is that correct?

22  A.   The first payment, yes.

23  Q.   So you are sending the second invoice even before you

24  receive the first payment?  Why are you doing that?

25  A.   Because the payment schedule, they noted that.

1    Q.    I'm sorry.  Can't hear you, sir.

2    A.    The payment schedule agreed, right, would have denoted that

3    the second invoice would be due.

4    Q.    Okay.  And what percentage of the total contract are you

5    invoicing on March 23rd?

6    A.    On this one it's down to 10 percent of the 45 million for

7    the gas turbine and 10 percent for the steam turbine.

8    Q.    And as a result, what is the total dollar amount that you

9    are requesting?

10   A.    Basically, further payments of 9,780,907.  After paying

11   back another payment of 1 million point 1 million [sic].

12   Q.    Okay.  When you say "paying back," what do you mean?

13   A.    Well, the new payment schedule that changed and given me,

14   meaning that the first invoice, right, was 10 percent of the

15   contract, which meant that I needed 10.2 million not 16 million,

16   so they actually only sent was 11-million-and-3, so there was a

17   deficit, so they'd overpaid us according to their next payment

18   schedule, right.  So I in theory had to pay that money back.

19   You know I can't accept anything that was not mine or

20   Mitsubishi, so I had to give them a credit on that one and then

21   the deduction is deducted.

22   Q.    Okay.  So let's go back to the first payment.  The first

23   payment originally your invoice was...

24   A.    16-million-  --

25   Q.    Something.

1    A.   -- -something.

2    Q.   And it was renegotiated and you were supposed to get...

3    A.   Basically, again, it was renegotiated and we were forced to

4    get, um --

5    Q.   14-something?

6    A.   It was 14,300,000.

7    Q.   And I've highlighted what you actually got.  How much?

8    A.   We actually got out of the 14 million, 11 million.

9    Q.   No, the actual -- when you were supposed to get 14 million,

10   you have put first payment received April 1st?

11   A.   Yes.

12   Q.   And how much did you actually receive?

13   A.   11-million-point-3.

14   Q.   Okay.  And -- but you expected based on the negotiation to

15   get more?

16   A.   Yes, 14 million.

17   Q.   All right.  Why are you giving money back if you got less

18   than you were supposed to get?

19   A.   Because they renegotiated again, because we didn't get the

20   money.  And so they made another payment schedule, right, to say

21   that the first payment, right, should have been

22   10-million-point-2, right, with it.

23        Then the second payment would be the second payment,

24   which is the top, would be 9 million as expected, additional 9

25   million, and then for the steam turbine, additional 1.1 million

1    for the second payment.  So when I put them both together what

2    I've got to look at is that now with the new payment schedule,

3    the first payment, which initially was 16.8 million, right, then

4    changed to 14, now it changed to actually 10.2 million.  I'd

5    received 11.3 million.  So I had deduct, right.  So there was

6    access -- in excess of the invoice of one point.  And because

7    we're honorable, right, we paid that back.  Well, we gave a

8    credit.  So I gave a credit of that back in the second invoice

9    and that's why that change.

10   Q.    In this box is this -- what is this language?

11   A.    Again, it's the same language I put on all, because we had

12   not received the direct payment.  The assignment of our

13   collection rights was not given to us still at this time, right,

14   so again I put that same block of language in and then I put

15   again remit to Mitsubishi bank.

16   Q.    Before you said that you have to accept a contract, had you

17   accepted this contract yet?

18   A.    No.

19   Q.    Why?

20   A.    Because it was too fairy-fairy.  It just -- I could not

21   operate it, you know, with it.  They were changing payment

22   schedules on me, right, with it, because we didn't get paid, so

23   then it was renegotiations, so we didn't get a rock solid, full

24   counter-contract for me to administrate it.  So then they wanted

25   to do a new amendment to make that contract whole, so a new

1    amendment was organized.

2    Q.   Was there ever an amendment about the collection rights?

3    A.   No.

4    Q.   Was there ever an amendment about the letters of credit?

5    A.   No.

6    Q.   Government's Exhibit Number 68, do you recognize this as

7    being your e-mail address?

8    A.   Yes.

9              MS. KANOF:  Move Government's 68 into evidence.

10             THE COURT:  Ms. Franco?

11             MS. FRANCO:  One moment, Your Honor.

12             THE COURT:  Yes, ma'am.

13             MS. FRANCO:  No, objection.

14             THE COURT:  GX-68 is admitted.

15   BY MS. KANOF:

16   Q.   And do you recognize this is an e-mail from you?

17   A.   Yes.

18   Q.   Can you -- what is the date of the e-mail?

19   A.   The date is April the 20th.

20   Q.   And are you saying the one saying "Dear, sir"?

21   A.   Yes.

22   Q.   What is this e-mail about?

23   A.   Basically, I'm asking that there be a mutual agreement to

24   the payment terms specified under the same contract.  And it's

25   been our recent agreement to amend payment terms and reflecting

1    annex five attached to this letter.  So I'm just reiterating

2    basically that our first payment under that annex should have

3    been 14-million-point-493-434.

4    Q.    And not the 11 million?

5    A.    No.

6    Q.    Okay.  Now in this second paragraph you talk about fees for

7    letter of credit.  Can you explain why you are talking about

8    that?

9    A.    Basically, our subcontract, again, we supplied the

10   equipment and the financial part of this would be guarantees,

11   had to be put up, and normally guarantees are letters of credit

12   put in place as a guarantee of financial.

13   Q.    Who was supposed to provide letters of a credit to

14   guarantee the equipment in this case?

15   A.    F.G.G.

16   Q.    F.G.G.?

17   A.    Yes.

18   Q.    And that -- was that in any of the other contracts that you

19   had entered into with them, if you can recall?

20   A.    As far as I know, all of the fees were F.G.G.s.

21   Q.    All right.  Let me go to -- were you familiar with the

22   teaming agreement?

23   A.    Not in-depth, no.

24   Q.    But was it one of the agreements that you had to review?

25   A.    Yeah.  I reviewed it as part of the risk analysis at the

1    beginning.

2    Q.    Okay.  And on page four of the -- what was the teaming

3    agreement?

4    A.    It was the mutual agreement between the parties about the

5    equipment and how it would be if it was sold and went forward, a

6    structure to go toward.

7    Q.    And it was between who?

8    A.    Between Mitsubishi, F.G.G. and T.A.I., Thomas Aircraft

9    International.

10   Q.    T.A.I.?

11   A.    T.A.I.

12   Q.    Okay.  And so you had to review this document in order to

13   do your job?

14   A.    I did a risk analysis, right, to find out if anything

15   affected, right, the administration to the subcontract.

16   Q.    Did you rely on the language in the teaming agreement to do

17   your risk analysis?

18   A.    Basically, yeah, it was there.  It was agreed by all

19   parties, so I took that as permittable.

20          MS. KANOF:  Government moves Government's Exhibit 7.

21          MS. FRANCO:  We object, Your Honor.  He's not the

22   author of it.

23          THE COURT:  All right.  So what is your objection?

24          MS. FRANCO:  Well, as to she hasn't laid the proper

25   foundation for it, Your Honor.  He says they've reviewed it for

1     risk assessment.  He didn't review for any other purpose but

2     that as far as the financial terms.

3              THE COURT:  Her objection is foundation, Ms. Kanof.

4              MS. KANOF:  Your Honor, the parties who entered into

5     this will testify.  It was signed by -- it was signed by -- I

6     think it was signed by Mr. Gireud and by John Adams who will

7     both testify.  John Adams should testify either today or

8     tomorrow and Mr. Gireud is going to testify next.

9              THE COURT:  And they will identify the documents?

10             MS. KANOF:  They will, Your Honor.

11             THE COURT:  And lay the proper foundation if that is

12    what it is?

13             MS. KANOF:  Yes.

14             THE COURT:  All right.  I'm going to admitted

15    provisionally with the understanding that that will be -- the

16    foundation will be laid by Mr. Gireud.

17    BY MS. KANOF:

18    Q.   Mr. Beddard on page four of the teaming agreement, there's

19    a paragraph number two called "mutual obligations," do you see

20    that?

21    A.   I do.

22    Q.   And in the middle of that paragraph, does it indicate who

23    must provide the letters of credit for the equipment and

24    service?

25    A.   It says F.G.G. will also provide any letters of credit

1    required by the R.F.P. for the supply of the equipment and

2    service.

3    Q.    What's an R.F.P.?

4    A.    It's basically the request for a price of estimate.

5    Q.    It's the bid?

6    A.    It's the bid, yeah.

7    Q.    Okay.  So there was an agreement then.  And did you look at

8    any other documents that also verified that?  Do you know

9    whether or not it's in the prime contract, the letters of credit

10   language?

11   A.    Again, I did not do the prime -- the prime contract is not

12   my contract.

13   Q.    Okay.

14         With regard then back to number 68, your letter, your

15   e-mail, you talk about this amount of money regarding two

16   letters of credit, fees for letters of credit

17   2-million-678-plus-change.  Why are you talking about that?

18   A.    Because what was informed to me is the reduction in the

19   price was based because F.G.G. were finding difficulty in paying

20   for all of the financial costs and hardship.  So basically it

21   was agreed that an additional monies would be given to them to

22   offset any hardship in providing all of the financial services,

23   which included the letter of credit.

24   Q.    Did you -- did Mitsubishi agree to that?

25   A.    To give them additional --

1    Q.   To allow more than $2 million to be withheld from your

2    payment for financing the letters of credit?

3    A.   No.  No.

4    Q.   No.  And are you telling them that?

5    A.   Basically, yeah.

6    Q.   So you've now -- has a discovery been made why you only got

7    11 million instead of 14 million?

8    A.   Basically, what we were informed that, and if I can get it

9    right, I think it was informed was that C.F.E., the Comisión had

10   actually distributed the monies accordingly, right.

11   Q.   Okay.  And you're not saying that you know that was the

12   truth, but that's what you were told?

13   A.   That's what I was told.

14   Q.   Okay.  And you continued to talk a little bit in this

15   e-mail about the monies; is that correct?

16   A.   Correct.

17   Q.   Okay.  What is the real purpose of this letter?  Why are

18   you saying Mitsubishi is insecure?

19   A.   Well, as I've said before, we're supplying the equipment

20   and we needed payment for that equipment, and because the only

21   guarantee was the equipment, it belonged to us, you know, title

22   and everything belonged to us.

23        Now, once we let that ship, right, because remember

24   this contract was assumed that we would deliver, right, and that

25   portion.  When it was ex works, right, that meant somebody else

1    would have to come in to the different factories around the

2    world and take our equipment and take it to Mexico.  Well,

3    basically, that was the only collateral, right, insurance that

4    we had is the equipment belonged to us.  And because of the

5    payments not coming on time and not coming in the amounts, gave

6    us an insecure feeling and we wanted -- first of all, the

7    collection rights were not there, again.

8            So if we had the direct collection rights on the

9    invoice amounts directly from the Comisión and C.F.E., them

10   being the government of Mexico, gives us a more assured [sic]

11   that we're okay, but the payments coming through from a third

12   party gave me no insurance.

13   Q.   I, what are you complaining about?

14   A.   Ensure prompt payment of unpaid deficiencies in the first

15   milestone invoice payment.

16   Q.   Okay.  So that's the missing money, correct?

17   A.   The missing money, yes.

18   Q.   And I, what are you complaining about?

19   A.   Future payments shall be wired directly to M.P.S.A.

20   designate account without any deductions or setups for any costs

21   or expenses currently outstanding, if any, which may arise in

22   the future connection with any financing nn secured on behalf of

23   F.G.G.

24   Q.   Okay.  Including the letters of credit?

25   A.   Yes.

1    Q.    Because that was F.G.G.'s responsibility?

2    A.    Correct.

3    Q.    And then how do you conclude?

4    A.    Please be advised that F.G.G.'s failure to deliver M.P.S.A.

5    written confirmation from the Federal Comisión acknowledging

6    that the full amount of all future milestone payments payable to

7    M.P.S.A. will be paid directly to M.P.S.A. pursuant to the

8    assignment of collection rights under the subcontract by the

9    close of business April 23, 2010.

10   Q.    And then you were saying -- what will that mean?

11   A.    Will be.  If it isn't done, will be deemed as a breach of

12   subcontract.

13   Q.    Okay.  And you sent this to Mr. Gireud; is that correct?

14   A.    Correct.

15   Q.    And what did you attach?

16   A.    Now, the payment schedule annex five.

17   Q.    Okay.  So what did you attach to this e-mail?

18   A.    This was the -- I attached the payment schedule that I was

19   under the impression was agreed by all parties in good faith.

20   Q.    Okay.  And is it your job to tell the party that it was in

21   breach of contract?

22   A.    Yes, because I administrated my subcontract.

23   Q.    Okay.  You also attached to your e-mail a letter in

24   Spanish; is that correct?

25   A.    Yes.

DIRECT BEDDARD                                                              54

1    Q.   Where did you get this letter?  Do you recall?

2    A.   I don't recall, actually, where I got it.

3    Q.   Why did you attach this letter?

4    A.   Because as I've said, the -- this was what was told to us

5    that the Comisión had distributed my invoice.

6    Q.   Okay.  I'm sorry.  You were told what, that the Commission

7    disputed your invoice?

8    A.   My invoice, right, was there as you see and somebody had

9    then took out all of the financials and charges from my invoice.

10   Q.   This?

11   A.   Well, here, right, as you see the first payment was that,

12   was 14.493 million.  It was supposed to be the payment.

13   Q.   Yes.

14   A.   Should have gone in our bank.

15   Q.   Okay.

16   A.   But then we were told that -- if you'd scroll down to the

17   Spanish one, right -- that they deducted the financials, which

18   is 2.6 million, and they deducted 1 million, right, which left

19   only 11.3 million to be paid to Mitsubishi.

20   Q.   And what does that have to do with you?  You don't have a

21   contract with C.F.E., do you?

22   A.   Exactly.  That's why I sent the letter to -- I want to be

23   paid my money or Mitsubishi.

24   Q.   You said you were told?  Who told you by you?  By "you," I

25   mean Mitsubishi?

1    A.    I think Marco.

2    Q.    The date of this letter that was provided to you is what?

3    A.    When I look at that, the 30th of March, 2010.

4    Q.    Okay.  And you notice underneath the date there is a

5    number, correct?

6    A.    Yes.

7    Q.    Number 20, correct?

8    A.    Correct S.T.-20.

9    Q.    Okay.  And so this was provided to you by someone, right?

10   A.    Correct.

11   Q.    And basically it explains why you only got $11 million?

12   A.    Well, that was what we were told as the explanation.

13   Q.    Okay.  And somehow -- so you're sending a letter saying,

14   well, what -- about that retention fee and that $1 million?

15   A.    Yeah.

16   Q.    What are you telling F.G.G. about -- they send you this

17   letter saying the Comisión decided to charge a fee for the

18   letters of credit and another million-dollar fee and what are

19   you felling F.G.G. about those fees?

20   A.    That's not my subcontract.  My subcontract said I needed

21   14.3 million as the first payment.

22   Q.    And that's the agreement that you had?

23   A.    Correct.

24   Q.    Okay.  And also that F.G.G., with regard to who's

25   responsible for the letters of credit and the financing of the

1    letters of credit, do you make it clear in the first page, fees

2    for the letters of credit are the responsibility of F.G.G.?

3              MS. FRANCO:  Objection, Your Honor, asked and

4    answered.  Leading.

5              THE COURT:  I'll sustain the leading objection.

6    BY MS. KANOF:

7    Q.   What do you make clear regarding the responsibility for

8    those fees?

9    A.   Basically, what I'm making clear is that Mitsubishi was due

10   14.3 million with no deductions.  All the deductions, if they

11   were true and factual was to the account of F.G.G. not to the

12   account of Mitsubishi.

13   Q.   After you sent this e-mail, does Mitsubishi continue to

14   negotiate with F.G.- -- I mean you're saying you're in breech;

15   is that correct?

16   A.   Yes.  Well, I put a date, I think, if it's not rectified.

17   Q.   Okay.  As we have e-mails -- oh, by the way, Government's

18   Exhibit Number 69, is that the response to Government's Exhibit

19   Number 68 copied also to you, part of the e-mail chain?

20             Let me show you the bottom so that you can see.

21   That's your original, the bottom of this e-mail?

22   A.   Yes.

23   Q.   Okay.  And Government's 69 are responses and further

24   communications with regard to that e-mail; is that correct?

25   A.   That's correct.

```
 1              MS. KANOF:  We move Government's Exhibit 69 into

 2    evidence.

 3              THE COURT:  Ms. Franco?

 4              MS. FRANCO:  No, objection.

 5              THE COURT:  GX-69 is admitted.

 6    BY MS. KANOF:

 7    Q.   Who is Patrick Altamura?

 8    A.   He's the leading representative.

 9    Q.   And does he send a follow-up e-mail to your breach of --

10    your notice of breach of contract?

11    A.   Yes, I think he did.  Yes.

12    Q.   In your notice of breach of contract you gave them three

13    days till April -- did you give them three days?

14    A.   I think I gave them a deadline of April 23rd.

15    Q.   Okay.  Now, in this particular -- in Government's Exhibit

16    Number 69, Mr. Altamura your legal counsel is -- what is he

17    doing?

18    A.   We received the documentation required under M.P.S.A.

19    notice sent by Kevin Beddard.  So, basically, he's -- from the

20    legal point of view, he's telling them legally he agrees with my

21    statement.

22    Q.   Okay.  Had Mitsubishi heard, since you had sent your notice

23    of breach, from anyone at F.G.G.?

24    A.   Not to my knowledge.  I don't know.

25    Q.   When Mr. Altamura says, we have tried to reach you by phone
```

DIRECT BEDDARD                                                    58

1    several times, did you try to reach anybody by phone?

2    A.   I cannot say "yes" or "no," because it was a lot of

3    messages.

4    Q.   You don't specifically recall this incident?

5    A.   No.

6    Q.   Okay.  And further when Mr. Altamura says it's imperative

7    they receive documentation, what documentation was he referring

8    to?

9    A.   I assume it was the collection rights.

10   Q.   Okay.  And had -- did you receive it?

11   A.   No.

12   Q.   Okay.  On that same day, does Mr. Altamura send another

13   e-mail to individuals at F.G.G., including copying it to

14   Mr. Delgado and to you?

15   A.   Yes.

16   Q.   Okay.  And was that in response to an e-mail that had been

17   sent from F.G.G. from an individual named Mace Miller?

18   A.   Um --

19   Q.   I'll go back up, so you can see it.

20   A.   It looks like it says Mace Miller review.  It looks like a

21   draft.

22   Q.   And you are copied on all of these e-mails; is that

23   correct?

24   A.   Correct.

25   Q.   And why are your copied on the e-mails?

1    A.   Basically because they're making an amendment to the

2    subcontract.

3              MS. KANOF:  We ask that Government's Exhibit Number 70

4    be admitted into evidence, Your Honor.

5              MS. FRANCO:  No, objection.

6              THE COURT:  GX-70 is admitted.

7    BY MS. KANOF:

8    Q.   What is Mr. Altamura -- who is Mace Miller?

9    A.   I don't really know.  He's part of the three people at

10   F.G.G. we dealt with.  He said he was the attorney.  Marco said

11   he was the attorney.  I just don't know.

12   Q.   Okay.  But it does refer to you, an updated draft that we

13   have sent to Kevin or sent to Kevin through Fernando; is that

14   you, Kevin, that they're referring to?

15   A.   Yes.

16   Q.   What draft?  Draft of what?

17   A.   Basically, there was being -- an amendment, there had been

18   changes sent forward and red lined, and that looks like Fernando

19   sent the copy the, red line copy directly.

20   Q.   What's being amended?

21   A.   The subcontract.

22   Q.   The original subcontract between F.G.G. and Mitsubishi?

23   A.   Yes.

24   Q.   Why were they amending it?

25   A.   Basically, as I said before, the contract wasn't really a

1    good structured contract, with it, and it was making it more

2    explicit and workable from a project point of view.

3    Q.   Okay.  And Mr. Altamura then forwards that amended

4    self-contract at the top of this e-mail stream and who does he

5    send it to?

6    A.   He sends it to Mace and Fernando Gireud and copies myself,

7    Marco, Ueki-san, a number of people.

8    Q.   Okay, with regard to the second paragraph there's somebody

9    referred to as the lending entity, correct?

10   A.   Yes.

11   Q.   And Mr. Altamura defines the lending entity; is that

12   correct?  What's he doing there?

13   A.   Basically, I think the under the prime contact for the

14   letter of credit it's going to be a financial --

15          MS. FRANCO:  Your Honor, that calls for speculation.

16   He's not the authorized.  He's just copied in on it.

17          THE COURT:  Well, unless he knows, I'll sustain that

18   objection.

19   BY MS. KANOF:

20   Q.   Do you know the importance of that and the meaning of that

21   paragraph?

22   A.   I can only speculate.

23   Q.   Okay.  Then I'll go on.

24          Do you recognize Government's Exhibit Number 72?

25   A.   I do.

```
1    Q.    What is Government's Exhibit 72?

2    A.    It is the amendment -- the agreed and signed, authorized

3    amendment to the subcontract.

4    Q.    Did you have to review and approve it?

5    A.    Basically, part of that, yes.

6    Q.    You -- you -- I'm sorry?

7    A.    Yes.

8              MS. KANOF:  We move Government's Number 72 into

9    evidence.

10             MR. HANSHEW:  No, objection.

11             THE COURT:  GX-72 admitted.

12   BY MS. KANOF:

13   Q.    And that's a subcontract, correct?

14   A.    The amendment.

15   Q.    After the amendment to the second contract or to the

16   subcontract is made, do you receive a letter from Mr. Gireud?

17   A.    I did.

18   Q.    And is that letter memorialized at Government's Exhibit

19   Number 73?  Is that the letter, Government's Exhibit Number 73?

20   A.    I can't see the number.

21   Q.    I'm sorry?

22   A.    I can't see the number.

23   Q.    Oh, sorry.

24   A.    Yes, it is.

25             MS. KANOF:  Move Government's 73 into evidence.
```

```
 1                    THE COURT:  Ms. Franco?

 2                    MS. FRANCO:  No, objection.

 3                    THE COURT:  GX-73 admitted.

 4       BY MS. KANOF:

 5       Q.    Yesterday, you talked about a kickoff meeting and the

 6       purpose of a kickoff meeting.  Who did you need to be

 7       communicating with at C.F.E.?

 8       A.    Basically -- well, not just for C.F.E., to the erection

 9       contractor, who was there, a contractor who would do all of the

10       balance of plan to the station and to install the equipment and

11       so if there are any clarifications or they needed technical

12       information from us, right, to do their job of interface design.

13       Q.    Now, it's May of 2010.  Are you -- do you have a free flow

14       of communication with the people that you need to talk to in

15       order to keep -- get this contract working?

16       A.    Yes, it started really well.

17       Q.    It did?

18       A.    Yes.

19       Q.    Were there people assigned to communicate with you?

20       A.    Yes, the -- yes.

21       Q.    Who was assigned?

22       A.    Basically, they were an engineering company.  C.F.E.

23       assigned project managers and engineers from Mexico City, with

24       it, also the E.P.C.  Their engineering design was called Serna,

25       so, um, they were getting involved.  And they had questions
```

1    because of the elicitation going out with it, so there was a lot

2    of questions going on.  And we found that C.F.E. were not happy

3    with Mitsubishi.

4    Q.    Could you explain why they weren't happy?

5    A.    They've been sending since January request for information,

6    right, to F.G.G. or letters going right away through and

7    actually we had not received them letters.

8    Q.    So let me understand this.

9          Are you verbally communicating with the technical

10   people you need to be communicating with?

11   A.    That's why we had the meeting for the technical people.

12   Q.    And what kind of relationship do you have, your technical

13   people and their technical people?

14   A.    Pretty good.  When engineers talk with engineers, it's

15   happy.

16   Q.    Okay.  Language problems?

17   A.    They're basically, you know -- drawings are always in

18   English, and the contract, how we subcontract, right, stipulate

19   our technical spec, that all technical correspondence and

20   language would be English.  So actually from a technical point

21   of view, it was English, right, was the language.

22   Q.    And you said you found out that C.F.E. was upset with

23   Mitsubishi?

24   A.    Yes.

25   Q.    Why?

1    A.   Because they thought we were not answering their questions

2    on a technical basis and we have not received them.

3    Q.   And who were they sending them to?

4    A.   F.G.G.

5    Q.   What happened when you found that out?

6    A.   It was agreed at the meeting.  Marco was at the meeting.

7    Q.   I'm sorry, there was a meeting?

8    A.   Yeah, you know, with C.F.E. we had regular meetings.

9    Q.   Well, let's go back then.

10             When did these regular meetings start?

11   A.   Well basically we had the kickoff meeting, finally, I think

12   sometime in April.

13   Q.   Where was the meeting?

14   A.   Mexico City.  And then from then it was --

15   Q.   Who was at the meeting?

16   A.   Myself, I took my project engineer, which was John Nest who

17   was the project engineer.

18   Q.   Is that N-E-S-T?

19   A.   N-E-S-T --

20   Q.   Okay.

21   A.   -- was my project engineer.

22   Q.   Who was there from F.G.G.?

23   A.   Marco.

24   Q.   Mr. Gireud was not there?

25   A.   No.

1    Q.   Mr. Miller was not there?

2    A.   No.

3    Q.   Okay.  So, Mr. Delgado was there?

4    A.   Correct.

5    Q.   Okay.  And who was there from C.F.E.?

6    A.   Well, who wasn't there from C.F.E.?  You know, the -- Marco

7    (phonetic) Campbell was the lead engineer from C.F.E.

8    Q.   Okay.  Go ahead.

9    A.   Mr. Avila, who was the director of all construction of

10   projects was there.  The project manager at the time, who was

11   Mr. Baptist (phonetic) -- and there was a multitude.

12   Q.   Were there executives from C.F.E. there?

13   A.   Well, Avila was the head at a time.

14   Q.   You are saying "Avila"?

15        You are saying Avila, A-V-I-L-A?

16   A.   Yes.

17   Q.   And so it was -- did it go well?

18   A.   No.

19   Q.   No?

20   A.   No.

21   Q.   Why?

22   A.   Basically, again what I said, they were very angry to us

23   because they thought that we never answered their questions; we

24   never received them.  And once that was cleared up, and then

25   they brought the correspondence out and the questions.  Some of

1    the questions I could answer straightaway and John Nest could,

2    but a lot of them I had to go back to the technical design

3    people with it.  So then we started what we call an action list,

4    right, of all of the topics that we brought them and we

5    formalized it, right, from that day on.

6    Q.   In order to alleviate this communication problem, did you

7    make any requests?

8    A.   Yes.  We asked for the protocols and can we be copied

9    directly on all of these correspondence.

10   Q.   Okay.  And who did you ask?

11   A.   Basically -- well, C.F.E. and Marco, we all agreed at that

12   table we would get the correspondence go directly to us or

13   copied to us.  We would get the first part of that and then we

14   could deal with that.

15   Q.   Did you?

16   A.   Yes.  Yes.

17   Q.   For how long?

18   A.   It went for about a month or so.  It had become evident

19   there was a difference in the scope of supply between the prime

20   contract between F.G.G. and C.F.E. and the technical spec

21   subcontract.  There was differences.  The clarifications did not

22   pass over in the prime, so...

23   Q.   Let's talk about that.

24            Yesterday, you looked at a paper and you said there

25   were two serial numbers?

1    A.    Yes.

2    Q.    And what did you say about those serial numbers?

3    A.    Those are technical specifications and that was in our bid

4    to F.G.G. and that was part of the contract with F.G.G., is the

5    annex, which is our technical spec --

6    Q.    You contracted with F.G.G. to provide that to C.F.E.?

7    A.    Well --

8    Q.    You, Mitsubishi?

9    A.    Yeah.  We provided to F.G.G. and that was our contract with

10   them, I would supply to them as my duty.

11   Q.    Okay.  And now, what was causing the problem, now?

12   A.    Because that was not the clarifications of what we didn't

13   supply was not in and F.G.G. guaranteed or agreed to supply

14   everything, right, so basically that was then; now, problems

15   that who supplied what.

16   Q.    Well, let's talk about the clarifications.  Why do you have

17   to make clarifications?

18   A.    Uh, on the gray market because the equipment is already

19   manufactured, so you've got what you've got.  We can't

20   unmanufacture it, right, so we can adapt or tweak to suit, but

21   in some cases, we can't do it because it's not there.

22   Q.    Give me an example.

23   A.    Their intake system, with it, because of the temperature

24   difference between Brazil, Paricomi, plus six degrees celsius to

25   Agua, minus 19.5 degrees, see, it's freezing.  Well, normally in

1    intake systems, if it's cold weather and then the icing system

2    is there, it -- we use warm air to warm the front of the

3    filters, if you like, so, right, it gets warm so we take the air

4    in.  And it can't freeze, because if you remember these are

5    outside and the filter system is outside, so you have a freezing

6    day that can ice and it can block and then a catastrophic

7    failure happens.

8    Q.   Mr. Beddard, can you give us a specific example -- --

9    A.   God.

10   Q.   -- instead of the technical example, like on a car or a

11   blackboard or something?

12            THE COURT:  Ms. Kanof, hold on.  Let's go ahead and

13   take a recess and maybe you can come up with a --

14            MS. KANOF:  Oh, he came up with one.

15            THE COURT:  Ladies and gentlemen, if you would be back

16   in the jury room at 10:59, I hope to restart our proceedings at

17   11 o'clock.  We're in recess for 15 minutes.

18            COURT SECURITY OFFICER HEIDTMAN:  All rise.

19            (Jury break.)

20            THE COURT:  Ms. Kanof, there's a lot of people in the

21   back.  I don't know if they're witnesses.

22            MS. KANOF:  They're not.

23            THE COURT:  If I could just remind you, the Rule has

24   been invoked.

25            MS. KANOF:  I don't see any witnesses, Your Honor.

1          THE COURT:  Each counsel is in charge of its

2     witnesses.

3          I thought that was a pretty simple example.

4          (Courtroom laughter.)

5          MS. KANOF:  Well, I needed it to be more simple, so he

6     did simplify it for me, but...

7          (Break at 10:48 p.m. to 11:04 a.m.)

8          (Jury present.)

9          THE COURT:  Let the record reflect that all members of

10    the jury are present, the United State's assistant attorney are

11    present, the defendant and his counsel is present.  The witness

12    Mr. Beddard is in the witness stand.

13          Ms. Kanof?

14    BY MS. KANOF:

15    Q.   So, during the break did you figure out a more simple way

16    of explaining this?  Maybe I am the only one that needs it, if

17    you could.

18    A.   In simpler terms, if you look at what we supply, if you buy

19    a new car, you have additions, you know, what you do extras, and

20    you take the extras you want, with it, the same with a turbine,

21    right, and we take them extras from the specification where it's

22    going, you need this, right, because this was already prebuilt,

23    but that option was not there.  So again, it's on the icing one

24    for the filter system, right, could cause blockage to the air

25    coming in this turbine, and if anybody has a car and you have

1    the air filter, you put your hand plus the filter, you block it,

2    the engine stops, exactly the same as turbine.

3    Q.   Who wanted an anti-icer?

4    A.   C.F.E.

5    Q.   And what was the problem?

6    A.   Basically, it was not in our specification and

7    clarification said so.

8    Q.   Okay.  And you found out they didn't have the

9    clarifications?

10   A.   Uh, that's when we started that it wasn't -- C.F.E. claimed

11   it was in the prime contract.

12   Q.   With regard to communications, you cleared up that

13   initially, and did there come a time again when there were no

14   communications or poor communications?

15   A.   Basically, yes.

16   Q.   What happened?

17   A.   Again, it's these additional additions weren't clarified,

18   not in our specification, but were in the prime contract.  So

19   now, C.F.E. wanted them all to be clarified and installed, so

20   there was a lot of, what we say, to and from.  My stance was as

21   the project lead, it's up to F.G.G., right, and F.G.G. said, no.

22   It's up to us to do it and C.F.E.  So there was a breakdown, if

23   you like.

24   Q.   Do you -- you said at the meeting -- at the kickoff

25   meeting, Mr. Gireud wasn't there, correct?

 1    A.   Correct.

 2    Q.   Okay.  Mr. Delgado was there?

 3    A.   Correct.

 4    Q.   At the technical meetings, who, if anyone, would go to the

 5    technical meetings from F.G.G.?

 6    A.   Marco Delgado.

 7    Q.   And do you know what he does for a living?

 8    A.   Yes.

 9    Q.   What?

10    A.   Well, it's attorney.

11    Q.   And do you know what Fernando Gireud did for a living?

12    A.   I knew him from the El Paso power.  I think he was a V.P.

13    Q.   At El Paso Electric Company?

14    A.   That's it.

15    Q.   Do you know what his education is or background?

16    A.   No.

17    Q.   He was not at the meetings?

18    A.   No.

19    Q.   All right.  Did Mr. Delgado attend all of the meetings?

20    A.   Um --

21    Q.   The technical meetings, I'm talking it.

22    A.   Yes.

23    Q.   And did he participate?

24    A.   Yes.

25    Q.   In what manner did he participate?

1   A.   I don't know how I can put this; gagging me, I think.

2   Q.   I'm sorry?

3   A.   Telling me to keep quiet.

4   Q.   Why did he tell you to keep quiet?

5   A.   Because of these differences.

6   Q.   An example, do you have any recollection of what he told

7   you to keep quiet?

8   A.   Basically, yeah, there was meeting where the anti-icing

9   come up, the code of order, differences come up.  The fuel gas

10  temperature come up.  There was a list, right.

11  Q.   And who had drawn up this list?

12  A.   Basically, the project managers of C.F.E.

13  Q.   All right.  And what was going on with regard to the list

14  at this meetings?

15  A.   Basically, who's going to supply it.

16  Q.   Who was present other than you and Mr. Delgado?

17  A.   The C.F.E.

18  Q.   C.F.E. technical people or --

19  A.   Yes, project manager.

20  Q.   What is a project manager, just...

21  A.   Well, project manager runs the project.  He manages the

22  project.  So he's the same as me; administers the contract, his

23  contract.

24  Q.   And they had -- did they give you the list directly?

25  A.   No.  It was in the -- as I said, we did an action item

1    list, so they're asking for clarifications, information, and

2    with our responses, right, we said that is not in our scope of

3    supply, that's where they got the list from.

4    Q.   Okay.  So, when do you first start to have disagreement?

5    You mentioned something about an anti-icer?

6    A.   Yeah, that was just one of the out of our scope -- not in

7    our scope to supply, right.

8    Q.   It's one of those things that's not part of the turbine?

9    A.   Correct.

10   Q.   Okay.  And was that part of the specification that was in

11   the subcontract?

12   A.   Basically, the omittance of that was in the subcontract.

13   Q.   Okay.  And should it have been provided to C.F.E.?

14   A.   Basically, for that temperature range, yes.

15   Q.   Did you provided it to F.G.G. to provide it to C.F.E.?

16   A.   No, because we couldn't.

17   Q.   No, I mean, did you provide the absence of that?

18   A.   Oh, yes, yeah.

19   Q.   Okay.  That you didn't meet that specification?

20   A.   Correct.

21   Q.   Okay.  And so what happened at this meeting when you

22   started to bring it up?

23   A.   Um --

24   Q.   What did you say about it?

25   A.   Well, the case is we can provide, now, but it's very

1    difficult, but there's going to be additional costs, right.

2    Technically, right, it's not an ideal situation, because at the

3    design stage of manufacturing, we can install, as I said

4    (indiscernible).  When it's manufactured, especially on the

5    icing, you need a heat source, right, you need to get the heat

6    from somewhere.  Normally, when we do it at the beginning in the

7    design, the heat comes off the compressor side of the turbine,

8    right, and we have valves in there and sends it out, because

9    that wasn't there.  All of this wasn't there.

