```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF TEXAS

 3                        EL PASO DIVISION

 4                        VOLUME 11 Of 20

 5

 6    UNITED STATES OF AMERICA          EP:13-CR-0370-DG

 7    v.                                EL PASO, TEXAS

 8    MARCO ANTONIO DELGADO             September 14, 2016

 9
                          STATEMENT OF FACTS
10              THE HONORABLE DAVID C. GUADERRAMA
                     UNITED STATES DISTRICT JUDGE
11

12

13    APPEARANCES:

14    For the Government:  Debra Kanof
                           Anna Arreola
15                         Luis Gonzalez
                           Assistant United States Attorney
16                         700 East San Antonio, Suite 200
                           El Paso, Texas 79901
17
      For the Defendant:   Maureen Franco
18                         Erik Hanshew
                           Assistant Federal Public Defender
19                         700 E. San Antonio, Suite 410
                           El Paso, Texas  79901
20
      Court Reporter:      Kathleen A. Supnet
21                         El Paso, Texas
                           (915)834-0573
22                         kathi.supnet5303@gmail.com

23

24         Proceedings reported by mechanical stenography,

25    transcript produced by computer-aided software and computer.
```

```
1                        CHRONOLOGICAL INDEX

2                         VOLUME 11 OF 20

3    September 14, 2016                          PAGE   VOL.

4    GOVERNMENT'S
     WITNESS TESTIMONY      DIRECT     CROSS     VOIR DIRE      VOL.
5
     ADAMS, JOHN MICHAEL    3,136     105,144    --            11
6    DAVILA, IRAIS          149       --         --            11
     GIREUD, FERNANDO       160       --         --            11
7
     Court Reporter's Certification . . . . . . . . . 298      11
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN A. SUPNET, CSR

 1                    (Open court.  Defendant and counsel present.)

 2                    (Jury not present.)

 3                    THE COURT:  Is there anything we need to take up

 4       before we have the jury come in?

 5                    MS. FRANCO:  No, Your Honor.

 6                    MS. KANOF:  No, Your Honor.

 7                    THE COURT:  Let's bring them in.

 8                    COURTROOM SECURITY OFFICER HEIDTMAN:  Yes, sir.

 9                    (Jury present.)

10                          JOHN MICHAEL ADAMS,

11             DIRECT EXAMINATION CONTINUED BY THE GOVERNMENT

12       BY MS. KANOF:

13       Q.   Good morning, Mr. Adams.  You understand you are still

14       under oath?

15       A.   Yes, I do.

16       Q.   Yesterday we were talking, I think, about the December 28th

17       letter that you wrote to F.G.G., specifically to Mr. Gireud

18       copied to Mr. Delgado, concerning your concerns.  Do you recall

19       that?

20       A.   I do, yes.

21       Q.   Okay.  Now, let me draw your attention to some other

22       exhibits.  First let me draw your attention to Government's

23       Exhibit Number 94, which has already been marked and admitted

24       into evidence.  This -- I'm sorry, this has not been admitted

25       yet into evidence, but if you could take a look at Government's

```
 1   Exhibit Number 94.
 2           And at this time February 25th of 2011, were you still
 3   at Mitsubishi?
 4   A.   Yes, I was.
 5   Q.   2011?
 6   A.   I'm sorry.  2011, I was not.  2010, I left.
 7   Q.   Let's go back and reestablish.  When did you leave
 8   Mitsubishi?
 9   A.   Middle of April, 2010.
10   Q.   Okay.  You said yesterday that you gave them a lot of
11   notice.  When did you tell Mitsubishi that you were planning on
12   taking a different job?
13   A.   It was early March of 2010.
14   Q.   Okay.  And then you didn't leave -- about how many weeks in
15   advance?
16   A.   Roughly, four to five weeks' notice.
17   Q.   When you left in April, had Mitsubishi yet learned that
18   their equipment had been pledged in lieu of the letters of
19   credit?
20   A.   No, we had not.
21   Q.   Okay.  And so when you left, there was -- did you
22   subsequently learn that that happened?
23   A.   I did after we got into reviewing records in the trial.
24   Q.   That's when you learned?
25   A.   Yes, uh-huh.  Yeah.
```

1    Q.   Okay.  So with regard to this e-mail, if you could just

2    look at the information contained therein.  And I know it's an

3    internal e-mail between employees of F.G.G., but just to refresh

4    or to learn about some information about you, that was alleged

5    about you, starting with this portion?

6    A.   So during John's visit negotiations --

7    Q.   Don't read it out loud.  It's not in evidence.  Read it to

8    yourself.

9    A.   Got it.

10   Q.   Okay.  Now, I'm going to show you Government's EXHIBIT

11   Number 96.  And this has been marked and admitted into evidence.

12   I just want --

13          MS. KANOF:  It has not?  How about 97?

14          THE COURT:  97 has.

15   BY MS. KANOF:

16   Q.   Government's Exhibit Number 97, marked and admitted into

17   evidence.

18          MS. KANOF:  If you would publish it, please.  Thank

19   you.

20   BY MS. KANOF:

21   Q.   Okay.  The bottom of this e-mail that was written on

22   February 28th of 2011 from a Mr. Mace Miller, do you know who

23   Mace Miller is?

24   A.   Yes, I know Mace.

25   Q.   Who is he?

1    A.   He was one of the F.G.G. people that were partnered with

2    F.G.G., part of the F.G.G. organization.

3    Q.   Did you meet with him?

4    A.   I had met him one or two times, yes.

5    Q.   I think yesterday you testified that the initiation of this

6    project you had flown to Ft. Worth to meet with Rick Williamson.

7    Was Mr. Miller at that meeting?

8    A.   I believe he was, yes.

9    Q.   Okay.  And you may have met with him how many other times?

10   A.   Maybe one or -- one other time, I believe.

11   Q.   But your communication concerning this project, when you

12   had to communicate with F.G.G., who did you communicate with?

13   A.   Mostly Fernando.  Sometimes Mace was copied on some of the

14   letters that went -- or e-mails back and forth, but Fernando was

15   the prime.

16   Q.   And how about Mr. Delgado?

17   A.   He was also copied on some of the e-mails as well, too.

18   Q.   With regard to this e-mail, it -- from Mr. Miller, if you

19   could read "as reflected," beginning in the first paragraph,

20   particularly the representations about your knowledge, starting

21   "as reflected."

22   A.   So as reflected by records and copy of this C.F.E.-F.G.G.

23   Agua Prieta contract in your possession, pursuant to John Adams'

24   request and final approval, said equipment was pledged with a

25   clear understanding that M.P.S.A. is the sole owner of the title

1    to the equipment until receipt of payment in full.

2    Q.    Okay.  So as reflected by your records, he's referring --

3    what records is he referring to when he's saying "Dear Kevin"?

4    A.    "As reflected by your records, Dear Kevin..."

5    Q.    Who is Kevin?

6    A.    Kevin of course is Kevin -- Kevin Beddard was the project

7    manager for this project that took over.

8    Q.    Okay.  And he's saying that your records would reflect,

9    meaning Mitsubishi's records would reflect, that you, Mr. Adams,

10   request and final approval -- that you requested and had a final

11   approval that the equipment would be pledged?

12   A.    Yeah, that's what it reads, yes.

13   Q.    Is that true?

14   A.    That's not true at all.

15   Q.    What records would have existed?

16   A.    None.  There were none that I know of, because we didn't

17   pledge the equipment.

18   Q.    Okay.  Then it says, "During John's visit and negotiations

19   with C.F.E., prior to final execution of the contract," did you

20   visit and negotiate with C.F.E. for a contract?

21   A.    Never had any negotiations at all or any contract with

22   C.F.E.

23   Q.    Did you have a contract with C.F.E.?

24   A.    We did not, no.

25   Q.    And yesterday you testified that you submitted information

1    to F.G.G. to include in the contract; is that correct?

2    A.   Yes, we did, to include in their contract, correct.

3    Q.   I'm going to bring your attention to I think it's

4    Government's Exhibit -- I'll come back to this -- but

5    Government's Exhibit Number 23.  Take a look at it.

6              Do you recognize this as your passport?

7    A.   Yes, I do.

8    Q.   What is your date of birth?

9    A.   July 24th, 1958.

10   Q.   I know it's blacked out I guess because we have to do it by

11   law, but 19 what?

12   A.   '58.  Uh-huh.

13   Q.   And you -- we asked you to provide copies of your passport

14   for this; is that correct?

15   A.   Yes.

16   Q.   And you don't have to use your passport to go to Mexico,

17   correct?

18   A.   I think you do now, yes.

19   Q.   In 2009, when this contract was being negotiated, did you

20   have to use your passport?

21   A.   I don't recall.  I don't believe we did, but I would have

22   had it with me in any event.

23   Q.   Did you have to use your passport to go to Japan?

24   A.   Yes.

25   Q.   And when you went to Japan, did you usually go through

1    Korea?

2    A.   No.

3    Q.   Did you also go to Korea during that time?

4    A.   I believe I did, uh-huh.

5         MS. KANOF:  Your Honor, we'd move admission of

6    Government's Exhibit Number 23.

7         THE COURT:  Ms. Franco?

8         MS. FRANCO:  No, objection.

9         THE COURT:  GX-23 is admitted.

10   BY MS. KANOF:

11   Q.   Back to Government's Exhibit Number 97.  And this e-mail to

12   Kevin from Mr. Miller, it states, of course, that you

13   participated.

14        Now let's assume for a minute -- it doesn't say what

15   contract, so let's assume for a minute that the contract is the

16   subcontract.  Did you participate in the drafting or signing of

17   the subcontract.

18   A.   I did not, no.

19   Q.   Did you participate in the drafting or the signing of the

20   first amendment to the subcontract?

21   A.   No, I did not.

22   Q.   So the only thing you participated in as far as

23   contracting-like-documents was what?

24   A.   The proposal that we put together was the main focus for

25   us, putting together the proposal and then any of --

1    Q.   The proposal that you submitted to F.G.G. and asked to be

2    included?

3    A.   Yeah, the proposal that we submitted to F.G.G. and then any

4    associated clarifications that would go with it.

5    Q.   Okay.  And the teaming agreement?

6    A.   The teaming agreement as well, uh-huh.

7    Q.   But anything directly with C.F.E.?

8    A.   Not at all, no.

9    Q.   For further reference and clarification on any and all of

10   the technical, administrative or financial agreements related to

11   the Agua II project, please refer to the copies of the final

12   agreement and its attachments that were -- this is crazy --

13   copies of the final agreement.  In the context of this e-mail,

14   what final agreement are they talking about?

15              MS. FRANCO:  Objection, Your Honor.  Calls for

16   speculation.

17              MS. KANOF:  That's exactly right.

18              THE COURT:  I'm sorry?  I'm going to sustain that

19   objection, unless he spoke to Mace or something.  I'm not sure

20   so I'm sustaining the objection.

21   BY MS. KANOF:

22   Q.   Can you even tell what agreement he's talking about?

23   A.   No, I can't really at all.

24   Q.   Okay.  Were approved and signed page by page by John Adams

25   in his capacity of a Mitsubishi officer in charge of the project

```
 1   and Mitsubishi Agent Hector Ponce.
 2          You said you hired Hector Ponce as a consultant in
 3   this case?
 4   A.   Yes.
 5   Q.   Would he have authority as a consultant to sign a contract
 6   on your behalf?
 7   A.   No, he would not.
 8   Q.   Yesterday I showed you the prime contract.  Did you
 9   recognize whether your initials were on any page?
10   A.   My initials are not on any page.
11   Q.   Your initials, were they on any page of the teaming
12   agreement?
13   A.   They were not.
14   Q.   Were your initials on every of the subcontract?
15   A.   They were not.
16   Q.   Were your initials on every page of the first amendment to
17   the subcontract?
18   A.   No, not at all.
19   Q.   Were Mr. Ponce's on any of those either?
20   A.   Not that I can tell.  And I've seen his initials before and
21   they weren't there.
22   Q.   And did Mr. Ponce sign any of the contracts?
23   A.   No.
24   Q.   Was Mr. Ponce with you any time you met with C.F.E.
25   officials?
```

1    A.   I believe he was.  Well, there were two visits for me to

2    Mexico and he was with me the second visit for sure.  I cannot

3    recall.  The first visit was way, way before the proposal and I

4    do not believe he was with me.  I cannot recall exactly if he

5    was with me or not through that whole thing.

6    Q.   What was the purpose of your two meetings with C.F.E.?

7    A.   The first one was prior to the proposal just to get to know

8    them, and then this second one was in an around when the

9    proposal was submitted and again more just to get to know who

10   some of the people would be should we execute the contract.

11   Q.   Okay.  And the last line of the first paragraph:  After

12   approving the scope of the same and received a copy with all of

13   the attachments.  Did you ever get a chance to see the contract

14   before it was submitted?

15   A.   No, we did not.

16   Q.   Or the proposal before it was submitted?

17   A.   We did not.

18   Q.   So did you ever approve the scope of the same?

19   A.   We did not, no.

20   Q.   And did you receive a copy with all of its attachments from

21   my C.F.E. counterparts?

22   A.   No, not at all.  Not from C.F.E., no.

23   Q.   Okay.  Do you know who Mace Miller's C.F.E. counterparts

24   are?

25   A.   I have no idea, no.

1   Q.    Did you ever receive any contractual documents from C.F.E.?

2   A.    Nothing from C.F.E. directly at all.

3   Q.    Okay.  With regard to -- let me keep on going down this

4   particular line.

5            MS. KANOF:  Government's Exhibit Number 98.  98 has

6   been admitted into evidence?

7            THE COURT:  Yes, it has.

8   BY MS. KANOF:

9   Q.    In Government's Exhibit Number 98, Mr. Delgado -- first,

10  Mr. Beddard asks Mr. Mace Miller or states that he finds the

11  e-mail confusing and vague, but then there is a requirement that

12  documents be provided, a copy of the specific document that

13  states F.G.G. claims contains John Adams' requests and final

14  approval that the Mitsubishi equipment be pledged.  Is that

15  correct?

16  A.    It's not correct that I gave that request or final

17  approval, no.

18  Q.    Okay.  And Mr. Delgado responds:  If Mitsubishi agrees or

19  not that there's a problem.  Please refer to John Adams' signed

20  copy of the contract.  Again, the only thing you signed was...

21  A.    The teaming agreement.

22  Q.    And the teaming agreement, did it have anything about a

23  pledge in it?

24  A.    Did not.  It did not at all.

25            MS. KANOF:  Government's Exhibit Number 103, which has

1    been admitted into evidence?

2            THE COURT:  Yes, it has.

3    BY MS. KANOF:

4    Q.   With regard to Government's Exhibit Number 3?

5            THE COURT:  Did you say 3 or 103?

6            MS. KANOF:  103.

7    BY MS. KANOF:

8    Q.   A request has been made for records, the copies of where

9    you approved of something, and now on March 7th of 2011,

10   Mr. Delgado responds to Mr. Beddard regarding you maybe verbally

11   having consented.  If you will look at the top portion of this:

12   Thank you for following up with John.

13           Do you recall getting any kind of a phone call or

14   anything from Mr. Beddard?

15   A.   Along those -- sometime post to me leaving Mitsubishi,

16   Kevin did call and just ask something along the ways of:  Did

17   you give a pledge?  And I said, absolutely not.

18   Q.   Okay.  And so earlier, Mr. -- attached to this e-mail by

19   the way, was your December 28th letter, and they're

20   acknowledging that that December 28th letter was regal I guess.

21           Given the time which has elapsed, I can only imagine

22   he has forgotten the various conversations surrounding the

23   topics.  Mr. Adams, would you forget a conversation about allow

24   F.G.G. to pledge $106 million worth of Mitsubishi equipment?

25   A.   I would not have forgotten that, no.

1    Q.    Just as what I have been told, he forgot C.F.E. provided

2    him with an entire copy of the contract and all of its

3    attachments.  Would you forget that as well?

4    A.    No, I would not forget that.  It would have been a fairly

5    large document.  I would not have forgotten.

6    Q.    Fortunately, two of the key conversations took place as

7    part of a conference call.  Now we have a conference call with

8    C.F.E. officials participating.  Do you ever recall a conference

9    call with C.F.E. officials participating, where you told C.F.E.

10   officials that F.G.G. could pledge your equipment?

11   A.    No, it didn't happen.  Not at all.

12   Q.    Did you ever have a conference call with Mr. Delgado and

13   C.F.E. officials?

14   A.    Not that I can recall at all.

15   Q.    Do you speak Spanish?

16   A.    Very little.

17   Q.    Would you speak Spanish sufficiently to have a conference

18   call where you were discussing a pledge of Mitsubishi equipment?

19   A.    No, not at all.

20   Q.    And then further the representation in this e-mail:  During

21   our visit of next week, I'll make it a point to discuss the

22   issue and see if their recollection varies from that of John.  I

23   will also work on getting copies of e-mails, John's e-mails,

24   regarding this issue.

25         Are there any e-mails --

1    A.   No, not that --

2    Q.   -- that you sent anywhere?

3    A.   Not that would give -- not at all that would give a pledge

4    in any way.

5    Q.   Are there e-mails saying they cannot pledge the equipment?

6    A.   Yes, there are.

7    Q.   Okay.

8         MS. KANOF:  Government's Exhibit Number 109, which I

9    believe has been admitted into evidence?

10        THE COURT:  Yes, ma'am.

11   BY MS. KANOF:

12   Q.   In Government's Exhibit Number 109, Mr. Beddard writes --

13   referring to the March 21st, e-mail, and in this take one he --

14   he responds and says that Mitsubishi did not authorize F.G.G. to

15   pledge the equipment.  Is that a correct statement?

16   A.   Yes, it is.

17   Q.   In any manner or form?

18   A.   (No response.)

19   Q.   Then it says, much less consent to or approve F.G.G.'s

20   misrepresentation made in writing and before a Mexican notary

21   public.  Okay.  Do you ever recall appearing before a Mexican

22   notary public?

23   A.   I've never appeared before a notary public in Mexican.

24   Q.   In El Paso, Texas?

25   A.   It's my first visit to El Paso.

1    Q.   Okay.  There's a U.P.S. office on a street called North

2    Mesa, the corner of North Mesa and Resler in El Paso, Texas.

3    Have you ever been to that U.P.S. store?

4    A.   I've never been there either.

5    Q.   Have you ever met a young lady by the name of Irais Davila?

6    A.   Not at all.

7    Q.   Then Mr. Beddard goes on and -- and when Mr. Beddard -- is

8    this after he spoke to you on the phone and got your assurances?

9    A.   I believe it was.  I don't have the time line, but I

10   believe it should have been, yes, uh-huh.

11   Q.   And then he makes the accusation that F.G.G. pledged the

12   equipment without their consent; is that correct?

13   A.   Correct.  Uh-huh.

14   Q.   As you know and have known all of this time this is

15   absolutely false, is that the position that Mitsubishi has

16   always taken?

17   A.   Yes, it is.

18   Q.   And then there was a request made that they clarify with

19   C.F.E. that no permission was had; is that correct?

20   A.   Correct.

21   Q.   More important number four:  F.G.G. has claimed to have

22   documentation executed by Mitsubishi in addition to e-mails and

23   hand notes, which purportedly proved that Mitsubishi assumed

24   obligations other than those contained in our subcontract.

25   Okay.  We -- you looked at Greg Wunder's little handwritten

1    that -- did that approve anything other than what was in the

2    subcontract?  What was the purpose of that addendum?  And I can

3    show it to you.

4    A.   Yeah, the purpose of that was because the subcontract

5    wasn't conformed to what the actual scope of supply and all of

6    the clarifications were, Mr. Wunder kept that open, tried to

7    keep the contract open such that it with be amended, so that it

8    would match the equipment that we had, so it was meant to

9    protect Mitsubishi to be able to have it match the offer that we

10   made in the proposal.

11   Q.   Did -- if you recall, and I can put the exhibit up for

12   you -- did that handwritten note by Greg Wunders say -- well

13   first of all, was it written by you?

14   A.   Was not.

15   Q.   Would Greg Wunder have had the authority to pledge $106

16   million worth of Mitsubishi equipment?

17   A.   He would not have.

18   Q.   And did it say anything about pledging equipment?

19   A.   It did not, no.

20   Q.   Other than that handwritten note, when you left Mitsubishi,

21   did you leave anything that was significant or important of your

22   documents regarding all of your projects?

23   A.   When -- I left all of the documents that I had with

24   Mitsubishi.

25   Q.   Did you make any handwritten notes about pledging the

1    equipment?

2    A.   No.

3    Q.   If you had, would you have left them behind in the file?

4    A.   If I had, I would have left them behind.

5    Q.   Okay.  Mitsubishi has repeatedly asked for the copies of

6    the documentation and has constantly refused -- F.G.G. has

7    constantly refused to provide it using all sorts of excuses.

8         Do you recall whether Mr. Beddard asked you about

9    handwritten notes and e-mails?

10   A.   I don't recall.  I don't recall when he asked for that.  He

11   did ask if we had pledged and I said absolutely not, so...

12   Q.   Okay.  Now, with regard to government's exhibit -- I'm

13   going to pull up the English, number 40A.  On -- you had written

14   some letters, and we'll get back to January 10th and January

15   12th in a minute -- but on January 13th, did you receive a

16   letter, marked Government's Exhibit 40, and this one is in

17   English, 40A, from Fernando Gireud?

18   A.   Yes, I believe I did.

19   Q.   And the letter was actually written in English, correct?

20   A.   Yes.

21   Q.   And that's because you dealt with F.G.G. in English?

22   A.   Yes, uh-huh.

23   Q.   Okay.

24        MS. KANOF:  We move that Government's Exhibit 40 and

25   40A be admitted into evidence.

1          THE COURT:  Ms. Franco?

2          MS. FRANCO:  Your Honor, I don't believe that -- I'm

3    sorry -- unless I'm looking at a different one, that this was a

4    correspondence that Mr. Adams received or sent.

5          MS. KANOF:  I'm looking at the attachment, the letter.

6          MS. FRANCO:  But your 40A includes the e-mails, right?

7          MS. KANOF:  It's the transmission e-mail that says

8    J. A. letter to -- A. meaning John Adams letter.  Here is the

9    response to John Adams' letter.

10          THE COURT:  So you just want to admit that, this

11   letter the one you --

12          MS. KANOF:  At this time.  That's fine, Your Honor.  I

13   can just do it at this time.

14          THE COURT:  All right.

15          MS. KANOF:  Mr. Ponce is going to testify, so we can

16   leave the actual transmittal e-mail subject to his testimony.

17          THE COURT:  All right.

18          Any objection to just the letter?

19          MS. FRANCO:  That Mr. Adams received this letter?  Did

20   he testify to that?  I'm sorry, Your Honor.

21          THE COURT:  You see the letter there, Mr. Adams?

22          THE WITNESS:  I do.

23          THE COURT:  You actually received that letter?

24          THE WITNESS:  I believe I did, yes.

25          MS. FRANCO:  No, objection, Your Honor.

```
 1                   THE COURT:  Okay.  So 40 and 40A --

 2                   MS. KANOF:  Oh, I think if I show him the untranslated

 3     one, he might -- I mean, the e-mail is the one that's in

 4     Spanish, but I think the actual original letter is in 40.  We

 5     just translated the transmittal, because Mr. Gireud was talking

 6     to Mr. Ponce in Spanish in an e-mail.

 7                   THE COURT:  Okay.

 8     BY MS. KANOF:

 9     Q.   Let me show you Government's Exhibit 40.

10                   MS. KANOF:  Same letter.  Doesn't make any difference.

11                   THE COURT:  And it's only the letter.

12                   MS. KANOF:  No, it's also the translation, but it's in

13     Spanish, so it's the original translation.

14                   THE COURT:  All right.

15                   So any objection to 40 or 40A, just the letter

16     portion?

17                   MS. FRANCO:  No, objection to just the letter portion.

18                   THE COURT:  All right.  So I'll admit that.

19                   MS. KANOF:  Since the letter is in English in both of

20     them, I'll go ahead and do 40.

21                   THE COURT:  So are you withdrawing 40A?

22                   MS. KANOF:  40A is just -- yeah, I'll withdraw 40A.

23                   THE COURT:  Just for the record, 40, the portion of

24     the letter is admitted.

25                   MS. KANOF:  Thank you, Your Honor.
```

1    BY MS. KANOF:

2    Q.    Okay.  So January 30th of 2010, did you receive a letter

3    through e-mail from Mr. Gireud?

4    A.    Yes.

5    Q.    Okay.  And yesterday -- well, we haven't yet talked about

6    your January 12th letter, but in this letter it said they were

7    responding to your January 12th letter; is that correct?

8    A.    Yes, uh-huh.

9    Q.    And we'll get back to this letter, but what I wanted to

10   point out and before we get to to your January 12th letter is

11   number five.  Do you know what the day of the pledge was?

12   A.    I do not, no.

13   Q.    Okay.  But number 5:  All conditions precedent and

14   obligations post bid award have been met by F.G.G.  Mitsubishi

15   will not be responsible for any letters of credit.

16            You had written a letter on November 22nd and a letter

17   on December 28th with your suspicions that they might pledge the

18   equipment.  Did this reassure you?

19   A.    Yes, it made us believe that they had taken care of the

20   letters of credit that were required for them.

21   Q.    At that time, did you know that Government's Exhibit Number

22   21 -- I'll show it to you -- did you -- I'm showing you a letter

23   dated January 10th of 2010 that purports to have your signature

24   on it.  Did you know this letter was in existence?

25   A.    I learned of this letter after the trial began.

1          MS. KANOF:  Your Honor, the government moves to admit

2    Government's Exhibit Number 21 and 21A.  The United States

3    received this letter from the P.G.R. and the Republic of Mexico

4    through the Mutual Legal Assistance Treaty as having been

5    derived from the records of C.F.E.

6          THE COURT:  All right.  I don't have 21A.

7          MS. KANOF:  It's just 21.  I'm sorry.

8          THE COURT:  Ms. Franco?

9          MS. FRANCO:  Subject to our earlier objection, Your

10   Honor.

11         THE COURT:  All right.  21 is admitted.

12   BY MS. KANOF:

13   Q.   Okay.  So this letter appears to be from you.  Did you

14   write it?

15   A.   I did not.

16   Q.   Okay.  How do you know that you didn't write it?

17   A.   Well, first off, it's not in the words that I would use.  I

18   would never say, you know, we have the desirability of pledging.

19   I mean, that's just not a business world -- word.  I would never

20   say desirability in one of my sentences.  So that's clearly not

21   my writing and not my idea of how I would write a letter.

22         And then very simply, I mean, there's no way that we

23   would be allowing, you know, the equipment to be pledged in lieu

24   of posting a letter of credit.  It was just not anything with --

25   I would have been fired if I had done such a thing.

1    Q.   Let's look at -- just before we go a little further, lets

2    look at a few different things.  It's signed Mitsubishi Power

3    Systems America and then it just -- oh, first of all, did you

4    have an electronic name stamp that you use on letters?

5    A.   I don't generally, so generally would sign them myself, so,

6    no, I do not.

7    Q.   And when you usually sign a letter, how do you end the

8    letter?  Do you say very truly yours?

9    A.   Always say very truly yours, sincerely or very truly yours

10   are my close and I would always close with some kind of a

11   statement like that.

12   Q.   And this doesn't have that kind of closure?

13   A.   It does not at all, no.

14   Q.   Okay.  Most important, do you usually put Mitsubishi Power

15   Systems Inc. before your signature?

16   A.   Never.  I would always put -- I would put John Adams.  I've

17   never put that before my signature.  It's not something that I

18   do.

19   Q.   So if we were to look at the other letters from you, we

20   would not find those words?

21   A.   You would not at all.  No, not before my signature.

22   Q.   And notably, this is a pretty -- this would be a fairly

23   significant notice.  You copy Eduardo Buendia.  Who is

24   Eduardo -- I'm sorry -- you are alleged to have copied, I

25   apologize -- Eduardo Buendia; is that correct?

1    A.   In this letter it appears this way, yes.

2    Q.   Let me go back.  Let's hypothetically say that you wrote

3    this letter and said you were going to pledge the equipment,

4    would that be sufficient to pledge your equipment anyway; just a

5    letter from you to F.G.G., would that be sufficient to pledge

6    $106 million worth of equipment?

7    A.   It would no, no.

8    Q.   Why?

9    A.   I would have needed permission.  I would have needed a

10   number of internal documents from Mitsubishi to give me any

11   rights or allowances to do such a thing and I did not have that.

12   Q.   And most times when you pledge some -- have you ever

13   pledged like say your house or something like that?

14   A.   Never have, no.

15   Q.   Okay.  And wouldn't you -- would you just send a letter and

16   say, yeah, okay, I pledge my equipment?

17   A.   No.  No, I wouldn't.

18   Q.   That's not your equipment?

19   A.   It's not mine.

20   Q.   Who is Eduardo Buendia?

21   A.   He was somebody from C.F.E. that we -- I'd heard the name

22   and I believe I met one time, but I can't recall exactly, but

23   it's not somebody I would normally send a letter to, no.

24   Q.   Did you ever send any other letter?

25   A.   No.

1    Q.    In fact, if a letter was being copied -- did you ever copy

2    a letter to anybody at C.F.E.?

3    A.    No.

4    Q.    Okay.  You didn't have a need or why didn't you?

5    A.    We didn't have a contract with them.  We didn't have a need

6    to do that.

7    Q.    And where would you even have gotten that name, Eduardo

8    Buendia?

9    A.    I would not have known it.

10   Q.    So do you even know his position at C.F.E.?

11   A.    No, I do not.

12   Q.    Do you know who the C.E.O. of C.F.E. was?

13   A.    I did not, no.

14   Q.    Do you know who the chief counsel of C.F.E. is?

15   A.    I do not.  No, I do not.

16   Q.    And then on the next line there's a copy to Mr. Delgado at

17   Delgado and Associates and to Hector Ponce.  Would you have put

18   them together on the same line?

19   A.    Absolutely not.  They would have been in different lines.

20   Q.    Why?

21   A.    They're different organizations.  Hector would have been

22   part of the M.P.S.A., so he would have had his own.  We would

23   have, you know copied the -- broke out the copy, the lines.

24   Actually, I wouldn't have done a copy-copy.  I would've done

25   copy for, you know, once -- only once, and it would have been

1    then one line for the Mitsubishi people and one line for the

2    other people, so it wouldn't have been copy-copy either.

3    Q.   Mr. Adams, did you have a secret reason to want to pledge

4    the equipment without anybody at Mitsubishi knowing about it?

5    A.   No, not at all.

6    Q.   Did you have a financial motive?

7    A.   No, not at all.

8    Q.   Were you to get a bonus for this project?

9    A.   No.

10   Q.   And gosh, was this project something -- well, you already

11   had an -- by January 10th, had you already had the offer from --

12   the more lucrative offer from the other company?

13   A.   Not yet, but I was in the process of looking at that point.

14   I knew that I would be leaving sometime later that year, but I

15   had not gotten the offer yet.

16   Q.   Would putting this three-turbine project on your resume

17   help you get that job?

18   A.   Not in any way, no.

19   Q.   Did you put this three-turbine project on your resume?

20   A.   No, I did not.

21   Q.   So any consequences to you personally for not getting this

22   project if it fell through?

23   A.   No, not at all.

24   Q.   Any consequences for you financially for this project going

25   through?

1    A.    No.

2    Q.    But from November 27th on, you recognized it was

3    problematic, the contract?

4    A.    Yes, I became more nervous about the contract, yes.

5    Q.    Okay.   Now, with regard to -- did you remember a guy named

6    Alanis?

7    A.    I somewhat remember a name, but I don't remember him, no.

8    Q.    Do you remember an individual by the name.   Nereo,

9    N-E-R-E-O, Vargas?

10   A.    I heard a name like that before, but I don't remember the

11   person at all.

12   Q.    Do you remember meeting the head or the -- effectively the

13   head of the Electrical Labor Union?

14   A.    I believe we did for a dinner one time, the first visit.

15   Q.    Did you make any promises to him about a pledge?

16   A.    No, not at all, no.

17   Q.    You don't even remember what his name was that was that it

18   was Nereo Vargas?

19   A.    No.

20   Q.    So let's look a little bit at this letter, the content of

21   the letter.

22          Mitsubishi has had a chance to review the desirability

23   of pledging its equipment instead of posting a letter of credit.

24   Well, did Mr. Mitsubishi ever have to post a letter of credit?

25   A.    No.   Our whole teaming agreement and the whole concept

1    under the contract was that we were not going to provide a

2    letter of credit.

3    Q.    So assuming you had written that would you have said,

4    instead of posting a letter of credit, or would you have put it

5    a different way?

6    A.    I would have -- yeah, I would have put it a different way.

7    I would not have said that.  We had -- we had no need to provide

8    a letter of credit.  Again, the wording on this is strange to

9    me.  It's not the wording that I would use, so...

10   Q.    Okay.  Would you have inserted F.G.G. in there?

11   A.    Yes, uh-huh.

12   Q.    And the initials L.C., would you have used the initials

13   L.C. or would you have used different?

14   A.    I would have probably used L.O.C., which is more typical

15   for us to use.

16   Q.    If we were to look at your other communications, would we

17   see you having used L.C.?

18   A.    Probably not.  I used L.O.C. or spelled it out letter of

19   credit.

20   Q.    Or spelled out the words letter of credit?

21   A.    Uh-huh, yes.

22   Q.    As discussed and agreed with C.F.E. officials, I know

23   you've said it, but now we're talking about this, if you had

24   made the representation in this letter, would it have been true?

25   A.    No.  I would not -- yeah, I have not discussed or -- with

1    C.F.E. officials.  That would not have been true.

2    Q.    During your past visit and subsequent phone conversations.

3    A.    There were no phone conversations with C.F.E.

4    Q.    And again I showed you those e-mails from Mr. Delgado in

5    responses from Mr. Miller and responses from Mr. Beddard

6    regarding these two issues and somehow that is in this letter,

7    but you are denying it; is that correct?

8    A.    Correct.

9    Q.    And decided to proceed with the pledge of the three

10   turbines that title will not be transferred until after final

11   payment is received.

12          Does that make a difference regarding the pledge?

13   A.    There's no pledge, so I think title transferring wouldn't

14   have made any difference.  There's -- again, it doesn't make

15   sense to me.

16   Q.    No material changes have been made to the draft of the

17   pledge agreement prepared by Fideicomiso, C.F.E. and reviewed

18   and approved by Mitsubishi, the pledge agreement.

19   A.    Never seen a pledge agreement a draft or otherwise.

20   Q.    Okay.  Well, let me not forget what exhibit this is,

21   because I got to get back to it.  21.

22          Let me show you the pledge agreement.  What language

23   does it appear to be in?

24   A.    This is Spanish.

25   Q.    Okay.  And it says you reviewed this?

1    A.   I had never seen it.

2    Q.   This is the first time you've ever seen it?

3    A.   I saw it in the documents while we were in the trial just

4    recently.

5    Q.   This is in Government's Exhibit Number 32.  So is there

6    anyway you would have reviewed this?

7    A.   No, not at all.

8    Q.   So somebody at Mitsubishi who speaks Spanish would have had

9    to review this, correct?

10   A.   If -- I'm sure nobody did though.

11   Q.   I understand that, but --

12   A.   Somebody would have, yes.

13   Q.   -- going back to your letter, Government's Exhibit 21,

14   going back to your letter, it says, pledge agreement prepared by

15   C.F.E., the Fideicomiso, C.F.E., and reviewed and approved by

16   Mitsubishi.  Okay.  Correct?  So for that letter to be accurate

17   somebody at Mitsubishi has to have reviewed it in Spanish?

18   A.   Correct, uh-huh.

19   Q.   And Hector Ponce speaks Spanish, correct?

20   A.   Correct, uh-huh.

21   Q.   So would Hector -- let's assume hypothetically that

22   Mitsubishi approved the pledge and Mitsubishi approved the

23   pledge agreement prepared by C.F.E., would Hector Ponce have

24   been the one to have read it in Spanish?

25   A.   I don't believe so.  Hector would not have done that

KATHLEEN A. SUPNET, CSR

1    without going to somebody else and having approval on it.

2    Q.   Is Hector Ponce a lawyer?

3    A.   He's not a lawyer and he's not authorized to approve

4    anything on behalf of M.P.S.A.  He was a contractor.

5    Q.   In order to allow -- in order to allow the pre-pledged

6    equipment inspection in France and Japan.  Okay.  So now we go

7    back to your December 28th, letter, correct?

8    A.   Correct, uh-huh.

9    Q.   And now that you're reading this letter, are your

10   suspicions in December 28th confirmed?

11   A.   Yes.  It confirms that there was more going on for those

12   visits than what we had anticipated at the end of the year of

13   that year.

14   Q.   Next paragraph.  Related to the above, Mitsubishi will not

15   transfer ownership or possession to F.G.G., but authorize F.G.G.

16   to pledge the equipment on its behalf as if it was its own.

17         Have you ever seen a business agreement in your

18   experience where you -- the company that you work for let an

19   intermediary that you had never worked with before pledge a

20   million-dollars worth of equipment as if its own?

21   A.   No, there's no way we would do this.  We would never let a

22   third party have any obligation or pledge to equipment that you

23   know they didn't own.  I mean we had no reason to.  We had no

24   contract with them, so we would never do that.

25   Q.   The next sentence:  Mitsubishi also authorizes F.G.G. as an

1    agent and representative of Mitsubishi?

2    A.    No.  We would not do that either.

3    Q.    Well, an agency relationship is a special kind of

4    relationship, correct?

5            MS. FRANCO:  Objection, Your Honor.  He's not a

6    lawyer, Your Honor.

7            THE COURT:  So your objection is?

8            MS. FRANCO:  Calls for speculation.

9            THE COURT:  Or opinion.  I'll sustain that objection.

10   BY MS. KANOF:

11   Q.    Well, you wrote this letter, didn't you?

12   A.    No, I did not.

13   Q.    So if you don't know what an Agent -- you are not a lawyer

14   are you?

15   A.    I'm not a lawyer, no.

16   Q.    So would you create an agency relationship, even though you

17   are not a lawyer, between Mitsubishi and F.G.G. in this letter?

18   Well, I can't ask you what you meant by it because you said you

19   didn't write it.

20   A.    I didn't write it and I wouldn't know what creating an

21   agent representative relationship would mean, so I would never

22   have done that.

23   Q.    What was F.G.G. to Mitsubishi?

24   A.    They were the buyer of our equipment and our teaming

25   partner through the proposal.

1  Q.   Okay.  So with regard to authorizing F.G.G. as an agent to

2  represent and to warrant and represent as it appears in the

3  pledge agreement -- this is now referring to a draft pledge

4  agreement -- did you ever see a draft pledge agreement?

5  A.   I never saw one, no.

6  Q.   That it is owner in possession -- that would be F.G.G. in

7  control of the turbines, the F.G.G. and the G.G.G. [sic] -- for

8  the exclusive purpose of perfecting the pledge?

9  A.   I don't know what that means.

10  Q.   Okay.  To post an L.C. again.  Would you have written L.C.?

11  A.   Would not, no.

12  Q.   Or any other financial guarantee to warrant completion of

13  the equipment prime to contract?

14  A.   Again, we wouldn't do that.  We had no party to the prime

15  contract, so we wouldn't pledge or do anything to warrant

16  completion of that prime.

17  Q.   And then, but allows -- is the last line --  but allows

18  F.G.G. to perfect pledge.  That's not exactly grammatically what

19  you have written --

20  A.   Again, I would not have written that.  I don't understand

21  what perfect pledge means.

22  Q.   And to make the necessary warranties and disclosures

23  without as Mitsubishi?

24  A.   Again, grammatically, I have no idea -- I would not have

25  written that.  That's not the way I write my business letters.

1    Q.   I notice that -- well, when you write a substantive letter

2    when Mitsubishi -- when you do it on behalf of Mitsubishi, do

3    you ever pass it on to anybody else?

4    A.   Yeah, if it's a big letter, any kind of letter that would

5    make any commitment, I would have to go up and beyond me to the

6    president and even in Japan for getting approval to do big

7    things.  Any proposal, for example, we would have the Japanese

8    review it, our parent review it.

9    Q.   And how many paragraphs -- let me just go back to it.

10            Attached to this document is something called an

11   (Spanish).  Again it came -- it's part of the same document that

12   came from the Mexican government.  And it's got the name of

13   somebody named Irais Davila, D-A-V-I-L-E [sic]; do you see that?

14   A.   I do, uh-huh.

15   Q.   And it says that that individual was acting as a notary

16   public for the State of Texas, correct?

17   A.   Correct.

18   Q.   And at the very bottom of the letter, there's a notary

19   stamp that has that same name, correct?

20   A.   Correct.

21   Q.   Notary public -- Irais Davila, notary public, State of

22   Texas with a date that her commission expired, correct?

23   A.   Correct.

24   Q.   On the right-hand side there's a signature that's

25   underneath which it says notary public with this -- a date that

1   has the expiration of the commission -- or with a date, correct?

2   And the date is June 30th of 2012.  Were you in El Paso on

3   June 30th of 2012?

4   A.   I was not, no.

5   Q.   Do you know where you were in 2012?

6   A.   Probably in Texas, but I don't know exactly.

7   Q.   Do you live in Texas?

8   A.   I do.  I live in Houston.

9   Q.   Okay.  And -- but I previously asked you if you had been in

10  the U.P.S. store on North Mesa and Resler, and now I'm going to

11  ask you where you were on June 20th, 2012?

12  A.   Now again, first visit to El Paso was this week.

13  Q.   Did anybody ever ask you as part of the Agua Prieta II

14  Project or anything that occurred as a result of that project to

15  come to El Paso and verify that this was your letter?

16  A.   No, nobody did.

17  Q.   Okay.  Now I'm going to show you Government's Exhibit

18  Number 22.  And I'm not going to admit this into evidence, but I

19  want you to look closely to see whether or not the first two

20  paragraphs -- first of all, does it purport to be January 10,

21  2010, the same -- initially the same letter as the previous

22  exhibit from you, the same individuals?

23  A.   It looks the same for the first two paragraphs, yes.

24  Q.   Okay.

25       MS. KANOF:  Actually, Your Honor, can I -- may I

1    approach the bench?

2            THE COURT:  Yes, ma'am.

3            MS. KANOF:  Or the witness, actually.

4    BY MS. KANOF:

5    Q.   You have Government's Exhibit Number 21, the two-paragraph

6    letter?  Do you have it in front of you?

7            THE COURT:  In the --

8            MS. KANOF:  No, I mean I want him to compare 21 to 22.

9            THE COURT:  In the binder or where?

10           MS. KANOF:  In the -- oh --

11           THE COURT:  In the binder?

12           MS. KANOF:  In the binder.  I forgot.

13   BY MS. KANOF:

14   Q.   In volume one of the binder, if you could turn to

15   Exhibit 21?  Sorry.

16   A.   Okay.

17   Q.   And that's the exhibit you were just testifying from,

18   correct?

19   A.   Correct.

20   Q.   Now, if you would look at the exhibit that's displayed on

21   this screen?  You can take that out of the binder if it makes it

22   easier for you to hold it up to the screen and compare.

23   A.   I can look at it fine uh-huh.

24   Q.   So now go ahead and examine the date, who it's addressed

25   to, who it's copied to, all of that in the first two paragraphs,

1    only the first two.

2    A.   They appear to be the same.  I don't see really any change

3    in it even in the words or anything.  They appear totally the

4    same.

5    Q.   Is there an addition to this letter?

6    A.   Yeah, there's a third paragraph on the -- on this letter on

7    the screen that wasn't on the Exhibit 21 that I'm looking at.

8    So it looks like there's an added paragraph to this.

9    Q.   Okay.  Did you ever write a second letter that had this

10   additional paragraph in it?

11   A.   No, I would never write two letters for the same subject

12   either.

13   Q.   Okay.  And is there any other difference between the two

14   letters other than there's no notary on it?

15   A.   It looks like the signature is the -- it's shifted over a

16   little bit if I look at it.  That's about the only thing I can

17   see different.  But other than that, the additional paragraph

18   and a little bit difference in maybe shifting of the -- of my

19   written name, if you will, underneath the signature itself.

20   Q.   Well, if you look at this Government's Exhibit Number 22,

21   the whole document, it's not straight is it?

22   A.   No, it's not.  It's actually at an angle, absolutely.  And

23   when I look at it now on the written form here, it actually

24   looks like a scan of some sort or moved over or shifted somehow,

25   exactly.

1    Q.   With regard to this letter, and we'll have someone from

2    C.F.E. to admit this letter, did you write it?

3    A.   I did not, no.

4    Q.   I just wanted to check something.  If you go back and look

5    one more time at 21 and 22, under your signature is there a

6    difference between 21 and 22?

7    A.   Yes.  21 has the notary stamp and signature underneath my

8    name and 22 does not.

9    Q.   Are there different typed words underneath your signature

10   on 22 and 21?

11   A.   Yes.  There's a Mitsubishi Power Systems Americas, Inc.,

12   underneath my signature that doesn't occur under 21.

13   Q.   So in 21, the words Mitsubishi Power Systems America

14   appears above your signature?

15   A.   Yes.

16   Q.   And in 22 it occurs again below your signature?

17   A.   Yes.  It's above and below, which is unusual.

18   Q.   And would you ever --

19   A.   No.

20   Q.   Any letter from Mitsubishi wouldn't ever have that?

21   A.   Would not, no.

22   Q.   Okay.  Now, have you ever seen that three-paragraph letter

23   before?

24   A.   I have not, no.

25   Q.   I'm going to ask you to look at Government's Exhibit

1    Number 25.  You previously testified that there was a company

2    within Mitsubishi that did all of your travel records; is that

3    correct?

4    A.   Yes, that's correct.

5    Q.   Government's Exhibit Number 25, are these -- is this the

6    company that does your travel records?

7    A.   Yes.  I.A.C.E. did all of the travel for for us at

8    Mitsubishi and I would always go through them for my travel.

9    Q.   Okay.  And are these records -- is your middle name

10   Michael?

11   A.   It is, yes.

12   Q.   And do these records purport to be your travel records for

13   the relevant times in January of 2010?

14   A.   Yes, it appears to be.

15           MS. KANOF:  Your Honor, there is an affidavit, a

16   self-proving affidavit that was attended to these records and

17   we'd move Government's Exhibit Number 25 into evidence.

18           THE COURT:  Ms. Franco?

19           MS. FRANCO:  No, objection, Your Honor.

20           THE COURT:  Government Exhibit 25 is admitted.

21   BY MS. KANOF:

22   Q.   Government's Exhibit Number 26, do you know who Sharon

23   Prader is?

24   A.   Yes, she was my admin assistant.

25   Q.   And she sort of kept you straight; is that correct?

 1    A.    She did.  She kept my travel and she did my expense

 2    reports.

 3    Q.    Okay.  And did she also keep your calendar?

 4    A.    She did, yes.

 5    Q.    January -- I'm scrolling through the records.  Do these

 6    appear to be your expense records?

 7    A.    Yes, they do.

 8    Q.    Okay.  And have your name on them, your expense records for

 9    the relevant time?

10    A.    Yes.

11    Q.    And also come with a self-proving affidavit.

12          MS. KANOF:  And we are asking that Government's

13    Exhibit Number 25 be admitted into evidence.

14          THE COURT:  26?

15          MS. KANOF:  I mean 26.

16          THE COURT:  Ms. Franco?

17          MS. FRANCO:  Your Honor, counsel testified that it was

18    the relevant time period.  If she could tell us what -- January

19    what?

20          MS. KANOF:  January --

21          THE COURT:  Lay the foundation.

22          MS. KANOF:  -- of 2010.  I'm sorry, Your Honor.  And

23    I'm there right now.  January 2010.

24          MS. FRANCO:  No, objection.

25          THE COURT:  All right.

1           MS. KANOF:  I have --

2           THE COURT:  Government's Exhibit 26 is admitted.

3    BY MS. KANOF:

4    Q.   I have displayed on --

5           MS. KANOF:  If you could publish?

6    BY MS. KANOF:

7    Q.   I have displayed part of these expense records for the jury

8    and they begin on January 6th of 2010.  First of all, could you

9    tell the jury what airport M.C.O. is?

10   A.   That's Orlando.

11   Q.   So on January 6th, what airline did you use?

12   A.   Delta.

13   Q.   And you flew economy class?

14   A.   Yes, we flew economy.

15   Q.   And what airport did you fly out of?

16   A.   Orlando.

17   Q.   And where did you go?

18   A.   Kansas City.

19   Q.   On January 7th, what airline did you use?

20   A.   That would be U.S. Air.

21   Q.   And what airport did you leave?

22   A.   M.C.I. was Kansas City.

23   Q.   And where did you go?

24   A.   Richmond, Virginia.

25   Q.   On January 8th, what airline did you use?

1    A.   F.L. -- I cannot remember what that one is.

2    Q.   Stands for Florida-something?

3    A.   I can't recall what that airline was, no.

4    Q.   What airline -- what location airport did you leave on

5    January 8th?

6    A.   Richmond, Virginia.

7    Q.   And where did you fly back to?

8    A.   Orlando.

9    Q.   Did you stay in Orlando for business, according to your

10   expense account, and not take any airline flights until January

11   20th?

12   A.   I did not take any airline flights till then, yes.

13   Q.   And on January 20th, what airline?

14   A.   U.S. Air.

15   Q.   What airport did you depart from?

16   A.   Orlando.

17   Q.   And through what airport?

18   A.   I believe that was D.C.  I believe I was going to D. C.

19   Q.   Is D.C.A. Reagan?

20   A.   I believe it is, yes.

21   Q.   And did you return on that same day to Orlando?

22   A.   Yes, I did, uh-huh.

23   Q.   And on January 25th, did you leave Orlando to go to Boston?

24   A.   Yes.

25   Q.   And return?

DIRECT EXAMINATION ADAMS                                                    44

1    A.   Same day, yes.

2    Q.   According to this record, did you go to Mexico on January

3    9th or 10th or 11th or 12th?

4    A.   I did not, no.

5    Q.   Yesterday, I asked whether or not -- or I asked you to

6    recite your phone.  You said the only phone you carried was the

7    Mitsubishi-paid-for-phone; is that correct?

8    A.   That is correct.

9    Q.   And I'm -- this is Government's Exhibit number 27.  Do you

10   recognize this as Mitsubishi's customer records from T-Mobile

11   for phone number 407-221-9508?

12   A.   Yes it appears to be.

13   Q.   And that's the phone that you carried?

14   A.   Yes, it was.

15            MS. KANOF:  We've made an agreement with defense

16   counsel that both 27 and 28, we made a stipulation that they

17   would be admitted into evidence.

18            THE COURT:  Ms. Franco?

19            MS. FRANCO:  That's correct, Your Honor.

20            THE COURT:  GX-27 and GX-28 are admitted.

21   BY MS. KANOF:

22   Q.   Okay.  Government's Exhibit number -- I'm going to display

23   to you the English speaking version.  Let me see.

24            MS. KANOF:  Did we get this thing unlocked --

25   BY MS. KANOF:

1    Q.   First, I'm going to show you the Spanish speaking version

2    and it's Government's Exhibit Number 31.  Do you know who

3    Alberto Ramos was?

4    A.   I know the name, but I don't know him, no.  I've heard the

5    name.

6    Q.   But he -- it's "su director" of something at C.F.E.,

7    correct?

8    A.   Correct, uh-huh.

9    Q.   Now I'm going to show you the English translation.  Alberto

10   Ramos, Deputy Director.  Did you ever meet him?

11   A.   I can't recall for sure.  I don't recall meeting him, but I

12   can't recall for sure.

13   Q.   Now the letter that you deny writing was January -- dated

14   January 10th of 2010, correct?

15   A.   Correct.

16   Q.   This letter is dated May 20th of 2012, more than two years

17   later, correct?

18   A.   Correct, uh-huh.

19   Q.   Read it to yourself, please.

20   A.   Uh-huh.

21   Q.   This letter states that you handed or you were in Mexico

22   City on January 10th, 2010?

23           MS. FRANCO:  Your Honor, she's testifying off --

24           THE COURT:  Sustained.

25   BY MS. KANOF:

1    Q.   If Mr. Ramos were to claim that you were in Mexico City on

2    January 10th of 2010 and provided that letter, would he be

3    telling the truth?

4    A.   No.

5              MS. FRANCO:  Objection, Your Honor.  Proper form.

6              THE COURT:  I'm not getting your objection from that,

7    but what's your objection.

8              MS. FRANCO:  She's asking another witness to comment

9    on the voracity of another witness.

10             THE COURT:  She's commenting on -- well, she's -- on

11   the contents of it that deals with this witness, so I'm --

12             MS. FRANCO:  My other objection would be to that, Your

13   Honor, that it's not in evidence.

14             THE COURT:  I'm going to overrule your objection and

15   allow the witness to --

16             What was your question?

17             MS. KANOF:  If Mr. Ramos were to claim that Mr. Adams

18   was in Mexico City on January 10th of 2010, would it be true.

19             THE WITNESS:  It's not true.

20             THE COURT:  I'll overrule the objection and let the

21   witness answer.

22             THE WITNESS:  Thank you.

23   A.   No, I was not in Mexico that day and it was not true.

24   BY MS. KANOF:

25   Q.   I draw your attention to Government's Exhibit Number 34.

1    And it's an e-mail that was sent from Mr. Ponce, but you were

2    copied on it.  Do you recall being copied on an e-mail that had

3    a letter from you attached to it?

4    A.   Yes.

5           MS. KANOF:  Your Honor, we move Government's

6    Exhibit Number 34 be admitted into evidence.

7           MS. FRANCO:  No, objection.

8           THE COURT:  GX-34 is admitted.

9    BY MS. KANOF:

10   Q.   So Hector Ponce -- the letter that you've been testifying

11   about that purported to be permission from you on January 10th

12   to pledge the equipment was on the 10th of January, correct?

13   A.   Correct.

14   Q.   This e-mail is on the -- and when did you find out about

15   the existence of that letter?

16   A.   The pledge letter was during the trial, during the

17   beginning of the trial.

18   Q.   During the preparation for trial?

19   A.   Yes, uh-huh.

20   Q.   And this e-mail is dated what?

21   A.   The 12th of January, 2010.

22   Q.   That would have been two days after that purported letter,

23   correct?

24   A.   Yes, uh-huh.

25   Q.   And what is the purpose of the e-mail?

1    A.   We had clarifications that we needed -- we wanted to

2    discuss and had clarifications request on a discussion that

3    proved that this occurred on 1-11, yes.

4    Q.   It says, clarification's letter attached.  So did you write

5    a letter on the 12th of January?

6    A.   I believe so, yes.

7    Q.   If you could please look at the attachment and indicate

8    whether or not -- you can scroll down if you wish; I'll go down

9    to your signature -- whether or not you wrote this letter?

10   A.   Yes, I did write this letter.

11   Q.   And why did you call -- do you need to take a look at it?

12   A.   Yes, I do.

13   Q.   Okay.

14   A.   I'm sorry.  Can you scroll down?

15   Q.   You also have it in the notebook.  It's 34.

16   A.   Thank you.

17   Q.   Is it easier for you not to look at the screen?

18   A.   Yeah, it may be.

19   Q.   I've also been accused of scrolling too fast.

20   A.   Okay.

21   Q.   So what was the purpose of the letter?

22   A.   We had still had a lot of confusion as to what it was that

23   we were offering to F.G.G., what was the direct payment rights

24   which we'd requested and what was the status of, you know,

25   L.T.S.A.s for the service agreement, what did we -- did we get

1    that long term service agreement, the L.T.S.A., which we had

2    intended to have per the teaming agreement, winning both the

3    equipment contract and the long term service agreement, so this

4    was really a clarification of where we are on this thing.

5    Q.   Okay.  Mr. Adams, do you do it in paragraphs and you number

6    your paragraphs?

7    A.   I do sometimes, yes.

8    Q.   At the end of each -- thew last sentence of each paragraph

9    is a request to who?

10   A.   To F.G.G. to clarify the situation.

11   Q.   This letter was written to Mr. Gireud.  Who was it copied

12   to?

13   A.   To Mr. Delgado.

14   Q.   Okay.  And the first paragraph, what did you provide?

15   A.   The very first paragraph?

16   Q.   Yes.  What information did you provide to assist F.G.G.?

17   A.   The very first paragraph was, you know, we -- oh, you're

18   saying number one, item one, yes.

19   Q.   I'm sorry.  I mean number one?

20   A.   Number one, yeah, that's what confused me.

21        We gave them the address of -- to FedEx.  We asked

22   them to Fed Ex a copy to our offices to Orlando.

23   Q.   But you begin with:  As previously requested.  What are you

24   referring to?

25   A.   We're referring to send us a copy of the contract and

1    annexes that went with it.

2    Q.    What does "as previously requested" relate to?

3    A.    We had talked about it in previous letters; please send us

4    the contracts so we can review and understand to make sure that

5    they matched up properly.

6    Q.    Okay.  So this is January 12th.  In the January 10th

7    letter, there appears to be a reference as if you had received

8    the contracts, but had you by January 12th?

9    A.    We had not.  We had not received the letter in all of the

10   annexes of the contracts.

11   Q.    After this letter, did anybody from F.G.G. call you and

12   say, what do you mean?  We already have -- you already have

13   those contracts.

14   A.    No.

15   Q.    Paragraph number two, you talk about price, correct?

16   A.    Correct, yes.

17   Q.    And your ultimate request is to clarify -- for F.G.G. to

18   clarify their contractual obligation to C.F.E.; is that correct?

19   A.    Correct.

20   Q.    Why are you asking them?

21   A.    Well, we wanted to understand what was offered to C.F.E.,

22   and then ultimately what we were offering in our contract to

23   F.G.G., so what was it that they specifically were taking.  We'd

24   made the offer to provide the equipment and deliver it, et

25   cetera, and we wanted to make sure that it matched up with what

1    our proposal stated.

2    Q.   You're asking if transportation and technical services are

3    a part of the prime contract, correct?

4    A.   Correct.

5    Q.   So you didn't know whether they were or not at that point?

6    A.   We did not know what was being included in our package,

7    yes.

8    Q.   Were you concerned that maybe they were?

9    A.   We were concerned that they -- that they were or were not,

10   and we didn't understand what we were then going to be

11   subsequently required to deliver.

12   Q.   Number three is about delivery dates and payment terms; is

13   that correct?

14   A.   Yes.

15   Q.   And what is your request at the end of that paragraph?

16   A.   We wanted to really confirm and specify that the payments

17   were going to be met and that, you know, the proper assurances

18   that Mitsubishi was going to get paid, again that being one of

19   the prime tenants of us was making sure that the money would

20   flow to us.

21   Q.   Number four is about what?

22   A.   This was the assignment of collection rights.  Again, we

23   were worried about the money flowing through F.G.G., so we had

24   as part of this contract asked for direct payment from C.F.E.

25   for the equipment payments such that it wouldn't flow through a

1    third party so it would go directly to us, so we wanted to make

2    sure that we were going to get the assignment of the payment

3    directly to us.

4    Q.   Okay.  Relating to the purported January 10 letter, number

5    five, the letter of credit provision and what you say on January

6    12th?

7    A.   So on January 12th, we'd asked where are we with the letter

8    of credit.  Please tell us what's going on.  Is it required?  Is

9    it not required?  Please confirm that F.G.G. was posting it per

10   the agreement, and then the date that -- which was posted to

11   satisfy the contract, because we were not -- was not our

12   intention to supply that letter of credit in any way.

13   Q.   Okay.  So this letter is not copied to anybody at

14   Mitsubishi, is it?

15   A.   It is not, no.

16   Q.   Okay.  So if you were -- if you truly had written the

17   January 10th letter and were attempting hide something, this

18   particular sentence wouldn't be going to anyone else, would it,

19   at Mitsubishi?

20   A.   Yes, I believe it would not.

21   Q.   So you're asking them what -- what are you asking them

22   about the letter of credit?  Is it whether or not they still

23   have to -- or is this a letter of credit for the prime contract

24   or for the long term servicing guarantee?

25   A.   We were at that point uncertain on the long term service

1     agreement.  We were unclear if we were going to offer that.  In

2     our mind, we weren't going to give a letter of credit for the

3     equipment, but we were asking for F.G.G. to confirm that if they

4     needed to give one for the equipment that they were doing it and

5     that similarly, you know, what would happen after that with

6     regards to the L.T.S.A. where we're kind of going.

7             It's confusing at some points through there.  I mean

8     it was clear to us that the L.T.S.A., since it would potentially

9     be a direct contract with C.F.E., we might have to put some kind

10    of parental guarantee or L.L.C., but in this case specifically,

11    we're talking about the equipment guarantee and that F.G.G. was

12    posting it, so we wanted confirmation that they were doing this.

13    Q.   Why do you include these words:  Has been complicated by

14    mixing long-term service agreements with the equipment contract?

15    A.   Yeah, again, we had envisioned that there was a direct

16    contract for the long-term service agreement with which we would

17    potentially post a letter of credit or parental guarantee.

18            And we had also very clearly stipulated that for the

19    equipment supply that we were not going to give any letter of

20    credit, because that was a direct sale to F.G.G., so there was

21    no reason for us to the letter, since we were in contact with

22    C.F.E.

23    Q.   Who was complicating by mixing?

24    A.   We believe that F.G.G. was doing that.  And again, we

25    weren't sure what their obligations were.  You know, they were

1   saying you need to give a letter of credit.  We were very clear

2   that we would give one for one thing, but we wouldn't give one

3   for the other thing.

4   Q.   And the last line is what?

5   A.   Please confirm whether letter of credit is required to

6   guarantee this equipment contract.

7        So we were again, you know, stating, you know, that we

8   weren't going to do that; please confirm that they were posting

9   it.  So we're asking what's going on.

10  Q.   You didn't ask it this time to see the letters of credit.

11  You just asked -- confirmed that they're posting them, correct?

12  A.   Correct.  We believed that they were doing that.

13  Q.   And this is two days after you purportedly agreed to pledge

14  the equipment instead of letters of credit?

15  A.   Yes.

16  Q.   With regard to your last paragraph, you now are talking

17  about the long-term service agreement letters of credit?

18  A.   Yes.

19  Q.   And in number six, are you talking about some other

20  paragraphs, including Annex W.?  What is Annex W.

21  A.   Annex W. was an annex to the prime contract that was very

22  important to us, because that would include any of the

23  clarifications that we had.  As we had, you know, built the

24  equipment and it was already made and manufactured, it looked

25  like this, we needed to be very certain that -- that we weren't

1    going to being specified to make something different than that,

2    so Annex W. was that clarification portion that really said,

3    look, it's in accordance with Mitsubishi's proposal because you

4    can't -- we didn't want -- we didn't intend to remake the

5    equipment that was already made.

6    Q.   Okay.  And you end with what?

7    A.   Time is of the essence to make sure any differences are

8    resolved prior to starting the execution activities.  So we

9    needed to get these items finished before we could start working

10   on the contract.

11   Q.   As you have previously testified, you ended with a signoff

12   word?

13   A.   Yeah.  I always use "sincerely" or "very truly yours" or

14   something like that.

15   Q.   You didn't put Mitsubishi Powers System Americas, Inc.?

16   A.   Did not.

17   Q.   Anywhere either above or below the signature?

18   A.   I did not.  This is typically how I would sign off.

19   Q.   I'm just going to Government's Exhibit Number 37, which

20   has -- it has not been admitted into evidence, correct?

21   A.   Has not.

22   Q.   Do you recognize this as an e-mail from Mr. Ponce to you?

23   A.   Yes.

24   Q.   Do you recall receiving this e-mail?

25   A.   Well, it's two.

 1    Q.   I'm sorry?

 2    A.   This one was copied to me.

 3    Q.   Copied to you?

 4    A.   Yes.

 5    Q.   Okay.  And I'm assuming that -- let me not assume anything.

 6    What did you do with regard -- before you wrote the January 12th

 7    letter?  Did you discuss it with anybody?

 8    A.   Yes, I would have discussed it with the commercial team,

 9    including Hector Ponce.

10    Q.   Okay.  And this is now the 18th of January, correct?

11    A.   Correct.

12    Q.   And there you have:  Transmitted -- the letter has been

13    transmitted on your behalf.

14         Is this a response to the letter?

15    A.   This is not a response.  It's more of a, hey, where is the

16    response letter?

17    Q.   Okay.

18         MS. KANOF:  Your Honor, we move that Government's

19    Exhibit Number 37 be admitted into evidence?

20         THE COURT:  Ms. Franco?

21         MS. FRANCO:  No, objection, Your Honor.

22         THE COURT:  GX-37 is admitted.

23    BY MS. KANOF:

24    Q.   Government's 37 also has attached to it your January 12th

25    letter, correct?

1    A.    Correct.

2    Q.    So between January 12th and January 18th, had Mitsubishi

3    gotten a response with your paragraph-by-paragraph requests?

4    A.    We have not.  We've not, no.

5    Q.    And are you writing this letter or this e-mail to who -- or

6    Ponce's writing it to who?

7    A.    To Fernando at F.G.G.

8    Q.    And who is he copying it?

9    A.    To me and Marco Delgado as well.

10   Q.    And what is the purpose of this e-mail?

11   A.    More to push for a response, really.  It was, hey, where is

12   your response?  We -- you know, we're still waiting for it.

13   Q.    When Hector writes this e-mail, does he reiterate and point

14   out some of the important portions of your letter that highlight

15   what they're asking?

16   A.    Yes.  He reiterates many of them item by item.

17   Q.    And does he refer to what is important to you in the

18   beginning; John asks?

19   A.    Yes, John asks.  We need a quick response.  Time is --

20   Q.    Well, have you asked for a meeting to resolve the issues

21   first before you wrote that letter?

22   A.    Yes.  We had asked for a meeting to get together to discuss

23   these issues.

24   Q.    And then did he -- did you compromise by requesting a quick

25   response to the letter instead of traveling to meet to respond

```
 1    to these issues?

 2    A.    Yes, uh-huh.

 3    Q.    And was time of the essence?

 4    A.    Yes.  It was sill of the essence.

 5    Q.    What -- why is time of the essence?  What's the hurry?

 6    A.    We're in the middle of -- we needed to understand what our

 7    obligations were such that we could begin working on this

 8    project.  There was delivery dates that we understood that we

 9    needed to deliver the equipment by and we didn't want to -- we

10    wanted to kick the project off to make the dates and make the

11    equipment as needed.

12    Q.    Did you discuss with Mr. Ponce what the contents of this

13    e-mail should be?

14    A.    Yes.  Yeah.

15    Q.    And because in it, does he include new observations?

16    A.    Yes, uh-huh.

17    Q.    Okay.  With -- and did you approve what he was putting in

18    this letter or e-mail?

19    A.    Yes.  Yes.

20    Q.    He states that they have received annexes but not Annex W.,

21    correct?

22    A.    Correct, uh-huh.

23    Q.    And then you indicate that somebody from F.G.G. has said

24    that they didn't receive Annex W. either.  What is Annex W.?

25    A.    So again, Annex W. is that critical annex to us that gave
```

1    the clarifications that matched up our equipment to what would

2    be the specifications.  So again, it would take what our

3    equipment was and if this specification differed, we would say

4    we can't do that because it's already made and it looks like

5    this.  So Annex W. was quite critical for us, both a technically

6    and commercially to match up what we offered to make sure that

7    it matched the propose proposal.

8    Q.    And then new observations include the warehouse locations

9    of the warehouse supplier, Annex Q.; is that correct?

10   A.    Yes, uh-huh.

11   Q.    And now let's go back to the original letter.  And was

12   paragraph number four the Assignment of Collection Rights?

13   A.    Yes, it was.

14   Q.    Was paragraph 59 Letter of Credit?

15   A.    Yes, it was.

16   Q.    And now there's an added paragraph number six to this that

17   was not in your original letter that say, please respond to item

18   five as originally stated, especially please point us to Annex

19   W. In its entirety, which takes priority over all other

20   documents.

21          So, why is Annex W. so important?

22   A.    So Annex W. again needed to be -- it was the clarification,

23   so it needed to be first of all of the annexes because it was

24   the one document that really conformed what it was that we were

25   offering to that specification that was out there.  So it took

1    the proposal and it says, look, this is what we made.  It's a

2    gas turbine that looks like this.  They have these many

3    components to it.  And if the specification is different than

4    that, that annex was to make sure that it said, look, it's not

5    like this.  It's this.  It's built.  We're not rebuilding again.

6    Q.   In this paragraph number six, does Mr. Beddard indicate

7    that Mr. Delgado said that clarification documents take first

8    priority in Mexico?

9         MS. FRANCO:  Objection, Your Honor.  This isn't a

10   Beddard document.

11        MS. KANOF:  Oh, I'm sorry.

12   BY MS. KANOF:

13   Q.   Ponce.  Mr. Ponce?

14   A.   Yes, it does.  Again, that was -- absolutely, we needed to

15   be verified and be certain that that Annex W. took priority and

16   had to be, you know, this is our proposal, this is what we

17   offer, this is what you're getting.  Even though the

18   specification may have said something differently, it was

19   already built, we couldn't re-do it to make it look like that.

20   Q.   Government's Exhibit Number 38.  You have it in front of

21   you.

22        Is that an e-mail from Mr. Ponce in which you are

23   copied?

24   A.   Yes.

25   Q.   And is the date January 24th?

1    A.   Yes, uh-huh.

2         MS. KANOF:  We move for the admission of Government's

3    Exhibit Number 38.

4         MS. FRANCO:  No, objection.

5         THE COURT:  GX-38 is admitted.

6    BY MS. KANOF:

7    Q.   Now, do you recall that Mr. Ponce actually sent notes to

8    meetings that the Mitsubishi Agua Prieta team had regarding

9    these issues?

10   A.   Yes, I do remember that.

11   Q.   And are they attached it to this e-mail?

12   A.   Yes, they are, uh-huh.

13   Q.   So, initially does -- what does Mr. Ponce tell Mr. Gireud?

14   A.   He's -- in this transmittal, he was forwarding that the

15   review of the contract that the team at Mitsubishi had done and,

16   you know, and then looking for, you know, issues with it.  So

17   that was the idea, was here is our review, here's where we are.

18   And you know that was what was being said, was really the

19   documents of the internal review that we were doing and some of

20   the issues and items that we found.

21   Q.   So do you recognize the first attachment as notes from

22   meeting that were held?

23   A.   Yes, it appears to be, uh-huh.

24   Q.   Okay.  Does Mr. Ponce reference the fact that other

25   documents had been sent on January 11th?  What is that about?

1    A.   So in the first --

2    Q.   Oh.  Let me go onto number three.

3    A.   Thank you.

4    Q.   Does number three talk about whether or not, now, on

5    January 24th, Annex W. had been received by Mitsubishi and

6    seemed to be in order?

7    A.   Yes.  It looks like at that time we had finally received an

8    Annex W. and it appeared that it matched to what we had needed.

9    Q.   Okay.  The delivery dates in terms of payment, they were

10   still being agreed to; is that correct?

11   A.   Correct.

12   Q.   Okay.  Look at number six, the Assignment of Collection

13   Rights?

14   A.   Yes.

15   Q.   This is January 24th.  Had that occurred?

16   A.   It had not, yet, occurred and we were still asking for it

17   to be.

18   Q.   Okay.  The letter of credit provision for the long-term

19   servicing agreement was discussed with F.G.G., was it not?

20   A.   Yes, it was.

21   Q.   I just want to take note that when Mr. Ponce talks about a

22   letter of credit, he does not say L.C., he says L.O.C., correct?

23   A.   Correct.

24   Q.   Then there are notes -- those notes from January 24th also

25   attached were notes from January 11th, which would have been

1    approximately two days -- two weeks earlier, correct?

2    A.   Correct, uh-huh.

3    Q.   And there had been some progress between the two; is that

4    correct?

5    A.   Yes, uh-huh.

6    Q.   Between the two days there had been progress?

7    A.   Uh-huh.

8    Q.   Attached also is a document that appears to be the prime

9    contract in English; is that correct?

10   A.   Yes.

11   Q.   Now, this was transmitted on January 24th.  The e-mail was

12   transmitted on January 24th with the document attached to them.

13   And if you will look at the left-hand side of this, it looks

14   like the front page has initials on it, correct?

15   A.   Correct.

16   Q.   And the date of the execution of the document, the

17   right-hand side in English says, January 6th of 2010?

18   A.   Yes.

19   Q.   So why is C.F.E. making changes to their copy of the prime

20   contract after it's already been entered into?

21        MS. FRANCO:  Objection, Your Honor.  Calls for

22   speculation.

23        THE COURT:  Sustained, unless you can lay a

24   foundation.

25        MS. KANOF:  Okay.

 1   BY MS. KANOF:

 2   Q.   Do you know why this was included in an e-mail from

 3   Mitsubishi to F.G.G.?

 4   A.   I don't recall exactly, other than here's what we had, and

 5   I think that was just attached to show what we were working

 6   from.

 7   Q.   Let me show you the last page.  The last page of this

 8   document, does it have annexes in it?

 9   A.   Yes, it does.

10   Q.   Does it have Annex W.?

11   A.   It does.

12   Q.   Do you know when Mitsubishi got this document?

13   A.   I don't recall exactly, but it was somewhere in between the

14   12th and the 24th, I would imagine -- oh, it says received

15   January 23rd in here, too, for Annex W.

16   Q.   This is the Spanish version of a transmittal e-mail.  This

17   is the English version of Government's Exhibit 40A.  And I think

18   the letter is already admitted into evidence from Government's

19   Exhibit 40, but not the transmittal.

20           MS. KANOF:  Is that correct, Your Honor?

21           THE COURT:  That's only the letter.

22   BY MS. KANOF:

23   Q.   So now this is six days later, January 24th; is that

24   correct?

25   A.   Yes.

1    Q.   And this is that letter again to you from Mr. Gireud,

2    correct?

3    A.   Yes.

4    Q.   This is a response to January 30th -- well, what does it

5    purport to be?

6    A.   It's kind of a -- it's supposed to be kind of a response to

7    my letter previously.

8    Q.   Okay.  And, um, what does it say about the annexes?

9    A.   That the annexes should be in our possession at this time.

10   Q.   The payment schedule?

11   A.   It said -- again, was submitted in the proposal, so it --

12   the minimum payment schedule was submitted in our proposal,

13   which is currently the one controlling, so it was the payment

14   schedule.

15   Q.   The Assignment of Collection Rights?

16   A.   Yeah, as being -- they said it was going -- it's being

17   considered, which is actually very soft language for us because

18   we we're requiring it to be mandatory for us to be done.

19   Q.   Okay.  Now what does it say about the letter of credit?

20   A.   It says that all of the conditions and obligations had been

21   met by F.G.G., so they were supplying what was needed to be for

22   the letter of credit and therefore Mitsubishi wouldn't be

23   responsible for any.

24   Q.   If Mitsubishi had pledged the equipment, would you consider

25   Mitsubishi having been made responsible for the letter of

1    credit?

2    A.   Yes, we would have been.

3    Q.   And then finally Annex W.?

4    A.   Uh-huh.

5    Q.   What does it say about that?

6    A.   That it clearly takes priority over all provisions of the

7    contract, which is what we were expecting and hoping for.

8    Q.   I'm going to show you --

9         THE COURT:  Before we move to any document, let's go

10   ahead and take our morning recess.

11        MS. KANOF:  Thank you, Your Honor.

12        THE COURT:  Ladies and gentlemen of the jury, I'd ask

13   you to be back in the jury room at 10:45.  We'll resume our

14   proceedings then.

15        COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

16        (Jury recessed.)

17        THE COURT:  Mr. Adams, if you'd be back at 10:45.

18        (Break 10:32 a.m. to 10:46 a.m.)

19        (Jury present.)

20        THE COURT:  Let the record reflect that all members of

21   the jury are present, the United States through its assistant

22   United State's attorneys are present, the defendant and his

23   counsel is present.

24        Mr. Adams is on the witness stand.

25        Ms. Kanof?

1              MS. KANOF:  Thank you, Your Honor.

2                       JOHN MICHAEL ADAMS,

3              DIRECT EXAMINATION CONTINUED BY THE GOVERNMENT

4      BY MS. KANOF:

5      Q.   We were talking about January 10th, January 12th, January

6      14th and January -- I'm sorry -- January 24th.

7              On January 15, there's a document that is the pledge.

8              MS. KANOF:  Your Honor, we move Government's Exhibit

9      Numbers 32 and 32A into evidence provided to us from the Mexican

10     government through the mutual lateral [sic] assistance treaty.

11             THE COURT:  Ms. Franco, same objection?

12             MS. FRANCO:  Yes, Your Honor.

13             THE COURT:  All right.  GX-32 and 32A are admitted.

14     BY MS. KANOF:

15     Q.   Have you ever seen this pledge agreement?

16     A.   Not before the trial, no.

17     Q.   And I think we already asked whether you signed it or your

18     initials are on it, but if we could just take a quick look at

19     it.

20     A.   I did not sign or initial this at all.

21     Q.   The pledge agreement is ultimately signed on January 15th,

22     in the middle of this discussion of the letters of credit.  And

23     do you see that on page -- I'm showing the Spanish version, and

24     unfortunately the pages are not numbered, but the signator is by

25     that individual Ramos, who wrote the letter that you were

1    present in Mexico on January 10th.  Do you recognize that same

2    name?

3    A.   I recognize the name, yes.

4    Q.   And by Mr. Delgado, correct?

5    A.   Yes.

6    Q.   So on January 15th, were you aware that the Mitsubishi

7    equipment had been pledged with the representation that you had

8    given permission that it had been pledged?

9    A.   I was not aware at all, no.

10   Q.   Okay.

11          MS. KANOF:  Your Honor, Government's Exhibit Number 43

12   was received by the government from mutual lateral assistance

13   treaty.  It is a letter that purports to have been written on

14   the 3rd March of 2010.  We'd ask it be admitted into evidence.

15          THE COURT:  Ms. Franco?

16          MS. FRANCO:  Subject to the same objection.

17          THE COURT:  GX-43 is admitted.

18   BY MS. KANOF:

19   Q.   In all of these letters that you've written and in many of

20   the e-mails, you were talking about assignment of collection

21   rights, correct?

22   A.   Correct.

23   Q.   Do you know in the initial contract where -- what bank

24   account the payments from C.F.E. were supposed to be deposited?

25   A.   I don't recall offhand.  We wanted, again, a direct

1    assignment of rights to our bank account, but I don't recall

2    where.  It was supposed to go directly to us is what we were

3    looking for, but I don't recall past that.

4    Q.   Okay.  The -- this has been marked and admitted into

5    evidence as Government's Exhibit Number 18 and 18A.  Did you

6    want the assignment of collection rights to be in the original

7    contract?

8    A.   Yes.

9    Q.   Okay.  I'm going to show you the wiring instructions that

10   are in the original contract, Government's Exhibit 18A, in the

11   Wells Fargo bank, bank account ending in 1614 at 6960 North

12   Mesa, El Paso, Texas.  Was that a bank at controlled by

13   Mitsubishi?

14          MS. FRANCO:  Objection, Your Honor.  He's indicated he

15   hadn't seen this contract.  I don't know why he's been

16   testifying.

17          MS. KANOF:  I'm just asking if that's the bank

18   account.

19          THE WITNESS:  It's not a Mitsubishi bank account that

20   I know of, no.

21          THE COURT:  I'll overrule that objection.

22   BY MS. KANOF:

23   Q.   Go back to Government's Exhibit 43 and 43A?

24          MS. KANOF:  Did I ask the admission of the English

25   translation as well, Your Honor?

1              THE COURT:  You did not, but --

2              MS. KANOF:  I'd ask that --

3              THE COURT:  Any objection to 43A, Ms. Franco?

4              MS. FRANCO:  Same objection.

5              THE COURT:  All right.  That's overruled.  43A and

6     GX-43 is admitted.

7     BY MS. KANOF:

8     Q.   If you would look at this next letter.  Who does it appear

9     to be addressed to?

10    A.   To Mr. Ramos.

11    Q.   Now you had just looked at the contract which was dated

12    January 6th.  Between January 6th and March 3rd, the date of

13    this letter, were you still seeking to have assignment of

14    collection rights so that C.F.E. would deposit what's going to

15    Mitsubishi to the Mitsubishi account in Japan?

16    A.   Yes.

17    Q.   Now it's March 3rd.  Who signed this letter?

18    A.   Marco Delgado it appears, uh-huh.

19    Q.   And does there -- let me put the English version -- in the

20    English version, the translation, the box, does it appear that

21    C.F.E. received this letter from Mr. Delgado on March 4th of

22    2010?

23    A.   Yes, it does.

24    Q.   And does it appear that this is a letter to Mr. Ramos from

25    Mr. Delgado asking to change the wiring instructions from the

1    Wells Fargo account in El Paso, Texas, to the First Caribbean

2    International Bank in the Turks and Caicos Islands?

3    A.   Yes, it does look like that.

4    Q.   And does it appear as though the bank account is held in

5    the name of company called Skippings and Rutley?

6    A.   Yes, uh-huh.

7    Q.   And uses American dollars?

8    A.   It appears so, yes.

9    Q.   And finally, is it with reference to F.G.G. Enterprises,

10   LLC?

11   A.   Yes, it appears so.

12   Q.   And does Mr. Delgado represent himself to be the attorney?

13   A.   Yes.

14   Q.   Do you control or -- do you know Skippings and Rutley?

15   A.   Not at all.

16   Q.   Do you -- does Mitsubishi have an account at the First

17   Caribbean International Bank in the Turks and Caicos Islands?

18   A.   I would -- not to my knowledge at all.

19   Q.   But was that -- you saw --

20   A.   We did not.  We had no intentions of running through that

21   bank.

22   Q.   Have you seen Mr. Beddard's invoice that he submitted?

23   A.   I believe so, yes.

24   Q.   If the wiring instructions were to a bank in Japan, that

25   wouldn't be the Turks and Caicos?

1    A.   It's not, no.

2    Q.   So on March 3rd, do you recall the date that the first

3    payment was supposed to be made to you?

4    A.   Not the exact date.  It was so many months -- well, I would

5    remember it if I get the document up, but it was so many months

6    after the contract was awarded.

7    Q.   Would paragraph six refresh your memory?

8    A.   Yeah, I believe so, uh-huh.

9    Q.   And?

10   A.   Two months after the contract, I believe, was the date,

11   so...

12   Q.   With regard to -- let me show you Government's Exhibit

13   Number 44, which I believe has been admitted into evidence.

14          MS. KANOF:  Am I correct?

15          THE COURT:  44?  No, ma'am.

16          MS. KANOF:  No?

17          THE COURT:  No, ma'am.

18   BY MS. KANOF:

19   Q.   Government's Exhibit 44, it's an e-mail.  Is it from

20   Mr. Ueki copied to you?

21   A.   Yes, it is.

22          MS. KANOF:  We'd move admission of Government's

23   Exhibit Number 44?

24          THE COURT:  Ms. Franco?

25          MS. FRANCO:  No, objection.

1          THE COURT:  GX-44 is admitted.

2          MS. KANOF:  Okay.  I can take that off again.

3     BY MS. KANOF:

4     Q.   Do you recall receiving -- who is Mr. Ueki.

5     A.   Mr. Ueki was part of the Mitsubishi Power Systems teams.

6     He was the Vice President of the commercial side, so he worked

7     alongside of me on projects.

8     Q.   Is this a transmittal to F.G.G.?

9     A.   Yes.

10    Q.   And does that transmittal contain an attachment from

11    Mr. Ueki?

12    A.   Yes, it does.

13    Q.   And I'm scrolling down.  What is it about?

14    A.   This is about the assignment of the payment rights and that

15    Mitsubishi has demanded that we get that payment rights as we

16    had been promised and thought we were going to get and then, you

17    know, being able to make sure we get the payment.

18    Q.   What's the date of the letter?

19    A.   March 3rd.

20    Q.   Is that the same date of Mr. Delgado's request to have the

21    wiring instructions transmitted to his Turks and Caicos account?

22    A.   Yes, it appears it is.

23    Q.   And you said that this is with relationship to what?  I'm

24    sorry?

25    A.   And so this letter was again to make sure that the payment

1    would flow properly and that the assignment of the payment

2    rights would be direct from C.F.E. to Mitsubishi so that it

3    wouldn't go through F.G.G. such that it could be sure that the

4    money would flow properly.

5    Q.   Does Mr. Ueki speak English?

6    A.   Yes.

7    Q.   So here it says imperative.  It is imperative that F.G.G.

8    obtain written approval for the assignment of collection rights,

9    correct?

10   A.   Correct.

11   Q.   And they coordinate and do those other things you talked

12   about, correct?

13   A.   Right.

14   Q.   Government's Exhibit Number 51, do you recognize that as a

15   letter to you?

16   A.   I do.

17   Q.   So in addition to the assignment of collection rights and

18   the letters of credit, were there also issues regarding the

19   payment schedule?

20   A.   Yes.  The payment schedule kept varying from what was in

21   the original proposal.

22   Q.   Were you involved in that issue?

23   A.   I became involved in the issue when they did not deliver

24   when they said they would deliver the payments.

25   Q.   Okay.  And did you receive a letter from Mr. Gireud

1    regarding that issue on March 24th of 2010?

2    A.   Yes, uh-huh.

3    Q.   And is Government's Exhibit Number 51 that letter?

4    A.   Yes.

5          MS. KANOF:   We move Government's Exhibit 51 into

6    evidence, Your Honor.

7          MS. FRANCO:   No, objection.

8          THE COURT:   GX-51 is admitted.

9    BY MS. KANOF:

10   Q.   So why is Mr. Gireud going to need this letter?

11   A.   He's notifying us that the payment terms -- he's

12   effectively offering new payment terms and seeing if it would be

13   acceptable to us since we were not getting paid in a timely

14   basis that we thought that we would, so it was effectively

15   proposing and seeing if we would accept a revision to the

16   payment terms as this letter states.

17   Q.   Okay.  Notably, what's the date of the letter?

18   A.   March 24th of 2010.

19   Q.   And again, the first payment was to be April 6th?

20   A.   Yes, uh-huh.

21   Q.   And this is in anticipation -- did -- was the first payment

22   at another time supposed to be another amount?

23   A.   Yes.  The original payment was higher and it was earlier.

24   It was roughly a month earlier and roughly $20 million instead

25   of the 15, so they were negotiating after the contract was done

1    to try to change the terms.

2    Q.    Who was negotiating?

3    A.    I mean this came from F.G.G. to Mitsubishi, so it was --

4    Q.    But who was negotiating to change the payment schedule?

5    Was Mitsubishi negotiating a new --

6    A.    No, it was actually a very big detriment.  Mitsubishi

7    hadn't been paid yet.  We were worried the contract wasn't going

8    to go forward, so we kept asking, hey, we have a contract that

9    says you must pay us on this day this day and this day.  We

10   didn't get that, so you know we were very much at a loss as to

11   what happened.

12   Q.    So Mitsubishi wasn't part of these negotiations to change

13   the original $20-million deposit payment schedule?

14   A.    We were not, no.

15   Q.    How did you first find out that F.G.G. was negotiating with

16   C.F.E. to change the payment schedule?

17   A.    By them issuing, you know, some letters that said, here,

18   would you consider these payment schedules and us then not also

19   getting paid when we were expecting to.

20   Q.    The other payment schedule, the one that was supposed to be

21   $20 million on March 6th of 2010, was that agreed to between

22   Mitsubishi and F.G.G. as part of the subcontract?

23   A.    Yes, it was, yeah.

24   Q.    So they were negotiating without you with C.F.E. to change

25   the payment schedule?

1    A.    Yes.

2    Q.    And this letter is dated March 24th of 2010?

3    A.    Yes.

4    Q.    Did you know that on March 24th when this -- was this the

5    first time that you heard or that Mitsubishi learned in an

6    effort to notify C.F.E. of agreed terms, is this the first time

7    you're asked to verify that you're agreeing to these terms?

8    A.    Yeah.  This was the first time that we were asked to verify

9    and effectively change what was the original terms of the

10   contract.

11   Q.    Do you know that when this letter was sent to you on

12   March 24th, that Mr. Delgado had already received $20 million

13   from C.F.E. in his Turks and Caicos account?

14   A.    No, because we hadn't received any, so we did not.

15   Q.    In fact, it wasn't time yet, because you were supposed to

16   receive it on April 6th, right?

17   A.    As of this letter, yeah.

18   Q.    Did you agree to this?

19   A.    We ultimately did, because we wanted to make -- we wanted

20   to keep the contract alive, so even though it was a negative to

21   Mitsubishi, we were still trying to do what we could do to keep

22   the project alive, so we did.

23   Q.    Before he sent you this letter for you to confirm in

24   writing that you agreed, if you would look at Government's

25   Exhibit Number 50.  Did he send you or did Marco Delgado send

KATHLEEN A. SUPNET, CSR

1    you an e-mail about revised payment plans?

2    A.   Yes, I believe he did.

3            MS. KANOF:  Move Government's Exhibit Number 50 into

4    evidence.

5            THE COURT:  Ms. Franco?

6            MS. FRANCO:  No, objection.

7            THE COURT:  GX-50 is admitted.

8    BY MS. KANOF:

9    Q.   Now the date of this is March 25th, correct?

10   A.   Yes.

11   Q.   So this is actually the day after the letter dated that

12   Mr. Gireud sent to you.  So his was March 24th and this is now

13   March 25th?

14   A.   Yes.

15   Q.   So the day after that letter is written, Mr. Delgado writes

16   you an e-mail, correct?

17   A.   Correct.

18   Q.   And what does he say?

19   A.   He says, "Please find C.F.E.'s conversation of the revised

20   payment plan," so that C.F.E. was confirming that they would do

21   what was agreed to.

22   Q.   So immediately, C.F.E. -- do you even know when you agreed?

23   I mean, you get the letter on the 24th, do you know if you

24   agreed on that very same day?

25   A.   I think it was -- I think we had to think about it, but I

1   can't recall exactly, so...

2   Q.   And he's telling you, "Please find C.F.E.'s confirmation of

3   revised payment plan" -- and we'll look at the attachment in a

4   minute -- but this allows -- "this allows us to proceed with the

5   assignment of collection rights."

6   A.   Yes.  So it was a way of -- so we'd been asking and asking

7   for the payment rights, and in exchange for the revision terms

8   of payment, we were then promised that C.F.E. would give us that

9   direct payment right, so that was the intent or the illusion.

10  Q.   Did this lead you to believe that this two weeks before

11  your first payment -- correct -- does it lead you to believe

12  that on the 6th of March, the money was going to go into

13  Mitsubishi's account in Japan?

14  A.   Yes, that's what we believed, directly from C.F.E.

15  Q.   Attached -- Ms. Arreola is asking me to highlight one more

16  thing.  It's pointed out, but regardless, let's just --

17        And when I ask you, did you believe, did it lead you

18  to believe because it says collection of rights prior to the

19  issuance?

20  A.   Yes, we believed we would get that assignment.

21  Q.   I just wanted to point that out so I asked that question.

22  A.   Yes, uh-huh.

23  Q.   So attached to that there's a letter that appears to be in

24  Spanish, correct?

25  A.   Yes.

1    Q.    Okay.  It has what appears to be this new payment plan,

2    correct?

3    A.    Correct.

4    Q.    Okay.  Signed by someone named Buendia?

5    A.    Yes.

6    Q.    And in English --

7              MS. FRANCO:  Your Honor, may we approach?

8              THE COURT:  Yes, ma'am.

9              (Bench conference.)

10             MS. FRANCO:  Your Honor, I have --

11             THE COURT:  Move that chair, so we can --

12             MS. FRANCO:  This testimony regarding the assignments

13   of, you know, was talked about now by Mr. Beddard and Mr. Adams.

14   But at this point, it's not alleged in the indictment that --

15   about the assignment of rights or that there was any fraud with

16   regard to the assignment of rights.  So I think at this point

17   it's cumulative.  She's already questioned about it enough

18   times, and I don't see -- it's not relevant to what the charges

19   are against him, so I just ask the Court to ask Ms. Kanof to

20   move on.

21             MS. KANOF:  It goes to motive.  It goes to intent.

22   And it's part of the scheme.

23             THE COURT:  Keep your voice down.

24             MS. KANOF:  Sorry.

25             It goes to motive.  It goes to intent.  And it's part

1    of the scheme and artifice to defraud, because if he had given

2    the assignment of collection rights, he couldn't have stolen the

3    money.

4              MS. FRANCO:  Your Honor, the proof that came out

5    yesterday was that they didn't steal money from Mitsubishi.  The

6    invoices actually matched up to what Government's Exhibit

7    Number 67 clearly shows that what Mr. -- when we combine that

8    with their summary that they gave, what Mitsubishi charged them

9    for, you know, the invoices and what was paid to them exactly.

10             MS. KANOF:  Absolutely not.  They never got the

11   $54-million balance.

12             MS. FRANCO:  It's in the contract.

13             MS. KANOF:  You just said they got it.  They did not.

14             MS. FRANCO:  They did.

15             THE COURT:  Tell me why it's important for you to go

16   into that.

17             MS. KANOF:  There are some pieces of evidence

18   regarding the assignment of collection rights that only this

19   witness was privy to and it -- the assignment of collection

20   rights is part of the scheme and artifice to defraud.  It is

21   also the part of covering up the crime, which is evidence of

22   coverup of the crime is always admissible.

23             Ms. Franco is absolutely incorrect that they did not

24   sustain a loss.  Mitsubishi sustained a huge loss, because they

25   settled for a much lower cost years later on the equipment,

1    because the equipment had deteriorated, and the loss also -- a

2    significant loss, millions-of-dollar loss to C.F.E.

3              MS. FRANCO:  I didn't say anything about loss.

4              THE COURT:  How much more evidence are we going to

5    have to have on this assignment issue?

6              MS. KANOF:  Just a little bit more.

7              MS. FRANCO:  I mean Mr. Beddard testified to it

8    yesterday.  "Ya (Spanish)."

9              MR. HANSHEW:  Judge, Ms. Kanof keeps mentioning this

10   scheme of artifice.  I would like to see her point out anywhere

11   in this indictment that there's a single mention anywhere in

12   this indictment about a fraud that relates to supposedly a

13   direct payment that was supposed to go from C.F.E. to

14   Mitsubishi.  Nowhere.  And that's what they've been proving up.

15   They're proving a different part that's not part of the scheme

16   and artifice and they know it.  They've modified that.  We'd ask

17   for the grand jury transcripts at this point, because they're

18   modifying and they are putting it all -- it's not alleged in the

19   indictment.  It's impermissible.

20             MS. KANOF:  That's not true, Your Honor.  We're not

21   modifying or changing anything.

22             MR. HANSHEW:  Whether the indictment said anything

23   about a fraud from the issues.

24             THE COURT:  I don't know why --

25             MS. KANOF:  Your Honor, we do not have to put every

1    overt act.  We do not have to put every aspect of conspiracy.

2    In fact the law says we only have to track the statute and

3    especially since there is a conspiracy and in wire fraud you

4    have to get overt acts anyway.

5            THE COURT:  Lower your voice because we don't want the

6    jury to hear.  That's why we're all here.

7            MR. HANSHEW:  She referenced the scheme and artifice,

8    that's what's listed in this indictment.

9            MS. KANOF:  But you don't have to --

10           MR. HANSHEW:  There is no mention and they know it.

11   And to say that somehow conspiracy law allows the government to

12   come into trial and create an entire different theory of fraud

13   is not alleged.  It's not alleged in the scheme and artifice.

14   It's not alleged in the account.  They're proving a different

15   idiom now.  And that is absolutely prohibited, Judge.

16           MS. KANOF:  Okay.  Your Honor, their first jury

17   instruction alleges the scheme and artifice.  I mean it alleges

18   there's a conspiracy, because they made Mr. Gireud a conspirator

19   in their jury charge.  But regardless, you do not have to allege

20   every scheme and artifice to defraud.  You are always

21   permitted --

22           THE COURT:  Keep your voice down.

23           MS. KANOF:  You are always permitted to permit

24   evidence with regard to masking or offering up aspects of the

25   scheme and artifice.  The assignment of collection rights is

1    integral of him not getting caught, because if he assigned the

2    collection right, if he had assigned them timely, he could never

3    have, the second payment would never have been issued.  The

4    $12 million would not have gone into his Turks and Caicos

5    account and he could not have diverted those funds.  And we

6    would -- the whole point of this testimony is that the e-mail

7    that I just presented between him and others.

8            It was very clear, Mr. Delgado tells him, and that was

9    before the first payment, you're going to get an assignment of

10   collection rights.  That means the whole $14.9 million is coming

11   to you directly from C.F.E.  That doesn't happen.  And the

12   reason it doesn't happen is he had no intent for the whole

13   $15-approximate-million to go.  He diverts $3 million.  It goes

14   into his account at Turks and Caicos.  He chooses what to send

15   to Mitsubishi.  He sends it to F.G.G. to send to Mitsubishi

16   which is $11 million.  That $3 million is sent to someone called

17   air proyecto (phonetic), and nobody can identify, which we

18   believe is the bribe, part of the bribe, because the very first

19   payment he makes out of the $20 million is to air proyecto

20   (phonetic).  It's money that should have gone to Mitsubishi.

21   Had he assigned the collection rights, he couldn't have done

22   that.

23           Secondly, he also would not have received the second

24   payment, which is July 6th.  So the whole fight about collection

25   rights is Mr. Delgado hiding his fraud, hiding his human

```
 1    artifice to obtain money and property by fraud by the wiring of

 2    the money.

 3              MR. HANSHEW:  By fraud, exactly.  They're proving up a

 4    fraud, Judge --

 5              MS. KANOF:  Well, that is what wire fraud is.

 6              (Counsel speaking over each other.)

 7              MR. HANSHEW:  -- not alleges artifice.  They're

 8    proving up a separate fraud.

 9              THE COURT:  I'm going to overrule your objection.

10    Let's not spend too much more time.

11              (Ms. Kanof not present at the bench.)

12              MR. HANSHEW:  Judge, could we ask for the grand jury

13    transcripts as well?

14              THE COURT:  That should have been made available

15    through discovery --

16              (Counsel speaks of the Court.)

17              MR. HANSHEW:  They haven't given it to us.

18              THE COURT:  This guy testifies?

19              MR. HANSHEW:  No, but we're asking for it because

20    they're modifying.

21              Judge, if we can have Ms. Kanof come up?

22              THE COURT:  Ms. Kanof?

23              MS. KANOF:  Yes, Your Honor.

24              MR. HANSHEW:  We're asking for a copy of the grand

25    jury transcripts.  At this point we believe, Judge, that they've
```

1    modified the indictment.  And the only way we can ensure what

2    they presented to the grand jury as it relates to this and not a

3    separate line of fraud is to be able to review that.

4          MS. KANOF:  Your Honor, there's no basis in the law.

5    The only way to obtain a grand jury transcript because of some

6    hypothetical --

7          THE COURT:  Did he testify?

8          MS. KANOF:  No.

9          MR. HANSHEW:  That's not the only basis, Judge.  If

10   there's --

11         THE COURT:  You can show me a case that says you get

12   it other than witnesses who testify and you can impeach them for

13   what they said at the grand jury, I'm happy to --

14         MR. HANSHEW:  Thank you, Judge.

15         (Bench concludes.)

16         MS. KANOF:  Your Honor when I moved Government's

17   Exhibit 50 into evidence, I failed to move Government's

18   Exhibit 50A, which is the English translation of that letter.

19         THE COURT:  All right.

20         Ms. Franco, 50A?

21         MS. FRANCO:  No, objection.

22         THE COURT:  All right.  50A is admitted.

23   BY MS. KANOF:

24   Q.   So sense you don't speak Spanish we'll look at 50A.  We

25   already talked about it having the revised payment plan,

1   correct?

2   A.   Yes.

3   Q.   And he's attaching a letter to you from Mr. Buendia; is

4   that correct?

5   A.   Yes, uh-huh.

6   Q.   And for which I ask that you perform the transaction so

7   they're done according to the new requested schedule.

8           They're actually forwarding Mr. Buendia's e-mail to

9   you, correct?

10  A.   Yes, uh-huh.

11  Q.   And it purports to say, I'm attaching this message,

12  Mr. Delgado, so that you can perform this schedule, correct?

13  A.   Yes.

14  Q.   So translated in English, this letter, it's not to you,

15  right?

16  A.   It's not, no.

17  Q.   So you -- this is something between -- purportedly between

18  C.F.E. and (indiscernible) -- and F.G.G., correct?

19  A.   Correct, uh-huh.

20  Q.   And by means of this letter the legal representative

21  confirms acceptance of the modified table of payments.

22          So, Mr. Delgado agreed to this modified payment on

23  March 23rd, correct?

24  A.   Correct, yes.

25  Q.   Even though -- and it's $15 million even though $20 million

1    has already opinion spent, correct?

2    A.   Correct, yes.

3    Q.   And notably, for purposes of clarification, it's noted the

4    payments are according to the agreed upon amounts and not

5    according to the percentage table which was used as a reference

6    for the exclusive case of those proposals, correct?

7    A.   Yes, uh-huh.

8    Q.   Likewise, I ask you to confirm as soon as possible the

9    collection amounts which will be assigned to your client's

10   subcontractors in order to complete my issuance of the first

11   payment.

12           So this letter that was attached, did that also give

13   you comfort that before the 6th of March -- oh, wait.  This

14   letter is the 23rd of March.  The first issuance of payment had

15   already been made, but you didn't know that.

16   A.   But it had not been made to Mitsubishi.  We had not had any

17   money at that point.

18   Q.   You previously testified that -- I'm showing you

19   Government's Exhibit Number 62.  Is this e-mail from Mr. Delgado

20   to you?

21   A.   Yes.

22   Q.   Okay.  And is it regarding the payment terms?

23   A.   Yes.

24   Q.   And is it April 12th, 2010?

25   A.   Yes, uh-huh.

1    Q.   Is it the -- what is the Mitsubishi payment reconciliation

2    operative procedures?  What is this document?

3    A.   This was an offer again to change the payment terms that

4    would come to Mitsubishi or proposal to do so.

5    Q.   Why is it being sent to you?

6    A.   Again trying to get us to change the payment terms and

7    before -- you know, as we had not yet, I believe, gotten any

8    payments or if we did, it was not the 15 million that we were

9    expecting at that time, so they were trying to talk about,

10   again, a further change in what the payment terms would be.

11   Q.   This is from Mr. Delgado to you, correct?

12   A.   Yes, it was.

13   Q.   There's no one copied on it, correct?

14   A.   No, there's not, correct.

15   Q.   And this proposal from Mr. Delgado, if you would look at

16   page four which is, I guess, your number one and number two

17   begin.  Under number one, does it say, F.G.G. will be

18   responsible for any and all of its finance closing costs,

19   including those associated with commitment fees applicable to

20   letters of credit?

21   A.   Yes, it does, uh-huh.

22   Q.   Do you know that Mr. Delgado had already pledged your

23   equipment at that time?

24   A.   Did not know that, no.

25              MS. FRANCO:  Objection, Your Honor.  It's a fact not

1   in evidence as to who pledged.

2            THE COURT:  I sustained the objection.

3            MS. KANOF:  I think the pledge is in evidence.

4            THE COURT:  The pledge is, but not who.

5            MS. FRANCO:  The pledge is not, who did it, and I'd

6   like the jury to be instructed to disregard that, Your Honor.

7            THE COURT:  The jury will disregard the last comment

8   by the --

9            MS. FRANCO:  And I also move for a mistrial, Your

10  Honor.

11           THE COURT:  -- by the prosecution.

12           And your motion for mistrial is denied.

13           Did you require any other instructions to the jury?

14           MS. FRANCO:  No.  I'd instruct the Court to have the

15  jury disregard that.

16           THE COURT:  And the jury will disregard that last

17  comment.

18  BY MS. KANOF:

19  Q.    Did you pledge the equipment?

20  A.    Did not pledge the equipment, no.

21  Q.    What did this offering language mean to you?

22  A.    It means that F.G.G. was responsible for all letters of

23  credit that were required, so they were providing them for the

24  project.

25  Q.    Okay.

1            MS. KANOF:  Number two.  I can't hear you.

2            We'd ask that Government's Exhibit Number 62 be

3    admitted into evidence.

4            THE COURT:  Ms. Franco?

5            MS. FRANCO:  No, objection.

6            THE COURT:  GX-62 is admitted.

7    BY MS. KANOF:

8    Q.    Now that it's been admitted, the highlighted part

9    associated with (mumbles) for applicable letters of credit,

10   correct?

11   A.    Correct.

12   Q.    Okay.  Did you know whether or not a pledge had been made

13   of your equipment at that time?

14   A.    We did not believe that a pledge was made.

15   Q.    Number two, being offered by Mr. Delgado -- and Mitsubishi

16   and F.G.G. agreed to the following payment terms and to have

17   Mitsubishi receive direct payment for its equipment and in term

18   disburse to F.G.G. money.  Is that what you wanted?

19   A.    No.  This was not at all what our agreement was.

20   Q.    Okay.  Look at the dollar amounts.  Were you familiar with

21   the dollar amounts?

22   A.    Yes.  I've seen this document since then, yes.

23   Q.    Okay.  And this is April 12th of 2010.  And by this time

24   has Mitsubishi received the first payment?

25   A.    I don't recall exactly, but if they had it was in an around

1    that time period and we were expecting the 15 million and it

2    didn't come.

3    Q.   Okay.  Instead to the $11,321,000?

4    A.   Eventually it did, yes.

5    Q.   Okay.  And did Mitsubishi agree to this?

6    A.   Did not.

7    Q.   Government's 58, is that an e-mail from Mr. Gireud copied

8    to you on April 5th of 2010?

9    A.   Yes.

10          MS. KANOF:  And we move that Government's Exhibit

11   Number 58 be admitted into evidence?

12          THE COURT:  Ms. Franco?

13          MS. FRANCO:  No, objection.

14          THE COURT:  GX-58 is admitted.

15   BY MS. KANOF:

16   Q.   Your first payment was supposed to be in March and now this

17   is April 5th.  Do you recall the e-mail exchange that was

18   occurring without the first payment?

19   A.   Yes.

20   Q.   And number -- paragraph number two from Mr. Gireud relates

21   to you.  Could you please explain what this is about?

22   A.   That second paragraph were specifically we were asking for

23   the wire payments from Mitsubishi's bank so that C.F.E. could

24   directly deposit the funds into Mitsubishi's bank directly.

25   Q.   The next paragraph from Mr. Gireud, does it indicate

1    that -- what does it indicate with regard to his control over

2    the funds?

3    A.   He's stating that he's not in the control of the funds,

4    that the payment would come directly from C.F.E. to Mitsubishi,

5    which is what we wanted which was what a direct payment, and so

6    it was out of his control and it was coming directly from the

7    C.F.E. side.  And he doesn't control it.  It's out of his

8    control.

9    Q.   Government's Exhibit 60, is that an e-mail from Mr. Gireud

10   to you?

11   A.   I believe it was, yes, uh-huh.

12        MS. KANOF:  We'd move that Government's Exhibit Number

13   60 be admitted into evidence.

14        THE COURT:  Ms. Franco?

15        MS. FRANCO:  No, objection.

16        THE COURT:  GX-60 is admitted.

17   BY MS. KANOF:

18   Q.   Attached to this e-mail is another letter from Mr. Buendia

19   or purports to be another letter from Mr. Buendia; is that

20   correct?

21   A.   Correct, yes.

22   Q.   And so let me show you the English version.

23        MS. KANOF:  We'd also move that Government's

24   Exhibit Number 60A be admitted.

25        MS. FRANCO:  No, objection.

```
1                   THE COURT:  GX-60A is admitted.

2       BY MS. KANOF:

3       Q.    And if you would look at that middle of the chart.  Was

4       there any agreement between C.F.E. -- or in between Mitsubishi

5       and F.G.G. for a retention of money to pay a financial

6       institution to buy letters of credit?

7       A.    No, there was not.

8       Q.    Was there any agreement for a retention of money to pay a

9       contractor?

10      A.    No.

11      Q.    In fact, all of the documents that you've been looking at

12      requires F.G.G. to pay for their own costs, correct?

13      A.    Exactly, yes.

14      Q.    Does it purport to be an explanation?

15                  Do you want to take a minute to read it to yourself?

16      A.    Yes, thank you.

17                  Got it okay.

18      Q.    And is this consistent with your understanding of the

19      requirements?

20      A.    No, this did not match what our payment terms were that we

21      agreed to previously.

22      Q.    Government's Exhibit Number 61, is that an e-mail from you

23      to Mr. Gireud?

24      A.    Yes, uh-huh.

25      Q.    Okay.
```

1          MS. KANOF:  And I'm asking that the Court admit

2     Government's Exhibit Number 61 into evidence?

3          THE COURT:  61 is in evidence.

4          MS. KANOF:  It is admitted?

5          THE COURT:  Yes, ma'am.

6     BY MS. KANOF:

7     Q.   Is this in response to the communications you had received

8     from Mr. Gireud?

9     A.   Yes, it was.

10    Q.   Okay.  And what are you telling him?

11    A.   Saying that, look, we were expecting to get at least

12    14,493.000.  Instead, we didn't.  Please confirm that we're

13    going to get the amount of money in the first payment that we

14    had expected and also confirm that all -- that again the amount

15    was the proper amount and that there are no banking fees in your

16    proposal, which was what was -- there's no banking fees that

17    would take money out which was what was reflected in that

18    previous note.

19    Q.   Did you ever discuss with them that Buendia letter?

20    A.   With Fernando?

21    Q.   With either Mr. Delgado, Mace Miller or Mr. Gireud?

22    A.   I don't recall exactly, but I do recall that we were --

23    that this was not acceptable to us, that we would not accept the

24    deduction or the reduction in our prices, so...

25    Q.   Does Mr. Delgado respond to your e-mail?

1              MS. FRANCO:  Objection, Your Honor.  Once again

2    assuming facts not in evidence.  It's not addressed to him nor

3    is he copied.

4              MS. KANOF:  It is addressed to him, Government's

5    Exhibit Number 62.

6              MS. FRANCO:  Oh, I thought it was 61.

7              THE COURT:  61 is addressed to Mr. Adams, according to

8    a little note here.

9              MS. KANOF:  I'm sorry, Your Honor?

10             THE COURT:  Yes, it's addressed to Mr. Adams.

11             MS. KANOF:  We'd ask that Government's -- it's

12   admitted already?

13             THE COURT:  62 is in evidence.

14   BY MS. KANOF:

15   Q.   Is this an e-mail to you from Mr. Delgado?

16   A.   Yes, it was.

17   Q.   And what is it regarding?

18   A.   It was again on a draft of a proposed change to the payment

19   terms.  So it was:  Please find another proposal to again change

20   the terms lowering what Mitsubishi would get.

21   Q.   Okay.  And this is another one of those reconciliation

22   documents, correct?

23   A.   Yes.

24   Q.   Does it have the same language?  The date of this is

25   April 12th, correct?

```
 1    A.    Correct, yes.
 2    Q.    Have the same language in it, but now it's 102 million
 3    instead of 103 million?
 4    A.    Correct.
 5    Q.    How did it change from 103 million to 102 million?
 6    A.    Again, this is an offer to reduce the price.  And when we
 7    had talked about 102, originally, it was if there were an
 8    L.T.S.A., and if we were providing an L.T.S.A., we would have
 9    considered to drop lower, but this was one was just an attempt
10    to further lower the price on what we had offered and the amount
11    of money that would be given to Mitsubishi.
12    Q.    On this version does it also say F.G.G. will be responsible
13    for applicable letters of credit?
14    A.    Yes, it does.
15    Q.    I'm showing you what's been marked as Government's Exhibit
16    Number 64 and ask whether or not it's an e-mail in which you
17    were copied?
18    A.    It is, yes.
19    Q.    Okay.
20          MS. KANOF:  We'd ask that Government's Exhibit Number
21    64 be admitted into evidence.
22          THE COURT:  Ms. Franco?
23          MS. FRANCO:  No, objection.
24          THE COURT:  GX-64 is admitted.
25    BY MS. KANOF:
```

1    Q.    You want to take a minute and read it to yourself?

2    A.    Yes, please.

3          Okay.

4    Q.    So you've been dealing with Mr. Delgado about his

5    understanding of his role?

6    A.    That he was the -- the deliverer, if you would, of the

7    documents and the proposals and the contact to help and assist

8    with C.F.E., that was his role.

9    Q.    Were you dealing with him as legal counsel?

10   A.    No.

11   Q.    Okay.  And here -- legal counsel for F.G.G., I meant.

12   A.    We believed he had a role as legal counsel for F.G.G.,

13   because he was their head, you know, their person that they

14   would defer to if you will, but he had that position.

15   Q.    Where he says, I am at no time negotiating or speaking on

16   behalf of F.G.G., but since I've been in the middle after

17   talking to John, I offered to prepare something that would

18   summarize my understanding and be as neutral as possible.

19         What did you think when you got that?

20   A.    I didn't believe it, because he had been acting as counsel.

21   And again it looked to me -- it was just another attempt to

22   lower, you know, the amount of money in the contract value.

23   Q.    Okay.  It goes on to say, some of your changes make it

24   difficult for me to maintain my position and lend themselves to

25   direct negotiations with F.G.G.; is that correct?

1    A.   Yes.

2    Q.   Was that to you?

3    A.   Again, I think I don't understand where he was -- you know,

4    he was trying to be somehow, you know, negotiating on behalf

5    for -- or negotiating for C.F.E.  I really didn't understand

6    what that meant.

7          MS. FRANCO:  Objection, Your Honor.  It's calling for

8    speculation as to what someone else said.

9          THE COURT:  Well, he says he doesn't understand what

10   that means, so I guess I'll overrule your objection.  He doesn't

11   understand what it means.

12   BY MS. KANOF:

13   Q.   Let me drop down to number three:  I am sensitive to your

14   need for full authority to communicate with C.F.E.  Makes sense

15   and is needed, but bottom line at this point in time there's

16   just too much distrust between F.G.G. and Mitsubishi to make

17   this realistic.

18          What is he referring to?

19   A.   So at this point, we were hoping to be able to work on this

20   contract directly with F.G.G. and we had asked for the ability

21   to communicate with them directly.  And this was a refusal where

22   they're saying we couldn't do that and he used the excuse that

23   there was distrust between F.G.G. and Mitsubishi, which really

24   didn't make sense either.

25   Q.   You are getting ready to leave Mitsubishi at this point,

1    correct?

2    A.    I was literally a day or so away from leaving at that

3    point.

4    Q.    Look at number four.  My engagement with F.G.G.

5    (indiscernible) March 11 that's creating a potential conflict of

6    interest if Mitsubishi were to retain me -- to retain me for

7    this project.  Is Mitsubishi considering retaining Mr. Delgado?

8    A.    Not that I know of, no.

9    Q.    You're copied on this?

10   A.    Yes, uh-huh.

11   Q.    Like I said, I'm not trying to negotiate terms, just

12   document payment terms in such a way that everybody feels

13   comfortable.  What does that --

14   A.    Again --

15   Q.    Terms just terms?

16   A.    Just payment terms.  I think he was trying to say, again,

17   we're renegotiating the flow of the money, the payment terms,

18   but not changing or not negotiating a contract I think is what

19   he was trying to say, but again it was -- it was to us a clear

20   change again in what our proposed payment flow was, the first

21   payments, the quantity, the amount and the timing of it.  And we

22   didn't accept it.

23   Q.    I bring your attention to Government's Exhibit Number 52.

24   Do you recognize that as an e-mail from you?

25   A.    Yes.

 1    Q.    Okay.  And to Mr. -- copied to Mr. Delgado -- to Mr. Gireud

 2    but copied to Mr. Delgado?

 3    A.    Yes.

 4          MS. KANOF:  We move that Government's Exhibit Number

 5    52 be admitted into evidence.

 6          THE COURT:  That's 5-2?

 7          MS. KANOF:  Yes, Your Honor.

 8          THE COURT:  Ms. Franco?

 9          MS. FRANCO:  No, objection, Your Honor.

10          THE COURT:  GX-52 is admitted.

11    BY MS. KANOF:

12    Q.    I'll give you a minute to review it.  Okay.

13          So this e-mail is in response to -- or actually to you

14    from Mr. Delgado or from Mr. Gireud, but it is Mr. Gireud

15    following -- forwarding a message to you and to Mr. --

16    Mr. Delgado forwarding a message to you and Mr. Gireud, correct?

17    A.    Correct.

18    Q.    Okay.  Because it begins John and Fernando?

19    A.    Yes.

20    Q.    And it's signed off by Mr. Delgado, correct?

21    A.    Correct.

22    Q.    What's it about?

23    A.    This is about giving the format for the wire transfer such

24    that C.F.E. could directly send from their bank to Mitsubishi's

25    bank  the payment that we were requesting.

1    Q.    Dated March 26th, correct?

2    A.    Correct, uh-huh.

3    Q.    Look at this sentence.  Assigned payments will be issued

4    directly to Mitsubishi by the trust.  And then does Mr. Delgado

5    inform you and Mr. Gireud?  What does he say about his payments?

6    A.    His payments would be direct issued from F.G.G.

7    Q.    He doesn't say that he's going to take his payments off the

8    top for himself?

9    A.    That does not, no.

10   Q.    What does he say about requesting assignment of his fees?

11   A.    Please note that he did not request assignment, so he

12   didn't do what we had done and he wanted to be able to push for

13   expedited payment assignment such that we could get the

14   expedited payment and assignment of collection rights.  So he

15   didn't ask for his to be directly assigned, just ours.

16   Q.    If the money was sent from C.F.E. into Mr. Delgado's

17   account, would that be a definition of assignment of collection

18   rights?

19   A.    Not at all, no.

20   Q.    So then does he ask a favor of you?

21   A.    Yes.  Please assist me in securing payment of his fees as

22   soon as possible after that, so he was saying once we got our

23   money, help him to -- you know, help him with F.G.G. to make

24   sure F.G.G. paid him since they were libel to do so.

25   Q.    Okay.  And lastly although -- also, although it is certain

1    that payment will be received by April 6th; what is he saying?

2    A.   He's saying that in accordance to the 23rd or 24th agreed

3    to date, which was April 6th, that the payment would come at

4    least by then if not earlier.

5    Q.   This was dated when?

6    A.   This was dated the 26th of March, 2010.

7    Q.   And what is Mr. Delgado optimistic of?

8    A.   That we would get our direct payment before the April

9    6th -- on or about the April 6th date directly.

10   Q.   Were you aware that by March 9th, Mr. Delgado had

11   $20 million in his Turks and Caicos account from C.F.E.?

12   A.   Not at all, no.

13   Q.   Could you look in your notebook at Exhibit Number 11,

14   please?  That is your November 27th letter, correct?

15   A.   Yes.

16   Q.   Is that the very first letter that you sent to Mitsubishi

17   regarding this contract?

18   A.   I'm sorry?  To F.G.G.?

19   Q.   To F.G.G. regarding this contract?

20   A.   I believe it was.  I don't believe there was any letters

21   before that.

22   Q.   And you sent it -- I know it's blue, but basically did you

23   write it and scan it, and sign it and scan it?  Do you recall?

24   A.   I can't recall.  I'm sure, yeah.  I'm sure we wrote it and

25   then scanned it and sent that as an attachment to them,

1    absolutely, yeah.

2    Q.   I want to you stay in the notebook on Exhibit Number 11.

3    And now I'm going to, on the screen, put Exhibit Number 21.

4    Exhibit Number 21, which is also in evidence, if you could

5    please look at your signature on Exhibit Number 21?

6    A.   Yes.

7    Q.   And could you compare your signature on Exhibit Number 11

8    to Exhibit Number 21?

9    A.   I believed it would be the same one.  Yeah, they look

10   exactly the same, the signature itself.

11   Q.   Have you ever signed your signature -- was this an auto

12   pen?

13   A.   No.

14   Q.   Have you ever signed your signature exactly the same in

15   your life, do you think?

16   A.   No.  I don't think I can do that.

17            MS. KANOF:  Anything else?

18            Pass the witness.

19            THE COURT:  Ms. Franco?

20            MS. FRANCO:  Your Honor, may we approach again?

21            (Bench conference.)

22            MS. FRANCO:  Your Honor, it's in regard to the motion

23   in limine.  The Court had instructed me or instructed us to

24   approach the bench if we wanted to get into the reasons of  fact

25   that Mr. Adams had been terminated or, in fact, resigned and

1    terminated.  He testified on direct through questioning by

2    Ms. Kanof the reasons why he left prior employment.  He

3    testified that in this case, twice now, that if he had done

4    something against company policy he would have been fired.

5          So I believe that the question by Ms. Kanof and the

6    answers by Mr. Adams opens the door as to maybe not why he had

7    to leave, so not getting into the affair, but the fact is that

8    his subsequent employment to M.P.S.A., he was let go because he

9    violated company policy.  He's saying that if he signed this

10   pledge agreement that that would have been a violation of

11   company policy and he would have been fired.  He said it twice.

12   So I think that the door has been opened and I can ask him about

13   it.

14         MS. KANOF:  Your Honor, in addition to our motion in

15   limine regarding the relevance, the -- okay.  She's saying --

16         THE COURT:  Well, see, it's because the jury's been

17   left with the impression --

18         MS. KANOF:  I got it.  Okay.  Go ahead, ask him.

19         (Bench concludes.)

20                        JOHN MICHAEL ADAMS,

21                 CROSS-EXAMINATION BY THE DEFENSE

22   BY MS. FRANCO:

23   Q.   Mr. Adams, are you ready?

24   A.   Yes.

25   Q.   Mr. Adams, you testified at length yesterday and today that

1    you had repeatedly asked for copies of the contract over and

2    over again from F.G.G. and it wasn't provided to you, correct?

3    A.   Correct.

4    Q.   Now your testimony later today indicated that, in fact,

5    through the admission of different government exhibits, that

6    M.P.S.A. and you did receive copies of the contract, translated

7    copies of the contract and anexos that you wanted of the

8    contract, correct?

9    A.   The contracts came after January.

10   Q.   I understand that, sir, but you spent a better part of

11   yesterday afternoon and the first part of this morning --

12            MS. KANOF:  Objection, Your Honor.  Argumentative.

13            THE COURT:  Let me hear the question.

14   BY MS. FRANCO:

15   Q.   Saying that you at no point in time had ever reviewed or

16   seen the contract between F.G.G. or C.F.E., correct?

17            MS. KANOF:  Objection --

18            THE WITNESS:  Not correct.

19            MS. KANOF:  -- Your Honor.  That is assuming facts not

20   in evidence.  The question was asked whether he had seen it

21   before --

22            THE WITNESS:  Exactly.

23            MS. KANOF:  -- that contract was entered.

24            THE WITNESS:  I had not seen it before it was issued.

25   BY MS. FRANCO:

1    Q.    Okay.  But you had at this point in time as you are sitting

2    here testifying under oath before this jury, you have in your

3    capacity when you were a senior vice president, you had reviewed

4    the documents that you had requested from F.G.G., correct?

5    A.    The documents came from F.G.G. well after the contract was

6    signed.

7    Q.    Maybe I'm not saying this clearly enough for you, so I'm

8    going to slow down.

9              MS. KANOF:  Objection, Your Honor.  Sidebar.

10              THE COURT:  Sustained.  Sustained to sidebar.  Just

11    ask the question.

12    BY MS. FRANCO:

13    Q.    Mr. Adams, before you left okay M.P.S.A., you had requested

14    that F.G.G. provide to you copies of the contract and the

15    anexos, correct?

16    A.    Correct.

17    Q.    And in fact, you did and Hector Ponce and other individual

18    at M.P.S.A. did receive that documentation, correct?

19    A.    Eventually, yes.

20    Q.    Now, you testified on direct examination I believe twice

21    that you wouldn't have entered into this pledge agreement or

22    that letter.  You wouldn't have signed that letter, because it

23    was -- ended up with you getting fired, correct?

24    A.    Correct.

25    Q.    And isn't it a fact Mr. Adams that your very next

1    employment that you took, you ended up resigning from that

2    position in lieu of termination?

3    A.   Yes.

4    Q.   And that was because you violated company policy, correct?

5    A.   Correct.

6    Q.   Now, with regard to the schedule of payments, the payments

7    that were provided by -- through Mr. Delgado to Mitsubishi, the

8    M.P.S.A., the first submission which was $11 million and the

9    second submission which was $7 million, that was actually

10   received by Mitsubishi at least to the best of your knowledge,

11   correct?

12   A.   Yes, it was.

13   Q.   And that was pursuant to the negotiation of the payment

14   terms, correct?

15   A.   No, it was not correct with what the payment terms had

16   asked for.

17   Q.   Have you had a chance to look -- let me just -- to make

18   sure, maybe I'm asking it wrong, have you seen the invoice that

19   Mr. Beddard had sent to F.G.G.?

20   A.   I have not, no.

21   Q.   Let me show you, I believe it's Government's Exhibit

22   Number 67 which has been admitted into evidence.

23            Is that up on your screen?

24   A.   Yes.

25   Q.   If I scroll down here, you see that the invoices that were

1    sent indicates that the total due is about $9 million, correct?

2    A.   Yes.

3    Q.   And that there was a credit that was given back to F.G.G.

4    for overpayment, correct?  Do you see the last overpayment from

5    the first amount that was paid?

6    A.   I see it written that way, yes.

7    Q.   In your correspondence, the different exhibit says then

8    that you testified about and that had been admitted, most of

9    your correspondence was to Mr. Gireud, correct?

10   A.   Correct.

11   Q.   As he was the president of F.G.G., correct?

12   A.   Correct.

13   Q.   And you testified a little while ago that you understood

14   Mr. Delgado's role was, is that he was the person that assembled

15   the bid documents and submitted it to C.F.E. or their approval,

16   correct?

17   A.   In the beginning -- yes, that was his role, uh-huh.

18   Q.   Now your role, you got involved in this through the teaming

19   agreement as a result of Mr. Williamson having heard of

20   Mr. Gireud or did you already know Mr. Gireud yourself?

21   A.   I did not, no.

22   Q.   Was it Mr. Williamson that brought this to your attention?

23   A.   Yes.

24   Q.   At this point in time gray market, these three turbines had

25   been -- two were in Japan and one was in France, correct?

1    A.   Correct.

2    Q.   And that was because of another deal had fallen through

3    between another purchaser and M.P.S.A., correct?

4    A.   Another purchaser and Mitsubishi Heavy Industries.

5    Q.   Okay.  So your parent industry, correct?

6    A.   Yes.

7    Q.   And you were aware that these gray market turbines were

8    available, correct?

9    A.   We learned that they were available, yes.

10   Q.   And so Mr. Williamson brought you this deal, correct?

11   A.   Mr. Williamson brought the opportunity for us to go after

12   this deal, yes.

13   Q.   And you testified yesterday that the meeting that took

14   place regarding the teaming agreement as to whether or not it

15   would be feasible, that transpired I believe you said in

16   Ft. Worth, correct?

17   A.   Correct.

18   Q.   And Mr. Delgado was not at that meeting, was he?

19   A.   He was not.

20   Q.   And that would have been Mr. Gireud or Mr. Gireud was there

21   and Mr. Miller was there, correct?

22   A.   I believe so.

23   Q.   And it was yourself and Mr. Williamson that was there?

24   A.   Yes.

25   Q.   And the teaming agreement, you indicated that your legal

1    department prepared that, drafted that and prepared that

2    agreement, correct?

3    A.    Correct.

4    Q.    And in that agreement which is Government's Exhibit

5    Number 7 -- I'll bring that up so you can look at it -- is that

6    there in front of you?

7    A.    Yes.

8    Q.    In that teaming agreement, it certainly contemplates that

9    the purchase price that F.G.G. would pay to M.P.S.A. would be

10   lower than the price F.G.G. would sell the equipment to C.F.E.,

11   correct?

12   A.    Yes.

13   Q.    And that's been your understanding or was your

14   understanding during this transaction with F.G.G.?

15   A.    Yes, that it could be, uh-huh.

16   Q.    If I scroll down to -- it's page four in the second

17   paragraph where it talks about the mutual obligations.  Do you

18   see that paragraph?

19   A.    I do.

20   Q.    And it talks in there about the requirement to get the

21   letters of credit and it talks about for the supply -- for the

22   supply of equipment and service; you see that, correct?

23   A.    Yes, uh-huh.

24   Q.    And -- or that that requirement could be waived by C.F.E.,

25   correct?

1    A.    Correct.

2    Q.    So the idea that C.F.E. could waive the requirement of

3    having a letter of credit certainly was contemplated back in

4    August when this teaming agreement was entered into, correct?

5    A.    Correct.

6    Q.    Now, this teaming agreement that you signed off on, there

7    wasn't an addendum to that, was there not, Do you recall that?

8    A.    I don't recall offhand, no.

9    Q.    I'm going to show you -- let me get it for you to identify

10   because it has not been admitted.  Is that showing up on your

11   screen?

12   A.    Yes.

13   Q.    And does this -- I'll give you a moment to look at it to

14   see if this refreshes your recollection.

15             THE COURT:  What exhibit number is it?

16             MS. FRANCO:  199.  I'm sorry, Your Honor.

17   BY MS. FRANCO:

18   Q.    It would be in the defendant's exhibit.  You can't read it?

19   A.    I can read part of it.  It's just you need to scroll up and

20   down a little bit if you wouldn't mind.

21             MS. FRANCO:  May I approach, Your Honor.

22             THE COURT:  Yes, ma'am.

23             You said 199?

24             MS. FRANCO:  199, Your Honor.  Defendant's 199.

25             THE COURT:  The one I have only goes to 173.

1          MS. FRANCO:  We'll update it, Your Honor.

2     BY MS. KANOF:

3     Q.   So is this something you entered into it with Mr. Gireud?

4     A.   Yes.

5     Q.   Signed on the same day was the teaming agreement, correct?

6     A.   I believe so.  I'm not -- again with the dates are the 11th

7     of August on this one, so...

8     Q.   Okay.  But it references the teaming agreement which was

9     signed on the 8th of August, correct?

10    A.   Yes.

11         MS. FRANCO:  Your Honor, at this time I'd move for

12    admission of Defendant's Exhibit 199.

13         MS. KANOF:  No, objection.

14         THE COURT:  Defendant's Exhibit 199 is admitted.

15    BY MS. FRANCO:

16    Q.   So in this addendum number one to your teaming agreement,

17    it talks about in that middle part, "so the parties agree as

18    follows."  And then it looks like there's a -- it's a, duh, and

19    then there looks like it's a handwritten with initials next to

20    it.  It looks like effectiveness of this teaming agreement; is

21    that correct?

22    A.   Correct.

23    Q.   And it says, shall be contingent upon, (A), review of the

24    final requirements of the owner's bid specifications and (B),

25    agreement between the parties on the final scope, price, market

DIRECT EXAMINATION ADAMS                                                114

1    commercial conditions, including any required concurrence from

2    Thomason and Pot Developments, LLC, who has a certain interest

3    in the equipment, correct?

4    A.   Correct.

5    Q.   All right.  So let me ask you first, in this, the owner,

6    that would be the trust or C.F.E., correct?  If you look at the

7    paragraph above that.

8    A.   Yes, yes.  It could be.

9    Q.   And then this Thompson and Pot development, LLC, who are

10   they?

11   A.   Those are Rick Williamson's company which I think it was

12   Rick Williamson's wholly owned company.

13   Q.   And they have some sort of interest in this gray market

14   Turbine as well?

15   A.   They did.

16   Q.   Was that result of the prior deal being broken?

17   A.   No, not at all.

18   Q.   How is it that Mr. Williamson had a financial interest in

19   these turbines?

20   A.   Mr. Williamson's job as a broker of turbines was to help

21   with the acquisition and then the reselling of equipment for us

22   to help define opportunities.  So in exchange for that he was

23   given a partial interest in the equipment.

24   Q.   Okay.  And do you know how much it was that M.P.S.A. paid

25   Mr. Williamson for bringing this deal to you?

1    A.   In addition to Mr. Williamson, it was some percentage like

2    six percent or eight percent, in that range.  It was a

3    relatively small percentage, but I can't remember.

4    Q.   Six percent or eight percent of --

5    A.   But he also contributed money to acquire the turbines back

6    from E.D.F. as well, so...

7    Q.   Okay.  So six or eight percent of the value of the

8    turbines?

9    A.   Six per-  -- or eight percent of the value of the turbines

10   and so he would have contributed a percentage of the price and

11   then he would have gotten a value percentage back on the sales

12   price.

13   Q.   The purchase price is 102 million?

14   A.   106.6 is the purchase price that I had.

15   Q.   So he had a cut of that or at least his company did,

16   correct?

17   A.   Correct, uh-huh.

18   Q.   I'm going to show to you what's been marked as Government's

19   Exhibit 61.  Do you have that in front of you?

20   A.   I do.

21   Q.   When you were testifying on direct examination with

22   Ms. Kanof and she was asking you about that letter that was used

23   to pledge the equipment, you said that you had never used "L.C."

24   for letter of credit, correct?

25   A.   I would not generally use "L.C."

1   Q.   And this -- and this is your e-mail, correct?

2   A.   It appears likely.

3   Q.   And if you look down on that third paragraph it says, also,

4   we need our confirmation that all financing of L.C. and banking

5   fees are outside our scope and price, correct?

6   A.   Correct.

7   Q.   So you have used L.C.?

8   A.   I didn't remember using it, but yes.

9   Q.   So it's not impossible that you would have used that

10  abbreviation?

11  A.   Unlikely, very unusual, but yes.

12  Q.   In fact, this date of April the 7th, 2010, that would be

13  after the date of the letter that was used to -- for the pledge

14  agreement, correct?

15  A.   Apparently, but we didn't know about the pledge agreement

16  at the time.

17  Q.   Well, I understand that's your testimony, Mr. Adams.

18            MS. KANOF:  Objection, Your Honor.  Argumentative.

19            THE COURT:  Sustained.

20            MS. KANOF:  Sidebar.

21            THE COURT:  Sustained.

22  BY MS. FRANCO:

23  Q.   Now, Mr. Adams, you are aware, are you not, that in Travis

24  County, Texas, that there is a law suit filed by M.P.S.A.

25  against F.G.G. Enterprises and Mr. Gireud and Mr. Delgado?

1    A.   I'm not -- I have not any knowledge of it.

2    Q.   Oh, you didn't provide an affidavit in that case?

3    A.   Not that -- not directly that I recall in that case.  I'm

4    not involved in that case.

5    Q.   So you didn't submit an affidavit that M.P.S.A. used?

6    A.   I submitted an affidavit at some point that I didn't write

7    this pledge letter.

8    Q.   Okay.  So I'm confused now.  So what did you write the

9    affidavit for?

10             MS. KANOF:  Objection, Your Honor, to whether she's

11   confused or not.  Sidebar.

12             THE COURT:  Sustained.

13   A.   The affidavit -- the affidavit was, from my understanding,

14   was for there.

15   BY MS. FRANCO:

16   Q.   It was for this?

17   A.   Yes, that's my understanding.

18             THE COURT:  What?  For this?

19             THE WITNESS:  For this trial, that's what I had

20   understood.  But again, I'm -- you know, I was asked for an

21   affidavit.  Did I write such a letter?  I did an affidavit and

22   they said that did I not write a letter and I believed it would

23   be used for here.

24   BY MS. FRANCO:

25   Q.   All right.  So who asked you for that affidavit?

```
 1    A.    My lawyer did.

 2    Q.    Okay.  And your lawyer is independent of M.P.S.A.?

 3    A.    Yes.

 4    Q.    And you don't know whether or not your lawyer had received

 5    information from M.P.S.A. for you to submit a lawsuit -- I mean

 6    an affidavit for a lawsuit?

 7    A.    I don't understand.  Well, I realized that I did an

 8    affidavit to state that I did not pledge the equipment and for

 9    whatever use it was needed I gave it to them.

10              MS. FRANCO:  Your Honor, may I have just a moment?

11              THE COURT:  Yes, ma'am.

12              MS. FRANCO:  May I approach Your Honor?

13              THE COURT:  Yes, ma'am.

14    BY MS. FRANCO:

15    Q.    Mr. Adams, I'm going to hand to you, which I'm marking for

16    identification purposes only as Defendant's 200, do you see

17    that?

18    A.    I do.

19    Q.    Do you recognize it?

20    A.    Yes, I do.

21    Q.    And is that your signature on it?

22    A.    Yes.

23    Q.    And that when you signed that, was the --

24              MS. KANOF:  Excuse me, Your Honor.  I don't believe we

25    have a copy of that.
```

1          MS. FRANCO:  Let me show it to her.

2          THE COURT:  Yes, ma'am.

3     BY MS. FRANCO:

4     Q.   And, sir, when you signed that document, was the style of

5     the case on it as it appears?  Was there a title up there where

6     it shows to be a lawsuit?

7     A.   Yes, it did.

8     Q.   It doesn't say the United States of America versus anybody,

9     right?

10    A.   No, it doesn't.  I didn't really know the difference

11    between this one and that one, so --

12    Q.   Okay.

13    A.   -- I just used it.  I gave my affidavit that I didn't sign

14    that.

15    Q.   Okay.  And how -- and you've been employed and a

16    businessman for 30-something-odd-years?

17    A.   Yes.

18    Q.   And you've never been involved in any type of lawsuits

19    before?

20    A.   No, ma'am.

21    Q.   So you don't recognize that that says in Travis County?

22    A.   Yeah, I believed it was in conjunction to this case, but

23    that's fine.

24    Q.   But it's not, correct?

25    A.   The affidavit was apparently, after looking at it now, it's

1   for a case Mitsubishi against F.G.G.

2   Q.   You testified on direct examination that there wouldn't

3   have been any benefit to you if this deal with F.G.G. and C.F.E.

4   had gone through, correct?

5   A.   Correct.

6   Q.   But at a time when you're working on this deal, in fact,

7   that was your job, right?  You were in the commercial aspect of

8   M.P.S.A., correct?

9   A.   I was, yes.

10  Q.   And so -- and you had found out about this deal that there

11  was a company that was interested in buying these gray market

12  turbines, correct?

13  A.   Correct.

14  Q.   And you had talked to Mr. Williamson and set up this for

15  the teaming agreement, correct?

16  A.   Correct.

17  Q.   And you formalized or had your legal department normalize

18  the teaming agreement, correct?

19  A.   Correct.

20  Q.   And there would be in addition to the $106.6 million for

21  the turbines, there's was lots of contemplation that M.P.S.A.

22  would get the long-term service agreement as well, correct?

23  A.   Correct.

24  Q.   You testified yesterday that was a very lucrative contract,

25  correct?

1    A.    Correct, but it wasn't under my department.

2    Q.    But it was lucrative for M.P.S.A., correct?

3    A.    It was a normal business contract that, yes, gave markups

4    for that service business, yes.

5    Q.    And you testified yesterday that the hope was at that point

6    in time, the hope was this long-term service agreement would be

7    in effect for I believe you said 12 years, correct?

8    A.    Correct.

9    Q.    And at the time when the teaming agreement was entered

10   into, was the figure of $121 million, does that sound in the

11   neighborhood of what that long-term service agreement was worth?

12   A.    No.  It was -- the 121 was the equipment supply.

13   Q.    And what was for the long-term service agreement?

14   A.    I don't recall actually.  I don't know.  It was in that

15   range, probably 100 million.

16   Q.    100 million for that?

17   A.    Probably.  But again, that wasn't in my department.  That

18   was in a different department within Mitsubishi.  Services were

19   managed by the head of service.  I managed the equipment

20   business.

21   Q.    So once the contract started, once the subcontract, the

22   teaming agreement and the subcontract and everything that

23   happened from there, at least until you departed from F.G.G.,

24   you had invested interest in making sure this deal got

25   consummated, that it went through, correct?

1   A.   It was my job to bring good business to Mitsubishi, and as

2   long as it was a good project, I'd bring it to Mitsubishi.  If

3   it became not a good project, it was my job also to make sure it

4   didn't go to Mitsubishi.

5   Q.   But you didn't do that.  You didn't terminate the agreement

6   with F.G.G., correct?

7   A.   We did not terminate although we threatened a number of

8   times.

9   Q.   Right.  And in fact, your letter before you entered into

10  the subcontract with F.G.G., you indicated in that letter, did

11  you not, that you could walk away at that point because your

12  proposal that you had submitted had already expired, correct?

13  A.   Correct, uh-huh.

14  Q.   But instead of walking away, you continued with it,

15  correct?

16  A.   Yes.

17  Q.   And you testified also that you have M.P.S.A. or at

18  least that you were able to have at your disposal an entire

19  legal department, correct?

20  A.   We have a legal department at Mitsubishi that worked with

21  us on all of these contracts, yes.

22  Q.   And this would be the same legal department that drafted

23  that teaming agreement, correct?

24  A.   Yes, it would be.

25  Q.   Are they the same department that drafted the subcontract?

1    A.   I don't recall.  I don't remember who drafted the

2    subcontract, to be truthful.  I do not remember.

3    Q.   You don't remember if it was M.P.S.A. or not?

4    A.   I can't remember who actually did the drafting.  I just

5    don't remember.  It was seven years ago.

6    Q.   All right.  And in the subcontract, that would be the

7    Spanish version of the subcontract, correct?

8    A.   We would not have drafted anything in Spanish.

9    Q.   You don't know where that came from?

10   A.   I don't know who drafted it, no.

11   Q.   But it was certainly a contract that Mr. Wunder had signed,

12   correct?

13   A.   Mr. Wunder did sign it, but he very carefully put in the

14   one-page handwritten statement that said the subcontract would

15   be adjusted per the proposal.

16   Q.   And at that time, what was Mr. Wunder's job at M.P.S.A.?

17   A.   Mr. Wunder was one of the, I believe, V.P. of sales at that

18   time.  I believe that was his job.

19   Q.   So you were his boss?

20   A.   I was.

21   Q.   And did you have an opportunity to look over that

22   subcontract that your subordinate signed?

23   A.   Not before it was signed, no.

24   Q.   Do you know whether or not Mr. Wunder provided, if M.P.S.A.

25   did not draft that contract, do you understand whether or not

1    Mr. Wunder had provided that to your legal department for them

2    to look at it before it was signed?

3    A.   I do not believe that he had that opportunity.

4    Q.   The contract was signed I believe in the middle of

5    December; is that correct?  Is that your recollection?

6    A.   That's my recollection.

7    Q.   And based upon your testimony yesterday, you indicated that

8    you'd been to Mexico on two prior occasions, correct?

9    A.   Correct.

10   Q.   And one was after the teaming agreement, but prior to the

11   bid submission, correct?

12   A.   Correct.

13   Q.   And that would have been in September of '09?

14   A.   September or October, that order of magnitude, yes.

15   Q.   And the second time was in early December, correct?

16   A.   December 9th, I believe, yes.

17   Q.   And on those two occasions, did you socialize with anyone

18   from C.F.E., if you can recall?

19   A.   I recall maybe one dinner with one person from C.F.E. and

20   then another dinner or lunch, if you will, with somebody from

21   the labor union.  That's all I can recall.

22   Q.   And the purpose of that social engagement was to discuss

23   this hopeful business deal between C.F.E., F.G.G. and M.P.S.A.?

24   A.   Yeah, to see how it could possibly work, yes.

25   Q.   And Mr. Ponce, who is your consultant that you brought in,

1    did you bring him in prior to the execution of the teaming

2    agreement or was that done later?

3    A.    Mr. Ponce was part of the consultation with Mitsubishi

4    prior to that, but he was brought in though to this project from

5    the teaming agreement.  He wasn't part of it before that.

6    Q.    So after the teaming agreement had been signed, Mr. Ponce

7    became part of it?

8    A.    He became assigned to this contract, yes.

9    Q.    And on those trips that you took to Mexico in September,

10   October and December, 2009, was Mr. Ponce with you on those

11   occasions?

12   A.    I believe he was.  I believe in both cases, but I can't

13   remember exactly, but I believe he was in both cases.

14   Q.    And when the subcontract was executed, was he in Mexico at

15   that time?

16   A.    No, not to my knowledge.

17   Q.    And was he -- was he in Mexico prior to the submission of

18   the bid to C.F.E.?

19   A.    I believe he was, yes.

20   Q.    And did he help -- did he help assemble the paperwork that

21   was required by C.F.E. for -- from F.G.G.?

22   A.    I don't know for certain.  I don't know what he was doing.

23   Q.    So you don't know why he was down there?

24   A.    He was down there representing Mitsubishi, but I don't know

25   that he helped to submit or not.  I do not know.

1    Q.   So you've testified several times that there was no

2    relationship between M.P.S.A. and C.F.E., correct?

3    A.   There was no direct relationship, no contract.

4    Q.   But Mr. Ponce was there prior to the submission of the bid

5    to C.F.E. from F.G.G. as you just testified to represent

6    M.P.S.A.'s interest, correct?

7    A.   To make sure that the products and equipment that we had

8    were consistent with what we had in the warehouse, to make sure

9    that here's our offer that we were giving to F.G.G. to make sure

10   and try to find out for certain that they matched.

11   Q.   So Mr. Ponce's in Mexico prior to the bid submission was to

12   ensure that M.P.S.A.'s interests were protected, that what

13   M.P.S.A. was willing to offer, C.F.E. was willing to accept

14   through the bid process?

15   A.   To the extent that he could, yes, but again his -- the most

16   important part for Mr. Ponce was to assure that what was offered

17   to F.G.G. was our equipment as it was, and then give them the

18   tools to be able to make sure it was offered from F.G.G. to

19   C.F.E. was consistent with what we had.

20   Q.   Right.  So he was the boots on the ground so to speak for

21   that bid submission to make sure that M.P.S.A. was protected in

22   that bid process, correct?

23   A.   He was in and out of Mexico a few times to work together to

24   put in the bid, yes.

25   Q.   To make sure that M.P.S.A.'s interests were protected,

1    correct?

2    A.   To make sure that what we offered was what we offered to

3    F.G.G. was consistent with what F.G.G. would offer to C.F.E.,

4    but we didn't have a relationship with C.F.E. because we weren't

5    going to have a contract with C.F.E. for the prime equipment and

6    we still --

7              MS. FRANCO:  Your Honor, he's nonresponsive to the

8    answer to my question, so...

9              THE COURT:  Sustained.

10   BY MS. FRANCO:

11   Q.   I'm going to show you what has been marked and admitted

12   into evidence as Government's Exhibit Number 34.  This was an

13   e-mail from Hector Ponce to Mr. Gireud and copied in are

14   yourself and Mr. Delgado and Mr. Wunder, correct?

15   A.   Correct.

16   Q.   This is e-mail submission.  I guess the letter was attached

17   to it.  And it said, Marco, here's a letter discussed with John

18   yesterday.  Correct?  I'm scrolling through, I'm sorry.

19   A.   I do, yes.

20   Q.   Okay.  And so this is the letter that you testified about

21   as the January 12th letter of 2010, where it's talking about the

22   cooperation on the project and you've testified about some of

23   the issues that you addressed to Mr. Gireud about the contract,

24   correct?

25   A.   Yes.

KATHLEEN A. SUPNET, CSR

1   Q.   In the last paragraph, you indicated you wrote:  We look

2   forward to your expedited responses and to finalizing our

3   subcontract and project plan as we discussed.  A meeting should

4   be held with C.F.E. to ensure complete understanding among us.

5   Finally, once we have final understanding, we must amend our

6   F.G.G. M.P.S.A. subcontract as agreed in Mexico.

7           And then you go on to say that time was of the

8   essence, correct?

9   A.   Correct.

10  Q.   Now, from when you testified to today, you were in Mexico

11  in the early part of December, correct?

12  A.   Correct.

13  Q.   And you testified that you did not return to Mexico either

14  the rest of the part of December or in January, correct?

15  A.   Correct.

16  Q.   But, yet, here in this letter that you sent in January

17  the 12th, you're saying that as agreed in Mexico, correct?

18  A.   This is regarding the handwritten letter that Mr. Wunder

19  did that said we would adjust the subcontract in accordance to

20  what the final was and this was our agreement to do that.

21  Q.   It doesn't say about -- it says, as agreed in Mexico.  It

22  certainly doesn't say --

23  A.   It doesn't say.

24  Q.   -- that what you and Mr. Wunder agreed to or what was in

25  that contract that was entered into in the middle of December,

1    correct?

2    A.    It does not say that, specifically.

3    Q.    And according your testimony, that was after your last trip

4    to Mexico, right?

5    A.    The letter with Mr. Wunder was after my trip to Mexico,

6    yes.

7    Q.    Well, this letter, also to Mr. Gireud, was after your trip

8    to Mexico, right?

9    A.    Correct.

10   Q.    I think it's defendant's exhibit -- you probably still have

11   a copy up there -- Defendant's Exhibit 199, which is that

12   addendum to your teaming agreement.

13   A.    Yes.

14   Q.    Let's pull it up again.

15          In the teaming agreement, you are binding yourself as

16   an officer of M.P.S.A. that you are to look at all of the

17   requirements of the bid specification and approve of them in

18   order for this teaming agreement to be effective, correct?

19   A.    No, not approve of them, to review them and see what the

20   differences were between what we had and what they offer.

21   Q.    So in order for your proposal, M.P.S.A.'s proposal to be

22   submitted by F.G.G., you're wanting to make sure that the

23   equipment that's being offered is going to be acceptable to

24   C.F.E. as per the bid specs, correct?

25   A.    Correct, with our comments back to explain to them where it

1    wasn't.

2    Q.   And you don't mention in here anything about a financial

3    a -- the financial proposal or the actual bid itself?

4    A.   (No response.)

5    Q.   In other words, when you are submitting this proposal with

6    the hopes of being able to sell these three turbines that were

7    out there, in order for you to make a wise business decision,

8    did you want to look at all of the bid documents that were

9    submitted prior to you signing off that, yes, you can use our

10   equipment for your bid application?

11   A.   We wanted to look at the specs and the offer back, the

12   proposal back, to see that it matched up with where we were.

13   Q.   Right.  And due diligence would have required that, would

14   it not?

15   A.   To review the specs?  Not necessarily, because we -- if we

16   could very clearly offer our equipment as it is and define what

17   it was, we could take blanket exception to some of the

18   specifications, we just say, well, really don't need that

19   because this is what it is we're offering.  And as long as we

20   were clear on that and that that was submitted as part of the

21   proposal, then we wouldn't have necessarily had to gone through

22   it and agreed to or not agreed to everything.

23   Q.   So to be clear on it, when you say to be clear on it, is

24   that when whatever documents that were submitted to C.F.E. by

25   F.G.G., you wanted to make sure that F.G.G. wasn't obligating or

1    presenting your equipment as something that would meet their

2    needs when, in fact, it would not meet their needs, correct?

3    A.   That was the whole purpose for the -- yes, that we wanted

4    to make sure that they would match up.

5    Q.   And you're saying that you, at least you, yourself, never

6    looked at the bid packet that was submitted to C.F.E.?

7    A.   I don't recall looking at the by pact that was submitted to

8    them, no.

9    Q.   And what you testified to a little while ago, Mr. Ponce was

10   in Mexico for that purpose, was to see with a was submitted

11   ultimately to C.F.E., correct?

12   A.   He was there to help to put in our proposal to make sure

13   things were there.  Again, I don't know what he did when he was

14   there, so I won't speculate.

15   Q.   I'm going to bring up Government's Exhibit 44 for you to

16   take a look at.  And in Government's Exhibit 44, this is a

17   communication from your vice president of M.P.S.A., correct?

18   A.   Correct.

19   Q.   And is this a subordinate to you?

20   A.   No.  He was kind of equal level to me.  He did not report

21   to me.

22   Q.   So you were -- if there was an organizational chart, you

23   would be lateral to each other?

24   A.   Pretty much, uh-huh.

25   Q.   So this is -- you testified to before under direct

1    examination that this was the assignment issue that M.P.S.A.

2    wanting to have that assignment of amount of collection for

3    payment, correct?

4    A.   Correct.

5    Q.   I'm going to direct you to the -- I'm sorry.  It's the

6    first page of it.

7             So this is addressed to Mr. Gireud as the President of

8    F.G.G., correct?

9    A.   Uh-huh.

10   Q.   And is that a yes?  I'm sorry.

11   A.   Yes.

12   Q.   And in this letter that -- the other vice president had

13   indicated that had they negotiated in good faith and executed

14   the subcontract upon the reliance of F.G.G., and it goes on and

15   it talks about during our meetings of December 17th and December

16   the 18th in Mexico City, do you see that?

17   A.   I did, uh-huh.

18   Q.   And this individual, this other vice president, is that

19   Ueki?

20   A.   Ueki, yes.

21   Q.   Ueki?

22   A.   Uh-huh.

23   Q.   Is it possible that he was responsible for the preparation

24   of that subcontract?

25   A.   No, he doesn't speak Spanish.

1    Q.    Okay.  Would you agree with me that it appears that since

2    he's talking about our meetings of December 17th and 18th in

3    Mexico City that he's referring to himself being in Mexico City

4    when the subcontract was negotiated and signed?

5    A.    Yes.  It appears that he's there when Mr. Wunder as there.

6    Q.    And do you have any information that would indicate

7    otherwise that he wasn't there?

8    A.    No, I don't.

9    Q.    Mr. Adams, you testified earlier about providing

10   information.  For instance, you thought the affidavit that you

11   had provided was for a criminal case?

12   A.    I just couldn't remember.

13   Q.    Which it wasn't?

14   A.    Until you showed me again.  Thank you.

15   Q.    And -- and you indicated yesterday in questioning by

16   Ms. Kanof that you hadn't met with her personally; is that

17   correct?

18   A.    I have not met personally, no.

19   Q.    But you talked to her over the phone, correct?

20   A.    Yes, uh-huh.

21   Q.    How many occasions did you --

22   A.    Three.

23   Q.    On three occasions?

24   A.    Uh-huh.

25   Q.    Did you speak to any of the case agents on this case?

1    A.   If they were on the conference call with us, I can't recall

2    directly.   There were other people in the room when we were

3    doing conference call.

4    Q.   And did you remember being interviewed by Agent Fry or

5    anything like that?   Do you see him in the courtroom?

6    A.   I don't recall being interviewed directly.   Mostly it was

7    most of the discussions.   I mean when I had some of the previous

8    discussions we had a conference call, a video conference and

9    there were three people in the room.

10   Q.   And so do you recall three times that you can recall with

11   Ms. Kanof, and do you recall any meetings that you may have had

12   with the case agents involved in this case?

13   A.   I don't recall any, no.

14   Q.   That didn't involve her, I should say?

15   A.   That did not involve her?

16   Q.   Yes, sir.

17   A.   I don't recall any, no.

18   Q.   So you talked to the government at least three times,

19   correct?

20   A.   I believe so, yes.

21   Q.   Okay.   And after your testimony yesterday and during your

22   testimony yesterday, did you have an opportunity to speak with

23   the -- Ms. Kanof or the agents in this case?

24   A.   Not before I got called in yesterday.

25   Q.   Okay.   And during your testimony yesterday during the

1   breaks, did you have an opportunity to meet with them or talk to

2   them about the case?

3   A.   No.

4   Q.   You testified that you would -- you really didn't have

5   anything to gain from this deal, correct, if this deal went

6   through?

7   A.   Correct.

8   Q.   But you certainly would have a lot to lose if in fact you

9   did author that pledge letter?

10  A.   Correct.

11  Q.   You indicated you would be fired, correct?

12  A.   Correct.

13  Q.   And certainly if there's lawsuits pending that you could've

14  been implicated in that, correct?

15          MS. KANOF:  I would object.  That's a hypothetical.

16  He already said he wasn't part of the lawsuits.

17          THE COURT:  Well she's asking whether or not he could

18  be implicated in that.  I'll overrule that objection.

19          Do you have any other?

20          THE WITNESS:  I don't know.  I have no idea.

21  BY MS. FRANCO:

22  Q.   So you think that if you had authorized that letter that

23  there wouldn't have been any civil ramifications against you?

24  A.   I honestly don't know.

25  Q.   You don't know?  You know there was a big dispute between

1    M.P.S.A. and C.F.E., correct?

2    A.   I knew there became one, yes.

3    Q.   Right.  So whether or not you admitted to having authored

4    that letter that could've affected that dispute between C.F.E.

5    and M.P.S.A., correct?

6    A.   I suppose.  I don't know.

7              MS. FRANCO:  Your Honor, may I have a moment?

8              THE COURT:  Yes, ma'am.

9              MS. FRANCO:  That's all I have, Your Honor.  Pass the

10   witness.

11             THE COURT:  Thank you, Ms. Franco.

12             MS. FRANCO:  Thank you, Your Honor.

13             THE COURT:  Ms. Kanof?

14                     JOHN MICHAEL ADAMS,

15             REDIRECT EXAMINATION BY THE GOVERNMENT

16   BY MS. KANOF:

17   Q.   Sorry about this Mr. Adams.  Which one of the companies did

18   you resign because you violated company policy?

19   A.   At Calpine.

20   Q.   What company policy did you violate?

21   A.   I had a relationship with one of the people in the company.

22   Q.   And what was the policy?

23   A.   The policy was no relationships with executives and with

24   other people in the company.

25   Q.   And as a result of violating company policy that said you

KATHLEEN A. SUPNET, CSR

1    couldn't have a relationship with other people, were you asked

2    to resign or be fired?

3    A.   I was asked to resign, yes.

4    Q.   And so you did resign?

5    A.   So I did, yes.

6    Q.   Did that expose Calpine to millions of dollars of financial

7    loss?

8    A.   Not at all.  This was just the relationship with a woman in

9    the company.

10   Q.   And how long did it take for you to get a new job?

11   A.   I was working four weeks later.

12   Q.   With the company that you are working with now?

13   A.   Correct.

14   Q.   Let me just clarify a couple of things.  Just with regard

15   to whether or not you reviewed F.G.G.'s submission to C.F.E.,

16   did you personally ever review F.G.G.'s submission to C.F.E.

17   before they got the contract signed with C.F.E.?

18   A.   I did not, no.

19   Q.   Do you know if anyone at Mitsubishi had an opportunity to

20   review the submission to make sure that everything Mitsubishi

21   provided to go into that submission was there?

22   A.   I do not believe that Mitsubishi did have that opportunity.

23   Q.   Did you find out after the contract was signed whether or

24   not everything Mitsubishi had submitted to F.G.G. ended up in

25   the contract?

1    A.   We found out that it had not, eventually.

2    Q.   Ms. Franco showed you Government's Exhibit Number 67, the

3    invoice.  With regard to this invoice, she was talking about

4    amounts of money and things like that.  Does this invoice

5    specifically indicate that Mitsubishi expected -- and the date

6    of the invoice is before the first payment.  It's March 23rd.

7    On March 23rd, did you know that Marco Delgado had $23 million

8    from C.F.E.?

9    A.   Did not, no.

10   Q.   Did Mr. Beddard include in that invoice what you expected,

11   which was that F.G.G. had secured or was going to secure before

12   the first payment collection rights?

13   A.   Yes.

14   Q.   And in fact below that box, did Mr. Beddard provide the

15   wiring instruction to C.F.E. to your bank in Tokyo?

16   A.   Yes, he did.

17   Q.   With regard to Rick Williamson, you originally testified

18   that he -- that company that was in Government's Exhibit 199,

19   it's sometimes in the documents you see T.A.I.; is T.A.I. his

20   company?

21   A.   Yes.

22   Q.   And Mr. Williamson is on a lot of these documents; is that

23   correct?

24   A.   Correct.

25   Q.   Do you know to what extent he participated in the teaming

1    agreement?

2    A.   He was part of bringing us together and he would review the

3    teaming agreement because he had an interest in the equipment as

4    well.

5    Q.   But he's not a signator on the teaming agreement, is he?

6    A.   No, he's not.

7    Q.   So he didn't have any legal interest in the teaming

8    agreement if he's not a signator or do you know?

9    A.   I do not believe he is, no.

10   Q.   And with regard to the purchase price -- let's see -- you

11   were selling the equipment to F.G.G. for a lower dollar amount

12   than F.G.G. was selling it to C.F.E., correct?

13   A.   That's what we understood happened, yes.

14   Q.   And in business is that called making a profit?

15   A.   It is, yeah.

16   Q.   In fact, that's what F.G.G. was trying to do was make a

17   profit, correct?

18   A.   Correct.

19   Q.   With regard to Rick Williamson's financial interest, how

20   was that going to be paid?  Was that going to be paid by C.F.E.

21   or the Fideicomiso?  Rick Williamson's interest, how was he

22   going to be paid if the deal went through?

23   A.   Mitsubishi was going to then go ahead and pay out of money

24   that came from C.F.E. to Williamson, and eventually Mitsubishi

25   took Mr. Williamson completely out and went ahead and removed

1   him from the deal.

2   Q.   What do you mean took him out?

3   A.   They went ahead and paid him a portion and said, okay, you

4   are finished.  We'll take care of it from here.  You don't need

5   to have an interest going forward.

6   Q.   With regard to talking to the government, I was not the

7   first attorney in this case, someone with the name Juanita

8   Fielden was.  Did you ever talk to her?  I didn't know whether

9   you had or not?

10  A.   I believe so, but again it's been some time.

11  Q.   Okay.  The initial prosecutor in this case was a woman

12  named Juanita, assistant U.S. --

13  A.   That's correct, yes.  Uh-huh.

14  Q.   And would one of those meetings have been with AUSA Fielden

15  or do you recall?

16  A.   I do not recall.

17  Q.   And they were teleconference or phone conferences; is that

18  correct?

19  A.   Yes, uh-huh.

20  Q.   Regardless.  It doesn't matter.

21       As far as you profiting from the long-term service

22  agreement, at some point in -- in negotiation, did Mitsubishi

23  actually say forget the long-term service agreement, we just

24  wanted to get the sale of the equipment done?

25  A.   It eventually came to that.  Mitsubishi offered both the

1    equipment and the service and we had intended to sell both as

2    was part of the teaming agreement, but it eventually came to the

3    point where F.G.G. and we couldn't come to any -- well, F.G.G.

4    took us out of the long-term service agreement more than us

5    withdrawing, although we certainly were not getting to the

6    direct negotiation with C.F.E. that we had looked for, because

7    it was going to be that long-term agreement.  And more so, that

8    negotiation was a different -- again, a different division,

9    service division of Mitsubishi.

10   Q.   You wouldn't have gotten to the long-term service agreement

11   until the equipment had been delivered anyway, would you?

12   A.   Correct.  It would not have started until after the

13   warranty had begun -- ended actually.

14   Q.   The warranty is a year?

15   A.   Yes.

16   Q.   And you would have been long gone from Mitsubishi by then,

17   correct?

18   A.   Correct, uh-huh.

19   Q.   First, there had to be all of these payments made and then

20   the equipment would have had to be shipped and installed, and

21   you were already gone in April; is that right?

22   A.   Correct.

23   Q.   And some of these e-mails where there hasn't even been a

24   third payment are already into 2012, correct?

25            MS. FRANCO:  Objection.  Leading, Your Honor.

1            THE COURT:  Sustained.

2    BY MS. KANOF:

3    Q.   And with regard to the drafting of the subcontract, you

4    previously testified that you had nothing to do with it.  Was

5    the subcontract signed in Mexico, do you know?

6    A.   I believe that it was and with again that clarification

7    page that it would be adjusted as need be.

8    Q.   And you don't know whether Mr. Ueki was there or not?

9    A.   I don't recall directly.  I suspect he must have been with

10   Mr. Wunder.

11   Q.   You were just interpreting the letter, not knowing for

12   sure?

13   A.   Yep.

14   Q.   Okay.  Let's see.  Mr. Ueki -- Government's Exhibit 34 --

15            MS. KANOF:  I don't have very much, Your Honor.

16   BY MS. KANOF:

17   Q.   We look forward to you expediting the -- expedited

18   responses and to finalize the subcontract and project plan.  As

19   we discussed, a meeting would be held with C.F.E. to ensure

20   complete understanding.  As we agreed in Mexico; were you in

21   Mexico?

22   A.   I was not in Mexico when the subcontract was done or at

23   this time.

24   Q.   Okay.  But you -- but you still say as we agreed in Mexico.

25   So who's we?

DIRECT EXAMINATION ADAMS                                          143

1    A.   I'm assuming that it was Mr. Wunder referring to when he

2    signed the subcontract and then had the, you know, the final

3    page that said it would be adjusted accordingly.  So that's what

4    we were talking about, finalizing it an finishing it up and make

5    it work.

6    Q.   As you said, agreed in Mexico, you mean the company agreed

7    to it?

8    A.   Yes.  Yes.

9    Q.   And Defense Exhibit Number 199, did you participate in the

10   drafting of this amendment?

11   A.   I believe I was there for it, yes.

12   Q.   You were there for it.  Where did it happen?

13   A.   This was again probably signed in Lake Mary or Orlando.

14   But it looks like it has both my signature and Fernando's, so

15   I -- again, I believe this is addendum to it was done right at

16   or around the time of the teaming agreement.

17   Q.   It was right after the team agreement?

18   A.   Yes, uh-huh.

19   Q.   What was the purpose of this addendum?

20   A.   The purpose was really to allow if the final requirements

21   of the bid didn't work, for us to get out of the agreement, if

22   you will.  If we were so far of a mismatch that the agreement

23   would not have been effective, if the review of the final

24   requirements didn't match up or if we couldn't come to agreement

25   on the final scope or price, the markup, the markup in

```
 1    particular.

 2    Q.    Does it change anything from the original teaming agreement

 3    or just add to it?

 4    A.    From our view, it adds to it.  And I think the key word is

 5    markup on that.  You know we were very careful that we didn't

 6    want F.G.G. to put a huge markup on it and that's what this was

 7    somewhat clarifying.

 8    Q.    And why did you have that concern?

 9    A.    Again getting to the point where they were going to offer a

10    higher price than what our subcontract -- what we were going to

11    offer to them, we didn't want it to be hugely, uh, in you know a

12    very crazy high markup.

13    Q.    Why?

14    A.    Because that would not, one, allow us to win, but, two, it

15    wouldn't be good business practice to allow someone to rack up a

16    crazy number and profit.

17    Q.    Would you know what the value of your equipment was?

18    A.    We would.

19                MS. KANOF:  Pass the witness.

20                THE COURT:  Thank you, Ms. Kanof.

21                Ms. Franco?

22                        JOHN MICHAEL ADAMS,

23                RECROSS-EXAMINATION BY THE DEFENSE

24    BY MS. FRANCO:

25    Q.    Mr. Adams, going back to Defendant's Exhibit Number 199,
```

1    you testified that this was another opportunity for M.P.S.A. to

2    terminate the relationship with F.G.G. should it decide that it

3    wasn't a good business deal for M.P.S.A., correct?

4    A.   Correct.

5    Q.   So in the teaming agreement itself, there was an

6    opportunity to get out, correct?

7    A.   Correct.

8    Q.   And in this addendum, it certainly added to the opportunity

9    to get out, correct?

10   A.   Correct.

11   Q.   And when you sent the letter back, I think it was in

12   December or I'm sorry in November of 2009, that was also an

13   opportunity that you could've gotten out of the contract, right?

14   A.   Correct.

15   Q.   Are you still in touch with Rick Williamson and Hector

16   Ponce?

17   A.   I hadn't seen Hector very much, but I've seen him, yes, and

18   I've talked to Rick Williamson occasionally, yes.

19   Q.   Are you and Hector still -- I know that you worked for him

20   at some point in time, correct?

21   A.   Correct.

22   Q.   And then you brought him in as a consultant to work on --

23   you said South America.  Mexico is not South America, but I

24   guess Latin America?

25   A.   Uh-huh.

1   Q.   And so in his current employee -- employee job and your

2   current job, do you still try to communicate and work business

3   with each other?

4   A.   No.  Hector is not in our -- we don't do business together

5   now.  He was employed with a company that did turbine work and

6   we talked when he was there, but he's no longer there.

7   Q.   So your relationship with Hector then is more of a cordial

8   one?

9   A.   Yes, at this point.

10  Q.   And would that be the same with Mr. Williamson?

11  A.   No more business relationship with Mr. Williamson.

12  Q.   And in redirect examination by Ms. Kanof, you talked about

13  that M.P.S.A. at some point in time just bought Mr. Williamson

14  out of hi interest in the turbines, correct?

15  A.   Correct.

16  Q.   And do you know if that was done before or after the

17  subcontract that was entered into between F.G.G. and M.P.S.A.?

18  A.   I don't know for sure, but I'm pretty confident it was

19  after the subcontract.

20  Q.   And you don't have a dollar figure as to what that was?

21  A.   No, I don't know exactly what it was, no.

22  Q.   Now going back to your subsequent employment to M.P.S.A.

23  was with Calpine, correct?

24  A.   Yes.

25  Q.   And that's the job that you resigned from, correct?

1    A.   Correct.

2    Q.   And in your redirect examination, you testified that it was

3    for having relationship with someone in the office and not

4    informing your employer?

5    A.   Correct.

6    Q.   So it was a company policy?

7    A.   Correct.

8    Q.   And that wasn't something that you revealed to your

9    employers, correct?

10   A.   Correct.

11   Q.   And that one was of the rules of their company, correct?

12   A.   Correct.

13   Q.   And was this employee a subordinate of yours?

14   A.   Yes.

15          MS. FRANCO:  That's all I have.  Pass the witness.

16          MS. KANOF:  Nothing further, Your Honor.

17          THE COURT:  May Mr. Adams be permanently executed?

18          MS. KANOF:  We would like that.

19          THE COURT:  Ms. Franco?

20          MS. FRANCO:  Your Honor, that's fine with us.  He's

21   excused.

22          THE COURT:  All right.

23          Mr. Adams, thank so much for coming down.  You are

24   free to go.

25          (Witness excused.)

1           THE COURT:  All right.  Ladies and gentlemen of the

2    jury, we'll recess for lunch.  I would ask you to be back in the

3    jury room about 1:55 and we'll resume or proceedings then or

4    shortly thereafter.  We're in recess until 1:55.

5           COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

6           (Lunch break at 12:43 p.m. to 2:00 p.m.)

7           (Open court.  Defendant and counsel present.)

8           (Jury present.)

9           THE COURT:  Let the record reflect that all members of

10   the jury are present, the United States through its assistant

11   United State's attorneys are present, the defendant and his

12   counsel is present.

13          Ms. Arreola, who will be your next witness?

14          MS. ARREOLA:  Irais Davila.

15          THE COURT:  I'm sorry.

16          MS. ARREOLA:  Irais Davila.

17          THE COURT:  And this witness requires an interpreter?

18          MR. GONZALEZ:  Yes, Your Honor.

19          THE COURT:  All right.

20          MR. GONZALEZ:  She prefers one.

21          THE COURT:  I'm sorry?

22          MR. GONZALEZ:  She prefers one.

23          THE COURT:  Okay.  Sure.

24          (Witness present.)

25          THE COURT:  Let me swear in Ms. Ledesma first and then

```
 1    I'll swear you in.
 2              (Interpreter Edna Ledesma sworn by the Court.)
 3              (Witness sworn by the Court through the interpreter in
 4              Spanish.)
 5                         IRAIS DAVILA,
 6              DIRECT EXAMINATION BY THE GOVERNMENT
 7    BY MS. ARREOLA:
 8    Q.   Ms. Davila, please state your name for the record.
 9    A.   Irais Davila.
10    Q.   Ms. Davila, where do you work?
11    A.   At Dunkin' Donuts.
12    Q.   What do you do at Dunkin' Donuts?
13    A.   I'm a manager there.  And I work for the training team for
14    the company.
15    Q.   Do you speak English?
16    A.   Yes.
17    Q.   Have you requested an interpreter for today?
18    A.   Yes.
19    Q.   Is that because you are more comfortable in Spanish?
20    A.   That's correct.  It is my first language.
21    Q.   Prior to working at Dunkin' Donuts, where did you work?
22    A.   At U.P.S.
23    Q.   Which location at U.P.S.?
24    A.   On Mesa and Resler in El Paso, Texas.
25    Q.   How long did you work at U.P.S.?
```

DIRECT DAVILA                                                        150

1    A.    Approximately for a year and two months.

2    Q.    When did you leave U.P.S.?

3    A.    Approximately at the beginning of December of 2012.

4    Q.    What were your responsibilities at the U.P.S. store?

5    A.    My responsibilities included notarizing, packaging and

6    customer service.

7    Q.    What is meant by notarizing?

8    A.    I certify that the document that I am notarizing is in the

9    presence of the person presenting it.

10   Q.    How do you confirm it is the person presenting it?

11   A.    With an official I.D.

12   Q.    What's an example of an official I.D.?

13   A.    It could be a driver's license.  It could be a passport.

14   Q.    And what you notarize, are you witnessing a signature?

15   A.    That's correct.

16   Q.    Did you have any notary stamps?

17   A.    Yes.

18   Q.    How many stamps?

19   A.    When I was working at the U.P.S., I had two seals.  One of

20   them had my name on it and the other seal was to certify that

21   this was a copy of the original.

22   Q.    When did you use the stamp that had your name on it?

23   A.    I used to use it a lot of times for documents, such as

24   letters where the person was there in person and I was just

25   authorizing the fact that they were the ones actually signing or

1    the other one is to just recognize that they were present there

2    before me.

3    Q.   Now you mention that there were two stamps.  What was the

4    other stamp?

5    A.   I used it for copies of official documents.

6    Q.   Did that stamp say, true and correct copy of the original?

7    A.   I can't recall.

8    Q.   When did you use that stamp?

9    A.   We used it when there were copies of admissible documents,

10   such as birth certifies, diplomas.

11   Q.   What were you certifying?

12   A.   I was certifying that it was a copy of the original.

13   Q.   Who would make the copy?

14   A.   We would do it there at U.P.S.

15   Q.   Did you use the true and correct stamp for letters?

16   A.   No.

17   Q.   Why not?

18   A.   Because a letter is not an official document.

19   Q.   I'm going to ask you to take a look at Government

20   Exhibit 21.  I'm going to turn to the third page.  And this

21   Ms. Davila, there's also a copy in one of the binders that's in

22   front of you in volume one, government Exhibit 21.

23           Do you see on the right-hand page a signature?

24   A.   Yes.

25   Q.   Does this look like your signature?

1    A.    No.

2    Q.    What is different between this signature and your

3    signature?

4    A.    My signature is much smaller.

5    Q.    When you used to notarize documents, did you date them?

6    A.    That's correct.

7    Q.    Did you put the date next to your signature?

8    A.    Yes.

9    Q.    Do you see the number or the date June 30, 2012, next to

10   this signature?

11   A.    Yes.

12   Q.    Is this your handwriting?

13   A.    No.

14   Q.    Can you take a look at this stamp at the bottom of the page

15   that says Irais Davila?

16   A.    Yes.

17   Q.    Does that look like your stamp?

18   A.    Yes.

19   Q.    And on this signature, with the June 30th, 2012 date, it's

20   hard to see, but does that vaguely look like this is a true and

21   correct copy of the original notary public?

22   A.    Can you please repeat that question?

23   Q.    It's hard to read what it says, because the print is light,

24   but does it look --

25         MR. HANSHEW:   Objection, Your Honor.   That's leading.

 1   She can ask her to read what it is, but not read to her.
 2          THE COURT:  Sustained.
 3   BY MS. ARREOLA:
 4   Q.   Ms. Davila, can you make out what this says?
 5   A.   No.
 6          MR. ARREOLA:  Your Honor, I'm going to ask the witness
 7   to sign her name on the piece of paper the way she used to sign
 8   it when she notarized.
 9          May I approach the witness with a sheet of paper?
10          THE COURT:  Yes, ma'am.
11          MS. ARREOLA:  The piece of paper is premarked with
12   Government Exhibit 30A.
13   BY MS. ARREOLA:
14   Q.   Ms. Davila, do you have in front of you a blank sheet of
15   paper with a stamp marked 30A?
16   A.   Yes.
17   Q.   Can you sign that the way you used to sign when you worked
18   at U.P.S.?
19   A.   (Complies.)
20   Q.   When you worked at U.P.S. and you notarized documents, did
21   you put the date in numbers or did you write out the date in
22   letters?
23   A.   Numbers.
24   Q.   Can you write on that document in numbers June 30th, 2012?
25   A.   (Complies.)

```
 1                MR. ARREOLA:  May I approach the witness, Your Honor.

 2                THE COURT:  Yes, ma'am.

 3                MR. ARREOLA:  Your Honor, the government offers what's

 4     been marked for identification purposes 30A.

 5                THE COURT:  Mr. Hanshew?

 6                MR. HANSHEW:  No objection.

 7                THE COURT:  30A is admitted.

 8                MR. ARREOLA:  May I publish, Your Honor?

 9                THE COURT:  Yes, ma'am.

10     BY MS. ARREOLA:

11     Q.   Ms. Davila, you mentioned earlier that your signature is

12     much smaller than the signature on Government's Exhibit 21?

13     A.   That's correct.

14     Q.   Did you see a difference here between a signature that you

15     just wrote on Government Exhibit 30A and the signature on

16     Government Exhibit 21?

17                MR. HANSHEW:  Your Honor, objection.  She's asking her

18     to describe the difference she sees.  It explains itself for the

19     trier of fact and to have her explain that --

20                THE COURT:  That's overruled.

21     A.   That's correct.

22     BY MS. ARREOLA:

23     Q.   I'm going to ask you to take a look at the top of the page

24     for Government Exhibit 21 which has a date.  Do you see that

25     date?
```

 1    A.   Yes.

 2    Q.   What date is shown?

 3    A.   January 10th of 2010.

 4    Q.   Were you working at U.P.S. in January of 2010?

 5    A.   No.

 6    Q.   When you worked at U.P.S., where did you leave those two

 7    stamps that you used?

 8    A.   Those seals remained in the store in a drawer and we did

 9    not have the opportunity to remove the seals off the premises.

10    Q.   Did you notarize outside the store?

11    A.   No.

12    Q.   I'm going to show you what's been marked for identification

13    purposes as Government's Exhibit 29 and 30?

14              MR. ARREOLA:  May I approach, Your Honor?

15              THE COURT:  Yes, ma'am.

16    BY MS. ARREOLA:

17    Q.   Ms. Davila, can you look at those documents and tell me if

18    you recognize them?

19    A.   Yes, that's correct.  These are the books that you utilized

20    when I notarized.

21    Q.   Now do you recognize them?

22    A.   By my seal.

23    Q.   Now, one of the exhibits, Government Exhibit 30, does it

24    show your seal on the first page?

25    A.   I can see it very lightly.

DIRECT DAVILA                                               156

1    Q.   What does it look like?

2    A.   They marked it.  They crossed it so somebody else could use

3    my book.

4    Q.   When did somebody else use your book?

5    A.   No one had access to my books until the time where I

6    stopped working at U.P.S.

7              MR. ARREOLA:  Your Honor, government offers marked for

8    identification purposes as Exhibits 29 and 30.

9              MR. HANSHEW:  No, objection.

10             THE COURT:  GX-29 and 30 are admitted.

11             MR. ARREOLA:  May I approach the witness, Your Honor?

12             THE COURT:  Yes, ma'am.

13   BY MS. ARREOLA:

14   Q.   Ms. Davila, were these the only two books that you used for

15   notarizing while you were at U.P.S.?

16   A.   That's correct.

17   Q.   How do you remember that?

18   A.   Because I can recall the day that I completed the first

19   book and then I requested a second book and I remember that I

20   only got half way through the second book.

21             MR. ARREOLA:  Your Honor, may we publish?

22             THE COURT:  The whole book or just the page?

23             MR. ARREOLA:  Government Exhibit 29, first page.

24             THE COURT:  Yes, ma'am.

25             MR. ARREOLA:  And then I'll flip through it.

1    BY MS. ARREOLA:

2    Q.   Ms. Davila, on the screen is the first -- the cover page

3    for Government Exhibit 29.  Do you see a stamp at the bottom?

4    A.   That's correct.

5    Q.   And I'm going to flip the pages until I get to the first

6    page that has handwriting on it.

7            MS. ARREOLA:  At the top of the page, is the name

8    Graciela Alva, for the record.

9    BY MS. ARREOLA:

10   Q.   Ms. Davila, can you briefly walk us through the information

11   that you recorded or that was recorded on this page?

12   A.   On the first column you can see that we have the name of

13   the person that is presenting themselves to notarize the

14   document.  On the second column we have the signature.  And the

15   third column includes the address that appears on the official

16   document.  And finally we have the I.D. number.

17   Q.   Is any of the information on here in your handwriting?

18   A.   Yes, the majority of the numbers that you can find on the

19   last column.

20   Q.   In the first row where it says 10057260, is that your

21   handwriting?

22   A.   Yes.

23   Q.   How about the next row?

24   A.   No, that is not my handwriting.

25   Q.   How about the third row?

1    A.    Yes.

2    Q.    Now I'm going to ask you about the date column.  A number

3    of the rows do not have a date.  Do you see that?

4    A.    That's correct.

5    Q.    Why don't they have a date?

6    A.    It was a mistake that I made.

7    Q.    I'm going to ask you to take a look at the cover page of

8    Government Exhibit 30.

9    A.    Okay.

10   Q.    There are two blacked out boxes on this page.  Were you

11   able to see when you had this in front of you, your stamp

12   underneath these boxes?

13   A.    That's correct.

14   Q.    So when you left U.P.S., did this book still have empty

15   pages in it?

16   A.    Yes.

17   Q.    I'm going to ask you to look at Government Exhibit 29 one

18   more time and I'm going to flip ahead to the first page that has

19   handwriting.

20   A.    Very well.

21   Q.    Whose handwriting is in the first column, the column that

22   says notarization date, time at the top?

23   A.    My handwriting.

24   Q.    I'm going to ask you to look at another document, which is

25   in one of your binders.  It is not in evidence.  It is marked

1    for identification purposes as Government's Exhibit 138.

2              Can you take a look at the second to the last page of

3    that document?

4    A.   Okay.

5    Q.   Do you see a signature on that page?

6    A.   That's correct.

7    Q.   Is that your signature?

8    A.   No.

9              MR. ARREOLA:  No further questions, Your Honor.

10             THE COURT:  Mr. Hanshew?

11             Thank you, Ms. Arreola.

12             MR. HANSHEW:  May I have a moment, Your Honor?

13             THE COURT:  Yes, sir.

14             MR. HANSHEW:  No questions, Your Honor.

15             THE COURT:  May this witness be permanently excused?

16             MR. HANSHEW:  Yes, Your Honor.

17             THE COURT:  Ms. Arreola?

18             MR. ARREOLA:  Yes, Your Honor.

19             THE COURT:  Ms. Davila, thanks for coming down, ma'am.

20   You are free to go.

21             Who's your next witness?

22             MS. KANOF:  Fernando Gireud.

23             THE COURT:  Mr. Gireud, did I swear you in yesterday

24   for purposes of this trial?

25             MR. GIREUD:  Yes, sir.

KATHLEEN A. SUPNET, CSR

1          THE COURT:  You may have your seat.

2          MR. HANSHEW:  Your Honor, I think that might have been

3     for the --

4          THE COURT:  For the hearing?

5          Mr. Gireud, if you'd raise your right hand?

6          (Witness sworn by the Court.)

7                    FERNANDO GIREUD,

8          DIRECT EXAMINATION BY THE GOVERNMENT

9     BY MS. KANOF:

10    Q.   Good afternoon, Mr. Gireud.

11    A.   Good afternoon, ma'am.

12    Q.   Could you tell us the correct pronunciation of your name?

13    A.   Gireud is fine.

14    Q.   And please excuse me if I mispronounce your name.

15         So state your name for the grand [sic] jury.  State

16    your name, your full name?

17    A.   I'm sorry?

18    Q.   State your full name?

19    A.   Oh, Fernando Gireud.  I'm sorry ma'am.  Fernando Gireud.

20    Q.   Mr. Gireud, how are you currently employed?

21    A.   I work for Universal Electric Corporation in Pittsburgh and

22    I have a home here in El Paso.

23    Q.   Pittsburgh, Pennsylvania?

24    A.   Yes, ma'am, Pittsburgh, Pennsylvania.

25    Q.   But you work out of the -- your home office here in

1    El Paso?

2    A.   Yes.  They provide me with equipment and they don't need me

3    to have an office, so I have a home office and I perform my

4    duties from home.

5    Q.   What kind of a company is that?

6    A.   They design distribution systems for data centers and we --

7    I design distribution systems and equipment to be used to

8    connect data centers into power systems to power the data

9    centers.

10   Q.   What is your title?

11   A.   Senior Applications Engineer.

12   Q.   What is your educational background?

13   A.   I have a degree in electrical engineering from UTEP.

14   Q.   And do you have the P.E.?

15   A.   Yes.  I also have Texas P.E., it's called Professional

16   Engineering certification for Texas.

17   Q.   When -- was it UTEP when you graduated?  Was it called

18   UTEP?

19   A.   Yes, it was called UTEP.  I look old, but I'm not that old,

20   I guess.  It was UTEP, yes, ma'am.  I graduated in 1981.

21   Q.   Okay.  And are you a naturalized citizen of the United

22   States?

23   A.   I'm what?  I'm sorry.

24   Q.   A naturalized citizen of the United States?

25   A.   Yes, I am.

1    Q.   When you first graduated -- when did you graduate from

2    UTEP?

3    A.   1981.

4    Q.   And after you graduated from UTEP with an electrical

5    engineering degree, what was your first position?

6    A.   I start working for a company called Hatch Incorporated in

7    El Paso here on Myrtle Avenue, pretty close over here.  I worked

8    with them until 1987, I think.

9    Q.   What did hatch do?

10   A.   Hatch do power panels for electrical utilities.

11   Q.   A power panels, did you say?

12   A.   Power panel is the control panel that they use to control a

13   power plant.

14   Q.   And how long did you work there?

15   A.   I think from 1980 to 1987, ma'am.

16   Q.   Where did you go in 1987?

17   A.   I went to work for El Paso electric Company.

18   Q.   And how long were you at El Paso electric Company?

19   A.   21 years, ma'am.

20   Q.   What were your duties and responsibilities?

21   A.   I was called what's called communications engineer.

22   Q.   And what does a communications engineer do?

23   A.   We take care of all of the communications; communications

24   to send all of the data from every substation in the system into

25   the control center so they can see what is happening at the --

1    on a every-second-basis.

2    Q.   And how long did you stay as a communications engineer?

3    A.   I think I was communication engineer for about

4    two-and-a-half years.

5    Q.   And then what happened?

6    A.   I was promoted to supervisor of the communications

7    department.

8    Q.   And after a couple of years there, what happened?

9    A.   A few years later, and I'm sorry don't have -- I cannot

10   tell you if it was three or four years -- I became the

11   supervisor of the environmental affairs.

12   Q.   What do the environmental affairs department do?

13   A.   Environmental affairs departments make sure they -- for

14   example, the generators in the power plants are following

15   certain rules by -- it was called -- well, EPA rule like, for

16   example, you cannot exceed knocks and vapors into the

17   atmosphere.  You have to control the unit, so you don't put

18   pollution out on the units.

19        You make sure that you take care of every spill that

20   happens, if somebody goes and hits a poll during the weekend and

21   the poll fails -- falls, I'm sorry, and they have a transformer

22   that it spill oils, you have to make sure that you clean up that

23   spill [sic] oil and dispose properly of all the dirt and

24   contamination that exists or you can prevent that from -- from

25   people to get involved in that.

DIRECT DAVILA                                                    164

1    Q.   You obviously speak fluent Spanish?

2    A.   I do, ma'am.

3    Q.   And as a result in 1997, were you asked to do something

4    with regard to the Republic of Mexico?

5    A.   Not exactly '97.  Oh, '97 yes.  I don't remember what was

6    the time.  The company was merging with a company in Dallas or

7    they were trying to do a merge, so the guy who took care of all

8    of the international business in the company moved to the

9    headquarters office of that company.  And actually it never

10   materialized, but he kept the job there.

11        So of course I speak Spanish and I was born and raised

12   in Mexico until I was 18 years old.  They asked me to see if I

13   can help them with the international business of the company.

14   Q.   And did you team up with the natural gas company in Juarez

15   to do a project?

16   A.   It was after a few years we did that.  The company brought

17   a new CEO and he was under -- he always thought that it was good

18   to have businesses like a subsidiary in Mexico, do business in

19   Mexico.  And so they didn't put me out of the company of El Paso

20   Electric, but they formed a new company that it was called

21   MiraSol.  And I was one of the director for MiraSol and I was

22   going to Juarez almost every day to meet with maquilas and see

23   if we could do energy efficiency projects or if we could do

24   generations so they can help then lower the bills with the

25   electric utility in Mexico.  So we worked for a year and a half,

KATHLEEN A. SUPNET, CSR

1    two years, and we didn't get much projects.  The economy in

2    Mexico was pretty bad, so we didn't have any good calls.

3    Q.   During the time that you worked at El Paso electric, did

4    you meet an individual by the name of Marco Delgado?

5    A.   Yes, I did, ma'am.

6    Q.   About when, during your tenure at El Paso Electric, did you

7    meet Mr. Delgado?

8    A.   I don't remember exactly the time.  When -- the company, I

9    think it was somewhere in 1990 -- '95, '96, I guess.  I don't

10   recall exactly the time.

11   Q.   Is he here in the courtroom?

12   A.   Yes, he is seated right here.

13   Q.   When you say right here, you opened up your hand.  If the

14   gentleman in the green tie is number one and the next gentleman

15   is number two and the lady is number three --

16   A.   Number two.

17        MS. KANOF:  Please let record reflect, Your Honor, the

18   witness has identified the defendant.

19        THE COURT:  Mr. Hanshew?

20        MR. HANSHEW:  No, objection.

21        THE COURT:  The record will so reflect.

22   BY MS. KANOF:

23   Q.   Under which circumstances did you meet Mr. Delgado?

24   A.   Actually, I talked to him before we were working together.

25   There was an incident that one of our employees lost or took one

1    of our company vehicles and went to Mexico, and he had a very

2    important piece of equipment and they stopped him at the border

3    and they took his car and equipment, and somebody in our legal

4    department called him to tell him to help us retrieve the car

5    and that's how I think the first time we call, because he was

6    somebody from my group, from the environmental Department, and

7    that's I think the first time we met.

8    Q.   Mr. Delgado is a lawyer; is that correct?

9    A.   Yes, ma'am.

10   Q.   And at some point in time you said before you started

11   working with him, did you work with him with regard to projects

12   at El Paso Electric?

13   A.   Yes, ma'am.  My understanding was that he had a retainment

14   or a contract with the firm that he was working on, which is

15   Delgado, Acosta, Braden and Jones.  I understand the company,

16   that firm had certain contracts with El Paso Electric to help us

17   with different things.

18   Q.   And his law firm assigned him to El Paso Electric?

19   A.   When I came over to that group, he was already working with

20   El Paso Electric with the guy previous in my previous capacity.

21   He was already working with him and he was already helping with

22   the relationships with Mexico, yes.

23   Q.   Did you and Mr. Delgado become friends?

24   A.   Very good friends, ma'am.

25   Q.   Okay.

1    A.    Very good friends.

2    Q.    Define what you mean by very good friends?

3    A.    I felt like he was my brother that we worked together in

4    many things and I love him and I help him and he was my brother.

5    Q.    When you started working on projects with him when he was

6    still an attorney for his I guess the Delgado Acosta Braden and

7    Jones, that Delgado was his cousin in Delgado Acosta Braden and

8    Jones, not Mr. Delgado?

9    A.    Yes, ma'am.

10   Q.    Okay.  Were you still working in Mexico?

11   A.    Yes.  We -- the projects in Mexico were to sell.  We have

12   some energy -- extra energy in our capacity and we wanted to

13   see -- and the company has two interconnections to Mexico, so

14   the company wanted to see if they could use those to make a

15   profit and to sell something to Mexico, because by the time

16   Mexico was growing, the Juarez area was growing very much, they

17   were building a lot of twin plants.  They couldn't keep up.

18   They needed our energy from El Paso, so we could help them with

19   that.  We had contracts before my time in that department and

20   the company make [sic] a lot of money with those sales of

21   energy.  So they stop, because again they don't need them all

22   the time or they didn't agree on pricing or something, so they

23   stop on and off, on and off.  So when I took over the department

24   they -- that's when I start working with Marco.

25   Q.    Did Mr. Delgado ever introduce you in Mexico to any people

DIRECT DAVILA                                                        168

```
 1    that worked at C.F.E.?
 2    A.   Yes, ma'am.  On the beginning of this, we met a lot of
 3    people from what is called see Cenase, C-E-N-A-S-E.  Cenase is
 4    the national center control in Mexico.  We met some people
 5    because eventually they were going to be the ones making the
 6    purchase for that group of people.  So we met a lot of people
 7    there.  We make a few trips to Mexico or several trips to
 8    Mexico.
 9    Q.   Do you remember what year that was about?
10    A.   '96, '97, ma'am.
11    Q.   Okay.  Do you remember any of the particular individuals
12    that you were introduced to by Mr. Delgado in Mexico?
13    A.   For people from the Cenase I don't remember a lot of names
14    to be honest with you.  It's been 14 years or something.  But
15    there was a person that I think it was one of the most person
16    that I think it was one of the most important persons in the
17    C.F.E. government or whatever his name was, Ingeniero Nereo
18    Vargas.  He was the head of the union at the time.
19    Q.   The electrical workers union?
20    A.   I'm sorry?
21    Q.   Electrical workers union?
22    A.   Yes, ma'am.  The electric union, yes.
23    Q.   And Mr. Delgado introduced you to Ingeniero Vargas?
24    A.   We met with him at the beginning.  Well, actually, it was
25    very strange so many times I went with him to the office and I
```

1    stay outside, like I was sitting outside of here, he goes and

2    meet with him and he came out.  And it wasn't probably until the

3    fourth or fifth time or I don't know if it was the third or the

4    fourth time, we met in a restaurant for breakfast and I met him

5    for the first time.

6    Q.   Okay.  So you went to Mr. Vargas' office with Mr. Delgado

7    several times; is that correct?

8    A.   Yes, ma'am.

9    Q.   But you didn't meet Mr. Vargas the first few times; is that

10   correct?

11   A.   Yeah.  If I [sic] correct, if I recall correctly, yes.

12   Q.   And what did Mr. Delgado tell you was his relationship with

13   Nereo Vargas?

14   A.   I could tell you that he was like a son to him, too.  They

15   were very close.  They had a lot of respect for each other.  And

16   I remember that he was a key individual in Mexico that he was

17   very good friends with.

18   Q.   At some point did you leave El Paso Electric?

19   A.   Yes, ma'am.  Somewhere in 2009, I think, or '10.

20   Q.   When you left El Paso Electric, was Mr. Delgado still

21   providing Delgado, Acosta, Braden and Jones for El Paso

22   Electric?

23   A.   I don't think so.  I think they had the company, the

24   attorney firm was dissolved or something and he was working on

25   his own I think.  And I don't remember exactly the timing, but I

1    think was after I left.  I don't think he was no longer working

2    with El Paso Electric.

3    Q.   Okay.  And who -- what is Kendrick Electric?

4    A.   When I left El Paso Electric, I started doing work using my

5    seal, my P.E. seal, the one we talked before.  I was working

6    with some friends.  F.M.S. Engineering is a company that's

7    called M.E.P., mechanical electrical and plumbing.  And When you

8    are going to build a building or a school or a house, you

9    usually contract an M.E.P. firm.  They can do all of the

10   engineering for you, so they can present it to the city, so we

11   can approve and they can start the building.  So I did that for

12   a few months.

13   Q.   For Kendrick Electric?

14   A.   When I finished El Paso Electric I start working with that.

15        One day I was approached by Mace Miller.  He is the

16   nephew of Mr. Kendrick.  And they were very interested in me,

17   because they had a lost of respect for the work I did before.  I

18   met Mace Miller in a plane one time.  His best man at his

19   wedding was Steve Ratchick.  He was one of my right hands in

20   El Paso Electric, so --

21   Q.   Mr. Gireud, please sort of answer my questions.  Okay?

22   A.   Yes, I'm sorry.

23   Q.   You met Mace Miller and Mace Miller was Buzz Kendrick's

24   nephew, correct?

25   A.   Yes.  They wanted to make the company a minority business

1   and they wanted to see if I could get into the company working

2   for them and be part owner and they wanted to sell 25.1 percent

3   of the company to me.  There was another individual and he was

4   going to acquire the other 25.1 percent to make it 51 or

5   52 percent, which was approved for the minority projects.

6   Q.   Was Marco Delgado involved with Kendrick Electric as well?

7   A.   No.

8   Q.   Okay.  But did you know whether or not Buzz Kendrick knew

9   Marco Delgado?

10  A.   I don't think he knew Marco Delgado.  I don't know, but I

11  think the first time we met.  He met with Mr. Kendrick was later

12  on.  I don't think he met because of us.

13  Q.   At some point in time, do you even know what Mr. Delgado

14  was doing when you were negotiating with Kendrick Electric to

15  become a partner?

16  A.   No.  I think we were still in contact, not as much as

17  before, but I think he wanted to see what kind of options we had

18  and if he could help with something with the ownership of that.

19  Q.   Did he approach you at some point about a project in Mexico

20  related to Agua Prieta II?

21  A.   Yes.  When I was working with Kendrick, he approached me

22  and he -- I don't know if he called me or we met in a restaurant

23  or something.  I don't remember the exact details, but he

24  approached me and he said there was an opportunity to be on a

25  big project in Mexico, which was going to be to provide two gas

1    generators and one steam generator.

2    Q.    Did he tell you where he got the information there was

3    going to be this big project in Mexico?

4    A.    No, ma'am.  I don't think he told me, but he knew it was

5    going to be a project and he knew a lot of things of the specs

6    so...

7    Q.    What do you mean he knew a lot of things of the specs?

8    A.    Well, he knew we are going to be in a project of this

9    magnitude.  It's just nobody knew, said, oh, I'm going to

10   provide this, this and that, so he knew that we needed to

11   provide two gas turbines for 200 megawatts each or something

12   like that and the one steam turbine at the end was going to be

13   about 489 megawatts capacity that they needed and they needed

14   for a project in Agua Prieta.

15   Q.    So the specific information about what the project

16   required?

17   A.    Yes.  He had a lot of information about the project.

18   Q.    Do you remember when he approached you with this?

19   A.    I think I was in Kendrick for three or four months and

20   that's when he approached me.

21   Q.    About what year?  Was it 2009?

22   A.    It could be 2009, yes, ma'am, somewhere in 2009.

23   Q.    Okay.  And what did he want from you?

24   A.    Well, since he knew I worked for a utility for many years,

25   he wanted to know if I was able -- if I had contacts to see if

DIRECT DAVILA                                                          173

1   we could find equipment, if we can get somebody to bid for us

2   and all of that and I think --

3   Q.   What do you mean, we.  Did you form -- did he want you to

4   be involved in the project?

5   A.   Yeah, he wanted me to find that and then eventually we even

6   discussed that if we do it, we're going to be partners,

7   50 percent partners, and he was going to take care of all of the

8   issues and legal issues and everything in Mexico and I was going

9   to take care of all of the technical in the U.S. since I was the

10  engineer and we were here.

11  Q.   He wanted to know if you could find out how to get the

12  generators?

13  A.   Is there a way that you can find something?  If you could

14  tell me, yeah, there's one here or we have to go to Mitsubishi

15  or Siemens or something?  In other words, he wanted me to see if

16  we could get any of this, if it was possible for us to find

17  something like that.

18  Q.   What did you do?

19  A.   I -- the first thing I did, I called one of my best friends

20  from El Paso Electric, who left the company the same time as me.

21  His name is -- we think that he was working for A.P.S. or some

22  kind of public service, and he was working on the generation

23  site of A.P.S., so --

24  Q.   Why did you call him?

25  A.   Because he was working with that field.  He was working on

KATHLEEN A. SUPNET, CSR

DIRECT DAVILA                                                              174

1    generation and he -- I mean, I was just fishing.  You know, you

2    have to -- where do you start?

3    Q.   Did he give you some leads?

4    A.   Yes, he did.

5    Q.   And did you follow those leads?

6    A.   Yes, I did.

7    Q.   Who did you contact?

8    A.   I contacted a gentleman by the name of Jun Wong.  I don't

9    know if it was the correct spell his last name, but Jun, J-U-N.

10   He was a person who worked on generation for many years and one

11   of those guys that he doesn't have roots anywhere, so he was in

12   this company for two years and then he moved.  By this time I

13   think he was working in a company in Canada.  He worked for

14   El Paso Electric for a year before I met him in El Paso

15   Electric, so he said Jun must have very good leads on how we

16   starting in this.

17   Q.   Did you talk to Jun?

18   A.   I have talked to Jun.  We make a conference call, Luis, Jun

19   and I.  And later on, two or three weeks later, Jun called me

20   and he mentioned a company in Dallas-Ft. Worth.  The owner was

21   Rick Williamson.  I don't remember exactly the name of that

22   company, but his expertise was to buy used equipment in the

23   market, refurbish the equipment, fix the equipment and sell it

24   at a price.  And he was a very powerful and very rich man when I

25   met him.  So he said that he had the contacts and he was willing

DIRECT DAVILA                                                              175

1    to talk to me and I should contact him.

2    Q.   So did you contact Rick Williamson?

3    A.   Yes.

4    Q.   Mace and you?  So we have you and Mr. Delgado coming to

5    you, how -- by Mace, do you mean Mace Miller?

6    A.   Yes.  Because I was still employed by Kendrick I see Mace

7    Miller every day.

8    Q.   Did you tell Mr. Miller, Mace Miller, about Mr. Delgado's

9    idea?

10   A.   Of course.

11   Q.   Okay.  And why are you telling Mace Miller about

12   Mr. Delgado's idea?

13   A.   Well, because we worked together at Kendrick.  We are

14   friend; we became friends by working together at Kendrick.  And

15   this could be another project that perhaps Kendrick -- well,

16   originally, Mace Miller thoughts and Mr. Kendrick's thoughts

17   were -- well, Kendrick electric is a -- it's company that they

18   perform electrical jobs as a contractor.  We thought in the

19   beginning how about if Mr. Kendrick can build a plan and

20   building and produce a lot of work.

21   Q.   So you shared the information with Kendrick Electric?

22   A.   Yes, ma'am, fully.

23   Q.   Okay.  So once you got the contact Rick Williamson, you

24   talked to Mace Miller about it?

25   A.   Mace Miller and I made the call.  We made the conference

1    call to him, to Mr. Williamson together.  Him and I were sitting

2    at his -- at Kendrick office and we make the call.

3    Q.   What was the result of that phone call?

4    A.   The result of that phone call was that he was willing to

5    talk to us.  He said if you can come over tomorrow or when you

6    can to the Dallas-Ft. Worth office, we can talk about it and you

7    can tell us what you have and then we can talk.

8    Q.   Did you tell Mr. Delgado right away that you were going to

9    talk to some man that might have that equipment?

10   A.   I am sure probably I did.  I probably -- we share a lot of

11   information, so I think I let him know that I think we found

12   somebody and that Mace and I were going to go pay a visit to

13   this gentleman.

14   Q.   Did Mr. Delgado go with you to pay a visit?

15   A.   No, he didn't.

16   Q.   Why not?

17   A.   I believe -- I don't know the reason, but I believe because

18   it was a technical meeting and he -- I was going to take care of

19   the technical issues.  But at this time we didn't have anything.

20   We were fishing and trying to find out anything.

21   Q.   So you and Mr. Miller went to meet with Mr. Williamson; is

22   that correct?

23   A.   Yes, ma'am.

24   Q.   Was there anyone else at that meeting?

25   A.   Yes.  When we arrived to the meeting in Dallas, he had a

DIRECT DAVILA                                                    177

1    gentleman by the name of John Adams, who he introduced to us one

2    of his best friends and he's a good friend of us.  We do a lot

3    of business together and they were in the same business and he

4    was the president of Mitsubishi then.

5    Q.   The president of Mitsubishi?

6    A.   I think his title was president -- I'm sorry -- of

7    M.P.S.A., which is Mitsubishi Power System of Americas which is

8    an office in Orlando or north of Orlando.

9    Q.   That's your recollection?

10   A.   That's my recollection.  On his title -- well, he was one

11   of the biggest executives of the company then.

12   Q.   What did you and discuss with them?  What did you tell

13   them?

14   A.   We told him that there was a possibility to be on a big

15   project that has the necessities of two generators -- I mean two

16   gas and one steam generator, and we were given his name by Jun

17   Wong and Luis Ito (phonetic), and we wanted to know if they

18   could help us find the units or any with way to find something

19   or, now, since Mitsubishi since was there or if you can build

20   some units for us and how long it would take.

21   Q.   Did you tell Mr. Adams and Mr. Williamson the location of

22   the project?

23   A.   We didn't.  And they put a lot of force in trying to get

24   that from us, because I'm sorry, but business, if they can get

25   it away from you, you're gone, I can do it myself, we don't need

1    you.  They ask a lot of questions.  And I said, you know we have

2    a lot of opportunities which is going to be in Mexico.  I said

3    we just tell you that we have this.  Are you -- do you think you

4    can produce the equipment?

5    Q.   And what did they tell you about their ability to produce

6    the equipment?

7    A.   After 30 or 40 minutes of discussing and trying to get

8    information from us, they said, oh, I don't know why this stupid

9    Mexican is doing with this gringo American guy here, so I don't

10   know if they have anything and they said there's some sandwiches

11   for you there and we're going to go and play golf and him and

12   Mr. Adams left.

13   Q.   What happened next?

14   A.   Well, we were able to find a little bit more information,

15   more technical information to make the things for credibility

16   for Marco, so we called them again and we presented and finally

17   they saw really this is going to happen.  So the first thing

18   that we did with them to protect ourself was we make an N.Y.U.

19   letter to say --

20   Q.   Okay.  Let --

21   A.   Oh, I'm sorry.

22   Q.   Don't volunteer a lot of information.  Let me ask the

23   questions, okay?

24   A.   I'm sorry, ma'am.

25   Q.   That's alright.  You -- I understand you're not a lawyer.

DIRECT DAVILA                                                    179

1            Let me ask you, just let me go back about the, well,

2      these Mexicans, did they actually say that to you or you thought

3      you were treated?

4      A.   I think nobody said that.  Nobody insulted us like that,

5      but the way people treat you, I mean if I invite you to my

6      house, and I said, hey, sit down there and have a sandwich and

7      I'm going to watch TV with my friend Is like we were not treated

8      properly.  They didn't take us seriously.  That was my feeling.

9      And I'm sorry if I said something wrong by saying this Mexican

10     guy, which was me.

11     Q.   Just giving your opinion about how --

12     A.   I was giving my opinion about this guy, how I felt.

13     Q.   When Mr. Delgado brought this project to you, did he tell

14     you how he knew about it, who told him about the project?

15     A.   No, ma'am.  I don't remember any of that conversation.

16     There's sometimes in the Mexican government, I think they have a

17     website that you can go and look for.

18     Q.   I don't want you to speculate.

19     A.   I don't remember what he told me to be honest with you.

20     Q.   So you made a phone call to Mr. Williamson or

21     Mr. Williamson made a phone call to you with regard to it

22     becoming more serious?

23     A.   We called him again.

24     Q.   Okay.  And you called Mr. Williamson and tried to impress

25     upon the fact that you were serious?

1    A.   Yes, ma'am.

2    Q.   And how did that phone call go?

3    A.   Well, it went better.  And I don't remember, but I think

4    Marco -- then we came back and we talked to Marco and we

5    explained all of this.  And he said let's make another phone

6    call, let's make another conference.  And I think Marco was

7    involved in the next conference or something and we talked a

8    little bit more and Marco is very good in selling himself and

9    selling things, so I think he -- they took us more seriously

10   then.

11   Q.   Okay.  So when you had that second phone call, did

12   Mr. Williamson indicate that there were units available?

13   A.   Yes.  Somewhere -- it wasn't just one phone call.  I don't

14   know if it was five or six.  And we were just discussing things

15   and Marco was giving us hints and he was giving us hints on how

16   to do it to try to make this happen.  And finally they said yes.

17   We found -- we have -- we have exactly the equipment that you

18   need, not even similar or nothing, we have exactly what you

19   need, they said.

20   Q.   What did you -- did you discuss that with Mr. Delgado?

21   A.   Yes.

22   Q.   And with Mr. Miller?

23   A.   Yes.

24   Q.   What did the three of you decide to do?

25   A.   Well, we -- I think that's what we decide, that we were

DIRECT DAVILA                                                                          181

1    going to buy the pre-bidding package.  In Mexico, you buy the

2    packages if your intent is to bid.  And we decide since we found

3    the equipment we had a lot of chances of winning this bid.

4    Q.   So you have to pay to have the opportunity to bid on a

5    project in Mexico?

6    A.   I think that's my understanding or -- and I think that was

7    the understanding when I discussed with Marco, because he said

8    we bought the package.

9    Q.   Where did you get the understanding that you had to pay to

10   bid?

11   A.   I think -- well, I think Marco explained to me that the

12   government sometimes they have to -- you have to pay for the bid

13   packages.  And it's not $1.00, $2.00.  It's let's say 10,000

14   pesos or something.  They make it like that so people don't go

15   and just play games around, I'm just going to be here, so they

16   want to make sure that people that buy the bid package is

17   serious about the bid contract.

18   Q.   Did you need money to --

19   A.   Yes.

20   Q.   -- engage in this endeavor?

21   A.   With Marco you need money every day for everything.

22   Q.   What do you mean?

23   A.   Well, he always ask for money.  You want me to help with

24   you this, let's say we're going to move on on this, so you need

25   to -- I need to get money, I need to get some money.

1    Q.   And how much money did he say he needed?

2    A.   I don't remember if he said an amount, but I think it was

3    $350,000 that he said I needed to start preparing for all of

4    this.

5    Q.   This was his idea and he was asking you for $350,000?

6    A.   Yes.

7    Q.   Where did you get -- did you get that money?

8    A.   Yes, we did.

9    Q.   Who did you get it from?

10   A.   By talking to Mr. Kendrick, he and Mace.  And after this is

11   not a one or two-day discussion, I think we took a few weeks or

12   two months to convince Mr. Miller that he -- that he wanted to

13   be part of this.  And so he finally, he said, I want to meet

14   Marco.

15   Q.   Mr. Kendrick you mean?

16   A.   I'm sorry.

17   Q.   Mr. Kendrick?

18   A.   Yes, for the first time, Mr. Kendrick, Marco, Mace Miller

19   and myself and I think it was Lozada (phonetic) there.  We met

20   at Ardovino's on Redd for the first time so they could meet.

21   And Mr. Kendrick wanted to hear everything from Marco.  Again he

22   explain all of these situations and all of that.  And he didn't

23   agree with it right away.

24   Q.   So Mr. Kendrick, Sr., you and Mr. Delgado and who else?

25   Was Mr. Miller there?

1    A.   Mr. Miller was there and I think it was Mr. Lozada, the

2    other --

3              (Court reporter asks for clarification.)

4              THE WITNESS:  Lozada (phonetic).

5    Q.   And who is Mr. Lozada?

6    A.   Mr. Lozada was the other partner that was going to be owner

7    of Kendrick to make it a minority business.  He was the other

8    Mexican or Latino or Hispanic people to make the company.

9    Q.   And he's an accountant?

10   A.   He was an accountant.

11   Q.   And so did Mr. -- you talked Mr. Kendrick into fronting

12   some money?

13   A.   It was mostly Mace trying to convince his uncle to help to

14   move on this project because we saw a lot of future and it was a

15   real thing and he convinced his uncle to fund that money.

16   Q.   And how much money did Buzz Kendrick provide to you?

17   A.   He didn't provide it to me.  He provided a check to Marco

18   Delgado for $350,000.

19   Q.   And what other money did you raise for the project?

20   A.   I have -- I have raised $250,000 from a friend of mine,

21   Dr. -- but his name is Dr. Vargas, Arturo Vargas.  He's a pedia-

22   -- pathologist in El Paso.  He's a good friend of mine.  I knew

23   their kids knew my kids.  He's one of these persons with money

24   that he's trying to -- he's an innovator looking for how to

25   invest and all of this.

DIRECT DAVILA                                                184

1   Q.   How much money did you get from him?

2   A.   $250,000.

3   Q.   And how about you?

4   A.   I put another $300,000 that I had from my retirement of the

5   El Paso Electric Comp.

6   Q.   How much did Mr. Delgado put up?

7   A.   None.  Nothing.

8   Q.   And where did the $250,000 from Mr. Vargas and 200 or

9   whatever from you, where did that money go?

10  A.   We put it in an account.  I opened an account -- well, I

11  have to -- prior to this, we sit down in a restaurant, Marco,

12  Mace, Lozada and we agree that we needed to found the company.

13  Q.   Is this the Pelicans' meeting?

14  A.   Yes.

15  Q.   Okay.

16  A.   We meet at Pelicans, everybody wanting to be part of the

17  company on this and I said, no, the only way to control it and

18  to make sure that it's fine, it's mine, so, Marco, I ask him and

19  he suggested I am going to open a company.  I'm going to found a

20  company for you and he founded F.G.G. Enterprises.  And he did

21  all of the paperwork for me and he gave me some document and say

22  you are the managing member of the company.  You are the sole

23  owner of the company and that's how we found the company.

24  Q.   I put a document on your screen and it's marked as

25  Government's Exhibit Number 3.  Can you see it?

1    A.   Yes, ma'am.

2    Q.   And are these the papers of incorporation of F.G.G.

3    Enterprises, LLC?

4    A.   That's what Marco gave me.  He gave me this form in blank

5    and I think I filled it out.  I think this is my writing.  I

6    filled it up to here and I sent it back to Nevada or wherever we

7    send it and we formed the company, yes, ma'am.

8    Q.   Okay.

9         MS. KANOF:  We'd move admission of Government's

10   Exhibit Number 3.

11        MR. HANSHEW:  No, objection.

12        THE COURT:  GX-3 is admitted.

13   BY MS. KANOF:

14   Q.   And with regard to how the company was formed, did he tell

15   you why he was picking the State of Nevada?

16   A.   No, ma'am.  He just picked Nevada.  I don't know why.

17   Q.   What was your role in the company?

18   A.   I was the owner and sole owner and the managing member.

19   Well, I ask what is managing member means he said you are the

20   owner.  He explained to me you are the owner.  You are the sole

21   owner of the company.

22   Q.   And then did you -- you started to say that after the

23   company was created you opened a bank account; is that correct?

24   A.   Yes.  I needed to put this money that we found the company

25   for operations -- to start operations.  I was required to go to

DIRECT DAVILA                                                    186

1    the city first, to register the company and all of that and then

2    with those papers I went to the bank and I opened an account.

3    Q.   I'm putting a new document on the screen.  That's

4    Government Exhibit Number 144.  It's already been admitted into

5    evidence.  And is account number on this particular account is

6    last four numbers 1614 is -- and the customer named F.G.G.

7    Enterprises, LLC; is this the account you opened?

8    A.   Yes, ma'am.

9    Q.   And who was the signator on this account?

10   A.   It was myself only.

11   Q.   And I notice that the opening deposit was $55,000; is that

12   correct?

13   A.   Yes, that's probably from my account from money that I put

14   at the beginning, yes.

15   Q.   Okay.  So it's not the 300 -- well, the 350 went to

16   Mr. Delgado directly, but it doesn't have the 200-thousand-plus

17   that was contributed by Dr. Vargas and the money contributed by

18   you yet --

19   A.   Yes.

20   Q.   -- on the opening day; is that correct?

21   A.   Yes, ma'am.

22   Q.   Did you open the account before -- the date of the opening

23   account as it appears to be July 17th of 2009, would that give

24   us a good time perspective?

25   A.   If this is on the document, I assume it is correct, yes.

DIRECT DAVILA                                                                          187

1    Q.   And the signature on the account is just you, correct?

2    A.   Yes, ma'am.

3    Q.   Tell us about how you became the only signator on the

4    account?

5    A.   Well because, number one, it was my company and I was the

6    managing member and I open the account because I was --

7    Q.   Did Mr. Delgado have input who was going to be the signator

8    on the account?

9    A.   No.  He just told me open an account and I did.  And then I

10   think once or twice he said, Fernando, according to the law or

11   something, you need to have two people signing on the account at

12   least and all of that and so I need to register my name and I

13   said, no.

14   Q.   He wanted to be a signator as well?

15   A.   He wanted to be a signator as well.

16   Q.   He told you in the law -- what did he tell you about the

17   law?

18   A.   Something by law or you need to have at least two other --

19   another account -- another signature, because if something

20   happened or something you need to have be able to use the

21   account, so I said if the law and I -- I don't know.  He always

22   used terminology, legal terminology with me.  He knew he was

23   going to get me, so I said, okay, if I need to have another

24   signature I'm going to put my wife.

25   Q.   And you evidently -- did you put your wife eventually?

1   A.   I think my wife went and signed and I told him, we're

2   covered.  We have legal company because now we have two

3   signatures.

4   Q.   Um --

5   A.   I'm sorry, but I'm going to put my wife.  I'm not going to

6   put nobody else.

7   Q.   Okay.  Now with regard to how this progressed, someone has

8   found some generators for you, you created a company.  What

9   happens next?

10  A.   Uh, we bought the solicitation package as I said.  Marco

11  had money to start moving on and we started moving on this

12  direction and a lot of meetings and phone calls with Rick

13  Williamson trying to negotiate a price and find -- finally they

14  told us they had the equipment and they told us a little bit of

15  information where the equipment was and how it was built.

16  Q.   Okay.  With regard to the relationship you developed, you

17  own the company and what was Mr. Delgado's role?

18  A.   Mr. Delgado's role was, number one, to take care of the

19  business in Mexico.  That was his specialty.  He had the

20  contacts in Mexico.  He has all of the knowledge of the law with

21  Mexico and all of this.  And I was going to take care of all of

22  the technical issues and finding equipment and all of that,

23  taking care of the United States.  He was going to take care of

24  the Mexico side and I was going to take care of the U.S. side.

25  Q.   And what about Mr. Miller?

DIRECT DAVILA                                                    189

1    A.    Mr. Miller was there with me all the time.  Somebody [sic]

2    ever asked me why we didn't have a contract, we never signed a

3    contract him and I.  I always saw him as my partner in the

4    business and I was going to share my profits with him, because

5    he was a very important role when he found out when he funded or

6    funded the $350,000.

7    Q.    He got that 350 from his uncle right?

8    A.    Yes, ma'am.

9    Q.    What does Mr. Miller do for a living?

10   A.    By this time I think -- well, he was helping his uncle in

11   Kendrick Electric and he knew or he used to work in funds or

12   things like that, so he was always trying to look for something,

13   but mostly he was helping his uncle develop businesses in Fort

14   Bliss and all of this, since we were supposedly a minority

15   company, which for the record, it never materializes.  We had

16   all of that and --

17   Q.    You didn't become -- you didn't file as a small business?

18   A.    We never paid the money, because we didn't have the money

19   to pay him for the ownership.  And one day in the middle of

20   something he arrives, he says, now you're going to make half of

21   the money that you're making and the next month, he says, you're

22   not getting paid.

23   Q.    Mr. Gireud --

24   A.    So it never materialized.

25   Q.    Now, when -- once you had a company and you had some

```
1    start-up money and you found the generators, Mr. Delgado's role

2    you said was to -- we he ever supposed to provide legal counsel?

3    A.   Well, he was the attorney.  He was my attorney.

4    Q.   Okay.  Um --

5    A.   He was not only my attorney; he was my best friend.

6    Q.   I have in front of you Government's Exhibit Number 4.

7    Could you take a look at Government's Exhibit Number 4?

8    A.   Yes, ma'am.

9    Q.   And I'm just going to go down to the bottom quickly before

10   I ask for admission of the document, and ask if your signature

11   is at the bottom of Government's Exhibit Number 4?

12   A.   Yes, ma'am, it is.

13   Q.   Government's Exhibit Number 4, is that a power of attorney

14   that you gave Mr. Delgado?

15   A.   Yes.

16        MS. KANOF:  We'd move admission of Government's

17   Exhibit Number 4.

18        MR. HANSHEW:  No, objection, Judge.

19        THE COURT:  GX-4 is admitted.

20        THE WITNESS:  Could I say something if I want?  This

21   power of attorney --

22        MR. HANSHEW:  Objection, Your Honor.

23   BY MS. KANOF:

24   Q.   No, Mr. -- Mr. Gireud, you can just answer my questions.

25   A.   Yes, ma'am.
```

DIRECT DAVILA                                                      191

1    Q.    So who drafted this power of attorney?

2    A.    Marco Delgado did.

3    Q.    And whose idea was it to draft this power of attorney?

4    A.    His idea.

5    Q.    And what did he tell you about this power of attorney?

6    A.    Since he was going to be working in Mexico on this

7    contract, he was going to be representing F.G.G. Enterprises.

8    He said part of the document that he needed to have to work on

9    this was to have a power of attorney for this.

10   Q.    Okay.  And I'm trying to get the tool.  You couldn't find

11   it.  I can't highlight anymore, but I'll try to do my best.

12             THE COURT:  We're about ready for a break.

13             MS. KANOF:  Okay.  That would be a good idea.

14             THE COURT:  Ladies and gentlemen, we'll take a

15   ten-minute recess.  If you'd be back in the jury room at 3:20,

16   we'll resume our proceedings then.

17             (Break at 3:10 p.m. to 3:22 p.m.)

18             THE COURT:  Let the record reflect that all members of

19   the jury are present, the United States through its assistant

20   United State's attorneys are present, the defendant and his

21   counsel are present.

22             Mr. Gireud is on the witness stand.

23   BY MS. KANOF:

24   Q.    We're looking at Government's Exhibit 4 for the power of

25   attorney.  Now, did Mr. Delgado tell you why you needed this?

```
1              THE COURT:  It's super dark on my screen.
2              MR. HANSHEW:  Don't tell me we shorted you out.
3    BY MS. KANOF:
4    Q.   Is it on your screen, Mr. Gireud?
5    A.   It's better now.
6    Q.   Okay.  Government's Exhibit Number 4, what did Mr. Delgado
7    tell you about needing this exhibit?
8    A.   He needed it in order for them to perform his duties as my
9    attorney representing F.G.G. in Mexico.  He needed a power of
10   attorney and he drafted it for me and told me get it notarized
11   for me.
12   Q.   And did you do that?
13   A.   Yes, ma'am.
14   Q.   Did you read it before you did it?
15   A.   I read it, yes.
16   Q.   Did you have Mace Miller read it?
17   A.   I don't remember, ma'am.
18   Q.   Okay.  So what is your understanding about this document?
19   What did Mr. Delgado tell you this document allowed him to do?
20   A.   Represent F.G.G. on the bid processing and bid processing
21   only.  And he needed this power so he can make decisions and
22   represent El Paso -- I mean F.G.G. Enterprises in meetings and
23   to put the documents together for the bid.
24   Q.   Let's look at the second paragraph and see -- it says, this
25   confers and grants in favor of Mr. Marco Delgado as ample as may
```

1   be required by law.  Do you know what that means, "ample as may

2   be required by law"?  Do you have any idea what that means?

3   A.   That it's a big power of attorney, I guess.

4   Q.   Don't guess.  Did you ask Mr. Delgado what that meant?

5   A.   I don't remember asking him.  I trusted him.

6   Q.   Okay.  So that in the name of the above company -- and the

7   above company it's up here, F.G.G. Enterprises, right?

8   A.   Yes, ma'am.

9   Q.   He may -- he being Mr. Delgado -- he may appear before the

10  Commisión Federal Electricidad Mexico, United States -- Mexican

11  United States.  And then what does it say?  To execute and

12  deliver -- and I'm sorry, but I think that's probably a typo --

13  de [sic] above-mentioned companies.  Did you translate this

14  or -- do you know who drafted this?

15  A.   I have no idea.  He just gave it to me to get it notarized.

16  Q.   Above mentioned companies response to public bid -- and

17  then there's a number, correct?

18  A.   Yes, ma'am.

19  Q.   Okay.  And then, authorizing said attorney in fact to

20  negotiate and execute any and all -- I can't get rid of it --

21  any and all contracts deriving from said public bid.  Is that

22  your understanding of the limits of this power of attorney?

23  A.   Yes.  My understanding the way he explained it to me was

24  that this is a power of attorney to represent -- for him to

25  represent the company in the bid process mentioned here and

1    that's it.  That's all I understood.

2    Q.   In your mind, would this enable him to change terms in the

3    contract between F.G.G. and C.F.E.?

4    A.   No, ma'am.

5    Q.   Did you ever read the contract between F.G.G. and C.F.E.

6    after or before it was signed?

7    A.   I read a few pages that he produced to me, not the complete

8    document.  He -- up to today, I haven't seen the whole document,

9    so I only read a few pages that he provided.

10   Q.   Well, what pages did he provide?

11   A.   He provided documents where, number one, to say that we --

12   you're saying after the contract was awarded or the bid package.

13   Q.   Let's start with the bid package.  Did you see the bid

14   package?

15   A.   No, ma'am?  We never saw the whole bid package, the

16   whole --

17   Q.   Who is we.  We never saw; who is we?

18   A.   I'm talking about Hector Ponce, who was the representative

19   for Mitsubishi in Mexico.  When the first time we saw the

20   package was the night before we produced -- we prepared the

21   bids, and they only asked us or they only showed the technical

22   documents that we --

23   Q.   So what about Mace Miller?  Do you know whether or not he

24   ever saw -- you're talking about the economic proposal, right?

25   A.   Yes, ma'am.

DIRECT DAVILA                                                    195

1    Q.   Let's look at the economic proposal, first in Spanish.

2              Is this what Mr. Delgado was hired partially -- this

3    is the bid, correct?

4    A.   That's all he was supposed to be representing F.G.G., to

5    provide the bid package for the bid.

6    Q.   And this is Government's Exhibit Number 9.  You see the

7    number 9 on there?

8    A.   Yes, ma'am.

9    Q.   And only the page that I've scrolled to, there's F.G.G.

10   letterhead where F.G.G. located at 7362 Remcon Circle?

11   A.   No, ma'am.  Marco Delgado asked me for the template or for

12   a blank page of this and he produced all of these documents.

13   Q.   That's Marco Delgado's virtual law office's address,

14   correct?

15   A.   Yes, ma'am.

16   Q.   He didn't have an actual law office, did he --

17   A.   Well, I went to his office once or twice and it was and it

18   one -- was is called virtual office.  You don't have an office.

19   They give you a cubicle when you need them and they sit you

20   there and you can work there.

21   Q.   So you gave him a blank piece of letterhead and does your

22   letterhead have F.G.G. Enterprises on it?

23   A.   Later -- yes, I think it has the office that I have and it

24   has all of the addresses and everything was correct, so I don't

25   know why --

DIRECT DAVILA                                                    196

1    Q.   But this economic proposal was submitted on behalf of your

2    company F.G.G. Enterprises, correct?

3    A.   Yes, ma'am.

4            MS. KANOF:  We'd move admission of Government's

5    Exhibit Number 9 and 9A the English translation.

6            MR. HANSHEW:  No objection.

7            THE COURT:  GX-9 and 9A are admitted.

8            MS. KANOF:  And if you could display 9 first so the

9    jury can see what I'm talking about?

10           COURTROOM DEPUTY DUEÑAS:  You're the one displaying

11   it.

12           MS. KANOF:  Oh, I am?  I didn't know that.

13   BY MS. KANOF:

14   Q.   So in front of you is the F.G.G. Enterprise letterhead.

15   You are saying this is not F.G.G. Enterprise's address, correct?

16   A.   No, ma'am.

17   Q.   Okay.  And did you -- and this is the economic proposal,

18   correct?

19   A.   Yes, ma'am.

20   Q.   And I'm sorry.  Did you see the proposal before Mr. Delgado

21   submitted it?

22   A.   No, sir [sic].  I saw it -- I saw it a week or two after

23   the bid process and after --

24   Q.   Did you have any input into the content?

25   A.   No, ma'am, I didn't have any input.

KATHLEEN A. SUPNET, CSR

1    Q.   And the page that I display now, that's another document

2    written on F.G.G. letterhead with Mr. Delgado's virtual office

3    address, correct?

4    A.   Yes, ma'am.

5    Q.   Okay.  I'm going to go -- we'll, get back to that later.

6              Now I'm going to go to the contract itself.

7    Government's Exhibit Number 18, which has been admitted into

8    evidence, the -- Government's Exhibit Number 18 the actual

9    contract between F.G.G. and C.F.E., did you see this contract

10   before it was signed?

11   A.   No, ma'am.

12   Q.   Did you have any input into this contract before it was

13   signed?

14   A.   No, ma'am.

15   Q.   Scroll to the bottom.

16             Do you know who Ingeniero Laris is?

17   A.   Yes.  He's the Director of Proyectos of -- it's called,

18   yeah, Director de Proyectos de Inversión Financiada, which is

19   the financial projects, developments or director.

20   Q.   Of C.F.E.?

21   A.   Yes, ma'am.

22   Q.   And do you know who, Ingeniero Alberto Ramos was?

23   A.   Yes.  He was his assistant or his right hand or his -- you

24   have a director then you have a subdirector below him.

25   Q.   Now this original contract has annexes to it.  They're in

1    Spanish "anexos," correct?

2    A.   Yes, ma'am.

3    Q.   And this is the page that is the index of the anexos; is

4    that correct?

5    A.   Yes, ma'am.

6    Q.   Do you see an Anexo W. in this original contract?

7    A.   No, ma'am.

8    Q.   Later on does that become an issue?

9    A.   Yes, ma'am.

10   Q.   Did you learn that Mitsubishi had provided an Annex W. that

11   was not provided by F.G.G. to C.F.E. for the contract?

12   A.   Yeah, they brought that up to our attention, yes.

13   Q.   I'm going to switch to English.

14           This is the English translation, 18A, of the contract.

15           You wouldn't have needed to read it in English though.

16   You could read it in Spanish yourself, correct?

17   A.   Yes, ma'am.

18   Q.   Okay.  And was this contract executed or do you know what

19   date it was executed on?  Do you remember?  Here at the bottom

20   of the page.

21   A.   Yes, January 6th, 2010.

22   Q.   Okay.  And as part of the contract -- sorry, this takes

23   awhile -- did the contract contain, now that you've seen it at

24   page 12, wiring instructions to the bank account that you

25   previously identified that you opened for F.G.G.?

1    A.   Yes, ma'am.

2    Q.   Okay.  And it's the Wells Fargo ending bank account in 1614

3    the F.G.G. bank account, correct?

4    A.   Yes, ma'am.

5    Q.   Okay.  So back to the power of attorney, would changing a

6    term in the contract to the Wells Fargo account to an account of

7    Skippings and Rutley in the Turks & Caicos be --

8             MR. HANSHEW:  Objection, leading.

9             MS. KANOF:  Okay.

10   BY MS. KANOF:

11   Q.   Did you authorize Mr. Delgado to change the wiring

12   instructions in the original contract to an account in the Turks

13   & Caicos?

14   A.   No, ma'am.

15   Q.   Did you know that he did?

16   A.   No, ma'am.

17   Q.   With regard to -- so Mr. Delgado asked you to go get it

18   notarized and that was that, right?

19   A.   Yes, ma'am.

20   Q.   After the power of attorney was signed, did you go to

21   Florida to meet with people from Mitsubishi?

22   A.   Yes, ma'am.

23   Q.   Who went?

24   A.   We have several trips to Mitsubishi and it was Mace, myself

25   and I think we met Rick Williamson.  This is one of the first

1    trips.  And --

2    Q.   Did Mr. Delgado go?

3    A.   I don't think he went the first time or probably he has.  I

4    don't remember exactly the times that he was there, if it was

5    the first or the second one, I don't remember.

6    Q.   And do you remember an issue arising about letters of

7    credit?

8    A.   Yes, ma'am.  That was one of the biggest issues of the

9    contract.

10   Q.   And who -- when did that issue of letters of credit first

11   arise?  When did you first learn about the fact that F.G.G. had

12   to provide $20 million as a guarantee in letters of credit?

13   A.   It was part of the request in the proposal that a company

14   who wins have to provide a $20-million letter of credit.

15   Q.   Did you discuss that with Mr. Delgado prior to the bid?

16   A.   Yes, ma'am.

17   Q.   Okay.  And was there anyone else present?

18   A.   I don't remember, ma'am.  I don't know if Mace -- probably

19   Mace should have been there, but I don't remember.

20   Q.   Did you know what a letters of credit was?

21   A.   Yes, ma'am.

22   Q.   And did F.G.G. have the financial backing to obtain a

23   $20-million letter of credit?

24   A.   No, ma'am.

25   Q.   And so what did you say to Mr. Delgado about being required

1    to obtain a $20-million letter of credit?

2    A.   When I found out that we needed to have $20-million letter

3    of credit, I said we don't have a chance anywhere to provide a

4    letter of credit.  And he -- the very first time that I

5    mentioned that to him or I told him my concerns, he says we

6    might use Ingeniero Vargas -- Ingeniero Vargas is trying to help

7    us to do something on this.  And I said, what do you mean he's

8    trying to help us.  He said, well, he can either -- he has a lot

9    of contacts with the union and they might use the 401k accounts

10   of the union for the backup of the letters of credit, but he's

11   helping us on that and I'm taking care of that.  Don't worry

12   about that.  We're taking care of that.

13   Q.   He said that Ingeniero Vargas might use the 401k of the

14   Electrical Union of Mexico?

15   A.   Yes, ma'am.

16   Q.   In other words, the retirement accounts of the workers?

17   A.   Yes, ma'am.

18   Q.   And then he told you not to worry about it?

19   A.   He said this is part of my job.  I'll take care of it.  You

20   take care of the technical part and I'll take care of this.

21   Q.   And we're going to talk about this more later, but did --

22   are there any other solutions that he offered other than using

23   the 401k of the Union's Workers' Retirement Account?

24   A.   If I recall, I don't remember if it was this conversation,

25   but he says we can even get a letter of guarantee from

1    Mitsubishi, which is a big company, and they can help us to --

2    on that or somewhere in the conversation in Mexico City, he

3    brought up the situation of using the equipment as a guarantee.

4    Q.    Okay.  Government's Exhibit Number 6.  There seems to be

5    some communications on which are you copied and some which are

6    you not, but Government's Exhibit 6 --

7              MR. HANSHEW:  Objection, Your Honor.

8              MS. KANOF:  I was going to ask him --

9              THE COURT:  What's the objection?

10             MR. HANSHEW:  Sidebar, the beginning part of that.

11             MS. KANOF:  I'll withdraw it.

12   BY MS. KANOF:

13   Q.    What happened to, L-O-Z-A-D-A?

14   A.    What happened to Mr. Lozada.

15   Q.    Did he -- was he -- did he become part of the project?

16   A.    No, ma'am.

17   Q.    So at what time did he drop out?

18   A.    I think when I was let out from Kendrick, he was no longer

19   working on this project.  He wanted so much to be working on

20   this, but he wasn't.

21   Q.    Who is Enail, E-N-A-I-L?

22   A.    For some reason once in a while I received e-mails from

23   Marco's personal account and it says Enail.

24   Q.    And Government's Exhibit Number 6, is that an e-mail from

25   enailmdelgado@aol.com to you?

```
 1    A.   Yes.
 2         MS. KANOF:  We'd move admission of Government's
 3    Exhibit Number 6.
 4         MR. HANSHEW:  No, objection.
 5         THE COURT:  GX-6 is admitted.
 6    BY MS. KANOF:
 7    Q.   This -- the date of this e-mail is what?
 8    A.   July the 30th, 2009.
 9    Q.   So you had already opened the bank account and you had
10    already had the formation of F.G.G., correct?
11    A.   Yes, ma'am.
12    Q.   Although Mr. Lozada is still copied on this e-mail by
13    Mr. Delgado, correct?
14    A.   Yes, ma'am.
15    Q.   And the subject is the Apostille and Power of Attorney.  Do
16    you know which power of attorney he's talking about or which
17    apostille he's talking about?
18    A.   No, ma'am.
19    Q.   He's talking to you but is he also talking to Mace Miller
20    and to Mr. Lozado [sic].  By this time has Mr. Lozada part -- I
21    mean you're already F.G.G.; is Mr. Lozada still in the project?
22    A.   He was -- he wanted to be part of the projects and he was
23    present in some things and he was copied probably automatically
24    but I don't think he was anymore.
25    Q.   He says the R.F.P. was delayed and continues to be delayed
```

1   until such time that F.G.G. becomes current on its past due

2   A.P.s.  So do you know what an R.F.P. is?

3   A.   Yeah, request for proposal.

4   Q.   Okay.  And -- I thought the R.F.P. had been issued by

5   C.F.E.

6   A.   Yes, ma'am.

7   Q.   So how can the R.F.P. have been delayed because of

8   something F.G.G. has done?

9   A.   I don't know, ma'am.

10  Q.   Okay.  And then it says until F.G.G. becomes current on its

11  pass due A.P.s.  What does he mean by that?  What's an A.P.?

12  A.   I assume it is the apostilles and power of attorney that

13  he's talking on the reference subject matters.

14  Q.   Since you have made no payment arrangements, I cannot in

15  good faith allow for my tech guys to incur additional time and

16  expense, given that it's been over two months and that you have

17  received payment for your expenses -- that you have received

18  payments for your expenses.  What is he telling you there?

19  What's that about?

20  A.   If I'm reading correctly, he said that I haven't made my

21  payment arraignments, so in other words, I don't think him and I

22  have a contract or something.  I don't know what he meant.

23  Q.   Well, you just opened a bank account on the 17th of July

24  and this is a little over two weeks later?

25  A.   Yeah.

1    Q.   Do you know what he's talking about, what payment

2    arrangements he's talking about?

3    A.   No, ma'am.

4    Q.   And what two months is he talking about?

5    A.   I don't know.  I don't know if the R.F.P., the date for the

6    opening date was changed a few times because of technical issues

7    or things like that it was delayed, so I don't know if he's

8    talking about these delays.

9    Q.   Okay.  But the R.F.P. being delayed, C.F.E. delaying the

10   R.F.P. what would that have to do with a bidder?

11   A.   I don't know, ma'am.  Nothing.  It shouldn't have nothing

12   to do with it.

13   Q.   And then he says, I think it is unfair that you receive

14   $30,000 before leaving on vacation.  That money was owed to my

15   guys.  What is he talking about there?

16   A.   I don't understand.

17   Q.   Did you receive $30,000 from somebody?

18   A.   No, ma'am.  I don't remember.

19   Q.   Who are his guys?

20   A.   That's a question for him, not for me.  I don't know.

21   Q.   Okay.  So make no mistake, this is the reason and no other;

22   the reason and no other for what?

23   A.   All I can tell is that most of the documents Marco sent

24   they were very ambiguous and hard to read.  He was very

25   confusing or trying to confuse the issues.  That's all I can

1    think of.

2    Q.   And then he says, so make no mistake this is the reason and

3    no other; is that correct?

4    A.   Yes, ma'am, that's what it says.

5    Q.   I did not consider it appropriate, but have no problem -- I

6    do not -- did not consider it appropriate, but have no problem

7    whatsoever with Mitsubishi being apprized of this fact.  I will

8    defer to you on it.  Apprised of what fact?

9    A.   I have no idea, ma'am.

10   Q.   Who is Alejandra?

11   A.   Reading further on the letter, it says Foster there, so I'm

12   assuming he's talking about Alejandra De La Vega Foster.

13   Q.   Tell me why he's talking about an Anna Foster, Paul

14   Foster's wife?

15   A.   I have no idea, ma'am.

16   Q.   Okay.  Regarding the L.C., you obviously weren't paying

17   attention during our meeting yesterday, because it was discussed

18   as being central to the teaming agreement.  What's he talking

19   about?  What did you say about the letters of credit that he's

20   mad at you about not paying attention?

21        MR. HANSHEW:  Objection, Your Honor.  Sidebar.  He's

22   mad about...

23   BY MS. KANOF:

24        Well, he says you weren't paying attention, so maybe

25   he's not mad.  He's just noting that you weren't paying

1    attention.

2    A.    Yeah.  I don't know what he meant by that.  I don't know if

3    he says he already has -- he says he's going to take care of

4    them and I keep asking and asking same questions.

5    Q.    In fact, referring to the L.C., he says, financing in place

6    and Hector was first to be made aware.  What was Hector first to

7    be made aware of?

8    A.    Well, he says financing in place.  That means that he has

9    the letters of credit.

10   Q.    Okay.  But he told Hector Ponce first?

11   A.    That's what I understand from this.

12   Q.    Okay.  As always, I'll make myself available for the

13   conference call, call you mentioned, but need the first item on

14   the agenda to be payment on behalf of F.G.G. and profit sharing

15   agreement.  What profit sharing agreement is he talking about?

16   A.    Since at the very beginning we discussed it's going to be

17   50/50 on the profits of this projects, I'm assuming he's talking

18   about a contract between him and me.

19   Q.    Okay.  Now his tech guys.  Let's go back really quickly for

20   a second to the Articles of Incorporation.  Okay.  The Articles

21   of Incorporation were filed, it appears, April 3rd of 2009; is

22   that correct?

23   A.    Yes.  Yes, ma'am.

24   Q.    And then the Power of Attorney it appears was July 13th,

25   correct?

1    A.    Okay.  Yes.

2    Q.    Is that government's Exhibit Number 4?

3    A.    Yes, ma'am.

4    Q.    Okay.  So now government's Exhibit Number 6 is two weeks

5    later and he's talking about after you've given him the power of

6    attorney that he's already got tech guys that you need to pay.

7    You've just given him the power of attorney.  What tech guys?

8    A.    I don't know, ma'am.

9    Q.    Did he give you invoices for tech guys that he hired?

10   A.    No, ma'am.  Only one time during the first time or second

11   payment he provide me with a copy of an (mumbles) proyectos or

12   something, that's it, that's all.

13   Q.    And what did it say on the invoice?  What did they do or

14   who was it?

15   A.    I don't remember, ma'am.  I don't -- I haven't seen that

16   invoice in many years, so I don't know what it says, but it was

17   something related to field services or something that he always

18   mentions.

19   Q.    To field service?

20   A.    Yes, ma'am.

21   Q.    Okay.  Of course, the generators -- were the generators

22   already up and running, that you would need field service?

23   A.    No, sir -- no, ma'am.

24   Q.    Okay.  And so did you ever need a tech guy?

25   A.    I think we met in Mexico one time or one time we did people

1    from Mitsubishi and they were one of two retirees from C.F.E.

2    that they were asking questions about the proposal and how to

3    put together some information, yes.

4    Q.   Do you remember their names?

5    A.   No, ma'am.

6    Q.   And did he tell you, I need money for my tech guys?

7    A.   As I said before, he asked for money every day any time he

8    had a chance to get money, he wanted money.

9    Q.   And you don't remember the $30,000 that you supposedly

10   received?

11   A.   No, ma'am.

12   Q.   Government's Exhibit Number 7, the Teaming Agreement.  Did

13   you participate in the drafting of the Teaming Agreement?

14   A.   I think it was produced by Mitsubishi Power Systems and

15   they would send to us and Mace and I looked at it, yes, but I

16   didn't participate in the creation.

17   Q.   In the creation of it.

18          And at the bottom is signatures?  It's your signature,

19   correct?

20   A.   Yes, ma'am.

21   Q.   And John Adams?

22   A.   Yes, ma'am.

23   Q.   Were you together with John Adams on the 8th of August of

24   2009 when it was signed?

25   A.   No, ma'am.  I think they sent these documents signed

1    already by e-mail and I signed it, scanned it and sent it back

2    to them.

3    Q.   Did Mr. Delgado review the teaming agreement before you

4    signed it?

5    A.   I don't remember, ma'am.

6    Q.   Okay.  Do you know whether he participated in drafting the

7    teaming agreement?

8    A.   No, ma'am.

9    Q.   No, you don't remember or no he didn't participate?

10   A.   If I recall, it was produced by Mitsubishi and they sent it

11   to us and --

12   Q.   Government's Exhibit Number 8, Memorandum of Understanding.

13   Is this the agreement you had with Mr. Delgado to split how

14   payment was going to occur?

15   A.   Yes, ma'am.

16   Q.   Okay.

17           MS. KANOF:  And we'd move admission of Government's

18   Exhibit Number 8.

19           THE COURT:  Mr. Hanshew?

20           MR. HANSHEW:  No, objection.

21           THE COURT:  GX-18 is admitted.

22   BY MS. KANOF:

23   Q.   How did this Memorandum of Understanding -- how did it

24   occur?

25   A.   He create it and then he called me as always saying I'm on

1    my way to the airport, I'm going to stop five minutes to see

2    you, so you need to sign that document pretty quick because I'm

3    leaving to Mexico.

4    Q.   Was that a pretty common thing that he said, I'm in a

5    hurry, I'm on my way to the airport?

6    A.   Yes.

7    Q.   Okay.  And where were you when he brought it for you to

8    sign?

9    A.   We met at Time Matters restaurant on Mesa.

10   Q.   Okay.  This was the 16th -- the 16th of September of 2009,

11   correct?

12   A.   Yes, ma'am.

13   Q.   Did you get a chance to read it before you signed it?

14   A.   I read it in front of him and I had five minutes to sign

15   and it and review it, and if not I was going to be -- I mean, he

16   put a lot of pressure on me all the time.  When he needed

17   something special or something that -- for him, he did it like

18   that.

19   Q.   Okay.  So let's go through this agreement.

20            Whereas F.G.G. Enterprises -- that's you, correct?

21   A.   Yes, ma'am.

22   Q.   -- has procured the right to bid on a request for bid from

23   the Commisión, okay, and whereas Delgado and associates -- is

24   that correct, the first paragraph?

25   A.   (No response.)

1    Q.   -- has assisted of said bid and are seeking compensation in

2    the event of a successful bid the following terms -- right?

3    A.   Yes, ma'am.

4    Q.   Okay.  Whereas F.G.G. wishes to compensate -- by the way,

5    did Mr. Delgado have any associates?

6    A.   Not that I know of, ma'am.

7    Q.   Okay.  And I noticed on his e-mail he puts office names

8    Calgary, Mexico City; have you ever been to an office in

9    Calgary, Canada of his?

10   A.   No, ma'am.

11   Q.   Do you know if he has an office in Calgary, Canada?

12   A.   I don't know, ma'am.

13   Q.   You've been in Mexico City with him a bunch.  Did you ever

14   go to an office in Mexico City?

15   A.   No, ma'am, never.

16   Q.   F.G.G. wishes to compensate Delgado and associates in the

17   event bid is awarded with the commercially satisfactory terms

18   presented by F.G.G.

19        Okay.  So he's -- he's drafting -- your attorney is

20   drafting this agreement saying these are your commercially

21   acceptable terms, correct?

22   A.   Yes, ma'am.

23   Q.   Okay.  Number one, Delgado and associates is instructed to

24   prevare [sic] and present said bid on behalf of F.G.G. and not

25   Kendrick Electric as originally contemplated; is that true?

1    A.   Yes, ma'am.

2    Q.   Releasing Delgado and associates of any fiduciary or

3    attorney relationship with Kendrick; is that true?

4    A.   Yes.

5    Q.   F.G.G. and Delgado will define on their sole discretion the

6    applicable commercially satisfactory terms to be presented as

7    part of the bid, including but not limited to price and payment

8    terms; correct?

9    A.   Yes, ma'am.

10   Q.   You are F.G.G., right?

11   A.   And I was -- yes.

12   Q.   Okay.  Did you participate in determining the applicable

13   commercially satisfactory terms to be presented as part of the

14   bid?

15   A.   Never, ma'am.

16   Q.   Never?  Okay.

17        Did you participate in determining the price of the

18   equipment?

19   A.   I participated with Mitsubishi trying to see the better

20   price for them to sell it to us, so we can sell to the C.F.E.

21   Q.   So you did do that?

22   A.   -- but that was -- I did participate with them.

23   Q.   What about the payment terms?  Did you participate in

24   determining the payment terms, the schedule of payment?

25   A.   No, ma'am.  Those are set out by the document by the

1    Mexican government.  We have nothing to do with changing those.

2    Q.   Why did you sign a contract saying you were going to

3    participate in things you didn't participate in?

4    A.   Because when your attorney prepares a document for you and

5    you review it and you trust him and he tells you this is the way

6    it is, you just trust the attorney.

7    Q.   Okay.  So Delgado and Associates will receive an equal

8    amount to 62.5 percent of the difference between purchase price

9    to F.G.G. of the equipment transportation and field service

10   required for the satisfaction of the bid and the amount for

11   which the equipment is sold to C.F.E.  That's more than half.

12   You said you had been talking about 50 percent.  That's more

13   than 50 percent.

14   A.   I agree with you, but when somebody arrives with a

15   contract, you said you sign it or you're gone or you're out of

16   this, so you sign it, and I need to get it to Mexico and I need

17   to present this to Mexico so they can start working with us,

18   so...

19   Q.   Did you have a relationship with Ingeniero Vargas?

20   A.   Not at this point.  I knew who he was and he met me once or

21   twice, but I don't have a relationship with him.

22   Q.   Did you have a relationship with Ramos or Laris?

23   A.   Not at all.

24   Q.   Why is that portion initialed?

25   A.   Because he wanted 62-and-a-half-percent.  If you move down

1     the document, it has an asterisk so there must be a note.

2     Q.   Okay.  We'll get there.

3              The current sale price to C.F.E. is

4     127-and-a-half-million.  The current negotiated price for the

5     equipment is 105 million.  So he would have gotten the

6     62 percent of the difference between those two amounts to start

7     with, correct?

8     A.   Yes, ma'am.

9     Q.   The cost of transportation is at this time undetermined and

10    the price of the field services is 4 million and 200-thousand,

11    correct?

12    A.   That's what he put in there.  I never had a chance to

13    review how much it was going to be or anything.  He just put

14    those numbers in there.

15    Q.   But transportation never occurred, correct?

16    A.   No, ma'am.

17    Q.   And neither did field services?

18    A.   No, ma'am.

19    Q.   Other than he wanted you to pay for somebody that was doing

20    field services before the contract was finished as you

21    previously testified, correct?

22    A.   That's what he says, yes.

23    Q.   The amount owed to Delgado and Associates will be become

24    due and payable.  Okay.

25              The amount owed to D. and A. will become due and

1    payable upon the awarding of the bid contract to F.G.G. and will

2    be paid by the first disbursement of funds by investor lending

3    institution as will be F.G.G. in accordance with the contract

4    terms.

5            So according to this contract, the entire amount due

6    and owing to Mr. Delgado and to F.G.G. would be due the day the

7    bid was awarded?

8    A.   It's impossible.  We don't have any payment yet, so how

9    could it be?

10   Q.   Will be paid at the first disbursement of funds?

11   A.   Yes.

12   Q.   Well, the first disbursement of funds, is it 62 percent of

13   127 million minus 150 -- 105 million?

14   A.   No, they were going to be a scheduled payments; payment

15   number one for certain amount, payment two, and again as the

16   note in the front on the top says, we needed to give money for

17   transportation and he said field services, so whatever the

18   difference in profit was, it was going to be shared by him and

19   I, yes.

20   Q.   Okay.  And let's see.  Disbursement by the investor lending

21   institution.  What -- who's the investor lending institution?

22   Is that who lends the money to C.F.E.?

23   A.   I'm assuming that he's talking about the fideicomiso or the

24   trust fund.

25   Q.   D. and A. commits to remaining fully engaged in managing

1    the contractual relationship with C.F.E. during F.G.G.'s

2    involvement in the project; correct?

3    A.   Yes.  Relationship, yes.

4    Q.   Okay.  Did -- in your mind, did managing include changing

5    the wiring instructions?

6    A.   Of course not, ma'am.

7    Q.   Prior to receiving -- prior to receiving any funds, F.G.G.

8    commits to establishing the corresponding escrow account to

9    ensure said payment in a timely fashion.

10           Okay.  What's an escrow account?

11   A.   An escrow account is where you're going to deposit money

12   and you are going to keep it there to make payments at a later

13   date.

14   Q.   Did you establish an escrow account?

15   A.   Well, I'm not a banker.  I went to the bank and I opened an

16   account for F.G.G. Enterprises and that was the account that we

17   were going to use to make payments to our suppliers.

18   Q.   In fact, it's Mr. Delgado who put that account in the

19   contract with F.G.G. and C.F.E., correct?

20   A.   Yes, ma'am.

21   Q.   The 1614 account?

22   A.   Yes, ma'am.

23   Q.   Okay.  So you established an account in your mind that was

24   sufficient?

25   A.   Well, if he -- yes, the answer is yes and that's why he put

1    it in the contract, because it was an account that he was.

2    Q.   Okay.  The next line:  To establishing the corresponding

3    escrow account to ensure said payment in a timely fashion.

4              So if you have to establish an escrow account, what's

5    the purpose of the escrow account?

6    A.   To keep the money on a safe place that we can use.  Let's

7    say we have $100 there and we're going to be paying $20 here, $5

8    here, to have the money in a secure place that we can keep the

9    money and pay that later on.

10   Q.   To ensure -- okay, I was trying to use -- I shouldn't try

11   to do things at my age -- to ensure -- here we go -- to ensure

12   said payment -- to ensure said payment.  What payment?  We're

13   talking about the payments to F.G.G. and to Marco Delgado,

14   correct?

15   A.   Well, it could be -- well, yes.  It could be payments to

16   Mitsubishi and the suppliers, I'm assuming.

17   Q.   Okay.  But is that what you're talking about?

18   A.   Well, I'm sorry.  Since this is the contract -- this is a

19   contract between him and I, probably it is for Marco Delgado.

20   Q.   Okay.  The beginning of number four starts out:  The amount

21   owed to Delgado?

22   A.   Yes, ma'am, you're correct.

23   Q.   And then it says, prior to receiving the funds, F.G.G.

24   commits to establishing the corresponding account to ensure said

25   payment in a timely fashion.  So, that account was --

1    Mr. Delgado was supposed to be paid out of the F.G.G. account,

2    correct?

3    A.    Of course, ma'am, yes.

4    Q.    And then the contract goes on to describe if there are

5    changes in prices, correct?

6    A.    Yes, ma'am.

7    Q.    In the event Delgado is able to increase the sales price

8    over 127 million, he will be entitled to an amount equal to

9    75 percent of the increase, correct?

10   A.    That's what he says.

11   Q.    And number six -- well, you agreed to it, didn't you?

12   A.    I didn't have any choice.  I just agreed.

13   Q.    In the event Delgado is able to decrease the amount of the

14   equipment.  In other words, Mitsubishi's price from 109, they

15   will be entitled to receive an amount equal to 75 percent of the

16   decrease, correct?

17   A.    Yes, ma'am.

18   Q.    So now that leaves you with 25 percent to share with Mace

19   Miller, those two?

20   A.    Yes, ma'am.

21   Q.    Okay.  Number seven, Delgado receive an amount equal to

22   75 percent of the reduction in price for the L.T.S.A. long-term

23   service agreement from Mitsubishi contemplated as part of the

24   bid, correct?

25   A.    Yes, ma'am.

1    Q.   Along with the 75 percent of any surcharge or overcharge

2    included in the bid and approved.  At some point in time was

3    there an overcharge, if you can recall?

4    A.   No, ma'am, I cannot.  I cannot recall.

5    Q.   For purposes of this calculation, the parties will use the

6    contract's figures provided by Mitsubishi prior to September 9th

7    of 2009, right?

8         Now, you said, hurry, hurry, hurry.  Number eight:

9    Time is of the essence with regard to the bid answer date.

10   Correct?

11   A.   Yes.

12   Q.   Parties agree to use the best efforts to cause the date of

13   the bid to be no later than five business days from the time

14   that the package was finalized.  Correct?

15   A.   That's what he says, yes.

16   Q.   Okay.  There's an asterisk and initials.  Whose handwriting

17   is that?

18   A.   That's Marcos.

19   Q.   And how did it come up that he handed you this document

20   that then still wanted to write some more on it?

21   A.   Well, because I was very angry, number one, for all of the

22   things that he put.  If you notice everywhere it says 75 for me

23   and 25 for you, like, I'm in charge, I'm the owner of this

24   contract, I'm writing this contract to you, so you either sign

25   it or get the hell out of here, so simple as that.  So

1    everything was in his -- favor.

2    Q.    In his handwriting it --

3    A.    -- favor.

4    Q.    -- it says also reimbursement for $470,000?

5    A.    Yes.

6    Q.    For expenses?

7    A.    Yes.

8    Q.    Is this in addition to the $350,000 that Kendrick Electric

9    gave him?

10   A.    No.  This is -- I -- if you notice, I ask him to put this

11   because he wanted to keep his part, and of the little I had less

12   he wanted me to pay investors and he paid everybody like --

13   Q.    I'm sorry.  I don't understand you.

14   A.    At the beginning, I told you we had $350,000 from Kendrick.

15   Q.    Yes.

16   A.    If you notice at the beginning of the document the first

17   thing he says, nothing to do with Kendrick.  I'm not -- nothing

18   to do -- it's like I'm not going to pay you, so I said, we are

19   going to pay him.  He put the money and we need to give the

20   money back.  And then I put the 210 for Dr. Vargas, so I said,

21   we're going to pay from that money our investors.  I'm not going

22   to steal money from them.  They invested and they need to get

23   their money back at least.  So fighting and fighting, we put

24   this detention [sic] there.

25   Q.    A good faith effort will be made by the parties to include

1    six percent payment to Mitsubishi as part of the initial

2    disbursement.  What's that about?

3    A.   I don't remember what is exactly that line.

4            MS. KANOF:  And I'm sorry, Your Honor.  The mouse has

5    stopped working.  May I have our audio technician see if he can

6    make the mouse work?

7            THE COURT:  Yes, ma'am.

8            MS. KANOF:  Would you mind, Your Honor?  He says he

9    has to turn it off and turn it back on.

10           THE COURT:  Ladies and gentlemen, let's go ahead and

11   take a recess to 4:15.  We'll resume our proceedings at 4:15.

12           COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

13           (Break at 4:09 p.m. 4:18 to p.m.)

14           THE COURT:  Let the record reflect that all members of

15   the jury are present, the United States through its assistant

16   United State's attorneys are present, the defendant and his

17   counsel are present.

18           The witness, Mr. Gireud, is on the witness stand.

19           Ms. Kanof?

20           MS. KANOF:  And I apologize to the Court for that

21   problem, Your Honor.

22           THE COURT:  No problem.

23   BY MS. KANOF:

24   Q.   Mr. Gireud, you were saying something about this $470,000

25   being in there because -- something related to paragraph one

1    regarding Kendrick Electric.  Could you explain that?

2    A.   We put that amount in there because I wanted to pay

3    investors.  I didn't want to be the only one paying that.  And

4    you notice on his original request, he says I have nothing to do

5    with Kendrick.  I'm not paying Kendrick or nothing, so I said

6    we're going to have to pay them.

7    Q.   So this reimbursement is for Kendrick Electric and

8    Dr. Vargas?

9    A.   Yes, ma'am.

10   Q.   Not for anyone else?

11   A.   No, ma'am.

12   Q.   And you insisted on that?

13   A.   Yes.

14   Q.   Okay.  With regard to -- let's move along a little bit.

15        Did there come a time when you started going to Mexico

16   City and meeting with Mitsubishi and others in Mexico City?

17   A.   Yes, ma'am.

18   Q.   Do you remember when the first time you went to Mexico City

19   was?

20   A.   I don't remember the date.

21   Q.   Was it after you got the contract or before you got the

22   contract?

23   A.   It was before we got the contract.

24   Q.   Okay.  I draw your attention to Government's Exhibit

25   Number 10.  What I'm going to be doing is showing you the

DIRECT DAVILA                                                                224

```
1    exhibit number, so you can verify that it's number ten.

2    A.    Yes, ma'am.

3    Q.    And do you recognize this is an e-mail from Enail from

4    Mr. Delgado on which you were copied?

5    A.    Yes, ma'am.

6          MS. KANOF:  We'd move admission of Government's

7    Exhibit Number 10 into evidence, Your Honor.

8          MR. HANSHEW:  No, objections, Your Honor.

9          THE COURT:  GX-10 is admitted.

10   BY MS. KANOF:

11   Q.    And the date of this e-mail is November 20th of 2009,

12   correct?

13   A.    Yes, ma'am.

14   Q.    And the subject of the e-mail is what?

15   A.    Letter of credit.

16   Q.    Okay.  And starting down at the bottom, the beginning of

17   the Enail stream, does Mr. Ponce send an e-mail to Mr. Delgado

18   first?

19   A.    Yes, ma'am.

20   Q.    And what is the substance of that e-mail?

21   A.    He's asking if the -- if they made official announcement of

22   the contract that it was awarded.  And he's asking:  You said it

23   going to be November 18th.

24   Q.    And how does Mr. Delgado respond?

25   A.    If you move up?
```

1   Q.   Right here?

2   A.   Oh, I'm sorry.  You're right.

3          Hector, I'm getting ready to board, but wanted to

4   remind you that we're going to be needing M.P.S.A. information

5   on the 20-million letters of credit as soon as possible, no

6   later than 14 days from today.

7   Q.   Okay.  So first of all, of the "I'm getting ready to

8   board," as you've testified to this jury, and this is right as

9   the contract is awarded, Mitsubishi is already talking about

10  wanting a copy of the letters of credit, correct?

11  A.   Yes, ma'am.

12  Q.   So how does Mr. Delgado -- or I'm sorry -- how does

13  Mr. Ponce respond to Mr. Delgado, starting here.  "This needs,"

14  starting at --

15  A.   Oh, okay.  This needs to be recurged (phonetic) with timing

16  of your contract signing, timing of assignment of the L.T.S.A.

17  to M.P.S.A., inclusion of the terms of our proposal and the

18  Teaming Agreement in the ultimate assignment to M.P.S.A. and

19  timing of the start of the L.T.S.A., which is not until the date

20  of commercial operation.  Fourteen days is not consistent in any

21  of the above.  We will have to understand the reasoning

22  initiating the timing and the needs for the L.O.C.s.  Our

23  proposal is based on a parent company guarantee from M.H.I. of

24  Japan and we would like to arrange for this during our

25  discussion.

1    Q.   Are they talking about two different things?  Hector is

2    talking about wanting a copy of the actual contract?

3    A.   Right.

4    Q.   And Mr. Delgado is talking about the long-term service

5    agreement, correct?

6    A.   Yes.

7    Q.   And the letters of credit, the $20-million letters of

8    credit that Mr. Ponce is asking about, is that different than

9    the letters of credit for the long-term service agreement?

10            MR. HANSHEW:  Objection, Your Honor.  I think it

11   speaks for what it says.  How would he know?

12            THE COURT:  If he knows he can tell us.

13            Don't try to interpret what the letter means.

14   BY MS. KANOF:

15   Q.   Do you know -- let me ask you this.  Why would you talk

16   about the long-term servicing agreement on the day the prime

17   contract for the sale of appointment is awarded?

18   A.   Why is he talking about that?  Because he wanted to use the

19   letters for credit on this one, the first one on that.

20   Q.   I didn't understand you.

21   A.   I'm thinking that by reading this, he wants Mitsubishi to

22   provide letters of credit that they are for the L.T.S.A., and he

23   wants to use them on the other ones, so he can prove that he has

24   the letters of credit.

25   Q.   And how does Mr. Delgado respond, copying you to Mr. Ponce?

1  A.    This is my co-writing.  He says, I will let you and Periko

2  sort it out.  But you and I have read the specs and we both have

3  known from days -- from day one of this requirement, otherwise

4  will -- M.P.S.A. will have 2 --

5  Q.    $1 million?

6  A.    -- $1 million to change it.  Yeah.  So he's saying well,

7  we've been talking about on thi and I let you -- I let you

8  discuss it with Hector or Fernando and...

9  Q.    Did you ever discuss letters of credit directly with anyone

10 at C.F.E.?

11 A.    No, ma'am.

12 Q.    Did you ever discuss --

13 A.    Later on in time I did, but not at this point.

14 Q.    I mean at this time, before things got heated?

15 A.    I only talked to Marco about the letters of credit.

16 Q.    Did you ever talk to anybody at Mitsubishi about the

17 letters of credit?

18 A.    No, ma'am.

19 Q.    Government's Exhibit -- I'm going to display -- I know you

20 speak Spanish -- Government Exhibit Number 12A, the subcontract.

21       Do you recall engaging -- I need to do the Spanish

22 because of the signatures.  I'm sorry.  Do you recall the

23 subcontract between Mitsubishi and F.G.G., Government's

24 Exhibit 12?

25 A.    Yes, ma'am.

1    Q.   And did you participate in drafting the subcontract?

2    A.   No.  We were in Mexico City and Mitsubishi sent like two

3    attorneys or three attorneys and a lot of people.  And what they

4    did is they copied the original -- the text from the original

5    contract between F.G.G. and C.F.E. and they copied it here and

6    they add or delete one or two things that they didn't like and

7    then they -- but they produced it.  They produced it and we were

8    there watching them discussing on this in Mexico City.

9    Q.   Okay.  And -- so you were present when the attorneys for

10   Mitsubishi -- and was Mr. Delgado there?

11   A.   No, ma'am.

12   Q.   Okay.  Well, he's your attorney, and according the power of

13   attorney, he's supposed to be doing all of the contracts that

14   have to deal with this project.  Why isn't he there?

15   A.   He's, um, in C.F.E. offices.  I called him and I don't get

16   answers or something, so he said he's very busy with C.F.E., so

17   I'll take care of this, you take care of that.

18   Q.   Okay.  But you are not a lawyer?

19   A.   No, ma'am.

20   Q.   Why is a contract between F.G.G. a Nevada company and

21   Mitsubishi in Spanish?

22   A.   We asked ourself that question, but since they wanted to

23   have exactly the same terminology on the other one, they decided

24   to keep it, number one, and second, the attorney that they had

25   there by his name of Altamura, he thought he speaks English --

1    Spanish very well so he was very comfortable doing it in

2    Spanish.

3    Q.   So they just lifted the Spanish version of the big contract

4    and put it into the subcontract, correct.

5    A.   Yes, ma'am.

6    Q.   And Greg Wunder does not speak Spanish, does he?

7    A.   Not at all.

8    Q.   But he signed it anyway?

9    A.   Yes, ma'am.

10   Q.   Okay.  There's an added portion at the end that you are

11   also asked to sign off on.  Do you remember this?

12   A.   I don't remember signing this piece of document with my

13   signature.  I don't remember if it was late or something.  I

14   don't recall this little piece.  You show it to me in

15   government, but I don't remember this.

16   Q.   If you don't remember, you don't remember.

17         Did there come a time where there was an issue about

18   inspect the three generators, the turbines?  Do you remember an

19   inspection?

20   A.   After the award of this contract, suddenly they became

21   desperate that they need to go -- Marco wanted them to go and do

22   an inspection of the equipment.  They needed to go to Japan

23   where two of the units were and the other one in France where

24   the turbine was.  And suddenly they said -- I mean they -- I was

25   in Mexico on vacation on Christmas vacation.  On the 24th of

1    December, Marco was calling me and like you need to set up a

2    meeting.  They need to see things -- see that we're leaving --

3    they're leaving to see that.  They want to see it.

4    Q.   So the 24th of December, Christmas Eve, where were you?

5    A.   I was in Mexico visiting my parents in Mexico.

6    Q.   And do you mind saying what city it was?

7    A.   Torreón.

8    Q.   Government's Exhibit Number 13 --

9              MS. KANOF:  Is that admitted into evidence?

10   BY MS. KANOF:

11   Q.   Okay.  Government's Exhibit Number 13, an e-mail first from

12   Hector Ponce or actually first from Mr. Ueki.  Do you know who

13   Mr. Ueki was?

14   A.   Yes.  He was a very high executive from Japan that had an

15   office in Orlando in the M.P.S.A. offices, and he was actually

16   -- I don't recall if he was him, but he was present when we were

17   doing the contract in Mexico.

18   Q.   He went to Mexico City?

19   A.   Yes, ma'am.  I'm pretty sure that he was.

20   Q.   And this e-mail chain starts on September 22, with Mr. Ueki

21   wanting an English version of the prime contract between C.F.E.

22   and F.G.G., correct?

23   A.   Yes, ma'am.

24   Q.   Then does Mr. Ponce forward that to Mr. Delgado asking for

25   a copy of the prime agreement contract and the payment and

1    critical dates, annexes, by December 24th, which is Christmas

2    Eve?

3    A.   Yes, ma'am.

4    Q.   And then he asks -- and then does Mr. Delgado respond and

5    copy you?

6    A.   Yes.  He responds to Hector Ponce and I'm copied here on my

7    e-mail.

8    Q.   What does he -- what's the first thing he says?

9    A.   You already know by now I'm running to the airport trying

10   to make a flight back home.  I will call you when I get in.

11   Wait list, keep fingers crossed -- waiting list.  C.F.E. wants

12   to know where we are on the independent third party notarized

13   certification verifying existence of the equipment?  They're

14   urgent.  Also, please provide exact location of equipment and

15   contact person of each facility.  They request this information

16   since Monday.  Please advise.  Thanks Happy Christmas.  Feliz

17   Navidad.

18   Q.   Now, the question was:  We want a copy of the prime

19   agreement.  Did Mr. Delgado respond to that?

20   A.   Of course not.

21   Q.   And when you were in Torreón, you got the phone call on the

22   same date, right?

23   A.   Yes, ma'am.

24   Q.   And what did Mr. Delgado tell you, you had to do?

25   A.   That I needed to get all of the this information from

DIRECT DAVILA                                                      232

1    Mitsubishi, because they had people from the C.F.E. leaving to

2    Japan.  They needed to do the inspection as soon as possible and

3    they needed to see the equipment, so whatever you need to do,

4    you have to do it.  They have to be there.  They were leaving.

5    Q.   Were you the go-between for F.G.G. and Mitsubishi?  Was

6    Marco Delgado not allowed to call Mitsubishi?

7    A.   Of course he was allowed.  And you can see there's plenty

8    of e-mails between them.  Yeah, he could.

9    Q.   Okay.  Why do you have to call Mitsubishi from Torreón to

10   make arrangements?

11   A.   I don't know, ma'am.

12   Q.   Because he was running to the airport?

13   A.   Yeah, probably.

14   Q.   What happened with the inspection?  Do you know?  Did you

15   make the arrangements as requested?

16   A.   No, I didn't make the arrangements.  They make all of them

17   in Mexico and they flew to -- I think they flew to Japan first

18   and they went to Kobe, Japan, where the two units were and they

19   did an inspection.  I don't know what kind of inspection.  I

20   wasn't there.  I never got a report of the inspection, but I

21   understand they went there.  And then they came back to Paris --

22   I mean to north of France where the equipment was, the third

23   piece of equipment, so they went and visit that.  The problem

24   with that one, I remember that there was a physical place that

25   is not -- I don't know how you call it -- when you bring in

1    equipment that you're going to be --

2    Q.    Secure?

3    A.    Secure, no ownership or something until you get the

4    importation documents or something free -- free -- whatever it's

5    called.  I don't remember the name.  But the equipment was

6    there.  They were having a lot of issues trying to get inside

7    the warehouse to receive the equipment, but eventually they did

8    because they got to review it.

9    Q.    When -- so you didn't have any communication -- when

10   Mr. Delgado called you and told you you had to arrange

11   immediately for inspection over the Christmas holidays, did you

12   ask him why they were inspected?

13   A.    Yes.  He said --

14   Q.    What did he tell you?

15   A.    -- C.F.E. requires and inspection of the equipment and they

16   want to go -- they need to go.  That's all I was told.

17   Q.    But he didn't specifically tell you why?

18   A.    No, ma'am.

19   Q.    Turning your attention to Government's Exhibit Number 14,

20   which is already marked and admitted into evidence, and this is

21   an e-mail with a letter attached to it.  First, did Mr. Ponce

22   send an e-mail to you and Mr. Adams with a letter of Mr. Adams'

23   attached to it?

24   A.    Okay.  Yes.

25   Q.    Okay.  And does he address you, first telling you something

DIRECT DAVILA                                                       234

1    regarding the attached letter.

2    A.   Uh --

3    Q.   Starting with Fernando.

4    A.   Fernando.  Please see attached letter from M.P.S.A.

5    requesting your immediate action and a formal (mumbles) to

6    respond as soon as possible.  Failure to provide request

7    documents and the usual request for equipment inspection -- for

8    the unusual request for inspection is of significant -- is of

9    significant concern.  After you -- after your reply, M.P.S.A.

10   also requests that you personally go to C.F.E., as it seems

11   necessary to get the contract documents, and that you bring them

12   to Orlando to finalize the request -- the agreement in order to

13   coordinate the project activities.  We will make ourselves

14   available any day this week to receive the documents and

15   finalize the equipment subcontract.

16   Q.   Did you have a good relationship with Hector Ponce?

17   A.   Yes, I did.

18   Q.   And he's asking you -- you, yourself -- to go to Mexico

19   City to get the contract documents and to fly to Orlando,

20   Florida, and bring them?

21   A.   Yes, ma'am.

22   Q.   Were you willing to do that?

23   A.   If I could, I will do that, but if I recall, they went to

24   Mexico and I was with them.  I went with them and they --

25   Q.   Who is they?

1    A.   It was actually this trip.  I think it was Hector Ponce and

2    John Adams.

3    Q.   This was before this letter?

4    A.   Yes, ma'am.

5    Q.   Okay.

6    A.   It was probably after this letter.  I don't recall the

7    exact time.

8    Q.   You don't recall when?

9    A.   No, ma'am.

10   Q.   But did you go for the contracts and didn't get them.

11   A.   We got -- they gave us one box that they said this is all

12   that we have of documents and we were able to copy most of the

13   documents.  But I don't remember that they have the -- since the

14   beginning of these projects, they were all the financial and

15   contracts and all of that.  A contract has two parts; the

16   financial part and the technical part.  Up to now, I haven't

17   seen the whole financial part.

18   Q.   You still have not seen the entire --

19   A.   I still have not seen the whole financial part.

20   Q.   And were you the one who owned F.G.G.?

21   A.   Yes, ma'am.

22   Q.   The letter that's attached was dated December 28th from

23   Mr. Adams, correct?

24   A.   Yes, ma'am.

25   Q.   Okay.  And not to belabor too many points, I want to point

DIRECT DAVILA                                              236

1    out to you paragraph number two:  Related to the above, F.G.G.'s

2    responsibility is required to arrange for letters of credit

3    warrant completion of the prime contract.

4         When you read this letter -- that is again asking for

5    the letters of credit.  Please provide a copy of the equipment

6    letters of credit as evidence that this arraignment has been

7    made without liens or restrictions on Mitsubishi's equipment --

8    what did you do?

9    A.   I called Marco right away and said they need to have copies

10   of the letters of credit.  And by the way, I've asked you 50

11   times for a copy myself and I don't have them.

12   Q.   Okay.  What do you mean you'd already asked him two or

13   three times?

14   A.   Since the first conversation we had, we don't have the

15   capacity to do it, and he said I can do it.  And then we want

16   the contract, and he said we provide all of the documentations

17   for that.  And I said again, they want to see the letters of

18   credit and I don't have them.  They are asking me for that and

19   so we need to -- you need to provide copies of the letters of

20   credit.

21   Q.   What did he say?

22   A.   They are -- well, he says 50 times I request 50 different

23   answers.  They are on the C.F.E. possession.  They are on H.P.C.

24   New York.  They are here, here, here --

25   Q.   Is that a bank?

1    A.    That's a bank in Mexico, H.P.C.

2    Q.    In Mexico or New York?

3    A.    Well, he says New York, but their -- they have subsidiaries

4    here in Mexico.  So very big answers all the time when related

5    to the letters of credit.

6    Q.    Did he ask for money to pay for the letters of credit?

7    A.    He says that part of the contract -- once we sign the

8    contract and we knew how much money we were going to make,

9    suddenly he brought this situation that we're going to have to

10   pay for the letters of credit and they're going to cost us about

11   $8 million.  So on the first payment, I'm going to get $4

12   million for the letters of credit and the second pay we're going

13   to pay the second one.  And I said okay.  If that's the only way

14   to fulfill this, that's fine.  We're not going to make any money

15   on the first contract.  We're going to make a certain

16   percentage.  The difference between 127 and 105 was 20 million,

17   now we're going to make a lot less.

18   Q.    Okay.

19   A.    But if that's the way to get it, that's fine.

20   Q.    Did you ask to see the letters of credit?

21   A.    Only 50 times.

22   Q.    And did he ever provide you with a copy of the letters of

23   credit?

24   A.    Up to now, I have never seen the letters of credit.

25   Q.    Did he tell you anything about you are supposed to do

1    something about the technical side, that that was his to take

2    care of?

3    A.   Yes.

4    Q.   Okay.  Did he ever tell you that he was going to or he had

5    pledged the Mitsubishi turbines instead of getting the letters

6    of credit?

7    A.   Can you repeat the question, please?

8    Q.   On January 15th of 2010 -- well, I'll show it to you.

9    A.   We're in Mexico City.

10   Q.   In Mexico City?

11   A.   Yes.

12   Q.   I'll show it to you in Spanish?

13            On January 10th -- this is the one in English.  I

14   meant to do the one in Spanish.

15            This is a document, Government's Exhibit Number 32,

16   that we received from the Mexican government and it's a pledge

17   agreement.  First of all, do you recognize this agreement?

18   A.   No, ma'am.  I've never seen it.  I don't know if I saw it

19   once pretty quick when I was in your office, but I don't recall

20   prior to this seeing it.

21   Q.   I'm trying to find the date.  On January 15th -- do you

22   recognize -- first of all, do you recognize Mr. Delgado's

23   signature?

24   A.   Yes, ma'am.

25   Q.   Okay.  And is that generally the way he signs his name?

1    A.   Yes, ma'am.

2    Q.   And this was also signed by Mr. Ramos, correct?

3    A.   Yes, ma'am.

4    Q.   But anyway, you never saw the pledge document, right?

5    A.   No, ma'am.

6    Q.   And did you keep asking him after January 15th of 2010,

7    about the letters of credit?

8    A.   Every time I talk to him, I asked him for the letters of

9    credit.

10   Q.   And did he tell you after January 10th, oh, I pledged

11   Mitsubishi's equipment instead of the letters of credit?

12   A.   No, ma'am.  In one of the trades to Mexico City, where John

13   Adams was there with us, I don't know if [sic] was the same trip

14   when he --

15   Q.   Let me just ask the questions.

16   A.   Sorry.

17   Q.   I draw your attention to Government's Exhibit Number 14.

18   And is this an e-mail that's been marked and admitted into

19   evidence, an e-mail that Hector Ponce sent to you?

20   A.   Yes.

21   Q.   And the attached letter that we talked about a few minutes

22   ago, the December 27th letter?

23   A.   Yes, ma'am.

24   Q.   Did you respond to that letter?

25   A.   No, ma'am.  I don't know.  I don't recall if we respond,

DIRECT DAVILA                                                      240

1   but when we were in situations like this of documents that he

2   had produced or documents that he has or relationships, he

3   always either send us a text and said send this please or

4   nothing, so -- and I think this is one of the cases that I'm

5   talking about.

6   Q.   Okay.  Did Mr. Delgado sometimes draft letters for your

7   letterhead and signature?

8   A.   Yes, ma'am.

9   Q.   I'm showing you what's being marked as Government's Exhibit

10  Number 15.  Do you see the number 15?

11  A.   Yes, ma'am.

12  Q.   And it's an e-mail dated December 30th of 2009, that

13  Mr. Delgado sends to himself or to Mr. Miller and to you.  Do

14  you recognize that?

15  A.   Yes, ma'am.

16        MS. KANOF:  We'd move admission of Government's

17  Exhibit Number 15.

18        MR. HANSHEW:  No, objection.

19        THE COURT:  GX-15 is admitted.

20  BY MS. KANOF:

21  Q.   Okay.  And does he start by telling you and Mr. Miller, hey

22  ladies, here's the draft doc?

23  A.   Yes.

24  Q.   As written -- did he call you Perico?

25  A.   I hated it and he called me Perico once in a while.

1   Q.   Did you tell him you hated it?

2   A.   Yes.

3   Q.   Did anybody else call you that?

4   A.   Nobody else.  Only him.

5   Q.   As written, you need to attach clarifications, existing

6   payment terms and model contract.  I suggest Rick is sent copy

7   first asking his advice and also whether we should copy

8   everybody or just John.  I think it may make us look a little

9   more grown up and more constructive if we just copy John, but on

10  the downside, it may give Hector ammunition that we are being

11  conspiratorial.  You all decide.  By the way, even the cover

12  e-mail needs to be constructive.

13          Is this the response that Mr. Delgado wanted you to

14  send to John Adams?

15  A.   Yes, ma'am.

16  Q.   Okay.  And did in fact you send this e-mail?  Did you put

17  this on F.G.G. letterhead and send this letter?

18  A.   Yes, ma'am.

19  Q.   So let's talk about it.  Did you draft any organization of

20  this letter?

21  A.   No, ma'am.

22  Q.   Did you send it as is?

23  A.   I was asked by my attorney to send it like this.

24  Q.   Did Mace Miller make any changes to it?

25  A.   No, ma'am.

1    Q.   Okay.  So, Dear John, hoping the holiday season -- yada

2    yada -- with regard to the reference matter and to respond to

3    the relevant issues.  I also want you to know that for those of

4    us here at F.G.G. Mitsubishi is more than just a subcontractor

5    for our C.F.E. project.  We see you as an ally and hope to work

6    with you in future projects.

7              So he wants you to start out nicely, correct?

8    A.   Yes, ma'am.

9    Q.   For this reason, we'll do our best to overcome any

10   communication gap which results in uncertainty and confusion.

11             Did an issue arise or was an issue already arising

12   regarding communications between Mitsubishi and C.F.E.?

13   A.   Yes, ma'am.

14   Q.   Tell the jury about that.

15   A.   They were a lot of requests that Mitsubishi did to Marco

16   Delgado directly or C.F.E. and, uh, nothing ever left the C.F.E.

17   until -- unless Marco approved it or he write something.  I mean

18   he was in complete control of this situation.  He was doing all

19   of the decisions and drafting letters for everybody.

20   Q.   The equipment supply component of the F.G.G.-C.F.E.

21   contract has been executed, but has yet to be formalized -- or

22   as he says in parenthesis, "protocolized."  And what does he say

23   here, if you could read it please?

24   A.   Until such time as a credit facility associated with entire

25   project is signed, as you will recall the project requires

DIRECT DAVILA                                                      243

1    F.G.G. to provide the necessary finances to purchase equipment

2    as such.

3    Q.    What is a credit facility?

4    A.    I have no idea.  I mean he's always very confusing in his

5    writing, but I'm assuming that is the credit facility that he

6    bought the letters of credit.  I don't know.

7    Q.    You thought he was referring to the letters of credit

8    there?

9    A.    Yes, ma'am.

10   Q.    Okay.

11   A.    Or unless he's --

12   Q.    Continuing -- go ahead and read that portion.

13   A.    This contract is ready for signature and was to be signed

14   contemporaneously to the execution of the equipment supply

15   component, but delayed at F.G.G.'s request in an effort to

16   modify payment terms.

17   Q.    Okay.  So wait a minute.  This contract up here referring

18   to the equipment contract --

19   A.    Yes.

20   Q.    -- is to be signed contemporaneously with the equipment

21   contract.  The equipment supply contract is to be signed

22   contemporaneously with the equipment supply contract.  Is that

23   what that says?

24   A.    Yes.

25   Q.    Okay.  As presented by accelerating payment for better --

1    to better accommodate F.G.G., M.P.S.C. -- A. and TY.  Did you

2    understand what he meant there?

3    A.   Every -- my understanding of this and if I recall, he was

4    offering to change their state of mind that they have because

5    of -- they believed something is wrong with the equipment.  So

6    he was offering, oh, are if you nice with me, I am going to be

7    able to modify the equipment payment terms and that is why

8    everything is delayed.  We are trying to help you accelerate the

9    payment terms.

10   Q.   Okay.  Let's start down here.  And the jury has the entire

11   document, but, however, just like in any construction or

12   equipment manufacturer contract throughout the world, were you

13   aware whether Mr. Delgado had been involved -- he'd been your

14   friend for years -- in construction and manufacturing equipment

15   contracts throughout the world?

16   A.   No, ma'am.

17   Q.   You knew or did not know whether he had?

18   A.   I didn't know.

19   Q.   You didn't know?

20   A.   I don't know.  I didn't know.

21   Q.   Neither C.F.E. nor the lender will approve such a drastic

22   change in terms.  What change in terms is he talking about?

23   A.   Well, on the above sentence as you read before, he's

24   talking about modifying payment terms.  So I think he's still

25   talking about the drastic change in terms.

1   Q.   Until able to verify the construction manufacture advances.

2   What is a construction manufacture advance?

3   A.   What I think he is saying right here, the equipment was in

4   Japan and the equipment was found there already built because it

5   was built for another project.  So this is in 2009, and I think

6   the equipment was built in 2004, so part of the agreement with

7   Mitsubishi was that they were going to use the equipment and

8   they were going to change like in a car, the front plates, so

9   they can look like a 2009 model, but the equipment was equipment

10  that was built before.  So that's what he's talking about,

11  construction of advances, that's what I guess.

12  Q.   The sense of urgency of the inspection was and is F.G.G.

13  driven.  So he wants you to tell Mitsubishi that the urgency of

14  the inspection was and is F.G.G. driven, in attempt to modify

15  payment terms; is that correct?

16  A.   That's what he wrote, yes.

17  Q.   And he wants you to sign this?

18  A.   Yes, ma'am.

19  Q.   When he called you in Torreón to hurry up that inspection

20  and help him with the inspection, did he tell you why there was

21  an urgency for the inspection?

22  A.   No, ma'am.

23  Q.   Did he discuss that it had anything it do with modification

24  of payment terms?

25  A.   No, ma'am.

DIRECT DAVILA                                                         246

 1    Q.   Did he tell you it was because he was about to pledge

 2    Mitsubishi's equipment?

 3    A.   He didn't tell me that either.

 4    Q.   Two terms prior to execution of financing facility,

 5    otherwise the process will prove more bureaucratic.  So he's

 6    telling you to tell Mitsubishi what?

 7    A.   That it's going to take forever to build these changes.

 8    Q.   He wants you to send this letter on January --

 9    December 30th, correct?

10    A.   Yes, ma'am.

11    Q.   And now they've already been to Japan, right?

12    A.   Yes, ma'am.

13    Q.   Because they had to go on Christmas Eve, right?

14    A.   Yes, ma'am.

15    Q.   But he wants on December 30th, for you to say for this

16    reason we request your assistance to secure the necessary

17    inspections as soon as possible?

18    A.   Yes, ma'am.

19    Q.   For something that's already happened?

20    A.   Yes, ma'am.

21    Q.   C.F.E. personnel traveling for the inspection would not be

22    accompanied by F.G.G. or Mitsubishi personnel.  When he called

23    you on Christmas Eve, did he ask you to accompany C.F.E. for the

24    inspections?

25    A.   No.  He make arrangements for the C.F.E. only people.

DIRECT DAVILA                                                   247

1    Q.   Please advise -- he's asking you to ask Mitsubishi what

2    dates work for the inspection?

3    A.   Yes.

4    Q.   But he called you on --

5    A.   The 24th.

6    Q.   -- December 24th, that it needed to happen immediately?

7    A.   Yes, ma'am.

8    Q.   He didn't ask you to ask Mitsubishi -- did he ask you to

9    ask Mitsubishi anything about dates that would work?

10   A.   No, ma'am.  He just said they are -- they need to go as

11   soon as possible.  They want to see the equipment and that's it.

12   Q.   Regarding item number one, now you're writing this, right?

13   You are responsible for this letter, correct?

14   A.   I didn't write it.  He sent it to me on the previous e-mail

15   that you saw and I just send it.  He's my attorney and he said

16   send this and just sign it.

17   Q.   This is in response to John Adams' December 28th letter

18   where they are suspicious that the hurried-up inspections were

19   because you were going to pledge the equipment, correct?  John

20   Adams said that in his letter, if you recall?

21   A.   Yes, ma'am.

22   Q.   Regarding item number one of your letter, you are supposed

23   to be referring back to Mr. Adams' letter, right?

24   A.   Yes.

25   Q.   Please be advised inspection of equipment is -- what does

KATHLEEN A. SUPNET, CSR

1    he say?

2    A.   The equipment is not tied.  Please be advised that although

3    the inspection of equipment is not tied to any pending

4    (mumbling) of M.P.S.A. equipment sold to F.G.G.  As previously

5    discussed, lien will be placed in favor of the C.F.E., but at no

6    time will this lien serve as a collateral of the financials or

7    the they needed letters of credit.

8    Q.   Okay.  So the a lien would be placed -- had he ever

9    discussed that a lien was going to be placed on the equipment,

10   with you?

11   A.   Some -- I recall probably when we started receiving a lot

12   of e-mails from Mitsubishi requesting and asking all of this

13   things, that they were thinking that they were happening, doing

14   by Marco, they ask --

15   Q.   When they became suspicious?

16   A.   Yes, when they became suspicious, they started asking

17   questions about we're not putting any lien.  We're not putting

18   anything.  Our equipment is not going to be released until it's

19   fully paid off, the title of the equipment is going to be

20   released.

21   Q.   Okay.  But he says, at no time will this lien serve as

22   collateral for the financing or the needed letters of credit?

23   A.   Of course.

24   Q.   Okay.  So there's a difference between actually pledging

25   the equipment itself and pledging the equipment as collateral

1   for letters of credit.  Very fine difference.  Do you understand

2   that?

3   A.   Yes, ma'am.

4   Q.   When you read this letter, did you understand that?

5   A.   Yes, ma'am.  I think I -- I mean that's so many times I was

6   under a lot of stress and pressure and I made stupid mistakes or

7   something, because I should not do, sign or send things, but he

8   was the attorney.  He was the one taking care of this and he

9   said just send this, sign it and send it.  So, yes, I --

10  Q.   And then again, related to the previous paragraph of your

11  letter:  Verification that the lien of equipment will not be

12  used to secure the necessary letters of credit.  Okay.  I'm

13  going to go back to John Adams' letter very quickly for just a

14  second.

15           MR. HANSHEW:  Object to that last statement and

16  struck.  That wasn't even a question.

17           THE COURT:  All right.  I'll sustain that.  We'll

18  strike that from the record.

19  BY MS. KANOF:

20  Q.   Government's Exhibit 14, do you recognize that letter?

21  A.   Yes, ma'am.

22  Q.   Okay.  Paragraph number two, the equipment inspection

23  issues lead us to suspect F.G.G. may be offering existing

24  Mitsubishi equipment as collateral for financing guarantees that

25  are the responsibility of F.G.G.  Do you remember that letter?

1    A.   Yes, ma'am.

2    Q.   Okay.  And the response that you sent related to -- you

3    said your letter of requests verification that the lien on the

4    equipment will not be used to secure the necessary letters of

5    credit?

6    A.   Yes.

7    Q.   Does that -- does that -- what does that mean to you?  Is

8    that answering --

9    A.   I'm just letting them know that we're not using their

10   equipment to secure the necessary letters of credit.

11   Q.   However, since the lien will be in favor of C.F.E. and

12   C.F.E. is not the issuer of the letters of credit, this

13   verification issue I'm sure you'll a agree becomes moot.

14        What does that mean?  What verification issue?

15   A.   Uh, that this verification trick that they did or something

16   doesn't -- I don't know understand what the word moot -- milt --

17   moot --

18   Q.   Do you remember Mr. Ueki's request back in November for a

19   copy of the prime contract on November 18th, when he thought it

20   had been executed?

21   A.   Yes, ma'am.

22        MR. HANSHEW:  Objection.  Leading, Your Honor.

23        MS. KANOF:  Just asking if he remembers.

24        THE COURT:  I'll overrule that objection.

25   BY MS. KANOF:

1    Q.   Okay.  This is December, 30th and you are responding to

2    them in item number three:  Your request for the -- a copy of

3    the prime contract will be provided upon full execution --

4    right?

5    A.   Yes, ma'am.

6    Q.   So they asked you in November for a copy when it had been

7    executed and you are now telling them you'll get it when it's

8    been fully excused, correct?

9    A.   Yes, ma'am.

10   Q.   Was there anything that hadn't been executed or -- why are

11   you saying that, that they just wanted a copy of what was

12   existing and had been thought --

13        MR. HANSHEW:  Objection, Your Honor.  She asked the

14   question why and made a statement afterwards.

15        THE COURT:  Let's just ask the question.

16        MS. KANOF:  I will, Your Honor.  I'm sorry.

17   BY MS. KANOF:

18   Q.   So you recall what Mr. Ueki asked for, correct?

19   A.   Yes, ma'am.

20   Q.   Did you provide it back there in November?

21   A.   I don't remember, ma'am.  I don't remember if we did, but I

22   think we -- I think we provide and we send them what we have.

23   Q.   Okay.  Then why are you now saying that it's not going to

24   be provided until fully executed?

25   A.   Probably my understanding it was we sent him a sample of

1    the way the contract is going to be, but it's going to be sent,

2    the executed contract as we signed that.

3    Q.    Wasn't it signed in November of 2009?

4    A.    Yes, ma'am.

5    Q.    And this is December of 2009?

6    A.    Yes, ma'am.

7    Q.    And my question again is why hadn't you sent him?

8    A.    Because I didn't have a copy of the full contract.

9    Q.    You didn't have a copy?

10   A.    I don't have a copy of the full contract.

11   Q.    Did you ask Mr. Delgado for a copy of the full contract?

12   A.    Yes, ma'am.

13   Q.    What did he tell you?

14   A.    I asked for the -- there was a big box with all of the

15   documents and I keep asking, and he said, oh, it's too heavy.  I

16   left it at an apartment in Mexico.  I left it at C.F.E. or I

17   bring it over to you.  It's very expen- -- very heavy and all of

18   that.  But again up to today, I haven't seen a copy of the full

19   contract package.

20   Q.    I'm going to show you what's been marked and admitted, the

21   Spanish version, as Government's Exhibit Number 21.  First of

22   all, do you know Irais Davila?

23   A.    No, ma'am.  I don't know who she is.

24   Q.    Did you ever use her as a notary?

25   A.    No, ma'am.  I don't think I ever -- well, I don't know the

1   name.  I used -- I always went to Wells Fargo and they had

2   notary publics there to sign it, so I don't remember the name.

3   Q.   This letter dated January 10th of 2010, I'm going to give

4   you an opportunity to take a look at it.

5   A.   (Complies.)

6   Q.   Did you see this letter on January 10, 2010?

7   A.   I saw this letter for the first time when you show it to me

8   two or three weeks ago in one of the meetings that we had.

9   Q.   Did Mr. Delgado tell you that you provided this letter to

10  F.G.G. in lieu of the letters of credit?

11  A.   He never mentioned that he pledged the equipment to me.

12  Q.   You said that you continued to ask him about the letters of

13  credit.  Did he ever respond by showing you this letter?

14  A.   No, sir -- no, ma'am.  He never -- he has never respond

15  about the letters of credit and he never showed me this letter.

16  Q.   Did you ever show you the pledge agreement that he signed

17  pledging the Mitsubishi equipment?

18  A.   No, ma'am.  I never saw it.

19  Q.   Government's Exhibit Number 38.  Do you recognize this as

20  an e-mail from Mr. Ponce to you and to Mr. Delgado --

21  A.   Yes, ma'am.

22  Q.   -- and others as well?

23       Again, you said you had a good relationship with

24  Mr. Ponce; is that correct?

25  A.   Yes, ma'am.

1    Q.   What is the purpose of this e-mail to you?  What was the

2    purpose of Mr. Ponce sending this e-mail?

3    A.   (Reading silently.)  (Mumbling.)

4              (Court reporter asks witness to speak louder.)

5              THE WITNESS:  Oh, I am sorry.

6    A.   Also, based on our conversations, I am in the process of

7    amending our subcontract for your review.  I will get it to you

8    on Tuesday first in its native Spanish text and later translate

9    it to English.  Regards.

10   Q.   Do you recall receiving this e-mail with Mr. Ponce's notes

11   on the Mitsubishi team meetings?

12   A.   I don't remember.  I've seen thousands of documents that I

13   don't remember exactly.

14   Q.   If you don't remember then okay.  I was going to ask you if

15   you discussed them with Mr. Delgado, because number --

16             MR. HANSHEW:  He answered he doesn't remember them.

17             MS. KANOF:  Okay.

18   A.   Can you put it again?

19   BY MS. KANOF:

20   Q.   No, it's all right.  We're going to move on.

21             On January 12th, did Mr. Ponce forward to you

22   Government's Exhibit Number 34, a letter that was written by

23   John Adams to you?  Do you recall this letter?

24   A.   (Reading to self; mumbling.)

25             Yes, ma'am.  I remember I read this.

1    Q.    Again, did you or do you recall whether you or Mr. Delgado

2    drafted a response to this letter?

3    A.    If you show me the response letter, I will let you know,

4    but...

5    Q.    Okay.  I'll do that.

6    A.    Okay.

7    Q.    This is Government's Exhibit, for the record, 40.

8    A.    It says should be in your possession, transportation --

9    (reading to self; mumbling.)

10   Q.    If you are going to read it out loud then read it out loud

11   so the Court reporter can understand you.

12             THE COURT:  Is it 4 or 40?

13             MS. KANOF:  40, 4-0.

14   A.    The annexes should be in you are possession.

15   Transportation and technical service are not required from

16   M.P.S.A.  The transportation component is being evaluated by the

17   customer to a certain -- (mumbling) -- the most cost effective

18   solution.  It is F.G.G. understanding the equipment will be

19   taking at the warehouse and/or factories of the supplier.  As

20   agreed, the equipment should be fully assembled and crafted in a

21   matter -- (mumbling) -- for transportation to Agua Prieta,

22   Mexico.

23             The minimum payment schedule, which was submitted in

24   our proposal is the schedule which is currently controlling.  It

25   seems all parties may have been -- have an interest in

 1   accelerating the schedule -- their schedule.  Counsel will need

 2   to be retained to address this issue with the customer.

 3           The assignment of collection rights is being

 4   considered by the customer.  Please be reminded remittance can

 5   only be made to F.G.G. as M.P.S.A. is not in privity with the

 6   customer.  F.G.G. and M.P.S.A. have the same objectives

 7   regarding this issue.

 8           All considered -- conditions proceed [sic] obligation

 9   post fee award have been met by F.G.G.  M.P.S.A. will not be

10   responsible for any letters -- letters of credit.

11   BY MS. KANOF:

12   Q.   Okay.

13           THE COURT:  This -- on Exhibit 40, there was only the

14   letter that was admitted.  You were going to --

15           MS. KANOF:  Oh, that's right.  I now move to admit the

16   e-mail from Mr. Gireud to Mr. Ponce.

17           THE COURT:  Mr. Hanshew?

18           MR. HANSHEW:  No, objection.

19           THE COURT:  That's admitted.

20   BY MS. KANOF:

21   Q.   So I want to ask you about number five.  All conditions

22   precedent and obligations post-bid award have been met by

23   F.G.G.; all conditions have been met.

24   A.   Yes, ma'am.

25   Q.   First of all, have assignment of collection rights been

1    met?

2    A.   I have signed it and I provide it to Marco.

3    Q.   Okay.  So you -- what do you mean?  What did you sign and

4    provide to Marco?

5    A.   They provided a draft of what they need with their account

6    numbers and all of the information that you need to wire

7    transfer money directly into their accounts, and we put it in

8    our letterhead and I signed it and sent it to Marco to be sent

9    to C.F.E.

10   Q.   What was the letter that you signed?

11   A.   It was a letter giving them the assignment of collections

12   rights.

13   Q.   Okay.  To provide to C.F.E.?

14   A.   Yes, ma'am.

15   Q.   Okay.  And you gave it to Marco; is that correct?

16   A.   Yes.

17   Q.   Do you remember when you gave it to Marco?

18   A.   I don't remember exact dates, but it was somewhere in this

19   time frame.

20   Q.   And when you were writing this letter, did you think it was

21   done?

22   A.   I'm sorry?

23   Q.   When you were writing this letter, did you think it was

24   done?

25   A.   Yes, ma'am, that we were told by Marco again we have

DIRECT DAVILA                                                      258

```
 1   letters of credit, so I'm just letting you know that they're not

 2   responsible for the letters of credit.

 3   Q.   I'm talking about the assignment of collection rights, sir.

 4   A.   Oh, yes.  I'm sorry.

 5   Q.   So since you had signed a letter on your letterhead and

 6   given it to Marco, it says all conditions precedent and

 7   obligations post-bid award have been met, so I'm first asking

 8   you about the condition of collection rights; you said it's met,

 9   you signed the letter and gave it to Marco, correct?

10   A.   Yes, ma'am.

11   Q.   Now, the letters of credit.  Why are you saying that's been

12   met?

13   A.   Because he told me they were met, that we met with all of

14   the financial conditions of the project.

15   Q.   Okay.  And did you ever see those letters of credit?

16   A.   Up to today, I have never seen the letters of credit.

17   Q.   After Mr. Adams' January 12th letter was sent, Government's

18   Exhibit Number 35, did Mr. Ponce send Mr. Adams' letter to you

19   and Mr. Delgado?

20   A.   Yes.

21         MS. KANOF:  Move Government's Exhibit Number 35 into

22   evidence.

23         MR. HANSHEW:  No, objection, Your Honor.

24         THE COURT:  GX-35 is admitted.

25   BY MS. KANOF:
```

1   Q.   And did Mr. Delgado respond on that forwarded letter from

2   John Adams to you and to Mace?

3   A.   Yes.  And he's actually saying, Mace, this is all yours.

4   Q.   'Arigatou.

5   A.   Yes, ma'am.

6   Q.   Japanese.

7   A.   Yes, ma'am.

8   Q.   Do you know what that means?

9   A.   See you or something like that.

10  Q.   I don't -- I just didn't know if you spoke any Japanese?

11  A.   I don't.

12            MR. HANSHEW:  Objection, Your Honor.  That's not a

13  question.

14            MS. KANOF:  I withdraw it.

15            THE COURT:  Sustained.

16  BY MS. KANOF:

17  Q.   So, on the 12th when that letter was forwarded from Hector

18  Ponce to you and Mr. Delgado, Mr. Delgado required Mr. Miller to

19  respond?

20  A.   I don't know if this e-mail was sent with an attached text

21  already or something, but it says, it's all yours, Mace.

22  Q.   I'm trying to find out if you wrote that response letter

23  for someone else?

24  A.   I have never write any responses.  They were all written by

25  Marco Delgado.

1    Q.   I'm going to show you what's been marked as Government's

2    Number 36, which is an e-mail in Spanish from you to Mr. Ponce.

3    Do you recognize it?

4    A.   Yes, ma'am.

5            MS. KANOF:  We'd move that 36 and 36A be admitted into

6    evidence, A being the translation into English.

7            MR. HANSHEW:  No, objection.

8            THE COURT:  36 and 36A are admitted.

9    BY MS. KANOF:

10   Q.   Let's look at 36A.  Do you -- it is initially a letter sent

11   from Eduardo Buendia to Marco Delgado, where Mr. Buendia is --

12   has instructions of some kind.

13   A.   It says, Mr. Marco, in accordance with Ingeniero Buendia --

14   Buendia's instructions, I'm sending the travel itinerary --

15   (mumbling) --

16           (Court reporter asks witness to repeat.)

17   A.   Mr. Marco Delgado, in accordance with Ingeniero Buendia's

18   instructions, I'm sending the travel itinerary.

19   Q.   Okay.  And then how does Mr. Delgado -- does he forward

20   that to you?

21   A.   Yes.  He forwarded it to me, and we didn't know, my parrot,

22   this is the itinerary.  It says, suicidal, but that's why --

23   that's what they -- that's what they want to do.  That's why

24   there is no hotel in Kobe.  They arrive at night, inspect ahead

25   the following day at (mumbling) for Paris.  That is why we need

1    to have someone to receive.  As much as I insisted, they want

2    it -- they wanted it that -- that way.  The customer rules.

3    Q.   Okay.  So this is January 12th and it's relating to the

4    hurried-up inspection trip, correct?

5    A.   Yes, ma'am.

6    Q.   And you respond to Mr. Ponce by saying what?

7    A.   This is what Eduardo secretary send.  Marco told me that

8    they don't want to arrive at hotel, that the reason they are

9    going is to verify the equipment.  These people don't know what

10   they are doing, but as you see they are crazy.  Speak with Marco

11   if you like, please, so that he explains to you I believe that

12   the reason for such a speedy visit was that there was going to

13   be a board meeting and they don't want to delay the inspection

14   anymore, according to -- I guess they want to go since the 26th

15   of December.

16   Q.   So where did you get the idea that they were speeding it up

17   for a board meeting?

18   A.   Because of board meeting.

19        Probably Marco told me to -- to send it like that

20   and/or -- I don't recall the specific, but he is always -- when

21   we're discussing Mitsubishi --

22        MR. HANSHEW:  Objection, Your Honor.  He answered he

23   didn't know.

24   BY MS. KANOF:

25   Q.   If you don't know, that's fine.

```
 1                THE COURT:  What's your objection?

 2                MR. HANSHEW:  Nonresponsive.

 3                THE COURT:  That's only the person asking the

 4     question.  It's overruled.

 5                MS. KANOF:  I'm sorry?

 6                THE COURT:  The nonresponsive objection is an

 7     objection of control not content and it pertains only to the

 8     person requesting the question.

 9                MS. KANOF:  I'm going to move on anyway, Judge.

10                THE COURT:  Okay.

11                MS. KANOF:  It's getting late.

12     BY MS. KANOF:

13     Q.   Do you recognize Government's Exhibit Number 37 as an

14     e-mail from Hector Ponce to you copied to Mr. Adams and to

15     Mr. Delgado?

16     A.   Please provide F.G.G.'s response to --

17     Q.   No.  Do you recognize that that's what it is?

18     A.   I think so, ma'am, yes.

19     Q.   And this is -- has already been admitted into evidence.

20                MS. KANOF:  Has it not?

21     BY MS. KANOF:

22     Q.   Okay.  So this is a follow-up e-mail.  Mr. Adams writes a

23     letter and sends a letter by e-mail on January 12th, and now

24     does it -- he -- Mr. Ponce is following up and because he hasn't

25     heard from you.  So between January 12th and January 18th,
```

1    between the time you got that demand letter from John Adams and

2    you get this new demand from Hector Ponce, did you discuss with

3    Mr. Delgado what to do about Mitsubishi's January 12th letter?

4    A.   Yes, ma'am.

5    Q.   You did?  And what did Mr. Delgado say?

6    A.   I will need to read the letter first.

7    Q.   Well, this is from Mr. Ponce.

8    A.   Yeah.

9    Q.   Go ahead.  To yourself.  Why don't you read it to yourself?

10   A.   Please provide F.G.G. --

11   Q.   No, to yourself, not out loud.

12   A.   Oh, I'm sorry.

13   Q.   Do you talk to yourself?  Do you read out loud when you

14   read to yourself?  Never mind.  Go ahead.  Read it without

15   talking.

16   A.   (Complies.)

17   Q.   I wanted to know if this would refresh your memory as to

18   whether or not your January 30th letter, who designed it and

19   wrote it?  Again, do you recall whether you, Mace Miller or

20   Mr. Delgado wrote that letter?

21   A.   Marco Delgado wrote that letter.

22   Q.   Okay.  I draw your attention to Government's Exhibit

23   Number 41, an e-mail that has been marked as Government's

24   Exhibit Number 41 from Mr. Beddard to you.  And this is already

25   in evidence.  And attached to this e-mail is the first invoice.

1           So, you are the party to whom most correspondence

2   goes, correct?

3   A.   Uh, I --

4   Q.   From Mitsubishi?

5   A.   Yes, ma'am.

6   Q.   Okay.  Do you get any correspondence from C.F.E.?

7   A.   Hardly ever.

8   Q.   All right.  Did you note that in the prime contract you are

9   the point of contact or are you?

10  A.   Yes, I am.

11  Q.   Did you -- but you say you hardly got any communications

12  from C.F.E.?

13  A.   Yes, ma'am.

14  Q.   Okay.  But Mitsubishi, did you get communications from

15  Mitsubishi?

16  A.   Yes, ma'am.

17  Q.   And sometimes was Mr. Delgado copied on them?

18  A.   I think most of the time he was copied.

19  Q.   And Government's Exhibit Number 41, was Mr. Delgado copied

20  on Government's Exhibit Number 41?

21  A.   Sorry.  Are you asking me a question?

22  Q.   I'm sorry?  Yes, I was.

23  A.   I'm sorry?

24  Q.   That's okay.  I'll just go forward and we'll talk a little

25  bit about the exhibit.

1          So, what were the payment requirements?  Who was the

2     invoice for Mitsubishi supposed to be sent to?

3     A.    To F.G.G. Enterprises, of course.

4     Q.    Is this the first e-mail that you received, Government's

5     Exhibit Number 41 from Mitsubishi?

6     A.    I received a lot of invoices from Mitsubishi.

7     Q.    Do you recall whether or not this was the first invoice?

8     A.    I don't recall if it was the first invoice, but they used

9     to send invoices almost every month for things just to kind of

10    remind us or telling us, but, yes, this is probably the first

11    invoice I got.

12    Q.    Did you read the invoices?

13    A.    Yes, ma'am.

14    Q.    Okay.  So this invoice was for $16,995,000.  Did you

15    participate in creating the payment schedule?

16    A.    No, ma'am.

17    Q.    Who created the payment schedule?

18    A.    It's on the main contract and it was provided by C.F.E.

19    directly by the utility.

20    Q.    And on the face of -- of the invoice, does it say where the

21    money is supposed to be sent?

22    A.    Yes, ma'am.  That's a wiring instructions that they sent on

23    the assignment of collection rights.

24    Q.    What did you do with the invoices that you got from Kevin

25    Beddard?

DIRECT DAVILA                                                              266

1    A.   I sent them to Marco, copied Marco.

2    Q.   Why did you send the invoices to Marco?

3    A.   So he can see that we have just information, but I kept

4    them all.  I have them all in the box.  And I have them all

5    because I was supposed to pay them.

6    Q.   Okay.  So how was Mitsubishi supposed to get their money?

7    A.   By either assignment of collection rights directly from the

8    financial institution, and since we -- Marco never provide this

9    to the C.F.E., they were supposed to get the payment from the

10   F.G.G. account in El Paso.

11   Q.   So.  Why are you sending it -- so then you would be wiring

12   out of the F.G.G. account, correct?

13   A.   Yes, ma'am.

14   Q.   Okay.  Did you -- did you wire $16,995,000 out of the

15   F.G.G. account on March 6th or 7th of 19- -- of 2009, to pay

16   them their first invoice?

17   A.   No, ma'am, because I had gotten -- I never got paid.

18   Q.   Okay.  Government's Exhibit Number 43.  Government's

19   Exhibit Number 43 is a letter dated the 3rd of March of 2010.

20   And I'm going to go ahead and let you look at that.  Do you know

21   what that is?

22   A.   Yes, ma'am.

23   Q.   What is it?

24   A.   He is asking the C.F.E., the utility to send -- to change

25   the accounts from the original contract signed by the government

1   with F.G.G. Enterprises to his personal account in the Caribbean

2   bank.

3   Q.   How did you find out that was Marco Delgado's account?

4   A.   Because when we got the first payment, whatever --

5   Q.   Who is we?

6   A.   When I got the first payment, when F.G.G. got the first

7   payment wire transferred from Marco Delgado, number one, the

8   first surprise was that it wasn't the full payment.  I remember

9   the first payment was going to be $18 million, for example.  I

10  don't remember exactly, but it was going to be that, and we

11  didn't receive --

12  Q.   It was supposed to be $20 million and it wasn't?

13  A.   Okay.  $20 million and it wasn't, number one.  And

14  second --

15           MR. HANSHEW:  Objection, Your Honor.

16           THE COURT:  Sustained.

17  BY MS. KANOF:

18  Q.   Okay.  Go ahead.  I'm sorry.

19  A.   And I went into the bank and I wanted to see where the

20  money was coming from and why I didn't get all of the wire

21  transfer.  So we got this information from the deposit or the

22  bank statement in the bank and we go both Mace --

23  Q.   Who is we?

24  A.   -- Mace and I were sitting in the office, we gotten this

25  information and we got a phone number of this whatever Turks &

DIRECT DAVILA                                                          268

1    Caicos, Skippings and Rutley, and we called.  We called that

2    number and I told them this is Fernando Gireud.  I'm the owner

3    of F.G.G. Enterprises and I want to know why money was sent to

4    that account when it was supposed to be coming from a

5    fideicomiso in Mexico from the C.F.E., and they said, let me

6    check.  And the lady went and checked and she said all of the

7    monies have been paid.  We have wired the monies to the people.

8    And I said what people, whose people, and why is the account

9    there, and she put me on hold again and she came back and says,

10   the account is in the name of Marco Delgado.  He's the owner of

11   the account.  If you have any questions you have to contact him.

12   Q.   Did Marco Delgado ask your permission to change the wiring

13   instructions from the F.G.G. account?

14   A.   No, ma'am.

15   Q.   Did he tell you that he had changed the wiring instructions

16   to the F.G.G. account?

17   A.   No, ma'am.

18   Q.   He was your attorney.  You are his client, correct?

19   A.   Yes, ma'am.

20   Q.   And this contract was F.G.G.'s contract?

21   A.   F.G.G. Enterprises' contract, yeah.

22   Q.   And you found out that the money was -- that the wiring

23   instructions -- did you ever see this letter before this case

24   came up?

25   A.   No, ma'am.

KATHLEEN A. SUPNET, CSR

1    Q.   So --

2    A.   I saw it later on.

3    Q.   Okay.  Your attorney, when you signed the power of

4    attorney, what if anything did you think Mr. Delgado was

5    responsible for with regard to the money and the transfer of

6    money by wire from the fideicomiso to F.G.G.?

7    A.   He was responsible to put the documents together for the

8    bid package.  He was never authorized to use any funds or any

9    changes on the accounts.

10   Q.   Did that memorandum of understanding say that once F.G.G.

11   received the money, they would pay Mr. Delgado?

12   A.   Yes, ma'am.

13   Q.   Again, you were his client as an attorney?

14   A.   Yes, ma'am.

15            MR. HANSHEW:  Objection -- scratch that.

16   BY MS. KANOF:

17   Q.   Did you ever have a conversation with Mitsubishi about the

18   change in the wiring instructions?

19   A.   Yes, ma'am.  I was going out of the country on a vacation

20   trip and they called me, Kevin Beddard called me and asked me

21   why is the money coming from --

22   Q.   Who called you?  I'm sorry?

23   A.   Kevin Beddard called me and he asked me why in the heck is

24   the money coming from an account in the Caribbean.  And I said,

25   I have no idea.  I'm looking for it.  I'm trying to find out

1    exactly what happened, but did you got paid, and he says, yes,

2    we got -- not all of our money, but we got paid some.  And I

3    said, well, at least you have something.  Let me find out what

4    happened or why did they -- did the money came from that.  It

5    was supposed to be coming from the fideicomiso in Mexico City to

6    my account and I was supposed to be transfer this to you.

7    Q.   But evidently they had gotten -- well, what you said.

8         I draw your attention to Government's Exhibit

9    Number 44 and you -- did you receive an e-mail from Mr. Ueki?

10   A.   Yes, ma'am.

11        MS. KANOF:  And Government's Exhibit Number 44, is it

12   in evidence?

13        THE COURT:  Yes, ma'am.

14   BY MS. KANOF:

15   Q.   And do you recall Mr. Ueki -- and you previously testified

16   he was high up; is that correct?

17   A.   Yes, ma'am.

18   Q.   And this letter is dated December 18th of 2009, correct?

19   A.   Yes, ma'am.

20   Q.   And what is Mr. Ueki -- he sent the letter to you.  Did you

21   read the letter before discussing it with anyone?

22   A.   Let me read here.

23        Yes, ma'am.  I read the letter first.

24   Q.   And did you discuss it with anyone?

25   A.   Probably I discussed it with Mace and Marco.

DIRECT DAVILA                                                    271

```
1     Q.   When you say probably, is that --

2     A.   I did.  I'm sure I did.

3     Q.   And colloquially I understand that you -- but if you can

4     be --

5              MR. HANSHEW:  Objection, Your Honor.

6              THE COURT:  Sustained.

7              MS. KANOF:  Okay.

8     BY MS. KANOF:

9     Q.   If you can be specific, more specific with your answers.

10             Did Government's Exhibit Number 45 -- is in -- part of

11    it is in Spanish -- did you receive an e-mail from Marco Delgado

12    forwarding you an acknowledgement from the fideicomiso in

13    Government's Exhibit Number 45?

14    A.   Yes, ma'am.

15             MS. KANOF:  We'd move Government's 45 into evidence.

16             THE COURT:  Mr. Hanshew?

17             MR. HANSHEW:  May we approach, briefly?

18             THE COURT:  Sure.

19             (Bench conference.)

20             MR. HANSHEW:  Judge, I thought that we had agreed in

21    pretrial that we would have English translations.  There's

22    nothing in there.  That doesn't have a translation.

23             THE COURT:  Right.

24             MS. KANOF:  Oh, okay.  We didn't translate it?

25             MR. ARREOLA:  Which one?
```

KATHLEEN A. SUPNET, CSR

```
 1                 MS. KANOF:  45.

 2                 THE COURT:  You have 45A, translation of exhibit.

 3                 MS. KANOF:  Oh, we do have it, yeah.

 4                 THE COURT:  I don't know if they have it, but that's

 5      what you have.

 6                 MS. KANOF:  Yeah, I have it.

 7                 (Bench concludes.)

 8      BY MS. KANOF:

 9      Q.    Let me just go ahead and identify that.  There's also

10      Government's Exhibit Number 45A, the English translation.

11                 MS. KANOF:  And I'd move them both into evidence.

12                 MR. HANSHEW:  No, objection.

13                 THE COURT:  GX-45 and 45A is admitted.

14      BY MS. KANOF:

15      Q.    Let's go ahead and look at the English portion.  Is

16      Mr. Delgado forwarding an e-mail to you from somebody at C.F.E.?

17      A.    Yes, ma'am.

18      Q.    And what is the e-mail about?

19      A.    By this, this document, I confirm receipt of your request

20      for the processing of assignment of collection rights for the

21      reference project in accordance with established guidelines in

22      the corresponding contract.  Since you sent us an original --

23      the original -- (indiscernible).

24                 (Court reporter asks witness to repeat.)

25                 THE WITNESS:  I'm sorry, ma'am.
```

1    A.   Dear Mr. Delgado, by means of this document, I confirm

2    receipt of your request for the processing of assignment of

3    collection rights for the reference project in accordance within

4    the established guidelines in the corresponding contract.  Since

5    you sent us the original required documentation in a timely

6    manner, we anticipate proceedings with the request process

7    without any problem.  We will keep you updated once said

8    authorization is confirmed or further information is required.

9         She's just saying that she received the assigned --

10   Q.   And that's -- that's March 5th of 2010?

11   A.   Yes, ma'am.

12   Q.   Did you believe it?

13   A.   Of course not.  The payment was already made.  I didn't

14   believe anything.  At this point, I -- I didn't believe anything

15   anymore.

16   Q.   And the assignment -- and later on, almost a year later,

17   you signed another letter, correct?

18   A.   Yes, ma'am.

19   Q.   For collection rights?

20   A.   Yes, ma'am.

21   Q.   But I scrolled upward where Mr. Delgado forwards it to you

22   and what does he tell you?

23   A.   I'm forwarding for your review C.F.E. acknowledgement of

24   formal F.G.G. request for collection rights assign ment.  Given

25   Hector request for written status report, I will attempt to

1    generate a rough draft for F.G.G. review by midweek.  Have a

2    good Monday.  Thanks.

3    Q.   Government's Exhibit Number 48.  An e-mail from you to

4    Mr. Ponce copying Mr. Adams.  Do you recognize that that's what

5    this document is?

6    A.   Yes, ma'am.

7    Q.   Okay.

8              MS. KANOF:  Is that in evidence, 48?

9              THE COURT:  No, ma'am.

10             MS. KANOF:  Move for admission of Government's Exhibit

11   Number 48.

12             MR. HANSHEW:  No, objection.

13             THE COURT:  48 is admitted.

14   BY MS. KANOF:

15   Q.   Okay.  So on -- you seem to have known on the last e-mail

16   that Mr. Delgado already had the money, and I guess did you know

17   at the time that Mr. Delgado already had the $20 million that

18   you got that e-mail?

19   A.   I believe we were paid somewhere in this time or something

20   and --

21   Q.   Let me ask you, on the -- this Government's Exhibit 48 on

22   March 22nd of 2010, did you write an e-mail to Hector Ponce

23   copying John Adams?

24   A.   Yes, ma'am.

25   Q.   And was it in response to an e-mail from Hector Ponce to

1    you?

2    A.   Yes, ma'am.

3    Q.   And if you could take a look at that e-mail.

4    A.   Okay.

5    Q.   Have you had an opportunity?

6         Number four of that e-mail, and this is March 22nd,

7    F.G.G. agrees to finalize the assignment of billing rights.  So

8    had it happened, yet?

9    A.   I don't know what is date of this, but no it hasn't

10   happened.

11   Q.   There's the date.

12   A.   No.

13   Q.   Okay.  But did you know Mr. Marco Delgado had $20 million

14   in the Turks & Caicos on that date?

15   A.   I think I knew somewhere, yes, that he already has the

16   money.

17   Q.   Did he tell you on March 9th of 2010, did Marco Delgado

18   tell you he had an account in the Turks & Caicos that had

19   $20 million of C.F.E. money in it?

20   A.   No, ma'am.

21   Q.   Did he ever tell you he had an account in the Turks &

22   Caicos?

23   A.   He never told me.

24   Q.   And you found out about it when money went into your

25   account; is that right?

```
 1    A.   Yes, ma'am.

 2    Q.   I'm showing what's been marked and been admitted into

 3    evidence as Government's Exhibit 2.  And according to this

 4    exhibit, April 1st of 2010, do you see -- are you F.G.G.

 5    Enterprises?

 6    A.   Yes, ma'am.

 7    Q.   Does that refresh your memory of when the money was sent to

 8    you?

 9    A.   April.

10    Q.   Okay.

11    A.   A month later or something like that.

12    Q.   And how much money did you get?

13    A.   $2,100,000.

14    Q.   Do you know how much money you were supposed to receive on

15    the first payment?

16    A.   You mention a minute ago or something, $20 million.  I

17    never got the final payment the schedule, but it was around

18    $20 million.

19    Q.   Okay.  And at the top in the first item, do you see the

20    date the $20 million went into Mr. Delgado's Turks & Caicos'

21    account?

22    A.   March the 20th -- the 9th.

23    Q.   You didn't know about this?

24    A.   No, I didn't know.  I kept asking him, why we don't get

25    paid.  When is the payment -- the payment was due on this date
```

DIRECT DAVILA                                                            277

1    and he said C.F.E. is holding it, so just relax, you'll get it.

2    Q.   Okay.  Back to the e-mail on March 22nd.

3            Mr. Ponce is asking you all kinds of questions and to

4    confirm your basic agreement and how do you respond?

5    A.   (Reading.)  That I'm saying that I can sign the document,

6    the assignment of collection rights to them right away.

7    Q.   Now, what if anything did you have to do with negotiating

8    the change in payment terms?

9    A.   Nothing, ma'am.

10   Q.   Do you know whether Mr. Delgado participated in changing

11   the payment terms?

12   A.   I don't know, ma'am.

13   Q.   I'm going to show you Government's Exhibit Number 50 and

14   show you a letter.  Do you know who Eduardo Buendia is?

15   A.   Yes, ma'am.

16   Q.   Okay.  And the letter is dated March 23rd of 2010.  Did you

17   ever -- did you --

18   A.   March 23rd?  Okay.  Sorry.

19   Q.   Did you see this letter with payment schedule on it on

20   March 23rd of 2010?

21   A.   No, ma'am.

22   Q.   Do you see Mr. Delgado's initials anywhere on this

23   document?

24   A.   I don't see his initials.

25   Q.   The date again of this letter from Mr. Buendia -- who is

DIRECT DAVILA                                                    278

1    the letter to?

2    A.   To Marco Delgado.

3    Q.   And the date?

4    A.   March the 23rd.

5    Q.   And underneath the date is there a letter number, a unique

6    letter number?

7    A.   Yes.

8    Q.   What is the number?

9    A.   ST0192010.

10   Q.   Now I'm going to show you Government's Exhibit 49 and ask

11   you, is this another letter from Mr. Buendia?

12   A.   It looks like the same letter, but with different numbers

13   and with Marco's initials in there.

14   Q.   Okay.  So you said it looks like the same number.  Let's

15   look again.  What's the date?

16   A.   The 23rd, yes.

17   Q.   And what's the letter number?

18   A.   I believe it's the same number.

19   Q.   19?

20   A.   ST0192010.

21   Q.   And there is also a chart in this for payment, correct?

22   A.   Yes, ma'am.

23   Q.   Are the numbers different?

24   A.   Yes, I believe they are different from the other one, yes.

25   Q.   Okay.  And on this one, are there any initials other than

1    Mr. Buendia's signature?

2    A.   I think these are just -- it's Marco's initials, that's it.

3    Q.   You recognize those as his initials.

4         Did you ever see this letter?

5    A.   No, ma'am.

6    Q.   Okay.  So your attorney did not show you this payment

7    schedule --

8    A.   No.

9    Q.   -- from Mr. Buendia?

10        And your attorney did not show you -- well, with

11   regard to Government's Exhibit Number 50 --

12        MS. KANOF:  I would move it be admitted into evidence,

13   the e-mail from Marco Delgado to John Adams and Mr. Gireud.

14        THE COURT:  Government 50 is in evidence.

15        MS. KANOF:  It's in evidence.  Okay.

16   BY MS. KANOF:

17   Q.   So this is the letter we were talking about, correct?  It

18   says 15 million.  And without saying what the amount was on the

19   other letter that had the same number, the same date, but had

20   Mr. Delgado's initials, was it more money or less money?

21   A.   A lot more money.  More money.  This is 15 and 7 and the

22   first payment and second payment.  So if the other one is --

23   Q.   Don't talk.  There's no question that's been asked of you,

24   please.

25   A.   I'm sorry.

1   Q.   On March 24th -- on March 24th of 2010, did you write a

2   letter to John Adams on F.G.G. letterhead?

3   A.   I don't remember.  It looks like my signature, but I don't

4   remember.

5   Q.   Government's Exhibit Number 51.  Would you have -- it's

6   already admitted into evidence -- would you have -- before you

7   said you don't recall ever writing any letters on your own, do

8   you know whether -- where you would have gotten the information

9   for this letter?

10  A.   From Marco Delgado, of course.

11  Q.   And do the numbers -- I want you to just look at the top

12  number -- did the top number match the letter that was attached

13  to the e-mail with a smaller dollar amount on it?

14  A.   The same amount you said?  You said -- I'm sorry?  Can you

15  repeat --

16  Q.   I showed you two letters that had the same date and the

17  same --

18  A.   Yes.

19  Q.   -- letter number for Mr. Buendia, right?

20  A.   Yes.

21  Q.   And this is a letter from you.  I'm asking whether or not

22  the top number that you're relating as a payment term matches

23  the second letter?

24  A.   No.

25  Q.   The second letter.  I'll go back for you.

1          MR. HANSHEW:  He answered, Your Honor.

2          MS. KANOF:  I'm going to Government's Exhibit --

3          MR. HANSHEW:  Asked and answered.

4          THE COURT:  Let me -- she can correct him if he needs

5    correcting.

6    BY MS. KANOF:

7    Q.   Does is match Government's Exhibit Number 50?

8    A.   Yes, ma'am, it does match 15 [sic].

9    Q.   Does it match Government's Exhibit Number 49; just "yes" or

10   "no"?

11   A.   No.

12   Q.   Government's Exhibit Number 53.  Sorry.  Government's

13   Exhibit Number 58.

14          Do you recognize this as an e-mail that you sent to

15   Mr. Ponce And for some reason to yourself and Mr. Delgado copied

16   to Mr. --

17   A.   Yes, ma'am.

18   Q.   Okay.

19          MS. KANOF:  Is Government's Exhibit Number 58 in

20   evidence?

21          THE COURT:  It is in evidence.

22   BY MS. KANOF:

23   Q.   Mr. Ponce began his -- or actually Mr. Williamson began the

24   e-mail stream:  Can you check with Fernando and see if they were

25   paid?  This is April 3rd.  And Mr. Williamson wants his money as

DIRECT DAVILA                                                    282

1    well, correct?

2    A.   Yes, ma'am.

3    Q.   And so does Mr. Ponce send you an e-mail on April 3rd,

4    directly to you copying Mr. Adams and Mr. Williamson?

5    A.   Yes, ma'am.

6    Q.   What does it say?  This one you can read out loud.  Let the

7    Court reporter hear you.

8    A.   I have tried to call you and left you several messages.

9    Please reply.  Did your money arrive in your account?

10   Yesterday, you mentioned you had been told $1 million, but the

11   payment from C.F.E. is 15 million and M.P.S.A. is 14-and-a-half.

12   How could you get $1 million?  M.P.S.A. is concerned the payment

13   is not in our account.  Also, if it is a quantity other than

14   invoice, there will be a great consternation.  Please reply as

15   soon as I get this.  Also on Monday -- also, on Monday, please

16   get us the copy of your F.G.G. instructions to C.F.E. with the

17   dates and amounts assigned by you to M.P.S.A.  This is

18   important.  Thanks.  Hector.

19   Q.   You notice that Mr. Delgado is not copied on this e-mail?

20   A.   Yes, ma'am.

21   Q.   And how did you respond to Mr. Beddard?

22   A.   I just answered Kevin's e-mail and answered and replied.

23   Q.   Or is this from you?  Yes?

24   A.   I'm seeing at the end of the day, C.F.E. and Bancomext are

25   the ones distributing the money, not F.G.G., and also since you

1    requested direct payment to you from Bancomext, I do not have

2    control of payments.  So in other words, I don't have an answer

3    to telling why is it coming from other accounts and not from my

4    account.

5    Q.   Okay.  And he also doesn't have an answer on why they --

6    A.   They reduce or --

7    Q.   Why they didn't get the money?

8    A.   -- change payments.

9    Q.   Government's Exhibit Number 60 and 60A in English and in

10   Spanish.

11            MS. KANOF:  I believe these are already in evidence or

12   is it just the letter that's in evidence, Your Honor?

13            THE COURT:  And this is 58?

14            MS. KANOF:  No, 60.

15            THE COURT:  I show e-mail assignment first payment in

16   evidence and the translation of 60 as 60A in evidence.

17            MS. KANOF:  Thank you.

18   BY MS. KANOF:

19   Q.   Government's Exhibit Number 60 is in the Spanish language.

20   Government's Exhibit Number and 60A in the English language.

21            You sent a letter to John Adams and I'm showing you

22   the translated letter.  And up at the top, before when you were

23   talking about the union member, this one is the next number.

24   It's the ST20, correct?

25   A.   Yes, ma'am.

DIRECT DAVILA                                                          284

1   Q.   And where did you get this letter to transmit it to John

2   Adams?

3   A.   Probably from Marco.  It says it was sent from C.F.E. to

4   Marco Delgado.

5   Q.   Okay.  And what is the purpose of sending this letter to

6   John Adams?

7   A.   I'm sure trying to tell him that you are not going to get

8   all of this money, because we have all of this partial

9   withholding for the financial institution that I don't

10  understand who they are.  Payment of technologist, I don't know

11  who they are.  Subcontractor --

12  Q.   You are kind of mumbling to yourself, so let me ask you.

13  Was there any agreement that you knew of that C.F.E. could

14  withhold more than two-and-a-half-million-dollars for partial

15  withholding for the financial institution?

16  A.   Of course not, ma'am.

17  Q.   Okay.  Was there any agreement that you knew of that a

18  million dollars could be withhold -- withheld by C.F.E. for

19  direct payment to the contractor?

20  A.   No, ma'am.

21  Q.   Who's the contractor?

22  A.   I don't know.

23  Q.   But you were provided this letter as an explanation to

24  respond to the questions that Mitsubishi was posting?

25  A.   Yes, ma'am.

1    Q.   Mr. Adams' response to you, in Government's Exhibit

2    Number 61, correct?

3    A.   Yes, ma'am.

4    Q.   And how does he respond to you?

5    A.   Unfortunately, your letter did not clear up our situation.

6    In good faith, we had agreed to the first payment from F.G.G. to

7    M.P.S.A. in the amount of 14,493,434.  And we are expecting you

8    to confirm the same as you did yesterday.  Please confirm that

9    M.P.S.A. and TY [sic] will receive the balance of the amounts

10   due immediately.  Also, we now must clearly be informed of the

11   upcoming payments, amounts and dates such that we will have a

12   certainty of the payments and that the dollar amounts of

13   $103 million will be paid.  Also, we need your confirmation that

14   all financing of letters of credit and banking fees are outside

15   our scope of price.

16   Q.   And that date of that letter is April 7th, correct?

17   A.   Yes, ma'am.

18   Q.   So he -- did you respond -- did you talk to Marco about

19   this?

20   A.   Of course, every time I talk to him.

21   Q.   Why did you -- how did you confront Marco?  What did you

22   tell him?

23   A.   All the time like what is happening.  How come the money is

24   coming from Turks & Caicos?  Why is Mitsubishi not paid the

25   whole amount?  Why -- where is the money?  Where are the letters

DIRECT DAVILA                                                            286

1   of credit.  Every time the same issues, the same topics.

2   Q.    Let's break it down.

3             Did you confront him about finding out that he had an

4   account in the Turks & Caicos?

5   A.    Yes.

6   Q.    And what did he tell you in response to that?

7   A.    C.F.E. instructed me to do it and I just followed orders

8   from the customer.

9   Q.    Is C.F.E. -- he's your attorney, correct?

10  A.    Yes, ma'am.

11  Q.    And I understand that C.F.E. would be F.G.G.'s customer,

12  correct?

13  A.    Of course, yes.

14  Q.    Are you F.G.G.?

15  A.    Yes, ma'am.

16  Q.    So you are Mr. Delgado's client, correct?

17  A.    Yes, ma'am.

18  Q.    So did he inform his client that C.F.E. required him to --

19  or to use an account in the Turks & Caicos before he used an

20  account in the Turks & Caicos?

21  A.    No, ma'am.

22  Q.    You had to confront him with it and then he said what now?

23  A.    The C.F.E. instructed me to do it.  I didn't do it myself.

24  They told me to do it, so I just followed their directions.

25  Q.    I now showed you the letter -- did he say that C.F.E. made

DIRECT DAVILA                                                    287

1    him sign a letter requesting that they do it?

2    A.   No, ma'am.

3    Q.   Okay.  So what else did you confront him with?  That was

4    the Turks & Caicos account and you gave us a whole list of

5    things.  What else did you confront him with?

6    A.   I confronted him, but again where are the letters of

7    credit?  If we already paid, if you said we were going to keep

8    some money for the letters of credit for the first payment,

9    where are they?  I haven't seen them since the first day.  I

10   haven't seen the contracts.  I haven't seen the payment terms.

11   So the same issues.

12            (Witness speaking over counsel.)

13   Q.   -- with the letters of credit?

14   A.   Yes.

15   Q.   And you said -- you said you were going to take money out

16   for the letters of credit from the first payment.  Did he take

17   money out?

18   A.   Yes, he kept all of the money.

19   Q.   And how did he respond?

20   A.   He said they are -- I mean the letters of credit exist.

21   They are on the C.F.E. possession.  They are here, but never

22   gave me a copy of the letters of credit.  And he hasn't -- up to

23   now, I haven't seen the letters of credit.

24   Q.   He said the letters of credit exist?

25   A.   Of course, yes, that's why he took $8 million to pay for

DIRECT DAVILA                                                    288

1    them.

2    Q.    Then what else did you confront him on?

3    A.    The letters of credit, the payment schedule, why did --

4    Q.    Okay.  Now let's talk about the payment schedule.  What did

5    you ask him about the payment schedule?

6    A.    Why did Mitsubishi claim that they didn't have their

7    payment, the full payment.

8    Q.    And what did he say?

9    A.    C.F.E. -- that's what C.F.E. sent and that's what -- I'm

10   just sending what C.F.E. sent.  I mean, always vague answers,

11   ma'am.

12   Q.    What else did you confront him on?

13   A.    Letters of credit, payment schedule, why the payments were

14   short.  I'm still asking for the whole copy of the contract.

15   Q.    And when you asked him for the whole copy of the contract,

16   what did he respond?

17   A.    It's in Mexico.  It's very heavy.  It's in C.F.E.  He said

18   one day we'll pick it up or I'll bring it over or I'll bring it

19   over tomorrow or a bunch of --

20   Q.    Was Mace Miller present during any of these confrontations?

21   A.    On -- on the strongest conversations -- situations like

22   this, yes, he was present most of the time or he was present --

23   yeah.

24   Q.    Did he participate?

25   A.    Yes.

1    Q.   In the confrontation?

2    A.   Yes, he did.  He was a little bit more calm.  He let me

3    since I was the owner, but he was very furious with Marco.

4    Q.   And Government's Exhibit Number 64 -- this has already been

5    admitted into evidence -- you are not copied on this, but I want

6    to ask you something about this.

7            Mr. Delgado wrote an e-mail to Patrick Altamura and

8    John Adams.  He did not copy you on this e-mail, did he?

9    A.   No, ma'am.

10   Q.   Okay.  In the e-mail he says -- he starts with -- he's

11   talking about the payment terms, correct?

12   A.   Yes, ma'am.

13   Q.   He states:  I am at no time negotiating nor speaking on

14   behalf of F.G.G.  This is April 14th of 2010.  Was he still

15   representing F.G.G. on April 14th?

16   A.   He is, yes.

17   Q.   And then he says, I am not nor will I be counsel for F.G.G.

18   on this issue.  Do you know what issue he might be referring to?

19   A.   No, ma'am.  Payment terms?

20   Q.   Are payment terms part of the contract?

21   A.   Yes, ma'am.

22   Q.   And he's saying that he's not representing F.G.G. regarding

23   the payment terms?

24   A.   That's what he's saying.

25   Q.   Those letters that I showed you from Mr. Buendia with the

1    boxes in them, were those payment terms?

2    A.    Yes, ma'am.

3    Q.    And were they sent to Mr. Delgado?

4    A.    Yes, ma'am.

5    Q.    Did he ever bring those letters to you and say, here, I

6    don't represent you on these payment terms, you take care of it?

7    A.    No, ma'am.

8    Q.    In your presence, did he ever do that with Mace Miller; I

9    don't represent you on these payments terms, you take care of

10   it?

11   A.    No, ma'am.

12   Q.    He continues by saying, however, some of your changes make

13   it difficult for me to maintain my position and lend themselves

14   to direct negotiation with F.G.G.

15          Again, he's your attorney and he's talking about

16   negotiations for F.G.G.  Did he ever provide you with a copy of

17   this e-mail?

18   A.    No, ma'am.

19   Q.    If we are able to resolve them, my offer stands to secure

20   signatures from F.G.G. ASAP.  But if you feel that they are

21   critical at this point, you'll need to discuss it with F.G.G.

22          So, on what -- I don't understand -- do you understand

23   what Mr. Delgado is offering --

24   A.    No, ma'am.

25   Q.    -- Mitsubishi?

1    A.   No, ma'am.

2    Q.   Okay.

3    A.   Excuse me.  Is that okay?  I have allergies and I am

4    feeling --

5              THE COURT:  Oh, go ahead.

6              THE WITNESS:  Thank you.

7              THE COURT:  There's some tissue here.

8              THE WITNESS:  If I can take one second break?

9    BY MS. KANOF:

10   Q.   Mr. Gireud, even though he's not representing F.G.G.,

11   number two, your language regarding payment dates inserted in

12   the table of section two, the earlier of the two payment dates

13   are set on the C.F.E.-F.G.G. contract as fixed.

14             Was he responsible to represent you on the

15   C.F.E.-F.G.G. contract?

16   A.   Yes, ma'am.

17   Q.   Does he say F.G.G.?

18   A.   Yes, ma'am.

19   Q.   Okay.  Just a minute.

20   A.   Oh.

21   Q.   Can promise that it is meaningless, because their ability

22   to pay Mitsubishi is strictly dependent on payment from C.F.E.?

23   A.   Yes.

24   Q.   Any expedited payment would need many approvals and be

25   established at the onset.

1          I want to direct you back to Government's Exhibit

2     Number 2.  And on March 9th, he's saying that it's all in the

3     hands of C.F.E., but that letter was April -- in April, and on

4     March 9th, he received $20 million from C.F.E., correct?

5     A.   Yes, ma'am.  Yes, ma'am.

6     Q.   And again, were you aware that he was no longer

7     representing you on these issues?

8     A.   No, ma'am.

9     Q.   So let's just talk a little bit about what you did some of

10    this.

11         Were you very concerned about what was going on?

12    A.   Yes, I was very concerned, ma'am.

13    Q.   Did that cause you to attempt to contact people at C.F.E.?

14    A.   I went to Mexico City myself.

15    Q.   And when did that occur?

16    A.   When the first payment was paid to us and I confronted

17    Marco with all of this, I think I had -- I was off the country

18    for a week on vacation with my family, but when I came back I

19    went to Mexico City and I look -- I wanted to --

20    Q.   Did you go by yourself?

21    A.   I went with Mace Miller on that trip.

22    Q.   Okay.

23    A.   And I wanted to talk to Ingeniero Eugenio Laris Analis, who

24    was the head of the project.

25    Q.   Before you went to Mexico City, did you make an

1    appointment?

2    A.   Yes.  I called -- I tried to call him and I got no answer,

3    so I called Alberto Ramos and he -- he didn't want to see me at

4    all and the pilot [sic] put a lot of pressure and I was able to

5    see them.

6    Q.   What did you tell -- what did you tell Alberto Ramos was

7    the purpose of your phone call?

8    A.   The purpose of my phone call was that I wanted to meet with

9    him, because I saw a lot of weird things going on in the

10   contract, in the project, in the payments, on the letters of

11   credit, on the contracts themselves, but mainly payments and

12   letters of credit.  And I said I need an answer from you.  You

13   are the owner of the contract and I need answers from you,

14   because I'm tired of no answers.

15   Q.   Okay.  And did he say he would meet with you?

16   A.   Yes, he agreed to meet.  We set up a date like the next day

17   or something and he set up a meeting, one of the weirdest

18   meetings I ever been.  It was in Sandborns.  Sandborns is like

19   a --

20   Q.   You flew to Mexico City?

21   A.   Yes, ma'am.

22   Q.   And Mr. Miller was with you?

23   A.   Yes, ma'am.

24   Q.   Did he go to the meeting?

25   A.   No, he was not allowed.  I told him that Mace and I was

1   there.  He said I'm going to meet with you, that's it.

2   Q.   Okay.  And who set the location of the meeting?

3   A.   Mr. Ramos, Alberto Ramos.

4   Q.   And you said it was Sanborns?

5   A.   Sanborns.  It's like a break [sic] for like IHOP or one of

6   those typical restaurants.

7   Q.   And where was it located, in Mexico City?

8   A.   It was located between the Sheraton Hotel where I stay --

9   where we stay and the C.F.E. offices.  It's between.  It's in a

10  big mall that they have in Reforma, one of the main streets in

11  Mexico, but it's all the way to the back.

12  Q.   A shopping mall?

13  A.   A shopping mall, yes.

14  Q.   And what do you mean by it's all the way to the back?

15  A.   It's -- let's say the mall is this room.  All the way to

16  the back is where the restaurant is.  And then he picked a table

17  that [sic] the most corner dark side of the restaurant.

18  Q.   And did you have a discussion with him?

19  A.   Yes.  I arrived --

20  Q.   What did you tell him?

21  A.   I told him that I was very worried that something is going

22  on with Marco, that he wasn't doing the right thing and he was

23  hiding a lot of information from me, that I don't have the

24  letters of credit and that he kept $8 million or $4 million on

25  the first payment for the letters of credit that I have never

1    seen and I requested for a long time.  I never got copies of the

2    whole box with the whole contract.  I never saw the whole

3    financials of the project.

4          And I -- I requested all of that and he said every

5    time I ask him, he says, you have them.  You have them or you

6    have to talk to the C.F.E.  And then he told me, well, he has

7    all of that information.  You're the owner of F.G.G. and he

8    should give them to you.  And I said, I'm telling you that I

9    don't get any information from him, nothing, that's why I'm

10   here.  You're the owner of the contract and I need to have

11   copies of all of that.

12   Q.   Did he give you copies?

13   A.   He didn't give me copies of anything.  He said let me think

14   about it.  Let me discuss it with or Eugenio and let me see what

15   I can do.  I'll call you later.

16   Q.   Did you go back and talk to Mace about this?

17   A.   Mace was outside the mall.  He was waiting for me.  And

18   when I came out, I told him what I did.  And he said, he didn't

19   give you anything?  No, he's going to review and see what he has

20   and contact me later.

21   Q.   What happened next?

22   A.   The most interesting thing that you ever thought.  I was

23   walking 15 minutes after the meeting and I got a phone call from

24   Marco Delgado.  He was furious.  He was furious that I went to

25   Mexico City on my own without his knowledge, that I talked to

DIRECT DAVILA                                                         296

```
 1    C.F.E. regarding all of these issues, that I was making a lot of
 2    stupid questions to the company and they were tired of me asking
 3    a lot of questions, and that if ever do something like that
 4    again, I was going to be in a lot of trouble.  They were going
 5    to sue me and take me out of the project and I was going to be
 6    in a lot of troubles.  He said you better stop asking the stupid
 7    questions.  They are tired of you asking stupid questions.
 8    Q.   How long -- did he say he knew you had talked to Ramos?
 9    A.   He told me I just talked to Alberto and he told me all
10    this.  And then I was -- suddenly, I felt like I was cornered in
11    in a room.  My attorney, which is my friend, he's betraying my
12    trust completely.
13    Q.   How many minutes passed from the time you left Mr. Ramos to
14    the time you got that phone call?
15    A.   Probably, 30 minutes.  We were walking back when I received
16    the phone call.  And then I said, well, my attorney and my --
17    he's betraying all my trust on these issues and now the owner of
18    the --
19    Q.   Was Mr. Miller present when you received that phone call?
20    A.   Yes, he did.  He was.
21             THE COURT:   I'm sorry?
22             MS. KANOF:  This would be a point if you wanted to
23    put --
24             THE COURT:   Yes.
25    A.   Yes.  Mace Miller was present when I received the call.
```

KATHLEEN A. SUPNET, CSR

1          THE COURT:  All right.

2          Ladies and gentlemen of the jury, we're going to

3   recess until tomorrow morning at 9:00.  Please remember the

4   instructions that I gave you about not discussing the case

5   amongst yourselves or with anyone else.  We're in recess until

6   then.

7          COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

8          (Jury recessed.)

9          THE COURT:  Mr. Gireud, I'll see you tomorrow at 9

10   o'clock tomorrow?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  All right.  We are in recess.

13          (Proceedings conclude for the evening.)

14                              * * *

15

16

17

18

19

20

21

22

23

24

25

1                          * * * * *

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.  I

4     further certify that the transcript fees and format comply with

5     those prescribed by the Court and the Judicial Conference of the

6     United States.

7     Signature:/S/KATHLEEN A. SUPNET        December 31, 2018
               Kathleen A. Supnet, CSR        Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25