1          IN THE UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF TEXAS

3                  EL PASO DIVISION

4                  VOLUME 12 Of 20

5

6   UNITED STATES OF AMERICA          EP:13-CR-0370-DG

7   v.                                EL PASO, TEXAS

8   MARCO ANTONIO DELGADO          September 15, 2016 a.m.

9
                          **STATEMENT OF FACTS**
10          THE HONORABLE DAVID C. GUADERRAMA
                UNITED STATES DISTRICT JUDGE
11

12

13   APPEARANCES:

14   For the Government:   Debra Kanof
                          Anna Arreola
15                        Luis Gonzalez
                          Assistant United States Attorney
16                        700 East San Antonio, Suite 200
                          El Paso, Texas 79901
17
     For the Defendant:   Maureen Franco
18                        Erik Hanshew
                          Assistant Federal Public Defender
19                        700 E. San Antonio, Suite 410
                          El Paso, Texas  79901
20
     Court Reporter:      Kathleen A. Supnet
21                        El Paso, Texas
                          (915)834-0573
22                        kathi.supnet5303@gmail.com

23

24          Proceedings reported by mechanical stenography,

25   transcript produced by computer-aided software and computer.

1                     CHRONOLOGICAL INDEX

2                      VOLUME 12 OF 20

3    September 15, 2016 a.m.                          PAGE   VOL.

4    GOVERNMENT'S
     WITNESS TESTIMONY      DIRECT      CROSS      VOIR DIRE        VOL.
5
     GIREUD, FERNANDO       3,14        114        8                12
6
     Court Reporter's Certification . . . . . . . . . . 150   12
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Open court.  Defendant and counsel present.)

2              (Jury present.)

3              THE COURT:  Let the record reflect that all members of

4    the jury are present, the United States through its assistant

5    United State's attorneys are present, the defendant and his

6    counsel are present.

7              Mr. Gireud is on the witness stand.

8                         FERNANDO GIREUD,

9         DIRECT EXAMINATION CONTINUED BY THE GOVERNMENT

10   BY MS. KANOF:

11   Q.   Mr. Gireud, you understand you are still under oath?

12   A.   Yes, ma'am.

13   Q.   Yesterday you were talking about a trip that you made to

14   Mexico.  When you made that trip -- did you make more than one

15   trip to Mexico to try to correct things?

16   A.   Yes, ma'am.  I make like about three -- three different

17   trips, yes, ma'am.

18   Q.   And when, if you can recall, was the next trip?

19   A.   If I recall correctly, I received a phone call, a very

20   strange phone call from Ingeniero Vargas to my house.  And he

21   said he wanted to talk to me and I said what do you want to talk

22   to.  Well, you need to come over so we can talk about what is

23   happening and I said okay.  I can be there --

24   Q.   Ingeniero Vargas?

25   A.   Ingeniero Vargas, yes.

1    Q.    Okay.  He doesn't work for C.F.E., correct?

2    A.    No, but he is the representative of the union employees, so

3    he's part of the C.F.E.

4    Q.    Okay.  And what did he ask you to do?

5    A.    He just asked me to see if I could meet him anytime soon,

6    so he wanted to talk to me.  And I said okay.  I mean he's

7    somebody high up in the rankings in C.F.E. and I --

8    Q.    In C.F.E.?

9    A.    In C.F.E. -- well, by representing the union, I don't know

10   if he's part or not, but he was somebody that he was always on

11   my previous meetings or somebody that was mentioned before in my

12   previous meetings with El Paso Electric, so I said okay.  I'd be

13   willing to go and see you.

14   Q.    Did you go see him?

15   A.    Yes, ma'am.

16   Q.    And what was the purpose of that meeting?

17   A.    When I arrived, we met in his office, in the back room of

18   his office and he says --

19              MR. HANSHEW:  Objection, Your Honor.  Hearsay.

20              THE COURT:  Sustained.

21              MS. KANOF:  Your Honor, I'm going -- it's the

22   Government's theory that Mr. Vargas is a co-conspirator with

23   Mr. Delgado, an unindicted co-conspirator.  And I know there

24   isn't a conspiracy indicted, but it's the government's theory

25   that -- well, I can actually put on evidence that would assist

```
 1    in that matter, predicate.
 2            THE COURT:  So if he's a co-conspirator and it's a
 3    statement in furtherance of the conspiracy, it would be an
 4    exception.
 5            MR. HANSHEW:  Well, as the Government conceded, Your
 6    Honor, they didn't indict, charge or even reference conspiracy
 7    in this case.
 8            THE COURT:  In relation to the rule that's not
 9    required.  That's only required that they actually be
10    conspirators, but I don't have any way of knowing that.
11            MR. HANSHEW:  Then, Your Honor, I guess we'd again
12    move for a mistrial on a constructive amendment to the
13    indictment.
14            (Court reporter asks counsel to use microphone.)
15            MR. HANSHEW:  We move for a mistrial for a
16    constructive amendment to the indictment, Your Honor, based on
17    yesterday's comments that they've added a new theory of fraud as
18    well as now they're adding a theory of conspiracy that's not
19    alleged in the superseding indictment, Judge.
20            THE COURT:  I'll overrule that the -- those two issues
21    are separate.
22            And if you, for purposes of the rules of evidence,
23    establish --
24            MS. KANOF:  I will, Your Honor.
25            THE COURT:  -- that relationship, then it will be an
```

1    exception, if not, then I'm sustaining the defense objection.

2    BY MS. KANOF:

3    Q.    Did you ever make a trip to Las Vegas with Mr. Vargas?

4    A.    Yes, ma'am.

5    Q.    And who else was on that trip?

6    A.    Marco and his girlfriend Liliana Narvaez was there.  It was

7    me and my wife.  It was Ingeniero Vargas and his wife.  And it

8    was Miguel Zaragosa and his wife.

9    Q.    Okay.  And what was the purpose of that trip to Las Vegas?

10   A.    Since we have a -- a permit to be a supplier of C.F.E.,

11   Miguel Zaragosa's business is --

12   Q.    Who is we?

13   A.    I'm sorry?

14   Q.    We have a permit.  Who is we?

15   A.    F.G.G. Enterprises has a permit to be a supplier, a formal

16   supplier for El Paso -- I mean for the utility.  Miguel

17   Zargoza's was on the same building that I was and he -- we met

18   many occasions in the floor and he -- his business is gas

19   business, and he thought he could have a chance to sell gas to

20   the C.F.E.  So they were going to be in Las Vegas and it was

21   like Ingeniero Vargas was going to be in Las Vegas, so we tried

22   to agree and tried to be together on the trip and see if we can

23   talk about the gas business.

24   Q.    And did you have a private conversation with Mr. Vargas?

25   A.    Yes, I did.

1    Q.   Who initiated the conversation?

2    A.   Marco Delgado asked me if we were having dinner and he

3    asked me to come out with him, and he says, Ingeniero Vargas

4    needs to ask you a question or he needs to talk to you private.

5    And I said what about, Marco?  He said just come over here.

6              And I went to sit down with Ingenieria Vargas and

7    Marco left that -- that -- the room -- or I don't know if he --

8    to be honest with you, I don't remember if he was exactly there,

9    but we just moved to a corner in the restaurant and Ingenieria

10   Vargas asked me for half a million dollars.

11   Q.   What did he ask you for half a million dollars for?

12   A.   He told me when you get paid, I need to get half a million

13   dollars.

14   Q.   When you get paid from what?

15   A.   From the project, when you get the payment.

16   Q.   Which project?

17   A.   From the Agua Prieta project.  When you get paid from the

18   Agua Prieta project, I need you to give me $500,000.00, because

19   I've been doing a lot of work on this and I said --

20             THE COURT:  Ms. Kanof, I think we need to take the

21   rest of this matter up outside the presence of the jury, so we

22   can establish whether or not this meets the exception to the

23   rule, so let's do that.

24             Ladies and gentlemen of the jury, if you would follow

25   Mr. Heidtman to the jury room.  Remain there.  I'm hoping this

 1     won't take more than ten minutes and we should be back and get

 2     started.

 3              COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

 4              (Jury recessed.)

 5              THE COURT:  You-all may be seated.

 6              MR. HANSHEW:  Your Honor, just for the record, I

 7     object again.  This is not even establishing co-conspiraty.

 8     It's also going to establish that there's a bribe, entirely

 9     separate crime.  Again, not alleged anywhere in this indictment,

10     the scheme or artifice at all.  They're literally proving up an

11     entirely different crime.  It's not just this is a

12     co-conspirator unindicted, obviously, but now they're trying to

13     prove up an entirely separate crime, Judge.

14              THE COURT:  All right.

15              Ms. Kanof?

16                        FERNANDO GIREUD,

17          VOIR DIRE EXAMINATION BY THE GOVERNMENT

18     BY MS. KANOF:

19     Q.   And what did you respond?

20     A.   I told him I cannot give you any money.  I don't have

21     money.  I cannot give you any money.  I don't know why you are

22     asking me for this.

23     Q.   Okay.  Going back to Mexico City, you received a call from

24     Ingeniero Vargas and did you go to Mexico City?

25     A.   Yes, ma'am.

1    Q.   And when you met with Mr. Vargas, what did he tell you?

2    A.   He told me --

3              MR. HANSHEW:  Objection.  Hearsay, Your Honor.

4              THE COURT:  For -- this is a Rule 104 hearing to see

5    if there is an exception, so the rules don't apply at this

6    particular portion.

7    BY MS. KANOF:

8    Q.   Go ahead.  What did Mr. Vargas tell you?

9    A.   He told me that -- he said we need to get -- Marco needs to

10   get out of the project.  He is doing a lot of crazy things.  He

11   doesn't have to be in the project.  He owes me a lot of money

12   and he needs to be out of this project.  So what I am going to

13   suggest is that you go and talk to Alberto Ramos and you get

14   Marco out of the project.

15             MS. KANOF:  That's it.

16             Your Honor, government's theory -- there's like

17   $4 million mission.  And in the Turks and Caicos account, the

18   very first payment after the $20 million goes into the Turks and

19   Caicos account is to a company called, Enero (phonetic)

20   Proyecto.

21             THE COURT:  All right.  There is two payments, I

22   guess.

23             MS. KANOF:  There's several payments to Ener

24   Proyectos.  And we have -- it's the government's theory that

25   Ener Proyectos is the bribe money.  And the -- that the

 1    contract, the ability of F.G.G., who did not have the power and

 2    did not meet the specifications for a bid to contract was

 3    because Mr. Vargas is barely -- basically the individual who had

 4    all of the power.  And Mr. Delgado had a lengthy relationship

 5    with Mr. Vargas, both personal relationship Mr. Vargas.

 6           Mr. Pimental, who is not going to testify, told us

 7    there was a bribery relationship in order to obtain this

 8    contract and that Mr. Vargas had asked for six percent of the

 9    contract in order to make sure that F.G.G. got the award of the

10    contract.

11           The purpose here of this testimony is, of course, if

12    the Court doesn't think it's relevant is that Mr. Vargas is a

13    co-conspirator with Mr. Delgado, but Mr. Gireud has not -- he

14    refused to pay the bribe.  And if a bribe did occur or the

15    inference of a bribe is certainly part of the scheme and

16    artifice to the fraud, so the government would offer or believes

17    that Mr. Vargas -- anything that Mr. Vargas said was the word of

18    a co-conspirator.

19           THE COURT:  All right.

20           Mr. Hanshew.

21           MR. HANSHEW:  Again, Your Honor, I mean that the --

22    the confusion this will cause with the jury about this topic is

23    absolutely prejudicial hear.  Again it goes back to there's no

24    charge of conspiracy in the indictment.  There's no mention of

25    any type of bribe.  And by the way, for the record, since

 1    Ms. Kanof is mentioning what Mr. Pimental said, Mr. Pimental

 2    said that Mr. Gireud is the one that went and paid the bribes in

 3    Mexico.  So you can see how this is going to open a can of worms

 4    of a trial within a trial, but worse, against my client's

 5    constitutional right to have due process.

 6             There's an indictment.  There's a superseding

 7    indictment they're to be bound to.  I mean this is a completely

 8    new -- not even charged charges, count, theory.  I mean this is

 9    absolute outside the boundaries, Judge.

10             MS. KANOF:  If I may respond?

11             There's a huge theory of law that comes out of 404(b)

12    about the difference between separate crimes and intrinsic acts.

13    And an intrinsic act to a charged act is always admissible and

14    basically you don't have to charge every intrinsic act.  There

15    were a lot of other crimes committed in order to facilitate

16    stealing this money, and the bribe is an intrinsic act to the

17    accomplishment of the wire fraud and the money laundering in

18    this case.

19             THE COURT:  We are looking at two weeks just trying

20    the primary case.  I'm not sure that if we open up this can of

21    worms and then Mr. Hanshew is going to want to spend I don't

22    know how much time showing that Mr. Gireud is also part of that

23    conspiracy and therefore his testimony should be considered

24    through that prism.  I think I'm just going to sustain the

25    hearsay objection and keep that from the jury at this time.

1          MS. KANOF:  May I ask --

2          THE COURT:  You might convince me later.  I mean we're

3    going to be here for two weeks and it can all change.

4          MS. KANOF:  We think we'll be done about Monday or

5    Tuesday of next week, Your Honor, so -- and I'd like that, so...

6

7          MR. HANSHEW:  Your Honor --

8          MS. KANOF:  Let me ask the Court, if -- may I ask the

9    question:  After you spoke to Mr. Vargas, what did you do next?

10         THE COURT:  So long as that's not going to be a

11   backdoor entrance into the hearsay.

12         MS. KANOF:  I actually don't even know what his answer

13   is going to be?

14         THE COURT:  Let's ask him and find out.

15   BY MS. KANOF:

16   Q.   Mr. Gireud, after you spoke to Mr. Vargas, what did you do

17   next?

18   A.   I requested -- actually, he set up a meeting with me and

19   Alberto Ramos again.  So I went to see that afternoon Alberto

20   Ramos and I told him the same things that I talked to him

21   before, that I didn't have a lot of documents, that I needed to

22   have this, and I'm not getting anything anymore.  So I decided

23   to get Marco out of the project and I told him that I had a

24   meeting with Ingeniero Vargas and that he agrees that he needs

25   to get out.

```
 1            And I provided him with two documents; one was to
 2   revoke Marco Delgado's power of attorney in case he was using
 3   and stealing something.  I said, I'm giving you the C.F.E.
 4   document to revoke the powers of Marco Delgado in this contract,
 5   and second, I want the change of accounts to the original estate
 6   on the original contract.  I want everything back to be paid to
 7   F.G.G. Enterprises as according to the main contract.
 8            MS. KANOF:  We would want to admit those two exhibits
 9   that he provided to Ramos, Your Honor.
10            THE COURT:  The revocation of the power of attorney
11   and the --
12            MS. KANOF:  And trying to change the wire
13   instructions.
14            MR. HANSHEW:  I don't have a problem with that, Judge,
15   but I'd also ask -- and no problem with those, Your Honor.
16            THE COURT:  Okay.
17            MR. HANSHEW:  But we'd ask for an instruction to the
18   jury to disregard the information earlier, Judge.
19            THE COURT:  Yes, sir.  All right.
20            Mr. Heidtman?
21            (Jury present.)
22            THE COURT:  Let the record reflect that all members of
23   the jury are present, the United States through its assistant
24   United State's attorney is present, the defendant and his
25   counsel is present.  The witness, Mr. Gireud, is on the witness
```

```
 1    stand.
 2           Ladies and gentlemen of the jury, disregard the last
 3    statement from the witness, everything that he said after his
 4    statement that I sat down with Mr. Vargas and Marco left the
 5    room.  Everything after that you are to disregard the comments
 6    about the half-million-dollars.  You must disregard and not
 7    consider it for any purpose whatsoever.
 8                          FERNANDO GIREUD,
 9           DIRECT EXAMINATION CONTINUED BY THE GOVERNMENT
10    Q.   Okay.  Mr. Gireud --
11           THE COURT:  Mr. Hanshew, do you require anything
12    further?
13           MR. HANSHEW:  I think that's it.  Thank you, Judge.
14           THE COURT:  Ms. Kanof?
15           MS. KANOF:  May I proceed, Your Honor?
16           THE COURT:  Yes, ma'am.
17    BY MS. KANOF:
18    Q.   Mr. Gireud, let's get back to Mexico when you met with
19    Mr. Vargas?
20    A.   Yes, ma'am.
21    Q.   And without saying what Mr. Vargas told you, after you met
22    with Mr. Vargas, what did you do?
23    A.   I went to see Mr. Alberto Ramos in his --
24    Q.   And where did you meet with Mr. Ramos this time?
25    A.   In a restaurant, not in the same location that I mentioned
```

```
 1    before.  We went to another restaurant.  It was pretty close to
 2    the same restaurant, to the C.F.E. offices.
 3    Q.   Were you by yourself?
 4    A.   Yes, I was by myself.
 5    Q.   And what did you tell Mr. Ramos this time?
 6    A.   I told Mr. Ramos that because of all of the issues that we
 7    talked before that I still don't have any information or
 8    anything, and I said I want Marco out of the project.  I give
 9    you documents, two documents; number one, one to revoke his
10    power of attorney to do -- to represent F.G.G. Enterprises
11    again, and also I give him wire transfer instructions to bring
12    the accounts back to the original accounts in the bank in
13    El Paso for F.G.G. Enterprises, the company.
14    Q.   I have displayed on the screen Government's Exhibit
15    Number 66.  Do you see the number before we go forward?
16    A.   Yes, ma'am.
17    Q.   Is that the power -- revocation of power of attorney that
18    you gave to Mr. Ramos that day?
19    A.   Yes, ma'am.
20              MS. KANOF:  We'd move Government's 66 into evidence.
21              MR. HANSHEW:  No, objections.
22              THE COURT:  GX-66 is admitted.
23    BY MS. KANOF:
24    Q.   Okay.  So what -- your understanding of Mr. Ramos' position
25    at C.F.E. was what?
```

1    A.    He was a subdirector of projects.  He was the right hand

2    of -- I'm talking about position of --

3    Q.    Ramos.  Why would you give this to Ramos?

4    A.    Oh, because he was the main point of contact on everything.

5    In the contract, he was the one -- he was the subdirector of

6    contracts, so he was the person that I should talk to, yes.

7    Q.    And who drafted this for you?

8    A.    This one I drafted myself or probably Mace helped me draft

9    this revocation.

10   Q.    And what does it say?

11   A.    It says that on this 14th day of April, 2010, Fernando

12   Gireud -- De Jesus Gireud, which is my full name -- appear

13   before me, the undersigned authority, and it stated that he's

14   above 21, he is the legal representative of F.G.G. Enterprises,

15   LLC.  The special power of attorney dated July 13, 2009, issue

16   at F.G.G. Enterprises, LLC, in favor of Mr. Marco Delgado for

17   response to Commisión Federal de Electricidad Mexican United

18   States public bid number this document, is hereby revoked.

19   Q.    And you said before that sometimes -- do you know who this

20   notary was?

21   A.    I'm pretty sure that it was a notary from the West -- Wells

22   Fargo bank.

23   Q.    Okay.  So with regard to the revocation, what did you think

24   handing that revocation of power of attorney would do?

25   A.    That number one, revoke this power of attorney that he had

 1   or --

 2   Q.   You have in front of you on the screen Government's Exhibit

 3   Number --

 4        MS. KANOF:  Could you display, please?  Could

 5   somebody --

 6        THE COURT:  Is that already in evidence --

 7        MS. KANOF:  It is already in evidence.

 8        THE COURT:  -- GX-4?

 9        THE WITNESS:  Yes.

10   A.   I was -- the purpose of that was, number one, to revoke his

11   power of attorney that Marco had in his power.

12   BY MS. KANOF:

13   Q.   Okay.  Is this the power of attorney that you were

14   revoking, the one that's on the screen now, Number 4?

15   A.   Yes, ma'am.

16   Q.   That you, yourself, had signed, giving Mr. Delgado -- okay.

17   That you signed initially on the 13th.  Does it say that you

18   signed it --

19   A.   Yes.

20   Q.   -- on the 13th day of July of 2009; is that correct?

21   A.   Yes, ma'am.

22   Q.   Okay.  And that's your signature.  And it was also

23   notarized, correct?

24   A.   Yes, ma'am.

25   Q.   So back to government's Exhibit Number 66, you are

1   referring specifically in Government's Exhibit Number 66 to the

2   special power of attorney of that day, correct?

3   A.   Yes, ma'am.

4   Q.   Did you ever give C.F.E. any other special power of

5   attorney for Mr. Delgado?

6   A.   No, I never did.

7   Q.   This is the only -- that one on July 13th of 2009, was it

8   the only power of attorney you gave them?

9   A.   Yes, ma'am.

10  Q.   And you gave this to Mr. Ramos --

11  A.   Yes, ma'am.

12  Q.   -- to revoke Mr. -- And what was the purpose of revoking

13  Mr. Delgado's power of attorney?

14  A.   So I can take control of all of the project and meetings

15  and everything in Mexico City, that I was going to take over

16  everything and get the power of the company back and remove

17  Marco Delgado from any business dealings.

18  Q.   This -- was this date, April 14th, around -- somehow around

19  at the time that you were meeting Mr. Ramos?

20  A.   Yes, ma'am.

21  Q.   And also it was after the first payment, correct?

22  A.   Yes, ma'am.

23  Q.   But was it before the second payment?

24  A.   I think it was before the second payment, yeah, the --

25  Q.   And you said on that day that you gave him a second

1    document, correct?

2    A.   Yes.  The second document was instructing the C.F.E. to

3    change the accounts back to the original contract, which was --

4    Q.   I have before you Government's Exhibit Number 77.  Do you

5    see that number?

