1          IN THE UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF TEXAS

3                 EL PASO DIVISION

4                 VOLUME 14 Of 20

5

6   UNITED STATES OF AMERICA          EP:13-CR-0370-DG

7   v.                                EL PASO, TEXAS

8   MARCO ANTONIO DELGADO             September 16, 2016

9                        **STATEMENT OF FACTS**
10            THE HONORABLE DAVID C. GUADERRAMA
                 UNITED STATES DISTRICT JUDGE
11

12

13  <u>APPEARANCES</u>:

14  For the Government:  Debra Kanof
                         Anna Arreola
15                       Luis Gonzalez
                         Assistant United States Attorney
16                       700 East San Antonio, Suite 200
                         El Paso, Texas 79901
17
    For the Defendant:   Maureen Franco
18                       Erik Hanshew
                         Assistant Federal Public Defender
19                       700 E. San Antonio, Suite 410
                         El Paso, Texas  79901
20
    Court Reporter:      Kathleen A. Supnet
21                       El Paso, Texas
                         (915)834-0573
22                       kathi.supnet5303@gmail.com

23

24          Proceedings reported by mechanical stenography,

25  transcript produced by computer-aided software and computer.

```
 1                      CHRONOLOGICAL INDEX

 2                      VOLUME 14 OF 20

 3   September 16, 2016                        PAGE   VOL.

 4   GOVERNMENT'S
     WITNESS TESTIMONY     DIRECT     CROSS     VOIR DIRE        VOL.
 5
     PONCE, HECTOR         3,70       23,79     --              14
 6   BROWN, JENNIFER       80         --        --              14
     LECENSE, KENNETH      87         --        --              14
 7   GLIVA, JOSEPH         94         --        --              14
     MEDLOCK, LINDA        103        160       --              14
 8   NARVAEZ, LILIANA      167        209       --              14
     MILLER, MACE          212        --        --              14
 9
     Court Reporter's Certification . . . . . . . . . . 277     14
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Open court.  Defendant and counsel present.)

2          (Jury present.)

3          THE COURT:  Let the record reflect that all members of

4    the jury are present, the United States through its assistant

5    United State's attorneys are present, the defendant and his

6    attorney is present.

7                          HECTOR PONCE,

8          DIRECT EXAMINATION CONTINUED BY THE GOVERNMENT

9    BY MS. ARREOLA:

10   Q.   Good morning, Mr. Ponce.  When we broke yesterday, we were

11   asking -- I was asking you about the amount of payments that

12   were due to F.G.G. under the prime contract and the amounts of

13   those payments.  And I'm going to resume where we left off.

14          I'd like to you take a look at what is already in

15   evidence as Government's Exhibit 19 and tell me if you recognize

16   this document.  And I'm going to show you the Spanish first and

17   then I'm going to show the translation.

18   A.   Okay.

19   Q.   Do you recognize this document?

20   A.   Yes.

21   Q.   Okay.  And what does this look like to you?

22   A.   It looks like the Annex, which was one of the attachments

23   of the prime contract, that is the contract between C.F.E. and

24   F.G.G., stating what the payment terms would be, that is each

25   progress payment and the date in which they would be paid.

1    Q.   So I'm going to pull up the English translation already in

2    evidence as Government Exhibit 19A.

3            Under Annex S., were the first two payments due to

4    F.G.G. 20 million and then $12 million, respectively?

5    A.   That is what's written there, yes.

6    Q.   Okay.  So I'm going to go back to the exhibit that we

7    looked at yesterday before we broke, which was Government

8    Exhibit Number 47 which is already in evidence.

9            Do you recall that -- do you recall seeing this e-mail

10   yesterday?

11   A.   Yes.

12   Q.   And this is an e-mail from Mr. Delgado to you dated March

13   12th?

14   A.   Correct.

15   Q.   And in this e-mail, he was forwarding an e-mail from

16   somebody who appeared to be at C.F.E.?

17   A.   Correct.

18   Q.   And was there a chart attached to this e-mail?

19   A.   The chart you are showing, yes.

20   Q.   Okay.  So we're going to go ahead and open up the English

21   version.

22            When you received this e-mail, did you know what this

23   chart was?

24   A.   When I received the e-mail, I did not know what the chart

25   was.  I didn't.

1    Q.    Okay.  And did you speak with Mr. Delgado about it after he

2    sent it to you?

3    A.    I believe we spoke sometime after he had sent it to me,

4    yes.

5    Q.    Was that over the phone?

6    A.    Yes.

7    Q.    And what did he say to you and what did you say to him?

8    A.    I -- well, the first thing that he did was to explain to me

9    that he was sending this because the C.F.E. wanted to change the

10   payment terms and that his specific question to me was would we

11   prefer Option A or Option B with respect to how those options

12   would affect the amount paid to Mitsubishi.

13          And my response was, we except neither.  You know, our

14   price and our payment terms are in our proposal to you and this

15   is -- this is not acceptable to us.

16   Q.    And did he say why C.F.E. wanted to reduce the amount of

17   the first payment?

18   A.    I believe the explanation was that the -- that the amounts

19   or the percentages were being reduced because C.F.E. was

20   considering accelerating the schedule of the project, which also

21   means accelerating our delivery of the equipment, and if they

22   were to pay earlier then they wanted to pay less, because that's

23   how they would manage their cash flow, that was my

24   understanding.

25   Q.    Let's take a look at Option A and Option B.  First, let's

1    look at the first column.  It says price offered $121 million.

2    What does that number represent?

3    A.   I believe it represents what the -- what F.G.G. had offered

4    to the client as the price of the equipment.

5    Q.   And who was the client?

6    A.   C.F.E., Commisión Federal de Electricidad de Mexico.

7    Q.   Okay.  Under this first column this says payment and it

8    says 20 and 12.  What do those numbers represent?

9    A.   Those are the -- that's the amount that C.F.E. would pay

10   under their contract with F.G.G. at the time of the first

11   payment, which was as you see on the left two months after the

12   signing of their contract, and the 12 would be the second

13   payment, six months after signing of the contract.

14   Q.   And do those numbers 20 and 12 match the numbers that we

15   saw in Annex S?

16   A.   A moment ago we saw 20 and 12 there, yes.

17   Q.   Okay.  So under Option A, what was the amount going to be

18   of the first two payments?

19   A.   Under Option A, it would 15 instead of 20 and 7 instead of

20   12.

21   Q.   Okay.  And under Option B, what were the amounts going to

22   be on the first two payments.

23   A.   It would be 10 million instead of the first 20 and 10

24   million instead of the first 12.

25   Q.   And so did Marco Delgado tell you that the amounts were

1   going to go from 20 to 15 or from 20 to 10?

2   A.   Yes, that was the explanation.

3   Q.   Okay.  And what was the date of this e-mail?

4   A.   It was March 12th, 2010.

5   Q.   I'm going to now show you Government Exhibit 2.  I'm going

6   to ask you to remember that date, March 12, 2010.

7   A.   Okay.

8   Q.   And I'm going to highlight a line item for the jury and I'm

9   going to read this and ask you a question.  March 9th,

10  2009 [sic], fideicomiso amount of incoming wire transfers $20

11  million.

12          THE COURT:  What was the date?

13          MR. ARREOLA:  March 9th, Your Honor.

14          THE COURT:  2000 --

15          MR. ARREOLA:  10.

16          THE COURT:  Thank you.

17  BY MS. ARREOLA:

18  Q.   I'm going to go back to the exhibit we just looked at,

19  Exhibit 47.  When Marco Delgado sent you this e-mail on

20  March 12th, 2010, did you know that he had already received

21  $20 million from C.F.E. into an offshore account in the Turks

22  and Caicos Islands?

23  A.   No, I did not know that.

24  Q.   Now after you got this chart from Marco Delgado, what

25  happened next?

1   A.   If I remember correctly, I sent one communication in

2   writing, an e-mail which said that this -- these options are not

3   acceptable to us and probably stated a couple of points

4   explaining why it was not acceptable.  And I don't remember if I

5   got a reply to it, but I did send a communication saying not

6   acceptable.

7   Q.   Okay.  Did you have any meetings with Mr. Delgado after you

8   received this e-mail?

9   A.   Um, there may have been one or two conversations going back

10  and forth, but the ultimate decision was that we should have a

11  meeting face-to-face, the parties, to discuss what was going on

12  here and to resolve it.

13  Q.   Okay.

14  A.   And we did have a meeting in Orlando, Florida, to discuss

15  the issue.

16  Q.   And who went to the meeting in Orlando, Florida?

17  A.   Three companies, were Mitsubishi Power Systems, including

18  myself as their consultant, T.A.I., Mr. Rick Williamson was

19  there if I remember correctly and Fernando Gireud of F.G.G.  I

20  believe Mr. Mace Miller was there, but I don't remember

21  specifically and Marco Delgado was there.

22  Q.   And what did Mr. Delgado say, do you recall, at this

23  meeting?

24  A.   Among many things said, the most important thing was his

25  explanation as to why the payment terms were changing.  And he

1   said that C.F.E. wanted the changes and they wanted their cash

2   flow to be correct and the schedule was being considered for

3   acceleration.  And also the grand total of the payments at the

4   bottom, instead of the 121 million, had been reduced to 106

5   million, and I think the explanation was that the transportation

6   and the technical service to be provided by Mitsubishi for the

7   equipment insulation would be contracted later.

8   Q.   Okay.  So did the parties reach an agreement?  What was he

9   asking from Mitsubishi as a result of his claim that C.F.E.

10  wanted to reduce the amount of the payments to F.G.G.?

11  A.   He was asking essentially for Mitsubishi to accept that

12  F.G.G. had to do that with C.F.E. and that Mitsubishi therefore

13  would receive less percentage for each payment and also a lesser

14  amount in the grand total after all payments were made.

15  Q.   And what was his explanation for why Mitsubishi should

16  receive less money from the grand total?

17  A.   I mean I don't remember a true explanation of that, but it

18  was because otherwise the deal can't happen.

19  Q.   Did the parties reach an agreement?

20  A.   Yes.  We eventually reached a compromise in which

21  Mitsubishi and also Mr. Rick Williamson agreed to give up some

22  of their earnings to try to make this work.  And so we agreed on

23  a new payment schedule to match one of the C.F.E. schedules and

24  we agreed on a new grand total.

25  Q.   Did your agreement, based on your representation from

1    Mr. Delgado that C.F.E. was going to reduce the amount of the

2    first two payments from 20 million to 15 million and from 12

3    million to 7 million -- let me strike that.

4              Was your agreement based on a representation from

5    Mr. Delgado that C.F.E. was going to reduce the amount of the

6    first and second payments?

7    A.   Definitely it was based on that.

8    Q.   Okay.  And then I ask you to take a look at Government

9    Exhibit 48.  It's already in evidence.

10   A.   Uh-huh.

11   Q.   I'm going to scroll through this document and ask you if

12   you recognize it?

13             Do you recognize this e-mail?

14   A.   I do.

15   Q.   So we're going to go to the top of the chain and then we'll

16   work our way through it.

17             Is this -- at the top of the e-mail chain, is this an

18   e-mail from Mr. Gireud to you copying John Adams and Marco

19   Delgado and Mace Miller?

20   A.   Yes, it is.

21   Q.   Okay.  And is the date sent that is shown on this document

22   March 22nd, 2010?

23   A.   It is.

24   Q.   So let's start at the bottom of the e-mail, so we can work

25   our way up in time.

1          So at the bottom of the e-mail chain, is there an

2    e-mail from you to Marco Delgado dated March 12, 2010?

3    A.   Yes, it is.

4    Q.   And is that the same date that you received the e-mail with

5    the chart that had a forwarding e-mail from C.F.E. --

6    A.   Yes.

7    Q.   -- if you remember.  Or would you like me to pull that

8    e-mail up again?

9    A.   I do remember.

10   Q.   And I'm going to go ahead and read a portion of this, and

11   I'm going to ask you a question, Marco, we have analyzed the

12   proposed payment options A and B being discussed for payments

13   between C.F.E. and F.G.G.  Mitsubishi cannot agree with the

14   depicted concept and request that although the transportation

15   and services may be subtracted per the contract, the percentages

16   and the executed C.F.E. F.G.G. contract should not change until

17   the final accelerated schedule is approved.  Therefore, the

18   first payment should be remain 16.5 percent of the adjusted

19   amount of 106.6 million.  The second should be ten percent.  The

20   third should be 49 percent and so on for now as shown in column

21   precio (Spanish) of the program comparison table that you sent

22   us.

23          Can you explain to the jury what you are saying in

24   this passage?

25   A.   After seeing the attachment that said we have to consider

1    options A and B, I was saying that if the transportation is not

2    to be contracted yet or the service, then we don't mind

3    reducing -- that the price would be 106.  But I was saying in

4    certain terms that the percentages of each payment should not

5    change.

6           And the reason I mentioned the accelerated schedule is

7    because I was making the point that if the explanation for the

8    percentages being changed is because they are going to pay us

9    sooner for faster delivery of the equipment, then we need to

10   document and memorialize a written agreement for the new

11   schedule before we can entertain any payments being less,

12   because we were just being told it's going to happen and

13   therefore you should accept these terms now and we're saying not

14   now.  It's after the schedule is -- is actually documented and

15   agreed to.

16   Q.   Was Mitsubishi going to agree to a lesser amount on its

17   contract, if you recall?

18   A.   A lesser amount?  You mean a total amount?

19   Q.   Yes, sir.

20   A.   Only to the extent that transportation and service would

21   not be purchased.  So if we didn't have to transport the

22   equipment we didn't expect to get paid for transport.

23   Q.   I'm going to now scroll further down into this e-mail.

24   What is the chart at the bottom of this e-mail?

25   A.   Would you scroll up so I can read the previous page a

1    little bit?

2              Okay.  Would you go down again, please?

3              So I was confirming that based on what we are saying,

4    that is the only thing we can do, then I was saying that

5    therefore here are details of where the money should be sent.

6    And for each payment, number one through six, I was now putting

7    the dates of the actual payment based on when I knew the prime

8    contract had been signed.  So now I was stating the dates and

9    putting the exact quantity that should be transmitted.

10   Q.   Now is this the amount that was due before Option A and B?

11   A.   This is the amount that would be due without us agreeing to

12   Option A and B.

13   Q.   Are you fluent in Spanish?

14   A.   Excuse me.

15   Q.   Are you fluent in Spanish?

16   A.   I am fluent in Spanish.

17   Q.   How did you learn Spanish?

18   A.   I was born and raised in Honduras.  And even when I lived

19   in the United States within my family we spoke Spanish and for

20   the last few decades I have been doing business in Spanish as

21   well as English and Japanese.

22             MR. ARREOLA:  Your Honor, may I ask the witness to

23   translate the header and the first line beginning "detalles en

24   pago numero uno" (Spanish) on this page.

25             THE COURT:  Well, he can tell us what it means to him.

1              MR. ARREOLA:  Okay.  Thank you.

2    BY MS. ARREOLA:

3    Q.   Mr. Ponce, can you explain what it means to you?

4    A.   This meant -- it was details of the payments to Mitsubishi,

5    both -- all of the payment numbers, the dates and the amounts.

6    Q.   And what is the first line?

7    A.   The first line, where, in the -- oh, it was payment number

8    one, date, March 6th, 2010, amount to Mitsubishi 16,995,000 U.S.

9    dollars.

10   Q.   Okay.  Now it says here March 6th, 2010, and the date of

11   this e-mail is March 12th?

12   A.   Uh-huh.

13   Q.   So was the first payment already late?

14   A.   The first payment was already late at that time, yes.

15   Q.   We're going to go to the next e-mail and is this an e-mail

16   from you to Mr. Gireud dated Sunday March 21st?

17   A.   Yes.

18   Q.   And that's a Sunday; is that correct?

19   A.   Over time, yes.

20   Q.   Can you read the two paragraphs that I've highlighted and

21   then I'm going to ask you a question?

22   A.   Read the first paragraphs?

23   Q.   The first two paragraphs and we'll read along with you.

24   A.   Okay.  It says, gentlemen, per authorization by John Adams

25   of M.P.S.A., F. Gireud of F.G.G. and R. Williamson of Thomassen

1    Amcot, I send you this conversation of our discussions and

2    agreement with respect to the subject C.F.E. Adjusted Payment

3    Schedule, in capital letters, and its effect on F.G.G. and

4    M.P.S.A. subcontract payments.

5              Firstly, for your information, below is the first

6    response sent to Marco Delgado on the 12th of March, 2010, when

7    he first sent the subject payments schedule for comments by

8    M.P.S.A.  According to what was explained to us, C.F.E.'s

9    position is that the adjustments in the schedule are necessary

10   because the transportation and technical services must be

11   subtracted.  We understand why, but hope eventually it will be

12   add.  And because C.F.E.'s cash flow will change if and when the

13   schedules and payments are accelerated, we do not think this is

14   applicable for now, since the schedule does not at all reflect

15   any accelerated schedule.  Our response below indicated our

16   disagreement in the change of percentages led, of course, to our

17   March 19th, 2010, meeting with Marco and Fernando visiting

18   M.P.S.A.

19   Q.   All right.  Can you tell us, is that March 9th, 2010,

20   meeting the same meeting that you talked about earlier in

21   Orlando?

22   A.   You meant March 19th?

23   Q.   Yes, sir.

24   A.   Yes, it is the same meeting.

25   Q.   Okay.  I'm going to ask you to jump down and read the

1    paragraph that I've highlighted, number one.

2    A.    Number one was the parties agree to accept Option A of the

3    attached C.F.E. payment schedule beginning with 14 point of

4    seven percent -- 14.07 percent, $15-million payment from C.F.E.

5    no later than March 6th, 2010, with the subsequent same

6    percentage payments summarized therein and a final payment to

7    complete the total price.

8    Q.    You said March 6th.  Did you mean to say April 6, 2010?

9    A.    I meant April 6th, yes.

10   Q.    And what is Option A that the parties agreed to?

11   A.    Option A was one of the columns originally sent to us with

12   a new total without the transportation and technical services as

13   well as new percentages, us, was being requested of M.P.S.A.

14   Q.    Okay.  So I've just highlighted a chart at the bottom of

15   that e-mail.  And is this Option A?

16   A.    This is Option A, but only as recalculated from the portion

17   which would go from F.G.G. to Mitsubishi.

18   Q.    Okay.  So thank you for that clarification.  So this is how

19   Option A would affect the payments made to Mitsubishi?

20   A.    Correct.

21   Q.    And Option A, under Option A that Marco sent you in that

22   chart that appeared to be from C.F.E., what was the amount of

23   the first payment that was going to be due to F.G.G. under

24   Option A?  Would you like me to pull it up again?

25   A.    Yes, I would.

1    Q.    Okay.  I'm going to show you Government Exhibit 47A.

2    A.    Got it.

3    Q.    What did Mr. Delgado represent would be the first payment

4    to F.G.G. from C.F.E. under Option A?

5    A.    He in this chart represented that it would be $15 million.

6    Q.    And I'm going to go back to Government Exhibit 48.  And as

7    a result of Option A, how much would be due to Mitsubishi as a

8    first payment?

9    A.    It would be 14,493,433 U.S. dollars.

10   Q.    Now the total at the bottom of the chart indicates $103

11   million to Mitsubishi.  Did Option A affect the total amount

12   that would be due at the end of the day to Mitsubishi, if you

13   recall?

14   A.    Option A was between F.G.G. and C.F.E., therefore it did

15   not directly affect, but we were agreeing that we would apply

16   the same percentages, therefore it affected each payment, but I

17   believe the total of $103 million was a separate number that we

18   agreed was the total due between F.G.G. and M.P.S.A.

19   Q.    Okay.  So let's go ahead and scroll up to the final e-mail

20   in this chain.  And is this an e-mail from Fernando Gireud to

21   you copying John Adams as well as Mr. Delgado and two others?

22   A.    It is.

23   Q.    And is the date on this March 22nd?

24   A.    It is.

25   Q.    I'm going to go ahead and read briefly from this e-mail.

1            Gentlemen, thank you for your prompt response.  Marco

2    could not get a ticket back from Orlando this morning and he is

3    flying at this moment.  I forwarded your documents to Mace

4    yesterday and he is still re- -- is still "review" them.  I do

5    not think it's necessary from John to go to Mexico today.  As

6    soon as I "talked" to Marco and Mace today, I will replay your

7    e-mail.  I do not see any problems in signing this document.

8    Thanks again very much for your patience and understanding and

9    especially good faith on this situation.

10           Which document did you understand him to be referring

11   to?

12   A.   I understand it was the e-mail below in which I said,

13   gentlemen, please reply to all to formally confirm your basic

14   agreement with this compromise.

15   Q.   In response to this e-mail, did Mr. Delgado write to say,

16   hey, guys, don't worry about it.  C.F.E. has actually made the

17   $20 million payment.  No need to do an Option A?

18   A.   No.  Mr. Delgado never said anything like that.

19   Q.   I'm going to ask you to look at Government Exhibit 94.  Now

20   you are not copied on this e-mail, but I'm going to read a

21   sentence where your name appears and then ask you a question.

22   Okay.  I'm going to read and then follow up with a question.

23           For further reference and clarification on any and all

24   of the technical administrative or financial agreements relating

25   to the Agua Prieta project, please refer to the copies of the

 1    final agreement and its attachments that were approved and

 2    signed page by page by John Adams in his capacity at M.P.S.A.,

 3    officer in charge of the project and M.P.S.A.'s agent, Hector

 4    Ponce.

 5             Did you sign any copies of a final agreement on the

 6    Agua Prieta II project?

 7    A.   I never signed any copies, no.

 8    Q.   Now, we looked at the pledge agreement.  I'm going to ask

 9    you to look at the subcontract which is Government Exhibit 12.

10    I'm going to look at the Spanish language because that's what

11    shows the signatures.  And I'm just going to scroll through this

12    document and ask you if your initials appear on any pages of

13    this document?

14    A.   Were we talking about the subcontract or the prime contract

15    a moment ago?

16    Q.   Out of an abundance of caution, I'm going to ask you about

17    both contracts.

18    A.   Okay.

19    Q.   For the record, we are looking at each page of Government

20    Exhibit 12, the subcontract, the original Spanish language

21    version.  Do your initials appear on any pages of this document?

22    A.   They do not appear.

23    Q.   And I'm going to ask you to look at Government Exhibit 18,

24    the prime contract between F.G.G. and Mitsubishi -- excuse me

25    the prime contract between F.G.G. and C.F.E.?

1    A.    Uh-huh.

2    Q.    And we're going to look at the Spanish language because

3    that has the signatures.

4          MR. ARREOLA:   And for the record we're scrolling

5    through every page of Government Exhibit 18.

6    BY MS. ARREOLA:

7    Q.    We just looked at the first 21 pages of Government 18.   Did

8    your initials appear on any of those pages?

9    A.    My initials are not there.

10   Q.    Were you employed with Mitsubishi Power Systems America

11   when you were working on the Agua Prieta II project?

12   A.    I was not employed, no.

13   Q.    And were you authorized to sign any contracts on behalf of

14   M.P.S.A. as a contractor?

15   A.    I was not authorized to sign anything.

16   Q.    I'm going to now ask you to look at Government Exhibit 144.

17   Please take a look at this document and tell me if you recognize

18   it?

19   A.    I recognize it.

20   Q.    Can you explain to the jury what this document is?

21   A.    It was a check made out from F.G.G. Enterprises made out to

22   me, even though my last name was slightly misspelled, for

23   2,200 U.S. dollars.

24   Q.    Why was this payment made to you?

25   A.    As the memo implies at the bottom, it says, LAPEM, This was

1    a situation under the qualification of Mitsubishi to supply

2    equipment and service.  F.G.G. and specifically Mr. Delgado had

3    told us that the C.F.E. required the suppliers of equipment and

4    service to be certified by LAPEM.  My understanding was that

5    LAPEM was an agency related to the C.F.E. that was in the

6    business of reviewing the qualifications of the supplier to see

7    if they were approved by the C.F.E. for providing the service.

8          So it was explained to me that we needed to quickly

9    provide qualifications of Mitsubishi Power Systems Americas in

10   Orlando, meaning our parts manufacturing, our I.S.O.

11   certifications, the kind of staff that we had indicating that we

12   had the people qualified to provide these services.  And we did

13   fill out and supply several forms that need to be filled out to

14   prove that M.P.S.A. was a qualified supplier.

15         One time I was in Mexico and Mr. Delgado said to me,

16   personally, that there was a fee involved for the processing of

17   the LAPEM certification.  And I said, no problem.  Give me the

18   documentations.  I'll get the fee paid by Mitsubishi and he

19   indicated to me, no, we need it now.  And I said now?  What does

20   it mean?  We need to now.  I need to run over there and take the

21   money.  And I said I don't have the money and he asked me if I

22   could get it out of my ATM, my personal account.  And I thought

23   it was urgent and I went to the ATM and I took out 2,200 and

24   gave it to Mr. Delgado and asked him to get me the receipt, so

25   that I could properly submit it to Mitsubishi and get my

1    personal money reimbursed as an expense.  That would not have

2    been a big deal.

3          The receipt was not given to me that day.  And then

4    for several days afterwards I asked Mr. Delgado to give me the

5    receipt and I did not get the receipt, so I could not recover my

6    money.  When I mentioned this to Mr. Gireud sometime after that,

7    he said I'll get you the receipt.  And then I chased him for a

8    few more days and he could not get me the receipt.  And I, as I

9    maintained the pressure, then he said I'll reimburse you the

10   money and F.G.G. will pay for that fee therefor and he sent me

11   this check I believe by mail.

12   Q.   How were you able to withdraw 2,200 from your ATM?  Didn't

13   you have a limit?

14   A.   I did have a limit.  I had a cell phone also so I called

15   the Bank of America, which was my bank at the time, and I asked

16   them, I told them I am in Mexico and I am Hector Ponce and of

17   course they asked me for the last four of your social and what's

18   your address and the security questions.  And they essentially

19   removed my limit for me to be able to withdraw $2,200 at that

20   moment from that machine.

21          MS. ARREOLA:  May I have a moment, Your Honor?

22          THE COURT:  Yes, ma'am.

23          Ladies and gentlemen, we are going to recess for ten

24   minutes.  If you'd be back in the jury room at 9:50, we'll

25   resume our proceedings then.

1              (Break at 9:41 a.m. to 9:52 a.m.)

2              THE COURT:  Let the record reflect that all members of

3     the jury are present, the United States through its assistant

4     United State's attorneys are present, the defendant and his

5     attorney is present.

6              Ms. Arreola, you passed the witness?

7              MR. ARREOLA:  Yes, Your Honor.

8              THE COURT:  All right.

9              MR. ARREOLA:  Thank you.

10             THE COURT:  Ms. Franco, good morning.

11             MS. FRANCO:  Good morning, Your Honor.  Thank you.

12                         HECTOR PONCE,

13             CROSS-EXAMINATION BY THE DEFENSE

14    BY MS. FRANCO:

15    Q.   Mr. Ponce, you testified yesterday afternoon and this

16    morning when you speak about what we would have done.  It sounds

17    as if you are saying you were an employee of M.P.S.A. at that

18    time.  You were not, correct?

19    A.   I was not an employee.

20    Q.   And you had left M.P.S.A. back in 2007, correct?

21    A.   That is correct.

22    Q.   And John Adams had asked you to come back specifically for

23    this project; is that right?

24    A.   Yes.

25    Q.   And that was sometime in 2009, correct?

 1    A.   I believe so, yes, early 2009.

 2    Q.   And at the time in 2009, you were aware, were you not, that

 3    there were these gray market turbines in the possession of

 4    either it would have been Mitsubishi heavy machinery or

 5    industries?

 6    A.   I was aware in general that there were machines in the gray

 7    market, yes.

 8    Q.   And that would include the turbines that are the subject

 9    matter of this and other litigations, correct?

10    A.   Specifically, I only found out and discussed those units at

11    the time that Mr. Mitsubishi asked me to come and help on this.

12    Q.   Right.  So what I'm asking you though is, is that it's the

13    same three turbines that we're talking about, correct?

14    A.   Yes.

15    Q.   And they were -- they were gray market because another

16    company had contracted with M.H.I. to build the turbines for

17    them, correct?

18    A.   Yes.

19    Q.   And that company decided to go with a different product?

20    A.   No, they cancelled the project.

21    Q.   They cancelled it?

22    A.   Right.

23    Q.   As you were telling the jury yesterday, did that company

24    have some type of a letter that protected M.H.I. from the

25    cancellation of this deal?

```
 1    A.   I'm not aware of any letter of credit.

 2    Q.   Are you aware of any amount of money that was given to

 3    M.H.I. as a result of cancellation of this project?

 4    A.   No.

 5    Q.   These were not going to be refurbished turbines as in the

 6    Agua Prieta case.   These were brand new constructed turbines,

 7    correct?

 8    A.   They were brand new and constructed and never been used and

 9    were being preserved.

10    Q.   And two of them were in Japan and one of them was in

11    France, correct?

12    A.   Or vice versa.

13    Q.   Okay.  Well you said earlier you were instrumental in this

14    teaming agreement with F.G.G. and working with C.F.E. for the

15    sale of these turbines, correct?

16    A.   Correct.

17    Q.   Is it now that you don't recall where they were located at

18    that time?

19    A.   It's not an important subject, but I believe the steam

20    turbine was in Japan [sic] and the two gas turbines in

21    France [sic].

22    Q.   So you think it was two of those in France and one that was

23    in Japan?

24    A.   I believe so.

25    Q.   And where the location of the turbines were, that wasn't
```

1    important to you in the teaming agreement?

2    A.   It wasn't important to me at the time.

3    Q.   Well of course the teaming agreement spoke about delivery,

4    who was going to pay for transportation and things like that,

5    correct?

6    A.   Correct.

7    Q.   So where they were located, that would be a material term

8    of this teaming agreement and subsequent subcontract with

9    F.G.G., correct?

10   A.   No, it is important.  I'm just saying to me the exact

11   location, the city name was not important at the time.

12   Q.   Or the country for that matter, apparently, correct?

13   A.   No the country I knew very well was Japan and France.

14   Q.   But you don't know which was where, correct?

15   A.   No.  At this moment when you were asking me, you said two

16   of them are in Japan and one in France.  At this moment, years

17   later, I could not answer your question specifically, so I said

18   it might be vice versa.

19   Q.   And this did take place a long time ago, correct?

20   A.   It look place in 2009.

21   Q.   Right.  So that was awhile ago, correct?

22   A.   Yes.

23   Q.   So when I'm asking you a question, are you having problems

24   recalling specifically what the answer is; correct?

25            MR. ARREOLA:   Objection, Your Honor.

1    A.   I was only having trouble with the city side you asked me

2    about.

3              MR. ARREOLA:  Argumentative.

4              MS. FRANCO:  Your Honor, I'm just pointing out that I

5    asked him a pretty simple question and he can't remember it.

6              THE COURT:  He answered the question.  Let's move on.

7    BY MS. FRANCO:

8    Q.   Now I believe you said instrumental in drafting the teaming

9    agreement, correct?

10   A.   Yes.

11   Q.   I know that you testified as to your qualifications and

12   where you went to school.  Did you also go to law school, and

13   you didn't testify to it yesterday?

14   A.   I never went to law school.

15   Q.   Did you draft the teaming agreement or did Mr. Altumura,

16   who is in the legal department, draft the legal agreement?

17   A.   We all participate in drafting what's important and he

18   writes it.

19   Q.   Okay.  Well, yesterday you testified that you were

20   instrumental in drafting that agreement.  Is that sales talk for

21   what you did or are you just saying that you helped Mr. Altamura

22   put the terms together?

23   A.   Typing is one thing.  Discussing as a team what are the

24   important concepts to be put into an agreement between two

25   companies is what I consider instrumental, not typing itself.

1    Q.   So the general counsel in the legal department at M.P.S.A.,

2    that was his job was just to type it up?  You went to law school

3    so you could type up a teaming agreement?

4    A.   That's not what I said.  I said I did not type it.  And

5    when I mean instrumental from my point of view is I had

6    knowledge to contribute in putting together a teaming agreement,

7    but we put it together as a company.

8    Q.   But you didn't -- you didn't have, you weren't instrumental

9    in putting all of the conditions and terms in that teaming

10   agreement?

11   A.   I don't think I understand your question.

12   Q.   Let me ask you this way.

13        Mr. Altamura is the one who actually drafted this

14   teaming agreement between F.G.G. and M.P.S.A., correct?

15   A.   Correct.

16   Q.   And what you're saying is that you had some input into some

17   of the terms between the parties, correct?

18   A.   Yes.

19   Q.   Now on the subcontract, you said that it was F.G.G. who had

20   requested that it be done in Spanish?

21   A.   I believe that is the case, yes.

22   Q.   But you don't know that to be the case, correct?

23   A.   I don't recall right now exactly how it came up, but we

24   would not normally do an agreement between two companies in

25   Spanish, therefore I believe it was F.G.G. who asked for that.

1   Q.   But you were in Mexico, right, when this contract was

2   executed, the subcontract?

3   A.   When it was executed, we were in Mexico, yes.

4   Q.   Right.  Because you were the one who wrote, handwritten on

5   that last page, in English, some additional terms, correct?

6   A.   Yes, uh-huh.

7   Q.   And you don't remember right now who it was that made you

8   sat behind the computer and typed in the Spanish language in

9   this contract.  You are telling the jury now that you don't

10  remember who it was that drafted that contract?

11  A.   The subcontract you're talking about?

12  Q.   Yes, sir.

13  A.   I believe that Altamura and I were there and we were both

14  probably typing in Spanish and translating.

15  Q.   So then that's different than what you just testified to,

16  because you said you don't know who drafted it and put it in

17  Spanish, but now you're saying in fact it was M.P.S.A. that

18  drafted and put this subcontract together in Spanish, correct?

19            MR. ARREOLA:  Objection, Your Honor.  Argumentative

20  and compound question.  Could you break it down?

21            THE COURT:  It's two questions, so let's break it

22  down.

23  BY MS. FRANCO:

24  Q.   A moment ago you said you didn't recall who wrote -- who

25  drafted the contract in Spanish, correct?

1   A.   Are you only talking with the subcontract or the teaming

2   agreement?

3   Q.   Yes, sir.  Yes, sir, the subcontract.  You're in Mexico

4   City.

5   A.   Right.

6   Q.   You and Mr. Altamura who is with the general counsel's

7   office at M.P.S.A. are in Mexico City working on the subject,

8   correct?

9   A.   Yes.

10  Q.   And yesterday you testified that you believed that M.P.S.A.

11  did not draft the contract in Spanish, correct?

12  A.   I do not recall testifying to that yesterday.

13  Q.   All right.  But -- let's move on.

14          Now you're saying that it probably was you and

15  Mr. Altamura who worked on that contract in Spanish, correct?

16  A.   We worked during those meetings on that contract in Spanish

17  and translating it as well to English for our peoples' benefit.

18  I do not --

19  Q.   Is that a yes?

20  A.   The problem is that I do not recall if we actually drafted

21  it or if it was given to us already in a drafted form.  But we

22  worked on it in order to finalize it, including both he and I

23  typed in a computer.  I just don't remember who wrote the

24  initial version.

25          What we do normally is that whatever document we're

1    working off, we red line, we go back and forth.  So I remember

2    working on that, but I don't remember if the initial draft was

3    given to us already drafted or if we typed it ourselves.  I just

4    don't remember that.

5    Q.   So let's back up and talk about that for a minute.

6            So when you met with F.G.G. the first time, it was

7    your understanding that they had never been involved in any type

8    of deal like this before, correct?  As far as buying turbines

9    and reselling them to the Mexican company, it was your

10   understanding this was the first time they had done it, correct?

11   A.   That's what I thought, but I don't remember anybody saying

12   this is the first time that we done it.  That's what I thought.

13   Q.   Do you remember going and speaking to the U.S. Attorney's

14   Office and maybe one of these agents with your attorney,

15   regarding this matter?

16   A.   Yes.

17   Q.   Do you remember telling them you found it strange that a

18   small company from El Paso would have been able to get the

19   bidding rights to the C.F.E. contract?

20   A.   Yes, I do find it unusual.

21   Q.   Did you have any indication that they had been in the

22   business for a long period of time buying equipment and then

23   selling it back to another entity?

24   A.   No, I didn't have such indication.

25   Q.   Now, on the other hand, M.P.S.A. is in the business of

1    heavy machinery, either from your parent in Japan or in the

2    local company here in the United States, correct?

3    A.   Yes.

4    Q.   And so entering into a subcontract would be something that

5    M.P.S.A. has probably done thousands of times, correct?

6    A.   Numerous times, yes.

7    Q.   Right.  And yet you're not sure exactly who it was that

8    brought that original Spanish subcontract to Mexico?

9    A.   Correct.

10   Q.   Okay.  And if Mr. Gireud had testified yesterday that in

11   fact it was M.P.S.A. that drafted that contract in Spanish,

12   copying information out of the prime contract, would -- or the

13   bid specifications, would that surprise you?

14   A.   I have no comment on what Mr. Gireud might say or might not

15   say.

16   Q.   Now, getting back to your relationship with Mr. Adams, you

17   had testified yesterday that you hired him, correct?

18   A.   Yes.

19   Q.   And he worked for you for a period of time, correct?

20   A.   Yes.

21   Q.   And then you left and he assumed, I presume, a higher

22   position in the company, correct, to the best of your knowledge?

23   In other words, after you left, was he promoted?

24   A.   I don't actually know if he was promoted.  No, I don't

25   know.

```
 1    Q.   Some period of time after you left M.P.S.A., Mr. Adams

 2    asked you to come back?

 3    A.   Yes.

 4    Q.   And in fact, you and Mr. Adams worked very closely on this

 5    contract, correct?

 6    A.   Yes.

 7    Q.   And -- and you and Mr. Adams were and have continued to be

 8    very close friends, correct?

 9    A.   Yes.

10    Q.   And you talk on a regular basis, correct?

11    A.   No.

12    Q.   You don't speak to Mr. Adams regularly?

13    A.   No.

14    Q.   And you and Mr. Adams actually share an attorney, do you

15    not?

16    A.   Uh, yes.

17    Q.   And that's the same attorney that has accompanied you to

18    your interviews with the agents in this case in the U.S.

19    Attorneys?

20    A.   I know who my attorney is, but I don't know.

21    Q.   I'm asking you about your attorney.

22    A.   My attorney is Bill Caulfield and, yes, he accompanies me

23    to those meetings.

