IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

VOLUME 16A of 16B OF 20


UNITED STATES OF AMERICA                    EP:13-CR-0370-DCG

v.                                          EL PASO, TEXAS

MARCO ANTONIO DELGADO                        September 20, 2016


**STATEMENT OF FACTS**
**CHARGE OF THE COURT**
THE HONORABLE DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:   Debra Kanof
                      Anna Arreola
                      Jose Luis Gonzales
                      Assistant United States Attorney
                      700 East San Antonio, Suite 200
                      El Paso, Texas 79901

For the Defendant:    Maureen Franco
                      Erik Hanshew
                      Assistant Federal Public Defender
                      700 E. San Antonio, Suite 410
                      El Paso, Texas  79901

Court Reporter:       Kathleen A. Supnet
                      El Paso, Texas
                      (915)834-0573
                      kathi.supnet5303@gmail.com




        Proceedings reported by mechanical stenography,

transcript produced by computer-aided software and computer.

1

CHRONOLOGICAL INDEX

2

VOLUME 16A of 16B OF 20

3

September 20, 2016                                    PAGE    VOL.

4

5

GOVERNMENT'S
WITNESS TESTIMONY      DIRECT     CROSS     VOIR DIRE        VOL.

6

MILLER, MACE           7,36       19,43     --               16A
CORTES, JUAN PABLO

7

   MATAMALA            44,117     109       --               16A

8

Government Rests. . . . . . . . . . . . . . . . . 126    16A

9

Motion for Acquittal. . . . . . . . . . . . . . . 126    16A

10

Court's Rulings . . . . . . . . . . . . . . . . . 127,   16A
                                                  131

11

Government and Defense Close. . . . . . . . . . . 134    16A

12

Objections to Charge. . . . . . . . . . . . . . . 135    16A

13

Charge of the Court . . . . . . . . . . . . . . . 136    16A

14

Court Reporter's Certification . . . . . . . . . 170    16A

15

16

17

18

19

20

21

22

23

24

25

1          (Open court.  Defendant and counsel present.)

2          (Jury not present.)

3          THE COURT:  Let the record reflect that the jury is no

4    present, the United States through its United State's assistant

5    attorneys are present, the defendant and his counsel are

6    present.

7          MR. HANSHEW:  If I may Your Honor, please?

8          Judge, we're asking, in light of yesterday, the Court

9    taking into evidence the statements of the marshal regarding

10   what occurred yesterday, that the Court additionally put into

11   evidence the video that was received from the marshals in this

12   case.

13         The record isn't reflected yesterday you had

14   statements from this marshal that, you know, indicated that

15   Mr. Delgado somehow assaulted this marshal, we believe the video

16   shows otherwise.  And so that there's a clear record, an

17   appellate record in this case that the video be introduced as

18   well because we believe that it not only shows otherwise, but it

19   contradicts the statements that the marshal put into the record

20   in this case, Judge.

21         THE COURT:  I'm not sure what relevance that would

22   have since the purpose for all of that was to determine whether

23   there was a voluntary absence of the defendant from trial so

24   that I could proceed to trial without him.

25         It came clear to me that that was not the case and so

1  introducing the video wouldn't add to that.  My decisions

2  already been made.  You're client did not voluntarily absence

3  himself.

4          MR. HANSHEW:  Right.  But I think that the problem --

5  the problem is that when the Court Appeals is looking at the

6  totality of a record, if the record were left as it stood

7  yesterday, it would appear that it would be unrebutted that

8  Mr. Delgado was somehow the law enforcement assaulter and we all

9  know how that can be considered in many facets of a case in a

10  trial.

11          THE COURT:  I'm happy to exclude the testimony of the

12  marshal.

13          MR. HANSHEW:  Well, I think it's important, as well,

14  to show in this case.  I mean he perjured himself, Judge, and

15  that something, you know, that needs to be considered.

16          THE COURT:  I'm not willing to make that judgment from

17  the very, very limited evidence that we received about that

18  activity.

19          MR. HANSHEW:  Well he, for example --

20          THE COURT:  There was -- my understanding -- I mean

21  what we saw was what happened right behind the door that comes

22  into the courtroom.  And I understand there was there was, you

23  know, contact with the defendant downstairs.  There's contact

24  with the defendant outside the little hallway, which is right

25  outside our door, none of which is in evidence and so if we're

1    going to make a judgment like that, we'd have to have a full

2    blown hearing where all of that evidence would come in.  And so

3    I'm going to deny your request.

4            MR. HANSHEW:  Well, Judge, and if I can just -- not

5    only did the video show that the statements he described about

6    what happened back there weren't true as he stated, additionally

7    we know through an absolute certainty that there is no

8    subjectivity in the statement he made that Mr. Delgado was the

9    one that asked to go to the hospital.  I mean that's how he

10   closed out his testimony yesterday.  And we heard from, you

11   heard from the number two in charge of the marshals here.  You

12   heard from counsel that was present and you heard from the EMS

13   that that was absolutely false.  We know that --

14           THE COURT:  I'd have to disagree with that as well,

15   Because the EMS guy said the defendant is the one that decides

16   whether he goes to the hospital or not.  That was clear.

17           Now, the EMS guy did suggest to the defendant that he

18   should go to the defendant.  The defendant, his primary

19   inclination wasn't to go to the hospital, it was to speak to his

20   counsel.  And so looking through the lens of determining whether

21   there was a voluntary absence, to me that would show that that

22   was not a voluntary absence because his primary concern was

23   speaking with counsel.  But decision to go to the hospital,

24   according to the EMS guy, clearly is your client's.

25           MR. HANSHEW:  That's not what the marshal said though.

```
 1    The marshal said that it was Mr. Delgado that asked for that,

 2    Judge.

 3              THE COURT:  Right.

 4              MR. HANSHEW:  And we know that --

 5              THE COURT:  That's a whole different issue that will

 6    inquire evidence and cross-examination from two sides.  I'm not

 7    going to litigate that as part of that trial.

 8              MR. HANSHEW:  Okay.  Well, we --

 9              THE COURT:  If you-all want to have a hearing to

10    litigate that, that's up to you.  But my purpose and my only

11    purpose for speaking to any of those people and reviewing the

12    video was to determine whether you client voluntarily absented

13    himself, because if he did, we were going to go to trial.

14              MR. HANSHEW:  But the Court took the evidence from one

15    side, which turned out to be incorrect and we're asking that the

16    record reflect the totality of the evidence, Judge.  But

17    Judge --

18              THE COURT:  You know what?  Once we're done here,

19    we'll have the hearing for as many days as it takes and we'll

20    get all of the video from all downstairs, outside that hallway,

21    everybody else, we'll get everybody's statements, we'll call

22    them in and we'll do a full-blown hearing for you.  How about

23    that?

24              MR. HANSHEW:  That's fine, Judge.

25              THE COURT:  All right.  Let's go.
```

1            (Jury present.)

2            THE COURT:  Let the record reflect that all members of

3    the jury are present, the United States through its assistant

4    United State's attorneys are present, the defendant and his

5    counsel are present.

6            The witness, Mr. Miller, is on the witness stand.

7            Mr. Arreola?

8                        MACE MILLER,

9            DIRECT EXAMINATION BY THE GOVERNMENT

10           MS. ARREOLA:  Your Honor, has the witness been

11   reminded that he's still under oath?

12           THE COURT:  Oh, I'm sure Mr.  Miller knows he's still

13   under oath.

14           MS. ARREOLA:  Okay.

15   BY MS. ARREOLA:

16   Q.   Mr. Miller, when we broke off, I had asked you about

17   Government Exhibit 131.

18           MR. ARREOLA:  Your Honor, may we publish?

19           THE COURT:  We're working in that direction.

20           MR. ARREOLA:  Okay.

21           THE COURT:  There you go.

22           MS. ARREOLA:  Thank you Judge.

23   BY MS. ARREOLA:

24   Q.   I'm going to read a line from Government Exhibit 131 and

25   then ask you a question.

1    A.    Okay.

2    Q.    We should still have a significant cash balance, but were

3    charged, in quotes, for and L.C., which currently does not exit

4    as a pledge was substituted.  Where did the information come

5    from that F.G.G. was charged for an L.C.?

6    A.    As I was trying to reconcile the amount of cash that was

7    available, which I never was able to do with documentation, I

8    was told by Fernando, who -- that we were charged for a letter

9    of credit.

10   Q.    Did Marco Delgado ever communicate to you that F.G.G. was

11   charged for a letter of credit?

12   A.    Yes.

13   Q.    And what did he say about that?

14   A.    That out of the proceeds, the existing proceeds that had

15   been brought in by F.G.G., that there was a charge for a letter

16   of credit as opposed to a pledge.

17   Q.    Did Mr. Delgado communicate to you how much had been spent

18   on the letter of credit?

19   A.    If memory serves me correctly, it was like 4 or $5 million,

20   like $4.6 million, something like that.

21   Q.    That was from Mr. Delgado?

22   A.    That's what I was told by Mr. Delgado and from Fernando,

23   who probably got the information from him.

24   Q.    And then I now ask you to take a look at -- what has been

25   marked for identification as Government Exhibit 132.  Can you

1    look at this and let me know if you recognize it?

2    A.   I do.

3    Q.   Is it an e-mail from you to Mr. Gireud and Mr. Delgado?

4    A.   Yes, ma'am.

5          MR. ARREOLA:  Your Honor, the government offers what's

6    been marked as Government Exhibit 132.

7          THE COURT:  Any objection to 132?

8          MS. FRANCO:  No, Your Honor.

9          THE COURT:  GX-132 is admitted.

10         MS. KANOF:

11   BY MS. ARREOLA:

12   Q.   Mr. Miller, was this e-mail sent from you to Mr. Delgado

13   and Mr. Gireud on November 9th in the morning?

14   A.   Yes, ma'am.

15   Q.   I'm going to ask you to read the first paragraph and then

16   I'm going to ask you question.

17   A.   Okay.  It has become apparent that F.G.G. Enterprises, LLC,

18   has been disparaged in Mexico with information that is very

19   confusing to me.  Maybe somebody can clear it up.

20   Q.   Why did you write to Mr. Delgado that F.G.G. was being

21   disparaged in Mexico?

22   A.   Well, as I had talked to this gentleman, as you go on in

23   the e-mail, I talked to this gentleman Andres Martinez.  I was

24   operating under the assumption that we had not been paid money

25   and Andres Martinez, who was with C.F.E., was a project manager,

1   said, yes, in fact, we were, and I considered that to be

2   disparaging in that we were not living up to our end of the

3   bargain when in fact I thought they were not living up to their

4   end of the bargain because they hadn't paid F.G.G.

5   Q.   Could you explain who Mr. Martinez was?  You said he was a

6   project manager.  For who?

7   A.   For this Agua Prieta project.

8   Q.   Who did he work for?

9   A.   C.F.E.

10  Q.   Can you read the next paragraph?

11  A.   Yes.

12       Andres Martinez believes that F.G.G. has 18 million in

13  the bank.  M.P.S.A. believes that also.  Now, we can sit around

14  sarcastically snickering, claim they are misinformed, and

15  that -- or F.G.G. can find out what is going on.  The math is

16  rather simple.

17       Would you like my to include the next -- it's a colon,

18  so technically it's the same paragraph.

19  Q.   Yes, please.

20  A.   Payment one, $20 million minus M.P.S.A. payment of around

21  11.2 equals 8.8.

22       Payment two, 12 million, yes, 12 -- excuse my

23  language -- stop -- stop the bullshit, minus 7 million equals 5.

24       Payment 3, 59 million minus 54.6 equals 4.4 million.

25  Q.   Why did you indicate for payment two, yes, 12, stop the

1    bullshit?

2    A.   Because I kept -- I kept being told that it was ten or that

3    it was seven.  And the 20 million and the 12 million, that was

4    the payment schedule on the C.F.E. contract.

5    Q.   Who told you that the payment was not $12 million, the

6    second payment?

7    A.   Marco and Fernando through Marco.

8    Q.   Why are you doing math here?  What was the reason for doing

9    the reason here?

10   A.   I need money right now.  One of my pri- -- probably, my

11   primary job in this whole deal is to get this gear over to the

12   job site is to arrange for transportation.  Transportation for

13   something like this costs tens of millions of dollars.  I need

14   that 8.8.  I need that 5.  I need that 4.4 million to pay the

15   transportation company, so I can get this huge gear over to the

16   job site, otherwise, F.G.G. is in breach.  I don't need money

17   just for the sake of having it.  I need money to perform the

18   contract.

19   Q.   Okay.  I'm going to ask you to continue reading the next

20   two paragraphs and we'll read along.

21   A.   All right.

22        Together that equals 18.2 million.  Obviously, we have

23   not received payment three, parenthetically, or have we, but

24   that looks like the computation.  F.G.G. has no capital, to my

25   knowledge to operate.  These anchors cost more than we have and

1    the money to pay for them did not originate from the equipment

2    acquisition contract.  Where is the 13.8 million that was

3    supposed to be in the account?  Letter of credit doesn't exist.

4    If we had that money, we could pay M.P.S.A. upfront for anchors,

5    pay our transportation obligation and move on.

6    Q.   Okay.  Can you continue reading?

7    A.   Sure.  Next paragraph:

8         However, it is my understandings the large majority of

9    that money has not been in F.G.G.'s possession.  I don't know

10   where it went, but it is time to find out.  F.G.G.'s problem

11   right now the is not the anchors, not the transportation, but

12   the fact that money has not been received to fulfill F.G.G.'s

13   obligation.

14        I know F.G.G. is ready to handle all contractual

15   commitments.  It is impossible with no money.  The problem has

16   never been F.G.G.'s ability -- inability to handle these issues.

17   The problem is the resources allocated to these line items never

18   got to F.G.G.  That is my perception.  Am I wrong?

19   Q.   And you write here:  It is my understanding the large

20   majority of that money has not been in F.G.G.'s possession.

21   What is that understanding based upon?

22   A.   Asking Fernando, did you get -- where's the money.  You're

23   the sole -- you're the person on the F.G.G. account.  You

24   control that account.  Where did you get the money, Fernando?

25   Does F.G.G. have money in the Wells Fargo bank account?

1            And his answer was no.

2    Q.    Did Mr. Delgado respond to your e-mail?

3    A.    It appears that he did, yes.

4    Q.    And your e-mail was sent November 9th 2011, correct?

5    A.    Correct.

6    Q.    And below this e-mail, is there an e-mail from Mr. Delgado

7    to you the following day, November 10th, in the morning?

8    A.    Yes.

9    Q.    Now, after you've communicated that F.G.G. doesn't have any

10   money, what was Mr. Delgado's response?  Can you read it for the

11   jury?

12   A.    Payment three has not been received.  Andres denies having

13   participation -- participated in said conversation,

14   parenthetically, but I don't believe him.

15   Q.    Did Marco Delgado verbally respond to you, your concern

16   that F.G.G. did not have any capital to operate?

17   A.    This is one of the first times it's memorialized.  I said

18   this every day.  I'm sure, you know, Fernando and Marco both

19   were very sick of hearing me.  And at this point, I'm getting,

20   you know, very upset, so, yes, the haranguing by me continued.

21   Q.    And when you said this every day, who did you say it to?

22   A.    I said it to whoever I was in front of; Fernando, Marco,

23   whomever.

24   Q.    What was Marco's response when you communicated this to

25   him?

1    A.   I don't think Marco really felt he owed me an explanation.

2    I never really got an explanation.  I got like explanations like

3    in the e-mail.  I was very, very frustrated.

4    Q.   I'm going to ask you to take a look at what is in evidence

5    as Government Exhibit 8.

6          Can you take a look at the indictment and let me know

7    if you recognize it?

8    A.   Yes.

9    Q.   What do you recognize it to be?

10   A.   A memorandum of understanding outlining the relationship

11   between F.G.G. Enterprises and Delgado and Associates, which is

12   Marco's law firm through Marco.

13   Q.   Already.  I'm going to read you a line from this and then

14   ask you a question.

15          D. And A. will receive an amount equal to

16   62-and-one-half-percent of the difference between the purchase

17   price to F.G.G. of all of the equipment transportation and field

18   services required for the satisfaction of all bid requirements

19   and the amount for which the equipment is sold to C.F.E.

20          Did this sentence give Mr. Delgado an ownership

21   interest in the company F.G.G.?

22          MS. FRANCO:  Objection, Your Honor.  Calls for

23   speculation.

24          MR. ARREOLA:  Your Honor, he was counsel for F.G.G.

25          THE COURT:  I'll sustain the objection.  He can tell

1     us what he thinks it says.

2               MR. ARREOLA:

3     BY MS. ARREOLA:

4     Q.   What is your understanding of this sentence?

5     A.   Oh, it gives Marco a profit percentage.  It does not give

6     him an ownership of percentage.  It's gives him a delineated

7     profit percentage.

8     Q.   I'm going to ask you to take a look at the next paragraph.

9     I'm going to read a sentence and then ask you a question.

10              The amount owed to D. And A. will become due and

11    payable upon the awarding of the bid contract to F.G.G. and will

12    be paid at the first disbursement of funds by investor lending

13    institution, as will be F.G.G., in accordance with the contract

14    terms.

15              Was it feasible -- was it possible for F.G.G. to pay

16    Delgado and Associates 62-and-a-half-percent of the profits from

17    the project at the first disbursement?

18    A.   No, it was not.  It was not feasible, because we didn't

19    know what those profits were going to be.  For instance, the

20    $4.2 million, which is referenced in paragraph three which is an

21    estimate of the cost of transportation was very wrong.  It was

22    going to be -- could be upwards of 8 to $9 million.  I wasn't

23    sure there was going to be profit on this job after I got into

24    it.

25    Q.   Did you advise Mr. Gireud to sign this agreement?

1    A.   No.  I -- I did not.  I was not in favor of Mr. Gireud

2    signing this agreement.

3    Q.   As F.G.G.'s counsel, in-house counsel, did you owe any duty

4    to F.G.G.?

5    A.   Sure.

6    Q.   What was that duty?

7    A.   To act in their best interests.

8    Q.   Why is that?

9    A.   I have a fiduciary duty to them.  I have a duty to put the

10   entity of the client -- it didn't have to be the entity -- any

11   of the client's interests before my interests.  I have an

12   obligation as an attorney to do that.

13   Q.   Was this agreement, this provision, in the best interest of

14   F.G.G.?

15   A.   In my opinion it wasn't.

16   Q.   I'm going to ask you to take a look at what's been marked

17   as Government Exhibit 40A.  Do you recall looking at this

18   document last week?

19   A.   Yes.

20          MR. ARREOLA:  Your Honor, housekeeping matter.  I

21   failed to offer this document, the Spanish language Government

22   Exhibit 40 is in evidence, but I didn't offer the translation

23   40A, so the government now offers what's been marked as

24   Government Exhibit 40A.

25          MS. FRANCO:  No, objection.

1          THE COURT:  GX-40A is admitted.

2    BY MS. ARREOLA:

3    Q.    Do you see on this document where it indicates that this is

4    an e-mail from Mr. Gireud to Mr. Ponce copying Mr. Delgado?

5    A.    Yes, ma'am.

6    Q.    And the date sent shown was February 11th 2010.  Do you see

7    that?

8    A.    Yes, ma'am.

9    Q.    Do you see that attached to the e-mail is a letter dated

10   January 30th, 2010, on F.G.G. letterhead?

11   A.    Yes, ma'am.

12   Q.    I'm going to read a paragraph from this and ask you a

13   question.

14   A.    Okay.

15   Q.    All conditions precedent and obligations post-bid award

16   have been met by F.G.G.

17          What is your understanding of what the term

18   "conditions precedent and obligations post-bid" were?

19   A.    To post a letter of -- letter of credit as required by the

20   contract.

21   Q.    And why did you call that, the letter of credit, a

22   condition precedent.  Or excuse me --

23   A.    I'm not sure that I called it that.

24   Q.    Do you know who wrote this?

25   A.    I'm not sure.

1    Q.   Okay.  So I withdraw the question.

2          Do you know -- what's your understanding of why it was

3    considered a condition precedent?

4          MS. FRANCO:  Objection, Your Honor.  Calls for

5    speculation.  He already said he didn't write the letter.

6          THE COURT:  I'll overrule the objection.

7          Don't speculate.  Tell us what it meant to you as

8    counsel.

9    A.   We had an obligation under a contract with C.F.E. and one

10   of the obligations was to provide a letter of credit.

11   BY MS. ARREOLA:

12   Q.   What was it precedent to?

13   A.   Precedent to us performing the contract.  We would run

14   parallel with the contract that needed to be provided at that

15   time.

16   Q.   Did Marco Delgado communicate this to you?

17   A.   Yes, I suppose he did since the contract was in Spanish.

18   Q.   Okay.  And --

19         MR. ARREOLA:  Your Honor, may I have a moment?

20         THE COURT:  Yes, ma'am.

21         MR. ARREOLA:  Your Honor, no further questions for

22   this witness.

23         THE COURT:  Ms. Franco?

24

25                         MACE MILLER,

CROSS-EXAMINATION BY THE DEFENDANT

BY MS. FRANCO:

Q.   Mr. Miller, you testified last week and a little bit this
morning about your relationship -- your attorney relationship
with F.G.G. and you indicated that you first became involved as
outside counsel, correct?

A.   Correct.

Q.   And then later you became more inside counsel or corporate
counsel to F.G.G., correct?

A.   Yes, ma'am.

Q.   And your understanding of what Mr. Delgado's role was is
that he was providing the service with regard to the Mexican
part of this deal.  Correct?

A.   That's correct.

Q.   And your responsibility on the American side as far as
arranging for shipments of the equipment to Mexico, correct?

A.   That's right.

Q.   And his was to ensure that the communication with C.F.E.
was done in a way to ensure the other part of the contract was
taken care of?

A.   Yes, ma'am.

Q.   Which would be the money portion of it, correct?

A.   Money and anything with C.F.E., he was the person in charge
with that.

Q.   And you and Mr. Gireud had known each other for sometime

1    prior to the corporation of F.G.G.?

2    A.   No, not really.  We had seen each other on a plane and been

3    introduced, but I hadn't known him for years.  I'd known him for

4    six months.

5    Q.   Did your relationship with Mr. Gireud, is it -- did it

6    predate any relationship you had with Mr. Delgado?

7    A.   That's a good question.  I mean I had met Marco a couple of

8    times in various settings, very similar to Fernando.  I met them

9    maybe at, you know, at a party.  I don't know which one I knew

10   first, frankly.

11   Q.   And Mr. Gireud worked for a relative of yours at Kendrick

12   Electric?

13   A.   Kendrick Electric is my uncle and Fernando had gotten --

14   had left El Paso Electric and I thought he would be a good fit

15   at Kendrick Electric.

16   Q.   So you helped make that business connection for your uncle

17   and Mr. Gireud?

18   A.   Yes.  Yes, ma'am.

19   Q.   And in fact, and Kendrick Electric was an initial investor

20   in F.G.G., correct?

21   A.   That's correct -- not in F.G.G.  It would be in this

22   project.  It wasn't an offering for like a share.  It was an

23   investment in the project.

24   Q.   F.G.G. was created as a sole purpose entity, correct?

25   A.   A single -- that was my understanding that it was going to

1    be specifically for this purpose.

2    Q.   And so your uncle wanted to invest in the deal between

3    C.F.E. and F.G.G. and M.P.S.A., correct?

4    A.   Yes, and he wanted to work on the job as well.

5    Q.   Now, you indicated last week that you had worked on the

6    teaming agreement, which is -- let me bring it up so you can

7    look at it while we're talking about it.

8              It's Government's Exhibit 7?

9    A.   Yes, ma'am.

10   Q.   And you've worked with Mr. Ponce on drafting this contract

11   between F.G.G. and M.P.S.A.?

12   A.   I didn't have a lot of conversation with Mr. Ponce.  It was

13   more Patrick Altamura.

14   Q.   So he wasn't instrumental in drafting this contract,

15   Mr. Ponce?

16   A.   Ponce?  I -- I don't know what kind of input he had on the

17   back end.  My communication with him I didn't find him

18   instrumental.

19   Q.   On to page four.  And it's a paragraph that you testified

20   about, so I'm not going to spend too much time on it, but in

21   paragraph that's number two, it talks about the fact about the

22   letters of credit unless C.F.E. were to waive such a requirement

23   as appropriate.  You see that, correct?