10             So then we have to look at -- it would have to be

11   another heat source, right.  So we first asked the question,

12   right, what heat source could you give us that we can send to

13   the filter system and we would make a grid system from the

14   filter to supply that turbine.

15   Q.   Who asked that question?

16   A.   I did.

17   Q.   And what did Mr. Delgado do; if you can recall?

18   A.   I cannot recall.

19   Q.   Okay.  What happened next?

20   A.   Basically, the next part was that C.F.E. said one of the

21   heat sources I suggested was not there.  So again it was left in

22   limbo, right, so we kept asking, is anybody going to clarify

23   this to us and can we develop and engineering solution and who's

24   going to pay it, right, with it.

25   Q.   Okay.  And was a request made of you after this meeting by

1    Mr. Delgado?

2    A.   Yes.

3    Q.   What did he ask you to do?

4    A.   He asked me at dinner that I give him a simplistic view of

5    everything, with it, so he is fully familiar with it and he'll

6    discuss that with C.F.E.

7    Q.   Did he ask you to do it in any particular manner?

8    A.   Uh, and I was not to speak directly with C.F.E.

9    Q.   Okay.  And did he tell you whether or not you could

10   provide -- how were you supposed to give him that information

11   and in what form?

12   A.   Basically, I stopped the conversation then.

13   Q.   Okay.  But could you do it publically?  Could you discuss

14   it with Mr. Gireud?

15   A.   But he wasn't there.

16   Q.   Well, okay.

17           Did Mr. Delgado -- in what manner did he ask you to

18   provide it to him, publicly or privately?

19   A.   Well, it was at dinner with my engineers, so...

20   Q.   Okay.  What did you tell him with regard to his request for

21   you to provide him a simplified list?

22   A.   No.

23   Q.   And how did he react?

24   A.   What can I say?

25   Q.   The truth.

```
 1    A.   Not nicely.

 2    Q.   Describe his demeanor.

 3    A.   Forceful.

 4    Q.   I'm sorry?

 5    A.   Forceful demeanor.

 6    Q.   Okay.  Did he raise his voice?

 7    A.   To my knowledge, yes.

 8    Q.   Was there anybody else present?

 9    A.   Yes, my engineers.

10    Q.   Your engineers were present?

11    A.   And I think his wife.

12    Q.   Mr. Delgado's wife?

13    A.   Well, that's what -- I was introduced as is.

14    Q.   Okay.  And had you seen that behavior before?

15    A.   Once or twice.

16    Q.   Under what circumstances?

17    A.   With C.F.E.

18    Q.   You said that C.F.E. provided a project manager to the

19    project; is that correct?

20    A.   Correct.

21    Q.   Do you recall the name of the project manager?

22    A.   The first one, I don't.  The second one was Baptist.

23    Q.   How much project managers were assigned?

24    A.   I had just finished the project and I had five.

25    Q.   Is that common?
```

1    A.    No.

2    Q.    Why did you have so many project managers -- when five, is

3    that serial or all at once?

4    A.    That was at the time.  The first between January and, I

5    think, May, we had three.

6    Q.    Okay.  And do you have knowledge of why they were removed?

7    A.    I can only say what I was told.

8              MS. FRANCO:  Objection, Your Honor.  Calls for

9    hearsay.

10             MS. KANOF:  If the defendant told him, by whom?

11             THE COURT:  Wait, wait.  Okay.  Hold on a second.

12   Let's identify who said it.

13             MS. KANOF:  Yes.

14   BY MS. KANOF:

15   Q.    Who told you?

16   A.    C.F.E.

17   Q.    Okay.  At the time that you were going through this process

18   of trying to work with the technical people, was there -- were

19   there any dates important to you?

20   A.    Yeah, actually, the delivery date is still a problem

21   because I've still got to get alls of the refurbishment.

22   Q.    Did you have a delivery date?  This is already -- we're

23   already going into May, right?

24   A.    No.

25   Q.    No?  And did you ask for a delivery date?

1    A.    Yes.

2    Q.    And who did you ask?

3    A.    Both F.G.G. and C.F.E., when they needed it.

4    Q.    And who did you ask for F.G.G.?

5    A.    Well, that was Marco.

6    Q.    And what would he respond when you were asking for delivery

7    date?

8    A.    He has to get with his logistics people and everything.

9    Q.    His logistics people?

10   A.    The people picking up the turbine and all of the equipment

11   from the different locations in the world.

12   Q.    Did he indicate to you that he had people that were going

13   to do those things?

14   A.    Initially, he said he was in negotiations and roundabout

15   and it could've been May.  He brought a company to one of the

16   meetings with C.F.E.

17   Q.    Okay.  Do you remember who that company was?

18   A.    I can't remember the name of the company, but when I said

19   that we have to have review them, right --

20   Q.    You have to review that company; is that --

21   A.    Well, remember, it's our turbines and we've got to make

22   sure that they're lifting plans, the lift and the equipment and

23   how they're putting it onboard and the packaging and for

24   shipment is correct, so no damage comes to the equipment, and

25   also that they're a reputable company and have done this

1    throughout thew years, they're experienced, right.

2    Q.    So this company that showed up with Mr. Delgado, were they

3    ever presented to you as the contracted-for-company that would

4    do that?

5    A.    That's why I came to the meeting, right.

6    Q.    And then what happened at the meeting?

7    A.    I asked them the questions, have you ever, like, delivered

8    turbines, transported turbines; they said, no.  I said, well,

9    what heavy equipment have you done, and they said they moved a

10   bottling plant once.

11   Q.    A bottling plant?

12   A.    Yes.

13   Q.    And was that sufficient to protect your turbines?

14   A.    No.

15   Q.    So did you reject them or what happened with regards to

16   them?

17   A.    I discussed I said we should look for a more experienced

18   company, because you got to look at insurance, right, with this.

19   Q.    Who would have to insure it?

20   A.    Basically, we would have to be named insurer on that,

21   because we are not doing that, it's not part of our contract,

22   but that still belongs to us, right.

23   Q.    So would you insure a moving company that had already moved

24   a bottling plant?

25   A.    I would not, personally, no.

1    Q.   Would you recommend to Mitsubishi that they do so?

2    A.   I would not.

3    Q.   With regard to -- and who did you tell at F.G.G. that they

4    needed to find a more experienced company?

5    A.   Marco Delgado.

6    Q.   And how did he respond?

7    A.   I -- took it under advisement.

8    Q.   Did you have get a delivery schedule?

9    A.   I actually made one myself.

10   Q.   No.  I asked the question, did you ever receive a

11   delivery --

12   A.   No, I didn't.

13   Q.   Okay.  Well, how could you make a delivery schedule

14   yourself if everything was so up in the air?

15   A.   Because what I had to do was then to C.O.D. with C.F.E. was

16   still there.  That hadn't moved.

17   Q.   From the original contract?

18   A.   Yes.

19   Q.   So you tried to make estimates based on the original

20   contract?

21   A.   Basically, I would work back from that and then I produced

22   dates and send it, do agree with these dates as the dates for

23   embarkation, and then with that dates, I backdated it from there

24   to refurbishment, et cetera.

25   Q.   Did anything happen that ended your friendly communications

1    was C.F.E. at this point?

2    A.   Yeah, I received a letter straight after that meeting, I

3    think it was the next day, from Mr. Gireud.

4    Q.   The next day after what?

5    A.   The meeting that we had with Marco at dinner when he asked

6    me to give him all of that information.

7    Q.   Okay.  And after you refused, you received a letter; is

8    that correct?

9    A.   Correct.

10   Q.   I'll ask you to take a look at Government's Exhibit

11   Number 74.  Oh, I'm sorry.  Yes, 74.  You need to look at the

12   number?

13   A.   Yes.

14   Q.   Okay.  Is that an e-mail?  Who's it from?

15   A.   From me to Gireud.

16   Q.   And what is it regarding?

17   A.   The letter that I received, I think.  I think this is a

18   reply to a letter I received.

19   Q.   Okay.  And is -- let me let you look at number 73.  Is that

20   the letter that you received, Government's Exhibit Number 73?

21   A.   Yes.

22        MS. KANOF:  We'd ask that Government's Exhibit Number

23   73 and 74 be admitted into evidence.

24        THE COURT:  I show 73 is already in there.

25        MS. KANOF:  Oh, I'm sorry, Your Honor.

1    BY MS. KANOF:

2    Q.    Let's look at number 73 first.

3    A.    (Complies.)

4    Q.    Mr. Beddard, you received a letter and who was it from?

5    A.    If I recollect, it was from Fernando Gireud.

6    Q.    I'll scroll down so you can see it, if this will stop.

7    A.    Yeah.

8    Q.    And what was the date of this letter that?

9    A.    That was the 7th of May.

10   Q.    And you said it was the next day after you refused to give

11   Mr. Delgado the --

12   A.    When we had the conflict, yes.

13   Q.    Okay.  And had you been communicating Mr. Gireud?

14   A.    Only on official communications, right, because he was the

15   protocol.

16   Q.    He was on your protocol?

17   A.    Yes.

18   Q.    And what -- what did he communicate to you in this letter?

19   A.    Basically saying that I haven't communicated with C.F.E.

20   and direct all communication direct to F.G.G.

21   Q.    Okay.  And what does he tell you about Mexican counsel?

22   A.    I took that as Marco.

23   Q.    Okay.  When he -- I'm highlighting a section -- when he

24   says, per counsel's instruction, please, direct all

25   communication to F.G.G., what counsel did you think he was

1  talking about?

2  A.   Marco.

3  Q.   Okay.  And did you understand what he meant by that when he

4  sent you that letter?

5  A.   Basically, I took it that he didn't want me to talk to

6  C.F.E.

7  Q.   And does he tell you that?

8  A.   Well, it says F.G.G. will conduct all communications for

9  C.F.E. as related to any issues which are potentially

10  problematic as F.G.G.

11  Q.   So immediately after that, did he send him the e-mail that

12  is Government's Exhibit Number 74?

13  A.   Yes.

14  Q.   Okay.  And you sent it again out of protocol?

15  A.   No.  I sent it basically not on the official mail.  I just

16  wanted to have a clarification am I correct.

17  Q.   And you didn't have any other attorney -- well, who did you

18  call?

19  A.   I talked with Mace Miller, right, Patrick, who's --

20  Mr. Altamura is our lawyer -- Marco and Rick Williamson.

21  Q.   Okay.  And what did you ask about?

22  A.   I just wanted a clarification.

23          MS. FRANCO:  Objection, Your Honor.  It hasn't been

24  admitted yet.

25          MS. KANOF:  I moved for admission.  I thought the

DIRECT BEDDARD                                                    84

1     Court had admitted it.  I'm sorry.

2              THE COURT:  74?

3              MS. KANOF:  Yes.

4              MS. FRANCO:  No, objection.

5              THE COURT:  GX-74 is admitted.

6     BY MS. KANOF:

7     Q.   Okay.  Let's start again, now that the jury can see it.

8     What was the date of this e-mail?

9     A.   The 8th of May.

10    Q.   Okay.  And who did you copy on the e-mail?

11    A.   I copied Mace Miller, Patrick Altamura, Marco Delgado and

12    Rick Williamson.

13    Q.   What's the purpose of this e-mail for clarification and

14    what it means by direct communications between C.F.E. and

15    M.P.S.A.

16              Okay.  In the middle sentence, what do you ask for?

17    A.   Can you please inform me your technical representative so

18    that we can have direct contact on information clarifications.

19    Q.   Did he ever provide you a direct technical representative's

20    name from F.G.G.?

21    A.   Later on, yes.

22    Q.   Okay.  But at this time?

23    A.   No.

24    Q.   Okay.  When did they provide you with the name of a

25    technical representative?

1   A.   To be honest, I can't remember when.

2   Q.   Was it later?

3   A.   It was later, yes.

4   Q.   Okay.  And that technical representative, did you work with

5   him?

6   A.   He turned up at the meetings and then he asked for

7   communications to go to him.

8   Q.   Okay.

9   A.   So, yes, we were working with him.

10   Q.   Later on?

11   A.   Yes.

12   Q.   Okay.  But for a while, Government's Exhibit Number 75, do

13   you receive an e-mail from Mr. Gireud -- this is very

14   frustrating -- if you would look at Government's Exhibit

15   Number 75 and identify if that is an e-mail to you?

16   A.   Yes.

17   Q.   And who is it from?

18   A.   Well, actually it's not just to me.

19   Q.   You see the exhibit number, so you can be sure.  And -- but

20   it is to you and others; is that correct?

21   A.   Yes, that's correct.

22   Q.   And who is it from?

23   A.   It's from Fernando Gireud.

24   Q.   And what -- how is it dated?

25   A.   May the 10, 2010.

1          MS. KANOF:  We'd ask that Government's Exhibit

2    Number 75 be admitted.

3          MS. FRANCO:  No, objection.

4          THE COURT:  GX-75 is admitted.

5    BY MS. KANOF:

6    Q.   Okay.  With regard to this e-mail, if you scroll down to

7    the bottom, it appears that you had sent an e-mail earlier about

8    assignment of collection rights; is that correct?

9    A.   Correct.

10   Q.   Okay.  And the e-mail that you had sent earlier was

11   regarding -- what were you demanding with regard to the

12   assignment of collection rights?

13   A.   That we were given written confirmation that this process

14   was end -- with the end user and we would eventually get it.

15   Q.   And you had made that request on April 20th; is that

16   correct?

17   A.   That's the date on that letter, yes.

18   Q.   And you referred to the Assignment of Collection Rights

19   Section 15, right?

20   A.   Correct.

21   Q.   In the contract?

22   A.   Correct.

23   Q.   Did you send the e-mail on May 10th?

24   A.   Correct.

25   Q.   All right.  And you referred to your e-mail of April 20th

1    in the May 10th, correct?

2    A.    Correct.

3    Q.    And Mr. Gireud responds to you and who does he copy?

4    A.    He copies himself and Mace Miller.

5    Q.    And who else?

6    A.    Well, he sends it to me, himself, Mace Miller and Marco

7    Delgado.

8    Q.    And who -- you're Kevin, right?

9    A.    Yes.

10   Q.    In he regards to his international counsel, who does he say

11   that is?

12   A.    Delgado and Associates.

13   Q.    Okay.  Did you ever deal with anybody other than

14   Mr. Delgado?

15   A.    Not to my knowledge.

16   Q.    As an attorney, do you know if he had associates?

17   A.    I don't really know.

18   Q.    And what is he asking you regarding the Assignment of

19   Collection Rights?  What is he telling you?

20   A.    Actually, the acknowledgment of the Federal Commisión of

21   the Assignment of Collection Rights.

22   Q.    Okay.  You had asked for --

23          Basically, what had to happen, they had to ask C.F.E.,

24   correct?

25   A.    Yes.

 1    Q.   And you're just asking them to ask C.F.E., right?

 2    A.   Not just asking, but a written request in, right, to them.

 3    I believe it was a formality.

 4    Q.   Okay.  And the last paragraph he addressed the

 5    communication issue, correct?

 6    A.   Yeah, he's asking me to abstain from any and all direct

 7    contact with F.G.G. until such time that F.G.G. advises

 8    otherwise.

 9    Q.   And who does he tell you to direct everything to?

10    A.   All communication questions, requests, responses need to be

11    addressed to me, Fernando Gireud, with a copy to Marco Delgado.

12    Q.   Okay.  So that -- that occurred on what date?

13    A.   May 10, 2010.

14    Q.   Okay.  After that, do you receive an e-mail, Government's

15    Exhibit Number 78, or do you -- or do you send an e-mail,

16    Government's Exhibit Number 78.  Let me get the number for you.

17    A.   78, yes.

18    Q.   I'm showing you the exhibit number so you can verify.

19    A.   Yes.

20    Q.   Okay.  And is that originating from you?

21    A.   Yes, from.

22    Q.   And who is it to?

23    A.   That one is to Marco Delgado.

24    Q.   And what is it regarding, the subject matter?

25    A.   It looks like on the balance 100 percent.

1    Q.   And the date?

2    A.   The 13th of May.

3    Q.   Okay.

4           MS. KANOF:  We'd move Government's Exhibit Number 78

5    into evidence, Your Honor.

6           THE COURT:  Ms. Franco?

7           MS. FRANCO:  No, objection.

8           THE COURT:  GX-78 is admitted.

9    BY MS. KANOF:

10   Q.   Okay.  Starting at the bottom of the e-mail chain, which is

11   actually in Spanish -- do you speak Spanish?

12   A.   No.

13   Q.   Who's Eduardo Espinosa?

14   A.   He was the second project manager.

15   Q.   And so Mr. Espinosa appears to have sent you an e-mail; is

16   that correct?

17   A.   Yes, he does.

18   Q.   Do you know whether he sent it directly to you?  Did you

19   receive an e-mail from him?

20   A.   I believe, yes, if that's --

21   Q.   But did you respond to it?

22   A.   Not directly.

23   Q.   He sent you an e-mail, but who did he copy?

24   A.   Marco Delgado, Marco Campbell, who was the engineer for

25   C.F.E., Benjamin Ramirez -- I can't remember who Benjamin was.

DIRECT BEDDARD                                                      90

1    Q.    Okay.  And you were not allowed to respond, correct?

2    A.    Yes, by the previous letters.

3    Q.    Okay.  He sent that e-mail on May 12th, so on May 13th, who

4    did you send and e-mail to?

5    A.    Marco Delgado.

6    Q.    And the first line of your e-mail says what?

7    A.    Dear Eduardo --

8    Q.    No, before.  Oh, yes.  Go ahead.

9    A.    Dear Eduardo, on instruction from Marco Delgado, we can't

10   answer you.

11   Q.    So how did you get permission from Mr. Delgado?

12   A.    I must have talked to him.

13   Q.    So you are making your technical responses through

14   Mr. Delgado; is that correct?

15   A.    With his permission.

16   Q.    With his permission.

17         Also on May 13th, this required two different

18   responses.  Again, did you accept an e-mail on that same day

19   inquiring Mr. Delgado's permission to respond to Mr. Espinosa?

20   A.    Correct.

21   Q.    Did you have a bad relationship with Mr. Espinosa?

22   A.    No, it was great.

23   Q.    It was great?

24   A.    It was a great one.

25   Q.    Okay.  Did having to have an intermediary cause any

1    problems?

2    A.    Of course, yeah.

3    Q.    Well, what do you mean by "of course"?

4    A.    An engineer to an engineer can talk, right, technical

5    person to technical person can talk, right.  When you put a

6    third party to talk through, things get changed.  And as I was

7    talking about, the technical was in English, so ours would be

8    English.  And then you didn't know, things get lost in

9    translation, you don't know what the interaction is, how they've

10   described it, so you can lose technical when commercial or legal

11   get involved.

12        I mentioned that earlier on, was this is one of the

13   reasons why on our official mail it went to the V.P. of

14   Commercial, Mr. Ueki, but he asked why I then had to approve it?

15   Well, I had to check it, that any decision on a commercial

16   thing, I can change the technical side.  So again, this is, you

17   know, the same thing.  I don't know, right, what's being said

18   outside.  And we, from the first amendment, right, were in

19   charge of the project.  It stated that and that was one of the

20   reasons we accepted in project to go ahead with this project,

21   because we have the right to manage the project.  It was in

22   there nobody signed that and now it had been taken away.

23   Q.    Okay.  So looking at Government's Exhibit Number 79.  Let

24   me pull up the number for you, so you can verify it.  Is that --

25   do you recognize this as an e-mail communication from you?

1    A.   Yes.

2    Q.   On May 14th of 2010?

3    A.   Correct.

4    Q.   And who is it to?

5    A.   Fernando Gireud.

6    Q.   And is it copied, among many other people, to Marco

7    Delgado?

8    A.   Yes, Marco is on there.

9         MS. KANOF:  We move admission of Government's Exhibit

10   Number 79.

11        THE COURT:  Ms. Franco?

12        MS. FRANCO:  No, objection.

13        THE COURT:  GX-79 is admitted.

14   BY MS. KANOF:

15   Q.   This is -- do you recognize this?  You might need to take a

16   look at it.  It's pretty complicated.

17        MS. KANOF:  May the witness have a moment, Your Honor,

18   to review?

19        THE COURT:  Yes, ma'am.

20   A.   Can you scroll?

21   BY MR. KANOF:

22   Q.   Oh, you need for me to.  I thought you could do it from

23   there.  Okay.

24        Do you recall this now?

25   A.   Yes.

1    Q.    So, on May 12th, did you receive a letter from Mr. Gireud

2    regarding communication with C.F.E.?

3    A.    Yes.

4    Q.    And what precipitated the letter from looking at it?

5    A.    Basically, the clarification is going nowhere again and the

6    project still has to go forward, so again I'm asking for

7    additional clarification regarding F.G.G. correspondence.  And

8    I've put the -- number one, appropriate water temperatures, two,

9    the solar field connection and, number three, the requirement

10   for deicing equipment.

11   Q.    And in this letter are you asking for the right to directly

12   discuss it with C.F.E.?

13   A.    Well this letter is from them to me, Dear Kevin, which is

14   not my letter.

15   Q.    What are they telling you about the communication?

16   A.    So that's the same, per my request for additional

17   clarification regarding F.G.G. correspondence on May the 7th

18   regarding the reference topics, the three I just mentioned, the

19   following items should be exclusively discussed directly with

20   F.G.G. and not C.F.E.

21   Q.    Okay.  You had indicated before that you had -- that this

22   all started when you refused to put something simple in writing

23   for Mr. Delgado, correct?

24   A.    Correct.

25   Q.    On the second paragraph after the three numbers, does it

1    require you to put in writing all technical issues, and then

2    what else does it inquire?

3    A.    Basically, it's a detailed examination will be performed in

4    order to assert by all parties obligated to the related issues.

5    In assisting with our examination, please describe in writing

6    the technical issues and direct F.G.G. to applicable

7    specification clause.

8    Q.    Okay.  So direct to the applicable bill bid specification

9    clause?

10   A.    Correct.

11   Q.    And what else?

12   A.    Basically, to go in the contract clause between F.G.G. and

13   M.P.S.A. subcontract clause.

14   Q.    Okay.  But the bid specification clause, the proposal, and

15   what else?

16   A.    Which relates to the technical issues which in M.P.S.A.'s

17   opinion determines responsibility party for the equipment or

18   solution.

19   Q.    Okay.  So does this cause a delay?

20   A.    Yes.  If it's not decided, right, if agreement on technical

21   issues which are directly on the critical part of a project,

22   yes, it will cause delays.  You can only do so many workarounds,

23   right, but these were fundamental to the project.

24   Q.    This sentence here it lists a lot of things they want you

25   to include in the writing.  It also lists F.G.G. FIDE Commisión

```
 1    contract clause.  Did you have anything to do with the F.G.G.

 2    FIDE Commisión contract?

 3    A.    No.

 4    Q.    Did you have the F.G.G. FIDE Commisión contract?

 5    A.    No.

 6    Q.    Is that is no?

 7    A.    No.

 8    Q.    By FIDE Commisión we're talking about the C.F.E. contract,

 9    right?

10    A.    Right.

11    Q.    So how are you going to put that in writing if you didn't

12    have that contract?

13    A.    I don't know.

14    Q.    So did you have communication problems as a result of the

15    fact that the contract had never been provided to you?

16    A.    Yes.  If there was a constant -- cause problems, because

17    C.F.E. engineering, right, when they ask for technical

18    information, they would always identify a page number of their

19    contract, right.  So let's say according to page 391, right, of

20    our contract of supply, you have to give us a box of chocolates,

21    right, so I take my subcontract technical document, which I

22    thought was passed over, right.  I go to page 391 and it's a bag

23    of all sorts.  And I'm thinking, well -- and then I have to go

24    back to C.F.E., could you please expand on this, because my

25    technical spec and your technical spec are not matching on page
```

1    numbers.  Could you give me a more detailed.  So then they would

2    after then, send me a more detailed explanation of that.

3    Q.   Did you ask for the F.G.G.-C.F.E. contract?

4    A.   Yeah, many times.

5    Q.   Who did you ask?

6    A.   Marco.

7    Q.   And did you ever get it?

8    A.   No.

9    Q.   What would he say when you asked for a copy of the

10   contract?

11   A.   He said, basically, Hector and John walked from my office

12   with bags of it, you know, so you've got it in your --

13   Q.   Did you ask Hector and John for a copy?

14   A.   John said he never did that.

15   Q.   I'm sorry?  John said what?

16   A.   He never received, right.

17   Q.   So -- and Hector?

18   A.   And Hector said --

19           MS. FRANCO:  Objection, Your Honor.  Hearsay.

20   BY MR. KANOF:

21   Q.   Did you ever get a copy?

22   A.   Basically, no not of that full contract, no.

23   Q.   So, basically, were you able to communicate in this way?

24   A.   Technical people work around things and -- if everybody has

25   a will to go forward with a project, we manage work around this,

1    right, with it.  Is it efficient?  No.  It's definitely not

2    efficient.

3    Q.   Is this -- in this e-mail you talk about the e-mail of

4    May 14th, Government's Exhibit Number 79.  Is this -- what is

5    this with regard to your permission or the manner in which you

6    had to communicate with C.F.E.?

7    A.   Well, please be informed during the technical meeting for

8    C.F.E., an issue of location of the emission of the solar field

9    12 megawatt in all steam turbine.  What it was, was part of the

10   Agua project.  There was a solar field, which is separate from

11   our project, but it fed in steam into our project.  And C.F.E.

12   wanted to put that steam directly into our gas -- our steam

13   turbine, which was a no-no.  We said, no, you cannot do that

14   because the temperature is too low to go into the turbine.  You

15   must put that through the H.R.S.G. and get the temperatures up

16   so we can supply that.  So we were saying, you know, 12

17   megawatt, right, we would incorporate that on our balanced

18   diagrams as 12 megawatt of duct firing, hypothetically, with you

19   telling us where the connection is going to go.  It's not going

20   to go into our steam turbine.

21   Q.   You're doing it in writing -- you're sending this in

22   writing to Mr. Gireud?

23   A.   Correct.

24   Q.   Copying it to a whole bunch of people in response to

25   questions that C.F.E. has asked you?

1    A.    Correct.

2    Q.    So, for example, item two of your letter that shows that

3    you are specifically responding to a communication?

4    A.    Yes.

5    Q.    And who provided this C.F.E. letter to you?

6    A.    I think it came from Mr. Gireud or Marco sent it, forwarded

7    it.

8    Q.    Okay.  Meeting conclusion?  What meeting are you referring

9    to?

10   A.    That would be the technical meetings where we had -- as you

11   can see, this is the action item list, which is a -- action

12   item, each question or issue, we give a specific number to, so

13   then we could track the progress and whether it was closed or

14   not.  So that was the first one here is item 31.  And actually

15   C.F.E. closed that item.  They agreed with us they would not put

16   the steam, right, into the steam turbine.  They would go and put

17   it through the H.R.S.G.

18   Q.    Okay.  And was this the meeting you talked about that ended

19   in the dinner that caused problems?

20   A.    No.

21   Q.    No?  This was a different meeting?

22   A.    Yeah.

23   Q.    So what happened at the meetings that you had after that if

24   you weren't allowed to communicate directly with C.F.E.?

25   A.    Basically, we still had some meetings.  It still had to go

```
 1   on.  And we were told whether we could answer or not answer.

 2   Q.   I'm sorry?

 3   A.   We were informed that the meeting, if we could answer or

 4   not answer.

 5   Q.   Explain how that occurred.

 6   A.   Well, basically, we go through the question and then,

 7   basically, Marco or another gentleman, I can't remember his

 8   name, Henders (phonetic), I think, was assigned.

 9   Q.   You are saying Andres, A-N- -- Andre?

10   A.   No.  Hernandez.

11   Q.   Hernandez?

12   A.   Hernandez.

13   Q.   Right.

14   A.   He would say, no, we'll come back to you.  I'll get advice.

15   We'll answer you later.  So that was left in or please go ahead

16   and answer that question.

17   Q.   Government's Exhibit Number 80 in front of you.

18            Are these e-mails -- this exhibit, does it have two

19   e-mails from you?

20   A.   Yes.

21   Q.   And are they to Mr. Delgado?

22   A.   Yes.  The first one and the second one is, too.

23            MS. KANOF:  Move -- make a motion to move Exhibit

24   Number 80 into evidence, Your Honor?

25            THE COURT:  Ms. Franco?
```

 1              MS. FRANCO:  No, objection.

 2              THE COURT:  GX-80 is admitted.

 3    BY MS. KANOF:

 4    Q.   Again, are these e-mails where you have to ask permission

 5    of Mr. Delgado do discuss technical things with Mr. Espinosa?

 6              MS. FRANCO:  Your Honor, leading.

 7              THE COURT:  Sustained.

 8    BY MS. KANOF:

 9    Q.   Of what are these e-mails?

10    A.   Basically, again because we had been given a gag order, we

11    can't talk directly technical to a technical.  We have to go out

12    and get permission, right.  So then I have to get permission, I

13    get permission, then I put it down on the e-mail on instruction

14    from Marco, I'm allowed to talk directly to you.

15    Q.   Government's Exhibit Number 81.  What is this?

16    A.   That is another letter from me to Delgado.  Again it's on

17    the instruction of Marco Delgado:  We can submit the following

18    directly to you.  There's another letter in there.

19    Q.   On a different date; is that correct?

20    A.   Yeah, it's -- again, I'm sending you a copy of the updated

21    action item list.  So I'm giving him an update, right, of where

22    these items are and the status of them.

23              MS. KANOF:  Move admission of Government's Exhibit

24    Number 81 into evidence.

25              THE COURT:  Ms. Franco?

```
 1              MS. FRANCO:  No, objection.

 2              THE COURT:  GX-81 is admitted.

 3    BY MS. KANOF:

 4    Q.   How long did that go on?

 5    A.   Too long.  I can't remember.

 6    Q.   All right.  At some point in time, did you send another

 7    invoice for another payment?

 8    A.   I did.

 9    Q.   You did.  I'm going to show you Government's Exhibit

10    Number 82 for your identification.

11    A.   Yes.

12    Q.   And is that the e-mail with invoice that you delivered

13    through the e-mail system to F.G.G.?

14    A.   Yes.

15              MS. KANOF:  We move Government's Exhibit 82 into

16    evidence.

17              THE COURT:  Ms. Franco?

18              MS. FRANCO:  No, objection.

19              THE COURT:  GX-82 is admitted.

20    BY MS. KANOF:

21    Q.   Okay.  So on May 18th of 2010, do you send another e-mail

22    with invoice attached?

23    A.   I do.

24    Q.   Okay.  And who do you send it to?

25    A.   Again as protocol, I send it to Mr. Gireud.
```

1    Q.    And is Mr. Gireud copied?

2    A.    He will be -- I can't -- yes, he is.  I see it.

3    Q.    And what do you tell them?

4    A.    Please find attached a copy of the reference invoice.  The

5    original, we sent by courier on the 18th May 2010.  Can you

6    please review the invoice submittal and then inform if you have

7    any further feedback documentation.

8    Q.    Do you have an independent recollection of what the date of

9    the second payment was supposed to be?

10   A.    I can't remember the payment schedule.  It's on the payment

11   schedule.

12   Q.    Scrolling down to your attachment, is that your

13   signature --

14   A.    That is my signature.

15   Q.    -- on the attachment to Government's Exhibit Number 82?

16   A.    Correct.

17   Q.    And is this your invoice?

18   A.    Yes.

19   Q.    And does it reference what you're expected date is?

20   A.    Yes.  It says and the payment by due date of the 6th of

21   July, 2010.

22   Q.    Where did you get that date?

23   A.    It would be the payment schedule.

24   Q.    I'm sorry?

25   A.    The payment schedule from the first amendment.

DIRECT BEDDARD                                                    103

1    Q.   Okay.  The contract of the first amendment?

2    A.   Yes.

3    Q.   And just briefly, we had -- we were talking about the first

4    amendment.  Now that we're talking about the first amendment

5    again, now you're getting your information from the first

6    amendment instead of the original subcontract, correct?

7    A.   No, the first amendment would have changed said clause is

8    in the subcontract, so it's amalgamated, but it takes

9    preference.

10   Q.   And with regard to that first amendment, I'm going --

11   looking at Government's Exhibit Number 72 --

12        MS. KANOF:  Is that admitted, because the 72 in --

13        THE COURTROOM DEPUTY:  Yes.

14   BY MS. KANOF:

15   Q.   Regarding to Government's Exhibit 72, when that amendment

16   was written, did you attempt to solve some of these

17   communication problems with language in that amendment?

18   A.   Oh, yes.  Yeah.

19   Q.   Okay.  What did you attempt to write into that contract

20   communication?

21   A.   Yeah.  Basically it's project management.  As I said

22   before, we didn't have any structure for this subcontract.  And

23   this clause that was put in was project management, which is

24   said that M.P.S.A. will spearhead all aspects of the scope of

25   work to be furnished under the subcontract.  F.G.G. will

1   facilitate and the establishment of an efficient line of

2   communication between all parties based on C.F.E.'s and

3   M.P.S.A.'s experience and recommendations.

4   Q.   Okay.  I notice you don't say F.G.G.'s experience and

5   recommendations, correct?

6   A.   Correct.

7   Q.   And the date of the signatures on this first amendment were

8   what?

9   A.   April 23, 2010.

10  Q.   The e-mails that I was showing you, what month were they

11  in, if you recall?

12  A.   May.

13  Q.   So did it help putting that information in there?

14  A.   Not really.

15  Q.   Would you call having to ask permission every time you

16  wanted to talk to Mr. Espinosa facilitating sufficient

17  communication?

18  A.   No, I do not.

19  Q.   With regard to your invoice, Government's Exhibit Number

20  82, you expected payment -- I think you said you expected

21  payment on what date?

22  A.   July the 6th.

23  Q.   And how much money did you expect?

24  A.   7 million U.S. dollars.

25  Q.   And how did you proceed to invoice?

 1   A.   Basically, I put the invoice as normal, with it, and

 2   putting the said clauses in for the accordance of the signing of

 3   collection rights by F.G.G. to M.P.S.A. set forth in clause, et

 4   cetera, et cetera, that we get correct payment.

 5   Q.   Are you referring to this box again?

 6   A.   I am.

 7   Q.   And do you have assignment of collection rights, yet?

 8   A.   No.

 9   Q.   And this is dated May 18th?

10   A.   Correct.

11   Q.   Do you also inquire wiring instructions again?

12   A.   Yes.

13   Q.   And does this payment get wired directly to you as you have

14   been requesting since the very first meeting?

15   A.   It was sent to us directly to my recollection, but if it

16   was directly from F.G.G.

17   Q.   That's what I'm asking, directly from C.F.E.?

18   A.   No, I did not get it from C.F.E.

19   Q.   Why did you want -- why did you want to get the money

20   directly from C.F.E.?

21   A.   Well again, it's assurances, right.  We go along with the

22   project.  We got money.  C.F.E. is a very reputable company.  We

23   deal with them over the years on other projects and we know that

24   they can be vouched for, and again our equipment is our own

25   insurance.

DIRECT BEDDARD                                                    106

1    Q.    Your equipment is your what?

2    A.    Is our own collateral.  It's ours, right.

3    Q.    So would you turn over your equipment at any time without

4    getting the money first?

5    A.    Basically, we get to a point that we normally that we

6    normally -- the project gets to a payment schedule prior to

7    shipment, which actually tries to make us whole, right, to that

8    point, right.

9    Q.    Government's Exhibit Number 83, is that an e-mail from you?

10   A.    Yes, it is.

11   Q.    And what is the date?

12   A.    That is the 17th of June, 2010.

13   Q.    Okay.  And who is it to?

14   A.    Mr. Gireud.

15   Q.    Do you copy Mr. Delgado on this e-mail?

16   A.    Yes, I do.

17   Q.    And --

18        MS. KANOF:  And we move that Government's Exhibit

19   Number 83 be admitted into evidence.

20        THE COURT:  Ms. Franco.

21        MS. FRANCO:  No, objection.

22        THE COURT:  GX-83 is admitted.

23   BY MS. KANOF:

24   Q.    In this e-mail, what are you trying to accomplish?

25   A.    Basically, the first paragraph that have is to say we're

KATHLEEN A. SUPNET, CSR

1    not working efficiently and certain informations, right, so I'm

2    saying, as you are aware, we've experienced several difficulties

3    in exchanging technical and other information with C.F.E. in

4    connection with the Agua Prieta number two project.