6    A.   Yes, ma'am.

7    Q.   And 77A, which is a translation into English.  Is 77 the

8    document -- a second document that you gave to Mr. Ramos?

9    A.   Yes, ma'am.

10         MS. KANOF:  May we -- we move for admission of 77 and

11   77A, Your Honor.

12         MR. HANSHEW:  No, objection, Your Honor.

13         THE COURT:  GX-77 and 77A are admitted.

14   BY MS. KANOF:

15   Q.   Okay.  So did -- who typed this up?

16   A.   If I recall correctly, Ingeniero Vargas' wife was a Mexican

17   attorney and she drafted this document and she -- and I just put

18   in our letterhead and I provide this document.  I'm sorry.

19         MS. KANOF:  I don't know who the force is with, Your

20   Honor.

21         But not with my legs, that's for sure.

22   BY MS. KANOF:

23   Q.   And so Genaro Vargas' wife drafted this document?

24   A.   Yes, ma'am.

25   Q.   And how did you get it?

1  A.   I don't recall if she gave it to me right there or she sent

2  it to me in an e-mail.  I looked for the e-mail before and I

3  couldn't find the e-mail, but she drafted this document for me.

4  She was an attorney in Mexico and she said this is what you need

5  so they can move the accounts back.

6  Q.   Okay.  And you handed this document -- what did you do this

7  document after she gave it to you?

8  A.   Well, I produced -- I put in our letterhead and I provide

9  this document to Ingeniero Alberto Ramos and I told him to

10  provide this to Ingeniero Laris, which is the boss, the head of

11  the projects department.

12  Q.   Okay.  So the English translation 77A is now in front you.

13  Let's go through it.

14       First, before many of the F.G.G. documents you looked

15  at had the Remcon address on it, which you testified was

16  Mr. Delgado's virtual office, correct?

17  A.   Yes, ma'am.

18  Q.   Now this one has a Rio Bravo and a suite.  What office is

19  that?

20  A.   This is the F.G.G. Enterprises office that I was renting,

21  leasing for the company.  That was the real address.

22  Q.   Did you pay rent for that office -- for the F.G.G. office

23  out of the F.G.G. account?

24  A.   Yes, ma'am.

25  Q.   And what's the date of this document?

```
 1    A.    May 11, 2010.

 2    Q.    And to who did you address the letter?

 3    A.    To Mr. Eugenio Laris Analis, who was the head of the

 4    project in Mexico City for the C.F.E.

 5    Q.    Why didn't you address it to Ramos -- well, who selected

 6    that this letter be addressed to Mr. Laris instead of Mr. Ramos?

 7    A.    That's the draft that Genaro Vargas' wife gave me and he --

 8    she told me to address this to him since he was the head and --

 9    Q.    Is he the director for financial investment projects?

10    A.    Yes, ma'am.

11    Q.    And did -- I understand she drafted it, but did she explain

12    to you what it said?

13              MR. HANSHEW:  Objection.  Hearsay, Your Honor.

14              MS. KANOF:  I didn't ask whether --

15              THE COURT:  It's overruled.

16              You can answer the question that was asked.

17    BY MS. KANOF:

18    Q.    Did she explain it to you?

19    A.    Yes.  She told me that --

20    Q.    Don't say what she said.

21              Did you read it before you provided it to him?

22    A.    Yes, ma'am.

23    Q.    In Spanish?

24    A.    Yes, ma'am.

25    Q.    What does it say?
```

1  A.   It says that in reference of the procurement of goods

2  contract that we have with the C.F.E. -- and the number is right

3  there, FAEGP0012009, signed last January 6th of the current

4  year, by and between F.G.G. Enterprises between C.F.E. and

5  F.G.G. Enterprises.  And also in reference to your letter, the

6  DPIF0862000, dated March the 3rd and addressed to licenciado

7  Carlos Flores Salinas, Deputy Trustee of the Banco Nacional de

8  Comercio Exterior, National Bank of International Commerce,

9  which is the trust fund that C.F.E. put the money for the

10 project.  And this is also in reference to the letter that they

11 sent to change the accounts to the Caribbean.

12 Q.   Have you seen that letter yet, the letter that was to

13 Mr. Laris to change the accounts to Turks and Caicos?

14 A.   It was provided to me in Mexico City that letter.

15 Q.   That day was the first time?

16 A.   That day was the first time I -- no.  No, ma'am.  I think

17 the letter -- the copy of the letter was provided to me on the

18 first meeting that I went with -- with --

19 Q.   With Mr. Ramos?

20 A.   With Mr. Ramos.

21 Q.   Okay.  So you were by that time aware of that letter?

22 A.   Yes, ma'am.

23 Q.   So go ahead, please.

24 A.   So that's what I reference, that letter into this letter

25 where our request was made for a change in the location for

1    payments and accounts:  We are informing you that this change

2    was not duly notified to or not approved by F.G.G. Enterprises.

3              So I'm letting them know that I never approved that

4    transfer of funds.

5              The power of attorney held by Mr. Marco Delgado does

6    not authorize him to carry out said transactions without the

7    authorization of Mr. Fernando Gireud --

8    Q.   And then does it define who you are with regard --

9    A.   -- who -- who is on the letter as the sole owner of F.G.G.

10   Enterprises, LLC.  Therefore, I respectfully request that you

11   issue your greatly appreciated instructions in order that the

12   accounts will maybe restore just as they appear in the original

13   contract, which will be as indicated.

14             And then I'm giving the transfer instructions.

15             Also, I hereby inform you the power of attorney held

16   by Mr. Marco Delgado to make decisions in the state of F.G.G.

17   Enterprises has been revoked.  See attached letter of

18   revocation.  So...

19   Q.   Did you meet with Mr. Laris?

20   A.   No.  I tried to meet with him several times, but I was

21   always blocked.

22   Q.   But you what?  I'm sorry?

23   A.   Blocked.  I couldn't ever see him.

24   Q.   Okay.  And so what did you ask of Mr. Ramos with regard to

25   this letter?

1   A.   To provide all of that information, number one, to Eugenio

2   Laris, which was his boss, and to follow the instructions that

3   I'm giving him in the letter.

4   Q.   And the date of this letter is May 11th of 2010?

5   A.   Yes, ma'am.

6   Q.   Is that after the first payment?

7   A.   Yes, ma'am.

8   Q.   But is it before the second payment?

9   A.   Yes, ma'am.

10  Q.   The second payment, did it -- was it deposited by C.F.E.

11  into the Wells Fargo account that is indicated here in this

12  letter?

13  A.   No, ma'am.

14  Q.   And by the way, the Wells Fargo account that you designate

15  in this letter, is it the Wells Fargo account that's in the

16  original contract for the sale of the equipment?

17  A.   Yes, ma'am.

18  Q.   So the second payment, the $12 million payment, where did

19  it go?

20  A.   To the Turks and Caicos account, to the original account

21  that he opened himself.

22  Q.   After you had made -- and that was in July, right?

23  A.   Yes, ma'am.

24  Q.   After you made these efforts, did the money -- the second

25  payment did not follow this letter; is that correct?

1    A.   Alberto Ramos didn't follow any of my instructions and the

2    second payment came and it went directly to the same account as

3    the original payment.

4    Q.   And with regard to the power of attorney, did Marco Delgado

5    continue to represent F.G.G.?

6    A.   Yes.

7    Q.   Did C.F.E. continue to resist communicating with you?

8    A.   Yes, ma'am.  In fact, the day I provide this documents to

9    Ramos, the same thing happened.  Later on in the day, I receive

10   another phone call from Marco Delgado completely upset, just

11   like first time, saying, don't you understand you shouldn't be

12   talking to them?  I'm the owner of the project.  I'm the one

13   that had the project.  You have nothing to do with this.  You

14   are not going to get me out of this prospective.  The C.F.E. is

15   with me on this and they are not going to let you do anything.

16   Q.   He said C.F.E. put him on that?

17   A.   Yes.

18   Q.   Did he work for C.F.E.?

19   A.   No, ma'am.

20   Q.   He was going to get paid as your attorney, correct?

21   A.   Yes, ma'am.

22   Q.   62-and-a-half-percent of some figure?

23   A.   Yes, ma'am.

24   Q.   Do you know whether he was going to get paid by C.F.E.?

25   A.   No, ma'am.  I don't -- I don't know.

1    Q.   If they put him on the project?

2    A.   I don't know, ma'am.

3    Q.   Did you ever confront Mr. Delgado?

4    A.   Yes, ma'am.

5    Q.   When was that?

6    A.   Well, that same day he called me and he told me again that

7    I shouldn't be doing this, that the C.F.E. and especially

8    Alberto Ramos was very offended and very upset at me, that I'm

9    asking the wrong questions, that I shouldn't be asking to do

10   this, and that he was dealing with Marco and he wasn't going to

11   take him out.  He is part of the project.  He said I will take

12   this to the proper people, but obviously he didn't bring any

13   documents to anybody.

14   Q.   When you got back to El Paso, did you talk to Mr. Delgado

15   about it again?

16   A.   Yes, I talked to Marco Delgado again.

17   Q.   And tell the jury what happened then.

18   A.   We -- one of the few instances that he really went to the

19   office, we were sitting in the conference room in the office.

20   It was himself, Mace and I, and I asked him a very strong

21   question.  I asked him, are you bribing C.F.E. officials?  Are

22   you paying C.F.E. officials?  And he saw me start looking all

23   over the place in the room like looking for cameras or

24   something, thinking that I was recording him or something, and

25   he took me out of the room and he says, you know I will never do

1    that, you know, I'm an attorney, you know.  You signed --

2    because in the contract, I signed a letter to Mitsubishi that I

3    wasn't going to be -- I don't know what it's called --

4    international code that you cannot bribe officials of other

5    projects, and he told me I will never ever do that to you.  We

6    are together on this.  You have to trust me.  I'm your friend.

7    I'm doing the right thing.  I know the law.  I know what I'm

8    doing, but I have never paid anything to any C.F.E. officials.

9    So he denied.

10   Q.   After that meeting, did he continue to -- did you ask him

11   anything else after that?  Did you ask him, for example, for a

12   copy of the contract?

13   A.   Yes.  Probably, yes, ma'am.  One of the things that I

14   always have in my mind that I never -- since I never got, every

15   time I had an opportunity I asked him for, please, I still need

16   to see the letters of credit.  I need to see the documents.  I

17   need to see everything so I can feel better.  Every time people

18   ask me for things, I feel stupid being the owner of the company

19   and not being able to show anything because I don't have

20   anything.

21   Q.   Okay.  Mr. Gireud, you talked a little bit about what your

22   purpose was, the separate purposes between you and Mr. Delgado

23   and Mace Miller.

24   A.   Yes, ma'am.

25   Q.   Your background is engineering; is that correct?

1    A.   Yes, ma'am.

2    Q.   Okay.  Did you attend the technical meetings between

3    Mitsubishi and C.F.E.?

4    A.   Probably only once and most of the meetings were held by --

5    by supposedly -- I mean Marco and the C.F.E. people.  And one

6    time that the C.F.E. requested my presence there, because they

7    were having some issues with Mitsubishi, Marco and I went to

8    Mexico and we -- he said, let's go to breakfast.  We went to

9    breakfast and then we went to the meeting at 10 o'clock.  And it

10   happened that the meeting was at 8 o'clock.  So there was always

11   things that he did so I don't meet with the people, so I don't

12   meet with the team, so I don't get information.  He knew that if

13   I was there, I'm going -- I was going to be able to find out a

14   lot of things.

15   Q.   Okay.  Well, let's talk about -- sort of find out about a

16   lot of things.

17            Currently, exactly, technically what do you do in your

18   job?

19   A.   I am an electric engineer and I design distribution systems

20   for data centers.

21   Q.   For data centers?

22   A.   Yes, ma'am.

23   Q.   What do you mean by distribution of data centers?

24   A.   A data center is a place that companies like Google,

25   Microsoft, all of these companies, that you'll have -- Facebook,

```
 1    for example, that you put a picture on the web.  Data center is
 2    a place where they store all of this information from millions
 3    of Facebook members, I guess.
 4    Q.    When you say, design, do you design the wiring systems?
 5    A.    Yes.  What they are they are just big racks and racks of
 6    storage media, so they can store all of this information that I
 7    said data coming back.  So my job is to design the distribution
 8    system, in other words, to provide electricity to those racks.
 9    Q.    Do sometimes do those -- and where are they, the storage
10    systems?
11    A.    Where are they?
12    Q.    How did the storage systems receive the information?
13    A.    Information is being received by -- it could be a lot of
14    mediums -- different mediums.  It could be a T1, a T2, a T3.
15    These are names that -- AT&T, for example, calls his data
16    transmission communication systems.  They call it T1.  The
17    difference between T1 and T2 is the speed, how fast do they do
18    [sic].
19    Q.    Okay.  And when you say data transmission for AT&T, do you
20    travel around the country?
21    A.    Yes, ma'am.
22    Q.    Why do you do that?
23    A.    Why do I travel around the country?  Because sometimes we
24    sell a customer the products and they want me to go help them
25    install the equipment and look and make sure that they're doing
```

1    the right thing.  Because usually this -- our equipment -- we

2    don't do the installation of the equipment.  We just sell the

3    equipment.  So usually they hire a general contractor and

4    sometimes they ask me, the owners or the reps or the people who

5    sold them the product, can you help us supervise or just to be

6    there as a moral support or if they have a question; how do we

7    put this joint or how do we put this connection, can you help us

8    and make sure that we're doing the right thing.  So, yes, I

9    traveled all over the country.

10   Q.   I'm going to draw your attention to Government's

11   Exhibit Number 40, which is in evidence.  It's an e-mail from

12   you to Mr. Ponce and copied to Mr. Delgado.

13        Why did you put both -- two different e-mail addresses

14   for Mr. Delgado?

15   A.   Because you never know what is he using.  Sometimes we

16   send -- we get e-mails -- actually, most of the e-mails that we

17   got from him, they are coming from AOL.  Hardly ever I remember

18   seeing Delgado and Associates.

19   Q.   Okay.  But you have it there, so how did you get --

20   A.   I wanted to make sure that he gets it.

21   Q.   And where were you when you sent this e-mail?

22   A.   In our office in Rio Bravo Street.

23   Q.   And were you on a computer?

24   A.   Yes, ma'am.

25   Q.   And did you -- you typed this e-mail on your computer?

1    A.   Yes, ma'am.

2    Q.   And was your computer plugged into the wall?

3    A.   Every computer has to be plugged into the wall or into a

4    device that it's wired, yes.

5    Q.   Okay.  And for -- now Mr. Delgado's AOL account, do you

6    know where Mr. Delgado might have been when he received this

7    e-mail?

8    A.   No, ma'am.

9    Q.   But in order for it to be transmitted to AOL, does it have

10   to go through a wire system?

11   A.   Completely, ma'am.

12   Q.   And if I told you that AOL's -- do you know what a server

13   is?

14   A.   Yes.

15   Q.   Do you work in your business with servers?

16   A.   Yes, ma'am.

17   Q.   What part of your business encompasses servers?

18   A.   Most of our customers have servers and we are providing

19   electricity and power to those servers.

20   Q.   Okay.  So --

21        MR. HANSHEW:  Your Honor, at this point I'm going to

22   object.  This appears to be building up an expert foundation.

23        MS. KANOF:  I'm done.  I'm done, Your Honor.  I just

24   wanted to lay a predicate for Government's Exhibit Number 53A.

25   BY MS. KANOF:

1    Q.   Government's Exhibit Number 53 --

2              MS. KANOF:  -- which I do not believe is in evidence.

3    Is it?

4              THE COURT:  It is not.

5    BY MS. KANOF:

6    Q.   I'm just going to ask you to look at this letter,

7    Government's Exhibit Number 53.  Do you ever recall, it's -- we

8    have referred to it before as letter number 20 from C.F.E.  Did

9    Mr. Delgado ever show you this letter?

10   A.   No, ma'am.  I've never seen this letter.

11   Q.   But you speak Spanish, so is this letter about a technical

12   meeting that's going to be held?

13   A.   Do you mind if I read it?

14   Q.   To yourself.

15   A.   (Complies.)

16              No, ma'am.  It says right there Commission

17   Technical --

18   Q.   No, no, no.  To yourself.

19   A.   Oh, I'm sorry.

20   Q.   The bottom paragraph, does it talk about a technical

21   meeting being held?  Just "yes" or "no."

22   A.   No, ma'am.

23   Q.   Okay.  Let me go to the English version or the past --

24   excuse me -- the past meeting of the technical meeting.

25   A.   Um --

1    Q.   The technical -- the trust technical committee?

2    A.   (Reading; mumbling.)  Okay.

3    Q.   Now that you've read it to yourself, you said you only

4    attended one technical meeting; is that correct?

5    A.   Yes, ma'am.

6    Q.   And when you were at that technical meeting was Mr. Delgado

7    there?

8    A.   Yes, ma'am.

9    Q.   Did you attempt to offer your opinion or advice or comments

10   about what was going on technically?

11   A.   Yes, ma'am.  I ask a lot of questions in the meeting and

12   things happening and I think that meeting was because they had a

13   disagreement with what the specs said and what Mitsubishi was

14   preparing, so it was actually a fight between the C.F.E. people

15   and Mitsubishi trying to agree with something that they were

16   disagreeing.

17   Q.   Why were you only -- were you aware there were many other

18   technical meetings going on?

19   A.   Yes, ma'am.

20   Q.   How were you aware?

21   A.   Usually, Kevin Beddard send me copies or send me e-mails.

22   He copied on most of the e-mails and they were requested or they

23   were going to have a meeting at 9 o'clock in the meeting and

24   things like that, so...

25   Q.   Why didn't you go to the technical meetings?

1    A.   Because Marco said that he was taking care of that or that

2    the group of C.F.E. was taking care of that.  That was a

3    discrepancy between Mitsubishi and C.F.E. and that was something

4    that they were already taking care of.

5    Q.   Were you aware that Marco Delgado was going to all of the

6    technical meetings?

7    A.   I presume he was, yes.

8    Q.   Did he report back to you about what happened at those

9    meetings?

10   A.   Many times he did.  Many times he called me and he said we

11   took care of this or now it's not a problem or he always

12   mentioned that we got Mitsubishi his -- he's not going to

13   proceed what they want or he's -- they're going to do what we

14   need or something like that.  But yes, once in a while he gave

15   me reports.

16   Q.   Did you ask to go to the technical meetings?

17   A.   Yes, ma'am.

18   Q.   And was that -- I mean, why did you take Mr. Delgado's

19   response that you didn't need to or that you shouldn't go or

20   whatever his response was, why did you take his word for it?

21   A.   Because I trust him.

22   Q.   Starting with Government's Exhibit Number 64 -- actually,

23   this one is a copy to you -- did you -- did Mr. Delgado show you

24   e-mails between himself and Mitsubishi that you were not on,

25   privy to?

1    A.   Only a few times.

2    Q.   Well, how do you know it was only a few times if you

3    weren't privy to the e-mails?

4    A.   Well, I was -- he sent me some of the ones like you saw in

5    previous e-mails that we reviewed first, that he -- that he

6    showed.

7    Q.   Okay.  Let me show you Government's Exhibit -- for example,

8    Government's Exhibit Number 63, from Patrick Altamura about the

9    subcontract.  Did you have anything to do with development or

10   drafting of the subcontract?

11   A.   No, ma'am.

12   Q.   Government's Exhibit Number 64, from Mr. Delgado to Patrick

13   Altamura and John Adams, revisions to the subcontract.  Did you

14   have anything to do with revisions to the subcontract?

15   A.   No, ma'am.

16   Q.   Did Mr. Delgado show you either of these e-mails?

17   A.   As I said before, I don't know how many e-mails he had.  He

18   showed me once in a while.

19   Q.   You don't recall?

20   A.   I don't recall.

21   Q.   Okay.  Did you know that they were amending the original

22   contract between F.G.G. and Mitsubishi?

23   A.   Not that I recall, ma'am.

24   Q.   So were you -- you didn't -- did you sign the subcontract

25   or do you recall the amendment -- I'm sorry -- the amendment to

1   the subcontract?

2   A.   I don't recall.

3   Q.   Government's Exhibit Number 65, another e-mail from Patrick

4   Altamura to Mr. Delgado and John Adams, again discussing the

5   amendment to the subcontract.  Did you participate in responding

6   to or addressing any of the changes that they wanted to make?

7   A.   No, ma'am.

8   Q.   Government's Exhibit Number 68.  On April 20th, had you

9   already provided C.F.E. with the letter to revoke Mr. Delgado's

10  power of attorney and the letter to change the wiring

11  instructions to the F.G.G. account?

12  A.   Yes, ma'am.

13  Q.   And Mr. Beddard sent you Government's Exhibit Number 68 and

14  copied a lot of individuals on this particular e-mail.  Do you

15  recall this e-mail?  Let me show you his letter.  It's about

16  breaching the contract.  Do you remember receiving this?

17  A.   If you show me the letter, I will.

18  Q.   That's it right there.  Dear sir, from Mr. Beddard.

19  A.   Oh, I'm sorry.

20  Q.   If you want to take a second to review it.

21  A.   Yes, please.

22           Yes, ma'am.

23  Q.   Were you aware of the payment schedule?

24  A.   No, ma'am.  I've seen it in documents that you've shown me

25  before that they have -- that they were two different payment

1    schedules.

2    Q.   Let me show -- you said that you got some of the -- of the

3    documents from the original contract.

4              MS. KANOF:  Your Honor, I'm displaying in Spanish

5    Government's Exhibit Number 19, Anexo S, which the government

6    received through the Mutual Lateral Assistance Treaty and we'd

7    like to move it, and 19A is the translation, into evidence.