24    Q.   Right.  And is he Mr. Adams' attorney as well?

25    A.   Only so far as I know, but I don't know that for a fact.
```

1    Q.    And he's here in the courtroom today?

2    A.    Yes.

3    Q.    And he's been here in the courtroom this entire time?

4    A.    Yes.

5    Q.    And after Mr. Adams left in April 2010, did you continue to

6    get consulting contracts from M.P.S.A. after he left?

7    A.    No.

8    Q.    Now, when you entered into your consulting contracts with

9    M.P.S.A., did you actually sign a contract with M.P.S.A. or was

10   it more as on a as needed basis?

11   A.    I signed a contract with M.P.S.A.

12   Q.    And what were the terms of that contract, sir?

13   A.    It was that I would provide service and get paid a daily

14   rate for my service.

15   Q.    And what was your daily rate?

16   A.    It was $800.

17   Q.    And when was the first time you entered into a contract to

18   work on this project?

19   A.    I believe it was early 2009.  That's to the best of my

20   recollection.

21   Q.    On your screen you should see what's marked as Defendant's

22   Exhibit 201.  Do you see that?

23   A.    Yes, I do.

24   Q.    And do you recognize it?

25   A.    Hold on.  If you slow down.

1    Q.   Let me know when you want me to scroll.

2    A.   Uh-huh.  Yes, I recognize it.

3    Q.   And what is it, sir?

4    A.   It's an invoice from me to Mitsubishi for nine days of

5    work.

6    Q.   All right.  Let me just stop you there, because it hasn't

7    been admitted yet before you testify off of it.

8         MS. FRANCO:  Your Honor, move for admission of

9    Defendant's Exhibit 201.

10        MR. ARREOLA:  No, objection.

11        THE COURT:  Defendant's 201 is admitted.

12   BY MS. FRANCO:

13   Q.   Now let's go back to what this is.  This is a consulting

14   service invoice, correct?

15   A.   Yes.

16   Q.   And this covers the time period of December 12th through

17   December 31st of 2009, correct?

18   A.   Correct.

19   Q.   And so it doesn't include the time that you spent on the --

20   well, let me back up.  Did you go with Mr. Adams to Mexico

21   around the 6th or 7th of December to meet with C.F.E. and F.G.G.

22   officials regarding the Agua Prieta deal?

23   A.   Could you repeat the question?

24   Q.   Did you accompany Mr. Adams to Mexico earlier in the month

25   in December to meet with C.F.E. and F.G.G. to discuss the Agua

1    Prieta contract?

2    A.   I don't remember what dates I went with John Adams.

3    Q.   Did you got with him at some point in time in December?

4    A.   I think at one point John and I were in Mexico together,

5    yes.

6    Q.   On the trip to Mexico, what you'll see in the middle of the

7    page, it says business trip to Mexico, December 16th through the

8    19th, 2009.  You see that, right?

9    A.   I see it.

10   Q.   And Mr. Adams was not with you on that trip, correct?

11   A.   I don't recall with respect to dates which dates John Adams

12   was with me or not.

13   Q.   Okay.  How many times did you go to Mexico in December?

14   A.   I don't recall that either.

15   Q.   Okay.  This December 16th through the 19th of 2009, that

16   corresponds with the signing of the subcontract with F.G.G. and

17   Mexico, correct?  And I can pull up that subcontract if that

18   would refresh your --

19   A.   If you would, please.

20   Q.   That's Government Exhibit 12.  Let me get that for you.

21        Do you have Government's Exhibit 12 in front of you?

22   A.   I have it.

23   Q.   Okay.  Does that refresh your recollection?

24   A.   December 16th, yes, I see it.

25   Q.   So, going back to -- going back to Defendant's Exhibit 201,

1    that trip where it says business trip to Mexico December 16th

2    through the 19th, that corresponds with the signing of the

3    subcontract?

4    A.   Correct.

5    Q.   And could you read to the jury what services, what the

6    invoice was for, the three bullet points?

7    A.   It was for various meetings and telephone conversations

8    with M.P.S.A., F.G.G. and T.A.I. for C.F.E. contract follow.

9    And it was for coordination and preparation of C.F.E. contract

10   and F.G.G. subcontract documents.  And it was for a business

11   trip to Mexico on December 16 through 19, 2009, for which a

12   separate expense report is for expenses.

13   Q.   And we'll get to your expenses in a moment.

14          So that reflects what you were supposed to -- what

15   that time period from December the 12th through December 31st,

16   what you were supposed to be doing for M.P.S.A. in order to earn

17   the $7,200 that you charged him for, correct?

18   A.   That's correct.

19   Q.   And they paid that, correct?

20   A.   Yes.

21   Q.   I am going to ask you about -- do you see a document in

22   front of you which is -- I'll scroll down so you can see it --

23   to defendant's Exhibit 202, do you see that one?

24   A.   I see it.

25   Q.   Do you want me to scroll through all of it so you can see

1    it?

2    A.   It's -- it's a similar invoice covering the dates

3    January 17th through January 31st.

4    Q.   And was this sent by you to M.P.S.A.?

5    A.   Yes, it was.

6            MS. FRANCO:  Your Honor, move for admission of

7    Government's Exhibit 202.

8            MR. ARREOLA:  No, objection, Your Honor.

9            THE COURT:  Defendant's 202 is admitted.

10   BY MS. FRANCO:

11   Q.   Now on this one, it's the same daily rate of $800 per day,

12   correct?

13   A.   Correct.

14   Q.   And you're charging M.P.S.A. for seven man-days, correct?

15   A.   Uh-huh, yes.

16   Q.   Okay.  And could you read to the jury the middle portion

17   here where it starts "this"?

18   A.   It says, contract management F.G.G. subcontract and C.F.E.

19   contract for Agua Prieta II project.  Business trip to El Paso,

20   January 22nd through 24th, see separate invoice and expense

21   report.

22   Q.   All right.  So at the same time -- this isn't your first

23   trip to El Paso, correct?

24   A.   It is not.

25   Q.   And you were in El Paso January 22nd through the 24th of

1    2010, correct?

2    A.    Based on this, yes.

3    Q.    And do you recall what the purpose of that meeting was?

4    A.    I believe that the purpose of that meeting was for me to

5    obtain a copy of the contract document which I have been asking

6    F.G.G. and Mr. Delgado to provide to Mitsubishi for our

7    evaluation.

8    Q.    Okay.  So let's talk about that for a second.

9          You were hired as a consultant by M.P.S.A. to shepherd

10   through this teaming agreement that you worked on, make it come

11   true into a subcontract, with the hopes that those three gray

12   market turbines would find a home in Mexico, correct?

13   A.    Yes.

14   Q.    And as part of that I think you testified earlier that

15   sometime in 2009, that you met with F.G.G. officials, correct?

16   A.    Yes.

17   Q.    And you had also met and looked at what C.F.E. wanted in

18   their bid, so to see if the equipment that M.P.S.A. or M.H.I.

19   had on him, would fit what C.F.E. was looking for, correct?

20   A.    It was to see if the equipment could be supplied to F.G.G.

21   in order for them to bid on the project.

22   Q.    Correct.  So you looked into that, you did your due

23   diligence and went to see what it is that C.F.E. needed,

24   correct?

25   A.    Yes.

```
 1   Q.   And then to see if whether or not Mitsubishi had had
 2   something that would suit C.F.E.'s needs, correct?
 3   A.   Yes.  We evaluated that.
 4   Q.   Okay.  Now M.P.S.A. or M.H.I., were they -- neither one of
 5   those, either the parent company or the subsidiary in America,
 6   neither one of those companies had received an offer to bid on
 7   the Agua Prieta contract, correct?
 8   A.   You don't receive an offer to bid.
 9   Q.   Well --
10   A.   You decide if you want to participate and you buy the bid
11   specs, but I don't know.  I don't know that they had received an
12   offer to bid the way you mentioned it.
13   Q.   Well, certainly M.H.I. and M.P.S.A. did not have the
14   ability to bid on this contract for whatever reason?
15   A.   That is correct.
16   Q.   And -- but two other large companies did.  That would have
17   been Siemens, which is your former employer, correct?
18   A.   Incorrect.  Siemens was never my employer.
19   Q.   Well, it was -- you worked for Westinghouse?
20   A.   Yes.
21   Q.   And Siemens took over Westinghouse?
22   A.   After I left Westinghouse already.
23   Q.   And another large company, General Electric, I believe, had
24   also been on this project, correct?
25   A.   They eventually did bid on the project.
```

1    Q.   M.P.S.A., the American subsidiary of M.H.I. nor M.H.I.,

2    neither one of them had a seat at the able so to spoke to bid on

3    this project; is that correct?

4    A.   Correct.

5    Q.   So when you meet with F.G.G. and you find out what this is

6    that you perhaps could have equipment that could match it, and

7    you travel to Mexico, you're not sure, but it could've been two

8    times, and we'll talk about that in a second, but you were there

9    with Mr. Adams sometime in December and you were there back for

10   the subcontract signing, correct?

11   A.   Yes.

12   Q.   And the packet that was put together, the subcontract that

13   was put together, are you telling this jury that when you wrote,

14   you participated in that subcontract, you didn't have any of the

15   other like the financial proposal from F.G.G., you hadn't seen

16   the bid specs from C.F.E., you hadn't seen anything when you put

17   together the subcontract?

18             MR. ARREOLA:  Objection, Your Honor.  Compact

19   question.

20             MS. FRANCO:  I can do it one by one, Your Honor.  Just

21   trying to make it go a little bit faster.

22             THE COURT:  All right.  Go ahead.

23   BY MS. FRANCO:

24   Q.   Had you seen the R.F.P. from C.F.E.?

25   A.   I had seen the bid specifications from C.F.E., yes.

1    Q.   Right.  Okay.  And an R.F.P. is a request for proposal; is

2    that correct, that's what that stands for?

3    A.   Yes.

4    Q.   And so you saw the bid specs that C.F.E. wanted, correct?

5    A.   Correct.

6    Q.   And did you see the financial proposal put together by

7    F.G.G.?

8    A.   No.

9    Q.   So when you're in Mexico writing this subcontract, you

10   never saw the proposal, are you telling this jury you never saw

11   the financial proposal that F.G.G. had put together to C.F.E.?

12   A.   That is correct, I never saw it.

13   Q.   And you never saw any of the annexes or anexos or

14   attachments to any type of the financial proposal that was

15   submitted?

16   A.   That is correct, I never saw it.

17   Q.   So you entered into a contract and subcontract having not

18   seen any of the documents from Mexico?

19          MR. ARREOLA:  Objection, Your Honor.  Clarification as

20   to what is meant by any of the documents from Mexico.

21          THE COURT:  Well the witness can answer whether any

22   means any, so...

23   A.   I saw the specifications for what C.F.E. was desiring.

24   BY MS. FRANCO:

25   Q.   Okay.  I understand that, but you had no idea what --

 1   you're now in the relationship between you and F.G.G., F.G.G. is

 2   now your prime and you are the sub, right?

 3   A.   Correct.

 4   Q.   So you had no idea what it was that your prime was offering

 5   to C.F.E. when you wrote that subcontract?

 6   A.   The only idea that we had was when we were told that they

 7   were going to offer $121 million, because remember that's also a

 8   readout of the offers made.  At the time you submit the proposal

 9   to the C.F.E., they read out the numbers for price.  So my

10   understanding was it was 121 million, but I had no access to the

11   annexes or the financial proposals or the payment terms that

12   F.G.G. was making specifically to the C.F.E.

13   Q.   I understand that that's your testimony.  My question to

14   you is that given what you're testifying to under oath today,

15   are you saying that you entered into a subcontract or at least

16   you participated in entering into the subcontract with this

17   prime, the F.G.G. prime, when you were saying you hadn't seen

18   any of the other documents to support it?

19   A.   That is correct.

20   Q.   Okay.  When you were in Mexico City for the subcontract --

21   let me go to another document here -- do you see the document --

22   do you see a document in front of you that's marked Defendant's

23   Exhibit 203?

24   A.   Yes.

25   Q.   And I'm scrolling up so you can see what it is.

```
 1              Do you recognize it?

 2   A.   Yes.

 3   Q.   Okay.

 4              MS. FRANCO:  Your Honor, at this time --

 5   BY MS. FRANCO:

 6   Q.   Is this something that you prepared?

 7   A.   Yes.

 8   Q.   And is it something that you sent to M.P.S.A.?

 9   A.   Yes.

10              MS. FRANCO:  Your Honor, at this time I move for the

11   admission of the Defendant's Exhibit 203.

12              MR. ARREOLA:  No, objection, Your Honor.

13              THE COURT:  Defense Exhibit 203 is admitted.

14              MS. FRANCO:  Thank you, Your Honor.

15   BY MS. FRANCO:

16   Q.   All right, Mr. Ponce, let's talk about what's in this

17   document.

18   A.   Uh-huh.

19   Q.   So in addition to your consulting agreement where you were

20   paid $800 a day, you also were entitled for reimbursement for

21   expenses that you incurred, correct?

22   A.   Correct.

23   Q.   So this period of time covers the November 11th, 2009

24   through December the 19th of 2009, correct?

25   A.   It does, yes.
```

1    Q.   All right.  And so this -- I'm going to read to you and ask

2    you some questions about it.

3    A.   Uh-huh.

4    Q.   So this starts out:  This invoice is for the following

5    expenses reported via attached M.P.S.A. expense report form,

6    incurred as independent contractor for M.P.S.A.  And it goes

7    through and says, dinners, dinners with F.G.G., C.F.E. during

8    Orlando trip and trip to Mexico, a business trip to Mexico

9    December the 9th through 11, 2009 for C.F.E. Agua Prieta project

10   meetings and a business trip to Mexico September 16th through

11   19the, 2009, for C.F.E. Agua Prieta project contract

12   negotiations.  Do you see that, sir?

13   A.   Yes, I do.

14   Q.   And the total you are asking to be reimbursed is $409,

15   correct -- or $4,970.19?

16   A.   Correct.

17   Q.   Let me scroll through -- this is kind of weird to see --

18   but if you can move your head a little bit, there's a -- I can

19   get you a -- do you want to see a --

20   A.    It doesn't matter, as long as you point me to what you want

21   me to comment on.

22   Q.   On the bottom of it, it talks about down here where it says

23   entertainment business meals, and it has listed out there on,

24   let's see, December the 16th and 17th and 18th, several

25   different business meetings that you had with -- it's indicating

1    C.F. -- F.G.G., Mr. Gireud, Mr. Miller, Mr. Delgado.  Do you see

2    that there?

3    A.   Yes, I do.

4    Q.   Scroll through.  This has attached several pages to it and

5    some of them are hard to read, but let's go three and two.  I

6    believe it's page 19.

7             Now, this is a -- looks like a receipt that you

8    presented to M.P.S.A. for reimbursement for a business dinner,

9    correct?

10   A.   Are you look -- I see two receipts there.  Which one are

11   you referring to.

12   Q.   I'm referring to the one that's on the bottom of the screen

13   that actually shows more of what was purchased during this

14   business meeting.  Do you see it?

15   A.   I see it.

16   Q.   And the other one on the top, it looks like the receipt is

17   covering up what was actually purchased during that meeting,

18   correct?

19   A.   I believe that's what it is, yes.

20   Q.   Okay.  And so it appears to be perhaps a meal of some sort

21   that you and several others had back on December the 16th of

22   2009, correct?

23   A.   That is what it appears to be, yes.

24   Q.   And so looking through that, it appears that there was

25   quite a bit of consumption of alcoholic beverages, correct?  You

```
 1    want to take a minute to look at that?
 2    A.    There was consumption of alcoholic beverages equivalent to
 3    a business meal, yes.
 4    Q.    So 20 drinks would be equivalent to a business meal?
 5    A.    It's -- you know the number of drinks are what's on there,
 6    so...
 7    Q.    And that was during the subcontract meetings that you had
 8    with F.G.G. and C.F.E. down in Mexico, correct?
 9    A.    December 16th is correct.
10    Q.    Do you recall a conversation with Mr. Gireud, who was the
11    president of F.G.G., where he indicated to you that Mr. Delgado
12    was to get 62.5 percent of the first payment made from C.F.E. to
13    F.G.G.?
14    A.    That Mr. Delgado was to get 62 percent of the first payment
15    from C.F.E. through F.G.G.?  I don't recall that conversation.
16    Q.    So you don't recall Mr. Gireud telling you that?
17    A.    Correct, I don't recall.
18    Q.    And if he had told you that, would that have caused some
19    concern for you?
20              MR. ARREOLA:  Objection.  Calls for speculation.
21              MS. FRANCO:  Just asking a hypothetical, Your Honor.
22              THE COURT:  Well I'll overrule the speculation
23    objection.
24              MR. ARREOLA:  The witness has said -- first of all
25    it's hearsay, and then the witness has said he doesn't recall
```

 1    hearing that.

 2              THE COURT:  She's asking a hypothetical.

 3              MR. ARREOLA:  Okay.

 4    BY MS. FRANCO:

 5    Q.   If Mr. Gireud had told you that Mr. Delgado, that he had

 6    entered into a contract with Mr. Delgado where he was to receive

 7    62.5 percent of the first disbursement of payment from C.F.E.,

 8    would that have caused you concern?

 9    A.   I would have been surprised, but I don't know if I would be

10    concerned.

11    Q.   I want to talk to you about the request for the equipment

12    inspection back on Christmas Eve of 2009?

13    A.   Uh-huh.

14    Q.   Were you aware -- and I think you testified about it

15    yesterday, but if not I'll bring it up through your

16    recollection -- which is John Adams had sent an e-mail to

17    Mr. Gireud and I'm referring to Government Exhibit Number 11,

18    which I'm bringing up for you.  Do you see that?  I'll Scroll

19    down so you can see that's number 11.  And this has been

20    admitted.

21              And this was an e-mail from Mr. Adams to Mr. Gireud

22    and to you and to Mr. Altamura and Huwabee (phonetic)?  Am I

23    saying that right?

24    A.   Yes.

25    Q.   And it said, Fernando, M.P.S.A. is concerned about

1    finishing up our deal.  Please see the attached letter.  And

2    signed by Mr. Adams, correct?

3    A.    That's correct.

4    Q.    Okay.  And this is the November 27th letter.  Do you recall

5    seeing that?

6    A.    Yes.

7    Q.    All right.  And that's where it's discussed what -- what

8    was anticipated, I guess, by everyone involved with regard to

9    the teaming agreement and the subsequent execution of a

10   subcontract between M.P.S.A. and F.G.G., correct?

11   A.    That is correct.

12   Q.    Okay.  And at this point in time, Mr. Adams is indicating

13   that he's concerned about an informality, perhaps, that F.G.G.

14   has been, I guess, acting, for a lack of a better word, with its

15   negotiations with M.P.S.A. and with C.F.E., correct?

16   A.    Correct.

17   Q.    Okay.  So this is back on November 27th.  At that point in

18   time there's no subcontract, correct?

19   A.    At that point in time there was no subcontract, correct.

20   Q.    So we're still under the teaming agreement, right?

21   A.    Yes.

22   Q.    And based upon his concerns, certainly you worked on the

23   teaming agreement, so you know that M.P.S.A. could've backed out

24   of this deal, correct?

25   A.    I would have to review that carefully.  I mean I believe

1   M.P.S.A. could have backed out of a deal.

2   Q.   Okay.  And then you say that -- so in December, mid

3   December, you enter into this subcontract not having looked at

4   any of the Mexican documents besides the bid specs.  And then

5   you get this odd call, according to what you testified to, this

6   suspicious call, where the C.F.E. wanted to look at the

7   equipment, correct?

8   A.   Correct.

9   Q.   And the actual prime contract between F.G.G. and C.F.E. had

10  not been entered into, yet, had it?

11  A.   As far as I know now, it had not been entered into.

12  Q.   And that had -- hadn't been entered into until January 6th,

13  I believe, of 2010?

14  A.   I subsequently found out that that was the date.

15  Q.   And you testified to the jury that after you got off the

16  phone with Mr. Delgado that you and Mr. Adams looked at each

17  other and you are like I think he's trying to pledge our

18  equipment, right?

19  A.   Or something to that effect.  Not to pledge, but something

20  is happening which doesn't seem right.

21  Q.   And you-all didn't back out at that point in time, either

22  did you?  You didn't call Mr. Delgado back -- it wouldn't have

23  been your place, because you weren't working for M.P.S.A., but

24  Mr. Adams didn't call Mr. Delgado back or more importantly

25  Mr. Gireud the president of F.G.G., and said, you know what,

 1    we're not interested in pursuing this relationship that didn't

 2    happen, did it?

 3    A.    That did not happen.

 4    Q.    And subsequent to that, when the officials, they actually

 5    showed up in Japan and France, M.P.S.A. -- M.H.I., I should

 6    say -- they let him in.  They let C.F.E. come in and look at the

 7    equipment, correct?

 8    A.    Yes.

 9    Q.    There wasn't a discussion by Mr. Adams calling up anyone or

10    you, yourself, advising Mr. Adams, hey, you know what, let's not

11    show them the equipment unless they show us the letters of

12    credit, correct?

13    A.    Correct.

14    Q.    That never happened, did it?

15    A.    It didn't happen.

16    Q.    Even though you had your suspicions as to whether or not

17    they had a letters of credit?

18    A.    Yes.  We wouldn't do such a thing based on suspicions.

19    Q.    So you wouldn't have said, hold your horses, let's find out

20    whether or not you met the requirements of what C.F.E. asked for

21    before we let you see our equipment.  You're saying that that

22    couldn't have been done by Mr. Adams or higher up at M.P.S.A. or

23    M.H.I?

24    A.    I don't see the relevance.  It could've been done, but it

25    wasn't done.

1    Q.    Correct?

2    A.    Correct.

3    Q.    Now, getting back to your handwritten note in the

4    subcontract.  Let me put it up in front of you.  Let me show

5    you.  It's in front of you, 12A, and that's the Spanish version,

6    so I can show you the handwritten note.  Okay?  All right.

7            So let's talk about this.  This is on the last page of

8    the subcontract.  You testified yesterday that you're the one

9    who wrote this, this term into the contract, correct?

10   A.    Yes.

11   Q.    Your initials aren't where you handwrote this, correct?

12   A.    Correct, they are not.

13   Q.    And you didn't sign this contract, correct?

14   A.    I did not sign it.

15   Q.    And what this says is with respect to the signed contract,

16   the parties agree to check and amend the subcontract as needed

17   and to adjust the price according to the final arrangements for

18   letter of credit costs, shipping, delivery terms and any errors

19   in the document in adjustments based on final prime contract,

20   correct?

21   A.    Correct.

22   Q.    And the final prime contract you are referring to is the

23   contract between F.G.G. and C.F.E., correct?

24   A.    That is correct.

25   Q.    And you testified yesterday that this subcontract that you

 1   helped work on and that you handwrote in, it specifically

 2   excluded any mention of the long long-term service agreement,

 3   correct?

 4   A.   I believe it does.

 5   Q.   In fact, yesterday you testified that if the long long-term

 6   service agreement is mentioned in this, it was to say it does

 7   not apply to the long-term service agreement?

 8   A.   Yes.

 9   Q.   Now, at the time when the bid was awarded in November,

10   F.G.G. got the -- they won the award for both the equipment

11   itself and also the long-term service agreement, correct?

12   A.   I don't remember if it was announced at that time.

13   Q.   So you don't recall that they won the bid on both?

14   A.   That's correct, I don't recall that.

15   Q.   So do you recall another company winning the bid on a

16   long-term service agreement?

17   A.   No, I don't remember an announcement with regard to the

18   L.T.S.A.

19   Q.   Let me ask you this.  Was it -- was a long-term service

20   agreement excluded from this subcontract, because the long-term

21   service agreement wouldn't begin until a year after the

22   equipment had been placed in Agua Prieta?

23   A.   No, that's not the reason why it would be excluded.

24   Q.   Why did you exclude it from this contract?

25   A.   I believe it's because the C.F.E. was awarding an equipment

1   purchase contract to F.G.G., and we were talking about an

2   equipment supply subcontract to F.G.G. from us.  And so one is

3   for equipment and the other one will be for long term service,

4   so here we are talking about the equipment subcontract.

5   Q.   And if F.G.G. had won the bid for the long-term service

6   contract, obviously M.P.S.A. would want to be able to provide

7   that service to C.F.E., correct?

8   A.   Correct.

9   Q.   But that would be a direct relationship between M.P.S.A.

10  and C.F.E.?

11  A.   No.  Specifically what we said in the teaming agreement was

12  that F.G.G. would obtain that contract when it was time and that

13  they agreed to, and that they would cost the C.F.E. to allow for

14  assignment of the contract once done from F.G.G. to M.P.S.A. at

15  which time we would become the prime contractor to the C.F.E.

16  for the L.T.S.A. only.

17  Q.   Okay.  For the long-term service agreement?

18  A.   Correct.

19  Q.   So the middleman, as you called F.G.G. yesterday, they

20  would have been out of it for the long-term service agreement?

21  A.   That is correct as far as an assignment.

22  Q.   So yesterday you testified that when you wrote the price

23  according to the final arrangements for letters of credit, that

24  really what you were talking about was the letters of credit for

25  the L.T.S.A.?

```
1    A.    That is correct.

2    Q.    But you agree with me as you just testified to, this

3    subcontract has nothing to do with the long-term service

4    contract?

5    A.    That's what I just said, yes.

6              MS. FRANCO:  Your Honor, may we approach?

7              THE COURT:  The bench?

8              MS. FRANCO:  Yes, sir.

9              THE COURT:  Sure.

10             (Bench conference.)

11             MS. FRANCO:  Your Honor, I had provided a copy of this

12   to counsel this morning.  It's in English translation and an

13   e-mail that Mr. Gireud had sent to Mr. Ponce, the forward of

14   what Mr. Delgado sent to Mr. Gireud.  And I don't have the

15   Spanish version of it.  I have the transmittal from them,

16   because they provided documents to us in English.  We haven't

17   seen or at least we can't find in the thousands of pages, the

18   Spanish, but we did receive this from them on --

19             THE COURT:  So you want to introduced this?

20             MS. FRANCO:  Yes, sir -- on April the 18th.

21             THE COURT:  This is something you gave them.  I guess

22   you all translated it.

23             MR. ARREOLA:  And I don't readily have the Spanish

24   translation.  I don't recall the document, but like Ms. Franco

25   just said, there are over 20,000 pages of documents that were
```

```
 1    produced.  And I don't recall the specific one, but the

 2    government will rely on defense counsel's representation that

 3    this was produced, so we have no objection to her showing it to

 4    the witness.

 5              THE COURT:  You want to look at it?

 6              MR. ARREOLA:  They provided it this morning.

 7              MS. FRANCO:  So that's all I wanted to let you know,

 8    so we didn't have a fight in front of --

 9              MR. ARREOLA:  Thank you, Ms. Franco.

10              MS. FRANCO:  Thank you.

11              (Bench concluded.)

12    BY MS. FRANCO:

13    Q.   All right.  Mr. Ponce --

14              MS. FRANCO:  May I approach, Your Honor?

15              THE COURT:  The witness?

16              MS. FRANCO:  Yes, Your Honor.

17    BY MS. FRANCO:

18    Q.   What I've marked as Defendant's Exhibit 205, take a look at

19    that.  There's a couple of pages attached to it.

20              THE COURT:  This is 205?

21              MS. FRANCO:  Yes, Judge.

22              THE COURT:  Is there also a 204?

23              MS. FRANCO:  I will get -- yes.  I will submit it in

24    just a second, Your Honor.

25    BY MS. FRANCO:
```

1    Q.    Let me know when you've had a chance to look at it.

2    A.    Okay.

3    Q.    Do you recall getting an e-mail from Mr. Gireud?

4    A.    I don't recall getting this e-mail, but as I see it, it's

5    an e-mail from him to me, yes.

6              MS. FRANCO:  Your Honor, at this time I move for the

7    admission of the defendant's Exhibit 205.

8              MR. ARREOLA:  No, objection, Your Honor.

9              THE COURT:  205 is admitted by the defendant.

10   BY MS. FRANCO:

11   Q.    I'm going to place it on here so you can see it.

12             All right.  Mr. Ponce, this is an e-mail that

13   Mr. Gireud sent to you on December the 8th, correct?

14   A.    Correct.

15   Q.    And that would have been prior to your trip to Mexico City

16   on December -- I believe you said you were there December

17   the 16th around that period of time, correct?

18   A.    Yes.

19   Q.    And he is forwarding you an e-mail that Mr. Delgado had

20   sent to Mr. Gireud where he said this is -- this is all.  Don't

21   ask for more, because there isn't anything more.  Read the

22   bidding rules if you want to see the original letter.

23             And so Mr. Gireud forwards that to you with some

24   documents and says, Hector, this is all there is.  If you want

25   to see originals you are going to be with us later in Mexico.

1    Okay.  Do you see that?

2    A.   I see it, yes.

3    Q.   All right.  Then attached to that e-mail were some

4    documents, correct?

5    A.   Correct.

6    Q.   And you have those in front of you?

7    A.   Yes.

8    Q.   But the first page looks like it's some sort of charges for

9    product warranty service.  Do you see that?

10   A.   Yes.

11   Q.   And that would be for the long-term service agreement?

12   A.   This would be for the long-term service agreement.

13   Q.   Okay.  And then the second page that was attached to that

14   is a continuation of that, correct?

15   A.   Yes.

16   Q.   And that is also for the long-term service?

17   A.   Yes.

18   Q.   And at the top of that page it has F.G.G. Enterprises, LLC,

19   and it says, federal electric -- electricity commission

20   international public bidding procedure and then it has a number.

21   Do you see that?

22   A.   I see it.

23   Q.   So this would have been a response to the R.F.P.  Is that

24   what it appears to be?

25   A.   It appears to be that, yes.

1   Q.   On the third page of Defendant's 205 that's in front of

2   you, it appears to be then the last quarter or the last page of

3   the L.T.S.A., correct?

4   A.   Yes.

5   Q.   The next page talks about financing offer.  Do you see

6   that?

7   A.   Yes.

8   Q.   And so then it talks about how F.G.G. was going to finance

9   the bid to the equipment, I guess, to C.F.E., correct?

10  A.   May I take a moment to read it?

11  Q.   Yes, sir.

12  A.   Okay.

13  Q.   Do you see the last paragraph where it says the financial

14  institution will withhold the title of the assets in question as

15  surety until the same enter into commercial operation and when

16  the purchase amount is paid in full.  Do you see that?

17  A.   I see that.

18  Q.   The next page, Defendant's 205, that would be the payment

19  schedule that we've been talking about sense yesterday, correct?

20  A.   Yes.

21  Q.   And then the last pages of that attachment is the actual --

22  it appears to be the first page to the bid submission by F.G.G.

23  to the C.F.E., correct?

24  A.   It appears to be that, yes.

25  Q.   And it's addressed to the trust and/or Federal Elect

1    Commission, correct?

2    A.    Correct.

3    Q.    And it talks about the generators.  Do you see that?

4    A.    Yes.

5    Q.    The steam generator and the two gas generators.  You see

6    that, right?

7    A.    I see it.

8    Q.    And it talks about if it's accepted that they'll get a

9    letter of credit or a standby for the $20 million.  You see

10   that, right?

11   A.    Yes.

12   Q.    Up at the first paragraph it talks about what the C.F.E. is

13   looking for which is the purchase contract.  Do you see that?

14   A.    Tell me again where you are pointing?

15   Q.    Let's go to the very first line where it says, after

16   examining the terms of the bidding rules, any documents and

17   their specifications and the agreements arising out of the

18   clarification meetings, which you see that, right?

19   A.    Uh-huh.

20   Q.    We, the undersigned offer to provide and deliver the

21   procurement and long-term product warranty service of two gas

22   turbine generators and the one steam.  You see that, correct?

23   A.    Yes.

24   Q.    So they are -- F.G.G. is asking C.F.E. to award them both

25   the long-term service agreement and the actual equipment

1    contract, correct?

2    A.    Yes.

3    Q.    And on this document it says, our proposal is accepted, and

4    it talks about the $20-million letter of credit.  You testified

5    yesterday that the long-term service contract would inquire

6    either a letter of credit or a parent warranty, correct -- or a

7    parent guarantee?  I'm sorry.

8    A.    I testified that our proposal to F.G.G. was based upon a

9    parent guarantee not a letters of credit for the L.T.S.A.

10   Q.    Right.  I know that that's what you wanted to get was a

11   parental guarantee from M.H.I., but when you entered into that

12   teaming agreement, at that time you didn't have the parental

13   guarantee, correct?

14   A.    We didn't have it meaning what?

15   Q.    Meaning that, well, it wasn't right at that point in time

16   because the long-term service agreement wouldn't come into

17   effect until after the equipment has been placed in Agua Prieta?

18   A.    That is correct.

19   Q.    Okay.  So the plan was to ask M.H.I. if they would, instead

20   of you having to pay a million dollars or however much it was

21   going to be to get the letters of credit to get the long-term

22   service contract, you were hoping they would give some sort of

23   parental guarantee, right?

24   A.    Correct.

25   Q.    Now in your discussions with -- in the teaming agreement

1   and with F.G.G., it was always understood, as you testified

2   before, that with the long-term service agreement, F.G.G. would

3   be out of the mix, that it was going to be a direct relationship

4   between M.P.S.A. or M.H.I. and C.F.E., correct?

5   A.   That the contract would be assigned to Mitsubishi Power

6   Systems Americas.

7   Q.   Right.  So F.G.G. would be out of it?

8   A.   That's what assignment means, correct.

9   Q.   Right?

10  A.   Uh-huh.

11  Q.   Is that a yes?

12  A.   Yes.

13  Q.   Now going back to the first page of defendant's

14  Exhibit 205, it indicates the date was December the 8th,

15  correct?

16  A.   Correct.

17  Q.   And presumedly then you did have the proposal from F.G.G.

18  prior to the execution of the subcontract a couple of weeks

19  later, correct?

20  A.   We had these pages.

21  Q.   Well, did you think -- and you had the specs.  You said you

22  had the specs?

23  A.   Right.

24  Q.   So did you think there were any other pieces of paper you

25  needed to review beforehand?

1    A.   In all honesty --

2    Q.   Well, I hope so.

3    A.   -- if we receive these pieces of paper on F.G.G. letterhead

4    specifying or representing that this is what they gave to F.G.G.

5    to C.F.E., we were never too sure if that was the case.  We did

6    receive this e-mail and it had this attached to it.

7    Q.   Okay.  You're telling this jury, so even now on December

8    the 8th, you weren't sure and that's prior to executing the

9    subcontract, right?  You still weren't sure if this was a good

10   deal or not.  It was on the up-and-up, that's what you are

11   testifying to?

12   A.   No, ma'am.  I'm testifying that we did not know what they

13   had submitted to the C.F.E.  The good deal for us was only what

14   we on F.G.G. were contracting, which was a price and a set of

15   payment terms.  What they did to the C.F.E. was we just wanted

16   to be sure that they were not proposing to the C.F.E. something

17   that we did not represent to them that we would deliver.

18   Q.   All right.

19   A.   But the term good deal that you just used, our deal was

20   specified by our teaming agreement on our discussions with

21   F.G.G., not what they submitted to the C.F.E.

22   Q.   Okay.  But you testified yesterday and today that you

23   hadn't seen anything that F.G.G. had submitted to the C.F.E.  Do

24   you recall that testimony?

25   A.   That is correct.

1   Q.   But in fact you did receive what F.G.G. had submitted to

2   C.F.E., correct?

3   A.   No, we received what Mr. Fernando said are copies of what

4   they supposedly would have submitted, but this does not give any

5   evidence that they in fact did submit this and that this is what

6   it is.

7   Q.   And did you think that back on December the 8th of 2009?

8   A.   We just wanted to know did you submit our proposal, you

9   know, with our specifications, the way we meant it.

10  Q.   Let me ask you the question again.

11  A.   Uh-huh.

12  Q.   Did you think that on December the 8th when you received

13  this e-mail with what F.G.G. said it had submitted to the

14  C.F.E., did the thought cross your mind, I wonder if this is

15  what they really submitted to the C.F.E.?

16  A.   Yeah, the thought crossed my mind.

17  Q.   But you went ahead and entered into a subcontract, correct?

18  A.   Correct.

19  Q.   You went ahead and let C.F.E. inspect the equipment in

20  Japan and France, correct?

21  A.   Correct.

22  Q.   And you didn't inquire that a letter of credit be presented

23  to -- or not you -- but M.P.S.A. didn't require the letter of

24  credit be submitted prior to any inspection of the equipment?

25  A.   A letter of credit submitted to who?