24   A.   Yes, ma'am.

25   Q.   So it was contemplated even back when this teaming

1     agreement was put together by F.G.G. and M.P.S.A. that such a

2     letter of credit could be waived by C.F.E. if they so desired?

3     A.   It appears that way, yes.

4     Q.   And just so that we all understand, the requirement of a

5     letter of credit, that was a requirement that C.F.E. had,

6     correct?

7     A.   That's correct.

8     Q.   It was not a requirement that M.P.S.A. had placed on

9     F.G.G., correct?

10    A.   That's correct.

11    Q.   And with regard to the subcontract that was later entered

12    into between F.G.G. and M.P.S.A. -- which is I believe

13    Government's 12?  Let me bring that up for you.

14          And you indicated that you don't read Spanish,

15    correct?

16    A.   That's right.

17    Q.   And so although you participated in the subcontract, you

18    weren't exactly clear of the terms; is that fair to say?

19    A.   That's probably fair to say.

20    Q.   And except for there is an English part of this, which was

21    a handwritten note that was placed in the contract -- I'm going

22    to scroll down so you can see it.  You see that, correct?

23    A.   I see it.

24    Q.   And it's something that Mr. Gireud is president of F.G.G.

25    or sole member of F.G.G. and Mr. -- it looks like Wunder had

1    signed, correct?

2    A.   Yes, ma'am.

3    Q.   And do you know who wrote this, this handwritten portion of

4    it?

5    A.   I would be speculating.

6    Q.   Okay.  And this handwritten portion in English on a Spanish

7    contract, it would indicate would it not that, there were still

8    some important terms of the contract between F.G.G. and M.P.S.A.

9    that had not been resolved, correct?

10   A.   That is correct.

11   Q.   And it would be substantial terms, for instance, the letter

12   of credit, correct?

13   A.   Yes.

14   Q.   Now, you indicated that when Mr. Delgado spoke to you about

15   John Adams that that was a conversation that occurred in Mexico;

16   is that correct?

17   A.   He spoke -- he called me.  The conversation between John

18   Adams and Marco would have occurred in Mexico, but he was

19   calling me and I was in the United States.

20   Q.   Okay.  And at that point in time you -- was that during --

21   prior to the -- the subcontract being entered into or was it

22   earlier in December?  Do you recall?

23   A.   I think it was prior to this.

24   Q.   All right.  And so -- and in that conversation, he's

25   indicating to you in early December, I guess, that he's in

1    Mexico with Mr. Adams, and Mr. Adams had indicated that F.G.G.

2    could pledge their equipment, correct?

3    A.   That's right.

4    Q.   And at the time you thought that was a smart and creative

5    way of handling the letter of credit issue, correct?

6    A.   Thought that was a good thing, yes.

7    Q.   And because from what you testified to, the letter of

8    credit would have required $20 million worth of assets that

9    F.G.G. would have had, correct?

10   A.   Or another party to come in and place $20 million and

11   F.G.G. would have to pay them for the use of those assets.

12   $20 million was going to have to be somewhere.

13   Q.   Okay.  And any -- was it clear that F.G.G. had $20 million

14   worth of assets?

15   A.   It was clear they did not.

16   Q.   That would have been clear to everyone, correct?

17   A.   I would think so.

18   Q.   I'm going to ask you to tell me about -- I have a couple of

19   questions about Government Exhibit 95.  If I can find it.

20   A.   Okay.

21   Q.   Do you see it on your screen there?

22   A.   Yes.

23   Q.   I think it's already been admitted into evidence.  I'm

24   going to scroll down, because there's something in there.  This

25   is an e-mail from you, correct, or Mr. Delgado?

1    A.    Eventually, it's an e-mail from me.

2    Q.    Okay.  There we go.

3          And on this last paragraph here where the little hand

4    is, it says, regarding another matter, it's my understanding

5    that Mitsubishi has attempted to interfere with an existing

6    long-term service agreement contract between F.G.G. and C.F.E.

7    Could you tell us about that?

8    A.    Yeah, I was -- it was communicated to me by Marco that --

9    so F.G.G. already had the long-term service agreement.  That was

10   part of the winning bid.  And so we have a contract to provide

11   equipment and then we have this other long-term service

12   agreement, which is an agreement, like you would think, to

13   service the equipment that we were giving them.  That was a

14   really important part of the win, of the bid.

15         And so we had tried to work out with Mitsubishi terms

16   where they would provide the long-term service agreement.  That

17   was unsuccessful.  And then I was told that they were trying to,

18   for a lack of a more technical term, go around F.G.G. and trying

19   to contract with C.F.E., you know, one-on-one without F.G.G.,

20   kind of circumventing that.

21   Q.    And in other words, they were trying to cut out the

22   middleman, so to speak?

23   A.    Yes.

24   Q.    And F.G.G. was a middleman in this circumstance with the

25   long-term service agreement?

1    A.   Yes, ma'am.

2    Q.   And you mentioned before that the long-term service

3    agreement was a very profitable part of the bid between the bid

4    award that F.G.G. received, correct?

5    A.   It was hoped to be, yes.

6    Q.   And that would be because it can last for several years or

7    why was it an important thing for a -- for part of this?

8    A.   That's part of it.  It was a long-term contract.  I don't

9    remember the duration right now, but I mean it -- you know, it's

10   many, many years, and there theoretically should be some

11   profitability every year, so it was a different cash flow model

12   than the -- providing the equipment.

13   Q.   And if F.G.G. had stayed in the middle between M.P.S.A. and

14   C.F.E., then that would have been something that F.G.G. would

15   have gotten that M.P.S.A. would not have gotten.  They would

16   have had to have paid for that?

17   A.   Right.  F.G.G. theoretically would have paid M.P.S.A. as a

18   subcontractor to perform the long-term service agreement.

19   Q.   Now Government's Exhibit Number 4, which is the Power of

20   Attorney.  I know you testified about this, I think last week on

21   Friday, but that when you asked Mr. Delgado about the changing

22   of the bank accounts that he told you that he believed that this

23   power of attorney that he and Mr. Gireud had executed gave him

24   the right to change the payment terms, correct?

25   A.   That's correct.

1    Q.   And you disagreed with his reading of that power of

2    attorney, correct?

3    A.   I did.

4    Q.   And did you have a chance to look at the power of attorney

5    at the time the two of you were discussing that?

6    A.   I don't know if it was in front of us when we were

7    discussing it.  I don't think it was.

8    Q.   Had you seen it when you were having this discussion with

9    him as to what this power of attorney conferred to Mr. Delgado?

10   A.   I had probably just seen it.

11   Q.   And I'm going to direct you to the last page of the power

12   of attorney.  And at the -- I guess these are standard terms

13   that are in the power of attorneys that are effective in Mexico.

14   And it talks --

15           MR. ARREOLA:  Objection, Your Honor.  Counsel is

16   testifying.

17           THE COURT:  Well --

18           MR. ARREOLA:  It's in -- I'll move on, Your Honor.

19           THE COURT:  Yes, ma'am.

20   BY MS. FRANCO:

21   Q.   At the top of page four, it walks about all of the general

22   powers of attorney for litigation and collections.  Do you see

23   that?

24   A.   Yes, ma'am.

25   Q.   And it would appear that this power of attorney would give

1   very broad rights to the holder of this, correct?

2   A.   What do you mean by broad?

3   Q.   All rights to -- let's see -- for litigation and

4   collections that -- if you read down, it says to be -- to have

5   all of the rights as an owner as an owner would have.

6   A.   It says -- I'm just reading -- general powers of attorney

7   for litigation collections.  Yes, it gives those powers, yes.

8   Q.   I'm going to ask you about Government's Exhibit -- let me

9   see if I can find it -- 87.  This is a letter that -- had you

10  had a chance to look at this letter at the time back in July of

11  2010?

12  A.   Can you just scroll down, please?

13  Q.   Yes, sir.

14  A.   I'm not sure.  I don't know.

15  Q.   You talked about it on Friday when Ms. Arreola was

16  directing you whether or not -- this is about the disbursement

17  of the $12 million payment, correct?

18  A.   This is about the disbursement of the $12 million payment,

19  yes.

20  Q.   And you testified a little while ago about -- I think that

21  was Government's Exhibit 132 -- that there was some disagreement

22  as to whether it was 10 million or 12 million, but this letter,

23  which predates your e-mail, because it's back on July 15th of

24  2010, it clearly shows Mr. Gireud giving directions to

25  Mr. Delgado as to how to disburse the $12 million?

1    A.    That's what the letter says, yes.

2    Q.    Now, with regard -- I want to talk to you about

3    Government's Exhibits 131 and 132.  So let me pull those.

4          In Government's Exhibit 131, you're indicating that

5    you're not sure where the money went that had been received,

6    correct?

7    A.    That's correct.

8    Q.    And the same is true in Government's Exhibit 132, correct?

9    A.    Correct.

10   Q.    It's also where you break down payment one, payment two,

11   correct?

12   A.    That's correct.

13   Q.    And you indicated that you weren't sure that F.G.G. had --

14   well, M.P.S.A. has no capital and you're not sure where -- if

15   F.G.G. had any money in its possession, correct?

16   A.    That's correct.

17   Q.    I'm going to refer to you Government's Exhibit 2, which is

18   summary chart, and if you'll look down here -- is that in front

19   of you, sir?

20   A.    It is, ma'am.

21   Q.    Okay.  And so if you look with me under that initial

22   disbursement of the $20 million, you'll agree with me that

23   F.G.G. Enterprises received $2.1 million, correct?

24   A.    Correct.

25   Q.    And that was an account that was for Mr. Gireud.  It's in

1   Mr. Gireud's name, correct?

2   A.   I can't tell by this document.  I mean I don't know what

3   account it went to.

4   Q.   Do you dispute that it went to F.G.G. Enterprises?

5   A.   Oh, no, I don't dispute that.  I just don't know nature of

6   the account that it went to.

7   Q.   And then on the $12 million payment, do you see right here

8   on July the 30th of 2010, that F.G.G. Enterprises received

9   $1,350,110?

10  A.   Yes.

11  Q.   So at that point in time when you are writing the e-mail,

12  going back to Government's Exhibit 132, in fact, F.G.G. had

13  received $4,450,100, correct?

14  A.   I don't know that.  I haven't added them up.

15  Q.   Do you want a moment to do the math so you can add it up?

16  A.   If that's close enough.

17  Q.   So you would agree with me then that when you wrote the

18  e-mail in July?

19  A.   Uh-huh.

20  Q.   Excuse me.  Let me pull it up for you -- I'm sorry -- in

21  November of 2011, that at that point in time, F.G.G. had

22  received over $4.4 million?

23  A.   I had no knowledge of that.

24  Q.   Okay.  Well, Mr. Miller, you did receive some money from

25  F.G.G., did you not?

1    A.   I did.

2    Q.   And in fact, going back to 2009, did you receive $20,000

3    from Mr. Delgado?

4    A.   In 2009?  I may have.

5    Q.   Let me show you what has been marked as Defendant's

6    Exhibit 167.  Do you see that in the front of you?

7    A.   Yes.

8    Q.   And that appears to be a check that Mr. Delgado --

9         MS. FRANCO:  Well, Your Honor, at this time, I move

10   for the admission -- I do not believe this has been admitted --

11   of Defendant's Exhibits 167, just the first page.

12        THE COURT:  Ms. Arreola, Defendant's 167?

13        MR. ARREOLA:  No, objection, Your Honor.

14        THE COURT:  Is there -- how much pages are there?

15        MS. FRANCO:  There's two pages, Your Honor.

16        THE COURT:  So it's just the first page.

17        MS. FRANCO:  Yes.  The second page is a different

18   check.

19        THE COURT:  Defendant's 167, the first page, is

20   admitted.

21        MS. FRANCO:  And if you can publish?

22        THE COURT:  Yes, ma'am.

23   BY MS. FRANCO:

24   Q.   Mr. Miller, so that would appear to be a check that

25   Mr. Delgado wrote to you in 2009 for $20,000; is that correct?

1    A.   Yes, ma'am.

2    Q.   And Government's Exhibit 144, there was a check that

3    Mr. Gireud wrote to you for $10,000 and that would be back in

4    2009.  Do you recall that?

5    A.   I don't recall it, but if you say so, I don't dispute it

6    either, I mean...

7    Q.   So Government's Exhibit 144, for the record, that's made

8    out to you, and it's a $10,000 check from Mr. Gireud from F.G.G.

9    Enterprises.  Do you see that?

10   A.   Yes, ma'am.

11   Q.   And at the bottom of that, it says consulting services,

12   correct?

13   A.   Correct.

14   Q.   And in 2010, also Government's Exhibit 144, it appears

15   Mr. Gireud wrote a check to you in the amount of three $4,000.

16   Do you see that, sir?

17   A.   Yes, ma'am.

18   Q.   And then it also in Government's Exhibit 144, there was a

19   check that Mr. Gireud wrote to you for $1,230, and it appears

20   that was for rent; is that correct?

21   A.   Yes, ma'am.

22   Q.   Was he renting space from you?

23   A.   No.  I probably paid the rent.  He probably reimbursed me.

24   Q.   And you also indicated that Mr. Kendrick or Kendrick

25   Electric is your uncle, correct?

1   A.   That's right.

2   Q.   And were you aware of Government's Exhibit 144 again that

3   Mr. Gireud apparently paid back Mr. Kendrick for his investment.

4   It's a check on April the 2nd, 2010, for $250,000.  Do you see

5   that?

6   A.   Yes, ma'am.

7   Q.   Okay.  And also Government's Exhibit 144, there's also a

8   check in September of 2010 and in the amount of $100,000.  And

9   is Ralph Kendrick your uncle?

10  A.   Yes, ma'am.  And I was aware of this check, yes.

11  Q.   And you were aware of that too?

12  A.   Uh-huh.

13  Q.   Is that a, yes, sir?

14  A.   Yes, ma'am.

15  Q.   And in 2011 -- let you see something since it has not been

16  admitted.

17          Did you see in front of you what's been marked as

18  Defendant's Exhibit 206?

19  A.   Yes, ma'am.

20          MS. FRANCO:  Your Honor, at this time I'd move for

21  admission of Defendant's 206.

22          THE COURT:  Any objection to 206, Ms. Arreola?

23          MR. ARREOLA:  No, Your Honor.

24          THE COURT:  Who's writing that check?

25          MS. FRANCO:  Mr. Gireud.

1           THE COURT:  It's F.G.G.?

2   BY MS. FRANCO:

3   Q.   And Mr. Miller --

4           THE COURT:  Do you-all have an updated list?

5           MS. FRANCO:  We'll provide it to you, Your Honor.

6   BY MS. FRANCO:

7   Q.   And Mr. Miller, that appears to be a check that Mr. Gireud

8   wrote to you for $200,000 back in June of 2011.

9   A.   Yes, ma'am.

10  Q.   Let me show you what's been marked as Defendant's

11  Exhibit 207.  Do you recognize that?

12  A.   Yes, ma'am.

13  Q.   Let me just show you the exhibit number.

14          MS. FRANCO:  I move at this time, Your Honor, for the

15  admission of Defendant's Exhibit 207.

16          THE COURT:  Any objection?

17          MR. ARREOLA:  No, objection, Your Honor.

18          THE COURT:  Defendant's 207 is admitted.

19  BY MS. FRANCO:

20  Q.   And Mr. Miller, this is a check also from Mr. Gireud in the

21  amount of 114,000; is that correct?

22  A.   Yes, ma'am.

23  Q.   At the time that you are writing the e-mail to Mr. Gireud

24  and Mr. Delgado, at that point in time between you and your

25  family, you had received over a million dollars from F.G.G.,

1    correct?

2    A.    Me and my family?  Are you talking about my uncle?

3    Q.    Yes, sir.

4    A.    Well he was repaid on an investment.  This money here was

5    money that I believe it was from Sulzer that was advanced in

6    2011, the 114 and the 200?

7    Q.    Okay.  Mr. Miller, let me back up and ask the question

8    again.

9    A.    All right.

10   Q.    At that point in time you wrote the e-mail to Mr. Gireud

11   and Mr. Delgado, you had personally received over $600,000,

12   correct, from an F.G.G. account?

13   A.    I personally received over 600,000.

14   Q.    And your uncle had received $350,000, correct?

15   A.    Yes.

16             MS. FRANCO:  May I have just a moment, Your Honor?

17             THE COURT:  Yes, ma'am.

18             MS. FRANCO:  Pass the witness, Your Honor.

19             THE COURT:  Ms. Arreola?

20             All right.  Apparently, I did not officially say 206

21   was admitted.  206 is admitted, Defendant's 206 is admitted.

22             MS. FRANCO:  Thank you, Your Honor.

23

24

25

1                          MACE MILLER,

2              REDIRECT EXAMINATION BY THE DEFENDANT

3    BY MS. ARREOLA:

4    Q.   Mr. Miller, I'm going to show you what's been or what is

5    already in evidence as Government Exhibit 4.  Do you recall

6    seeing this when Ms. Franco was asking you questions?

7    A.   Yes, ma'am.

8    Q.   I'm going to ask you to take a look at a page that she

9    showed you which is page four.  Do you recall seeing this during

10   your examination?

11   A.   Yes, ma'am.

12   Q.   I'm going to scroll up to the bottom of the page before.

13   And I'm going to read that and then I'm going to ask you a

14   question.

15   A.   Okay.

16   Q.   Article 2554 of the Federal Civil Code of the Mexican

17   United States reads as follows.

18           Is this series of paragraphs on page four a recitation

19   of what is in a Mexican Federal Civil Code?

20   A.   Yes, ma'am.

21   Q.   And in this, is Mr. Fernando Gireud giving all of the

22   powers that are within these paragraphs of the Mexican Federal

23   Civil Code?

24           MS. FRANCO:  Objection, Your Honor.  Calls for an

25   expert opinion.

1           MR. ARREOLA:  She asked him the question; same

2    question a different way.

3           THE COURT:  Well, I'm going to overrule that

4    objection.  He can tell us what it means to him as a lawyer.

5    BY MS. ARREOLA:

6    Q.   And if you need to look at the numbered document, it's in

7    front of you in one of the binders?

8    A.   Could you repeat your question, ma'am?

9    Q.   Is this Power of Attorney providing Mr. Delgado with all of

10   the powers that are recited here or is it simply quoting what is

11   in the Mexican Federal Civil Code?

12   A.   It's Roman numeral VII is quoting the Federal Civil Code of

13   the Mexican United States.

14   Q.   And on page four, is there any paragraph here, any

15   provision here that gives authorization to divert funds to an

16   offshore account and go on a spending spree?

17   A.   No.

18   Q.   Is there any authorization here to defraud a client?

19   A.   No, ma'am.

20   Q.   Is there any authorization in here to conceal how much

21   money was deposited into F.G.G.'s account?

22   A.   No, ma'am.

23   Q.   Is there any authorization in here to misrepresent how much

24   money has been deposited into the account?

25   A.   No, ma'am.

1    Q.   Ms. Franco also asked you about the e-mail that you sent in

2    November 2011, which is Government Exhibit 132.

3    A.   Uh-huh.  Yes.

4    Q.   Do you see that this e-mail was sent on November 9th, 2011?

5    A.   Yes, ma'am.

6    Q.   After you sent this e-mail or at the time that you sent

7    this e-mail, did you know that there was at least $36,000 in the

8    account that Mr. Delgado later used to pay somebody named

9    Gabriel Larraguivel?

10   A.   No.  No, I do not.

11   Q.   At the time that you sent that e-mail in November 2011, do

12   you know that there was over $100,000 that Mr. Delgado then sent

13   to Jar Investments and Rudolph Chevrolet?

14   A.   No, ma'am.

15   Q.   At the time that you sent that e-mail, did you know that

16   there was at least $10,000 that he then spent --

17            MS. FRANCO:  I'm sorry to interrupt, but she's

18   indicating that this is after the e-mail had been sent 2012, and

19   she's talking about in November of 2011, so it's a

20   mischaracterizing what has been in evidence.

21            MR. ARREOLA:  Your Honor, the e-mail is dated

22   November 2011, and the transactions I'm looking at are in 2012.

23            THE COURT:  I'm not sure what your objection is,

24   Ms. Franco.

25            MS. FRANCO:  Your Honor, she's testifying about --

1          THE COURT:  Right.  You're saying that he couldn't

2    have known.

3          MS. FRANCO:  Right, because this happened in 2011.

4          THE COURT:  All right.  But I guess you can cover that

5    on your re-cross.

6    BY MS. ARREOLA:

7    Q.   Do you see any other deposits into the account on summary

8    chart two other than the March 9th, 2010 deposit and a July 6th,

9    2010, deposit?

10   A.   I don't see any other deposits, no, ma'am.

11   Q.   And at the time that you sent that e-mail on November of

12   2011, were you aware that there was at least $150,000 in the

13   account that then went to Delgado and Associates' IOLTA account?

14   A.   No, ma'am.

15   Q.   Now Ms. Franco also asked you about a number of checks.

16   A.   Yes, ma'am.

17   Q.   And I'm going to ask you about those in a moment.

18          Did you receive any funds from a Skippings and Rutley

19   account in the Turks and Caicos Islands?

20   A.   No, ma'am.

21   Q.   I'm going to ask you to take a look at Defense Exhibit 206.

22   A.   Yes, ma'am.  I see it.

23   Q.   What was this check for?

24   A.   This check, my recollection of this is that there had been

25   some payments made by Sulze Turbo Services, which was going to

1    provide the L.T.S.A.   It was really a loan, it was an upfront

2    loan from Sulzer to F.G.G. to get things moving on the L.T.S.A.

3    Q.    Why were you paid from that money?

4    A.    Because I needed to be paid for my work that I was doing.

5    I was spending hours a day, you know, all week arranging

6    transportation and doing other things.   What I was told is there

7    was no money in the F.G.G. account from the equipment sales to

8    pay me and so they paid me out of this.

9    Q.    I'm going to ask you now to look at Defense Exhibit 207.

10   A.    Yes, ma'am.

11   Q.    What was this check for?

12   A.    Same thing.   It was that same type of a deal.   I needed to

13   get paid and Sulzer Turbo Services had given some money to

14   F.G.G. and that's how F.G.G. paid me.

15   Q.    Now Ms. Franco also asked you some questions about the

16   teaming agreement, which I'm going to pull up.   That's

17   Government Exhibit 7.   I'm going to read you a paragraph from

18   the teaming agreement and then ask you a question.

19          For the record, it's Government Exhibit 7, and I'm

20   going to be reading from Section 1.3, Teaming for L.T.S.A.,

21   paragraph D:   Prior to submission of the proposal, F.G.G. shall

22   obtain C.F.E.'s unconditional consent for the assignment of the

23   L.T.S.A. prime contract -- I'm going to skip what's in

24   parenthesis -- between F.G.G. and C.F.E. to M.P.S.A. as provided

25   in paragraph 1.3E below, if F.G.G. is awarded the L.T.S.A. prime

1    contract.  C.F.E.'s refusal to give its prior unconditional

2    consent to F.G.G. for the assignment or F.G.G.'s inability or

3    refusal to assign the L.T.S.A. prime contract to M.P.S.A. for

4    any reason, such that M.P.S.A. will not be the sole party and

5    contract directly with C.F.E. on the basis described below that

6    the L.T.S.A. prime contract shall be a reasonable cause for

7    termination of this agreement.

8              Isn't it a fact that F.G.G. agreed to assign the

9    L.T.S.A. prime contract to M.P.S.A.?

10   A.   They -- the memorialization of the contract -- this is a

11   teaming agreement.  Certainly under this teaming agreement, that

12   was the case.  F.G.G. and M.P.S.A. never reached terms as to how

13   each of those organizations would participate in the L.T.S.A.

14   prime contract.  But certainly under the teaming agreement, that

15   is an affirmative duty, yes.

16   Q.   I'm going to now ask to you look at Government Exhibit 40A.

17   Oh, excuse me.  That's the wrong exhibit.

18              I'm going to ask you to take a look at Government

19   Exhibit 95.  Do you recall Ms. Franco asking you about this

20   e-mail?

21   A.   Yes, ma'am.

22   Q.   And do you recall her asking about this last paragraph?

23   A.   Yes, ma'am.

24   Q.   I'm going to read the first sentence just to refresh your

25   memory.