5           On several occasions, technical information that we

6    have provided to F.G.G. for the delivery to C.F.E. have not been

7    timely received by C.F.E. and some C.F.E. managers have voiced

8    their concerns at the flow of information is not adequate.

9    Q.   Who did -- what C.F.E. managers and who did they voice

10   their concerns to?

11   A.   Basically, to me.  They actually voiced it to Mitsubishi

12   Mexico and went outside.

13   Q.   Mitsubishi has a company actually in Mexico?

14   A.   Yeah.  We have two.  We have Mitsubishi Corp, which is the

15   Corp global, and then we have Mitsubishi of the industry of

16   Mexico.

17   Q.   Okay.  But also to you, you said?

18   A.   Yes.

19   Q.   Who voiced a concern to you?

20   A.   Marco Campbell.

21           MS. FRANCO:  Objection, Your Honor.  Calls for

22   hearsay.

23           MS. KANOF:  I just said "who."

24           THE COURT:  Well, but who voiced --

25           MS. FRANCO:  Whatever he says is going to be hearsay.

```
 1              THE COURT:  Yeah, because obviously it's going to be a

 2   concern.

 3              MS. KANOF:  I wasn't going to ask him what he said.

 4              THE COURT:  I know, but it's a concern we're

 5   communicating that part of the hearsay.

 6              MS. KANOF:  No.

 7              THE COURT:  I'll sustain the objection.

 8              MS. KANOF:  So he can't say who?

 9              THE COURT:  Not who voiced a concern.

10              MS. KANOF:  Okay.

11   BY MS. KANOF:

12   Q.   What did you do with regard to the concerns that were

13   voiced?

14   A.   I wrote this letter.

15   Q.   Okay.  And what were you requesting?

16   A.   Pursuant to the request in our letter of May the 7th, we

17   discontinued communicating directly with C.F.E. and relied on

18   you to promptly pass along, coordinate the flow of information

19   between C.F.E. and M.P.S.A., and I've just avoided direct

20   communications with C.F.E. per your request.  Unfortunately, the

21   inefficient process posed by F.G.G. has not worked.  M.P.S.A.'s

22   inability to communicate directly with C.F.E. has become an

23   obstacle in exchanging critical information with C.F.E. and

24   negatively impacting M.P.S.A.'s project management.

25   Q.   Did you get any relief from this?
```

1    A.    By tension, yeah.

2    Q.    I'm sorry?

3    A.    Personal.

4    Q.    Oh, no.

5            Was Mitsubishi, after this e-mail, did anything change

6    about the rules regarding your communication with C.F.E.?

7    A.    It started to change, yes.  We had meetings.

8    Q.    Did you have any discussion with Mr. -- I know you sent the

9    e-mail to Mr. Gireud, but did you have any discussions with

10   Mr. Delgado regarding this communication problem?

11   A.    I think we had a telephone conversation, with it, with

12   regard to this.

13   Q.    And things did change after that?

14   A.    There was a process and we started putting in a -- new

15   protocols with C.F.E.; how we'd send letters, how we was going

16   to be there to go forward.

17   Q.    Okay.  Explain what this new process and protocol was?

18   A.    Bringing back the direct communications with it, so then I

19   could actually send it, F.G.G. would copy C.F.E. and the

20   technical people.

21   Q.    Okay.  In front of you, I have Government's Exhibit

22   Number 86.  Could you please review it to indicate whether or

23   not you recognize it and you are the author?

24   A.    I am the author, yes.

25   Q.    And to whom did you send a copy?

1    A.    Again, to Mr. Gireud.  This was an official Mitsubishi

2    mail.

3              MS. KANOF:  We'd move that Government's Exhibit Number

4    86 be admitted into evidence.

5              THE COURT:  Ms. Franco?

6              MS. FRANCO:  No, objection.

7              THE COURT:  GX-86 is admitted.

8    BY MS. KANOF:

9    Q.    Mr. Beddard, what's the date of this e-mail?

10   A.    The 13th of July 2010.

11   Q.    Okay.  And what is the purpose of this e-mail?

12   A.    Uh, it says, we have not received our money with regard to

13   the subcontract payment due date of the 6th of July 2010 for the

14   second invoice in the sum of 7 million per the payment schedule

15   on the M.P.S.A.-F.G.G. subcontract as amended by amendment

16   number one on the 23rd of April, 2010 has now passed.  We are

17   urgently awaiting receipt of these funds and/or an

18   acknowledgment of the assignment to M.P.S.A. of all F.G.G.'s

19   collection rights under the acquisition contract between F.G.G.

20   and C.F.E. in accordance with F.G.G.-M.P.S.A. subcontract as

21   amended by the amendment number one.

22   Q.    So this is July 16th, correct?

23   A.    Correct.

24   Q.    And you refer again to the assignment of collection rights,

25   you don't have it yet?

1  A.   Correct.

2  Q.   And you don't have the money yet?

3  A.   Correct.

4  Q.   And what date were you supposed to get the money?

5  A.   We were supposed to receive it on the 6th of July.

6  Q.   And were you aware that on the 6th of July, Mr. Delgado got

7  12 million into his Turks & Caicos' account?

8  A.   No, I was not.

9  Q.   On Government's Exhibit Number 89, I'm going to show it

10  just to you.  Do you recognize this is an e-mail that you

11  authored?

12  A.   Yes.

13  Q.   And who did you write it to?

14  A.   Again, it was it was official mail to Mr. Gireud.

15       MS. KANOF:  We'd ask that Government's Exhibit Number

16  89 be admitted into evidence.

17       THE COURT:  Ms. Franco?

18       MS. FRANCO:  No, objection.

19       THE COURT:  GX-89 is admitted.

20  BY MS. KANOF:

21  Q.   Mr. Beddard, did you send an e-mail to Mr. Gireud and copy

22  it to a multitude of individuals including Mr. Delgado?

23  A.   Correct.

24  Q.   Okay.  And the date of this is October 19th of 2010; is

25  that correct?

1  A.   Correct.

2  Q.   And what is the purpose of this?

3  A.   Basically, what I'm saying is that F.G.G. is in breach of

4  the subcontract by failing to provide a letter of the commission

5  confirming its approval of the irrevocable assignment of F.G.G.

6  collection rights under the contract, executed on January the

7  6th.

8  Q.   So now it's October?

9  A.   Yes.

10  Q.   And way back in April, you had given them notice of breach

11  of contract; is that correct?

12  A.   Correct.

13  Q.   Did you ever walk away from that contract because it was in

14  beach?

15  A.   No.  That's not Mitsubishi way.

16  Q.   I'm sorry?  I couldn't hear you.

17  A.   No.  That is not Mitsubishi way.

18  Q.   That's not the Mitsubishi way?  Is that what you said?

19  A.   I did.

20  Q.   What do you mean by that?

21  A.   We have standards in our brand name, right.  We respect in

22  the industry and is respected for honesty and integrity.  And

23  basically with C.F.E. is one of our major clients.  For

24  Mitsubishi, in general, it's one of our major global entities.

25  We would want to help them, if possible.

DIRECT BEDDARD                                                       113

1    Q.    You said they're one of your major clients.  At this time,

2    had you ever worked a project in Mexico?

3    A.    Not personally.

4    Q.    Had Mitsubishi worked projects with C.F.E.?

5    A.    Oh, many projects.

6    Q.    Okay.  And so you said you did not execute the breach?

7    A.    To be totally honest, as I said before, there was never no

8    stake to terminate.  There was to termination clause.  Even

9    after the amendment we thought -- well, I thought -- I accepted

10   a project after that amendment on the reliance on the clause for

11   project management saying that we were the sole spearer of all

12   project manager in all affairs meaning that our decision was it,

13   right, so I relied on that, right, to accept the project for

14   projects, but again, there was no termination clauses put in.

15   Q.    In this October 19th, 2010 e-mail, are you again notifying

16   Mitsubishi of a breech?

17   A.    Uh, yes.

18   Q.    And the basis of the breach is?

19   A.    Again, there's no assignment of collection rights.

20   Q.    Anything else?

21   A.    Basically, the financial assurances.  We needed demand

22   adequate assurances and letters for the collection rights, give

23   us that.  And also what I state at the end is that although

24   M.P.S.A. is the sole owner of the title to the equipment until

25   receipt of full payment, we require payment security.  And we

1   relied on F.G.G.'s assignment of collection rights when we

2   agreed to proceed with the performance of the subcontract and

3   release the possession of the equipment under receipt of the

4   fair payment under the amendment number one.

5   Q.   So this is -- the purpose of this letter since you're not

6   going to breach the contract is what?

7   A.   Basically, to put a shot across the bows of F.G.G. saying,

8   until we get this and we are assured, we are not leaving the

9   equipment, right, we need that third payment and the collection

10  rights in our name prior to releasing the equipment.

11  Q.   Okay.  So before, you had been talking a lot about meeting

12  a delivery date, would you deliver the equipment without the

13  assignment of collection rights?

14  A.   I would not.

15  Q.   And what does this do to your planning obligations?

16  A.   Well, again, that would be the critical part.  We would not

17  release -- I would not release.  It would take a higher senior

18  management, right, to instruct me to do that.

19  Q.   Okay.  I'm showing you Government's Exhibit Number 92.  Do

20  you recognize this is an e-mail that you wrote?

21  A.   I did.

22  Q.   Okay.

23       MS. KANOF:  We ask that Government's Exhibit Number 92

24  be admitted into evidence.

25       THE COURT:  Ms. Franco?

1          MS. FRANCO:  No, objection, Your Honor.

2          THE COURT:  GX-92 is admitted.

3     BY MS. KANOF:

4     Q.   On -- do you have it in front of you?

5     A.   Yes, ma'am.

6     Q.   We're now in 2011; is that correct?

7     A.   Yes.  It's the 24th of February, 2011.

8     Q.   And who did you write this e-mail to?

9     A.   Again, because it was official mail, it was to Mr. Gireud.

10    Q.   And that's your protocol?

11    A.   Correct.

12    Q.   And did you copy it to Mr. Delgado?

13    A.   I -- yes.

14    Q.   And what is the subject matter of the e-mail?

15    A.   Basically, there were F.G.G. stock urging clarification of

16    equipment title.

17    Q.   Going to the text, what's the purpose of this e-mail?

18    A.   As it says, can you urgently confirm or rebut by return if

19    F.G.G. used our equipment as a guarantee in a pledge agreement

20    with C.F.E. in place of a letter of credit.  Please be informed

21    that M.P.S.A. is the sole owner of the title to the equipment

22    until receipt of full payment -- payment in full.

23    Q.   So why are you writing this e-mail?

24    A.   Being advised there was no letter of credit and pledge had

25    been given and the pledge was in place for 20 million, letter

1    for credit, and our equipment was pledged in place of that.

2    Q.   Okay.  What's a letter of credit?

3    A.   Again, it's our assurance with it for this project, the

4    supplier of it or the winner of the project had to put a letter

5    of credit of 20 million in place that if you didn't meet your

6    guarantees and everything that the end user or who is assigned

7    could drawdown on that letter of credit.

8    Q.   Okay.  So you said something about $20 million?

9    A.   Yeah.  I think -- looking at the documents, the letter

10   credit ought to be 20 million set by the commission of C.F.E.

11   Q.   So C.F.E. required $20-million-dollar letter of credit for

12   the equipment?

13   A.   That's what I was getting.

14   Q.   Who was supposed to provide that letter of credit?

15   A.   F.G.G.

16   Q.   Okay.  You had no response -- Mitsubishi, did they have any

17   responsibility for that letter of credit?

18   A.   No.

19   Q.   Did you have any contract between Mitsubishi and C.F.E.?

20   A.   No.

21   Q.   How much was your equipment worth according to this

22   contract?

23   A.   102 million.

24   Q.   And you've been in this business how long?

25   A.   40 years.

1    Q.   Are letters of credit common?

2    A.   Yes.

3    Q.   And your equipment is worth -- have you ever collateralized

4    a letter of credit or participated in collateralizing a letter

5    of credit?

6    A.   Yes.

7    Q.   And what value do you have -- first of all, do you usually

8    pay for a letter of credit?

9    A.   Yes.

10   Q.   And how does that work?

11   A.   Basically, you go to a financial institution, banks, and

12   then what you say is the amount of letter of credit that you'd

13   want and then the language, and then you say who is payable and

14   you put rules of a drawdown into it.

15   Q.   So, if you needed a $20-million letter of credit, you know,

16   do you have it pay for it?

17   A.   Yes.

18   Q.   How much do you have to pay for, say, a $20-million letter

19   of credit?

20   A.   I've just done a 10 million one.  It cost me -- I think it

21   was about 700-thousand.

22   Q.   Okay.  So for a $10-million letter of credit, you just need

23   700-housand?

24   A.   Yes.

25   Q.   Okay.  Does it make business sense to pledge a $106 million

DIRECT BEDDARD                                                    118

1    of equipment for a $20-million letter of credit?

2    A.   Not on my -- not in my experience, no.  You would only make

3    a letter of credit the value of your risk.

4    Q.   Okay.  And what -- so what do you mean by the value of your

5    risk?

6    A.   Well, as I said to you, what we look at when we do a risk

7    assessment is what the L.D.s are, which is liquidated damages,

8    in case you don't meet your delivery dates or your performance

9    of the unit and there's set figures in there.  So you calculate

10   what your maximum is and then that maximum would be the maximum

11   amount of any letter of credit you would put up there.  You

12   wouldn't just put it open-ended for the full contract.

13   Q.   You worked for Mitsubishi for a long time; is that correct?

14   A.   Associated for a long time.

15   Q.   Okay.  Who at Mitsubishi would have to approve pledging

16   their equipment for a letter of credit -- in lieu of letter of

17   credit?

18   A.   Basically, an officer of the company could do that.

19   Q.   What level of an officer?

20   A.   Basically, that would be -- depending if he is an officer,

21   a V.P. level, minimum.

22   Q.   Okay.  V.P. Japan or?

23   A.   No, because this was not a Japanese contract.  This was a

24   contract in the U.S. by M.P.S.A., right, so basically I become

25   an officer of the company later on, and so I can sign contracts

1   and different things, so I was an officer so I can pledge the

2   company, but as a non-officer, you cannot pledge or engineer the

3   contract.

4   Q.   Would you permit another company to pledge Mitsubishi

5   equipment?

6   A.   Me personally?  No.  Definitely not.

7   Q.   So you reviewed all of the contracts in this case in order

8   to do your job; is that correct?

9   A.   The subcontract part, right.  I didn't review the prime

10  contract.

11  Q.   Okay.  And did you ever find anything that gave F.G.G.

12  permission to pledge Mitsubishi equipment?

13  A.   No.

14  Q.   With regard to Government's Exhibit Number 82, why are you

15  asking for urgent confirmation or rebuttal by return if F.G.G.

16  used the equipment?

17  A.   Because I'd been informed that this had occurred.  And in

18  normal things a lot of gossip goes on.  I just wanted to make

19  category clear that this was not the case.

20  Q.   Government's Exhibit Number 93.  Got it?

21  A.   Yeah.

22  Q.   Is this an e-mail being written to you?

23  A.   Yes.

24  Q.   Do you recall receiving it?

25  A.   Yes.

1            MS. KANOF:  Moving exhibit -- request to move Exhibit

2     Number 93 into evidence.

3            THE COURT:  Ms. Franco?

4            MS. FRANCO:  If I could just have a moment, Your

5     Honor.

6            THE COURT:  Yes, ma'am.

7            MS. FRANCO:  No, objection Your Honor.

8            THE COURT:  GX-93 is admitted.

9     BY MS. KANOF:

10    Q.   Mr. Beddard, the beginning of this e-mail stream is the

11    e-mail that we already talked about in 92.  Now we're in 93.

12    And do you receive a response to your e-mail?

13    A.   I did, from Mace Miller.

14    Q.   And again, who is Mace Miller?

15    A.   He's one of the three people I knew at F.G.G.

16    Q.   Okay.  But you don't know anything about his credentials or

17    anything like that?

18    A.   Only that he did go to law school, but he was involved in

19    the electric company in El Paso in some form.  I don't know.

20    Q.   And is Mr. Delgado copied on this e-mail?

21    A.   Yes, he is.

22    Q.   What did Mr. Miller say to you?

23    A.   Well, first of all -- actually, he's asked me who's

24    coordinating this, where is the information coming from.  And

25    then he told me he spoke to Mr. Gireud and he has no knowledge

1    of any deviation from our spec.

2    Q.   Okay.  Well, you're not talking about specifics specs, are

3    you?

4    A.   Uh, no.

5    Q.   Okay.  What did you take him to mean?

6    A.   That -- I took it that there was no pledge, right.

7    Q.   That there was no pledge?

8    A.   Yeah.  And so with that, I assumed wrongly that there was

9    still a letter of credit.

10   Q.   You respond to him how?

11   A.   I can't remember actually.

12   Q.   It's in front of you.

13   A.   Oh, sorry.

14          One of the things I looked at when you say how did I

15   respond, I responded to this accusation of this pledge as not

16   being part of my contract.  So basically that was a legal entity

17   with it.  So what I did is I passed it to our legal department

18   and the legal representative, and Mitsubishi -- that project was

19   Mr. Patrick Altamura.

20   Q.   So how do you respond to Mr. Miller or I mean how does

21   Mr. Altamura respond?

22   A.   Basically, he just says it is in your representation that

23   neither you nor Fernando Gireud are aware of the pledge

24   agreement in which F.G.G. has attempted to pledge M.P.S.A.

25   equipment to furnish -- to be furnished under our subcontract

1    with F.G.G.

2    Q.   Government's Exhibit Number 94.  You got the number?

3    A.   Yes.

4    Q.   Is that an e-mail that is sent from Mr. Delgado.  And that

5    you are -- let's see.  Oh, no, I'm sorry.  It's about you.  You

6    are not copied on it.  I take it back.

7            Okay.  Government's Exhibit Number 97.  I'll show you

8    the number.  Let me scroll down so that you can identify it by

9    exhibit number.

10           Is that an e-mail from you?

11   A.   Yes, it is.

12   Q.   Okay.  On February 28th of 2011 at the top?

13   A.   28th of February, 2011.

14           MS. KANOF:  Move that Government's Exhibit Number 97

15   be admitted.

16           THE COURT:  Ms. Franco?

17           MS. FRANCO:  No objection.

18           THE COURT:  GX-97 is admitted.

19   BY MS. KANOF:

20   Q.   Do you write a response to a response by Mace Miller?

21   A.   Yes.

22   Q.   Okay.  So first, let's talk about what Mace Miller wrote to

23   you about having researched the matter.  What does he tell you?

24   A.   Mace says that as reflected by your records and copy of

25   C.F.E.-F.G.G. Agua contract in your possession, pursuant to John

1    Adams' request and approval of the said equipment was pledged

2    with a clear understanding that M.P.S.A. is the sole owner of

3    the title to the equipment until receipt of full payment.

4    During John's visit negotiations with C.F.E., prior to final

5    execution of the contract of said agreement was reached and

6    memorialized as such.

7              For further reference and clarification on any and all

8    of the technical administration or financial agreements related

9    to Agua Prieta project, please refer to copies of the final

10   agreement and it's attachments that were approved and signed and

11   pledged by page -- pledged by page, by page, by John Adams in

12   his capacity of M.P.S.A. officer in charge of the project and

13   M.P.S.A. Hector Ponce.

14   Q.   Okay.  So he -- first of all he talks about the

15   C.F.E.-F.G.G. contract in your possession.  Did you have a

16   contract in your possession that said that John Adams gave them

17   permission to pledge the equipment?

18   A.   No.

19   Q.   Okay.  Now let's talk about copies of the final agreement

20   and it's attachments that were approved and signed page by page

21   by John Adams and Hector Ponce, right?

22   A.   That's what it says.

23   Q.   Okay.  So that would be some kind of contract between

24   F.G.G. and Mitsubishi, correct?

25   A.   Yes, because he said --

1  Q.   Okay.  So let's look first at Government's Exhibit

2  Number 7, the original teaming agreement.  Do you see

3  signatures -- I'm going to page through quickly any page by page

4  initials or signatures of Mr. Ponce or Mr. Adams of the teaming

5  agreement.

6  A.   I see no initials at all of anything.

7  Q.   Would you recognize them if you saw them, their signatures?

8  A.   Well, it's usually -- a signature, possibly, but --

9  Q.   Okay.  Well --

10 A.   -- this is a time ago.  I don't know if I can do it now.

11 Q.   So keep looking, please.  So that's -- this is one of the

12 written agreements.  Do you see any signatures or initials?

13 A.   Now I see signatures.

14 Q.   But on every page?

15 A.   No.

16 Q.   And -- we'll let the jury look at it, but there's nothing

17 about a pledge in here, is there?

18 A.   This was the teaming agreement, which I just verified on a

19 risk analysis.  I didn't see anything because this is the

20 teaming agreement not the subcontract.

21 Q.   Okay.  Government's Exhibit Number 12A which is in

22 evidence.  This is the first subcontract.  It's the English

23 version.  So let me go to the Spanish version, since it's the

24 signed version, Government's Exhibit Number 12, and let's page

25 through it and see if every page is signed or initialed .

1           Stop me, please, if you see a signature or initial on

2    every page.  Almost there, sorry.

3    A.   I see a signature.

4    Q.   Is that John Adams signature?

5    A.   No.

6    Q.   Whose signature is that?

7    A.   That's Greg Wunder.

8    Q.   Is that Hector Ponce's signature?

9    A.   No.

10   Q.   No.  It's Greg Wunder's signature?

11   A.   Correct.

12   Q.   So neither John Adams nor Hector Ponce are even on the

13   original subcontract, correct?

14   A.   Correct.

15   Q.   That you know of.

16         Okay.  Government's Exhibit 18, the prime contract --

17         MS. KANOF:  Is 18 in evidence?

18         THE COURT:  Yes, ma'am.

19         MS. KANOF:  Okay.

20   BY MS. KANOF:

21   Q.   Page through real quick.  I'll just go to the signature

22   page and see who signed this contract.

23         Mitsubishi was not a party to this contract, correct?

24   A.   Correct.

25   Q.   For Mitsubishi -- for F.G.G.?

```
1              MS. FRANCO:  Your Honor, if I may, the U.S. attorney

2    is scrolling through it too quickly.  There are initials on each

3    of the pages in the Mexican version.

4              MS. KANOF:  I think the e-mail said it was a contract

5    between F.G.G. and Mitsubishi and I'm showing that they're not

6    parties to this contract.

7              MS. FRANCO:  Your Honor, the e-mails speak for itself.

8              MS. KANOF:  She can go through every page of this if

9    she wants.

10             THE COURT:  I'm sorry?

11             MS. FRANCO:  The e-mail of the exhibit will speak for

12   itself, the e-mail that she introduced prior to it.  My point

13   is, is that out of an abundance caution and fairness, that she

14   slow down so that the jury ask see on the Spanish version of the

15   prime contract there are initials on every single page of it.

16             MS. KANOF:  That's fine.

17   BY MS. KANOF:

18   Q.   Do you recognize -- I have before you page 18 -- do you

19   recognize any of those initials as any individual that you've

20   worked with?

21   A.   No.

22   Q.   No.  Any initials on page 17?

23   A.   No.

24   Q.   Any initials on page 16?

25   A.   No.
```

DIRECT BEDDARD                                                    127

1    Q.    You've worked in Mexico before, haven't you?

2    A.    No.  This was my first project in Mexico.

3    Q.    Let's look at who signed -- would you recognize

4    Mr. Delgado's signature and initials?

5    A.    No, I don't think so.  Not now.  So many years have passed.

6    But normally, there was a glossary with whose name and signature

7    initialed, so I don't...

8    Q.    The person signing this contract, "el proveedor," whose

9    name is on there?

10   A.    Basically that's el Commisión and --

11   Q.    No, no.  Below.

12   A.    Uh --

13   Q.    Is that Mr. Delgado?

14   A.    Yeah, Where it says Señor Marco Delgado.

15   Q.    Okay.  And if the jury wants to go through and see if his

16   initials are on it, they could, correct?

17   A.    I would imagine.

18   Q.    Government Exhibit Number 72.  You recognize that's been

19   admitted into evidence of the amendment to the subcontract?

20   A.    Yes.

21   Q.    I'm trying to get that thing off.  We'll page through it.

22   This is amendment between F.G.G. and Mitsubishi, correct?

23   A.    Correct.

24   Q.    And do you see Mr. Adams or Mr. Ponce's initials or

25   signature on every page?

1   A.   They would not be on the page, because they were not in the

2   plan.

3   Q.   And again, who signed this on behalf of Mitsubishi?

4   A.   Greg Wunder.

5   Q.   And by April 23rd of 2010, was John Adams still employed

6   with Mitsubishi?

7   A.   No.

8   Q.   I'm sorry?

9   A.   No.

10  Q.   Okay.  What happened to John Adams?

11  A.   He left the company I think the 16th to take another

12  position with some other company.

13  Q.   Had he been planning to leave for sometime?

14  A.   I don't know.  You have to ask John that.

15  Q.   We'll ask him.  He'll be here soon.

16       Government's Exhibit 97, that's what we were talking

17  about.  So copies of the final -- and it's attachments that were

18  approved and signed page by page by John Adams in his capacity

19  as an officer and by agent Hector Ponce.  So can you think of

20  any other agreements or attachments that would have approved the

21  pledge that we haven't gone through?

22  A.   Not to my knowledge.

23  Q.   Okay.  You -- then it says, as you are aware both Mr. Adams

24  and Mr. Ponce were part of all contract negotiations regarding

25  the contract itself and after approving the scope of the same

1    received a copy with all of its attachments.

2              Did Mitsubishi receive a copy with all of the

3    attachments of the C.F.E.-F.G.G. contract?

4              MS. FRANCO:  Your Honor, he's not the custodian of

5    record.  He can say what he got, not what the company got.

6              THE COURT:  Yeah, I'll sustain that objection.

7    BY MS. KANOF:

8    Q.   What else do you talk about?

9    A.   Uh, regarding another matter -- it' saying regarding

10   another matter, right, Mace talks -- is saying --

11   Q.   That's Mace Miller?

12   A.   Yeah, from Mace.  He saying regarding another matter, it is

13   my understanding that Mitsubishi has attempted to interfere with

14   an existing long-term service agreement between F.G.G. and

15   C.F.E.

16   Q.   What's a long-term service agreement?

17   A.   It's the maintenance agreement after we finish the project,

18   commission it and go through the warranty thing.  It becomes

19   final and handed over to the service center.  And a long term

20   service agreement goes on for a long time.  It can be 10 years

21   20 years.  And then we provide hot parts, right, and provide the

22   intervals -- the inspection intervals.

23   Q.   In the original teaming agreement and original subcontract,

24   did that contract Mitsubishi for the long-term servicing

25   agreement?

1    A.   I was informed on this thing that --

2    Q.   Well, if you don't know, just say you don't know.

3    A.   Oh, I don't know.

4    Q.   The long-term servicing agreement was independent -- was it

5    independent of the prime -- of the equipment agreement?

6    A.   Yes, it was independent, but whoever got the -- use their

7    technology would get the -- normally would get the long-term

8    service agreement.

9    Q.   Normally.

10         If you would look at that and verify it was an e-mail

11   sent to you.

12   A.   Yes.

13   Q.   Okay.  And is it from Mr. Delgado?

14   A.   It's from -- yes.

15         MS. KANOF:  We move that Government's Exhibit 98 be

16   admitted into evidence?

17         MS. FRANCO:  No, objection.

18         THE COURT:  GX-98 is admitted.

19   BY MS. KANOF:

20   Q.   So initially, is the letter from or the e-mail from Mace

21   Miller that we just went through, correct?

22   A.   Correct.

23   Q.   And then how do you respond?

24   A.   Basically, I sent a notice to or e-mail to Mace that I

25   disagree with your confusion and vague explanation in your

1    e-mail, actually.

2    Q.   And what do you ask?

3    A.   And I just state M.P.S.A. requires that F.G.G. immediately,

4    by return mail, provide a copy of the specific document which

5    F.G.G. claims contains John Adams request and final approval

6    that the M.P.S.A. equipment be pledged in place of a letter of

7    credit which was to be by F.G.G.

8    Q.   And how does Mr. Delgado respond?

9    A.   If M.P.S.A. agrees or not, that is their problem.  Please

10   refer to signed company of the contract.

11   Q.   What contract is he talking about?

12   A.   It's not the subcontract.

13           MS. FRANCO:  Objection, Your Honor.  Calls for

14   subcontract.  How would he know?

15           THE COURT:  Sustained.

16   BY MS. KANOF:

17   Q.   What contract -- were there any contracts that Mr. Adams

18   signed?

19   A.   Not to my knowledge.

20   Q.   Government's Exhibit 99.  I'm showing you the number.

21           Is that an e-mail to you?

22   A.   Yes.

23   Q.   Okay.

24           MS. KANOF:  Move that Government's Exhibit Number 99

25   be admitted into evidence.

```
 1                THE COURT:  Ms. Franco?

 2                MS. FRANCO:  No objection, Your Honor.

 3                THE COURT:  GX-99 is admitted.

 4   BY MS. KANOF:

 5   Q.   So after you send your e-mail on February 28th of 2010,

 6   does Mr. Miller respond to you on March 1st of 2011?

 7   A.   Yes.

 8   Q.   And what does he say to you?

 9   A.   Kevin, per your request, I requested a copy of the document

10   from C.F.E.  Hopefully that will clear this thing up.

11   Q.   Okay.  But, Mr. Beddard, in his letter to you or his

12   lengthy e-mail to you, doesn't he refer you to contracts, page

13   by page of John Adams, that have that pledge permission in it?

14   A.   Yes.

15   Q.    In that case, what is -- I mean, why does he have to get it

16   from C.F.E.?

17   A.   I do not know.

18   Q.   Government's Exhibit Number 100.  You see that it's 100.

19   Is this an e-mail from you to Mr. Miller?

20   A.   And to Mr. Marco Delgado.

21   Q.   And to Mr. Delgado?

22                MS. KANOF:  Move admission of Government's Exhibit

23   Number 100.

24                THE COURT:  Ms. Franco?

25                MS. FRANCO:  No, objection.
```

1              THE COURT:  GX-100 is admitted.

2    BY MS. KANOF:

3    Q.   And what are you telling Mr. Delgado and Mr. Miller?

4    A.   Well, I must have received a -- can you scroll down so I

5    can --

6    Q.   This is 100 and -- I'm sorry.  You asked -- this is a --

7    A.   Yes.

8    Q.   -- confusing and vague explanation and Mr. Delgado's saying

9    it was John Adams's contract.  Again, you're seeing it's

10   Mr. Miller saying he's going to retrieve it.  And you respond?

11   A.   I just said, thanks Mace.  Looking forward to receiving it.

12   Q.   Did you ever receive it?

13   A.   No.

14   Q.   Government's Exhibit Number 102.  Do you recognize an

15   e-mail from yourself?

16   A.   Yes.

17   Q.   And is it to Mr. Delgado?

18   A.   Yes.

19              MS. KANOF:  Move that Government's Exhibit Number 102

20   be admitted into evidence.

21              THE COURT:  Ms. Franco?

22              MS. FRANCO:  No, objection.

23              THE COURT:  GX-102 is admitted.

24   BY MS. KANOF:

25   Q.   Government's Exhibit 102, do you write to Mr. Delgado now?

1   A.   Yes.

2   Q.   And you're writing with regard to an attached letter; is

3   that correct?

4   A.   Yes.

5   Q.   Okay.  Was a letter sent to -- not to you, personally, but

6   to Mitsubishi on December 28th?

7   A.   There's was a letter saying on the 28th, this letter from

8   Mitsubishi to Mr. Gireud.

9   Q.   And that was a long time before this e-mail stream.  This

10  is the 28th of 2009, correct?

11  A.   That would be after the first contract -- subcontract.

12  Q.   And you are now attaching a letter that was written by

13  whom?

14  A.   John Adams.

15  Q.   Okay.  And do you recognize that as John Adams' signature?

16  A.   I couldn't say yes are no.

17  Q.   And why are you attaching this letter?

18  A.   Could we go back to --

19  Q.   Sure.

20  A.   There must be something contained.  Above reference

21  letter -- basically, we were told that John had put that letter

22  in the 28th, and he was told that it had been redacted.  So I

23  contacted John, with it, and said John, this letter, right, did

24  you ever redact this letter?  And he said, no, it was written --

25           MS. FRANCO:  Objection, Your Honor.  Hearsay.

```
 1                THE COURT:  Sustained.
 2    BY MS. KANOF:
 3    Q.   Let's look at the letter then.  So you are attaching the
 4    letter, correct?
 5    A.   Correct.
 6    Q.   And with regard to this letter, what was Mr. Adams talking
 7    about?
 8    A.   Basically in that letter, he says Mitsubishi's once again
 9    very concerned about the informality of F.G.G.'s actions on the
10    project.
11    Q.   Continue please.
12    A.   And the failure to respect M.P.S.A.'s request.
13                MS. FRANCO:  Your Honor, if I may?  Mr. Adams is
14    scheduled to testify and it's more appropriate for him to
15    testify as to a letter he sent.
16                THE COURT:  Well, this witness can tell us what he
17    thought it meant to him.  He can't tell us what it meant to
18    Mr. Adams.
19                MS. FRANCO:  Right, but he's reading the letter.  He's
20    reading the exhibit, so I don't know what it meant.
21                THE COURT:  If he's reading the exhibit, the exhibit
22    is in evidence.  He can do that.
23    BY MS. KANOF:
24    Q.   Okay.  Look at paragraph number two, please.
25    A.   Number two is related to the above, is F.G.G.'s
```

1    responsibility if required to arrange the letter of credit to

2    warrant completion of the equipment prime contract.

3    Q.   Okay.  And you -- why were you attaching this letter?

4    A.   Because when we referenced this letter at the meeting, I

5    was told by Marco that John had redacted that letter, right, he

6    had taken it back.

7    Q.   And was this letter in the, I don't know, in the files of

8    Mitsubishi?

9    A.   In the legal file.  I got it from legal, yes.

10   Q.   Okay.  And the next sentence, please provide a copy of the

11   equipment.  What is L.O.C.?

12   A.   It's letter of credit.

13   Q.   Okay.  This is way back in December of 28; is that correct?

14   A.   Correct.

15   Q.   Number three?

16   A.   I finally provide a complete copy of the C.F.E. prime

17   contract for our review and for finalization of our equipment

18   supply subcontract.  We already have a copy of the bid specs and

19   technical specifications, which were initiated for the contract

20   attachment purposes.  We therefore need a final signed copy of

21   the prime contract as well as any additional annexes that were

22   attached to the executed contract.

23   Q.   Did he ever provide you with the redacted version?

24   Dr. Mr. Delgado, Mr. Gireud or Mr. Miller, any of the three from

25   F.G.G., ever provide you with what they said was the redacted

1    version of the December 28th Adams letter?

2    A.   Not to me, no.

3    Q.   Do you know if any redacted letter was provided -- whether

4    or not any redacted letter was provided to Mitsubishi?