8              MR. HANSHEW:  Subject to our motion.

9              THE COURT:  GX-19 and 19A are admitted.

10   BY MS. KANOF:

11   Q.   Have you ever seen -- let me go to the page.

12              Did you ever see this document before?

13   A.   No, ma'am.

14   Q.   What -- you speak Spanish.  What is it called?

15   A.   (Reading in Spanish) -- payment schedules for the gas

16   turbines and the steam turbine.

17   Q.   Okay.  And the payment schedule was developed by -- by --

18   do you even know who agreed to this payment schedule on behalf

19   of you?

20   A.   I don't know who produced this document and I don't know

21   who approved it or I don't know who present it.

22   Q.   I'm going to go to the English.  We asked for a copy that

23   didn't have the stamps all over it.  I'm going to go to the

24   English copy.

25              So being able to see the copy in English, do you see

1    that the original two months after the signing of the contract

2    that the original payment was supposed to be how many millions

3    of dollars?

4    A.   20 million.

5    Q.   And six months after the signing of the contract, how much

6    money?

7    A.   12 million.

8    Q.   So pursuant to the wiring instructions in the contract to

9    the F.G.G. account, were you supposed to receive $20 million

10   into the F.G.G. account two months after the signing of the

11   contract?

12   A.   Yes, ma'am.

13   Q.   And do you recall the contract was signed January 6th of

14   2010?

15   A.   Yes, ma'am.

16   Q.   Let me show you -- uh-oh, I did something bad.

17             (Technical difficulties.)

18   BY MS. KANOF:

19   Q.   Let me show you the -- your bank account bank statements.

20             Do you recognize this as the bank account we talked

21   about before that you opened?  Do you recognize that?

22   A.   Yes, ma'am.

23   Q.   Okay.  And let me go to the bank statements.  With regard

24   to March of -- let's start first from March, bank statement from

25   March 2009.  And March 1st, do you see March 1st through

1    March 31st, the bank statement, correct?

2    A.   Yes, ma'am.

3    Q.   Okay.  And I'm just looking general at deposits, and in the

4    month of March, did you receive any deposits?

5    A.   No, ma'am.

6    Q.   Okay.  And just taking a quick look at the actual

7    statement, no deposits in the month of March; is that correct?

8    A.   No, ma'am.

9    Q.   Okay.  In the month of April --

10            (Sotto voce conversation amongst government.)

11   BY MS. KANOF:

12   Q.   So deposits in March, none?

13   A.   No, ma'am.

14   Q.   Okay.  In April?

15   A.   25,000 or something.

16   Q.   Total of $25,000?

17   A.   Yes, ma'am.

18   Q.   So there's nothing -- certainly nothing from C.F.E. being

19   deposited in your account in March or April, correct?

20   A.   Yes, ma'am.

21   Q.   In May there appears to have been a larger balance in May,

22   correct?

23   A.   Yes.

24   Q.   Okay.  And there was a deposit of one $180,000 that

25   appears, correct?

1   A.   Yes, ma'am.

2   Q.   And -- find it -- we'll come back to bank accounts, but

3   back to Government's Exhibit Number 68.

4        This appears to be Mr. Beddard sending an e-mail to

5   you saying that what amount of money did Mitsubishi expect to

6   get on the first payment?

7   A.   Yes, ma'am.

8   Q.   What -- can you read the amount of money?

9   A.   Yeah, $14,493,434.

10  Q.   And he's complaining that they didn't get that amount?

11  A.   Yes, ma'am.

12  Q.   And among other concerns that he has, does he threaten that

13  F.G.G. is now in breach of their original subcontract with

14  Mitsubishi?

15  A.   Yes, ma'am.

16  Q.   Okay.  In fact, if you could read this part?

17  A.   It says, please be advised that F.G.G. failure to deliver

18  to M.P.S.A. a written confirmation from the fideicomiso

19  acknowledging that the full amount of all future amounts and

20  payments would be --

21  Q.   I'm sorry.  Go ahead.

22  A.   -- that the full amount of all future milestone payments

23  payable to M.P.S.A. will be paid directly to M.P.S.A. pursuant

24  to the assignment of the date of collection rights under the

25  subcontract by the close of business April 23, 2003?

1    Q.   And attached to that, did he send you a schedule of

2    payments?

3    A.   Yes, ma'am.

4    Q.   So of the $20 million that was in Anexo S --

5    A.   Yes.

6    Q.   -- Mitsubishi was supposed to get, according to the payment

7    schedule that Mr. Beddard attached, a little over

8    $14-and-a-half-million according to this e-mail; is that

9    correct?

10   A.   Yes, ma'am.

11   Q.   And he's complaining that that did not happen; is that

12   correct?

13   A.   Yes, ma'am.

14   Q.   Is this the first time you knew of this or had you heard

15   about those issues before?

16   A.   I think this is the first time I heard about this.

17   Q.   What did you do about it?

18   A.   Well confront Marco again and ask him what is happening or

19   how come they didn't get the payment due, the same questions all

20   over.  And again, why did the accounts were [sic] changed and --

21   because I would have done the right thing and sent the right

22   amounts.

23   Q.   After that -- did you talk to Beddard?  Did you call

24   Beddard and talk to him about it?

25   A.   I talked to Beddard and told him that Marco was talking to

1    C.F.E., that I didn't have the schedule of payments, and again

2    one of the situations that I felt terrible because I didn't have

3    all of the information that I could provide to him.

4    Q.    Okay.   In Government's Exhibit Number 69, an e-mail is sent

5    to you regarding this breach and the payment plan?   Do you

6    recall this?

7    A.    Yes, ma'am.

8    Q.    And it's got that same schedule attached; correct?

9    A.    Yes, ma'am.

10   Q.    And in this, Mr. Altamura is the author of this, their

11   lawyer, correct?

12   A.    Yes, ma'am.

13   Q.    Is he complaining that even though they sent you that

14   letter and gave you the deadline of April 23rd, they've not

15   received the documentation that they requested of you, correct?

16   A.    Yes, ma'am.

17   Q.    Nor have they heard from you?

18   A.    Yes, ma'am.

19   Q.    Okay.   So is it like you not to respond?

20   A.    No, ma'am.   I felt so horrible I could not give them any

21   answers, because I didn't have the answers.   They were not

22   provided to me by Marco and I don't know what he was doing with

23   the C.F.E., so I felt very, very disappointed and I couldn't

24   answer.   So all I did is call Marco and said we received this

25   Marco.   What is happening?   What are we going to do.   And all

1    the time was that.

2    Q.   Well, with the regards to the demands they made, looking at

3    Government's Exhibit 60, you had sent Mr. Adams this Spanish

4    document from -- to Mr. Delgado from Mr. Buendia, had you not?

5    A.   Yes, ma'am.

6    Q.   Okay.  And for convenience, in English, 60A, did this not

7    indicate that the reason they didn't get what they expected was

8    because there had been withholding for -- by the financial

9    institution of almost $2.7 million and another million dollars?

10   A.   Yes, ma'am.

11   Q.   Okay.  This letter was sent to Mr. Delgado.  Who provided

12   it to you to send to Mr. Adams?

13   A.   Marco Delgado, my attorney.

14   Q.   Did you question Mr. Delgado about it?

15   A.   Yes, ma'am.

16   Q.   And what did he say?

17   A.   C.F.E. sent me this letter and this is the way they're

18   doing it and that's the way it is.

19   Q.   Okay.  And did Mr. Delgado promise Mr. Adams that the --

20   this $1 million, that's referenced as a direct payment to the

21   contractor, would be made up in future payments or do you know?

22   A.   I don't know, ma'am.  I don't recall.

23   Q.   Okay.  And with regard to this, Mr. Altamura's letter of,

24   okay, now it's the 23d, and we haven't heard from you, what did

25   you do?

1    A.   I called Marco again and asked him, how are we going to

2    respond to all of these questions and what are we going to do?

3    Because he was the attorney, he was the one always taking the

4    lead or providing documents to me regarding all of these issues.

5    Q.   So in lieu of you -- did you talk to Mace Miller about

6    this?

7    A.   Yes.  He was most of the time we were together and we were

8    discussing all of these issues, how to fix them, and we couldn't

9    fix them because we don't have the information.  Marco is the

10   one that is doing all of these changes and corrections without

11   us knowing.

12   Q.   Okay.  Government's Exhibit Number 70.  It appears that

13   Mr. Altamura is now also including Mr. Miller in discussions of

14   the subcontract; is that correct?

15   A.   Yes, ma'am.

16   Q.   Did Mr. Miller participate in the drafting of the

17   subcontract?  If you know.

18   A.   No, I don't know.

19   Q.   Government's Exhibit Number 71.  In this exhibit, it

20   appears as though you are the one who are sending the signed

21   amendments?

22           MR. HANSHEW:  Objection.  Leading, Honor Your.

23           THE COURT:  Sustained.

24           MS. KANOF:  Okay.

25   BY MS. KANOF:

DIRECT GIREUD                                                    45

1    Q.   Government's exhibit --

2              MS. KANOF:  Is it in evidence, 71?

3              THE COURT:  No.

4              MS. KANOF:  It's not?  I'm sorry.  I thought it was.

5    BY MS. KANOF:

6    Q.   Are you e-mailing Mr. Altamura and Mr. Miller on April 23rd

7    of 2010 regarding the subcontract -- you having signed the

8    subcontract?

9    A.   Yes, ma'am.

10             MS. KANOF:  Okay.  We move Government's Exhibit 71

11   into evidence.

12             MR. HANSHEW:  No, objection.

13             THE COURT:  GX-71 is admitted.

14   BY MS. KANOF:

15   Q.   Okay.  Now, you are -- what are you doing in this e-mail?

16   A.   I'm saying that I'm sending the Amendment One signed and

17   backing information for the payments.

18   Q.   And attached is a payment schedule; is that correct?

19   A.   Yes, ma'am.

20   Q.   And is that your signature?

21   A.   Yes, ma'am.

22   Q.   And I think you previously testified you just scanned it

23   and e-mailed it; is that correct?

24   A.   Yes, ma'am.

25   Q.   And -- do you know anything about how Mitsubishi and F.G.G.

1    came to these figures?

2    A.   No, ma'am.  I don't remember how we came up with these

3    numbers.

4    Q.   Did you participate in coming up with these numbers?

5    A.   No, ma'am.

6    Q.   Are you a dollars guy?

7    A.   Am I a what?

8    Q.   Are you a finance person?

9    A.   No, ma'am.

10   Q.   Is Mace Miller a finance person?

11   A.   I think he claims that he is.

12   Q.   He claims that he is?

13   A.   I'm sorry.

14   Q.   Well, we'll ask him.

15        So you -- did you understand this when you signed it?

16   A.   Yes, ma'am.

17   Q.   And why did you go ahead and sign dollar numbers without

18   really knowing what you were signing?

19   A.   Because Marco provided to us and he said this is what

20   C.F.E. agrees and this is what we're going to send.

21   Q.   The numbers?

22   A.   Yes, ma'am.

23   Q.   Okay.  Government's Exhibit Number 73 --

24        MS. KANOF:  Is this in evidence?

25        THE COURT:  73 is.

```
 1                 MS. KANOF:  Okay.

 2                 THE COURT:  Yes, ma'am.

 3      BY MS. KANOF:

 4      Q.   Do you recall -- I'll give you a second to read it.  You

 5      had previously talked about communications, a little bit about

 6      communications with -- between C.F.E. and F.G.G., and do you

 7      recall writing this letter in May of 2010?

 8      A.   I think I did this.  I don't -- I realize it has my

 9      signature and I reviewed it, so...

10      Q.   That's a question.  Is that your signature?

11      A.   Yes, ma'am.

12      Q.   Were you at some meetings in Mexico on the 5th and 6th?

13      A.   I don't recall exactly that date, ma'am.

14      Q.   Okay.  And did you draft this letter?

15      A.   No, ma'am.

16      Q.   Do you recall who drafted this letter?

17      A.   Probably, Marco Delgado.

18      Q.   Would it have had to have been someone who was at the

19      meeting?

20      A.   Yes, ma'am.

21      Q.   Did Marco come back from Mexico in early May and tell you

22      that he had a disagreement with Kevin Beddard in Mexico at a

23      meeting at a dinner?

24      A.   He has -- I think I cannot remember something.  Marco had a

25      lot of problems with a lot of suppliers.
```

1    Q.    Specifically with Mr. Beddard from Mitsubishi in early May?

2    A.    It ring my -- the bell that yes.  Yes, ma'am.

3    Q.    Do you remember -- and I understand this is a long time

4    ago -- do you remember any specifics about what he told you

5    about the disagreement with Mr. Beddard at a dinner in Mexico

6    City?

7              MR. HANSHEW:  Object to leading, Your Honor.  She's

8    adding in all of the details.

9              THE COURT:  I'll overrule that objection.

10             You can answer if you remember.

11   A.    No, I don't remember.

12   BY MS. KANOF:

13   Q.    And here in the middle paragraph, what are you writing

14   about?

15   A.    It says, per counsel's instructions, please direct all

16   communication directly to F.G.G.  Multiple sources providing

17   factual information will be counterproductive, therefore F.G.G.

18   will be -- will conduct all communication with C.F.E. as related

19   to any issues which are potentially problems, specifically

20   F.G.G. privity of contract with C.F.E.

21   Q.    Okay.  Who's your counsel?

22   A.    Marco Delgado.

23   Q.    So what did he instruct you?

24   A.    Per counsel's instruction, please direct all communication

25   that we do all communications now.  Anything has to go through

1    F.G.G. not through C.F.E.

2    Q.    What did Marco tell you about putting that in the letter or

3    did he tell you anything about putting that in the letter?

4    A.    I don't remember, ma'am, to be honest with you.

5    Q.    But would you have put that in the letter if he hadn't

6    talked to you about it?

7    A.    Of course, yes.

8    Q.    After you transmitted that letter by wire, by e-mail, did

9    Mr. Beddard respond to you, Government's Exhibit Number 74?

10   A.    Yes, he did reply.

11   Q.    Okay.  And what is he asking you?

12   A.    Please, please clarify -- (reading; mumbling) --

13              (Court reporter asks witness to repeat.)

14   A.    Please clarify -- can I read it out loud?

15   Q.    Sure.  It's in evidence.

16   A.    Please clarify.  This now stops any direct communication

17   between C.F.E. and M.P.S.A.  If our interpretation is correct

18   that you -- that you can please inform C.F.E. of this

19   occurrence -- I don't know what occurrence he is talking about.

20              Also, please forward officially the translated 6th,

21   May communication regarding request for information sent to

22   F.G.G.  After receipt, we will (indiscernible) and receive

23   update actions, items list with revised (mumbling) and expectant

24   days for your further technical discussions.

25   Q.    Let's start with the first paragraph.  Did you clarify to

1  them or let me ask you, did you think this was a good idea?

2  A.   No.

3  Q.   Did you tell Mr. Delgado what you thought about it?

4  A.   Yes, ma'am.

5  Q.   What did you tell Mr. Delgado?

6  A.   That we are together on this huge contract and you cannot

7  stop any direct communication between Mitsubishi and C.F.E.  It

8  just --

9  Q.   And as an engineer, what if anything did you think about

10  what would happen if the engineers couldn't talk directly to

11  each other?

12  A.   Well, the project is going to be a disaster and you cannot

13  just stop communication between engineers.  They have to be in

14  direct contact.

15  Q.   In direct contact?

16  A.   In direct communication, yes.

17  Q.   As an engineer that worked for El Paso Electric for

18  21 years, what was your assessment regarding Mr. Delgado's

19  knowledge of technical specifications in an electrical power

20  generation plant?

21  A.   He's not qualified to do technical situations.

22  Q.   The second paragraph regarding a May 6th communication for

23  information sent to F.G.G., it appears to be about what?

24  A.   Technical discussions.  Further technical discussions.

25  Q.   And as an engineer, what is an action item list?

1   A.   Well, I'm assuming that it is when you -- when we engineers

2   have meetings, we create minutes and we put action items.  This

3   is we need to follow up on this, we need to answer this, and we

4   provide documents to say, well, we have pending items.

5   Q.   All right.  And regardless of the fact that you had sent

6   that letter, what is Mr. Beddard asking for in order to deal

7   with this action item list?

8   A.   That we need to have a technical representative that they

9   can be contact [sic], that they can be talked to.

10  Q.   Is that "yes" or "no" or in your opinion, is that

11  reasonable?

12  A.   Yes.

13  Q.   Government's Exhibit Number 75.  In response to

14  Mr. Beddard, did you send an e-mail that you also copied to

15  Mr. Delgado?

16  A.   Yes.

17  Q.   And this one is about the assignment of collection rights?

18  A.   Yes, ma'am.

19  Q.   Okay.  This is on May 10th, correct?

20  A.   Yes, ma'am.

21  Q.   And where did you get the information that F.G.G.

22  anticipated securing this confirmation in the near future?

23  A.   I would have to request that first that letter or minutes

24  from Marco.

25  Q.   Well, I understand that you already signed a letter, but

1    where did you get the information that C.F.E. was going to

2    confirm it in the near future?

3    A.   I never got that information, I guess.

4    Q.   Then why did you but it in an e-mail?

5    A.   Because Marco suggested and Marco drafted and he said this

6    is what we need to send.

7    Q.   And then going back to the issue of communications, did you

8    clarify, yes, that they could not directly talk to C.F.E.?

9    A.   Yes, ma'am.

10   Q.   Is this -- was this your desire?

11   A.   No, ma'am.

12   Q.   Whose desire was it?

13   A.   Marco.

14   Q.   That was on May 10th.  Let me go back to it.  That e-mail

15   was May 10th, correct?

16   A.   Yes, ma'am.

17   Q.   And the letter that we talked about earlier that

18   Mr. Vargas' girlfriend drafted for you is the next day, correct?

19   A.   Yes, ma'am.

20   Q.   Was that your solution to the problems?

21   A.   Yes, ma'am, I thought.

22   Q.   What do you mean, you thought?

23   A.   I thought by doing this and making sure that I was going to

24   be in charge in completing that, that was going to solve the

25   problem, but they never proceed with my instructions.

1    Q.   So you made that request or you wrote that you provided

2    that to Mr. Ramos on the -- at sometime after the 11th, and now

3    we're on May 13th.  Government's Exhibit Number 78, which has

4    been admitted into evidence, and Mr. Beddard sent an e-mail to

5    Mr. Delgado, who is or do you -- did you know who Eduardo

6    Espinosa was?

7    A.   No, ma'am.

8    Q.   You had no idea who Eduardo Espinosa was?

9    A.   I don't remember that name.

10   Q.   Did you have an idea of who Benjamin Ramirez was?

11   A.   No, ma'am.

12   Q.   They both have C.F.E. e-mails.

13            How about Marco Campo?

14   A.   No, ma'am.

15   Q.   You didn't know any of these people?

16   A.   No, ma'am.

17   Q.   Government's Exhibit Number 79.  Mr. Beddard sent an e-mail

18   to you and the date now is May 14th; is that correct?

19   A.   Yes, ma'am.

20   Q.   By the way, when you drafted the letter to Mr. Laris trying

21   to change the wiring instructions back to the F.G.G. account,

22   did you tell Mitsubishi about it?

23   A.   Yes, I did.

24   Q.   Who did you talk to?

25   A.   Probably, Kevin.  Probably, Kevin.

1    Q.   And did you do it around the same time that you went to

2    Mexico?

3    A.   I don't recall the exact date, but probably has been done

4    during that time.

5    Q.   And why did you tell Kevin about it?

6    A.   Well, because I wanted to fix all of this situations of

7    communications and problems that we have, and I knew I will be

8    much better to communicate and to really do the teaming that we

9    have.  We're a team.  We were working together through the same

10   project, so I was able -- I knew I was going to be able to fix a

11   lot of the situations and problems that they had.

12   Q.   With regard to the other letter, the May 11th letter

13   revoking the power of attorney, did you tell anybody at

14   Mitsubishi about it?

15   A.   I don't recall the exact time, but I'm sure -- I'm sure I

16   did mention that I was going to be in charge of this.

17   Q.   You did?

18   A.   Yes.

19   Q.   And who would you have said that to?

20   A.   Probably, Kevin.  Kevin was -- after the contract was

21   signed and the project started, Kevin Beddard was the manager of

22   the product, so he was -- he was always involved in everything.

23   Q.   He was the project manager at this time, correct?

24   A.   Yes, ma'am.

25   Q.   And did you know that by this time by May, John Adams was

1   gone?

2   A.   I knew that after signing the contract he was going to move

3   to another company.  I don't remember when was the exact date

4   that he moved.

5   Q.   Okay.  Now, the letter dated May 11th, and now it's

6   May 14th and Mr. Beddard is sending an e-mail to you regarding

7   some technical information.

8            Do you want to look at it really briefly?

9   A.   Yes.

10  Q.   If you need me to scroll up, let me know.

11  A.   Yeah.

12  Q.   As an engineer, are these technical issues?

13  A.   I completely forgot about it for a long time and it

14  refreshed my memory.  That was part of the specification to have

15  a solar field in the units.

16  Q.   I understand that, but I'm asking -- what I'm asking is

17  he's talking about technical meetings with C.F.E.  Were you at

18  these technical meetings?

19  A.   No, ma'am.

20  Q.   Should you have been?

21  A.   Excuse me?

22  Q.   Should you have been?

23  A.   Of course, ma'am, yes.

24  Q.   You're F.G.G., and if you had been there representing

25  Mitsubishi, would it have reduced the communication problem?

1    A.   Yes, ma'am.

2    Q.   Government's Exhibit Number 80, also dated the 14th of may,

3    this Government's Exhibit Number 80 contains two e-mails showing

4    that Marco had to give permission for Mitsubishi to discuss

5    technical issues with F.G.G.