```
 1    Q.   To M.P.S.A., to verify that it had not pledged the
 2    equipment, as you suspected at the time.
 3    A.   No, we did not require the letter of credit at that time.
 4         MS. FRANCO:  Your Honor, I believe defendant's
 5    Exhibit 204 is what I'm lacking to submit.  Let me go back to
 6    that.
 7    BY MS. FRANCO:
 8    Q.   Okay.  So on -- is that on your screen, Mr. Ponce?
 9         COURTROOM DEPUTY DUEÑAS:  Not yet.
10         MS. FRANCO:  Oh, sorry.
11    BY MS. FRANCO:
12    Q.   Do you see it on your screen, sir?  It's marked at the
13    bottom as Defendant's 204.
14    A.   I see it.
15    Q.   And is this an expense report reimbursement that you
16    submitted?
17    A.   Yes.
18    Q.   And this covers the time period of January 22, 2010, to
19    January 24, 2010, correct?
20    A.   Correct.
21    Q.   And this is for a business trip to El Paso for the C.F.E.
22    Agua Prieta project meetings, correct?
23    A.   Yes.
24         MS. FRANCO:  Your Honor, I move --
25    BY MS. FRANCO:
```

1    Q.   And you prepared this?

2    A.   Yes.

3    Q.   And you submitted it to M.P.S.A.?

4    A.   Yes.

5         MS. FRANCO:  Your Honor, move for admission of

6    Defendant's Exhibit 204.

7         MR. ARREOLA:  No, objection.

8         THE COURT:  Defendant's 204 is admitted.

9    BY MS. FRANCO:

10   Q.   Mr. Ponce, when we were looking at your expense report for

11   December where there was a business meeting, there was two trips

12   on the 9th and then later on the 16th, correct?

13   A.   Yes.

14   Q.   Do you remember that?

15        Okay.  I'm going to show you what has already been

16   admitted into evidence as Government's Exhibit 26.  And this is

17   Government's Exhibit Number 26 and this would be the travel

18   reimbursement for Mr. Adams.  Do you see that on your screen?

19   A.   I see it, yes.

20   Q.   And at the bottom of -- just as is your expense report,

21   there's an entertainment meals expense account that's on the

22   bottom of that page.  Do you see it?

23   A.   Would you repeat the question, please?

24   Q.   You submitted a similar looking expense report.  So you're

25   familiar with the form, correct?

 1   A.   Yes.

 2   Q.   And at the bottom of the form that M.P.S.A. uses, the

 3   entertainment and business meals is at the bottom of the page,

 4   correct?

 5   A.   Correct.

 6   Q.   Do you see it?

 7            And do you see where it's noted that it looks like the

 8   date is kind of cut off, but it says '09 and it has C.F.E.

 9   Vargas Gonzalez, F.G.G. Fernando Gireud, Ponce.  Do you see

10   that?

11   A.   Yes.

12   Q.   And it shows that he was one of the ones attending,

13   correct?

14   A.   Yes.

15   Q.   And from M.P.S.A. and it looks like there was -- it says La

16   Nueva Opera, so maybe there was some opera tickets bought.  But

17   underneath there it shows subsequent expense for

18   $600-and-some-odd to Casa Bell, Mexico.  Do you see that?

19   A.   I see it.

20   Q.   And if I scroll up, do you see where it's handwritten,

21   someone handwrote next to miscellaneous expense, it says 5,373,

22   do you see that?

23   A.   Hold on one second.  Can you put the cursor near it so I

24   can see it?

25   Q.   Yes, sir, right here.

1    A.    Yes.

2    Q.    And can you read what that said in the handwritten note?

3    A.    It says -- it is hard to read, but I can't read the top of

4    it, but then it says gift for Marco Delgado, parenthesis, which

5    I can't read, then F.G.G. see attached e-mail, is what it says.

6              MS. FRANCO:  May I have just a moment, Your Honor?

7              THE COURT:  Sure.

8              MS. KANOF:  Sorry.  We didn't catch the exhibit.

9              MS. FRANCO:  That's Government's Exhibit Number 26,

10   page ten.

11             Pass the witness, Your Honor.

12             THE COURT:  Ms. Arreola?

13             MR. ARREOLA:  May I have just a very brief moment?

14             THE COURT:  Yes, ma'am.

15             MR. ARREOLA:  Your Honor, may we request sidebar

16   please?

17             THE COURT:  Yes, ma'am.

18             (Bench conference.)

19             MR. ARREOLA:  Can the government have a brief reset so

20   we can try to find the Spanish language version of the document

21   that was just shown to the witness?  It's Exhibit 203.  We

22   just -- it wasn't on the exhibit list originally and it was just

23   added this morning, and we think we should have an opportunity

24   to pull the Spanish language version.

25             MS. KANOF:  We have provided them the economic

1    proposal.  It's the last page of the economic proposal and it's

2    in Spanish.  Our translator, which we also provided to them,

3    translates that last sentence very differently.  And so it's

4    pretty critical.

5                THE COURT:  Translation of what?

6                MS. KANOF:  The last sentence that she -- the sentence

7    that's in the economic proposal that's the last page of that

8    e-mail that Mr. Delgado sent in English was provided by

9    Mr. Delgado to C.F.E. in Spanish.  We had it translated and

10   provided it to defense counsel.  The way our certified

11   interpreter translated it is very different than the way

12   Mr. Delgado translated it and sent it to Mr. Ponce, so we would

13   like a minute to look for the Spanish version, and they said

14   they couldn't find the Spanish version.  We'd like them to be

15   able to find the Spanish version if they can.

16               MS. ARREOLA:  In the meantime, we're going to look to

17   see if we can find it.

18               And Your Honor, again, this document --

19               THE COURT:  You can't do it right now?  You can't do

20   it in 20 minutes so we can take our break?

21               MR. ARREOLA:  Oh, certainly.  I can go back to it.  I

22   don't want the witness to be excused before I look for it, but I

23   can proceed with questions right now.  Thank you, Judge.

24               (Bench concluded.)

25               COURTROOM DEPUTY DUENAS:  Same exhibit.

1          MR. ARREOLA:  Yes, sir.

2          THE COURT:  What exhibit is it, GX 12?

3          MR. ARREOLA:  Yes, Your Honor.

4                      HECTOR PONCE,

5          REDIRECT EXAMINATION BY THE GOVERNMENT

6   BY MS. ARREOLA:

7   Q.   Mr. Ponce, take a look at Defense Exhibit 205?

8   A.   Yes.

9   Q.   And do you see the date on that document as December 8th of

10  2009?

11  A.   I see it.

12  Q.   And by the time that this e-mail was dated, had F.G.G.

13  already submitted its bid to C.F.E.?

14  A.   I believe so, yes.

15  Q.   I'm going to see if I can refresh your recollection.  I'm

16  going to ask you to look at Government Exhibit 11.  Do you see

17  this is an e-mail from John Adams to Mr. Gireud and copying you

18  on November 27th?

19  A.   Yes.

20  Q.   I'm going to ask you to take a look at the attachment.  Is

21  this a letter dated November 27th, 2009?

22  A.   Yes.  Yes.

23  Q.   So this letter is dated before the e-mail --

24  A.   Yes.

25  Q.   -- as Defense Exhibit 205 sending a copy of an F.G.G.

1    proposal; is that correct?

2    A.   Yes.

3    Q.   I'm going to read from this.

4         As we discussed the other day, congratulations on the

5    receipt of the reward of the project.

6    A.   Yes.

7    Q.   Now, at the time that this letter was sent on

8    November 27th, 2009, had F.G.G. shared its bid proposal with

9    M.P.S.A.?

10   A.   No.

11   Q.   Okay.  And was that a concern to Mitsubishi?

12   A.   Yes.

13   Q.   Why was that a concern?

14   A.   Because the teaming agreement said very clearly that they

15   were supposed to keep us informed of what they were submitting

16   to the C.F.E. and that they would not be allowed to submit to

17   the C.F.E. something other than what our specifications were

18   saying we would supply.  And you know we were concerned that

19   they were not actually giving us originals of what they were

20   submitting.  And we were asking for originals of what was

21   actually submitted or something showing some formality that we

22   would be comfortable they would not submit something other than

23   what we had proposed to them.

24   Q.   And did Mitsubishi communicate their concerns that they had

25   not seen F.G.G.'s bid prior to submission?  Did Mitsubishi

1    communicate concern to F.G.G.?

2    A.   In this letter, included, we're very clearly saying, we're

3    concerned that your not keeping us informed and that you shall

4    submit the equipment proposal to C.F.E. unchanged in any respect

5    whatsoever, and it wasn't clear to us that that's what they

6    would have done.  We were concerned that something might have

7    been changed.

8    Q.   I'm going to now read you a paragraph from Exhibit 11 and

9    then ask you a question.

10           We cannot understand nor accept F.G.G.'s failure to

11   keep M.P.S.A. informed about the details of the bid, especially

12   when we require specific information.  We are especially

13   concerned that we were not given the opportunity to review the

14   commercial offer prior to submission to C.F.E., and now that

15   associate contract R.D.B.S. is executed, F.G.G. is in danger of

16   entering into such contracts which M.P.S.A. will not be able to

17   support if they do not include our required terms and

18   conditions.  Did I read that correct?

19   A.   You read it correctly.

20   Q.   Okay.  And I'm going to continue to the next sentence.

21           In particular, we are concerned that if liberties were

22   taken and our terms were not specified in the bid, F.G.G. will

23   try to seek terms from us which conflict with or are outside the

24   teaming agreement and our proposals.  We will not renegotiate

25   any of these terms with F.G.G.

REDIRECT PONCE                                                          73

1              In the teaming agreement, was it made clear that

2    F.G.G. was solely responsible for the letters of credit for the

3    equipment contract?

4    A.   Yes, it was clear.

5    Q.   Now after this, Defense Exhibit 205 which is dated

6    December 8th, 2009, did Mitsubishi Power Systems America and

7    F.G.G. in fact enter into a contract?

8    A.   Repeat your question.

9    Q.   After Defense Exhibit 205 which is dated December 8th,

10   2009, did Mitsubishi and F.G.G. enter into a subcontract?

11   A.   Yes.

12   Q.   And did that subcontract define specifically the

13   obligations and promises of each party in that contract?

14   A.   Yes.

15   Q.   And did that contract impose any obligation on Mitsubishi

16   to provide the letters of credit for the equipment contract?

17   A.   No.

18   Q.   And did that contain any promise by Mitsubishi to pledge

19   its equipment in lieu of the letters of credit?

20   A.   No.

21   Q.   I'm going to ask you now to take a look at Government

22   Exhibit 14.  Is this an e-mail from you to Mr. Gireud copying

23   Mr. Delgado?

24   A.   Yes.

25   Q.   And is this -- is the date shown December 28th, 2009?

```
 1    A.   Yes.

 2    Q.   And is this date after Defense Exhibit 205 which is dated

 3    December 8th, 2009?

 4    A.   Yes, it is.

 5    Q.   I'm going to read from this and then ask you a question.

 6         The equipment inspection issue leads us to suspect

 7    F.G.G. may be offering existing M.P.S.A. equipment for

 8    collateral for financial guarantees that are the responsibility

 9    of F.G.G.  This is unacceptable to Mitsubishi Power Systems

10    America.  Therefore, please confirm that Mitsubishi Power

11    Systems America's equipment is not being negotiated or offered

12    to anyone as collateral and that no liens or restrictions of any

13    kind are being discussed with any third parties.

14         Did I read that correct?

15    A.   Yes.

16    Q.   I'm now I'm going to show you Government Exhibit 40 which

17    is in evidence.  Do you see that this is an e-mail from

18    Mr. Gireud to you?

19    A.   Yes.

20    Q.   Do you see that Mr. Delgado is copied?

21    A.   Uh-huh.

22    Q.   Do you see that the date is February 11, 2010.

23    A.   Yes, I do.

24    Q.   And is that several months after Defendant's Exhibit 205

25    dated December 8th, 2009?
```

REDIRECT PONCE                                                           75

1    A.   Yes, it is.

2    Q.   Do you see that attached to this e-mail is a letter on

3    F.G.G. letterhead addressed to Mr. Adams?

4    A.   Yes.

5    Q.   And I'm going to read from this and ask you a question.

6         All conditions precedent and obligations post bid

7    award have been met by F.G.G.  M.P.S.A. will not be responsible

8    for any letter of credit.

9         Did I read that correct?

10   A.   Yes.

11   Q.   Did anyone from F.G.G. ever show you the John Adams letter

12   dated January 10th, 2010, which purported to authorize a pledge

13   of Mitsubishi's equipment?

14   A.   No.

15   Q.   Did anyone from F.G.G. or C.F.E. ever show you the pledge

16   challenge agreement signed with a signature by Mr. Delgado in

17   which he pledged Mitsubishi's equipment?

18        And did anybody from Mitsubishi ever give

19   authorization for such a pledge?

20   A.   No.

21   Q.   Ms. Franco also asked you if Mitsubishi terminated the

22   contract negotiations after you became suspicious that F.G.G.

23   was pledging the equipment.  Do you recall that line of

24   questioning?

25   A.   Yes.

REDIRECT PONCE                                                          76

```
 1    Q.   After you became suspicious, did Mitsubishi in fact send

 2    notice to F.G.G. that F.G.G. was not permitted to pledge the

 3    equipment?

 4    A.   We did some notice, yes.

 5    Q.   I'm going to ask you to take a look at Government

 6    Exhibit 34.  Is this an e-mail from you to Mr. Gireud?

 7    A.   Yes.

 8    Q.   Is Mr. Delgado copied on this e-mail?

 9    A.   Yes.

10    Q.   January 12th, 2010?

11    A.   Yes.  Yes, it is.

12    Q.   And attached to this, is there an e-mail on Mitsubishi

13    letterhead also dated January 12th, 2010?

14    A.   Yes, it is.

15    Q.   And again is Mr. Delgado copied?

16    A.   Uh-huh, yes.

17    Q.   And then I'm going to read a sentence and ask a question.

18         We had already agreed that M.P.S.A. will not provide

19    any letters of credit for either contract.  Please confirm

20    F.G.G. will not ask Mitsubishi Power Systems America to

21    guarantee equipment or service obligation via any letter of

22    credit.  Did I read that correct?

23    A.   Correct.

24    Q.   I'm going to ask you to take a look at Government

25    Exhibit 37.  Is this an e-mail from you to Mr. Gireud?
```

REDIRECT PONCE                                                              77

1    A.   Yes, it is.

2    Q.   And is Mr. Delgado copied on this e-mail?

3    A.   Yes, he is.

4    Q.   And is the date January 8th, 2010?

5    A.   January 18th.

6    Q.   And is this following the pledge agreement that we looked

7    at yesterday which was dated January 15, 2010?

8    A.   Yes.

9    Q.   And in this e-mail, do you indicate that you are requesting

10   a response to the January 12th John Adams' letter?

11   A.   Yes, I do.

12   Q.   And is that letter attached to this e-mail?

13   A.   Reattached, yes.

14   Q.   And in that letter do you again indicate please confirm

15   F.G.G. will not ask M.P.S.A. to guarantee equipment or service

16   obligation via any letters of credit?

17   A.   Yes, the letter says that.

18   Q.   And in response to this e-mail which was dated

19   January 18th, 2010, did Mr. Delgado write to you and say,

20   Mr. Ponce, we just pledged the equipment.  What are you talking

21   about?

22   A.   No.  No, he didn't.

23   Q.   Okay.

24        MR. ARREOLA:  May I have a second, Your Honor.

25        THE COURT:  Yes, ma'am.

```
 1              MR. ARREOLA:  Your Honor, request for sidebar.

 2              THE COURT:  Yes, ma'am.

 3              (Bench conference).

 4              MR. ARREOLA:  I'm done with the questions I have, but

 5   I will like an opportunity to track down that Spanish language

 6   document.

 7              THE COURT:  We're about three minutes from break.

 8   We'll break now and you'll have 15 minutes.

 9              MR. ARREOLA:  Okay.  Thank you, Judge.

10              (Bench concludes.)

11              THE COURT:  All right.  Ladies and gentlemen of the

12   jury, we're going to recess for 15 minutes -- well, 17 minutes.

13   If you'd be back in the jury room at 11:30, we'll resume our

14   proceedings then.

15              COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

16              (Break at 11:15 a.m. to 11:33 a.m.)

17              (Open court.  Defendant and counsel present.)

18              (Jury present.)

19              THE COURT:  Let the record reflect that all members of

20   the jury are present, the United States through its assistant

21   United State's attorneys are present, the defendant and his

22   attorney is present.

23              Mr. Ponce is on the witness stand.

24              Ms. Arreola?

25              MR. ARREOLA:  Your Honor, the government passes the
```

```
 1    witness.
 2                        HECTOR PONCE,
 3              RECROSS-EXAMINATION BY THE DEFENDANT
 4    BY MS. FRANCO:
 5    Q.   We went over the various correspondence from when the
 6    teaming agreement was signed through the -- and past the
 7    execution of the subcontract.  You recall that, correct?
 8    A.   Yes.
 9    Q.   And at no point in time did M.P.S.A. back out of the deal
10    with F.G.G., did it?
11    A.   Correct.
12    Q.   While you were with -- employed as a consultant, correct?
13    A.   That is correct.
14              MS. FRANCO:  Pass the witness, Your Honor.
15              THE COURT:  Ms. Arreola?
16              MR. ARREOLA:  No further questions, Your Honor.
17              MS. KANOF:  May this witness be excused?
18              THE COURT:  May Mr. Ponce be permanently excused?
19              MS. FRANCO:  Yes, Your Honor.
20              THE COURT:  And the government is excusing him as
21    well.
22              MS. KANOF:  (Nodding head affirmatively.)
23              THE COURT:  Thanks for coming down.
24              THE WITNESS:  Thank you very much.
25              (Witness excused.)
```

DIRECT BROWN                                                              80

```
 1                THE COURT:  Who is your next witness?

 2                MS. KANOF:  Jennifer Brown.

 3                This witness has not been sworn, Your Honor.

 4                (Witness present and sworn.)

 5                THE COURT:  Ms. Kanof?

 6                MS. KANOF:  Thank you, Your Honor.

 7                          JENNIFER BROWN,

 8                DIRECT EXAMINATION BY THE GOVERNMENT

 9     BY MS. KANOF:

10     Q.   Good morning.

11     A.   Good morning.

12     Q.   Could you state your name for the jury please?

13     A.   Jennifer Brown.

14     Q.   How are you employed?

15     A.   I'm employed at AOL.

16     Q.   What is AOL?

17     A.   They are an internet service provider, e-mail provider.

18     Q.   An e-mail provider; is that correct?

19     A.   Yes.

20     Q.   And are they one of the oldest?

21     A.   Yes.

22     Q.   Have they sort of moved into other services as well?

23     A.   Advertising mostly now.

24     Q.   How long have you worked for AOL?

25     A.   20 years.
```

1   Q.   And when you first started 20 years ago, what were your

2   duties and responsibilities at AOL?

3   A.   I actually started off in the call center and I took

4   inbound technical support calls.

5   Q.   And how long did you do that?

6   A.   About eight years.

7   Q.   Where was your position located?

8   A.   Located in Tucson, Arizona.

9   Q.   And after you finished with the call center, what happened?

10  A.   I was promoted to northern Virginia into the network

11  operations center.

12  Q.   Where in northern Virginia?

13  A.   Dulles, Virginia.

14  Q.   Is that one of the big airports outside of Washington D.C.?

15  A.   Yes, it is.

16  Q.   About what year did you move to Dulles, Virginia?

17  A.   2001.

18  Q.   And when you said you were promoted, what position were you

19  promoted to?

20  A.   I was a network analyst.

21  Q.   What is a network analyst?

22  A.   I monitor the network.  People that would dial into modems,

23  I made sure that they stayed connected, and if they didn't I

24  fixed it.

25  Q.   And how did you learn to do all of the requirements of your

1    job?

2    A.   It's all in-house training.

3    Q.   AOL provided that training for its employees?

4    A.   Yes, they did.

5    Q.   How long did you do network monitoring?

6    A.   For about five years.

7    Q.   And then what happened?

8    A.   I was promoted into the legal department.

9    Q.   And is that where you are now?

10   A.   Yes, it is.

11   Q.   So how long have you been in the legal department?

12   A.   Since 2005.

13   Q.   And what kind of service -- so 2005, would that be about

14   11 years?

15   A.   Yes.

16   Q.   What kind of service does the legal department of AOL

17   provide to the courts?

18   A.   We -- I'm a custodian of records and we process subpoenas

19   and search warrants that get served.

20   Q.   In this case did you provide a self-proving affidavit with

21   regard to the -- I don't think we actually asked you for

22   records -- but -- so if a subpoena is served on AOL, what is

23   your job?

24   A.   I read over it, make sure it's legal and respond with

25   whatever data they want.

1    Q.    And if a search warrant is served, what do you do?

2    A.    Just process it and give the data back.

3    Q.    Do you also -- is it also part of your job to testify in

4    trial?

5    A.    Yes, it is.

6    Q.    So are you here as part of your job?

7    A.    Yes, I am.

8    Q.    And you were subpoenaed to testify; is that correct?

9    A.    I was, yes.

10   Q.    Now you said that you worked for years in Dulles, Virginia;

11   is that correct?

12   A.    That is correct.

13   Q.    Why Dulles, Virginia?

14   A.    That's where everything is located.

15   Q.    When you say everything, let me ask you a little bit about

16   the equipment.

17         Are you fully familiar with the equipment that is used

18   by AOL in order to transmit e-mails?

19   A.    Yes.

20   Q.    Okay.  In order to fulfill your job responsibilities?

21   A.    Correct.

22   Q.    What is a server?

23   A.    It is what sends and delivers e-mail.

24   Q.    And where are AOL's servers located?

25   A.    Dulles, Virginia.

1    Q.   Does AOL have servers anywhere else in the United States?

2    A.   No.

3    Q.   If an individual sends an e-mail from anywhere in the world

4    and uses an AOL provider, has an account, does that e-mail have

5    to go through Dulles, Virginia?

6    A.   Yes, it does.

7    Q.   I'm going to draw your attention to what has been marked

8    and admitted into evidence as Government Exhibit Number 40.

9            MS. KANOF:  Ask that it be displayed.

10   BY MS. KANOF:

11   Q.   Do you see it in front of you?

12   A.   I do.

13   Q.   You don't have to know anything about this, but on the cc

14   line, do you see an AOL Internet address?

15   A.   I do, yes.

16   Q.   And how does someone acquire an AOL Internet address?

17   A.   They just register for the service.

18   Q.   And if an e-mail is transmitted by AOL as an internet

19   provider, how is it transmitted through the wires?

20   A.   It goes from one computer to the servers and delivers to

21   whatever computer at the end.

22   Q.   Looking at this e-mail, say hypothetically the person who

23   sent it, this Fernando person, was sitting next to this person

24   Delgado, who was copied on it, and neither of them were in

25   Virginia, let's say -- well, no -- yes, neither of them were in

 1    Virginia, would that communication still have had to go through

 2    the server in Virginia?

 3    A.   Yes.

 4    Q.   If they were sitting next to each other in El Paso, Texas,

 5    would it have to have traveled?

 6    A.   Yes.

 7    Q.   What is the only way that a transmission through AOL would

 8    not have to pass through different states in the United States?

 9         MR. HANSHEW:  Your Honor, ask if we can approach

10    briefly?

11         THE COURT:  Yes, sir.

12         (Bench conference.)

13         MR. HANSHEW:  It appears this is expert testimony.

14    They agreed in the motion in limine that they wouldn't bring

15    them in.

16         MS. KANOF:  This is not expert testimony.  I'm sorry.

17    But it's not -- we usually get a stipulation.  She has knowledge

18    as an employee.  This is what she does for a living.

19         THE COURT:  Right, but she has knowledge as an

20    employee greater than that of a regular person.  You become an

21    expert by training, experience, all of the things that are

22    listed in Rule 702.  Experience is one of those.  She has

23    knowledge that the ordinary human being doesn't have.  She can

24    testify to what she does, but what she is going into, to me, is

25    expert.

1          MS. KANOF:  It's not scientific.  It's lay expertise.

2          THE COURT:  I'm just going to get you the rule.

3          MR. ARREOLA:  She's saying the servers in Virginia.

4          MS. KANOF:  That's not what he's saying.

5          Your Honor, how about if I just -- just say that she

6    observes that there are wires plugged into the service instead.

7          THE COURT:  Yeah, that's -- that's --

8          MS. KANOF:  Then I don't mine.

9          MR. HANSHEW:  Ask to strike her testimony.

10         THE COURT:  The objection came a little late for that,

11   but I'll sustain your objection.  The witness is qualified by

12   knowledge, skill, experience, training or education; testify as

13   to expert scientific, technical or other specialized --

14         MS. KANOF:  I'll phrase it in other terms.

15         MR. HANSHEW:  Judge, we reiterate our request and

16   strike the previous testimony.

17         (Bench concludes.)

18   BY MS. KANOF:

19   Q.   Again, Ms. Brown, let me ask you, are there servers

20   anywhere else other than Virginia?

21   A.   They are not.

22   Q.   Have you been in the physical room where the servers are

23   located?

24   A.   I have, yes.

25   Q.   Are they plugged into the wall?

1    A.   Yes, they are.

2    Q.   And do they use electricity when they are plugged in the

3    wall?

4    A.   Yes.

5    Q.   Has any -- if they were not plugged into the wall, could

6    AOL provide the services that AOL provides to their customers?

7    A.   No.

8              MS. KANOF:  Pass the witness.

9              THE COURT:  Mr. Hanshew?

10             MR. HANSHEW:  No questions, Your Honor.

11             THE COURT:  May Ms. Brown be permanently excused?

12             MS. KANOF:  Yes, Your Honor.

13             MR. HANSHEW:  Yes, Your Honor.

14             THE COURT:  Ms. Brown, you may go.

15             (Witness excused.)

16             THE COURT:  Who's your next witness?

17             MS. ARREOLA:  Your Honor, the government calls Kenneth

18   LeCense.

19             (Witness present and sworn by the Court.)

20                      KENNETH LECENSE,

21             DIRECT EXAMINATION BY THE GOVERNMENT

22   BY MS. ARREOLA:

23   Q.   Please introduce yourself to the jury.

24   A.   Kenneth LeCense.

25   Q.   How are you employed, sir?

1    A.    I work for T-Mobile Metro P.C.S. cellular cel phone

2    company.

3    Q.    Are you assigned to any particular division or section at

4    T-Mobile?

5    A.    Yes, sir -- yes, ma'am.  I'm sorry.

6    Q.    What section is that?

7    A.    I'm assigned to the subpoena compliance unit, law

8    enforcement relations team.

9    Q.    What are your duties and responsibilities as a member of

10   that section?

11   A.    My official title is records custodian slash testifier.

12   I'm assigned to that unit.  That is the unit that receives.

13   It's in Richardson, Texas.  It's a unit that receives legal

14   demands in form of subpoenas, court records, search warrants

15   requesting records from Metro, T-Mobile Metro PCS telephone

16   company.  Normally, I'm in court testifying in court.  When I'm

17   not in court, I do process those legal demands that come into

18   the company and send them back to the requesting attorney's

19   office, insurance company, law enforcement agencies that make

20   the request.

21   Q.    I'm going to ask you to take a look at Government

22   Exhibit 27?

23   A.    Yes, ma'am.

24   Q.    Can you see this on the screen or is it too small?

25   A.    I can see it here.

DIRECT BROWN                                                              89

1   Q.   Do you recognize this?

2   A.   Yes, ma'am.

3   Q.   What is it?

4   A.   This is customer billing records for the customers

5   Mitsubishi Power Systems, Inc., with the account number and the

6   corporate ID of the records.

7   Q.   Who, if anybody, at T-Mobile or who if anybody at T-Mobile

8   provides these types of documents to?

9   A.   Directly to the customer at the customer's request.

10  Q.   Now did you print this particular document yourself?

11  A.   I printed this document and also an exhibit.

12  Q.   I'm sorry, sir.  I think you misunderstood my question.

13        Did you print -- did you print this document from the

14  T-Mobile system yourself or provided to you by somebody else?

15  A.   Provided by someone else.

16  Q.   Is that the government?

17  A.   The government, yes.

18  Q.   So you haven't verified the information in this document;

19  is that correct?

20  A.   That's correct.

21  Q.   Okay.  I'm going to ask to you take a look at the top of

22  the page.

23        MR. ARREOLA:  And Your Honor, just so the record is

24  clear, defense counsel stipulated to the authenticity of this

25  document.  It's already been admitted.

1    BY MS. ARREOLA:

2    Q.   Mr. LeCense, does this document identify who the customer

3    is?

4    A.   Yes, ma'am.

5    Q.   And who is that?

6    A.   It's in the upper right-hand corner, Mitsubishi Power

7    Systems, Inc.  It's abbreviated, the incorporated portion.

8    Q.   What are the numbers in the left-hand side of the page?

9    A.   It is account charges for multiple phone numbers that are

10   associated with this account, with the Mitsubishi account.

11   Q.   So would that be, for example, different employees of

12   Mitsubishi who have different phones under this account number?

13   A.   It could be, yes, ma'am.

14   Q.   Okay.  And I'm going to turn to the third page.  What

15   information is shown on this document?

16   A.   This is a specific statement for a specific phone number

17   associated with Mitsubishi Power Systems in this account.

18   Q.   So would this be one --

19            MR. HANSHEW:  Object that this is going to be expert

20   testimony again.  He's testifying based on his specialized

21   knowledge of what these documents are to reach conclusions of

22   fact.

23            THE COURT:  Let me hear the question and we'll see.

24            MR. ARREOLA:  Oh, was there a question pending?  I

25   don't recall, Your Honor.

```
 1              THE COURT:  Your question was, this is a specific

 2      statement -- no, that's the answer.  So would you -- and then

 3      Mr. Hanshew objected.  That's what's pending.

 4      BY MS. ARREOLA:

 5      Q.   Would this page reflect one phone number for the Mitsubishi

 6      account, for example, one phone number of the many that appear

 7      on the first page?

 8      A.   That's correct.

 9              MR. HANSHEW:  Objection, Your Honor.  Same objection.

10              THE COURT:  Overruled.

11      BY MS. ARREOLA:

12      Q.   I'm going to now turn a few pages ahead.

13              I'm going to ask you about this page.  Do you see the

14      word roaming charges?

15      A.   Yes, ma'am.

16      Q.   What are roaming charges?

17              MR. HANSHEW:  Objection, Your Honor.  Expert

18      testimony.

19              MR. ARREOLA:  Your Honor, the government is not asking

20      for an opinion or an analysis.  We're simply asking for him what

21      roaming charges are.

22              THE COURT:  I'm going to overrule that objection.

23      BY MS. ARREOLA:

24      Q.   What are roaming charges, sir?

25      A.   Roaming charges is when a customer is using their phone and
```

1    their actually using different cell towers as opposed to the

2    T-Mobile cell towers, the CT-mobile network.

3    Q.   Now towards the top of the page it says Mexico tell Cal?

4    A.   Yes, ma'am.  That identifies the cell towers that were

5    being used for these roaming charges on this particular time

6    during this time period.

7    Q.   And further down on the page it says, Mexico (Spanish) PCS.

8    What is that?

9    A.   That is a different set of cell towers that were being used

10   during the certain period of time during the dates.

11           MR. HANSHEW:  We'd have a continuing objection, so I

12   don't have to interrupt.

13           THE COURT:  And it's overruled as long as it's this

14   same line.  Anything else you can object.

15           MR. ARREOLA:  Your Honor, can I hear back to see what

16   the witness said?

17           THE COURT:  "That is a different set of cell towers

18   that were being used during the certain period of time during

19   the dates."

20   BY MS. ARREOLA:

21   Q.   And where are those cell towers located, if you know?

22   A.   Mexico.

23   Q.   Would somebody, who's in the U.S., be charged roaming fees

24   for a roaming fee in 2009 and to 2010?  Only if you now the

25   answer.

1            MR. HANSHEW:  Objection, Your Honor.

2            MR. ARREOLA:  I'll withdraw the question, Your Honor.

3    BY MS. ARREOLA:

4    Q.   I'm going to ask you to take a look at Government

5    Exhibit 28.  Is this also a type of customer service record,

6    sir?

7    A.   That's a customer billing record.

8    Q.   And who's the customer?

9    A.   Mitsubishi Power Systems, Inc.

10   Q.   Okay.  And what is the time frame indicated on this

11   document?

12   A.   On this particular document, they start at the very top in

13   the upper left-hand corner.  The customer service when these

14   records were actually sent to the customer was January 28, 2010.

15   Q.   Okay.  So that would be the billing period, the end of the

16   billing period?

17   A.   That's correct during that billing period.

18   Q.   All right.  And then again it says Mexico Telcel, what

19   would that date?

20   A.   That would indicate on the two dates under Mexico Telcel

21   that the Mexico Telcel towers were being used for the phone

22   calls.

23           MR. ARREOLA:  No further questions, Your Honor.

24           THE COURT:  Mr. Hanshew?

25           MR. HANSHEW:  No questions, Your Honor.

```
 1              THE COURT:  May Mr. LeCense be permanently excused?

 2              MR. HANSHEW:  Yes, Your Honor.

 3              MR. ARREOLA:  Thank you, Judge.  Yes, Your Honor.

 4              THE COURT:  Mr. LeCense, you are free to go.

 5              (Witness excused.)

 6              THE COURT:  Your next witness?

 7              MR. ARREOLA:  Your Honor, the government calls Joseph

 8    Gliva.

 9              (Witness present and sworn by the Court.)

10              THE COURT:  Ms. Arreola?

11              MR. ARREOLA:  Your Honor, the government offers what's

12    been marked for identification as Government Exhibits 143 and

13    158.

14              THE COURT:  These are Wells Fargo records?

15              MR. ARREOLA:  Which are accompanied by a self-proving

16    affidavit.

17              THE COURT:  Who is it going to be, Ms. Franco or

18    Mr. Hanshew?

19              MR. HANSHEW:  No, objection.

20              THE COURT:  All right.  Government 143 is admitted.

21    Government 158 is admitted.

22                          JOSEPH GLIVA,

23                DIRECT EXAMINATION BY THE GOVERNMENT

24    BY MS. ARREOLA:

25    Q.   Please introduce yourself to the jury.
```

1   A.   My name is Joe Gliva.  I am Senior Vice President

2   Technology Manager for Wells Fargo bank currently in

3   Philadelphia.

4   Q.   How are you employed, sir?

5   A.   I'm technical manager at Wells Fargo responsible for the

6   funds transfer, international funds transfer computer systems.

7   Q.   Are you assigned to any particular division at Wells Fargo?

8   A.   Yes.  It's the Enterprise Information Technology Division.

9   It is responsible for all of the computer applications at Wells

10  Fargo and I specifically support the International Global

11  Financial Institution Business.

12  Q.   I apologize if I didn't say this earlier.  Did you state

13  your title?

14  A.   Senior Vice President Technology Manager.

15  Q.   How long have you been a senior vice president and

16  technology manager?

17  A.   I've begun senior vice president technical manager since

18  about 1998 with Wells Fargo.  From 2008 I was with -- with a

19  Wachovia Bank, which was acquired by Wells Fargo in 2008.

20  Q.   And as part of your duties and responsibilities as a senior

21  vice president and technology manager, do you do any work with

22  international fund transfers?

23  A.   Yes, I do.  I support the system that processes those

24  transactions.

25  Q.   I'm going to ask you to take a look at Government Exhibit

1    Number 143.

2            What type of document is this, sir?

3    A.   This is a document report from the International Funds

4    Trust Application that shows a transaction that was executed and

5    all of its details.

6    Q.   And what is an International Funds Transfer System that you

7    just mentioned?

8            MR. HANSHEW:  Objection, Your Honor.  Looking at this

9    document and questions already heard is going to get into what

10   the meaning of all of these is behind all of this information

11   is.  We've already heard he's a senior technological adviser.

12   This is clearly within the realm of expert testimony, Jude.  No

13   lay person could ever look at this document and explain it and

14   that's what they're trying to do.

15           MR. ARREOLA:  Your Honor, may I be heard?  The

16   governments not going to be asking for any opinion or analysis

17   by the witness.  And the government anticipates that he will

18   testify that he actually developed this application, so he has

19   firsthand knowledge about what this means.

20           THE COURT:  Right.  I'm going to overrule the

21   objection for now.  If it goes beyond that which is in the

22   expert area then I'll sustain the objection.

23   BY MS. ARREOLA:

24   Q.   You were explaining what the I.T.F. system is.

25   A.   Yes.  At the International Funds Transfer application that

1    processes payments that come into Wells Fargo bank.

2    Q.   Okay.  And what transfers reflected, if any, on this page?

3    A.   This transaction shows a payment for $20 million from -- I

4    can't see the customer.  Can you slide to the right?  From the

5    Bank of -- Banco Nacional to -- I can't see.

6    Q.   I'm going to pull it up on the other screen.  Give me one

7    second.

8             MR. HANSHEW:  Your Honor, re-urge my objection at this

9    point.  Again they provided no notice of experts.

10            THE COURT:  I got your objection.  It's still

11   overruled.

12            MR. HANSHEW:  Would you like me to assert it each

13   question?

14            THE COURT:  Not if it's the same nature.

15            MR. HANSHEW:  Thank you, Judge.

16   BY MS. ARREOLA:

17   Q.   So you were saying what transfer, if any, is reflected on

18   this page.

19   A.   Yes.  This is a transaction from fideicomiso gastos to

20   Skippings and Rutley.  And the originating customer went through

21   the Banco Nacional to pay Skippings and Rutley through First

22   Caribbean International, which is a customer first -- at Wells

23   Fargo.

24   Q.   And what is the date on the amount of the transaction?

25   A.   It's $20 million dated March 8th, 2010.

1    Q.    Okay.  Now does this printout come from the International

2    Funds Transfer System?

3    A.    Yes, it does.

4    Q.    Who developed that system at Wells Fargo?

5    A.    I was one of the original team members.

6    Q.    And that system is still being used today?

7    A.    Yes.

8    Q.    Who is the originating bank on this document?

9    A.    What you see there is a SWIFT identifier that identifies

10   Banco Nacional.

11   Q.    And who is listed as the receiving bank?

12   A.    The receiving bank is the First Caribbean International.

13            THE COURT:  Where is this?

14   BY MS. ARREOLA:

15   Q.    Sir, can you highlight, point out where you are looking?

16   A.    The Banco Nacional is the originating bank.  Right there,

17   that is an identifier for the Banco Nacional.  The receiving

18   bank of the transaction is right here, First Caribbean

19   International.

20   Q.    Can you identify for the jury where the amount and

21   transaction is shown on the document?

22   A.    Okay.  The amount of the transaction is right here, 20

23   million, and the date of the transaction is March 8th, 2010.

24   Q.    Okay.  Now, does this document indicate any other banks

25   that were involved in the transfer?

1    A.    Yes, it does.  There are two intermediary banks that are

2    part of the transaction.

3            The first one is a standard charter bank, which is

4    right below the $20-million amount, right here, and the second

5    one, which isn't there is obviously Wells Fargo, as we received

6    the transaction.

7    Q.    Okay.  So if the originating bank is Bancomext and the

8    receiving bank is First Caribbean, why are two banks involved?

9            MR. HANSHEW:  Objection, Your Honor.

10           THE COURT:  I don't know how he sees that, unless he

11   has some expertise, because that's not something that we would

12   know, at least I wouldn't.  I'm going to sustain the objection.

13           MR. ARREOLA:  Your Honor, may we be heard on sidebar?

14           THE COURT:  Sure.

15           (Bench conference.)

16           MR. ARREOLA:  Your Honor, the government's position is

17   that the custodians of the record are not experts and this

18   witness --

19           THE COURT:  You can introduce the record.  It's

20   already in evidence.  But he can't tell us what it is as to

21   custodian.  He's now telling us what that means.  Now he's going

22   to tell us how somehow the international banking system in the

23   document.  There's no way you or I know how that works, unless

24   you have expertise in that field.

25           MR. ARREOLA:  Your Honor, the government submits that

1    because of where he's worked, he has personal knowledge about

2    how these things operate.

3            THE COURT:  Right.  And he's got experience and

4    training which is covered by --

5            MR. ARREOLA:  He's not offering any sort of opinion or

6    analysis.  He's stating what he observes as a person of his

7    employment.

8            THE COURT:  It doesn't have to be.  Expert scientific,

9    technical, specialized knowledge, that's the rule.

10           MR. ARREOLA:  Can the government have a few minutes to

11   convene about this?

12           THE COURT:  Sure.  Do we need to take a recess?

13           MS. KANOF:  Yes.

14           THE COURT:  All right.

15           (Bench concludes.)

16           THE COURT:  Ladies and gentlemen of the jury, we're

17   going to recess for about ten minutes.  If you'd be back in the

18   jury room in ten minutes.

19           COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

20           (Break at 12:06 p.m. to 12:17 p.m.)

21           (Open court.  Defendant and counsel present.)

22           (Jury present.)

23           THE COURT:  Be seated please.

24           Let the record reflect that all members of the jury

25   are present, the United States through its assistant United

```
 1    State's attorneys are present, the defendant and his attorney is

 2    present.

 3              The witness, Mr. Gliva is on the witness stand.

 4              Ms. Arreola?

 5    BY MS. ARREOLA:

 6    Q.   According to this document, Mr. Gliva, where did this wire

 7    transfer originate from?

 8              MR. HANSHEW:  Objection, Your Honor.  This calls for

 9    expert testimony again.

10              THE COURT:  I'll overrule that objection.

11    A.   The wire transfer originated from (indiscernible) gastos.

12              THE COURT:  Can you show us that on the document?

13    A.   Yes.  This is the originating customer.  This is the person

14    who requested the funds transfer.

15    BY MS. ARREOLA:

16    Q.   And what was the originating bank?

17    A.   The originating bank is Banco Central.  This is a code for

18    Banco Central.

19    Q.   What's the destination of these funds according to this

20    document?