1              Regarding another matter, it is my understanding that

2      Mitsubishi has attempted to interfere with an existing long-term

3      service agreement contract between F.G.G. and C.F.E.

4              Where did this information come from?

5      A.   From Marco.

6      Q.   Do you have any personal knowledge of Mitsubishi having

7      tried to interfere with an L.T.S.A.?

8      A.   No, I don't have any personal knowledge of that.

9      Q.   Ms. Franco also asked you about a conversation with

10     Mr. Delgado in which he represented to you that John Adams had

11     agreed to a pledge.  Do you recall that testimony?

12     A.   I do.

13     Q.   Did John Adams ever personally communicate to you that he

14     had approved a pledge of Mitsubishi's equipment?

15     A.   No, ma'am.

16     Q.   I'm going to ask you to take a look at Government

17     Exhibit 18A, which is the prime contract.

18     A.   Okay.

19     Q.   Oh, excuse me.  I'm looking at the wrong exhibit.

20              Ms. Franco asked you about whether or not it was

21     contemplated that C.F.E. could waive the letter of credit

22     requirement.  Do you recall her asking you about that?

23     A.   I do, yes.

24     Q.   Did Marco ever represent to you that C.F.E. had waived the

25     letter of credit requirement?

1    A.   No.

2    Q.   What was your understanding of the letter of credit

3    requirement based on what Mr. Delgado told you?

4    A.   That it still existed.  That it always existed.

5    Q.   And what did he say to you that gave you that impression or

6    understanding?

7    A.   We have to go get a letter of credit.  We need to look for

8    a letter of credit.

9    Q.   And did he tell you whether or not he had successfully

10   obtained a letter of credit?

11   A.   He said that he arranged for a letter of credit to be

12   posted, by a third party.

13              MR. ARREOLA:  Your Honor, may I have a moment?

14              THE COURT:  Yes, ma'am.

15              MR. ARREOLA:  No further questions, Your Honor.

16              THE COURT:  Ms. Franco?

17                        MACE MILLER,

18              RECROSS-EXAMINATION BY THE DEFENSE

19   BY MS. FRANCO:

20   Q.   Mr. Miller, the teaming agreement between M.P.S.A. and

21   F.G.G. contemplated a letter of credit for the long-term service

22   contract as well, correct?

23   A.   Yes, I believe it did.

24   Q.   And the requirements of C.F.E. would require a long-term

25   service -- I'm sorry -- under the long-term service contract

1    with C.F.E., it too required a letter of credit, correct?

2    A.   Yes, ma'am.

3              MS. FRANCO:  May I have just a moment, Your Honor?

4              THE COURT:  Yes, ma'am.

5              MS. FRANCO:  Pass the witness, Your Honor.

6              THE COURT:  May Mr. Miller be permanently excused?

7              MS. KANOF:  Yes, Your Honor.

8              THE COURT:  Ms. Franco?

9              MS. FRANCO:  Yes, Your Honor.

10             THE COURT:  Mr. Miller, thanks so much for coming

11   down.  You are excused and free to go.

12             (Witness excused.)

13             THE COURT:  Who's your next witness?

14             MS. KANOF:  Your Honor, the government calls Juan

15   Pablo Matamala Cortes.

16             (Interpreter Edna Ledesma sworn in by the Court.)

17             (Witness present and sworn by the Court.)

18                  JUAN PABLO MATAMALA CORTES,

19             DIRECT EXAMINATION BY THE GOVERNMENT

20   BY MS. KANOF:

21   Q.   State your name, please.

22   A.   Juan Pablo Matamala Cortez.

23   Q.   And how are you employed, sir?

24   A.   I work at the Attorney General's office for the

25   electrical -- the Federal Electrical Commission.

 1 | Q.   And where is that located?

 2 | A.   In the City of Mexico.  Mexico Distrito Federal.

 3 | Q.   And you say you worked in the Attorney General's office.

 4 | Can we call it -- first of all, do you call it C.F.E.?

 5 | A.   Yes.

 6 | Q.   Okay.  And you said you work in the Attorney General's

 7 | office with the C.F.E.  Are you an attorney?

 8 | A.   Yes.

 9 | Q.   Where are you an attorney?

10 | A.   In Mexico City.

11 | Q.   And could you briefly give the jury a little bit of your

12 | employment background with regard to your practices as an

13 | attorney with the government of Mexico?

14 | A.   I'm sorry.  Can you repeat the question?

15 | Q.   How long have you been an attorney?

16 | A.   Since 1998.

17 | Q.   In 2004, where did you go to work?

18 | A.   For a Mexican petroleum company.

19 | Q.   And what is it called?

20 | A.   PEMEX.

21 | Q.   And is that -- it's P-E-M-E-X, all caps -- is PEMEX owned

22 | by the Mexican government?

23 | A.   Yes.  It was a centralized entity.

24 | Q.   And did you work as an attorney for PEMEX?

25 | A.   Between 2004 and 2008.

1    Q.    Where did you go in 2008?

2    A.    I went to work with a company Luz, L-U-Z, y, that's Y,

3    Fuerza, F-U-E-R-Z-A.

4    Q.    And did the power and light company break up?

5    A.    Yes.   The electric company that's provided power to the

6    center of the country, the city.

7    Q.    And after that company broke up, did you continue to work

8    jobs for short periods of time with different parts of the

9    Mexican government?

10   A.    Yes.

11              THE INTERPRETER:  I need clarification, Your Honor.

12              THE COURT:  Yes, ma'am.

13              (Interpreter and witness conversing in Spanish.)

14   A.    Yes.   I worked first at the legal advisory office for the

15   presidency of the Mexican government, and then I went to work

16   for D.I.F., which is the Department of Family Integration, and

17   then following that I went back to work for another seven years

18   with -- I'm sorry.   Correction -- seven months at PEMEX.

19   BY MS. ARREOLA:

20   Q.    And the president that you worked for, was that Calderon?

21   A.    Yes.

22   Q.    Why did you leave PEMEX a second time?

23   A.    Because while I was working, the Attorney General working

24   for the C.F.E., I requested that I go work with them with the

25   C.F.E.

1    Q.   Was that the same attorney general that you had worked for

2    at PEMEX before?

3              THE INTERPRETER:  I'm sorry?  In PEMEX?

4              MS. KANOF:  Yes.

5    BY MS. ARREOLA:

6    Q.   Was that the same general counsel that you worked for now

7    at C.F.E.?

8    A.   Yes.  Where he was working previously with PEMEX, he was

9    head of a contractual obligations, and then when he requested I

10   go work with him with C.F.E., at that point he was now Attorney

11   General.

12   Q.   And when did you go to begin your job in the Attorney

13   General's office and C.F.E.?

14   A.   That would be May 19th, 2011.

15   Q.   What is C.F.E.?

16   A.   The C.F.E. is a commission.  It's a state entity whose main

17   objective -- excuse me -- is to generate, transmit the sale, the

18   distribution of electrical energy throughout the country of

19   Mexico.

20   Q.   What is the Fideicomiso?

21   A.   The one related to prior expenses?  The Commisso?

22   Q.   Is there -- in the documents that have been admitted into

23   evidence with regard to C.F.E., there is a term the Fideicomiso.

24   So what is the Fideicomiso?

25              MR. HANSHEW:  Objection, Your Honor.  He hasn't been

1    shown the documents that have been admitted into evidence.  How

2    is he going to testify to that?

3            THE COURT:  Maybe -- has he seen these documents that

4    we can just lay some foundation?

5            MS. KANOF:  Yes, Your Honor.

6    BY MS. ARREOLA:

7    Q.   Are you familiar with the documents -- all of the documents

8    that were generated to enter into an agreement to provide

9    electrical generation for Agua Prieta?

10   A.   Yes.

11   Q.   I have in front of you --

12           MS. KANOF:  If it would please be published,

13   Government Exhibit 18, in Spanish?

14           THE COURT:  GX-18 has been admitted.

15   BY MS. KANOF:

16   Q.   And is it in front of you on the screen?

17   A.   Yes.

18   Q.   And it's hard to read through the stamps, but del

19   fideicomiso?

20   A.   (Responds in Spanish.)

21           THE INTERPRETER:  I'm sorry.

22           MS. KANOF:  Sorry.

23           THE INTERPRETER:  Just a minute.

24           THE COURT:  Did you --

25           THE INTERPRETER:  Are we looking at the pledge or the

1    contract?

2              MS. KANOF:  You're looking at Government's

3    Exhibit Number 18.

4              THE COURT:  Is it not on your screen?

5              MS. KANOF:  It's Government Exhibit 18.

6              THE COURT:  It should be on that screen.

7              THE INTERPRETER:  Yes, Your Honor, but I have the

8    translated documents that if I understand it, have been --

9              THE COURT:  It's 18A.  Do you need to look at the

10   English version?

11             THE INTERPRETER:  I want to follow the English.

12             MS. KANOF:  I'll open it for you.  That would be

13   the -- it's the prime contract.  Do you see it?

14             THE INTERPRETER:  Oh, I see it now.  "This would be

15   the contract by and between the trustee for the trust for the

16   management of prior expenses number 10248."

17   BY MS. KANOF:

18   Q.   Okay.  And I'm going to go back to the Spanish for the

19   witness.

20             What is the Fideicomiso?

21   A.   The Fideicomiso is essentially a contract that was

22   celebrated between for the C.F.E. and this was signed between

23   the C.F.E. and the National Bank of International Commerce and

24   they would serve as a fiduciary for F.C.E. [sic] --

25             MS. KANOF:  C.F.E.

1          THE INTERPRETER:  "C.F.E.," thank you.

2          MR. HANSHEW:  This testimony is expert testimony.  You

3    have an individual that who's already been identified that he's

4    worked at the C.F.E. till May 2011, but she postdates these

5    documents and is now testifying about the legal meaning of these

6    documents as a lawyer.  They provided no notice of an expert,

7    Judge.

8          MS. KANOF:  Your Honor, he -- oh, I'm sorry.

9          MR. HANSHEW:  He clearly could've contemporarily never

10   been part of this and yet is already starting to opine about

11   what these mean, and this is not information that's the

12   standard, you know, layperson understands.  It's only the

13   specialized training as they already built up in his resume in

14   Mexico, Judge.

15         MS. KANOF:  First of all, it's not expert testimony.

16   He works for this company and I'm asking definitions to assist

17   the jury.  Secondly, he is going to testify about he did meet

18   Mr. Delgado and he did participate in this contract towards the

19   end, and I'm going to ask about policies of C.F.E.  I'm not

20   going to ask for any expert testimony or legal interpretation of

21   anything.

22         THE COURT:  Well, I'm going to sustain Mr. Hanshew's

23   objection up to now.  You can ask another question under what

24   you just told me and that would be fine.

25         If it relates to his time with the C.F.E., that

1    certainly is something he has personal knowledge of and perhaps

2    can tell us about it.  But I think he's telling us about

3    something that happened when he wasn't there?

4           MS. KANOF:  I asked him to explain what the

5    Fideicomiso is and perhaps he was just too much of a narrative.

6           THE COURT:  All right.  I guess he answered that

7    question that it was an agreement.

8    BY MS. KANOF:

9    Q.   Now --

10          THE INTERPRETER:  I'm sorry, Your Honor.  Did you

11   want -- the testimony is not being put on the record?

12          THE COURT:  No, I'm sustaining Mr. Hanshew's objection

13   at the point he objected.  So the remainder of your answer is

14   excluded.

15   BY MS. KANOF:

16   Q.   At some point in time, were you asked to investigate what

17   happened with regard to the Agua Prieta II as part of your job

18   with the Agua Prieta contract in this case?

19   A.   Yes.

20   Q.   By whom were you asked to investigate?

21   A.   The Attorney General for the C.F.E.

22   Q.   Are you also a custodian of the records of C.F.E.?

23   A.   The ones that are related to project development and are of

24   a legal nature, yes.

25   Q.   Okay.  The employees of C.F.E. that are not management, do

1    they belong it to a labor union?

2    A.   Yes.   There're two types of employees that are working with

3    the C.F.E.   There are those of us that are deemed administration

4    and those that are part of the labor union.

5              THE COURT:  Ms. Kanof, if I can just have --

6              Do we need a break?

7              (Jury members nod affirmatively.)

8              THE COURT:  Ladies and gentlemen of the jury let's

9    recess for ten minutes.  If you'll be back in the jury room in

10   ten, we'll resume our proceedings then.

11             THE COURT SECURITY OFFICER:  All rise.

12             (Break at 10:21 a.m. to 10:33 a.m.)

13             THE COURT:  Let the record reflect that all members of

14   the jury are present, the United States through its assistant

15   United State's attorneys are present, the defendant and his

16   attorneys are present.

17             At the next break talk amongst yourselves and see if

18   you would be interested in starting at 8:30 rather than 9:00,

19   because I see most of you get here by 8:30.  If you want to

20   start earlier we can certainly do that.  Talk about it over the

21   break and let us know.

22             MS. KANOF:  Your Honor, can we approach the bench?

23             THE COURT:  You don't want to start at 8:30?

24             MS. KANOF:  I'd love to start at 8:30.

25             THE COURT:  We can talk it, about the break.

1          MS. KANOF:  It doesn't have anything to do about the

2     time.  It has to do with a witness, Your Honor.

3          THE COURT:  All right.

4          (Bench conference.)

5          MR. ARREOLA:  Your Honor, we'd ask the court to look

6     at Rule 701, the advisory committee notes, because they

7     distinguish between expert testimony and testimony or knowledge

8     that a witness gains by virtue of his or her position in the

9     business.  And the government submits that the information we're

10    asking about is not expert, but things he's learned by virtue of

11    being an attorney in the A.G.'s Office at C.F.E.  So I'm looking

12    the amendments -- the 2000 amendments to Rule 701.

13         THE COURT:  Okay.

14         MR. ARREOLA:  And I'm looking at the paragraph

15    beginning with "for example."

16         THE COURT:  Is that O'Connor's?  What do you have?

17         MS. ARREOLA:  The West.

18         THE COURT:  I don't know that I have that.  Show me

19    where.

20         MR. ARREOLA:  Under the 2000 Amendment, sir.

21         THE COURT:  2000.  Okay.

22         MR. ARREOLA:  The paragraph beginning "for example."

23         THE COURT:  Okay.  I get that first sentence.  I agree

24    with that.  No problem.

25         MS. ARREOLA:  And then if you'd continue reading to

1    such opinion testimony is admitted, not because of experience,

2    training or specialized knowledge, but because of the

3    particularized knowledge that the witness has by his or her

4    position in the business.

5           THE COURT:  All right.  So there's a huge difference

6    between testifying as to the value of things which the courts

7    traditionally have allowed people to testify about the value of

8    things, but -- because I'm not sure why that's always been

9    something they do, but to extrapolate from that, then you can go

10   into him testifying about things that are within his expertise

11   as an attorney and those functions there.  I don't see how that

12   would make that legal.

13          MR. ARREOLA:  There's another example.

14          THE COURT:  Okay.

15          MS. ARREOLA:  The amendment goes on, for example, to

16   give an example of somebody who is a user of a narcotic and that

17   person was able to testify that they identified a substance as

18   such based on their prior use, but that didn't convert them into

19   an expert.  It was simply by virtue of what they had witnessed.

20          THE COURT:  Well, the courts just have to decide what

21   they -- they can't talk out of both sides of their mouth,

22   because clearly the rule is if a witness is testifying as an

23   expert based on scientific technical or other specialized

24   knowledge -- that would be, let's see, 702 -- qualified as an

25   expert by knowledge, skill, experience.  That guy is an expert

1    in what a drug looks like through his experience and for the

2    courts to then say that the rule will apply in some cases and

3    not others, I don't understand that.  To me, if you are an

4    expert because of your experience, then you're an expert because

5    of your experience.  I'm not sure why some cases -- what circuit

6    that -- is that a Fifth Circuit or some circuit that doesn't

7    matter to us?

8              MR. ARREOLA:  It's an Eighth Circuit case cited under

9    the Advisory Committee notes.

10             MS. KANOF:  But it's the Advisory Committee notes.

11             THE COURT:  You know, if we're going to have a rule,

12   let's have a rule, but if you're telling me you're an expert

13   because of your knowledge, skill, experience, training or

14   education then that makes you an expert.  That makes him an

15   expert.  It makes that drug addict an expert because of

16   experience.  How they get around it by that, I have no idea.

17   I'm not -- I guess --

18             MR. ARREOLA:  Your Honor, the rule does distinguish

19   between Rule 7 -- and there two different rules -- Rule 701, the

20   opinion testimony --

21             THE COURT:  Right.

22             MS. ARREOLA:  -- and rule 702.

23             THE COURT:  Right.  And lay opinion and these people

24   can give their testimony based on things that don't require --

25   but not based on scientific, technical or other specialized

1      knowledge.  If it's based on one of those three, it takes you

2      out of 701 and takes you to 702, because of expertise based on

3      knowledge, skill, experience or education.

4             MS. KANOF:  Judge, here's the problem.  Here's why

5      we're here.

6             MR. HANSHEW:  The problem is he's an expert.  I think

7      we all agreed on that.

8             MS. KANOF:  Excuse me.  I think I was trying to

9      explain something to the Court.

10            He is an attorney, but the documents in this case deal

11     with C.F.E. policy and he knows about the policy by virtue of

12     him being in the Attorney General's office.  It's his job to

13     know about the policies.

14            THE COURT:  As long as he's not going to interpret,

15     give us legal meanings and things like that, he can tell us what

16     the function of his job is like anybody else.

17            MS. KANOF:  Can he tell you what the function of a

18     document is though?  That's the question.

19            THE COURT:  If it's going to require --

20            MS. KANOF:  Per C.F.E., because what he tells us in

21     pretrialing is this is not -- I'm not telling what you Mexican

22     law is.  I am telling you what the policy of C.F.E. was to enter

23     into a contract, what the policy was required to do certain

24     things.  And that's different than him saying Mexican law

25     requires this, for example.

1          THE COURT:  I got that.  If he's talking about things

2     going on within his office, because what's going on in his

3     office, I don't consider that to be expert testimony because

4     then otherwise every human being that comes into court would be

5     an expert.  I get that.

6          MS. KANOF:  But it's complicated in this case because

7     he's a lawyer.

8          THE COURT:  Yeah.

9          MS. KANOF:  And him knowing -- part of is is being a

10    lawyer.

11          THE COURT:  And there are some exceptions for factual

12    and legal issues that are mixed and whether or not that's

13    expertise, but let's just hear --

14          MS. KANOF:  And that's exactly the problem.  We're

15    going to have here.

16          MR. HANSHEW:  Since we're up to here, I have suspicion

17    that this is leading towards the document route into the

18    investigations of Buendia and these other categories.

19          MS. KANOF:  No.

20          MR. HANSHEW:  Okay.  I just want to make sure we're

21    not going there about what others conclude other people have

22    done or not at C.F.E., their propriety or not.  This is a

23    problem we had with those documents translated about the

24    conclusions that he's not going to get into.

25          MS. KANOF:  No.  No.

1          MR. HANSHEW:  Okay.

2          (Bench concludes.)

3   BY MS. KANOF:

4   Q.   Okay.  Mr. Matamala, I was starting to ask you about the

5   interrelationship between the union and employs of C.F.E.  And

6   you started to explain the relative positions of individuals and

7   whether they are in the union or not.  Could you explain that

8   please?

9   A.   (Spanish.)

10          MR. HANSHEW:  This is getting into the discussion

11   about what Mexican law says.

12          THE COURT:  You can translate everything up to that

13   point.  But not about (Spanish).

14   A.   All employees per se are actually employed by the C.F.E.

15   And then we're divided by those that are under specific -- the

16   labor union and those that are deemed administrative employees.

17   BY MS. KANOF:

18   Q.   In order to enter into the contract of Agua Prieta II, does

19   the union have input?

20   A.   No.

21   Q.   Okay.  Who is Nereo Vargas?

22   A.   Mr. Nereo Vargas is one of the heads of the labor union of

23   the electrical works for the C.F.E.

24   Q.   Do you know whether or not Mr. Vargas controls the

25   retirement plan for the union workers?

1    A.    I wouldn't know.

2    Q.    Okay.  Is the union involved in public solicitations to

3    build projects?

4         MR. HANSHEW:  Objection, Your Honor.  That calls for a

5    legal conclusion.

6         MS. KANOF:  I'll rephrase it, Your Honor.

7         THE COURT:  Okay.

8    BY MS. KANOF:

9    Q.    Was the union involved in the public solicitation for the

10   R.F.P. and input into the solicitation for Agua Prieta II?

11   A.    I don't know.  I have no knowledge of that.  I don't know.

12   Q.    In your capacity at C.F.E., at some point in time did you

13   get involved with the Agua Prieta II project?

14   A.    Yes.  At the point where the C.F.E. became aware that the

15   project was not moving forward as expected, then the general

16   counsel was brought in in order to try to recuperate the

17   turbines so the project could then move forward.

18   Q.    Where is Agua Prieta?

19   A.    It is to the north of the state of Sonora in Mexico.

20   Q.    How big is it?

21   A.    It's a very small city.

22   Q.    Did it need a new power generation plant?

23   A.    Well, Agua Prieta per se on its own perhaps, but I'm not

24   aware, but the state of Sonora that, is to say the whole

25   northern part of the country, did need this power plant.

1    Q.    Okay.  And do you -- do you remember when it was that you

2    got involved with the Agua Prieta II contract?

3    A.    I became aware of the project in December of 2011.

4    Q.    What was the first thing you did with regard to it?

5    A.    The first time that I became involved with this project was

6    when the general counsel requested that I accompany him to a

7    meeting around the middle of December of 2011 between F.G.G. and

8    C.F.E. in order to come to an agreement in order to make the

9    project move forward.

10   Q.    Okay.  And where was that meeting?

11   A.    That meeting took place in the offices of C.F.E. and the

12   office of finance project -- finance projects department.

13   Q.    For C.F.E., who was at the meeting?

14   A.    (Spanish.)

15   Q.    Let me do it one by one.

16          Who is Ingeniero Laris?

17   A.    He was the head -- he was the director of finance projects

18   for that department.

19   Q.    Who else?

20   A.    And then we had Alberto Ramos.  He was the deputy director

21   of construction projects under the same department of financed

22   projects.

23   Q.    Okay.  And who else was there for C.F.E.?

24   A.    And we also have engineer Ramon Fernandez.

25   Q.    What was his role?

1    A.    He was the coordinator for projects of thermo electricity

2    under the finance department.

3    Q.    And was there anybody else under C.F.E.?

4    A.    And then the general counsel and myself.

5    Q.    For F.G.G., who was present?

6    A.    Mr. Marco Delgado.

7    Q.    Was Fernando Gireud there?

8    A.    No.

9    Q.    Have you ever met Fernando Gireud?

10   A.    No.

11   Q.    Was Mace Miller there?

12   A.    No.

13   Q.    Have you ever met Mace Miller?

14   A.    No.

15   Q.    Would you recognize Mr. Delgado if he were here in the

16   courtroom?

17   A.    Yes.

18   Q.    Could you indicate where he is?  If I said this was number

19   one, that was number two and that was number three at this

20   table, which number is he, if any?

21   A.    Number two.

22           MS. KANOF:  Government asks that the record reflect

23   that the witness has identified the defendant.

24           THE COURT:  Mr. Hanshew?

25           MR. HANSHEW:  No, objection.

1          THE COURT:  The record will so reflect.

2    BY MS. KANOF:

3    Q.   Was there a technical person from F.G.G. present at the

4    meeting?

5    A.   Yes, Ramon Fernandez.

6    Q.   Was he there for F.G.G.?

7    A.   No.  He was a C.F.E. representative.

8    Q.   Okay.  Was there anyone from F.G.G. that was from a

9    technical side?

10   A.   No.  The only one that I remember would be Mr. Marco

11   Delgado.

12   Q.   What was the major concern for the meeting?

13   A.   That the meeting was held because there were communication

14   problems between F.G.G. and C.F.E.  The representative from

15   C.F.E. argued that the representative from F.G.G. was not

16   answering their communications, was not paying attention to

17   them, was not providing documents related to the project.

18   Q.   Was there something particular going on with the project as

19   a result of that lack of communication?