5    A.   To my knowledge there was no redacted letter.

6    Q.   Okay.  Government's Exhibit 104.

7              Is this an e-mail to you?

8    A.   Yes.

9    Q.   On March 7th of 2011?

10   A.   Yes.

11             MS. KANOF:  We move 103 into evidence, Your Honor.

12             THE COURT:  Ms. Franco?

13             MS. FRANCO:  No, objection.

14             THE COURT:  GX-103 is admitted.

15   BY MS. KANOF:

16   Q.   After that, do you receive an e-mail from Mr. Delgado?

17   A.   Correct.

18   Q.   And what does he tell you?

19   A.   Thank you for the follow-up with John.  Given the time

20   which has lapsed, I can only surmise he has forgotten the

21   various conversations surrounding the topic.  Just from what I

22   have been told, he forgot C.F.E. provided him with an entire

23   copy of the contract and all its attachments.  Unfortunately,

24   two of the key conversations took place as part of the

25   conference call with C.F.E. officials participating.  During our

1   visit of next week, I will make a point to discuss the issue and

2   see if their recollections varies from that of Johns.  I will

3   also work on getting copies of John's e-mails regarding this

4   issue.

5   Q.   Okay.  And the second paragraph?

6   A.   I have also reviewed the pledge agreement and formally

7   confirm to you that under the applicable terms, title was not

8   transferred and will not be transferred until such time that all

9   payments are made.  As such F.G.G. will formally request from

10  C.F.E. two, number one, confirm the title, will not transfer it

11  until full payment; number two, waiver of confidentiality

12  agreements in order to share with M.P.S.A. all pertinent

13  information.  Looking forward to seeing you.

14  Q.   Okay.  So first of all, did he send a copy of the pledge

15  agreement?

16  A.   No.

17  Q.   And what difference does it make whether or not title

18  transfers?

19  A.   To me, that wasn't the issue.

20  Q.   Okay.  What was the issue?

21  A.   The issue was pledging our equipment in place of a line of

22  credit and getting monies from us to pay for the financials of

23  that.

24  Q.   Does he address the issue of a letter being redacted?  You

25  just sent him a letter saying it wasn't redacted.  And does he

```
1    address or send you the alleged redacted letter?

2    A.    No.   He just says, John's got it.   I'll mail it to you.

3    Q.    Government's Exhibit 104.   Do you recognize that this is

4    the e-mail to you?

5    A.    Yes.

6    Q.    Do you -- we move Government's Exhibit 104 into evidence?

7              THE COURT:   Ms. Franco?

8              MS. FRANCO:   No, objection.

9              THE COURT:   GX-104 is admitted.

10   BY MS. KANOF:

11   Q.    Government's Exhibit 104 is from Mr. Delgado, correct?

12   A.    Correct, yes.

13   Q.    He says, now we've changed subjects on the same day; is

14   that correct?

15   A.    It appears so.

16   Q.    First you sent an e-mail on March 6th, and what do you tell

17   Mr. Delgado?

18   A.    With regard to your statement and information to the above

19   referenced attached letter during our meeting of the 2nd of

20   March, 2011, we confirmed with Mr. John Adams that he did not

21   issue such a letter.

22   Q.    Okay.   So that's talking about the December 28th letter.

23   Okay.

24   A.    Um --

25   Q.    He did issue it December 28th, '11.
```

1   A.   He did issue such letter.

2   Q.   Yeah.  And then Mr. Delgado doesn't address that, but

3   responds instead about what?

4   A.   Big favor -- Kevin, big favor.  I just received an e-mail

5   from the Commisión requesting that an assignment request be

6   specific as to each payment in terms -- in terms of time and

7   amount.  Thanks.

8   Q.   Okay.  So now we're in 2011 and he's talking about the

9   assignment of collection rights?

10  A.   Yes.

11  Q.   You still don't have them.

12  A.   I still don't have them.

13  Q.   Government's Exhibit Number 105.

14          Do you recognize that as an e-mail on which are you

15  copied?

16  A.   Yes.

17          MS. KANOF:  Move Government's Exhibit Number 105 into

18  evidence.

19          MS. FRANCO:  No, objection.

20          THE COURT:  GX-105 is admitted.

21  BY MS. KANOF:

22  Q.   On March 10th of 2011, who is Luis Burgueño?

23  A.   Luis?  What we did, we brought in a Mexican law firm to

24  support us in Mexico, and Luis was assigned to me because we

25  were uncomfortable when we were meeting on the technical of

1    engineers and I wanted a lawyer from F.G.G. there.  So basically

2    what I did, I got Luis, who was a Mexican lawyer, to accompany

3    me to every meeting, right, so he was like protection.

4    Q.   So basically in this e-mail, he prepared a draft of what a

5    letter requesting an assignment of collection rights should look

6    like?

7    A.   Yes.  We asked him what it would look like in Mexico.  We

8    can do one in the U.S. for our legal, but these nuances in

9    Mexico, you've got to look after them, so we asked the Mexican

10   law firm to produce --

11   Q.   And did you attach this and send it to Mr. Delgado in

12   Government's Exhibit 105?

13   A.   We sent the draft, yes, but I don't know what number it

14   was.

15   Q.   Government's Exhibit Number 106.  Do you recognize this as

16   an e-mail originating from you?

17   A.   Yes.

18   Q.   To Mr. Gireud and copied to Mr. Delgado?

19   A.   Yes.

20            MS. KANOF:  We move that Government's Exhibit 106 be

21   admitted into evidence.

22            THE COURT:  Ms. Franco:

23            MS. FRANCO:  No, objection.

24            THE COURT:  GX-106 is admitted.

25   BY MS. KANOF:

1    Q.    Is this just a transmittal of that letter?

2    A.    Yes.

3    Q.    Also, are you asking in the second paragraph or -- I'm

4    sorry -- the beginning e-mail from you starting with, likewise,

5    F.G.G. L.L.C. hereby authorizes, what's that about?

6    A.    Basically, what we're looking at is I can't send a letter

7    to C.F.E. or the Commisión because it's not my contract, it's

8    not a protocol.  So what we're doing is drafting a letter, and

9    then we're saying, okay then, Marco, F.G.G. or Gireud, put --

10   paste that onto your letterhead unless -- and look at it and

11   revise it and then submit it.

12   Q.    Okay.  Government's Exhibit Number 107.  Do you recognize

13   that as an e-mail from you?

14   A.    Yes.

15   Q.    To Mr. Gireud copied to Mr. Delgado?

16   A.    Correct.

17            MS. KANOF:  We move Government's Exhibit 107 be

18   admitted into evidence.

19            THE COURT:  Ms. Franco?

20            MS. FRANCO:  No, objection.

21            THE COURT:  GX-107 is admitted.

22   BY MS. KANOF:

23   Q.    What's the date of this e-mail?

24   A.    Uh, the 17th of March, 2011.

25   Q.    And what is the content of this e-mail?

1    A.   We have recently received information regarding the pledge

2    agreement executed on the January, the 15th, 2010, by F.G.G.

3    Enterprises and the Federal Electricity Commission, C.F.E., and

4    the administration trust, by which the following equipment

5    collectively the property of M.P.S.A. and which to this date

6    remain -- you're going a bit fast.

7    Q.   I'm sorry.

8    A.   Remain in M.P.S.A.'s possession.

9         I've been purportedly pledged by F.G.G. Enterprise in

10   favor of the trust of C.F.E. to secure F.G.G.'s obligations in

11   connection with the purchasing agreement.

12   Q.   And this is the equipment, correct?

13   A.   Correct, yes.

14   Q.   Okay.  Starting with, it has been confirmed?

15   A.   It has been confirmed by us that in executing the pledge

16   agreement, F.G.G. represented itself to be the owner and

17   possessor of the equipment which remains untrue in all aspects.

18   Q.   Go ahead.

19   A.   And we have informed you repeatedly, M.P.S.A. has not

20   agreed or consented to such pledge in any form or manner and

21   it's M.P.S.A.'s position that such pledge agreement is null and

22   void and ineffective.

23   Q.   Okay.  Now, in the third paragraph, what are you telling

24   them?

25   A.   That during the meeting of March the 8th, 2011, you

```
1    promised to correct the foregoing misrepresentation with C.F.E.

2    Q.    And did they?

3    A.    Uh, not to my knowledge.

4    Q.    Who promised to correct the misrepresentation?

5    A.    I cannot remember who it would be.

6    Q.    Somebody from F.G.G.?

7    A.    Yes.

8    Q.    Government's Exhibit Number 108.

9          Is that an e-mail to you from Mr. Miller copied to

10   Mr. Delgado?

11   A.    (Nodding head affirmatively.)

12   Q.    Is it?

13   A.    Yes.  Sorry.

14         MS. KANOF:  We move that Government's Exhibit 108 be

15   admitted into evidence.

16         THE COURT:  Ms. Franco?

17         MR. HANSHEW:  No, objection.

18         THE COURT:  GX-108 is admitted.

19   BY MS. KANOF:

20   Q.    This March 21st regarding the pledge, correct?

21   A.    Yes.

22   Q.    And Mr. Miller writes to you, concerning your e-mail of

23   March 17th, correct?

24   A.    Correct.

25   Q.    And he says he's been instructed by F.G.G.'s board of
```

1    directors.  Do you know if F.G.G. had a board of directors?

2    A.   I don't know.

3    Q.   Do you know?

4    A.   I do not know if they did or didn't.

5    Q.   Number two -- paragraph number two:  M.P.S.A.'s denial of

6    authorization and knowledge of the pledge is the third and

7    latest attempt to disavow consent and knowledge of key

8    negotiations and commercial terms reached with C.F.E. in

9    conjunction with Mitsubishi Agent Hector Ponce and John Adams.

10            When did Mitsubishi ever negotiate with C.F.E.?

11   A.   Uh, contractual wise --

12           MS. FRANCO:  Objection, Your Honor.  He can only

13   testify to what he did and not the entire company.

14           THE COURT:  I'll sustain that objection.

15   BY MS. KANOF:

16   Q.   Okay.  But basically, what is Mr. Miller telling you?

17   A.   He's saying that we endorsed the C.F.E. contract.

18   Q.   Is that true?

19   A.   Not to my knowledge, no.  I cannot.

20   Q.   109?

21           THE COURT:  Ms. Kanof, before you go on to the next

22   exhibit, let's break for lunch.  And we'll come back at 2

23   o'clock, resume our proceedings then.

24           Ladies and gentlemen of the jury, if you'd be back in

25   the jury room by 2 o'clock, we'll resume our proceedings then.

1              COURT SECURITY OFFICER HEIDTMAN:  All rise.

2              (Jury recessed for lunch.)

3              THE COURT:  Mr. Beddard, if you would be back at 2

4     o'clock.  We're in recess until two.

5              (Lunch break at 12:54 p.m. to 2:03 p.m.)

6              (Jury present.)

7              THE COURT:  Be seated please.

8              Let the record reflect that all members of the jury

9     are present, the United State's through it's assistant United

10    States attorney is present, the defendant and his counsel is

11    present.

12             Kevin Beddard is on the witness stand.

13             Ms. Kanof?

14                        KEVIN BEDDARD,

15          DIRECT EXAMINATION CONTINUED BY THE GOVERNMENT

16    BY MS. KANOF:

17    Q.   Good afternoon Mr. Beddard.  I have before you government's

18    Exhibit 109.  It's not in front of you?

19    A.   It is not.

20    Q.   Okay.  It is about an e-mail that you wrote.

21    A.   Yes.

22             MS. KANOF:  We move Government's Exhibit 109 into

23    evidence.

24             THE COURT:  Ms. Franco?

25             MS. FRANCO:  No, objection.

```
 1              THE COURT:  GX-109 is admitted.

 2   BY MS. KANOF:

 3   Q.    Okay.  So who did you write it to?

 4   A.    Fernando Gireud.

 5   Q.    And did you copy Mr. Delgado?

 6   A.    I did.

 7   Q.    This is still with regard, as far as the subject matter is

 8   concerned, to what?

 9   A.    To the pledge of the equipment, the alleged pledge to the

10   equipment.

11   Q.    And the date?

12   A.    The date was the 24th of March, 2011.

13   Q.    Okay.  And this appears to be in response to something; is

14   that correct?

15   A.    Yes.  It was:  Refer to your e-mail dated the 21st of

16   March, 2011.

17   Q.    Okay.  And let's go through how you are responding to the

18   e-mail.

19              Paragraph number one, what are you claiming?

20   A.    Well, your response is so vague and convoluted and concerts

21   that merely unsupported assertions that only proves that FGG

22   attempted to pledge Mitsubishi Power Systems Americas equipment

23   without M.P.S.A.'s consent and actually against M.P.S.A.'s

24   express instructions for all purposes and without prejudice to

25   the specific comments below.  M.P.S.A. rejects all of your
```

1    assertions in all respects.

2    Q.    Paragraph number two, do you -- what do you address?

3    A.    Basically, I reconfirm that M.P.S.A. did not authorize

4    F.G.G. to pledge the M.P.S.A. equipment in any form or manner,

5    much less consent to approve F.G.G.'s misrepresentation made in

6    writing before a Mexican notary.

7    Q.    Let's skip to paragraph number four.  What are you

8    asserting in paragraph number four?

9    A.    F.G.G. has claimed to have documentation executed by

10   M.P.S.A. in addition to e-mails and notes which purportedly

11   prove that M.P.S.A. assumed obligations other than contained in

12   the subcontract of December the 18th and amended on the 1st of

13   May -- and amended by amendment number one thereafter on the

14   23rd of April, 2010.

15   Q.    And then?

16   A.    M.P.S.A. has repeatedly asked for copies of such document

17   and F.G.G. has constantly refused to provide it using all sorts

18   of excuses.  If any such document exists, please provide it by

19   return to this e-mail and identify the specific language or

20   section which supports your assertions, otherwise, we will

21   continue abiding by the contracts actually executed by M.P.S.A.

22   and F.G.G. which is exactly what we have been doing so far.

23   Q.    Number five?

24   A.    You also maintain that key officers of C.F.E. participated

25   in discussions with M.P.S.A.  In such a case, please provide the

1    names and titles of such C.F.E. officers and their direct

2    contact information.  If you do not provide such names and

3    titles, we will assume that this is nothing but another false

4    statement.

5    Q.    Okay.  And then do you give them, on number six, a

6    deadline?

7    A.    Yes.  M.P.S.A. demands for F.G.G. to provide written

8    evidence that a misrepresentation was made, and I put the

9    deadline for March 17, 2011.

10   Q.    Did you write this on your own or did you have assistance?

11   A.    It was assistance.

12   Q.    From whom?

13   A.    Legal.

14   Q.    I'm sorry?

15   A.    From the legal department.

16   Q.    From the legal department.

17         Government's Exhibit Number 110.  Is that an e-mail

18   from Mr. Delgado in response to the preceding e-mail?

19   A.    Yes.

20         MS. KANOF:  We move that Government's Exhibit

21   Number 110 be admitted into evidence?

22         THE COURT:  Ms. Franco?

23         MS. FRANCO:  No, objection.

24         THE COURT:  GX-110 admitted.

25   BY MS. KANOF:

1    Q.    How does he respond to you?

2    A.    He confirms that he's in receipt of the e-mail regarding

3    the pledge.

4    Q.    And what has he done with it?

5    A.    And then he said, I circulated and discussed it with the

6    appropriate parties and I'm being charged with preparing the

7    corresponding response.  Said response involves and requires

8    C.F.E. participation at this time.  Please be advised that on

9    behalf of C.F.E., we are committing to you to provide a formal

10   response by the end of business on Monday, March 28th, 2011.

11   Thank you in advance for your kind consideration.

12   Q.    Did you get a formal response on March 28th?

13   A.    I cannot remember if we did or didn't.

14   Q.    Government's Exhibit Number 111.  Is that another e-mail to

15   you on March 28th from Mr. Delgado?

16   A.    Correct, yes.

17         MS. KANOF:  Move that Government's Exhibit 111 be

18   admitted into evidence?

19         THE COURT:  Ms. Franco?

20         MS. FRANCO:  No, objection, Your Honor.

21         THE COURT:  GX-111 is admitted.

22   BY MS. KANOF:

23   Q.    Pursuant -- okay.  And this is his response; is that

24   correct?

25   A.    Yes.

1    Q.    And what is he telling you?

2    A.    That pursuant to your inquiry regarding the reference

3    matter, please find F.G.G.'s formal information clarification

4    request presenting to engineer, Ing. Eduardo Buendia from C.F.E.

5    I am asking engineer to provide response at his early

6    opportunity.  Likewise, I'm attaching a pre-pledge inspection

7    report prepared by C.F.E., wherein the location and possession

8    of the equipment is clearly identified for your review.  I hope

9    this will assist you in clarifying the issue in hand.

10   Q.    Okay.  So attached to 111 is a letter in Spanish, correct?

11   A.    Correct.

12   Q.    But it's on what kind of letter head?

13   A.    It's F.G.G. letterhead.

14   Q.    Okay.  And attached to that is what?

15   A.    It looks like information regarding to our scope of supply.

16   Q.    But this is in Spanish as well?

17   A.    Well, parts of it is, yes.

18   Q.    It's not in English, is it?

19   A.    Well, Mitsubishi M501F.

20   Q.    I can't hear you.  I'm sorry.

21   A.    Basically the Mitsubishi name is in English, so...

22   Q.    Okay.

23         Do you know -- is that a Mitsubishi document?

24   A.    No.

25   Q.    And it's been attached to this e-mail and this letter,

```
 1    correct?

 2    A.    Correct.

 3    Q.    That was e-mailed to you?

 4    A.    Correct.

 5    Q.    Okay.  Let me just quickly talk to you about this

 6    inspection.  Here it says from Mr. Delgado, likewise, I'm

 7    attaching the pre-pledge inspection report provided by C.F.E.

 8    okay.  And is there any --

 9    A.    Can I --

10    Q.    Yes.

11    A.    Looking at this, I don't think I got this e-mail because

12    that's not my e-mail address.

13    Q.    It has your name on it with no e-mail address?

14    A.    That's why I'm just saying, right, that would not have gone

15    to me under that.

16    Q.    Okay.

17          MS. FRANCO:  Your Honor, based on that, I move that

18    this exhibit be removed.  He can't identify it.

19    BY MS. KANOF:

20    Q.    You don't have an independent recollection of this e-mail?

21    A.    No.

22    Q.    Okay.  Let me ask you this then.  Let me ask you about

23    inspections.

24          THE COURT:  What about her motion that we withdraw --

25          MS. KANOF:  We got it from information and there's not
```

1    always an e-mail address when there's a name.  I think we can

2    clear that up later.

3              THE COURT:  Okay.

4    BY MS. KANOF:

5    Q.   You have no independent recollection of this, correct?

6    A.   No.

7    Q.   Do you know who Eduardo Buendia is?

8    A.   Yes.  He works for C.F.E. in the administration of

9    contracts in the reforma, right.

10   Q.   The Reforma is one of the two of the C.F.E. buildings; is

11   that correct?

12   A.   Yeah, Reforma do all of the contracts and everything.  They

13   get formulated at that office.  And then contracts then get

14   moved over to the projects in C.F.E., which is in a different

15   office in Mississippi office.

16   Q.   What is the purpose of doing an inspection of equipment?

17   A.   Well, it depends.  There's lots of different inspections.

18   I do an inspection.  I was looking for refurbishing what needs

19   to be done, so that's how I do them.

20   Q.   Well, what is the purpose of the end user in inspecting

21   equipment?

22   A.   Basically, here I can only think, is that he just makes

23   sure they exist.

24             MS. FRANCO:  Objection, Your Honor.  He said he would

25   have to speculate.

```
 1                  THE COURT:  Sustained.

 2      BY MS. KANOF:

 3      Q.   Were you aware of an emergency inspection that occurred on

 4      this equipment in December of 2009?

 5      A.   Yes.

 6      Q.   And what do you remember about it?

 7      A.   I was asked by both Hector and John Adams, could I organize

 8      inspections at Japan Takasago factory on the gas turbines and

 9      also could I facilitate inspection entrance to the Dunkirk port

10      authority where the warehouse was within the bonded area within

11      the part of Dunkirk.

12      Q.   And did you do that?

13      A.   Yes, I did, but I had to get further information, because

14      in Takasago, it's my factor, I can facilitate, but because it's

15      in a different country in France I have no authority.  So when I

16      asked the French authorities could I excerpted entrance, they

17      said we need passports, details, copies and everything, so we

18      can produce the proper documentation for the entrance.

19      Q.   Okay.  And -- what if anything did you think about the

20      inspection occurring at Christmastime?

21      A.   Well at the time I thought it was unusual.

22      Q.   Why?

23      A.   Because it's Christmas.

24      Q.   Well, the end user, when do they usually inspect the

25      equipment?
```

1  A.   Well, normally before you get a contract.

2  Q.   Before you get a contract?

3  A.   Yeah.

4  Q.   Okay.  And when did the technical people -- who usually

5  inspects the equipment?

6  A.   Basically, it would be a technical person and usually a

7  salesperson from our side, you know.  It would be usually a

8  salesperson would visit with you, a technical person, right, and

9  possibly somebody from global sources, who can have the bill of

10 materials.

11 Q.   Okay.  And is Mr. Buendia a technical person?

12 A.   Well, I know he is, right, just by his initials.

13 Q.   Okay.

14 A.   I think it's got "Ing.," which means he's an engineer, but

15 I know he's an engineer.

16 Q.   Okay.  Is he one of the individuals that you arranged to go

17 in and inspect the equipment?

18 A.   Yes.

19 Q.   Okay.  Government's Exhibit 12, I'm going to display the

20 English version to you, show you that.  Do you recognize your

21 name on this e-mail?

22 A.   Yes, it's from me.

23 Q.   And let me get to the text.  What is it, do you know?

24 A.   It's a letter from Marco to Mr. Buendia, engineer,

25 technical assistant manager, in relation to the property pledge

1    agreement related to the contract for procurement of the assets.

2    Q.   Okay.  Does this --

3

4            MS. KANOF:  I'm sorry.  Did I move it into evidence?

5    I forgot.

6            THE COURT:  No.

7            MS. KANOF:  We move admission of 112 and 112A, Your

8    Honor.

9            MS. FRANCO:  No objection.

10           MS. KANOF:  Okay.

11           THE COURT:  GX-112 and 112A are admitted.

12   BY MS. KANOF:

13   Q.   This appears to be a letter to Mr. Buendia from

14   Mr. Delgado, correct?

15   A.   Yes.

16   Q.   And Mr. Delgado is asking something of Mr. Buendia,

17   correct?

18   A.   I think he's informing him of a clarification.

19   Q.   That what?  What is he informing him?

20   A.   By request you kindly confirm as soon as possible that the

21   Federal Electricity Commission, as signee of the above-mentioned

22   instrument, verifies that according to paragraph 2.6 of the

23   contract in question, it's legal.

24   Q.   What contract?  Does it say which contract?

25   A.   It doesn't say.

1    Q.   The procurement of assets contract?

2    A.   Yes.

3    Q.   Okay.  It says the assets verifies that according to that,

4    title to the assets will not be effective until the time of

5    payment.

6    A.   At the time of the full payment of the cost in commercial

7    operation of the equipment which is C.O.D.

8    Q.   Okay.  It was -- again, was it the title to your equipment

9    that you were concerned with?

10   A.   Basically, looking at this now, yes.

11   Q.   Okay.  And this is Mr. Delgado writing to Mr. Buendia,

12   correct?

13   A.   Yes.

14   Q.   Government's Exhibit Number 113, is that an e-mail from you

15   on March 29th?

16   A.   Correct.

17   Q.   Okay.

18              MS. KANOF:  Move that 113 be admitted into evidence?

19              THE COURT:  Ms. Franco?

20              MS. FRANCO:  No, objection.

21              THE COURT:  GX-113 is admitted.

22   BY MS. KANOF:

23   Q.   Do you h ave it in front of you?

24   A.   Yes.

25   Q.   It begins with an e-mail from you, is that correct,

1    regarding the pledge?

2    A.   Yes.

3    Q.   So in the preceding e-mail from you, you asked -- you gave

4    a deadline for the documentation; is that correct?

5    A.   Correct, March the 28th.

6    Q.   And now you are writing what?

7    A.   Referring to your e-mail dated March 24th whereby we

8    require you to respond to M.P.S.A.'s demand that F.G.G. provide

9    written evidence that the misrepresentations made by F.G.G.

10   regarding the equipment, including the invalidity of the pledge

11   as being corrected with C.F.E. and the trust by close of

12   business on the 24th -- 28th, extended by F.G.G. request to

13   close of business the 28th of March, 2011.

14   Q.   And so no paperwork has been provided to you?

15   A.   No.

16   Q.   Have you gotten the handwritten notes that allegedly exist?

17   A.   No.

18   Q.   Have you gotten the e-mails that supposedly John Adams

19   wrote?

20   A.   No.

21   Q.   Have you gotten any of the contracts that supposedly have

22   Hector Ponce's and John Adams' initials all over them?

23   A.   No.

24   Q.   Have you gotten anything in writing the promise to clear up

25   this issue?

1    A.   Uh, basically, no.

2    Q.   Okay.  And you wrote this and sent it to Mr. Gireud and to

3    Mr. Delgado on March 29th; is that correct?

4    A.   Correct.

5    Q.   Government's Exhibit Number 115.  Do you recognize that as

6    an e-mail from you to Mace Miller copied to Mr. Delgado?

7    A.   Yes.

8    Q.   And what is the topic of this e-mail?

9    A.   Collection rights.

10   Q.   Back to that; is that correct?

11   A.   Yes.

12   Q.   And you address it to Mace Miller.  What are you talking

13   about?

14   A.   Can you confirm that M.P.S.A. will be directly copied on

15   the response from C.F.E.  As far as your proposal meeting next

16   week in Orlando with regard to the pledge, I would like to look

17   at all of the documents relating to the pledge.  I don't believe

18   I have everything I need over here.  Please let me know your

19   availability.

20   Q.   Government's Exhibit Number 117.  Do you recognize that as

21   an e-mail from Mr. Delgado to you dated April 8th of 2011?

22   A.   Yes, I do now.

23   Q.   Okay.

24        MS. KANOF:  We move that Government's Exhibit 117 be

25   admitted into evidence.

```
 1                 THE COURT:  Ms. Franco, any objection to 117?

 2                 MS. FRANCO:  No, Your Honor.

 3                 THE COURT:  GX-117 is admitted.

 4      BY MS. KANOF:

 5      Q.   Is this in response to you, this e-mail from Mr. Delgado?

 6      A.   (Reading silently.)

 7      Q.   You have asked that e-mail streams starts with an e-mail

 8      from you on March 22nd of 2011, correct?

 9      A.   Correct.

10      Q.   Or no, I'm sorry.

11      A.   It says, reply by.

12      Q.   March 17th of 2011, correct?

13      A.   Correct.

14      Q.   Okay.  And it's an e-mail in which you are asking for

15      assignment of collection rights, correct?

16      A.   Correct.

17                  MS. FRANCO:  Objection, Your Honor.  Leading.

18                  THE COURT:  Sustained.

19      BY MS. KANOF:

20      Q.   What were you asking for?

21      A.   As per our request, please find attached the draft letter

22      for your submission on F.G.G. letterhead requesting the

23      authorization for assignment of collection rights for the

24      contract in favor of Mitsubishi Power System.

25      Q.   And how did Mr. Delgado rescind -- respond?
```

1    A.   Kevin, with regard to the topic, I spoke to Patrick

2    Altamura yesterday.  Please visit with him regarding this.

3    Thank you.

4    Q.   Did you visit with Mr. Altamura about that?

5    A.   I did, yes.

6    Q.   And what happened?

7         MS. FRANCO:  Your Honor, if this answer calls for

8    hearsay, I'm going to object to it.

9         THE COURT:  I'm sorry.

10        MS. FRANCO:  Your Honor, she said, what happened with

11   her conversation with the -- Altamura, so presumedly he's going

12   to respond as to what some other witness said or some other --

13        MS. KANOF:  I'll withdraw the question.

14        THE COURT:  All right.

15   BY MS. KANOF:

16   Q.   Government's Exhibit Number 118.  Is that an e-mail from

17   Mr. Delgado to you?

18   A.   Yes.

19        MS. KANOF:  We'd ask that 118 be admitted into

20   evidence.

21        THE COURT:  Ms. Franco.

22        MS. FRANCO:  No, objection.

23        THE COURT:  GX-118 is admitted.

24   BY MS. KANOF:

25   Q.   Mr. Beddard, Mitsubishi has been asking for information

1    about the pledge, correct?

2    A.   Yes.

3    Q.   And what is the date of this e-mail?

4    A.   The date of this one is the 8th of April, 2011.

5    Q.   And in response to your many requests for information about

6    the pledge, does Mr. Delgado send you this e-mail?

7    A.   Yeah, I assume so.

8    Q.   If you don't know, you don't know.

9            What did you tell him or what does he tell you?

10   A.   He says, Dear Kevin, as discussed during our meeting on the

11   6th of April, 2011, C.F.E. has informed us that M.P.S.A. has

12   already been provided with all of the information related to the

13   contract via M.P.S.A.'s I.F.A.I. request.  For this reason,

14   F.G.G. are will not process the request in question at this time

15   given it's redundancy.

16   Q.   Okay.  So do you remember meeting on the 6th of April of

17   2011?

18   A.   No.

19   Q.   Okay.  And what is an I.F.I.A. request?

20   A.   I don't know what that stands for, the initials.

21   Q.   But he's telling you, we're not going to give you the

22   records because of some request Mitsubishi has made to the

23   Mexican government; is that what he's saying?

24   A.   Apparently, so, yes.

25   Q.   Where did you get that information to put it into this

DIRECT BEDDARD                                                              163

1    e-mail?

2             MS. FRANCO:  Objection, Your Honor.  He didn't author

3    this e-mail.

4             MS. KANOF:  I'm sorry.

5    BY MS. KANOF:

6    Q.   Do you know where Mr. Delgado got the information?

7             MS. FRANCO:  Objection.  Calls for speculation.

8             MS. KANOF:  Well, maybe he know.

9             THE COURT:  Let's see.  Maybe it does and maybe it

10   doesn't.

11            Without speculating, do you know where...

12            MS. KANOF:  Right.

13   BY MS. KANOF:

14   Q.   Do you know where he got that information?

15   A.   It could only come from Mexico, C.F.E.

16   Q.   Government's Exhibit Number 121.  Do you recognize that as

17   an e-mail from Mr. Delgado to you?

18   A.   Yes.

19            MS. KANOF:  We'd ask that Government's Exhibit 121 be

20   admitted into evidence.

21            THE COURT:  Ms. Franco?

22            MS. FRANCO:  No, objection.

23            THE COURT:  GX-121 is admit.

24   BY MS. KANOF:

25   Q.   Okay.  So this is -- what's the date?

DIRECT BEDDARD                                                    164

1    A.    The date is the 10th of April, 2011.

2    Q.    And what is the purpose of this e-mail?

3    A.    It's an e-mail from Marco myself:  Please be advised after

4    visiting with C.F.E. and pursuant to your discussion last week,

5    F.G.G. continues to be very interested in exploring of -- in a

6    very short time the options discussed as being represented to

7    F.G.G. by C.F.E. top management, that all contract information

8    has been provided to M.P.S.A.; however, F.G.G. is not privy to

9    it nor in a position to confirm with it.  Redactions are being

10   made.  Thank you.

11   Q.    Previous to that, had you written an e-mail to Mr. Gireud?

12   A.    I don't know.

13   Q.    Right here on this screen?

14   A.    Oh, sorry.  It won't scroll up.

15   Q.    Okay.  The bottom is the previous e-mail, the one about not

16   giving you any documents because the I.F.A.I. [sic] requests.

17   And then you responded in this e-mail.  You see the regards,

18   Kevin Beddard?

19   A.    Yes.

20   Q.    So did you respond to Mr. Delgado on April 10th -- but

21   actually to Mr. Gireud?

22   A.    I directed it to Fernando Gireud.

23   Q.    Why did you do that instead of directing it to Mr. Delgado?

24   A.    Because he's the lead for the F.G.G.

25   Q.    And what did you -- how did you respond with regard to the

1   refusal to provide you documents because M.P.S.A. had sought

2   them otherwise?

3   A.   I explained in there.  I explained the discretion to inform

4   F.G.G. that, one, M.P.S.A. project management did not have any

5   of these documents and would contact our legal representatives

6   with regard to these mentioned submitted documents via M.P.S.A.,

7   I.F.A. [sic].

8   Q.   Okay.  And what else?

9   A.   And I put a note, M.P.S. [sic] note:  We will have our

10  legal representative confirm to F.G.G. directly with regard to

11  these mentioned submitted documents via M.P.S.A., I.F.A.I.

12  Q.   The last line says could you please confirm.  What are you

13  asking?

14  A.   (Reading silently.)

15  Q.   What matter are you talking about?  Are you talking about

16  the whole contract or what matter are you talking about?

17  A.   Basically, I'm looking for -- we require if F.G.G. could

18  confirm that these documents were complete without redaction and

19  inclusive of the annexes.  So basically the full prime contract

20  included annexes.

21  Q.   Because before did you have a concern about the annexes?

22  A.   Well, again, I've always had a concern as we've mentioned

23  here.  There was differences in the technical supply, right, who

24  supplied what and that will all be covered in their annexes.

25  Q.   Government's exhibit -- let's see.  I'm not sure if you're

 1    copied on this.  Yes, sir.

 2         Government's government's Exhibit Number 122 is that

 3    an e-mail to you and to Mr. Delgado both?

 4    A.   Yes.  That's what it looks like, yes.

 5         MS. KANOF:  I'll move that Government's Exhibit 122 be

 6    admitted into evidence.

 7         MS. FRANCO:  No, objection.

 8         THE COURT:  GX-122 admitted.

 9    BY MS. KANOF:

10    Q.   And what is the nature -- and it's from Patrick Altamura,

11    correct?

12    A.   Correct.

13    Q.   In-house lawyer for Mitsubishi?

14    A.   Correct.

15    Q.   And what is it regarding?

16    A.   Marco, you called me last Thursday to request a meeting to

17    discuss possible ways for F.G.G. to cure the problems created by

18    F.G.G.'s unauthorized attempt to pledge M.P.S. equipment.

19    During the call, you expressed assurances that during the

20    meeting you would somehow see to it that the assignment of the

21    collection rights would be affected.

22    Q.   Go on.

23    A.   It is important to bear in mind, one, F.G.G. breach of its

24    obligations under the subcontract to securing the assignment of

25    collection rights in favor of M.P.S.A. and, two, F.G.G.

1    unauthorized attempt to pledge Mitsubishi's, M.P.S.A.'s

2    equipment at two distinctly different issues.

3    Q.   Go ahead.

4    A.   Despite numerous past assurances over the past year that

5    F.G.G. had filed the appropriate documents for the assignment

6    collection rights and the approval and the approval was

7    imminent, F.G.G. continues to be in breach of this important

8    material term of the subcontract.

9    Q.   Can you continue, please?

10   A.   For the avoidance of any misunderstanding, your invitation

11   to meet with F.G.G. does not change the concerns expressed by

12   M.P.S.A. and in Kevin's e-mail of the 8th of April -mail below.

13   F.G.G. continues to be in breach of obligations to secure the

14   assignment of Collection rights in favor of Mitsubishi.

15          Consequently, F.G.G. must expedite -- expeditiously

16   proceed with all diligence to submit the forms that were

17   prepared by M.P.S.A.'s outside counsel at your request to C.F.E.

18   and cause the assignment of collection rights in favor of

19   M.P.S.A. to be expeditiously approved by C.F.E. acknowledged by

20   the Commisión and affected by F.G.G.