6             Did you discuss this specific issue -- you're copied

7    on it -- with Mr. Delgado about why this would or would not be a

8    good idea?

9    A.   I don't remember, ma'am.  I'm sure we had, but I don't

10   remember.

11   Q.   With regard to the problems that were developing, I'm

12   showing you Government's Exhibit Number 83, which has been

13   admitted into evidence.  Again an e-mail from Mr. Beddard to

14   you, and the date being -- now we're in June.  By June had there

15   been a second payment made at all in June or was it supposed to

16   be July?

17            Let me withdraw this question, so we can talk about

18   the e-mail while it's up here.

19            Mr. Beddard writes to you that there's difficulties in

20   exchanging information because of this restriction.  Did you

21   talk to Mr. Delgado and explain to him anything about the need

22   for the engineers to have to talk to each other?

23   A.   Yes, ma'am.

24   Q.   Did you talk to him more than once?

25   A.   Yes, ma'am.

1    Q.   Did you talk to him when you got this e-mail?

2    A.   Yes, ma'am.

3    Q.   And what did he respond?

4    A.   Well, that he has -- if I recall correctly, he brought one

5    person.  I don't remember the name or something, that he was

6    going to be the technical guy in Mexico and I don't even

7    remember who it was, but he said I'm taking care of that.

8    Q.   Did you get to meet this technical person?

9    A.   No, ma'am.  I got some e-mails from him later on that

10   saying, Fernando, we need to take care of this and that and

11   we're not doing anything to take care of this, and C.F.E. is

12   getting very desperate on this.  Mitsubishi is also getting very

13   desperate in this.  And by the way, I was contracted by Marco

14   Delgado and I haven't get [sic] paid one penny and it's been two

15   or three months.  I remember somebody and I don't remember the

16   name.

17   Q.   You got an e-mail -- was he asking you for money?

18   A.   I think he did.

19   Q.   In the e-mail?

20   A.   Yes, ma'am.  I cannot remember that he did.

21   Q.   And did you pay him?

22   A.   No, ma'am.

23   Q.   Did you talk to Mr. Delgado about not having paid him?

24   A.   Of course.  He's the one who hired him.  He's the one -- he

25   wanted somebody to be there, so he hired him, yes.

DIRECT GIREUD                                                    58

1    Q.   Did Mr. Delgado ever give you invoices from that individual

2    so that F.G.G. could pay him out of the F.G.G. account?

3    A.   No, ma'am.

4    Q.   Did Mr. Delgado ever demand the money from you to pay his

5    technical people?

6    A.   Yes, ma'am.

7    Q.   Okay.  And did you give him money for that purpose?

8    A.   No, ma'am.

9    Q.   Why not?

10   A.   Because he already have most of the money in his accounts

11   and he's -- he says that he was paying Innertech for field

12   services or whatever, so that's the money for that.  I mean, if

13   you have -- hire somebody, you have the money to pay.

14   Q.   How did you know -- who's Innertech?

15   A.   I don't know, ma'am.  It's a company he -- when I --

16   Q.   Are you talking about Ener Proyectos?

17   A.   Yes, I'm thinking of Ener Proyectos.

18   Q.   Okay.  And who is Ener Proyectos?

19   A.   According to Marco, he showed me one -- when he put it that

20   he was paying him or we have to pay certain money, he showed me

21   a -- like an invoice from Ener Proyectos and he said that they

22   were doing field services.

23   Q.   Okay.  Well, what are field services?

24   A.   Field services is when the unit is up and running, you are

25   going to have people there to work and to make sure that they

1    coordinate the general contractor building the company, M.P.S.A.

2    It's like a coordinator.  I mean field services can be a

3    thousand things, but this was going to be somebody coordinating

4    the efforts of Mitsubishi, the efforts of C.F.E., the efforts of

5    F.G.G. to make sure that we were all in the same frequency of

6    thoughts.

7    Q.    Did he tell you that's what Ener Proyectos was going to do?

8    A.    That's what he told me.

9    Q.    Okay.  So that was after the turbines were in place those

10   field services?

11   A.    Correct.

12   Q.    I'm showing you Government's Exhibit Number 2.  It's a

13   chart that's been admitted into evidence.  And you see that

14   money wen -- the first payment went into Mr. Delgado's account

15   on March 9th of $20 million from C.F.E., correct?

16   A.    Yes, ma'am.

17   Q.    And the very first payment made was to -- is this the

18   company you are talking about, Ener Proyectos?

19   A.    Yes, ma'am.

20   Q.    Of $2 million, correct?

21   A.    Yes, ma'am.

22   Q.    Why would you pay field services a year or two before the

23   turbines are even put in place?

24   A.    We shouldn't be paying field services when the unit is not

25   up and running yet.

1    Q.   Was it going to be F.G.G.'s responsibility for paying for

2    field services?

3    A.   No, ma'am.

4    Q.   Who's responsibility was it going to be?

5    A.   It was going to be Mitsubishi responsibility.

6    Q.   That's if they got the long-term service agreement?

7    A.   Yes, ma'am.

8    Q.   There were two different -- in the subcontract there were

9    going to be two subcontracts, correct?

10   A.   Yes, ma'am.

11   Q.   Was there a long-term agreement set up in March of 2010?  I

12   mean, had you entered into a contract or had -- actually had

13   C.F.E. entered into a contract with Mitsubishi for long term?

14   A.   No, ma'am.

15   Q.   Okay.  That doesn't happen till the equipment -- till after

16   the warranty expires on the equipment, correct?

17   A.   They supposed to -- that contract, which is the long-term

18   service agreement is just you buy a car right now, and you said

19   I don't want to have any problems with this car for the next

20   five years, I want to buy a warranty that includes everything;

21   parts, labor, nothing.  I don't want to pay a penny.  I'm going

22   to pay you $50 a month for the next five years.  That's a

23   long-term service agreement.  But it starts until the car is

24   delivered to you or till the thing is up and running, so, yes.

25   Q.   Okay.  So previously you testified that you noticed that

1    the first payment to F.G.G. came from the Turks and Caicos.  And

2    let me show you April 11th.  I'm sorry, April 1st.

3    A.   Yes, ma'am.

4    Q.   Did F.G.G. get paid the $2,100,000 on April 1st, from the

5    Skippings and Rutley account in the Turks and Caicos?

6    A.   Yes, ma'am.

7    Q.   And did Mitsubishi get paid that $11 million?

8    A.   That's what it shows here, yes.

9    Q.   That they were complaining was supposed to be 14-something?

10   A.   Yes, ma'am.

11   Q.   Immediately after that on the 7th of May, did Ener

12   Proyectos get another $320 million?

13   A.   Well, yes.

14   Q.   Did you know that Ener Proyectos had now gotten $2,320,000?

15   A.   I wasn't aware of any payment from here.

16   Q.   Did Mr. Delgado tell you, I'm paying these technical people

17   millions of dollars?

18   A.   I didn't know by this sometime, number one, that he had the

19   money into an account, into his account.  I found out on April

20   the 1st -- I'm sorry -- that we got paid and that later on I

21   found out that the company -- I mean, the -- there was a bank

22   account in the Caribbean with Marco Delgado's name.

23   Q.   The letter that you gave to change -- the letters that you

24   handed to Ramos to withdraw the power of attorney and to change

25   the wire routing -- the wire routing letter, was May 11th,

1    correct?

2    A.    Was what?  I'm sorry?

3    Q.    The wire routing letter you gave to Ramos was May 11th,

4    correct?

5    A.    Correct, ma'am.

6    Q.    On May 19th you see a payment made, and we'll talk about

7    that later, but the second you were -- you asked Mr. Ramos to

8    provide the change in routing to the F.G.G. account, correct?

9    A.    Yes, ma'am.

10   Q.    The second payment by the fideicomiso, C.F.E., was made on

11   July the 6th, correct?

12   A.    Yes, ma'am.

13   Q.    According to this chart of $12 million, right?

14   A.    Yes, ma'am.

15   Q.    And so you'd already requested C.F.E. to deposit it in the

16   F.G.G. account, not the Turks and Caicos account, correct?

17   A.    Yes, ma'am.

18   Q.    Did that happen?

19   A.    I requested that previous to the second payment and it

20   never happened, as you can see here.

21   Q.    Okay.  The very next day or the very first payment after

22   the $12 million, who did it go to?

23   A.    Ener Proyectos.

24   Q.    Is it another $2,320,000?

25   A.    Yes, ma'am.

DIRECT GIREUD                                                        63

1    Q.   So did Mr. Delgado tell you why he was paying some company

2    out of first few payments $4,640,000?

3    A.   No, ma'am.  I didn't know who was he sending the money to.

4    Nothing.

5    Q.   Looking at the July -- on July 2th -- let me get rid of

6    some of the things at the bottom -- on July 27th, again, we have

7    the July 13th to Ener Proyectos.  On July 27th again, he does --

8    Mr. Delgado sends $7 million to Mitsubishi, correct?

9    A.   Yes, ma'am.

10   Q.   But on that same day, does he send more money to Ener

11   Proyectos?

12   A.   Yes, ma'am.

13   Q.   And this time $9,300?

14   A.   Yes, ma'am.

15   Q.   Again, who did he tell you Ener Proyectos was?

16   A.   People doing field services.

17   Q.   So almost $4,700,000 went to a company on behalf of F.G.G.;

18   is that correct?

19   A.   Yes, ma'am.  It wasn't on behalf of F.G.G.  It was on

20   behalf of Marco Delgado.  I don't see any F.G.G. numbers on that

21   account.

22   Q.   Well, Mr. Delgado -- what did he tell you about who Ener

23   Proyectos was?

24   A.   People doing field services for us.

25   Q.   And did you ever visit the offices of Ener Proyectos?

1   A.   I don't know if I was in one trip he says we were -- one of

2   the few trips that we did together, he says, I need to go and

3   meet these engineers, so just go with me.  We went to an office,

4   a very strange office on the fifth floor of a very old building.

5   We went to the elevator and it was kind of weird, because we

6   knocked on the door and somebody opened like a little window and

7   said, okay, Mr. Delgado, so he came in and told me to stay here.

8   So I waited right here.

9   Q.   What do you mean stay here?

10  A.   I mean sit down.  There was like a little sofa or

11  something.  He said, I'm here and he went outside.

12  Q.   Outside the door?

13  A.   No, inside the door.

14  Q.   Okay.

15  A.   But I didn't go in.  He went to a room somewhere in the

16  back.  There was this guy, who opened the door sitting there,

17  and I saw pictures of electrical equipment and things like that

18  on that very small room.  And I asked the guy after I was there

19  an hour, and then I went and asked the guy, whose office is this

20  or something, and he mentioned the name of somebody.  I don't

21  remember the name, but it was I think the head of Ener

22  Proyectos.

23         Somewhere in the meetings that I have with you, you

24  brought up the name or something; have you heard this name or

25  something.  And I cannot believe that was the same name that he

1   went to.

2   Q.   And did you ever get to meet that person?

3   A.   No, ma'am.

4   Q.   But you were -- you thought it was some kind of engineer

5   person?

6   A.   Yes, ma'am.

7   Q.   And were you an engineer?

8   A.   Yes, ma'am.

9   Q.   And this is your project?

10  A.   Yes, ma'am.

11  Q.   Did you ever get to meet this person ever?

12  A.   I asked Marco why I always stay in the back and you go to

13  meetings and all this, and he said, oh, this is another meeting.

14  This is a meeting for somebody else, so in other words, this is

15  not related to your project.

16  Q.   Oh, he told you Ener Proyectos was not related to your

17  project?

18  A.   I didn't know that we were in the Enero Proyectos's office

19  at the time.

20  Q.   Oh, you didn't know that you were in Ener Proyectos --

21  there wasn't a sign that said Ener Proyectos?

22  A.   Nothing, ma'am.  Just frames in the wall and the door was

23  like I said very strange and with a little window --

24  Q.   So on the outside of that door before that little window

25  was open?

```
 1    A.   No, ma'am, not even on the building, not on anywhere it has
 2    any commercial sign or nothing.
 3    Q.   Is that the only time you ever visited a place that
 4    Mr. Delgado represented -- he told you it was Ener Proyectos'
 5    office?
 6    A.   No, ma'am, he didn't.
 7    Q.   Oh, okay.  So why did you think that's who you were
 8    visiting, just because that man sitting there said it?
 9    A.   The man mentioned a name of who was he visiting.  And later
10    on, on meetings that I had with you reviewing documents --
11    Q.   Okay.  But don't say anything --
12    A.   I'm sorry.
13    Q.   -- about what I might have suggested, but --
14    A.   No, I didn't know it was Ener Proyectos' office.
15    Q.   Okay.  But did you assume that it was?
16    A.   No, ma'am.  He never told me we were going on something for
17    this project.  He just said I need to visit a customer or a
18    friend or something, so I went with him.
19    Q.   Did you ever meet anybody from Ener Proyectos?
20    A.   No, ma'am.
21         THE COURT:  Is this a good time for a break?
22         MS. KANOF:  Yes, it is.
23         THE COURT:  Ladies and gentlemen of the jury, I'd ask
24    you to be back in the jury room in 15 minutes at 10:50.  We'll
25    be in recess until then.
```

```
 1              (Break at 10:35 a.m. to 10:52 a.m.)

 2              (Jury present.)

 3              THE COURT:  Let the record reflect that all members of

 4    the jury are present, the United State through its assistant

 5    Unites States' attorneys are present, the defendant and his

 6    counsel is present.

 7              Mr. Gireud, remains on the witness stand.

 8              Ms. Kanof?

 9    BY MS. KANOF:

10    Q.   Okay.  So we're talking about Ener Proyectos.  I'm going to

11    show you Government's Exhibit Number 87.  Do you recognize this

12    as a letter from you --

13    A.   Yes, ma'am.

14    Q.   -- to Mr. Delgado?

15              MS. KANOF:  We move Government's 87, Your Honor.

16              THE COURT:  Any objection?

17              MR. HANSHEW:  No objection, Your Honor.

18              THE COURT:  GX-87 is admitted.

19    BY MS. KANOF:

20    Q.   Before we were looking at the chart, we found that

21    $12 million went to the Turks and Caicos account on July 6th,

22    correct?

23    A.   Yes, ma'am.

24    Q.   And then on July 30th, $1.3 million went into the F.G.G.

25    account from the Turks and Caicos account; is that correct?
```

1    A.   Yes, ma'am.

2    Q.   Back to Government's Exhibit Number 87, the date is

3    July 15th, correct?

4    A.   Yes, ma'am.

5    Q.   And on July 15th, you had not yet received the 1.3 million;

6    is that right?

7    A.   Yes, ma'am.

8    Q.   But you had -- you, meaning F.G.G. -- so you hadn't

9    received anything from the first payment, correct -- I mean from

10   the second payment, only from the first payment?

11   A.   Yes, ma'am.

12   Q.   Okay.  With regard to Government's Exhibit Number 87,

13   you're writing a letter to Mr. Delgado.  Why are you writing a

14   letter to Mr. Delgado?

15   A.   He brought the letter for me to sign.

16   Q.   Okay.  And what does it say?

17   A.   It says that Mitsubishi was going to pay -- be paid

18   $7 million, Ener Proyectos in accordance with terms applicable

19   to the consulting agreement $2 million, international counsel in

20   accordance with terms applicable --

21   Q.   Wait, wait, wait.  Maybe we're not looking at the same --

22   are you looking at 87?

23   A.   Yes, ma'am.

24   Q.   Okay.  And you are writing a letter to Mr. Delgado, right?

25   Hereby you are instructed to make and proceed with necessary

1    arrangements for disbursement of funds?

2    A.   Yes, ma'am.

3    Q.   And the -- upon receipt of the $12 million; is that

4    correct?

5    A.   Yes, ma'am.

6    Q.   And you're telling Mr. Delgado to disburse funds; is that

7    correct?

8    A.   My agreement of this when we wrote this letter is that,

9    again, I was going to make the payments to this -- this way,

10   yes.

11   Q.   And -- but you're telling Mr. Delgado to make the necessary

12   arrangements for disbursement of the money.  What does that

13   mean?

14   A.   Well, he needs to get a -- I guess a -- not receipt.  How

15   do you say?  I mean invoices and whatever so we can make the

16   payments, I guess.

17   Q.   Okay.  Okay.  But are you saying -- are you acknowledging

18   that the money should go into the Turks and Caicos account and

19   he should disburse the money?

20   A.   No, ma'am.  By this time when this document occurred, I

21   already produced all the documents to the C.F.E. to change the

22   accounts back to me, so...

23   Q.   Okay.  But $7 million was supposed to -- you're basically

24   telling Mr. Delgado what's supposed to go to who and that you

25   need invoices.

1              Number two, $2 million to Ener Proyectos?

2    A.   Yes, ma'am.

3    Q.   Mr. Delgado wrote this letter?

4    A.   Yes, ma'am.

5    Q.   Previously you testified that he said that Ener Proyectos

6    was providing field services for F.G.G.?

7    A.   Yes, ma'am.

8    Q.   And why did you authorize this $2 million?

9    A.   Because he came and he told me you need to sign this.  This

10   is the way we're going to pay the money and this is the contract

11   that we have with these people doing the field services, so I

12   already have all of this contracts signed with them.

13   Q.   So the $2 million that was paid way back on March 23rd or

14   the $2 million that was paid on July 6th, which $2 million are

15   you authorizing?

16   A.   For the second payment, for the July 6th.

17   Q.   Okay.  And did he ever ask to authorize the $2 million from

18   the first payment?

19   A.   I don't recall, ma'am.

20   Q.   Is this the only time he asked for an authorization of

21   payment?

22   A.   Yes, ma'am.

23   Q.   Did he give you an invoice?

24   A.   Probably this is the time that he showed me an invoice for

25   the first time.

1    Q.    And you authorized it?

2    A.    Yes, ma'am.

3    Q.    Then the international counsel in accordance terms of

4    applicable fee agreement.  What is that?

5    A.    I don't remember what it was.  It probably was his counsel

6    fees or whatever.  He was -- that was his fees, international

7    counsel.

8    Q.    Oh, he's asking you for million dollars?

9    A.    Yes.

10   Q.    So in addition to the money he retained for himself, he's

11   asking you to pay him a million dollars?

12   A.    No, ma'am.  This would cover -- that would cover

13   everything.

14   Q.    I don't understand.

15   A.    This will cover his fee.  This would cover his contract or

16   memorandum.

17   Q.    That memorandum of agreement that we talked about, is this

18   pursuant?

19   A.    Yes, I believe so.

20   Q.    He's authorizing -- he's asking you to authorize him to

21   authorize a million dollars to him?

22   A.    Yes, ma'am.

23   Q.    Okay.  And then authorizing $2 million to F.G.G.?

24   A.    Yes, ma'am.

25   Q.    Okay.  For -- and that would add up to the total of

1    $12 million, correct?

2    A.   Yes, ma'am.

3    Q.   Then the next paragraph:  Likewise, you hereby directed to

4    proceed with securing the corresponding invoices from any and

5    all vendors, including for the payment in the amount of

6    $4.6 million to the financial arrangers of the project,

7    including JP Morgan and HSBC.  Okay.

8              So you -- he writes a letter for you to sign to tell

9    him to give you invoices for all of these things?

10   A.   Yes, ma'am, especially for the letters of credit that you

11   can see right here.

12   Q.   Did he invoice you for the million dollars for him?

13   A.   No, ma'am.

14   Q.   We do know that Mitsubishi invoiced F.G.G. for the 700 --

15   the 7 million, right?

16   A.   Yes, ma'am.

17   Q.   Okay.  With regard to this $4.6 million, what was that for?

18   A.   For the letters of credit.  For the famous letters of

19   credit.

20   Q.   And did he show you the letters of credit?

21   A.   No, ma'am.

22   Q.   Did he show you a receipt for $4.6 million for the letters

23   of credit?

24   A.   No, ma'am.

25   Q.   And you previously testified that this is one of the banks

1    in New York that had an office in Mexico City that he said he

2    would get the letters of credit from, correct?

3    A.   Yes, ma'am.

4    Q.   Is that one of the banks that you testified to yesterday?

5    A.   Yes, ma'am.

6    Q.   Did he show you any evidence that HSBC -- is that -- that's

7    the same that Best Buy uses, right, or you do you know?

8    A.   No, I don't know, ma'am.

9    Q.   Did he show you any evidence at all?

10   A.   No, ma'am.

11   Q.   Did you authorize him taking 6 point -- $4.6 million for

12   payment to HSBC for $20 million of letters of credit?

13   A.   No, ma'am.

14   Q.   Okay.  But in here, he's asking for that authorization,

15   correct?

16   A.   Yes.

17   Q.   The date of this is July 15th, 2010.  Were you aware that

18   on January 15th of 2010, he had pledged Mitsubishi's equipment

19   in lieu of, instead of any letters of credit?

20   A.   No, ma'am.

21   Q.   After the first payment of $20 million and after paying

22   Ener Proyectos 2,320,000, on May 19th, do you see that someone

23   named Sheral Maloy got $375,000?

24   A.   I did not know till now.

25   Q.   Do you know who Sheral Maloy is?

 1    A.   No, ma'am.

 2         MS. KANOF:  Anna, do you know the number right

 3    offhand?

 4    BY MS. KANOF:

 5    Q.   I'm going to show you what's been marked as Government's

 6    Exhibit Number 147?

 7         MS. KANOF:  Your Honor, it has a self-proving

 8    affidavit the government would move into evidence.