21    A.   The destination of these funds is First Caribbean

22    International Bank.

23    Q.   Okay.  Now I'm going to go down to the next document on the

24    next page of this document.  Can you identify where this

25    document indicates the dates and the amounts of the transaction
```

DIRECT GLIVA                                                    102

1    shown here?

2    A.    Yes.   The date of the transaction is right here, July 6th,

3    2010, and the amount of the transaction is $12 million.

4    Q.    According to this document, where did this wire transfer

5    originate from?

6              MR. HANSHEW:   Objection, Your Honor.   Expert.

7              THE COURT:   Overruled.

8    BY MS. ARREOLA:

9    A.    Fideicomiso Gastos, here.

10   Q.    What is the name of the originating bank?

11   A.    Again, originating bank was Banco Central.

12   Q.    And what was the -- what was its destination?

13   A.    Destination is First Caribbean International Bank.

14   Q.    Where does Wells Fargo keep its servers or wire transfers?

15   A.    North Carolina and Alabama.

16             MR. ARREOLA:   May I have a moment, Your Honor?

17             THE COURT:   Yes, ma'am.

18   BY MS. ARREOLA:

19   Q.    Sir, is Banco Nacional in Mexico?

20   A.    Yes.

21   Q.    And First Caribbean is in the Turks and Caicos Islands?

22   A.    Yes.

23             MR. ARREOLA:   Your Honor, the government passes the

24   witness.

25             THE COURT:   Mr. Hanshew?

1            MR. HANSHEW:  No questions, Your Honor.

2            THE COURT:  May Mr. Gliva be permanently excused?

3            MR. HANSHEW:  Yes, Your Honor.

4            THE COURT:  Ms. Arreola?

5            MR. ARREOLA:  Yes, Your Honor.

6            THE COURT:  All right.

7            Mr. Gliva, thanks for coming down.  You are excused,

8    free to go.

9            (Witness excused.)

10           THE COURT:  All right.  Who is your next witness?

11           MS. KANOF:  Linda Medlock.

12           (Witness present.)

13           MS. KANOF:  This witness has not been sworn, Your

14   Honor.

15           (Witness sworn by the court.)

16                        LINDA MEDLOCK,

17              DIRECT EXAMINATION BY THE GOVERNMENT

18   BY MS. KANOF:

19   Q.   Good afternoon, Ms. Medlock.  Could you state your name for

20   the jury, please?

21   A.   Linda Medlock.

22   Q.   And the microphone is very adjustable.  If you need to pull

23   it around so you can see the screen and talk at the same time,

24   okay, and there's water for you there if you need it.

25           What do you do for a living?

1    A.   CPA.

2    Q.   What does that mean?

3    A.   Certified public accountant.

4    Q.   How long have you been a CPA?

5    A.   Since 1982.

6    Q.   Where are you from?

7    A.   England.

8    Q.   Okay.  When did you come to the United States?

9    A.   In 1971.

10   Q.   Were you educated here in the United States?

11   A.   Partially.

12   Q.   And did you receive your CPA here in the United States?

13   A.   Yes.

14   Q.   Do you practice certified public accounting here in

15   El Paso, Texas?

16   A.   Yes.

17   Q.   For how long have you practiced as a CPA in El Paso?

18   A.   Since 1982.

19   Q.   Do you have your own business?

20   A.   Yes.

21   Q.   How long?

22   A.   Since 1992.

23   Q.   If you could speak up just a --

24   A.   1992.

25   Q.   It's most important the court reporter and jury hear you?

1   A.   Okay.

2   Q.   Since 1992?

3   A.   Yes.

4   Q.   Do you currently have a CPA business?

5   A.   Yes, but I am semi-retired.

6   Q.   In the year 2009 -- well, let's go a little bit earlier.

7        Between 2008 and 2012, where was your business

8   located?

9   A.   7362 Remcon Circle.

10  Q.   And what kind of a building is that?

11  A.   It's called the intelligent office.

12  Q.   What does that mean, the intelligent office?

13  A.   It's a franchise and you can either get permanent offices

14  in there or you can have what they call virtual.

15  Q.   What kind of office did you have?

16  A.   Permanent.

17  Q.   And had -- when did you first take a permanent office in

18  the Remcon building?

19  A.   2001, when it was first constructed.

20  Q.   Did you actually own that building?

21  A.   No.

22  Q.   And how many suits did your CPA firm occupy?

23  A.   Two.

24  Q.   And at some point in time did you meet an individual named

25  Marco Delgado?

1    A.    Yes.

2    Q.    Is he here in the courtroom?

3    A.    Yes.

4    Q.    Could you identify him and say this is person number one,

5    two or three?

6    A.    Number two.

7          MS. KANOF:  May the record reflect, Your Honor, the

8    witness has identified the defendant?

9          THE COURT:  Any objection?

10         MS. FRANCO:  No, objections.

11         THE COURT:  All right.  There being no objection, the

12   record will so reflect.

13   BY MS. KANOF,

14   Q.    Before we start your testimony, Ms. Medlock, did you hire

15   an attorney in light of your testimony that ultimately led to

16   your testimony in this case?

17   A.    Yes.

18   Q.    And who is that?

19   A.    Mary Stillinger.

20   Q.    How did it come about that you hired an attorney?

21   A.    You want the whole story now?  I mean, I -- I came a little

22   concerned about the situation, so I called my corporate attorney

23   and explained to her and she said it would be all right, but

24   then the next morning she called me and said Mary Stillinger is

25   expecting a call from you.

DIRECT MEDLOCK                                                    107

1    Q.   And when you went to Mary Stillinger, where did she take

2    you or who did she have you talk with?

3    A.   The FBI.

4    Q.   And when you started to talk, did she request a document

5    from you called a proffer letter?

6    A.   Yes.

7    Q.   Okay.  Did you think you'd done anything wrong?

8    A.   No.

9    Q.   But did you sign this letter?

10   A.   Yes.

11   Q.   And why did you sign the letter?

12   A.   I was advised to.

13   Q.   By your attorney, Ms. Stillinger?

14   A.   Yes.

15   Q.   Now let's proceed.

16         When did you first meet Mr. Delgado?

17   A.   2010.

18   Q.   And how did you meet him?

19   A.   He approached me in my office.

20   Q.   Had you ever seen him before he approached you in your

21   office?

22   A.   I may have seen him around, but I don't remember.

23   Q.   Did he have an actual office at Remcon?

24   A.   No.

25   Q.   And how do you know that?

DIRECT MEDLOCK                                                    108

1    A.    Because I paid his bills.

2    Q.    Okay.  When he approached you, why did he approach you?

3    A.    He needed some help, because he traveled a lot in his job.

4    Q.    What did he say to you when he approached you?

5    A.    Would I be interested in helping him in his business.

6    Q.    Okay.  And what exactly did he want you to do?

7    A.    Pay his bills, take care of his situation while he was

8    gone.

9    Q.    Did he say why he needed someone to pay his bills while he

10   was gone?

11   A.    Because he traveled a lot.

12   Q.    And was there anything happening to him financially that

13   resulted in his leave for assistance?

14   A.    Well, he was late many times because he wasn't there.

15   Q.    Is that what he said to you?

16   A.    Yes.

17   Q.    And was his -- did he explain why being late caused him

18   concern?

19   A.    Well for his credit and also for the penalties.

20   Q.    The penalties?

21   A.    Yes.

22   Q.    So when he -- where were you when he approached you?

23   A.    In my office.

24   Q.    And did you agree?

25   A.    Yes.

1    Q.   Did you enter into a formal written contract or just an

2    oral agreement?

3    A.   Oral.

4    Q.   And did you have a discussion with him exactly what he

5    wanted you to do?

6    A.   Yes.

7    Q.   And then how did you proceed?

8    A.   Time lapsed a little and then he asked me to open a bank

9    account with him.

10   Q.   Between the time that he first engaged you -- in addition

11   to paying these bills, did he want you to do his personal income

12   taxes?

13   A.   Yes.

14   Q.   And did he ask you to do that on the first meeting or

15   sometime later, if you can recall?

16   A.   On the first meeting.

17   Q.   Okay.  Are you also a tax accountant?  Do you do peoples'

18   taxes?

19   A.   Yes.

20   Q.   And you said sometime lapsed between his first engagement,

21   but and then something about a bank account?

22   A.   Yes.

23   Q.   What did he ask you about a bank account?

24   A.   Well, so I could pay his bills, I had to open a bank

25   account.

1    Q.   Why would you have to open a bank account to pay his bills?

2    Did he not have a bank account already?

3    A.   That, I don't know, but he you know there had to be one

4    with my name so I could sign the checks.

5    Q.   What did you advise him?

6    A.   We agreed to meet at Wells Fargo to open a joint account.

7    Q.   Which one?

8    A.   The one on Redd Road.

9    Q.   Okay.  And did you set a specific time to meet?

10   A.   Yes.

11   Q.   Did you do this in person or telephonically?  If you can't

12   recall, that's fine.

13   A.   I can't remember.

14   Q.   So did you go to Wells Fargo?

15   A.   Yes.

16   Q.   And did Mr. Delgado go to Wells Fargo?

17   A.   No.

18   Q.   Explain to the jury what happened.

19   A.   I went to Wells Fargo to open an account so I could pay his

20   bills and he was supposed to meet me there and he didn't come.

21   So he advised me that he needed some funds transferred because

22   the following day he had to do some traveling.

23   Q.   How did he advise you?  You are waiting for him and what

24   are you doing when he's not showing up?  What acts did you

25   engage in?

DIRECT MEDLOCK                                                    111

1    A.   I'm talking to the banker.

2    Q.   Okay.

3    A.   And he was calling.

4    Q.   Calling you or the banker?

5    A.   I can't remember.

6    Q.   Okay.  But somehow it was communicated that he needed -- he

7    was going to have funds transferred; is that correct?

8    A.   Yes.

9    Q.   And what happened next?

10   A.   The banker advised me the only way the funds could be

11   transferred were for me to open the account in my name only and

12   then he could sign later.

13   Q.   So he could add his signature to the account later; is that

14   correct?

15   A.   Yes.

16   Q.   Did you accommodate that need for him?

17   A.   Yes.

18   Q.   When you talked to him on the phone that day, what did he

19   promise you about putting his name on the account?

20   A.   He would go.

21        MS. FRANCO:  Objection, Your Honor.  She couldn't

22   recall if she was speaking to the banker or Mr. Delgado.

23   BY MS. KANOF:

24   Q.   Did you talk to Mr. Delgado that day?

25   A.   Yes.

1   Q.   And did he make any representations to you about putting

2   his name on the account?

3   A.   Yes, he did.

4   Q.   What did he say?

5   A.   He said he would go down to Wells Fargo and sign.

6   Q.   Did he?

7   A.   No.

8   Q.   Did he ever?

9   A.   No.

10  Q.   During the whole time that you were paying his bills out of

11  the account, did you repeatedly ask him to go put his signature

12  on the account?

13  A.   Yes.

14  Q.   Did he?

15  A.   No.

16  Q.   Okay.  So, did that transfer?

17  A.   Yes.

18  Q.   Do you recall what date it was?

19  A.   I know we opened the account on October 26th, so it must

20  have been the day or the day after that.

21  Q.   I'm going to show you Government Exhibit Number 145.

22         MS. KANOF:  Your Honor, we have a self-proving

23  affidavit for Government Exhibit Number 145 and move it into

24  evidence.

25         THE COURT:  Ms. Franco?

1            MS. FRANCO:  No objection, Your Honor.

2            THE COURT:  145 is admitted.

3    BY MS. KANOF:

4    Q.   It's going to be displayed on the screen in front of you.

5    A.   Yes.

6    Q.   It's Government Exhibit Number 145.

7    A.   Yes.

8    Q.   And do you recall the account number?  Does it look

9    familiar to you.  Let me scroll down just a little bit for you.

10   A.   Yes.

11   Q.   In fact, is your -- does your name appear on the account?

12   A.   Yes, it does.

13   Q.   Okay.  And you previously testified he -- he required you

14   to open the account, because he was going to be receiving a

15   funds transfer?

16   A.   Yes.

17   Q.   Did you learn that Mr. Delgado already had an account at

18   Wells Fargo?

19   A.   I wasn't aware of it.

20   Q.   On that date?

21   A.   On that date.

22   Q.   Okay.  And in fact, the beginning balance it appears is how

23   much?  This is the day you open the account, correct?

24   A.   Zero.

25   Q.   Okay.  And then is there a deposit that occurs fairly

1    shortly after that?

2    A.   Yes.

3    Q.   Of how much money?

4    A.   I'm sorry, If I can get my glasses.

5    Q.   Oh, of course.  Do you have them there with you?

6    A.   In my bag.

7    Q.   We've been trying to make it difficult.  Does that help?

8    A.   It's still a little blurry.

9    Q.   Let me see if I can find his name.  I found his name, but I

10   don't want to screw it up.  There you go.  Better?

11   A.   Yes, thank you.

12   Q.   A deposit occurred, and if we scroll down just a little

13   bit, do you see the date of the deposit?

14   A.   10-26.

15   Q.   And where did the money come from?

16   A.   First Caribbean International.

17   Q.   How much money?

18   A.   150,000.

19   Q.   And immediately after that, two days later, there's on

20   October 28th it says online transfer to Complete Advantage with

21   a bank account ending in 2596 correct?

22   A.   Yes.

23   Q.   Since you are the only signature on the account, who made

24   that transfer to Complete Advantage account?

25   A.   What Wells Fargo does is they have two accounts.  They have

```
 1    one where money normally is transferred into which earns

 2    interest and then they have a secondary account where you make

 3    transfers so that you can pay your bills.

 4    Q.   Okay.  So this complete advantage account was also

 5    Mr. Delgado's account?

 6    A.   Under my name.

 7    Q.   And so in order to pay the bills, you had to transfer the

 8    money to another account to pay the bills?

 9    A.   Yes.

10    Q.   Okay.  And -- but that Complete Advantage account was also

11    just Mr. Delgado's money?

12    A.   Yes.

13    Q.   Okay.  And I'm going to show you Government Exhibit

14    Number 2 and this is just a chart.  I know you've probably not

15    seen it before, but on October 26th of 2010, do you see your

16    name, Linda Medlock, and your address and $150,000?

17    A.   Yes.

18    Q.   In wire transferred out of this account?

19    A.   Yes.

20    Q.   Okay.  Through the tenure of your employment for

21    Mr. Delgado, did you receive into that account with your name at

22    Wells Fargo many wire transfers from this Turks and Caicos

23    account?

24    A.   Yes.

25    Q.   Did you ever receive money into the account that you opened
```

1   for Mr. Delgado from any other source?

2   A.   Not that I can recall.

3   Q.   Okay.  And did you -- what did you use that money for?

4   A.   To pay his bills.

5   Q.   While we're looking at this chart, do you see December 15th

6   of 2010, a wire transfer to you?  It appears like it's to you,

7   $100,000?

8   A.   Yes.

9   Q.   February 1st, $70,000 --

10  A.   Yes.

11  Q.   -- of 2011.  February 23rd of 2011, $150,000 to Linda

12  Medlock, correct?

13  A.   Correct.

14  Q.   April 7th of 2011, $75,000 to Linda Medlock, correct?

15  A.   Yes.

16  Q.   25th of May of 2011, an additional $50,000 to Linda

17  Medlock?

18  A.   Yes.

19  Q.   27th of June of 2011, $50,000 to Linda Medlock?

20  A.   Yes.

21  Q.   July 8th of 2011, $20,000 to Linda Medlock?

22  A.   Yes.

23  Q.   July 19th of 2011, another $20,000?

24  A.   Yes.

25  Q.   July 28th of 2011, another $20,000?

1    A.   Yes.

2    Q.   I think that's it.

3         And all of those would be transferred into the account

4    that you opened at Wells Fargo on Redd here in El Paso?

5    A.   Yes.

6    Q.   Okay.  Do you know that as a CPA -- I know it says Linda

7    Medlock CPA on it -- did you have any interest in this account

8    in Turks and Caicos?

9    A.   No.

10   Q.   Did you ask Mr. Delgado about the account?

11   A.   Yes.

12   Q.   Did you need to know about the source of money?

13   A.   Yes.

14   Q.   Why did you need to know?

15   A.   Well when you have money just coming into an account, you

16   need to explain example that to the IRS where it's coming from

17   in case it's taxable.

18   Q.   In case it's taxable.  So if money is earned in a foreign

19   country, is it taxable in the United States?

20   A.   Yes.

21   Q.   And you were going to do his personal tax return, correct?

22   A.   Yes.

23   Q.   Was that one of the reasons you needed to know about the

24   source of this money?

25   A.   Well, I -- I got a little curious to where all of this

1    money was coming from.

2    Q.   Did you ask Mr. Delgado what the source of the money in the

3    Turks and Caicos account was?

4    A.   Yes.

5    Q.   What did he tell you?

6    A.   He said it was a line of credit.

7    Q.   What's a line of credit?

8    A.   A line of credit.

9         MS. FRANCO:  Objection, Your Honor.  Calls for expert

10   testimony.

11        MS. KANOF:  I don't think so.  This is a fact witness

12   and he's hired her as part of his scheme and artifice to

13   defraud.

14        THE COURT:  I'm going to overrule that objection.  You

15   can answer that.

16   BY MS. KANOF:

17   Q.   What's a line of credit?

18   A.   A line of credit is something you normally set up with a

19   bank where you're allowed a certain amount in money, say 50,000

20   or however much you need for a certain job or whatever, and then

21   you, depending on what your credit is like, then it depends on

22   how much this line of credit is.

23   Q.   So do you have to pay interest?  Is it like a loan?

24   A.   Yes.

25   Q.   Do you have to pay interest on a line of credit?

DIRECT MEDLOCK                                                    119

1   A.   You do, but it's more flexible than a fixed loan.  A fixed

2   loan is where you have a set payment every month like a car

3   payment.  A line of credit you draw on it as you need it and you

4   pay it back.

5   Q.   So if it's a line of -- as a line of credit, how did you

6   handle it for his tax return, income?

7   A.   I didn't.

8   Q.   Is a line of credit income?

9   A.   No.

10  Q.   If this money was money that he earned as an attorney for

11  consulting fees for a client, would it have been income?

12  A.   Yes.

13  Q.   And would you have needed to know that?

14  A.   Yes.

15  Q.   Okay.  When you would communicate with Mr. Delgado was it

16  always in person?

17  A.   No.

18  Q.   And how was it -- the communication usually done?

19  A.   A telephone and then later I came more sophisticated; text.

20  Q.   How about e-mails?

21  A.   Yeah, in person.

22  Q.   What about e-mails?

23  A.   E-mails?  Sorry.  Yes, e-mails.

24  Q.   Did you have an assistant that worked for you that assisted

25  you in your business?

1    A.   Yes.

2    Q.   And what was her name?

3    A.   Rosie Saenz.

4    Q.   Okay.  And so as the time went on, did you develop any kind

5    of a relationship with Mr. Delgado?

6    A.   Yes.

7    Q.   Explain to the jury about that?

8    A.   I thought we had a very good relationship.  He was almost

9    like my third son.  And my husband and myself had him at our

10   house.  We went to dinner with him.  We liked him very much.

11   Q.   In fact, some of the e-mails that I'm about to show you,

12   does he call you his mother?

13   A.   Yes.

14   Q.   And do you sometimes refer to yourself as his mum, M-U-M?

15   A.   Yes.

16   Q.   Relating to your British heritage?

17   A.   Yes.

18   Q.   Did you trust him?

19   A.   Yes.

20   Q.   I'm going to show you what's been marked Government Exhibit

21   Number 10.  Whoops.  Oh, I'm sorry.

22        Did you provide the government with e-mails that you

23   had in your possession between -- were transmitted between you

24   and Mr. Delgado?

25   A.   Yes, I did.

1   Q.   And do you recognize Government Exhibit Number 139 being

2   the first of those e-mails?  I was showing you the exhibit

3   number just so you know what I'm talking about.

4   A.   Yes.

5   Q.   Okay.

6        MS. KANOF:  We'd move admission of Government's

7   Exhibit Number 139.

8        MS. FRANCO:  No, objection Your Honor.

9        THE COURT:  Government Exhibit 139 is admitted.

10  BY MS. ARREOLA:

11  Q.   Okay.  So Ms. Medlock, this first e-mail is dated what?

12  What's the date on it?

13  A.   May 20th, 2010.

14  Q.   Were there sometimes difficulties in communicating with

15  Mr. Delgado?

16  A.   Yes.

17  Q.   What did he communicate to you about what he really did for

18  a living?

19  A.   He said he was an energy attorney.

20  Q.   Okay.  Did he elaborate?

21  A.   He did.  To be honest, I didn't fully understand all of it,

22  but I know it was something to do with the environment and oil.

23  Q.   And so the -- the money you were using to pay his bills was

24  a line of credit; is that correct?

25  A.   Yes.

1    Q.    Did you ever handle the money that he made as an energy or

2    environmental attorney?

3    A.    No.

4    Q.    How could you do his taxes if you didn't see his income?

5    A.    I saw some of the 1099s, but I never handled the money.

6    Q.    With regard to the first e-mail, page number 1, on May 20th

7    of 2010, did you send an e-mail to Mr. Delgado?

8    A.    Yes.

9    Q.    Okay.  And what's this e-mail basically?  You can read it

10   real quick to yourself and we'll talk about it a bit.

11   A.    Yes.

12   Q.    Okay.  So in addition to doing -- is this May 20th of 2010?

13   A.    Yes.

14   Q.    In addition to him requesting that you do his, I guess it

15   would be 2009 taxes, is that what he wanted you to start with?

16   What years taxes did he want you to work on?

17   A.    It looks like I needed '5, '6, '7, '8 and '9.

18   Q.    The years?

19   A.    Yes.

20   Q.    You were trying to collect information to do back taxes as

21   well?

22   A.    Yes.

23   Q.    Okay.  And what was your main concern in this e-mail?

24   A.    That I thought he had some deductions for making payments

25   to other people for fees or whatever and these would be a

1   deduction, but I needed documentation for it.

2   Q.   In the last part of the part that I highlighted, you said,

3   please call Wells Fargo and request these statements.  I thought

4   he wasn't on the account at Wells Fargo.

5   A.   He -- I suppose -- I don't remember this, but he must have

6   told me he had an account there.

7   Q.   He had an account at Wells Fargo, also; is that correct?

8   A.   But I didn't remember that.

9   Q.   And then you also asked, are you in town?

10  A.   Yes.

11  Q.   Okay.  Did he keep you abreast of where he was at least in

12  the beginning of the relationship?

13  A.   Well, he told me, you know, that he would be leaving.  He'd

14  be in Mexico, South America.  He didn't keep me specifically on

15  a week to week.

16  Q.   If you would look at the next e-mail.  And before I go on

17  with that, this line of credit in the Turks and Caicos, you paid

18  all of his personal bills; is that correct?

19  A.   Yes.

20  Q.   Out of that alleged line of credit money?

21  A.   Yes.

22  Q.   When you have a line of credit, do you have to pay it back?

23  A.   Yes, depending on the arrangement you have.

24  Q.   Did you ever make a payment --

25  A.   No, I did not.

DIRECT MEDLOCK                                                        124

1    Q.    -- on the line of credit in the Turks and Caicos?

2    A.    No.

3    Q.    Mr. Delgado answers you.  Is this the e-mail that he

4    generally used, the Delgado and Associates e-mail?

5    A.    Yes.

6    Q.    Do you -- did you ever pay a bill for him for an office in

7    Calgary, Canada?

8    A.    No.

9    Q.    Did you ever pay a bill for him in an office in Mexico

10   City?

11   A.    No.

12   Q.    He says that his business address is the same as yours,

13   correct, 7362 Remcon?

14   A.    Yes.

15   Q.    Did he have an actual, physical office there?

16   A.    No.

17   Q.    What did he have there?

18   A.    He had the accommodation of the mail and any telephone

19   calls that came in.

20   Q.    So there's a receptionist?

21   A.    Yes.  And if he needed a virtual office, he had that.

22   Q.    Okay.  So he didn't have a physical office there, correct?

23   A.    No.

24   Q.    And he tells you, I'm not, in response to your question if

25   he was in town; is that correct?

1    A.    Yes.

2    Q.    And asking you -- and you're asking in here for a payment

3    of some kind; is that correct?  Can you send me a check?

4    A.    Yes.

5    Q.    Made out to the U.S. Treasury?

6    A.    Yes.

7    Q.    Okay.  And he responds to you how?

8    A.    He's not in town, can it wait till he comes back.

9    Q.    And you respond?

10   A.    Okay.

11   Q.    Moving down to the next e-mail -- do you speak Spanish?

12   A.    No.

13   Q.    Okay.  He forwarded this e-mail to you that was in Spanish.

14   Did Rosie speak Spanish?

15   A.    Yes.

16   Q.    Did she help you with this?

17   A.    Yes.

18   Q.    Okay.  And so he forwards an e-mail to you in Spanish, but

19   actually it's really to Rosie who works there in your office; is

20   that correct?

21   A.    Correct.

22   Q.    And he's asking you to pay a business expense?

23   A.    Yes.

24   Q.    Using the line of credit in Turks and Caicos?

25   A.    Yes.

1   Q.   And that business expense is for something called the

2   University Club in Mexico; is that correct?

3   A.   Yes.

4   Q.   And just to verify that, the e-mail in Spanish is the IP

5   address universityclub.com.mx, M-X?

6   A.   Yes.

7   Q.   Okay.  So if this is -- he's asking you to pay a business

8   expense for his business, but you're not going to be doing his

9   business taxes, correct?

10  A.   Correct.

11  Q.   And he's asking you to pay a business expense out of a line

12  of credit out of the Turks and Caicos account; is that correct?

13  A.   Yes.  And I don't even remember that, paying that.

14  Q.   Was that attached to the e-mail, this picture?

15  A.   Yes.

16  Q.   It's an invoice, correct?  I know you don't speak Spanish.

17  Never mind.  I withdraw that question.

18           On October 21st, this is actually the date you open

19  the account, correct?

20  A.   It was around that time.

21  Q.   Okay.  And does -- this is page seven of the e-mails that

22  you provided to the government.

23           Does -- do you send an e-mail on the 7th to

24  Mr. Delgado with regard to the bank account?

25  A.   Yes.

1    Q.   Okay.  And the first thing you say to him is, hope your

2    trip to Brazil was pleasant?

3    A.   Yes.

4    Q.   Why did you say that?

5    A.   Because he told me he was in Brazil.

6    Q.   Do you know whether or not he was in Brazil?

7    A.   I have no idea.

8    Q.   What do you tell him about having to go back to the bank?

9    A.   I had to open another account, because his signature wasn't

10   on the first one and it's required on a joint account.

11   Q.   And that's what you were telling us before, that that's why

12   there's two accounts, where it comes into your account and then

13   you have to transfer it to another account?

14   A.   That's different.  We needed a totally new account with

15   both signatures on it.

16   Q.   Did you ever -- is that a third account now?

17   A.   Yes, but it never happened.

18   Q.   It didn't happen?

19   A.   No.

20   Q.   Why didn't it happen?

21   A.   Because he never went, as far as I know, anyway.

22   Q.   Okay.  And do I send your child support directly to your

23   wife?

24        So is this when you started to develop this personal

25   relationship with him?

1    A.    Yes.

2    Q.    Did you meet his ex-wife?

3    A.    Yes.

4    Q.    What did you do for him with relationship to his divorce?

5    A.    I was trying to negotiate some kind of settlement between

6    him and his ex-wife.

7    Q.    Page eight.  Is that, that -- what is -- that's the next

8    day, correct, October 22nd?

9    A.    Yes.

10   Q.    And again, are you trying to get some information?  Let me

11   start at the bottom.

12         After that first e-mail, the preceding day when you

13   are trying to open that third account, does he respond to you?

14   Because this is at 10:21 p.m. on the same day.  And do you say,

15   Marco, what's going on?  Do you want me to help or not?  Why are

16   you asking him that?

17   A.    Because I got very little cooperation.

18   Q.    And how does he respond to you on the next morning?

19   A.    He said he would initiate the transfer today.  Can you

20   leave checks with Rosie ready for when funds become available to

21   take care of his child support.

22   Q.    Oh, okay.

23   A.    Among other things.

24   Q.    Among other things?  Okay.  And (foreign language), that's

25   not Spanish, is it or do you know?

1    A.   Italian, is it?

2    Q.   And how do you respond?  His e-mail was at 5:47 in the

3    morning and you obviously were awake, because at 6:11 a.m., are

4    you again asking him or explaining to him what you're going to

5    do to make his personal payments?

6    A.   Yes.  I wanted to set up bills online, so I could pay them

7    wherever I was because we travel quite a bit, too.

8    Q.   Who is we?

9    A.   My husband and I.

10   Q.   And by the way, you didn't misspell the word "check," did

11   you?

12   A.   That's the way we write it.

13   Q.   "We" meaning the British?

14   A.   Yes.

15   Q.   And what do you mean by the account will not activate until

16   funded?

17   A.   I can't set up bills online until money is in there.

18   Q.   So on October 21st, you're waiting at Wells Fargo for him

19   to show up to be on the account, correct?

20   A.   Yes.

21          MS. FRANCO:  Objection.  There was testimony that the

22   account was opened on the 26th of October, not the 25th.

23   A.   I must have.

24          MS. KANOF:  No, Your Honor.  She went there on the

25   21st.

DIRECT MEDLOCK                                                      130

```
 1                THE COURT:  Let's ask the witness.

 2   BY MS. KANOF:

 3   Q.   Okay.  Did you go to the bank and he did not show up?

 4   A.   Yes.

 5   Q.   And his reason was what?  I mean, that the bank account had

 6   to be opened right away?

 7   A.   He wanted the bank account opened so that he could get

 8   funding for travelling.

 9   Q.   Was there going to be a transfer?

10   A.   Yes.

11   Q.   Okay.  And on the 22nd of October, did you say the account

12   will not activate until funded?

13   A.   Yes.

14   Q.   Had you already tried to open an account, but it will not

15   open until funded?

16   A.   I can't remember.

17   Q.   Page number ten of your e-mails.  On January or, actually,

18   I think January 2011 -- on January 2011, is -- do you write him?

19   And does it show how your relationship had progressed?

20   A.   Yes.

21   Q.   And when you called yourself -- and again, "favorite"

22   spelled a little bit different than we would spell in the United

23   States?

24                MS. FRANCO:  Sidebar.  Objection.

25                THE COURT:  Sustained.
```

KATHLEEN A. SUPNET, CSR

```
1    BY MS. KANOF:

2    Q.   Is that a proper way of spelling favorite to you?

3    A.   Yes.

4    Q.   What was the purpose of this e-mail?

5    A.   To remind him to initiate the transfer.

6    Q.   Okay.  And why did you need a transfer on that day?

7    A.   To pay his bills.

8    Q.   And how does he respond?

9    A.   Let me know if you got it.

10   Q.   And that was -- and then how did you respond?

11   A.   Have not received yet.

12   Q.   Is this a common interchange between you and Mr. Delgado?

13   A.   Yes.

14   Q.   Okay.  Explain that, please.

15   A.   Well, if people were sending bills to my office, and if

16   they needed to be paid, I had to ask him to transfer funds so I

17   could pay the bills.

18   Q.   And did he always promptly respond to transfer?

19   A.   Not always, no.

20   Q.   And is this an example that sometimes on occasion when he

21   said he would transfer funds were they always transferred?