20   A.   Well, the project was starting to fall behind schedule and

21   it was not clear that it would be completed and that is why we

22   were called in.

23   Q.   Okay.  And what happened at the meeting?

24   A.   Well, there were back and forth discussions mainly between

25   Marco Delgado and Ramon Fernandez, and they just could not come

1    into an agreement as to why there was a breakdown in

2    communication.  Finally it was decided that Alberto Ramos would

3    take responsibilities for communications between F.G.G. and

4    C.F.E.

5    Q.   Okay.  So what was Mr. Ramos' role in this project prior to

6    this meeting?

7              THE INTERPRETER:  Prior to this meeting?

8              MS. KANOF:  Prior to this meeting.

9    A.   Well, Alberto Ramos was actually head of the technical

10   area.  When it came time to do the assessment when they put the

11   project out to bid for Agua Prieta for the manufacturing of the

12   turbines, he is the one that approved the request for the bids

13   that eventually F.G.G. won through the bidding process and he

14   was granted the project for the building of the turbines for

15   C.F.E.

16   BY MS. KANOF:

17   Q.   Okay.  So I'm not sure I understand what role he actually

18   played.  He approved the bid?  Is that what he did, Ramos?

19   A.   Yes.  He approved a portion, the technical aspects of it.

20   Q.   And once a bid is in place, who at C.F.E. takes over?

21   A.   (Spanish.)

22              MR. HANSHEW:  Your Honor, there's additional questions

23   being asked.

24              THE COURT:  She's clarifying what he said.

25              MR. HANSHEW:  I didn't quite hear.

1              THE COURT:  So she can interpret what he said.

2    A.    C.F.E. then takes over the processing of the contract,

3    finalizing the contract for the Agua Prieta project.  And since

4    this is a thermal electric project then they have to coordinate

5    this.  So this then falls into the care of the C.P.T. [sic], the

6    coordinators for thermal projects.

7    BY MS. KANOF:

8    Q.    Would that be what's called a project manager?

9    A.    Yes.  The project administrator of the thermal electric

10   projects, yes, that would be the one in charge of this project.

11   Q.    And at the December 2011 meeting, was that Mr. Fernandez?

12   A.    Yes.

13   Q.    Are you aware of what Mr. Delgado does for a living?

14   A.    Now?

15   Q.    Is he an attorney?

16   A.    Well, I just met him as a representative for F.G.G.

17   Q.    Okay.  Was anybody from Mitsubishi there at this meeting?

18   A.    No.

19   Q.    And the -- were there any technical issues being discussed

20   at this meeting?

21   A.    No.  No, it was an exclusive meeting between C.F.E. and

22   F.G.G.

23   Q.    How is communication usually coordinated once a project

24   gets going?

25   A.    Well, the contract specifies that the communication would

1    be between a representative from C.F.E. and contractor, the

2    provider that is granted the bid, a representative from them.

3    Q.   Okay.  The technicians, do they usually talk to each other

4    directly?

5    A.   Yes, constantly.

6    Q.   Okay.  And was that happening in this case?

7    A.   Yeah, there were several meetings where there were

8    discussions about the technical aspects between the technical

9    people and the C.F.E.

10   Q.   With regard -- do you know what -- was there any discussion

11   about anchors at this meeting?

12   A.   Actually, there was no discussion about the anchors, not

13   for the meeting at December.  That was actually discussed at

14   other meetings at another time, but not at the December meeting

15   was there a discussion about the anchors.

16   Q.   When was the next meeting that you attended?

17   A.   That would be approximately February of 2012.

18   Q.   And where was that meeting held?

19   A.   That was also at the office of finance projects.

20   Q.   And who was at that meeting?

21   A.   On behalf of the C.F.E., we had Engineer Laris, Engineer

22   Alberto Ramos, the general counsel, Mr. Marco Delgado, and then

23   we had Mr. Burgueño on behalf of Mitsubishi.  There was another

24   individual from Mitsubishi, but I do not recall their name.  And

25   I was present as well.

1    Q.   Mr. Burgueño, by that time was an attorney for Mitsubishi

2    in Mexico; is that correct?

3    A.   Yeah, by that time Mr. Burgueño was part of a group of

4    attorneys, Von Wobeser y Sierra, on behalf of Mitsubishi.

5             THE COURT:  Could we get a spelling of that, because

6    for the record --

7             MS. KANOF:  Yes, absolutely.

8             Sorry, Kathi.

9             THE WITNESS:  V-O-N B-E-B-B-E-R [sic].

10            THE COURT:  Where is the Fon (phonetic)?  Where is the

11   Fon in all of this?  Is it F-O-N or V-O-N?

12            THE WITNESS:  B- [sic] -O-N.

13            MS. KANOF:  Is that the name of the law firm?

14            THE COURT:  Hold on.

15            THE INTERPRETER:  It's a German name of the law firm

16   that would be -- I'm sorry -- V-O-N B-O-B-E-C-E-R [sic].

17            THE COURT:  You said V-O-N, as in Von?

18            THE INTERPRETER:  As in Victor, yes, Your Honor.

19            MS. KANOF:  That's the German name of the law firm

20   that Mr. Burgueño was with.

21   A.   It's the German firm, yes.

22   BY MS. KANOF:

23   Q.   Okay.  All right.

24            So this was held again at C.F.E., correct?

25   A.   That's correct.

1   Q.   And why did you have to have a second meeting?

2   A.   Well, by the beginning of February, we received some

3   communications from Emilio [sic] Burgueño indicating that F.G.G.

4   had pledged on behalf of Mitsubishi some property that did not

5   belong to F.G.G., and it was not valid because Mitsubishi was

6   the actual owner of the turbines that were pledged.

7   Q.   And what was the purpose of the meeting once you received

8   that information?

9   A.   Well, mainly what we wanted to determine was whether this

10  was actually the case, whether Mitsubishi had pledged or not

11  pledged these projects -- these turbines and mainly for the

12  project to move forward.

13  Q.   Had Mr. Delgado provided you with some inventory numbers

14  for the turbines?

15  A.   No.

16  Q.   No?  Okay.

17          The purpose of the meeting, did you proceed -- did you

18  discuss this pledge issue?

19  A.   Well, yes, this pledge was discussed, but we really didn't

20  come to any type of conclusion.  What ended up being offered

21  was -- F.G.G. was now offering to substitute this pledge to

22  C.F.E., wherein they had previously pledged these turbines.

23  Q.   What were they going to substitute it with?

24  A.   They were offering a bond from F.G.G. and this would be

25  provided to C.F.E.

1    Q.    C.F.E.?

2    A.    C.F.E. within a 10- to 15-day period.

3    Q.    Who made that offer?

4    A.    Mr. Marco Delgado.

5    Q.    What was the dollar amount of the bond that Mr. Delgado

6    offered within 10 to 15 days?

7    A.    What we were requesting is a guarantee in the amount of

8    $20 million, which was the original amount, in addition to the

9    $34 million that were provided as a down payment.

10   Q.    What $34 million are you talking about as a down payment?

11   A.    I believe that it was in 2010, where the trust granted

12   F.G.G., and I correct myself, it was $32 million as a down

13   payment for delivery of the turbines.

14   Q.    I draw your attention to what's been marked as Government

15   Exhibit 21.

16         And it's -- do you recognize this document?

17         THE INTERPRETER:  I'm sorry, could you run it?

18         MS. KANOF:  Oh, okay.

19         THE INTERPRETER:  He can't see it.  I'm sorry.

20         MS. KANOF:  Okay.

21   BY MS. KANOF:

22   Q.    Now?  Can you see it now?

23   A.    Yes, but -- I don't know if I could please see the whole

24   document.

25   Q.    In the notebooks next to you, it's number 21.  It would be

 1    in book one.  You can put that in front of you.

 2             Do you know what that is?

 3    A.   No.

 4    Q.   Okay.  What language does it appear to be in?

 5    A.   English.

 6    Q.   In it, it says, requested for use in Mexico?

 7             MR. HANSHEW:  Object to leading, Your Honor.

 8             THE COURT:  Well let me hear the question.

 9             MS. KANOF:  Yes.

10             The part that I've highlighted in yellow, could the

11    court reporter [sic] just translate that line to him and then

12    I'll ask questions about it.  It's in evidence.

13             MR. HANSHEW:  He already said we knew it's in English.

14    She's going to have to translate it in Spanish, but that's not

15    what this document is.  He said he doesn't know it because --

16             THE COURT:  Ms. Kanof is asking her to translate the

17    part of the document that's highlighted in yellow.  It's already

18    in evidence, so what's your objection?

19             MR. HANSHEW:  Objection leading on this.  You're

20    leading the witness' conclusion about this, Judge.

21             THE COURT:  I'll overrule that objection.

22    BY MS. KANOF:

23    Q.   Okay.  Do you -- does C.F.E., as a policy, require a

24    document like this for a letter from someone?

25    A.   What is required by C.F.E. is a document indicating that a

 1   person is authorized to represent -- to represent on behalf of

 2   another entity.

 3   Q.   Okay.  And here in Spanish, what does that say?

 4   A.   You --

 5            THE INTERPRETER:  You want it interpreted?

 6            MS. KANOF:  It's in Spanish, so it doesn't need to be

 7   interpreted.

 8   A.   The Hague convention of October 5th of 1961.

 9   BY MS. KANOF:

10   Q.   The Hague convention?  Is that a document -- does C.F.E.

11   policy require a document under the Hague Convention of 1961 to

12   consider a letter legitimate?

13            MR. HANSHEW:  Objection, Your Honor.  This is an

14   expert --

15            THE COURT:  Sustained.

16            MS. KANOF:  Can we just have the "no"?

17            THE INTERPRETER:  "No."

18            THE COURT:  Yes, you can have the "no."

19   BY MS. KANOF:

20   Q.   And at the top, the State of Texas and the Secretary of the

21   State of Texas, that's not in Mexico City, isn't in the State of

22   Texas, correct?

23   A.   Yes.

24   Q.   I'm sorry?  I forgot my question.

25            At the top of this document, there's a word that's

1  something in Spanish.  At C.F.E., do they have a stamp that has

2  that word?

3  A.   Yes, the word "cotejado," verified, yes.

4  Q.   Well, does it usually have the word "notario" under the --

5  when C.F.E. uses it?

6  A.   No.  No, just verified.

7  Q.   At some point in time are you aware that the Department of

8  Justice made a request under the Mutual Lateral Assistance

9  Treaty for evidence?

10  A.   No.

11  Q.   You were not prepared of making documents in response to

12  that request?

13  A.   No.

14  Q.   Scrolling down again, before you -- if you want to -- under

15  that same tab, there's a tab --

16         MS. KANOF:  If he needs to look that tab.

17         THE INTERPRETER:  What number is that?

18         MS. KANOF:  21.

19  BY MS. KANOF:

20  Q.   Okay.  Again we see that "contejado nortario 103," is that

21  a stamp of C.F.E.?

22  A.   No.

23  Q.   Have you ever seen this letter before?

24  A.   Yes.

25  Q.   When did you see it for the first time?

1    A.   I would say more or less at the end of February or

2    beginning of March when we tried to integrate all of the

3    documents for the contract for F.G.G.

4    Q.   And where did you find it?

5    A.   We requested it from the department of finance projects.

6    It was part of the record of the contract.

7    Q.   And do you know -- at the meeting that you were at in

8    February, did -- was this document discussed?

9    A.   No, we didn't talk about this document.

10   Q.   So at that time you hadn't seen this document?

11   A.   No.

12   Q.   And Mr. Delgado didn't bring a copy and show it to you

13   then?

14   A.   No.

15   Q.   In fact, if you look at the bottom of the document, what is

16   the alleged date of that big signature?

17   A.   June 30th of 2012.

18   Q.   And this meeting was in February of 2012?

19   A.   Correct.

20   Q.   I'm going to show you what's been marked, but not admitted

21   into evidence.

22            MS. KANOF:   If you can show him the next tab, please,

23   22.

24   BY MS. KANOF:

25   Q.   Do you recognize this document?

1    A.   Yes.

2    Q.   When did you first see this document?

3    A.   Likewise, approximately the end of February beginning of

4    March of 2012.

5    Q.   And where was that document found?

6    A.   This was also provided to us by the department of finance

7    projects.

8    Q.   Of C.F.E.?

9    A.   Correct.

10        MS. KANOF:   We move admission of Government's Exhibit

11   Number 22 into evidence.

12        THE COURT:   Mr. Hanshew?

13        MR. HANSHEW:   No, objection, Your Honor.

14        THE COURT:   Okay.   GX-22 is admitted.

15   BY MS. KANOF:

16   Q.   Okay.  Now, you didn't -- had you seen this letter when you

17   were at that meeting?

18   A.   No.

19   Q.   And have I asked you to look at these two documents and

20   compare them to each other when we were discussing this case?

21   A.   Yes.

22   Q.   Are they different?

23   A.   Yes.

24   Q.   Do they have the same date?

25   A.   No.

1    Q.   Look at the two documents, 21 and 22.  If you need to take

2    them out of the binder to hold them side by side, that's fine.

3             Okay.  Do they have the same date?

4    A.   Yes.

5    Q.   And are they both addressed or copied to Eduardo Buendia?

6    A.   Yes.

7    Q.   Who is Eduardo Buendia?

8    A.   Okay.  Mr. Buendia is -- well, actually, he was the head or

9    the director of the production of foreign energy, also, under

10   the department of finance projects.

11   Q.   The Director of Foreign Energy.  Is he an engineer?

12   A.   Well, he's not the head.  He's actually just a manager.

13   Q.   If someone were to commit to pledge equipment in lieu of a

14   letter of credit, who would they address that commitment to?

15   A.   That would be to the head of financed projects.

16   Q.   Which is who?

17   A.   Eugenio Laris.

18   Q.   He's not on any of these letters, is he?

19   A.   Yes, that's correct.  He does not appear.

20   Q.   Is this letter sufficient to pledge

21   $100-million-plus-equipment in lieu of letters of credit?

22   A.   No.

23   Q.   Looking at the two letters, what is -- let's look -- I want

24   you to look side by side at the first paragraph.

25             THE COURT:  I just want to clarify something for the

1    record.  Is it $1 million or $100 million?

2                MS. KANOF:  $100 million is what I asked?

3                THE INTERPRETER:  I stand corrected, Your Honor.  It's

4    100 million, according my notes.

5                THE COURT:  Right.

6                THE INTERPRETER:  But that's not what I put on the

7    record.

8                THE COURT:  Right.  No, I heard it in Spanish, but by

9    the time it got up here it was one.  I wanted to make sure it

10   was clear.

11   BY MS. KANOF:

12   Q.   $100 million worth of equipment.

13                If you look at the two documents side by side, you

14   don't -- do you speak English?

15   A.   Yes, a little.

16   Q.   Enough to read this paragraph in English and understand it?

17   A.   Yes.

18   Q.   If you could take a look at the first paragraph in each and

19   then I'll ask you a question.

20   A.   Correct.

21   Q.   Okay.  Are they the same?

22   A.   Well, yeah, I suppose they are.  Yes, they would be.

23   Q.   Let me just draw your attention to this particular

24   sentence.

25                No material changes has been made to the draft of the

```
 1    pledge agreement.

 2              MR. HANSHEW:  Objection, leading.  Why doesn't she

 3    have him read it like the other witnesses if he understands it.

 4              THE COURT:  What's leading about it?  She's drawing

 5    his attention.

 6              MR. HANSHEW:  She's reading what it is.

 7              THE COURT:  It's in evidence.

 8              MR. HANSHEW:  The question is if he understands or not

 9    what it is.

10              THE COURT:  It's in evidence.  She can read it if she

11    wants.

12              Let me hear your question.  What's the question?

13              MS. KANOF:  I was going to ask if he knew about the

14    inspections.

15              THE COURT:  That are referred to in the letter?

16              MS. KANOF:  Yes.

17              THE COURT:  I'm going to overrule the leading

18    objection.

19    BY MS. KANOF:

20    A.   Yes, I was aware that they were going to have inspections,

21    yes.

22    Q.   According to this letter, there was a draft of the pledge

23    agreement prepared by C.F.E. prior to the inspections; is that

24    correct?

25    A.   I wouldn't know.  I suppose there would be, but I don't
```

1    know it.

2    Q.   Okay.  The second paragraph, if you could look at the two

3    paragraphs on the second paragraph in each and again for the

4    purpose of seeing whether they are the same.

5    A.   Correct.

6    Q.   Okay.  Going back to Government Exhibit Number 21, just the

7    letter portion, is there a third paragraph?

8    A.   There's one missing.

9    Q.   Number 21?

10        MS. KANOF:  I'm sorry.  Go ahead.

11   A.   Yes, there's one missing.

12   BY MS. KANOF:

13   Q.   There's one missing?  Okay.

14        With regard to number 22, Exhibit 22, at that meeting,

15   did Mr. Delgado discuss a parental -- some kind of parental

16   guarantee instead of the pledge and letters of credit by

17   Mitsubishi Heavy Industries of Japan?

18   A.   No.  They never spoke of any said change in guarantees on

19   behalf of C.F.E.  It was not ever discussed whether there ever

20   was a guarantee between F.G.G. and Mitsubishi.  Mitsubishi

21   always indicated that there was not.  So F.G.G. then offered

22   C.F.E. a substitution for guarantee of the -- the pledge that

23   was in dispute.

24   Q.   What are the difference between the two letters?  Do you

25   see the signature on both letters?

 1    A.   Yes.

 2    Q.   And is there a big space between Exhibit 22 that does not

 3    exist in Exhibit 21, between the signature and the title of the

 4    individual allegedly signing it?

 5    A.   Yes.

 6    Q.   So you said that when you called for records from the

 7    finance department, you found both of these letters; is that

 8    correct?

 9    A.   Yes.  First I received one and a few days later I received

10    the other.

11    Q.   What do you mean?  Who do you receive -- why didn't you get

12    them at the same time?

13    A.   Well, when we initially requested -- made our first request

14    through the first search when we received the first letter.

15    Then subsequently there was another request and we received a

16    different letter, and at that time was when the general counsel

17    made a request to the finance department to please provide both

18    documents in order to determine and to certify which one was the

19    correct one.

20    Q.   And again, back to 21, is there anyone at C.F.E. that is

21    notario 103?

22    A.   No.

23    Q.   So after -- okay, so -- now you're at the second meeting

24    and Mr. Delgado has made this second promise, correct?

25    A.   Yes.  At that moment he did offer this as a guarantee.

DIRECT EXAMINATION MATAMALA CORTES                                    79

1    Q.    Who offered that as a guarantee?

2    A.    Mr. Marco Delgado was offering it to C.F.E.

3    Q.    The letter?

4    A.    No, the bond.

5    Q.    Sorry.

6          I'm going to hand you what's been marked Government

7    Exhibit Number 31.  Have you seen this document before?

8    A.    Yes.

9    Q.    When did you see this document?

10   A.    Well, it was shown to us at the moment that we were told

11   that they had requested from Mr. Marco Delgado proof of him

12   being an authorized representative to be able to pledge.

13   Q.    When a letter is written about a specific project, does it

14   carry a number?

15   A.    Yes.  Because C.F.E. is actually a government entity, we

16   are obligated to number all documents that are remitted from

17   that office and these are the ID numbers.

18   Q.    Okay.  Would it ever happen that the same letter or that

19   two different letters would have the same number on them?

20   A.    No.  Each document has to carry its own identification

21   number.

22   Q.    Okay.  What is the identification number?

23         MS. KANOF:  Well, first of all, we'd move Government's

24   Exhibit 31 into evidence.

25         THE COURT:  Mr. Hanshew.

1              MR. HANSHEW:  No, objection.

2              THE COURT:  GX-31 is admitted.

3    BY MS. KANOF:

4    Q.   Okay.  And now again this letter appears to have been

5    written in May of 2012; is that correct?

6    A.   Correct.

7    Q.   Okay.  And I'm going to ask you to read the last to your

8    self, the last line.

9              And who was this letter written by?

10   A.   Alberto Ramos Elorduy.

11             MS. KANOF:  And we'd also move Government's Exhibit

12   31A, the English translation.

13             MR. HANSHEW:  No, objection, Your Honor.

14             THE COURT:  GX-31A is admitted.

15   BY MS. KANOF:

16   Q.   And the last line, does it read:  It is worth mentioning

17   that when Mr. Adams was in Mexico on that date, he delivered the

18   corresponding copy to C.F.E.

19             Is that what it says?

20   A.   Yes.

21   Q.   And it is referring to the official letter dated

22   January 10th of 2010.  Is that the date he's referring to that

23   Mr. Adams was in Mexico City?

24   A.   Yes.

25   Q.   Are you aware that January 10th of 2010 was a Sunday?

1          MR. HANSHEW:  Objection.  Leading, Your Honor.

2          THE COURT:  Sustained.

3          MS. KANOF:  I'll ask the Court to take judicial notice

4    that January 10, 2010, was a Sunday.

5          THE COURT:  January what?

6          MS. KANOF:  January 10th of 2010.

7          THE COURT:  Based upon the calendar embedded in my

8    computer, January 10th of 2010, is a Sunday.

9          MS. KANOF:  And would the Court take judicial notice

10   based on the calendar in your computer?

11         THE COURT:  Mr. Hanshew, did you want an opportunity

12   to challenge that?

13         MR. HANSHEW:  The question was not about the -- what

14   the Court's calendar said.  The question is what he knew that

15   date was.

16         THE COURT:  Right.  Now she's asking the Court to take

17   judicial notice.  I have to give you an opportunity to challenge

18   that.

19         MR. HANSHEW:  No, objection.

20         THE COURT:  The Court will take judicial notice that

21   the date was Sunday.

22   BY MS. KANOF:

23   Q.   Is C.F.E. open on Sundays?

24   A.   No.

25   Q.   Okay.  So when Mr. Delgado offered the performance bond,

 1   was that offer accepted by C.F.E.?

 2   A.   Well, they accepted the change so long as the project was

 3   completed.

 4   Q.   Okay.  And did Mr. Delgado -- in ten days, did he provide

 5   that performance bond?

 6   A.   No.

 7   Q.   Did Mr. Delgado provide that performance bond in 15 days?

 8   A.   No.

 9   Q.   Did you also discuss -- did Mr. Delgado tell you that

10   F.G.G. had a contract with Mitsubishi for the pledge in order to

11   pledge the equipment?

12   A.   No, he never indicated that to me.

13   Q.   Was the assignment of collection rights also discussed at

14   that meeting?

15   A.   During the meeting, one of the main points of discussion

16   were the collection rights wherein F.G.G. was going to grant

17   these collection rights to Mitsubishi, but F.G.G. at no point

18   accepted giving up all collection rights until a certain amount

19   was paid out upon delivery of the anchors to C.F.E.

20   Q.   Well, wait a minute.  Who was there for F.G.G.?

21   A.   Marco Delgado.

22   Q.   Anyone else?

23   A.   No.

24   Q.   Okay.  And so did Mitsubishi bring up the fact that they

25   wanted assignment of collection rights?

1    A.   I don't recall per se who it was that initially brought up

2    the topic, but I do you recall this was extensively discussed

3    during the meeting between F.G.G. and Mitsubishi as to these

4    collection rights.

5    Q.   Okay.  And had -- what did Mitsubishi want?

6    A.   What F.G.G. wanted was -- no, Mitsubishi wanted -- what

7    Mitsubishi wanted was for F.G.G. to give up the rest of its

8    collection rights so that they could bring the turbines to

9    C.F.E. in Agua Prieta II.

10   Q.   And what did Mr. Delgado want?

11   A.   What Mr. Delgado wanted was -- I don't recall whether it

12   was 5 million or $500,000, but he also wanted as a down payment

13   1.6 million in order to bring the anchors for the turbines to

14   Agua Prieta.

15   Q.   What did that have to do with the collection rights?

16   A.   Well, the collection rights come into play because C.F.E.

17   would be paying for the turbines per the contract.  F.G.G. would

18   be paid fees directly, whereas if the collection rights were

19   granted, then Mitsubishi would get paid directly in virtue of

20   these collection rights.

21   Q.   So Mr. Delgado wanted money from whom before he would agree

22   to the assignment of collection rights to Mitsubishi?

23   A.   For C.F.E. to pay for the transportation of the anchors in

24   addition to the sum of money before they would grant collection

25   rights to Mitsubishi.