21   Q.   Government's Exhibit Number 123.  Is this an e-mail from

22   Mr. Delgado to you and others?

23   A.   Yes.

24          MS. KANOF:  Move that 123 be admitted into evidence.

25          MS. FRANCO:   No, objection.

```
 1              THE COURT:  GX-123 is admitted.

 2   BY MS. KANOF:

 3   Q.   And how does Mr. Delgado respond?

 4   A.   Well, he responds to Patrick because it's Patrick.  Thank

 5   you forgetting back to me on the possibility of meeting to

 6   resolve the issues related to the pledge and assignment of

 7   collection rights between F.G.G. and M.P.S.A.  You're e-mail

 8   correctly reflects F.G.G.'s interest in addressing and resolving

 9   the issues at hand, including, as it relates to the assignment

10   of collection rights; however, please note and confirm that as

11   part of your conversation, our conversation, we agree to

12   disagree on F.G.G.'s position regarding the validity of the

13   pledge.  F.G.G. never accepted M.P.S.'s position as correct and

14   that F.G.G. shares the same position as C.F.E. regarding the

15   issue as presented by C.F.E. officials to M.P.S.A. counsel,

16   Mexico counsel, this past week.

17   Q.   Go ahead.

18   A.   We also discussed the need for you to visit with management

19   to decide on the feasibility of the proposed meeting in

20   tentative days of appropriate -- (mumbles).  Please advise

21   regarding the -- next one.

22   Q.   That's fine.

23              So the assignment of collection rights, it's now a

24   year and a half later, correct?

25   A.   Yes.
```

1   Q.   If you had this assignment of collection rights, the money

2   could not go into any other bank account than Mitsubishi's from

3   C.F.E., correct?

4   A.   From my invoice, yes.

5   Q.   And regarding the first cut of money, you were supposed to

6   get how much, 14-something-million?

7   A.   Well, the initial was 16 million, because that was the

8   first invoice we put in from the first payment schedule.  Then

9   the second payment schedule, what was done was 14 point, I don't

10  know, 5 or something.

11  Q.   And you got how much?

12  A.   11.3 million.

13  Q.   So, I'm no mathematician, but approximately how much less

14  did you get that you were supposed to get?

15  A.   Over 3 million.

16  Q.   And if you had assignment of collection rights within five

17  days as the prime contract said, would you have known where that

18  money came from and went?

19  A.   Could you explain?

20  Q.   If you had assignment of the collection rights and only

21  gotten $11 million instead of $14 million, it would have come

22  from C.F.E. correctly?

23  A.   Well, it would have come from the Mexican bank, which would

24  be the --

25  Q.   A trust?

1    A.    The trust, yeah.

2    Q.    Representing C.F.E.

3    A.    Correct.

4    Q.    Okay.  And so then you -- who would you have been able to

5    complain to that you are not getting the right amount of money?

6    A.    Basically then I would go back to F.G.G., first of all,

7    right, and say I put this in, we've got the collection rights,

8    can we go to C.F.E. and find out the reason why we have not

9    received our full amount as per our invoice?

10   Q.    Did you ever find out why you didn't receive that full

11   amount?

12   A.    Well, it was on a letter previously that said it was

13   financials were taken out and a fee of 1 million was taken out.

14   Q.    Okay.  And you protested that.  Did you ever get back the

15   money that was owed to you?

16   A.    Well, again, right, as I've stated, another negotiations

17   were taking place and then another payment schedule come out,

18   and actually then, right, I had to give actually 1.1 million

19   back in a credit, because the new payment schedule was due for

20   two invoices.  So actually I was due 9 million, right.

21   Q.    Government's Exhibit Number 124, in front of you.

22   A.    Yes.

23   Q.    Do you recognize that as an e-mail to you and Mr. Delgado

24   and others from Mr. Altamura?

25   A.    Yes.

```
 1    Q.    Is that --

 2           MS. KANOF:  We move that Government's Exhibit 124 be

 3    admitted into evidence.

 4           THE COURT:  Ms. Franco?

 5           MS. FRANCO:  No, objection.

 6           THE COURT:  GX-124 is admitted.

 7    BY MS. KANOF:

 8    Q.    Is that a response to Mr. Delgado's previous e-mail?

 9    A.    That appears that part is sent back.  Dear Marco, I

10    currently note I do not agree with the statements which you paid

11    on the third sentence of your -- of the first paragraph were

12    part of our conversation.

13    Q.    So, previously, Mr. Delgado had said that there had been a

14    conversation about these matters and Mr. Altamura's disagreeing?

15    A.    That appears so on this, yes.

16    Q.    Government's Exhibit Number 125.  Do you recognize this as

17    an e-mail from Mr. Delgado to Mr. Altamura and to you and

18    others?

19    A.    What I could say as to the part I noticed, again, when it

20    goes into this, it doesn't show my e-mail so I can't say that.

21    Q.    You had previously mentioned somebody named Andres?

22    A.    Yes.

23    Q.    Is he on this e-mail?

24    A.    Yes.

25    Q.    And who was Andres?
```

1   A.   Andres Maynez (phonetic) was my fourth project manager with

2   C.F.E.

3              MS. KANOF:   And we move, Your Honor, 125 into

4   evidence.

5              THE COURT:   Ms. Franco?

6              MS. FRANCO:   No objection, Your Honor.

7              THE COURT:   GX-125 is admitted.

8   BY MS. KANOF:

9   Q.   And what is the date of this?

10  A.   The date is the 12th of April, 2011.

11  Q.   All right.  And is this from Mr. Delgado?

12  A.   Yes.

13  Q.   And what is he telling Mr. Altamura?

14  A.   He's thanking him for his response saying that I thank you

15  for your response.  I had a chance to review your latest e-mail

16  and I will defer to your better recollection.  That being the

17  case, please note that both C.F.E. and F.G.G. differ from your

18  appreciation of the validity of the pledge as discussed by

19  C.F.E. with your Mexican attorneys, but nonetheless are

20  extremely sensitive to the importance of M.P.S.A.'s concern.

21  For this reason, it is F.G.G.'s sincere hope that we will still

22  meet and resolve the issues under consideration.  I look forward

23  to hearing from you.

24  Q.   Mr. Beddard, did you have any other involvement in this

25  matter?

1    A.   No, because I left it to legal.  It was purely a legal

2    matter.  I needed to concentrate on the project, so I handed it

3    over to the legal department.

4               MS. KANOF:  I'll pass the witness.

5               THE COURT:  Ms. Franco?

6               MS. FRANCO:  Thank you, Your Honor.

7                    KEVIN JOSEPH BEDDARD,

8               CROSS-EXAMINATION BY THE DEFENSE

9    BY MS. FRANCO:

10   Q.   Good afternoon, Mr. Beddard.  I promise I won't keep you

11   very much longer.

12   A.   Okay.

13   Q.   Just a few questions.  I wanted to clarify some things.

14        What it is is that you weren't a party to the teaming

15   agreement, correct?

16   A.   Correct.

17   Q.   And that was an agreement that was reached between

18   Mr. Gireud and Mr. Adams, John Adams?

19   A.   Again, I wasn't party to it.  I know Rick Williams was

20   involved and I know John Adams was.  I don't know who the

21   parties for F.G.G. were.

22   Q.   Okay.  And you testified earlier, I think, yesterday and

23   today that you had looked it over to find out whether or not it

24   was feasible, if this is something that M.P.S.A. should do

25   because you had to have -- because you had this -- those

 1   turbines available if one were to enter into a contract,

 2   correct?

 3   A.   No.  I said what I did when I got the subcontract.  I did a

 4   risk analysis, which I do.  So I got the subcontract in December

 5   and because it had a -- it says what -- one sentence in there

 6   refers to the teaming agreement, as a risk analysis I have to

 7   look at that document to see if there's any risk or potholes,

 8   anything that can affect the subcontract.

 9   Q.   Okay.  And from your recollection, now, some few years

10   later, after you looked at that teaming agreement, nothing

11   jumped out at you that made you concerned that this was a bad

12   risk for M.P.S.A., correct?

13   A.   Basically, that was the assumption if that was held up.

14   Q.   Let me see if I can get my exhibits back up.

15        Your Honor, if you'll just give me a second.

16   BY MS. FRANCO:

17   Q.   I think it's already been admitted, but it's government's

18   Exhibit 12A, I believe, which is the subcontract.  Do you see

19   that on your screen?

20   A.   Yes, I do.

21   Q.   Okay.  And this is the English version of it.  I imagine?

22        MS. FRANCO:  If we haven't already, Your Honor, I'd

23   ask for the Spanish version to also be admitted.

24        THE COURT:  Is that Exhibit 12?

25        MS. FRANCO:   12A.  This is 12A and then 12 is the

CROSS-EXAMINATION BEDDARD                                    175

1    Spanish version.

2              THE COURT:  Yes, ma'am.  12 and 12A have both been

3    admitted.

4              MS. FRANCO:    Thank you.

5    BY MS. KANOF:

6    Q.   I'm scrolling down because through this contract, this

7    subcontract, and I know you have a difference of opinion as to

8    whether or not it's a real contract or not, but there's a

9    handwritten note at the bottom of it at the end of the contract.

10   Do you see that?  I'm getting to it, I promise.  Okay.  This is

11   the English version.

12             And the Spanish version, it's actually handwritten

13   into the contract.  But here it says where it's handwritten in

14   English it says, with respect to the signed subcontract, the

15   parties agree to check and amend the subcontract as needed and

16   to adjust the price according to the final arrangements for the

17   letter credit, cost, shipping delivery terms and any errors in

18   the document and adjustment based on final prime contract.  You

19   see that, right?

20   A.   I do, yes.

21   Q.   Okay.  So the subcontract in some ways it refers back to

22   the prime contract that C.F.E. and F.G.G. were going to enter

23   into, correct?

24   A.   Could you repeat that?

25   Q.   The -- based upon that written --

1    A.   Could we go back?

2    Q.   Uh-huh.  Oh, I'm sorry.

3         Based upon that handwritten note -- it's typed in the

4    English version -- but in the handwritten note, it refers back

5    to that prime contract, correct?

6    A.   Yes.

7    Q.   Now you testified yesterday and I think sometime today as

8    well, that this is an unusual occurrence for you to be involved

9    in this three-party contract.  And normally, what you would be

10   doing is you would be working directly with the customer,

11   correct?

12   A.   Basically, the normal thing would be directly with the end

13   user or through the erection contractor, right.  It was

14   installing all of the plans for the end user.

15   Q.   Right.  So you -- so this situation, where you have

16   basically a broker which would be F.G.G., this was an unusual

17   circumstance for you that you were having to use an intermediary

18   to talk to the customer who wanted your equipment, correct?

19   A.   Correct.

20   Q.   Okay.  And you weren't a party to any of the conversations

21   that F.G.G. had with either your boss, Mr. Adams, or with the

22   consultant, Mr. Ponce, correct?

23   A.   Correct.

24   Q.   And that became apparently very true later on in this saga

25   between all of you-all regarding the installation of these

1     turbines, because you mentioned just a little while ago --

2            MS. KANOF:  Objection, Your Honor.  Compound question

3     and is there a question.

4            THE COURT:  Well, I'll sustain it as to a compound

5     question.  You ask one question then.

6     BY MS. FRANCO:

7     Q.   You mentioned earlier the terms of kept changing, correct?

8     A.   Yes.

9     Q.   The original invoice that you said -- sent out, that wasn't

10    based on anything that was in the subcontract.  That was

11    something that was told to you that to charge the 16 percent of

12    the overall contract price to C.F.E., correct?

13    A.   Correct.

14    Q.   And as a result of other individuals being involved in this

15    contract, those numbers were eventually reduced down, correct?

16    A.   There's changes, yes.

17    Q.   Yes.  And so when you testify that the 11 million payment

18    that came in in March, at first you thought it had been shorted,

19    correct?  In other words, M.P.S.A. should have gotten more than

20    $11 million, correct?

21    A.   Correct.

22    Q.   But later on, because the contractual terms were changed,

23    payment terms were changed, that amount was actually an

24    overpayment, that the money that was made to M.P.S.A. was an

25    overpayment, correct?

 1    A.   Correct, yes.

 2    Q.   And you had to reimburse back to or give a credit, I should

 3    say, back to F.G.G. and C.F.E. for that overpayment, correct?

 4    A.   Correct.

 5    Q.   And the $7 million that was paid I believe in July, if I'm

 6    not mistaken, that was the $7 million that you had submitted on

 7    your invoice, correct?

 8    A.   We have to just go back a little bit here, right.

 9         The first invoice was for 16 million, right.

10    Q.   Yes, sir.  I'm asking you about the second.  The second

11    payment that came in was the $7-million payment, correct?

12    A.   I can't remember if that was the second time or the third

13    payment time.

14         MS. FRANCO:   Your Honor, may I have a moment and I'll

15    pull up the exhibit?

16         THE COURT:  Yes, ma'am.

17         MS. FRANCO:  I think it's Government's Exhibit Number

18    80.  I'll move on, Your Honor, while --

19    BY MS. FRANCO:

20    Q.   And I'll come back to you on that --

21    A.   Okay.

22    Q.   -- as to the $7 million that came through.

23         Now, going back to my point though is, is that a lot

24    of -- from what you testified to yesterday about commercial,

25    people in commercial and marketing being involved in this, and

1    you're the tech guy; you're the engineer; you're the one that

2    needs to sign off on this, because these are your babies, these

3    turbines are yours to make sure that they go to a good home

4    right?  Is that correct?

5    A.   Basically, they are not mine.  They belong to Mitsubishi.

6    Q.   Right.  But they were your responsibility.

7    A.   Right.

8    Q.   So you want to make sure the customer, the end user, is

9    happy with the equipment that you are responsible for, correct?

10   A.   Correct.

11   Q.   And so you didn't have any dealings with whatever was going

12   on, on the other part of this deal, the M.P.S.A. deal, as far as

13   the monies involved or pledges being made or anything like that.

14   You had no part in that conversation.  Your conversation was

15   regarding the equipment and it's suitability for what Mexico,

16   what C.F.E. needed it for, correct?

17   A.   No.

18   Q.   It's not correct?

19   A.   No, it's not correct.

20   Q.   Okay.  So tell me your -- your responsibility was to make

21   sure that all of this -- the contract was met as far as the

22   specifications were met, that it was ready to go, that you knew

23   that you were going to get paid -- obviously, M.P.S.A. --

24   A.   That's what I just said.

25   Q.   Right, for the equipment, correct, before you got moved on.

1    A.   Correct.

2    Q.   But as far as the terms between the parties, be it F.G.G.,

3    Mr. Gireud, Mr. Adams, Mr. Ponce, many of those terms you were

4    not privy to, correct?

5    A.   Correct.

6              MS. FRANCO:   May I have just a moment, Your Honor?  I

7    think we found that exhibit.

8    BY MS. FRANCO:

9    Q.   Now the other part of what was being contemplated at this

10   times was a long-term service agreement.  I think we saw some

11   e-mail with regard long-term service agreement, correct?

12   A.   Reference to it.  But that part of the business is not

13   mine.

14   Q.   Okay.  So when you're looking at these documents and

15   figuring out if the turbines are going to make specs and what

16   Mexico, what C.F.E. wanted, the long-term service agreement,

17   that was not of a concern to you, correct?

18   A.   Correct.

19   Q.   Now I have a couple of questions, a few questions really,

20   about the gray market that you talked about that's going back to

21   the turbines that were available.

22             You had testified that the turbines were -- they had

23   already been manufactured and they had already been built for

24   another project that fell through, correct?

25   A.   Correct.

1    Q.   And when you were first brought into this, was it Mr. Adams

2    that brought you into this deal?

3    A.   Uh, yes.

4    Q.   He asked you to get an estimate for the, you know, the

5    refurbishment or making these three turbines work in the Mexico

6    project, correct?

7    A.   Correct.

8    Q.   Do you recall what that dollar amount was?

9    A.   No, I don't.

10   Q.   Okay.  And you knew that or I suppose, and correct me if

11   I'm wrong, but Mr. Adams knew also that the two gas and the one

12   steam turbines were available, correct?

13   A.   Yes.  Yes.

14   Q.   And do you know for how long those turbines had been

15   sitting around waiting for someone to purchase them?

16   A.   The initial purchases was 2003, so that would be the

17   manufacturing date.  I cannot say what the bill of sale was,

18   date, when they changed back to us.

19   Q.   And if you don't know, then say you don't know, but do you

20   know whether or not M.P.S.A. ever received any type of monetary

21   compensation for those three turbines from the cancelled deal?

22   A.   Oh, no.

23   Q.   M.P.S.A. didn't receive any money from that?

24   A.   No.

25   Q.   At least to the best of your knowledge?

1    A.    Oh, yes.

2    Q.    So they had been in a -- I guess two were in a warehouse in

3    Japan and one was in France, correct?

4    A.    The turbines were, but the auxiliaries were spread around

5    the world.

6    Q.    But the meat of this contract are the turbines, right?

7    They're a big portion of the costs.

8    A.    They don't work without the auxiliaries.

9    Q.    Pardon me?

10   A.    They can't twirl without the auxiliaries.

11   Q.    Okay.  But the turbines that I'm asking you about, the two

12   of them were in Japan and one in France, correct?

13   A.    Correct.

14   Q.    And have they been there for since 2003 when they were

15   manufactured and at some point in time that deal fell through?

16   A.    No.  When the deal -- the initial deal, they were on

17   shipment; the steam turbines were on a shipment from Japan to

18   Brazil.  And what I'm told the deal went south, so A.D.F. called

19   the ship to go to Dunkirk and offload there.

20   Q.    Okay.  Just the one turbine, correct?

21   A.    The one turbine, the steam turbine.

22   Q.    Okay.  And you talked about this idea of a gray market in

23   that the sense that, and correct me if I've misunderstood what

24   you were saying, but a gray market is that because these are

25   already manufactured, it's not like you're starting the deal

1    from brand new.  You already had the equipment available,

2    correct?

3    A.   Correct.

4    Q.   And have you ever worked a deal before with a broker like

5    F.G.G. on a gray market deal?

6    A.   Basically, not me, no.

7    Q.   Okay.  And earlier you testified -- I'm going back to

8    Government's Exhibit Number 12 that -- I'll pull up 12A -- that

9    this -- that the procurement, this subcontract, that the reason

10   why you had problems with it from the get-go was because of some

11   substantial terms were left out, correct?

12   A.   Yes.

13   Q.   And you talked about the specs of the equipment like the

14   specificity of them as to far as modifications that would need

15   to be made, because now these turbines are going to a different

16   climate, correct?

17   A.   Correct.

18   Q.   And also missing from there would be the payment schedule,

19   like how is it that M.P.S.A. is going to get paid for the

20   delivery of or the transfer of these turbines to C.F.E.,

21   correct?

22   A.   Correct.

23   Q.   And also where they're supposed to go, correct?

24   A.   Correct.

25   Q.   And how they're supposed to get there.  That wasn't in the

1    contract either, correct?

2    A.   Correct.

3    Q.   But M.P.S.A. made this contract, correct?

4    A.   Um --

5    Q.   They drafted it, correct?

6    A.   I do not know that.

7    Q.   You don't know that?

8    A.   (Shaking head negatively.)

9    Q.   But M.P.S.A. signed the contract, correct --

10   A.   Correct.

11   Q.   -- and the amendment that was done later.  So after you

12   have identified that, mailman, there's some problems here with

13   this subcontract, that amendment to the contract, that was also

14   prepared by an done by M.P.S.A., correct?

15   A.   Correct.

16   Q.   And at that point in time, whether or not anyone had gotten

17   a copy of the prime contract, that had already been discussed,

18   correct?

19   A.   Many times.

20   Q.   Many times.  And, yet, they're -- yet, at this point in

21   time, at least from your recollection, no one had looked or you

22   had not looked at the prime contract, correct?

23   A.   Correct.  I had not looked at it.

24   Q.   Pardon me?

25   A.   You're correct that I did not look at that.

1    Q.   And one of the things I just wanted to make clear is that

2    when you were testifying in direct, everything that's going on

3    here is what you -- what happened with you, not what Mr. Adams

4    was doing, not what Mr. Ponce was doing or what they were doing

5    somewhere else, correct?

6    A.   Correct.

7    Q.   Did you know that the prime contract called for the

8    turbines to be new, brand new, as opposed to I guess old but not

9    used?

10   A.   Uh, you --

11   Q.   Which I think is how you described it is that it was --

12   they'd never been used, but they weren't new, correct?

13   A.   They were not newly manufactured.

14   Q.   Pardon me?

15   A.   They weren't newly manufactured.

16   Q.   So you didn't know that the prime contract called for those

17   turbines to be --

18   A.   I cannot remember.

19   Q.   When you're looking at -- once you looked at the

20   subcontract, you identified that there were several problems

21   with it, I think you had indicated that you contacted

22   representatives back at M.P.S.A. with your concerns.  And so my

23   question with regard to that, would that be Mr. Adams or

24   Mr. Ponce that you were talking to?

25   A.   Yes, and the legal.

 1  Q.   And who?

 2  A.   And with legal.

 3  Q.   With legal, too.

 4       Okay.  And so the ones that are responding back to you

 5  primarily during this early part of the contract, was that

 6  Mr. Adams and Mr. Ponce?

 7  A.   Correct.

 8  Q.   Now if you know -- this is a big deal.  It was $120-million

 9  deal, correct?

10  A.   It was a deal.

11  Q.   Right.  Well, I guess it's relative, right, because you

12  probably do bigger deals.

13  A.   We do.

14  Q.   To me that's a big deal.

15       MS. KANOF:  Objection, Your Honor.  What's a big deal

16  to her?

17       THE COURT:  So what's your objection?

18       MS. KANOF:  It's not a question.  It's a side comment.

19  It's evidence.

20       THE COURT:  I'll sustain the sidebar objection.

21  BY MS. FRANCO:

22  Q.   With the $120-million deal, do you know whether or not

23  anyone on the commercial part of it would have gotten a bonus

24  for securing this deal for getting these turbines out of storage

25  and getting them out and operating?  Do you know whether

1    Mr. Adams or Mr. Ponce would be financially compensated for

2    making this deal going through?

3    A.   I have no knowledge of that at all.

4    Q.   One of the things that concerned you also about the

5    contract was the subcontract, was that the big stick wasn't

6    there, the termination agreement or termination terms, correct?

7    A.   Correct.

8    Q.   And in fact there was a -- I think it's an arbitration

9    language in the contract, correct?

10   A.   Correct.

11   Q.   And from your -- based on your experience, that was a

12   problem for you, because there wasn't anything to force the

13   parties to do what they needed to do, correct?

14   A.   Basically, yes.

15   Q.   And when you went in and renegotiated part of the

16   subcontract by coming up with the amendment, there still wasn't

17   a termination agreement in there, correct?

18   A.   You are correct, yes.

19   Q.   And that was after you-all had problems with the terms with

20   C.F.E. and F.G.G., correct?

21   A.   Correct.

22   Q.   When you express your concerns at the subcontract, you

23   testified earlier, I believe yesterday, that you were the one to

24   implement the contracts, correct?

25   A.   Correct.

1  Q.   And if you didn't want a contract to be implemented, it

2  wouldn't be implemented, correct?

3  A.   No.  Basically, we have standard operating procedures.  Now

4  basically -- and one of them is the hand over from commercial

5  and sales and marketing to projects to administrate, so they've

6  got to hand over the contract to us and it's got to be in full

7  form, evident, and also they've got to give us their risk

8  analysis of what happened getting this, so then we could look at

9  that, with it, and we've got everything so we can administrate

10  that contract.  And basically, as you've just said, all of these

11  pieces went together.

12  Q.   Right.  So even though you, as the implementer of the

13  contract, and you didn't like the terms of the contract, in

14  fact, you didn't even think it was a contract, it still went

15  through because your boss, Mr. Adams, said he wanted it to go

16  through, correct?

17  A.   Did it go through?  I don't understand the question.

18  Q.   Okay.  Well, you got paid, M.P.S.A. got paid, correct, for

19  the turbines, even though they hadn't been delivered yet, but

20  the partial payments, the first two partial payments had been

21  made, correct.

22  A.   We have to, right.

23  Q.   Right.  But the subcontract was signed back in December of

24  20 -- 2009, correct?

25  A.   Correct.

 1    Q.    And the amendment was sometime later, correct?

 2    A.    That was in April --

 3    Q.    In April of 2010?

 4    A.    -- the following year, yeah.

 5    Q.    Right.  So at that point in time, any error that you

 6    thought might have been problematic with the subcontract, it was

 7    the amendment to the contract, that was an attempt to fix some

 8    of the problems in the subcontract, correct?

 9    A.    Correct.  Yes.

10    Q.    Okay.  But from what you were testifying to just a moment

11    ago, there are still persisted problems with the contract,

12    correct?

13    A.    Yes.

14    Q.    One of the things you testified about yesterday was on the

15    delivery location.  I asked you earlier before, that part of the

16    problems with the subcontract is that the delivery and location

17    wasn't in there, at least it wasn't described as to how the

18    turbines were supposed to get to Mexico, correct?

19    A.    Correct.

20    Q.    And on that -- you testified yesterday that John Adams had

21    told you to -- that that was going to be a second phase of the

22    contract?

23    A.    Yes.

24    Q.    And so he instructed you to not worry about that part, that

25    that -- that there would be a separate contract with regard to

1    the delivery as far as who is responsible for it and how much

2    M.P.S.A. would get paid for it?

3    A.   I couldn't say not that he said do not worry, right,

4    because I always worry because they're my babies, as you said.

5    Q.   Okay.  But he told you not to worry about it.  It was going

6    to be handled in a second contract?

7    A.   Yes, which would be a sale, a change order.

8    Q.   A change order.  Okay.

9            When you were testifying earlier, you talked about

10   that I think you said that there had been five project managers

11   on this Agua Prieta project, correct?

12   A.   Correct.  Since it finished, but, you know.

13   Q.   Right.  That's what I was going to ask you.  So it's

14   finished, right?

15   A.   Yeah, I finally completed it.

16   Q.   So you found a home for the turbines, which was originally

17   contemplated back in 2009, correct?

18   A.   Yes, the same home.

19   Q.   The same home?

20   A.   The same home.

21   Q.   A lot of your e-mail correspondence that you had went

22   directly to Mr. Gireud as the managing partner of F.G.G.,

23   correct?

24   A.   Correct.

25   Q.   And you said that was pursuant to protocols within your own

CROSS-EXAMINATION BEDDARD                                              191

1   company, correct?

2   A.   Correct.

3   Q.   And as far as you could tell, that Mr. Gireud was an active

4   participant in trying to make this deal happen between C.F.E.,

5   F.G.G. and M.P.S.A., correct?

6   A.   I would hope so, yes.  That's the intention.

7   Q.   And you mentioned, also, that your own internal controls

8   are, I guess protocol, is a lot of times you're supposed to copy

9   in your higher-ups in some of your e-mails, but in some of your

10  e-mails you don't do that.  Some of your e-mails were without

11  all of that extra language that was on the bottom; is that

12  right?  So sometimes you would follow that protocol and copy in

13  every one in the company, and other times it would be an e-mail

14  from you to Mr. Gireud or to Mr. Adams or to Mr. Ponce or...

15  A.   If it was an official mail, then we have set people on the

16  copy list, right.  So the copy list would be saying they need to

17  be on the copy list so you put them on.

18        And depending on the subject matter, right, if it was

19  a technical, say electrical, I put the electrical engineer on

20  the copy.  If it was mechanical, I put the mechanical engineer,

21  except -- so relevant people could change on the copy list.

22  Q.   In other words, it would change as far as it wasn't a set

23  protocol, it would depend on what the circumstances are and what

24  the subject matter was?

25  A.   It was a minimum protocol then you could add in the

1    different names relative.

2    Q.    The assignment of collection rights, we heard a lot of

3    testimony about that.  Eventually, the assignment of collection

4    rights, in other words, the ability for M.P.S.A. to get paid

5    directly from the trust in Mexico, that was eventually

6    effectuated, correct?

7    A.    No.

8    Q.    It never was?

9    A.    It never was.

10   Q.    The -- when you were sending your invoices to F.G.G. to get

11   paid and you said that you based it off of because you didn't

12   have a payment schedule at the very beginning, so you were

13   basing it off of what was common -- well, I think there was

14   something in there about two months after signing the contract,

15   so you're basing it upon that, correct?

16   A.    Correct.

17   Q.    And then that's when the other part of M.P.S.A. got

18   involved and they renegotiated as far as when or how much --

19   when you were supposed to invoice and how much F.G.G. was

20   supposed to pay you, correct?

21   A.    No.  First part was the -- for the contract there.  There

22   was one payment schedule, so we invoiced to that payment

23   schedule, right, which was the 16.9 million, right.  We didn't

24   get paid that amount.

25   Q.    Right.

1      A.    Then there was negotiations in that with the parties.   And

2      then a new payment schedule would come out, an agreement that we

3      would get paid the 14.5 million, right, so again another invoice

4      went out.   And then we didn't get paid again, right, or we got a

5      reduced amount of 11 million, with it.   And then, why, and then

6      negotiations went on again, and then another payment schedule

7      would come out, right, and again, then I had to send in to the

8      amount of 11 million, which was received, and we need another 9

9      million to make us whole for that first invoice.

10     Q.    Okay.   But all of those terms with regard to the payment

11     schedule, that was being handled by Mr. Ponce and Mr. Adams,

12     correct?

13     A.    Correct.

14     Q.    So you weren't a party to that?

15     A.    No.

16     Q.    And so when you were sending the invoices out --

17            MS. KANOF:   Your Honor, I'm going to object to

18     assuming facts not in evidence, because Mr. Adams left before

19     the first amendment, and so he couldn't possibly have been

20     participating in all of the negotiations for the changes.

21            THE COURT:   All right.

22            MS. FRANCO:   The change in payment --

23            THE COURT:   Ms. Franco?

24            MS. FRANCO:   Pardon, me?

25            THE COURT:   Ms. Franco, response to Mr. Kanof?

1          MS. FRANCO:  Well, Your Honor, I'm just asking.  He

2    was the one who was there, and I said Mr. Adams and Mr. Ponce,

3    so I mean he responded to that and that -- another part of

4    M.P.S.A. was working on negotiating the payment reductions.

5          THE COURT:  All right.

6    BY MS. FRANCO:  So whether it be Mr. Adams, Mr. Ponce or

7    Mr. Jones, somebody else at M.P.S.A. was negotiating with F.G.G.

8    to reduce the amount of payment being paid -- made from F.G.G.

9    to M.P.S.A., correct?

10   A.   Of the payment schedule --

11   Q.   Right.

12   A.   -- reduction or an increase.

13   Q.   Right.  So that the schedule was negotiated by somebody

14   else, correct?

15   A.   Correct.

16   Q.   You testified earlier that your -- there was an insecurity,

17   because money was getting paid to M.P.S.A. from F.G.G., but you

18   were concerned because of the changes that were made in the

19   payment schedule.  And as far as you shipping or having somebody

20   receive the equipment, you said that you would want the title to

21   transfer once you were paid in full; is that right?

22   A.   That's from the first contract.  That's -- the title would

23   never change hands until the last payment was received.

24   Q.   Okay.  And change hands meaning the title to the equipment,

25   correct?

1    A.   Correct.

2    Q.   Because the actual equipment would need to get to Mexico

3    before that happened, correct?

4    A.   Correct.

5    Q.   And the big chunk of payment that was outstanding at the

6    time that this contract ended, which is in sometime in 2011, I

7    believe, the greatest portion that was going to be paid to

8    M.P.S.A. was yet to be paid, and that would be once you-all

9    released the turbines for someone to pick them up or you-all

10   would have shipped them for an additional sum of money?

11   A.   It was prior to that.

12   Q.   Right.  So you would have gotten a big chunk if this

13   contract had gone through on that third payment, that's where

14   the bulk of the money would have come in, correct?

15   A.   Yes.

16   Q.   And the bulk of the money would have come in prior to the

17   actual shipment of the turbines to Mexico, correct?

18   A.   Correct.

19   Q.   And at that point in time, they would be in Mexico,

20   correct?

21   A.   No.

22   Q.   Well, assuming that you got paid on that third installment.

23   Okay?  Follow me here.  Assuming you got paid on that third

24   installment, those turbines would have been located at Agua

25   Prieta, correct?

1    A.   We would release them, right, for pick-up.

2    Q.   And they would have been delivered to Mexico, either by

3    you-all with extra money being paid to you or the F.G.G. or

4    C.F.E. would have paid somebody to ship it to them, correct?

5    A.   Well, it wouldn't have been us, because we did not get a

6    change order.

7    Q.   Right.  But I'm saying if that had happened.

8    A.   If that had happened --

9    Q.   Right.

10   A.   -- and we got that and we got that payment, then yes we

11   would have shipped it.

12   Q.   Okay.  So when the actual equipment made it to Mexico on

13   the payment schedule, the purchaser would still owe M.P.S.A.

14   money after the turbines had actually gotten to the plant,

15   correct?

16   A.   Correct.

17   Q.   And the actual title to the equipment would not transfer

18   until M.P.S.A. had been paid in full?

19   A.   Correct.

20   Q.   And the information that was related to you with regard to

21   this pledge agreement that C.F.E. had regarding the M.P.S.A.

22   equipment, everyone made it clear that the actual, physical

23   title to the equipment would not transfer to C.F.E. until

24   M.P.S.A. was paid in full, correct?

25   A.   Could you rephrase that?

CROSS-EXAMINATION BEDDARD                                          197

1    Q.   The pledge agreement, you testified --

2    A.   Yeah.  (Mumbles.)

3    Q.   Pardon me?

4    A.   I am not part of the pledge agreement.

5    Q.   Right.  But you testified about it earlier today about

6    the -- that there was some sort of effort, from your point of

7    view, to pledge the equipment to C.F.E.?

8              MS. KANOF:  Objection, Your Honor.  That's

9    mischaracterizing anything he said.  He didn't ever say --

10             THE COURT:  I'm going to overrule the objection.  He

11   talked about it in those e-mails, so she can cross him.

12   BY MS. FRANCO:

13   Q.   So you remember what we're talking about, the e-mails

14   towards the end of your dealings with F.G.G., you're asking

15   about this non-possessory pledge agreement, correct?

16   A.   I'm asking about the pledge agreement, but I don't have the

17   content of the pledge agreement.

18   Q.   Right.  But in the e-mails that you got, back from -- well

19   C.F.E. and also from F.G.G., was that the title was very clear

20   that title to the turbines would not transfer until they'd

21   been -- until you-all had been paid in full, correct?

22   A.   That's what it said, yeah.

23             MS. FRANCO:  May I have just a moment, Your Honor?

24             THE COURT:  Ms. Franco, why don't we go ahead and take

25   a break.

 1             Ladies and gentlemen of the jury, we'll recess for

 2    15 minutes.  If you would be back in the jury room at 3:30,

 3    we'll resume our proceedings at 3:30.

 4             COURT SECURITY OFFICER HEIDTMAN:  All rise.

 5             (Break at 3:17 p.m. to 3:34 p.m.)

 6              (Jury not present.)

 7             THE COURT:  Ms. Kanof, you say you didn't think we

 8    would do go to the 30th?

 9             MS. KANOF:  I don't think so.

10             THE COURT:  More or less, do you have a new guess as

11    to when we'll be done?

12             MS. KANOF:  Do I have any guess?  I'd need a calendar,

13    but I don't think it will go a third week.

14             THE COURT:  Just two weeks?  That might make the Mayor

15    of Anthony feel a little better.

16             MS. KANOF:  Oh, it's for the Mayor of Anthony?  I've

17    always thought it would be a two-week trial.  It's the defense

18    that's talking about the extra week, so what you're asking --

19             THE COURT:  Let me ask.

20             MR. HANSHEW:  Two weeks at the far end.

21             THE COURT:  Okay.  Thank you.

22             MS. KANOF:  But I don't think you have an obligation

23    to the Mayor of Anthony.

24             THE COURT:  I don't.  I'm looking at the paper voir

25    dire.  The Mayor says this is the accountant for the city, who

1    does all of the payroll.  Paper voir dire says she's a clerk and

2    her concern was her pregnant daughter.  So where in all of that,

3    where we can do something about it, that we can figure out that

4    she's the accountant?  The daughter was supposed to have the

5    baby on the 29th, something like that, 28 or 29th.

6              All right.

7              (Jury present.)

8              THE COURT:  Let the record reflect that all members of

9    the jury are present, the United State's through its assistant

10   attorney's present, the defendant and his counsel are present.