 9         MR. HANSHEW:  No objection, Your Honor.

10         THE COURT:  GX-147 is admitted.

11    BY MS. KANOF:

12    Q.   These are records for the purchase of a house, Mr. Gireud,

13    in El Paso.  And on the page --

14         MR. HANSHEW:  Objection.  Leading, Your Honor.

15         THE COURT:  Sustained.

16         MS. KANOF:  Okay.

17    BY MS. KANOF:

18    Q.   Let's just look at the first page of these records.  Do you

19    see that on May 19th, these records, that a wire transfer --

20         MR. HANSHEW:  Your Honor, she hasn't established that

21    Mr. Gireud actually knows what this document is.  There's no

22    authentication document.

23         (Court reporter asks counsel to use microphone.)

24         MR. HANSHEW:  Oh, I'm sorry.

25         She hasn't established his knowledge of this document

1    at all.

2              MS. KANOF:  Well, I don't think he has --

3              THE COURT:  It's in evidence so she can ask him about

4    a document because it's in evidence.

5    BY MS. KANOF:

6    Q.   On the screen is the name Sheral Maloy, Attorney at Law,

7    correct?

8    A.   Yes, ma'am.

9    Q.   Are these records of Rio Bravo Title in their escrow

10   account?  I've highlighted it.

11   A.   Yes, that's what it says.

12   Q.   And with regard to the escrow account, on May 19th -- I'm

13   trying to get this to work -- did Sheral, did Rio Bravo Title

14   receive $375,000 from the Skippings and Rutley First Caribbean

15   account in the Turks and Caicos Island?

16   A.   Yes, I see that.

17   Q.   Did you authorize Mr. Delgado to pay First, this title

18   company, $375,000?

19   A.   No, ma'am.

20   Q.   Of F.G.G.'s -- of the first payment from --

21   A.   No, ma'am.

22   Q.   -- C.F.E.

23             With regard to -- do you know a person by the name of

24   Gabriel Antonio Larraguivel Delgado?

25   A.   No, ma'am.

```
1   Q.   There are several payments that were made from both the
2   first and second disbursement.  The first one $52,000 on
3   June 11th.  The second one $50,000 on July 21st, specifically
4   with regard to the first payment.  Do you know who he is?
5   A.   No, ma'am.
6           MS. KANOF:  Anna help.
7           We'll wait until the witness that those records comes.
8   BY MS. KANOF:
9   Q.   Now with regard to those payments, did you authorize any
10  payments to be made out of the F.G.G. monies -- did you
11  authorize Mr. Delgado to pay himself other than that $1 million?
12  A.   No, ma'am.
13  Q.   Out of the -- that was out of the second payment.  Did you
14  authorize Mr. Delgado to pay himself out of the first payment?
15  A.   No, ma'am.
16  Q.   Okay.
17          MS. KANOF:  Can we switch to the ELMO?
18          COURTROOM DEPUTY DUEÑAS:  What do we have on the
19  screen?
20          THE COURT:  He'll put it up once it's in evidence.
21          MS. KANOF:  It's in evidence.  It's a document from
22  Government's Exhibit Number 144.  I just selected one document.
23  Government's Exhibit 144 the F.G.G. --
24          THE COURT:  Yes.
25          MS. KANOF:  -- bank account.
```

1         How do I zoom?  I see it.  Never mind.

2    BY MS. KANOF:

3    Q.   On -- according to the chart, did Mr. Delgado send to the

4    F.G.G. account on April 1st, $2,100,000?  I'm having a little

5    trouble with the thing, but do you see it?  It's the fourth one

6    on the chart that's in front of you.

7    A.   I'm just looking at the check that you have there.

8    Q.   Oh, I'm sorry.  You don't have that?

9         Immediately after, the next day, after you received

10   the money of the first payment into the F.G.G. account, did you

11   write a check to Mr. Delgado from that account?

12   A.   Yes, ma'am.

13   Q.   How much money did you pay him?

14   A.   $620,000.

15   Q.   And what is the -- in the memo portion of the check, what

16   did you put?

17   A.   Consulting fees.

18   Q.   Did he cash the check?

19   A.   Yes.

20   Q.   Okay.  Back to -- after you authorized disbursement -- you

21   authorized disbursement of a million dollars to Mr. Delgado on

22   the second payment; is that correct?

23   A.   Yes, ma'am.

24   Q.   And you authorized $2 million disbursement to Ener

25   Proyectos on the second payment; is that correct?

1    A.    Yes, ma'am.

2    Q.    Did you authorize an additional $320,000 to Ener Proyectos?

3    A.    No, ma'am.

4    Q.    Did you authorize an additional $9,300 to Ener Proyectos?

5    A.    No, ma'am.

6    Q.    With regard to the second payment, did you in fact pay

7    Mitsubishi the $7 million as Mr. Delgado authorized you to

8    authorize him to -- for you to receive an invoice to pay?

9    A.    Yes, ma'am.

10   Q.    Okay.  Did you authorize Mr. Delgado to pay the attorneys

11   Skippings and Rutley for operating his account $90,000?

12   A.    No, ma'am.

13   Q.    Okay.  And did you authorize Mr. Delgado to pay Charlotte's

14   Furniture $70,000 on August 6th?

15   A.    No, ma'am.

16   Q.    And how about Mr. Delgado, August 11th, $40,000 --

17   A.    No, ma'am.

18   Q.    -- out of that payment?

19         And $150,000 out of that payment?

20   A.    I don't even know who he is, ma'am, no.

21   Q.    You don't know.

22         How about $45,000 out of that payment?

23   A.    No, ma'am.

24   Q.    Okay.  Do you know who Linda Medlock is?

25   A.    Linda Medlock?  No.  The name sounds -- I heard it before

1  or I'm confused.  I don't know who she is.  I don't know her.

2  Q.   Did you authorize in December of that -- we're still on the

3  second payment, right?

4  A.   Yes, ma'am.

5  Q.   The second payment, did F.G.G. receive $1.3 million on the

6  second payment?  It's right here, July 10th.

7  A.   Probably we did, yes, ma'am.

8  Q.   And what did you do with that money?

9  A.   Well, right away, he came to see me the next day and wanted

10  his part.

11  Q.   The million dollars that had been authorized?

12  A.   Yes.

13  Q.   And let me ask you, did you always pay him in a check or

14  did sometimes you paid in cash or go to your ATM or something

15  like that?

16  A.   No, in a check.

17  Q.   Okay.  At the end of the year, at the end of 2010, for tax

18  purposes, what did you do?

19  A.   I do the taxes for -- an accountant do the taxes for the

20  firm.  And I provided him with a 1090 or 1099 or I don't know

21  what it's called.  1099.

22  Q.   Okay.  If you would please look at this document marked 136

23  for the year 2010.  Do you recognize that as a 1099?

24  A.   Yes, ma'am.

25       MS. KANOF:  We'd move admission of Government's

 1    Exhibit Number 136.

 2              MR. HANSHEW:  No, objection, Your Honor.

 3              THE COURT:  GX-136 is admitted.

 4    BY MS. KANOF:

 5    Q.   Did you have a discussion with Mr. Delgado about providing

 6    him 1099s for the money you were paying him as a consultant and

 7    an attorney?

 8    A.   I don't remember that I had, but it's by law, you have

 9    to -- if you pay somebody some money, you have -- I need to have

10    consulting fees you have to provide him with a 1099.

11    Q.   Okay.  So for the year -- we have a $620,000 check.  For

12    the year of 2010, did you report paying Mr. Delgado $820,000?

13    A.   Yes, ma'am.

14    Q.   And just while we are here, in the year 2011, does

15    Government's Exhibit Number 137 represent other 1099, but for

16    the year 2011?  Is that the 2011, 1099?

17    A.   Yes, ma'am.

18              MS. KANOF:  We move admission of Government's Exhibit

19    Number 137.

20              THE COURT:  Mr. Hanshew?

21              MR. HANSHEW:  No, objection, Your Honor.

22              THE COURT:  GX-137 is admitted.

23    BY MS. KANOF:

24    Q.   Let go back to 136.  When you paid him in 2010, you just

25    pay him by his name.  You don't say Delgado and Associates; is

1   that correct?

2   A.   Yes, ma'am.

3   Q.   Why is that?  Why didn't you pay it to his law firm?

4   A.   Because he was my attorney and he -- the checks I made were

5   made into his name.

6   Q.   Why didn't -- some of -- didn't you ever write checks to

7   Delgado and Associates or do you remember?

8   A.   I don't remember, ma'am.

9   Q.   Government's Exhibit Number 94.

10         Did Mr. Delgado ever talk to you about wanting to be

11   paid from a foreign bank account?

12   A.   Not that I recall, ma'am.

13   Q.   With regard to Government's Exhibit Number 94, do you

14   recognize this as being an e-mail from Mr. Delgado to you and to

15   himself?

16   A.   Yes, ma'am.

17         MS. KANOF:  Move admission of Government's

18   Exhibit Number 94.

19         MR. HANSHEW:  No, objection.

20         THE COURT:  GX-94 is admitted.

21   BY MS. KANOF:

22   Q.   This goes back to -- this is now in 2011.

23   A.   Okay.

24   Q.   And again, is he -- what is -- we didn't have this

25   translated, but you speak Spanish.  What is he providing to you?

1    What is he providing to you?  What's "borrador a Kevin"?

2            MR. HANSHEW:  Objection, Your Honor.  He's not a

3    certified translator.

4            MS. KANOF:  I think -- it's to him.

5    BY MS. KANOF:

6    Q.   What is your understanding of that?

7            MR. HANSHEW:  Object.

8            THE COURT:  I'll overrule the objection.

9    A.   A draft.  A draft.  It is a draft for Kevin.

10   BY MS. KANOF:

11   Q.   Okay.  And what is -- a draft for something, for a letter

12   for you to send?

13   A.   Yes, ma'am.

14   Q.   Okay.  And what does he want you to write to Kevin Beddard?

15   A.   Well, general, it says that we need to write him that the

16   equipment was actually pledged and that it doesn't mean that the

17   title of the equipment is going to be transferred in full

18   until -- to C.F.E. until the payment is full.  And that this is

19   during John visits in negotiations with C.F.E. prior to

20   finalization.  So he -- he's saying that this was agreed by John

21   Adams in prior negotiations which C.F.E. -- with C.F.E., prior

22   to the final execution of the contract, said agreement was

23   reached and memorialized as such for further reference and

24   clarification of any of the technical -- (reading; mumbling) --

25   Q.   Wait, wait, wait.  She can't get you if you're going to --

1    A.    I'm sorry.

2    Q.    The court reporter can't get you like that.

3    A.    I'm sorry, ma'am.

4          Yes.  It just -- this is just saying that the

5    equipment was pledged.  He's finally putting it in writing.

6    We're putting that the equipment was pledged, but with a clear

7    understanding that this is not in any way I receipt of the title

8    or a transfer of the title until payments are completely full.

9    Q.    Is this after Mitsubishi finds out there equipment's been

10   pledged?

11   A.    I don't know when -- I cannot put dates and tell you

12   exactly when was this letter and when was the date, but

13   Mitsubishi had already a lot of suspicions before and that's

14   what they were start F.G.G. [sic].

15   Q.    Then let me show you Government's Exhibit Number 92 first

16   before we talk about this, which I believe is in evidence, when

17   Mr. Beddard sends an e-mail to you.  Can you urgently confirm or

18   rebut if F.G.G. used our equipment as a guarantee?  Do you

19   recall that?

20   A.    Yes, ma'am.

21   Q.    Does that help you refresh your memory, the date on this is

22   the 24th of February?

23   A.    Yes, ma'am.

24   Q.    Okay.  So now let's go back to February 25th the next day.

25   And is this a draft that Mr. Delgado gives you to respond to

1    Mr. Beddard?

2    A.   Yes, ma'am.

3    Q.   Do you know whether anything in this draft is true?

4    A.   Not to my knowledge.  I never got --

5    Q.   When --

6    A.   -- a pledge from John Adams or nothing, no.  No, ma'am.

7    This is -- I don't have proof to say that this is true.

8    Q.   Okay.  Where it says, during John's visit and negotiations

9    with C.F.E., were you ever present when John Adams was

10   negotiating with C.F.E.?

11   A.   No, ma'am.  I wasn't even aware that he was in C.F.E.  The

12   times that he was in Mexico, I was with him.

13   Q.   Oh.  So how many times was he in Mexico with you?

14   A.   If I recall, probably twice.

15   Q.   And in those two times were you always or were you usually

16   with him?

17   A.   Yes, ma'am.

18   Q.   And did he go negotiate -- did you ever leave you to go

19   negotiate with C.F.E.?

20   A.   Never, ma'am.

21   Q.   Were you ever in a meeting with him negotiating with

22   C.F.E.?

23   A.   No.  The only meeting we went to C.F.E. was to see Alberto

24   Ramos and the reason was --

25   Q.   I didn't ask a reason why.

1    A.   I'm sorry.

2    Q.   Was he negotiating with Roberto Ramos about pledge?

3    A.   No, ma'am.

4    Q.   Okay.

5    A.   Not at all.

6    Q.   And where it says, as you are well aware, both Mr. Adams

7    and Mr. Ponce were part of the contract negotiations.  Again,

8    were you ever present?  You said you were present two times in

9    Mexico, the two times John Adams went.  Were he and Mr. Ponce

10   negotiating contract terms on the prime contract with C.F.E.

11   when you were there with them?

12   A.   Yes, I was with them.

13   Q.   No, but were they negotiating with C.F.E. the contract

14   terms?

15   A.   No, ma'am.  I'm sorry.  No.

16   Q.   But you wrote what your attorney gave you to write?

17   A.   Yes, ma'am.

18   Q.   This is -- this is before you tried to get him out of the

19   contract, right, or tried to release him from -- with the power

20   of attorney?

21   A.   Yes, ma'am.

22   Q.   Government's Exhibit Number 93.  You wrote a letter that

23   had that information in it, correct?

24   A.   Yes, ma'am.

25   Q.   And after Mr. Beddard, Government's Exhibit Number 93 which

1    is in evidence, after Mr. Beddard asks for confirmation that

2    their equipment was not pledged, did Mace Miller respond and

3    ask, who's telling you this?  Who are you quoting that it's been

4    pledged?

5    A.    Yes.

6    Q.    Did you and Mr. Miller discuss this?

7    A.    Yes.  He came to my office and he told me that we -- they

8    are -- they found out that Marco Delgado pledged equipment and

9    that did you or were you aware of that?  And neither him nor me

10   were aware of any of this and we were in shock.  We were in

11   shock.

12   Q.    Did you -- what did you decide to do about that?

13   A.    We replied right away.  We're quoting you.  I just talked

14   to Fernando and he has no knowledge of any deviation.  So we

15   told him we have no knowledge.  Mace responded right away to

16   that e-mail.

17   Q.    And then after Mace makes this response that he -- that he

18   spoke to you and you have no knowledge of any deviation,

19   correct?

20   A.    Yes, ma'am.

21   Q.    And then does Patrick Altamura make that response saying

22   that neither you, Mace or you, Mr. Gireud, are aware of the

23   pledge agreement; is that right?

24   A.    Yes, ma'am.

25   Q.    And in this particular e-mail, Government's Exhibit

1    Number 95 --

2              MS. KANOF:  Is it in evidence, 95?

3    BY MS. KANOF:

4    Q.   If you could just take a look at it, an e-mail from

5    Mr. Delgado to you and copied to Mr. Miller.  Is this an e-mail

6    with regard to your response to C.F.E. about the pledge?

7    A.   Yes, ma'am.

8    Q.   Okay.

9    A.   He wrote the --

10             MS. KANOF:  We'd move Government's --

11   Q.   Just a minute.

12             MS. KANOF:  We'd move Government's -- Government's 95

13   into evidence.

14             MR. HANSHEW:  No, objection, Your Honor.

15             THE COURT:  GX-95 is admitted.

16   BY MS. KANOF:

17   Q.   And does Mr. Miller start assisting you to draft this

18   letter?

19   A.   Yes, ma'am.

20   Q.   Okay.  So at the bottom, does Mr. Miller use the language

21   that Mr. Delgado had provided to you about:  As you are well

22   aware, Mr. Adams and Mr. Ponce were part of the contract

23   negotiations and the other words that were in the preceding

24   e-mail that we talked about?

25   A.   Yes, ma'am.

1    Q.    And then do you -- is that e-mail then forwarded by you on

2    February 28th to Mr. Delgado?

3    A.    Yes, ma'am.

4    Q.    And does Mr. -- what does Mr. Delgado respond?

5    A.    It's perfect.

6    Q.    After they receive your response, Mitsubishi receives your

7    response, does Mr. Beddard send Mace?  Mace actually transmitted

8    the letter that you signed, correct?

9    A.    Yes, ma'am.

10   Q.    And does Mr. Beddard respond that -- this is Government's

11   Exhibit Number 97, which is already in evidence -- does he

12   respond to Mace, copied to you, that they just don't agree with

13   your e-mail?

14   A.    Yes, ma'am.

15   Q.    What did you do when you got this?  I mean you had signed

16   the letter and sent it.  When you signed and sent the letter,

17   did you believe the contents to be true?

18   A.    No, ma'am.

19   Q.    Did you send it anyway?

20   A.    I'm sorry?

21   Q.    When you signed and sent the letter, because Mitsubishi --

22   A.    Yes, I --

23   Q.    Did you believe the contents of the letter that you signed

24   was true?

25   A.    No, I didn't believe it was true.

1   Q.   Then why did you send it?

2   A.   Because he gave it to me.  And as you can see in the

3   paragraph before it says, please send this.  This is the warning

4   we need to send.

5   Q.   Well, did you do everything that Mr. Delgado tells you to

6   do?

7   A.   I wish I didn't, but I trusted him.  He was my attorney and

8   I trusted him as an attorney and as a friend.

9   Q.   This is still in February?

10  A.   Yes.

11  Q.   And you're asking about the letters of credit and you're

12  getting no response?

13  A.   Of course.  No, ma'am.

14  Q.   But you still trusted him?

15  A.   After my meetings in Mexico with the people in Mexico, I'm

16  cornered.  There's nothing I can do.  They had trusted me --

17  Q.   That's later.  That's later.  But this is still in

18  February, right?

19  A.   Well, I trust him.  I'm sorry, you're right.  Yeah, at this

20  time I trust him.  He say if we have this, I have all of these

21  documents and John Adams met with the C.F.E. people, so, yes I

22  trust him.

23  Q.   Okay.  And so when Mr. Beddard sends Mr. Miller and copies

24  you that your explanation -- oh, I'm sorry.  This is actually a

25  year later when your -- when they find out about the pledge.  So

 1    let me go back.

 2            With regard to Government's Exhibit Number 2, let me

 3    ask you a few more questions about -- we talked about money

 4    going to Charlotte's on December 10th.  Did your authorize

 5    $200,000 of the second payment to go to Charlotte's Furniture in

 6    El Paso, Texas?

 7    A.   No.

 8            MS. KANOF:  Your Honor, the government is displaying

 9    to the witness, but just asking the Court, there's a

10    self-proving affidavit at Government's Exhibit Number 146, the

11    records from -- the bank records from Charlotte's be admitted

12    into evidence.

13            THE COURT:  Mr. Hanshew?

14            MR. HANSHEW:  May I have a moment to look, Your Honor?

15            No, objection.

16            THE COURT:  GX-146 is admitted.

17    BY MS. KANOF:

18    Q.   On the first page of Bank of the West records of

19    Government's Exhibit Number 146, on August 6th, is there a

20    $70,000 deposit from Skippings and Rutley attorneys, a wire

21    transfer credit --

22    A.   Yes.

23    Q.   -- from that account?

24            Did you authorize the use of --

25    A.   No, ma'am.

1   Q.   -- for the second payment for payment to Charlotte's

2   Furniture?

3   A.   No, ma'am.

4   Q.   And here is the wiring information from Skippings and

5   Rutley.

6            By the way, in August, did you even know the money was

7   going into that account still?

8   A.   No, ma'am.

9   Q.   You had already requested the money not go into that

10  account, correct?

11  A.   Yes, but I didn't know.

12  Q.   What did you do when it didn't happen?

13  A.   On the second payment?

14  Q.   Uh-huh.

15  A.   I went back to Mexico again and I met --

16  Q.   Is this a third trip or was this --

17  A.   This is probably a third trip to see him.  And I was very

18  upset --

19  Q.   Who is him?

20  A.   Alberto Ramos.  And I was --

21  Q.   Before you talk about that, let's just look at the

22  December, out of these records, let's just look at

23  December 10th.  And this is still the second payment.  The third

24  payment has not been made, correct?

25  A.   No, ma'am.

 1    Q.   Okay.  So $200,000 wire transfer, Skippings and Rutley from

 2    the Turks and Caicos, did you authorize Mr. Delgado to use

 3    $200,000 from the first payment?

 4    A.   No, ma'am.

 5    Q.   Now, if you -- you want to go ahead and talk about your

 6    third trip to Mexico?  What caused you to go to Mexico a third

 7    time?

 8    A.   That the second payment came again from the Caribbean.  And

 9    I went back to Alberto and told him what happened.  I gave all

10    of this documentation.  I gave you this authorization to change

11    accounts and I gave you this and you haven't done anything.  It

12    still came from the same account.

13    Q.   Was this just you and he again?

14    A.   Yes, ma'am, him and me only, yes.

15    Q.   Okay.

16    A.   And he told me again --

17              MR. HANSHEW:  Objection, Your Honor, hearsay.

18              THE COURT:  Sustained.

19    BY MS. KANOF:

20    Q.   Were you satisfied with the response that he gave you?

21    A.   No, I was very upset and very upset that they didn't change

22    it back to my instructions and nothing changed.  Everything was

23    still the same and they were still in control.

24    Q.   Did you get a call from Mr. Delgado after this meeting?

25    A.   Yes, for sure I did.  I don't know what time or an hour or

1    two hours later, but again he told me the same thing, but a

2    little bit more violent; that I keep telling you that stop

3    bothering the C.F.E. people.  The C.F.E. people are very upset

4    of you [sic] stupidity, making questions, asking a lot of

5    questions.  And the same situation.  No, I never got any answers

6    and I still check that they were together on this and I wasn't

7    going to be able to do anything.