22   A.   Usually, eventually, yes.

23   Q.   What do you mean by eventually?

24   A.   Sometimes it would take time if he was out of the country.

25   Q.   Did you know he was out of the country?
```

1   A.   No, I just assumed.

2   Q.   For example, previously, the previous e-mail was

3   January 28th, and that was on page ten, and did Mr. Delgado say

4   let me know if you got it?  Thanks?

5   A.   Yes.

6   Q.   And now on Page 11, it's February, 1st and what are you

7   telling him?

8   A.   Still no transfer.

9   Q.   Okay.  And how does he respond?

10  A.   I just called.  I'm assuming he called the bank.  They will

11  get his tracking number.

12  Q.   And while you're waiting for this money, is there anything

13  that's occurring with regard to the bills?

14  A.   Anything that's occurring?

15  Q.   What kind of bills are you paying?

16  A.   He was having a lot of work done on his house that utility

17  bills, various bills.

18  Q.   For example?

19  A.   School bills for his son.

20  Q.   Page 12 of this exhibit, on February 3rd, two days later,

21  he says, need your help with a check for Ethan wells -- West for

22  $5,000, correct?

23  A.   Yes.

24  Q.   Who is Ethan West?

25  A.   He was a tailor in Ft. Worth.

DIRECT MEDLOCK                                                      133

1    Q.    On page number 13 you do note that -- you're trying to pay

2    bills for that individual.  Why were you urgently trying to get

3    money to pay for that individual?

4    A.    Because he was urgently in need of it.

5    Q.    Okay.  Did -- what was the relationship between you and

6    Mr. Delgado's contractors that were doing work for him?

7    A.    Well, because he was not in the country or not in the city

8    or wherever he was, we paid all of his contractor bills.  They

9    came to the office.  They came to my house.

10   Q.    What do you mean they came to the office and your house?

11   A.    They brought the bills to my office, and if I wasn't there

12   they would come to my house.

13   Q.    Why are they coming to your house and office?

14   A.    Because they need to get paid.

15   Q.    Well, weren't you paying them timely?

16   A.    I didn't pay unless I got the invoice.

17   Q.    And where would you get the invoice from?

18   A.    From the contractor.  And then I had to make sure it was

19   okay with Mr. Delgado.

20   Q.    Well, when they were coming to your house, when they were

21   coming to the office, did you already have the invoice?

22   A.    No.

23   Q.    And did you tell them, well, I need the invoice?

24   A.    Yes.

25   Q.    And once you had the invoice were you able to pay them?

1    A.    Well, I had to check with Mr. Delgado.

2    Q.    And did that cause delays?

3    A.    Yes.

4    Q.    Why?

5    A.    Well, if I couldn't get hold of him.  And then if I

6    remember correctly, he told me to pay certain ones without, you

7    know, any permission, so I did, like child support, Columbia

8    University for his son, for example.

9    Q.    Okay.  Government Exhibit -- okay.

10         Page 16 -- all of these are in evidence so I'm not

11   going to go through every single one of them, but on page 16,

12   did you send Mr. Delgado on February 4th an e-mail regarding his

13   taxes?

14   A.    Yes.

15   Q.    Okay.  And were you specifically asking him a list of

16   questions so that you could work on his taxes?

17   A.    Yes.

18   Q.    And did he respond on February 7th, hola, Linda.  Response

19   in body of text in caps.  Long live the queen.

20   A.    Yes.

21   Q.    Okay.  So the e-mail that is at the bottom of page 16, the

22   portions that are in caps after your questions, are those

23   Mr. Delgado's responses to your questions?

24   A.    Yes.

25   Q.    Okay.  So you ask him about some personal expenses about

DIRECT MEDLOCK                                                    135

1    his wife and his kids, I understand.

2            Down a little bit below or right about the middle,

3    you -- I'm going to highlight this and ask to you read it.

4    A.   I checked the 1099s, the large ones with the 2009, so I

5    still need F.G.G. and the Electric Company for 2010.

6    Q.   Okay.  And he said what?

7    A.   Just left invoice mail.

8    Q.   Okay.  So did he represent to you that he had done work for

9    the Electric Company in 2010?

10   A.   Yes.

11   Q.   Did you ever get 1099s from the Electric Company in 2010?

12   A.   I can't remember.  I know I got some, but I can't remember

13   specifically which year.

14   Q.   And you were doing taxes all the way back to 2004, correct?

15   A.   Yes.

16   Q.   And who's F.G.G.?

17   A.   I didn't know.

18   Q.   Did you ask him who F.G.G. was?

19   A.   No, because it was just a 1099.  It was income.  If it was

20   an expense, I probably would have asked more specifically.

21   Q.   Okay.  And the next line, the invoices for Ener Proyectos,

22   what specifically were they for, consulting or engineering?  And

23   how does he respond?

24   A.   Consulting and engineering.

25   Q.   What -- why were you asking him this question?

1    A.   So can come categorize it.

2    Q.   As what?

3    A.   Consulting or engineering.

4    Q.   You are doing his personal taxes, correct?

5    A.   Yes.

6    Q.   Okay.  And why do you need to know information about

7    invoices from Ener Proyectos?

8    A.   Because he had a Schedule C and that's under his personal.

9    Q.   Okay.  Explain that.

10   A.   A Schedule C is a -- it's a business you have when you are

11   a sole proprietor.

12          MS. FRANCO:  Objection, Your Honor.  Calls for expert

13   opinion.

14          MS. KANOF:  No, he's asking her to do this.

15          MS. FRANCO:  She's already testified she's a CPA.

16          THE COURT:  I'm going to sustain the objection.

17   BY MS. KANOF:

18   Q.   You were doing his personal taxes, correct?

19   A.   Yes.

20   Q.   And I'm not -- and I wouldn't ask you why, but did you need

21   this information?

22   A.   Yes.

23   Q.   For personal taxes?

24   A.   I did.

25   Q.   And did you need this information to determine whether or

1    not he had a business deduction?

2    A.   Yes.

3    Q.   Who's Rick?

4    A.   I believe that's Rick Lara.  He's a friend --

5    Q.   And --

6    A.   -- of Marco's.  I happened to know him as well.

7    Q.   Okay.  And to your question, I'm working on the child

8    support issue, what does he respond?

9    A.   Let's get it behind us.

10   Q.   Why would you be responsible for getting his child support

11   issue behind you?

12   A.   Because I was trying to work out with Sharon.

13   Q.   Who is Sharon?

14   A.   Marco's ex-wife.

15   Q.   Did you know her before Mr. Delgado?

16   A.   No.

17   Q.   Page number 17, the 8th of February.  Starting at the

18   bottom on the 8th of February, he writes to you this

19   information.  Could you plead read it out loud?

20   A.   Dear Linda, just wanted to remind you Liliana needs you to

21   advance her $3,000 for her landscaper.

22   Q.   Who is Liliana?

23   A.   A friend of Marco.

24   Q.   Just a friend?

25   A.   Well, girlfriend.

1    Q.   And when you said you had developed a personal

2    relationship, did you also spend personal time with him and his

3    girlfriend?

4    A.   Yes.

5    Q.   What does this sentence that I'm now highlighting mean?

6    A.   If you're going to take this out of my allowance, please do

7    it in at least two installments, thanks.

8    Q.   What allowance what are you talking about?

9    A.   I'm trying to remember.  I think it was a little bit of a

10   joke where he, you know, wanted me to set up an allowance for

11   him.  I think it was tongue and cheek.

12   Q.   Okay.  When we're talking about payments that you were

13   making out of the money that was transmitted from the Turks and

14   Caicos account, did you also pay your own fees out of that

15   account?

16   A.   Yes.

17   Q.   And he permitted you to do that, right?

18   A.   Yes.

19   Q.   He didn't pay you from a separate account?

20   A.   No.

21   Q.   Page number 18.  Who is Saul at Cost Plus Pools?

22   A.   He was a gentleman who was doing the pool in his personal

23   residence.

24   Q.   Okay.  And it appears here that he did give you an invoice.

25   A.   Yes.

1    Q.    And were you able to pay that invoice?

2    A.    Yes.

3    Q.    Okay.  Immediately?

4    A.    No.  Let me see.  Yeah, Mr. Delgado wanted the deck

5    finished before the invoice was paid.

6    Q.    Okay.  And so you communicated that on his behalf?

7    A.    Yes.

8    Q.    Who is Gustavo Cordova?

9    A.    I do not know.

10   Q.    Do you know anything about El Conquistador Polo Club?

11   A.    I just heard of it.

12   Q.    Did you pay those bills as well?

13   A.    Yes.

14   Q.    Okay.  So the e-mail in the middle of page 19 from

15   Mr. Delgado is him authorizing you to pay his polo club dues as

16   well as the horse boarding?

17   A.    Yes.

18   Q.    And you respond that you've done that.

19          And then with regard to this man -- did you get to

20   know this name Saul pretty well or Saul?

21   A.    Once I knew him, I wouldn't say, well, I knew him to come

22   to my office and house.

23   Q.    You said he gave you invoices, right?

24   A.    Yeah.  He has given me invoices.

25   Q.    Okay.  And in this -- on February 16th, do you say Saul

1    wants another 2,200 for the pool.  Is that okay?  What kind of

2    pool are you building?  And do you also say, you had to pay

3    3,000 last week for the decorator, and you ask him if he wants

4    to sign his 2005 return; is that correct?

5    A.   Yes.

6    Q.   Page 21.  On February 18th, again, you're basically trying

7    to get the information that you need to do his tax returns; is

8    that correct?

9    A.   Correct.

10   Q.   Page 23.  Do you know who -- so we've been talking about

11   the intelligent office, so you paid his bills for the

12   intelligent office, and on page 23, is that an example of the

13   statements for payment for having that intelligent office?

14   A.   The statement isn't here, but...

15   Q.   But it's an example of?

16   A.   Yes, from Veronica, yes.

17   Q.   Being built for Mr. Delgado's intelligent office?

18   A.   Yes.

19   Q.   That's not for your actual office, correct?

20   A.   No.

21   Q.   Page 24, you're again asking him about helping with him

22   giving him legal -- financial advice about his future, correct?

23   A.   Yes.

24   Q.   And let me go forward.  Did you also communicate with his

25   children for him?

1    A.   Yes, with Emiliano, in particular.

2    Q.   Okay.  And also provide from the Turks and Caicos account

3    payments for them?

4    A.   Yes.

5    Q.   Did -- did you ever receive any transmissions or any other

6    money to pay for child support or anything for his family from

7    any other account other than the Turks and Caicos?

8    A.   No.

9    Q.   Okay.  Let's see.  Most of these are personal bills.

10            THE COURT:  Is this a good time for a lunch break?

11            MS. KANOF:  Yeah, it is.

12            THE COURT:  Ladies and gentlemen of the jury, if you

13   would be back in the jury room at 2:20, we'll resume our

14   proceedings at 2:20.

15            COURTROOM SECURITY OFFICER HEIDTMAN:  All rise.

16            (Lunch break at 1:16 p.m. to 2:23 p.m.)

17            (Open court.  Defendant and counsel present.)

18            (Jury present.)

19            THE COURT:  Let the record reflect that all members of

20   the jury are present, the United States through its assistant

21   United State's attorneys are present, the defendant and his

22   attorney is present.

23            Ms. Medlock is on the witness stand.

24            Ms. Kanof?

25            MS. KANOF:  May I proceed, Your Honor.

1           THE COURT:  Yes, ma'am.

2    BY MS. KANOF:

3    Q.   Let's see.  We'd gone to page 31.  Let me go back to page

4    30 for just a second and draw your attention to the top e-mail

5    from Mr. Delgado to you on March 21st of 2011 and, Hi Linda.

6    I'm -- does it say, Hi Linda, I'm dead tired, but had a blast.

7    Wire instructions have been issued.  Do you recall that?

8    A.   Yes.

9    Q.   And what wire instructions is he referring to?

10   A.   The one --

11   Q.   If you know?

12   A.   Well, I may not specifically, the one that we were talking

13   about prior.

14   Q.   So had you -- do you recall if he made a request to wire

15   for money from the Turks and Caicos?

16   A.   Yes.

17   Q.   Okay.  On the 31st at -- I mean on the 23rd of March, then

18   though had you recognized that no wire has in fact come through

19   yet.

20   A.   Yes.

21   Q.   Okay.  With regard to page 32 of your e-mails, you had been

22   asking him for 1099s in order to complete his tax returns?

23   A.   Yes.

24   Q.   Starting at the bottom, an e-mail that he forwarded to you

25   March 28th, he received an e-mail from somebody named Fernando

1    Gireud, G-I-R-E-U-D.  It's on your screen in front of you.

2    A.   I don't know who that is.

3    Q.   And that was going to be my questions.  You never met

4    anybody by that name?

5    A.   No.

6    Q.   And then did he forward it to you on that same day with a

7    message?

8    A.   (Reading silently.)

9    Q.   I highlighted it to give you some assistance.

10        Did he say anything to you before when he forwarded

11   it?

12   A.   (No response.)

13   Q.   Hi Linda?

14   A.   Yes.

15   Q.   In your response to him on that same day, I'm going to go

16   ahead and let you read to the jury what your response was?

17   A.   I hate to knock you, but funds are low and child support

18   and tuition and student loan payments are due very soon.  How

19   are you?

20   Q.   Page number 33.  Did you request expenses to do his tax

21   returns for certain years?

22   A.   Yes.

23   Q.   And did he have somebody named Amy Padilla send them to

24   you?

25   A.   No, I did.

1    Q.    Oh, you did?

2    A.    I did.

3    Q.    Who's Amy Padilla?

4    A.    She's a daughter of a friend of mine.  I had to do some

5    spread sheets.

6    Q.    Did you give her information to put on the spreadsheets?

7    A.    Yes, receipts.

8    Q.    Who provided the information to you that she put on the

9    spreadsheets?

10   A.    Mr. Delgado.

11   Q.    Page 34.  Did you pay Mr. Delgado's utility bills?

12   A.    Yes.

13   Q.    And on April 2nd of 2011, did Mr. Delgado send you an

14   A.T.& T. Bill to be paid?

15   A.    Yes.

16   Q.    Okay.  And it was for $982?

17   A.    Yes.

18   Q.    Page number 36.  Were you also required as part of your

19   agreement with Mr. Delgado to pay such expenses as his son's

20   fraternity dues, personal visit, spring break and other expenses

21   and vacations?

22   A.    Yes.

23   Q.    And did sometime come where you were just communicating

24   directly with his son?

25   A.    Yes.  Not very often, but yes.

1   Q.   And all of that money came out of the Turks and Caicos

2   account?

3   A.   Yes.

4   Q.   Did you pay his bills for meals and things for the Coronado

5   Country Club?

6   A.   Yes.

7   Q.   And on page number 38, did somebody by the name of Irene at

8   the Coronado Country Club send you a monthly invoice to make a

9   payment for him?

10  A.   Yes.

11  Q.   And page number 39, is that the invoice?

12  A.   Yes.

13  Q.   For the month of March of 2011?

14  A.   Yes.

15  Q.   And did you make that $1,786.02 payment out of the monies

16  that you received from the Turks and Caicos account?

17  A.   Yes.

18  Q.   Page number 40, April 5th of 2011, did you send an e-mail

19  to Mr. Delgado?

20  A.   Yes.

21  Q.   And what did you say?

22  A.   No transfer yet.

23  Q.   And what transfer are you referring to?

24  A.   When -- the last one that I requested.  I can't remember

25  the amount.  I didn't usually ask for any amount.

1    Q.    Just for a transfer?

2    A.    Yes.

3    Q.    So did you ever get a transfer without having to ask?

4    A.    No, not that I remember.

5    Q.    So you had -- and how long did you wait to ask until --

6    under what circumstances did you ask?

7    A.    Well, I knew that the child support was extremely important

8    and also the tuition, so when I saw the deadline approaching,

9    then I would ask.

10   Q.    Okay.  On page 41, in -- are there invoices for Franklin

11   Pool Service?

12   A.    Yes.

13   Q.    And did you pay that invoice as well?

14   A.    Yes.

15   Q.    Page 42, there's starting at the bottom, did Mr. Delgado

16   send an e-mail to you about his daughter's summer program?

17   A.    Yes.

18   Q.    Did his daughter go to a finishing camp in Switzerland?

19   A.    Yes.  Switzerland or France.

20   Q.    But it's in France?

21   A.    Yes, it is.

22   Q.    And again, another invoice from Cost Plus Pools?

23   A.    Yes.

24   Q.    Did you pay that invoice?

25   A.    Yes, presumedly, I did.

1    Q.   And was the balance $15,500?

2    A.   Yes.

3    Q.   Page 46.  What are you referring to -- on April 12th, 2011,

4    what strategy is he referring to?

5    A.   About the negotiating with his ex-wife.

6    Q.   Why are you involved with the negotiations of his ex-wife?

7    A.   I don't know, but...

8    Q.   And this is an example of your relationship at the bottom?

9    A.   Yes.

10   Q.   And on page number 47, just in the e-mail of -- now on page

11   number 48, if you recall, dated April 20th of 2011, what did you

12   observe if anything that was unusual?

13   A.   I don't remember all of the specifics, but it seemed like

14   there was an incorrect birthday on the passport.

15   Q.   And whose?

16   A.   His son.

17   Q.   And why were you looking at his son's passport?

18   A.   You know, I can't remember.

19   Q.   You paid veterinary bills and grocery bills and things like

20   that?

21   A.   Yeah.  They were from Sharon Delgado.

22   Q.   I'm looking for -- page number 56.  Okay.

23             Did you get an e-mail from an individual by the name

24   of -- I have the wrong page numbers on my notes.  I'm sorry.

25             Did you get an e-mail on May 3rd of 2011, by an

1    individual named Joan?

2    A.   Yes.

3    Q.   Have you ever met Joan?

4    A.   No.

5    Q.   Okay.  And when you received this -- Joan Duncan, I guess

6    is her name -- when you received this e-mail, do you know what

7    it was regarding?

8    A.   No, I didn't.

9    Q.   But she seemed to know your name, correct?

10   A.   Yes.

11   Q.   And if you could please read this e-mail to the jury?

12   A.   I'm an interior designer in Taos, New Mexico and I'm

13   working with Mr. Delgado on his newly purchased condo up in

14   Canada.  I sent Marco a text asking him about his past due

15   invoice and received a reply on April 29th saying that he would

16   talk to you about taking care of it.  I have still not received

17   payment and very much appreciate it if you could take care of

18   this today.

19   Q.   Did you know anything about a condo?

20   A.   No, I didn't, but I did ask him and he told me he had

21   purchased one.

22   Q.   And prior to receiving this e-mail, you had -- he didn't

23   tell you that he had bought a condominium?

24   A.   No.

25   Q.   And did he warn you that he was going to give your e-mail

1   address and ask you to make payments for his -- something

2   regarding his condominium?

3   A.   No, I didn't.  I don't remember him asking me prior.

4   Q.   And the -- on page 59, on May 13th from you to Mr. Delgado,

5   did this woman then also call you or somebody else call you?

6   A.   Presumedly, it was her, yes.

7   Q.   Did the manager of the Condo Heart condos, a woman by the

8   name of Elizabeth, also -- did he send you or forward an e-mail

9   to you to pay the expenses that were required like the H.O.A.

10  fees for the condominium?

11  A.   Yes.

12  Q.   Okay.  And again, did he warn you that you were going to be

13  paying those?

14  A.   I don't remember.

15  Q.   On May 14th of 2011, again did you have to remind him --

16  well, I'll go ahead and ask you to please read this e-mail to

17  the jury.

18  A.   We are starting to get low on funds.  This has been an

19  expensive month.  The tailor Swiss school, Russian school, et

20  cetera.  Also I have two tickets for you to Vegas Night Out at

21  the museum for the opera.  Can you make it?

22  Q.   And did you make all of those payments for all of those

23  events out of the money that was transferred to the account that

24  was only in your name that received money only from the Turks

25  and Caicos account?

1    A.   Yes.

2    Q.   That was page 61.  Page 62, yet another e-mail from Joan

3    Duncan.  Is that to you, is that correct?

4    A.   Yes.  Yes.

5    Q.   And when Ms. Duncan writes to you, is it May 18th of 2011?

6    A.   Yes.

7    Q.   And does she tell you hopefully you've heard from Marco and

8    we can put it to rest?

9    A.   Yes.

10    Q.   Did you know what she was doing for him?

11    A.   No.

12    Q.   But what does it say?

13    A.   I'm assuming interior design.

14    Q.   When -- sometimes did you have to deal directly with the

15    former Mrs. Delgado?

16    A.   Yes.

17    Q.   And on May 20th, did you have to apologize to her?

18    A.   Yes.

19    Q.   Please read that to the grand [sic] jury?

20    A.   I am sorry that I have not sent a check to you, but

21    unfortunately low on budget.  The children have cost a small

22    fortune month, tuition in Switzerland and Russia.  I am hoping I

23    can accommodate at the end of the month.  Any thoughts on my

24    proposal?

25    Q.   What kind of proposal?

1    A.   We were trying to get a settlement between the two of them.

2    Q.   You called it your proposal, not Mr. Delgado's proposal.

3    Did you develop the proposal?

4    A.   Yes, I did it.

5    Q.   Number 64.  Did you receive an e-mail or did you send an

6    e-mail to Mr. Delgado on -- I didn't mean number 64 -- but page

7    63 on May 27th of 2011, and address it to my wayward son?

8    A.   Yes.

9    Q.   Now, in the first -- the first line, what did you say to

10   him?

11   A.   I have paid $1,200 on your phone bill on my credit card, so

12   there will be no interruptions of service.

13   Q.   Is that in response to an e-mail that he sent you earlier

14   in which he said what?

15   A.   Don't let A.T.& T. cut me off.  Thanks.

16   Q.   And so why did you charge $1,200 on your personal credit

17   card for his A.T.& T. BILL?

18   A.   So it wouldn't be cut off.

19   Q.   How often did you use your personal credit card to bail

20   Mr. Delgado out?

21   A.   Quite a lot.

22   Q.   Well, what do you mean by quite a lot?

23   A.   Well, in the beginning, not at all, and then towards the

24   end, a lot, last three months, maybe.

25   Q.   You got paid back?

DIRECT MEDLOCK                                                        152

1    A.   Yes.

2    Q.   On May 27th, page 65, did you send Mr. Delgado an e-mail

3    with regard to the problems he was having settling his divorce?

4    A.   Yes.

5    Q.   And what did you say?

6    A.   It's embarrassing.

7    Q.   Well, just the first line.

8    A.   Marco, have a brain.  Sharon went to your house and has

9    seen what you have done.  That's why she doesn't settle.  I

10   would like to see this Taj Mahal.

11   Q.   Were you just trying to help him?

12   A.   Yes.

13   Q.   Is this the A.T.& T. bill, the one that's attached, that

14   you put on your credit card, if you can recall?

15   A.   I can't see if it was 1,200 there, but presumedly, yes.

16   Q.   Oh, with regard to this page 66, this June 9th, 2011

17   e-mail, does he say, Hi ya, mom.  My flight lands at 7:30?

18   A.   Yes.

19   Q.   Okay.  Was he often in a hurry?

20   A.   Always.

21   Q.   Explain that, please.

22   A.   Everything had to be done immediately.  He was always in a

23   hurry, that's why things had to be -- you know, that's why I

24   used my credit card.

25   Q.   Okay.  On page 68, on June 18th of 2011, again, do you

DIRECT MEDLOCK                                                      153

1    remember her -- remind him that you need another transfer ASAP?

2    A.   Yes.

3    Q.   Because you need to pay things for him, correct?

4    A.   Yes.

5    Q.   Okay.  And on Saturday, June 18th, what does he tell you?

6    A.   He needs $2,000 for his travel.

7    Q.   Explain how that worked?  Did Mr. Delgado have an ATM card?

8    A.   I still don't know.

9    Q.   Well, how often did he ask you for cash?

10   A.   A lot.  I can't give you an exact amount.

11   Q.   How did that work?

12   A.   He had another account and when he needed money he asked me

13   to transfer into that account for his travelling.

14   Q.   Okay.  And that was separate from the two accounts you

15   opened at Wells Fargo?

16   A.   Yes.

17   Q.   So you had that account money; is that correct?

18   A.   Yes.

19   Q.   And are there several e-mails in this package where he's

20   asking for $1,000, $1,000, $2,000?

21   A.   You can only transfer $1,000 a day.

22   Q.   Is that why it's the limited amount?

23   A.   Yes.

24   Q.   And occasionally his children are the same?

25   A.   Yes.

1    Q.   And how would you transfer it?  What would you do?

2    A.   I do it online.

3    Q.   Page number 70.  Let's go to 75.

4         Oh, just quickly, on page number 72, Mr. Delgado

5    forwards to you a bill asking you to cut a check in the amount

6    identified, which was 149 euros.  What did you do in order to

7    transmit or pay in euros?

8    A.   I'm trying to remember.  I did it by wire.

9    Q.   Page number 75.  Who is Hensal Glass?  What was $4,173 to

10   Hensal Glass for?

11   A.   For his house.

12   Q.   Is there another A.T.& T. bill also on page 75?

13   A.   Yes.

14   Q.   And is this bill for $4,127, continuing to page 76?

15   A.   Yes.

16   Q.   Is this just a phone bill or also for U-verse or internet?

17   Do you know?

18   A.   I'm not sure.

19   Q.   Okay.  Page 77 -- skip -- 79.  You -- the subject of the

20   e-mail on July 11th of page 79 appears to be flight.  What were

21   you talking to Mr. Delgado about in this particular e-mail

22   exchange?

23   A.   His son was changing his -- he was in Russia and he was

24   changing his flight and wanted to stop off in New York and so

25   wanted a roundtrip from New York to El Paso.

DIRECT MEDLOCK                                                                    155

1    Q.   But -- does that have to do with make -- you and he making

2    decision expenses of his ex-wife?

3    A.   Because the children are involved.

4    Q.   And you wanted to help him with that?

5    A.   Yes.

6    Q.   Okay.  Page 80.  Subject:  Hotel payment, Florence.  Is

7    that Florence, Italy?

8    A.   Yes.

9    Q.   July 11th of 2011, did you receive an e-mail from him

10   asking you to pay for his stay in Italy?

11   A.   Yes.

12   Q.   Okay.  And does this -- what information does this e-mail

13   request?

14   A.   My credit card number.

15   Q.   Also, what else?

16   A.   Confirmation of payment is approved and cashed.

17   Q.   And what else does he ask for?  Cash?

18   A.   Yes.

19   Q.   Okay.  Preceding that on page 81, on that same day or based

20   on his request, did you send this e-mail?

21   A.   I did.

22   Q.   And who did you send it to?

23   A.   It's Mrs. Enzer.

24   Q.   Go ahead and read it.

25   A.   Dear Ms. Enzer, I would like to set up the account for

1   Marco Delgado in apartments 435 and 330.  The credit card is

2   under Linda Medlock, Mastercard, so and so, expiration, so and

3   so.  Thank you, Linda.

4   Q.   Did he tell you what the purpose of this trip is?

5   A.   He actually told me that he was taking the Foster's in-laws

6   to Europe.

7   Q.   Paul foster's in-laws?

8   A.   Ys.

9   Q.   Did he tell you it was a business trip?

10  A.   Yes.

11  Q.   And did he tell you anyone else went?

12  A.   No.

13  Q.   Okay.  No, he didn't tell you or --

14  A.   He did not tell me that anyone else went.  He just said the

15  Foster's in-laws.

16  Q.   Did he indicate if Liliana went or not?

17  A.   He did not.

18  Q.   And on the 11th, after your payment, did he say that's why

19  we love you?

20  A.   Yes.

21  Q.   But the amount of money was 1,662 euros for the hotel in

22  Florence; is that correct?

23  A.   Yes.

24  Q.   For the two apartments for him and the Fosters?

25  A.   Yes.

1   Q.   Okay.  On the 13th, two days later, does Mr. Delgado ask

2   you for more money?

3   A.   Yes.

4   Q.   And what does he say about the cash or is that from you?

5   That's from you actually.

6            You give him another $1,000; is that correct?

7   A.   Yes.

8   Q.   But you, even though he's on a business trip in Europe,

9   you're still trying to communicate to him about money?

10  A.   Yes.

11  Q.   On page 84, another bill from the tailor; is that correct?

12  Am I going too fast for you?

13  A.   Yes.

14  Q.   Sorry.

15           On page 85 -- now this is the other one.  I think it

16  was July 11th.  This is ten days later.  You ask him if he's

17  still in Italy?

18  A.   Yes.

19  Q.   So when you send him the $1,000 or the $2,000, do you have

20  to know where he is in order to send him the money?

21  A.   No, I don't.

22  Q.   Okay.  And in this case, did he ask you for funds needed?

23  A.   Yes.

24  Q.   And did he say, Hi Mom, hope all is well?  He recognizes

25  that he received some money, but he really needed money in his

1    ATM card.

2    A.   Correct.

3    Q.   And he's down to the last $300; is that correct?

4    A.   Yes.

5    Q.   And by the way, did you get reimbursed off your credit card

6    for the Italy trip?

7    A.   Yes.

8    Q.   Okay.  Another, just reminder, I need ATM cash.  You are

9    the best.  Let me know if there's a good time to talk today to

10   update you on your final itinerary on page 86?

11   A.   Yes.

12   Q.   Did you handle his flight arrangements?

13   A.   No.

14   Q.   Do you know how his pilot arrangements were handled?

15   A.   I don't know.

16   Q.   So -- would there be a way that you would know where he was

17   at a given time?

18   A.   If I did the flight arrangements, yes.

19   Q.   Okay.  Except that on page 88 --

20   A.   Except for the children, I have done that.

21   Q.   Okay.  In the middle of page 88, there's an e-mail from

22   Mr. Delgado also talking about a Wells Fargo transfer to another

23   customer and asking about flight arrangements.  What was that?

24   A.   Yeah, he asked me how he should arrange the flight

25   arrangements; do you want me to do it and use your card?  So I

DIRECT MEDLOCK                                                    159

1   said yes.

2   Q.   Was this the first time that he asked you to assist with

3   airline arrangements?

4   A.   Yes.

5   Q.   And did you use your credit card to make airline

6   arrangements?

7   A.   I didn't do it.  I just gave him permission to use my card.

8   Q.   To use your card?

9        And on page 90 he needs another $2,000, correct?

10  A.   Yes.

11  Q.   Reminder, $2,000 more?

12       On page 91 -- I'm trying to find the final -- oh,

13  there it is.  Page 92, subject:  Budget from you to Mr. Delgado.

14  How much did that trip cost?

15  A.   This was the amount that was on my credit card.

16  Q.   $34,000?

17  A.   Yes.

18  Q.   And what other amounts are you talking about?

19  A.   He and Marco and I discussed his son Emiliano and that we

20  were trying to set up a budget for him so that he could, you

21  know, learn a little physical control.

22  Q.   Okay.  But the amount that he put on your credit card while

23  he was in Europe was $34,000?

24  A.   Yes.

25  Q.   How did he pay you?

1    A.   I paid myself.

2    Q.   Out of Turks and Caicos money?

3    A.   Yes.

4    Q.   Well, let me ask one other question.

5            Did there come a time when you were concerned about

6    the fact that this money was coming from the Turks and Caicos

7    and your name was the only one on the account?

8    A.   Yes.

9    Q.   Did you go see a lawyer about it?

10   A.   I did.

11           MS. KANOF:  Pass the witness.

12           THE COURT:  Ms. Franco?

13                       LINDA MEDLOCK,

14           CROSS-EXAMINATION BY THE DEFENDANT

15   BY MS. FRANCO:

16   Q.   Good afternoon.

17           Now, at this time, did you have a going rate for what

18   you would charge for your accounting services?

19   A.   Yes.

20   Q.   And what was that, ma'am?

21   A.   200.

22   Q.   200 an hour?

23   A.   Yes.

24   Q.   And is that the amount of money that you charged

25   Mr. Delgado?

1    A.   Yes.

2    Q.   And it sounds like you worked on putting together his tax

3    returns, correct?

4    A.   Yes.

5    Q.   And paying his expenses for the last, looks like about

6    seven months or so; is that correct?

7    A.   Yes.

8    Q.   And did you have any idea how much money it was that you

9    paid yourself out of that account.

10   A.   I don't know.

11   Q.   Do you remember?

12   A.   I can't remember.

13   Q.   Do you remember meeting with the agents in this case and

14   perhaps Ms. Kanof?

15   A.   Yes.

16   Q.   And do you recall telling them that you had taken about

17   $60,000 in fees from that account?

18   A.   I don't remember, but that sounds about right.

19   Q.   So if my math is right, that's about 300 hours worth of

20   work that you believe you did for Mr. Delgado?

21   A.   Yes.

22   Q.   So when Ms. Kanof was asking well why did you do this and

23   that you were getting paid for it, correct?

24   A.   Oh, yes.

25   Q.   The bank account -- I'm -- just to clear that up.  It

1    appears that the bank account that we're talking about was the

2    one that was opened towards the end of -- I think it was

3    October; is that right?

4    A.   Yes.

5    Q.   But the e-mails start earlier than that, about a week

6    before?

7    A.   Yes.

8    Q.   So that week before is that when he asked you to meet me at

9    the bank so I can pay my bills?

10   A.   Yes.

11   Q.   And that's when he was unable to meet you at the bank,

12   correct?

13   A.   Yes.

14   Q.   And at that point in time, you opened up an account in your

15   own name?

16   A.   Yes, as per the banker's suggestion.

17   Q.   So his banker suggested to you to open it up in your name.

18   A.   Yes.

19   Q.   And as time went on, you indicated that you believed that

20   the money that was being transferred was from a line of credit?

21   A.   Correct.

22   Q.   And that was based upon you said that's what Mr. Delgado

23   told you?

24   A.   Yes.

25   Q.   But in all of these e-mails you'll agree with me that they

1    just spent sometime going over, there's no conversation in there

2    about a line of credit, correct?

3    A.   Correct.

4    Q.   And there's nothing in there about him -- you being

5    concerned about him paying down a line of credit, correct?

6    A.   Correct.

7    Q.   At the -- I know at first you didn't recall, but then after

8    having looking at the e-mails you recalled that Mr. Delgado did

9    have another account or at least one other account at the Wells

10   Fargo bank, correct?

11   A.   Yes.

12   Q.   And that would have been an account in his own name?

13   A.   Yes.

14           MS. FRANCO:  May I have just a moment, Your Honor?

15           THE COURT:  Yes, ma'am.

16           MS. FRANCO:  Pass the witness.

17           MS. KANOF:  No further questions, Your Honor.

18           THE COURT:  May Ms. Medlock be permanently excused?

19           MS. KANOF:  Yes, please, Your Honor.

20           MS. FRANCO:  Yes, Your Honor.

21           THE COURT:  Ms. Medlock, you are excused and free to

22   go.

23           THE WITNESS:  Thank you.

24           (Witness excused.)

25           THE COURT:  Who is your next witness?

```
 1              MS. KANOF:  The government calls Liliana Narvaez.

 2              Your Honor, can we approach the bench?

 3              THE COURT:  Sure.

 4              (Bench conference.)

 5              MS. KANOF:  In regard to the motion to the limine on

 6     the photographs --

 7              THE COURT:  Oh, yeah.

 8              MS. KANOF:  -- of the furniture, and I also wanted --

 9     we didn't really talk about other photos.  I wanted

10     clarification before we went forward.

11              During cross-examination of Mr. Gireud, they went

12     through all of his purchases at Ashley Furniture, and I think

13     that made the photographs relevant, because Charlotte's is not

14     Ashley's Furniture.  And so I was going to basically ask the

15     Court if I can go ahead and show these pictures and also if I

16     can show one picture of the outside of the house, one of the

17     condos and of each one of the vehicles?

18              THE COURT:  Let me see it.

19              MS. KANOF:  For her to identify it?

20              There're in Volume 4 towards the very back, like in

21     the 140s.  151.  Further down.  Further down.

22              That's just a picture of the door to the condo.

23     That's to identify the photo.  That's the SUV.  One of them is

24     the Land Rover.  Yeah, that's the Land Rover.  And that's the

25     Suburban and that's exterior of the house.  And the rest is the
```

KATHLEEN A. SUPNET, CSR

interior of the house.  Every single item in these pictures was

purchased at Charlotte's with the exception of the artwork.  Oh,

I would remove this because of the -- I would remove that, the

kitchen.  He spent the money to refurbish.  The artwork was not

purchased, but the rest of the furniture is from Charlotte's.

He spent a great deal of money to actually re-do the house.

There's the backyard.  The kitchen, the pool, $15,000 for a

deck.

        MR. HANSHEW:  We'll stipulate that the Court's list is

property of the -- this is for inflammatory --

        THE COURT:  I don't find anything particularly

inflammatory.  It's just pictures.

        The rule is it has to be -- it has to substantial,

outweigh its probative value.  Perhaps it outweighs its

probative value.  I don't see it.

        MS. KANOF:  Especially since that lamp never worked.

        THE COURT:  I totally agree with you.

        MR. HANSHEW:  We're stipulating that all of the

property on that Charlotte's list is at his house.

        MS. KANOF:  I think we have a right.

        THE COURT:  And I understand your objection, but the

rule is in order to keep presumption of innocence relevant,

evidence, it comes in.  The exception of the rule is that if

it's prejudicial substantially, underline substantially, how it

outweighs the probative value.  I can keep it out and I don't

1    think those photographs substantially outweigh --

2           MR. HANSHEW:  For the record, purchases in the El Paso

3    community to put on the record and show pictures of thousands of

4    dollars of each piece of furniture in his home that that --

5           THE COURT:  I'll let you make a record all you want

6    for days.  I'll never keep from you making your record.

7           MR. HANSHEW:  I'm just making the record here on our

8    motion in limine.  I'll make one statement about it and then if

9    I can ask for a continued objection, so I don't have to stand up

10   in front of the jury.

11          MS. KANOF:  That was exactly my point when he brought

12   up the Ashley's Furniture.

13          THE COURT:  I don't think that opens the door to this.

14          MS. KANOF:  Thank you, Your Honor.

15          THE COURT:  You said you aren't going to use that?

16          MS. KANOF:  You know what?  He did spend the money to

17   refurbish the kitchen.  They did incredible work on the

18   cabinets.  She'll testify about the unique person they hired to

19   turn these cabinets into glass.

20          MR. HANSHEW:  Exactly.  This unique and does that mean

21   incredibly expensive?

22          MS. KANOF:  All right.  I'll take it out.

23          (Bench concludes.)

24          (Witness present and sworn by the Court.)

25

1                           LILIANA NARVAEZ,

2              DIRECT EXAMINATION BY THE GOVERNMENT

3     BY MS. KANOF:

4     Q.   Good afternoon, Ms. Narvaez?

5     A.   Good afternoon.

6     Q.   Could you state your name for the jury, please?

7     A.   Liliana Narvaez.

8     Q.   Okay.  That's your maiden name, correct?

9     A.   Correct.

10    Q.   You're recently married and haven't changed your name yet?

11    A.   Correct.

12    Q.   And how are you employed?

13    A.   I'm in sales.

14    Q.   Do you know Marco Delgado?

15    A.   I do.

16    Q.   How do you know him?

17    A.   I was in a six-year relationship with him.

18    Q.   Six years?

19    A.   Uh-huh.

20    Q.   Was that a serious relationship?

21    A.   Yes.  We were engaged.

22    Q.   You were engaged?

23         And when did that relationship end?

24    A.   It ended 2012.

25    Q.   Were you in a serious relationship with him during 2009,

1    2010, 2011?

2    A.   Yes, I was.

3    Q.   Okay.  And at sometime, did he ask you sometimes to assist

4    him from a business sense in some things in his business as an

5    attorney?

6    A.   Yes.

7    Q.   Okay.  What would he ask you to do?

8    A.   He would ask me to present out things that he needed for a

9    meeting or putting things in binders for him, things like that.

10   Q.   Okay.  And by -- when he would do that, how would he

11   provide the documents to you?

12   A.   He would sometimes bring them over or e-mail them to me.

13   Q.   Okay.  I'm going to show you, before I display this to the

14   jury -- first of all, do you speak Spanish?

15   A.   I do.

16   Q.   Okay -- what's been marked for identification purposes as

17   Government's 85.  It's a document in Spanish.  And do you

18   recognize your e-mail address on that document?

19   A.   Yes, I do.

20   Q.   Okay.  And did Mr. Delgado send that e-mail to you?

21   A.   Yes.

22        MS. KANOF:  Your Honor, we would move Government's

23   Exhibit Number 85, the Spanish version, and 85A into evidence.

24        THE COURT:  Mr. Hanshew?

25        MR. HANSHEW:  No, objection, Your Honor.

1              THE COURT:  85 and 85A are admitted.

2    BY MS. KANOF:

3    Q.   Okay.  Is this an example of a document that he would send

4    to you for your assistance in his legal business?

5    A.   Yes.  You can read right there where it says, (Spanish.)

6    That means please print.

7    Q.   Um --

8    A.   You see?

9    Q.   Yes, I see.  Let me get the highlighter going.  Are you

10   talking about right there?

11   A.   Yes.

12   Q.   Would you -- the things that he would send for you to print

13   or work on with him, did you read them?

14   A.   No.

15   Q.   No?  So you don't know anything about the context of this

16   document; is that correct?

17   A.   Correct.

18   Q.   Okay.  But -- did you provide this to the United States

19   government in a package of e-mails that you had received from

20   Mr. Delgado?

21   A.   Yes.

22   Q.   Okay.  So -- and the date of this is July 9th of 2010; is

23   that correct?

24   A.   Yes.

25   Q.   Okay.  So let's go and talk about a few other things.

1              Mr. Delgado had an e-mail header that had the words
2       Calgary, El Paso and Mexico D.S.
3              MR. HANSHEW:  Objection.  Leading, Your Honor.
4              THE COURT:  Let me hear the question.
5       BY MS. KANOF:
6       Q.   Did he have an office in Calgary, Canada?
7       A.   No.
8       Q.   Did he have an office in Mexico City?
9       A.   No.
10      Q.   Did you go to Mexico City which him?
11      A.   Often.
12      Q.   Okay.  Not just in relationship to the Agua Prieta II, but
13      just as his girlfriend or fiancée?
14      A.   I'm sorry.  Not what?
15      Q.   How often did you go?
16      A.   Um --
17      Q.   Over the years?
18      A.   Over the years, maybe -- I don't know.  A dozen times over
19      six years?
20      Q.   Did you go with him on business trips?
21      A.   Well, I wouldn't go for business, but accompany him to
22      spend weekends or...
23      Q.   When he went on business, you would accompany him?
24      A.   Yes.
25      Q.   And then when he was finished with his business, you would

1    have a weekend together?

2    A.    Correct.

3    Q.    Did he ever mention to you that he was working on a project

4    called Agua Prieta?

5    A.    Yes.

6    Q.    What did he tell you?

7    A.    That it was a big -- he was putting together a big bid,

8    some sort of plant.

9    Q.    Did he say who he was putting it together with or for?

10   A.    I just remember he had a lot of business partners.

11   Q.    Okay.  And do you remember who they were?

12   A.    There were a lot of companies.  I know there were a group

13   from El Paso.

14   Q.    And did you meet any of those people from El Paso?

15   A.    Yes.

16   Q.    Who?

17   A.    Mr. Fernando Gireud.

18   Q.    And had you ever met Mr. Fernando Gireud before?

19   A.    No.

20   Q.    And just when this project came up?

21   A.    Correct.

22   Q.    And did you socialize with him and his wife?

23   A.    Yes.

24   Q.    About how many times?

25   A.    With him, a handful of times with he and his wife, maybe

1    one or two.

2    Q.    Anybody else from El Paso for that project?

3    A.    Mr. Miller.

4    Q.    Okay.  And anyone else from El Paso?

5    A.    No, I think that's it.

6    Q.    Okay.  And did he tell you what the other companies

7    involved, who the other companies involved were?

8    A.    I would just hear different names.  I know he was like the

9    attorney handling I guess maybe the paperwork on it.

10   Q.    That's what he told you?

11   A.    Or that's what I assumed.  I really never got into the

12   details as to what his exact role was.

13   Q.    But you made an assumption he was acting as an attorney?

14   A.    Correct.

15   Q.    Did you ever go to Mexico with him when he was working on

16   this project?

17   A.    Yes.

18   Q.    Okay.  About how many times?

19   A.    About half a dozen times.

20   Q.    And when you would go, where would you stay?

21   A.    In hotels.

22   Q.    Would you stay in the same hotels that his business

23   partners were staying in?  In other words, did you meet them in

24   the hallway or did you go to dinner in the hotel with any of his

25   business partners?

1    A.    Maybe a couple of times we were in the same hotels, but I

2    can't be sure of all of the times.

3    Q.    Okay.  Now, did he ever mention Mitsubishi Power Systems

4    America to you?

5    A.    Yes.

6    Q.    In what capacity?

7    A.    I would just hear him on the phone and, you know,

8    Mitsubishi was one of the companies that was I guess as a part

9    of this bid.

10   Q.    And what about C.F.E. or the fideicomiso?

11   A.    The electrical company in Mexico?

12   Q.    Yes, any companies that you can recall mentioned was

13   involved.

14   A.    You know, he had business.  He would mention business all

15   over the world, so I can't tell you exactly what other

16   companies.

17   Q.    He mentioned business all over the world?

18   A.    Uh-huh.

19   Q.    Is that a yes?

20   A.    I'm sorry.  Yes.

21   Q.    Can't spell, uh-huh.

22   A.    I'm sorry.

23   Q.    Where else did he say he had business?

24   A.    He would go to France or Brazil.

25   Q.    Did you accompany him to France?

```
 1    A.    No.

 2    Q.    Did you accompany him to Brazil?

 3    A.    No, never.

 4    Q.    So how do you know that's where he was?

 5    A.    Oh, I don't know.

 6    Q.    But that's what he told you?

 7    A.    Correct.

 8    Q.    When you were in Mexico, did you ever accompany him to any

 9    of his client meetings?

10    A.    Yes.

11    Q.    Okay.  What meetings did you accompany him to?

12    A.    When he would have maybe breakfast or lunch.

13    Q.    With some of these people?

14    A.    With certain, yes, individuals.

15    Q.    Okay.  And did you -- who would be present at some of these

16    breakfasts or lunches?  First, let me start with Mr. Fernando?

17    A.    Fernando, sometimes.

18    Q.    Was he always at these breakfasts or lunches?

19    A.    No.

20    Q.    How much -- when would -- in relationship to over time,

21    when was Mr. Gireud present?