1    Q.   Up unto this point had Marco Delgado facilitated collection

2    rights directly to Mitsubishi from C.F.E. at all?

3    A.   No, because C.F.E. had not received any type of

4    notification and therefore they were paying directly to F.G.G.

5    Q.   Okay.  I draw your attention to page 12 of Government's

6    Exhibit 18, the prime contract in Spanish, between the

7    Fideicomiso and F.G.G. assignment?

8    A.   Yes.

9    Q.   What part of this -- does this have anything to do with

10   collection rights?

11   A.   No not at all.

12   Q.   Okay.  So pursuant to the original contract, where was

13   C.F.E. or the Fideicomiso supposed to send the money?

14   A.   Well, according to this contract, these were supposed to be

15   deposited into a Wells Fargo account as indicated in the

16   original contract as payments of the funds owed to F.G.G.

17   Q.   While we're still on this page, what is an "el proveedor."

18   A.   The proveedor would be the individual that won the bid and

19   in this case it's F.G.G.

20   Q.   Is there a difference between a proveedor and I'll say it

21   in English, a builder, somebody who constructs something?

22        MR. HANSHEW:  Objection, Your Honor.  Expert

23   testimony.

24        MS. KANOF:  I'll just show him the document, Judge.

25   I'll withdraw the question.

1    BY MS. KANOF:

2    Q.    Okay.  So the money should have gone to the Wells Fargo

3    bank, correct?

4    A.    It should have been done so that way, yes.

5    Q.    Okay.  And I'm going to show you what's been marked and

6    admitted in evidence as Government Exhibit Number 43.

7              Have you seen this document before?

8    A.    Yes.

9    Q.    What is it?

10   A.    This would be a document by which an F.G.G. representative

11   is requesting from Ramos Elorduy to change the place where the

12   payments would be sent to as part of the collection rights for

13   the turbine contract.

14   Q.    So this document is a request for modification to

15   collection rights?

16   A.    No.

17   Q.    What is it again then?

18   A.    Well this document actually seems to have a contradiction

19   wherein it is being requested that a modification to the

20   contract to the place where the payments are being made to -- be

21   made, but in effect it is changing the person to whom the

22   payments are being made and actually there's a reference here

23   within this same document wherein they are changing the person

24   whom the payments are being done to instead of F.G.G.

25              The contract has a means by which they can waive the

KATHLEEN A. SUPNET, CSR

1    collection rights, and by this means they would give these

2    collection rights to a third party.  But this is very different

3    than asking to -- for a modification for the contract itself.

4    Q.    Okay.  So this is not a modification of the contract?

5    A.    No, it's not a modification to the contract.  If it were

6    anything it would be a waiver of the -- or the signing of

7    collection of rights to somebody else.

8    Q.    And would that be Skippings and Rutley, who it would be

9    assigned to?

10   A.    Yes, that's correct.  That would be the person that the

11   collection rights would be granted to.

12   Q.    Do you know who Skippings Rutley is?

13   A.    I heard that perhaps it was a law firm, but that was just

14   hearsay.  I wouldn't be sure.

15   Q.    Were they included in any of the Agua Prieta contracts as

16   having a right to receive this money?

17   A.    No.

18   Q.    Now with regard to who it's addressed to, if you are going

19   to change -- first, if you were going to modify the contract,

20   who would that modification go to?

21              MR. HANSHEW:  Your Honor, objection.  Expert

22   testimony.

23              MS. KANOF:  I'm asking policy at C.F.E., who it has to

24   go to.

25              THE COURT:  Overruled.

1    A.    The contract administrator.

2    BY MS. KANOF:

3    Q.    Which was who?

4    A.    At that time it would be Ramon Fernandez that -- which

5    would be the project coordinator.

6    Q.    Okay.  And that Mr. Ramos would not have been the proper

7    person to modify the contract?

8    A.    Correct, he wouldn't be.

9    Q.    And if this was a change of collection rights to somebody

10   who is not in privy to the contract, what is the policy at

11   C.F.E. as to who would have to make that decision?

12   A.    Well, this request to actually come by a notification

13   through a public -- notary public to the finance department at

14   C.F.E.  From there, it would then go to the general counsel's

15   office for approval.  And upon approval, the collection rights

16   would be assigned.

17   Q.    Okay.  And Mr. Ramos is not in that -- is Mr. Ramos in that

18   chain?

19   A.    No.

20   Q.    I show you what's been marked as Government's Exhibit, and

21   admitted into evidence as and Government's Exhibit Number 49 --

22   well, I'll open 50, first.

23         I'm going to first show you Government's Exhibit

24   Number 50 -- oh, 49.  I was trying do it chronologically

25   correct.

1        And you had previously talked about unique numbers for

2   each letter.  Do you recall that?

3   A.   Correct, yes.

4   Q.   Okay.  Drawing your attention to Government Exhibit

5   Number 49, what is the date that this letter appears to have

6   been written in?

7   A.   March 23rd of 2010.

8   Q.   And what is the unique number of the letter for this

9   project?

10  A.   That would be F.T. back slash 019 back slash 2010.

11  Q.   Is the relevant number the 19?

12  A.   Yes.

13  Q.   And in your collection of documents, do you recognize this

14  letter?

15  A.   Yes.

16  Q.   And if you want to look at the whole document -- I'm going

17  to ask you to compare 49 and 50.  I don't know if they're in

18  notebook one.  They might be in notebook two.  If you want to

19  take a look and pull them out.

20        MS. KANOF:  Go ahead and pull it out so he can stay in

21  front of the screen and microphone, please.

22        One will have an e-mail on the front.  It's not

23  just letter by itself.  Just those two exhibits.

24        THE INTERPRETER:  There's just a letter, 49.

25        MS. KANOF:  That's fine.  And 50 should have like a

 1   couple of different documents with the letter at the end or I

 2   can put 50 up in the screen.

 3   BY MS. KANOF:

 4   Q.   Okay.  Do you have before you 49?  And then if you page

 5   through 50, if you'll come to the letter in 50.

 6   A.   Yes.

 7   Q.   So let's start with number 49.  It's letter number 19,

 8   correct?

 9   A.   Correct.

10        MS. KANOF:  We move admission of Government's Exhibit

11   Number 49 into evidence.

12        MR. HANSHEW:  No, objection.

13        THE COURT:  GX-49 is admitted.

14   BY MS. KANOF:

15   Q.   And who -- whom is it addressed?

16   A.   Mr. Marco Delgado.

17   Q.   But it does address him by attorney, correct?

18   A.   Yes.  It does say Attorney Marco Delgado, that's correct.

19   Q.   Who is it signed by?

20   A.   Eduardo Buendia Dominguez.

21   Q.   And before we were talking about this kind of stamp, is

22   that what the C.F.E. "contejado" stamp looks like?

23   A.   Yes.  They were stamped on certified copies.

24   Q.   Okay.  Now, if you could just read this to yourself so that

25   we can discuss what this letter is about.

1    A.   I'm ready.

2    Q.   Okay.  What is it about?

3    A.   This is a payment schedule.  It's actually an extract from

4    a payment schedule between the trust and F.G.G. for payment of

5    the turbines.

6    Q.   Okay.  And the date is the 23rd of March, correct?

7    A.   Yes.

8    Q.   Is it -- what would be the purpose -- what was

9    Mr. Buendia's position again?  What was his action in this

10   contract?

11   A.   At that time he was the Deputy Director of Foreign Energy

12   Producers.

13   Q.   Okay.  And why would he be sending Mr. Delgado a letter

14   that has the agreed payment terms between C.F.E. and F.G.G. in

15   it?

16   A.   Well, I don't know per se, but this is a very common

17   practice where a summary of the main contract is shared among

18   the parties and I suppose this is the purpose of this letter,

19   but I wouldn't know.

20   Q.   Okay.  Well is it also a practice for the payment schedule

21   to be incorporated into the prime contract with an annex?

22   A.   Yes, it's indispensable that this annex be included.

23   Q.   Government's Exhibit Number 19, which has been admitted

24   into evidence, do you recognize that as Anexo S?

25   A.   (Nodding head.)

1    Q.   You have to speak, so she can --

2    A.   Yes, I do recognize it.

3    Q.   Okay.  And then is this also a schedule of payments for the

4    project?

5    A.   Correct, yes.

6    Q.   Okay.  And if you could just look at letter number 19 from

7    the 23rd of March and Anexo S, and I will ask you, the first

8    payment, was it supposed to be $20 million?

9    A.   Yes.

10   Q.   And was the second payment per Anexo S and that letter,

11   $12 million?

12   A.   Yes.

13   Q.   Now let me show you Government Exhibit 50.

14           Government Exhibit Number 50, let me just show you

15   that it's 50 -- starts with an e-mail; is that correct?

16   A.   Correct.

17   Q.   And do you recognize the date as being March 25th, two days

18   after that letter from Mr. Buendia?

19   A.   Yes.

20   Q.   And is it an e-mail from Mr. Delgado?

21   A.   Yes.

22   Q.   And is it to -- first, is it to John Adams?

23   A.   That's correct.

24   Q.   Do you know who John Adams was?

25   A.   Yes.

1    Q.   Who was he?

2    A.   We were told that he worked for Mitsubishi Power Systems

3    America and he was the project head.

4    Q.   Okay.  I'm going to put it in English, because he writes it

5    in Spanish, is this -- this is the same letterhead.  It's also

6    to F. Gireud and Mace Miller.  And you said you never met them,

7    correct?

8    A.   Correct, I don't know them.

9    Q.   Okay.  But does it say, attached please find C.F.E.

10   confirmation of revised payment plan?  Does it say that?

11   A.   That's correct, yes.

12   Q.   And does it say, this allows us to proceed with the

13   assignment of collector's rights prior to the issuance of the

14   first payment?

15   A.   That's correct, yes.

16   Q.   First of all, did you know that on March 25th, the first

17   payment had already been issued two weeks prior?

18   A.   Well, I didn't know that.

19   Q.   But with the assignment of collection rights, did you tell

20   this jury that that was still being discussed at that meeting of

21   2012?

22   A.   Yes, up to that date, but in fact that was never signed.

23   The assignment of collection rights was never signed.

24   Q.   And that never happened?

25   A.   No.

1   Q.   Okay.  Now I've scrolled down to the attachment to that

2   e-mail.  And if you would look at it, part of Government's

3   Exhibit Number 50, and if you could have next to you

4   Government's Exhibit Number 49.  Okay.

5            First of all, are they the same date?

6   A.   Yes.

7   Q.   Are they the same letter number 19?

8   A.   Yes.

9   Q.   Now, I'm going to ask you again to read and compare the

10  first paragraph and tell me if the letters are the same, if the

11  content of the first two paragraphs of 49 and 50 are the same?

12  A.   Yes.

13  Q.   And let's skip the chart for a second, but look at the next

14  paragraph and tell me if it is the same in 49 as it is in 50?

15  A.   Yes.

16  Q.   And the last paragraph?

17  A.   Yes.

18  Q.   Okay.  Going back briefly to number 49, at the bottom of 49

19  there's something handwritten.  What is that?

20  A.   This is a verification or receipt.  The person whom this is

21  addressed to signs on it.

22  Q.   So this would have been handed over, physically handed over

23  to the person who signed it as receipt?

24  A.   Yes.

25  Q.   Okay.  And it's kind of faint, but can you read what it

1  said underneath that signature?

2  A.   It says, receive 30 -- that's actually would be the date of

3  March 30th of 2010.

4  Q.   So the person that is writing this would have been handed

5  this document on the 30th of March; is that correct?

6  A.   Yes, correct.

7  Q.   On Government's Exhibit Number 50, do you see any

8  indication that was received?

9  A.   No.

10 Q.   However, is everything else on the letter, including the

11 letter number 19 and the date, identical?

12 A.   Actually, the table, they're not alike as far as the table.

13 The amounts differ from one document to another.

14 Q.   So let's look at the table.  The table on Government's

15 Exhibit Number 50 that was part of the e-mail, instead of

16 $20 million, what does it say?

17 A.   15.

18 Q.   And instead of $12 million?

19 A.   7.

20 Q.   So the chart in the two are different; is that correct?

21 A.   Correct, yes.

22 Q.   Do you know how much money was issued as the first payment?

23 A.   The first payment was a total of $32 million, which would

24 be the 20 million initially and then the additional 12 million.

25 Q.   So the first was 20 and second was 12, in reality?

1    A.    That's correct.

2    Q.    And is there any reason -- is there any reason why

3    Mr. Buendia would send a letter with the wrong payments on it or

4    hand a letter with the wrong payments and the same everything

5    else identical in the letter?

6    A.    I don't know and I can't imagine why that would be.

7    Q.    Did you -- have you seen both of these letters in the

8    records of C.F.E. when you called for all records on the

9    contract?

10   A.    No.  Just the one that had the correct payment schedule.

11   Q.    So Government's Exhibit 49, did you retrieve this exhibit

12   from the files of C.F.E.?

13   A.    Yes.  This is the one that is found within the documents at

14   C.F.E.

15   Q.    And Government Exhibit Number 50, the one attached to an

16   e-mail from Mr. Delgado to Mr. Gireud, Mr. Miller and Mr. Adams,

17   did you ever locate this one in the records of C.F.E.?

18   A.    No.

19   Q.    Let me show you what's been marked as Government's Exhibit

20   Number 53?

21          MS. KANOF:  Are 53 and 53A both in?

22          THE COURT:  Neither one.

23          MS. KANOF:  Okay.  Let me get him to identify them

24   first.

25   BY MS. KANOF:

1    Q.   Government's Exhibit Number 53, do you recognize this as a

2    document that was in the custody of C.F.E. as part of the Agua

3    Prieta contract?

4    A.   Yes.

5    Q.   Okay.

6         MS. KANOF:   We move admission of Government's

7    Exhibit number 53.

8         MR. HANSHEW:   No, objection.

9         THE COURT:   GX-53 is admitted.

10   BY MS. KANOF:

11   Q.   And now let me show you Government's Exhibit Number 60.

12        THE COURT:   You only offered 53.

13        MS. KANOF:   Oh.  Yes.  I'm sorry, Your Honor, 53A as

14   well.

15        MR. HANSHEW:   No objection.

16        THE COURT:   GX-53A is admitted.

17        MS. KANOF:   Is 60 admitted, Your Honor?  I believe it

18   is.

19        THE COURT:   It is.

20   BY MS. KANOF:

21   Q.   So let's go first to 53.  Again, what is the date of

22   Government's Exhibit Number 53?  First of all, identify that

23   it's a letter.  Is it a letter again to Attorney Delgado from

24   Mr. Buendia?

25   A.   Well, that's actually backwards.  It was Mr. Buendia to

1    Mr. Delgado.

2    Q.   And the date of the letter?

3    A.   March 30th of 2010.

4    Q.   And does the letter have any indication that was personally

5    received by anyone?

6    A.   Yes.  There's a receipt confirmation.

7    Q.   And is it also March 3rd of 20 -- I mean, March 30th of

8    2010?

9    A.   That's correct.

10   Q.   In addition to the handwritten receipt, what is this thing

11   in a box at the bottom?

12   A.   That is also a receipt certification from another part of

13   the C.F.E. company.  In this case it is -- it is the deputy

14   directors of the project management.  Because if you notice at

15   the bottom part, it says carbon copy of this document to Alberto

16   Ramos Elorduy, and this would be the receipt certification from

17   his stamp, his office.

18   Q.   Here?  Is that where it says it's copied to Mr. Ramos?

19   A.   That's correct, yes.  That would be it.

20   Q.   Okay.  So if you could read this to yourself --

21        MS. KANOF:  And if he could pull 60 out of the binder.

22   That'll be 53 and 60 that he's comparing.

23        I'll ask him about that one in a minute.  Let me ask

24   him about 53, first.

25   BY MS. KANOF:

1  Q.    Have you read the government's exhibit, the letter in

2  Government's Exhibit 53?

3  A.    Yes.

4  Q.    What -- first of all, I forgot -- I forgot to ask you, what

5  is the unique letter number to the project?

6  A.    That would be F.T. back slash 020 back slash 2010.

7  Q.    So the other letter that Government's Exhibit 49 was letter

8  number 19, correct?

9  A.    Yes, correct.

10 Q.    And this is letter 20, correct?

11 A.    Correct.

12 Q.    Would there be any letters in between that March 23rd and

13 this March 30th letter regarding Agua Prieta II?

14 A.    No.

15 Q.    What is this letter about?

16 A.    In this letter, they are indicating to Attorney Marco

17 Delgado to please accelerate the project to a gentleman in

18 Bancomext by the name of Carlos Flores Salinas.

19 Q.    What do you mean accelerate the project?

20 A.    Something that was part of the original contract, they are

21 requesting that they please move ahead of what was originally

22 contractually declared to move the project forward.

23 Q.    Does this letter have anything about change in payments?

24 A.    No.

25 Q.    I'll show you what's been marked as Government's Exhibit

DIRECT EXAMINATION MATAMALA CORTES                                    99

1    Number 60.  Do you have it before you?

2    A.   Yes.

3    Q.   Okay.  And what is the date?

4    A.   June 4th of 2010 or April.

5    Q.   April 6th?

6    A.   I'm sorry.  That would be April 6th of 2010.

7    Q.   And what is the subject matter, in Spanish, of this letter?

8    A.   Assignment of first payment?

9    Q.   Okay.

10        Attached to that e-mail was the letter.  Now if you

11   could look at 53, the other letter, is it the same date?

12   A.   The same date, March 30th of 2010.

13   Q.   Is it the same letter number 20?

14   A.   That's correct.  That's the same number.

15   Q.   Does it say Delgado?

16   A.   Yes.  It was addressed to Attorney Marco Delgado.

17   Q.   Is it -- does it have the same contents as Government's

18   Exhibit 53?

19   A.   No.

20   Q.   Starting with the beginning, are the first, let's say, the

21   first three sentences the same?

22   A.   Yes.

23   Q.   And, one, two, three -- is the fourth line the same?

24   A.   No, it doesn't.  It differs.

25   Q.   Where does it start to differ, the line (Spanish)?

1   A.   That's correct.  Modification of payment plan.

2   Q.   Okay.  Is that the same as the first letter or different?

3   A.   No, it's different.

4   Q.   So.  So starting with that -- let me go here.

5        This whole section then, is it different than the

6   original -- the other letter 20?

7   A.   Yes, completely.

8   Q.   Okay.  How is it different?

9   A.   On the first letter, it's talking about the information

10  regarding the public -- the individual at the Bancomext to whom

11  these payments were going to be addressed to, and here in this

12  one, we are talking about financing costs and about costs of

13  letters of credit.

14  Q.   So the part that I just highlighted, what is that about?

15  A.   That's where they are authorizing -- authorizing the

16  assignment of payments to somebody else.

17  Q.   An assignment of collection rights?

18  A.   No.  We're talking about assignment of payments.  We're not

19  talking about collection rights.

20  Q.   Okay.  And then the next part of that sentence, what does

21  that say?

22  A.   That it was given to us and that this deduction from the

23  financing party for financing costs and the initial hiring

24  specified by the letters of credit on the project reference

25  before.  Herein, they are notifying the trust of the bank.

1        They are indicating them to proceed with payments as

2   specified below, directly to the beneficiary and his capacity of

3   a signee -- the person receiving the payments.

4   Q.   So what's it talking about the letters of credit?  What's

5   it saying about the letters of credit?

6        MR. HANSHEW:  Your Honor, I'm going to object to this

7   expert testimony.  I'm objecting to his expert testimony.

8        THE COURT:  I'm going to overrule that objection.

9   A.   When C.F.E. is actually in their investment of projects,

10  this is very normal that they grant this to the contractors and

11  they go to the bank in order to receive financing.  And in doing

12  so, they grant collection rights to the bank whereby C.F.E. then

13  pays directly to the bank.

14  BY MS. KANOF:

15  Q.   Okay.  None of that -- that stuff wasn't in the first

16  letter number 20, right?

17  A.   None that was included.

18  Q.   Now in the first, was there any kind of -- the first letter

19  with the (Spanish) -- in it, letter number 20 of March 30th,

20  was there any kind of a chart?

21  A.   None of this at all.

22  Q.   So let's look at the first dollar amount on the chart to a

23  little over 2.6 million.  What is Mr. Buendia telling

24  Mr. Delgado about the $2.6 million, alleged ly?

25       MR. HANSHEW:  Objection.  Calls for hearsay, asking

KATHLEEN A. SUPNET, CSR

1    what Mr. Buendia is saying.

2              THE COURT:  Are you asking about what he means in the

3    letter?

4              MS. KANOF:  I'm asking what that money is supposed to

5    be for.

6              THE COURT:  From this letter?

7              MS. KANOF:  From this letter.

8              THE COURT:  I'll overrule that objection.

9    A.   What Mr. Buendia would be indicating here was the provider.

10   They were withholding partial payment on behalf of a financial

11   institution, but C.F.E. never withholds money on behalf of

12   anybody.  What they do is assign collection rights and then the

13   provider assigns collection rights to the entity providing the

14   financing, but they never hold or withhold funds on behalf of

15   any financial institution.

16   BY MS. KANOF:

17   Q.   So C.F.E. would never withhold $7,678,907 as this letter

18   says?

19   A.   No.  They would never withhold anything.

20   Q.   The second dollar amount, who is that 11-million-plus

21   supposed to go to?

22   A.   This, according to this letter, would go directly to the

23   technology director, but I reiterate.  C.F.E. would never pay

24   anybody else other than the contractor who signed the actual

25   contract or anybody whom that -- that contractor would assign

1    collection rights to.

2    Q.   Would it be any of C.F.E.'s business how much the

3    subcontractor gets?

4    A.   No.

5    Q.   And the third line, what is that million dollars about?

6    A.   Actually, under here where it mentions direct payment to

7    the contractor, that actually doesn't apply here, because this

8    term of contractor would not apply on somebody who earns -- wins

9    the bid for a public works project.  Actually, the correct term

10   here would be provider, as this contract was for the acquisition

11   of turbines, and so there would not be a contractor.  There

12   would only be a provider.

13   Q.   Is that "proveedor" that you have been referring to?

14   A.   Yes, the provider.

15   Q.   And is that what F.G.G. is referred to throughout the

16   contract, Government's Exhibit Number 18 in its original

17   Spanish?  Looking at page number four, is F.G.G. the

18   "proveedor"?

19   A.   Yes.  For all purposes, he would be a provider for us.

20   Q.   Okay.  He would not be a (Spanish)?

21   A.   No, provider.

22   Q.   And with regard to the $15-million number on this second

23   letter with a number 20 on it, is that a correct dollar amount

24   with regard to Anexo S and letter [sic] 49 that was shown to you

25   earlier?

1    A.   I guess, but that would be incorrect, because what was

2    actually paid out was the 20 million in addition to the 12

3    million, not this 15 million.

4    Q.   When you gathered the records from the finance department

5    to look at the case, was this document in the records of C.F.E.?

6    A.   No.

7    Q.   When is the first time you saw it?

8    A.   Well, I guess this would be the first time.  I hadn't seen

9    it.

10   Q.   Okay.  Now, if you could look back at 53 and read the rest

11   of the letter just to note whether it's the same or different

12   than the other letter number 20?

13   A.   Essentially, it is the same.

14   Q.   Okay.  So, the other document that I was showing you from

15   number 53, I forgot to ask you, was that document that did not

16   have a payment schedule in it, but merely had Mr. Flores

17   Salinas's name in the center, was that found in the records of

18   C.F.E.?

19   A.   Yes.

20          MS. KANOF:  I'm going to a new topic.  Do you want me

21   to --

22          THE COURT:  Let's recess.

23          Ladies and gentlemen, we're going to recess until

24   1:50.  I'd ask you to be back in the jury room at 1:50.  We'll

25   resume our proceedings then.

1          On your break, if you have the opportunity to discuss

2    amongst yourselves whether you want to keep the start time the

3    same or you want to move it up depending on how your commute is

4    in the morning, please let us know.  We can start as early as

5    7:00 if you want.  You just decide amongst yourselves if you

6    want to change it or not.

7          We are in recess until 1:50.

8          COURTROOM SECURITY OFFICER:  All rise.

9          (Lunch break at 12:45 p.m. to 1:55 p.m.)