11             The witness, Mr. Beddard, is on the witness stand.

12             Ms. Franco?

13             MS. FRANCO:  Thank you, Your Honor.

14                       CROSS-EXAMINATION CONTINUED

15   BY MS. FRANCO:

16   Q.   All right.  Mr. Beddard, I found it.  It's Government's

17   Exhibit Number 82, which is the -- is it up on your screen?

18             So this is the second invoice for the payment; do you

19   see that?

20   A.   I do.

21   Q.   So you testified on direct examination that the amount due

22   to M.P.S.A. was $7 million, correct?

23   A.   Could you go down there?

24   Q.   Yes, sir.

25   A.   Yes.

1   Q.   And this was sent, looks like it's dated May 17th, but this

2   was for the July 6th payment.  That's when you believed it was

3   supposed to land in M.P.S.A.'s bank account, correct?

4   A.   Correct.

5   Q.   I wanted to talk about the contract amendment again for

6   just a second, which is Government's Exhibit Number 72.  Do you

7   remember looking at this before?

8   A.   I do.

9   Q.   It's dated in April of 2010.  And in this it talks about

10  the equipment price.  And this is the agreement that still had

11  some problems with it.  We've already talked about it, so we

12  won't beat that dead horse.  There's still problems with this

13  agreement, correct?

14  A.   Yes, but it's a lot better agreement now.

15  Q.   Under -- I believe it's on page two of two, and it has the

16  payment dates and disbursements.  I direct your attention to the

17  middle of the page where it says third payment and then it's the

18  $54 million, $54,600,000?

19  A.   Correct.

20  Q.   And that says, prior to the embarkment of the equipment,

21  meaning before the equipment is shipped, right?

22  A.   Correct.

23  Q.   And so when the equipment is shipped, what's still owed to

24  M.P.S.A. even though the equipment is no longer in your custody,

25  is approximately -- it looks like it's about almost $18 million,

1    correct?

2    A.    Correct.

3    Q.    Is that correct?

4    A.    Correct.

5    Q.    Great.

6          You testified, and we talked a little bit about it a

7    little while ago was, about that teaming agreement which is

8    Government's Exhibit Number 7.  I'm showing that to you now.

9    It's already been admitted.  And you'd indicated that you'd

10   looked at it briefly to find out whether or not this would be a

11   good deal for M.P.S.A., correct?

12   A.    Right.

13   Q.    And in your direct examination yesterday, Ms. Kanof had you

14   look at a portion of it, which is page four under paragraph two

15   where it says mutual obligations.  And she read to you yesterday

16   that it says, in the middle, probably, fourth line down,

17   additionally, F.G.G. shall cause its outside legal counsel,

18   Marco Delgado, to assemble all of the documentation required by

19   the R.F.P., which is the request for proposals for the C.F.E.

20   job, yes?

21   A.    I have to read.

22   Q.    That's what an R.F.P.  stands for, right?

23   A.    Right.

24   Q.    Okay -- and ensure that all of the certifications and

25   formalities had been met.  And then it also says F.G.G. will

1    also provide any letters of credit required by the R.F.P. for

2    the supply of the equipment and service and cause the financing

3    required by the R.F.P. to be provided, correct?  Do you see

4    that?

5    A.   Correct.

6    Q.   And that's what she had you read yesterday, correct?

7    A.   I can't remember reading it yesterday.

8    Q.   What's the rest of that sentence?

9    A.   Or cause C.F.E. to (mumbles) its requirements as

10   appropriate.

11   Q.   Correct.  And so she didn't have you read that yesterday,

12   correct?

13   A.   To be totally honest, I can't remember.

14   Q.   But it certainly was in the teaming agreement that it would

15   be letters of credit or F.G.G. would try to get C.F.E. to waive

16   that requirement?

17   A.   I did not formulate this, so I can't have an opinion of the

18   thought process behind it.

19   Q.   Right.  But that's what the words say in this teaming

20   agreement, correct.

21   A.   That's what it says.

22   Q.   Okay.  You mentioned earlier that John Adams left the

23   company at some point in time.  Do you recall when this

24   happened?

25   A.   It was in April term 2011.  I think it was around about the

 1    16th, but I'm not sure, mid April.

 2    Q.   So John Adams was around for the agreement, this amendment

 3    or the supplemental agreement to the subcontract with F.G.G.,

 4    correct?

 5    A.   Well, on the 23rd it was processed, so I don't know when it

 6    started.  I remember that Potter (phonetic) sent a letter with a

 7    draft, so whatever that date was.  I don't know.

 8    Q.   Okay.  Do you want me to go back to government's

 9    Exhibit 72?  I think it has a date in there.

10            Do you see a date up at the top where it says 4-23,

11    2010?

12    A.   That's when it was executed.

13    Q.   Okay.  That's what I was talking about?

14    A.   Oh.

15    Q.   So Mr. Adams was still with M.P.S.A. --

16    A.   No.

17    Q.   Okay.  So he -- because you testified that he left in April

18    of 2011 and so this would be prior to that?

19    A.   It must have been 10, sorry.

20    Q.   So when did he leave?

21    A.   I'm not sure.

22    Q.   Okay.  And Mr. Ponce, was he still employed as a consultant

23    during this period of time?

24    A.   I do not think so, but again I don't know.

25    Q.   But again this amendment to this subcontract was negotiated

1   with between F.G.G. and M.P.S.A., you're not sure of the

2   principles of Mr. Ponce and Mr. Adams were employed with

3   M.P.S.A.?

4   A.   Correct.

5   Q.   You said earlier that through your efforts and efforts of

6   other individuals at M.P.S.A. it sounds like -- and C.F.E. and

7   F.G.G. -- that everybody wanted this contract to work out,

8   because that's the M.P.S.A. way.  That's what you testified to;

9   is that correct?  Is that a "yes"?

10  A.   Yes.

11  Q.   So that was all of the correspondence to and from trying to

12  clarify these terms was effort on everyone's part to make sure

13  that the deal went through?

14  A.   I would say so, yes.

15  Q.   Because it was advantageous for M.P.S.A. for this deal to

16  get approved, worked out and finished, correct?

17  A.   Well, yes.

18  Q.   Right.  And C.F.E. is a big customer of M.P.S.A., correct?

19  A.   Yes.  Oh, no.  Sorry.  No.

20  Q.   They're not?

21  A.   No.

22  Q.   Because you testified --

23  A.   M.S.- -- Mitsubishi, they're a big customer and globally

24  for Mitsubishi Heavy Industries, our parent company.

25  Q.   Okay.  So the parent company and C.F.E., they had a desire

CROSS-EXAMINATION BEDDARD                                    205

1    to have a good working relationship, because it was mutually

2    benefit to both of them, correct?

3    A.   I can't answer to them.

4    Q.   Is it beneficial to M.P.S.A. to have a success with this

5    contract?

6    A.   That would be the case.

7    Q.   You testified also about being present -- well, at least

8    coordinating, and I'm going to ask you if you were present, but

9    coordinating the equipment inspection in around Christmastime of

10   2009; is that right?

11   A.   Correct.

12   Q.   And you -- the plant in Japan that you refer to that as

13   your plant, so there wasn't any problem coordinating a site

14   visit there, correct?

15   A.   Correct.

16   Q.   And how about the one in France?  I know that you testified

17   that passports were needed and the factory was closed, but did

18   that eventually occur?  Was there an investigation in France?

19   A.   It is not a factory.  It's a port.  It's a port in France.

20   And it's a warehouse within the bonded area where you can go

21   none tax, free, where things are put in there because it's not

22   imported into the country, so there's special restrictions.

23   Nobody can go in there without government authority.

24   Q.   And were you able to coordinate getting the authority for

25   that site visit to occur?

```
 1    A.    Yes.

 2    Q.    And were you present for that site visit?

 3    A.    No, I was not.

 4    Q.    Was anyone from M.P.S.A. present for that site visit?

 5    A.    Our representative in Dunkirk, right, and in Paris.

 6    Q.    Was present?

 7    A.    Was present.

 8    Q.    And that would have been with the officials from C.F.E.,

 9    their representatives, correct?

10    A.    Yes.

11    Q.    Was anyone from F.G.G. present for that?

12    A.    Not to my knowledge.

13              MS. FRANCO:  May I have just a moment, Your Honor?

14              THE COURT:  Yes, ma'am.

15    BY MS. FRANCO:

16    Q.    Follow up question to my question regarding the benefit to

17    Mitsubishi for this deal to go through.

18              Was this the first time that Mitsubishi M.P.S.A. and,

19    I guess it's Florida, that they had a contract of this size of

20    this importance in Mexico?

21    A.    It was our first direct contract in Mexico, yes.

22    Q.    Okay.  And so was that important for it to be successful

23    because it was the first contract?

24    A.    No.  All contracts are wanted to be successful.

25    Q.    This was your first contract with a governmental authority
```

1    in a foreign country?

2    A.   In Mexico, yes.

3    Q.   All right.  So it was important to M.P.S.A. America,

4    Mitsubishi America, for this deal to get done and be successful

5    with the hopes perhaps that there would be more business

6    generated from that relationship between C.F.E. and M.P.S.A.?

7    A.   No, I wouldn't say that.  Every contract stands on its own

8    merits for succession.  And again this was gray market.  We

9    didn't have anymore gray market.

10   Q.   But you certainly were in a position or your company was in

11   a position to build new turbines, so if C.F.E.  needed, let's

12   say they needed no more gray market, so they want to create a

13   turbine for their use, if they have a good working relationship

14   with M.P.S.A., would they not go back to M.P.S.A. for that?

15   A.   No, we go through Mexico office, with Mexico -- Mitsubishi

16   Corp.  And then to put an A.M.P. (phonetic) with them and it

17   would go through that process.

18   Q.   So you thought this was a one-shot deal for work with

19   Mexico?

20   A.   My personal opinion is that contract -- I've got to make

21   that contract work.  I've got to make the units to get there,

22   I've got to install it to make sure they install it correctly,

23   commission correctly, and produce, right, to our performance

24   guarantees.

25   Q.   Right.  I guess maybe I'm asking the wrong person when

1    other individuals for -- who worked at M.P.S.A. come in, I can

2    ask them.

3              MS. KANOF:  Objection, Your Honor.  Sidebar.

4              THE COURT:  Sustained.

5    BY MS. FRANCO:

6    Q.   You weren't in on the commercial aspect of it or the sales

7    aspect.  You've already testified to that, correct?

8    A.   That's correct.

9    Q.   Okay.

10             MS. FRANCO:  That's all I have, Your Honor.  Pass the

11   witness.

12             THE COURT:  Thank you, Ms. Franco.

13             Ms. Kanof.

14                       KEVIN JOSEPH BEDDARD,

15              REDIRECT EXAMINATION BY THE GOVERNMENT

16   BY MS. KANOF:

17   Q.   Agua Prieta, when did it get up and running?

18   A.   It got C.O.D.'d on August the 12th of this year.

19   Q.   Last month?

20   A.   Yes.

21   Q.   And this contract was in 2009?

22   A.   The initial first contract, yes.

23   Q.   Was it up and running on the initial contract?

24   A.   No.

25   Q.   Did F.G.G. have anything to do with the contract that got

1    it up and running?

2    A.   No.

3    Q.   So Ms. Franco asked you about the first amendment.  Let me

4    go first to the subcontract.

5             Oh, no, that's the first amendment.  I forget.

6             I'm going to show you the Spanish version that's been

7    admitted into evidence.  She was showing you the English version

8    of the contract, because there's some handwriting at the bottom

9    of it, of the English version of the subcontract.

10            Is it up there?  Yeah.  Okay.

11            And I think you did read this before, but first of

12   all, did Mr. Adams or Mr. Ponce have anything to do with signing

13   this?

14            MS. FRANCO:  Objection, Your Honor, as to whether or

15   not he knows.

16   BY MS. KANOF:

17   Q.   Did they sign it?

18   A.   They did not sign it.

19   Q.   And with regard to this little amendment, it's not really

20   an amendment to this handwriting on the bottom of the original

21   Spanish version, what does it say?

22   A.   With respect to the signed subcontract, the parties agree

23   to check and amend the subcontract as needed and to adjust the

24   price accordingly to the final arrangements for the letter of

25   credit cost, shipping and delivery terms, and any errors in the

1    document and adjustments based on the final prime contract.

2    Q.   Okay.  And so then when you go to Government's Exhibit

3    Number 70 -- that was number -- the first amendment number 72 --

4    is there anything -- I'm going to let you look at it for just a

5    second, because I've been told I'm scrolling too fast.  So let

6    me first look at the first paragraph.

7            One of the changes was it's no longer 103 million;

8    it's a 102 million, correct?

9    A.   Correct.

10   Q.   Okay.  Let me ask you, in the end, Ms. Franco showed you a

11   payment schedule, and I believe -- yes, she showed you this

12   payment schedule that's in here.  Was the contract price still

13   102 even when you got to this page?

14   A.   Well, according to the -- yes, it should have been.

15   Q.   So that didn't change.  So how did you make up the

16   $3 million that you didn't get up -- that you didn't get on the

17   first -- when you are supposed to get the 14 point whatever and

18   you only got 11.3, how did you make up that $3 million or did

19   you ever get it back?

20           My question is, was it made up in the third payment?

21   A.   Basically, it would have been readjusted in the payments

22   here, right.

23   Q.   It would or would not?

24   A.   It would have.  It's 102 not the 103, that million would

25   not be there.

REDIRECT EXAMINATION BEDDARD                                              211

1    Q.   So regardless of the fact that you're now agreeing -- I

2    mean the first payment has already happened, right, by the time

3    that this is written; is that correct?

4    A.   The 11.3 million.

5    Q.   So what else, if you are amending it, what other number

6    could you use?

7    A.   That's all I could use.

8    Q.   But with regard to the fact that you are supposed to get

9    $14-plus-million, you're still going to get the 102 million,

10   correct?

11   A.   Yes.

12   Q.   So you didn't just agree that that was the correct number

13   by putting it into this chart?

14   A.   I did not put it into that chart.

15   Q.   Okay -- or whoever -- you're still going to be made whole?

16   A.   Correct.

17   Q.   Also, now, again, scrolling slowly if you could do it

18   yourself, I'm asking you to look to see pursuant to the original

19   subcontract that you could amend it, anything in here about a

20   pledge agreement?

21   A.   Not to my knowledge.  I can't see anything.

22   Q.   Is there any other amendment than this?

23   A.   No, this was the only amendment.

24   Q.   There's no amendment that says we agree to a pledge?

25   A.   No.

1    Q.   Is there -- are you aware of any agreement that C.F.E.

2    entered into to waive the letters of credit?

3    A.   To my knowledge, I'm not aware of anything.

4    Q.   With regard to -- I have --

5         MS. KANOF:  May I go to my place, Your Honor?  I

6    forgot some exhibits.

7         THE COURT:  Yes, ma'am.

8         MS. KANOF:  Hold on, Your Honor.  It seems to have

9    disappeared.

10   BY MS. KANOF:

11   Q.   I previously showed you, but we did not admit into

12   evidence, Government's Exhibit -- there's a 50 and a 50A.  This

13   is 50A.  And do you recall my showing you this letter in English

14   and showing you the date March 23rd of 2010, a letter from

15   Mr. Delgado to Mr. Buendia?

16   A.   I have.  It's in there.

17   Q.   Just to identify Government's Exhibit 50A, is it an e-mail

18   from Mr. Delgado to Mr. Adams?  I'm just asking you to identify

19   whether it's an e-mail, not the contents of the e-mail, just if

20   it's an e-mail.

21   A.   It's an e-mail there from Marco Delgado to -- it says John

22   Adams, because there's no e-mail address there.

23   Q.   I'm asking you, it says John Adams?

24   A.   Yes.

25   Q.   And attached is a letter to Mr. Buendia.  This is the

1   English version?

2   A.   Could you scroll down to the bottom?

3        Yes, it's from --

4        MS. KANOF:  May I approach the witness, Your Honor.  I

5   want him to hook at two documents at the same time.

6   BY MS. KANOF:

7   Q.   I'm going to hand you -- and we're going to have Mr. Adams

8   testify in a few second -- I'm going to hand you government's

9   Exhibit 49 and Government's Exhibit 50A.  I need to actually

10  give you the Spanish version.

11       MS. KANOF:  May I approach, Your Honor?

12       THE COURT:  Yes, ma'am.

13  BY MS. KANOF:

14  Q.   Government's Exhibit 50, the Spanish version, if you would

15  look at it and then look at Government's Exhibit 49.  Are there

16  unique -- are both -- do both exhibits contain letters from

17  Mr. Buendia?

18  A.   Correct, yes.

19  Q.   Do both exhibits carry the same date?

20  A.   23rd of March, 2010.

21       MS. FRANCO:  Objection, Your Honor.  It has not been

22  admitted into evidence.

23       MS. KANOF:  I'm not asking for the contents.

24       THE COURT:  Well, she --

25       MS. KANOF:  Mr. Adams is going to be next.  I think

1    she opened the door to this by asking about the payment

2    schedule.

3            THE COURT:  Well, you can ask about the payment

4    schedule, but you can't refer to exhibits that aren't in

5    evidence.

6    BY MS. KANOF:

7    Q.   If you could look at Government's Exhibit Number 49 and say

8    do you recognize that payment schedule?

9    A.   I do not.

10   Q.   And Government's Exhibit Number 50, do you recognize that

11   payment schedule?

12   A.   Actually, yeah.

13           MS. KANOF:  May I approach them, Your Honor.

14           THE COURT:  Yes, ma'am.

15   BY MS. KANOF:

16   Q.   Okay.  Okay.  Ms. Franco asked you something about the

17   subcontract having left out all of this different information.

18   Before you testified there were annexes to the subcontract that

19   had all of the information in that.  Are you changing your

20   testimony, the specs?  She said in her question to you that the

21   subcontract was missing information regarding the

22   specifications.

23   A.   Could you clarify that?

24   Q.   I'm going to pull up the document for you.

25           With regard to the technical specifications, if you'll

1    look at Government's Exhibit 12A, which is the English version,

2    you previously testified about these two numbers?

3    A.    Correct.

4    Q.    Okay.  And what did those numbers mean?

5    A.    They are our technical specification for -- one, is for the

6    gas turbine generator set and the other is for the technical

7    specifications for the steam turbine and the steam turbine

8    generator.

9    Q.    Okay.  And right above the two bullet points, does it say

10   attached to this contract?

11   A.    Yeah.  Two gas turbines, one steam, respective attached to

12   this subcontract.

13   Q.    Okay.  So were the specifications missing from the

14   subcontract?

15   A.    From our contract, no.

16   Q.    So when you answered that question, what contract were your

17   specifications missing from or were they missing from any

18   contract?

19   A.    Our subcontract at our technical specifications in whole as

20   we had submitted them, right, and agreed to subcontract on.  As

21   I was saying, the same technical specifications presented to me

22   from C.F.E.'s contract, right, had deletions and omissions from

23   our technical specification, which made to the page numbering

24   being different.

25   Q.    Was Mitsubishi at all a party to that prime contract?

1    A.    To my knowledge, no.

2    Q.    Okay.  And with regard to whether or not this was a big

3    deal -- referring to this is a big deal, how many turbines were

4    there in this?

5    A.    Two gas turbines and one steam.

6    Q.    And they were preexisting, correct?

7    A.    They were.

8    Q.    And when were they manufactured?

9    A.    2003.

10   Q.    So as contracts go, were these a big deal?  Whatever that

11   means, I don't know what it means, but to you.

12   A.    As I explained earlier, it wouldn't matter if the contract

13   was $10 or 100 billion.  We, in Mitsubishi, give our all on

14   everything and we go for our brand.  So it's not how big the

15   price is or whatever it is.  We follow standards and that's our

16   standard, right.

17   Q.    Was anyone fired because this contract initially fell

18   through that you know of?

19   A.    In Mitsubishi?

20   Q.    In Mitsubishi.

21   A.    You say it, right, I don't.  Basically, not to my

22   knowledge.

23   Q.    Okay.  And let's see -- Ms. Franco also stated that you

24   received e-mails from C.F.E. that title could not transfer.  Did

25   you receive any e-mails from C.F.E.?

1    A.    I can't remember.  With that subject matter I can't

2    remember getting an e-mail directly from them.

3    Q.    Okay.

4              MS. KANOF:  May I have a moment, Your Honor?

5              THE COURT:  Yes, ma'am.

6              MS. KANOF:  I'll pass the witness.

7              THE COURT:  Ms. Franco?

8                      KEVIN JOSEPH BEDDARD,

9                RECROSS-EXAMINATION BY THE DEFENSE

10   BY MS. FRANCO:

11   Q.    Mr. Beddard, the finishing up of the Agua Prieta project

12   that you testified to was just finished in August, last month?

13   A.    It got C.O.D.'d.

14   Q.    And that was a direct contract between Mitsubishi and

15   C.F.E., correct?

16   A.    It was a settlement agreement contract by -- and it was a

17   Judge in Mexico City reviewed it and stamped is --

18   Q.    Right.

19   A.    -- so it's a judicial settlement agreement.

20   Q.    But I'm asking you though is, is that it was something that

21   M.P.S.A. and C.F.E. -- through that mechanism, I understand what

22   you're saying about the settlement, but there wasn't a middleman

23   between C.F.E. and M.P.S.A. anymore, correct?

24   A.    Well, the commission was there, as in the first one, so,

25   yes.

1    Q.   Right.  So that's how you get paid is through the

2    commission, correct?

3    A.   Yeah, Banco Mex [sic].

4    Q.   Okay.  What I'm getting at is, is that F.G.G. was not

5    longer part of the contract, right?

6    A.   Right.

7    Q.   And they didn't get any of the profits, correct?

8    A.   Not to my knowledge, no.

9    Q.   You testified and Ms. Kanof brought it up again about the

10   teaming agreement, and I understand that you just barely looked

11   at it, but it appears that Mr. Adams had been involved in it,

12   correct?

13   A.   As far as I know, yes.

14   Q.   And you testified earlier that on the -- as far as there

15   was to be a pledge of equipment in lieu of a letter of credit,

16   that it had to be somebody at the vice president level or

17   higher, correct?

18   A.   It would have to be an officer of the company.

19   Q.   Right.  And you said it would be a vice president or

20   higher, correct?

21   A.   Normally, that would be the minimum level officer, vice

22   president.

23   Q.   Correct.  And Mr. Adams was the Vice President, correct?

24        MS. KANOF:  Objection.  Beyond the scope of redirect.

25        MS. FRANCO:  Well, she brought up the teaming

1    agreement and whether or not --

2            THE COURT:  You are going to want this witness to go

3    back home soon, right?

4            MS. KANOF:  Yes, absolutely.

5            THE COURT:  All right.  So I'm going to let her direct

6    questions to him under rules of direct examination outside the

7    scope.

8            MS. KANOF:  I have no objection to that, Your Honor,

9    because this witness needs to go back to England.

10           THE COURT:  On all of those questions that you are

11   outside the scope, you're on direct.

12           MS. FRANCO:  All right.  Thank you.

13   BY MS. FRANCO:

14   Q.   So I think I asked you, Mr. Adams was the Vice President at

15   that time, correct?

16   A.   I think he was the Senior Vice President, but I'm not

17   certain.

18   Q.   So you were higher than the minimum level?

19   A.   (No response.)

20           MS. FRANCO:  May I have just a moment, Your Honor?

21           THE COURT:  Yes, ma'am.

22           MS. FRANCO:  Pass the witness.

23           THE COURT:  Ms. Kanof?

24           MS. KANOF:  Nothing further for this witness.

25           Your Honor, may he be excused?

1              THE COURT:  Ms. Franco, may --

2              MS. FRANCO:  Yes, we have no objection, Your Honor.

3              THE COURT:  All right.

4         Mr. Beddard, thank you so much for being with us.  You

5    are free to go.

6              (Witness excused.)

7              MS. KANOF:  The government calls John Adams.

8              THE COURT:  John Adams.

9         Was Mr. Adams sworn?

10             MS. KANOF:  He was not, Your Honor.

11             (Witness present and sworn by the Court.)

12                       JOHN MICHAEL ADAMS,

13             DIRECT EXAMINATION BY THE GOVERNMENT

14   BY MS. KANOF:

15   Q.   Good afternoon, Mr. Adams.

16   A.   Good afternoon.

17             THE COURT:  Could I ask you just to role into the

18   microphone a little bit, kind of lean into it.  You can adjust

19   it to where you need it and we'll Be able to hear you better.

20             THE WITNESS:  Thank you.

21   BY MS. KANOF:

22   Q.   I haven't had an opportunity, but you have a computer

23   screen in front of you that will display an exhibit.  Some of

24   the exhibits have been admitted into evidence, some of them have

25   not.  If it has not been admitted, please don't testify from it

1    until the Court has admitted the exhibit.

2          State your name for the jury, please?

3    A.   My name is John Michael Adams.

4    Q.   And Mr. Adams, in what business are you?

5    A.   I'm in the power business, either in the generation of

6    electricity or of making equipment to make electricity.

7    Q.   What is your, briefly, your educational background?

8    A.   I have a Bachelor's Degree in Mechanical Engineering from

9    Michigan Technological University and I've got some other side

10   training, management training, cubby training, et cetera,

11   associated with that.

12   Q.   When did you graduate from Michigan Technological

13   University?

14   A.   I graduated in 1980.

15   Q.   And after you graduated, is there some kind of a

16   certification, like an accountant has a CPA, for an engineer?

17   A.   Yes.  I did become a professional engineer in the State of

18   Texas.  I have the license, but I haven't kept it current.

19   Q.   Often referred to as a P.E.?

20   A.   P.E., yes.

21   Q.   So after you got out of college, what type of engineering

22   did you engage in first?

23   A.   Mechanical engineering and I went straight into power

24   plants.  First thing we did is to work at a power plant right

25   out of college.

1    Q.    What company?

2    A.    Foster Wheeler.

3    Q.    And what were your duties and responsibilities with Foster

4    Wheeler?

5    A.    So I started off as a commissioning engineer, where I would

6    go to the power plants and effectively take it from being

7    manufactured to actually making it run and teaching the power

8    plant owners how to actually run the power plant.

9    Q.    How long did you -- you got out of college in 1980.  How

10   long did you work for Foster Wheeler?

11   A.    Approximately, 22 years.

12   Q.    What happened?  Why did you leave them?

13   A.    So Foster Wheeler, in approximately 22 years after I was

14   there, was in a downsizing period and I had an opportunity to go

15   to Mitsubishi Power Systems that was opening up a new business

16   in North America.  They brought me in to help them form this new

17   company.  And roughly it was a good opportunity for me to leave

18   and to try something different and go to a Japanese company, but

19   to build something, rather than to really kind of close a

20   company that was on a decline at the time.

21   Q.    Where was Mitsubishi located at that time?

22   A.    So Mitsubishi was opening their offices in Orlando,

23   Florida.  Lake Mary is the actual suburb of Orlando.  Now,

24   I'm -- at a time, again, I was one of the first ones there.

25   Q.    Okay.  And what were your duties -- did you have a title

DIRECT EXAMINATION ADAMS                                      223

1    when they hired you?

2    A.   So when they hired me, they hired me to be the Vice

3    President of Sales to go ahead and set up a sales organization.

4    So I immediately went to setting up a sales group to go ahead

5    and offer Mitsubishi's power equipment into the United States.

6    So that was my job, was to set up the sales team and to set up

7    the commercial team to be able to offer the different goods that

8    Mitsubishi from Japan was making into the U.S.

9    Q.   When you say offered and in the United States, did the

10   organization in Florida build Mitsubishi equipment?

11   A.   So the Japanese were interesting.  They actually built a

12   factory.  It was kind of the reverse of what you see across the

13   United States.  The Japanese invested hundreds of millions of

14   dollars and built the factory in North America to build

15   components for gas turbines.

16   Q.   When was that?

17   A.   It started when I got there, which was in the early 2002

18   period if you will.  They built the factor and then we proceeded

19   to hire people.  We went from 40 people when I joined to a

20   thousand people after when I was there.

21   Q.   And your sales staff, how big was it?

22   A.   So there were two sales staff.  There was a no equipment

23   sales staff and I had roughly eight people on my time.

24   Q.   How long did you work for Mitsubishi?

25   A.   Roughly, nine years.

1    Q.   When did you leave M.P.S.A.?

2    A.   I left Mitsubishi in, roughly, 2010.

3    Q.   What part of the year?

4    A.   April-ish, right in the spring of it.  And I left to go to

5    a company called Calpine, which is one of the largest owners of

6    power plants in North America.

7    Q.   Why did you leave Mitsubishi?

8    A.   I had an opportunity to actually get a promotion to become

9    the Senior Vice President at Calpine to take over all of the

10   operating fleet.  There were 93 plants across the United States.

11   It was a much bigger job.

12   Q.   Was it a much-more-money-job?

13   A.   It was -- yes, it was considerably more money, yes.

14   Q.   Did you leave on good terms from Mitsubishi?

15   A.   Yes, I did.  I gave them plenty of notice.  And I think as

16   I left, I left the company in good order at the time.

17   Q.   Okay.  How long were you at Calpine?

18   A.   I was at Calpine for almost six years.

19   Q.   And when did you leave Calpine?

20   A.   I left Calpine in August, one year ago.

21   Q.   And who do you work for now?

22   A.   I work for Blackstone, which Blackstone is the largest

23   private equity firm in the United States.  And we own and we

24   operate power plants.  We're buying more as we speak, so...

25   Q.   Okay.  And what do you do for Blackstone?

1    A.   I'm chief Operating Officer for the company, for the

2    division that runs the power plants.

3    Q.   Okay.  And do you have any power plants in Texas?

4    A.   We have four and a coal mine, as well.

5    Q.   Okay.  So when you got to Mitsubishi in 2001, you

6    started -- what were your duties and responsibilities as the

7    Vice President of Sales?

8    A.   So my job was to go ahead and set up the sales team and

9    then to bring the Japanese products to the U.S. power market

10   in -- not U.S., but really the full North American power market,

11   including Canada as well as Mexico -- and to try to then get up

12   the organization such that Mitsubishi became well known and

13   respected and then to deliver the product that they made into

14   that market, so my job was to try to help to facilitate making

15   the sales.  And then after that, I was promoted really to take

16   over the sales as well as the execution side of the businesses

17   where I would absolutely deliver the equipment and make it work,

18   too.

19   Q.   Who was your boss?

20   A.   My boss, uh, when I first got there, they were both

21   Japanese.  There was two.  The first boss was a Japanese fellow

22   that left after I was there about five or six years.  And then

23   they brought in another Japanese president.  So I was the

24   highest American that you could be on the new equipment side,

25   but we always had a Japanese boss.

1  Q.   And who is Hector Ponce?

2  A.   So Hector Ponce was an employee and he was actually the

3  Executive Vice President when I started at Mitsubishi.  And then

4  Hector left and then I hired him back to be one of the sales

5  managers or sales people to help us with sales into Latin

6  America.

7  Q.   Okay.  So when you started and he was the Executive Vice

8  President --

9  A.   Yes.

10  Q.   -- was he in any kind of a supervisory position over you at

11  that time?

12  A.   Yes.  Actually, when I first joined, he was for the first,

13  say, six months or a year or so of my work or maybe even two

14  years of working there, he was then the E.V.P. position and I

15  was the S.V.P. underneath him, but mostly I was reporting to the

16  President.

17  Q.   Okay.  And Mr. Ponce left within several months after --

18  left Mitsubishi within several months after you arrived?

19  A.   Yes, within some time after.  It was probably more like a

20  year, but it was that order of magnitude.

21  Q.   Okay.  You said you hired him back.  What do you mean?

22  A.   Mr. Ponce went off and opened up a restaurant and ran that

23  for a couple of years, and after a while he decided that he

24  wanted to get out of the restaurant business and come back to

25  Mitsubishi, so I brought him back in to be the salesperson to

1    help facilitate sales in Latin America.

2    Q.   As an employee or contract?

3    A.   He was a contractor.

4    Q.   Or a consultant.

5    A.   Consultant.  Yes, exactly.

6    Q.   As the Vice President of sales, could you tell the grand

7    [sic] jury how normally you get involved in contracting for the

8    sale of generation equipment?

9    A.   Sure.  For generation equipment, we would have the sales

10   people around the country, North America, that would have the

11   direct contact with the customers.  Most of these customers are

12   large utilities, so they would know the utilities or the owners

13   that would own the power plants.

14   Q.   Do those salespeople live in those communities or do they

15   all live in Florida?

16   A.   No.  My philosophy was to have salespeople in their region,

17   so they could be directly connected to their customers.  There

18   was a few support people in Florida that worked with me, but

19   predominantly we would have the salespeople out near their

20   customers all across North America.

21   Q.   So, basically, their ears were to the ground?

22   A.   Their ears to the ground, listening for when the next

23   project would be coming, when there was a need for a new power

24   to come into a different area and they would then communicate

25   back to us and get ready, and then the owner generally would

1    issue something called a request for quotation or request for

2    proposal.

3    Q.    And that's usually called an R.F.P.?

4    A.    Yes, R.F.P. or R.F.Q., depending on who the customer is.

5    Q.    What is a request for proposal or a request for

6    qualifications?  What is that?

7    A.    Those are really a specification for going out to buy the

8    generation equipment that they're looking for.  So it's I need

9    this gas turbine or I need a wind turbine or I need a solar cell

10   or I need one of these things and I want this many of them and I

11   want it on such and such a date, and I want it delivered to here

12   and I want it up and running, et cetera.  So we'd get the

13   specifications associated with when a power plant was going to

14   be needed and what was needed.

15   Q.    Do people sometimes mislabel that as a request for a bid?

16   A.    Sometimes.  And they tended it to be request for bid,

17   request for quotation, request for proposal, somewhat are

18   interchanged as saying -- meaning the same thing.

19   Q.    And in a request for proposal, what information is issued

20   by the entity that is wanting somebody to supply goods?

21   A.    For this kind of solicitation, if you will, they would tell

22   you how big their power plant was that they needed, how many

23   megawatts or kilowatts, how many different units they wanted,

24   how efficiently they wanted it, when they wanted it delivered,

25   when they wanted it up and running, and sometimes could go into

1    very big detail as far as they wanted green with certain kind of

2    wiring, they wanted it some ways other times not.

3    Q.   What is gray market?

4    A.   So gray market developed in and around the 2000 period when

5    there was a lot of gas turbine power plants being built.  And

6    what happened was in 2000 and 2001, there were many, many

7    gas-fired power plants built that use new style of gas turbines

8    in a big combined cycle, very efficient, very clean power

9    plants.  And in 2001 and 2000, 2001 and even in 2002, there was

10   a flurry of activity where many of these power plants were

11   built.  Roughly 20 percent of the power plants in the United

12   States were replaced in that time period and then it actually

13   was so many that they actually overbuilt.  So what happened was

14   a number of these gas turbines that were put on order were

15   effectively put in a warehouse, because they didn't need them;

16   they overbuilt them in that short window.  So those gas turbines

17   that never got sold were put into inventory, if you will,

18   waiting for the next customer to look for them.

19   Q.   Were you employed as Vice President of Sales at Mitsubishi

20   Power Systems America in 2009 and 20 -- until April of 2010?

21   A.   Yes, I was.

22   Q.   Okay.  And did a possible project come to your attention

23   regarding the gray market during that time?

24   A.   Yes.  Yes, there was.  There was a number of them, but this

25   one in particular, yes.

1    Q.   Who is Rick Williamson?

2    A.   Rick Williamson is a broker that works out of Ft. Worth

3    that we'd worked with before that would have -- his primary

4    function in life was to buy gray market or assist in buying gray

5    market turbines and then finding homes for them, finding

6    customers that would buy them.  And I did work with Rick on a

7    couple of other occasions where he found us customers or found

8    us turbines in need that were gray market that we could use and

9    re-do and resell.  Particularly, most of these gray markets were

10   never operated.  They were like a brand new turbine that really

11   never ran, so they were brand new.

12   Q.   Did Rick Williamson -- or how did you get involved with a

13   company called F.G.G. in El Paso?