8    Q.   Any of this furniture that was purchased, the $270,000

9    worth of furniture purchased as Charlotte's, did any of it go to

10   you?

11   A.   No, ma'am.

12          MS. KANOF:  Government's Exhibit Number 151, Your

13   Honor, with a self-proving affidavit.  We move it -- it's money

14   from the Turks and Caicos that went to a college.  We ask that

15   it be admitted into evidence.

16          MR. HANSHEW:  No, objection, Your Honor.

17          THE COURT:  GX-151 is admitted.

18   BY MS. KANOF:

19   Q.   Did you authorize Mr. Delgado with the second payment to

20   wire transfer from the Turks and Caicos account?  It's sideways.

21   But $250,000 to Carnegie Mellon College?

22   A.   No, ma'am.

23   Q.   To set up some kind of financial benefit for students in

24   his name?

25   A.   No, ma'am.

1           MS. KANOF:  Government's Exhibit Number 152, Your

2     Honor, with a self-proving affidavit, we'd ask that it be

3     admitted into evidence?

4           MR. HANSHEW:  No, objection.

5           THE COURT:  GX-152 is admitted.

6     BY MS. KANOF:

7     Q.   And that's -- payments made to another college on behalf of

8     one of Mr. Delgado's children.  Did you authorize the use of

9     F.G.G. funds for those payments?

10    A.   No, ma'am.

11    Q.   Mr. Gireud, now you sent a letter that -- how many letters

12    did you send that you were unsure of the contents but signed

13    anyway?

14    A.   I don't know the exact amount, but they were plenty of them

15    when we have issues or situations with Mitsubishi or with

16    anybody so.  I don't have any, ma'am.

17    Q.   Government's Exhibit Number 99.

18          MS. KANOF:  I believe this is in evidence, Your Honor?

19          THE COURT:  Yes it is.

20    BY MS. KANOF:

21    Q.   In March of 2011, when Mitsubishi found out that their

22    equipment has been pledged, Mr. Miller sent an e-mail to Kevin

23    Beddard and copied you and Mr. Delgado.  Mr. Miller is asking --

24    let's go back first -- Mr. Beddard is asking for records that

25    contain John Adams' request and final approval of the pledge of

1    the Mitsubishi equipment.

2              MR. HANSHEW:  Objection.  Leading, Your Honor.

3              THE COURT:  Sustained.

4    BY MS. KANOF:

5    Q.   What is Mr. Beddard asking Mace for?

6    A.   He wants to know what is the document that I put -- I mean

7    that John Adams produced to pledge the equipment or to authorize

8    the equipment.

9    Q.   In the letter that you sent to Mitsubishi, you said that

10   there were documents, correct?

11   A.   Yes, ma'am.

12   Q.   And so now Mace responds what?

13   A.   Per your request, I have requested a copy of the documents

14   from C.F.E.  So we tried to get documents directly from the

15   C.F.E. to --

16   Q.   Well, didn't you have those documents?

17   A.   No, ma'am.  I never saw that letter.

18   Q.   Well, did you ask Mr. Delgado for the documents first?

19   A.   Yes, of course, and he says everything is in C.F.E. and I

20   believe there was even an e-mail that he requested C.F.E. to

21   send me to tell me that they comply with all of the financial

22   obligations of the contract.

23   Q.   Okay.  Did Mr. -- I'm showing you Government's Exhibit

24   Number 102.  Do you recall -- it's in evidence, this

25   December 28th letter that Mr. Adams sent to you and Mr. Delgado

1    when he was first complaining about the inspection in the

2    letters of credit and assignment of collect rights.  Do you

3    remember the letter?

4    A.   Yes, ma'am.

5    Q.   And so now it's 2011, March of 2011, and they're attaching

6    the letter because -- why are they attaching this letter to send

7    to you again in 2011?

8    A.   They just replied that they didn't do this letter or never

9    redacted such a letter.

10   Q.   Okay.  What's this redaction thing about?

11   A.   The pledge of the equipment.

12   Q.   Did you -- was there a discussion whether or not there was

13   a redaction of this letter between you and Mr. Delgado?

14   A.   No, ma'am.

15   Q.   On March 17th, Mr. Beddard sends you an e-mail requesting

16   a -- talking about a letter that you had sent or had forwarded

17   to him.  And this letter, do you recognize the letter?

18   A.   Yes.

19   Q.   Okay.  What is this letter that he attached?

20   A.   That they want to get all, most of the information and

21   everything pertaining to the contract.  They want to have copies

22   of everything that's related to the contract.

23   Q.   Who wants -- I'm sorry, let me back up.

24              MS. KANOF:  Is 106 in evidence?

25              THE COURT:  Yes.

1    BY MS. KANOF:

2    Q.    Okay.  Who wants everything relating to the contract?

3    Mitsubishi?

4    A.    Mitsubishi.

5    Q.    Okay.  And as a result, Mitsubishi is -- is Mr. Delgado

6    asking for everything?

7    A.    Yes.

8    Q.    Okay.  Do you know whether or not he sent that letter?

9    A.    No, ma'am.  I don't know.

10   Q.    But he didn't ask you to send the letter?

11   A.    No, ma'am.

12   Q.    In an e-mail, Government's Exhibit Number 107 which I

13   believe is in evidence, Mr. Beddard writes to you asking you,

14   telling you that they have recently received information

15   regarding the pledge that occurred.

16           MR. HANSHEW:  Objection.  Leading, Your Honor.

17           THE COURT:  Sustained.

18           MR. HANSHEW:  Sidebar, Your Honor.

19           THE COURT:  Sustained.

20   BY MS. KANOF:

21   Q.    What is the substance of Mr. Beddard's e-mail to you?

22   A.    That they received information regarding the pledge

23   agreement executed in Mexico or on January 15, 2010, by F.G.G.

24   Enterprises and the C.F.E. and initiation of the trust.

25   Q.    Okay.  With regard to this letter, what is he concerned

1    about?

2    A.   The execution of a pledge agreement.

3    Q.   And what representations is he concerned about that F.G.G.

4    made?

5    A.   That F.G.G. represented itself to be the owner and

6    possessor of the equipment.

7    Q.   Okay.  Did you at any time think F.G.G. owned and

8    possessed --

9    A.   No, ma'am.

10   Q.   -- the three turbines?  And this would have been March of

11   2011.

12   A.   No, ma'am.

13   Q.   Had they been delivered?

14   A.   No, ma'am.

15   Q.   One was still in Dunkirk?

16   A.   Dunkirk, France, yes, ma'am.

17   Q.   And the other two were in?

18   A.   Kobe, Japan.

19   Q.   And he references a meeting that occurred on March 8th of

20   2011.  Do you remember that meeting?

21   A.   No, ma'am.

22   Q.   Okay.  The e-mail is sent to you, but it's also copied to

23   Mr. Delgado and to Mr. Miller.  You didn't attend a meeting with

24   Mitsubishi on March 8th of 2011?

25   A.   No, ma'am.

1    Q.   Do you know whether Mr. Delgado did?

2    A.   No, ma'am, I don't.

3    Q.   So --

4    A.   But it says during our meetings, so I'm sure they were if

5    he's saying that.

6    Q.   But you know for sure you didn't go to the meetings.

7    A.   I didn't and I don't know if Marco went.

8    Q.   Mr. Miller -- this is Government's Exhibit Number 108 which

9    is also in evidence -- you are copied on this e-mail.  In

10   response to that demand, does Mr. Miller send an e-mail to

11   Mr. Beddard copying you and Mr. Delgado?

12   A.   Yes, ma'am.

13   Q.   And he -- does Mr. Miller reference that same meeting?

14   A.   Yes, he's referenced at that meeting.

15   Q.   Do you know whether Mr. Miller drafted this or if

16   Mr. Delgado drafted this?

17   A.   It was either Marco or Mace, but I don't remember who did.

18   Q.   But did you draft this?

19   A.   I wish I write ten percent of the way they write.

20   Q.   So is that a no?

21   A.   No.  Yes, that's a no.

22   Q.   And on the next day on March 24th, did Mr. Beddard write --

23   send an e-mail to you referring to your e-mail of March 21st?

24   A.   Yes, ma'am.

25   Q.   And what did you do when again that they're alleging that

1   you misrepresented the fact that you were the owner of the

2   equipment?

3   A.   Well, I call Marco and told him this is what's happening,

4   so what are you suggesting we do, since it was like we never

5   pledge that equipment -- I didn't know that we pledge the

6   equipment.

7   Q.   Okay.  Now in Government's Exhibit Number 110, Mr. Delgado

8   sent an e-mail to Mr. Beddard and to himself.  Did you -- you

9   didn't get a copy of this; is that correct?

10  A.   No, ma'am.

11  Q.   But in this e-mail, he says he has circulated and discussed

12  Mr. Beddard's e-mail regarding the pledge with the appropriate

13  parties.  Did Mr. Delgado circulate and discuss Mr. Beddard's

14  e-mail with you?

15  A.   No, ma'am.

16  Q.   Well, who -- do you know who the appropriate parties would

17  have been?

18  A.   No, ma'am.

19  Q.   And he says the appropriate parties who have been charged

20  with preparing the corresponding response.  Who would have been

21  charged with preparing the corresponding response?

22  A.   Marco.

23  Q.   Have you -- this is March of 2011.  Have you hired other

24  counsel by this time?

25  A.   No, ma'am.

```
1    Q.   Okay.  So at some point in time you hire other attorneys;

2    is that correct?

3    A.   Yes, ma'am.

4    Q.   But not at this time?

5    A.   No, ma'am.

6    Q.   Government's Exhibit Number 111, which I believe is in

7    evidence, Mr. Delgado copies you on an e-mail to Mr. Beddard,

8    and attached to that is a letter on F.G.G. Enterprises

9    letterhead.

10            MS. KANOF:  I believe this is in evidence,

11   Government's Exhibit 111?

12            THE COURT:  Yes, ma'am, it is.  I have note, something

13   about clarifying names and addresses.

14            MS. KANOF:  I'm sorry, Your Honor?

15            THE COURT:  I had a note when you introduced this that

16   you would clarify names and addresses maybe in the e-mail.

17            MS. KANOF:  Yes.

18   BY MS. KANOF:

19   Q.   In this particular e-mail, you -- do you know who Eduardo

20   Buendia is?

21   A.   Yes.  He was the assistant of Alberto Ramos, the third in

22   charge, yes.

23   Q.   He was underneath Alberto Ramos?

24   A.   Underneath Alberto Ramos, yes.

25   Q.   And the letter that's attached, is that F.G.G.'s address?
```

DIRECT GIREUD                                                              102

```
 1    A.   No, that's Marco Delgado's address, I believe.

 2    Q.   And is this letter from you?

 3    A.   No, ma'am.

 4    Q.   Did you authorize Mr. Delgado to send this letter to

 5    Mr. Buendia?

 6    A.   No, ma'am.

 7    Q.   Did Mr. Delgado show the letter to you?

 8    A.   No, ma'am.

 9    Q.   Before he sent it to Mr. Buendia?

10    A.   No, ma'am.

11         MS. KANOF:  Government's Exhibit Number 112 and 112A,

12    have they been moved, Your Honor, into evidence?

13         THE COURT:  Yes, ma'am.

14    BY MS. KANOF:

15    Q.   Okay.  So this is an English or I clicked on the English

16    translation.

17         Patrick Altamura receives an e-mail of what has been

18    forwarded to him.

19         MR. HANSHEW:  Objection.  Leading, Your Honor.

20         MS. KANOF:  Sorry.

21         THE COURT:  Sustained.

22    BY MS. KANOF:

23    Q.   Do you recognize on the letter from before, the 28th of

24    March, 2011, Mr. Delgado's signature?

25    A.   Yes, ma'am.
```

1    Q.    Okay.  And in the English translation, if you could please

2    read what Mr. Delgado is telling Mr. Buendia?

3    A.    In relation to the (reading; mumbling) pledge agreement

4    related to the contract for the procurement of assets number

5    FAGP0012009, I request that you kindly confirm as soon as

6    possible that the Federal Electricity Commission, as the signee

7    of the above-mentioned instrument, verifies that according to

8    paragraph 2A -- 2.6, I'm sorry -- of the contract requesting

9    title ownership to the assets will not be affective until the

10   time of payment in full of the cost and commercial operations of

11   the equipment.  And that likewise stated -- is aware of and

12   informed that the position of said assets remain with M.P.S.A.

13   in the workshop where they agreed upon and attachments are being

14   done under terms of the corresponding contract.  With nothing

15   further, I await your confirmation.

16   Q.    Do you know who Francisco Moreno is?

17   A.    No.  No, ma'am.

18   Q.    Was Eduardo Buendia a lawyer?

19   A.    No, ma'am.

20   Q.    Did you ever meet a lawyer by the name of Francisco Moreno

21   from C.F.E.?

22   A.    It sound -- the name sounds familiar, but I don't remember

23   meeting him.

24   Q.    But this is a confirmation of the meeting of the pledge

25   agreement, but not from a lawyer?

1    A.   Yes, ma'am.

2    Q.   And was -- was Mitsubishi concerned about whether title

3    transferred or just about the pledge itself?

4    A.   The main thing was the pledge.  Yes, they were concerned

5    about the pledge of the equipment.

6    Q.   And Government's Exhibit Number 113, an e-mail from

7    Mr. Beddard to you, which is already in evidence, what is

8    Mr. Beddard concerned about?

9    A.   He wants us to confirm in writing that the pledge of the

10   equipment has been corrected, that it was something that --

11   Q.   Back to that, right?

12   A.   Yes.

13   Q.   Government's Exhibit Number 115, Mr. Beddard writing to

14   Mace Miller and copying you, and what is -- this is now March of

15   2011 -- and what is the substance?

16   A.   He wants to confirm, Kevin to Mace, that they're -- they be

17   directly copied from the response from the C.F.E. that they want

18   to have direct copy from the C.F.E.

19   Q.   Okay.

20        MS. KANOF:  Government's Exhibits Number 15 [sic],

21   we'd add admission, Your Honor, for it to be into evidence, Your

22   Honor.

23        THE COURT:  That was 115?

24        MS. KANOF:  Yes, sir.

25        MR. HANSHEW:  No, objection.

1            THE COURT:  GX-115 is admitted.

2    BY MS. KANOF:

3    Q.   So this is already March of 2011.  And Mace is the first

4    individual to write in the e-mail stream.  And what is he

5    attaching to this e-mail?

6    A.   The executed Assignment of Collection Rights.

7    Q.   Okay.  You had signed and executed an assignment of

8    collection rights according to your testimony, first, when?

9    When was the first time you signed a letter and provided it to

10   Marco Delgado to provide to C.F.E.?

11   A.   It was prior to this, a long time before this.  I don't

12   remember exact date.

13   Q.   With relationship to the project --

14   A.   Oh.

15   Q.   -- was it more than a year before this?

16   A.   Yes, ma'am.

17   Q.   And so this is still an issue?

18   A.   Yes, ma'am.

19   Q.   That has not been resolved; is that correct?

20   A.   Yes, ma'am.

21   Q.   And so there's another letter being signed?

22   A.   Yes, ma'am.

23   Q.   And then in response to that, what does Mr. Beddard have

24   concerns about?

25   A.   The pledge of the equipment.

1    Q.   Okay.  Does Mr. Beddard ask for copies?

2    A.   Yes.

3    Q.   Did you have copies of the pledge?

4    A.   No, ma'am.

5    Q.   This is 2011.

6    A.   No, ma'am.

7    Q.   How did you respond to him or did you respond to him, if

8    you can recall?

9    A.   I don't remember our response.

10   Q.   Government's Exhibit Number 119.  Is this an e-mail from

11   Mace Miller copied to you and Mr. Delgado?

12   A.   Yes, ma'am.

13   Q.   Or sent actually to you and Mr. Delgado?

14   A.   Yes, ma'am.

15   Q.   What's happening now?  This is a month later, May of 2011.

16   A.   Well, he's bringing some --

17          THE COURT:  It's not --

18          MS. KANOF:  I offer it.  Move for admission of

19   Government's Exhibit Number 119.

20          THE COURT:  Mr. Hanshew?

21          MR. HANSHEW:  No, objection.

22          THE COURT:  GX-119 is admitted.

23   BY MS. KANOF:

24   Q.   Are you now looking for counsel for F.G.G.?

25   A.   We have counsel.

1    Q.   Well, I've been on the phone with perspective counsel with

2    F.G.G. for about an hour.

3    A.   Yes.

4    Q.   Okay.  So you are looking for counsel, additional counsel;

5    is that correct?

6    A.   Well, Mace and I were frustrated so many times and so many

7    things we wanted to see if we can look for legal advice because

8    everything was going down the drain.

9    Q.   Government's Exhibit Number 125.  Is that an e-mail from

10   Mr. Delgado to you and -- yes to you and others?

11   A.   Yes, ma'am.

12   Q.   Okay.  And what is --

13            MS. KANOF:  We move that Government's Exhibit

14   Number 125 be admitted into evidence.

15            THE COURT:  125 is in evidence.

16            MS. KANOF:  Oh.

17   BY MS. KANOF:

18   Q.   What's the substance of this?  And this is again April of

19   2011.

20   A.   Well, its saying that we don't agree on the validity of the

21   C.F.E.-F.G.G., of the pledge agreement.

22   Q.   But is -- is -- are you discussing with Mr. Delgado whether

23   or not you are going to lose this contract?

24   A.   Yes, ma'am.

25   Q.   And what does he tell you about whether or not you are

1    going to lose this contract?

2    A.   Well, somewhere about this time we are desperate and we

3    don't know what to do.  We know -- I know somewhere close to

4    sometime that we're going to have to produce the letters of

5    credit, that we're going have to do what was the right thing

6    from the very beginning, because they're getting very upset that

7    they -- that we pledged something that didn't belong to us --

8    and I said we, as F.G.G. Enterprises -- but we know that Marco

9    Delgado is the one that pledged the equipment himself.

10   Q.   And you discussed it with Mr. Delgado and does he reassure

11   you?

12   A.   Probably up to this point we still have letters of credit

13   or --

14   Q.   Oh, he assured you that you have letters of credit?

15   A.   Yes.  I mean because if not --

16   Q.   And he's vouching --

17   A.   Because I ask him if -- he always said letters of credit.

18   I said you lied to me all of this time, but then where is the

19   money?  If you bought the letters of credit, where is the money?

20   If the money doesn't exist, then the letters of credit should

21   be.  So it's -- it was beginning to be very, very difficult

22   times because we still don't get answers.

23   Q.   Government's Exhibit Number 126.  Do you recognize F.G.G.

24   letterhead?

25   A.   Yes, ma'am, but it still has a wrong address.

```
1    Q.   Okay.  Did you sign this letter?

2    A.   No, ma'am.

3    Q.   Did Mr. Delgado pass it by you before he sent it to

4    Francisco Moreno at F.G.G.?

5    A.   No, ma'am.

6    Q.   When he transmitted it to Mr. Moreno, how -- did he copy

7    you on it?

8    A.   Yes, I have copy there, but --

9         MS. KANOF:  We'd move admission of Government's

10   Exhibit 126 into evidence.

11        MR. HANSHEW:  No objection.

12        THE COURT:  126 is admitted.

13        MS. KANOF:  And 126A, the English translation.

14        THE COURT:  Mr. Hanshew?

15        MR. HANSHEW:  No, objection.

16        THE COURT:  126A is admitted.

17   BY MS. KANOF:

18   Q.   So you didn't know who Francisco Moreno was?

19   A.   No, ma'am.  I don't really know.

20   Q.   But Mr. Delgado copies on -- this to you and it's a

21   transmittal e-mail.  And what does he write to Mr. Moreno?

22   A.   I'm attaching a formal request for (reading; mumbling) --

23        (Court Reporter asks witness to repeat.)

24   A.   I'm attaching the formal request for assignment of

25   collection rights to Mitsubishi, which we are discussing.  We
```

1    will send you the original by special delivery today.  As you

2    will notice, we incorporated the changes you suggested to the

3    draft that Mitsubishi drafted.  I hope that document will

4    fulfill the requirements and that you will support us by

5    expeditiously proceeding [sic] your approval.  We respect that

6    the director's recommendation, I inform you that the suggested

7    meeting with Mitsubishi still hasn't been set.  Their attorney

8    informed me Mitsubishi is still evaluating the convenience of

9    meeting with F.G.G.  We will keep you updated on the matter.  I

10   remain at your service for any clarifications, Marco Delgado.

11   Q.    All right.  And the letter that Mr. Delgado sent on

12   April 14th to an attorney legal adviser at C.F.E., again, you

13   never saw this, correct?

14   A.    No, ma'am.

15   Q.    But let me ask you, do you know what clause 15 of the

16   contract is?

17   A.    No, ma'am.

18   Q.    And Mr. Moreno -- or Mr. Delgado tells Mr. Moreno it's

19   regarding the rights, which are the object of assignment that we

20   are dealing with.

21   A.    Yes, ma'am.

22   Q.    Okay.  And attached to that is a schedule of payments for

23   the gas and steam turbines.  And the date of this letter is 2011

24   and this is a schedule of payments that has been attached, I

25   guess, by Mr. Delgado, do you know?

1   A.   I don't know who attached to it, but I never saw this

2   letter.

3   Q.   Well let me ask you, who wrote this letter?

4   A.   Marco Delgado.

5   Q.   And he wrote it to who?

6   A.   To Moreno.

7   Q.   And previously did you testify that it was your

8   understanding that Mitsubishi set the payment schedule, the

9   schedule of payments?