22    A.    Maybe in the beginning, part of whatever the project was.

23    Q.    Okay.  About how many times?

24    A.    A couple.

25    Q.    And how about Mr. Miller?  Was he over there when you were
```

1    at --

2    A.    No, I never saw him in Mexico.

3    Q.    Did you ever -- were there ever any people from Mitsubishi?

4    A.    Yes.

5    Q.    Do you remember meeting anybody from Mitsubishi?

6    A.    I do.

7    Q.    And do you remember their name?

8    A.    No.

9    Q.    Okay.  Do you remember meeting anybody from C.F.E.?

10   A.    Yes.

11   Q.    Do you remember their names?

12   A.    I don't.

13   Q.    Do you remember -- did you ever meet a man named Ramos?

14             MR. HANSHEW:  Objection, Your Honor.  She asked and

15   said no.

16             THE COURT:  The question was do you remember meeting a

17   man.  I'll overrule that objection.

18   BY MS. KANOF:

19   Q.    Did you ever --

20             MR. HANSHEW:  Her question, Judge, was do you remember

21   the name of anyone and now she's going to list off the names for

22   her to answer the questions.

23             THE COURT:  All right.  I'm overruling the objection.

24   BY MS. KANOF:

25   Q.    Did you ever meet a man named Ramos from C.F.E.?

1    A.    Yes.

2    Q.    Did you ever meet a man named Buendia?

3    A.    Yes.

4    Q.    Did you ever meet a man named Nereo Vargas?

5    A.    Yes.

6    Q.    When did you meet him?

7    A.    When?

8    Q.    Yes.  Did you meet him during the Agua Prieta project or a

9    different time?

10   A.    No, it was when he was doing this project.

11   Q.    And was Mr. Vargas present at the breakfasts or lunches

12   with Mitsubishi?

13   A.    No.

14   Q.    Was Mr. Vargas present at the breakfasts or lunches with

15   Fernando?

16   A.    I think once.

17   Q.    When you met with -- did you ever go to any meals with

18   Mr. Vargas and Mr. Delgado?

19   A.    Yes.

20   Q.    Did you ever go to any meals with Mr. Vargas and

21   Mr. Delgado where there were no other business partners present?

22   A.    Yes.

23   Q.    Okay.  Could you tell the grand [sic] jury -- I mean the

24   jury about that?  I'm sorry.

25   A.    About going?

DIRECT EXAMINATION NARVAEZ                                      177

1    Q.   Yes, about the circumstances.

2    A.   We would maybe meet for lunch or dinner in a restaurant or

3    in a certain venue and Mr. Vargas had his partner, his

4    girlfriend, I think.  She was, there.

5    Q.   Do you remember what she did for a living?

6    A.   I have no clue.  And I spoke a lot with her, but I don't

7    remember.  I'm sorry.  We would just go and have lunch or

8    dinner.

9    Q.   Did they talk business?

10   A.   Yes.

11   Q.   Did you pay attention?

12   A.   No.

13   Q.   Did you ever go to Mr. Vargas' office?

14   A.   Yes.

15   Q.   And when was that?  I'm not asking for a date.

16   A.   Yeah, I don't remember dates.

17   Q.   On one of these trips or more, how many times did you go to

18   Mr. Vargas' office?

19   A.   Two.  A couple of times.

20   Q.   And did you go with who?

21   A.   With Marco.

22   Q.   And did you go into Mr. Vargas' office with Marco?

23   A.   Well, we would go in and then I would wait and he would go

24   into a meeting with him and then I would be waiting outside in

25   the waiting room.

1    Q.    You didn't go into the meeting with Mr. Vargas?

2    A.    No.

3    Q.    Who did Mr. Delgado say Mr. Vargas was?

4    A.    Businessman.  He really never gave me the ins of who he was

5    exactly.  I don't know.

6    Q.    Did he say that he was part of the business with --

7               MR. HANSHEW:  Objection.  Leading.  She already

8    answered.

9               THE COURT:  Sustained.

10   BY MS. KANOF:

11   Q.    So during this project, how many times you went you said

12   about half a dozen times, how many of those half a dozen times

13   did Mr. Delgado meet with Mr. Vargas?

14   A.    Probably four, five.

15   Q.    Did Mr. Delgado ever mention to you that he hired

16   individuals to assist him in the project?

17   A.    No.

18   Q.    Did he ever mention a company called Ener Proyectos?

19   A.    No.

20   Q.    This e-mail, Government's Exhibit Number 85, you said you

21   didn't read it; is that correct?

22   A.    Correct.

23   Q.    Have you ever heard of Ener Proyectos before I asked you

24   about it?

25   A.    I haven't.

1    Q.    Did you ever go with Mr. Delgado to the C.F.E. building?

2    A.    Yes.

3    Q.    Did -- what did you do when you were at the C.F.E.

4    building?

5    A.    He would go and meet with different people there.

6    Q.    Did you ever go with Mr. Delgado with individuals that were

7    involved in the Agua Prieta business to Las Vegas?

8    A.    Yes.

9    Q.    Okay.  Who went on that trip?

10   A.    It was Fernando and his wife and Mr. Vargas and his

11   girlfriend and Mr. Zaragosa and his wife and Marco and I.

12   Q.    Was Mr. Gireud there?

13   A.    Yes.

14   Q.    And did you go on a trip in July of 2011 with Mr. Delgado

15   to Florence, Italy?

16   A.    Yes.

17   Q.    Was that a business trip?

18   A.    No, it was a family trip.

19   Q.    Who went on that trip?

20   A.    His mom.  His brothers, myself, my daughter.  His cousin.

21   The cousin's son.

22   Q.    Do you know who Paul Foster is?

23   A.    Uh-huh.  I'm sorry, yes.

24   Q.    Were Paul Foster's parents with you on that trip?

25   A.    No.

```
 1              MR. HANSHEW:  Mischaracterization.  She sayings --
 2              THE COURT:  No, she answered no.  She's the witness.
 3  BY MS. KANOF:
 4  Q.   At the end -- how did that trip end?  What was the last
 5  place that you visited?
 6  A.   The last place was Switzerland and that's when some of us
 7  flew back to the United States.  Not everybody.
 8  Q.   Why did you go to Switzerland?
 9  A.   To pick up his daughter from summer camp.
10  Q.   Did Mr. Delgado complain to you about not having money?
11  A.   No.
12  Q.   Did you ask him for money?
13  A.   I'm sure I did.  I don't remember.
14  Q.   Did he ever tell you he didn't have to give it to you?
15  A.   No.
16  Q.   Did he ever tell you he had an account, a bank account in
17  the Turks and Caicos --
18  A.   No.
19  Q.   -- islands?
20  A.   No.
21  Q.   At no time did he ever mention a Turks and Caicos Island
22  bank account?  I'm not asking to say when.  I'm just asking if
23  he ever mentioned it?
24  A.   A bank account?
25  Q.   Or money in the Turks and Caicos?
```

1   A.   No.

2   Q.   Who is Gabriel Larraguivel Delgado?

3   A.   He's an architect and I guess slash builder that lives in

4   Texcoco, Estado de Mexico.

5   Q.   Could you spell that for the Court reporter please?

6   A.   T-E-X-C-O-C-O and then E-D-O- period D-E [sic] and then the

7   word Mexico.

8   Q.   I'm displaying to you what's been marked as Government's

9   Exhibit Number 141.  Do you recognize that e-mail and its

10  attachments?

11  A.   Yes.

12  Q.   Was that an e-mail sent to you?

13  A.   Yes.

14        MS. KANOF:  Move that Government's Exhibit 141 be

15  admitted into evidence.

16        THE COURT:  Mr. Hanshew?

17        MR. HANSHEW:  No, objection.

18        THE COURT:  141 is admitted.

19        MS. KANOF:  And also 141A, the English translation.

20        THE COURT:  Mr. Hanshew?

21        MR. HANSHEW:  No, objection.

22        THE COURT:  141A is admitted.

23  BY MS. KANOF:

24  Q.   Okay.  What is this document?

25  A.   It's the proposal of a project that Mr. -- de Gabriel -- to

1    model the home that belongs to Marco's parents.

2    Q.    Where is that home located?

3    A.    In Texcoco.

4    Q.    Do they actually live here in El Paso?

5    A.    Yes.  They live here and the mother would go back and forth

6    because this is the house where they all grew up in.

7    Q.    This e-mail is sent to you; is that correct?

8    A.    Yes.

9    Q.    Why are you receiving the e-mail with the invoice?

10   A.    I think he was just doing it for --

11   Q.    I don't want you to guess, if you don't know, but -- and

12   who is he?

13   A.    The architect.

14   Q.    Okay.

15   A.    For formality he would e-mail Marco and myself.

16   Q.    Do you have any of the e-mails that he sent to Marco?

17   A.    I don't know.  Maybe.  I haven't really checked.

18   Q.    But that's your recollection that he would also?

19   A.    Well, yes, because Marco and I would discuss, you know, him

20   sending the proposal or whatever and we would talk about it.

21   Q.    I'm going to go to the English version, 141A.  And so he

22   sent this to you; is that correct?

23   A.    Uh-huh.  I'm sorry, yes.

24   Q.    And it was an estimate for Mr. Delgado; is that correct?

25   A.    Correct.

1    Q.    What does he say?

2    A.    He says, house is going Liliana and Marco.  I'm sending you

3    the observations made after reviewing observations made by you.

4    For any questions, we will be in contact.  Your visit to the

5    work site the is a bit complicated.  Soon I will send you photos

6    of the progress.

7    Q.    And then attached to that, do you recognize the date is

8    January 14th?  Do you know what year that is?

9    A.    I don't recall.  Maybe it's on the e-mail.  I don't know.

10   Q.    This date is your transmission to the government, correct?

11   That's not the date --

12   A.    Yeah, no.

13              MR. HANSHEW:  Objection.  Leading.

14              THE COURT:  Sustained.

15   BY MS. KANOF:

16   Q.    Do you recognize this as being in pesos?

17   A.    Yes.

18   Q.    And is this one -- were there more than one invoices or

19   estimates?

20   A.    There were two, yes.

21   Q.    Okay.  Then let me show you Government's Exhibit

22   Number 140.

23              MS. KANOF:  Your Honor, which did I admit before?  Was

24   it 140?

25              THE COURT:  You admitted two and it was 141 and 141A.

1    BY MS. KANOF:

2    Q.   Now I'm going to show you Ms. Narvaez Government's Exhibit

3    Number 140 from this same gentleman to you.

4    A.   Can you go up so I can see the heading please?

5    Q.   Yes.

6              Is that you're e-mail address?

7    A.   Yes.

8              MS. KANOF:  Move admission of Government's Exhibit

9    Number 140 and 140A the English translation into evidence.

10             MR. HANSHEW:  No objection.

11             THE COURT:  GX140 and 140A are admitted.

12   BY MS. KANOF:

13   Q.   And let me switch to the English version.  Is this actually

14   from you or from Mr. Delgado?

15   A.   It's from Mr. Delgado.

16   Q.   But the response is to your e-mail; is that correct?

17   A.   Yes.

18   Q.   And what is the arch -- what is the architect indicating to

19   Mr. Delgado or what is Mr. Delgado indicating to the architect?

20   A.   It's, greetings.  The band just informed me that given the

21   international nature of the transfer, they need additional

22   information from you in order to make payment as soon as

23   possible.  I'm attaching the request, which I ask you to fill

24   out as is, so as to avoid any delay in the work.  Thank you so

25   much.  Please confirm receipt by this text.  Regards.

DIRECT EXAMINATION NARVAEZ                                    185

1    Q.    Okay.  And did he ask for wiring information?  Do you know?

2    Or do you know what this is?

3    A.    No.

4    Q.    Now, with regard to the international nature of the

5    transfer, you were in receipt of this e-mail, correct?

6    A.    Correct.

7    Q.    And what does Mr. Delgado, if you know, referring to about

8    the international nature of the transfer?

9    A.    I don't know.  I wasn't aware of this e-mail.

10   Q.    Well, it's sent to you or you have it.

11   A.    I think he sent it through my e-mail, but I had not seen

12   this.

13   Q.    Oh, he sent it through your e-mail?

14   A.    Well, that's my e-mail address.

15   Q.    And this was in your SBC Global e-mail account?

16   A.    Correct.

17   Q.    That's how you were able to provide it to the government?

18   A.    Correct.

19   Q.    Did you have access to use your e-mail account?

20   A.    Yeah.

21         THE COURT:  "Yes" or "no" please.

22   A.    Yes.

23   BY MS. KANOF:

24   Q.    Okay.  Let me show you what's been marked and admitted into

25   evidence as Government's Exhibit Number 2.  Do you remember when

1    you first -- about what time you first went to Mexico and

2    started talking to Mr. Delgado's architect about renovating

3    Mr. Delgado's, the defendant's home, a parent's home?

4    A.   2000 -- well, I'm seeing here the date.  I don't recall

5    exactly.  It's sometime around 2009, 2010.

6    Q.   Okay.  And I'm drawing your attention to Government's

7    Exhibits Number 2, to the 11th of June of 2010.  Do you see --

8    is that the name of the individual we're talking about that I've

9    highlighted?

10   A.   Yes.

11   Q.   And do you see $52,000 being paid to him June 11th?

12   A.   Yes.

13   Q.   Do you know if that's the payment of a receipt an invoice?

14   A.   I don't know.

15   Q.   Well, next to it says reference loan.

16            MR. HANSHEW:  Objection, Your Honor.  She answered.

17   She said no.

18            THE COURT:  Well, she can test her knowledge.  I'll

19   overrule the objection.

20   BY MS. KANOF:

21   Q.   Do you know whether or not Mr. Delgado had borrowed money

22   from this individual?

23   A.   No, I don't know.

24   Q.   On July 21st of 2010, another $50,000 to the same

25   individual, again, reference loan.  So now that's $102,000 to

1    that individual.  Do you recall whether he -- did you discuss

2    with Mr. Delgado how much this renovation was going to cost?

3    A.   I didn't because the he was paying for it, so...

4    Q.   So you didn't pay attention?

5    A.   Not really.

6    Q.   Okay.  Again, on August 11th, a $40,000 payment to this

7    gentleman.  It's the same gentleman, correct?

8    A.   Correct.

9    Q.   But it says, reference, a loan?

10   A.   Uh-huh.  Yes.

11   Q.   Okay.  So that's now $142,000.  Do you -- what -- did you

12   ever go and see this house?

13   A.   Yes.

14   Q.   Okay.  Was it -- describe it?

15   A.   It was the home where -- the house that belongs to Marco's

16   parents and this is the home where they grew up.  It's in the

17   outskirts of Mexico City and it was a normal size home and Marco

18   wanted to update it and remodel it for his mom.

19   Q.   Let me jump forward a little bit.  Do you know how much --

20   eventually, Mr. Delgado bought a house that you-all were

21   supposed to live in when you got married, correct?

22   A.   Correct.

23   Q.   Do you know how much was spent to remodel that house here

24   in El Paso?

25   A.   I have an approximate.

1   Q.   How much approximately?

2   A.   The remodel cost?

3   Q.   Yes.

4   A.   Maybe $100,000.

5   Q.   Is the house here in El Paso that he remodeled a more

6   expensive house than the one in Mexico?

7   A.   No.

8   Q.   No?  So the next payment, September 7th, 2010, to the same

9   individual, reference, loan, $150,000.  Do you see that?

10  A.   Uh-huh.  Yes.

11  Q.   All right.  So not the greatest mathematician, but

12  $292,000, correct?

13  A.   Correct.

14  Q.   On the 8th of October, again, reference loan, to -- this is

15  the same architect, right?

16  A.   Correct.

17  Q.   Another $45,000; is that correct?

18  A.   Correct.

19  Q.   On December 10th, another $45,000 to him reference a loan,

20  correct?

21  A.   Correct.

22  Q.   On March 7th of 2011, $83,000 to -- is that the same

23  architect individual?

24  A.   Yes.

25  Q.   Okay.  And I have lost count of the total, but how about

1    December 16 of 2011, was there another $36,000 to him reference

2    a loan?

3    A.    Yes.

4    Q.    And on July 13th of 2012, another $14,826 reference a loan?

5    A.    Correct.

6    Q.    I think that's more than 200,000.  I'm not a mathematician,

7    but you're in sales, aren't you?

8    A.    Yes.

9    Q.    Is that a fair estimate, over $200,000 for the renovation

10   that were done at his parents' house?

11   A.    Well, the house had been -- was in very bad condition and

12   they pretty much had to -- they knocked down walls.  They --

13   they re-did a lot of it and they added a lot to it.  They

14   expanded.  So, I mean it is a lot of money, but they did a lot

15   of work.  It was a long project.

16   Q.    Did you see it finished?

17   A.    Yes.

18   Q.    We started to talk about -- did you ever meet Linda

19   Medlock?

20   A.    Yes.

21   Q.    And I'll show you Government's Exhibit Number 141.

22         In addition to your e-mail address, and I'm not going

23   to take the jury's time to look at it, but was your street

24   address on this, if I can recall, on some of these invoices from

25   the architect, your personal street address?

1    A.    I don't recall.

2    Q.    At some point in time, did you and Mr. Delgado go shopping

3    for a ski cabin?

4    A.    Yes.

5    Q.    And did he purchase it?

6    A.    Yes.

7    Q.    Where?

8    A.    In Taos, New Mexico.

9    Q.    And can you just talk about the circumstances surrounding

10   that?

11   A.    We were spending a weekend in Taos and Marcos is an avid

12   skier, and so he was looking for a good deal, a repo, something

13   he could purchase.

14   Q.    Okay.  And was that -- and did he purchase it?

15   A.    Yes.

16   Q.    And was it located in Taos, New Mexico?

17   A.    Yes.

18   Q.    Okay.

19            MS. KANOF:  Your Honor, we have a self-proving

20   affidavit for the title records for the Condo Heart condominium,

21   Government's Exhibit 150 and we'd move it into evidence.

22            MR. HANSHEW:  No objection.

23            THE COURT:  150?

24            MS. KANOF:  150.

25            THE COURT:  These were admitted through Mr. Gireud.

```
 1                MS. KANOF:  I'm sorry.
 2     BY MS. KANOF:
 3     Q.    And let me just ask you, is that a picture of the front
 4     door of Condo Heart.
 5     A.    Yes.
 6     Q.    And that would be Government's Exhibit Number 153, do you
 7     recognize it?
 8                THE COURT:  That's -- that's not in evidence.
 9                MS. KANOF:  I know, Your Honor.  I'm going to move it
10     right now.  We move admission of Government's Exhibit 153.
11                MR. HANSHEW:  No, objection, Your Honor.
12                THE COURT:  153 is admitted.
13     BY MS. KANOF:
14     Q.    Did you -- you talked about a minute ago about a house here
15     in El Paso.  Could you tell the jury about purchasing a house
16     with Mr. Delgado?
17     A.    Yes.  Marco and I were engaged to be married and we were
18     looking for a house for a couple of years, actually, and then I
19     found one that I was driving by and I called him to come and
20     look at it and we liked it and then we called the realtor to
21     come and show it to us.
22     Q.    And what happened?
23     A.    And --
24     Q.    How did it turnout?
25     A.    You mean the remodeling?
```

```
 1    Q.    No.  Did he buy it?

 2    A.    Oh, yes.

 3    Q.    He purchased the house; is that correct?

 4    A.    Yes.

 5    Q.    Okay.  And what -- tell now to the jury about the

 6    remodeling.

 7    A.    Well, it was a house that was outdated, so Marco hired a

 8    gentleman and with the help of an interior decorator remodeled

 9    the house.

10    Q.    Did you assist him in that endeavor?

11    A.    Yes.

12    Q.    In what way did you assist him?

13    A.    I found the house.

14    Q.    I mean in the remodeling?

15    A.    Yes.  Well, Marco had contact with the decorator.  She had

16    done prior projects with him, so he went to her immediately and,

17    of course, I would sit with her with, you know, picking out

18    furniture or materials and things like that.

19          MS. KANOF:  We move admission --

20    Q.    I'm showing you -- you're the only one that can see it --

21    Government's Exhibit Number 157.  Is that a photograph of the

22    front of the house on Cerrito Feliz here in El Paso?

23    A.    Yes, it is.

24    Q.    Okay.

25          MS. KANOF:  We'd move admission of 157, with the
```

1     exception of that one photograph, Your Honor.

2              MR. HANSHEW:  Your Honor, we're going to object.

3     These photos are being presented to try to inflame the jury

4     about the expenses in the home.  We've already stipulated to all

5     of the items they're going to show are items that were -- that

6     came from the accountant.  There's no reason to go through this,

7     Judge.

8              THE COURT:  That objection is overruled and 157 is

9     admitted.

10    BY MS. KANOF:

11    Q.   Okay.  Is that the front of the house?

12    A.   Yes.

13    Q.   That you -- did you and Mr. Delgado purchase it together?

14    A.   No.

15    Q.   What happened there?

16    A.   He bought it.  It's only under his name.

17    Q.   Did you expect to be on the title?

18    A.   Yes, I think I did.  But he -- he said it was going to be

19    somehow a part of his law firm or something with business, so

20    that it couldn't have my name on it, only his.

21    Q.   So the first photograph -- let me just ask you, are you

22    aware that -- tell me how Charlotte's Furniture was involved in

23    the decorating of the house?

24    A.   Well, the interior decorator I was telling you about helped

25    Marco in prior projects was the one that helped us with this

1    house and she works for Charlotte's.

2    Q.   And of course you didn't seem to be interested in the

3    expenses.  Do you know how much money was spent at Charlotte's?

4    A.   Well, now I do, because I just saw it on the list.

5    Q.   You just saw part of it?

6         Government's Exhibit Number 2, let me get some of this

7    yellow stuff off of here real quick.

8         So first, the purchase of the house, would it be

9    consistent with your memory that the house was purchased on May

10   19th?

11        MR. HANSHEW:  Objection, Your Honor.  This line of

12   questioning is leading and she's showing her and we already

13   heard her answer:  Well, now I know, because I'm looking at the

14   screen you're highlighting.  I mean, she's testifying.

15        THE COURT:  Sustained.

16   BY MS. KANOF:

17   Q.   I draw your attention -- do you remember when the house was

18   purchased?

19   A.   2010.

20   Q.   And you said that you didn't know about the Turks and

21   Caicos account; is that correct?

22   A.   Correct.

23   Q.   Do you know how the house was paid for?

24   A.   I know it was cash, because I saw the contract, but that's

25   all.

1    Q.   So we were starting to talk about Charlotte's.  Tell us

2    about what you know about the involvement of Charlotte's

3    Furniture in the house?

4    A.   Well, the interior decorator bought 90 percent of

5    everything from Charlotte's to decorate the house.

6    Q.   Did you go to Charlotte's?

7    A.   Yes, a couple of times I went to Charlotte's and then other

8    time she would bring catalogs or send e-mails with pictures and

9    things like that.

10   Q.   Were you -- did you accompany Mr. Delgado or did you do it

11   yourself?

12   A.   No, we -- in the beginning we went together and then I

13   would make -- like if we were together, I would decide, if we

14   were to part he would decide, so...

15   Q.   Okay.  So let's first look at this first photograph.  And

16   the photographs do have numbers on them.  If I could get rid of

17   that display at the bottom.  This is photograph number two.

18   What portion of the house is that?

19   A.   This is the interior of the foyer.

20   Q.   What items in this photograph were purchased from

21   Charlotte's?

22   A.   Everything except the artwork.

23   Q.   This painting?

24   A.   Uh-huh.

25   Q.   Everything else; is that correct?

1    A.    Correct.

2    Q.    The rugs, also?

3    A.    Yes.

4    Q.    Okay.  Picture number three, what part of the house was

5    this?

6    A.    This is the formal living room and dining room.

7    Q.    And what items in this room were purchased from

8    Charlotte's?

9    A.    Everything except the draperies.

10   Q.    And would that include the lamps, the mirrors and the items

11   on top of the tables?

12   A.    The small decorations were not all from Charlotte's, but

13   all of the furniture was.

14   Q.    Government -- page number four, what part of the home is

15   this?

16   A.    This is the family room.

17   Q.    And what items in this room were purchased at Charlotte's?

18   A.    Everything except the artwork and that little front table

19   that you see right there, the -- that you just see a glance.

20   No, not --

21   Q.    This little one here?

22   A.    That one and the little chair on the right.

23   Q.    This chair and table and that piece of artwork were not

24   from Charlotte's; is that correct?

25   A.    Correct.

DIRECT EXAMINATION NARVAEZ                                         197

1    Q.   What this is number six?  What room is this?

2    A.   It's also the formal living and dining.  It's just from

3    another side.

4    Q.   Had we seen this furniture already?

5    A.   Yes.

6    Q.   Number seven, what is this?

7    A.   This is the master bedroom.

8    Q.   And what pieces -- what items in this photograph were

9    purchased at Charlotte's?

10   A.   Everything except the mattress and the TV.

11   Q.   Picture number eight is -- what part of the house is that?

12   A.   This is part of the master.  It's like a sitting area in

13   the master.

14   Q.   And what items in that photograph were purchased at

15   Charlotte's?

16   A.   Everything except the artwork and the floor arrangement.

17   Q.   Number nine, did you -- was this -- well, what is this a

18   photograph of?

19   A.   The master bathroom.

20   Q.   And was that part of the refurbish ment of the house that

21   was done after the purchase?

22   A.   Yes.

23   Q.   And is there anything in there from Charlotte's?

24   A.   The little bench, the rug.

25   Q.   Is that another view of the same?

1    A.    Yeah, the same thing another view.

2    Q.    Number 11?

3    A.    This is one of the bedrooms.

4    Q.    Any items in that there not from Charlotte's?

5    A.    Yes, the swinging chair.

6    Q.    It's from Pier One, isn't it?

7              MR. HANSHEW:  Objection.

8              THE COURT:  Sustained.

9    BY MS. KANOF:

10   Q.    And what else is not from --

11   A.    Um, the work -- the artwork.

12   Q.    These two pieces of artwork?

13   A.    Correct.

14   Q.    In this particular -- what room is this?

15   A.    This is another bedroom.

16   Q.    Is there anything in here that's from Charlotte's?  Is the

17   rug from Charlotte's?

18   A.    The rug and the lamp, maybe.

19   Q.    What is this?

20   A.    This is the -- it's kind of like a second master that's

21   towards the back of the room.

22   Q.    And any items here purchased at Charlotte's?

23   A.    Maybe just the chair at the desk.

24   Q.    In this photograph, above the bed there is a cloth poster.

25   What is that?

1    A.   It's a poster of Bowdoin University and that's the school

2    where one of Marco's sons attended, university.

3    Q.   Picture number 14?

4    A.   This is the backyard.

5    Q.   Was that extensively renovated as well?

6    A.   Yes, it was.

7    Q.   15?

8    A.   This is the patio and the outdoor kitchen and the backyard.

9    Q.   Was that added as well?

10   A.   Yes, it was.

11   Q.   Number 16?

12   A.   This is the -- what do you call that swing?  The hammock

13   and the pool.

14   Q.   Could you tell the jury a little bit about the pool?  Was

15   there something unique about the pool?

16   A.   Yes.  The pool was an infinity pool, so it had -- I don't

17   know if you can notice on the right-hand side like two bowls

18   that water would drop down from and then it had a back

19   waterfall.

20   Q.   Photo number 17, what part of the house is that?

21   A.   This is part of the family room.

22   Q.   And are there any items in that photograph that were

23   purchased at Charlotte's?

24   A.   All of those items except the artwork.

25   Q.   Except this?

1    A.    Correct.

2    Q.    Photo number 18, what part of the house is that?

3    A.    That's part of the formal dining room.

4    Q.    Any items purchased at Charlotte's?

5    A.    Yes, everything except the floral arrangement.

6    Q.    Number 19, what part of the house is that?

7    A.    This is a piece that was in the formal living room.

8    Q.    And anything in that photograph that was purchased from

9    Charlotte's?

10   A.    That furniture piece.

11   Q.    Number 20?

12         MR. HANSHEW:  Again, Your Honor, I'm going to object.

13   This is cumulative.  I think the jury has got the idea that the

14   house is full of property from Charlotte's Furniture.  They

15   don't need to waste everyone's time.

16         THE COURT:  That objection is overruled.

17   BY MS. KANOF:

18   Q.    Photograph number 20, what part is this?

19   A.    This is part of the foyer.

20   Q.    And what if anything in that photograph was purchased at

21   Charlotte's?

22   A.    Everything except the artwork.

23   Q.    Number 21, was that a piece of furniture purchased at

24   Charlotte's?

25   A.    Yes.

1   Q.   Number 22, was that piece of furniture purchased at

2   Charlotte's?

3   A.   Yes.

4   Q.   Number 23, was that piece of furniture purchased at

5   Charlotte's?

6   A.   Yes.

7   Q.   Number 24, was that piece of furniture purchased at

8   Charlotte's?

9   A.   Yes.

10   Q.   What about the elephant?

11   A.   Yes.

12   Q.   Number 25, were all three of those pieces of furniture and

13   rug purchased at Charlotte's?

14   A.   Yes.

15   Q.   Number 26, what is that?

16   A.   A chandelier.

17   Q.   And was it purchased at Charlotte's?

18   A.   Yes.

19   Q.   How about the artwork, no?

20   A.   No.

21   Q.   And number 27, what is that?

22   A.   A chandelier.

23   Q.   Purchased at Charlotte's?

24   A.   Yes.

25   Q.   How about the artwork?

1    A.   No.

2    Q.   Number 28, what is that photograph of?

3    A.   It's the family room.  That's a sofa, the carpet or the rug

4    with a table and the two chairs.

5    Q.   Was the table and the rug purchased at Charlotte's?

6    Because I think we saw pictures of the other things.

7    A.   Yes, uh-huh.

8    Q.   And I think we've already seen that one.

9         Number 30, what part of the house is that?

10   A.   That's part of the formal dining room.

11   Q.   And was that purchased at Charlotte's?

12   A.   Yes.

13   Q.   Number 31, what is that?

14   A.   That's part of the formal living room.

15   Q.   And what items were purchased at Charlotte's?

16   A.   All of them.

17   Q.   And number 32?

18   A.   Yes.

19   Q.   What is that?

20   A.   An elephant.

21   Q.   Do you remember how much that elephant costs?

22   A.   I have no clue.

23   Q.   Number 33?

24   A.   That's a brown statue.

25   Q.   Of?

1    A.   Of a horse.

2    Q.   Does Mr. Delgado have horses?

3    A.   Yes.

4    Q.   How many?

5    A.   Three.

6    Q.   And was this brown statue purchased at Charlotte's?

7    A.   Yes.

8    Q.   How about this number 34, bronze statue of a horse?

9    A.   Yes.

10   Q.   And the table that it's none?

11   A.   Also.

12   Q.   What about the artwork?

13   A.   No.

14   Q.   Number 35, were these and the rug purchased at Charlotte's?

15   A.   Yes.

16   Q.   Number 36, was this piece of furniture that the horse's

17   head is sitting on purchased at Charlotte's?

18   A.   Yes.

19   Q.   The artwork?

20   A.   No.

21   Q.   Number 37, this is a different table and rug.  Were those

22   purchased at Charlotte's?

23   A.   Yes.

24   Q.   And what is number 38?

25   A.   Purchased at Charlotte's.

1    Q.   What is it?

2    A.   Oh, it's a fireplace cover and the little broom and shovel

3    for the fireplace.

4    Q.   Do you have any idea how much that cost?

5    A.   No.

6    Q.   Number 39, what room is that?

7    A.   That is part of the master bedroom, Marco's office.

8    Q.   Was that -- I guess is that a desk?

9    A.   Yes.

10   Q.   And was that purchased at Charlotte's?

11   A.   Yes.

12   Q.   And what is this?

13   A.   This is a --

14   Q.   Number 40.

15   A.   A cabinet with drawers.  It looks like an old fashioned

16   file cabinet, but it's a cabinet.

17   Q.   Is it an antique?

18   A.   I think it's made to look like an antique.

19   Q.   So did all of those drawers open?

20   A.   No.

21   Q.   Is there a -- was that purchased at Charlotte's?

22   A.   Yes.

23   Q.   There's something on top of that cabinet.  Do you recognize

24   what that is?

25   A.   A printer.

1    Q.   So, did Mr. Delgado have his own printer?

2    A.   Yes.

3    Q.   But why were you printing for him then?

4    A.   Well, we didn't have this house when I was printing for

5    him.

6    Q.   Picture Number 41, what part of the house is that?

7    A.   This is the sitting room in the master bedroom.

8    Q.   And what items were purchased from Charlotte's?

9    A.   Everything.

10   Q.   Including the tapestry?

11   A.   Correct.

12   Q.   In addition to that during this time period, did

13   Mr. Delgado also buy some vehicles?

14   A.   Did I and Mr. Delgado or did Mr. Delgado?

15   Q.   Mr. Del- -- I -- did you and Mr. Delgado?  I don't know,

16   did you?

17   A.   No, not me.

18   Q.   Did Mr. Delgado buy some vehicles?

19   A.   Yes.

20   Q.   Did he buy a Chevy from Rudolph Chevrolet?  Do you

21   remember?

22   A.   I was never with him, but I saw the vehicles once they were

23   purchased around the house.

24   Q.   I'll show you the photo an a second.

25            MS. KANOF:  We'd move admission of Government's

1    Exhibit Number 148, the title documents from Rudolph Chevrolet.

2    There's a self-proving affidavit.

3              THE COURT:  Any objection?

4              MR. HANSHEW:  No, objection.

5              THE COURT:  GX-148 is admitted.

6    BY MS. KANOF:

7    Q.   Did he purchase a Land Rover?

8    A.   Yes.

9              MS. KANOF:  We'd move admission of Government's

10   Exhibit Number 149, the title papers to the Land Rover, Your

11   Honor.  There's a self-proving affidavit.

12             MR. HANSHEW:  No objection, Your Honor.

13             THE COURT:  GX-149 is admitted.

14   BY MS. KANOF:

15   Q.   And did he buy a Jeep?

16   A.   Yes.

17             MS. KANOF:  Move admission -- well, wait.

18   BY MS. KANOF:

19   Q.   Before I do that, let me show you some photographs.

20             I show you Government's Exhibit Number 155.  Do you

21   recognize what's depicted in that photograph?

22   A.   Yes.

23             MS. KANOF:  Your Honor, we move Government's Exhibit

24   155 into evidence.

25             MR. HANSHEW:  No, objection.

```
 1              THE COURT:  GX-155 is admitted.

 2   BY MS. KANOF:

 3   Q.   Is it on your screen?

 4   A.   Correct.

 5   Q.   What is it?

 6   A.   A Range Rover.

 7   Q.   I'm sorry.  I think said a Land Rover?  It's a Range Rover?

 8   A.   Correct.

 9   Q.   Mr. Delgado purchased that?

10   A.   Yes.

11   Q.   For whom?

12   A.   For himself.

13   Q.   Government's Exhibit Number 156, do you recognize that

14   photo?

15   A.   Yes.

16   Q.   And what's depicted in it?

17   A.   A Suburban.

18              MS. KANOF:  Wed move Government's Exhibit 156 into

19   evidence?