10         THE COURT:  Let the record reflect that all members of

11   the jury are present, the United States through its assistant

12   United State's attorneys are present, the defendant and his

13   counsel are present.

14         The witness, Mr. Matamala, is on the witness stand.

15         Ms. Kanof?

16              JUAN PABLO MATAMALA CORTES,

17         DIRECT EXAMINATION BY THE GOVERNMENT

18   BY MS. KANOF:

19   Q.  Mr. Matamala, I have before you what's marked as

20   Government's Exhibit Number 133.  And could you take a look at

21   it and see if you recognize it?

22   A.  No.

23   Q.  You do not recognize it.

24         You had previously indicated that Mr. Delgado was

25   given an opportunity to provide a performance bond so the

```
 1    contract could continue, correct?

 2    A.   Yes, that's correct.

 3    Q.   Did that happen?

 4    A.   No.

 5    Q.   And when it did not happen, what did you do on behalf of

 6    C.F.E.?

 7    A.   I -- once this -- I'm sorry.  Once this did not happen,

 8    when the bond was not presented, then C.F.E. decided to rescind

 9    on the contract as a result of F.G.G.'s failure to provide

10    technical documentation on the required turbines.

11    Q.   What do you mean by rescind the contract?

12    A.   This is an administrative process contemplated by a

13    rescinding on the contract that is available to any properties

14    that are the -- that belong to the federal government and

15    contribute balance to the provider, and in this case that would

16    be F.G.G.

17    Q.   In regard to that, did you visit El Paso?

18    A.   Yes.

19    Q.   By yourself or with someone else?

20    A.   I came on two occasions.  The first time I came with

21    somebody.

22    Q.   And who was that person that you came with?

23    A.   That first time was a colleague of mine and attorney by the

24    name of Daniel Jimenez.  He worked at the C.F.E. office of the

25    general counsel.
```

1    Q.   Did you notify Mr. Delgado that you were coming to El Paso

2    before you came?

3    A.   No.

4    Q.   What was the purpose of your visit?

5    A.   According to the contract, it was to initiate the process

6    to rescind on the contract.

7    Q.   And what -- where did you go in El Paso?

8    A.   I went to an office as indicated on the contract itself on

9    Remcon Circle.  It was a virtual office with a receptionist that

10   would receive notification.

11   Q.   And did you leave it there with that receptionist?

12   A.   Yes.

13   Q.   However, was there a time limitation -- excuse me -- what

14   kind of document did you leave?

15          MR. HANSHEW:  Objection, Your Honor.  Expert

16   testimony.

17          THE COURT:  Well, he might be drifting on -- he can

18   tell us about the document he left.

19   BY MS. KANOF:

20   Q.   Was it some kind of a notice that you left for Mr. Delgado?

21   A.   It was a notification to initiate the process to rescind on

22   the contract.

23   Q.   And did he have a certain time limit on which to respond to

24   that notification?

25   A.   He had ten days to respond to the notification.

1    Q.   Did he?

2    A.   Yes, he did respond.

3    Q.   And what happened next?

4    A.   When we came to go over the arguments presented from

5    F.G.G., their motives for noncompliance, it was determined that

6    they did not have a basis for those arguments and therefore we

7    decided to rescind on the contract and for reasons attributable

8    to F.G.G.

9    Q.   And did you make a second visit to El Paso?

10   A.   Yes.

11   Q.   When was that?

12   A.   April of 2012.

13   Q.   And what document did -- did you tell Mr. Delgado you were

14   coming in advance?

15   A.   No.

16   Q.   Where did you go?

17   A.   Remcon.  Once again, I returned to the office on Remcon

18   center in order to notify them of our determination to rescind

19   on the contract, and after that, to nullify or void the

20   contract.

21   Q.   Did you make a finance demand in that notice?

22   A.   Yes.  By means of this document we notified F.G.G. that he

23   was to return -- to refund the $32 million that were given

24   initially on the initial payment and then an additional

25   $6 million that were for the delays for costs of the delays of

1    the project.

2    Q.   Did you say $6 million?

3    A.   I did mention $6 million, but I believe it was more than

4    that.  I believe it was around $12 million.

5    Q.   What was the total amount of the demand?

6    A.   I believe it was $52 million.

7              MS. KANOF:  Pass the witness.

8              THE COURT:  Mr. Hanshew?

9                    JUAN PABLO MATAMALA CORTES,

10                   CROSS-EXAMINATION BY THE DEFENSE

11   BY MR. HANSHEW:

12   Q.   Good afternoon, sir.

13   A.   Good afternoon.

14   Q.   That's the C.F.E. lawyer sitting in the back, right?

15   A.   Yes.

16   Q.   And he and you have met with the government and agents on a

17   number of occasions before you came here, correct?

18   A.   Yes.

19   Q.   And one of the reasons was to prepare your testimony for

20   this trial, correct?

21   A.   Yes.

22   Q.   And the first time that you met with them, did they record

23   your first impression of the documents they showed you?

24   A.   No.

25   Q.   No videos?

1    A.    No.

2    Q.    No audio recordings?

3    A.    No.

4    Q.    And you had subsequent meetings after that first one to go

5    over those same documents again, correct?

6    A.    Yes.

7    Q.    And they re-reviewed your impressions of the documents?

8    A.    I don't understand what you mean by my impressions on the

9    documents.

10   Q.    Your thoughts about the documents.

11   A.    No.  I already had my own thoughts beforehand.

12   Q.    Okay.  And when they re-reviewed it, they didn't record

13   this meeting either, did they?

14   A.    No, it was not recorded.

15   Q.    And I want to make something clear.  You started with

16   C.F.E. in May of 2011; is that right?

17   A.    Yes.

18   Q.    Okay.  So your testimony today about any documents,

19   contracts, e-mails, that predated May, 2011, you weren't part of

20   those documents being created, correct?

21   A.    That's correct.

22   Q.    Okay.  And you -- but you are familiar with the documents

23   in the record -- the C.F.E. documents that relate to Agua Prieta

24   II project, correct?

25   A.    Yes, correct.

1   Q.   And one of the documents that Ms. Kanof showed you earlier,

2   I put up there on the screen, you indicated you are familiar

3   with this document, correct?

4            MS. KANOF:   Objection, Your Honor.   He said he was not

5   familiar with the document.

6            THE COURT:   Well, he can tell us what he said.

7   A.   Yes, I do recognize this document.

8   BY MR. HANSHEW:

9   Q.   Okay.   And you are asked about C.F.E.'s impression of this

10  document, correct?

11  A.   Yes.

12  Q.   And you stated that it was deficient for collateral,

13  correct?

14  A.   Yes.

15  Q.   Now, to be clear, C.F.E. has never agreed that this

16  document is invalid, correct?

17  A.   Yes, correct.

18  Q.   And C.F.E. has always maintained that this is enforceable?

19  A.   Well, what we have always maintained is that as far as what

20  is enforceable was the pledge that was formalized in Mexico

21  before a notary public.

22  Q.   That pledge includes this document, correct?

23  A.   No, that's not correct.

24  Q.   Okay.   And so you're saying that C.F.E. has not -- that

25  C.F.E. has given up its claim that the document's enforceable?

1    A.    No.  This document from our perspective is just part of the

2    authorizing documentation that makes the pledge valid and

3    whereby an entity -- a notarizing entity in Mexico has declared

4    this pledge to be valid, we accept it as such.

5    Q.    Go ahead and look at the document in front of you.  And

6    it's Defendant's Exhibit 172.  Do you see that?

7    A.    Yes.

8    Q.    You're familiar with this document, correct?

9    A.    Yes.

10              MR. HANSHEW:  I'd ask to admit that, Your Honor.

11              MS. KANOF:  No, objection.

12              THE COURT:  Defendant's 172 is admitted.

13   BY MR. HANSHEW:

14   Q.    All right.  I'm going to show you a section here.  Well,

15   I'll show you -- can you read that section there?

16   A.    And it says M.P.S.A.'s position regarding the existing

17   validity and/or intention of the pledge.

18              MS. KANOF:  Your Honor, can we approach the bench for

19   just a second?

20              THE COURT:  Sure.

21              (Bench conference.)

22              MS. KANOF:  Perhaps I misunderstood the Court's

23   ruling, but I thought the Court says the existence of the

24   settlement was admissible, but not the contents for

25   cross-examination.

1          THE COURT:  Remind me?  Was that last week?

2          MS. KANOF:  It was the week before and on the Thursday

3    meeting on the motions in limine with regard to the lawsuits

4    document.  This is one of the lawsuit documents and this is

5    where C.F.E. settled with Mitsubishi.

6          THE COURT:  Right.  And so the evidence in the lawsuit

7    was to show some sort of motive?

8          MS. KANOF:  Bias.

9          THE COURT:  On behalf of the person that was

10   testifying?

11         MS. KANOF:  Right.

12         THE COURT:  But not on the -- is that what that is?

13         MS. KANOF:  It's actually a settlement of the lawsuit

14   and so I don't have any objection for him to talk about the fact

15   that there was a lawsuit and -- but the contents of the

16   settlement --

17         THE COURT:  Okay.  Well, what is --

18         MR. HANSHEW:  Well, Judge, he talked to us earlier

19   about the document about the document not being a valid pledge.

20   And this document that I've highlighted in red, in these

21   meetings, showed that C.F.E. kept their position that the pledge

22   was valid and enforceable.  It goes directly to what they put up

23   in their whole entire direct.

24         MS. KANOF:  And the next paragraph says that

25   Mitsubishi kept their position that the document was not

1    enforceable, so now we're trying the lawsuit which is why the

2    government --

3              THE COURT:  I suppose I'll let him put in the

4    paragraph and you come back with the other paragraph and

5    hopefully we're done there.

6              MS. KANOF:  Okay.

7              (Bench concludes.)

8    BY MR. HANSHEW:

9    Q.   So you'd agree that this paragraph -- in this paragraph,

10   C.F.E. maintains the validity of the pledge, correct?

11   A.   Yes.

12   Q.   Then were you asked about how you sent a termination letter

13   to Mr. Delgado, correct?

14   A.   Yes.

15   Q.   And that that was for approximately $44 million?

16   A.   Yes, that's correct, $44 million.

17   Q.   32 million for the payments that were made already,

18   correct?

19   A.   Yes, ahead of time.

20   Q.   And then 12 million for damages?

21   A.   Yes.

22   Q.   All right.

23              Now in this same document you just looked at here,

24   C.F.E. gives over that $44 million to M.P.S.A., don't they?

25              MS. KANOF:  Now I'm going to object to the relevance,

1     Your Honor.

2            MR. HANSHEW:  They brought up the damages in the

3     termination letter.  They brought it up here and asked him about

4     the termination letter, what it included and how much quantity

5     it was, and this goes directly -- this goes directly to M.P.S.A.

6            THE COURT:  How is that relevant to their damages?

7            MR. HANSHEW:  They are a financial interest in the

8     outcome of this document in this case, Judge.

9            THE COURT:  They have a financial interest in the

10    outcome of this case?

11           MS. KANOF:  Correct.

12           THE COURT:  I'm going to allow the questioning.

13    That's going to allow Ms. Kanof to get into what she needs to in

14    response to that.

15           MR. HANSHEW:  I understand, Judge.

16           THE COURT:  All right.

17    A.   Yes.

18    BY MR. HANSHEW:

19    Q.   In this document, M.P.S.A. also got to keep the $18 million

20    they got paid, correct?

21    A.   Yes.

22    Q.   And M.P.S.A. also gets paid another $76 million for the

23    same turbines, correct?

24    A.   Correct.

25    Q.   Now, Ms. Kanof asked you about whether the people of Agua

1    Prieta needed this -- the electricity to be provided by the

2    project, correct?

3    A.   Yes.  And just to mention that this plant in Agua Prieta

4    doesn't just supply energy to the town itself, but the entire

5    northeastern area of Mexico.

6    Q.   Okay.  And you just explained that in the present tense,

7    that's because the turbines are in Agua Prieta right now, aren't

8    they?

9    A.   The turbines in Agua Prieta have been in place as of May of

10   2015, but to date, the plant is not running at 100 percent due

11   to the delays directly related to the late delivery of the

12   turbines.

13   Q.   And those turbines came as a result of a direct contract

14   between M.P.S.A. and C.F.E., correct?

15   A.   No.  The contract between M.P.S.A. and C.F.E. was actually

16   in order to recover the turbines that C.F.E. had already

17   purchased.  The turbines were in the possession of M.P.S.A.  And

18   after we -- everything was said and done, at the end it was

19   determined who the owner was.  What happened is that C.F.E. was

20   trying to recover the turbines that it had originally purchased.

21        And it's important to mention that for the Agua Prieta

22   II plant, the turbines were defined for that particular plant

23   by -- they were designed by Mitsubishi.  We could only use these

24   and no other ones.

25   Q.   You're saying that Mitsubishi designed these turbines just

1    for the Agua Prieta project?

2    A.    No.  It was designed for the Mitsubishi turbine.

3    Q.    And C.F.E. got the Mitsubishi turbine, correct?

4    A.    Yes.

5    Q.    And they got them without F.G.G., correct?

6    A.    Yes.

7              MR. HANSHEW:  No further questions, Your Honor.

8              THE COURT:  Thank you, Mr. Hanshew.

9              Ms. Kanof?

10                  JUAN PABLO MATAMALA CORTES,

11             REDIRECT EXAMINATION BY THE GOVERNMENT

12   BY MS. KANOF:

13   Q.    Okay.  Mr. Matamala, first of all, before we go into the

14   settlement agreement, did C.F.E. loose a lot of money on this

15   because of Mr. -- because it fell through and was rescinded?

16   A.    Yes, a lot of money.

17   Q.    How was that?

18             THE INTERPRETER:  I need to clarify a word, Your

19   Honor.

20             THE COURT:  Yes, ma'am.

21   A.    Well, specifically, it pertains to the Agua Prieta project,

22   what was -- well, it was -- had to be done, because there was a

23   deficit in the amount of turbines that were available in the

24   market.  They had to divide this in two portions; the purchase

25   of the turbines and then the public works portion of it.

1          Due to the fact that the turbines were late, this

2     resulted in delays in public works, which C.F.E. then had to

3     finance to pay for this delay as a result of the turbine delays

4     resulting in millions of dollars.

5          The last amount that I was aware of was up to

6     $90 million directly related to these delays affecting the

7     public work.  That's not take into account that this Agua Prieta

8     branch normally works off of natural gas in order to generate

9     power, which is a source that is a lot cheaper than the

10    substitutions that C.F.E. then had to take in order to source

11    this project.  They had to then substitute it with fuel oil in

12    order to keep supplementing this expense at the plant.

13    BY MS. KANOF:

14    Q.   So the turbines according to the original contract were

15    supposed to be installed in 2012; is that correct?

16    A.   Yes.  They were to be delivered by 2012 and they were

17    supposed to be operational by 2013.

18    Q.   And between 2013 and the present, to make up for the power

19    that was going to be generated, did C.F.E. have to purchase

20    power to keep the electricity going in that part of northern

21    Mexico?

22    A.   Yes.  Yes.  If you are to calculate that it costs

23    approximately 140 -- $140 per megawatt and the plant in Agua

24    Prieta was expected to generate about 3,000 megawatts annually,

25    then you can calculate that we had to pay out $400 million in

1      order to continue processing electricity.

2              And up to date, we are calculating that we're up to

3      $1.2 billion in losses due to delays for the turbines in Agua

4      Prieta.

5      Q.   So just as a result of this project not being completed

6      timely, it's costing the Republic of Mexico more than a billion

7      dollars to make up for the electricity that could have been

8      generated by these turbines if they had been installed in time?

9      A.   Yes, correct.

10     Q.   And you said something about financing the public --

11     something about $90 million, and I didn't understand what that

12     $90 million was to pay for.  What was it to pay for?

13     A.   Those $90 million are actually fees that have to be paid as

14     fines per se, because C.F.E., when they are building this plant

15     and because the turbines were not delivered in a timely basis,

16     they had to pay this to the contractors that were working on the

17     Agua Prieta project number II, because these contractors have to

18     find their own financing.  And normally, they have to go to a

19     bank in order to get the financing for the project.  When they

20     are delayed, the bank charges interest and therefore C.F.E.

21     needs to pay this interest that the contractors have incurred

22     due to the delays.

23     Q.   Do you know who the contractor was that you had to pay?

24     A.   Yes.

25     Q.   Who was it?

1   A.   There was a company by the name of P.A.P.

2   Q.   It wasn't Mitsubishi, was it?

3   A.   No, it's not Mitsubishi.

4   Q.   Okay.  Defense Exhibit 172, this is a legal -- there were

5   lawsuits that came out of this, correct?

6   A.   That's correct.

7   Q.   Is this document a -- Defense Exhibit 172 a settlement

8   between Mitsubishi and C.F.E.?

9   A.   Yes.  That is because when we filed suit in order to recoup

10  our turbines, it turned out this that the turbines were in

11  possession of Mitsubishi and we had to file lawsuits against

12  Mitsubishi and F.G.G. jointly.

13  Q.   Because of what the pledge document said?

14  A.   Yes, that's correct.  Due to the pledging documents, we

15  were under the impression that the turbines were under the

16  possession of F.G.G., but that was not the case.  They were in

17  the possession of Mitsubishi.

18  Q.   In fact, the pledge agreement says they're in the

19  possession of the "proveedor," right?

20  A.   Yes, that's correct.  It was explicitly detailed in the

21  pledge documents that they were under -- they were the property

22  and under the control of the "proveedor."

23  Q.   And who was the "proveedor"?

24  A.   F.G.G.

25  Q.   Now the settlement document -- it was settled in 2013,

1    correct?

2    A.    Correct.

3    Q.    And defense counsel showed you paragraph E. from there

4    exhibit, something about the trust still recognizes the pledge

5    agreement, correct?

6    A.    Yes, it says that.  It recognizes that there exists -- that

7    a dispute exists.

8    Q.    If you scroll down, on that same page under D, C.F.E. also

9    recognizes the existence of a dispute among the parties?

10   A.    That's correct.

11   Q.    However, but in order to terminate the existing dispute and

12   prevent any future disputes, they decide to enter into this

13   agreement, correct?

14          In order to terminate the existing dispute and prevent

15   any future dispute, they agree to settle?

16   A.    Well, yeah, that's correct, because once we saw that there

17   was no solution as to whether the pledge was valid or not and we

18   weren't able to settle that, then we reached an agreement with

19   the turbine holder from whom we then received the turbines.

20   Q.    That was page 7 of 23 of the pages that we were looking at,

21   correct?

22   A.    Yes.

23   Q.    But if you scroll down to page 8, Mitsubishi makes a

24   declaration at 12, correct?

25   A.    Yes, that's correct.

REDIRECT EXAMINATION MATAMALA CORTES                                    122

1    Q.    And doesn't Mitsubishi also say they recognize the
2    existence of the dispute?
3    A.    That's correct, the same dispute.
4    Q.    Regarding the pledge, correct?
5    A.    That's correct.
6    Q.    And just like the trust, just like C.F.E., they also don't
7    give up their position regarding the existence of the validity
8    that it is not valid, correct, the pledge?
9    A.    Correct.
10   Q.    So it doesn't change anything regarding their positions?
11   A.    That's right, it doesn't.
12   Q.    But similarly, in order to terminate the existence of the
13   dispute and to any future disputes exactly like C.F.E., they
14   agreed to enter into the settlement, correct?
15   A.    Yes.  It was M.P.S.A., yes, correct.
16   Q.    From the time that C.F.E. entered into the contract with
17   F.G.G., did they start to make ready the location near Agua
18   Prieta to build the power plant?
19   A.    Yes.
20   Q.    And are those some of the expenses you are talking about?
21   A.    Yes, more than just a location.  It was a public works, the
22   place where they actually placed the turbines.
23   Q.    Is the -- you think you previously testified that the plant
24   was still not at a 100 percent; is that correct?
25   A.    That's correct.

1    Q.   When they were making ready the location for the turbines,

2    were they making it ready for the specific turbines that C.F.E.

3    agreed to buy from F.G.G.?

4    A.   No, because F.G.G., once they got the bid, they were

5    granted the bd by C.F.E., they already knew which turbines they

6    were going to build the plant for.  And so the location itself,

7    it was ready before they even put the turbines out to bid.

8           And so once the proveedor gets the bid for the

9    turbines, then they start building the actual plant to fit the

10   size of the turbines, not the other way around.

11   Q.   Okay.  So did they begin building that plant at the time

12   that they got the bid?

13   A.   That's correct.

14   Q.   Okay.  Are the turbines still in the testing phase?

15   A.   Correct.

16   Q.   Is C.F.E. still having to pay money to buy wattage from

17   elsewhere?

18   A.   Yes.  Although the loss is less now, because once the

19   turbines are in the testing phase they are able to generate a

20   certain degree of electricity which then can be sold, so the

21   loss is less, but it's still a loss.

22   Q.   Did you have any personal financial interest in the outcome

23   of this case?

24   A.   No.

25   Q.   Are you afraid you'll be fired if this case does not go the

1     way that your bosses want it to go?

2     A.   No.

3               MS. KANOF:  Pass the witness.

4               THE COURT:  Ms. Hanshew?

5               MR. HANSHEW:  No further questions, Your Honor.

6               THE COURT:  All right.

7               May Mr. Matamala be permanently excused?

8               MR. HANSHEW:  Yes, Judge.

9               THE COURT:  Ms. Kanof?  Ms. Kanof?

10              MS. KANOF:  Yes, we would ask that he be permanently

11     excused.

12              THE COURT:  Mr. Matamala, thank you so much for coming

13     down, you are free to go.

14              (Witness excused.)

15              THE COURT:  Who is your next witness?

16              MR. ARREOLA:  Your Honor, as a housekeeping matter,

17     the government would like to offer a few exhibits that haven't

18     been offered yet.  First, what's been marked for identification

19     is Government's 20 and 20A.  Those are Attachment T to the prime

20     contract and they were received pursuant to the Mutual Equel

21     Assistance Treaty Request of the Mexican government.

22              THE COURT:  All right.

23              Mr. Hanshew, aside from that which you've already

24     stated into the record, any objections to 20?

25              MR. HANSHEW:  No, Your Honor.

```
 1              THE COURT:  GX-20 is admitted.
 2              How about 20A, which is the translation?
 3              MR. HANSHEW:  No, Your Honor.
 4              THE COURT:  All right.  20A is admitted as well.
 5              MR. ARREOLA:  Your Honor, government also offers from
 6    the MLAT, Government's Exhibits 46, 46A and 84.  Those --
 7              THE COURT:  Hold on hold on.
 8              As to 46 and 46A, aside from anything that you've
 9    already articulated, any objection?
10              MR. HANSHEW:  No, Your Honor.
11              THE COURT:  GX-46 and 46A is admitted.
12              What was your next one?
13              MR. ARREOLA:  84, what has been marked as Government's
14    Exhibit 84.
15              THE COURT:  Mr. Hanshew, other than what you've
16    already stated into the record, any objections to 84?
17              MR. HANSHEW:  No, Your Honor.
18              THE COURT:  GX-84 is admitted.
19              MR. ARREOLA:  Your Honor, the government also offers
20    what's a self-proving affidavit what's been marked as
21    Government's Exhibit 142.
22              THE COURT:  Standard charter records.
23              Any objection to GX-142?
24              MR. HANSHEW:  No, Your Honor.
25              THE COURT:  Okay, GX-142 is admitted.
```

1          MR. ARREOLA:  And Your Honor, does your record show

2    145 is in evidence?

3          THE COURT:  Yes, ma'am.

4          MR. ARREOLA:  That's all, Your Honor.  Thank you.

5          MS. KANOF:  Your Honor, the government rests.

6          THE COURT:  All right.

7          Ladies and gentlemen, let's recess for 12 minutes.

8    I'd ask you to be back in the jury room at 3 o'clock.  We'll

9    resume our proceedings at 3:00 -- 2:55, actually.  2:55.

10         COURT SECURITY OFFICER:  All rise.

11         (Jury not present. )

12         (Interpreter excused.)

13         THE COURT:  Mr. Hanshew, did you have something?

14         MR. HANSHEW:  Yes, Judge.  If I may.  I have two

15   motions to make, the first of which -- if I can approach your

16   deputy?