14   A.   Rick Williamson called one day in the middle of the summer

15   July-ish and say, hey, I got this opportunity.  These people

16   from F.G.G. believe that they've got an opportunity to help work

17   with us to sell some turbines on this project in Mexico and

18   would you care about or listen to what the project is.

19   Q.   Did you -- and did he tell you what kind of turbines they

20   were looking for?

21   A.   Yes.  He knew pretty much that we had these turbines,

22   because Rick and I had worked on these turbines in the past, and

23   he said, hey, this is a good opportunity for these 501 gas

24   turbines and a steam turbine and these highly efficient machines

25   were what they were looking for that application.

1    Q.    So what happened next after he communicated to you that he

2    might have a buyer for your turbines?

3    A.    He introduced us to this company F.G.G. that was

4    effectively qualified to submit a bid.

5              In the process that we had in this project, in

6    particular, you had to be pre-qualified to bid, and there were

7    only three pre-qualified bidding companies were allowed at that

8    time; general electric, Westinghouse and F.G.G., so they had the

9    opportunity for us to offer this equipment.

10   Q.    You said Westinghouse?

11   A.    I'm sorry.  Yes, Westinghouse Electric, yes.

12   Q.    Okay.  Are you sure it was General Electric and

13   Westinghouse?

14   A.    Siemens-Westinghouse.  Sorry.  Siemens Westinghouse,

15   they're in my mind the same company as Siemens bought

16   Westinghouse, yes.

17   Q.    Westinghouse used to be very involved, but they sold the

18   electrical portion of their turbines to Siemens?

19   A.    Not that long ago, but yes.  Siemens bought Westinghouse,

20   so Siemens or Westinghouse was a competitor.

21   Q.    Siemens, S-I-E-M-E-N-S?

22   A.    Siemens out of Germany, yes, as the owner of that

23   technology.

24   Q.    So it was General Electric, Siemens and F.G.G. of El Paso?

25   A.    Correct.

1    Q.   And those were the three companies that were permitted by

2    Mexico to respond to the R.F.P.?

3    A.   Correct.

4    Q.   So did you go to the meeting?

5    A.   We did.  We met with the F.G.G. people in Ft. Worth and

6    talked about how we could possibly team together to be able to

7    go after this opportunity.

8    Q.   Who did you meet with?

9    A.   Rick Williamson, Fernando Gireud was there.  There was, I

10   believe, Mace was at that same meeting, myself and then another

11   of our salespeople that cover the Texas market was there as

12   well.

13   Q.   Okay.  You met in Ft. Worth.  Now do you remember when this

14   meeting might have been approximately?

15   A.   It was approximately the end of July, that era of time

16   period.

17   Q.   Of what year, 2009?

18   A.   Of 2009, yes.  Uh-huh.

19   Q.   And it was that a productive meeting?

20   A.   Yes.  It sounded like it was a good fit for us and it

21   really prompted us to look at coming together and making teaming

22   agreement where we would team exclusively with this F.G.G. to

23   offer the equipment that we had.

24   Q.   How many other teaming agreements had you been involved in?

25   A.   We've done a few in the past where we found applications.

1    Not that many, but a few in the past where we would team with

2    another customer or another company to help to offer our goods,

3    but not that many, but I would say one or two or three in my

4    nine or in my career at Mitsubishi.

5    Q.   Do you have a -- the whole time that you are at Mitsubishi

6    Power Systems America, was there a legal department?

7    A.   There was.  We had our own full legal staff, roughly, five

8    or six people on the new equipment side and then a few people on

9    the services side as well.

10   Q.   Was there an attorney by the name of Patrick Altamura?

11   A.   Yes.  Patrick was one of the attorneys that was working

12   closely with us.

13   Q.   Was Marco Delgado at that meeting?

14   A.   He was not.

15   Q.   Do you know Marco Delgado?

16   A.   I've met Marco sense then, but not at that time.

17   Q.   Would you recognize him today?

18   A.   I think so.

19   Q.   Is he here in the courtroom?

20   A.   I don't know.  Let me get my glasses on.

21        I don't see him, actually.  I thought I would

22   recognize him, but I don't see him here.

23   Q.   Okay.  Now what did you do after you left the meeting in

24   Ft. Worth?

25   A.   We went ahead back to Orlando and drafted and worked on or

1    teaming agreement.

2    Q.    Who is we?

3    A.    My legal team and the salesperson with us.  And we worked

4    with Rick Williamson and we developed kind of a methodology or

5    team methodology for us to go forward.

6    Q.    Was -- do you know the equipment that Mr. Williamson was

7    recommending might fit the needs for this particular power

8    plant, was this the Agua Prieta II?

9    A.    This was Agua Prieta II, yes.

10   Q.    Did you -- do you know what the original purpose or what

11   the original destination was for these three turbines before it

12   was Agua Prieta?

13   A.    Yes.  Yeah.  We had worked this project was with E.D.F.

14   originally and we had worked with E.D.F. for placing these

15   turbines into a -- and to, again, a foreign location for a

16   similar kind of project.

17   Q.    So you drafted a teaming agreement in anticipation of the

18   potential of what?

19   A.    In anticipation of them offering this for that specific

20   application, because it looked like it was a very nice fit.

21   Q.    Well, did you think that a company like F.G.G. would win

22   this bid?

23   A.    We didn't know that F.G.G. would win.  We knew that our

24   equipment should be favorable for this opportunity, so we

25   thought if we put our best foot forward with F.G.G. that we

1   might have a shot at it.  We thought we would have a pretty good

2   opportunity.

3   Q.   I'm going to turn your attention to the screen now to

4   Government's Exhibit Number 5.  And you're not on this exhibit.

5   I don't believe your name is on this exhibit, but do you

6   recognize the information as referring to the meeting that you

7   had or to another meeting?

8   A.   No, this looks like the information for a couple of

9   productive long days and meetings, so it sounds like it was the

10  meeting that we had.

11  Q.   Okay.  So after your first meeting, did you do the

12  teaming -- did you draft the teaming agreement or did you have

13  other meetings?

14  A.   I didn't have any other meetings that I recall, but I mean

15  other than discussions with my team, but I don't recall any

16  other meetings that I am went to, but I'm sure there were other

17  of my staff that would have.

18  Q.   Okay.  At what point did you bring Hector Ponce in?

19  A.   Hector became involved in and around the time that we got

20  this opportunity, so it was roughly in that same time period.

21  It was after we had, I think, finished the teaming agreement,

22  but Hector was right in around that time period.  Because he was

23  a South American guy, he was brought in to -- brought up to date

24  on the project so they could learn more about it.

25  Q.   What did you need him for?  You said you had 2000

1    employees.  What did you need --

2    A.    Well, we had 2000 employees in North America and

3    predominantly those were factory people to build the turbines.

4    Hector was our salesman for South America.  So when we had an

5    opportunity to go build a project in South America, it was up to

6    him to understand what was the project, where were we going,

7    what were we building.

8    Q.    Is he fluent in Spanish?

9    A.    Very much so, that's why we chose him for South America.

10   Q.    Was there anyone else in Mitsubishi that was fluent in

11   Spanish that had these qualifications?

12   A.    Not to the degree that Hector did.  Hector had good

13   Spanish, but he also had good people skills.  He was on the

14   sales team with the specific charter.  He had been brought in to

15   the sales team earlier, but he was brought on this project after

16   we found out about it, so it became then his target project to

17   go after.

18   Q.    And did you enter into a formal consulting agreement with

19   him?

20   A.    Hector had a consulting agreement, yes.  I think he had a

21   previous to this as we were doing projects in Venezuela and

22   other areas, but it was when we brought Hector to this one after

23   we found out about it from F.G.G.

24   Q.    On the screen is Government's Exhibit Number 7, which has

25   been admitted into evidence already.  I don't know how familiar

1   you are or if you recall, but did you write this teaming

2   agreement yourself?

3   A.   No.  I would have my legal team write it.  We would have

4   some basic concepts that we would talk through as a group and we

5   would come up with the teaming agreement based on, you know,

6   basic business principles and then the legal team would draft it

7   for us.

8          MS. KANOF:  Isn't it -- is it not been admitted?

9          COURTROOM DEPUTY DUEÑAS:  I'm sorry?

10         MS. KANOF:  Okay.

11         THE COURT:  It's conditionally admitted.

12         MS. KANOF:  Now I would move admission, Your Honor.

13  BY MS. KANOF:

14  Q.   Is Government's Exhibit Number 7 the teaming agreement that

15  you entered into with F.G.G.?

16  A.   This looks like the agreement, yes, uh-huh.

17         MS. KANOF:  Now I move admission, Your Honor.

18         MS. FRANCO:  No, objection.

19         THE COURT:  All right.  G-7 is admitted for all

20  purposes.

21  BY MS. KANOF:

22  Q.   So what was the purpose of the teaming agreement?

23  A.   The teaming agreement was to aline us together with F.G.G.

24  such that we would be exclusive with each other.  That means

25  that they would offer our equipment as it was and we would

1    effectively dictate to them what price we needed for it and what

2    the conditions of the sale would be and how we would be, you

3    know, safe, if you will, for making this offer together.  So the

4    teaming agreement made sure there wasn't anything funny going

5    on, that we were trying to offer just our equipment and really

6    that we could effectively control the offer as it went in.

7    Q.   What do you mean that there wasn't anything funny going on?

8    A.   Having worked in foreign countries before, we are cognizant

9    of making sure that there's no -- nothing illegal going on, so

10   we were very careful to make sure that the teaming agreement

11   said that nothing like that could happen, Foreign Corrupt

12   Practices Acts, and then also that the offer that we would make

13   would be very specifically tailored to the equipment that was

14   already there.

15        The interesting thing for us was this equipment was

16   already made, so we had to make sure that it fit the -- you

17   know, it's like buying a blue car; if the customer wanted a red

18   car, you had -- you know, we were offering a blue car, that was

19   the color that the car was.  And in fact that's what we had with

20   our gas turbines.

21   Q.   Okay.  And so with regard -- let's start with the first

22   page of the teaming agreement.  The 8th of August, do you recall

23   that that was signed on the 8th of August?

24   A.   Yes, it sounds the right period, yes.

25   Q.   Where was it signed?  Do you recall?

1   A.   I don't recall.  I think I signed it in Lake Mary, but I

2   don't recall exactly.

3   Q.   Did you ever come to El Paso?

4   A.   Never.  First trip hear was today or yesterday.

5   Q.   And this is the first time we've met face-to-face; is that

6   correct?

7   A.   Yes, uh-huh.

8   Q.   And with regard to the first paragraph, it appears:

9   Whereas F.G.G. has been qualified as a bidder, on -- by the 8th

10  of August of 2009, was this just in anticipation that they were

11  going to be qualified or they had already been qualified as a

12  bidder?

13  A.   We were led to believe they were going to be a bidder, they

14  were going to be qualified as a bidder.  They told us they

15  would.  We didn't have any means of checking it, but we heard it

16  was going to be one of the three bidders.

17  Q.   But they had not submitted a bid yet?

18  A.   No.

19  Q.   The purpose of the teaming agreement was in the first

20  paragraph; the intent of the aforementioned R.F.P. is to award a

21  contract.  So the first thing that you did in the teaming

22  agreement was what, define Mitsubishi's equipment; is that

23  correct?

24  A.   We defined Mitsubishi's equipment and we also defined that

25  we wanted the service agreement to go with it.

1           So, the way these work, these are very large gas

2    turbines which are like a jet engine, and you need to maintain

3    those as well.  So our intent and what we understood the intent

4    of the request for proposal, the R.F.P., was to offer the

5    equipment, but then also to offer the service agreement that

6    went with it for multiple years afterwards.

7    Q.   Okay.  So lets -- was there a dual purpose in this

8    agreement?  Because I see and "I" and then I see and "II"?

9    A.   Exactly, there was both.  It was a dual purpose which was

10   to define that we were going to team together to offer the

11   equipment and the service as two separate contracts for this

12   project.

13   Q.   So with regard to the contract to provide the equipment,

14   was you were going to team together.  And who was the seller and

15   who was the buyer?

16   A.   So our understanding was that for the equipment that F.G.G.

17   would sell to C.F.E. and we would sell our equipment from

18   Mitsubishi Power Systems to F.G.G.  So it was two steps, if you

19   will.  And that's somewhat different than what the L.T.S.A.

20   intent was.

21   Q.   The long term service agreement, are you familiar with

22   basically all of these contracts relating to Agua Prieta before

23   you left in April of 2010?

24   A.   Basically, yes.  Uh-huh.

25   Q.   And the long term service agreement, is that referred to in

1     the contracts in capital letters, L.T.S.A.?

2     A.   It is, yes.

3     Q.   So save somebody some typing?

4     A.   Yes, correct.

5     Q.   So the second purpose of the teaming agreement is the "II";

6     is that correct?

7     A.   Correct.

8     Q.   And what is that purpose?

9     A.   The second purpose was the long term service agreement for

10    maintaining of these gas turbines, maintaining of these jet

11    engines over a period of time, and that was the purpose.

12    Q.   Okay.  What -- maintaining them.  So would that be -- at

13    what point would a long term service agreement start?

14    A.   Typically a long term service agreement starts when the

15    warranty ends on the new equipment.  The way a gas turbine

16    works, generally has a one-year warranty to it, and one year

17    depending on how you run it is 8600 hours-ish, if you will.

18         These gas turbines every 8,000 hours of operation if

19    you were to run it continuously, you would go in and replace

20    certain components every 8,000 hours.  So that was what the

21    service agreement was, was to bring the replacement parts and

22    the people to go in and do this maintenance that would occur

23    8,000, 16,000, 24,000 hours.

24    Q.   These were gray market turbines though, right?

25    A.   Yes.

 1    Q.    But they had never run?

 2    A.    They had never run, and since we were part of the -- of

 3    Mitsubishi, we were able to give a warrant with that.

 4    Q.    That was my question.  Did they still come that one-year

 5    warranty?

 6    A.    Yes.  We provided it with a one-year warranty.

 7    Q.    And so when were you going to make a determination of

 8    whether or not Mitsubishi would also contract for the long term

 9    service agreement?

10    A.    It was always our intent from the very beginning to offer

11    both.  And that's what the teaming agreement basically said was

12    that we really wanted to offer the gas turbines, but then to

13    offer the service agreement with it, because the service

14    agreement is a long term commitment for making sure that the

15    equipment runs right, but it was a profit setter for the

16    organization as well.

17    Q.    A long term service agreement is pretty lucrative, right?

18    A.    They can be, yes, uh-huh.

19    Q.    Now that long term service agreement, would F.G.G. have

20    anything to do with it?

21    A.    We didn't intend for them to do, because our -- you know,

22    the idea was we wanted to have F.G.G. put in the offer, and we

23    specifically drafted the teaming agreement such that we would

24    effectively contract directly with C.F.E., because this

25    agreement would go for as many as 12 years or more and we didn't

1    want to have to go through F.G.G. for the next 12 years as we

2    continued to maintain the equipment.

3    Q.   Were you aware whether or not F.G.G. had any expertise with

4    regard to servicing turbines?

5    A.   We believed they did not and that was one of the reasons

6    why we certainly didn't need to go through them with anything.

7    Q.   Okay.  Now, there are many terms with regard to the teaming

8    agreement.  And I think you previously testified your legal

9    department was integral in developing this; is that correct?

10   A.   Correct.

11   Q.   What, to you, looking at, for example, under general on

12   page two, we do see the L.T.S.A. and is -- that's what we're

13   talking about, correct?

14   A.   Correct.

15   Q.   Okay.  So the relationship of the parties, does that

16   define -- what does that define, the relationship of the

17   parties?

18   A.   So I guess, you know, the idea, and again this was a few

19   years ago, but the relationship was that F.G.G. would be the

20   deliverer of the proposals and the prime contract for the

21   equipment sale and we would be, if you will, the seller to them

22   and they would effectively resell to C.F.E.

23        So that's what that first section would define and

24   then the second section, I believe, was intended to define how

25   the L.T.S.A. would go directly to the C.F.E.

1    Q.    So the, A. requires that F.G.G. be the prime contractor

2    with C.F.E., correct?

3    A.    Yes.

4    Q.    But the B. regards the long term service agreement; is that

5    correct?

6    A.    Correct.  And they were the bidding entity that introduced

7    us so that we could have a direct negotiation with C.F.E.

8    Q.    Okay.  And so then you start defining the terms required

9    for the teaming agreement for the equipment; is that correct?

10   A.    Correct, uh-huh.

11   Q.    And that is separate and apart than the terms from the

12   teaming equipment for the bidding of the long term service

13   agreement, correct?

14   A.    Correct.

15   Q.    With regard to the prime contract, were there anything --

16   any terms that were particularly significant to be included by

17   Mitsubishi?  Was there anything that legal was particularly or

18   you were particularly concerned about?

19   A.    For a project like this, and again I'm remembering kind of

20   without looking into too deep, into too much detail, there was a

21   couple of items that we were particularly careful on; one was to

22   make sure that we get paid, because again getting shipping

23   equipment and not having the money in advance would put us into

24   a position where we could be without the equipment and without

25   getting paid, so we had to have surety of payment.

1        The other was that the equipment being pre-made

2    technically it had to be as it was.  We couldn't remanufacture

3    something that was already made, so we had to make sure that the

4    specifications were close enough and that we could take

5    exception to what things were not within the specification.

6    Q.   Looking at page four, and I've scrolled to page four,

7    number two, mutual obligation.  And in discussing -- by this

8    time had you met Mr. Delgado?

9    A.   I do not believe so at this time, yet.

10   Q.   So this is -- basically who related to you that Mr. Delgado

11   was the outside legal counsel for F.G.G.?

12   A.   I think this came back from F.G.G. that they were going to

13   use Marco Delgado to help to assemble.

14   Q.   According to the agreement, his responsibility was to

15   assemble all of the documentation required for the R.F.P.; is

16   that correct?

17   A.   Correct, uh-huh.

18   Q.   And ensure all of the certifications and formalities were

19   incorporated into the proposal; is that right?

20   A.   Correct, uh-huh.

21   Q.   And then the next sentence, is that of particular

22   importance to Mitsubishi; are consistent and in strict

23   conformity with the Mitsubishi proposal?

24   A.   Yeah, very much so.  There was a couple of items on there,

25   again being that the equipment was already made, it had to be

1    exactly what we were offering because we couldn't remake it.

2    The other areas that we were worried about was our price is our

3    price and our terms and conditions were our terms and

4    conditions.  So we needed to make sure that what we offered in

5    our proposal the conditions of sale, the price, the payment

6    terms and then the technical specs and technical aspects were

7    matching what we offered because that's what we had.  We

8    couldn't sell something that we didn't have.

9    Q.   What is the Mitsubishi proposal?  Who were you proposing

10   what to?

11   A.   We proposed our gas turbines and steam turbine -- gas

12   turbines and steam turbine on the equipment side to F.G.G.  And

13   again, we were selling to them and then they were selling as the

14   prime to C.F.E., so we needed to make sure that it passed

15   through in accordance that was exactly the same.

16   Q.   Did you make that proposal in writing?

17   A.   Yes.

18   Q.   Is that what the subcontract is?

19   A.   The proposal is different than the subcontract.  A proposal

20   is a proposal.

21   Q.   And what was the substance of the proposal?

22   A.   Proposal defined Mitsubishi's equipment.  It defined what

23   price we wanted for it.  It defined the terms of payment, when

24   we wanted to get paid.  It defined when it would ship.  It

25   defined how many megawatts and how much -- what the efficiency

1  was of the equipment and when it would deliver, et cetera.  It

2  gave really the, you know, all of the terms associated with

3  bringing the power plant equipment to the power station.

4  Q.   And with regard to this language, the word "strict," was

5  that an important word?

6  A.   Very important.  We needed it to be exactly the way it was,

7  because we couldn't -- we were not going to take a contract that

8  didn't conform to the equipment that we had or the price that we

9  had or the terms and conditions that we needed to make sure that

10  we were safe in doing business in a foreign country.

11  Q.   All right.  And then in the next sentence -- I'm going to

12  try to get rid of this yellow so that I can use other yellow.

13          In the next sentence, F.G.G. will also provide any

14  letters -- sorry -- of credit required by the R.F.P. for the

15  supply and equipment service.  What does that mean?

16  A.   So, in doing business in -- anywhere, sometimes you have to

17  put some type of credit, some type of bond.  This was a specific

18  letter of credit and we had no intentions with the gas turbine

19  with the equipment supply contract to offer any sureties at all.

20  We were not going to offer letter of credit or a bank guarantee

21  or anything.  We were going to offer the equipment and we

22  believed that it was F.G.G.'s obligation as part of the teaming

23  agreement to provide any letters of credit or any bank

24  guarantees or anything associated with the equipment contract

25  for -- you know, for their needs.  We were not providing any.

1    Q.   Generally, in your industry, if you are the direct supplier

2    to the end user without an intermediary company, who is

3    responsible for the letters of credit?

4    A.   Generally, the equipment supplier would do or could do some

5    letter of credit.  Usually that was -- that was not usual for

6    that to happen for the equipment supplier to bring a letter of

7    credit.  And that tended to be the general way.

8    Q.   Who was the equipment supplier to C.F.E., you or F.G.G.?

9    A.   F.G.G. was.

10   Q.   With regard to the rest of this sentence:  And cause the

11   financing?

12   A.   Again, similarly, if there was any financing required to

13   happen where -- some projects would require the seller of the

14   equipment to help to go to the bank to solicit financing for the

15   owner, and if there was any that was needed, we intended for

16   F.G.G. to do that.  We had no provisions in our contract to

17   provide letters of credit or assistance for the financing of

18   this equipment.

19   Q.   So say El Paso Electric Company needed to borrow money to

20   pay for a new power plant, is that what you are talking about?

21   A.   Yeah, in those kind of cases that would be what would

22   happen.  If they were to borrow it, sometimes they would want

23   the supplier of the equipment to help them go to the bank and

24   get the financing.

25   Q.   So you were just covering your bases?

1    A.    We didn't.  We didn't have any -- we had no intentions of

2    supplying either of those.  We were covering our bases for both,

3    yes.

4    Q.    And -- or cause C.F.E. to waive such requirements as

5    appropriate?

6    A.    Exactly.  If they didn't need it, then that's fine.

7    Q.    Does that clause modify both the letters of credit for the

8    equipment and service and any financing required?

9    A.    That was our intent, yes.

10   Q.    Do you know if either in the prime contract in this case

11   between F.G.G. and C.F.E., if either the letters of credit or

12   the financing requirement were waived?

13   A.    I do not believe they were.  I don't know for sure --

14   Q.    Okay.

15   A.    -- because we weren't in that contract.

16   Q.    Now new topic, because --

17         THE COURT:  Before you get to that Ms. Kanof, let's

18   take a ten-minute recess.  That'll be our last for today.  We'll

19   be in recess till 5 o'clock.  We'll resume our proceedings at

20   5 o'clock.

21         COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

22         (Break at 4:53 p.m. to 5:03 p.m.)

23         THE COURT:  Let the record reflect that all members of

24   the jury are present, the United State's through its assistant

25   United States attorneys is present, the defendant and his

1    counsel is present.

2           The witness, Mr. Adams, is on the witness stand.

3           Ms. Kanof?

4           MS. KANOF:  Thank you, Your Honor.

5    BY MS. KANOF:

6    Q.   Mr. Adams, I'm still on that paragraph.  With regard to

7    your representation between or your representation of Mitsubishi

8    by F.G.G. with C.F.E., does Mitsubishi try to cover themselves

9    by saying they will have the active support.  What is this part

10   about?

11   A.   So the idea was on this section Mitsubishi will actively

12   support F.G.G. by furnishing our Mitsubishi's proposal.  They

13   would help with the strategy in how to win.  They would be the

14   ones putting in the proposal.  And whatever was needed from a

15   technical standpoint, F.G.G. was really the ones delivering the

16   proposal and acting on the behalf of delivering it.

17   Q.   Okay.  Now, bullet point number one, why is this important?

18   A.   We wanted to be -- you know, if there was any change in the

19   direction, if the project was changing we wanted to know

20   immediately if our equipment would work or not work.  We wanted

21   to be kept aware of what might happen, you know, if there was

22   any change that could impact us during this project.

23   Q.   Okay.  With regard to the bullet point that I'm

24   highlighting, was communications important?

25   A.   Very much.  We wanted to be very careful and make sure that

1    they were delivering the proposal as we offered it, again to

2    make sure that it matched with the commercial terms and

3    technical terms that we'd given.  Yes, communication was very

4    important.

5    Q.   Did you have an opportunity to do what it says in this

6    bullet part to review in comment on F.G.G.'s proposal to C.F.E.?

7    A.   We did not.

8    Q.   Can you explain why you went through with it if you didn't

9    have an opportunity to do that?

10   A.   We were led to believe that they had offered our proposal

11   as it was, but we never really saw it till it went in, so we

12   thought it's still going to be -- it's going to be our proposal.

13   We just never got it as we had requested that we would get it,

14   we never got it and before it was actually submitted.  We

15   thought it would still be okay.  We thought we were still being

16   offered, our offer was still being offered as it was.

17   Q.   Was it?

18   A.   Turned out it was not.

19   Q.   How do you know that?

20   A.   We later found out that they had changed some of the

21   commercial terms, in particular, the payment terms were a little

22   bit different from what we found.

23   Q.   How did you find that out?

24   A.   They came back to us after the award and said here's -- you

25   know, here's what our payment terms are and here's how much

1    money you are going to get.  Both the price of the payment terms

2    were somewhat different than what our proposal was when we had

3    originally offered.

4    Q.   Were they significantly different?

5    A.   Yes.  Yes, they were.

6    Q.   Okay.  Give us some examples of how they were different?

7    A.   Well, we originally offered the equipment for $121 million

8    and the payment terms, I believe the first payment was 20

9    million.  When it came back to us, you know, considerably later

10   in time, they had taken away of a number of the scope items like

11   the delivery and they had also changed some of the payment terms

12   to a lower payment term that were not sufficient for us.

13   Q.   Okay.  One of the last bullet points here has to do with

14   Mr. Delgado, does it not?

15   A.   Yes.

16   Q.   And what is that?

17   A.   That it -- that F.G.G. was fully responsible for Marco,

18   that he was under their watch and under their payment, that

19   Mitsubishi in no way had intended to hire Marco or pay for

20   Marco.

21   Q.   And does it give certain responsibilities that he has with

22   regard to the teaming agreement, Mr. Delgado --

23   A.   Yes.

24   Q.   -- cause its legal counsel too?

25   A.   Yes, it does.  He was to do a number of things associated

1    with it.  And again I don't have the document other than you

2    just scroll down, but, yes, he was to do a number of things; to

3    do the translation, you know, as it says in here, to be

4    responsible to the delivery of the proposal.

5    Q.    Without -- we don't need to go through all of them, but

6    look at E. or we can do it later -- the document's in

7    evidence -- but look at E. --

8    A.    Uh-huh.

9    Q.    -- and tell me what that's about.

10   A.    So Mr. Delgado was responsible in developing the

11   relationship with C.F.E., so he was the one that was having some

12   of the direct discussions with C.F.E. and support the team, you

13   know, through the whole project through the equipment contract

14   so he was to have that relationship.

15   Q.    Okay.  And did you want to commune- -- did Mitsubishi need

16   to communicate with C.F.E.?

17   A.    Yes.  We would need to communicate with them as well as the

18   project.

19   Q.    And were they supposed to assist you in developing a

20   relationship with C.F.E. so you could do that?

21   A.    Yes, that was the purpose.  He was supposed to help us to

22   develop the relationship, thus we would execute the project.

23   Q.    Did he?

24   A.    Not really, no.

25   Q.    At the very -- I think I might need to go to the Spanish

1  document.  Okay.

2         In this subcontract on page seven, does it have who

3  the contact point for F.G.G. was for all purposes in the teaming

4  agreement?

5  A.   Yes.  Can you scroll down a little bit?  But it was

6  Fernando who was the -- for the purposes of the teaming

7  agreement, we were working with Fernando.

8  Q.   Okay.  And it wasn't Mr. Delgado?

9  A.   No, it was not.

10  Q.   And for Mitsubishi, the Senior Vice President of Projects?

11  A.   That would be me.

12  Q.   That would be you?

13  A.   Uh-huh.

14  Q.   Was this supposed to expire, this teaming agreement, at any

15  time?

16  A.   When we lost the project, the teaming agreement would have

17  expired.  Yes, there was expirations to it.

18  Q.   Okay.  Let me go down to signatures.  On the right-hand

19  side, is that your signature?

20  A.   Yes, it is.

21  Q.   And I think you previously said that you signed this in

22  Florida?

23  A.   I believe so, yes.

24  Q.   And was Mr. Gireud there as well?

25  A.   I do not believe he was.  I don't think we signed it

1    directly with each other.  I think we, you know, had

2    electronically transmitted back and forth.

3    Q.   Oh, so you electronically sent your documents with your

4    signature on it?

5    A.   Yes.  What we would -- we would fax and scan and fax some

6    documents, yes, uh-huh.

7    Q.   And was -- so was there anybody from F.G.G. in Orlando when

8    you signed this document?

9    A.   I don't recall anybody there, no.

10   Q.   Let me try to get the Mexican version up.  Oh, that's the

11   subcontract.  We're doing fine.

12           Okay.  So once the teaming agreement was signed, what

13   happened next?

14   A.   Then we waited to go ahead and submit the proposal, our

15   proposal for the equipment to F.G.G. such that they could go

16   ahead an submit their proposal to C.F.E.

17   Q.   Okay.  With regard to -- once you had signed the teaming

18   agreement, what were your duties and responsibilities with

19   regard to this particular project?

20   A.   Our duties we had, according to the teaming agreement, the

21   intent and obligation to supply the equipment to F.G.G. and then

22   to provide the bid for the L.T.S.A. to F.G.G. for their help to

23   get us to work directly with them for the L.T.S.A.

24   Q.   At some point in time, did F.G.G. win the R.F.P.?

25   A.   Yes.

1   Q.   Do you remember when that was?

2   A.   I believe it was in the November time period.

3   Q.   Maybe, approximately, November 19th of 2009?

4   A.   Roughly, yes.

5   Q.   Did they communicate that to you?

6   A.   Yes.

7   Q.   And upon communication to the fact that you now had a

8   teaming agreement and with a company that had now won a bid,

9   what did you do next?

10  A.   We wanted to get more details and to figure out what it is

11  that we want, and we requested F.G.G. to help us to understand

12  more and to go into contract with them.

13  Q.   And I'm going to show you the exhibit number --

14  Government's Exhibit 11 that you're viewing.

15  A.   Yes.

16  Q.   And is it an e-mail from you to Mr. Gireud, copied to

17  Hector Ponce, Patrick Altamura and another individual?

18  A.   Yes, it was.  We were -- yes, it was.

19  Q.   And does it have a letter attached to it?  Just by looking

20  at the word attachment does it appear to?

21  A.   It should, yes, uh-huh.

22  Q.   Okay.

23       MS. KANOF:  We'd move Government's Exhibit Number 11

24  into evidence.

25       MS. FRANCO:  No, objection.

KATHLEEN A. SUPNET, CSR

```
 1              THE COURT:  GX-11 is admitted.

 2    BY MS. KANOF:

 3    Q.    So what's this e-mail about?

 4    A.    So as we were notified that we had won, we were concerned

 5    about finishing up the deal, which was, you know, going ahead

 6    and making our contract, you know, with F.G.G. for the equipment

 7    such -- and making sure that it matched with what it was being

 8    offered to C.F.E.

 9    Q.    Did you write a letter to Mr. Gireud?

10    A.    Yes.

11    Q.    Is this the letter that's being displayed that was attached

12    to the e-mail, Government's Exhibit 11?

13    A.    Yes.

14    Q.    Okay.  So can you tell the jury about this letter?

15    A.    So this letter was, you know, thank you for, you know,

16    telling us that we won, but we were very worried about the lack

17    of communication and we wanted to get all of the documents and

18    try to get everything together such that we could collectively

19    do what we said we would to do.

20    Q.    You just won the bid in November and you are already

21    concerned about lack of communication?

22    A.    Yes, uh-huh.

23    Q.    Tell the jury about that.

24    A.    Well, we had hoped that we would have gotten a copy of the

25    proposal that they submitted to C.F.E., which was what requested
```

1    in the team agreement, and we never did.  We never got --

2    Q.   Did you ask for it?

3    A.   We did ask for it.

4    Q.   Who asked for it?

5    A.   Hector Ponce asked for it a number of times as well as

6    myself.

7    Q.   Okay.

8    A.   Uh-huh.

9    Q.   And who did you ask?

10   A.   Fernando, who would be, you know, the contact that we would

11   go to.

12   Q.   And what would he reply?

13   A.   He would always be that it's coming, it's coming, but it

14   never can came.

15   Q.   Okay.  What else -- so this is less than ten days after the

16   award of the contract and you are already concerned about

17   communications.  And so are you writing this letter?

18   A.   Yes, uh-huh.

19   Q.   And you say, pattern of poor communications.  I think

20   that's where we are.

21   A.   Correct, uh-huh.

22   Q.   And what is this reluctance thing?

23   A.   Just we would ask for and they would not give us the

24   information, you know, that we'd asked for, which was their

25   proposal to C.F.E.

1    Q.    And you explained that in that paragraph, correct?

2    A.    Correct, uh-huh.

3    Q.    And the next paragraph?

4    A.    Again, the same thing, that we'd had under our teaming

5    agreement a number of requests and, you know, we wanted to get,

6    you know, copies to make sure that they were complying with what

7    the teaming agreement said.  We wanted to make sure they were

8    giving us what we were entitled to under that agreement.

9    Q.    Do you consider this strong language?

10   A.    Yes, for me, this is pretty strong language.  You know, in

11   order for us to have a chance to be working together, yes.

12   Q.    Why were you concerned so quickly?

13   A.    Because we were told they wanted something.  And it was a

14   pretty good size contract, $121 million, and we didn't know what

15   we had won, so it was concerning for us that we might be having

16   something that we couldn't deliver and we didn't want to have

17   our representation at risk.

18   Q.    Was there anything about the fact that they were not

19   General Electric or Siemens that concerned you?

20   A.    They were a smaller company, so we were very much concerned

21   that they -- we were concerned that they didn't have the ability

22   to do this without us, that you know they didn't necessarily

23   have the depth to be able to work through this.  We were

24   concerned with their size, yes.

25   Q.    Do you know anything about the qualifications of

1    Mr. Gireud?

2    A.   Very little.  We knew a little bit of his background.  We

3    had met shortly, but we also knew he was an expert in the power

4    industry.

5    Q.   Do you know anything about the qualifications of

6    Mr. Delgado?

7    A.   Not really, at that time.  We knew he was a lawyer, but we

8    didn't know much beyond that.

9    Q.   Do you know anything about the qualifications of

10   Mr. Miller?

11   A.   No, not so much.  Again, we met him and we had no idea

12   whether -- of the qualifications, so...

13   Q.   Why did you think this was a sound idea if you knew nothing

14   about the company that was the intermediary between you and the

15   Commisión?

16   A.   Because we were selling directly to them for resale.  We

17   thought they would just pass through exactly what we offered.

18   So we didn't think there was much risk for us, provided they

19   followed the teaming agreement that, you know, as long as here's

20   what we offer, here's the terms and conditions, here's the

21   price, here's what it is that we offer, it was a pure resale.

22   We did not anticipate any big issues there, because the

23   equipment was what it was.  It was just a passthrough and we

24   didn't expect that they would cause any issues.  We thought they

25   would just, you know, pass it through.

1    Q.   You then in this letter recite letters in verse, some of

2    the clauses from the teaming agreement?

3    A.   Yes.

4    Q.   Looking at the second paragraph, do you talk about

5    submitting the proposal agreement unchanged?

6    A.   Yes.

7    Q.   Okay.  And you already had a concern about that?

8    A.   Yes.  Uh-huh.

9    Q.   With regard to -- the next paragraph as well talks about

10   not making any changes in price, right?