10  A.   No, ma'am.

11  Q.   Okay.  Did you know who was setting the schedule of

12  payments?

13  A.   C.F.E. set the schedule of payments in the very beginning.

14  Q.   But on F.G.G. letterhead, attached to the letter to

15  Mr. Moreno, does this say payment schedule?

16  A.   Yes, ma'am.

17  Q.   And what does it say underneath it?

18  A.   In this context -- (reading silently).

19  Q.   In bold.

20  A.   That he certifies that he's declaring under oath to tell

21  the truth.

22  Q.   That his client, F.G.G.?

23  A.   That his client F.G.G. has not previously signed any other

24  assignment of rights nor any other legal action that translates

25  into assignment of said collection rights through third parties.

1    Q.    And what else is he saying?

2    A.    As I state above, it is requested that the failure to --

3    (reading; mumbling) -- finance department, based on the second

4    section of clause 15 of contract numbers of so, issue their

5    express written approval with regards to the request for

6    assignment of collection rights of the pending payments to the

7    company Mitsubishi Power Systems of America, Inc.

8    Q.    The -- this is the English version, correct?

9    A.    Yes, ma'am.

10   Q.    Okay.  It's now April of 2011 and Mr. Delgado has sworn

11   under oath that there's never been an assignment of collection

12   of rights, correct?

13   A.    Yes.

14   Q.    And what has he told you about the assignment of collection

15   rights?

16   A.    That they were really done in Mexico City, that they have

17   everything in Mexico City.

18   Q.    And do you know what he's told Mitsubishi with regard to

19   the assignment of collection rights?

20   A.    No, ma'am.

21   Q.    On -- with regard to the summary chart, there was just one

22   or two more documents I wanted to offer.

23          On March 17th of 2011, the third payment -- well, was

24   there ever a third payment issued?

25   A.    I don't recall, ma'am.  I don't think so.

 1    Q.    It fell apart before the third payment?

 2    A.    Yes, ma'am.

 3    Q.    Okay.  Do you know who First New Mexico Title an Abstract

 4    is?

 5    A.    No, ma'am.

 6    Q.    Did you authorize Mr. Delgado to make $152,000 payment to

 7    First New Mexico Title an abstract Company?

 8    A.    No, ma'am.

 9              MS. KANOF:  I'm looking for it.  Anna, do you know?

10              We'd move for Government's Exhibit Number 150, Your

11    Honor.  I have a self-proving affidavit regarding to the

12    Kandahar Condominium in Taos, New Mexico, the titles documents,

13    we move admission into evidence.

14              MR. HANSHEW:  No, objection, Your Honor.

15              THE COURT:  GX-150 is admitted.

16              MS. KANOF:  I'll pass the witness.

17              THE COURT:  Mr. Hanshew?

18              THE WITNESS:  Excuse me, Your Honor?

19              THE COURT:  Yes, sir.

20              THE WITNESS:  Can I be excused to go to the restroom?

21              THE COURT:  Oh, absolutely.

22              Let's take a ten-minute recess.  Everyone be back at

23    12:10, we'll resume our proceedings then.

24              THE WITNESS:  Thank you.

25              COURTROOM SECURITY OFFICER HEIDTMAN:  All rise for the

1         jury.

2              (Break at 12:04 p.m. to 12:15 p.m.)

3              (Jury present.)

4              THE COURT:  Let the record reflect that all members of

5    the jury are present, the United States through its assistant

6    United State's attorneys is present, the defendant and his

7    counsel are present.

8              The witness, Mr. Gireud, is on the witness stand.

9              Mr. Hanshew?

10             MR. HANSHEW:  Thank you, Your Honor.

11                      FERNANDO GIREUD,

12             CROSS-EXAMINATION BY THE DEFENSE

13   BY MR. HANSHEW:

14   Q.   Good afternoon, Mr. Gireud?

15   A.   Good afternoon, sir.

16   Q.   Earlier this morning you were testifying that Ms. Kanof had

17   suggested some information to you about Ener Proyectos; is that

18   correct?

19   A.   Repeat the question?  I'm sorry.

20   Q.   Earlier, you stated that Ms. Kanof had suggested to you

21   information, names related to Ener Proyectos, correct?

22   A.   Yes, sir.

23   Q.   And you also mentioned throughout your testimony today and

24   yesterday about meetings you have had with Ms. Kanof, correct?

25   A.   Yes, sir.

1    Q.    How many meetings have you had with Ms. Kanof?

2    A.    I'm sorry, sir.  I don't know.  Probably, four -- three,

3    four meetings.

4    Q.    Three or four meetings?

5    A.    Yes, ma'am [sic], to the best of my recollection, yes.

6    Q.    And you started meeting with the law enforcement, the

7    agents here, back in 2012 about this case; is that right?

8    A.    Yes, sir.

9    Q.    Okay.  And from 2012 till today, how many meetings have you

10   had with the agents?

11   A.    I never had any meetings alone with the agents.  The agents

12   that I have, Ms. Kanof and Ms. Arreola were always present, so I

13   think it's the same.  I think it's the same, three or four

14   meetings, sir.  I cannot remember exactly how many meetings.

15   Q.    But you believe three to four meetings over a four-year

16   period?

17   A.    Every time there was going to be a trial, they met with me

18   for three, four hours, five hours, depends on the length.  And

19   then we'll see you next week or we see you in two weeks, if we

20   have more questions, and then the trial was moved or changed or

21   extended.  I don't know how to say it, extended.  So next time

22   we have to meet again and we have to review things and then the

23   meeting is being rescheduled, the trial had to be rescheduled.

24   I don't recall if it was three or four times, but it's been many

25   times, four times probably.

1    Q.    Four times then?

2    A.    I don't know, sir.  I don't know if it's three or four.  I

3    remember -- that's all I remember.

4    Q.    Okay.

5    A.    But they were different meetings, yes.

6    Q.    And so throughout those four meetings, you're saying, did

7    you provide any written statements to the officers?

8    A.    No, sir.  I don't remember providing anything to them.

9    Q.    So, in the time span from 2012 to today, you've never

10   provided any written statements that you've created?

11   A.    Originally, when I met with them the very first time, I

12   have a set of documents and I have Mary Stillinger as my

13   attorney.  And I provide a lot of documents to her and I think

14   she provides these documents to the agents.

15          I don't remember if I ever provided anything directly,

16   myself.  I don't remember, sir.  The only time that I brought

17   documents, but I wasn't providing and we talked about it that's

18   when they delivered documents for me for your subpoena, that's

19   the only time that I remember I brought those.

20   Q.    So you don't know whether you provided a statement to the

21   government?

22   A.    If I provided a statement.  That means a written -- a

23   verbal statement or something like that?  Is that what you mean?

24   Q.    A document that has words on it that you created?

25   A.    No.  There was a document in Spanish that I provided to my

1    Mexican counsel in Mexico and they have a copy of it.  But I

2    don't remember giving that to them.  I gave it to Mary

3    Stillinger once and to the other Mexico Attorney General, but I

4    don't have a recollection that I provided that document to them

5    directly.

6    Q.   Okay.  And Mary Stillinger is your criminal lawyer,

7    correct?

8    A.   No, she's not.  She's not my criminal attorney anymore.

9    Q.   She was your criminal lawyer?

10   A.   She was, yes.

11   Q.   And the Mexican lawyer you mentioned, who is that?

12   A.   Ms. Armando Gutierrez, an attorney.

13   Q.   And what's his area of specialty in law?

14   A.   He's a criminal law and I believe it's business law.  I

15   mean he works -- he has an office in El Paso and he also has an

16   office in Juarez.

17   Q.   So you've had two criminal lawyers related to this matter?

18   A.   No.  Armando Gutierrez was to be representing me with the

19   case in Mexico with the C.F.E., so he had nothing to do with the

20   case in the United States.  He was just representing me with the

21   allegation that is happened after this incident from the C.F.E.

22   in Mexico.

23   Q.   Okay.  So then just Mary Stillinger?

24   A.   Yes.

25   Q.   And that gentleman sitting back there, is he your lawyer as

1    well?

2    A.   Yes.

3    Q.   He's been in here the whole time, correct?

4    A.   Yes.  He's been in here since we started this, yes.

5    Q.   He's been here for the whole trial, correct?

6    A.   Yes.

7    Q.   And he's your criminal lawyer as well?

8    A.   Yes, sir.

9    Q.   Now, when you had these meetings with the agents and the

10   prosecutors, did you take any notes?

11   A.   Probably once or twice I -- I didn't recall a document or

12   something, and I said let me make a note and see if I can go

13   back and look at my e-mails or something, but I hardly ever.

14   The last time I met with attorney Jose Luis Gonzalez, I took two

15   notes, and I told you already previously what they meant, but,

16   no, I hardly ever take any notes, never.  Probably once, and it

17   was remind me to look for this document or to review this or to

18   read the contract, I mean things like that, but nothing that I

19   was needing to produce.

20   Q.   So you never provided any of these notes to the agents or

21   the U.S. Attorney's Office?

22   A.   No, sir.

23   Q.   Now, did the agents take notes while you had these

24   interviews?

25   A.   I don't remember that the agents take notes.  I'm sorry.  I

1    don't think I pay attention.  I know Ms. Kanof and Ms. Arreola,

2    yes, they did took a lot of notes and things like that.  But

3    I -- I don't recall if the agents took notes to be honest with

4    you.

5    Q.    Okay.  Do you recall if they videotaped these interviews?

6    A.    I'm sorry?

7    Q.    Do you recall if they videotaped the interviews?

8    A.    I don't remember if they were videotaped or I wasn't aware

9    of that, not that I know of.

10   Q.    You didn't see a camera, for example?

11   A.    No, sir, I don't remember seeing a camera.

12   Q.    Did they audio record it to your knowledge?

13   A.    Not that I remember, sir.

14   Q.    And when you met with them, did you have your lawyer

15   present?

16   A.    Yes, sir.  Well, the first meeting or two with the agents

17   at the beginning of all of this, yes, Mary Stillinger was always

18   present.  There was a time that she has court and we still had

19   some questions and she -- the agents asked and Ms. Kanof I

20   believe or -- they asked if I could continue for another hour or

21   two without my attorney present and I said yes.  And every time

22   I met with them, the last year or two, I called my attorney or

23   actually they called my attorney, and they said is that okay

24   that I go, and I've been going there without my attorney the

25   last two meetings.  But they are aware of it and my attorney

1    tells me you can go, so...

2    Q.   So each time they did an interview, they'd call your

3    attorney?

4    A.   Yes --

5    Q.   And get the approval?

6    A.   -- yes or they call me.  I don't know if one time they

7    called me directly, do you have time on this time and I said

8    yes.  They said check with your attorney if you can come to the

9    meeting or something like that, and yes, and then they have

10   talked, yes, sir.

11   Q.   Okay.  And during these interviews, at any point did they

12   accuse you of breaking the law?

13   A.   No.  No, sir.  Not that I'm aware of.

14   Q.   Not that you are aware of or You would be aware if someone

15   accused you of breaking the law?

16   A.   If I recall correctly, the very first meeting I had with

17   the agents, I -- they didn't know I had a case and I have all of

18   these issues and they start showing me documents that they have,

19   a wire or something, and probably at that moment they never

20   accused me of anything, but they -- they were very strong with

21   me.  I felt -- I felt -- well, anyways, that was my very first

22   time in a situation like this, so I was very nervous.  I didn't

23   know what it expect.  I didn't know what they wanted.  I didn't

24   know what I was going to say, so, yeah, I was -- but I don't

25   think I ever been accused of anything.

1   Q.   Okay.  Because were you there with Mary Stillinger at that

2   first meeting?

3   A.   Yes.

4   Q.   And to be clear you were also there, you had an agreement

5   to protect you, correct?

6   A.   Well, yes, I did have proof in letter or I don't know what

7   you call it, yes.

8   Q.   Proffer letter?

9   A.   Proffer letter or immunity letter.  I don't know what you

10  call it.  I heard different names from different attorneys.

11  Q.   So you think you had I immunity?

12  A.   At the very beginning, to be honest with you, I thought I

13  have a complete immunity, including that I put on that document

14  that you referred me for, if I ever written something or

15  something, I put it there that I have immunity.  I put I have

16  immunity.  They gave me a document that I had immunity.

17       And later on, on the meetings with Ms. Arreola and

18  Ms. Kanof, they asked me, we have a copy of this document that

19  you produced and are you saying that you have this?  It says you

20  talked to your lawyer.  You better clarify this very clear with

21  your attorneys, so they can explain to you what it means and

22  what is this document.  But we want you to pay the time [sic]

23  and time to talk to your attorneys, so you can understand this,

24  because you said you have complete immunity here and the

25  government never gives complete immunity.  You need to make sure

CROSS GIREUD                                                            122

1    you review this with your attorney.  They wanted to make sure

2    that I did.

3    Q.   And you reviewed this agreement with your attorney?

4    A.   Yes, sir.

5    Q.   And this agreement, you remember indicates that you are

6    there to talk with them about your criminal activities?

7    A.   No, sir.  It's not my understanding of that.  They said

8    you're there to show a case.  You came with us with a case and

9    you're here to tell us everything you have, all of the evidence

10   you have to claim that you have a claim or that you have a case.

11        And they emphasize all the time that you have to tell

12   us the truth, you have to tell us what you know and we're going

13   to do this, but it never says that I was accused a criminal.

14   Q.   So my question was, to be clear here, whether or not this

15   agreement said that you were there to provide information about

16   your criminal activity, yes or no, sir?

17   A.   No, sir.  I don't have a criminal activity.

18   Q.   And that's not what this agreement said.

19        MS. KANOF:  Your Honor, I'm going to object to the

20   mischaracterization of the proffer letter.

21        THE COURT:  You can cover that on your redirect.

22   BY MR. HANSHEW:

23   Q.   I'm going to have you look at that document marked

24   Defendant's Exhibit 163?

25   A.   Yes, sir.

1    Q.   Tell me when you get a chance to look at that.

2    A.   What number do you want me to see?

3    Q.   163.

4    A.   Okay.

5    Q.   Do you see it there on your screen?

6    A.   Yes, sir.

7    Q.   Does that look familiar to you?

8    A.   Yes.  I think that's the letter that I'm talking about,

9    yes.

10   Q.   Okay.

11           MR. HANSHEW:  Your Honor, move to admit Defendant's

12   Exhibit 163.

13           MS. KANOF:  Object, Your Honor.  It's hearsay.

14           THE COURT:  Mr. Hanshew?

15           MR. HANSHEW:  The letter is not hearsay.  It's not --

16   it's to show the statements that he just made in contrary,

17   Judge.  It's for impeachment purposes.

18           THE COURT:  Okay.

19           MS. KANOF:  Your Honor, there's -- the law is very

20   clear you cannot introduce extrinsic evidence to impeach.

21           MR. HANSHEW:  It's not extrinsic evidence.

22           THE COURT:  If this is -- if he said something that's

23   contrary to this, then it would not be hearsay, because it's a

24   prior inconsistent --

25           MS. KANOF:  I'm not sure if he said something

1    contrary.

2           THE COURT:  If it's not his own statement, it's not a

3    prior inconsistent statement.  If it's not a prior inconsistent

4    statement then what is it?

5           MR. HANSHEW:  He made a statement that he didn't sign

6    an agreement about his criminal activities.  I'd just have the

7    Court look at first, number one --

8           MS. KANOF:  Before he had an opportunity to read it.

9           MR. HANSHEW:  -- number one --

10           THE COURT:  I'll review it at the break.

11           MR. HANSHEW:  I'm sorry, Judge?

12           THE COURT:  I'm going to withhold a ruling on it.

13    I'll review it at the break.

14           Do you have something like that?  I mean if you can

15    just give me 163.

16           MR. HANSHEW:  Sure.

17           May I approach?

18           THE COURT:  Yes, sir.

19           I'm going to review it over the break.  You can go

20    ahead and proceed.

21           MR. HANSHEW:  Okay, Judge.  I would just point to

22    number one on that document.

23           MS. KANOF:  You know what, Your Honor?  I'm going to

24    withdraw the objection and let it go into evidence.

25           THE COURT:  All right.  163 is admitted.

```
 1   BY MR. HANSHEW:
 2   Q.   Sir, can you read paragraph number one there?
 3   A.   You want me to read it loud?
 4   Q.   Yes, sir.
 5   A.   The purpose the purpose of your client making a proffer --
 6   proofer [sic] is to provide the government with an opportunity
 7   to assess the value, extent and truthfulness of your client's
 8   information about the criminal activity of your client and
 9   others.
10   Q.   Okay.  So you'd agree then that that statement there is
11   criminal activities of you?
12   A.   Yes, sir.
13   Q.   And you had a full opportunity to read this agreement,
14   correct?
15   A.   Well, sir, it was provided to me during a very difficult
16   time.  They gave me a document that is -- was full of legal
17   terminology and she just said sign it, you're okay with this.
18   And I trust Mary Stillinger and I didn't really -- she just said
19   you can sign it and everything was going to be -- you're okay.
20   Q.   So another lawyer hurried you along on this agreement as
21   well?
22   A.   I'm sorry?
23   Q.   You were hurried along to sign this?
24   A.   No.  No, I wasn't hurried along, but I read it and I [sic]
25   said do you have any questions and said, well, I have a lot of
```

1    questions.  I don't understand the legal terms.  Sign it, it's

2    okay.  Sign it and I can go over it later on with you in detail.

3    But I signed it.  No, I wasn't in a hurry to sign it.

4    Q.   Well, if you weren't in a hurry you would have had plenty

5    of time to understand it, correct?

6    A.   Yes.  Yes, sir.

7    Q.   And can you read now the blocked out section there?

8    A.   Yes, sir.  You want me to read it?

9    Q.   Yes, sir.

10   A.   I, Fernando De Jesus Gireud have read proofer [sic]

11   agreement and review every part of it with my attorney.  I

12   understand this agreement and I voluntarily and knowingly and

13   willingly agree to it without force, threat or coercion.  No

14   other promises or documents have been made to me other than

15   those contained or refers in this letter.  I am satisfied with

16   the representation of my attorney in this matter.

17   Q.   So you read it fully, correct?

18   A.   Yes, sir.

19   Q.   And you said you understood the agreement?

20   A.   Yes, sir.

21   Q.   And you signed it?

22   A.   Yes, sir.

23   Q.   And you did all of that before you ever had a first meeting

24   with the government, prosecutors and the agents, correct?

25   A.   Yes, sir.

1    Q.   So you felt comfortable at that point because you were

2    protected?

3    A.   Yes, sir.

4    Q.   Because were you scared, right?  You didn't want to go to

5    jail for having commit a crime?

6    A.   I want to understand the question, please.

7    Q.   Before you had this agreement were you concerned about your

8    activities?

9    A.   No, sir.

10   Q.   You weren't?  Then why would you have this agreement?

11   A.   I didn't ask for the agreement.  The agreement was

12   presented to me and given to me on that meeting.  I didn't ask

13   or I didn't know they exist, so I was just arrived to the

14   meeting and we started discussing on this.  And somewhere in the

15   meeting it was shown to me and Mary Stillinger, my attorney,

16   said we're good, sign it and that's it.  But when I went to the

17   meeting I wasn't afraid or scared that I did something wrong.

18   Q.   Well, you wouldn't need this then if you hadn't done

19   something wrong, right?

20   A.   Yes, sir.

21   Q.   Now, Mary Stillinger, Mr. Hobbs, the Mexican attorney you

22   mentioned, you have other lawyers as well, correct?

23   A.   Yes, sir.

24   Q.   Who are they?

25   A.   Well, I had Mary Stillinger first and then I have Armando

1   Gutierrez in Mexico.  He had another group in Mexico City.  I

2   don't -- I remember one of the names is Cesar Nava in Mexico

3   City.  And another one of his attorneys I don't remember the

4   name.  And then later on, I hired Rene Ordoñez to help me with

5   the civil lawsuit.  Oh, actually, and the very first attorney I

6   had was Andritos, George Andritos from El Paso.  And I think so

7   far that's all I have.

8   Q.   Okay.  Your son as well?

9   A.   My son is an attorney, too.

10  Q.   And you mention Mr. Rene Ordoñez?

11  A.   Yes, sir.

12  Q.   And he's your attorney for the civil lawsuits that are

13  related to this case, correct?

14  A.   Yes, sir.

15  Q.   Because those are -- those are all about money, aren't

16  they?

17  A.   Yes, sir.

18  Q.   And about you having to pay money or you receiving money?

19  A.   Me receiving money and paying money.

20  Q.   And if Mr. Delgado were to be found guilty, that would help

21  you in those lawsuits, wouldn't it?

22  A.   Yes, sir.

23  Q.   Now, I want to talk a little more about your background.

24  You're trained both in education and professionally as an

25  electrical engineer?

1    A.   Yes, sir.

2    Q.   You are taught to be logical, correct?

3    A.   Yes, I guess so, yes.

4    Q.   Analytical?

5    A.   Yes.

6    Q.   Meticulous to details?

7    A.   Yes, you could say that, yes, sir.

8    Q.   And when you moved into your first job, what were your

9    duties at that job?  I mean after you graduated from college.

10   A.   We were designing power panels for utilities, control

11   panels for utilities.

12   Q.   Did you work on any type of accounting matters?

13   A.   No, sir.

14   Q.   Did you work on any contract reviews?

15   A.   No, sir.

16   Q.   Did you work on any equipment sales contracts?

17   A.   Yes.  I was able to review -- they usually provided me with

18   copies of contracts of our customers so I can see exactly what

19   is this report.  They were simple contracts, nothing big, but

20   yes, yes, sir, the answer is yes.

21   Q.   Okay.  How about long term service agreements?

22   A.   No, sir.  I never see any one of those.

23   Q.   And then from that job you moved into the El Paso Electric

24   job; is that correct?