20              THE COURT:  Any objection?

21              MR. HANSHEW:  No, objection.

22              THE COURT:  GX-156 is admitted in evidence.

23   BY MS. KANOF:

24   Q.   And who did Mr. Delgado purchase that Suburban for?

25   A.   For himself and the family.
```

1    Q.   Government's Exhibit Number 154, do you recognize what's

2    depicted in that photo?

3    A.   Yes.

4    Q.   Is it one of the vehicles we're talking about?

5    A.   Yes.

6          MS. KANOF:  I move Government's Exhibit 154 into

7    evidence, Your Honor.

8          MR. HANSHEW:  No objection, Your Honor.

9          THE COURT:  GX-154 is admitted.

10         MS. KANOF:  May we publish, Your Honor?

11         THE COURT:  Yes, ma'am.

12   BY MS. KANOF:

13   Q.   And is that the Jeep that he bought at the time?

14   A.   Yes.

15   Q.   And for who?

16   A.   His son.

17   Q.   You have talked about a lot of renovations that were made

18   to the house; is that correct?

19   A.   Yes.

20   Q.   Were you with Mr. Delgado when some of these contractors

21   were seeking to be paid?

22   A.   Well, they would sometimes ask me, if you see him please

23   remind him that we need the weekly payment or whatever.

24   Q.   And how did he respond?  Did you tell him?

25   A.   Yes.

1    Q.    Okay.  Do you know whether or not he responded and

2    contacted those individuals?

3    A.    I don't know.

4              MS. KANOF:  A moment, Your Honor?

5              Pass the witness.

6              THE COURT:  Before we begin, Mr. Hanshew, let's go

7    ahead and take a recess.  I'd ask the jury to be back in the

8    jury room at 4:10.  We'll resume our proceedings at 4:10.

9              COURT SECURITY OFFICER:  All rise.

10             (Break at 3:55 p.m. to 4:13 p.m.)

11             THE COURT:  Let the record reflect that all members of

12   the jury are present, the United States through its assistant

13   United State's attorneys are present, the defendant and counsel

14   is present.

15             The witness, Ms. Narvaez, is on the witness stand.

16             Mr. Hanshew?

17             MR. HANSHEW:  Thank you, Your Honor.

18                        LILIANA NARVAEZ,

19              CROSS-EXAMINATION BY THE DEFENDANT

20   BY MR. HANSHEW:

21   Q.    Good afternoon, Ms. Narvaez.

22   A.    Good afternoon.

23   Q.    Is it fair to say you like Charlotte's Furniture, right?

24   A.    Yes.

25   Q.    And then you were asked earlier about how many times you

1    went to Mexico City with Mr. Delgado related to Agua Prieta,

2    correct?

3    A.   Correct.

4    Q.   And you said about at least six times you went there?

5    A.   Uh-huh, yes.

6    Q.   And when you were there, did you help set up a war room, a

7    suite at a hotel?

8    A.   Well, they had a few days before they had to turn in this

9    paperwork, whenever it was due, so Marco had kind of like a

10   suite-style hotel with a big table, so everybody can be working,

11   checking whatever needed to be turned in.

12   Q.   The documents that they were going to turn in?

13   A.   Correct.

14   Q.   Okay.  And you helped put those together as well?

15   A.   Yes, I was copying and making binders.

16   Q.   And Fernando Gireud was there?

17   A.   Yes.

18   Q.   And he was going through these documents as well?

19   A.   Fernando, I guess he was there, but he would always go --

20   we had to use multiple copy machines around the hotel.

21   Q.   Right.

22   A.   And we kept on making them jam, because we were copying so

23   many documents, so he would run to one copy center and i would

24   run to another and we were making lots of copies.

25   Q.   The day when these documents were being taken for the

 1    delivery, Mr. Gireud went a long, correct?

 2    A.   I believe so.  I can't -- we were up all night long, so I

 3    remember at the end they all ran out, because they had to go

 4    turn this in, and I don't know exactly who was in the vehicle

 5    and who wasn't.  I don't know.

 6    Q.   So this was -- this was a night and day project that you

 7    were --

 8    A.   It was.  They were working around the clock, yes.

 9    Q.   And Mr. Delgado was working night and day on the project?

10    A.   Yes.

11    Q.   Thank you.

12              MR. HANSHEW:  No further questions.

13              THE COURT:  All right.

14              Ms. Kanof?

15              MS. KANOF:  Your Honor, I don't have anything further.

16              THE COURT:  May Ms. Narvaez be permanently excused?

17              MS. KANOF:  Yes, Your Honor.

18              MR. HANSHEW:  Yes, Your Honor.

19              THE COURT:  Ms. Narvaez, thank you, ma'am, for coming

20    down.  You're free to go.

21              (Witness excused.)

22              THE COURT:  Who is your next witness?

23              MR. ARREOLA:  Your Honor, the government calls Mace

24    Miller.

25              (Witness present and sworn by the Court.)

1          THE COURT:  All right.  Ms. Arreola?

2                         MACE MILLER,

3          DIRECT EXAMINATION BY THE GOVERNMENT

4    BY MS. ARREOLA:

5    Q.   Good afternoon, sir.  Please introduce yourself to the

6    jury.

7    A.   My name is Mace Miller.

8    Q.   Can you briefly describe your educational background?

9    A.   I have an accounting degree from UTEP.  I have an MBA from

10   UTEP and I have a law degree from Texas Tech.

11   Q.   When were you graduate from a Texas Tech?

12   A.   1994.

13   Q.   Can you briefly walk us through your work history after law

14   school up until 2009?

15   A.   After school, I came back here to practice law locally.

16   I'm originally from El Paso.  And I practiced a firm called

17   Miller and Hays and we did primarily construction work and

18   estate planning and tax planning.

19          After doing that till about 1998, I began to work with

20   a financial service firm here locally and then in 2001 I became

21   a principal with Raymond James, which is a financial service

22   firm as well.

23          From 2001 to 2006, I served in that capacity with

24   Raymond James Financial Services.  From 2006 to about 2008, I

25   was a managing member of a hedge fund by the name of Coronado

1   Capital Advisors.  I also ran a -- or owned and represented

2   legally a third-party logistics, which is a transportation

3   company.

4   Q.   Did you have any professional licenses?

5   A.   I've had various Series 7, Series 24, Series 6 financial

6   services license and licensed attorney.

7   Q.   And currently what professional licenses do you have at

8   this point?

9   A.   I'm not practicing law right now.  I'm a licensed attorney,

10  but I'm not practicing law.

11  Q.   Did you have a proffer agreement from the government?

12  A.   I did.  Yes, I did.

13  Q.   I would like to direct your attention to F.G.G.  Did there

14  come a time when you became involved with F.G.G.?

15  A.   I did.  Yes, I became involved with F.G.G. through --

16  Fernando Gireud was working at my family's business and was

17  going to eventually be the president of my family's business.

18  Fernando was very competent professionally.  And he formed

19  F.G.G. Enterprises and that's how I became acquainted with

20  F.G.G.

21  Q.   And when he approached you -- is he the one that approached

22  you about F.G.G.?

23  A.   Yes.

24  Q.   And when he approached you was it about any specific

25  project?

1    A.    Yes.   It was about the, what I would call, the Agua Prieta

2    project as related to furnishing equipment and long-term service

3    agreement for C.F.E.

4    Q.    Did you agree to work on that?

5    A.    I did.

6    Q.    What was your role going to be?

7    A.    I was going to represent the company domestically.  By

8    domestically, I mean in the United States.  I was going to

9    interface with Mitsubishi Power Systems.  And probably most

10   importantly I was going to arrange for, given my background, and

11   if we got the project, transportation, customs and so forth.

12   Q.    Okay.  And did you agree to work on the project?

13   A.    I did.

14   Q.    Did you become F.G.G.'s counsel?

15   A.    I did, yes.

16   Q.    Did F.G.G. have any other attorneys?

17   A.    Yes.  Marco Delgado was also an attorney for F.G.G.

18   Q.    Did you know Marco Delgado when you became involved with

19   F.G.G.?

20   A.    I knew of him, a little bit.  We had passed occasionally,

21   but I didn't know him intimately.

22   Q.    Did you have any prior business dealings with him?

23   A.    No.

24   Q.    Why did F.G.G. need two attorneys?

25   A.    Marco was going to handle the -- Marco had experience

1    handling projects in Mexico, specifically with C.F.E.  He would

2    take -- he would be handling all of the work down in Mexico.

3    And I would be handling the work primarily in the United States,

4    as for as the transportation issues go, that would be my

5    responsibility.

6    Q.   Okay.  And were you and Marco similarly situated with

7    respect to being outside counsel or inside counsel?

8    A.   I certainly think we both started as outside counsel and

9    there was a time where I became working -- I -- this was

10   consuming for me and I actually became inside general counsel.

11   Q.   What is the different between inside and outside counsel?

12   A.   Inside counsel is you're almost always just working on this

13   project trying to handle administrative matters.  And outside

14   counsel you have an agreement as an attorney to provide service

15   to that entity.

16   Q.   Once you became involved, did there become a time where

17   F.G.G. entered into an agreement with Mitsubishi Power Systems

18   America or M.P.S.A.?

19   A.   Yes.

20   Q.   What was the agreement?

21   A.   It was a title teaming agreement between F.G.G.

22   Enterprises, LLC and Mitsubishi Power Systems.

23   Q.   Government's Exhibit 7, do you recognize this?

24   A.   I recognize this, the title.  Yes, I don't have the whole

25   document in front of me, but I recognize the title, yes.

1    Q.   Okay.  If you'd like to look at the documents, there's a

2    series binders in front of you and you're welcome to pull out

3    the entire document if you'd like.

4    A.   This looks like the teaming agreement between F.G.G. and

5    Mitsubishi.

6    Q.   What role, if any, did you play in the drafting or

7    negotiating of the teaming agreement?

8    A.   Quite a bit.  Several conversations, a dialog about certain

9    terms and conditions.  This was the -- this was a very important

10   document for F.G.G.

11   Q.   And what was the purpose of the teaming agreement?

12   A.   The teaming agreement was to set out roles and

13   responsibilities that related to the Agua Prieta-C.F.E. project.

14   Q.   Did the teaming agreement create a letters of credit

15   provision?

16   A.   Excuse me?

17   Q.   Did the teaming agreement create any terms regarding

18   letters of credit?

19   A.   Not to my knowledge.  The responsibility to provide letters

20   of credit by F.G.G. or Mitsubishi, is that the question?

21   Q.   Yes, sir.  Do you recall?

22   A.   Yeah.  F.G.G. was going to be providing letters of credit

23   and Mitsubishi Power Systems was not.

24   Q.   Okay.  I'm going to ask you to take a look at a provision

25   in the teaming agreement at page four.  Can you read that

1    paragraph and we'll follow along?

2    A.   Sure.  F.G.G. will also provide any letters of credit

3    required by the R.F.P. for the supply of equipment and services

4    and cause the financing required by the R.F.P. to be provided or

5    cause C.F.E. to waive such requirement as appropriate.  F.G.G.

6    will not be responsible for letters of credit or financing for

7    the L.T.S.A.

8    Q.   Okay.  So can you briefly explain what the letters of

9    credit were?

10   A.   Okay.  F.G.G. was bidding to C.F.E., and one of the

11   conditions that F.G.G. had to satisfy was to provide these

12   letters of credit for the benefit of C.F.E.

13            The letters of credit are a mechanism, a financial

14   instrument, whereby if something went wrong with the project,

15   that C.F.E. could go hit that with, what I would say, go and

16   make a claim against that letters of credit and damages could be

17   paid from that letter of credit.

18   Q.   All right.  Now this agreement -- this teaming agreement

19   references a letter of credit for the supply of equipment and

20   services, and then in the next sentence references a letter of

21   credit for the L.T.S.A.  Can you explain the difference between

22   those two letters of credit?

23   A.   Sure.  There were two contracts awarded; one was for the

24   equipment and services, the other was for a long-term service

25   agreement.  There were two distinct contracts but awarded with

DIRECT MILLER                                                    218

1    the same bidding mechanism.  As you read here, F.G.G. will

2    provide any letters of credit required by the R.F.P. for the

3    supply of equipment and services.

4          So that particular letter of credit was associated

5    with bringing the gear over here, bringing the equipment over

6    here, getting it on the right spot, making sure it wasn't

7    damaged, making sure that the goods that C.F.E. was paying for

8    was exactly what in fact they received.  And so the equipment

9    and services letter of credit was for that type of situation.

10         And then the L.T.S.A., which again the acronym [sic]

11   is long-term service agreement, that was a separate letter of

12   credit.  And in this teaming agreement it was contemplated that

13   Mitsubishi would provide -- be providing the long-term service

14   agreement and F.G.G. therefore would not be responsible for the

15   letters of credit for the L.T.S.A.

16   Q.   Okay.  The sentence also refers to financing for the

17   equipment and services contract.  With a was the difference

18   between financing and letters of credit?

19   A.   C.F.E. wanted, in their bid process they wanted to see if

20   the provider could provide a financing mechanism to buy the

21   equipment, okay, to -- not unlike a car loan, can you provide

22   the financing so we can buy the equipment.  That is completely

23   different.

24         A letters of credit would be more like, okay, if

25   something is wrong with the car, can I go hit something like a

1    warranty or letter of credit there in case there are any issues

2    with the equipment, issues with F.G.G. performing their

3    obligations under the contract.

4    Q.   I'm going to scroll down and I'm going to read a section

5    and then ask you a question.

6            F.G.G. shall, at its cost and expense, cause its legal

7    counsel, Marco Delgado, to provide -- and I'm going to jump to

8    subsection B -- provide initial liaison between F.G.G. and

9    C.F.E.  And then under Subsection E:  Act as liaison between

10   C.F.E. and F.G.G. and shall be responsible for assisting F.G.G.

11   in developing a working relationship with C.F.E. and support the

12   team throughout the performance of the equipment prime contract.

13           Why did the teaming agreement provide a specific

14   provision stating in substance that Marco Delgado would act as a

15   liaison between C.F.E. and F.G.G.?

16   A.   It was thought to be important to have a -- definitive

17   roles outlined, and specifically Marco had experience with

18   regard to this and it was thought best to have one point of

19   contact with C.F.E. so that a lot of information doesn't get

20   crossed up.  And frankly, he was the -- he was the most logical

21   individual within F.G.G. or with any of service providers to

22   handle that kind of thing.

23   Q.   Do you speak Spanish, sir?

24   A.   No.

25   Q.   And is that actually what happened, is Marco the person who

1    became the liaison between C.F.E. and F.G.G.?

2    A.    Certainly Marco was the liaison between F.G.G. and C.F.E.,

3    yes.

4    Q.    What, if anything, did Marco tell you about the Mexican

5    side of the project, the side dealing with Mexico?

6    A.    The Mexican side of the project was his responsibility and

7    he would take care of it.

8    Q.    What if anything did he say about who this project belongs

9    to?

10   A.    Marco I think felt that he was doing the brunt of the work

11   and the project was, you know, most rightfully his; that he was

12   handling the interface with C.F.E. and he was doing the brunt of

13   the work, so he felt like it was his project, primarily.

14   Q.    And what does that based -- understanding based on?

15   A.    Just conversations we had within the group.

16   Q.    I'm going to direct your attention to Government

17   Exhibit 12.  Now, this is a Spanish language document.  I'm

18   going to show you the English version in a second.  Do you

19   recognize this from the first page?

20   A.    I recognize the title of the document, yes.  I recognize

21   what it is.

22   Q.    I'm going to show you the English version.  What do you

23   recognize this document to be?

24   A.    This is an agreement, a subcontract agreement whereby

25   Mitsubishi would provide F.G.G. with the gear, the generators

DIRECT MILLER                                                    221

1    and the steam turbo generator.

2    Q.   Okay.  And what role, if any, did you play in the

3    negotiating or the drafting of the contract?

4    A.   I was at the meeting when this contract was being

5    negotiated.  Interestingly enough, this was negotiated in Mexico

6    City, even though this is an agreement between a United States

7    company and another United States company with a Japanese

8    parent.  And I was present in the meeting when this contract was

9    being negotiated.

10   Q.   All right.  And was this entered into after the teaming

11   agreement?

12   A.   Yes, this was after.

13   Q.   What was the purpose of this subcontract?

14   A.   Just to outline the terms and conditions whereby F.G.G.

15   would acquire the equipment from Mitsubishi.

16   Q.   Did it define the different obligations and promises

17   between the parties?

18   A.   To the extent that I remember, yes, it did.

19   Q.   Okay.  And did this subcontract give Mitsubishi Power

20   Systems America any responsibility for the letter of credit for

21   the equipment contract?

22   A.   No.

23   Q.   And if either party had agreed -- if Mitsubishi had agreed

24   to provide something of value, would that have been provided in

25   the subcontract?

1    A.   I'm sorry.  I didn't hear you.

2    Q.   Oh, let me strike that question.

3         If Mitsubishi had agreed to provide the letter of

4    credit or be responsible for the letter of credit, is that

5    something the parties would have included in the subcontract?

6    A.   Yes, this would be an appropriate document for that

7    obligation.

8    Q.   Now you testified -- you testified a moment ago that F.G.G.

9    was responsible for the letters of credit for the equipment

10   contract; is that right?

11   A.   Correct.

12   Q.   Did you take any steps to try to get the letter of credit

13   for the equipment contract?

14   A.   I did.  Actually, I called several banks, inquired about

15   the cost of the letter of credit and inquired about exactly what

16   type of arrangement would be necessary for us to get that letter

17   of credit.  We met with private individuals to see if they would

18   post the letter of credit on behalf of F.G.G.  And so, yes, the

19   answer to your question is yes, I did take a role in that.

20   Q.   When you say you called banks, how much did they quote you

21   for the letter of credit?

22   A.   Typically, one to two percent, provided it was a standby

23   letter of credit.  The letter of credit is -- is basically, if

24   it's a $20 million of credit, you need to have $20 million and

25   then they'll charge you a percentage to issue that letter of

DIRECT MILLER                                                    223

1    credit say one to two percent.

2    Q.    Can you say in dollar terms how much that was?

3    A.    That would -- you know that would be if you added an

4    existing banking relationship, it could be $400,000 if you had

5    the 20 million.  The 20 million could still be in -- it's still

6    yours, you could have an account and the 20 million is still

7    yours, but if the bank was going to issue a standby letter of

8    credit based upon that asset, they're going to charge you

9    between 200 to $400,000.

10   Q.    Were you successful in getting the letter of credit?

11   A.    No.

12   Q.    Why not?

13   A.    Well, primarily because F.G.G. didn't have $20 million,

14   number one.  So the first most logical deal would have been,

15   hey, I got $20 million, issue me this letter of credit.

16           Secondarily, if you don't have the $20 million, you

17   can get other individuals to post that for you, give them some

18   sort of payment for that or business interest for that, but I

19   was not successful in securing that type of arrangement.

20   Q.    After you called the banks, did Marco Delgado at any time

21   indicate that he had found a solution to the letter of credit?

22   A.    Marco and I talked about the letter of credit and, yes, he

23   indicated that he had found a solution.

24   Q.    Okay.  Can you tell us about that conversation?  Where was

25   it and where were you?

DIRECT MILLER                                                    224

1    A.   Marco was trying to get an alternative to the letter of

2    credit.  The letter of credit was really what was required.  But

3    he -- and actually, I believe that it was -- it maybe not have

4    been Marco's idea.  It may have been one of the owners of the --

5    Rick Williamson's idea, at least that's what I was told, to

6    maybe pledge the equipment, the existing equipment, pledge the

7    equipment in lieu of the letter of credit.  And so that would

8    mean, hey, if you guys screw up, I am going to have the

9    equipment, I'm going to have a pledge agreement for the -- in

10   lieu of the letter of credit.

11   Q.   Who told you this?

12   A.   Marco had told me that he had -- that John Adams had agreed

13   to pledge the equipment and this was good news.

14   Q.   And where were you when Marco told you that John Adams

15   agreed to pledge the agreement?

16   A.   I remember that everybody was in Mexico City.  I was

17   standing on my balcony.  This was good news.  And so I remember

18   the conversation distinctly.

19   Q.   Now, did John Adams tell you that he had agreed to pledge

20   the equipment?

21   A.   No, he did not.

22   Q.   Did you ever have any conversations with John Adams

23   discussing a pledge of the equipment?

24   A.   No.  I, myself, did not.

25   Q.   Okay.  Did you reach out to Mitsubishi Power Systems

DIRECT MILLER                                                      225

1    America to confirm whether or not they were going to agree to

2    pledge the equipment?

3    A.   I didn't have to reach out to them.  They sent various

4    correspondence basically stating that they were not interested

5    in doing that.

6    Q.   Okay.  So after you began -- we're going to take a look at

7    that correspondence in a moment -- but after Mitsubishi

8    indicated in that correspondence they were not going to pledge

9    the equipment, what happened?

10   A.   After it game apparent that they were in the going to

11   pledge the equipment, this was -- there had to be alternatives

12   for this letter of credit.  The letter of credit had to be

13   posted.  And Marco stated that he had found a solution for the

14   letter of credit, Actually was going to get the letter of credit

15   issued by another party.

16   Q.   And who was that other party?

17   A.   I believe the other party was the Union in Mexico.

18   Q.   What did Marco say about the Union in Mexico?

19   A.   That they would be -- that they were -- they had that kind

20   of money and that they would be able to post that and have a

21   letter of credit issued, and it was going to be good for the

22   Union as well, because apparently union workers were going to

23   work on this and so it made sense.

24   Q.   Okay.  So at some point did the conversation change from a

25   pledge to the Union?

1    A.   At some point when it came apparent that, hey, these guys

2    don't want to pledge this equipment, they have to do -- we have

3    to do something else, so, yeah, then it became again a letter of

4    credit conversation.

5    Q.   Okay.  I'm going to ask you to take a look at Government

6    Exhibit 14.

7    A.   Okay.

8    Q.   And then I'm going to scroll through here and ask you if

9    you recognize it?

10   A.   Yeah, I recognize it.

11   Q.   Okay.  And do you see a reference in here to an equipment

12   inspection?

13   A.   Give me one second, please.  There it is.  That makes it

14   easier to find.  Uh-huh.

15   Q.   Did you have any conversations with Marco Delgado about an

16   equipment inspection?

17   A.   I did, actually.  I was in El Paso.  And I can't remember

18   where Marco was.  He was away and I was -- there needed to be an

19   equipment inspection for due diligence purposes.  And it was at

20   a very inopportune time of the year.  I can't see the date on

21   this, but if I recall, it was around Christmas, and certainly

22   during the holiday season and C.F.E. wanted to inspect the

23   equipment and that was very difficult to arrange.

24   Q.   Did Marco Delgado indicate to you why the equipment

25   inspection needed to get done at that time?

DIRECT MILLER                                                    227

```
1    A.   Due diligence as far as awarding the bid and that was it.

2    Q.   Did he indicate whether the equipment inspection had

3    anything to do with a pledge of Mitsubishi's equipment?

4    A.   No.

5    Q.   I'm going to read from this document and then ask you a

6    question.

7    A.   Okay.

8    Q.   Mitsubishi is once again very concerned about the

9    informality of F.G.G.'s action on this project and the failure

10   to respect M.P.S.A.'s request for information.  Specifically, we

11   are suspicious about, A, the short notice and apparent urgency

12   for M.P.S.A. to support equipment inspections during end of your

13   holidays and, B, F.G.G.'s failure to provide prime contract

14   documentation which we have requested repeatedly.  And I'm going

15   to jump down to one, paragraph one.

16        The equipment inspection issue leads us to suspect

17   F.G.G. may be offering existing M.P.S.A. equipment as collateral

18   for financial guarantees that are the responsibility of F.G.G.

19   This is unacceptable to M.P.S.A., therefore, please confirm that

20   M.P.S.A.'s equipment is not being negotiated or offered to

21   anyone as collateral and that no liens or restrictions of any

22   kind are being discussed with any third parties.

23        Is this the type of letter that indicated to you that

24   Mitsubishi did not want to pledge its equipment?

25   A.   Yes.  Very, very expressly, yes.
```

DIRECT MILLER                                                    228

1    Q.    Okay.  And at any time did any official from Mitsubishi

2    discuss pledging the equipment with you?

3    A.    Me?  No.

4    Q.    When Marco told you about using the Union as a means of a

5    letter of credit, did he say how that would get paid for?

6    A.    It would have to be paid for out of the proceeds of the

7    project.

8    Q.    And at some point in time, did he indicate to you he had

9    gotten the letter of credit?

10   A.    He did.  He indicated that he had secured the letter of

11   credit and was going to have to be paid for out of -- out of, as

12   I said, the proceeds of the equipment.

13   Q.    Did you ask him for a copy of the letter of credit?

14   A.    Many times.

15   Q.    And what was his response?

16   A.    He would get it to me.  He's going to get it to me.

17   Q.    Did you hear Fernando Gireud ask for a letter of credit?

18   A.    Fernando asked for it as many times or more than I did.

19   Q.    Did you ever see a letter of credit?

20   A.    I never saw a letter of credit, no.

21   Q.    Did Marco ever indicate to you that he had obtained a

22   pledge of equipment from Mitsubishi?  A formal pledge of

23   equipment.

24   A.    A formal -- the only time I learned about that was from

25   Mitsubishi themselves.

```
1   Q.   And that was approximately 2011?

2   A.   I would imagine there was some correspondence, but yeah, I

3   learned about that from Mitsubishi themselves.

4   Q.   Okay.  So we'll get to that in a few minutes.

5   A.   Okay.

6   Q.   I'd ask you to take a look at Government's Exhibit 15.  Can

7   you take a look at this and tell me if you recognize it?

8   A.   Yes, I recognize it.

9   Q.   Is this an e-mail from Mr. Delgado to you and Fernando

10  Gireud?

11  A.   Yes, ma'am.

12  Q.   And is the e-mail date sent, December 30th, 2009?

13  A.   Yes.

14  Q.   I'm going to read the first line.  Hoping the holiday

15  season finds you well.  I'm writing to update you with regard to

16  the reference matter and to respond to relevant issue raised by

17  your correspondence dated December 28th, 2009.

18         Is this a draft letter to respond to the

19  December 28th, 2009 letter that we just looked at?

20  A.   Can you go back up?

21  Q.   Yes, certainly.  We can go back to the other exhibit if you

22  would like.

23  A.   Just up on this one, between the e-mail and that.

24  Q.   This way?

25  A.   Yes, perfect.  Thank you.  Okay.  Yes.  The answer to your
```

DIRECT MILLER                                                    230

1    question is, yes, this would be the response to -- to that

2    correspondence.

3    Q.   I'm going to ask you to take a look at paragraph two and

4    read that quietly to yourself.

5    A.   Okay.  I've read that paragraph.

6    Q.   I'm going to read a sentence from here and then ask you a

7    question about this paragraph.

8              The sense of urgency of the inspection was and is

9    F.G.G. driven in attempt to modify payment terms prior to

10   execution of financing facility because otherwise the process

11   will prove more bureaucratic.

12             What was your understanding of what Marco was saying

13   regarding the reason for the inspection?

14   A.   Just as stated in the preface to the highlighted part, in

15   order to accelerate the payment, which would help with the

16   transportation negotiation from the lender, that's why I came on

17   so quickly, was my understanding of what it meant.

18   Q.   Did Marco -- in any way, did Mr. Delgado -- excuse me -- in

19   any way indicated in this paragraph that the purpose of the

20   equipment inspection was in order to pledge Mitsubishi's

21   equipment?

22   A.   No.

23   Q.   I'm going to read a line out of the paragraph below or a

24   sentence from the paragraph below.

25             Regarding item one of your letter, please be advised

1    that although the inspection of equipment is not tied to any

2    pending encumbrance on the M.P.S.A. equipment sold to F.G.G., as

3    previously discussed, a lien will be placed in favor of the

4    C.F.E., but at no time will this lien serve as collateral for

5    the financing or the need of letter of credit.

6              Did Mitsubishi ever agree to the placement of a lien

7    on its property?

8    A.   Not to my knowledge.

9    Q.   I'm going to ask you to take a look at Government

10   Exhibit 35.

11             MS. ARREOLA:  Your Honor, may I have one moment,

12   please?

13             THE COURT:  Yes, ma'am.

14   BY MS. ARREOLA:

15   Q.   Okay.  Let's go back to Government Exhibit 35.  I apologize

16   for the delay.

17   A.   Okay.

18   Q.   Can you take a look at this exhibit and tell me if you

19   recognize it?

20   A.   I do, yes.

21   Q.   I'm going to scroll down and look at the attachment to

22   this.  Is this attachment of the January 12th, 2010, letter from

23   John Adams to Mr. Gireud?

24   A.   Yes, ma'am.

25   Q.   And going back up to the e-mail, is this an e-mail from

DIRECT MILLER                                                    232

1   Marco Delgado to you and to Fernando?

2   A.   Yes.

3   Q.   And the e-mail dated January 12th, 2010?

4   A.   Correct.

5   Q.   Okay.  And in this e-mail, I'm going to read it to you and

6   ask you a question.

7           Señor Mace, it's all yours.  Arigato (Japanese).

8           What was your understanding of what Mr. Delgado was

9   asking or telling you to do with this?

10  A.   Probably deal with it in some way.  I would have to look at

11  the letter in more detail.  I can only see this.

12  Q.   Let's go ahead and look at the attachment.

13  A.   So I was not copied on that.  That would be the first time

14  that I'm seeing that.

15  Q.   I'm going to read from this letter and then ask you a

16  question.

17          Please address the following --

18          MS. FRANCO:  Your Honor, if I may, he said he wasn't

19  copied on it.  It's the first time he's seen it.  How is he

20  going to testify?

21          THE COURT:  We'll, he's seeing it now.

22  BY MS. ARREOLA:

23  Q.   Can you clarify that, sir, because on the first page it

24  indicates that it says from Marco Delgado to Ann Miller.  Is

25  that your me ail address?

1    A.    No, the e-mail, I did -- I get -- I got e-mailed the

2    letter.  There's a point of reference is why it was being sent

3    to me, which you asked me that question because I wasn't

4    addressed on the letter, the actual letter.

5    Q.    All right.  Was the letter attached to this e-mail that

6    Fernando sent to you?

7    A.    Marco sent me the e-mail.

8    Q.    Sorry.  Pardon me.

9    A.    Yes.

10   Q.    Was the letter attached to the e-mails from Mr. Delgado?

11   A.    Yes, yes.  Exactly.  I was just trying to provide some

12   clarification as to why it was sent to me.

13   Q.    When you indicated that it had -- you were seeing it for

14   the first time, did you mean that you hadn't been copied on the

15   letter when it was initially sent from Mr. Ponce to Mr. Gireud

16   or January 12th?

17   A.    Exactly.  That was exactly what I was saying.  And I was

18   not copied on the top of the letter.

19   Q.    All right, sir.  Thank you.

20   A.    Sorry about that confusion.

21   Q.    So I'm going to read a sentence from this here and then ask

22   you a question.

23         Please address the following items for our review, so

24   we can reach agreement as quickly as possible.

25         Is it your understanding that Mitsubishi was asking

DIRECT MILLER                                                        234

1    for a response from F.G.G. on the items listed in this letter?

2    A.   Sure, yes.

3    Q.   I'm going to read two sentences in this letter under

4    paragraph five.

5              Please confirm with a letter of credit is required to

6    guarantee this equipment contract.  Please confirm that F.G.G.

7    is posting such letter of credit and the date by which it was to

8    be posted to satisfy the contract.

9              I'm going to jump below.

10             We had already agreed that M.P.S.A. will not provide

11   any letter of credit for either contract.  Please confirm F.G.G.

12   will not ask M.P.S.A. to guarantee equipment or service

13   obligations via any letter of credit.

14             What was your understanding when you saw this letter

15   about the letters of credit?

16   A.   That they're not going to be doing it and F.G.G. -- it's

17   F.G.G.'s responsibility and it needs to be figured out.

18   Q.   And is this another example of Mitsubishi making clear at

19   the time to you that it was not responsible for the letters of

20   credit?

21   A.   Exactly, yes.

22   Q.   Government's Exhibit 40.  Actually 40A, the English

23   translation.  Is this an e-mail from Mr. Gireud to Mr. Ponce

24   copying Mr. Delgado?

25   A.   It seems to be, yes.

1   Q.   And is the date sent indicated February 11th, 2010?

2   A.   Yes, that's what I'm reading.

3   Q.   I'm going to scroll down to the attached letter.

4            Is this the date on the letter, January 30th, 2010?

5   A.   Yes, ma'am.

6   Q.   And that is a few days after, when the e-mail was sent a

7   few days after the date on that letter; is that correct?

8   A.   Yes, ma'am.  Yes.

9   Q.   And is the letter from F.G.G. to Mr. Adams?

10  A.   Yes, it is.

11  Q.   I'm going to read from the first line of the letter.

12           We are in receipt of your January 12th, 2010,

13  correspondence wherein you delineate several items requiring

14  clarification.

15           Does this letter respond to the January 12th, 2010,

16  letter that we just saw in the e-mail where Marco wrote, Señor

17  Mace, it's all yours?

18  A.   Yes.

19  Q.   I'm going to read from a paragraph of this letter and then

20  ask you a question.

21           All conditions precedent and obligations post-bid

22  award have been met by F.G.G.  M.P.S.A. will not be responsible

23  for any letter of credit.

24           Where did this information come from that all

25  conditions precedent and obligations post-bid have been met by

1    F.G.G.?

2    A.   From Marco.

3    Q.   And it writes here:  M.P.S.A. will not be responsible for

4    any letter of credit.  Is that -- that language, was it your

5    understanding that that language would have answered any of

6    Mitsubishi's concerns about its equipment being pledged?

7    A.   It certainly, very definitively states that they will not

8    be responsible for any of the, in my mind, conditions of the

9    contract, specifically, the letter of credit.

10   Q.   I'm going to scroll back up to the e-mail, which was

11   originally in Spanish and we're looking at the translation.

12        Mr. Gireud writes:  Hector, here is the response to

13   John's letter.  Forgive the delay, but we had to review it with

14   the Mexican attorneys and they're a bit slow.

15        Did you have any contact with any Mexican attorneys at

16   this time?

17   A.   I did, but much later in the process.

18   Q.   And at this time, February 2010, did you have any contact

19   with any Mexican attorneys?

20   A.   I personally did not.

21   Q.   And do you know who from F.G.G. contacted Mexican

22   attorneys, if anybody?

23   A.   At this stage of the game, I didn't think anybody had been

24   in contact with Mexican attorneys, but that was not my deal.

25   But I don't think anybody had contact with Mexican attorneys at

DIRECT MILLER                                                                237

```
1    that time.
2    Q.   So you don't know who's being referred to in this e-mail?
3    A.   I don't.
4    Q.   I'm going to ask you to take a look at Government
5    Exhibit 21?
6    A.   Okay.
7    Q.   Do you see that this is a January 10th, 2010 letter on
8    Mitsubishi letterhead addressed to Mr. Gireud with a copy to
9    Mr. Delgado?
10   A.   Yes, ma'am.
11   Q.   Can you take a look at this, the contents of letter and let
12   me know when you're done?
13   A.   Okay.  Okay.  I've read the letter.
14   Q.   When was the first time you saw this letter?
15   A.   I believe when I was reviewing it with your office.
16   Q.   At the U.S. Attorney's Office?
17   A.   Yes.
18   Q.   You testified that you asked Marco Delgado for a copy of
19   the letter of credit; is that correct?
20   A.   Sure, many times, yes.
21   Q.   And when you asked him for it many times, did he ever tell
22   you about this January 10th, 2010 letter?
23   A.   He didn't tell me about this.  At one point he told me that
24   they had agreed to a pledge, but he didn't tell me that there
25   was a document actually written in this these terms.
```

1    Q.    He never showed this document to you?

2    A.    No.

3    Q.    And he never told you about it?

4    A.    No.

5    Q.    Now you're and attorney for F.G.G.  In your view, was this

6    type of letter sufficient to permit F.G.G. to go forward and

7    pledge to Mitsubishi's equipment?

8    A.    No.  I would say that if somebody -- if I am C.F.E., okay,

9    and I want a pledge from somebody, I would require the owner of

10   that equipment to give me an attested to, 100 percent, no holds

11   barred pledge.  And so in my mind, if I'm C.F.E., I would not

12   accept that.

13   Q.    And how much money had Mitsubishi Power Systems America

14   received from F.G.G. at this time, January 10th, 2010?

15   A.    I have no idea.  I would have to --

16   Q.    Are you aware of them receiving any money at this time?

17   A.    To be 100 percent accurate, I'd have to look at documents.

18   Q.    Now as far as you know, did Mitsubishi Power Systems

19   America ever give F.G.G. permission to pledge its equipment?

20   A.    The only thing I heard about, that was from Marco telling

21   me that they agreed to it, but, no, my personal independent

22   knowledge I never saw them give permission.

23   Q.    And did Mitsubishi Power Systems America, as far as you

24   know, ever agree to satisfy the letter of credit requirement for

25   F.G.G. for the equipment contract?

DIRECT MILLER                                                    239

1    A.   That's a 100 percent no.

2    Q.   Pardon?

3    A.   A 100 percent no.  There was never any discussion that they

4    were going to post any kind of letters of credit or if there was

5    a discussion, it would last for about two seconds and the answer

6    was no.

7    Q.   What written agreements did Mitsubishi have with F.G.G.?

8    A.   Well, we had a teaming agreement to initially set the

9    parameters of the relationship and then we had the subcontract

10   that was written in Spanish, and then I looked at the English

11   version here a few minutes ago.

12   Q.   Okay.  And in either of those agreements, did Mitsubishi

13   agree to provide the letter of credit for the equipment

14   contract?

15   A.   No.

16   Q.   And under either of those agreements, did Mitsubishi agree

17   to pledge it's equipment in lieu of the letter of credit for the

18   contract?

19   A.   No.

20   Q.   Now did there come a time that you learned that Mitsubishi

21   equipment had been pledged?

22   A.   Yes.

23   Q.   How did you learn that?

24   A.   I learned that through a phone all with Mitsubishi and then

25   various e-mails after that.

DIRECT MILLER                                                          240

1   Q.   When did -- when -- approximately, what year was this?

2   A.   Oh, I would have to look at specific documents.  It's

3   delineated in some e-mails.

4   Q.   Okay.  And do you remember who the phone call was with at

5   Mitsubishi?

6   A.   If my memory serves me correctly, it was with Patrick

7   Altamura, general counsel for Mitsubishi.

8   Q.   Okay.  And what did he say on the call and what did you

9   say?

10  A.   He said, basically --

11       MS. FRANCO:  Objection, Your Honor.  Calls for

12  hearsay.

13       THE COURT:  Sustained.

14  BY MS. ARREOLA:

15  Q.   I'm going to ask you to take a look at Government Exhibit

16  Number 93.

17  A.   Yes, ma'am.

18  Q.   Do you recognize this?

19  A.   Yes.  Yes, I do.

20  Q.   Okay.  So I'm going to -- excuse me one second.

21       At the bottom of this e-mail chain is there an e-mail

22  sent February 24th, 2011, from Kevin Beddard to -- excuse me --

23  Marco Delgado -- and do you know if you were a recipient of this

24  e-mail?

25  A.   It looks I am.  My name is in that chain.

KATHLEEN A. SUPNET, CSR

1    Q.   So I'm going to go ahead and read from this and ask you a

2    question.

3              Dear, sir, can you urgently confirm or rebut by return

4    if F.G.G. used our equipment as a guarantee in a pledge

5    agreement with C.F.E. in place of a letter of credit?  Please be

6    informed that M.P.S.A. is the sole owner of the title to the

7    equipment until receipt of payment in full.  Your urgent reply

8    is required by return.

9              Did I read that correct?

10   A.   Yes, ma'am.

11   Q.   Was the phone call that you received from counsel for

12   Mitsubishi notifying you about the pledge, was it around this

13   time period, February 24th, 2011?

14   A.   Yes, ma'am.

15   Q.   So did you learn about the pledge at around -- first

16   learned about the pledge at around this time?

17   A.   It would be around that time, yes.

18   Q.   And in response to that e-mail from Mr. Beddard, what did

19   you say?

20   A.   I'll read it.  I said, Kevin, who are you quoting?  If you

21   recall in the last e-mail there was some quotes.  I just spoke

22   to Fernando and he has no knowledge of deviation from the specs.

23   Mace.

24   Q.   So is it fair to say that on February 24, 2011, you had no

25   idea there was a pledge agreement for the equipment?

DIRECT MILLER                                                    242

1    A.   Yes, ma'am.  That's correct.

2    Q.   And what if anything did Fernando Gireud say to you about

3    his knowledge of a pledge of the equipment?

4         MS. FRANCO:  Objection, Your Honor.  Calls for

5    hearsay.

6         THE COURT:  Sustained.

7    BY MS. ARREOLA:

8    Q.   I'm going to ask you to take a look at Government Exhibit

9    94.  This is already in evidence.  And I'm going to ask you to

10   take a look at the contents of this e-mail.  Tell me when you're

11   done reviewing it.

12   A.   Okay.  Okay.

13   Q.   Okay.  Now do you see this is an e-mail from Marco Delgado

14   to Mr. Gireud and you are not copied on this; is that correct?

15   A.   That's correct.

16   Q.   And is the date February 25th, 2011?

17   A.   Yes, ma'am.

18   Q.   All right.  So I'm going to now show you Government

19   Exhibit 95.  I'm going to scroll down.  At the bottom of

20   Government Exhibit 95, do you see an e-mail from you to Fernando

21   dated February 28th?

22   A.   Yes, ma'am.

23   Q.   And in this e-mail, did you include the paragraphs that

24   were in the e-mail that we just looked at from Marco Delgado to

25   Fernando Gireud?

DIRECT MILLER                                                        243

1    A.   Yes, I did.

2    Q.   And did you -- have you looked at this before at the U.S.

3    Attorney's Office, these two e-mails together?

4    A.   I have, yes.

5    Q.   And is the e-mail -- did you copy exactly the e-mail that's

6    in Government Exhibit Number 94, which I will show you again?

7    Did you copy this e-mail exactly in the e-mail that you sent to

8    Mr. Gireud?

9    A.   Yes, it appears I did, yes.

10   Q.   Was there an additional paragraph in here?

11   A.   Yes, ma'am.

12   Q.   And is that the paragraph that begins:  Regarding another

13   matter?

14   A.   Correct.

15   Q.   All right.  So at some point, the e-mail that Marco Delgado

16   sent to Fernando Gireud with the response to Kevin somehow was

17   forwarded or reached you somehow; is that correct?

18   A.   Apparently, yes.

19   Q.   Okay.  And after you sent this e-mail from -- to Fernando

20   Gireud, did he then, according to this, did he then send it to

21   Marco Delgado?

22   A.   That's what it says in the text of the e-mail, so I assume

23   so.

24   Q.   At the top of the e-mail chain, do you see an e-mail from

25   Mr. Delgado to Mr. Gireud, copying you?

DIRECT MILLER                                                    244

```
 1    A.   Yes, ma'am.

 2    Q.   Okay.  And does he write está perfecto (Spanish)?

 3    A.   He does.

 4    Q.   All right.  So this e-mail, do you see it's dated

 5    February 2011?

 6    A.   Yes, ma'am.

 7    Q.   I'm now going to show you Government Exhibit Number 96.  Is

 8    this an e-mail from you to Kevin Beddard?