17         THE COURT:  Yes, sir.

18         MR. HANSHEW:  Thank you.

19         The first motion, Judge, is a motion to dismiss

20   Counts One and Two for lack of jurisdiction.  I incorporate by

21   reference the written memorandum and ask that the Court enter

22   and file that, that was provided to the deputy, Judge.

23         In brief, I will explain that our position here is

24   that the government failed to show that there's a jurisdictional

25   hook as it relates to Count One and Two.  As you'll see in the

1        superseding indictment, the wire transfers in Counts One and
2        Two, the 20 million and 12 million that we've heard so much
3        about, are described in the indictment of going from Banco
4        Mexico, Mexico, to the Caribbean account, therefore, obviously
5        missing any contact with the United States.  So it's our
6        position that those two counts should be dismissed for lack of
7        jurisdiction, Judge, and we've detailed that a bit more in our
8        motion.

9                 The second motion is -- in that motion, you'll note at
10       the end that we alternatively ask for a judgment of acquittal
11       related to that.

12                The second motion in full is for a motion for a
13       judgment of acquittal on all counts, Judge.

14                THE COURT:  All right.  And I'll deny your second
15       motion.

16                What about his jurisdictional argument regarding the
17       20 and $12-million transfers to Banco de Mexico to the Turks &
18       Caicos?

19                MS. KANOF:  Could we read his memo first?  We do have
20       a response, Your Honor, and I will tell the Court -- can we read
21       it first?

22                THE COURT:  Oh, sure.

23                MR. ARREOLA:  Your Honor, the government has a brief
24       response to, and we've now reviewed the motion, and what appears
25       they are relying on is this Fifth Circuit pattern jury

1    instruction regarding foreign commerce and suggesting that

2    this -- these two transfers did not pass through the United

3    States; however, the evidence in the record is they passed

4    through the United States both at standard charter and through

5    Wells Fargo, which was formally Wachovia.  That's the

6    government's response to that.

7         I'd also like to add that one of the essential

8    elements of wire fraud is a scheme to defraud and there's ample

9    evidence in the record that that scheme to defraud was

10   orchestrated here in El Paso, Texas.  For example, and just off

11   the top of my head, there was an early meeting at Ardivino's

12   restaurant where Mr. Delgado made a pitch to the uncle of Mace

13   Miller to get an initial investment.  He also presented the

14   M.O.U. at Time Matters restaurant here in El Paso.  That

15   memorandum of understanding was presented to Mr. Gireud at that

16   Time Matters restaurant.  There was also the power of attorney,

17   which is also on the record, and that was notarized and it was

18   signed here in El Paso, the document itself says it was signed

19   in El Paso.

20        The victim account, for a lack of a better word, the

21   account to which the funds were supposed to go was an F.G.G.

22   account, which was right here in El Paso.  The document

23   directing that the funds be sent to an offshore account in the

24   Turks & Caicos Islands, that has Mr. Delgado's signature on it.

25   That also has an El Paso address on it.  So if there were any

1      place for this case to be, it's here in El Paso.

2              And with respect to their jurisdictional argument,

3      Your Honor, the wires transferred through the United States, and

4      that's clear from the First Caribbean bank records which show --

5              THE COURT:  Can you show me that?

6              MR. ARREOLA:  Sure.  Absolutely, Your Honor.

7              THE COURT:  And this is GX --

8              MR. ARREOLA:  Government's Exhibit 1, Your Honor.  I'm

9      looking at age 789.  And those records indicate --

10             THE COURT:  Can you read that?  I can't read that.

11     Should I look it up?  Oh, I see Wachovia there.

12             MR. ARREOLA:  Those indicate sender institution,

13     Wachovia Bank, New York.  And also, Your Honor, this is the 20

14     million and the wire transfer credit advice for the 12 million

15     followed the same route.

16             Your Honor, if I could also invite the Court to look

17     at Mr. Delgado's request for the transaction for the accounts to

18     be changed, that also indicates the route was supposed to go

19     throughout the United States, and that was government exhibit --

20             THE COURT:  Is that GX-43?

21             MR. ARREOLA:  Yes, Your Honor, this was Government's

22     Exhibit 43.

23             THE COURT:  Send via --

24             MS. ARREOLA:  Send via Wachovia Bank in New York.

25             MR. HANSHEW:  If I may, Judge?

KATHLEEN A. SUPNET, CSR

```
 1              THE COURT:  Sure.

 2              MR. HANSHEW:  Thank you.

 3              I'd again refer the Court back to the superseding

 4   indictment.  Both Counts One and Two specifically delineate this

 5   wire transfer of funds from a bank account in Republic of Mexico

 6   to a bank account in the Turks & Caicos Islands.

 7              In terms of the, you know, the purported evidence that

 8   showed that, you know, those banks had something to do with the

 9   United States, that's not explained in those documents and

10   you'll remember the testimony on Friday that this Court

11   correctly precluded, which was they brought in the Wells Fargo

12   person to start testifying about what these things meant.

13              THE COURT:  Yeah.

14              MR. HANSHEW:  And it was excluded because expert

15   testimony.  The only testimony that that individual put on to

16   explain what these documents are, Judge, was that it went from

17   Caribbean -- Mexico to Caribbean, nothing else.  They didn't

18   provide any testimony or evidence about what the rest of those

19   meant.

20              THE COURT:  What's the case that you have that says

21   that that's it?

22              MR. HANSHEW:  I don't think there's a case that says

23   this, because this is a first impression in the sense of you're

24   applying --

25              THE COURT:  I think I'm limited to the four corners of
```

1    the indictment to what they say, that it goes from Mexico to the

2    Caribbean and evidence that it actually traveled through some

3    other places.

4              MR. HANSHEW:  Well, I don't think there's -- it's our

5    position there's no --

6              THE COURT:  -- jurisdiction --

7              MR. HANSHEW:  There's -- I'm sorry, Judge.  There was

8    no evidence that was put in this case that shows that United

9    States contact.  In fact, it was properly precluded from being

10   introduced.  They didn't bring an expert to explain.

11             THE COURT:  She just showed me the wire fraud that it

12   went through the United States.

13             MR. HANSHEW:  I don't think that proves that up.

14   That's our position.

15             THE COURT:  That what?

16             MR. HANSHEW:  I don't believe that that evidence

17   proves up that it's wired through the United States.

18             THE COURT:  Oh, okay.  All right.

19             Anything else?

20             MR. ARREOLA:  Nothing else, Your Honor.

21             THE COURT:  Okay.  I'm going to deny your first

22   request for dismissal for lack of jurisdiction as well.

23             So your relief is denied in all respects.

24             Are you going to put on evidence?

25             MR. HANSHEW:  We are not going to put on any

1    witnesses, Judge.

2         THE COURT:  Then I think Waheed has been working with

3    you on the charge, right?

4         MR. HANSHEW:  Correct.

5         THE COURT:  If I have the jury back, let's say at

6    3:30, we should work it out and give you a chance to make your

7    objections.

8         MR. HANSHEW:  I believe so.

9         MS. KANOF:  That's fine.  I just wanted to know how

10   much time we have for argument.

11        THE COURT:  How much time do you want?  Let's see.

12        MS. KANOF:  An hour for the government.

13        THE COURT:  Mr. Hanshew?

14        MR. HANSHEW:  We'll take an hour as well.

15        THE COURT:  Okay.  All right.  We can do that.  Do an

16   hour each.

17        That's going to take us to right after 6 o'clock.  So

18   at that time, do I send them home and come back in the morning

19   to deliberate or have them start deliberating tonight and let

20   them go as long as they want?

21        MS. KANOF:  I think we would prefer they started

22   deliberating, but I wouldn't mind you asking what they wanted to

23   do.

24        THE COURT:  I think they're going to want to go home

25   and maybe they'll come back tomorrow early.

```
 1                 THE COURT:  Let's get the charge.  I'll get Waheed out
 2     here.  And once we boil it down to what I need to make a call
 3     on, I'll do that.
 4                 MR. HANSHEW:  And Judge, for purposes of the record,
 5     re-urge our motion for acquittal now that everything is closing.
 6                 THE COURT:  Okay.  Well, I guess I'm going to call him
 7     back out.  You are going to rest.  The government will close.
 8     You'll close.  And at that point you can re-urge your motion
 9     or --
10                 MR. HANSHEW:  Thank you.
11                 THE COURT:  -- or do you do it now and not --
12                 MR. HANSHEW:  I think procedurally I have to do it
13     after it closes.
14                 THE COURT:  Okay.  So we'll do it then.  Right after
15     that I'll read them the charge.  By then we will have the
16     charge.
17                 COURTROOM SECURITY OFFICER:  All rise.
18                 (Break at 2:57 p.m. to 3:37 p.m.)
19                 THE COURT:  Let the record reflect that all members of
20     the jury are present, the United States through its assistant
21     United State's attorneys are present, the defendant and his
22     counsel are present.
23                 All right.  Mr. Hanshew, the government has closed --
24                 MS. KANOF:  The government --
25                 THE COURT:  -- has rested.
```

1          MR. HANSHEW:  Your Honor, with that, move for a

2    judgment of acquittal.

3          THE COURT:  Denied.

4          MR. HANSHEW:  And we rest as well.

5          MS. KANOF:  Your Honor, the government closes.

6          THE COURT:  All right.

7          Ladies and gentlemen, we are very close to having the

8    final charge ready.

9          MS. KANOF:  They need to close, Your Honor.

10         THE COURT:  He rested and closed.

11         MR. HANSHEW:  Rest and close and move for judgement of

12    acquittal.

13         THE COURT:  That's denied.

14         We'll have the final charge ready for you shortly.  I

15    say 15 minutes.

16         And it's my understanding you want to proceed today

17    with closing; is that correct?

18         MS. KANOF:  I think both sets have agreed to proceed

19    today.

20         THE COURT:  So then each side will argue to you for

21    about 30 minutes.

22         So my guess is that somewhere around 5:30, 5:45,

23    there'll be done with your arguments to you, and at that point,

24    you can begin your deliberations or if you'd rather come back in

25    morning to start your deliberations, all you got to do is let me

1    know.  At that point you'll be in charge and you'll let me know

2    how long you want to work.

3           With that, I'll ask that you follow Mr. Heidtman to

4    the jury room.  We'll bring you back in about 15 minutes to read

5    to you the Court's charge.

6           COURT SECURITY OFFICER:  All rise.

7           (Jury recessed.)

8                    FORMAL OBJECTIONS TO THE CHARGE

9           THE COURT:  Let the record reflect that the jury is

10   not present, the United States through its assistant United

11   State's attorneys are present, the defendant and his counsel are

12   present.

13          Ms. Kanof, has the government received a copy -- this

14   says draft.

15          MS. KANOF:  Yes, we have, Your Honor.

16          THE COURT:  And do you have any objections to the

17   Court's charge?

18          MS. KANOF:  No, Your Honor.

19          THE COURT:  Mr. Hanshew, has the government received a

20   copy of the Court's charge?

21          MR. HANSHEW:  The defense has.

22          THE COURT:  I'm sorry, the defense.

23          MR. HANSHEW:  Yes.

24          THE COURT:  Have you had an opportunity to review it?

25          MR. HANSHEW:  Yes, Your Honor.

1          THE COURT:  Do you have any objections to it?

2          MR. HANSHEW:  No, Your Honor.

3          (Jury present.)

4          THE COURT:  Be seated please.

5          Let the record reflect that all members of the jury

6    are present, the United States through its assistant United

7    State's attorneys are present, the defendant and his counsel are

8    present.

9          Ladies and gentlemen of the jury.  Thank you so much

10   for your patience with us during this break.  We have finalized

11   the Court's charge.  I'm going to read that charge to you.

12         Once you retire to the jury room at the end of the

13   arguments, there'll be a copy of this charge for all of you and

14   there'll be one copy that'll be designated for the presiding

15   juror.

16                      CHARGE OF THE COURT

17         THE COURT:  Members the jury:

18         In any jury trial, there are in effect two judges.  I

19   am one of the judges, the other is the jury.  It is my duty to

20   preside over the trial and to decide what evidence is proper for

21   your consideration.  It is also my duty at the end of the trial

22   to explain to you the rules of law that you must follow and

23   apply in arriving at your verdict.

24         First, I will give you some general instructions which

25   apply in every case, for example, instructions about the burden

1   of proof and how to judge the believability of witnesses.  Then

2   I will give you some specific rules of law about this particular

3   case.  And finally, I will explain to you the procedures you

4   should follow in your deliberations.

5         You as jurors are the judges of the facts, but in

6   determining what actually happened, that is in reaching your

7   decision as to the facts, it is your sworn duty to follow all of

8   the rules of law as I explain them to you.

9         You have no right to disregard or give special

10  attention to any one instruction or to question the wisdom or

11  correctness of any rule I may state to you.

12        You must not substitute or follow your own notion or

13  opinion as to what the law is or ought to be.  It is your duty

14  to apply the law as I explain it to you regardless of the

15  consequences.

16        It is also your duty base your verdict solely upon the

17  evidence without prejudice or sympathy.  That was a promise you

18  made and the oath you took before being accepted by the parties

19  as jurors and they have the right to expect nothing less.

20        The superseding indictment or formal charge against

21  the defendant is not evidence of guilt.  Indeed the defendant is

22  presumed by the law to be innocent.  The defendant begins with a

23  clean slate.  The law does not require a defendant to prove his

24  innocence or produce any evidence at all.

25        The government has a burden of proving the defendant

guilty beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.  While the government's burden of prove is a strict or heavy burden, it is not necessary that the defendant's guilty be proved beyond all possible doubt.  It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt.

A reasonable doubt is doubt based upon reason and commonsense after careful and impartial consideration of all of the evidence in the case.  Proof beyond a reasonable doubt therefore is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions of your own affairs.

If a defendant is found guilty, it will be my duty decide what the punishment will be.  You should not be concerned with the punishment in any way.  It should not enter your consideration or discussion.

As I told you earlier, it is your duty to determine the facts.  To do so, you must consider only the evidence presented during the trial.  Evidence is the sworn testimony of the witnesses, including the stipulations and the exhibits.  The questions, statements, objections and arguments made by the lawyers are not evidence.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise

escape your notice.  In the final analysis, however, it is your own recollection an interpretation of the evidence that controls in the case.  What the lawyers say is not binding upon you.

During the trial I sustained objections to certain questions and exhibits.  You must disregard those questions and exhibits entirely.  Do not speculate as to what the witness would have said if permitted to answer the question or as to the contents of an exhibit.  Also, certain testimony or other evidence has been ordered removed from the record and you have been instructed to disregard this evidence.  Do not consider any testimony or other evidence which has been removed from your consideration in reaching your decision.

Your verdict must be based solely on the legally admissible evidence and testimony.  Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case, except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your verdict.

Certain charts and summaries have been received into evidence.  You should give them only such weight as you think they deserve .

In considering the evidence, you are you permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In

other words, you may make deductions and reach conclusions if that reason and commonsense lead you to draw from the facts which have been established by the evidence.

Do not be concerned about whether evidence is direct evidence or circumstantial evidence.  You should consider and weigh all of the evidence that was presented to you.

Direct evidence is the testimony of one who asserts actual knowledge of the facts such as an eye witness. Circumstantial evidence is proof of a chain of events and circumstances indicating that something is or is not a fact.

The law makes no distinction between the weight to be given either direct or circumstantial evidence, but the law requires that you, after weighing all of the evidence, whether direct or circumstantial, be convinced of the guilt of the defendant beyond a reasonable doubt before you can find him guilty.

I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt.  In doing so, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to the witness' testimony.  An important part of your job will be making judgments about the testimony of the witnesses who

1    testified in this case.  You should decide whether you believe

2    all, some, part or none of what each person has to say and how

3    important that testimony was.

4         In making that decision, I suggest that you ask

5    yourself a few questions.  Did the witness impress you as

6    honest?  Did the witness have any particular reason not to tell

7    the truth?  Did the witness have a personal interest in the

8    outcome of the case?  Did the witness have any relationship with

9    either the government or the defense?  Did the witness seem to

10   have a good memory?  Did the witness clearly see or here the

11   things about which he testified?  Did the witness have the

12   opportunity and ability to understand the questions clearly and

13   answer them directly?  Did the witness' testimony differ from

14   the testimony of the other witnesses?  These are a few of the

15   considerations that will help you determine the accuracy of what

16   each witness said.  Your job is to think about the testimony of

17   each witness you have heard and decide how much you believe of

18   what each witness had to say.

19        In making up your mind in reaching a verdict, do not

20   make any decisions simply because there were more witnesses on

21   one said than on the other.  Do not reach a conclusion on a

22   particular point just because there were more witnesses --

23        There's a dash here that needs to come out on the

24   charge, which I'll take out.  Any objection?

25        MS. KANOF:  No, objection.

1          MR. HANSHEW:  No, objection.

2          THE COURT:  All right.

3          -- there were more witnesses testifying from one side

4   on that point.

5          You will always bear in mind that the law never

6   imposes upon a defendant in a criminal case, the burden or duty

7   of calling any witnesses or producing any evidence.

8          The testimony of one who provides evidence against the

9   defendant for personal advantage or vindication must always be

10  examined and weighed by the jury with greater care and caution

11  than the testimony of ordinary witnesses.  You, the jury, must

12  decide whether the witness' testimony has been effected by these

13  circumstances, by the witness' interest in the outcome of the

14  case, by prejudice against the defendant or by the relationship

15  that the witness has with the prosecutors.  You should keep in

16  mind that such testimony is always to be received with caution

17  and weighed with great care.

18         You should never convict any defendant upon the

19  unsupported testimony of such a witness, unless you believe that

20  testimony beyond a reasonable doubt.

21         The testimony of a witness may be discredited but

22  showing that the witness testified falsely or by evidence that

23  at some other time, the witness said or did something or failed

24  to say or do something which is inconsistent --

25         There's another dash there that needs to come out in

1    the final version.

2            THE COURT:  Any objection, Mr. Hanshew?

3            MR. HANSHEW:  No, Your Honor.

4            THE COURT:  Ms. Kanof?

5            MS. KANOF:  No, Your Honor.

6            THE COURT:  -- which is inconsistent with the

7    testimony the witness gave at this trial.

8            Earlier statements of a witness were not admitted in

9    evidence to prove that the contents of such statements are true.

10   You may not consider the earlier statements to prove that the

11   content of an earlier statement is true.  You may only use

12   earlier statements to determine --

13           There's another dash there that needs to come out.

14           Any objection?

15           MR. HANSHEW:  No, objection.

16           MS. KANOF:  No, objection.

17           THE COURT:  -- whether you think the earlier

18   statements are consistent or inconsistent with the trial

19   testimony of the witness and therefore whether they affect the

20   credibility of that witness.

21           If you believe that a witness has been discredited in

22   this manner, it is your exclusive right to give the testimony of

23   that witness whatever weight you think it deserves.

24           A superseding indictment charges under various counts

25   that the offense was committed on or about a specified date.

The government does not have to prove that the crimes were committed on those exact dates, so long as the government proves beyond a reasonable doubt that Mr. Delgado committed the crimes on dates reasonably near the date stated in the superseding indictment.

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of a mistake or accident.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly, because there is no way of directly scrutinizing the workings of the human mind.

In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.  It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of

1    the crime charged.  The defendant is not on trial for any act,

2    conduct or offense not alleged in the superseding indictment.

3    Neither are you called upon to return a verdict as to the guilt

4    of any other person or persons not on trial as a defendant in

5    this case except as you are otherwise instructed.

6         A separate crime is charged in each count of the

7    superseding indictment.  Each count and the evidence pertaining

8    to it should be considered separately.

9         The fact that you may find the defendant guilty or not

10   guilty as to one of the crimes charged should not control your

11   verdict as to any other.

12        Counts one through three of the superseding indictment

13   alleges offenses under Title 18 United States Code, Section

14   1343, which makes it a crime for anyone to use interstate or

15   foreign wire communications in carrying out a scheme to defraud.

16        For you to find the defendant Mr. Delgado guilty as to

17   any one of the three counts, you must be convinced that the

18   government has proved each of the following four elements beyond

19   a reasonable doubt for that count.

20        First, that Mr. Delgado knowingly devised or intended

21   to devise a scheme to defraud as described in paragraphs 1

22   through 12, on pages numbers 3 through 5 of the superseding

23   indictment, that is:

24        On or about September 16th, 2009, the defendant, Marco

25   Antonio Delgado, doing business as a law firm Delgado and

Associates P.C., entered into an agreement with F.G.G. entitled
memorandum of understanding, which acknowledged that D. and A.
Have assisted F.G.G. in procuring the right to bid for the award
of a contract with C.F.E. to provide power generating equipment
and maintenance for the equipment for the Agua Prieta II
project, and stipulated that should F.G.G. be awarded the
contract, D. and A. would be compensated for its involvement.

Two:  Pursuant to the memorandum of understanding, the
defendant, Marco Antonio Delgado, agreed in part to prepare and
submit the bid to C.F.E. on behalf of F.G.G.  In exchange, the
defendant, Marco Antonio Delgado, was to be paid 62.5 percent of
the difference between the purchase price to F.G.G. of all of
the equipment, transportation and field services required to
satisfy the bid requirements and the amount for which the
equipment was ultimately sold to C.F.E. plus other expenses.

Three:  In the memorandum of understanding, the
defendant, Marco Antonio Delgado, and F.G.G. agreed that the
estimated sales price of the equipment to C.F.E. would be
$127 million, that the current negotiated price for the
equipment was $105 million and that the price for the field
services was $4,200,000 and the that the cost of transportation
was undetermined.

Four:  In or about October 2009, the defendant, Marco
Antonio Delgado, as a representative of F.G.G., submitted the
bid for the Agua Prieta II project, which offered the costs of

1    the equipment at $121 million and the cost of services and

2    maintenance at $121,000,107 as part of the bid.

3           F.G.G. represented that if C.F.E. were to award the

4    contract to F.G.G., F.G.G. would obtain letters of credit in the

5    amount of $20 million to guarantee F.G.G.'s fulfillment of its

6    obligations under the Agua Prieta II project contract.

7           Five:  On or about November 19th, 2009, C.F.E. awarded

8    the Agua Prieta II project contract to F.G.G., the power

9    generating equipment to be sold through F.G.G. to C.F.E. was

10   comprised of two natural gas turbo generators and one steam

11   turbo generator, both owned and warehoused by Mitsubishi Power

12   Systems America, Inc., M.P.S.A.

13          Six:  On or about March 3, 2010, the defendant, Marco

14   Antonio Delgado, without the knowledge and consent of F.G.G.,

15   the sole owner and managing member of F.G.G., delivered to

16   C.F.E. written instructions redirecting --

17          There's a dash there that we need to take out.

18          Mr. Hanshew?

19          MR. HANSHEW:  No objection, Your Honor.

20          THE COURT:  Or maybe not.

21          Ms. Kanof?

22          MS. KANOF:  No objection.

23          THE COURT:  -- the deposits of payments to be made to

24   F.G.G. by C.F.E. for the Agua Prieta II project into an account

25   at the First Caribbean International Bank in the Turks & Caicos

1    Islands, which account was  under the control of Marco Antonio

2    Delgado instead of the F.G.G. Wells Fargo account stipulated in

3    the contract between F.G.G. and C.F.E. for the Agua Prieta II

4    project, which account was under the control of F.J.G.

5             Is that a typo?  F.J.G.?

6             MS. KANOF:  It's a type.

7             THE COURT:  It should be F.G.G.

8             Mr. Hanshew?

9             MS. KANOF:  I'm sorry, Your Honor.  It's not a typo.

10            MR. HANSHEW:  It's Gireud.

11            MS. KANOF:  It's his name.

12            THE COURT:  So then the defendant, Marco Antonio

13   Delgado, lied to F.J.G. concerning the change in location for

14   the deposits from C.F.E., by claiming that C.F.E. made the

15   decision to change the bank account to a bank in the Turks &

16   Caicos Islands instead of the F.G.G. bank account in El Paso,

17   Texas.

18            Number eight:  The defendant, Marco Antonio Delgado,

19   intended to use, and to use and did use the money that had been

20   fraudulently deposited into the First Caribbean International

21   bank account in the Turks & Caicos Island, which account was

22   controlled by defendant, Marco Antonio Delgado, for his personal

23   enrichment.