11   A.   Correct.

12   Q.   What about payment terms?

13   A.   Same thing; price, payment terms, scope of work, terms and

14   conditions.

15   Q.   What about Mitsubishi being afforded an opportunity to

16   review and comment on the proposal that they already submitted

17   their proposal and won and now you are reminding them that you

18   should have because it's a little too late, isn't it?

19   A.   Well, we reminded them we didn't know yet that it was too

20   late and we didn't know what they had offered, so we had hoped

21   that they had offered what we had, but we didn't -- we were

22   hoping that they'd offer it exactly as we had given it.  We

23   wanted to look at that and see.

24   Q.   Okay.  With regard -- like I said, it's pretty strong

25   language, but was that intentional on your part?

1     A.   Yes, very much so.

2     Q.   I've scrolled down to a paragraph that starts with:  It is

3     especially important.  What was especially important?

4     A.   That they complied with the terms under the teaming

5     agreement, which meant that we would get direct payment which

6     was very important.  So again, the things that were important to

7     Mitsubishi as a company were that we didn't have any liability,

8     that we got paid and that the equipment was what we offered, so

9     we were very careful to make sure that they -- that the

10    requirements for the direct payment, the requirements for

11    exclusion of risk for us, waivers and separation, et cetera,

12    were all per our offer.  We wanted to make sure that they again

13    passed through the terms and conditions that we were not going

14    to get stuck with any liability.

15    Q.   Perhaps you can explain who the Fideicomiso is?

16    A.   The Fideicomiso, we believe to being the agency for C.F.E.

17    that would process the payments and the contracts.

18    Q.   Okay.  And direct payment, do you mean the right?

19    A.   Yeah, we were -- so, again, being that F.G.G. was a small

20    company, we wanted to be sure that we were going to get paid.

21    That was one of the specific intents of what we were trying to

22    do.  So what we had asked for was and what we wanted and what we

23    believed was fair was a direct payment from C.F.E., because

24    F.G.G. didn't have the money so we didn't want to have to pass

25    money through them.  We wanted a direct payment.

1    Q.   And what is the formal term for that in most of these

2    communications, the assignment of --

3    A.   The assignment of payment rights is what we would want

4    from -- you know, since they were getting paid from F.G.G., we

5    wanted them -- from C.F.E. to F.G.G., we wanted them to assign

6    their rights of payment direct to us, since we were the ones

7    making the equipment, and we could therefore rely that the money

8    would be coming to us.

9    Q.   And was it assigned directly to you or was the agreement

10   that they would provide a letter to C.F.E. requesting that the

11   assignment go to you?

12   A.   We requested directive full assignment.  We wanted -- and

13   specifically in our agreement, we wanted the rights for the full

14   assignment, not just them to ask, but for them to get us the

15   assignment of the payment to us.

16   Q.   Okay.  The next paragraph starting with:  One example that

17   illustrates, what's that about?

18   A.   So we had heard or thought that in some of the discussions

19   that we were having that M.P.S.A. was to -- you know, somebody

20   had suggested that we were to prepare a letter of credit for

21   $20 million.  And we very specifically in our equipment contract

22   didn't have any letters of credit.  We very specifically made

23   sure that we were not going to offer any letters of credit.  We

24   were offering the equipment.

25           So again the two pieces were the letter that we had no

1    intentions of, would put no money in and we -- and you have

2    to -- you know, letters of credit cost money.  It's like putting

3    money in the bank and you have to pay the interest payment on

4    that as well.  We didn't have a proviso to do that.  That's part

5    of what F.G.G. was offering in their offer to us, so we were

6    very concerned that they were trying to confuse the issue.  So

7    for the equipment -- for the equipment bid, there was no letters

8    of credit offered.

9           For the L.T.S.A., we were looking at a direct contract

10   with C.F.E., we would -- therefore, we would do so there.  There

11   was a difference, a distinct difference between the two.

12   Q.   Mr. Adams, did you ever go to Mexico prior to the contract

13   being signed between F.G.G. and C.F.E.?

14   A.   Yes.  I went one time, uh-huh.

15   Q.   You went one time.  When was that?

16   A.   I went one time -- I went in December of -- well, the one

17   time before, I can't remember exactly, it was September-ish and

18   then I went one more time in December.

19   Q.   When you traveled, did you travel at the expense of

20   Mitsubishi?

21   A.   Yes.

22   Q.   Who set up your travel?

23   A.   We had an in-house travel agent called I.A.C.E. Travel.

24   They did all of my travel for me.

25   Q.   Did somebody keep your calendar of travel?

1    A.   Yes.  I.A.C.E. people would give me travel documents.  And

2    then I had an assistant that would help we with a lot of that,

3    so both.

4    Q.   When you traveled to Mexico, did you -- just working at

5    Mitsubishi, did they provide you a cell phone?

6    A.   Yes.  I had a company-provided cell phone.

7    Q.   And when did you use that company-provided cell phone?

8    A.   Wherever I was on business, whether it was Mexico or

9    whether it was any country, I would use the cell phone

10   forever -- for wherever I was, I would use it as a business

11   phone.

12   Q.   Did you ever use a personal cell phone for business?

13   A.   Never.

14   Q.   Did you ever -- did your business phone ever or your

15   Mitsubishi phone ever conk out so you had to use your personal

16   phone?

17   A.   I didn't have a personal phone.

18   Q.   Neither do I.

19        So who paid the bill?

20   A.   Mitsubishi direct paid all of the cell phone bills.

21   Q.   It's going to take me a second to find this.

22        I have Government's Exhibit Number 27.  What does it

23   look like to you?

24   A.   Looks like Mitsubishi Power System's cell -- it looks like

25   a cell phone charge account, if you will.

1    Q.   Did you ever review the charges that you made on your cell

2    phone?

3    A.   No, I never did actually.

4    Q.   Okay.  And I'm looking for your -- for a cell phone number

5    on here.

6         Page three of this document, and it's Government's

7    Exhibit Number 27, there's a phone number at the top.  Do you

8    recognize that phone number?

9    A.   Yes.  That was my cell phone number.

10   Q.   And could you tell us what that number was?

11   A.   That was my business cell phone with Mitsubishi.

12   Q.   And what's the number?

13   A.   407-221-9508.

14   Q.   Okay.  And they didn't let you review them to see if they

15   were correct or anything like that, but the customer for that

16   phone was actually Mitsubishi, correct?

17   A.   Correct.

18   Q.   When you -- so who kept your calendar now?

19   A.   Uh, I had an assistant, Sharon Prader.  She was my

20   assistant that kept my calendar and the then the travel agent

21   would manage the travel, too.

22   Q.   When you would go -- so we started to talk about you going

23   to Mexico for this contract.  Where in Mexico did you go?

24   A.   Mexico City.

25   Q.   How did you get there?

1    A.   I flew.

2    Q.   Okay.  And how did you get from Mexico City -- well when

3    you left -- how many times did you go to Mexico before January

4    1st or before you left between the time this contract began and

5    the time you left Mitsubishi in April of 2010?  How many times

6    did you go to Mexico?

7    A.   Before the contract actually or before the proposal?

8    Sorry.

9    Q.   Okay.  Let's start --

10   A.   Before the contract?  I didn't go any -- I went one time in

11   December and then one time before that.

12   Q.   Okay.  I'm sorry one time when?

13   A.   In December and one time before that.

14   Q.   Did you ever go any time after December?

15   A.   No.

16   Q.   Did you ever go in the year 2010?

17   A.   No, not at all.

18   Q.   Let's talk about the two times that you went in 2009.

19            What airport did you fly out of?

20   A.   The first trip I believe I flew out of Orlando.  The second

21   trip I flew out of Las Vegas.

22   Q.   And the first trip when you flew out of Orlando, when you

23   returned to the United States from Mexico, what airport did you

24   fly into?

25   A.   I believe it was Miami, but I think it was, but I'm not

1    really clear on it.  It was a few years ago.

2    Q.   And when you came into the United States for the trip that

3    you had departed from Las Vegas, what airport did you fly into?

4    A.   I believe Miami, but I'm not 100 percent --

5    Q.   Miami International Airport, correct?

6    A.   Correct, uh-huh.

7    Q.   Do you -- you fly -- you've flown for years

8    internationally, correct?

9    A.   Correct, uh-huh.

10   Q.   I understand at some point did you have to fill out any

11   kind of a form or anything coming into the United States as an

12   American citizen?

13   A.   Usually, you do customs.  I always do a customs declaration

14   when I come back into the United States.

15   Q.   Okay.  Back to the -- we were talking about your letter,

16   the November 27th letter -- I forgot which exhibit it was.

17           So you were pretty adamant in this and we were talking

18   about the letters of credit.  Right here.  So, how do you --

19   when you have to -- when you are responsible in any projects for

20   letters of credit, how do you obtain letters of credit?

21   A.   So letters of credit, first off, before I could do one, I

22   would have to go back to M.H.I. in Japan and ask is it okay to

23   get one, because it ties up some of the company's money, so you

24   go to the treasurer, you would ask for that.  So it's something

25   I couldn't do without permission.  So we would go to our parent

1    and we would ask for a letter of credit, and if they would give

2    you one, then you'd have to go ahead and pay for it and spend

3    money to get it.

4    Q.   Not your money.

5    A.   Excuse me?

6    Q.   Not your money.

7    A.   The company's money, yes.

8    Q.   Okay.  And $20 million in a letter of credit would cost

9    about how much?

10   A.   As much as much as a million dollars a year, that

11   magnitude.

12   Q.   Okay.  So for 20, if you wanted to buy letters of a credit

13   valued at $20 million, it might cost a million dollars?

14   A.   Yes.

15   Q.   Okay.  And you know that, also, because you were prepared

16   if you got the long term service agreement to submit letters of

17   credit to C.F.E., correct?

18   A.   Correct.

19   Q.   But not for the prime contract for the equipment?

20   A.   Correct, because we were not in contract with the prime.

21   So we were not with C.F.E.  We didn't have a contract with them.

22   Q.   Okay.  In the middle of that paragraph, you're talking

23   about the long term service agreement and Mitsubishi Heavy

24   Industries in Japan.  What is this about?  Does this have

25   anything to do, first of all, with the prime equipment

1    agreement?

2    A.    It does not from our perspective.

3    Q.    Okay.  So this was discussed with you and addressed:  In

4    our long term service agreement proposal in which we propose to

5    provide assurance through a parent guarantee for Mitsubishi

6    Heavy Industries Japan, explain to the jury what that's about?

7    A.    So instead of a letter of credit for the service agreement,

8    we thought it might save ourselves money collectively as a group

9    if in direct contract with C.F.E., if we could get our parent

10   Mitsubishi Heavy, to put a guarantee out that they would

11   guarantee this project.  So they would -- they put out a

12   parental guarantee and that assures that they would backstop

13   this project for us if anything would happen and it saves

14   monies.  It's done fairly frequently to save money.

15   Q.    What's a parental guarantee?

16   A.    A parental guarantee is your subsidiary Mitsubishi Heavy

17   Industries, the big Japanese Heavy Industries, and they would

18   put a company guarantee out that would way that they would step

19   in and do what needs to be done to fulfill this contract should

20   we fail.  So that was what the guarantee does is that instead of

21   allowing the buyer to go ahead and collect your money from the

22   bank, it really obligated our parent to fulfill what was needed

23   under the contract.

24   Q.    Does the guarantee require a separate contract?

25   A.    A parental guarantee?

1    Q.   Yes.

2    A.   You wouldn't -- it doesn't necessarily require a separate

3    contract.

4    Q.   It would have to be in writing?

5    A.   It would have to have a written guarantee, yes.

6    Q.   Okay.  In some document?

7    A.   In some form, an attachment or something from our parent,

8    yes.

9    Q.   So is that because Mitsubishi or M.H.I. is just so wealthy?

10   They're worth a lot of money.

11   A.   No, I don't think so.

12   Q.   Why is a parent guarantee better than a Mitsubishi Power

13   Systems America's guarantee?

14   A.   Well, they were a bigger company and they did have more

15   assets than Mitsubishi Power Systems, so it would, also, being

16   the parent, would obligate them to put their money in or their

17   fulfillment obligation as well.

18   Q.   Okay.  So you were willing to do that on the L.T.S.A.?

19   A.   Yes, because we were in -- yes, we were.

20   Q.   Suppose F.G.G. could not provide the $20-million letter of

21   credit on the prime contract and came to you and said they

22   couldn't do it, what would you have done?

23   A.   I don't know.  I have -- I don't have a good answer for

24   that, because we certainly didn't have a contract with C.F.E.

25   We would not have provided that for them.

1    Q.    Would you have pledged Mitsubishi's three turbines?

2    A.    Absolutely not.

3    Q.    Why?

4    A.    We have no way of assuring that we would get paid, so

5    unless we had this surety of payment and a contract direct with

6    C.F.E., we would never pledge our equipment to someone else.  We

7    would not do that.

8    Q.    Did you ever agree to pledge the Mitsubishi equipment?

9    A.    No.  I would have been fired had I done that.

10   Q.    Did you have the authority to pledge the Mitsubishi

11   equipment?

12   A.    Not at all.

13   Q.    What would it have taken to actually get the authority to

14   pledge the Mitsubishi equipment?

15   A.    We would have had to go directly to Japan and had at least

16   the management in Japan sign off that we would have that right

17   to do that.

18   Q.    Was -- was there any reason -- okay.

19          So you went to Mexico City twice; is that correct?

20   A.    Correct.

21   Q.    And the first time, what was the purpose of the meeting?

22   A.    First time was just to hear more about the project and to

23   meet some of the people that we could meet in C.F.E.

24   Q.    And who did you meet?

25   A.    I can't really recall.  I really don't remember.  I

1   remember we had a dinner, a dinner out, but I don't recall the

2   peoples' names actually.

3   Q.   Did you go to one of the C.F.E. buildings?

4   A.   I believe we went to one of the C.F.E. buildings and then

5   we had dinner.

6   Q.   Who was with you from Mitsubishi?

7   A.   I think it was Hector, but I can't quite recall.

8   Q.   Did you walk to the C.F.E. building?

9   A.   Yes.  In one of the meetings we did, correct.

10  Q.   And did Mr. Delgado ever approach you about the letters of

11  credit when you were walking to the C.F.E. building?

12  A.   Not that I recall.

13  Q.   Okay.  The second time that you went to Mexico, did he

14  approach you about letters of credit that you recall?

15  A.   I don't recall, no.

16  Q.   You don't remember?

17  A.   No.

18  Q.   If he had asked you if you could pledge the equipment in

19  lieu of the $20-million letter of credit, what would you have

20  said?

21  A.   It's impossible.  I have no authority to do so and

22  couldn't.

23  Q.   Okay.  And again you couldn't identify Mr. Delgado today?

24  A.   Well, I think he's here.  He looks different, but I think

25  he -- he may be here, but yeah.  He doesn't look like the same

1    person.

2    Q.   Okay.  With regard back to your letter, you also talk about

3    an incentive.  We offered an incentive.  What is this about?

4    A.   So this was with regard to the L.T.S.A. that we could

5    conceivably drop the price somehow, whether it be the equipment

6    price or the L.T.S.A. price, if we didn't have to post that

7    letter of credit for the L.T.S.A., so we were very specific for

8    that.  If we would get a parental guarantee it saved us a

9    million dollars.

10   Q.   Do you remember what the original price of the equipment

11   was to F.G.G.?

12   A.   121 million.

13   Q.   No, to F.G.G.

14   A.   To F.G.G.?  I believe it was 1-0-6-6, but I believe that

15   was the number.

16   Q.   At some point in time did that drop to 103 million?

17   A.   It was pushed to that point, yes.

18   Q.   And then to 102 million?

19   A.   That was the push.

20   Q.   So this incentive has -- really has to do with long term

21   service?

22   A.   The $1-million drop from 103 to 102 I believe was with

23   regard to not having to supply an L.T.S.A. -- or with the

24   L.T.S.A. and not having to supply any kind of L.O.C.  We would

25   give a parent guarantee instead.

1    Q.   So in this letter you are telling what your concerns are

2    that have quickly developed.  What's your second example?

3    A.   In this one it was duties paid.  We had no money and to pay

4    for duties or taxes, so we thought again we didn't have any

5    ability to do could that.

6    Q.   You were concerned that they might try to include that?

7    A.   Yes.

8    Q.   And third example?

9    A.   That they were changing potentially the terms of the

10   service agreement, so the service agreement had its own specific

11   payment terms, and we were worried that that wasn't being again

12   reflected as it should be.

13   Q.   Okay.  It says, a third example is the apparent change in

14   the rates of payment which F.G.G. finally proposed to C.F.E.;

15   and this is the L.T.S.A. or this is the prime contract?

16   A.   This is the L.T.S.A. specifically.

17   Q.   Okay.  And then you said there may be additional concerns

18   about delivery dates?

19   A.   You know, we had specific dates in the contract and we

20   wanted to make sure that we'd matched what we offered in our

21   proposal; we're going to deliver this project on such and such a

22   date.  We wanted to make sure they didn't change that.

23   Q.   In the next paragraph does that basically -- is that what

24   you're talking about, that you really just -- you didn't have a

25   copy and you didn't know what they offered?

1   A.   Exactly.  We had no idea if it matched what we had offered.

2   Q.   And because you didn't know, you never got to see their

3   proposal, you didn't even know what other issues may exist.

4   A.   Correct.

5   Q.   But regardless of that were you willing to go ahead?

6   A.   Yes.  We were, if we could verify again that we were

7   offering the equipment as we had offered it, if it was -- as

8   long as our offer to F.G.G. was our offer and as long as that

9   was unchanged, we were willing to go ahead, provided they could

10  eventually show us that everything matched.

11  Q.   Okay.  And was this letter sent electronically?

12  A.   I believe this was e-mailed, yes.

13  Q.   Did you receive a response to Government's Exhibit

14  Number 11?

15  A.   I think so, but again I don't have the documents in front

16  of me.

17  Q.   So you never saw their proposal?

18  A.   Never did, no.

19  Q.   Okay.  Did you then enter into a subcontract?

20  A.   Mitsubishi did enter into a subcontract with F.G.G., yes.

21  Q.   Okay.  And I'm going to first pull up the Spanish.

22       Did you participate in drafting this subcontract?

23  A.   I did not.

24  Q.   Why is it in Spanish?  Do you know?

25  A.   I actually -- we had big problems with that.  I do not

1    know.

2    Q.   What do you mean you had big problems?

3    A.   Well, we -- you know our language for working with F.G.G.

4    was English, so when it came through in Spanish, it was a

5    surprise.

6    Q.   What did you do when you saw it in Spanish?  Did you

7    complain or...

8    A.   We complained and then we translated it.

9    Q.   Okay.  Who translated it?  Do you know?

10   A.   I don't recall.

11   Q.   Hector Ponce speaks fluent Spanish.

12   A.   Yeah, yeah, uh-huh.

13   Q.   But it was executed -- the original was executed in

14   Spanish, correct?

15   A.   I believe it was, yes.

16   Q.   And I'm going to scroll down to the bottom of Government's

17   Exhibit Number 12.  And look at the signature.  You said you

18   didn't have anything to do with generating the subcontract?

19   A.   Did not.

20   Q.   Well, do you speak Spanish?

21   A.   Very little.

22   Q.   Not well enough to generate?

23   A.   Not well enough to write anything in Spanish.

24   Q.   And signator for Mitsubishi Power Systems was who?

25   A.   It was -- I believe it was Greg Wunder, who was in the

1    sales department.

2    Q.   Okay.  And do you know anything about -- do you know

3    where -- this looks like it was signed in person.

4    A.   I believe Greg signed it in person, but I believe there was

5    a letter or a handwritten piece behind it that he had that he

6    put in specifically to make sure that with the signed

7    subcontract that it would be adjusted to make it match the

8    proposal that we had.

9    Q.   So I have in front of you -- do you recognize that as

10   Mr. Wunder's scrawl?

11   A.   It looks like it, yes.

12   Q.   And did you know about this at the time that he put it in

13   or did you learn about it after it had been signed?

14   A.   He had called me afterwards and said, look, I needed to

15   sign this, but I wrote a very specific handwritten piece at the

16   end of it that allowed us to make adjustments to the subcontract

17   to make sure it is in accordance with what we offered, and he

18   had then -- he signed that, as did Fernando at the same time.

19           So this -- you know, we believed or he believed and

20   referred to me that we had this ability to make the adjustments

21   to make it match, that it was just a formality to sign it, but

22   we would then match up the contracts in accordance to what our

23   proposal was.

24   Q.   So this little handwritten part was still as a result of

25   the fact that you had never seen what they gave C.F.E.?

1   A.   Correct, uh-huh.

2   Q.   Okay.  And when did you -- did you even read the

3   subcontract before it was signed?

4   A.   No.  We were given it and signed it, but then he used this

5   letter in the end to go ahead and to cover us was the intent.

6   Q.   Okay.  Did you become familiar with the payment schedule?

7   A.   Eventually, yes, uh-huh.

8   Q.   Okay.  So I'm displaying to you Government's Exhibit

9   Number 19, a Spanish document.  And do you know what these are?

10  It says anexo.  Do you know what an anexo is?

11  A.   An attachment.

12  Q.   Do you have any input into the anexo?

13  A.   No.

14  Q.   I'm going to scroll down.  Can you tell me if you -- have

15  you ever seen this document before?

16  A.   I have recently, yes.

17  Q.   Okay.  Any of the initials -- the date of this is the 6th

18  of January of 2010, correct?

19  A.   Correct.

20  Q.   And I'm showing you the first page with initials.  Are any

21  of those yours?

22  A.   No.

23  Q.   Are any of them Hector Ponce?

24  A.   Not that I know of, no.

25  Q.   Were you present when this contract was signed?

1    A.    No.

2    Q.    Do you know where it was signed?

3    A.    No, I do not.

4    Q.    Okay.  I'm just going to try to scroll down very slowly and

5    ask you, next page, are any of those your initials?

6    A.    Not at all.

7    Q.    Are any of them Hector Ponce's initials?

8    A.    Not that I know of, no.

9    Q.    And the next page?

10   A.    No.

11   Q.    The next page?

12   A.    No.

13   Q.    The next page?

14   A.    No, not at all.

15   Q.    The next page?

16   A.    No.

17   Q.    Next page?

18   A.    No.

19   Q.    Next page?

20   A.    Not at you all, no.

21   Q.    Same?

22   A.    Same.

23   Q.    Page 11 now?

24   A.    Not at all.  I have a very specific initial.

25   Q.    Page 12?

1    A.   Not at all.

2    Q.   Page 13?

3    A.   No.

4    Q.   Getting there.  That's page 13.  I'm not going to go

5    through every page.  You weren't present during the signing of

6    this contract?

7    A.   I was not, no.

8    Q.   Did you put your initials on this contract?

9    A.   Not at all.

10   Q.   Okay.  Or it's an anexo and I understand it's not a

11   contract, but I am looking for the prime contract.

12        I showed you the teaming agreement.  Do you recall

13   whether or not your initials were on the teaming agreement?

14   A.   I do not believe they were.

15   Q.   Do you ever remember initialing any -- every page of any

16   document in this case?

17   A.   No.

18   Q.   With regard to Government's Exhibit Number 13, who is Ueki?

19   A.   Ueki was one of the vice presidents in the commercial

20   department that the proposals would be  signed off through.

21   Q.   And Government's Exhibit Number 13, is that an e-mail on

22   which you are copied that is from Marco Delgado?  Look at the

23   signature.

24   A.   Yes, it was, uh-huh.  Yes.

25        MS. KANOF:  Move Government's Exhibit Number 13 into

 1    evidence, Your Honor.

 2              MS. FRANCO:  No, objection.

 3              THE COURT:  GX-13 is admitted.

 4    BY MS. KANOF:

 5    Q.   The starting with the e-mail chain at the very bottom, is

 6    that an e-mail from Mr. Ueki?

 7    A.   Yes, uh-huh.

 8    Q.   Okay.  And that's to who?

 9    A.   It was to Hector Ponce.

10    Q.   And go ahead and read it.

11    A.   Thank you very much for your support on this project.  As I

12    mentioned before, Hasegawa-san will be back in the office

13    December 28th.  Could I expect to receive some parts of the

14    English version of the prime agreement by them?

15    Q.   Okay.  So Mr. Ueki, does he speak English?

16    A.   Yes.

17    Q.   Does he speak Spanish?

18    A.   Uh, I don't believe so.

19    Q.   Mr. Ponce, does he speak Japanese?

20    A.   Yes.

21    Q.   Because he's referred to Ponce-san, so...

22    A.   Yes.

23    Q.   And so the next e-mail in this chain, if you'll note

24    Christmas Eve, December 24th of 2009, and it appears to be from

25    Hector Ponce to Marco Delgado, correct?

1    A.    Correct, uh-huh.

2    Q.    And what is Mr. Ponce telling Mr. Delgado?

3    A.    He needs a copy of the prime agreement and the payment and

4    the critical dates, annexes by today.  He has to put a summary

5    together for Monday morning for a request for Mr. Ueki and

6    Mr. Hasegawa.

7    Q.    Okay.  Who is Mr. Hasegawa?

8    A.    Hasegawa-san was the President.

9    Q.    Of Mitsubishi Power Systems Americas?

10   A.    Mitsubishi Power Systems Americas, yes.

11   Q.    Here in the United States?

12   A.    Yes, uh-huh.

13   Q.    And how does an e-mail have you come to know is Mr. Delgado

14   [sic]?

15   A.    (Nodding head affirmatively.)

16   Q.    Is that is yes or a no?

17   A.    Yes, uh-huh.

18   Q.    Okay.  And how does he respond?

19   A.    He was in a hurry.  They were verifying, so he was in a

20   hurry to fly back.  He will call.  And then he responds back

21   that he needs, you know, verification of the equipment and so he

22   ignored the request.

23   Q.    That was my question.  Does he even address the fact that

24   the President and Vice President of Mitsubishi Power Systems

25   Americas would like a copy of the prime agreement and payment

1    and critical dates?

2    A.   He totally ignored it.

3    Q.   Instead what does he talk about?

4    A.   Providing certification and verification of where the

5    equipment is.

6    Q.   Okay.  You've been in this business how long?

7    A.   36 years.

8    Q.   Why would someone request a certification of the existence

9    and their location after a contract has just been signed?

10   A.   It's a good question.  I have no idea.

11   Q.   Ever seen that before?

12   A.   I have not, other than to go inspect it, maybe, but I have

13   no idea, yeah.

14   Q.   Had there been a request for inspection yet at this time?

15   A.   Not that I recall.

16   Q.   Okay.  Let me show you Government's Exhibit Number 14.

17   A.   Uh-huh.

18   Q.   I have to show the exhibit number first, so you can verify.

19   Is this Government's Exhibit 14?

20   A.   Yes, it is.  Uh-huh.

21   Q.   And do you recognize that it's an e-mail to you from Hector

22   Ponce, copied to Mr. Delgado?

23   A.   Yes, to me, and yes.  Uh-huh.

24        MS. KANOF:  Government moves to admit Government's

25   Exhibit Number 14.

```
 1              THE COURT:  Ms. Franco?

 2              MS. FRANCO:  No, objection.

 3              THE COURT:  GX-14 is admitted.

 4   BY MS. KANOF:

 5   Q.   Okay.  Mr. Ponce is now -- this is four days later.

 6   Initially Mr. Ponce writes to Mr. Gireud, what?

 7   A.   Let me just read it again and remind myself.

 8              Oh, again, he's asking, please give us the

 9   documentation.  The failure -- it's a significant concern that

10   we haven't gotten the requested documentation, well, the

11   contract.

12   Q.   Okay.  And there's a letter that's attached to this.  Is

13   that correct?

14   A.   Yes.

15   Q.   And the letter is forwarded from Hector to both Mr. Gireud

16   and to Mr. Delgado, correct?

17   A.   Correct.

18   Q.   Okay.  Now, with regard to the letter, what is the date?

19   A.   December 28th, 2009.

20   Q.   And is the letter from you?

21   A.   Yes, it is.

22   Q.   Do you recall writing this letter?

23   A.   Yes, I do.

24   Q.   And why did you write this letter?

25   A.   We were very concerned.  Again, we were not getting any
```

1    confirmation of the contracts.  We were not getting any

2    information.  We were not getting good communication.  And we

3    were very worried that -- where this contract was headed, that

4    it was, you know, we were not working together per the teaming

5    agreement.

6    Q.   So on the 24th on Christmas Eve, there's an e-mail wanting

7    to know the location of the equipment, correct?

8    A.   Correct.

9    Q.   And four days later, there's this letter from you, correct?

10   A.   Correct.

11   Q.   And the letter begins about you being very concerned for

12   failure of Mitsubishi providing information, correct?

13   A.   Correct.

14   Q.   And then what are you specifically suspicious about?

15   A.   That they were in such a quick hurry to go look at this

16   equipment and why would they want to do that, what was -- what

17   were they trying to do over the holiday, why -- what was the

18   reason all of a sudden that they needed to go do that.

19   Q.   And also you addressed, in that first paragraph, the

20   failure to provide the prime contract documentation?

21   A.   Correct.

22   Q.   So let's talk about the inspections first.  When our --

23   when is equipment usually inspected?

24   A.   Usually right before it ships.  That's the typical time for

25   it.

DIRECT EXAMINATION ADAMS                                          287

1    Q.   Was this right before it was going to ship?

2    A.   No.  This was six months before it was going to ship.

3    Q.   And who usually inspects it?

4    A.   Usually, you would have an engineering firm go out and look

5    at it in detail and get a good look to make sure that it is in

6    accordance to what it's supposed to be.

7    Q.   Okay.  Would it be inspected before -- this is gray market

8    equipment, correct?

9    A.   Correct.

10   Q.   And does gray market equipment have to be refurbished

11   before it was shipped?

12   A.   Yes, that's why it took some period of time before we

13   shipped it there.  As part of our contract, we wanted to make

14   sure that we had to give a warranty.  By giving a warranty, all

15   of the equipment stored was still in workable condition.

16   Q.   With regard to the -- this inspection, would they want to

17   inspect it after it's been refurbished or before it's been

18   refurbished?

19   A.   Certainly after would make more sense.

20   Q.   And of course refurbishing had not begun?

21   A.   Not begun, no.

22   Q.   Okay.  What are you especially concerned about?

23   A.   About them going ahead and continuing to negotiate and not

24   coordinating with us what was going on and not -- negotiating

25   beyond what we had offered in our proposal without our consent

1    or agreement.

2    Q.   Are you referencing that this is an ongoing problem, that

3    it occurred during the bid process as well?

4    A.   Yes.  Again, we were specifically hoping and expected to

5    see that proposal.  We didn't and we were worried that they were

6    continuing to do discussions and negotiations outside of the

7    teaming agreement and proposal.

8    Q.   So as a result, are you asking for them to give you certain

9    documents?

10   A.   Yes, uh-huh.  We requested documents from before.

11   Q.   Okay.  So let's look at number one.

12   A.   Yeah, the -- we -- at that point, when they very much

13   jumped out and said, hey, we need to go see your equipment at an

14   odd time, it triggered us to think, well, what could be going on

15   here.  And that was the first time that we had considered that,

16   you know, they might be trying to put equipment that they didn't

17   own up as collateral and that's what we were starting to get

18   suspicious about at that time.

19   Q.   Who is we?

20   A.   Me and M.P.S.A. team; Hector, myself and the other

21   commercial people.

22   Q.   Okay.  And why were you -- you were suspecting what?

23   A.   Well, we were asking -- you know, there were questions back

24   and forth on the prime contract and letters of credit.  There

25   was allusions that they were supposed to bring whatever

1    financing and letters of credit were required.  They were not

2    able to show us their prime documents.  They were trying to get

3    the letters of credit.  And then all of a sudden out of the

4    blue, we get this, hey, let's go look at equipment request, and

5    it made us wonder, well, why would you do that now.  So it kind

6    of triggered some suspicion.

7    Q.   The next sentence -- okay.  So the next sentence is this is

8    unacceptable to M.P.S.A.?

9    A.   Yeah.  It's again, as a company, we were not going to give

10   our equipment as collateral.  We were not going to ship our

11   equipment.  We were not going to give anybody any rights to that

12   equipment, not until it was paid for.

13   Q.   Therefore, please confirm that Mitsubishi's equipment is

14   not being negotiated or offered to anyone as collateral,

15   correct?

16   A.   Correct.

17   Q.   Okay.  So I want to go back to the top, to the e-mail.

18   A.   Uh-huh.

19   Q.   And Mr. Ponce is sending this to who?

20   A.   To Fernando and copying me as well and copying Marco and

21   then all of the Japanese management as well.

22   Q.   Did you get an e-mail after you sent this to Mr. Gireud or

23   for Fernando saying, what do you mean, you promised we could

24   pledge you the equipment?

25   A.   Did not.

1    Q.   Did you ever get any kind of communication arguing with you

2    that when you were in Mexico you promised to pledge the

3    equipment?

4    A.   I did not.

5    Q.   And number two:  Related to the above, what are you telling

6    them?

7    A.   It's their responsibility to provide those letters of a

8    credit for the prime equipment, for the equipment prime

9    contract.  We were not going to do that.

10   Q.   And what are you requesting?  Please provide?

11   A.   Show us a copy of that, so you can show that you've done

12   it.

13   Q.   I'm looking for my pointer.  I can't find it.

14        Please provide a copy of the equipment letter.

15   L.O.C., does that stand for letters of credit?

16   A.   Letters of credit, yes.

17   Q.   As evidenced that this arrangement has been made without

18   liens or restrictions on Mitsubishi's equipment?

19   A.   Correct.

20   Q.   So let me ask you, are you saying, well, what we're really

21   just concerned about is that title does not change to our

22   turbines.  It's okay to pledge it, just as long as title doesn't

23   change?

24   A.   No.  No, we were not going to allow any -- for that

25   equipment to be used as collateral in any way.  We -- you know,

1    it's not our contract.  We had no obligation and we had no

2    intent and we weren't going to do it.

3    Q.   And you were selling it for $106 million?

4    A.   Yes.

5    Q.   Would you ever pledge $106 million for $20-million

6    valued --

7    A.   Absolutely not.

8    Q.   Does that even make good business sense?

9    A.   Doesn't make sense.  It's not something we would be allowed

10   to do and we would never do it.

11   Q.   In your own personal business life, would that make any

12   kind of sense?

13   A.   Doesn't make any sense.

14   Q.   Okay.  And then number three -- oh, here it is -- finally

15   provide what?

16   A.   A complete copy of the prime contract, again, for

17   finalization of our equipment supply contract, so that we could

18   make sure that it matched up.

19   Q.   Okay.

20        MS. KANOF:  I'm sorry, Your Honor.  I can't get the

21   mouse to work.

22        THE COURT:  It's because it's 6 o'clock.

23        MS. KANOF:  The mouse tells better time than I do.

24        THE COURT:  Let's go ahead -- can we break here or do

25   you want --

1           MS. KANOF:  Yes, absolutely.

2           THE COURT:  All right.

3           Ladies and gentlemen of the jury, we'll recess for the

4    evening.  Please remember the instructions I gave you yesterday

5    about not discussing the case with any of your family members or

6    friends or even amongst yourselves.  And with that, we'll see

7    you tomorrow morning at 9 o'clock.  We're in recess till

8    tomorrow at 9 o'clock.

9           COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

10          (Jury recessed.)

11          THE COURT:  Mr. Adams, if you would be back at 9:00

12   tomorrow morning please.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Thank you, sir.  We're in recess until

15   then.

16          (Proceedings conclude for the evening.)

17                               *  *  *

18

19

20

21

22

23

24

25                           *  *  *  *  *

1          I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.  I

3    further certify that the transcript fees and format comply with

4    those prescribed by the Court and the Judicial Conference of the

5    United States.

6    Signature:/S/KATHLEEN A. SUPNET         December 31, 2018
             Kathleen A. Supnet, CSR         Date
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25