25   A.   Yes, sir.

1    Q.    And that's where you spent the majority of your career?

2    A.    Yes, sir.

3    Q.    And what was the first job that you had there?

4    A.    As a communications engineer.

5    Q.    And as part of that job, were you dealing with account

6    management?

7    A.    No, sir.

8    Q.    Financials?

9    A.    No, sir.

10   Q.    Were you reviewing sales equipment contracts?

11   A.    No, sir.  They -- my job was to put the specifications of

12   an equipment and to purchasing in-department buys, that, and

13   they had their own contracts.  We were not involved in the

14   contract.

15   Q.    Okay.  And now as you progressed through the years at

16   El Paso Electric, at any point did you become involved in

17   accounting?

18   A.    No, sir.

19   Q.    Finances?

20   A.    No, sir, not directly.

21   Q.    But you did get involved in reviewing equipment sale

22   contracts?

23   A.    No, sir.

24   Q.    How about long term service agreements?

25   A.    No, sir.

1    Q.   You explained that that's where you first met Mr. Delgado,

2    correct?

3    A.   Yes, sir.

4    Q.   And the two of you worked on a deal with the Mexican

5    Electric Company?

6    A.   Yes, sir, contract in Mexico, yes.

7    Q.   Is that the C.F.E. as well?

8    A.   Yes, it was the C.F.E.

9    Q.   And that was in 1996?

10   A.   I don't recall exactly the year, but it was somewhere in

11   that time.

12   Q.   And did you take part in that deal in reviewing documents

13   like contracts?

14   A.   It was mostly doing -- we -- the more -- the thing that I

15   did the most was to -- just to get the information from them and

16   presented it to our legal department in El Paso Electric, and

17   Marco was also there reviewing the contracts on that.  So Marco

18   was the attorney present there representing El Paso Electric and

19   we have a legal department in the office, too, so they had the

20   chance to review all of the documents as a legal.  I was -- I'm

21   not an attorney, so I'm not -- I wasn't responsible to make sure

22   that they were written fine, so I was not.

23   Q.   You didn't review the documents?

24   A.   I probably had a chance or two to review them when we were

25   going to take them to be signed or when they signed, I probably

1    get the copy and I don't know if I -- I had a chance to look at

2    them once in a while, yes.

3    Q.   And what types of documents were those that you looked at?

4    A.   They were contracts to sell energy to Mexico for a

5    three-month period, for example.

6    Q.   They weren't for the sale of turbines?

7    A.   No, sir.

8    Q.   Had you worked on sale-of-turbine-contracts when you were

9    at El Paso Electric?

10   A.   No, sir.

11   Q.   Had you been involved in looking at, for example, the

12   specifics related to that type of a deal?

13   A.   Yes, I have.

14   Q.   And what did you look at there?

15   A.   Well, they -- when I want -- when I was in the

16   environmental department, part of the job was to review the

17   operation of the power plants as far as emissions and I was able

18   to see a little bit of that, a little bit of the technical

19   aspect of what do you need to have an emission, what kind of

20   equipment do you put, just -- so I was involved a little bit on

21   that, but mostly where my people, I was the manager of the group

22   so I just heard things that they prepared.

23   Q.   So your experience at El Paso Electric on this type of

24   contract was looking at the technical specs of emissions?

25   A.   One of the jobs of the jobs that I have was environmental

1    and we were in charge of that, so I had an engineer to take care

2    of that, to review that, to make sure that everything was done

3    up to specs.  And I just sometimes just even review the

4    documents quick and sign them or actually they -- they send

5    them, but I wasn't responsible to produce those documents to

6    make sure they were correct.  I had people to do that.

7    Q.    Okay.  So somebody that was your person under you actually

8    did the detail review of the documents then passed them to you;

9    is that right?

10   A.    Yes, sir.

11   Q.    And you said you just quickly looked at it and signed off?

12   A.    Yes, sir.  Not quickly.  I took my time to review them, I

13   guess.

14   Q.    Well, that's what you just said, right?

15   A.    Yes, sir.

16   Q.    Now, you end up leaving El Paso Electric and go to Kendrick

17   Electric; is that correct?

18   A.    Yes, sir.

19   Q.    And that's where you -- had you met Mace Miller before

20   that?

21   A.    Yes, I met him.  As I mentioned before, my -- one of my

22   engineers who work under me, his name was -- is Steve Boracic.

23   I think he still works at El Paso Electric.  Mace, me and him

24   grew up in the northeast area and they went to high school

25   together.  They were beast friends.  I think he was the best man

 1      at his wedding.

 2            And one day I was on my way to Phoenix, I believe, to

 3      a meeting in Phoenix for the Electric Company and he was on the

 4      same plane, so I was introduced to him there.

 5      Q.   Okay.  And Mace Miller is an attorney as well, correct?

 6      A.   Yes, sir.

 7      Q.   And what was your title at Kendrick?

 8      A.   I don't recall.  I don't even recall having business cards.

 9      It was just electric engineer I guess.  I don't remember the

10      title.

11      Q.   And then you testified yesterday that at some point there

12      was a plan for you to purchase part of Kendrick, correct?

13      A.   That was the initial invitation from Mace.  At that time

14      they were building a lot of -- there were -- there was going

15      on -- there was a lot of construction going on in Fort Bliss and

16      they couldn't get to any contracts because it was mostly for --

17      it has a specific name, a minority company.  So Mace had the

18      idea and he talked to his uncle saying that we bring Fernando as

19      a owner, 25 percent, 25.1 and then Mr. Lozada, another Hispanic

20      individual, they were going to be able start bidding on those

21      projects, so they -- I mean we talk for a while until they

22      convinced me.

23      Q.   So my question was, there was a plan?

24      A.   Yes.

25      Q.   For you to purchase part of Kendrick?

1    A.   Yes, sir.

2    Q.   And documents were executed for that?

3    A.   Yes, sir.

4    Q.   And the reason it fell through, you didn't put your money

5    in, correct?

6    A.   No, because we have -- part of the contract that we sign

7    for the stock, the way it was going to be changed.  I don't

8    recall the exact amount.  They wanted us to pay like $300,000

9    and he gave us like three years to pay.  You have one year to

10   pay the first 100, the second year -- and didn't -- I remember

11   telling him I don't have the money.  If you want it at the end

12   of the first year, we'll see if we can move on still.  I didn't

13   even spend six months with him or something, so it never

14   materialized.

15   Q.   So the answer is yes, it didn't work because you didn't put

16   money in, correct?

17   A.   Yes, sir.

18   Q.   Now you moved from Kendrick and this is the birth of

19   F.G.G., that time frame?

20   A.   Yes.

21   Q.   And he explained this was the result of a meeting between

22   Mace, yourself and Marco Delgado?

23   A.   It was originally a call or a meeting with me and Marco

24   when he brought up the project to me.  And then since I was

25   working for Kendrick I brought it up to Mace and then Mace got

1    involved into this because we thought -- they thought we could

2    have Kendrick do some work for this project.

3    Q.    And you became the sole managing member of F.G.G.?

4    A.    Later on we decide on when we were moving in this

5    direction, I -- we discussed the opening of the company, and I

6    discussed with Marco and I said I want to be -- I'm the owner of

7    the company, because Mace wanted to be part of the other ones,

8    and I said, no, I'm going to be the only owner of the company.

9    And Marco says that's fine, that's perfect.  I'll go ahead and

10   set it up for you and he set it up in Nevada.

11   Q.    So you wanted to be the sole found -- the sole member,

12   correct?

13   A.    Yes, sir.

14   Q.    And you're pretty certain about that?

15   A.    Well, again, I told Marco I'm the owner of the company and

16   he's sending documents that you are the managing member and you

17   are the owner of the company and that was it.

18   Q.    That was your dictate to be the managing member?

19   A.    Yes.

20   Q.    You got that done?

21   A.    Yes, sir.

22   Q.    And F.G.G. is not a chair at this organization, is it?

23   A.    No, sir.

24   Q.    It's not a 501c corporation?

25   A.    No, sir.  I never heard that terminology.

1    Q.   It's a corporation that has one purpose, right?

2    A.   I think so.

3    Q.   And the purpose is to bid on the C.F.E. project, right?

4    A.   Yes.  It was founded with that idea in mind, yes.

5    Q.   To make the money off of that deal?

6    A.   Yes.

7    Q.   Now, you subsequently entered into a memorandum of

8    understanding with Mr. Delgado, correct?

9    A.   Yes, sir.

10             MR. HANSHEW:  I believe this has been admitted

11   already.

12             THE COURT:  What is that, GX -- what is that, 8?  It

13   is admitted.

14   BY MR. HANSHEW:

15   Q.   All right.  Mr. Gireud, yesterday Ms. Kanof went through

16   this document with you, correct?

17   A.   Yes, sir.

18   Q.   And to be clear, at the end you signed this document,

19   right?

20   A.   Yes, sir.

21   Q.   You testified that you read the document?

22   A.   Yes.  At that time I didn't have all of the time to review

23   and question.  I requested Marco to have more time, but he said

24   I needed to sign it, because I'm on my way to the airport I need

25   to leave, you need to sign it, if not there's no deal.

1    Q.    Yesterday you said you read it?

2    A.    Yes.

3    Q.    Are you changing your answer?

4    A.    No, I'm not changing my answer.  I was forced to read it

5    pretty quick, so one thing is to take the time and read the

6    documents and when somebody forces, but yes, yes, sir.

7    Q.    I mean you're the meticulous engineer, right?

8    A.    Yes, sir.

9          MS. KANOF:  Your Honor, argumentative.

10         THE COURT:  I'll overrule that.

11   BY MR. HANSHEW:

12   Q.    You said yes, right?

13   A.    Yes, sir.

14   Q.    Careful attention to the detail of this?  You didn't do

15   that?

16   A.    I don't think I did.

17   Q.    Well, can you read that part there for me where it's

18   highlighted?

19   A.    Yes.  Delgado and Associates will receive an amount equal

20   to 62-and-1-half-percent of the difference between the purchase

21   price to F.G.G. and all of the equipment, transportation and

22   field services required for the satisfaction of this bid

23   requirements and the amount for which the equipment is sold to

24   the C.F.E.

25         The current sub-price to C.F.E. is estimated at

1    $127-and-a-half-million, United States dollars, 127,500 U.S.D.

2    The current negotiated purchase price for the equipment is

3    $105 million, United States dollars, 105.  The cost of

4    transportation is at this time undetermined and the price for

5    the (mumbling) services is $4 million and $200,000.

6    Q.   So, it says there from -- if I'm reading this wrong, that

7    Delgado and Associates gets 62-and-a-half-percent of the

8    profits, correct?

9    A.   Yes, sir.

10   Q.   And the estimated profit is delineated here is $22 million?

11   A.   That was not the original price, but yes that's what the

12   document says.

13   Q.   This document here has an estimated price, correct?

14   A.   Yes, sir.

15   Q.   All right.  And the deferential would be from those figures

16   there in this contract, $22 million?

17   A.   Yes, sir.

18   Q.   And Delgado and Associates would then be entitled to

19   62.5 percent of that?

20   A.   Yes, sir.

21   Q.   Do you know what that amount would be?

22   A.   No, sir.

23   Q.   Then the next paragraph here reads that that amount, the

24   62-and-a-half-percent of $22 million is due and payable upon the

25   award of the bid contract, correct?

1    A.   Yes, sir.

2    Q.   And when did that occur?

3    A.   It says it's going to be paid when the contract is wired.

4    How do we pay it if we don't have the money?

5    Q.   When was the bid contract award in this case, sir?

6    A.   What [sic] was the bid contract awarded?  I'm sorry, I

7    don't understand your question.

8    Q.   You've been involved -- you are the sole member of a

9    corporation whose only purpose is to bid, correct?

10   A.   Yes, sir.

11   Q.   And you are trying to get the contract?

12   A.   Yes, sir.

13   Q.   So when did that happen?

14   A.   The contract -- I think the contract was signed on

15   January 2010, I think.

16   Q.   And according to this, it would be due at that moment,

17   correct?

18   A.   It says will be paid at the first disbursement of funds by

19   investor or lending institution.

20   Q.   That's wasn't my question, sir.  It's due at that moment in

21   the contract, correct?

22          MS. KANOF:  Your Honor, I'm going to object only

23   because it's inconsistent and assuming facts not in evidence.

24   The contract wasn't awarded at that time.  The contract was

25   awarded --

```
 1              MR. HANSHEW:  She's testifying.

 2              THE COURT:  I'm going to overrule the objection.  I

 3   just --

 4              Are you reading off the document?

 5              MR. HANSHEW:  I'm sorry, Judge?

 6              THE COURT:  Your question, you're reading directly off

 7   the document?

 8              MR. HANSHEW:  On number -- on paragraph four there the

 9   question was when did it become due and payable, and I asked him

10   when the bid contract was executed.  He provided that date and

11   that would be the date that it's due and payable.

12              THE COURT:  All right.  You can ask him.  Go ahead and

13   ask him.

14   BY MR. HANSHEW:

15   Q.   That would be the date, correct, sir?

16   A.   Yes, sir.

17   Q.   And you started to read on there to the first disbursement,

18   right?  The first disbursement is when Delgado and Associates

19   gets paid?

20   A.   Yes, sir.

21   Q.   And when was the first disbursement in this case?

22   A.   February of 2012, I think.

23   Q.   So at that point, that is when Mr. Delgado is owed the

24   62-and-a-half-percent of $22 million?

25   A.   Yes, sir.
```

1    Q.    Do you have a question about that?

2    A.    But I do.  Can I say something?

3    Q.    I didn't ask a question, sir.

4    A.    Okay.

5    Q.    Now, it also goes on here, correct, to say that prior to

6    receiving any funds, F.G.G. commits to establishing the

7    corresponding escrow account to ensure said payments in a timely

8    fashion.  That's what it reads, correct?

9    A.    Yes, sir.

10   Q.    And you were asked earlier yesterday what an escrow account

11   meant to you, correct?

12   A.    Yes, sir.

13   Q.    And you said that was for monies to be secured to be safe?

14   A.    Monies to be secured so you can pay your suppliers at a

15   later time.

16   Q.    So an account that keeps the monies safe for subsequent

17   payments?

18   A.    Yes, sir.

19   Q.    And safe from what?

20   A.    Not -- I don't know.  I just said the word safe, just an

21   account that is going to keep the money, the funds.  That's it.

22   Q.    And then to effectuate that, you set up an account at Wells

23   Fargo?

24   A.    Yes, sir.

25   Q.    And Ms. Kanof showed you yesterday the documents that

1    established that account?

2    A.   Yes, sir.

3    Q.   You were the signator on it?

4    A.   Yes, sir.

5    Q.   And you testified that Mr. Delgado asked to also be put as

6    a signator as well?

7    A.   No.  He said that the account should have two signatures on

8    the account to be on the safe side, that's when I decide to

9    bring my wife and put the account, and I said, hey, we fulfilled

10   your requirements.  We have two signatures.

11   Q.   Right.  I understand that's what happened, but did he ask

12   to be a signator?

13   A.   No, sir -- well, yes, he said the account has to have two

14   signatures and -- well, I said that's fine, I will have my wife

15   to sign, and then we have two signatures that are required.

16   Yes, sir.

17   Q.   So yes he did ask?

18   A.   Yes, sir.

19   Q.   And I'm going to have you look at that document there in

20   front of you marked Defendant's Exhibit 194.  Are you able to

21   see that?

22   A.   It's not very clear, but yes I can see that.

23   Q.   But at the top, can you see a number there?

24   A.   Yeah, that's -- if you highlight it, it looks even worse,

25   so if you just put your finger in there, please?

1    Q.    There you go.

2    A.    Yeah, I see the account number.

3    Q.    So you're familiar with this document, correct?

4    A.    Yes, sir.

5    Q.    All right.

6          MR. HANSHEW:  Judge, at this time I'd move for

7    admission of Defendant's Exhibit 194.

8          THE COURT:  Ms. Kanof?

9          MS. KANOF:  No, objection.

10         THE COURT:  194 is admitted.

11   BY MR. HANSHEW:

12   Q.    All right, sir, so this is the account page from April 2010

13   for your Wells Fargo business account, correct?

14   A.    Yes, sir.

15   Q.    All right.  Earlier, Ms. Kanof showed you these records and

16   went through and said no payment in March, correct?

17   A.    Yes, sir.

18   Q.    She showed you April, no payment in April, correct?  Did

19   she show you?

20   A.    I think so, sir, yes.

21   Q.    Well, let's look there at that first item.  Tell me what

22   that one is?

23   A.    It's the deposit from the -- came from the Caribbean

24   account in 4-1, April the 1st.

25   Q.    So April 1st, there's $2.1 million put into this account

1   you created, correct?

2   A.   Yes, sir.

3   Q.   All right.  And we go down and this is what you believe to

4   be your escrow account, correct?

5   A.   There was -- yes, there was another account that the bank

6   did a lot of things that I'm not a banker, so we they said we're

7   going to have to have this account like this, so -- but, yes,

8   this is the escrow account that we have.

9   Q.   This is the escrow account?

10  A.   Yes, sir.

11  Q.   All right.  That is the same one for F.G.G.?

12          MS. KANOF:  Your Honor, I just want to object to

13  mischaracterization.  The account I was showing him was not this

14  account.  So when I said I want to show you and I said no money

15  went into the account, I was showing the 1614 account?

16          MR. HANSHEW:  She's testifying.

17          THE COURT:  Right.  I don't think he challenged that,

18  so I'll sustain the objection.  And if there's any confusion,

19  you can clarify on your direct.

20  BY MR. HANSHEW:

21  Q.   All right.  So --

22          THE COURT:  Is there any way you can focus that?  I

23  mean is that the best you can do?

24          MR. HANSHEW:  Maybe I can make it bigger, Judge.

25          THE COURT:  Can you see it clearly on yours, Greg?  Is

```
 1    it just me?

 2            THE COURTROOM DEPUTY:  They have the resolution set to

 3    where it's squashing.

 4            THE COURT:  Didn't you bring an I.T. person?  I

 5    can't -- can't they make that look better?

 6            (Technical difficulties.)

 7            MR. HANSHEW:  I have no excuse.  I'm definitely not

 8    21 years older than Ms. Arreola.

 9    BY MR. HANSHEW:

10    Q.   All right, sir, so can you see that better now?

11    A.   Yes, sir.

12    Q.   You got -- let me zoom in a little bit.  Is that making it

13    too small for you or...

14    A.   That's okay, sir.

15    Q.   On 4-2 you have a withdrawal for $400,000; is that right?

16    A.   Yes, sir.

17    Q.   Okay.  Then you have down here an entry on 4-5 for Ashley

18    Furniture?

19    A.   Yes, sir.

20    Q.   That's for $1,700?

21    A.   Yes, sir.

22    Q.   Another Ashley Furniture for $3,877?

23    A.   Yes, sir.

24    Q.   The San Marcos Vault on 4-9?

25    A.   Yes, sir.
```

```
 1    Q.    $273?

 2    A.    Yes, sir.

 3    Q.    That's like a bar or club in San Marcos?

 4    A.    Say which one is it?  Can you point it out to me?

 5    Q.    April 9th.

 6    A.    San Marcos Vault.  No, it's a store.  It should be a store

 7    or something.

 8    Q.    You got Del Friscos Restaurant for $1,500?

 9    A.    Yes, sir.

10    Q.    And more Ashley Furniture for $400?

11    A.    Yes, sir.

12    Q.    And at the bottom there, 429?

13    A.    Yes, sir.

14    Q.    4,700 at Lacey's?

15    A.    Yes, sir.

16    Q.    A jewelry store, right?

17    A.    Yes, sir.

18    Q.    That was for F.G.G.

19    A.    That was -- I was the owner of the account.  I didn't have

20    a salary, so I shared with my accountant and she says you can --

21    this is your company, so this is profit after I paid Marco

22    Delgado his share and everybody else.  This is my profit, so I

23    did that, yes.

24    Q.    Okay.  So your accountant told you that you could pay to

25    buy jewelry out of the F.G.G. escrow account?
```

1    A.   Yeah.  It is my -- I'm dealing with the company.  I already

2    paid whatever I needed to pay and, yeah, this is my account,

3    yes.

4    Q.   Okay.  That explains the next page, sir.  Hooters?

5    A.   Yes, sir.

6    Q.   Pelicans?

7    A.   Yes, sir.  We have a lot of business meetings and lunches

8    and, yes, we did.

9    Q.   And now I'm going to show you down here, it's on 7-30, you

10   get paid $1.3 million; is that right?

11   A.   Yes, sir.

12   Q.   And that's for this C.F.E. contract?

13   A.   Yes, sir.

14   Q.   So at this point, F.G.G. has gotten paid 2.1, an additional

15   1.35?

16   A.   Yes, sir.

17   Q.   So over $4 million?

18   A.   Yes, sir.

19   Q.   Now you just mentioned you have an accountant that worked

20   with you on the F.G.G. finances?

21   A.   Yes, sir.

22   Q.   And this accountant helped you prepare --

23           THE COURT:  Are you going to another document?

24           MR. HANSHEW:  Yes, Judge.

25           THE COURT:  All right.  Let's go ahead and break for

1    lunch.

2           Ladies and gentlemen, we'll take our lunch recess.  If

3    you'd be back in the jury room at 2 o'clock, we'll resume our

4    proceedings at 2:00.

5           COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

6           (Lunch break at 1:03 p.m.)

7                              *  *  *

8           (Rhonda McKay court reporter took over for afternoon

9            proceedings.)

10                             *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    * * * * *

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of the

6    United States.

7    Signature:/S/KATHLEEN A. SUPNET        December 31, 2018
             Kathleen A. Supnet, CSR          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25