 9    A.   Yes.

10    Q.   And is Marco Delgado and Fernando Gireud, are they copied

11    on this e-mail?

12    A.   Yes, ma'am.

13    Q.   And this e-mail is dated February 28th, 2011; is that

14    right?

15    A.   Correct, yes.

16    Q.   And if you look at this e-mail, did you -- is this the

17    e-mail that we just looked at that was forwarded to Marco

18    Delgado where he responds está perfecto (Spanish)?

19    A.   Yes.

20    Q.   So let's go ahead and take a look at this e-mail, because

21    I'm going to ask you some questions about it.

22              So our computer seems to have died.

23    A.   I see that.

24    Q.   Or taking an early break for the weekend.  Let me see if I

25    can show you a hard copy.
```

1             MS. ARREOLA:  Your Honor, is Government Exhibit 96 not

2    in evidence?

3             THE COURT:  96 is not.

4             MS. KANOF:  Oh, I apologize that it was not shown to

5    the jury.

6             Your Honor, the government offers what's been marked

7    for identification as Government's 96.

8             MS. FRANCO:  No, objection, Your Honor.

9             THE COURT:  GX-96 is admitted.

10   BY MS. ARREOLA:

11   Q.   All right.  The computer is back up.

12             All right.  So I'm going to go ahead and highlight

13   some things about this e-mail to you.  This is -- is this an

14   e-mail to you from Mr. Beddard?

15   A.   Yes.

16   Q.   And did you copy Fernando and Mr. Delgado?

17   A.   Yes, ma'am.

18   Q.   Okay.  And is this a response to Kevin's earlier e-mail

19   asking you about the pledge?

20   A.   Yes.

21   Q.   All right.  Okay.  So I'm going to read from this and ask

22   you a question.

23             As reflected by your records in the copy of the

24   C.F.E.-F.G.G. Agua Prieta contract in your possession, pursuant

25   to John Adams' request and final approval, said equipment was

DIRECT MILLER                                                        246

1   pledged with a clear understanding that M.P.S.A. is the sole

2   owner to the title of the equipment until receipt of payment in

3   full.

4            Are you aware of any request by John Adams in final

5   approval by John Adams?  Let me withdraw that.

6            Did you ever receive any request for final approval

7   from John Adams to pledge the agreement?

8   A.   I, individually, did not.

9   Q.   Okay.  And why did you send this?

10  A.   Because that was the answer given to me by Marco and

11  Fernando.  At this point, I had to find out what was going on

12  and this is the answer they gave me.

13  Q.   You didn't have any personal knowledge or see anything to

14  support that John Adams had requested or given final approval

15  for pledge of the equipment?

16  A.   That's correct.

17  Q.   You were relying solely on that e-mail from Marco Delgado?

18  A.   Yes, ma'am.

19  Q.   During John's visit and negotiations with C.F.E. prior to

20  final execution of the contract, said agreement was reached and

21  memorialized as such.

22           Were you present during any visit by John Adams and

23  negotiations with C.F.E., in which an agreement was reached to

24  pledge the equipment?

25  A.   No.

DIRECT MILLER                                                    247

1    Q.    Let me continue on.

2          For further reference and clarification on any and all

3    of the technical, administrative or financial agreements related

4    to the Agua Prieta project, please refer to the copies of the

5    final agreement and its attachments that were approved and

6    signed page by page by John Adams in his capacity of M.P.S.A.,

7    officer in charge of the project and M.P.S.A.'s agent, Hector

8    Ponce.

9          Did you see any technical, administrative or financial

10   agreement in which the equipment -- Mitsubishi agrees to pledge

11   the equipment?

12   A.    I personally did not, no.

13   Q.    And there was a reference here to a final agreement and its

14   attachments that were approved and signed by John Adams.  What

15   is the final agreement being referred to here?

16   A.    I believe it's the final agreement between F.G.G. and

17   C.F.E., that's my understanding.

18   Q.    And do you know if John Adams was a signatory to that

19   contract?

20   A.    I did not know that.  No, he was not, but I had heard

21   previously that he was there when it was signed.

22   Q.    Did you understand that Mitsubishi was not a party to that

23   contract?

24   A.    Yes, ma'am.  They definitively were not.

25   Q.    Okay.  I'm going to now ask you to take a look at

1    Government Exhibit 97.  I'm going to ask you to take a look at

2    this and tell me if you recognize it?

3    A.   Yes.

4    Q.   Is the e-mail that we just looked at from you to

5    Mr. Beddard on February 28th, 2011?  Is that at the bottom of

6    this e-mail chain?

7    A.   Yes, ma'am.

8    Q.   And at the top of the e-mail chain, is that the top of the

9    response from Mr. Beddard to you?

10   A.   Yes, ma'am.

11   Q.   And did he also copy Mr. Delgado on that e-mail?

12   A.   Yes, ma'am.

13   Q.   So I'm going to read what Mr. Beddard wrote and then ask

14   you a question.

15        Mace, M.P.S.A. did not agree with your confusing and

16   vague explanation in your e-mail.  M.P.S.A. requires that F.G.G.

17   immediately, by return e-mail provide a copy of the specific

18   document which F.G.G. claimed contains John Adams' request and

19   final approval that the M.P.S.A. equipment be pledged in place

20   of a letter of credit which was to be procured by F.G.G.

21        What did you do in response to receiving this e-mail

22   from Mr. Beddard?

23   A.   My -- I imagined that I asked for the copy of the specific

24   document which contains John Adams' request and final approval.

25   Q.   And who did you make that request to, if you recall?

DIRECT MILLER                                                    249

```
 1    A.   I don't recall, frankly.

 2    Q.   Okay.  Did you ever receive --

 3    A.   It would have been Fernando or Marco.

 4    Q.   Did you ever receive any document which contained John

 5    Adams' request and final approval for the pledge of the

 6    equipment?

 7    A.   No.

 8    Q.   I'm going to now ask you to take a look at Government

 9    Exhibit 98.  Tell me if you recognize this.

10    A.   I do.

11    Q.   Is this an e-mail from Mr. Delgado to Kevin Beddard,

12    copying you, sent March 1st, 2011?

13    A.   Yes, ma'am.

14    Q.   And this is Mr. Delgado's response to Mr. Beddard's e-mail?

15    A.   Yes, it is.

16    Q.   Okay.  Can you read the response?  And then I'm going to

17    ask you a question.

18    A.   All right.  If M.P.S.A. agrees or not, that is their

19    problem.  Please refer to Adams' signed copy of the contract.

20    Q.   What was your understanding of the contract that

21    Mr. Delgado was referring to?

22    A.   I'm sure that I didn't quite understand that, but the

23    signed copy of the contract that I'm -- that I'm thinking that

24    is, is a contract between F.G.G. and C.F.E.

25    Q.   And was Mr. Adams a signatory on that contract?
```

DIRECT MILLER                                                        250

1    A.    No.

2    Q.    And was Mitsubishi a party to that contract?

3    A.    No.

4    Q.    I'm going to ask you -- did Mr. Delgado ever provide you a

5    signed contract in which Mitsubishi agreed to pledge its

6    equipment?

7    A.    No.  And maybe I was misinterpreting what -- a signed copy

8    of the contract.  That was my impression of what that meant.

9    Q.    I'm going to ask you to take a look at Government Exhibit

10   108.

11   A.    Yes.

12   Q.    Can you tell me if you recognize this?

13   A.    I do.

14   Q.    Is this an e-mail from you to Mr. Beddard, copying

15   Mr. Delgado?

16   A.    It is.

17   Q.    And was this sent March 21st?

18   A.    Yes.

19   Q.    So I'm going to go ahead and read from this and ask you

20   some questions.  Or actually, I'm going to ask you to read and

21   we'll read along with you.  If you can start at the beginning?

22   A.    Dear Kevin, regarding your electronic communication dated

23   March 17th, 2011, dealing with the referenced matter, I have

24   been instructed by F.G.G.'s board of directors to advise you of

25   the following information given M.P.S.A.'s attempt to -- and I'm

1   sorry, the little deal is in the way.  What does that say -- and

2   misconstrue the facts -- oh -- obfuscate and misconstrue the

3   facts.

4   Q.   So let me stop you there.  Who is F.G.G.'s board of

5   directors?

6   A.   F.G.G. is a single member LLC.  There's only one.  There's

7   only one board that's essentially Fernando.

8   Q.   Okay.  And did you write this e-mail?

9   A.   Fernando Gireud.

10  Q.   Did you write this e-mail, sir?

11  A.   I don't know.  I sent it.  It -- I probably did.

12  Q.   Okay.  Does this sound like the type of letter you would

13  write?  Do you use this type of language?

14  A.   Well, I've never used the word obfuscate in my entire life

15  and, honestly, I don't know what it means.

16  Q.   And how about Mr. Gireud, does he write like that?

17  A.   Mr. Gireud does not write like that.  He might write like

18  that in Spanish, but not in English.

19  Q.   Okay.  So I'm going to scroll down and ask you a question.

20  Or I'm going to ask you to read and we'll follow along.  Can you

21  read starting at paragraph two?

22  A.   Sure.  M.P.S.A.'s denial of authorization and knowledge of

23  the pledge agreement is the third and latest attempt by M.P.S.A.

24  to disavow consent and knowledge of key negotiations and

25  commercial terms reached with C.F.E. in conjunction with

DIRECT MILLER                                                      252

1   M.P.S.A. agent, Hector and John Adams.

2   Q.   Now at the time that you except this letter, March 21st,

3   2011, had you seen any pledge agreement?

4   A.   I had not seen the pledge agreement, no.

5   Q.   So why did you accept this e-mail?

6   A.   Because that was the position given to me by F.G.G.  I'm

7   not F.G.G.  I'm communicating that for F.G.G., because that's

8   what was told to me.

9   Q.   Okay.  And were you aware of any negotiations and

10  commercial terms reached with C.F.E. in connection with M.P.S.A.

11  agents Hector Ponce and John Adams regarding a pledge?

12  A.   All --

13  Q.   Did you have any personal knowledge?

14  A.   All I knew is that Marco had told me that they had had a

15  conversation, but I never -- I wasn't there and I had no

16  personal knowledge.

17  Q.   Okay.  Can you continue reading with "bear in mind"?

18  A.   Bear in mind, however, that just as in the previous denials

19  dealing with approval of payment terms and changes throughout

20  the payment schedule, F.G.G. has the corresponding pertinent

21  e-mail flow, handwritten notes from your agent, as well as the

22  formal approval submitted to C.F.E. at the time that both your

23  agents reviewed and initialed page by page of the contract,

24  included the aforementioned pledge agreement.

25  Q.   Okay.  I'm going to stop you there.  Are you aware of any

DIRECT MILLER                                                    253

```
 1    e-mail flow, handwritten notes from M.P.S.A. agents?

 2    A.   I never -- I never saw any of that, no.

 3    Q.   Okay.  So let me go ahead and --

 4    A.   But I was glad to hear we had.

 5    Q.   Let me go ahead and finish the question.

 6              Are you aware of any handwritten notes from M.P.S.A.

 7    agents providing formal approval for a pledge?

 8    A.   I am not aware of any, no.

 9    Q.   So again, if you weren't aware of any pertinent e-mail flow

10    or handwritten notes, why did you send this e-mail?

11    A.   Because that was communicated to me by F.G.G., who I am --

12    that's who I represent is F.G.G.

13    Q.   All right.  Was there a payment schedule under the contract

14    between F.G.G. and C.F.E., in other words the prime contract?

15    A.   Sure there was a payment schedule.

16    Q.   Okay.  And do you remember what the first two payments were

17    supposed to be?

18    A.   If memory serves my correctly, I believe 20 million and 12

19    million.

20    Q.   Okay.  I'm going to show you Government Exhibit Number 50.

21    I'm going to ask you to take a look at this and let me know if

22    you recognize it.

23    A.   Yes.

24    Q.   Is this an e-mail from Mr. Delgado to John Adams, you and

25    others?
```

DIRECT MILLER                                                      254

1    A.   Yes, ma'am.

2    Q.   And is the date of the e-mail March 25th, 2010?

3    A.   Yes, it is.

4    Q.   So I'm going to read from this and ask you a question.

5         Attached, please find C.F.E. confirmation of revised

6    payment plan.  This allows us to proceed with the assignment of

7    collection rights prior to issuance of first payment.

8         Why -- what was your understanding of why C.F.E. had

9    revised the payment plan?

10   A.   Well, I heard a lot of different things, economic

11   conditions.  That was primarily the reason I was given, economic

12   conditions.  I thought it was absurd that there was a revised

13   payment plan.

14   Q.   And where did you hear the reason for the revised payment

15   plan?  Where did it come from?

16   A.   From Marco.  Either from Marco or from Fernando.

17   Q.   Okay.  So I'm going to ask you to take a look at Government

18   Exhibit 50A, which is a translation.

19   A.   (Complies.)

20   Q.   Under the revised payment plan, what was the amount of the

21   first payment supposed to be to F.G.G.?

22   A.   15 -- this is in millions, United States dollars, 15

23   million.

24   Q.   Okay.  And under the original payment plan, what was the

25   amount of the first payment supposed to be?

1    A.    If memory serves me correctly, 20 million.

2    Q.    Do you see that the date is March 25th, 2010?

3    A.    Yes, ma'am.

4    Q.    I'm going to ask you to take a look at Government

5    Exhibit 2.  Were you aware when you received that e-mail

6    regarding a revised payment plan on March 25th, 2010, that a few

7    weeks earlier on March 9th, 2010, C.F.E. had already made the

8    first payment of $20 million into an offshore account in the

9    Turks and Caicos Islands?

10   A.    No, I wasn't.

11   Q.    I'm going to ask you to look again at Government

12   Exhibit 50.  Do you see the references to collection rights?

13   A.    Yes, I do.

14   Q.    What was your understanding of what -- with -- did F.G.G.

15   have a relationship with Mitsubishi regarding collection rights?

16   A.    They did.

17   Q.    What was that agreement?

18   A.    C.F.E. owed F.G.G. money.  F.G.G. owed Mitsubishi money.

19   Mitsubishi did not want to have and I didn't want F.G.G. having

20   custody of the money and then paying Mitsubishi.  And so

21   assignment of collection rights means C.F.E. is not going to pay

22   F.G.G. the entire amount and then F.G.G. pay Mitsubishi.

23   Instead, Mitsubishi was going to be able to collect what was

24   owed to them directly.

25   Q.    All right.  And the parties actually reached that agreement

1    to do that?  Did F.G.G. actually agree to assigned collection

2    rights to Mitsubishi?

3    A.   Yeah.  Yes.  This was a good thing.  I mean I, in

4    particular, was very much for that, because I didn't want to

5    have custodianship of Mitsubishi's money, and I didn't want to

6    have to pay them -- on that amount of money, I didn't want to

7    have to pay them interest on one or two days, which would be

8    hard to figure out and very burdensome.

9    Q.   Was this something that was difficult to get done, the

10   signing collection rights to Mitsubishi?

11   A.   It seemed to take a long time, therefore, it seemed to be

12   difficult.

13   Q.   Who was responsible?  Who, with F.G.G., was responsible for

14   getting the collection rights assigned to Mitsubishi?

15   A.   Marco was getting the collection rights.

16   Q.   Okay.  And what, if anything, did he tell about the status

17   of assigning the collection rights?

18   A.   You know Marco didn't have any problem with the concept of

19   assignment of collection rights, but he just said it was coming,

20   coming, coming.  We should have it very soon.

21   Q.   Okay.  I'm going to ask you to take a look at Government

22   Exhibit 52.  Tell me when you're done.

23   A.   Okay.

24   Q.   Do you recognize this?

25   A.   I do.

DIRECT MILLER                                                    257

1    Q.    Okay.  Is this an e-mail from Mr. Delgado to John Adams,

2    Mr. Gireud and to you?

3    A.    Yes, ma'am.

4    Q.    Okay.  And is the date of the e-mail, March 26th, 2010?

5    A.    Yes, it is.

6    Q.    Okay.  So I'm going to ask you to read starting at the

7    beginning and I'll tell when you to stop.

8    A.    Okay.  John and Fernando, attached please find format for

9    wire transfer instructions as required by C.F.E., BancoMext and

10   the investor.  This needs to be filled out by you exactly as

11   provided by the format and returned to me ASAP, so I can

12   finalize assignment of collection rights and secure issuance of

13   first payment by due date.

14   Q.    Okay.  I'm going to stop you there.  When you received this

15   e-mail on March 26th, 2010, did you know that Marco Delgado had

16   already secured issuance of the first payment on March 9th,

17   2010, into an offshore account into the Turks and Caicos

18   Islands?

19   A.    No, I didn't know that.

20   Q.    Can you continue reading?

21   A.    Also include the physical address of your banks and

22   respective companies.  Assigned payment will be issued directly

23   by -- to M.P.S.E. [sic] by trust.  My payment will be issued to

24   F.G.G., who will then wire it to my account within 14 hours of

25   receipt.  Please note I did not request assignment of my fees so

1    as not to undermine my ability to push for expedited payment and

2    the assignment of collection rights.  So please assist me in

3    securing payment of my fees as soon as practical.  The bank will

4    also cover its closing cost.  I will provide estimates the

5    minute I receive them and approved by the actual trust.

6    Q.   So there you go.

7         All right.  Where were the payments to F.G.G. supposed

8    to go under the prime contract between F.G.G. and C.F.E.?

9    A.   I believe into a Wells Fargo bank account.

10   Q.   And who -- who is the account holder of that account, if

11   you know?

12   A.   Fernando Gireud.  F.G.G., I believe the account was in

13   F.G.G.'s name, but the Fernando Gireud is the sole member of

14   F.G.G., so...

15   Q.   Okay.  Were you a signatory on F.G.G.'s account?

16   A.   No.

17   Q.   Why not?

18   A.   Well, I do not want -- in my capacity, I do not want that

19   kind of financial responsibility.

20   Q.   And at some point in time, did you come to learn that the

21   monies that were being paid from C.F.E. to F.G.G. were not going

22   into F.G.G.'s account?

23   A.   I did come to learn that.

24   Q.   Okay.  Can you tell us about that?

25   A.   Well, Fernando obviously told me that the monies were not

1    being received and --

2              MS. FRANCO:  Objection, Your Honor, strike that as

3    to -- it's hearsay.

4              THE COURT:  Sustained.

5    A.   I found out that the monies were not being received and

6    were in that account and were going into another account.

7    BY MS. ARREOLA:

8    Q.   Okay.  And after you found out that the monies were going

9    into another account, what actions if any did you take?

10   A.   I tried to contact the firm that was listed as the account

11   where the monies were being received and that the monies were

12   coming into the F.G.G. account from a Turks and Caicos account.

13   Q.   Okay.  And who, if anybody, was present when you tried to

14   contact that firm?

15   A.   Fernando was present.

16   Q.   And did you do this by phone?

17   A.   By phone, yes, ma'am.

18   Q.   And were you successful in reaching anybody at the firm?

19   A.   Eventually I reached a live person at the firm and my

20   inquiry was is this an F.G.G. account or who's the owner of this

21   account.  And I was told that the only person --

22             MS. FRANCO:  Objection, Your Honor.

23             THE COURT:  Sustained.

24             MR. ARREOLA:  Your Honor, the government offers this

25   just to explain what happened next.  There's a subsequent

1    conversation with Mr. Delgado about this.

2           THE COURT:  So what's its relevance beyond its truth?

3           MR. ARREOLA:  To explain the next step taken and

4    Mr. Delgado response.

5           THE COURT:  Ask him what the next step is.

6    BY MS. ARREOLA:

7    Q.   As a result of the information given to you by somebody at

8    Skippings and Rutley, did you confront Marco Delgado.

9    A.   I did.

10   Q.   And at the time that you called this law firm, Skippings

11   and Rutley, was F.G.G.'s own er present with you?

12   A.   Yes, ma'am.

13   Q.   And would the law firm give either you or F.G.G.'s owner

14   any information about the account?

15   A.   They would not.

16   Q.   Okay.  So you mentioned a moment ago that you confronted

17   Marco Delgado about the account.  Where were you when you

18   confronted him?

19   A.   I think we were -- we often met at Barrigas -- Barrigas?

20   Barrigas, and we had the conversation there.

21   Q.   And who was present?

22   A.   Marco and I.

23   Q.   What did you say and what did he say?

24   A.   Basically -- I'm paraphrasing, I am not quoting -- but what

25   the heck are you doing diverting that money that's supposed to

1    go to F.G.G. into another -- into this offshore account?  And he

2    said that he had the right to do that, because he had a power of

3    attorney associated with the project, and what are we going to

4    have for breakfast?  It was very dismissive.

5    Q.    Did he give you any reason for why the money was being sent

6    to the Turks and Caicos?

7    A.    He did not trust Fernando to handle the money correctly.

8    Q.    That's what he told you?

9    A.    Yeah, that's what he told me.

10   Q.    How long was this meeting?

11   A.    It was very short.  I was very mad.

12   Q.    And how long was it?

13   A.    Two or three minutes.

14   Q.    Okay.  Was Marco Delgado, was he an owner OF F.G.G.?

15   A.    No.

16   Q.    Was he an officer or director?

17   A.    Not to my knowledge, no.

18   Q.    Okay.  So who was the only owner of F.G.G.?

19   A.    F.G.G. is a single member LLC, so Fernando Gireud is the

20   only owner.

21   Q.    Now you said Marco Delgado mentioned to you a power of

22   attorney during that Barrigas restaurant meeting and did you

23   then go -- after the meeting, did you then go look for this

24   power of attorney?

25   A.    Yes.

DIRECT MILLER                                                        262

1    Q.    Were you able to find it?

2    A.    Yes.

3    Q.    And then I'll ask you to take a look at Government

4    Exhibit 4.  Can you take a look at that and tell me if you

5    recognize it?

6    A.    I do.  I've seen this document, yes.

7    Q.    Okay.  And does this document contain any language

8    authorizing Marco Delgado to change the account into what's

9    F.G.G.'s monies being deposited?

10   A.    In my mind it does not.

11   Q.    Did you confront Marco Delgado about the language in the

12   power of attorney.

13   A.    Yes, we discussed it aggressively.

14   Q.    And what did you say and what did he say?

15   A.    I said that I don't believe this gives you the authority to

16   divert funds from F.G.G. and he told me, well, yeah it does.

17   Q.    Pardon?

18   A.    Yes, it does.  I -- his -- his stance was, yes, it does

19   give me authority to do that.

20   Q.    Okay.  Now once you realize that the account had been

21   changed, did you and Fernando Gireud take any action to change

22   it back?

23   A.    Yes.  We went to Mexico to try and get the authority to

24   move this money to another account withdrawn.

25   Q.    Okay.  And did you participate in any meetings?

 1    A.   I did not.  I went down there with Fernando, but I was told

 2    not to attend the meeting.

 3    Q.   Okay.  So do you know why you were told -- who told you not

 4    to attend the meeting?

 5    A.   Fernando.

 6    Q.   And do you know why he told you not to attend the meeting?

 7    A.   I think they probably thought that I would loose my temper

 8    and be very threatening to the people that had done -- that

 9    changed this, so...

10    Q.   Okay.

11    A.   And then also so that the meeting could be in Spanish

12    without, you know, somebody having to translate for my benefit.

13    Q.   Okay.  Now did you accompany Mr. Gireud to any of the

14    meetings even if you didn't sit in on them?

15    A.   I did.  One of the meetings was at a mall.  I don't know

16    the name of the mall.  It was a restaurant in the mall.  It

17    sounds like I'm a child, but I was told to wait outside and wait

18    while the meeting was taking place.

19    Q.   Now regarding -- now you're an attorney.  You're a licensed

20    attorney.  What are IOLTA accounts?

21    A.   An IOLTA account is a trust account that an attorney has --

22         MS. FRANCO:  Objection, Your Honor.  Expert testimony.

23    The jury wouldn't know about an IOLTA.

24         MR. ARREOLA:  He was counsel for F.G.G. and the

25    accounts of F.G.G. are at issue in this case, so the government

 1    submits that it's proper for F.G.G.'s own counsel to testify

 2    about accounts and attorney accounts.

 3              THE COURT:  Well, I think you have to have specialized

 4    knowledge to know what they're used for.  He can tell us what

 5    IOLTA stands for, because it's an acronym that doesn't take any

 6    kind of expertise.  But I don't know if anything beyond that

 7    is -- would be in the common knowledge of the regular human

 8    being.  It is something, the specialized knowledge that lawyers

 9    know.

10    BY MS. ARREOLA:

11    Q.   All right.  So I'm going to ask you to take a look at

12    Government Exhibit 58.  And can you take a moment to look at it

13    and tell me if you recognize it?

14    A.   Sure.  Okay.

15    Q.   Do you recognize this e-mail chain?

16    A.   I got the first part.  The other part is moving relatively

17    quickly and I can't read it fast.  I recognize this first part,

18    yes.

19    Q.   So I'm going to read from this and then ask you a question.

20    A.   Okay.

21    Q.   Is this an e-mail from Mr. Gireud to Hector Ponce,

22    Mr. Delgado and to you?

23    A.   Yes, ma'am.

24    Q.   And was the date sent April 5th, 2010?

25    A.   Yes, ma'am.

1   Q.   So I'm going to go ahead and read and ask you a question.

2             Hector, I just answered Kevin's e-mail and I also

3   replied to him last week.  And as you know, I talked to you last

4   week several times -- I'm sorry.

5             I just answered Kevin's e-mail and I also replied to

6   him last week.  And as you know I talked to you last week

7   several times.  I do not have control of what C.F.E. is going to

8   pay me or you.  As you know it is coming from fideicomiso and

9   the C.F.E. not me.

10            Second, Marco sent you and John an e-mail with some

11  info -- I won't read what's in parenthesis -- dated March 26th,

12  2010, where he asks me and M.P.S.A. for wire instruction for the

13  payment, which I went directly into my bank and asked them to

14  fill them for me.  I even called you and asked you to carefully

15  review this document, Bancomext and the investor requested this

16  document.

17            Okay.  I'm going to skip a little bit further down.

18            At the end of the day, C.F.E. and Bancomext are the

19  ones that are shipping the monies, not F.G.G.  And also since

20  you requested direct payment to you from Bancomext, I do not

21  have control of payments.

22            In this e-mail is Mr. Gireud responding to an inquiry

23  from Hector Ponce about where the money is?

24  A.   Yes.

25  Q.   Okay.  And was the date on this e-mail April 5th, 2010?

DIRECT MILLER                                                                266

1    A.   Yes, ma'am.

2    Q.   And in response to this e-mail, did Mr. Delgado notify you

3    guys that he already had in his account since March 9, 2010,

4    $20 million?

5    A.   Did he notify us?  No, he did not.

6    Q.   And I should have started at the e-mail at the bottom, but

7    I'm going to go ahead and get to that right now.

8              At the bottom is an e-mail from Mr. Ponce to

9    Mr. Gireud, correct?

10   A.   Mr. Ponce?  Yes.

11   Q.   And the date sent was April 3rd?

12   A.   Yes.

13   Q.   Okay.  So I'm going to go ahead and read from that.

14             Did your money arrive in your account?  Yesterday, you

15   mentioned you had been told 1 million, but if the payment from

16   C.F.E. is 15 million and M.P.S.A.'s is 14-and-a-half-million,

17   how could you get 1 million?

18             Was it your understanding at this point and time that

19   C.F.E. was going to be paying $15 million to F.G.G. instead of

20   $20 million?

21   A.   I'm not sure.  I'm not sure if that was my understanding at

22   that time.

23   Q.   Well, we talked about the revised payment schedule.  Do you

24   recall that?

25   A.   Right, yeah.

DIRECT MILLER                                                           267

1    Q.   And under the revised payment schedule, what was the amount

2    that C.F.E. was going to be paying F.G.G.?

3    A.   Correct.  $15 million.

4    Q.   Okay.  And in response to this e-mail, did Mr. Delgado

5    respond to you and indicate and notify you that in fact C.F.E.

6    had in fact paid $20 million and not $15 million to F.G.G.?

7    A.   Oh, no.

8    Q.   Okay.  I'd ask you to take a look at Government Exhibit

9    119.  Can you tell me if you recognize it?

10   A.   Yes.

11   Q.   Okay.  Is this an e-mail from you to Mr. Gireud and

12   Mr. Delgado?

13   A.   Yes, ma'am.

14   Q.   And is the date sent April 8th, 2011?

15   A.   Yes.

16   Q.   So this is almost a year after the first payment from

17   C.F.E. to F.G.G.; is that correct?

18   A.   Apparently, yes.

19   Q.   Okay.  So I'm going to go ahead and read a paragraph from

20   this and ask you a question.

21        C.F.E. is 2,000 -- $2 million delinquent with the

22   second payment, which according to a letter from C.F.E. on

23   C.F.E. letterhead has been moved to the third payment.  That has

24   got to be the most unbelievable, stupidest thing I ever heard.

25   It certainly was the stupidest thing counsel had heard.  It's

KATHLEEN A. SUPNET, CSR

1   suggested notice be sent to C.F.E. in order to preserve F.G.G.'s

2   right.

3             Why are you writing that C.F.E. was $2 million

4   delinquent with the second payment?

5   A.   That's way was told.

6   Q.   And what was your understanding of what the payment was

7   supposed to be?

8   A.   Well, first it was 20 and 12, but then I guess it got

9   changed to 15 and 7; is that right?

10  Q.   Okay.  And you were under the understanding that the second

11  payment had been changed from 12 million to $7 million; is that

12  correct?

13  A.   That's what I recall from the previous document.

14  Q.   Okay.  And this is April 8th, 2011?

15  A.   Uh-huh.

16  Q.   Were you aware that almost one year earlier on July 6th,

17  2010, C.F.E. had paid the full amount of the second payment,

18  $12 million, to an offshore account in the Turks and Caicos

19  Islands?

20  A.   No.

21  Q.   In response to this e-mail, which you sent to both

22  Mr. Gireud and Mr. Delgado, did Mr. Delgado write to you to say,

23  hey, Mace, you're wrong; C.F.E. actually made the full payment

24  of $12 million almost a year ago?

25  A.   No.  And you understand, I was in charge of transportation,

1    and we desperately needed to put down a transportation deposit

2    or we were not going to get the gear over there.

3    Q.   So I'm going to go ahead and read the next paragraph, and

4    ask you a question about transportation in a moment, but I want

5    to read you the next paragraph.

6              Regarding the pledge and the he said, she said bull,

7    he would need to examine the letter from John Adams authorizing

8    said pledge.  The pledge itself, the initial L.C., which was

9    posted to satisfy contract terms, the contract between F.G.G.

10   C.F.E. and F.G.G., M.P.S.A. and all correspondence thereafter.

11             I have gathered this with the exception of those items

12   I did not have.  Don't expect me to fight this battle without

13   all of the information and documentation.

14             At this time April 8th, 2011, had you seen a copy of a

15   pledge?

16   A.   No.

17   Q.   Had you seen a letter from John Adams authorizing such

18   pledge?

19   A.   No.

20   Q.   Had you seen an L.C.?

21   A.   No.

22   Q.   What documents -- it says you indicated here I have

23   gathered this with the exception of those items I do not have.

24             Which items had you gathered?

25   A.   The contract between F.G.G. and C.F.E., F.G.G.-M.P.S.A, and

1   probably most burdensome, all of the correspondence, all of the

2   e-mails.

3   Q.   Okay.  And had you gathered anything which in any way

4   authorized F.G.G. to pledge Mitsubishi's equipment?

5   A.   No.

6   Q.   How long after this -- I withdraw that.

7        In response to this e-mail in which you copied or sent

8   to Mr. Delgado, did he ever provide you with a copy of the

9   pledge agreement or the John Adams' letter?

10  A.   No, ma'am.

11  Q.   Did he provide you with any letter of credit?

12  A.   No.

13  Q.   I'm going to ask you to take a look at Government Exhibit

14  120.  Do you recognize this?

15  A.   Yes, ma'am.

16  Q.   Is this Mr. Delgado's response to the e-mail that we just

17  looked at, the e-mail about the delinquent second payment and

18  the pledge?

19  A.   Yes, ma'am.

20  Q.   Can you read what Mr. Delgado wrote to you?

21        THE COURT:  It's not in evidence.

22        MR. ARREOLA:  Pardon?

23        THE COURT:  It is not in evidence.

24        MR. ARREOLA:  Oh, the government offers what's been

25  marked for identification as Government Exhibit 120.  May we

DIRECT MILLER                                                    271

1    publish, Your Honor?

2              THE COURT:  Ms. Franco.

3              MS. FRANCO:  Just a moment, Your Honor.

4              THE COURT:  You said 120, right?

5              MS. FRANCO:  No, objection.

6              THE COURT:  GX-120 is admitted.

7              MR. ARREOLA:  May we publish, Your Honor?

8              THE COURT:  Yes, ma'am.

9    BY MS. ARREOLA:

10   Q.   I'm sorry.  I didn't realize it wasn't admitted.  I'm going

11   to go ahead and look at it again so the jury can see it.

12             Mr. Miller, at the bottom of this e-mail, is this the

13   e-mail that we had looked at earlier where you were writing to

14   Mr. Delgado and Mr. Gireud about the C.F.E. being $2 million

15   delinquent and about the pledge?

16   A.   Yes, ma'am.

17   Q.   Okay.  And at the top of this e-mail, is that Mr. Delgado's

18   response to both you and Mr. Gireud?

19   A.   Yes.

20   Q.   And the date sent as April 8th, 2011?

21   A.   Yes.

22   Q.   Okay.  So you just notified Mr. Delgado about the

23   delinquency and the pledge.  And can you read what he wrote to

24   you?

25   A.   Counsel needs to be retained ASAP.

1    Q.    I'm going to ask you to take a look at Government Exhibit

2    131.  Is this an e-mail from you to Mr. Gireud and to

3    Mr. Delgado?

4    A.    Yes, ma'am, it is.

5    Q.    And was the date October 11th, 2011?

6    A.    Yes, ma'am.

7    Q.    Do you recognize this letter or this e-mail?

8    A.    I do.

9          MR. ARREOLA:  Your Honor, the government offers what's

10   been marked as Government Exhibit 131.

11         THE COURT:  Ms. Franco?

12         MS. FRANCO:  No, objection, Your Honor.

13         THE COURT:  GX-131 is admitted.

14         MS. ARREOLA:  May we publish, Your Honor?

15         THE COURT:  Yes, ma'am.

16   BY MS. ARREOLA:

17   Q.    Okay.  I'm going to ask you if you can read the first

18   paragraph of Government Exhibit 131, what you wrote to

19   Mr. Gireud and to Mr. Delgado.

20   A.    Okay.  Gentlemen, given the content of the latest e-mail

21   from M.P.S.A. concerning transportation, it appears we are at a

22   crossroads.  Two viable, capable transportation companies have

23   been contacted, both expect a significant upfront payment which

24   appears we don't have.  If the project is going to halt from

25   F.G.G.'s perspective, I think it's best to discuss the exit

1    strategy so to speak.

2    Q.    Okay.  Why are you talking about an exit strategy?  What is

3    your reference to exit strategy mean?

4    A.    From what I've been told, F.G.G. didn't have any money to

5    fulfill its obligation, specifically, that gear was never going

6    to get over there.  Taking this type of gear across the ocean,

7    and this stuff is in Japan and it's in France, is unbelievably

8    expensive; 8, 10, $12 million.  F.G.G. did not have the money to

9    fulfill that obligation.  We were going to be in default because

10   we couldn't get the gear over there.

11   Q.    Did you talk to Marco Delgado about not having money to pay

12   for transportation?

13   A.    I said that every day, yes, to Marco and everybody, yes.

14   Q.    And what was Marco's response to you when you said that

15   money was needed for transportation?

16   A.    Not really his problem.

17   Q.    I'm going to ask you to take a look at the next sentence

18   and go ahead and read and we'll follow a long.

19   A.    You want me to read it?

20   Q.    Yes, please.

21   A.    First, if a breach letter is sent to F.G.G., it should be

22   followed immediately with a request for accounting from the

23   Mexican fiduciary.  I personally have no answer as to how F.G.G.

24   is so deficient regarding cash to operate.

25   Q.    Can you stop there?

DIRECT MILLER                                                        274

1          So you mentioned that F.G.G. didn't have any money for

2    transportation.  What was F.G.G.'s financial situation, in

3    general, at that time?

4    A.   My understanding is F.G.G. didn't have any money.

5    Q.   And what --

6    A.   I will say this.  I didn't have access to F.G.G.'s account,

7    so -- but I was being told there was no money.

8    Q.   Okay.  So can you go ahead and continue reading?

9    A.   The first payment was offset by large payments to M.P.S.A.

10   and our consulting firm.  That being said, we still should have

11   a significant cash balance, but we're charged for an L.C., which

12   currently does not exist as a pledge was substituted, a pledge

13   which does not cost money.

14          The second payment, which was supposed to be $12

15   million, has miraculously been reduced to 10 million, according

16   to a letter from an individual who was nothing to do with

17   payments.

18          I have been told last week that the deficient

19   $2 million will be spread over the next few payments.

20   Q.   I'm going to ask you to stop there.  You've just mentioned

21   that F.G.G. -- you don't understand how F.G.G. has no money.

22   And I'm going to scroll down and ask you to read what Marco's

23   response was to your e-mail.  Can you read the last sentence of

24   your e-mail and we'll scroll down?

25   A.   I suggest we have a face-to-face meeting to discuss.

1    Please advise as to availability.

2    Q.   Okay.  Now you've just mentioned the cash flow situation,

3    you mentioned the letters of credit and the pledge, and what is

4    Marco's response to you?

5    A.   Any time after Thursday works for me.

6    Q.   Did he respond to you verbally about the pledge or the

7    letters of credit or having money in the Turks and Caicos

8    account?

9    A.   No.

10   Q.   Okay.  I'm going to now ask you to take a look at what's

11   been marked for identification as Government Exhibit 132.

12          THE COURT:  Ms. Arreola?

13          MS. ARREOLA:  Yes, sir?

14          THE COURT:  Mr. Miller, are you available on Monday?

15          THE WITNESS:  I'll make myself available.  I live in

16   El Paso, so I'll make myself available.

17          THE COURT:  All right.

18          Can we go ahead and break for the evening and come

19   back with Mr. Miller on Monday?

20          MR. ARREOLA:  Yes.  This is a good place to stop.

21   Thank you.

22          THE COURT:  Ladies and gentleman of the jury, we're

23   going to recess for the weekend.  Please remember the

24   instructions I gave you on Monday about not discussing the case

25   amongst yourself or anyone outside the jury.  See you back on

1    Monday morning.

2              COURT SECURITY OFFICER:  All rise.

3              (Proceedings conclude at 6:00 p.m.)

4                          *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      * * * * *

2              I certify that the foregoing is a correct transcript

3       from the record of proceedings in the above-entitled matter.  I

4       further certify that the transcript fees and format comply with

5       those prescribed by the Court and the Judicial Conference of the

6       United States.

7       Signature:/S/KATHLEEN A. SUPNET        December 31, 2018
                   Kathleen A. Supnet, CSR          Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```