24            Nine:  In order to transfer some of the funds from the

25   First Caribbean International bank account to himself, the

defendant, Marco Antonio Delgado, caused his accountant to open a new bank account in El Paso, Texas, in his or her name rather than in the defendant's name.

Ten:  On or about January 10th, 2010, the defendant, Marco Antonio Delgado, wrote and transmitted a fraudulent and fictitious letter to C.F.E., which letter the defendant purported to be from an M.P.S.A. vice president of new projects to F.J.G. as president of F.G.G. and in which the defendant falsely reported that M.P.S.A. had reviewed the desirability of pledging its equipment instead of posting an L.C., letter of credit, as discussed.  And the defendant apparently forged the signature and letterhead of said M.P.S.A. official when the defendant, Marco Antonio Delgado, knew that on December 28th, 2009, M.P.S.A. sent a letter to F.G.G. expressly prohibiting F.G.G. from using M.P.S.A.-owned equipment as collateral to fulfill F.G.G.'s obligation to provide letters of credit to C.F.E.

Number 11:  Despite the fact that M.P.S.A. told F.G.G. and the defendant, Marco Antonio Delgado, that was unacceptable to use M.P.S.A. equipment as collateral, despite the fact that F.G.G. contractually agreed to provide letters of credit to C.F.E., the defendant, Marco Antonio Delgado, did in fact pledge the M.P.S.A. equipment as collateral to fulfill that term of the F.G.G. contract with C.F.E., so that C.F.E. would begin to transfer funds to F.G.G. pursuant to the defendant's new

instructions for the routing.

Twelve:  To facilitate the success of the C.F.E. contract with F.G.G., the defendant, Marco Antonio Delgado, never informed M.P.S.A. that he had pledged their equipment as collateral.

Second, the scheme to defraud employed false material representations, false material pretenses or false material promises.

Third, that for the purpose of executing such a scheme, Mr. Delgado transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce, a writing, sign, signal, picture or sound, to wit, the communication listed in the appropriate count of the superseding indictment, that is:

For Count One, that for the purpose of executing such a scheme on March 8th, 2010, Mr. Delgado transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce, a wire transfer of funds in the amount of approximately $20 million from a bank account in the Republic of Mexico to a bank in the Turks & Caicos islands;

For Count Two, that for the purpose of executing such a scheme on July 6th, 2010, Mr. Delgado transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce, a wire transfer of funds in the amount of approximately $12 million, from a bank account in the Republic

1    of Mexico to a bank in the Turks & Caicos Islands;

2           For Count Three, that for the purpose of executing

3    such a scheme on February 11th, 2010, Mr. Delgado transmitted or

4    caused to be transmitted by means of wire communications in

5    interstate or foreign commerce, an e-mail containing a letter

6    from F.J.G., as president of F.G.G., to an M.P.S.A. vice

7    president of new projects, stating that M.P.S.A. will not be

8    responsible for any letter of credit despite Mr. Delgado having

9    already caused M.P.S.A.'s equipment to be pledged as collateral

10   in order to fulfill F.G.G.'s obligation to provide letters of

11   credit to C.F.E.

12          Fourth, that Mr. Delgado acted with a specific intent

13   to defraud.

14          Now, I will give you more detailed instructions on

15   some of these elements of proof in terms:

16          The word "knowingly" means that the act was done

17   voluntarily and intentionally, not because of mistake or an

18   accident.

19          A "scheme to defraud" means any plan, pattern or

20   course of action intended to deprive another of money or

21   property.

22          A "specific intent to defraud" means a conscious

23   knowing intent to deceive or cheat someone.

24          A representation, pretense or promise is false if it

25   is known to be untrue or is made with reckless indifference as

1    to its truth or falsity.  A representation, pretense or promise

2    would also be false if it constitutes a half truth or

3    effectively omits or conceals a material fact provided it is

4    made with the intent to defraud.

5           A representation, pretense or promise is material if

6    it has a natural tendency to influence or is capable of

7    influencing the decision of the person or entity to which it is

8    addressed.

9           It is not necessary that the government prove all of

10   the details alleged in the superseding indictment concerning the

11   precise nature and purpose of the scheme.  What must be proven

12   beyond a reasonable doubt is that the defendant knowingly

13   devised or intended to devise a scheme to defraud by means of

14   false or fraudulent pretenses, representations or promises that

15   was substantially the same as the one alleged in the superseding

16   indictment.

17          It is also not necessary that the government prove

18   that the material transmitted by wire communications was itself

19   false or fraudulent or that the use of interstate or foreign

20   wire communication facilities was intended as a specific or

21   exclusive means of accomplishing the alleged fraud.

22          What must be proven beyond a reasonable doubt is that

23   the use of the interstate of foreign wire communication

24   facilities was closely related to the scheme, because the

25   defendant either wired something or caused it to be wired in

interstate or foreign commerce in an attempt to execute or carry out the scheme.

The alleged scheme need not actually succeed in defrauding anyone.  To cause interstate or foreign wire communication facilities to be used is to do an act with knowledge that the use of the wire communications facilities will follow in the ordinary course of business where such use can reasonably be foreseen.

E-mails and wire transfers of funds constitute transmissions by means of wire communication.  Each separate use of the interstate or foreign wire communications facilities in furtherance of a scheme to defraud by means of false pretenses, representations or promises, constitutes a separate offense.

The term "interstate commerce" means commerce or travel between one state, territory or possession of the United States and another state, territory or possession of the United States, including the District of Columbia.

The term "foreign commerce" means commerce or travel between any part of the United States, including its territorial waters and any other country including its territorial waters.

The term "commerce" includes travel, trade, transportation and communication.

Counts Four through Ten of the superseding indictment allege offenses under Title 18 United States Code, Section 1956(a)(2)(B) little (i), which makes it a crime for anyone to

transmit or transfer or attempt to transfer or transfer funds to

a place in the United States from or through a place outside the

United States, knowing that funds involved represented the

proceeds of some form of illegal activity and that such

transmission or transfer is designed in whole or in part to

conceal or disguise the nature, location, source, ownership or

control of the proceeds of the specified unlawful activity.

For you to find Mr. Delgado guilty of this crime as to

any of the seven counts, you must be convinced that the

government has proved each of the following beyond a reasonable

doubt for that count.

First, that Mr. Delgado knowingly transmitted or

transferred or attempted to transmit or transfer funds to a

place in the United States from or through a place outside the

United States as described in the superseding indictment for the

appropriate count, that is:

For Count Four, that on or about October 26th, 2010,

Mr. Delgado knowingly transmitted or transferred or attempted to

transmit or transfer funds in the amount of approximately

$150,000 from an account in the Turks & Caicos Island to an

account in El Paso, Texas.

For Count Five, that on or about December 15th, 2010,

Mr. Delgado knowingly transmitted or transferred or attempted to

transmit or transfer funds in the amount of approximately

$100,000 from an account in the Turks & Caicos Island to an

1    account in El Paso, Texas.

2            For Counts six, that on or about February 1sr, 2011,

3    Mr. Delgado knowingly transmitted or transferred or attempted to

4    transmit or transfer, funds in the amount of approximately

5    $70,000 from an account in the Turks & Caicos Island to an

6    account in El Paso, Texas.

7            For Counts Seven, that on or about February 23rd,

8    2011, Mr. Delgado knowingly transmitted or transferred or

9    attempted to transmit or transfer funds in the amount of

10   $150,000 from an account in the Turks & Caicos Island to an

11   account in El Paso, Texas.

12           For Count Eight, on or about April 7th, 2011,

13   Mr. Delgado knowingly transmitted or transferred or attempted to

14   transmit or transfer funds in the amount of approximately

15   $75,000 from an account in the Turks & Caicos Island to an

16   account in El Paso, Texas.

17           For Count Nine, that on or about May 25th, 2011,

18   Mr. Delgado knowingly transmitted or transferred or attempted to

19   transmit or transfer funds in the amount of approximately

20   $50,000 from an account in the Turks & Caicos Island to an

21   account in El Paso, Texas.

22           And for Count Ten, that on or about June 27th, 2011,

23   Mr. Delgado knowingly transmitted or transferred or attempted to

24   transmit or transfer funds in the amount of approximately

25   $50,000 from an account in the Turks & Caicos Island to an

account in El Paso, Texas.

Second, that Mr. Delgado did so knowing that the funds involved in the transmissions or transfers represented the proceeds of some form of unlawful activity.

And third, that Mr. Delgado knew that the transmission or transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity, namely wire fraud.

Now I give you more detailed instructions on some of these elements of proof and terms.

With respect to the first element to transmit or transfer includes sending electronic transfer by wire or computer or other means.

With respect to the second element, the government must prove that Mr. Delgado knew that the funds involved in the transmission or transfer were the proceeds of some kind of crime, that is a felony under federal state or foreign law, although it is not necessary to show that the defendant knew exactly what crime generated the funds.

I instruct you that wire fraud is a felony. With respect to the third element, the government must show that in fact the funds involved in the transmission or transfer were the proceeds of wire fraud. I instruct you that wire fraud is a specified unlawful activity under the statute.

Further, with respect to the third element, the

1    government must prove that Mr. Delgado knew that one of the

2    intended purposes of the transmission or transfer was to conceal

3    or disguise the nature, location, source, ownership or control

4    of the proceeds.  Proof that the transmission or transfer had

5    merely the effect of concealing the proceeds is insufficient.

6    Similarly, proof that Mr. Delgado transmitted the proceeds an

7    used them is insufficient.  Rather, the government must prove

8    that at least one of the purposes of the transmission or

9    transfer was to conceal the nature, location, source, ownership

10   or control of those proceeds.

11        The term "proceeds" means any property derived from or

12   obtained or retained directly or indirectly through some form of

13   unlawful activity, including the gross receipts of such

14   activity.

15        The term "knowingly" has the same meaning as provided

16   previously.

17        Counts 11 through 19 of the superseding indictment

18   allege offenses under Title 18 United States Code, Section 1957,

19   which makes it a crime for a person to knowingly engage in or

20   attempt to engage in a monetary transaction involving criminally

21   derived property in excess of $10,000 that is derived from a

22   specified criminal activity.

23        For you to find Mr. Delgado guilty of this crime for

24   any of the nine counts, you must be convinced that the

25   government has proved each of the following beyond a reasonable

1      doubt for that count.

2            First, that Mr. Delgado knowingly engaged or attempted

3      to engage in the monetary transaction described in the

4      superseding indictment for the appropriate count.  That is:

5            For Count Eleven, transfer on or about May 19th, 2010,

6      of approximately three $375,000 from an account in the Turks &

7      Caicos Island to a Wells Fargo account in the United States.

8            For Count Twelve, transfer on or about July 14th of

9      2010, of approximately $200,000 from an account in the Turks &

10     Caicos Island to a Mellon bank account in the United States.

11           For Count Thirteen, transfer on or about August 26th,

12     2010, of approximately $70,000 from an account in the Turks &

13     Caicos Island to a Bank of the West account in the United

14     States.

15           For Count Fourteen, transfer on or about

16     December 10th, 2010, of approximately $200,000 from an account

17     in the Turks & Caicos Island to a Bank of the West account in

18     the United States.

19           For Count Fifteen, transfer on or about March 17th,

20     2011, of approximately $152,000 from an account in the Turks &

21     Caicos Island to a Centinel Bank of Taos account in the United

22     States.

23           For Count Sixteen, transfer on or about June 2nd of

24     2011 of approximately $40,000 from an account in the Turks &

25     Caicos Island to a Bank of the West account in the United

States.

For Count Seventeen, transfer on or about January 5th, 2012 of approximately $59,151.27 from an account in the Turks & Caicos Island to a Compass bank account in the United States.

For Count Eighteen, transfer on or about March 30th, 2012 of approximately $46,655 from an account in the Turks & Caicos Island to a West Star bank account in the United States.

For Count Nineteen, transfer on or about September 27th, 2012, of approximately $150,000 from an account in the Turks & Caicos Island to a Wells Fargo account in El Paso, Texas.

Second that the monetary transaction was of a value greater than $10,000.

And third, that the monetary transaction involved criminally derived property.

Fourth, that the criminally derived property was derived from specified unlawful activity, namely wire fraud.

Fifth, that Mr. Delgado knew that the monetary transaction involved criminally derived property.

And sixth, that the monetary transaction took place within the United States.

Now, I will give you more detailed instructions on some of these elements of proof and terms.

The term "monetary transaction" means the deposit, withdraw, transfer or exchange in or affecting interstate or

foreign commerce of funds or a monetary instrument by, through
or to a financial institution.

The terms knowingly, commerce, interstate commerce and
foreign commerce have the same meaning as provided previously.

The term financial institution includes an insured
bank, a commercial bank, any foreign bank, a trust company, any
credit union, a loan or finance company, a business engaged in
vehicle sales, a licensed sender of money or any other person
who engages in the business of transmission of funds and the
person involved in real estate closings and settlements.

The term criminally derived property, means any
property constituting or derived from proceeds obtained from a
criminal offense.  The government is not required to prove that
the defendant knew that the offense from which the criminally
derived property was derived -- constituted specified unlawful
activity as defined by the statute creating this offense.  The
government must prove, however, that the defendant knew the
involved property was obtained or derived from the commission of
a crime.  I instruct you that wire fraud is a federal crime and
is specified an unlawful activity.

To reach a verdict whether it is guilty or not guilty,
all of you must agree.  Your verdict must be unanimous on each
count of the superseding indictment.  Your deliberations will be
secret.  You will never have to explain your verdict to anyone.
It is your duty to consult with one another and to deliberate in

1    an effort to reach an agreement if you can do so.  Each of you

2    must decide the case for yourself, but only after an impartial

3    consideration of the evidence with your fellow jurors.  During

4    your deliberations, do not hesitate to reexamine your own

5    opinions and change your mind if convinced that you were wrong.

6    But do not give up your honest beliefs as to the weight or

7    effect of the evidence solely because of the opinion of your

8    fellow jurors or for the mere purpose of returning a verdict.

9         Remember at all times, you are the judges, judges of

10    the facts.  Your duty is to decide whether the government has

11    proved the defendant guilty beyond a reasonable doubt.

12         When you go to the jury room, the first thing that you

13    should do is select one of your number as foreperson, who will

14    help you guide your deliberations and will speak for you here in

15    the courtroom.  A verdict form has been prepared for your

16    convenience.  The foreperson will write the unanimous answer of

17    the jury in the space provided for each count of the superseding

18    indictment, either guilty or not guilty.  At the conclusion of

19    your deliberations, the foreperson should date and sign the

20    verdict.

21         If you need to communicate with me during your

22    deliberations, the foreperson should write the message and give

23    it to the court security officer.  I will either reply in

24    writing or bring you back into court to answer your message.

25    Bear in mind that you are never to reveal to any person, not

1    even to the Court, how the jury stands numerically or otherwise,

2    on any count of the superseding indictment until after you have

3    reached a unanimous verdict.

4           And it is signed by myself today, David Guaderrama,

5    United States District Judge.

6           Verdict Form Count One:  As to the charge of wire

7    fraud involving wire transfer, on March 8th, 2010, of funds in

8    the amount of approximately $20 million from a bank account in

9    the Republic of Mexico to a bank in the Turks & Caicos Island,

10   we the jury unanimously find Marco Antonio Delgado not guilty.

11          And there's a line for your answer or guilty and

12   there's a line for your answer.

13          Count Two:  As to the charge of wire fraud involving

14   wire transfer, on July 6th, 2010, of funds in the amount of

15   approximately $12 million from a bank account in the Republic of

16   Mexico to a bank in the Turks & Caicos Island, we the jury

17   unanimously find Marco Antonio Delgado not guilty.

18          There's a line for your verdict or guilty there's a

19   line for your verdict.

20          Count Three:  As to the charge of wire fraud involving

21   e-mail, on February 11th, 2010, containing a letter from F.J.G.,

22   as president of F.G.G. to an M.P.S.A. vice president of new

23   projects, stating that M.P.S.A. will not be responsible for any

24   letter of credit, we the jury unanimously find Marco Delgado

25   guilty or guilt.

1          Count Four:  As to the charge of money laundering

2     involving transmission or transfer, on or about October 26th,

3     2010, of funds in the amount of approximately one $150,000 from

4     an account in the Turks & Caicos Island to an account in

5     El Paso, Texas, we the jury unanimously find Marco Antonio

6     Delgado not guilty or guilty.

7          Count Five:  As to the charge of money laundering

8     involving transmission or transfer, on or about December 15th,

9     2010, of funds in the amount of approximately $100,000 from an

10    account in the Turks & Caicos Island to an account in El Paso,

11    Texas, we the jury unanimously mind Marco Antonio Delgado guilty

12    or not guilty.

13         Count Six:  As to the charge of money laundering

14    involving transmission or transfer, on or about February 1st of

15    2011, of funds in the amount of approximately $70,000 from an

16    account in the Turks & Caicos Island to an account in El Paso,

17    Texas, we the jury unanimously find Marco Delgado not guilty or

18    guilty.

19         Count Seven:  As to the count of money laundering

20    involving transmission or transfer, on or about February 23rd,

21    2011, of funds in the amount of approximately $150,000 from an

22    account in the Turks & Caicos Island to an account in El Paso,

23    Texas, we the jury unanimously find Marco Antonio Delgado not

24    guilty or guilty.

25         Count Eight:  As to the charge of money laundering

1    involving the transmission or transfer on or about April 7th,

2    2011, of funds in the amount of approximately $75,000 from an

3    account in the Turks & Caicos Island to an account in El Paso,

4    Texas, we the jury unanimously find Marco Delgado not guilty or

5    guilty.

6            Count Nine:  As to the charge of money laundering

7    involving transmission or transfer on or about May 25th, 2011,

8    of funds in the amount of approximately $50,000 from an account

9    in the Turks & Caicos Island to an account in El Paso, Texas, we

10   the jury unanimously find Marco Antonio Delgado not guilty or

11   guilty.

12           Count Ten:  As to the charge of money laundering

13   involving transmission or transfer on or about June 27th, 2011,

14   of funds in the amount of approximately $50,000, from an account

15   in the Turks & Caicos Island to an account in El Paso, Texas, we

16   the jury unanimously find Marco Antonio Delgado not guilty or

17   guilty.

18           Count Eleven:  As to the charge of engaging in

19   monetary transactions in property derived from specified

20   unlawful activity involving transfer on or about May 19th, 2010,

21   of approximately $375,000 from an account in the Turks & Caicos

22   Island to a Wells Fargo account in the United States, we the

23   jury find Marco Delgado not guilty or guilty.

24           Count Twelve:  As to the charge of engaging in

25   monetary transactions in property derived from specified

1    unlawful activity involving transfer on or about July 14th, 2010

2    of approximately $200,000 from an account in the Turks & Caicos

3    Island to a Mellon bank account in the United States, we the

4    jury unanimously find Marco Antonio Delgado not guilty or

5    guilty.

6           Count Thirteen:  As to the charge of engaging in

7    monetary transactions from property derived from specified

8    unlawful activity involving transfer on or about August 6th,

9    2010, of approximately $70,000 from an account in the Turks &

10   Caicos Island to a Bank of the West in the United States, we the

11   jury find Marco Delgado not guilty or guilty.

12          Count Fourteen:  As to the charge of engaging in

13   monetary transactions from property derived from specified

14   unlawful activity involving transfer on or about December 10,

15   2010, of approximately $200,000 from an account in the Turks &

16   Caicos Island to a Bank of the West account in the United

17   States, we the jury unanimously find Marco Delgado not guilty or

18   guilty.

19          Count Fifteen:  As the to charge of engaging in

20   monetary transactions in property derived from specified

21   unlawful activity involving transfer on or about March 17th of

22   2011 of approximately $152,000 from an account in the Turks &

23   Caicos Island to a Centinel Bank of Taos account in the United

24   States, we the jury unanimously find Marco Antonio Delgado

25   guilty or not guilty.

1          Count Sixteen:  As to the charge of engaging in

2     monetary transactions in property derived from specified

3     unlawful activity involving transfer on or about June 2nd, 2011,

4     of approximately $40,000 from an account in the Turks & Caicos

5     Island to a Bank of the West account in the United States, we

6     the jury unanimously find Marco Antonio Delgado not guilty or

7     guilty.

8          Count Seventeen:  As to the charge of engaging in

9     monetary transactions in property derived from specified

10    unlawful activity involving transfer on or about January 5th of

11    2012, of approximately $59,151.27 from an account in the Turks &

12    Caicos Islands to a Compass bank account in the United States,

13    we the jury unanimously find Marco Antonio Delgado not guilty or

14    guilty.

15         Count Eighteen:  As to the charge of engaging in

16    monetary transactions in property derived from specified

17    unlawful activity involving transfer on or about March 30th,

18    2012, of approximately $46,655 in an account in the Turks &

19    Caicos Island to a West Star Bank account in the United States,

20    we the jury unanimously find Marco Antonio Delgado not guilty or

21    guilty.

22         Count Nineteen:  As to the charge of engaging in

23    monetary transactions in property derived from specified

24    unlawful activity involving transfer on or about September 27th,

25    2012, of approximately $150,000 in an account in the Turks &

1     Caicos Island to a Wells Fargo account in El Paso, Texas, we the

2     jury unanimously find Marco Antonio Delgado not guilty or

3     guilty.

4          And there's a space for the date when you return your

5     verdict and the signature line for the foreperson.

6          All right.  Ladies and gentlemen of the jury, let's

7     take a short recess and we'll come back to begin the arguments.

8     We'll be in recess for ten minutes.  Be back in the jury room at

9     5:04.

10          COURT SECURITY OFFICER:  All rise.

11          (Jury recessed.)

12          THE COURT:  On page 16 in Count Three, the way I read

13    it to the jury was:  M.P.S.A. will not be responsible for any

14    letter of credit.  The charge says "will not will."  That's also

15    the indictment.  It's tracking the indictment.  But I don't

16    think it meant "will not will."  I think it meant "will not" be

17    responsible that was M.P.S.A.'s letter saying they were not

18    going to be responsible for the letters of credit.  Am I right?

19          MS. KANOF:  I'm not sure I understand.

20          THE COURT:  Look at page 16, Count Three, the 7th

21    line.

22          MS. KANOF:  Oh, yeah.  It's a typo "will not be."

23          THE COURT:  I read it "will not."  I didn't even read

24    the second "will."

25          MS. KANOF:  Okay.  But the indictment says Mitsubishi

1   "will not will."

2          THE COURT:  The indictment says the same thing.

3          MS. KANOF:  It's a typo in the indictment.

4          THE COURT:  So what do we do now.  I didn't read the

5   second "will."

6          MS. KANOF:  We can amend a typographical indictment at

7   any time and remove.

8          THE COURT:  And Mr. Hanshew, did you have any

9   objection?

10          MR. HANSHEW:  Yeah, we'd object.  Obviously, this jury

11   trial started.  Amending at the close of evidence, we'd object

12   to that.

13          THE COURT:  And I'll overrule the objection.  I'm

14   going to, in the charge to the jury take out that second "will"

15   so that it tracks what I read, which was "will not" be

16   responsible.

17          MS. KANOF:  Your Honor, it's not in the exhibit.  It

18   was a typo in the indictment.

19          THE COURT:  Mr. Hanshew has objected to that.

20          I'm letting you know the copy I'm going to present for

21   the jury will track what I read, Mr. Hanshew.  I know you've

22   already objected to removing it from the indictment.  Do you

23   object to the charge too?

24          MR. HANSHEW:  Yes, Judge, same reason the indictment

25   says what it says, and that's what the government should have

1    their burden to, and it's a violation of due process at this

2    point to change it.

3              THE COURT:  Thank you.  That'll be overruled.

4              (Jury present.)

5              THE COURT:  Let the record reflect that all members of

6    the jury are present, the United States through its assistant

7    United State's attorneys are present, the defendant and his

8    attorney is present.  We'll now hear the closing arguments from

9    counsel.  I remind you, what they say is not evidence.  You

10   should not consider it to be evidence.

11                            *  *  *

12             (Closing arguments Volume 16B of Volume 20.)

13                            *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1                          * * * * *

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of the

6    United States.

7    Signature:/S/KATHLEEN A. SUPNET          December 31, 2018
              Kathleen A. Supnet, CSR         Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25